EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**GENIE INVESTMENTS NV, LLC,**

         **Plaintiff,**

v.                                                                    Civil Action No.

**JOSHUA WEARMOUTH, JAMES**    [Jury Trial Demanded]
**WILLIAM BYRD, and NORDIC**
**TRUST ALLIANCE KB, LLC,**

         **Defendants.**

## COMPLAINT

Plaintiff Genie Investments NV (Genie), by and through its attorneys, Spiegel & Utrera, P.A., files this Complaint against Defendants Joshua Wearmouth, James William Byrd, and Nordic Trust Alliance KB, LLC (Nordic Trust) and alleges, on knowledge at to its own actions, and otherwise upon information and belief, that:

## SUMMARY

1. In 2022 and 2023, Respondents Joshua Wearmouth and James Byrd, directly and through Velanos Principal Capital (Velanos), an entity that Wearmouth controlled, defrauded Plaintiff Genie Investments NV (Genie) out of

1

<u>EXHIBIT C</u>

$9.0 million using a type of scheme commonly referred to as a "prime bank" or "advanced-fee" fraud.

2. Wearmouth and Byrd represented to Genie verbally and in writing that Wearmouth, through Velanos, could procure one or more standby letters of credit (SBLCs), which Wearmouth would then sell at a significant profit in pre-arranged trades. Wearmouth and Byrd told Genie that Wearmouth would use this trading profit to procure one or more additional SBLCs, which Wearmouth would again sell in pre-arranged trades, again at a significant profit.

3. In October 2022, Wearmouth and Byrd told Genie that, if Genie contributed $3.0 million to a joint venture with Velanos, Wearmouth would use Genie's capital to generate profits of many times the amount of the capital contribution within 60 days. Wearmouth and Byrd subsequently told Genie that it could increase its profit by making additional capital contributions.

4. Based on these representations, Genie invested a total of $9 million in a joint venture with Velanos. Wearmouth and Byrd represented that Genie would receive a total of $75.0 million – comprising a return of its $9 million in capital contributions plus $66 million in profit – by the end of 2022.

5. Wearmouth and Byrd represented to Genie that the SBLC trading presented no risk of loss to Genie's capital contribution.

EXHIBIT C

6. Wearmouth and Velanos never obtained SBLCs with Genie's capital, never earned any of the promised returns in a trading program, never paid any profits to Genie, and never intended to do so. To date, Velanos has returned only $500,000 of the $9 million invested by Genie.

7. To keep the scheme going and to forestall legal action against them and Velanos, Wearmouth, Byrd, and Defendant Nordic Trust Alliance KB (Nordic Trust) made lulling statements to Genie, representing falsely that the trading program was successful and/or that payments to Genie were imminent or had been made.

## PARTIES

8. Plaintiff Genie Investments NV (Genie) is a closely held corporation organized and existing under the laws of the state of Nevada, with its principal place of business in Reno, Nevada. Since 2021, Genie has been in the business of providing financing to small and medium-sized businesses through lines of credit.

9. Defendant Joshua Wearmouth is an individual who, on information and belief, resides in Newport Beach, California, and is a citizen of the state of California.

10. Defendant James William Byrd is an individual who, on information and belief, resides in Dallas, Texas, and is a citizen of the state of Texas.

EXHIBIT C

11. Defendant Nordic Trust Alliance KB is a limited-liability company that is organized under the laws of the state of Florida and that has its principal place of business in Miami, Florida.

## JURISDICTION AND VENUE

12. This Court has original subject-matter jurisdiction of this action pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because it concerns violations of the Securities Act of 1933 ("the '33 Act"), the Securities Exchange Act of 1934 ("the '34 Act"), and Exchange Act Rule 10b-5.

13. This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and the Defendants.

14. This Court has jurisdiction over Plaintiff's related state-law claims pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

15. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mail in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

16. Venue in this district is proper pursuant to Section 22(a) of the '33 Act, 15 U.S.C. § 77v(a), and Section 27(a) of the '34 Act, 15 U.S.C. § 78aa. Among other things, certain of the acts, practices, and courses of business

EXHIBIT C

constituting the violations of the federal securities laws alleged herein occurred within this district, including that Defendants directed misrepresentations and deceptive conduct toward Genie representatives residing within this district.

17. This Court has personal jurisdiction over Defendant Wearmouth because Wearmouth purposefully directed actions at this forum in furtherance of the SBLC scheme.

18. This Court has personal jurisdiction over Defendant Byrd because Byrd purposefully directed actions at this forum with respect to the SBLC Scheme.

19. This Court has personal jurisdiction over Defendant Nordic Trust Alliance because Nordic Trust Alliance maintains a place of business within this district and purposefully directed its conduct at this forum with respect to the SBLC Scheme.

