UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:

Genie Investments NV, Inc.,   Case No.: 3:24-bk-00496-BAJ
                               Chapter 11


        Debtor.
_____/

**UNITED STATES TRUSTEE'S REPLY TO DEBTOR'S RESPONSE TO
EXPEDITED MOTION TO APPOINT CHAPTER 11 TRUSTEE,
APPOINT EXAMINER, DISMISS CASE OR CONVERT TO CHAPTER 7**

Mary Ida Townson, United States Trustee for Region 21 (the "United States Trustee"), by and through the undersigned counsel, replies to the Response to Expedited Motion to Appoint Chapter 11 Trustee or in the Alternative, Appoint an Examiner, Dismiss this Case or Convert this Case to Chapter 7 ("Response"; Doc. No. 34) filed by the debtor, Genie Investments NV, Inc. ("Debtor"). In support, the United States Trustee states as follows.

**SUMMARY OF ARGUMENT**

Even if the Court believes the Debtor's narrative, a chapter 11 trustee should be appointed immediately, or this case should be converted to chapter 7. The Debtor lost its money to Velanos in an obviously speculative or fraudulent investment. This would constitute "incompetence or gross mismanagement" if the Debtor used its own money, but it constitutes fraud as well because the Debtor used money that was supposed to be reserved for its customers' prepaid interest payments. Furthermore, the Debtor's investment with

Velanos cannot fully excuse the Debtor's conduct because the Debtor continued collecting funds from the same victims even after learning that Velanos would not disburse funds.

The Debtor's argument that other parties, notably McMann Commercial Lending ("McMann"), are responsible for the Debtor's conduct is undone by the Debtor's own admission that it entered numerous "Bridge Loan" agreements establishing direct privity with its victims. Finally, during the section 341 meeting of creditors, the Debtor testified that it transferred hundreds of thousands of dollars to "asset protection" companies which, standing alone, warrants immediate appointment of a chapter 11 trustee or conversion to chapter 7. At a minimum, the Court must appoint an examiner because the Debtor admitted liquidated debts exceeding $5 million.

## ADDITIONAL BACKGROUND

1. The United States Trustee's Expedited Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint an Examiner, Dismiss This Case, or Convert This Case to Chapter 7 ("Trustee's Motion"; Doc. No. 20) provides additional facts and background information. Those facts are incorporated into this reply by reference.

2. After filing the Trustee's Motion, the United States Trustee conducted an Initial Debtor Interview ("IDI"), collected various documents from the Debtor, and conducted a section 341 meeting ("341 Meeting"). The United States Trustee also interviewed and collected documents from numerous victims of the Debtor's lending scheme.

3. On March 14, 2023, the Debtor participated in the IDI with United States Trustee Bankruptcy Analyst Daniel Muñoz. At the IDI, David Hughes stated that he and

John Cohan operate a Wyoming corporation called "Better Method." Mr. Hughes explained that Better Method functioned as an asset protection company. He explained that certain victims, including Blake Stringer and "Kristin," sought to receive refunds through threatening litigation and trying to reverse wire transfers. According to Mr. Hughes, Better Method was established to stymie these efforts.

4. In connection with the IDI, the Debtor provided financial documents, including a summary of debts owed to customers and Morgan Stanley bank statements. The Debtor's Morgan Stanley bank account shows that the Debtor had $10,566,138.22 in cash on January 1, 2024, less than two months before filing for bankruptcy relief, and $2,516.80 in cash on January 31, 2024.

5. The 341 Meeting was held on March 27, 2024, where the United States Trustee asked Mr. Hughes questions regarding the Debtor's transfers of cash in January 2024. Mr. Hughes explained that, in January 2024, the Debtor paid back a loan with Morgan Stanley in the approximate amount of $10,000,000. He also explained that it transferred approximately $500,000 to an affiliate company identified as "Genie Investments II" to pay legal fees and for asset protection. He also confirmed the existence of Better Method.

6. During the 341 Meeting, the United States Trustee also asked Mr. Hughes questions about the summary of debts spreadsheet provided by the Debtor. The summary is an Excel spreadsheet listing several categories of debts, including $9,727,644 as "Total Refundable." The Debtor admitted that $9,727,644 was, in fact, the outstanding amount that the Debtor believes it owes its customers.

