## EXHIBIT COVER SHEET

**Exhibit**

Party Submitting:    **Mary Ida Townson, U.S. Trustee for Region 21**

Admitted:    **YES**    or   **NO**    **(circle one)**    <u>**3**</u>

Chapter 11 Debtor:    **Genie Investments NV, Inc.**

Case No.    **3:24−bk−00496−BAJ**

Nature of Hearing:    **Trial on**

**U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**

**Debtor's Response Thereto (Doc. No. 34)**

**U.S. Trustee's Reply (Doc. No. 38)**

Trial Date:    **April 9, 2024, at 9:00 a.m.**

**United States Bankruptcy Court**
**Middle District of Florida**

**Dated:_____, 2024.**

**By: _____, Deputy Clerk**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:

Genie Investments NV, Inc.,                    Case No.: 3:24-bk-00496-BAJ
                                               Chapter 11

                                               **Expedited Hearing Requested**

          Debtor.
_____/

**UNITED STATES TRUSTEE'S EXPEDITED MOTION TO APPOINT CHAPTER 11 TRUSTEE, OR, IN THE ALTERNATIVE, APPOINT AN EXAMINER, DISMISS THIS CASE, OR CONVERT THIS CASE TO CHAPTER 7**

Mary Ida Townson, United States Trustee for Region 21 (the "United States Trustee"), by and through the undersigned counsel, moves for the appointment of a chapter 11 trustee, or, in the alternative, appoint an examiner, dismiss this case, or convert this case to chapter 7. In support, the United States Trustee states as follows.

**SUMMARY OF ARGUMENT**

The Court should not permit the debtor, Genie Investments NV, Inc. ("Debtor"), to continue as a debtor-in-possession because the Debtor conducted fraudulent schemes against small business owners. The Debtor offered its victims the prospect of loans with attractive rates and no personal guarantees. Debtor conditioned funding on the small business owners transferring money to the Debtor as prepaid interest. The Debtor then failed to fund the loans and failed to return the money. According to its own admissions, the Debtor invested the money received from the small business owners in a highly speculative scheme and lost most of the funds. The Debtor's conduct demonstrates dishonesty, incompetence, gross

mismanagement, and risks harming the Debtor's creditors further should the Debtor remain a debtor-in-possession. Consequently, the Court should order the United States Trustee to appoint a chapter 11 trustee in this case. In the alternative, the Court should appoint an examiner, dismiss this case, or convert this case to proceed under chapter 7.

**FACTUAL BACKGROUND**

1.       On February 21, 2024, (the "Petition Date") the Debtor, Genie Investments NV, Inc., filed a skeletal voluntary chapter 11 petition to initiate this case. (Doc. No. 1).

2.       Shortly thereafter, a group of eighteen small business owners who organized themselves through social media (collectively, the "Small Business Owners"), contacted the United States Trustee. The Small Business Owners credibly allege that the Debtor is involved in a scheme of fraud. The allegations in this motion are based upon interviews with the members of the Small Business Owners and their signed statements, which are attached to this motion as Composite Exhibit A.

3.       As part of its fraudulent scheme, the Debtor and a co-conspirator entity known as McMann Commercial Lending, LLC ("McMann") would offer a loan program they called the BELOC, which stands for "business expansion line of credit." This loan program was advertised as having below market interest rates and no personal guarantees – a critical allure for any small business owner.

4.       The Small Business Owners approached the BELOC program with a variety of business objectives. One member of the Small Business Owners is a farmer who wished to refinance the line of credit that secures his farm.[1] Another member is a real estate agent,

---

[1] See Exhibit A, Statement of Blake Stringer.

who due to her business success, sought to put her savings to work by combining a business loan with buying an apartment building.[2] Yet another member is the owner of a technology company that develops a mental-health-oriented smartphone app, who sought to expand her business.[3] In summary, the Small Business Owners were pursuing salutary business objectives for which they needed capital.

5.      Although the BELOC program appealed to the Small Business Owners, the terms of the BELOC included one less-favorable provision. The Debtor informed the Small Business Owners that, to prepay interest or for other manufactured reasons, they would need to wire money into a so-called "ICA" or interest carry account. Based upon these representations, the Small Business Owners each wired between $30,000 and $500,000 into an ICA.

6.      The Debtor did not fund the loans of the Small Business Owners, despite having received their substantial payments through the ICA. Instead, the Debtor made a litany of excuses. The Debtor hid behind contractual language or blamed McMann Commercial and third-party "wholesale lenders" even though the Small Business Owners were led to believe that the Debtor itself would be the capital provider. When the Small Business Owners eventually asked for their money back, the Debtor refused. In summary, the Debtor kept the Small Business Owners' money and did not provide them with any benefit.

7.      The Small Business Owners suffered serious consequences resulting from

---

[2] See Exhibit A, Statement of Lea Muse.
[3] See Exhibit A, Statement of Lis Butkiewicz.

losing their money to the Debtor. One of the Small Business Owners borrowed a total of $30,000 from "Happy Money" and "Rocket Loans" under unfavorable terms to prepay the fictious interest alleged by the Debtor.[4] Another of the Small Business Owners, a farmer, had to file a personal bankruptcy case because he could not recover from the loss of $365,000 in working capital.[5]  All the Small Business Owners suffered lost business opportunities.

       8.     The Debtor's conduct has resulted in at least one lawsuit. North Haven Lodging Partners, LLC and Willingford Lodging Partners, LLC (collectively the "Lodging Partners") filed a federal lawsuit against the Debtor.[6] The Lodging Partners allege that the Debtor and McMann offered the Lodging Partners lines of credit totaling $36,000,000. However, as a condition precedent, the Lodging Partners were required to transfer money to the Debtor for "prepayment of interest" in the amount of $3.6 million. As with the Small Business Owners, the Lodging Partners allege that the Debtor did not fund the loan and wrongfully kept the Lodging Partners' $3.6 million. Upon information and belief, the Debtor filed this bankruptcy case to obtain a stay in the Lodging Partners litigation.

       9.     Recently, the Debtor filed a lawsuit in the Middle District of Florida (the "Florida Fed. Lawsuit")[7] wherein the Debtor attempts to explain the disposition of the Small Business Owners' and Lodging Partners' money. In its complaint,[8] Debtor alleges that it

---

[4] See Exhibit A, Statement of Lea Muse.

[5] See Exhibit A, Statement of Blake Stringer and Case No. 24-2000-11 in the U.S. Bankruptcy Court for the Northern District of Texas.

[6] See Case No. 1:23-cv-16264 in the Northern District of Illinois, which complaint is attached hereto as Exhibit B. The Lodging Partners are not among the Small Business Owners who contacted the United States Trustee.

[7] See Case No. 6:24-cv-00271 in the U.S. District Court for the Middle District of Florida.

[8] The complaint in the Florida Fed. Case is attached hereto as See Exhibit C.

invested $9 million with an entity known as Velanos Principal Capital ("Velanos"). Velanos promised that it would purchase and trade "standby letters of credit" to increase the Debtor's initial investment of $9 million to $75 million within sixty days, which, according to Velanos, was a risk-free investment. See Exhibit C, at p. 2. Debtor claims that Velanos kept the money, except for $500,000, which was refunded to the Debtor in May 2023. Id. at 3.

## LEGAL STANDARDS

10.    The presumption in chapter 11 is that a debtor will continue managing its own affairs during the duration of a case. "This presumption is based on the belief that the debtor-in-possession is most knowledgeable about, and best able to run, the debtor's business." *In re Sundale, Ltd.,* 400 B.R. 890, 899 (Bankr. S.D. Fla. 2009). "Nevertheless, in the appropriate case, the appointment of a trustee is a power which is critical for the Court to exercise in order to preserve the integrity of the bankruptcy process and to ensure that the interests of creditors are served." *In re Matter of Intercat, Inc.,* 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000).

11.    The Bankruptcy Code at 11 U.S.C. § 1104(a) provides two alternative grounds for appointing a trustee, one mandatory and one discretionary. Section 1104(a) states in pertinent part:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee —
>
>> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . .; or

(2) if such appointment is in the interest of creditors, any equity security holders, and other interests of the estate . . .

12.    Subsection 1104(a)(1) is mandatory and § 1104(a)(2) is discretionary. "Once the court finds that cause exists under § 1104(a)(1), there is no discretion; an independent trustee must be appointed. Unlike subsection (a)(1), § 1104(a)(2) may well entail the exercise of a spectrum of discretionary powers and equitable considerations, including a cost-benefit analysis, to determine whether the appointment of a reorganization trustee would be in the interests of creditors, equity security holders and other interests of the estate." *In re SunCruz Casinos, LLC*, 298 B.R. 821, 828–29 (Bankr. S.D. Fla. 2003) (internal citations and quotations omitted). "Among the factors courts consider in determining whether to appoint a chapter 11 trustee under § 1104(a)(2) are: (1) the trustworthiness of the debtor; (2) the debtor's past and present performance and prospects for the debtor's reorganization; (3) confidence, or lack thereof, of the business community and creditors in present management; and (4) the benefits derived by appointment of a trustee, balanced against the costs of appointment." *In re Keeley & Grabanski Land P'ship,* 455 B.R. 153, 164–65 (B.A.P. 8th Cir. 2011).

13.    The movant bears the burden in seeking the appointment of a trustee. Although Courts disagree on what burden of proof to apply, the better view is that Courts should apply the "preponderance of the evidence" standard. Considering an analogous legal standard, the Supreme Court has held that the appropriate standard of proof in § 727 litigation was "preponderance of the evidence," notwithstanding the chapter 7 debtor's presumptive entitlement to a discharge. *Grogan v. Garner*, 498 U.S. 279 (1991). The same standard should apply to chapter 11 trustee appointments, notwithstanding the chapter 11

debtor's presumptive entitlement to manage its own affairs. *See Keeley*, 455 B.R. at 163 (finding that the evidentiary standard for appointment of a chapter 11 trustee should be the same as for § 727 discharge exceptions). *But see Sundale*, 400 B.R. at 899-900 (applying clear and convincing standard).

14.     If the Court does not appoint a trustee, the Court may in its discretion appoint an examiner. 11 U.S.C. § 1104(c)(1). *E.g., In re Hardy*, 319 B.R. 5 (Bankr. M.D. Fla. 2004) (appointing an examiner as an alternative to a chapter 11 trustee appointment). As a further alternative, the Court may also dismiss or convert a case to chapter 7 for cause, whichever is in the best interests of creditors. 11 U.S.C. § 1112. Grounds for dismissal or conversion under § 1112 includes gross mismanagement of the estate and bad faith. 11 U.S.C. § 1112(b)(4)(B). *In re 239 Worth Ave. Corp.,* 236 B.R. 492, 495 (Bankr. S.D. Fla. 1999) (equating bad faith with "an intent to abuse the judicial process and the purposes of the reorganization process, which may include the breach of a debtor's fiduciary duty.")

## **ARGUMENT**

15.     The appointment of a chapter 11 trustee is required in this case under both the mandatory and discretionary prongs of 11 U.S.C. § 1104(a). The United States Trustee addresses each prong in turn.

16.     The appointment of a chapter 11 trustee is required, for cause, due to "fraud and dishonesty" or, in the alternative, "incompetence and gross mismanagement." The Debtor engaged in a pattern of promising business loans with low interest rates and no personal guarantees to induce victims, including the Small Business Owners and the Lodging Partners, to advance funds for pre-payment of interest and for other manufactured

motives. The Debtor then simply stole the Small Business Owners' and the Lodging Partners' money. These actions constitute a dishonest and fraudulent scheme mandating the appointment of a chapter 11 trustee.

17. In the alternative, the Debtor's management is at least culpable of incompetence and gross mismanagement. According to the Debtor's own allegations in the Florida Lawsuit, the Debtor paid $9 million dollars to an entity, Velanos, that promised to provide a 800% return within sixty days at zero risk. The terms offered by Velanos were obviously suspect because it is common knowledge that the sorts of investments that can yield an 800% return in sixty days (*e.g.*, cryptocurrency, options, or highly leveraged stock purchases) come with a high risk of total loss. If the Debtor indeed made this investment with Velanos, the transaction demonstrates the absence of sound, practical judgment and a high degree of recklessness particularly because the investment was made with other people's money. This incompetence and gross mismanagement require the immediate appointment of a chapter 11 trustee in this case.

18. The Court also should order the appointment of a chapter 11 trustee under § 1104(a)(2) as all the relevant factors support such an appointment. The first factor - "trustworthiness of the debtor" - weighs strongly in favor of appointing a trustee because the Debtor's management admittedly made poor investment decisions and has been credibly accused of fraud. The second factor - "the debtor's past and present performance and prospects for the debtor's reorganization" - weighs strongly in favor of appointing a trustee because the Debtor failed to fund numerous loans, admittedly lost large sums of money, and whose incompetence and reckless disregard for other people's money caused harm. The third

factor is "confidence, or lack thereof, of the business community and creditors in present management" An entire community of business owners fell victim to the Debtor's fraud, as demonstrated by composite Exhibit A, and they have no confidence in the Debtor's management. Finally, the fourth factor is "the benefits derived by appointment of a trustee, balanced against the costs of appointment." Although the value of the funds currently in the Debtor's possession is unknown, the benefits derived from appointing a trustee likely outweighs the costs of appointment. The Debtor admitted to receiving $500,000 in May 2023 and can fund its attorney's post-petition retainer. The recent implementation of subchapter V has demonstrated that chapter 11 trustees can be cost-effective and successful. For these reasons, the appointment of a trustee would be most beneficial for the estate. Thus, the Court should use its discretionary authority to appoint a chapter 11 trustee in this case.

19.    In the alternative, if the Court does not appoint a chapter 11 trustee, the Court should appoint an examiner, dismiss this case, or convert this case to chapter 7. The same discretionary factors that support appointing a chapter 11 trustee support the appointment of an examiner. Likewise, if the Court is not inclined to appoint a chapter 11 trustee, the Debtor's gross mismanagement and bad faith abuse of the bankruptcy process warrants dismissal or conversion to chapter 7.

## **CONCLUSION**

The appointment of a chapter 11 trustee is necessary to protect the integrity of the bankruptcy system. The Debtor's management engaged in a scheme to defraud and dishonestly target small business owners luring them with false promises of below market business loans with attractive rates and no personal guarantees. The promotion and

protection of small businesses is a critical component of the bankruptcy code and an entity that defrauds small business owners should not continue as a debtor-in-possession.[9]

At a minimum, the Debtor engaged in "incompetence and gross mismanagement" which requires the immediate appointment of a chapter 11 trustee. The Debtor admittedly made a highly suspect investment with money provided by third parties to whom the Debtor had outstanding obligations. This undisputed allegation was conceded by the Debtor in Court filings. The Court should immediately order the United States Trustee to appoint a chapter 11 trustee in this case, dismiss this case, convert the case to chapter 7, or appoint an examiner.

WHEREFORE, the United States Trustee moves this Court for an order directing the United States Trustee to appoint a chapter 11 trustee in this case, appoint an examiner in this case, dismiss this case, convert this case to chapter 7, or for such other relief as the Court deems appropriate.

Dated:  March 5, 2024.

Respectfully Submitted

Mary Ida Townson
United States Trustee for Region 21

 /s/  Scott Bomkamp
Scott Bomkamp, Trial Attorney
Office of the United States Trustee
U.S. Department of Justice
400 W. Washington St., Suite 1100
Orlando, FL 32801
Telephone No.:   (407) 648-6301, Ext. 150
Facsimile No.:   (407) 648-6323

---

[9] The exclusion of small business owners with primarily business debt from means testing and the recent enaction of subchapter V are two examples of the bankruptcy code's promotion and protection of small business.

Email: scott.e.bomkamp@usdoj.gov
Indiana Bar No.: 28475-49

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion was served on March 5, 2024 on all parties appearing electronically via CM/ECF, or via First Class United States mail on the following:

Genie Investments NV, Inc.
Attention: John Michael Cohan
PO Box 60443
Jacksonville, FL 32236

_/s/  Scott Bomkamp_____
Scott Bomkamp, Trial Attorney

COMPOSITE EXHIBIT A

Lisa Butkiewicz
5434 E. Kathleen Rd.
Scottsdale, AZ
85254

██████████

TOTAL LOSSES TO DATE: $60,000
*Total recovered: $0*

I, Lisa Butkiewicz of 5434 E. Kathleen Road, Scottsdale, Arizona, do hereby testify that David

Hughes, of Illinois working via his companies Zoomeral and Genie Investments NV, through his

broker Jessica Seithel of Scottsdale, AZ sent me an 85-page contract in October 2022. This

contract stated that Hughes was able to provide my business with a low interest non-recourse

line of credit in the amount of $3 million for a technology company.

As per the contract, Hughes asked me to wire him $60,000 to be held in an ICA account, for pre-

paid interest. The money was to be 'safe' in that account. The first tranche of capital was to be

wired to me within 75-90 days so was to be wired in January of 2023, THIS NEVER CAME

THROUGH. The second tranche was to be wired in the amount of $2.4 million in April of 2023.

THIS NEVER CAME THROUGH.

For months, it was excuse after excuse after excuse, and lie after lie. He knew full well he was

not going to fund anyone, and he committed massive securities fraud by taking the money from

COMPOSITE EXHIBIT A

the ICA account and wiring it to another party (this was only disclosed in February of 2023, when he initiated a lawsuit against his "Wholesale Lender").

David Hughes had no intention of funding this line of credit, as he already had breached his contracts with others, leaving them in a wake of financial ruin. Hughes failed to disclose to any of his victims that others were not funded, but continued to take in people's money for his Ponzi Scheme. In October of 2023, I wrote to him via his Zoomeral portal and got him to admit that he was still offering these "loans" which is nothing more than a big Ponzi scheme.

When anyone would get upset or post negative reviews online, he would threaten a lawsuit, and has initiated a claim against some of his victims who went public with his Ponzi scheme. To date, there are about 40 identified victims, and about $8.5 million in direct losses. The amounts of the lines of credit that he had committed to his victims is ~$94,000,000.