## DEFENDANTS' PRIME BANK SCHEME

20. In late 2023, Genie was seeking capital to lend to customers. Byrd, who had previously acted as a finder for Genie, introduced Genie to Wearmouth, who ran a business called Velanos Principal Capital (Velanos).

21. Wearmouth and Byrd represented to Genie both verbally and in writing that Wearmouth, through Velanos, regularly used financial instruments known as standby letters of credit (SBLCs) to raise capital.

<u>EXHIBIT C</u>

22. Wearmouth and Byrd told Genie that Wearmouth had specialized experience, knowledge, and connections through allowed him to purchase SBLCs at a discount and immediately sell them at a large profit in pre-arranged transactions.

23. Wearmouth proposed a joint venture between Genie and Velanos whereby Velanos, using capital supplied by Genie, would initiate a series of SBLC trades that would generate massive profits for Genie and Velanos (the SBLC scheme).

24. Byrd regularly acted as Wearmouth's go-between in communications with Genie concerning the SBLC scheme.

25. Wearmouth and Byrd told Genie that Velanos would return Genie's principal and distribute profits to Genie of up to 800% of the principal investment within 60 days.

26. Wearmouth and Byrd assured Genie that the SBLC scheme posed no risk of loss to Genie's capital.

27. Wearmouth also introduced Genie to a lawyer who, according to Byrd, had experience with financing arrangements similar to the SBLC scheme. Genie retained the lawyer to advise them about the proposed joint venture.

<u>EXHIBIT C</u>

28. On or about October 19, 2022, Velanos and Genie executed a Joint Venture Agreement (JVA) concerning the SLBC scheme. Wearmouth executed the JVA on behalf of Velanos.

29. The JVA required Genie to contribute $3.0 million in capital to the joint venture, which Velanos would use to engage in a "Strategic Capital/Systematic Purchase and Sell Transaction" involving SBLCs issued by HSBC or other "Top Rated" issuers.

30. The JVA also required Velanos to return Genie's capital contribution, plus half the profits generated through the transactions, within 60 days.

31. Shortly after Genie and Velanos executed the JVA, Wearmouth and Byrd told Genie that it could increase its capital contribution by an additional $3 million and, in exchange, would receive a guaranteed profit distribution of $50 million. Genie agreed and, on November 21, 2022, Genie and Velanos executed an amendment to the JVA (First JVA Amendment) providing that Genie would increase its capital contribution to $6.0 million and that, in return, Velanos would increase Genie's profit to $50 million dollars.

32. The First JVA Amendment did not change any terms of the JVA besides the amounts of (a) Genie's capital contribution and (b) its profit participation.

EXHIBIT C

33. Shortly after the First JVA Amendment, Wearmouth and Byrd again offered to increase Genie's profit from the JVA, to a total of $66 million, in exchange for an additional $3 million capital contribution.

34. Genie agreed and provided Velanos an additional $3 million, bringing its total capital contribution to the joint venture to $9.0 million.

35. Although the parties did not memorialize Genie's third $3 million payment with a formal amendment to the JVA, correspondence from both Wearmouth and Byrd reflected the updated terms of the agreement – namely, that Genie would receive a total of $66 million in profits, in addition to the return of its $9 million in capital, by mid-January 2023.

36. Velanos and Wearmouth never paid Genie any of the profits promised in the JVA and has returned barely 5% of Genie's capital contributions.

37. Since January 2023, Wearmouth and Byrd have repeatedly and falsely represented that Wearmouth transferred or initiated transfers of multimillion-dollar payments to Genie.

38. On or about January 24, 2023, Wearmouth provided Genie with a screenshot of an email that Wearmouth supposedly received from a person identified only as "Simon," who, according to Wearmouth, was a banker with HSBC Bank. The email stated that Velanos had more than 349 million Euros on account with HSBC Bank in London and provided an account number. Wearmouth

EXHIBIT C

asserted that this amount included the profits realized from the Genie-Velanos joint venture's trading activity.

39. Approximately three days later, Velanos provided Genie with photographs and a screenshot that appeared to show a $10.0 million wire transfer from a ScotiaBank account to Genie's account at Chase Bank.

40. In March 2023, Wearmouth falsely told Genie in writing that the $10.0 million wire transfer he supposedly initiated on January 27, 2023, was being held up by Wells Fargo Bank, which he described as the "corresponding bank" for the wire transfer.

41. In the same letter, Wearmouth falsely claimed that profits from trading conducted using Genie's $9.0 million in capital were "being held at HSBC, UK under a sub account…" and that Velanos would need to open a "master" account with HSBC to access the trading profits in the subaccount.