7. During the 341 Meeting, the United States Trustee inquired regarding the

Debtor's payments to Velanos. The Debtor confirmed a $9 million payment to Velanos to "put its money to work." The Debtor confirmed the money came from the Debtor's victims. The Debtor characterized the loss of the Velanos money as a "*force majeure*" event.

8. The United States Trustee interviewed numerous victims of the Debtor, and most believed that their money was being placed into a secure account that would pre-pay several months of their loan indebtedness. Not one of the victims believed that the Debtor would take the money and use it in a high-risk investment. Some victim accounts conflict with the Debtor's explanation of losing all its money to Velanos. According to the Debtor's lawsuit against Velanos, attached as Exhibit C to the Trustee's Motion, Velanos promised the Debtor $75 million by the end of 2022. Yet, the Debtor accepted $3.8 million from North Haven Lodging Partners, LLC and its affiliate in May 2023 in connection with a promised loan. The Debtor has not explained why it continued to accept money from its victims after, by its own admission, its funding source (Velanos) had proven to be a fraud.

9. The United States Trustee also interviewed numerous victims of the Debtor to better understand the relationship between the Debtor, McMann, and other third parties. Most customers were in contractual privity with both McMann and the Debtor. Typically, the "BELOC" documents named McMann as the lender and required a 10% pre-payment. The "Bridge Loan" was devised to finance this 10% pre-payment, and the Bridge Loan itself typically required a 15% pre-payment. The Bridge Loan documents typically named the Debtor as the lender. Hypothetically, if a customer ultimately wanted a $3,000,000 loan (from McMann), he or she would need a $300,000 pre-payment. To facilitate this, a $300,000 Bridge Loan was offered (from the Debtor) requiring a $45,000 pre-payment to

the Debtor.[1] On top of this 15% fee, the Debtor also charged many of the victims a $25,000 (or $30,000) "due diligence" fee.

10.  Numerous victims communicated with the Debtor directly after their loans failed to fund. Some victims received phone calls in which they were offered excuses or bullied by the Debtor. Some were dragged into arbitration by the Debtor when they attempted to reveal the truth of the Debtor's practices online. At least one victim believes that the Debtor manipulated loan documents to make the arbitration process more favorable for the Debtor. Some victims were offered a "reward program" as an incentive to fund the Debtor's attorney fees in its litigation against Velanos in exchange for being in the "front of the line" on any potential recovery. One victim was offered money by the Debtor to divulge contact information on some of the more activist victims.

11.  The Debtor's victims recounted harrowing stories of personal loss. A mother of ten children has struggled to afford school supplies and shoes for her family. A father of five children second mortgaged his home for over $200,000 in an equity loan and may soon declare bankruptcy or lose his home. Another victim indebted herself to hard money lenders. A family farmer, who may be the last organic family farmer in his area of Texas, had to file a personal bankruptcy case and may now lose his farm. Another victim took a leap of faith from a secure corporate job to become an entrepreneurial property investor and may now be stranded for employment. Family bonds have been torn by recriminations over intrafamily loans that were used to fund the pre-payments for the Bridge Loans. Ultimately, society suffers because small business owners, like the Debtor's victims, are the very people who

---

[1] The undersigned adopts the language of the scheme with a large grain of salt.

efficiently allocate capital and employ other members of the community.

12. Finally, the Debtor is delinquent in filing many required documents. Although the Debtor has received an extension to file its Schedules, the Local Rule 2081-1 documents, Statement of Financial Affairs, and numerous required filings are not covered by the extension. The delinquent filings include: (1) a certification of authorization to file the case; (2) a corporate ownership statement; (3) a list of 20 largest creditors; and (4) a case management summary. (See Doc. No. 6-1).