I am willing to testify to the above under penalty of perjury. ████████████████████

COMPOSITE EXHIBIT A

Lisa Butkiewicz

<u>COMPOSITE EXHIBIT A</u>

[This Page Was Intentionally Left Blank to Separate Statements]

## COMPOSITE EXHIBIT A



ACRES & ROYALTY

---

February 28, 2024

**Scott E. Bomkamp, Trial Attorney**
Florida Bar No.: 0578541
United States Department of Justice
Office of the United States Trustee
George C. Young Federal Building 400 W.
Orlando, Florida 32801
Telephone No.: (407) 648-6069
Facsimile No.: (407) 648-6323
scott.e.bomkamp@usdoj.gov

RE:     **Affidavit_Genie-McMann**

Dear Mr. Bomkamp,

Please find attached affidavit to be used at your discretion for filings involving Genie Investments, McMann Commercial Lending, their associated entities, managers/owners and partners.

Happy to make myself available for any further questions you may have regarding this case. Thank you very much for your time and attention to this matter!

Respectfully,

G. Chase Buxton
Manager
Acres and Royalty, LLC

---

P.O. Box 1087, Ruston, LA 71273-1087

## COMPOSITE EXHIBIT A

## **AFFIDAVIT**

STATE OF LOUISIANA

PARISH OF LINCOLN

BEFORE ME, the undersigned Notary Public, duly commissioned and qualified within and for the State and Parish aforesaid, and in the presence of the undersigned competent witnesses, personally came and appeared:

> **G. CHASE BUXTON**, a person of the full age of majority and a resident and domiciliary of the Parish of Lincoln, State of Louisiana, who further declared his present mailing address is P.O. Box 1087, Ruston, Louisiana 71273;

hereinafter referred to as "Affiant", who upon being duly sworn, declared the following statements to be true:

1.  I am the manager and owner of Acres and Royalty, LLC with a principal business address of 499 CCC Road, Ruston, Louisiana 71273.

2.  Acres and Royalty, LLC has had an active status since January 1st, 2011, and is in good standing with the office of the Louisiana Secretary of State.

3.  Acres and Royalty, LLC submitted a Business Line of Credit Application, dated April 3, 2023, to McMann Commercial Lending LLC. Application required a due diligence fee of $7,900.00, which was wired to account no. ████████, McMann Commercial Lending LLC, 205 N Michigan Avenue, Suite 810, Chicago, Illinois 60601, on April 6th, 2023. Receiving financial institution was Old Plank Trail Community Bank, NA. Wire confirmation attached hereto.

4.  Following McMann's approval of application, Acres and Royalty, LLC entered into a Due Diligence Fee Agreement, dated April 12, 2023, with Genie Investments NV. Agreement required a due diligence fee of $37,000.00, which was wired to account no. ████████, Genie Investments NV, 401 Ryland Street, Suite-200-A, Reno, Nevada 89502 8, on April 12th, 2023. Receiving financial institution was JPMorgan Chase Bank, NA. Wire confirmation attached hereto.

5.  Following McMann's approval of application, Acres and Royalty, LLC entered into a Business Expansion Line of Credit Agreement, dated May 4, 2023, with McMann Commercial Lending LLC. Agreement required an ICA Advance Fee of $45,118.50, which was wired to account no. ████████, McMann Commercial Activations, 205 N Michigan Avenue, Suite 810, Chicago, Illinois 60601, on May 5th, 2023. Receiving financial institution was Old Plank Trail Community Bank, NA. Wire confirmation attached hereto.

## COMPOSITE EXHIBIT A

6.  Per Article 7.1 of the Business Expansion Line of Credit Agreement, dated May 4, 2023, "Lender agrees that the first tranche of funding will be no later than seventy-five (75) calendar days following the opening of the ICA by the lender with its wholesale lender." To date, no funding has been received by McMann Commercial Lending LLC and/or Genie Investments NV.

7.  On September 11, 2023. Genie Investments NV, via email correspondence, confirmed receipt of bridge payment funds in the amount of $37,000.00, and also stated ICA funds ($45,118.50) remained with McMann Commercial Lending LLC.

8.  On September 12, 2023, Genie Investments forwarded a letter dated August 23, 2023 by Adam Walker titled "Genie Investments – Update on Funding Delays" which communicated their attempts to settle with their capital provider, but no bona-fide offer had been received.

9.  Following the delay of funding by lender, numerous inquiries were submitted via email, phone calls/messages and texts to McMann Commercial Lending. In many cases, Michael Lanza and/or Walt Trock did not respond. When responses were received, the messages and updates regarding status of funding and/or return of ICA account funds was vague, and offered little information on recourse for lender's delay of funding.

10. After numerous requests regarding Zoomeral credentials to McMann Commercial Lending LLC, I was provided credentials on October 4, 2023. ███████ Upon access of the Zoomeral portal, no information was available regarding Acres and Royalty, LLC's funding request, loan documents, loan status, etc.

11. Since the submission of the application and up-front fees and payments, McMann and Genie have provided very few updates, and only when initiated by me, the "Borrower." It is my understanding (through various sources, including recently filed suits) that McMann Commercial Lending LLC and Genie Investments NV have no ability to repay funds, which were all forwarded to a "capital provider" for a high-risk investment strategy. I am currently working towards a resolution of lender's failure of funding, and return of funds, with the help of several entities/parties who have experienced the same lending failure, lack of transparency and unrefunded fees/payments.

12. I would request any funds forwarded to, and received by, Genie Investments, including the Due Diligence Fee Agreement payment of $37,000.00, and any funds transferred from McMann Commercial Lending LLC in the amount of $45,118.50 for the ICA Advance Fee, be returned as a result of the provider's failure to fund per the terms of the Due Diligence Fee Agreement and the Business Expansion Line of Credit Agreement.

13. McMann Commercial Lending LLC, Walt Trock has continued to solicit the Business-Personal Line of Credit product. Acres & Royalty, LLC having received an offer as recently as February 13, 2024, via email.

*~ Signatures on Next Page ~*

## COMPOSITE EXHIBIT A

THUS DONE AND SIGNED by **G. CHASE BUXTON,** in the presence of the undersigned competent witnesses, and me, Notary Public, in the City of Ruston, Parish of Lincoln, State of Louisiana, on this the _29_ day of February, 2024.

WITNESSES:

_Melynda S. Benson_
_Melynda S. Benson_
PRINT NAME

_Tia Culpepper_
_Tia Culpepper_
PRINT NAME

**G. Chase Buxton**
Affiant

_____
NOTARY PUBLIC

_____
(PRINT NAME) Elizabeth K. Johnson #058040
Notary Public, Lincoln Parish, Louisiana
NOTARY ID: _____ My Commission is for Life

## COMPOSITE EXHIBIT A

### ORIGIN BANK (144)

#### Funds Transfer / Payment Order Request

| | | | | |
|---|---|---|---|---|
| Today's Date | **06-APR-2023** | Transfer Date | **06-APR-2023** | |
| Branch Name | | **RETAIL (200)** | Branch Code **200** | |
| Originator's Account # | | | | |
| Online Institution's Routing Number (9 digits) | | | | |
| Wire Number ▮▮▮▮ | Wire Amount | USD 7,900.00 | Service Charge | **25.00** Product Code CTR |
| | Debit Amount | USD 7,925.00 | Exchange Rate | |
| | Created By | NITRA HALL | | |

Telegraphic Name **OLD PLANK TRAIL COMMUNITY BANK, NA**
Name of Originator **ACRES AND ROYALTY LLC**
Taxpayer ID
Address of Originator     PO BOX 1087
                                       RUSTON LA 71273-1087

Corresponding Institution
(If Beneficiary's Bank is offline or Outside the United States)
Beneficiary Institution
(Final Destination Bank's Name & Address)

Beneficiary's Name (Final Recipient of Funds)    **MCMANN COMMERCIAL LENDING LLC**
Beneficiary's Address (required)                          **205 N MICHIGAN AVE**
                                                                         **SUITE 810**
                                                                         **CHICAGO IL 60601**

Beneficiary's Account Number (required)          ▮▮▮▮
Other Beneficiary Information, Reference Information, or Payment Instructions
**DUE DILLIGENCE FEE**

### THIS TRANSACTION IS SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS

1. Processing Payment Orders: We will use our best efforts to execute your Payment Order on the date received provided the Payment Order is received by us before our established cutoff time and is received on a day which is a business day for us, for the funds transfer or communications facility ("communications facility") selected by us, and for any receiving financial institution. We will treat Payment Orders received by us after our cutoff time as received on our next business day. In our sole discretion, we may reject any Payment Order for any reason. We will notify you of any rejection orally, electronically, or in writing. We are not liable to you for the rejection, and we are not obligated to pay you interest for the period before you receive the notice of rejection. You must provide us with complete and correct beneficiary information including the name of the beneficiary, the name and address of the beneficiary's financial institution, and the beneficiary's account number at that financial institution. Receiving financial institutions may credit a Payment Order on the basis of the account number provided, even if the account number does not correspond to an account of the intended beneficiary.

2. Confirmation of Executed Payment Orders: Provided that prior arrangements have been made, we will send you a notice of debit to your account and a copy of your Payment Order after we have executed your Payment Order. You agree to review these items and report any errors to us immediately.

3. Cancelling or Amending Payment Orders: Any request to cancel this Payment Order must be made before we execute it. We will consider a request to amend a Payment Order as a request to cancel it. We will make a reasonable effort to act on a timely request to cancel a Payment Order but we will not be liable if for any reason the Payment Order is not canceled.

4. Liability: We shall be responsible only for performing the services expressly provided for in this Funds Transfer Request, and shall be liable only for our gross negligence or willful misconduct in performing those services. We shall not be responsible for the acts or omissions of any other person, including without limitation any Federal Home Loan Bank, Federal Reserve Bank or communication facility, or any receiving financial institution, and no such person shall be deemed our agent. In no event shall we be liable for any consequential, special, punitive or indirect loss or damage which you may incur or suffer in connection with or arising out of this Funds Transfer Request.
We shall be excused from failing to act or delay in acting if such failure or delay is caused by legal constraint, interruption of transmission or communication facilities, conflicts between the time of our execution of a Payment Order and the deadlines of any Federal Reserve Bank or communications facility, equipment failure, war, labor dispute or job action, emergency conditions, acts of God, or other circumstances beyond our control. In addition, we shall be excused from failing to execute or delay in executing a Payment Order if such execution would result in our exceeding any limitations on our intra-day net funds position established according to Federal Reserve Board guidelines or in our otherwise violating any provision of any risk control program of the Federal Reserve Board or any rule or regulation of any other U.S. government regulatory authority.

5. Foreign Payment Orders: You agree that if you request that a Payment Order be sent to a foreign country, we may send the Payment Order in the currency of the receiving financial institution's country at our buying rate of exchange for U.S. dollar transfers. You agree that, if for any reason the Payment Order is returned to us, you will accept the refund in U.S. dollars of the amount of the foreign money credit, based on our current buying rate on the date of the refund, less any charges or expenses to us.

| | | |
|---|---|---|
| _____ | 4/6/2023 | Acres and Royalty, LLC |
| Authorized Signature (and Title, if applicable) | Date | Name of business or organization, if applicable |
| _____ | 4/6/2023 | _____ 4-6-2023 |
| Authorized Signature (and Title, if applicable) | Date | Authorized Signature (and Title, if applicable)   Date |

## COMPOSITE EXHIBIT A

### ORIGIN BANK (144)

### Funds Transfer / Payment Order Request

| | | | | | |
|---|---|---|---|---|---|
| *Today's Date* | 12-APR-2023 | | *Transfer Date* | 12-APR-2023 | |
| *Branch Name* | | | RETAIL (200) | *Branch Code* 200 | |
| *Originator's Account #* | | | | | |
| *Online Institution's Routing Number (9 digits)* | | | | | |
| *Wire Number* | ▮▮▮▮▮ | *Wire Amount* USD 37,000.00 | *Service Charge* | 25.00 | *Product Code* CTR |
| | | *Debit Amount* USD 37,025.00 | *Exchange Rate* | | |
| | | *Created By* ARIEL WEBB | | | |
| *Telegraphic Name* | JPMORGAN CHASE BANK, NA | | | | |
| *Name of Originator* | ACRES AND ROYALTY LLC | | | | |
| *Taxpayer ID* | | | | | |
| *Address of Originator* | PO BOX 1087 | | | | |
| | RUSTON LA 71273-1087 | | | | |

*Corresponding Institution*
(If Beneficiary's Bank is offline or Outside the United States)
*Beneficiary Institution*
(Final Destination Bank's Name & Address)

*Beneficiary's Name (Final Recipient of Funds)*    GENIE INVESTMENTS NV
*Beneficiary's Address (required)*    401 RYLAND STREET SUITE 200-A
    RENO, NEVADA 89502 8
    UNITED STATES

*Beneficiary's Account Number (required)*    ▮▮▮▮▮
*Other Beneficiary Information, Reference Information, or Payment Instructions*
DUE DILIGENCE USER ID ▮▮▮▮

### THIS TRANSACTION IS SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS

**1. Processing Payment Orders:** We will use our best efforts to execute your Payment Order on the date received provided the Payment Order is received by us before our established cutoff time and is received on a day which is a business day for us, for the funds transfer or communications facility ("communications facility") selected by us, and for any receiving financial institution. We will treat Payment Orders received by us after our cutoff time as received on our next business day. In our sole discretion, we may reject any Payment Order for any reason. We will notify you of any rejection orally, electronically, or in writing. We are not liable to you for the rejection, and we are not obligated to pay you interest for the period before you receive the notice of rejection. You must provide us with complete and correct beneficiary information including the name of the beneficiary, the name and address of the beneficiary's financial institution, and the beneficiary's account number at that financial institution. Receiving financial institutions may credit a Payment Order on the basis of the account number provided, even if the account number does not correspond to an account of the intended beneficiary.

**2. Confirmation of Executed Payment Orders:** Provided that prior arrangements have been made, we will send you a notice of debit to your account and a copy of your Payment Order after we have executed your Payment Order. You agree to review these items and report any errors to us immediately.

**3. Canceling or Amending Payment Orders:** Any request to cancel this Payment Order must be made before we execute it. We will consider a request to amend a Payment Order as a request to cancel it. We will make a reasonable effort to act on a timely request to cancel a Payment Order but we will not be liable if for any reason the Payment Order is not canceled.

**4. Liability:** We shall be responsible only for performing the services expressly provided for in this Funds Transfer Request, and shall be liable only for our gross negligence or willful misconduct in performing those services. We shall not be responsible for the acts or omissions of any other person, including without limitation any Federal Home Loan Bank, Federal Reserve Bank or communication facility, or any receiving financial institution, and no such person shall be deemed our agent. In no event shall we be liable for any consequential, special, punitive or indirect loss or damage which you may incur or suffer in connection with or arising out of this Funds Transfer Request.
We shall be excused from failing to act or delay in acting if such failure or delay is caused by legal constraint, interruption of transmission or communication facilities, conflicts between the time of our execution of a Payment Order and the deadlines of any Federal Reserve Bank or communications facility, equipment failure, war, labor dispute or job action, emergency conditions, acts of God, or other circumstances beyond our control. In addition, we shall be excused from failing to execute or delay in executing a Payment Order if such execution would result in our exceeding any limitations on our intra-day net funds position established according to Federal Reserve Board guidelines or in our otherwise violating any provision of any risk control program of the Federal Reserve Board or any rule or regulation of any other U.S. government regulatory authority.

**5. Foreign Payment Orders:** You agree that if you request that a Payment Order be sent to a foreign country, we may send the Payment Order in the currency of the receiving financial institution's country at our buying rate of exchange for U.S. dollar transfers. You agree that, if for any reason the Payment Order is returned to us, you will accept the refund in U.S. dollars of the amount of the foreign money credit, based on our current buying rate on the date of the refund, less any charges or expenses to us.

| | | | |
|---|---|---|---|
| *Authorized Signature (and Title, if applicable)* | 4/12/2023 *Date* | *Name of Business or organization, if applicable* | |
| *Authorized Signature (and Title, if applicable)* | 4/12/23 *Date* | *Authorized Signature (and Title, if applicable)* | 4/12/2023 *Date* |

## COMPOSITE EXHIBIT A

### ORIGIN BANK (144)

### Funds Transfer / Payment Order Request

*Today's Date* 05-MAY-2023                                   *Transfer Date* 05-MAY-2023
*Branch Name*                                                 RETAIL (280)          *Branch Code* 200
*Originator's Account #*
*Online Institution's Routing Number (9 digits)*
*Wire Number*                          *Wire Amount*   USD 45,118.50    *Service Charge*   25.00   *Product Code*  CTR
                                       *Debit Amount*  USD 45,143.50    *Exchange Rate*
                                       *Created By*    ARIEL WEBB
*Telegraphic Name*          OLD PLANK TRAIL COMMUNITY BANK, NA
*Name of Originator*        ACRES AND ROYALTY LLC
*Taxpayer ID*
*Address of Originator*     PO BOX 1087
                            RUSTON LA 71273-1087

*Corresponding Institution*
(If Beneficiary's Bank is offline or Outside the United States)
*Beneficiary Institution*
(Final Destination Bank's Name & Address)

*Beneficiary's Name (Final Recipient of Funds)*  MCMANN COMMERCIAL ACTIVATIONS
*Beneficiary's Address (required)*

*Beneficiary's Account Number (required)*
*Other Beneficiary Information, Reference Information, or Payment Instructions*
BRIDGE PAYMENT
USER ID

### THIS TRANSACTION IS SUBJECT TO THE FOLLOWING TERMS AND CONDITIONS

1. Processing Payment Orders: We will use our best efforts to execute your Payment Order on the date received provided the Payment Order is received by us before our established cutoff time and is received on a day which is a business day for us, for the funds transfer or communications facility ("communications facility") selected by us, and for any receiving financial institution. We will treat Payment Orders received by us after our cutoff time as received on our next business day. In our sole discretion, we may reject any Payment Order for any reason. We will notify you of any rejection orally, electronically, or in writing. We are not liable to you for the rejection, and we are not obligated to pay you interest for the period before you receive the notice of rejection. You must provide us with complete and correct information including the name of the beneficiary, the name and address of the beneficiary's financial institution, and the beneficiary's account number at that financial institution. Receiving financial institutions may credit a Payment Order on the basis of the account number provided, even if the account number does not correspond to an account of the intended beneficiary.

2. Confirmation of Executed Payment Orders: Provided that prior arrangements have been made, we will send you a notice of debit to your account and a copy of your Payment Order after we have executed your Payment Order. You agree to review these items and report any errors to us immediately.