42. In early June 2023, Wearmouth and Byrd proposed that Genie agree to an amendment of the JVA. The proposal, as memorialized in a "Second Amendment to Joint Venture Agreement" (Second JVA Amendment), was for Velanos to (1) "facilitate the opening of a commercial bank account" in Genie's name at Nordic Trust Alliance KB (Nordic Trust) in Miami, Florida, (2) deposit $9.5 million into Genie's Nordic Trust account on or before June 15, 2023, and (3)

<u>EXHIBIT C</u>

deposit an additional $50.0 million into Genie's Nordic Trust account on or before June 30, 2023.

43. The parties executed the Second JVA Amendment on June 3, 2023. Shortly afterward, Genie received notice that its Nordic Trust account had been established and that it had access to an online account portal (Portal). On June 20, 2023, according to the Portal, Velanos transferred $9.5 million into Genie's Nordic Trust Account. Genie promptly instructed Nordic to wire the $9.5 million to its checking account at Chase Bank. That transfer never happened, however, and the Portal showed that Nordic Trust canceled the request as of June 29, 2023.

44. On June 30, 2023, Genie attempted to initiate a transfer of $9.4 million from its Nordic Trust account to its Chase account. Although the Portal showed that this transaction was executed – the Portal thereafter reflected a remaining balance of $100,000 in Genie's account – no money ever transferred to Genie's Chase account from Nordic Trust.

45. Genie sent multiple requests through the Portal for information from Nordic Trust about the status of its outgoing wire transfers. The only responses it received were non-substantive. When Genie asked to speak with an individual so that it could arrange to visit Nordic in Florida and withdraw the money in person, it received no reply at all. Shortly thereafter, Genie lost its ability to view account-related information through the Portal.

EXHIBIT C

46. On information and belief, Nordic Trust is not a legitimate bank, never held any funds in Genie's name, and knowingly participated in Wearmouth's and Byrd's efforts to forestall legal action against Wearmouth, Byrd, and others by convincing Genie that it would imminently receive a portion of the promised SBLC scheme proceeds.

47. From late 2022 to mid-2023, Genie entered various agreements to provide lines of credit to customers and did so in reliance on Defendants' false promises and misrepresentations that Genie would soon receive some or all of the promised proceeds from the SBLC scheme.

48. Genie's reliance on these false statements and misrepresentations was reasonable given the lengths Defendants went to give their false statements and misrepresentations an air of legitimacy. In addition, Genie's attorney at the time did not advise Genie that there was any reason to question the validity of either the SBLC scheme or any of the Defendants' subsequent statements about Velanos' ability and intention to distribute profits to Genie and return its capital contributions.

49. Genie relied on Defendants' false statements and misrepresentations to its substantial detriment, in that it was ultimately unable to provide the financing it had promised to numerous customers, which in turn led to an avalanche of terminations, refund requests, demand letters, disparaging public statements, and

<u>EXHIBIT C</u>

legal actions against Genie. In addition, Defendants' false statements and misrepresentations, and Genie's detrimental reliance on them, have made it impossible for Genie to enter into new lending arrangements with customers.

50. Other than a $500,000 payment it received in or about May 2023, Genie has never received any return of its capital contributions. It has never received any of the promised profits from the joint venture.

## **FIRST CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act and
Exchange Act Rules 10b-5(a) and (c) – All Defendants**

51. Genie realleges and incorporates by reference its allegations in Paragraphs 1 through 50.

52. During 2022 and 2023, Defendants Wearmouth, Byrd, and Nordic Trust, in the purchase or sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mail, directly and indirectly:

    a. employed devices, schemes, and artifices to defraud,

    b. made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and

EXHIBIT C

    c.    engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

53. Defendants Wearmouth, Byrd, and Nordic Trust made these misrepresentations and omissions of material fact with scienter – that is, with an intent to deceive, manipulate, or defraud, or with a severely reckless disregard for the truth by inducing Genie's investment in the SBLC scheme while having no intention of using Genie's funds to carry out any legitimate trading of securities or other financial instruments.

54. Genie relied on the misrepresentations and omissions of Wearmouth, Byrd, and Nordic Trust, both in contributing capital to the putative Genie-Velanos joint venture and in delaying legal action against the Defendants and others.

55. Defendants carried out their fraudulent and deceptive acts using means or instrumentalities of interstate commerce. Defendants used interstate electronic messages and telephone communication to propose the SBLC scheme, to induce Genie's participation in the joint venture, and to communicate with Genie about why Genie did not receive either the promised profits or a return of its capital contributions.

Case 3:24-bk-00496-BAJ   Doc 20-3   Filed 03/05/24   Page 14 of 20
Case 6:24-cv-00271-ACC-LHP   Document 1   Filed 02/06/24   Page 14 of 20 PageID 14
EXHIBIT C

56. As a direct and proximate result of the Defendants' conduct described herein, Genie has suffered economic loss in that it has been deprived of the benefit of its bargain and has suffered lost profits and consequential damages.