## LAW AND ARGUMENT

### A. The Court Should Immediately Appoint a Chapter 11 Trustee or Covert This Case to Chapter 7

13. Facially, the Debtor's management is at least culpable of incompetence and gross mismanagement. The Debtor alleges it paid $9 million dollars to Velanos who promised to provide an 800% return within sixty days at zero risk. As set forth in the Trustee's Motion, such a transaction is obviously suspect and warrants the appointment of a chapter 11 trustee based on the Debtor's admitted incompetence or gross mismanagement.

14. The circumstances surrounding this suspect transaction also warrants a finding of dishonesty and fraud. The Debtor's victims were told that their money would be used to fund interest payments on their BELOC loan or their Bridge Loan. No one was told that their money would be used for a speculative investment or that the funding of their loans was somehow dependent upon the success of a speculative investment. Furthermore, the Debtor continued taking the victims' money, including from the North Haven Lodging Partners, well after the Debtor was aware that Velanos would not provide the return anticipated by the end of 2022. The Debtor's deceptions elevate their incompetence and

gross mismanagement to fraud. The Debtor's fraud is reinforced by their continued attempts to silence and bully its victims after the loans failed to fund.

15. The Debtors cannot establish that McMann, or some other entity, was the actual party at fault. As discussed in the Response, the Debtor was in direct contractual privity with numerous victims, and every victim wired money to the Debtor's accounts. Numerous victims had communications with the Debtor after the loans defaulted and some were threatened or offered inducements for their silence. The Debtor offered some victims money to turn on other victims and solicited additional funds from some victims to fund its litigation against Velanos. The Debtor also initiated arbitration against several of the victims. Ultimately, the Debtor itself made the ill-fated investment of investor money in Velanos.

16. The appointment of a chapter 11 trustee is also mandated by the pre-petition transfers to which the Debtor admitted at the IDI and the 341 Meeting. To keep money away from the victims, the Debtor admittedly transferred funds to both "Genie Investments II" and "Better Method." These transfers are fraudulent based upon the pendency of litigation, the insolvency of the Debtor, the overall character of the Debtor, and the nature of its actions in this fraudulent scheme. *See In re Levine*, 134 F.3d 1046, 1053 (11th Cir. 1998) (discussing badges of fraud). The Debtor also transferred approximately $10 million to a creditor on the eve of filing its chapter 11 bankruptcy petition. A chapter 11 trustee should be appointed because the Debtor admitted to deliberately diminishing the bankruptcy estate before filing.

**B.     In the Alternative, an Examiner is Mandated**

17. If no trustee is appointed, the bankruptcy code mandates the appointment of an examiner because the Debtor's liquidated debts exceed $5 million. Pursuant to 11 U.S.C.

7

§ 1104, if a debtor owes a liquidated amount over $5 million for "other than debts for goods, services, or taxes, or owing to an insider" an examiner is mandated. *See In re FTX Trading Ltd.*, 91 F.4th 148 (3d Cir. 2024) (holding that such an appointment is mandatory). The Debtor's own spreadsheet demonstrated a $9,727,644 debt which the Debtor admitted it owes its customers. This debt is liquidated even if it were disputed. Accordingly, the Court must appoint an examiner if it does not convert the case to chapter 7 or appoint a chapter 11 trustee.

WHEREFORE, the United States Trustee moves this Court for an order directing the United States Trustee to appoint a chapter 11 trustee in this case, or alternatively appoint an examiner in this case, or dismiss this case and convert it to chapter 7, or for such other relief as the Court deems appropriate.

Dated:  March 29, 2024.                    Respectfully Submitted

                                           Mary Ida Townson
                                           United States Trustee for Region 21

                                            /s/  Scott Bomkamp
                                           Scott Bomkamp, Trial Attorney
                                           Office of the United States Trustee
                                           U.S. Department of Justice
                                           400 W. Washington St., Suite 1100
                                           Orlando, FL 32801
                                           Telephone No.:  (407) 648-6301, Ext. 150
                                           Facsimile No.:  (407) 648-6323
                                           Email: scott.e.bomkamp@usdoj.gov
                                           Indiana Bar No.: 28475-49

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion was served on March 29, 2024 on all parties appearing electronically via CM/ECF.

                                                           /s/ *Scott Bomkamp*
                                             Scott Bomkamp, Trial Attorney