3. Canceling or Amending Payment Orders: Any request to cancel this Payment Order must be made before we execute it. We will consider a request to amend a Payment Order as a request to cancel it. We will make a reasonable effort to act on a timely request to cancel a Payment Order but we will not be liable if for any reason the Payment Order is not canceled.

4. Liability: We shall be responsible only for performing the services expressly provided for in this Funds Transfer Request, and shall be liable only for our gross negligence or willful misconduct in performing those services. We shall not be responsible for the acts or omissions of any other person, including without limitation any Federal Home Loan Bank, Federal Reserve Bank or communication facility, or any receiving financial institution, and no such person shall be deemed our agent. In no event shall we be liable for any consequential, special, punitive or indirect loss or damage which you may incur or suffer in connection with or arising out of this Funds Transfer Request.

We shall be excused from failing to act or delay in acting if such failure or delay is caused by legal constraint, interruption of transmission or communication facilities, conflicts between the time of our execution of a Payment Order and the deadlines of any Federal Reserve Bank or communications facility, equipment failure, war, labor dispute or job action, emergency conditions, acts of God, or other circumstances beyond our control. In addition, we shall be excused from failing to execute or delay in executing a Payment Order if such execution would result in our exceeding any limitations on our intra-day net funds position established according to Federal Reserve Board guidelines or in our otherwise violating any provision of any risk control program of the Federal Reserve Board or any rule or regulation of any other U.S. government regulatory authority.

5. Foreign Payment Orders: You agree that if you request that a Payment Order be sent to a foreign country, we may send the Payment Order in the currency of the receiving financial institution's country at our buying rate of exchange for U.S. dollar transfers. You agree that, if for any reason the Payment Order is returned to us, you will accept the refund in U.S. dollars of the amount of the foreign money credit, based on our current buying rate on the date of the refund, less any charges or expenses to us.

Authorized Signature (and Title, if applicable)     Date 5|5|2023          Name of business or organization, if applicable

Authorized Signature (and Title, if applicable)     Date 6/5/23          Authorized Signature (and Title, if applicable)     Date 5/5/2023

<u>COMPOSITE EXHIBIT A</u>

[This Page Was Intentionally Left Blank to Separate Statements]

## COMPOSITE EXHIBIT A

Carla Harrison
Legacy Land Developers, LLC

████████████████

**Total Financial Loss:**
$49,900

Last year (around March 2023) a lender, RGC Capital, advised our business consultant about a great opportunity for our new business for new construction and development.  My husband and I entered into a contractual loan agreement with a company by the name of McMann Commercial Lending LLC, in which they were to provide a BELOC (Business Expansion Line of Credit) and Bridge loan – where they kept emphasizing that there were no out-of-pocket funds, no personal guarantors, and no collateral – all funds were to be funded by them (through private lenders), no outsourcing.  Over the course of several months, we gave McMann our business plan, financial statements, and proof of funds for the 20% required (that we would get back with the loan).

The BELOC loan would be paid out by Tranche's - $20% (14-75 days) and then followed by an 80% payout – however, the interest on the Bridge Loan would have to be wired (instructions below) to them to start the BELOC loan and remain in their account, which was somewhere around $260,000.  We applied for the loan on May 2nd, 2023, and received the $7,900 Due Diligence Fee wire instructions on the evening of May 11th, 2023 – we sent that to them on May 12th, 2023 – which was supposedly for a background check and to make sure we are not a fraudulent company or participating in money laundering.  We received an email approval of $11,500,000 on the morning of May 16th, 2023, of which $1,7250,000 was for the Bridge Loan at 4.5% interest – we received a hard letter on May 23rd, 2023.  This seemed pretty quick since this process supposedly included the underwriting process.  All the while, we are having conference calls with Ed Perez and Michael Lanza, confirming our approval status and reiterating the process steps.  Additionally, we received emails that we should not have, for meetings and letter updates that did not apply to us.

**WIRE INSTRUCTIONS:**
**McMann Commercial Lending Wire Instructions:**
Commercial Account
Beneficiary: McMann Commercial Lending LLC,
205 N Michigan Ave, Suite 810 Chicago IL 60601
Bank: Old Plank Trail Community Bank 60423
Phone: ████
Routing: ████████
Account #: ████████

On May 18th, 2023, we signed a contract for the property next to our desired land, this was assuming we would have our first tranche and could purchase the property with the funds.  We eventually lost our $2000 earnest money, because we could not fund the purchase.

## COMPOSITE EXHIBIT A

On May 25th, 2023, we received the agreement forms for the $40,000 Origination Fee/Due Diligence Fee, Term Sheets, and Data Management Sheet. At that point, I pulled the funds we needed for the Origination Fee and the 20% from my retirement accounts (resulting in 10% penalty). All required documents and a Due Diligence Fee of $40,000 were sent to them on June 6th, 2023. From our calls and interactions, the next step was to receive our agreement documentation for the Bridge and BELOC loan, which we were told we would receive in 5-7 days. This did not happen, so my team members and I constantly called, texted, and emailed about the delay. We were told that the attorneys were changing all of the agreements across the board to be more transparent and user-friendly, and the attorneys work at their own pace. I had text conversations with Ed Perez for the entire month of June, inquiring about the agreements – I was then advised that they have all NEW attorneys working on it, and it should not be long. At this point, we are getting leery about everything because wouldn't they have known BEFORE we sent our $40,000 that the new agreements were being worked on, and there was an issue with attorneys, so the documents would not be out in the 5-7 days as expected, there definitely was some misleading here? So, to appease us, McCann agreed to a discounted Data Management & Success Fee of .5 points instead of the 1 point as initially stated.

We finally received the long-awaited Bridge Loan and BELOC agreement forms at 11:54 p.m. on June 27th, 2023 – 21 days after our $40,000 was received. At this point, we review and have concerns about the documents, but at the same time, we are seeing many more bad reviews on the BBB website and Bigger Pocket reviews. So, our team does send change requests for the documents, BUT ultimately, we do not want to risk moving forward with all of the RED FLAGS that we have already had.

So, on August 8th, 2023, we chose to terminate our loan request. We sent in a notarized termination form and requested our $40,000 Origination Fee since NO LOAN was originated. Ed Perez acknowledged our request on August 9th, 2023. On September 20th, 2023 my husband called Walt Trock and he answered; Mr. Trock acted as if he did not know the scenario (although he sent an email stating we could do a call but never followed up on it) – Mr. Trock said to send an email with the pertinent info, which we did, but then no response from him.

On October 16th, 2023, I reached out to Mr. Trock again, and he said someone else handles BELOC loan info and to email him again, and he would give me the information, which was Sandra Colthirst. She was supposedly looking into this but, then I was referred back to Mr. Trock. After a few back-and-forth emails, Mr. Trock pointed the finger at Genie Investments. I advised him none of my contractual agreements were with them but this is what he said:

## COMPOSITE EXHIBIT A

Walt Trock ██████████████████

To: You

Cc: Sandra Colthirst;  Michael Lanze;  Rene Jamulitrat;  Ed Perez;  jeffharrison1143 (Guest)

Fri 11/17/2023 9:49 AM

Genie Investments that McMann had a contractual relationship with and any funds sent to McMann Commercial would have been sent to Genie Investments as part of our financial agreement. Genie Investments is the firm that backed our program.  You may not be aware of this relationship, however now that McMann Commercial is involved with legal proceedings, I am bound by the attorney group that represents McMann Commercial on what I can and cannot do.

I will be check with these attorneys about your matter.  I will let you know when I get direction.

Walt Trock

██████████████

So directly, we have wired McMann $47,900; however, due to our thinking that we were receiving the BELOC and Bridge loan from them, this has caused our business to lose much more.  We would not have placed a contract on the property adjacent to our development land, so $2,000 Earnest money is gone.  I also would not have pulled my personal retirement funds resulting in penalties and taxes, $30,000 penalties, and taxes monies are due as a result.

Respectfully,

*Carla Harrison*

Carla Harrison

Legacy Land Developers, LLC

██████████████

<u>COMPOSITE EXHIBIT A</u>

[This Page Was Intentionally Left Blank to Separate Statements]

## COMPOSITE EXHIBIT A

2/29/24

Rejoe Joy for Global Verse Holdings LLC

Against Mcmann Commercial Lending and Genie Investments

**Complaint:** Mcmann Lending took $7800 for a loan application that I never received a loan. Mcmann Instructed me to cover the 10% I could take a bridge loan for a fee of $50,000 plus 3 months at $15,000/mth for a total of $45,000, Genie Investments would cover the 10% thru the bridge loan.

They then over a year later and stall after stall, Mcmann said I could not receive a refund of my monies to them and I needed to contact Genie to try and get my money back. I then set demand notes via email and mail (letter returned undeliverable) and received a response from Mcmann stating Genie may be able to provide a 50% refund if I signed a document that states I may only receive up to 50% of my money back.

**Time Line:**

Oct 4, 2022, I was introduced to Larry Roche, from Crestview Mortgage, the broker in this deal, who then introduced me to Michael Lanza, with Mcmann Lending. I then filed the application and sent all my documents and $7,800 to Mcmann Lending.

Oct 7, 2022, received email from Sandra Colthurst, processing manager, that term sheet will be sent out soon.

October 11th received my term sheet for $10 million loan.

October 14th paid 'retention fee" to Genie for bridge loan for $50,000

October 15th, I originally applied for a $10 million dollar loan, then once they stated I needed to put 10% in I said I only have about $100,000, so we lowered the loan amount to 3.57 million.

October thru January after months of emails Michael Lanza, got updated paper work for the new loan amount of 3.57 million. Also then sent me instructions to prepay Genie the interest portion for the bridge loan.

January thru early October 2023 Michael kept saying the loan is about to be funded, then more delays and excuses.

October 16th, I sent them a demand letter via email and mail (returned due to not locating Mcmann), asking for a refund of all my costs totaling $102,800.

October 18th, I received a response from Sandra Colthirst with all parties copied, there is not refund for $7800 that went to Mcmann for due diligence, and I would need to contact Genie for the retention fee and interest. Attached to that was a "Refund Opt-in Agreement" stating that if I sign, I could get up to 50% of what I paid back. I was done with them after this and began contacting lawyers and groups to begin a process to get my money back.

## COMPOSITE EXHIBIT A

These people have no conscious. I talk to them about my plan and they were that is a great idea and go forward and the loan would be here by no time. I began planning how to buy down most of my high interest rate real estate purchases with this loan, but now I am stuck with high rates and negative cashflow and in a terrible financial position because of these crooks. Please help in any way you can.

Thanks

Rejoe Joy

Global Verse Holdings LLC

Chief Executive Manager

<u>COMPOSITE EXHIBIT A</u>

[This Page Was Intentionally Left Blank to Separate Statements]

March 1, 2024

## COMPOSITE EXHIBIT A

U.S. Department of Justice

Executive Office for U.S. Trustees

441 G Street, NW Suite 6150

Washington, DC 20530

Attention:    Scott E. Bomkamp

Subject:    Genie Investments Bankruptcy

To Whom it May Concern,

My name is Christopher Lovett, and I believe I have been involved in wire fraud. In December of 2022, I was made aware of a business equity line of credit through a New Orleans mortgage broker named Aaron Levy with Alliance Mortgage ████████.

The deals of the loan were $2.4M for 10 years at 4% if we could get the paperwork signed by the end of the year. We submitted our application through Aaron along with a $7,900 application fee wired to McMann Commercial Lending LLC in Chicago, IL.

We were informed in January 2023 that our loan was "approved," and we would need to wire $30,000 to start the process to Genie Investments in Reno, NV. That money was wired on January 26, 2023.

Again on February 26, 2023, we were informed that the remaining $34,575 would need to be wired to finalize the deal.

Shortly after I wired my money, I was informed that it would be 3-4 weeks before I received my first tranche of 20% of the full loan amount. Then, within 2 weeks I would receive the second tranche for the balance of the loan. In early April, I was informed that the first tranche would happen by the end of the month. Again, in May 2023, I was informed that by the end of May we would receive our first tranche. This happened again in June and July.

Finally, in August 2023, I realized I was never going to receive this money. I was told by Walter Trock with McMann Commercial Lending that I needed to submit a transaction cancellation form. I submitted that form on September 6th, 2023. I was then told it would be 45 days until I received my refund.

Since then, I have received a notification from both McMann and Genie that they are not required to give me a refund. I have also received a Cease and Desist and Demand letter from Genie stating that I tried to commit wire fraud by attempting to recall the wired funds and that I owed them $25,000 in legal fees within 5 business days of receiving the letter.

I have also received a Demand for Arbitration from Genie on December 22, 2023. I have since filed a Motion to Dismiss on February 8, 2024. The fees for arbitration, totaling $4,750, were paid on or around February 16, 2024. No date for arbitration has been set.

If you have any questions, please do not hesitate to contact US at ████████.

Sincerely,

*Chris Lovett*

Christopher J. Lovett

<u>COMPOSITE EXHIBIT A</u>

[This Page Was Intentionally Left Blank to Separate Statements]

## COMPOSITE EXHIBIT A

February 28, 2024

To whom it may concern,

September 2020 starts everything off when I entered into an agreement with Genie for a line of credit in the amount of 4x my deposit of $190,000.00 into an interest carrying account that would serve the purpose of escrow satisfying the interest over the 5-year term of the loan. The $760,000.00 was to be sent to me via 4 tranches. The first tranche came back to me in the amount of $145k which was net of the 6% "closing fee" for the entire loan that never happened. So, I paid for goods that never came. No other tranches ever came and received every excuse imaginable from covid to the economy on why the funds haven't come. They continue to take other people's money knowing they won't perform, and I feel totally defrauded. I would like to at least recoup what I am out, the 45k, and move on with my life. I believe this a very well-orchestrated scheme and needs to stop before more damage is done to families hoping that have found exotic financing that will help their businesses grow as I did.

Thank you for looking into this for me and many others that have been stolen from.

Sincerely,

Mitchell Mims

MIMS-IPR, LLC

<u>COMPOSITE EXHIBIT A</u>

[This Page Was Intentionally Left Blank to Separate Statements]

## COMPOSITE EXHIBIT A

Lea Muse
Belle Maison Realty, LLC
███████████

**TOTAL FINANCIAL LOSS:**
**$127,131.30**

I went to McMann Commercial Lending as a client to be consulted on a BELOC (Business Expansion Line of Credit) loan. Over the course of several months I gave McMann a business plan and wired McMann an upfront "Due Diligence" fee of $7,800 on December 13, 2023, which I wired to the following:

McMann Commercial Lending Wire Instructions:
      Beneficiary:    McMann Commercial Lending LLC, 205 N Michigan Ave, Suite 810 Chicago IL 60601
      Bank:          Old Plank Trail Community Bank 60423
      Phone:
      Account #:    ███████████
      Routing:       ███████████

| | |
|---|---|
| **Michael Lanza** ████████████████████████████████ | |
| **Walter Trock** ████████████████████████████ | |

According to the BELOC program, Micheal Lanza suggested I need 20% of the $600,000 for the Bridge Loan for a total of $120,000. He forwarded me to Preferred Lending. With Preferred Lending, a middle man, I was then forwarded to "Happy Money" and "Rocket Loans" to take out two personal loans. The table below is the cost of loans with fees.

| Account | Loan Amount | Financed Amount | Terms | Origination Fees | Fees to Preferred Funding Group | Payments Made as of September 2023 | |
|---|---|---|---|---|---|---|---|
| Happy Money | $40,000.00 | $39,000.00 | | $1,000.00 | $5,850.00 | $5,356.86 | |
| Rocket Mortgage | $20,000.00 | $18,704.00 | 60 months | $1,296.00 | $2,805.60 | $2,917.92 | |
| TOTAL | $60,000.00 | $57,704.00 | | $2,296.00 | $8,655.60 | $8,274.78 | $19,226.38 |
| | | | | | | | Total Loss |

## COMPOSITE EXHIBIT A

After I was approved for a $3 million dollar loan, I was instructed by Michael Lanza of McMann Commercial Lending to wire $25,000 to Genie Investments as a Retention Fee. I received a Term and Contingent Commitment Letter and Bridge Loan agreement along with a Business Expansion Line of Credit Agreement. I signed all the documentation and received a funding date of May 4, 2023. I submitted these documents to McMann Commercial Lending on February 11, 2023.

On March 20, 2023 I was instructed by Michael Lanza of McMann Commercial Lending to wire $45,000 to Genie Investments for prepaid interest on a $600,000 Bridge Loan. The bridge loan was to cover the 20% "down payment" for my requested BELOC of $3,000,000. Michael Lanza assured me all documentation was complete and funding will occur as dated on May 4, 2023. I wired a total of $70,000 to Genie Investments to the following:

| | |
|---|---|
| Bank Name & Address: | Chase Bank |
| | 1515 Atlantic Boulevard Jacksonville, Florida 32207 |
| Account Mailing Address: | 401 Ryland Street Suite 200-A Reno, Nevada 89502 8 |
| Routing Number: | |
| Credit Account Number: | |
| Account Title: | Genie Investments NV |

****Genie Investments operated by the same individuals that run Zoomeral.

**David Hughes**
 Email:
 Website:
**John Michael Cohan** -
 Website:

There were multiple phone calls with Michael Lanza as time passed the May 4, 2023 funding date. However, the responses were vague and inconsistent with his prior promises. He would always assure me there were always delays with this type of funding and "I'll get back to you". Michael Lanza has never called me to update me on the loan or the process. I never received any calls from his loan processors Rene Jamulitrat or Sandra Colthirst. I also never received confirmation that the funds I wired to Genie were received. I was also instructed to log into a **Zoomeral** website which was a portal for borrowers to submit documents, and receive updates on their loans and any other communications. The website is bare bones and I was never sent any correspondence through this site.

## COMPOSITE EXHIBIT A



On June 15, 2023, McMann sent an email for the first time since the start of the loan process. The letter states:

> "McMann is pleased to inform you that these investors have advised McMann that it intends to provide McMann with funds before the end of this month (June 2023). As delays on the investors' end have purportedly been resolved. McMann thanks you for your patience." ...

On June 23, 2023, received an email from McMann:

> "BELOC Loan Closing Protocol" "The protocol for BELOC loan closings will be going out this coming week. Once the BELOC loan information has been confirmed then the funding process will begin. We will not have a funding schedule until after applicants have been confirmed. McMann Commercial Lending would like to thank everyone for their patience while we are working through this loan closing process."...