57. Through the Defendants' conduct described herein, Wearmouth, Byrd, and Nordic Trust willfully violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

## SECOND CLAIM FOR RELIEF

### California Corp. Code § 25401 – Against Wearmouth and Byrd

58. Genie realleges and incorporates by reference its allegations in Paragraphs 1 through 50.

59. During 2022 and 2023, Defendants Wearmouth and Byrd, in the offer and sale of the securities described herein in and/or from the State of California, made untrue statements and/or misrepresentations of material fact to Genie. The false statements and misrepresentations included, without limitation:

    a. Wearmouth and Byrd falsely stated that SBLCs were tradable instruments and that the SBLC scheme was a legitimate investment program that presented no risk of loss to Genie's capital,

    b. Wearmouth and Byrd represented that Genie's capital contributions would be returned after the contributions were used to

<u>EXHIBIT C</u>

purchase and trade SBLCs, when in fact, Defendants never returned Genie's investment principal and, on information and belief, never used Genie's capital contributions to purchase and trade SBLCs, and

 c. Wearmouth and Byrd represented that the SBLC scheme would generate significant profits and that Genie would receive a guaranteed profit of $66.0 million in addition to the return of its capital contributions.

60. The misstatements and omissions referred to herein concerned "material facts" within the meaning of the California Corporations Code section 25401.

61. As a result of the Defendants' conduct described herein, Genie has been damaged in an amount to be determined at trial, but not less than $10 million.

62. Through the conduct described herein, Defendants Wearmouth and Byrd violated California Corporations Code section 25401.

### THIRD CLAIM FOR RELIEF

**Common-Law Fraud – Against All Defendants**

63. Genie realleges and incorporates by reference its allegations in Paragraphs 1 through 50.

64. As alleged above, Defendants Wearmouth, Byrd, and Nordic Trust made false written and verbal statements and/or material omissions of material fact to Genie, including but not limited to:

EXHIBIT C

    a.    Wearmouth's ability to purchase SBLCs and resell them for a profit;

    b.    The legitimacy of any investment strategy involving trading SBLCs;

    c.    Wearmouth's intention to pay Genie the promised profits and to return Genie's capital contributions;

    d.    Wearmouth's knowledge and experience trading SBLCs;

    e.    Attempts by Wearmouth/Velanos to issue payments to Genie between January 2023 and the present;

    f.    Nordic Trust's legitimacy as a bank and its ability to accept deposits and process withdrawals.

65.    The statements and/or omissions were false when made and were in service of an actual fraud.

66.    Wearmouth and Byrd knew that the representations were untrue and/or that the omissions were misleading.

67.    Wearmouth and Byrd made each of the aforementioned misrepresentations and omissions with the intent that Genie would rely on them in deciding to contribute capital to the joint venture and/or to refrain from bringing legal action against Velanos, Wearmouth, Byrd, and others.

EXHIBIT C

68. Genie did, in fact, rely on the aforementioned misrepresentations and omissions when it contributed $9.0 million in capital to the joint venture and when it refrained from bringing legal action for several months after Wearmouth and Velanos failed to return those capital contributions and distribute promised profits on schedule.

69. But for Wearmouth's and Byrd's material omissions and misrepresentations alleged above, Genie would not have contributed capital to the joint venture with Velanos and would have brought legal action against Wearmouth, Byrd, and others long ago.

70. Genie's reliance upon Wearmouth's and Byrd's material omissions and misrepresentations of fact was reasonable.

71. Wearmouth's and Byrd's material omissions and misrepresentations of fact have damaged Genie in an amount in excess of $10 million, with the exact amount of damages to be determined at trial.

72. Wearmouth's and Byrd's conduct alleged herein was willful and wanton and they acted with actual malice, fraud, and/or gross negligence.

## PRAYER FOR RELIEF

WHEREFORE, Genie respectfully requests that this Court enter a judgment against Defendants, granting Plaintiff the following relief:

<u>EXHIBIT C</u>

- The entry of judgment in favor of the Genie on each and every cause of action;

- The award of actual, consequential, and statutory damages in an amount to be established at trial, but not less than $10 million;

- The award of punitive damages in an amount to be established at trial;

- The award of costs of the suit and attorney's fees; and

- Such other relief as the Court deems just and proper.

## **<u>DEMAND FOR TRIAL BY JURY</u>**

Genie demands a trial by jury on all issues that are so triable.

EXHIBIT C

Dated: 2-6-2024

Respectfully submitted,

/s/ *Michael Faragalla*
Michael Faragalla  (Bar No. 1014235)
Spiegel & Utrera P.A

1840 Coral Way Fl 4
Miami, FL 33145-2748
Telephone: (800) 603-3900, x204
Facsimile: (800) 520-7800
Email: attorneyfaragalla@amerilawyer.com CC: litassistant@amerilawyer.com
Attorneys for Plaintiff Genie Investments NV

EXHIBIT C

# CERTIFICATE OF SERVICE