July 2023 - I have not received any communications from Genie Investments or McMann regarding funding. I received multiple excuses from Michael Lanza with what is causing the delays. I go to Google to see if any complaints have been noted on McMann's reviews and I found multiple clients also complaining of the same experience with McMann. (Please go to Google and find McMann Commercial Lending for the reviews)

August 18, 2023 - I talk to the manager and owner of McMann Commercial Lending, Walter Trock. He says there is a problem with the "capital provider" and they are working with their lawyers to push Genie Investments and the capital provider to action. Walter Trock gave me his lawyer's information, Dan Klapman, SWK Attorneys, 500 Skokie Blvd., Suite 600 | Northbrook, IL 60062, ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ I called Dan Klapman 3 times, texted him twice and sent an email and he did not return any response.

October 3, 2023 - I visited a Chase branch bank in-person to talk to a representative regarding the bank account I wired my funds to Genie. I give them my wiring instructions to Genie Investments. After looking into the account, the representative could not indulge further, except to advise me to get a lawyer.

### COMPOSITE EXHIBIT A

I spoke to Michael Lanza October 6, 2023, He goes on to inform me that Genie Investments has transferred the money overseas and they are trying to recall it back. He further explains that Genie is having trouble bringing money back into the US as it is more difficult to bring money in than going out. This was the excuse I could not accept. I immediately started to report Michael Lanza (McMann Commercial Lending)  Walter Trock (McMann Commercial Lending), David Hughes (Genie Investments) and Mike Conner (Genie Investments)

October 18, 2023 - I have incurred  $30,000 in debt due to the negligence of McMann Commercial Lending.

As of today, February 27, 2024.  I have not received a refund of funds and no communications from Genie and McMann. ████████████████████████████████
████████████████████████████████████████

<u>COMPOSITE EXHIBIT A</u>

[This Page Was Intentionally Left Blank to Separate Statements]

<u>COMPOSITE EXHIBIT A</u>

I, Kim Nash, Am a victim
Of fraud by Genie Investments
and McMann Commerical
lending. My francial lost to
Genie is $57,500.00 My francial
lost to McMann is 7900.00


Sincerly
Kim Nash

A Complete Home

<u>COMPOSITE EXHIBIT A</u>

[This Page Was Intentionally Left Blank to Separate Statements]

<u>COMPOSITE EXHIBIT A</u>

From: Kristin Stegent █████████████████
Date: March 1, 2024 at 8:46:15 PM EST
To: "Bomkamp, Scott E. (USTP)" <Scott.E.Bomkamp@usdoj.gov>
Subject: [EXTERNAL] Genie Investments Scam Statement

Hi Scott,

Here is my signed statement. Please let me know if you need anything else!

Thanks,

Kristin Stegent

## COMPOSITE EXHIBIT A

March 1, 2024

We applied for a $1.787M BELOC (Business Equity Line of Credit) loan with McMann Commercial Lending for the purpose of refinancing our RV park December 2022.

We were asked by McMann to create a Zoomeral account and to upload all our documents there. The Zoomeral platform never worked for uploading documents, though. We sent all documents through email and were told by McMann that they would upload the documents to Zoomeral for us.

We were approved for the BELOC loan and also approved for a bridge loan that would be provided by Genie Investments. The owner of Zoomeral is part owner of Genie Investments.

We wired a $7,900 application fee to McMann. Then we wired a $35,000 non-refundable due diligence fee to Genie Investments for a $178,000 bridge loan (10% of the BELOC loan). And we wired $26,805 to Genie Investments for prepaid bridge loan interest ($21,444) and a Zoomeral origination fee ($5,361) on January 10, 2023.

The contract with Genie Investments stated that Genie would provide McMann with the $178,000 bridge loan as a downpayment for the BELOC loan.

The contract with McMann stated we'd receive 20% of our BELOC loan within 75 calendar days of wiring the prepaid bridge loan interest and then receive the other 80% of loan within 75 calendar days from the first funding.

We never received any funding and were given all sorts of excuses such as the bank had placed a hold on the account due to the size of the deposits coming into and going out of the account and that attorneys were working to get the hold released. Plus many more.

I reached out to the owner of Zoomeral and Genie Investments, David Hughes. He told me that there are no guaranteed loans. He also told me that my prepaid interest for the bridge loan was expired. In the contract with Genie Investments, it states that you have to ask in writing to renew your loan interest after 90 days. Otherwise, it is theirs and is non-refundable. Yet, the $178,000 was supposed to be sent to McMann and McMann provide the first portion of the BELOC loan within 75 calendar days. David Hughes laughed and told me there was no BELOC loan.

After leaving an honest, non-disparaging online review after 5 months of waiting for a loan that was not funded, David Hughes of Genie Investments canceled my Zoomeral account. He pleaded with me over the phone to take down my review and then threatened to bring a lawsuit against me. Ultimately he brought a suit against me in arbitration that is currently on hold due to lack of response on his part.

David Hughes is now asking clients for even more money to help him bring a lawsuit against his wholesale lender, claiming clients may get their funds returned if they participate. First come, first serve. And an extensive confidentiality agreement must be signed. Just today he offered a client $20,000 to remove her online reviews and for her to give information on what is going on within a large group of clients who have all been scammed by him.

I believe both Zoomeral and Genie Investments make their money from the upfront fees and have little motivation or intention to actually fund loans. I have personally heard from over 40 clients of Zoomeral and Genie Investments who paid heavy upfront fees and never received a loan. I believe he either gambled our money trying to acquire a loan or that he's just running a

<u>COMPOSITE EXHIBIT A</u>

massive Ponzi scheme and has covered himself in every way he could think of legally to keep
the operation rolling.

This scam has damaged my husband, me and our 10 kids in an immeasurable way. It put us in
the worst financially position of our lives and has caused immense struggle.

*Kristin Stegent*

Kristin Stegent

<u>COMPOSITE EXHIBIT A</u>

[This Page Was Intentionally Left Blank to Separate Statements]

COMPOSITE EXHIBIT A


Genie Investments

In October 2022  I was seeking an option for a refinance package on my existing 7,000 acre organic farming operation in the Texas Panhandle.
I had a broker by the name of Clyde Allsop from New Jersey that had been given some information about a financial institution by the name of Mcmann Commercial Lending LLC located out of Chicago, Illinois.
This finance group had a program called a BELOC business expansion line of credit. I paid an initial $7900 for an application, application fee upfront to McMann.
 This loan product looked to be a very good fit for what I was exploring.
My initial contact with Mcmann was with their loan officer a fellow named Michael Lanza, He presented me with the contracts, and also made several calls and question and answer sessions with my Lenders and even their attorneys on numerous conference calls. My loan that I was approved on was for 24 million against my 35 million in assets of my current operations. This loan was to refinance roughly $18 million in pre-existing debt and provide me with some additional operating capital.
I also had dealings with the owner and manager of Mcmann, Mr. Walter Trock. Mr. Trock later made many representations to my Lenders with letters of guarantees & explanations of funding delays.

The Mcmann group  provided all the initial loan documentation, and as a part of their services as being agents for a " Sister Company"  of Genie Investments NV .
Mcmann facilitated what they called a bridge loan and an ICA interest Carry account that Was needed in order to facilitate the business expansion line of credit BELOC loan.
It was explained over and over to myself, my Lenders and others, That it was necessary to put up 10% on the total loan value in order to do a lock on the rates on the business expansion line of credit.
Where Genie comes into the picture is this Mcmann claimed that Genie was their "Sister company" and had vast experience in the funding process of these BELOC Loans and because of that Genie would provide the Bridge loan or the necessary bridge funding in order to receive the 10% upfront funds to lock in the loan for the borrowers that were unable to put up the entire amount, themselves out-of-pocket.
Mcmann provided to me & my new formed entity Nutra-Acres LLC the necessary documentation, and loan documentation for the bridge loan that Genie investments would provide in front of the Mcmann BLOC loan package.
In Feb-March of 2023 I paid in a total of $365,000 by wire into the Genie Investment ICA account.
It was represented to us that this was a trust account set up for the pre-payment of interest on the total of the Bridge loan that would be provided further to Mcmann and the BELOC business expansion line of credit loan.

This m_____ wired into Chase Bank
ABA ████
Acco ████
Genie Investments NV

It was understood that this money would preserve the position of an interest carry account on the bridge loan.  I have multiple emails & the contracts that explain this and even several phone recording conversations from Mr. LANZA explaining this.

## COMPOSITE EXHIBIT A

The original contractual agreement from Mcmann explained and outlined that once the ICA account was fully funded then we would receive a notice and at that point the "timeline" would start on a 14-75 day period for the receipt of the first Tranche payment of 20% Of the total loan.  I was refinancing existing debt, and I was under an agreement with my current lenders to wait for the funds to close the refinance process. The money never showed and after the 75 day Period and many many conversations of excuses and letters of the delays I had an attorney that I had previously worked with who is a bankruptcy attorney from Fort Worth Texas by the name of Jeff Prostok he served a letter of demand to Genie investments, and Mcmann commercial lending group, we never got a satisfactory response from either party.
I later served a demand letter of civil theft from my attorney, Mr. John Lovell from Amarillo Texas. This demand letter was to all parties both Mcmann and Genie and again no response.

Genie filed an arbitration suit against me and my entity some months later.  That suit was objected to and has been put in a position of stay due to my January 2, 2023 forced filing of Chapter 11 bankruptcy in the Northern District of Texas. Case # 24-20000-11
I have listed Genie investments, and Mcmann commercial lending in my schedules, As a claimant.
The plan is to list both these lenders as an adversarial and file suit in the bankruptcy case.
All of the above comments and writings are as of fact.

Blake Stringer
Nutra-Acres LLC

2/28/2024

COMPOSITE EXHIBIT A

[This Page Was Intentionally Left Blank to Separate Statements]

<u>COMPOSITE EXHIBIT A</u>

**March 1st 2024**
**Orlando, Florida**

On or around September 27th 2022 I signed a contract for a $18,750MM  Beloc loan with McMann
Commercial Lending and I had to provide a deposit of $281,250.00 and also a finders fee of 40k.
This money was wire to Genie Investment and I got told by McMann that Genie investment was a
third party and my money will be held in escrow until the loan funds and this money will be used to
prepay some interest on the loan for the first few months. The loan never fund and I got promise
multiple times the money was coming in before the end of the month. I asked to get my money back
and I never got it back. Walter Trock from McMann is accusing David Hugues from Genie to be
responsible and vice versa.

Nicholas Virthe
Sun Coast Entertainment Live LLC
6960 Brescia way
Orlando, Florida , 32819
USA

<u>COMPOSITE EXHIBIT A</u>

[This Page Was Intentionally Left Blank to Separate Statements]

## COMPOSITE EXHIBIT A

**From:** D Wiker ▮▮▮▮▮▮▮▮▮▮
**Sent:** Wednesday, February 28, 2024 10:18 AM
**To:** Bomkamp, Scott E. (USTP) <Scott.E.Bomkamp@usdoj.gov>
**Subject:** [EXTERNAL] Genie/McMann Fraud

Mr. Bomkamp

When I was introduced to David Hughes, it was through a woman named Michelle, a credit repair agent, who informed me about financing options for a business line of credit. Initially, she attempted to charge me $50,000 to initiate the line of credit commitment through a Wyoming company named Star Enterprises LLC. After realizing Star Enterprises was a scam, I contacted David Hughes directly. He instructed me to fill out information on the Zoomeral website, promising a swift provision of a term sheet and loan commitment. He assured me that everyone gets funded, citing the use of a hedge fund for financing.

Subsequently, I paid upfront interest of $180,000 to finalize the LOC. However, David's attitude shifted dramatically afterward. He became rude, combative, and distanced himself from Genie, claiming they were separate entities and that Genie had been defrauded, resulting in a refusal to fund loans.

Later, I discovered they were still issuing term sheets under a different profile, albeit with similar premises. The only noticeable difference was the bank account for wiring funds, changing from Chase Bank to TD Bank.

Recently, David Hughes contacted me, stating he was raising legal funds to reimburse my money. However, he insisted that I wire him money first, equivalent to 10% of the previous amount sent. For instance, if I sent $1,000, I could supposedly recover $10,000, and so forth.

I have all my correspondence if needed and access to their lending portal. I'd be happy to share my credentials and you could interact with them directly under my profile.

Respectfully,
Doug Wiker
WW LLC

<u>EXHIBIT B</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| NORTH HAVEN LODGING PARTNERS LLC, a South Dakota limited liability company, and WALLINGFORD LODGING PARTNERS LLC, a South Dakota limited liability company, | ) ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:23-cv-16264 |
| | ) | |
| vs. | ) | |
| | ) | |
| MCMANN COMMERCIAL LENDING LLC n/k/a MCMANN PROFESSIONAL SERVICES LLC and/or MCMANN CAPITAL, an Illinois limited liability company, and GENIE INVESTMENTS NV, a Nevada corporation, | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

## <u>COMPLAINT</u>

Plaintiffs, NORTH HAVEN LODGING PARTNERS LLC, a South Dakota limited liability company ("<u>North Haven</u>"), and WALLINGFORD LODGING PARTNERS LLC, a South Dakota limited liability company ("<u>Wallingford</u>", together with North Haven, the "<u>Plaintiffs</u>"), for their complaint against Defendants, MCMANN COMMERCIAL LENDING LLC n/k/a MCMANN PROFESSIONAL SERVICES LLC and/or MCMANN CAPITAL, an Illinois limited liability company ("<u>McMann</u>"), and GENIE INVESTMENTS NV, a Nevada corporation ("<u>Genie</u>"), together with McMann, the "<u>Defendants</u>"), states as follows:

## <u>NATURE OF ACTION</u>

1.    Plaintiffs bring this action to recover $3,600,000 in funds that the Defendants have wrongfully withheld and willfully refused to return to the Plaintiffs despite both Defendants acknowledging orally and in writing that Plaintiffs are entitled to a return of the funds.  At issue

EXHIBIT B

are two $18,000,000 lines of credits made by McMann to the Plaintiffs.  As part of the lines of

credit, the Plaintiffs were obligated to, and did, prepay $1,800,000 in interest under each line of

credit.  At the direction of McMann, the Plaintiffs wired the prepaid interest directly to Genie to

be held in trust and accounted for pursuant to the loan documents as prepaid interest to be applied

against each of the lines of credit. No other use of the deposit funds was authorized by Plaintiffs.

Pursuant to the loan documents, McMann and/or Genie was obligated to fund each of the lines of

credit, yet McMann and/or Genie failed to do so.  Pursuant to the loan documents, McMann and/or

Genie was obligated to refund the prepaid interest payments if the lines of credit were not funded.

The Plaintiffs have demanded return of the prepaid interest.  Both Defendants have acknowledged

orally and in writing that Genie received the funds and that the Plaintiffs are entitled to a return of

the funds, yet each of the Defendants have failed to return any of the $3,600,000 to the Plaintiffs

in an effort to defraud Plaintiffs.

## THE PARTIES

2.      North Haven is a South Dakota limited liability company with its principal place of

business located at 2517 West Brentridge Circle, Sioux Falls, South Dakota. The members of

North Haven are PB Corporation TN, a Georgia corporation with its principal place of business in

Athens, Georgia, Hari Har Management, Inc. a South Dakota corporation with its principal place

of business in Sioux Falls, South Dakota, and two individuals, who are residents of and domiciled

in Connecticut.

3.      Wallingford is a South Dakota limited liability company with its principal place of

business located at 2517 West Brentridge Circle, Sioux Falls, South Dakota.  The sole member of

Wallingford is an individual who is a resident of and domiciled in South Dakota.

4.      McMann is an Illinois limited liability company with its principal place of business

located at 205 N. Michigan Ave., Ste. 810, Chicago Illinois 60601 and its registered agent located

4889-8151-4893

EXHIBIT B

at 500 Skokie Blvd., Ste. 600, Northbrook, IL 60062.  According to the Illinois Secretary of State records McMann changed its name to McMann Professional Services LLC and/or McMann Capital on or about August 4, 2023.  Upon information and belief, none of the members of McMann are residents of, or domiciled in, Georgia, South Dakota, or Connecticut.

　　　　5.　　　Genie is a Nevada corporation with its principal address in Reno, Nevada.

**JURISDICTION AND VENUE**

　　　　6.　　　This Court has diversity subject matter jurisdiction over this lawsuit under 28 U.S.C. §§ 1332(a)(1) as this action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

　　　　7.　　　Plaintiffs are South Dakota limited liability companies whose members are citizens of Georgia, South Dakota, and/or Connecticut.

　　　　8.　　　Defendant McMann is an Illinois limited liability company and upon information and belief, and based upon a reasonable pre-suit investigation, none of the members of McMann are citizens of Georgia, South Dakota, or Connecticut.

　　　　9.　　　Defendant Genie is a Nevada corporation with its principal place of business in Reno, Nevada.

　　　　10.　　This Court has personal jurisdiction over each of the parties to this matter.  The Plaintiffs have conducted business with McMann, an Illinois limited liability company.  The Defendants have conducted and presently conduct business in Illinois.  McMann is an Illinois limited liability with its principal place of business in this state and in this district.  Genie has conducted and presently conducts business in this state and in this district by conducting business for and on behalf of McMann both as related to the two lines of credit at issue and, upon information and belief, as to other loans made by McMann to other McMann borrowers.  One of

3

4889-8151-4893

EXHIBIT B

Genie's officers, David Hughes, who has directly interacted with Plaintiffs related to the lines of credit at issue, resides in the state of Illinois and has conducted business within this state as related to the two lines of credit, and upon information and belief related to other transactions with McMann. Genie is subject to personal jurisdiction in accordance with Illinois' long-arm statute, which provides, in relevant part:

> Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person . . . to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts: (1) The transaction of any business within this State . . . .

735 ILCS 5/2-209(a).

11.    This Court is the proper venue for this lawsuit under 28 U.S.C. § 1391(a) because the events giving rise to Plaintiff's claim against the Defendants occurred in this judicial district.

## FACTS

### Loan to North Haven

12.    On or about April 10, 2023, McMann, through Walter Trock, Michael Lanza, and others, agreed to make a loan to North Haven in the form of a $18,000,000 line of credit, with a maximum amount of $18,600,000 ("North Haven Loan").

13.    The purpose of the line of credit was for the construction of a 105-room limited-service hotel.

14.    The North Haven Loan is governed by that certain Business Expansion Line of Credit Agreement ("North Haven BELOC") dated April 10, 2023 made by and between North Haven and McMann. Walter Trock executed the North Haven BELOC for McMann.  A copy of the North Haven BELOC is attached as **Exhibit 1**.

4889-8151-4893

<u>EXHIBIT B</u>

15.     The North Haven Loan is evidenced by that certain Promissory Note dated April 10, 2023 in the principal amount of $18,600,000 ("<u>North Haven Note</u>") made by North Haven in favor of McMann.  The North Haven Note is attached to the North Haven BELOC as Exhibit A. *See* Ex. 1 North Haven BELOC, Ex. A.

16.     The North Haven Loan is secured by that certain Security Agreement dated April 10, 2023 made by North Haven in favor of McMann ("<u>North Haven Security Agreement</u>").  The North Haven Security Agreement is attached to the North Haven BELOC as Exhibit E. *See* Ex. 1 North Haven BELOC, Ex. E.

17.     The North Haven BELOC required North Haven to pay $1,800,000 to McMann as prepaid interest for the North Haven Loan ("<u>North Haven ICA Payment</u>").

18.     The North Haven BELOC required McMann to establish on McMann's books and records an interest credit account for the North Haven ICA Payment ("<u>North Haven ICA</u>") so that interest payments on the North Haven Loan would first be satisfied by using the North Haven ICA Payment.  *See* Ex. 1, North Haven BELOC, Recitals C, D; §3.5.

19.     The North Haven BELOC required McMann to fund the advances under the North Haven Loan pursuant to the parties' agreed upon schedule, with the first funding advance to occur within seventy-five (75) days of the ICA Payment. *See* Ex. 1, North Haven BELOC, §7.1 and Ex. B, Tranche Schedule.

20.     The Plaintiffs reasonably relied on McMann's, Trock's, and Lanza's promises, agreement, and statements to fund the North Haven Loan in accordance with the parties' agreements.

21.     In reliance on McMann's, Trock's, and Lanza's assurances, the Plaintiffs paid the North Haven ICA Payment.

4889-8151-4893

<u>EXHIBIT B</u>

22.    On April 10, 2023, McMann directed North Haven to wire the North Haven ICA Payment to a bank account at Chase Bank, Account Number xxxxx8502, titled in the name "Genie Investments NV."

23.    On April 10, 2023, North Haven wired the North Haven ICA Payment as instructed by McMann to the Chase Bank Account, Account Number xxxxx8502.

24.    Both McMann and Genie have confirmed in writing that Genie received the North Haven ICA Payment.

**Loan to Wallingford**

25.    On or about April 10, 2023, McMann, through Walter Trock, Michael Lanza, and others, agreed to make a loan to Wallingford in the form of a $18,000,000 line of credit, with a maximum amount of $18,600,000 ("<u>Wallingford</u> <u>Loan</u>").

26.    The purpose of the line of credit was for the construction of a 105-room limited-service hotel.

27.    The Wallingford Loan is governed by that certain Business Expansion Line of Credit Agreement ("<u>Wallingford BELOC</u>" together with the North Haven BELOC, the "<u>BELOCs</u>") dated April 10, 2023 made by and between Wallingford and McMann. Walter Trock executed the Wallingford BELOC for McMann. A copy of the Wallingford BELOC is attached as **<u>Exhibit 2</u>**.

28.    The Wallingford Loan is evidenced by that certain Promissory Note dated April 10, 2023 in the principal amount of $18,600,000 ("<u>Wallingford Note</u>") made by Wallingford in favor of McMann. The Wallingford Note is attached to the Wallingford BELOC as Exhibit A. *See* Ex. 2, Wallingford BELOC, Ex. A.

29.    The Wallingford Loan is secured by that certain Security Agreement dated April 10, 2023 made by Wallingford in favor of McMann ("<u>Wallingford Security Agreement</u>"). The

6

<u>EXHIBIT B</u>

Wallingford Security Agreement is attached to the Wallingford BELOC as Exhibit E. *See* Ex. 2, Wallingford BELOC, Ex. E.

30.    The Wallingford BELOC required North Haven to pay $1,800,000 to McMann as prepaid interest for the Wallingford Loan ("<u>Wallingford ICA Payment</u>" together with the North Haven ICA Payment, the "<u>ICA Payments</u>").

31.    The Wallingford BELOC required McMann to establish on McMann's books and records an interest credit account for the Wallingford ICA Payment ("<u>Wallingford ICA</u>") so that interest payments on the Wallingford Loan would first be satisfied by using the Wallingford ICA Payment.  *See* Ex. 2, Wallingford BELOC, Recitals C, D; §3.5.

32.    The Wallingford BELOC required McMann to fund the advances under the Wallingford Loan pursuant to the parties' agreed upon schedule, with the first funding advance to occur within seventy-five (75) days of the ICA Payment. *See* Ex. 2, Wallingford BELOC, §7.1 and Ex. B, Tranche Schedule.

33.    The Plaintiffs reasonably relied on McMann's, Trock's, and Lanza's promises, agreement, and statements to fund the Wallingford Loan in accordance with the parties' agreements.

34.    In reliance on McMann's, Trock's, and Lanza's assurances, the Plaintiffs paid the Wallingford ICA Payment.

35.    On April 10, 2023, McMann directed Wallingford to wire the Wallingford ICA Payment to a bank account at Chase Bank, Account Number xxxxx8502, titled in the name "Genie Investments NV."

36.    On April 10, 2023, Wallingford wired the Wallingford ICA Payment as instructed by McMann to the Chase Bank Account, Account Number xxxxx8502.

4889-8151-4893

<u>EXHIBIT B</u>

37.    Both McMann and Genie have confirmed in writing that Genie received the Wallingford ICA Payment.

**McMann's Breach of the North Haven Loan and Wallingford Loan and Plaintiffs' Demand for Refund**

38.    McMann failed to fund both the North Haven Loan and Wallingford Loan as required by the BELOCs.

39.    The North Haven BELOC provides North Haven the right to terminate the agreement and demand refund of the North Haven ICA Payment in the event that McMann fails to timely fund the North Haven Loan.  Specifically, Section 13.7(a) of the North Haven BELOC provides:

> Upon the occurrence of such default, Borrower shall deliver a written notice in the form of a notarized termination letter, a copy of which is attached hereto as Exhibit F ("the Termination Letter"), to Lender by certified mail. Upon receipt of such notice, **Lender shall have forty (40) international business-banking days from the date of receipt ("Refund Period") within which to return the ICA Payment to the Borrower**….

Exhibit 1, §13.7(a) (emphasis added).

40.    The Wallingford BELOC provides Wallingford the right to terminate the agreement and demand refund of the Wallingford ICA Payment in the event that McMann fails to timely fund the Wallingford Loan.  Specifically, Section 13.7(a) of the Wallingford BELOC provides:

> Upon the occurrence of such default, Borrower shall deliver a written notice in the form of a notarized termination letter, a copy of which is attached hereto as Exhibit F ("the Termination Letter"), to Lender by certified mail. Upon receipt of such notice, **Lender shall have forty (40) international business-banking days from the date of receipt ("Refund Period") within which to return the ICA Payment to the Borrower**….

<u>EXHIBIT B</u>

Exhibit 2, §13.7(a) (emphasis added).

41.    On August 17, 2023, North Haven and Wallingford each tendered a Termination Letter for each of the North Haven Loan and Wallingford Loan pursuant to the BELOCs and demanded a refund of each of the ICA Payments (the "<u>Termination Notices</u>").  A copy of each of the Termination Letters is attached as **<u>Exhibit 3.</u>** The Termination Notices were provided to both McMann and Genie via a communication platform utilized by McMann and Genie called Zoomeral.

42.    Pursuant to the BELOCs, McMann was obligated to refund the ICA Payments on or before October 17, 2023.

43.    Upon information and belief, McMann did not have the loan funds to fund either the North Haven Loan or Wallingford Loan when it entered into the BELOCs.

44.    To date, McMann has failed to refund the North Haven ICA Payment and the Wallingford ICA Payment.

**McMann Provides False Oral and Written Information to Plaintiffs**

45.    Instead of refunding the ICA Payments as required by the loan documents, McMann has engaged in a series of false oral and written statements.

46.    On or about October 16, 2023, Walter Trock, Senior Managing Partner of McMann sent a series of text messages to Preet Patel, a representative of the Plaintiffs, in which Mr. Trock assured the Plaintiffs that McMann would obtain a refund from Genie for the Plaintiffs despite McMann's own obligation to provide a refund to Plaintiffs.

47.    Mr. Trock also falsely stated to the Plaintiffs that this is the first time Genie has refused to refund money to a McMann borrower.  As the Plaintiffs unfortunately learned later,

<u>EXHIBIT B</u>

McMann and Genie have engaged in similar misconduct and apparent fraud for a host of other borrowers.

48.    The Plaintiffs reasonably relied on McMann's and Mr. Trock's representations and actions and believed that McMann would obtain a refund of the ICA Payments.

49.    On October 24, 2023, counsel for McMann sent a demand letter to Genie demanding that Genie immediately refund the ICA Payments to Plaintiffs.  A copy of the October 24, 2023 letter is attached as **<u>Exhibit 4.</u>**

50.    The October 24, 2023 letter also makes a series of admissions that confirm Plaintiffs' entitlement to the return of the ICA Payments and confirm McMann's and Genie's liability to the Plaintiffs.

51.    Specifically, McMann admits:

a.    Genie received payment of each of the ICA Payments on May 3, 2023;

b.    Genie was obligated to hold the ICA Payments in trust for the benefit of the Plaintiffs;

c.    The Plaintiffs properly terminated the BELOCs;

d.    The Plaintiffs properly exercised their rights under Section 13.7 of the BELOCs and demanded refund of the ICA Payments;

e.    The Plaintiffs have complied with every term of the BELOCs;

f.    Genie properly received notice of the Plaintiffs' termination of the BELOCs and demand of refund of the ICA Payments;

g.    Genie admitted that the Plaintiffs' are entitled to a refund of the ICA Payments;

h.    Genie promised to refund the refund of the ICA Payments on or before October 13, 2023; and

i.    The Plaintiffs are entitled to the immediate return of the ICA Payments and there is no legal or good faith basis that these funds should not be returned.

4889-8151-4893

<u>EXHIBIT B</u>

52.     McMann has falsely stated orally and in writing that it will refund ICA Payments.

53.     Despite McMann's written and oral representations, statements, assurances, and promises, McMann continues to refuse to refund the ICA Payments.

54.     The Plaintiffs reasonably relied on McMann's continued assurances and promises that it will refund the ICA Payments and the Plaintiffs believed that McMann would obtain and issue a refund of the ICA Payments.

**Genie and David Hughes Provides False Oral and Written Information to Plaintiffs**

55.     Genie has admitted and acknowledged orally and in writing that it received the ICA Payments.

56.     On August 18, 2023, the Plaintiffs provided Genie notice that the Plaintiffs exercised their rights under the BELOCs and terminated the agreements.

57.     On August 18, 2023, the Plaintiffs demanded a refund of the ICA Payments.

58.     Instead of refunding the ICA Payments as required, Genie, through its Director, David Hughes has engaged in a series of oral and written false statements to induce the Plaintiffs into believing that Genie will refund the ICA Payments.

59.     On September 14, 2023, Genie represented, in writing via Zoomeral, that it would refund the ICA Payments on October 13, 2023.  *See* Exhibit E to Complaint Exhibit 4.

60.     Additionally, on October 11, 2023 David Hughes confirmed to Plaintiffs there was "nothing" to be done when asked by Preet Patel (representative of Plaintiffs) "nothing on our end left to do re: refund this week correct?"

61.     Genie and David Hughes also orally confirmed to the Plaintiffs that the Plaintiffs were entitled to the refund of the ICA Payments during multiple telephone discussions. The most recent confirmation of entitlement to a refund was provided during a October 17, 2023 telephone

<u>EXHIBIT B</u>

discussion with David Hughes wherein Hughes assured Plaintiffs that Genie had never failed to make an ICA refund in the past. As the Plaintiffs unfortunately learned later, McMann and Genie have engaged in similar misconduct and apparent fraud for a host of other borrowers.

62.    Genie knew these representations were materially false when made because Genie did not have the funds to refund the ICA Payments. As the Plaintiffs unfortunately learned later, McMann and Genie have engaged in similar misconduct and apparent fraud for a host of other borrowers.

63.    The Plaintiffs reasonably relied on Genie's representations that it would refund the ICA Payments on October 13, 2023.

64.    Instead of refunding the payments on October 13, 2023, Genie, through its counsel Adam Walker of Walker Law Office, LLC sent a letter to the Plaintiffs for each of the loans alleging it is unable to refund the ICA Payments at this time because of "the ongoing failure of its capital provider to comply with its contractual obligations to provide funds to Genie."   A copy of the October 13, 2023 letters are attached as **<u>Group Exhibit 5</u>**.

65.    Genie's October 13, 2023 letter is an admission that it unlawfully transferred the ICA Payments and did not hold those funds in trust for the benefit of the Plaintiffs are required by the BELOC and obligations delegated to Genie by McMann related to the ICA Payments.

66.    Specifically, Genie stated that it is working to "compel the capital provider to deliver the funds it owes, so that Genie can, in turn, provide refunds to its borrowers." Ex. 5.

67.    In other words, Genie admitted that it no longer has the ICA Payments in its possession and control.  Instead, Genie admits that it used the ICA Payments for an unauthorized purpose and was apparently relying on another third-party to pay funds to Genie and Genie would

4889-8151-4893

EXHIBIT B

then in turn pay those funds to the Plaintiffs for refund of the ICA Payments.  Plaintiffs never authorized any other use of their funds other than to be held in trust pursuant to the BELOCs.

**McMann Misappropriates the ICA Payments and Violates its Fiduciary Duties to the Plaintiffs**

68.    The BELOCs require McMann to hold the ICA Payments in trust to be used to repay the Loans pursuant to each of the BELOC agreements.

69.    Specifically, the BELOCs required McMann to establish an Interest Reserve Account and to account for the ICA Payments on McMann's books and records and apply a credit equal to the amount of each payment "purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein" Exs. 1 and 2, Recitals C, D.

70.    Likewise, Section 3.5 of the BELOCs required McMann to pay interest on the Loans directly from the ICA Payments. Exs. 1 and 2, §3.5.

71.    McMann agreed to repay the ICA Payments within 40 business days of its default under the Loans. Exs. 1 and 2, §13.7(b).

72.    McMann owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

73.    McMann owed a fiduciary duty to the Plaintiffs to act in accordance with the BELOCs, including to hold the funds in trust, apply the funds pursuant to the parties' agreement, and return the funds as required by the BELOCs.

74.    McMann breached its fiduciary duties and misappropriated the ICA Payments by, among other breaches:

      a.    Failing to hold the ICA Payments in trust and safeguard those funds;

      b.    Failing to establish the Interest Reserve Accounts;

      c.    Failing to account for the ICA Payments on McMann's books and records;

13

EXHIBIT B

    d.      Failing to comply with the terms of the BELOCs; and

    e.      Failing to return the ICA Payments as required by the BELOCs.

75.    McMann also violated its fiduciary duties to the Plaintiffs and the terms of the BELOCs by sending the ICA Payments to Genie when it knew Genie was not a trustworthy fiduciary of those funds, thus diverting and converting those funds.

76.    McMann was aware, prior to the transfer of the ICA Payments, that Genie was not a trustworthy fiduciary because, upon information and belief, Genie and McMann previously refused and were unable to fund other loans and previously refused and were unable to refund other similar prepaid interest payments for other McMann borrowers.

77.    The Plaintiffs reasonably relied on McMann and reasonably believed that McMann would honor its fiduciary duties to the Plaintiffs.

78.    As a result of the Plaintiffs' reliance and beliefs, the Plaintiffs have suffered damages.

**Genie Misappropriates the ICA Payments and Violates its Fiduciary Duties to the Plaintiffs**

79.    Upon information and belief, Genie drafted and provided to McMann the loan documents for each of the North Haven and Wallingford Loans and directed McMann on how to use the loan documents. McMann and Genie were effectively partners in issuing the loans to Plaintiffs.

80.    Upon information and belief, Genie was aware of the terms of each of the Loans.

81.    Upon information and belief, Genie was aware that the ICA Payments were to be held in trust and safeguarded so the funds could be applied pursuant to the BELOCs and Genie directed that wiring instructions state that the ICA Payments were to be wired directly to Genie.

14

<u>EXHIBIT B</u>

82.     Upon information and belief, Genie agreed to hold the ICA Payments in trust and safeguard those funds for the benefit of Plaintiffs.

83.     Genie received each of the ICA Payments into Genie's Chase Bank Account Number xxxxx8502 on or about May 3, 2023.

84.     Genie owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

85.     Upon information and belief, Genie transferred the ICA Payments from its Chase Bank Account Number xxxxx8502 to another location, thus diverting and converting those funds.

86.     Genie did not hold the ICA Payments in trust so the funds could be applied pursuant to the BELOCs.

87.     Genie admits that it is obligated to return the ICA Payments to the Plaintiffs.

88.     Plaintiffs (and McMann) has demanded that Genie return the ICA Payments to the Plaintiffs.

89.     Genie promised to refund the ICA Payments by October 13, 2023.

90.     Genie breached its fiduciary duties and misappropriated the ICA Payments by, among other breaches:

        a.      Failing to hold the ICA Payments in trust and safeguard those funds; and

        b.      Failing to return the ICA Payments as it agreed to do and as directed by McMann.

91.     The Plaintiffs reasonably relied on Genie and reasonably believed that Genie would honor its fiduciary duties to the Plaintiffs.

92.     As a result of the Plaintiffs' reliance and beliefs, the Plaintiffs have suffered damages.

4889-8151-4893

<u>EXHIBIT B</u>

<b><u>COUNT I</u></b>
<b><u>BREACH OF CONTRACT</u></b>
<b>(against McMann)</b>

93.     The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

94.     The BELOCs and Loan Documents are legally valid, binding and enforceable agreements.

95.     Pursuant to the BELOCs, McMann agreed to provide the Loans to the Plaintiffs in exchange for, among other consideration, payment of the ICA Payments.

96.     The Plaintiffs paid the ICA Payments pursuant to the BELOCs.

97.     Pursuant to the BELOCs, McMann agreed to refund the ICA Payments within 40 business days of receipt of the Termination Notices.

98.     McMann admits that the BELOCs are valid and binding agreements.

99.     McMann defaulted under the terms of the BELOCs.

100.    The Plaintiffs properly exercised their rights to terminate the BELOCs, properly provided the Termination Notices, and are entitled to the immediate refund of the ICA Payments.

101.    The Plaintiffs have fully performed all obligations under the BELOCs.

102.    McMann has no legally recognized justification or excuse for breaching the BELOCs and Loan Documents.

103.    McMann has no legally recognized justification or excuse for refusing to refund the ICA Payments.

104.    The Plaintiffs are entitled to a return of the ICA Payments.

105.    McMann has breached the BELOCs and Loan Documents by, among other breaches:

4889-8151-4893

EXHIBIT B

    a.       Failing to fund each of the Loans;

    b.       Failing to hold the ICA Payments in trust and safeguard those funds;

    c.       Failing to establish the Interest Reserve Accounts;

    d.       Failing to account for the ICA Payments on McMann's books and records;

    e.       Failing to comply with the terms of the BELOCs; and

    f.       Failing to refund the ICA Payments within 40 business days from receipt of the Termination Notices.

106.    The Plaintiffs have been damaged as a result of each and every breach of the BELOCs and Loan Documents in an amount not less than $3,600,000.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

    A.       Awarding the Plaintiffs $3,600,000 for McMann's breach of the BELOCs and Loan Documents;

    B.       Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

    C.       Awarding the Plaintiffs their costs and attorney's fees, as provided by the BELOCs and applicable law; and

    D.       Grant the Plaintiffs such other relief as this Court deems just.

**COUNT II**
**CONVERSION**
**(against McMann)**

107.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

108.    The BELOCs and Loan Documents are legally valid, binding and enforceable agreements.

109.    Pursuant to the BELOCs, McMann agreed to provide the Loans to the Plaintiffs in exchange for, among other consideration, payment of the ICA Payments.

EXHIBIT B

110.    The Plaintiffs paid the ICA Payments pursuant to the BELOCs.

111.    The BELOCs require McMann to hold the ICA Payments in trust to be used solely to repay the Loans pursuant to each of the BELOC agreements.

112.    Specifically, the BELOCs required McMann to establish an Interest Reserve Account and to account for the ICA Payments on McMann's books and records and apply a credit equal to the amount of each payment for the "purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein" Exs. 1 and 2, Recitals C, D.

113.    Likewise, Section 3.5 of the BELOCs required McMann to pay interest on the Loans directly from the ICA Payments. Exs. 1 and 2, §3.5.

114.    Pursuant to the BELOCs, McMann agreed to refund the ICA Payments within 40 business days of receipt of the Termination Notices.

115.    McMann admits that the BELOCs are valid and binding agreements.

116.    McMann admits that the Plaintiffs properly and fully paid the ICA Payments.

117.    McMann defaulted under the terms of the BELOCs.

118.    McMann has no legally recognized justification or excuse for breaching the BELOC and Loan Documents.

119.    McMann has no legally recognized justification or excuse for refusing to refund the ICA Payments.

120.    The Plaintiffs properly exercised their rights to terminate the BELOCs, properly provided the Termination Notices, and are entitled to the immediate refund of the ICA Payments.

121.    The Plaintiffs have fully performed all obligations under the BELOCs.

122.    The Plaintiffs are entitled to a return of the ICA Payments.

123.    The Plaintiffs demanded return of the ICA Payments.

18

EXHIBIT B

124.    McMann is obligated to return the ICA Payments within 40 days of receipt of the Termination Notices.

125.    McMann has exercised unauthorized and wrongful assumption of control, dominion, or ownership of the ICA Payments.

126.    McMann has wrongfully refused to return the ICA Payments.

127.    The ICA Payments are the Plaintiffs lawful property.

128.    The Plaintiffs are absolutely and unconditionally entitled to the immediate possession of the ICA Payments.

129.    McMann has unlawfully converted the ICA Payments. McMann's conduct as alleged herein was willful and wanton and McMann acted with actual malice, fraud, and/or gross negligence.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

    A.    Awarding the Plaintiffs $3,600,000 for McMann's conversion of the ICA Payments;

    B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

    C.    Awarding punitive damages in an amount to be proven at trial;

    D.    Awarding the Plaintiffs their costs and attorney's fees, as provided by the BELOCs and applicable law; and

    E.    Grant the Plaintiffs such other relief as this Court deems just.

## COUNT III
## TO AVOID AND RECOVER ACTUAL FRAUDULENT TRANSFER
### (against McMann)

130.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

4889-8151-4893

EXHIBIT B

131.    On or about May 3, 2023, McMann caused the ICA Payments to be transferred to

Genie into Chase Bank Account Number xxxxx8502.

132.    After May 3, 2023, upon information and belief the ICA Payments were transferred

from the Chase Bank Account Number xxxxx8502 to another source.

133.    740 ILCS 160/5 provides, in relevant part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent
> as to a creditor, whether the creditor's claim arose before or after the
> transfer was made or the obligation was incurred, if the debtor made
> the transfer or incurred the obligation:
>
>> (1) with actual intent to hinder, delay, or defraud any creditor
>> of the debtor . . .
>>      . . . .
>
> (b) In determining actual intent under paragraph (1) of subsection
> (a), consideration may be given, among other factors, to whether:
>
>> (1) the transfer or obligation was to an insider;
>>
>> (2) the debtor retained possession or control of the property
>> transferred after the transfer;
>>
>> (3) the transfer or obligation was disclosed or concealed;
>>
>> (4) before the transfer was made or obligation was incurred, the
>> debtor had been sued or threatened with suit;
>>
>> (5) the transfer was of substantially all the debtor's assets;
>>
>> (6) the debtor absconded;
>>
>> (7) the debtor removed or concealed assets;
>>
>> (8) the value of the consideration received by the debtor was
>> reasonably equivalent to the value of the asset transferred or the
>> amount of the obligation incurred;
>>
>> (9) the debtor was insolvent or became insolvent shortly after
>> the transfer was made or the obligation was incurred;
>>
>> (10) the transfer occurred shortly before or shortly after a
>> substantial debt was incurred; and
>>
>> (11) the debtor transferred the essential assets of the business to
>> a lienor who transferred the assets to an insider of the debtor.

134.    740 ILCS 106/8 provides:

EXHIBIT B

(a) In an action for relief against a transfer or obligation under this Act, a creditor, subject to the limitations in Section 9, may obtain:

(1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by the Code of Civil Procedure;

(3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure,

(A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(C) any other relief the circumstances may require.

(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

135.    McMann's transfer of the ICA Payments was a fraudulent conveyance because, among other reasons:

a.    The transfer was made with actual intent to hinder, delay, or defraud McMann's creditors, namely the Plaintiffs;

b.    Genie is an insider of McMann;

c.    The transfer was concealed from the Plaintiffs;

d.    The transfer was intended to conceal or remove McMann's assets;

e.    Upon information and belief the value of the consideration received by McMann in exchange for the transfer to Genie was not reasonably equivalent to the assets transferred; in fact, McMann received no consideration for the transfer; and

f.    McMann was insolvent or became insolvent shortly after the transfer as evidenced by its inability to funds the Loans and return the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

4889-8151-4893

<u>EXHIBIT B</u>

A.      Avoiding the $3,600,000 transfer from Genie to an unknown source to the extent necessary to satisfy the Plaintiffs' claim;

B.      Permitting an attachment or other provisional remedy against the transferred funds or other property of McMann in accordance with the procedure prescribed by the Illinois Code of Civil Procedures;

C.      Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

D.      Awarding punitive damages in an amount to be proven at trial as McMann's conduct as alleged herein was willful and wanton and McMann acted with actual malice, fraud, and/or gross negligence;

E.      Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

F.      Grant the Plaintiffs such other relief as this Court deems just.

<u>**COUNT IV**</u>
**<u>TO AVOID AND RECOVER CONSTRUCTIVE FRAUDULENT TRANSFER</u>**
**(against McMann)**

136.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

137.    On or about May 3, 2023, McMann caused the ICA Payments to be transferred to Genie into Chase Bank Account Number xxxxx8502.

138.    After May 3, 2023, upon information and belief, the ICA Payments were transferred from the Chase Bank Account Number xxxxx8502 to another source.

139.    740 ILCS 160/5(a)(2) provides, in relevant part:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
                   * * *
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

EXHIBIT B

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they become due.

140.    740 ILCS 106/6(a) provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

141.    The Plaintiffs' claim arose before the transfer was made.

142.    Upon information and belief, the value of the consideration received by McMann in exchange for the transfer to Genie was not reasonably equivalent to the assets transferred; in fact, McMann received no consideration for the transfer.

143.    Upon information and belief, the transfer occurred shortly after the Plaintiffs made the ICA Payments.

144.    McMann believed, or reasonably should have believed that it would incur debts beyond its ability to repay because McMann knew it could not fund the Loans and knew that Genie was an untrustworthy custodian of the ICA Payments.

145.    McMann was insolvent or became insolvent shortly after the transfer as evidenced by its inability to fund the Loans and return the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

A.    Avoiding the $3,600,000 transfer from Genie to an unknown source to the extent necessary to satisfy the Plaintiffs' claim;

23

EXHIBIT B

B.      Permitting an attachment or other provisional remedy against the transferred funds or other property of McMann in accordance with the procedure prescribed by the Illinois Code of Civil Procedures;

C.      Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

D.      Awarding punitive damages in an amount to be proven at trial as McMann's conduct as alleged herein was willful and wanton and McMann acted with actual malice, fraud, and/or gross negligence;

E.      Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

F.      Grant the Plaintiffs such other relief as this Court deems just.

## COUNT V
## FRAUD AND FRAUDULENT MISREPRESENTATIONS
### (against McMann)

146.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

147.    As alleged above, McMann entered into the BELOCs and Loan Documents and obtained payment of the ICA Payments by use of false oral and written statements that were materially false, including but not limited to:

a.      McMann's ability to fund the Loans;

b.      McMann's agreement to hold in trust and safeguard the ICA Payments; and

c.      McMann's ability and agreement to refund the ICA Payments, if and when required.

148.    The statements amounted to false pretenses, were false representations, were false when made, and were in service of an actual fraud.

149.    McMann knew that the aforesaid misrepresentations were untrue and omissions misleading.

24

<u>EXHIBIT B</u>

150.    Each of the aforesaid misrepresentations and omissions were made with the intent that the Plaintiffs would rely on them to enter into the Loans and pay the ICA Payments.

151.    The Plaintiffs did in fact rely on each of the alleged omissions and misrepresentations in entering into the Loans and paying the ICA Payments.

152.    But for McMann's material omissions and misrepresentations as alleged above, the Plaintiffs would not have entered into the Loans and would not have paid the ICA Payments.

153.    The Plaintiffs justifiably relied upon McMann's material omissions and misrepresentations of fact.

154.    As a direct and proximate result of McMann's material omissions and misrepresentations of fact, the Plaintiffs have been damaged in an amount in excess of $3,600,000. McMann's conduct as alleged herein was willful and wanton and McMann acted with actual malice, fraud, and/or gross negligence.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

A.    Awarding the Plaintiffs $3,600,000;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding punitive damages in an amount to be proven at trial;

D.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

E.    Grant the Plaintiffs such other relief as this Court deems just.

**<u>COUNT VI</u>**
**<u>BREACH OF FIDUCIARY DUTY</u>**
**(against McMann)**

155.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

4889-8151-4893

EXHIBIT B

156.    The BELOCs and Loan Documents are legally valid, binding and enforceable agreements.

157.    Pursuant to the BELOCs, McMann agreed to provide the Loans to the Plaintiffs in exchange for, among other consideration, payment of the ICA Payments.

158.    The Plaintiffs paid the ICA Payments pursuant to the BELOCs.

159.    Pursuant to the BELOCs, McMann agreed to refund the ICA Payments within 40 business days of receipt of the Termination Notices.

160.    McMann owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

161.    McMann owed a fiduciary duty to the Plaintiffs to act in accordance with the BELOCs, including to hold the funds in trust, apply the funds pursuant to the parties' agreement, and return the funds as required by the BELOCs.

162.    McMann breached its fiduciary duties and misappropriated the ICA Payments by, among other breaches:

      a.    Failing to hold the ICA Payments in trust and safeguard those funds;

      b.    Failing to establish the Interest Reserve Accounts;

      c.    Failing to account for the ICA Payments on McMann's books and records;

      d.    Failing to comply with the terms of the BELOCs; and

      e.    Failing to return the ICA Payments as required by the BELOCs.

163.    McMann also violated its fiduciary duties to the Plaintiffs and the terms of the BELOCs by sending the ICA Payments to Genie when it knew Genie was not a trustworthy fiduciary of those funds, thus diverting and converting those funds.

4889-8151-4893

EXHIBIT B

164.    McMann was aware, prior to the transfer of the ICA Payments, that Genie was not a trustworthy fiduciary because, upon information and belief, Genie and McMann previously refused and were unable to fund other loans and previously refused and were unable to refund other similar prepaid interest payments for other McMann borrowers.

165.    The Plaintiffs properly exercised their rights to terminate the BELOCs, properly provided the Termination Notices, and are entitled to the immediate refund of the ICA Payments.

166.    The Plaintiffs have fully performed all obligations under the BELOCs.

167.    The Plaintiffs are entitled to a return of the ICA Payments.

168.    McMann has failed to return the ICA Payments.

169.    The Plaintiffs have been damaged as a result of McMann's breaches of its fiduciary duties in the amount not less than $3,600,000.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

A.    Awarding judgment in the amount of $3,600,000;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

D.    Grant the Plaintiffs such other relief as this Court deems just.

**COUNT VII**
**CONSTRUCTIVE TRUST**
**(against McMann)**

170.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

171.    The BELOCs and Loan Documents are legally valid, binding and enforceable agreements.

EXHIBIT B

172.    Pursuant to the BELOCs, McMann agreed to provide the Loans to the Plaintiffs in exchange for, among other consideration, payment of the ICA Payments.

173.    The Plaintiffs paid the ICA Payments pursuant to the BELOCs.

174.    Pursuant to the BELOCs, McMann agreed to refund the ICA Payments within 40 business days of receipt of the Termination Notices.

175.    McMann owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

176.    McMann owed a fiduciary duty to the Plaintiffs to act in accordance with the BELOCs, including to hold the funds in trust, apply the funds pursuant to the parties' agreement, and return the funds as required by the BELOCs.

177.    McMann breached its fiduciary duties and misappropriated the ICA Payments by, among other breaches:

        a.    Failing to hold the ICA Payments in trust and safeguard those funds;

        b.    Failing to establish the Interest Reserve Accounts;

        c.    Failing to account for the ICA Payments on McMann's books and records;

        d.    Failing to comply with the terms of the BELOCs; and

        e.    Failing to return the ICA Payments as required by the BELOCs.

178.    McMann also violated its fiduciary duties to the Plaintiffs and the terms of the BELOCs by sending the ICA Payments to Genie when it knew Genie was not a trustworthy fiduciary of those funds, thus diverting and converting those funds.

179.    McMann was aware, prior to the transfer of the North Haven ICA Payment and the Wallingford ICA Payment, that Genie was not a trustworthy fiduciary because, upon information and belief, Genie and McMann previously refused and were unable to fund other loans and

28

EXHIBIT B

previously refused and were unable to refund other similar prepaid interest payments for other McMann borrowers.

180.    McMann engaged in actual and constructive fraud that justifies imposition of a constructive trust.

181.    As alleged above, McMann entered into the BELOCs and Loan Documents and obtained payment of the ICA Payments by use of false oral and written statements that were materially false, including but not limited to:

      a.      McMann's ability to fund the Loans;

      b.      McMann's agreement to hold in trust and safeguard the ICA Payments; and

      c.      McMann's ability and agreement to refund the ICA Payments, if and when required.

182.    The statements amounted to false pretenses, were false representations, were false when made, and were in service of an actual fraud.

183.    McMann knew that the aforesaid misrepresentations were untrue and omissions misleading.

184.    Each of the aforesaid misrepresentations and omissions were made with the intent that the Plaintiffs would rely on them to entered into the Loans and pay the ICA Payments.

185.    The Plaintiffs did in fact rely on each of the alleged omissions and misrepresentations in entering into the Loans and paying the ICA Payments.

186.    But for McMann's material omissions and misrepresentations as alleged above, the Plaintiffs would not have entered into the Loans and would not have paid the ICA Payments.

187.    The Plaintiffs justifiably relied upon McMann's material omissions and misrepresentations of fact.

## EXHIBIT B

188.    The Plaintiffs properly exercised their rights to terminate the BELOCs, properly provided the Termination Notices, and are entitled to the immediate refund of the ICA Payments.

189.    The Plaintiffs have fully performed all obligations under the BELOCs.

190.    The Plaintiffs are entitled to a return of the ICA Payments.

191.    McMann has failed to return the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

A.    Establishing a constructive trust for the ICA Payments in the amount of $3,600,000;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

D.    Grant the Plaintiffs such other relief as this Court deems just.

### COUNT VIII
### BREACH OF CONTRACT
**(against Genie)**

192.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

193.    Genie drafted the BELOCs and Loan Documents.

194.    Genie provided drafts of the BELOCs and Loan Documents to McMann.

195.    Genie knew of and understood the terms of the BELOCs and Loan Documents.

196.    At the direction of Genie and McMann, the Plaintiffs paid the ICA Payments into Genie's Chase Bank Account Number xxxxx8502.

197.    Genie received payment of the ICA Payments.

EXHIBIT B

198.    Genie knew of its duty and obligation to, and agreed to, hold the ICA Payments in trust for the benefit of the Plaintiffs to be used in accordance with the BELOCs and Loan Documents.

199.    Following receipt of the ICA Payments, Genie received copies of the Termination Notices.

200.    Genie knew and currently knows that the Plaintiffs exercised their rights to terminate the BELOCs and Loan Documents and that the Plaintiffs are entitled to the immediate return of the ICA Payments.

201.    The Plaintiffs made demand on Genie for a return of the ICA Payments.

202.    McMann made demand on Genie for a return of the ICA Payments.

203.    Genie, through oral and written agreements, agreed to return the ICA Payments to the Plaintiffs no later than October 13, 2023.

204.    The oral and written agreements to refund the ICA Payments are legally valid, binding and enforceable agreements.

205.    The Plaintiffs have performed all of their obligations under the oral and written agreements.

206.    Genie materially breached the oral and written agreements by failing to return the ICA Payments.

207.    Genie has no legally recognized justification or excuse for breaching the oral and written agreements.

208.    The Plaintiffs have been damaged as a result of Genie's breach of the oral and written agreements in an amount not less than $3,600,000.

4889-8151-4893

EXHIBIT B

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.    Awarding the Plaintiffs $3,600,000 for Genie's breach of the oral and written agreements;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

D.    Grant the Plaintiffs such other relief as this Court deems just.

**COUNT IX**
**CONVERSION**
**(against Genie)**

209.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

210.    Genie drafted the BELOCs and Loan Documents.

211.    Genie provided drafts of the BELOCs and Loan Documents to McMann.

212.    Genie knew of and understood the terms of the BELOCs and Loan Documents.

213.    At the direction of Genie and McMann, the Plaintiffs paid the ICA Payments into Genie's Chase Bank Account Number xxxxx8502.

214.    Genie received payment of the ICA Payments.

215.    Genie owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

216.    Genie owed a fiduciary duty to the Plaintiffs to act in accordance with the BELOCs, including to hold the funds in trust, apply the funds pursuant to the parties' agreement, and return the funds as required by the BELOCs.

4889-8151-4893

<u>EXHIBIT B</u>

217.    Genie knew of its duty and obligation to, and agreed to, hold the ICA Payments in trust for the benefit of the Plaintiffs to be used in accordance with the BELOCs  and Loan Documents.

218.    Following receipt of the ICA Payments, Genie received copies of the Termination Notices.

219.    Genie knew and currently knows that the Plaintiffs exercised their rights to terminate the BELOCs and Loan Documents and that the Plaintiffs are entitled to the immediate return of the ICA Payments.

220.    The Plaintiffs made demand on Genie for a return of the ICA Payments.

221.    McMann made demand on Genie for a return of the ICA Payments.

222.    Genie, through oral and written agreements, agreed to return the ICA Payments to the Plaintiffs no later than October 13, 2023.

223.    The oral and written agreements to refund the ICA Payments are legally valid, binding and enforceable agreements.

224.    The Plaintiffs have performed all of their obligations under the oral and written agreements.

225.    Genie materially breached the oral and written agreements by failing to return the ICA Payments.

226.    The Plaintiffs are entitled to a return of the ICA Payments.

227.    The Plaintiffs demanded return of the ICA Payments.

228.    Genie is obligated to return the ICA Payments.

229.    Genie has exercised unauthorized and wrongful assumption of control, dominion, or ownership of the ICA Payments.

4889-8151-4893

EXHIBIT B

230.    Genie has wrongfully refused to return the ICA Payments.

231.    The ICA Payments are the Plaintiffs lawful property.

232.    The Plaintiffs are absolutely and unconditionally entitled to the immediate possession of the ICA Payments.

233.    Genie has unlawfully converted the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.    Awarding the Plaintiffs $3,600,000 for Genie's conversion of the ICA Payments;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding punitive damages in an amount to be proven at trial as Genie's conduct as alleged herein was willful and wanton and Genie acted with actual malice, fraud, and/or gross negligence;

D.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

E.    Grant the Plaintiffs such other relief as this Court deems just.

**COUNT X**
**TO AVOID AND RECOVER ACTUAL FRAUDULENT TRANSFER**
**(against Genie)**

234.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

235.    On or about May 3, 2023, Genie caused or directed the ICA Payments to be transferred to Genie into Chase Bank Account Number xxxxx8502.

236.    After May 3, 2023, upon information and belief, Genie transferred or caused the ICA Payments to be transferred from the Chase Bank Account Number xxxxx8502 to another source.

237.    740 ILCS 160/5 provides, in relevant part:

4889-8151-4893

<u>EXHIBIT B</u>

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor . . .

. . . .

(b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was disclosed or concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

238.    740 ILCS 106/8 provides:

(a) In an action for relief against a transfer or obligation under this Act, a creditor, subject to the limitations in Section 9, may obtain:

(1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by the Code of Civil Procedure;

(3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure,

4889-8151-4893

<u>EXHIBIT B</u>

(A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(C) any other relief the circumstances may require.

(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

239.    Genie's transfer of the ICA Payments was a fraudulent conveyance because, among other reasons:

a.    The transfer was made with actual intent to hinder, delay, or defraud Genie's creditors, namely the Plaintiffs;

b.    Genie is an insider of McMann;

c.    The transfer was concealed from the Plaintiffs;

d.    The transfer was intended to conceal or remove Genie's assets;

e.    Upon information and belief the value of the consideration received by Genie in exchange for the transfer to Genie was not reasonably equivalent to the assets transferred; in fact, Genie received no consideration for the transfer; and

f.    Genie was insolvent or became insolvent shortly after the transfer as evidenced by its inability to return the ICA Payments and the apparent necessity of a third-party to pay Genie so Genie can refund the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.    Avoiding the $3,600,000 transfer from Genie to an unknown source to the extent necessary to satisfy the Plaintiffs' claim;

B.    Permitting an attachment or other provisional remedy against the transferred funds or other property of Genie in accordance with the procedure prescribed by the Illinois Code of Civil Procedures;

C.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

4889-8151-4893

EXHIBIT B

D.    Awarding punitive damages in an amount to be proven at trial as Genie's conduct as alleged herein was willful and wanton and Genie acted with actual malice, fraud, and/or gross negligence;

E.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

F.    Grant the Plaintiffs such other relief as this Court deems just.

## COUNT XI
## TO AVOID AND RECOVER CONSTRUCTIVE FRAUDULENT TRANSFER
### (against Genie)

240.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

241.    On or about May 3, 2023, Genie caused and directed the ICA Payments to be transferred to Genie into Chase Bank Account Number xxxxx8502.

242.    After May 3, 2023, upon information and belief, Genie transferred or caused the ICA Payments to be transferred from the Chase Bank Account Number xxxxx8502 to another source.

243.    740 ILCS 160/5(a)(2) provides, in relevant part:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
        * * *
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they become due.

244.    740 ILCS 106/6(a) provides:

37

EXHIBIT B

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

245.     The Plaintiffs' claim arose before the transfer was made.

246.     Upon information and belief, the value of the consideration received by Genie in exchange for the transfer from Genie to an unknown source was not reasonably equivalent to the assets transferred; in fact, Genie received no consideration for the transfer.

247.     Upon information and belief, the transfer occurred shortly after the Plaintiffs made the ICA Payments.

248.     Genie believed, or reasonably should have believed that it would incur debts beyond its ability to repay because Genie knew it could not refund the ICA Payments when the transfer was made.

249.     Genie was insolvent or became insolvent shortly after the transfer as evidenced by its inability to return the ICA Payments and the apparent necessity of a third-party to pay Genie so Genie can refund the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.     Avoiding the $3,600,000 transfer from Genie to an unknown source to the extent necessary to satisfy the Plaintiffs' claim;

B.     Permitting an attachment or other provisional remedy against the transferred funds or other property of Genie in accordance with the procedure prescribed by the Illinois Code of Civil Procedures

C.     Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

4889-8151-4893

<u>EXHIBIT B</u>

D.      Awarding punitive damages in an amount to be proven at trial as Genie's conduct
        as alleged herein was willful and wanton and Genie acted with actual malice,
        fraud, and/or gross negligence;

E.      Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

F.      Grant the Plaintiffs such other relief as this Court deems just.

**<u>COUNT XII</u>**
**<u>FRAUD AND FRAUDULENT MISREPRESENTATIONS</u>**
**(against Genie)**

250.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

251.    As alleged above, Genie induced the Plaintiffs to transfer the ICA Payments to Genie at the direction of Genie (through McMann) by use of false representations, including terms included in the BELOCs provided by Genie to McMann, that were materially false, including but not limited to:

        a.      Genie's agreement to hold in trust and safeguard the ICA Payments; and

        b.      Genie's ability and agreement to refund the ICA Payments, if and when
                required.

252.    The statements amounted to false pretenses, were false representations, were false when made, and were in service of an actual fraud.

253.    Genie knew that the aforesaid misrepresentations were untrue and omissions misleading.

254.    Each of the aforesaid misrepresentations and omissions were made with the intent that the Plaintiffs would rely on them to enter into the Loans and pay the ICA Payments.

255.    The Plaintiffs did in fact rely on each of the alleged omissions and misrepresentations in paying the ICA Payments.

EXHIBIT B

256.     But for Genie's material omissions and misrepresentations as alleged above, the Plaintiffs would not have entered into the Loans and would not have paid the ICA Payments.

257.     The Plaintiffs justifiably relied upon Genie's material omissions and misrepresentations of fact.

258.     As a direct and proximate result of Genie's material omissions and misrepresentations of fact, the Plaintiffs have been damaged in an amount in excess of $3,600,000. Genie's conduct as alleged herein was willful and wanton and Genie acted with actual malice, fraud, and/or gross negligence.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.     Awarding the Plaintiffs $3,600,000;

B.     Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.     Awarding punitive damages in an amount to be proven at trial;

D.     Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

E.     Grant the Plaintiffs such other relief as this Court deems just.

**COUNT XIII**
**BREACH OF FIDUCIARY DUTY**
**(against Genie)**

259.     The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

260.     Genie drafted the BELOCs and Loan Documents.

261.     Genie provided drafts of the BELOCs and Loan Documents to McMann.

262.     Genie knew of and understood the terms of the BELOCs and Loan Documents.

4889-8151-4893

<u>EXHIBIT B</u>

263.    At the direction of Genie and McMann, the Plaintiffs paid the ICA Payments into Genie's Chase Bank Account Number xxxxx8502.

264.    Genie received payment of the ICA Payments.

265.    Genie owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

266.    Genie owed a fiduciary duty to the Plaintiffs to act in accordance with the BELOCs, including to hold the funds in trust, apply the funds pursuant to the parties' agreement, and return the funds as required by the BELOCs.

267.    Genie knew of its duty and obligation to, and agreed to, hold the ICA Payments in trust for the benefit of the Plaintiffs to be used in accordance with the BELOCs and Loan Documents.

268.    Following receipt of the ICA Payments, Genie received copies of the Termination Notices.

269.    Genie knew and currently knows that the Plaintiffs exercised their rights to terminate the BELOCs and Loan Documents and that the Plaintiffs are entitled to the immediate return of the ICA Payments.

270.    The Plaintiffs made demand on Genie for a return of the ICA Payments.

271.    McMann made demand on Genie for a return of the ICA Payments.

272.    Genie, through oral and written agreements, agreed to return the ICA Payments to the Plaintiffs no later than October 13, 2023.

273.    The oral and written agreements to refund the ICA Payments are legally valid, binding and enforceable agreements.

<u>EXHIBIT B</u>

274.     Genie breached its fiduciary duties and misappropriated the ICA Payments by, among other breaches:

        a.     Failing to hold the ICA Payments in trust and safeguard those funds; and

        b.     Failing to return the ICA Payments as required by the BELOCs.

275.     The Plaintiffs properly exercised their rights to terminate the BELOCs, properly provided the Termination Notices, and are entitled to the immediate refund of the ICA Payments.

276.     The Plaintiffs have fully performed all obligations under the oral and written agreements.

277.     The Plaintiffs are entitled to a return of the ICA Payments.

278.     Genie has failed to return the ICA Payments.

279.     The Plaintiffs have been damaged as a result of Genie's breaches of its fiduciary duties in the amount not less than $3,600,000.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.     Awarding judgment in the amount of $3,600,000;

B.     Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.     Awarding the Plaintiffs their costs and attorney's fees, as provided by law;

D.     Grant the Plaintiffs such other relief as this Court deems just.

**COUNT XIV**
**CONSTRUCTIVE TRUST**
**(against Genie)**

280.     The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

281.     Genie drafted the BELOCs  and Loan Documents.

4889-8151-4893

EXHIBIT B

282.    Genie provided drafts of the BELOCs and Loan Documents to McMann.

283.    Genie knew of and understood the terms of the BELOCs and Loan Documents.

284.    At the direction of Genie and McMann, the Plaintiffs paid the ICA Payments into Genie's Chase Bank Account Number xxxxx8502.

285.    Genie received payment of the ICA Payments.

286.    Genie knew of its duty and obligation to, and agreed to, hold the ICA Payments in trust for the benefit of the Plaintiffs to be used in accordance with the BELOCs and Loan Documents.

287.    Following receipt of the ICA Payments, Genie received copies of the Termination Notices.

288.    Genie knew and currently knows that the Plaintiffs exercised their rights to terminate the BELOCs and Loan Documents and that the Plaintiffs are entitled to the immediate return of the ICA Payments.

289.    The Plaintiffs made demand on Genie for a return of the ICA Payments.

290.    McMann made demand on Genie for a return of the ICA Payments.

291.    Genie, through oral and written agreements, agreed to return the ICA Payments to the Plaintiffs no later than October 13, 2023.

292.    The oral and written agreements to refund the ICA Payments are legally valid, binding and enforceable agreements.

293.    The Plaintiffs have performed all of their obligations under the oral and written agreements.

294.    Genie materially breached the oral and written agreements by failing to return the ICA Payments.

43

<u>EXHIBIT B</u>

295.    Genie has no legally recognized justification or excuse for breaching the oral and written agreements.

296.    Genie owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

297.    Genie owed a fiduciary duty to the Plaintiffs to act in accordance with the BELOCs, including to hold the funds in trust, apply the funds pursuant to the parties' agreement, and return the funds as required by the BELOCs.

298.    Genie knew of its duty and obligation to, and agreed to, hold the ICA Payments in trust for the benefit of the Plaintiffs to be used in accordance with the BELOCs and Loan Documents.

299.    Genie breached its fiduciary duties and misappropriated the ICA Payments by, among other breaches:

   a.    Failing to hold the ICA Payments in trust and safeguard those funds; and

   b.    Failing to return the ICA Payments as required by the BELOCs.

300.    Genie engaged in actual and constructive fraud that justifies imposition of a constructive trust.

301.    As alleged above, Genie obtained payment of the ICA Payments by use of false oral and written statements that were materially false, including but not limited to:

   a.    Genie's agreement to hold in trust and safeguard the ICA Payments; and

   b.    Genie's ability and agreement to refund the ICA Payments, if and when required.

302.    The statements amounted to false pretenses, were false representations, were false when made, and were in service of an actual fraud.

4889-8151-4893

EXHIBIT B

303.    Genie knew that the aforesaid misrepresentations were untrue and omissions misleading.

304.    Each of the aforesaid misrepresentations and omissions were made with the intent that the Plaintiffs would rely on them to pay the ICA Payments.

305.    The Plaintiffs did in fact rely on each of the alleged omissions and misrepresentations in paying the ICA Payments.

306.    But for Genie's material omissions and misrepresentations as alleged above, the Plaintiffs would not have entered into the Loans and would not have paid the ICA Payments.

307.    The Plaintiffs justifiably relied upon Genie's material omissions and misrepresentations of fact.

308.    The Plaintiffs properly exercised their rights to terminate the BELOCs, properly provided the Termination Notices, and are entitled to the immediate refund of the ICA Payments.

309.    The Plaintiffs have fully performed all obligations under the oral and written agreements with Genie.

310.    The Plaintiffs are entitled to a return of the ICA Payments.

311.    Genie has failed to return the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.    Establishing a constructive trust for the ICA Payments in the amount of $3,600,000;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

D.    Grant the Plaintiffs such other relief as this Court deems just.

45

<u>EXHIBIT B</u>

**COUNT XV**
**<u>UNJUST ENRICHMENT</u>**
**(against Genie)**

312.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

313.    Genie drafted the BELOCs and Loan Documents.

314.    Genie provided drafts of the BELOCs and Loan Documents to McMann.

315.    Genie knew of and understood the terms of the BELOCs and Loan Documents.

316.    At the direction of Genie and McMann, the Plaintiffs paid the ICA Payments into Genie's Chase Bank Account Number xxxxx8502.

317.    Genie received payment of the ICA Payments.

318.    Genie knew of its duty and obligation to, and agreed to, hold the ICA Payments in trust for the benefit of the Plaintiffs to be used in accordance with the BELOCs and Loan Documents.

319.    Following receipt of the ICA Payments, Genie received copies of the Termination Notices.

320.    Genie knew and currently knows that the Plaintiffs exercised their rights to terminate the BELOCs and Loan Documents and that the Plaintiffs are entitled to the immediate return of the ICA Payments.

321.    The Plaintiffs made demand on Genie for a return of the ICA Payments.

322.    McMann made demand on Genie for a return of the ICA Payments.

323.    Genie has refused to return the ICA Payments.

324.    By retaining the funds, Genie has unjustly retained the benefit of those funds to the detriment of the Plaintiffs.

4889-8151-4893

EXHIBIT B

325.    The Plaintiffs are entitled to a return of the ICA Payments.

326.    The Plaintiffs demanded return of the ICA Payments.

327.    Genie is obligated to return the ICA Payments and has no legal or colorable right to keep the ICA Payments.

328.    Genie has wrongfully refused to return the ICA Payments.

329.    The ICA Payments are the Plaintiffs lawful property.

330.    Genie's retention of the ICA Payments violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.    Awarding the Plaintiffs $3,600,000 for Genie's unjust enrichment related to retention of the ICA Payments;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

D.    Grant the Plaintiffs such other relief as this Court deems just.

4889-8151-4893

## EXHIBIT B

Dated:  November 27, 2023                    Respectfully submitted,


                                             NORTH HAVEN LODGING PARTNERS
                                             LLC and WALLINGFORD LODGING
                                             PARTNERS LLC


                                             By:____/s/ *William J. McKenna*_____
William J. McKenna (IL Bar No. 3124753)              One of Its Attorneys
Andrew T. McClain (IL Bar No. 6313453)
Foley & Lardner LLP
321 North Clark Street, Suite 3000
Chicago, Illinois 60654
Telephone:  312.832.4500
Fax:  312.832.4700
wmckenna@foley.com
amcclain@foley.com

4889-8151-4893

EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

**GENIE INVESTMENTS NV, LLC,**

                  **Plaintiff,**

**v.**                                     **Civil Action No.**

**JOSHUA WEARMOUTH, JAMES**      **[Jury Trial Demanded]**
**WILLIAM BYRD, and NORDIC**
**TRUST ALLIANCE KB, LLC,**

                  **Defendants.**

**COMPLAINT**

Plaintiff Genie Investments NV (Genie), by and through its attorneys, Spiegel & Utrera, P.A., files this Complaint against Defendants Joshua Wearmouth, James William Byrd, and Nordic Trust Alliance KB, LLC (Nordic Trust) and alleges, on knowledge at to its own actions, and otherwise upon information and belief, that:

**SUMMARY**

1.     In 2022 and 2023, Respondents Joshua Wearmouth and James Byrd, directly and through Velanos Principal Capital (Velanos), an entity that Wearmouth controlled, defrauded Plaintiff Genie Investments NV (Genie) out of

EXHIBIT C

$9.0 million using a type of scheme commonly referred to as a "prime bank" or "advanced-fee" fraud.

2.      Wearmouth and Byrd represented to Genie verbally and in writing that Wearmouth, through Velanos, could procure one or more standby letters of credit (SBLCs), which Wearmouth would then sell at a significant profit in pre-arranged trades. Wearmouth and Byrd told Genie that Wearmouth would use this trading profit to procure one or more additional SBLCs, which Wearmouth would again sell in pre-arranged trades, again at a significant profit.

3.      In October 2022, Wearmouth and Byrd told Genie that, if Genie contributed $3.0 million to a joint venture with Velanos, Wearmouth would use Genie's capital to generate profits of many times the amount of the capital contribution within 60 days. Wearmouth and Byrd subsequently told Genie that it could increase its profit by making additional capital contributions.

4.      Based on these representations, Genie invested a total of $9 million in a joint venture with Velanos. Wearmouth and Byrd represented that Genie would receive a total of $75.0 million – comprising a return of its $9 million in capital contributions plus $66 million in profit – by the end of 2022.

5.      Wearmouth and Byrd represented to Genie that the SBLC trading presented no risk of loss to Genie's capital contribution.

EXHIBIT C

6.      Wearmouth and Velanos never obtained SBLCs with Genie's capital, never earned any of the promised returns in a trading program, never paid any profits to Genie, and never intended to do so. To date, Velanos has returned only $500,000 of the $9 million invested by Genie.

7.      To keep the scheme going and to forestall legal action against them and Velanos, Wearmouth, Byrd, and Defendant Nordic Trust Alliance KB (Nordic Trust) made lulling statements to Genie, representing falsely that the trading program was successful and/or that payments to Genie were imminent or had been made.

## **PARTIES**

8.      Plaintiff Genie Investments NV (Genie) is a closely held corporation organized and existing under the laws of the state of Nevada, with its principal place of business in Reno, Nevada. Since 2021, Genie has been in the business of providing financing to small and medium-sized businesses through lines of credit.

9.      Defendant Joshua Wearmouth is an individual who, on information and belief, resides in Newport Beach, California, and is a citizen of the state of California.

10.     Defendant James William Byrd is an individual who, on information and belief, resides in Dallas, Texas, and is a citizen of the state of Texas.

EXHIBIT C

11.    Defendant Nordic Trust Alliance KB is a limited-liability company that is organized under the laws of the state of Florida and that has its principal place of business in Miami, Florida.

## JURISDICTION AND VENUE

12.    This Court has original subject-matter jurisdiction of this action pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because it concerns violations of the Securities Act of 1933 ("the '33 Act"), the Securities Exchange Act of 1934 ("the '34 Act"), and Exchange Act Rule 10b-5.

13.    This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and the Defendants.

14.    This Court has jurisdiction over Plaintiff's related state-law claims pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

15.    Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mail in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

16.    Venue in this district is proper pursuant to Section 22(a) of the '33 Act, 15 U.S.C. § 77v(a), and Section 27(a) of the '34 Act, 15 U.S.C. § 78aa. Among other things, certain of the acts, practices, and courses of business

EXHIBIT C

constituting the violations of the federal securities laws alleged herein occurred within this district, including that Defendants directed misrepresentations and deceptive conduct toward Genie representatives residing within this district.

17.    This Court has personal jurisdiction over Defendant Wearmouth because Wearmouth purposefully directed actions at this forum in furtherance of the SBLC scheme.

18.    This Court has personal jurisdiction over Defendant Byrd because Byrd purposefully directed actions at this forum with respect to the SBLC Scheme.

19.    This Court has personal jurisdiction over Defendant Nordic Trust Alliance because Nordic Trust Alliance maintains a place of business within this district and purposefully directed its conduct at this forum with respect to the SBLC Scheme.

## DEFENDANTS' PRIME BANK SCHEME

20.    In late 2023, Genie was seeking capital to lend to customers. Byrd, who had previously acted as a finder for Genie, introduced Genie to Wearmouth, who ran a business called Velanos Principal Capital (Velanos).

21.    Wearmouth and Byrd represented to Genie both verbally and in writing that Wearmouth, through Velanos, regularly used financial instruments known as standby letters of credit (SBLCs) to raise capital.

EXHIBIT C

22.     Wearmouth and Byrd told Genie that Wearmouth had specialized experience, knowledge, and connections through allowed him to purchase SBLCs at a discount and immediately sell them at a large profit in pre-arranged transactions.

23.     Wearmouth proposed a joint venture between Genie and Velanos whereby Velanos, using capital supplied by Genie, would initiate a series of SBLC trades that would generate massive profits for Genie and Velanos (the SBLC scheme).

24.     Byrd regularly acted as Wearmouth's go-between in communications with Genie concerning the SBLC scheme.

25.     Wearmouth and Byrd told Genie that Velanos would return Genie's principal and distribute profits to Genie of up to 800% of the principal investment within 60 days.

26.     Wearmouth and Byrd assured Genie that the SBLC scheme posed no risk of loss to Genie's capital.

27.     Wearmouth also introduced Genie to a lawyer who, according to Byrd, had experience with financing arrangements similar to the SBLC scheme. Genie retained the lawyer to advise them about the proposed joint venture.

EXHIBIT C

28.     On or about October 19, 2022, Velanos and Genie executed a Joint Venture Agreement (JVA) concerning the SLBC scheme. Wearmouth executed the JVA on behalf of Velanos.

29.     The JVA required Genie to contribute $3.0 million in capital to the joint venture, which Velanos would use to engage in a "Strategic Capital/Systematic Purchase and Sell Transaction" involving SBLCs issued by HSBC or other "Top Rated" issuers.

30.     The JVA also required Velanos to return Genie's capital contribution, plus half the profits generated through the transactions, within 60 days.

31.     Shortly after Genie and Velanos executed the JVA, Wearmouth and Byrd told Genie that it could increase its capital contribution by an additional $3 million and, in exchange, would receive a guaranteed profit distribution of $50 million. Genie agreed and, on November 21, 2022, Genie and Velanos executed an amendment to the JVA (First JVA Amendment) providing that Genie would increase its capital contribution to $6.0 million and that, in return, Velanos would increase Genie's profit to $50 million dollars.

32.     The First JVA Amendment did not change any terms of the JVA besides the amounts of (a) Genie's capital contribution and (b) its profit participation.

EXHIBIT C

33.    Shortly after the First JVA Amendment, Wearmouth and Byrd again offered to increase Genie's profit from the JVA, to a total of $66 million, in exchange for an additional $3 million capital contribution.

34.    Genie agreed and provided Velanos an additional $3 million, bringing its total capital contribution to the joint venture to $9.0 million.

35.    Although the parties did not memorialize Genie's third $3 million payment with a formal amendment to the JVA, correspondence from both Wearmouth and Byrd reflected the updated terms of the agreement – namely, that Genie would receive a total of $66 million in profits, in addition to the return of its $9 million in capital, by mid-January 2023.

36.    Velanos and Wearmouth never paid Genie any of the profits promised in the JVA and has returned barely 5% of Genie's capital contributions.

37.    Since January 2023, Wearmouth and Byrd have repeatedly and falsely represented that Wearmouth transferred or initiated transfers of multimillion-dollar payments to Genie.

38.    On or about January 24, 2023, Wearmouth provided Genie with a screenshot of an email that Wearmouth supposedly received from a person identified only as "Simon," who, according to Wearmouth, was a banker with HSBC Bank. The email stated that Velanos had more than 349 million Euros on account with HSBC Bank in London and provided an account number. Wearmouth

EXHIBIT C

asserted that this amount included the profits realized from the Genie-Velanos joint venture's trading activity.

39.    Approximately three days later, Velanos provided Genie with photographs and a screenshot that appeared to show a $10.0 million wire transfer from a ScotiaBank account to Genie's account at Chase Bank.

40.    In March 2023, Wearmouth falsely told Genie in writing that the $10.0 million wire transfer he supposedly initiated on January 27, 2023, was being held up by Wells Fargo Bank, which he described as the "corresponding bank" for the wire transfer.

41.    In the same letter, Wearmouth falsely claimed that profits from trading conducted using Genie's $9.0 million in capital were "being held at HSBC, UK under a sub account…" and that Velanos would need to open a "master" account with HSBC to access the trading profits in the subaccount.

42.    In early June 2023, Wearmouth and Byrd proposed that Genie agree to an amendment of the JVA. The proposal, as memorialized in a "Second Amendment to Joint Venture Agreement" (Second JVA Amendment), was for Velanos to (1) "facilitate the opening of a commercial bank account" in Genie's name at Nordic Trust Alliance KB (Nordic Trust) in Miami, Florida, (2) deposit $9.5 million into Genie's Nordic Trust account on or before June 15, 2023, and (3)

EXHIBIT C

deposit an additional $50.0 million into Genie's Nordic Trust account on or before June 30, 2023.

43.     The parties executed the Second JVA Amendment on June 3, 2023. Shortly afterward, Genie received notice that its Nordic Trust account had been established and that it had access to an online account portal (Portal). On June 20, 2023, according to the Portal, Velanos transferred $9.5 million into Genie's Nordic Trust Account. Genie promptly instructed Nordic to wire the $9.5 million to its checking account at Chase Bank. That transfer never happened, however, and the Portal showed that Nordic Trust canceled the request as of June 29, 2023.

44.     On June 30, 2023, Genie attempted to initiate a transfer of $9.4 million from its Nordic Trust account to its Chase account. Although the Portal showed that this transaction was executed – the Portal thereafter reflected a remaining balance of $100,000 in Genie's account – no money ever transferred to Genie's Chase account from Nordic Trust.

45.     Genie sent multiple requests through the Portal for information from Nordic Trust about the status of its outgoing wire transfers. The only responses it received were non-substantive. When Genie asked to speak with an individual so that it could arrange to visit Nordic in Florida and withdraw the money in person, it received no reply at all. Shortly thereafter, Genie lost its ability to view account-related information through the Portal.

EXHIBIT C

46.     On information and belief, Nordic Trust is not a legitimate bank,

never held any funds in Genie's name, and knowingly participated in Wearmouth's

and Byrd's efforts to forestall legal action against Wearmouth, Byrd, and others by

convincing Genie that it would imminently receive a portion of the promised

SBLC scheme proceeds.

47.     From late 2022 to mid-2023, Genie entered various agreements to

provide lines of credit to customers and did so in reliance on Defendants' false

promises and misrepresentations that Genie would soon receive some or all of the

promised proceeds from the SBLC scheme.

48.     Genie's reliance on these false statements and misrepresentations was

reasonable given the lengths Defendants went to give their false statements and

misrepresentations an air of legitimacy. In addition, Genie's attorney at the time

did not advise Genie that there was any reason to question the validity of either the

SBLC scheme or any of the Defendants' subsequent statements about Velanos'

ability and intention to distribute profits to Genie and return its capital

contributions.

49.     Genie relied on Defendants' false statements and misrepresentations

to its substantial detriment, in that it was ultimately unable to provide the financing

it had promised to numerous customers, which in turn led to an avalanche of

terminations, refund requests, demand letters, disparaging public statements, and

EXHIBIT C

legal actions against Genie. In addition, Defendants' false statements and misrepresentations, and Genie's detrimental reliance on them, have made it impossible for Genie to enter into new lending arrangements with customers.

50.     Other than a $500,000 payment it received in or about May 2023, Genie has never received any return of its capital contributions. It has never received any of the promised profits from the joint venture.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5(a) and (c) – All Defendants

51.     Genie realleges and incorporates by reference its allegations in Paragraphs 1 through 50.

52.     During 2022 and 2023, Defendants Wearmouth, Byrd, and Nordic Trust, in the purchase or sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mail, directly and indirectly:

a.     employed devices, schemes, and artifices to defraud,

b.     made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and

EXHIBIT C

     c.    engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

53.    Defendants Wearmouth, Byrd, and Nordic Trust made these misrepresentations and omissions of material fact with scienter – that is, with an intent to deceive, manipulate, or defraud, or with a severely reckless disregard for the truth by inducing Genie's investment in the SBLC scheme while having no intention of using Genie's funds to carry out any legitimate trading of securities or other financial instruments.

54.    Genie relied on the misrepresentations and omissions of Wearmouth, Byrd, and Nordic Trust, both in contributing capital to the putative Genie-Velanos joint venture and in delaying legal action against the Defendants and others.

55.    Defendants carried out their fraudulent and deceptive acts using means or instrumentalities of interstate commerce. Defendants used interstate electronic messages and telephone communication to propose the SBLC scheme, to induce Genie's participation in the joint venture, and to communicate with Genie about why Genie did not receive either the promised profits or a return of its capital contributions.

EXHIBIT C

56.     As a direct and proximate result of the Defendants' conduct described herein, Genie has suffered economic loss in that it has been deprived of the benefit of its bargain and has suffered lost profits and consequential damages.

57.     Through the Defendants' conduct described herein, Wearmouth, Byrd, and Nordic Trust willfully violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

**SECOND CLAIM FOR RELIEF**

**California Corp. Code § 25401 – Against Wearmouth
and Byrd**

58.     Genie realleges and incorporates by reference its allegations in Paragraphs 1 through 50.

59.     During 2022 and 2023, Defendants Wearmouth and Byrd, in the offer and sale of the securities described herein in and/or from the State of California, made untrue statements and/or misrepresentations of material fact to Genie. The false statements and misrepresentations included, without limitation:

        a.     Wearmouth and Byrd falsely stated that SBLCs were tradable instruments and that the SBLC scheme was a legitimate investment program that presented no risk of loss to Genie's capital,

        b.     Wearmouth and Byrd represented that Genie's capital contributions would be returned after the contributions were used to

14

EXHIBIT C

purchase and trade SBLCs, when in fact, Defendants never returned Genie's investment principal and, on information and belief, never used Genie's capital contributions to purchase and trade SBLCs, and

      c.    Wearmouth and Byrd represented that the SBLC scheme would generate significant profits and that Genie would receive a guaranteed profit of $66.0 million in addition to the return of its capital contributions.

60.    The misstatements and omissions referred to herein concerned "material facts" within the meaning of the California Corporations Code section 25401.

61.    As a result of the Defendants' conduct described herein, Genie has been damaged in an amount to be determined at trial, but not less than $10 million.

62.    Through the conduct described herein, Defendants Wearmouth and Byrd violated California Corporations Code section 25401.

## THIRD CLAIM FOR RELIEF

### Common-Law Fraud – Against All Defendants

63.    Genie realleges and incorporates by reference its allegations in Paragraphs 1 through 50.

64.    As alleged above, Defendants Wearmouth, Byrd, and Nordic Trust made false written and verbal statements and/or material omissions of material fact to Genie, including but not limited to:

<u>EXHIBIT C</u>

      a.      Wearmouth's ability to purchase SBLCs and resell them for a profit;

      b.      The legitimacy of any investment strategy involving trading SBLCs;

      c.      Wearmouth's intention to pay Genie the promised profits and to return Genie's capital contributions;

      d.      Wearmouth's knowledge and experience trading SBLCs;

      e.      Attempts by Wearmouth/Velanos to issue payments to Genie between January 2023 and the present;

      f.      Nordic Trust's legitimacy as a bank and its ability to accept deposits and process withdrawals.

65.    The statements and/or omissions were false when made and were in service of an actual fraud.

66.    Wearmouth and Byrd knew that the representations were untrue and/or that the omissions were misleading.

67.    Wearmouth and Byrd made each of the aforementioned misrepresentations and omissions with the intent that Genie would rely on them in deciding to contribute capital to the joint venture and/or to refrain from bringing legal action against Velanos, Wearmouth, Byrd, and others.

<u>EXHIBIT C</u>

68.   Genie did, in fact, rely on the aforementioned misrepresentations and omissions when it contributed $9.0 million in capital to the joint venture and when it refrained from bringing legal action for several months after Wearmouth and Velanos failed to return those capital contributions and distribute promised profits on schedule.

69.   But for Wearmouth's and Byrd's material omissions and misrepresentations alleged above, Genie would not have contributed capital to the joint venture with Velanos and would have brought legal action against Wearmouth, Byrd, and others long ago.

70.   Genie's reliance upon Wearmouth's and Byrd's material omissions and misrepresentations of fact was reasonable.

71.   Wearmouth's and Byrd's material omissions and misrepresentations of fact have damaged Genie in an amount in excess of $10 million, with the exact amount of damages to be determined at trial.

72.   Wearmouth's and Byrd's conduct alleged herein was willful and wanton and they acted with actual malice, fraud, and/or gross negligence.


**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Genie respectfully requests that this Court enter a judgment against Defendants, granting Plaintiff the following relief:

<u>EXHIBIT C</u>

- The entry of judgment in favor of the Genie on each and every cause of action;

- The award of actual, consequential, and statutory damages in an amount to be established at trial, but not less than $10 million;

- The award of punitive damages in an amount to be established at trial;

- The award of costs of the suit and attorney's fees; and

- Such other relief as the Court deems just and proper.

## **<u>DEMAND FOR TRIAL BY JURY</u>**

Genie demands a trial by jury on all issues that are so triable.

EXHIBIT C

Dated: 2-6-2024

Respectfully submitted,


/s/ *Michael Faragalla*
Michael Faragalla  (Bar No. 1014235)
Spiegel & Utrera P.A

1840 Coral Way Fl 4
Miami, FL 33145-2748
Telephone: (800) 603-3900, x204
Facsimile: (800) 520-7800
Email:
attorneyfaragalla@amerilawyer.com CC:
litassistant@amerilawyer.com
Attorneys for Plaintiff Genie Investments
NV

<u>EXHIBIT C</u>

## CERTIFICATE OF SERVICE