# EXHIBIT COVER SHEET

**Exhibit**

| | |
|---|---|
| Party Submitting: | **Mary Ida Townson, U.S. Trustee for Region 21** |

| | | |
|---|---|---|
| Admitted: | **YES     or     NO        (circle one)** | **4** |

| | |
|---|---|
| Chapter 11 Debtor: | **Genie Investments NV, Inc.** |

| | |
|---|---|
| Case No. | **3:24−bk−00496−BAJ** |

| | |
|---|---|
| Nature of Hearing: | **Trial on** |
| | **U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)** |
| | **Debtor's Response Thereto (Doc. No. 34)** |
| | **U.S. Trustee's Reply (Doc. No. 38)** |
| Trial Date: | **April 9, 2024, at 9:00 a.m.** |

**United States Bankruptcy Court**
**Middle District of Florida**

**Dated:_____, 2024.**


**By: _____, Deputy Clerk**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

IN RE: GENIE INVESTMENTS NV, INC.

                                     CASE NO.: 3:24-bk-00496-BAJ

        Debtor (s).

_____/

**RESPONSE TO EXPEDITED MOTION TO APPOINT CHAPTER 11 TRUSTEE OR IN THE ALTERNATIVE, APPOINT AN EXAMINER, DISMISS THIS CASE OR CONVERT THIS CASE TO CHAPTER 7 FILED BY UNITED STATES TRUSTEE**

GENIE INVESTMENTS NV, INC (GENIE or Debtor) in the above case responds to the Expedited Motion to Appoint Chapter 11 Trustee or in the Alternative, Appoint an Examiner, Dismiss This Case, or Convert This Case to Chapter 7 Filed by United States Trustee (Doc. No. 20), and would state:

**Summary of Proposed Chapter 11 Case and Plan**

This case was filed as an attempt by GENIE to pay back it's obligations to customers and other parties affected by a fraud perpetrated on GENIE by unscrupulous third parties. GENIE is pursuing multiple avenues of recovery against the third parties in order to recover funds that may be turned over to the customers as a distribution under the terms of any confirmed plan. GENIE currently has an arbitration action pending against a group of perpetrators, as well as a United States District Court fraud complaint against another group of perpetrators of the fraud against the Debtor in order to attempt to make the customers whole.

The United States Trustee has alleged that such suit is evidence of the pre-bankruptcy fraud and/or malfeasance of GENIE. However, even a cursory review of the allegations by the customers revealed that almost the entire customer list in the Trustee's Motion consisted of individuals and

small businesses which had entered into contracts with third party brokers unrelated to GENIE. The customers have admitted that they had been directed to wire funds directly to GENIE by such brokers. In fact, McMann Commercial Lending, LLC is named in the customers' suit in Illinois as a defendant and directed the deposits from the customers.

## Procedural Background

This case was filed on February 21, 2024 as an attempt by the Debtor to attempt to save it's lending business. The case was filed as an emergency *pro se* filing with only the petition and matrices filed. A complete set of schedules and statement of financial affairs is to be filed within 14 days of the filing of the Petition. The Court entered an Order Granting Motion To Extend Deadline to File Schedules and Statements (Extended until 4/5/24) (Doc. No 13) on February 28, 2024 allowing the Debtor until April 5, 2024 to complete the necessary filings. The Debtor is still gathering the records required in order to complete the initial filing.

The Trustee's Motion was filed on March 5, 2024. Neither the Court nor the United States Trustee had the opportunity to review any financial statements prior to the filing of the motion since the Voluntary Petition filing occurred approximately two (2) weeks prior to the Motion filed by the United States Trustee.

Additionally, a Plan has not been filed in this case. The Debtor is attempting to recover funds from third parties through arbitration and civil litigation which will allow the Debtor to fund it's Plan. A copy of the arbitration demand that has been pending for several months is attached as Exhibit 1. The Debtor expects significant recovery from this arbitration award with the ability to collect a substantial sum against the lender and/or the principals of the lender based on the discovery received by the Debtor through the arbitration process.

2

### Factual Background

Genie Investments is a Nevada corporation that provided financing to numerous small and medium-sized businesses through lines of credit. Genie had a history of successfully funding loans for 2+ years and of issuing all requested refunds until August of 2023 when Velanos committed it's fraud against GENIE.

Genie located potential borrowers through a network of finders and brokers that, in return for bringing potential borrowers to Genie, may qualify for fees or commissions. Genie also works with so-called "white labelers" that lend directly to retail borrowers using funds that the white labelers, in turn, borrow from Genie. A white labeler generally charges its borrower a marginally higher rate than it pays to Genie for the same amount of funds. Genie funds it's lending operations by obtaining capital from "warehouse lenders/capital providers" and other sources and, in turn, lends those funds to borrowers at marginally higher rates.

The majority of the complaints on the United States Trustee's Motion relate to a Business Expansion Line of Credit (BELOC) agreement between the small businesses/individuals listed and an entity called McMann Commercial Lending (This appears to be 9 of the 12 individuals and small businesses listed by the United States Trustee). In each BELOC transaction, McMann acted as a white labeler, as it did in numerous instances with funds it borrowed from Genie. Genie was not a party to the BELOC agreements and was not disclosed to the individual borrowers by McMann during the loan process. A sample BELOC agreement is attached as Exhibit 2 to this Response.

A key provision of the standard BELOC agreement that both Genie and McMann used was that borrowers were required to establish an "Interest Credit Account" or "ICA" by prepaying 10%

3

of the total line of credit amount (the "ICA Payment"). The agreement specified that the ICA Payment would be reflected on the lender's books and records as a credit and used to satisfy interest payments due until the ICA was depleted. There were also charges for due diligence and other fees included in the standard BELOC agreements.

Just as McMann and any small business or individual entered a BELOC agreement with each other, McMann entered a corresponding BELOC agreement with Genie. The terms and conditions of the McMann-Genie BELOC agreement were nearly identical to those of the agreement McMann made with the small businesses and individuals; the notable exceptions were the fees charged and interest that would be due on advances. Like the small businesses and individuals, McMann was obligated to establish an Interest Credit Account by making an ICA Payment to Genie.

In some instances, rather than having McMann collect the ICA Payment from the small businesses or individuals, deposit it into it's account, and then send the ICA Payment to Genie, McMann instructed the small businesses and individuals to wire the ICA Payment directly to Genie. This was purely for administrative convenience. It did not make Genie a party to McMann's contracts with the small businesses or individuals. McMann's borrowers have no conceivable contractual right to pursue refunds of their ICA Payments from Genie. Under the terms of the BELOC contracts. GENIE would be obligated only to McMann to return any payments made to an ICA account by a customer.

McMann was never able to fund the lines of credit described in its agreements with the small businesses and individuals. This gave small businesses and individuals the right to terminate the agreements with McMann and request a refund of its ICA Payment. Any refund that is owed

to the customers is due from McMann, not from Genie. See Attached Exhibit 2; Pages 23-28. In turn, GENIE would owe McMann the ICA payments that McMann had provided to GENIE as a result of entering into the BELOC loan agreements with the customers.

### The VELANOS Capital Provider Scheme

Genie is owed approximately $75M by a business entity ("capital provider") with which Genie had formed a joint venture in late 2022. In late 2022, following failures by its previous warehouse lender, Genie had sought new sources of affordable capital. At the time, Genie worked with a network of finders who introduced Genie to potential borrowers. One of those finders was Will Byrd. Upon learning that Genie wanted to find new sources of capital to lend, Byrd introduced Genie to Josh Wearmouth and Velanos in October 2022.

Wearmouth told Genie that he used capital from business partners to monetize SBLCs (Standby Letter of Credit) by buying them at a discount and then selling them at a profit. He proposed a business relationship wherein Velanos would use capital supplied by Genie to complete a series of prearranged trades of SBLCs. Wearmouth further represented that this would pose no risk to Genie's capital. Byrd, who has frequently acted as Wearmouth's spokesperson in communications with Genie, vouched for Wearmouth and supported his assertions. Wearmouth provided Genie with a draft Joint Venture Agreement (JVA) that called for Genie to contribute capital, for Velanos to use those capital contributions to trade SBLCs, and for Velanos to return the capital contributions and distribute resulting profits to Genie within 60 days.

The United States Trustee characterized the Velanos agreement as demonstrating "dishonesty, incompetence, gross mismanagement, and risks harming the Debtor's creditors

5

further should the Debtor remain a debtor-in-possession." That statement is untrue and was made without a full understanding of the facts surrounding the transaction by the United States Trustee. Genie went to extraordinary lengths to ensure that the JVA agreement was a legitimate investment vehicle. Genie approached several reputable financial consultants regarding the SBLC proposal by Velanos. Genie then hired a law firm to review the JVA and SBLC arrangements in order to vet the proposals for legal and/or financial fraud issues. See Attached Exhibit 3 for retainer agreement.

Only after Genie's then-lawyer reviewed the contract and supposedly vetted the underlying trading program, Genie and Velanos signed the JVA in October 2022. In November 2022, upon invitations from Wearmouth and Byrd, Genie contributed an additional $6.0 million in capital. In exchange, Velanos agreed to provide Genie a total of $75 million ($9.0 million in capital contributions and $66.0 million in profits) within 60 days.

The JVA (Attached as an Exhibit to the Exhibit 1 arbitration complaint) also required Velanos to deploy Genie's capital contributions "strategically and with discretion, including facilitating a systematic purchase and sale of financial instruments routine." Elsewhere, the JVA identified "SBLC (Standby Letter of Credit) HSBC London/Top Rated Issuer" as the "Transacting asset(s)." The JVA also included nondisclosure and non-circumvention clauses. Genie did not know at the time that these and many other aspects of the JVA and Wearmouth's description of the putative trading program were hallmarks of a type of fraudulent scheme well-known to law enforcement and securities regulators. *See, e.g.,* https://www.fbi.gov/contact-us/field-offices/honolulu/news/press-releases/fbi-warns-public-about-platform-trading-investment-scams

6

Almost immediately, Wearmouth and Byrd began making false promises of imminent payments, followed by bogus excuses when those payments did not happen. When making those promises and excuses, Wearmouth and Byrd often invoked terms that Genie later learned were hallmarks of SBLC and similar scams.

In a letter to Genie dated December 30, 2022, Velanos claimed "that the $75,000,000.00 USD owed to you will be available on or before January 15th, 2023." The same letter identified an account Velanos purportedly had with HSBC Bank and asserted that the account held nearly 350 million Euros. Wearmouth also provided a screenshot of an email that he supposedly received from a representative of HSBC Bank "confirming" that Velanos "with accounts at HSBC bank located 79 Piccadilly, Mayfair, London are the lawful and legal owner of funds on deposit in the amount of...€ 349,220,053.20...as of this date 19th of December, 2022." The document identified the supposed account number in which the funds were held, and stated:

> ...these funds have been earned, being good, clean, and of a non-criminal origin, being free of and clear of any and all liens and encumbrances, and are freely assignable and transferable upon the instruction of the authorized account signatory.

The phrase "good, clean, and of a non-criminal original" closely resembles language that law-enforcement agencies have identified as emblematic of "prime bank" or advance-fee frauds.

In January 2023, Wearmouth told Genie that Velanos had wired $10.0 million from a Scotiabank account to Genie's account with Chase bank. Wearmouth provided Genie's lawyer with a screenshot that purported to show tracking details for the wire transfer. Genie, however, never received any portion of that supposed transfer. As of late March 2023, Wearmouth claimed that the transferred funds were and had been held by the "corresponding [sic] bank" – later

identified as Wells Fargo – since January 2023. This was false. The only thing that should hold up a wire transfer is if a party to the transfer is listed on the Sanctions list maintained by the Office of Foreign Asset Control. Neither Genie nor any of its principals is on that list.

In March 2023, Wearmouth sent Genie a letter stating that trade profits (ostensibly from trades effected with Genie's $9M) were being held at HSBC in a "sub account." The letter outlined a supposed strategy for accessing those funds. One aspect of the strategy Wearmouth described was that "a major top 25 bank will open a line of credit..." This phrase is yet another hallmark of prime-bank and advance-fee scams.

As of June 2023, Velanos still had not paid Genie any of the amounts due under the JVA. Wearmouth, who continued to blame various banks for his failure to deliver promised payments to Genie, proposed the following: Velanos would facilitate the creation of a commercial bank account in Genie's name at Nordic Trust Alliance KB in Miami, Florida, where Velanos also had an account, and subsequently deposit $9.5 million into the newly established Genie account by June 15, 2023, and an additional $50 million by June 30, 2023.

Thereafter, Genie submitted an account application to Nordic Trust and received notification that an account in its name had been established. Genie received access to an online account portal. The online portal showed a $9.5 million credit to Velanos' account on June 20, 2023. When Genie attempted to transfer that amount or any portion of it to its account at Chase Bank no money ever reached the Chase account. When Genie asked Nordic Trust to explain why it couldn't access the funds in its account, it received vague responses. At one-point, Nordic Trust asserted that Genie's outgoing wire transfer was awaiting ECB (European Central Bank) approval, despite the fact that its account with Nordic Trust – a Swedish company – was

8

ostensibly created through a Florida-based branch. Eventually, Nordic Trust stopped responding to any inquiries from Genie.

Subsequent investigation indicates that Nordic Trust is not authorized to conduct banking activities in Florida. Given its conduct and its negligible online presence, Genie suspects that it is a front created or used to facilitate Wearmouth's SBLC fraud.

As of August 2023, Will Byrd told Genie's legal counsel that Genie's money was still held up at HSBC. He further claimed to know that the money in Genie's Nordic Trust "account" was held up because there were red flags associated with one of Genie's principals. Byrd claimed to have this information because Velanos had a "contact" with Nordic Trust and could therefore obtain information. On February 6, 2024 Genie filed a Federal Fraud suit in the Middle District of Florida District Court in case name and number: *Genie Investments NV, LLC v. Joshua Wearmouth, James William Byrd and Nordic Trust Alliance KB, LLC* 6:24-cv-00271. Exhibit C of the United States Trustee's Motion.

Genie has been attempting to collect the Velanos debt throughout 2023 and at various times has been told that payments were imminent. As of yet, however, the capital provider has failed to make good on its obligations to Genie. Although many settlements have been offered and agreed upon by the capital provider between May 2023 and today. In every instance Velanos has failed every time to deliver funds. Most recently, a settlement was accepted by Genie on December 22nd, 2023, but Velanos failed to deliver yet again.

Knowing that the situation with the capital provider would affect its ability to fund advances to borrowers, Genie began providing written updates to borrowers in March 2023. These updates, which were drafted by Genie's then-attorney, contained Genie's understanding at the time

of why funds were delayed. Because it also knew that the situation would also impair McMann's ability to perform its white-labeled BELOC agreements, Genie asked McMann to share those updates with McMann's borrowers – none of whom had to that point interacted or communicated with Genie. McMann apparently failed to heed Genie's advice and thereby left its borrowers in the dark about whether loans would be funded and when refunds might be delivered.

Genie is and has been diligently working to resolve its dispute with the capital provider. It has filed an arbitration against the capital provider in New York and is also engaged in active settlement negotiations. Genie appears to have no legal obligation to refund any monies to the affected parties. However, Genie hopes that it will resolve the arbitration dispute promptly so that it can issue refunds to all borrowers affected by this situation through the Chapter 11 Plan. Attached as Exhibit 4 to this Response is the Declaration of Adam Walker as the attorney for GENIE in the arbitration action which recites his knowledge of Velanos transaction.

**BELOC Loan Customers - Any Promise by GENIE to Refund Money to the Customers is an Unenforceable Promise to Make a Gift**

McMann is solely responsible for any customer refunds pursuant to the clear language of the BELOC contracts between McMann and the customers. McMann abandoned the customers and directed that the customers call Genie regarding any moneys allegedly owed. Genie became involved in communications about the various refunds owed to the small businesses and individuals only as a result of the abandonment. Any promise by Genie to make the payments on behalf of McMann was without consideration and only intended as a gift if Genie had been able to recover the funds owed by Velanos.

The offer by Genie to refund the customer funds constituted an unenforceable promise to

make a gift. An offer without consideration is a gift. In addition to being irrevocable, there are two additional elements that a gift must meet in order to be valid: The donor must intend to make a present gift of the property; The donor must actually deliver the property to the donee. *Lowry v. Florida Nat. Bank of Jacksonville*, 42 So. 2d 368 (Fla. 1949).

In this case, there cannot be donative intent on the part of Genie since it did not possess the funds required to pay the customers' claims. It is also clear that Genie never did or could deliver the refunds to the customers due to a lack of funds in it's possession. Accordingly, the statements by Genie are merely unenforceable promises to make a gift at some point in the future.

Genie fully intends to refund ICA Payments for loans it was unable to fund because of Velanos' breach of contract and has been working diligently for many months to do so. In any Chapter 11 Plan GENIE would attempt to recover the Velanos funds from the various available avenues of recovery and direct recovery of the Velanos funds to be paid to McMann for eventual distribution to the customers to the extent of any allowed claims. It is the sincere desire of GENIE to make all customers whole through the payment to McMann of the ICA funds. However, the Velanos recovery efforts have been very difficult and it is not a certainty that any funds will be recovered. GENIE estimates that it owes approximately $4.4M to McMann as a return of the ICA funds. It will continue to use it's best efforts to recover that amount from Velanos to make customers whole.

**Bridge Loan Customers - Refunds**

In some instances, customers would contract directly with Genie to procure a "Bridge Loan". This bridge loan would enable the customer to pay the 10% owed to McMann as an ICA fee due pursuant to the BELOC contract between McMann and the customer with a loan from

Genie. A copy of a sample bridge loan agreement is attached as Exhibit 5.

Pursuant to the bridge loan agreement, the customer would pre-pay for 90 days of interest on the bridge loan (and in some cases other fees such as due diligence) to allow the original BELOC loan to be funded by McMann. GENIE had approximately $10M on deposit in a Morgan Stanley account at the time of any Bridge Loan contracts. GENIE would place a hold on it's own Morgan Stanley funds in the amount of the ICA funds to be provided to the customer or to McMann upon closing of the BELOC loan. Any due diligence fees would be earned in full by either GENIE or McMann. Such funds would not be subject to return. GENIE never held any funds in trust for any of the customers as a result of a Bridge Loan. Any amounts paid to GENIE were either pre-paid interest or due diligence fees.

Due to the contractual language in the Bridge Loan agreement, GENIE has no obligation to return the 90 days of interest to the customer as the segregated funds were held by GENIE during the 90 day bridge period. However, due to fact that the loans from McMann were never funded by GENIE due to the actions of Velanos, then Genie has offered to refund such 90 day pre-paid interest to the customers as part of this Chapter 11 plan. This is solely due to the direct contractual relationship between the customer and Genie related to the bridge loan.

GENIE estimates that approximately $1.23M is owed to customers from Bridge Loan ICA accounts generated through McMann. Again, GENIE will use it's best efforts to recover the Velanos funds and make the Bridge Loan customers whole. However, to the extent that such recovery efforts are not successful or there are amounts owed by the customers to GENIE as a result of litigation ongoing, then GENIE may not be able to make a 100% payment to the Bridge Loan customers.

## CERTIFICATE OF SERVICE

I DO HEREBY CERTIFY that a copy of the foregoing was furnished to the United States Trustee and all creditors per the attached matrix by CM/ECF filing    this __15____ day of March, 2024.

Law Offices of Mickler & Mickler, LLP

By:__/s/ Bryan K. Mickler_____
     Bryan K. Mickler
Florida Bar No. 091790
Attorney for the Debtor(s)
5452 Arlington Expressway
Jacksonville, FL 32211
(904) 725-0822
(904) 725-0855 FAX
bkmickler@planlaw.com

docs\bankrupt\chap 11\genie\response to trustee motion

13

# EXHIBIT 1

# EXHIBIT B

**DEMAND FOR ARBITRATION**

GENIE INVESTMENTS NV,

     Claimant,

v.                                                    Case No. _____

VELANOS PRINCIPAL CAPITAL, INC.,

     Respondent.

---

## I.    **INTRODUCTION**

In 2022 and 2023, the Respondent, Velanos Principal Capital (Velanos) induced Genie Investments NV (Genie) to participate in and fund a joint venture. Through its president and sole owner, Joshua Wearmouth, Velanos represented to Genie both verbally and in writing that it was in the business of purchasing financial instruments know as standby letters of credit (SBLCs) at a discount and immediately selling them at a large profit in pre-arranged transactions. Wearmouth claimed that he was able to generate these profits because of his specialized experience, knowledge, and connections. He told Genie that, if it supplied him with capital, he could use it complete a series of SBLC trades that would generate massive profits, and that he would return Genie's principal and distribute significant profits within 60 days. Wearmouth assured Genie that the SBLC trading posed no risk of loss to Genie's capital.

On or about October 19, 2022, Velanos and Genie executed a Joint Venture Agreement (JVA) to effectuate the SBLC transactions Velanos had described. The initial version of the JVA

1

required Genie to contribute $3.0 million to the joint venture, which Velanos would use to engage in a "Strategic Capital/Systematic Purchase and Sell Transaction" involving SBLCs issued by HSBC or other "Top Rated" issuers. The JVA also required Velanos to return Genie's capital contribution, plus half the profits generated through the transactions, within 60 days. The parties subsequently amended the agreement to increase both Genie's investment and the profits Velanos would pay Genie. Ultimately, pursuant to the original JVA and subsequent amendments, Genie invested a total of $9.0 million and Velanos agreed to pay Genie $66.0 million in profits, in addition to the return of its principal.

Although Genie fully performed its obligations under the JVA and the amendments thereto, Velanos has never paid Genie any of the $66.0 million in profits due to it and has returned only $500,000 of Genie's $9.0 million in capital contributions. Thus, Velanos has materially breached its contract with Genie. Genie's contractual damages are in excess of $74.5 million.

## II.    <u>PARTIES</u>

Genie Investments NV (Genie) is a closely held corporation formed under the laws of the state of Nevada. Since 2021, Genie has provided loans to businesses through lines of credit and other instruments. Genie is represented in this proceeding by the undersigned law firm.

Velanos Principal Capital (Velanos) is a corporation registered in Wyoming. On information and belief, Velanos conducted the majority of its activities related to the instant dispute from California.

## III.    <u>STATEMENT OF FACTS</u>

In October 2022, Genie was seeking capital to support its business of providing financing to businesses (Genie's "borrowers") through lines of credit and other arrangements. At the time,

Genie had recently become acquainted with James "Will" Byrd, who provided Genie with leads on potential sources of capital. Within a few weeks of his first contact with Genie, Byrd suggested that Genie meet with Josh Wearmouth, who, according to Byrd, had a profitable investment opportunity that Genie could potentially use to fund its operations.

Byrd introduced Genie's principals to Wearmouth in early October 2022. In telephone conversations and written communications with Genie, Wearmouth stated that he routinely traded a type of financial instrument called a standby letter of credit, and that he, acting through Velanos, could use Genie's money to purchase one or more SBLCs and subsequently sell them at substantial mark-ups in pre-arranged trades. Wearmouth told Genie that this type of trading occurred frequently in the world of high finance and that Velanos could generate huge returns in a matter of weeks, with no risk of loss to Genie's principal.

    **A.**    <u>**Genie and Velanos entered into the Joint Venture Agreement in October 2022 and subsequently amended its terms so that Genie invested a total of $9.0 million in exchange for a guaranteed return of $66.0 million in profit, plus a return of its capital contributions.**</u>

In October 2022, Velanos provided a draft Joint Venture Agreement to Genie. Following review and negotiation of certain changes by Genie's legal counsel at the time, Genie executed the JVA with Velanos on October 19, 2022.

The JVA initially required Genie to contribute $3.0 million, which Velanos agreed to deploy, "strategically and with discretion," in purchases and sales of SBLCs. The JVA further stated that Velanos would provide Genie with "a rolling profit participation in the [joint venture] activities up to $25,000,000." The JVA required Velanos to make a first profit distribution 30 days "post commencement," with the "commencement date" defined as within 10 days of Genie's capital contribution, and to distribute all profits within 60 days "post commencement."

Velanos also agreed to provide Genie with account statements "showing the relevant [SBLC] trade transactions every 30 days during [Genie's] participation in the JV."

In accordance with the JVA, Genie sent $3.0 million to Velanos by wire transfer on October 20, 2022. Approximately 30 days later, at or near the time the JVA required Velanos to make its first distribution of profits, Will Byrd contacted Genie and relayed an offer from Velanos to increase Genie's profit to $50.0 million if Genie would double its capital contribution. Genie and Velanos thus executed an amendment to the JVA (the First JVA Amendment) on November 21, 2022.

A recital to the First JVA Amendment states that Velanos "desires to amend the JVA to better facilitate the delivery of [Genie's] Profit in a more efficient and expedient manner." The First JVA Amendment provided:

1. In consideration of Party A's increase in the Contribution of three million dollars ($3,000,000.00), Party B has agreed to increase Party A's Profit to fifty million dollars ($50,000,000.00) for the Transaction.

2. All other terms and conditions of the JVA shall remain in full force and effect.

Genie and Velanos were identified in the First JVA Amendment as Party A and Party B, respectively. Besides these adjustments, the First JVA Amendment stated, "all other terms and conditions of the JVA shall remain in full force and effect." On November 21, 2022, as required by the First JVA Amendment, Genie sent Velanos an additional $3.0 million by wire transfer.

Shortly thereafter, the parties agreed that Genie would increase its capital contribution by another $3.0 million in exchange for Velanos's agreement to increase Genie's total profit participation to $66.0 million. Genie agreed and sent an additional $3.0 million to Velanos by wire transfer on November 30, 2022. In subsequent correspondence with Genie, Byrd relayed

assurances from Wearmouth that Velanos would pay Genie $9.0 million on or before December 5, 2022, and the remaining $66.0 million on December 20, 2022.

**B.**    **Velanos has failed to pay any profits due under the amended JVA and has returned only a small portion of Genie's principal.**

Velanos failed to meet either of the December 2022 payment deadlines and, in fact, has returned only a small fraction of Genie's $9.0 million in principal and has never made any of the profit distributions required under the JVA. The only thing Velanos has delivered since the parties executed the JVA is a string of bogus excuses for its failure to pay Genie what it is owed.

In a letter to Genie dated December 30, 2022, Velanos claimed "that the $75,000,000.00 USD owed to you will be available on or before January 15th, 2023." The same letter identified an account Velanos purportedly had with HSBC Bank and asserted that the account held nearly 350 million Euros. The letter further stated that Wearmouth would "provide a copy of the wire transfer as soon as it has been submitted."

In January 2023, Wearmouth told Genie that Velanos had wired $10.0 million from a Scotiabank account to Genie's account with Chase bank. Wearmouth provided Genie's lawyer with a screenshot that purported to show tracking details for the wire transfer. Genie, however, never received any portion of the putative wire transfer.

In March 2023, Velanos again told Genie that it had wired $10.0 million to Genie's Chase account. Again, Genie never received any portion of the supposed wire transfer.

As the weeks and months passed, Velanos's failure to return Genie's principal or make profit payments to Genie had harmful spillover effects on Genie's business. Genie had contracted to provide borrowers with lines of credit totaling more than $150 million. Its ability to fund those lines of credit depended, in turn, on Velanos performing its contractual obligations to Genie. When Velanos failed to do so, Genie was unable to satisfy its borrowers' demands. Consequently,

many borrowers canceled their agreements with Genie and demanded refunds of fees they had paid in connection with their loans/lines of credit. Some borrowers have threatened legal action against Genie and/or have posted highly negative statements about Genie and its principals on public websites. To allay borrowers' concerns and to protect its business reputation, Genie has promised refunds of fees paid by borrowers – including fees designated as non-refundable in borrower agreements – upon the resolution of its dispute with Velanos. In short, Velanos's actions have damaged Genie not only by depriving it of the amounts due under the contract, but by causing Genie to incur substantial costs to deal with resulting customer fallout.

    **C.**    **<u>Another JVA Amendment, which would have reduced the amount owed to Genie, has no continuing effect because Velanos failed to perform its obligations thereunder.</u>**

In June 2023, while Genie was dealing with an influx of queries, terminations, and refund requests from borrowers, Velanos proposed an amendment to the JVA that was supposed to provide Genie prompt payment of approximately 80% of the amount owed by Velanos under the JVA as previously amended. The terms of the June 2023 amendment are set forth in a document entitled "Second JVA Amendment," which the parties executed on June 3, 2023.

Under the Second JVA Amendment, Velanos agreed to "facilitate the opening of a commercial bank account" in Genie's name at Nordic Trust Alliance, KB ("Nordic Trust"), in Miami, Florida, and to deposit $9.5 million into Genie's Nordic Trust account "on or before June 15, 2023." The Second JVA Amendment called for Genie to then immediately transfer the $9.5 million to its account at Chase bank. The Second JVA Amendment also required Velanos to deposit an additional $50 million (fifty million) into Genie's Nordic Trust account on or before June 30, 2023.

Velanos's stated reason for establishing an account for Genie at Nordic Trust was that Velanos already had an account there and could easily transfer money to Genie's Nordic Trust account without encountering the kinds of difficulties that had supposedly prevented Velanos from sending Genie money via wire transfer for the previous six months.

Shortly after the parties executed the Second JVA Amendment, Wearmouth and/or Byrd informed Genie that a Nordic Trust account had been established for Genie. Genie subsequently received access to an online portal (the "Portal") through which Genie would manage the account. The Portal appeared to show that Velanos had transferred $9.5 million to Genie's Nordic Trust Account on June 20, 2023. On June 29, 2023, however, when Genie instructed Nordic to wire the $9.5 million to its checking account at Chase bank, Nordic canceled the request. On June 30, 2023, Genie attempted to initiate a transfer of $9.4 million to its Chase account. Although the Portal showed that this transaction was executed – the Portal subsequently reflected a balance of $100,000 in Genie's Nordic Trust account – no money ever transferred to Genie's Chase account from Nordic Trust.

When its attempts to send outgoing wire transfers from its putative Nordic Trust account failed, Genie sent multiple requests through the Portal for information from Nordic Trust about the status of its outgoing wire. Genie typically received non-substantive responses to these requests. When Genie asked to speak with an individual to arrange to come to Nordic in Florida and withdraw the money in person, it received no reply at all. Shortly thereafter, Nordic removed Genie's ability to view account-related information through the Portal.

Although there is a business entity registered in Florida under the name "Nordic Trust Alliance KB," it is not registered as a bank with the state of Florida. Further, no entity with the name Nordic Trust Alliance or anything similar is reflected on the websites of the FDIC, the

federal Office of the Comptroller of Currency, or the Federal Reserve Board as a regulated financial institution, and no entity with the name Nordic Trust Alliance is FDIC-insured.

On information and belief, Nordic Trust is not a legitimate financial institution, but a sham entity created and used to convince Genie that delivery of its funds was imminent and to forestall legal action against Velanos and others.

## IV.    ARBITRATION AGREEMENT

This arbitration is initiated pursuant to the arbitration agreement in paragraph 6 of the JVA, which states that "all disputes between the parties shall be resolved by arbitration at the New York International Arbitration Center." Although the New York International Arbitration Center provides space for international arbitrations, it does not administer arbitration proceedings. Thus, although the JVA evinces the parties' agreement to submit any disputes to arbitration, it does not specify an arbitration provider or set of rules to govern any arbitrated disputes. For these reasons, it is appropriate for Genie to submit this demand for arbitration through JAMS.

## V.    GOVERNING LAW

Paragraph 6 of the JVA states, "This agreement shall be governed by the law of New York, NY, United States."

## VI.    PLACE OF HEARING

Genie proposes that any hearing in this arbitration take place in New York, New York. This proposal is consistent with the intent of paragraph 6 of the JVA.

## VII.    ELECTION FOR EXPEDITED PROCEDURES

Claimant proposes that this arbitration be conducted in accordance with the Expedited

Procedures of Rule 16.2 of JAMS Comprehensive Arbitration Rules & Procedures.

## VIII.    CAUSES OF ACTION

Based on the foregoing factual allegations, Claimant asserts the following causes of

action against Velanos:

### A.    Velanos has materially breached the Joint Venture Agreement, as amended, and the attendant covenant of good faith and fair dealing.

The JVA and its amendments constituted a valid and binding agreement between Velanos

and Genie. Whereas Genie has fully performed all of its obligations under the JVA, as amended,

other than any obligations whose performance has been waived or legally excused, Velanos has

breached the Agreement repeatedly and in multiple material respects, including, without

limitation:

- Failing to use Genie's capital contributions in the purchase and sale of SBLCs or any other financial instruments, as required by Section 2.4 and Appendix I of the JVA.

- Failing to pay profits to Genie within 60 days after Genie made its initial capital contribution, as required by paragraph 6 of the JVA.

- Failing to provide account statements showing that Velanos conducted any SBLC trading in furtherance of the JVA, as required by Appendix I to the JVA.

- Failing to make any portion of the $59.5 million payment due by June 30, 2023, as required by the Second JVA Amendment.

Implicit in the JVA, as amended, is a covenant of good faith and fair dealing obligating

the parties to act towards each other in good faith, to deal fairly with one another, to make all

material disclosures, and to abstain from any actions that might deprive the other of the

expectations and benefits of the JVA, and obligating each party to do everything that the JVA presupposes to accomplish its purposes. For the reasons stated herein, Velanos has breached this obligation of good faith and fair dealing.

As a direct and proximate result of the breaches described herein, Genie has been damaged in an amount to be proved at hearing, but not less than $74,500,000, plus interest, attorneys' fees, and other costs as provided by law and/or contract, for which sum Velanos is liable to Genie.

**B.    Unjust enrichment**

By reason of the conduct described above – including fraudulently inducing Genie to enter into the JVA and the amendments thereof, deliberately breaching the JVA, and failing and refusing to honor their legal and contractual obligations to return Genie's capital contribution – Velanos has profited and enriched itself unjustly at Genie's expense and to its detriment. Velanos should not be permitted, in equity and good conscience, to retain money that rightfully belongs to Genie.

By reason of the foregoing, Genie has been injured in an amount to be determined at trial, but not less than $8.5 million, plus interest, for which sum Velanos is liable to Genie.

**C.    Conversion**

Velanos is liable to Genie for conversion. Genie had a legal and possessory right and interest in the $9.0 million in total capital contributions it provided to Velanos through the joint venture. After a brief period during which Velanos would supposedly use those funds to engage in SBLC trading, the amended JVA required Velanos to return Genie's $9.0 million.

Although Velanos was required to remit this money to Genie in December 2022, it has, to date, returned only $500,00 of it. Despite multiple requests by Genie for Velanos to refund the

remainder of its capital contributions, Velanos has failed to do so and, on information and belief, has used Genie's $8.5 million for its own benefit.

These acts of conversion, which were committed with malice and with reckless and willful disregard of Genie's rights, have damaged Genie in an amount to be proved at trial, but not less than $8.5 million, plus interest, for which amount Velanos is liable to Genie.

IX.     **CONCLUSION**

For the reasons set forth above, the Claimant, Genie Investments NV, requests an order requiring the Respondent, Velanos Principal Capital, to pay damages in an amount to be proved at a hearing in this matter, together with prejudgment interest as allowed by law, attorney's fees, arbitration fees and costs of this action, and such other and further relief as the panel deems just and proper.

Respectfully submitted,

_____
Adam Walker
Walker Law Office, LLC
4050 Pennsylvania Ave., Suite 115-10
Kansas City, Missouri 64111
(816) 226-6476
adam@awsecuritieslaw.com

DocuSign Envelope ID: 509F6C2E-8415-4F06-A6941-9E69B62FF565

**TRANSACTION CODE: JVA/VPCL-GINV-I-10142022**

**VELANOS PRINCIPAL CAPITAL**

# EXHIBIT C          JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT (HEREINAFTER REFERRED TO AS ("**AGREEMENT**" OR "**JVA**") IS EXECUTED WITHOUT PREJUDICE OR CONFLICT OF INTEREST, DULY UNDERSTOOD AND SIGNED BY BOTH PARTIES ACTING AT THEIR OWN ACCORD ON THIS DAY, OCTOBER 19TH, 2022, BY AND BETWEEN:

## THE REFERRING PARTNER ("PARTY A")

| | |
|---|---|
| COMPANY NAME | GENIE INVESTMENTS NV, LLC |
| REGISTERED ADDRESS | 11064 Lothmore Rd, Jacksonville, FL 32221 |
| REGISTRATION NUMBER | 87-4036343 |
| REPRESENTED BY | CALEB MICHAEL DAVIS |
| POSITION | MANAGING PARTNER |
| PASSPORT NUMBER | 670625919 |
| COUNTRY OF ISSUE | UNITED STATES OF AMERICA |
| TELEPHONE | +1 (904) 487-8650 |
| EMAIL | calebmdavis8@gmail.com |

**AND**

## THE MANAGING PARTNER ("PARTY B")

| | |
|---|---|
| COMPANY NAME | **VELANOS PRINCIPAL CAPITAL INC.** |
| REGISTERED ADDRESS | 120 Adelaide Street West, Suite 2500, Toronto ON, M5H 1T1, Canada |
| REGISTRATION NUMBER | 1095476-4 |
| REPRESENTED BY | **JOSHUA M. WEARMOUTH** |
| POSITION | **MANAGING PARTNER** |
| PASSPORT NUMBER | 515363842 |
| COUNTRY OF ISSUE | UNITED STATES OF AMERICA |
| TELEPHONE | +1 949-220-3555 |
| EMAIL | **JMW@VELANOS.ORG** |

EACH OF THE PARTIES, AS THE CONTEXT MAY REQUIRE, MAY SOMETIMES HEREAFTER BE REFERRED TO AS COLLECTIVELY AS THE "**PARTIES**".



Initials

DocuSign Envelope ID: 509F6C2E-8415-4E88-A682-9E59B62FE565

**TRANSACTION CODE: JVA/VPCL-GINV-I-10142022**

**VELANOS PRINCIPAL CAPITAL**

<u>**RECITALS**</u>:

I.    WHEREAS THE PARTIES WISH TO FORM A JOINT VENTURE IN ORDER TO PARTICIPATE IN ONE OR MORE PRIVATE BUSINESS OPPORTUNITIES, INCLUDING BUT NOT LIMITED TO THE TRADING OF CURRENCY, NOTES, BONDS, FINANCIAL INSTRUMENTS, PHYSICAL COMMODITIES, PRECIOUS METALS, AND PROJECT FINANCING INITIATIVES(EACHA"**TRANSACTION(S)**" OR"**TRADE(S)**", AND HAVING THE SAME MEANING HEREIN); AND

II.    WHEREAS PARTY B IS EXPERIENCED IN AND WILL PROVIDE THE STRUCTURING TO GENERATE LIQUIDITY AND RETURNS AND PROJECT FINANCING FROM ASSETS AND CASH THROUGH COLLATERALISATION, SECURITISATION, MANAGING TRADES AND TRANSACTIONS, AND STRUCTURING AND ADMINISTERING JOINT VENTURES; AND

III.    WHEREAS PARTY A IS PREPARED TO MAKE AVAILABLE A FINANCIAL INSTRUMENT(S) FOR MONETIZATION, AND/OR CASH TO PUT ON TRADE OR TO FACILITATE TRANSACTIONS, (THE "**CASH/ASSET**") TO PROVIDE THE JOINT VENTURE PARTNER WITH INITIAL CAPITAL RESOURCES; AND

IV.    WHEREAS PARTY A HEREBY CONFIRMS, WITH FULL LEGAL RESPONSIBILITY, UNDER PENALTY OF PERJURY OF LAW THAT IT IS READY, WILLING AND ABLE TO DELIVER A FULLY CASH BACKED STANDBY LETTER OF CREDIT (SBLC) AND/OR CASH FUNDS, UNDER THE TERMS AND CONDITIONS DESCRIBED BELOW, BASED ON GOOD, CLEAN, CLEAR UNENCUMBERED FUNDS OF NON-CRIMINAL ORIGIN; AND

V.    WHEREAS PARTY B IS PREPARED TO DIRECT AND MANAGE THE PLACEMENT OF THE CASH/ASSET(S) INTO ONE OR MORE TRADES, AND/OR FACILITATE AND/OR EXECUTE ONE OR MORE TRANSACTIONS TO ACCOMPLISH THE OBJECTIVES OF THE JOINT VENTURE (THE "**PURPOSE**"),

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS HEREBY ACKNOWLEDGED, THE PARTIES AGREE IN-PRINCIPLE TO THE FOLLOWING:

1. <u>**JOINT VENTURE:**</u> THE PARTIES AGREE TO ENTER INTO THIS JOINT VENTURE (THE "**JV**") ON THE TERMS AND CONDITIONS SET FORTH HEREIN. THE JV SHALL NOT BE A NEW CORPORATE, LEGAL, OR SPECIAL PURPOSE VEHICLE / ENTITY, BUT INSTEAD BE CREATED BY THIS AGREEMENT AND MANIFESTED THROUGH THE MUTUAL COOPERATION OF THE EXISTING TWO ENTITIES ACCORDING TO THEIR SPECIFIC CONTRIBUTIONS AS DETAILED HEREIN ("**ACTIVITIES**"), AND THE SHARING OF PROFITS THAT RESULT FROM THE JV ACTIVITIES AND ARE CONTRACTUALLY FOR THE BENEFIT OF THE JV ("**PROFITS**"). THE JV SHALL COMMENCE OPERATIONS AS OF THE EFFECTIVE DATE OF EACH TRANSACTION WHICH WILL BE BASED ON THE DATE OF THE CASH/ASSET CONTRIBUTION AND ADVISED BY PARTY B TO PARTY A ON A CASE-BY-CASE BASIS.

2. <u>**BUSINESS PURPOSE / CONTRIBUTIONS / PROFIT SHARING:**</u> THE PARTIES ARE ENTERING INTO THIS JV TO COLLECTIVELY PURSUE PRIVATE BUSINESS OPPORTUNITIES FOR THEIR MUTUAL BENEFIT CONSISTENT WITH THE PURPOSE AND ACTIVITIES. THEPARTIES'CONTRIBUTIONSANDROLESINTHE JV SHALL BE AS FOLLOWS:

   2.1. PARTY A SHALL CONTRIBUTE THE CASH/ASSET FOR TRANSACTION/TRADE ACCORDING TO THE TERMS AND CONDITIONS BELOW AND THE SCHEDULE ATTACHED HEREIN.

   2.2. PARTY A SHALL BE CONSIDERED TO HAVE DONE SO BY SIGNING THIS AGREEMENT AND WILL SERVE AS THE CAPITAL PARTNER TO THE JV.

   2.3. REGARDING THE CONTRIBUTED ASSET, PARTY A REPRESENTS AND WARRANTS THAT:



**Initials**

DocuSign Envelope ID: 509F6C2E-8415-4FB6-A6321-0A59B62FF565

TRANSACTION CODE: JVA/VPCL-GINV-I-10142022

**VELANOS PRINCIPAL CAPITAL**

2.3.1. IT OWNS, CONTROLS, AND/OR HAS BEEN GRANTED NECESSARY AUTHORITY OVER THE CASH/ASSET THROUGH ANOTHER AGREEMENT THAT IS OUTSIDE OF THIS AGREEMENT AND TO WHICH THE MANAGING PARTNER IS  NOT A  PARTY, AND IT WILL TAKE FULL AND SOLE RESPONSIBILITY AND LIABILITY FOR ITS PROPER AND TIMELY DELIVERY AS REQUIRED BY THE TERMS AND CONDITIONS BELOW AND PROCEDURES DESCRIBED HEREIN; AND

2.3.2.  THE CASH/ASSET IS FREE AND CLEAR OF ANY AND ALL LIENS AND ENCUMBRANCES AND COMPOSED OF GOOD, CLEAR, CLEAN FUNDS OF NON-CRIMINAL ORIGIN; AND

2.3.3. IT HAS SUCCESSFULLY COMPLETED RIGOROUS DUE DILIGENCE ON THE CASH/ASSET AND ANY ASSOCIATED PARTIES AND CONFIRMS THEIR CREDIBILITY AND LEGITIMACY.

2.4. PARTY B SHALL CONTRIBUTE ITS EXPERIENCE, INTELLECTUAL PROPERTY,  CONTACTS, RELATIONSHIPS AND STRUCTURAL RESOURCES, PROFESSIONAL SERVICE PROVIDERS,  AND FACILITIES TO THE JV AND SERVE AS THE MANAGING PARTNER OF THE JV AS SET FORTH BELOW. PARTY B SHALL HAVE THE AUTHORITY TO STRUCTURE AND EXECUTE ASSET LIQUIDITY AND PROJECT FINANCING STRATEGIES, PLACE CASH/ASSET(S) INTO OR TO FACILITATE ONE OR MORE TRANSACTION/TRADE(S) AND TO MANAGE, DIRECT, AND OVERSEE SUCH TRANSACTION/TRADE(S).

2.5   PARTY B SHALL NOT BE CONSTRUED AS AN INVESTMENT OR FUND MANAGER OR ADVISOR, OR IN ANY WAY BE CONSIDERED TO BE CONDUCTING ANY FINANCIAL OR OTHER ACTIVITY WHATSOEVER WHERE A REGULATORY LICENSE WOULD BE REQUIRED.

3. **COMPENSATION**: THE PARTIES SHALL BE COMPENSATED HEREUNDER ON A PROFIT-SHARING BASIS.
THE COMPENSATION SHALL BE DISTRIBUTED TO THE PARTIES ACCORDING TO THE SPECIFIC SCHEDULE FOR EACH TRANSACTION (DETAILED IN THE **"PROFIT SHARING SCHEDULE"** IN APPENDIX I HEREIN), EACH WITH ITS OWN UNIQUE REFERENCE CODE. FOR PURPOSES HEREIN, PROFITS SHALL BE DEFINED AS THE GROSS PROFITS RESULTING FROM THE ACTIVITIES WHICH ARE CONTRACTUALLY FOR THE  BENEFIT OF THE JV PARTNERS AS DETAILED IN THE PROFIT SHARING SCHEDULE I, LESS ANY BANKING, LEGAL, ADMINISTRATIVE, OR PROFESSIONAL SERVICES COSTS INCURRED BY THE JV IN THE COURSE OF CONDUCTING THE ACTIVITIES.

4. **JOINT VENTURE GOVERNANCE:** PARTY B SHALL MANAGE THE BUSINESS AFFAIRS OF THE JV FOR THE BENEFIT  OF  THE PARTIES IN ITS REASONABLE BUSINESS JUDGMENT AND SHALL CONFER WITH THE PARTY A ON A REGULAR BASIS WITH REGARD TO JV MATTERS.

5. **COSTS AND EXPENSES**: EACH PARTY SHALL BE RESPONSIBLE FOR ITS OWN COSTS IN CONNECTION WITH THE PREPARATION, NEGOTIATION OF THE FORMATION OF THE JOINT VENTURE AND THE EXECUTION OF THIS AGREEMENT.

6. **BREACH, LAW,  JURISDICTION  AND  REMEDIES:** PARTY B'S FAILURE TO PAY PROFITS TO PARTY A WITHIN 60 DAYS OF ITS CONTRIBUTION OF ASSETS SHALL CONSTITUTE A MATERIAL BREACH OF CONTRACT. IN THE EVENT OF MATERIAL BREACH BY PARTY B, PARTY A MAY TERMINATE THIS AGREEMENT AND DECLARE THE SAME NULL AND VOID BY WRITTEN NOTICE DELIVERED TO PARTY B BY EMAIL, WHICH SHALL BE EFFECTIVE UPON DELIVERY. UPON RECEIVING PARTY A'S NOTICE OF BREACH, PARTY B SHALL IMMEDIATELY RELEASE AND RETURN PARTY A'S ASSETS TO PARTY A BY WIRE TRANSFER TO PARTY A'S DESIGNATED BANK COORDINATES.  PARTY A'S FAILURE TO CONTRIBUTE ASSETS AS REQUIRED BY THE AGREEMENT SHALL CONSTITUTE A MATERIAL BREACH WHICH SHALL ENTITLE PARTY B TO TERMINATE THIS AGREEMENT BY WRITTEN NOTICE AS DESCRIBED HEREINABOVE. THIS AGREEMENT SHALL BE GOVERNED  BY THE LAW  OF  NEW YORK, NY, UNITED STATES.  ALL DISPUTES BETWEEN THE PARTIES SHALL BE RESOLVED BY ARBITRATION AT THE NEW YORK INTERNATIONAL ARBITRATION CENTER. THE PARTIES HEREBY AGREE AND ADMIT TO THE PERSONAL JURISDICTION OF, AS APPLICABLE, THE NEW YORK INTERNATIONAL ARBITRATION CENTER. THE PARTIES AGREE THAT THE LOSING PARTY IN ANY SUCH ARBITRATION HEARING HEREUNDER SHALL HOLD THE PREVAILING PARTY HARMLESS FROM ALL COST, DAMAGE AND EXPENSE INCURRED AS A RESULT OF THE APPLICABLE CLAIM OR ACTION.



Initials

DocuSign Envelope ID: 509F6C2E-8415-4E86-A682-1D50B67FF565
**TRANSACTION CODE: JVA/VPCL-GINV-I-10142022**

**VELANOS PRINCIPAL CAPITAL**

7. <u>**LEGAL ADVICE:**</u> EACH PARTY HAS HAD THE OPPORTUNITY TO RECEIVE BUSINESS, FINANCIAL AND LEGAL ADVICE WITH RESPECT TO THIS AGREEMENT, AND/OR HAS THE REQUISITE EXPERIENCE AND SOPHISTICATION TO UNDERSTAND, INTERPRET AND AGREE TO THE TERMS AND PROVISIONS HEREOF AND HAVE VOLUNTARILY WAIVED THEIR RIGHT TO RECEIVE INDEPENDENT COUNSEL AND ADVICE WITH RESPECT THERETO.

8. <u>**ENTIRE AGREEMENT / ASSIGNMENT / RECITALS:**</u> THIS AGREEMENT CONTAINS THE ENTIRE UNDERSTANDING AND AGREEMENT BETWEEN THE PARTIES HERETO WITH RESPECT TO THE SUBJECT MATTER HEREOF, SUPERSEDING ALL NEGOTIATIONS, PRIOR DISCUSSIONS, PRELIMINARY AGREEMENTS AND ALL PRIOR AGREEMENTS BETWEEN THE PARTIES AND THEIR AFFILIATES MADE PRIOR TO THE DATE HEREOF, AND SHALL NOT BE CHANGED EXCEPT BY AN INSTRUMENT SIGNED BY THE PARTIES HERETO. THIS AGREEMENT MAY NOT BE ASSIGNED WITHOUT THE EXPRESS, WRITTEN PERMISSION OF THE NON-ASSIGNING PARTIES. THE RECITALS TO THIS AGREEMENT SHALL BE DEEMED TO BE PART OF THE AGREEMENT.

9. <u>**NOTICES:**</u> ALL NOTICES HEREUNDER SHALL BE IN WRITING, ADDRESSED TO THE PARTY AT THE ADDRESS SET FORTH HEREIN, AND SHALL BE SENT, WITH PROOF OF DELIVERY, BY ELECTRONIC, CERTIFIED OR REGISTERED MAIL, OR BY COURIER. IN THE EVENT THAT THE ADDRESS OR CONTACT INFORMATION FOR ANY PARTY CHANGES, SUCH PARTY SHALL PROMPTLY PROVIDE NOTICE TO THE OTHER PARTY OF SUCH CHANGE(S).

10. <u>**CONFIDENTIAL INFORMATION**</u>: BY VIRTUE OF THIS AGREEMENT, EACH PARTY MAY OBTAIN CERTAIN CONFIDENTIAL OR PROPRIETARY INFORMATION. FOR PURPOSES OF THIS AGREEMENT, THE TERM "**CONFIDENTIAL INFORMATION**" MEANS ALL INFORMATION WHICH IS DELIVERED BY ANY PARTY, THEIR AFFILIATES OR THEIR REPRESENTATIVES IN CONNECTION WITH THIS AGREEMENT, WHICH IS NON- PUBLIC AND IDENTIFIED AS BEING CONFIDENTIAL OR PROPRIETARY. THE PARTIES AGREE THAT THEY AND THEIR RESPECTIVE REPRESENTATIVES WILL NOT USE ANY CONFIDENTIAL INFORMATION FOR ANY PURPOSE OTHER THAN TO FULFILL THEIR UNDERTAKINGS PURSUANT TO THIS AGREEMENT FOR A PERIOD OF FIVE YEARS FROM TERMINATION OF THIS AGREEMENT. THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES WILL KEEP THE CONFIDENTIAL INFORMATION COMPLETELY CONFIDENTIAL; PROVIDED, HOWEVER, THAT THE CONFIDENTIAL INFORMATION MAY BE DISCLOSED TO THEIR REPRESENTATIVES OR AFFILIATES WHO NEED TO REVIEW THE CONFIDENTIAL INFORMATION (IT BEING UNDERSTOOD THAT THEIR REPRESENTATIVES SHALL BE INFORMED OF THE CONFIDENTIAL NATURE OF SUCH CONFIDENTIAL INFORMATION AND SHALL BE DIRECTED TO TREAT THE CONFIDENTIAL INFORMATION IN ACCORDANCE WITH THIS AGREEMENT). THE PARTIES SHALL TREAT AS CONFIDENTIAL ALL NAMES, TELEPHONE NUMBERS, EMAIL ADDRESSES, TELEX NUMBERS, FACSIMILE NUMBERS AND ANY OTHER FORM OF CONTACT COORDINATES AS WELL AS ANY OTHER INFORMATION EXCHANGED BETWEEN THE PARTIES, EACH PLEDGING NOT TO DISCLOSE TO ANY OTHER ENTITY OR INDIVIDUALS, EXCEPT WHEN REQUIRED FOR THE PURPOSE OF THE JV TRANSACTION(S), ANY SUCH INFORMATION, WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE NON-DISCLOSING PARTY. SHOULD THE NON-DISCLOSING PARTY OR ANY RELATED INDIVIDUALS, CORPORATIONS, DIVISIONS, ASSOCIATES, THIRD PARTIES OR OTHER FORM OF ENTITY RELATED IN ANY WAY TO THE NON-DISCLOSING PARTY ATTEMPT TO PARTICIPATE IN A SUBSEQUENT TRANSACTION INVOLVING THE OF THE SAME INDIVIDUALS OR ENTITIES DISCLOSED BY THE DISCLOSING PARTY DURING THE TERM OF THIS AGREEMENT AND DURING THE THREE (3) YEARS THEREAFTER IN RESPECT OF INTRODUCTIONS, INFORMATION, RECOMMENDATIONS, DATA OR OTHER KNOWLEDGE ACQUIRED FROM THE DISCLOSING PARTY, THE DISCLOSING PARTY SHALL BE ENTITLED TO COMPENSATION IN AN AMOUNT EQUAL TO ALL PROCEEDS PAID TO THE NON-DISCLOSING PARTY OR ITS RELATED PARTIES OR AFFILIATES.

11. <u>**REQUIRED DISCLOSURE:**</u> IN THE EVENT THAT A PARTY OR ANY OF THEIR REPRESENTATIVES RECEIVES A REQUEST, OR IS REQUIRED (BY DEPOSITION, INTERROGATORY, REQUEST FOR DOCUMENTS, SUBPOENA, CIVIL INVESTIGATIVE DEMAND OR SIMILAR PROCESS) TO DISCLOSE CONFIDENTIAL INFORMATION, THE PARTIES AGREE TO (I) IMMEDIATELY NOTIFY THE OTHER PARTY OF THE EXISTENCE, TERMS AND CIRCUMSTANCES SURROUNDING SUCH A REQUEST; (II) CONSULT WITH THE OTHER PARTY ON THE ADVISABILITY OF TAKING LEGALLY AVAILABLE STEPS TO RESIST OR NARROW SUCH REQUEST; AND (III) ASSIST THE OTHER PARTY IN SEEKING A PROTECTIVE ORDER OR OTHER APPROPRIATE REMEDY. IN THE EVENT THAT SUCH PROTECTIVE ORDER OR OTHER REMEDY IS NOT OBTAINED, OR THE OTHER PARTY WAIVES COMPLIANCE WITH THE PROVISIONS HEREOF, (I) A PARTY OR THEIR REPRESENTATIVES MAY DISCLOSE TO ANY TRIBUNAL ONLY THAT PORTION OF SUCH CONFIDENTIAL INFORMATION WHICH THEY ARE ADVISED BY COUNSEL IS LEGALLY REQUIRED TO BE DISCLOSED, AND SHALL EXERCISE THEIR BEST EFFORTS TO OBTAIN ASSURANCE THAT CONFIDENTIAL TREATMENT WILL BE ACCORDED SUCH CONFIDENTIAL



Initials

DocuSign Envelope ID: 509F6C2E-8415-4F06-A622-1DF9B67FF565

Case 3:24-bk-00496-BAJ   Doc 34   Filed 03/15/24   Page 30 of 142

**TRANSACTION CODE: JVA/VPCL-GINV-I-10142022**

**VELANOS PRINCIPAL CAPITAL**

INFORMATION; AND (II) THEY SHALL NOT BE LIABLE FOR SUCH DISCLOSURE UNLESS DISCLOSURE TO ANY SUCH TRIBUNAL WAS CAUSED BY OR RESULTED FROM A PREVIOUS DISCLOSURE BY A PARTY OR THEIR REPRESENTATIVES NOT PERMITTED BY THIS AGREEMENT.

13. __NON-CIRCUMVENTION:__ WITH RESPECT TO ANY INTRODUCTIONS MADE BY THE PARTIES TO EACH OTHER HEREUNDER, THE PARTIES AGREE THAT THEY SHALL EACH NOT: (I) CIRCUMVENT, OR ATTEMPT TO CIRCUMVENT, THE OTHER PARTY FOR THE PURPOSE OF DEPRIVING THE OTHER PARTY OF ANY COMPENSATION TO WHICH THE OTHER PARTY IS OR WOULD BE ENTITLED TO HEREUNDER; AND (II) SOLICIT ANY PARTY INTRODUCED BY THE OTHER PARTY FOR THE PURPOSE OF ANY TRANSACTION, DEAL OR OPPORTUNITY FOR A PERIOD OF FIVE (5) YEARS FROM THE DATE OF ANY SUCH INTRODUCTION, WITHOUT THE EXPRESS WRITTEN CONSENT OF THE INTRODUCING PARTY. THE PARTIES FURTHER AGREE THAT IN THE EVENT THAT A PARTY CIRCUMVENTS OR ATTEMPTS TO CIRCUMVENT THE OTHER PARTY, THE NON-CIRCUMVENTING PARTY SHALL BE ENTITLED TO LIQUIDATED DAMAGES EQUAL TO THE TOTAL COMPENSATION RECEIVED BY THE CIRCUMVENTING PARTY FROM THE TRANSACTION IN WHICH THE ATTEMPTED CIRCUMVENTION OR ACTUAL CIRCUMVENTION OCCURS.

14. __REPRESENTATIONS AND WARRANTIES:__ THE PARTIES REPRESENT AND WARRANT AS FOLLOWS:

   14.1.    THE PARTIES ARE NOT REGISTERED AND ARE NOT REQUIRED TO BE REGISTERED AS INVESTMENT ADVISERS.

   14.2.    THE INDIVIDUAL PERSONS EXECUTING THIS AGREEMENT ON BEHALF OF EACH RESPECTIVE PARTY ARE DULY AUTHORIZED TO ENTER INTO THIS AGREEMENT BY AND ON BEHALF OF EACH RESPECTIVE PARTY.

   14.3.    THE PARTIES ARE DULY FORMED, VALIDLY EXISTING AND IN GOOD STANDING UNDER  THE REGISTRAR OF COMPANIES IN THEIR JURISDICTION OF FORMATION AND ARE QUALIFIED TO DO BUSINESS IN ALL OTHER JURISDICTIONS WHERE THEIR BUSINESS REQUIRES THEM TO BE QUALIFIED.

15. __BINDING EFFECT:__ THIS AGREEMENT SHALL BE BINDING UPON THE PARTIES HERETO AND UPON THEIR RESPECTIVE HEIRS, SUCCESSORS, LEGATEES, EXECUTORS, ADMINISTRATORS AND PERMITTED ASSIGNS, AND WILL INURE TO THEIR BENEFIT.

16. __WARRANTIES / DISCLAIMER:__  THE PARTIES MUTUALLY WARRANT AND REPRESENT TO EACH OTHER THAT THEY EACH HAVE THE FULL RIGHT, POWER, AND AUTHORITY TO ENTER INTO THIS AGREEMENT AND TO FULLY PERFORM THEIR OBLIGATIONS HEREUNDER.

17. __BENEFICIARIES:__ THE BENEFIT OF THIS AGREEMENT AFTER EXECUTED BY THE PARTIES HEREIN SHALL BE INCLUSIVE TO THE HEIRS OF THE ESTATES OF THE NAMED PARTIES/BENEFICIARIES ANDTHE PARTIES' ASSIGNS.

18. __TAXES:__   NO REPRESENTATIONS ARE HEREBY MADE OR IMPLIED WITH REGARD TO THE TAX IMPLICATIONS, IF ANY, IN RESPECT OF ANY TRANSACTIONS HEREUNDER. THE PARTIES INDIVIDUALLY AND SEPARATELY ACCEPT THEIR OWN RESPONSIBILITIES AND LIABILITIES FOR ANY TAXES, IMPOSTS, LEVIES, DUTIES OR CHARGES THAT MAY ARISE FROM THEIR RESPECTIVE INTERESTS IN THE JOINT VENTURE AND ITS ACTIVITIES.

19. __FORCE MAJEURE:__ THIS AGREEMENT SHALL BE SUBJECT TO THE GENERAL RULES OF "FORCE MAJEURE" AS ESTABLISHED BY  THE LAW OF THE STATE OF NEW YORK, NY, UNITED STATES AND RESOLVED BY ARBITRATION AT THE NEW YORK INTERNATIONAL ARBITRATION CENTER.   FURTHER, SHOULD ANY ACT OF GOD, WAR, BANK OR GOVERNMENT COMPUTER FAILURE, INSURRECTION OR CIVIL DISTURBANCE OCCUR IN ANY COUNTRY WHERE THE JOINT VENTURE IS ACTIVE, IN WHOLE OR IN PART, THEREBY DELAYING OR MAKING PERFORMANCE BY ANY OF THE PARTIES AND/OR COUNTER PARTIES IMPOSSIBLE, THEN THIS AGREEMENT SHALL BE  EXTENDED FOR SUCH TERM, AS IS REASONABLY DETERMINED BY THE NATURE OF THE OCCURRENCE.

20. __COUNTERPARTS / SIGNATURES:__ THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS, EACH OF WHICH  SHALL BE DEEMED  TO BE AN ORIGINAL, AND ALL OF WHICH TAKEN TOGETHER SHALL CONSTITUTE ONE AND THE SAME DOCUMENT. A DIGITAL OR FACSIMILE SIGNATURE ON  THIS AGREEMENT SHALL BE THE EQUIVALENT OF AN ORIGINAL SIGNATURE AND SUCH AGREEMENT SHALL BE DEEMED AN ORIGINAL AND SHALL BE FULLY ADMISSIBLE AND ENFORCEABLE IN ALL PROCEEDINGS.



Initials

DocuSign Envelope ID: 509F6C2E-8415-4F06-A682-9E6B67FF565

**TRANSACTION CODE: JVA/VPCL-GINV-I-10142022**

**VELANOS** PRINCIPAL CAPITAL

21. **EXCLUSIVITY / ADDITIONAL TRANSACTIONS:** THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS JV IS EXCLUSIVE.  IN THE EVENT THAT THE PARTIES MUTUALLY AGREE FOR ADDITIONAL ASSETS TO BE INVESTED INTO THE JV (THE"NEWINVESTMENT"), THEN THEY SHALL AMEND THIS AGREEMENT BY A WRITTEN AMENDMENT, SIGNED BY THE AUTHORIZED SIGNATORIES OF PARTY A AND THE TERMS AND CONDITIONS HEREOF SHALL APPLY TO ANY SUCH NEW TRANSACTION.

**WHEREUPON** THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED BY THEIR RESPECTIVE DULY AUTHORIZED SIGNATORIES AS OF THE EFFECTIVE DATE HEREOF.

SIGNED ON THIS DAY, OCTOBER 19TH, 2022

FOR AND BEHALF OF PARTY A:

_Caleb Davis_
DocuSigned by:
568FFB8F31644BD...

NAME: MR. CALEB MICHAEL DAVIS
TITLE: MANAGING PARTNER

FOR AND BEHALF OF PARTNER B:

DocuSigned by:
6BD0F535F3B84AC...

NAME: MR. JOSHUA MATTHEW WEARMOUTH
TITLE: MANAGING PARTNER

Initials

DocuSign Envelope ID: 509F6C2E-8415-4F86-A682-1059B67FF565
**TRANSACTION CODE: JVA/VPCL-GINV-I-10142022**

**VELANOS PRINCIPAL CAPITAL**

## APPENDIX I:

### TRANSACTION PROFIT SHARING SCHEDULE

| | |
|---|---|
| **TRANSACTION CODE** | JVA/VPCL-GINV-I-10142022 |
| **TRANSACTION TYPE** | Strategic Capital/Systematic Purchase and Sell Transaction |
| **TRANSACTING ASSET(S)** | SBLC (Standby Letter of Credit) HSBC London/Top Rated Issuer |
| **CAPITAL PARTY CONTRIBUTION** | Liquid Cash Funds |
| **CAPITAL PARTY INSTRUMENT** | Rolling Strategic Participation |
| **CAPITAL PARTY CONTRIBUTION SIZE** | $3,000,000.00 USD (Three Million US Dollars) |
| **CAPITAL PARTY CONTRIBUTION DATE** | $2,100,000.00 within Twenty-Four (24) Hours of the JVA Execution for; and within seven (7) days for the remaining balance |
| **INSTRUMENT COMMENCEMENT DATE** | Within Ten (10) Banking Days, post contribution |
| **INSTRUMENT TERM** | Sixty (60) Banking Days |
| **INSTRUMENT RETURN CALCULATION PEROID** | Monthly |
| **TARGET RETURN PERIOD** | One Hundred Percent (100%) in Thirty (30) days; remaining within Sixty (60) days, post commencement |
| **PROFIT DISTRIBUTION FREQUENCY** | Thirty (30) days post commencement |
| **CAPITAL PARTY CONTINUATION TERMS** | Subject to opportunity and mutual agreement |
| **TRANSACTIONAL BANK(S)** | HSBC London / Barclays London |
| **SPECIAL NOTES** | 1. PARTY A WILL RETURN THE DULY EXECUTED JOINT VENTURE AGREEMENT WITH DUE DILIGENCE DOCUMENTS AS REQUIRED BY PARTY B.<br>2. PARTY A WILL REMIT THE CAPITAL PARTNER CONTRIBUTION TO PARTYB'SRECEIVINGBANKCOORDINATES.<br>3. PARTY B WILL DEPLOY THE CONTRIBUTED CASH/ASSET STRATEGICALLY AND WITH DISCRETION, INCLUDING FACILITATING A SYSTEMATIC PURCHASE AND SALE OF FINANCIAL NSTRUMENTS ROUTINE.<br>4. PARTY B WILL PROVIDE PARTY A WITH A ROLLING PROFIT PARTICIPATION IN THE JV ACTIVITIES UP TO $**25,000,000.00**.<br>5. PARTY A MAY CHOOSE TO RECEIVE PROFITS DISTRIBUTIONS TO ANY OF ITS NOMINATED BANK COORDINATES.<br>6. PARTY A MAY DECIDE TO WITHDRAW ITS CONTRIBUTED ASSET PLUS ANY ACCRUED PROFITS ENTITLEMENT AND EXIT THE JV AT ANY TIME AFTER THE FIRST DISTRIBUTION.<br>7. SUBJECT TO OPPORTUNITY AND MUTUAL AGREEMENT, AT THE END OF THE INSTRUMENT TERM, PARTY A MAY CONTINUE ITS ROLLING STRATEGIC PARTICIPATION.<br>8. AFTER PARTY A CONTRIBUTES ITS ASSETS, PARTY B SHALL PROVIDE PARTY A COPIES OF THE CURRENT TRANSACTIONAL BANK ACCOUNT STATEMENT SHOWING THE RELEVANT TRADE TRANSACTIONS EVERY THIRTY (30) DAYS DURING PARTY A'S PARTICIPATION IN THE JV. |

ACKNOWLEDGED, ACCEPTED, AND SIGNED ON THIS DAY: OCTOBER 19TH 2022,

FOR AND BEHALF OF PARTY A:

DocuSign signed by:

*Caleb Davis*

NAME: MR. CALEB MICHAEL DAVIS

TITLE: MANAGING MEMBER

Initials

DocuSign Envelope ID: 509F6C2E-8415-4E06-A621-0A69B67FF565

**TRANSACTION CODE: JVA/VPCL-GINV-I-10142022**

**VELANOS PRINCIPAL CAPITAL**

## APPENDIX II:

### PARTY A BANKING COORDINATES FOR SENDING CONTRIBUTED CASH/ASSET

| | |
|---|---|
| BANK NAME | JP Morgan Chase |
| BANK ADDRESS | 7301 Baymeadows Way, Jacksonville, FL 32256 |
| SWIFT CODE | CHASUS33 |
| SORT CODE | N/A |
| EUR ACCOUNT NUMBER | N/A |
| USD ACCOUNT NUMBER | 4012372222 |
| IBAN | N/A |
| ACCOUNT NAME | Genie Investments NV, LLC |
| BANK OFFICER | Stephen Massicotte |
| BANK TELEPHONE | Office: 904-462-1016 | Cell: 904-536-7959 |
| BANK OFFICER EMAIL | stephen.m.massicotte@chase.com |
| SPECIAL INSTRUCTIONS | |

### PARTY B BANKING COORDINATES FOR RECEIVING CONTRIBUTED CASH/ASSET

| | |
|---|---|
| BANK NAME | Scotiabank / Bank of Nova Scotia |
| BANK ADDRESS | 3401 Dufferin St Mail Box 54, Toronto, Ontario, Canada M6A 2T9 |
| SWIFT CODE | NOSCCATT |
| SORT CODE | N/A |
| EUR ACCOUNT NUMBER | N/A |
| USD ACCOUNT NUMBER | 2215200076171520007617 |
| IBAN | N/A |
| ACCOUNT NAME | VELANOS PRINCIPAL CAPITAL INC. |
| BANK OFFICER | Jasotha Ulaganathan |
| BANK TELEPHONE | 416-784-5126 x4300 |
| BANK OFFICER EMAIL | jasotha.ulaganathan@scotiabank.com |
| SPECIAL INSTRUCTIONS | |



Initials

**STRICTLY PRIVATE AND CONFIDENTIAL**

# EXHIBIT 2

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

among

## McMann Commercial Lending LLC

as Lender

and

## A Complete Home Inspection, LLC
as Borrower

_____

dated as of

January 10, 2023

_____

Initials: _____

## BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated or otherwise modified, this "**Agreement**") is made and entered as of January 10, 2023, between McMann Commercial Lending LLC (the "**Lender**"), and  A Complete Home Inspection, LLC, a Louisiana Limited Liability Company ("**Borrower**").

## RECITALS

A.      The Borrower desires to obtain from Lender an asset backed line of credit loan (the "**LOC**") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

B.      The Borrower desires to obtain the LOC from Lender for the purpose of Business Expansion for Real Estate Investing (as more fully described on **Exhibit D** attached hereto the "**Project**"). Acquired assets will be legally described on **Exhibit E** attached hereto (the "**Property**").

C.      The Borrower has agreed to pay a minimum contribution of ten percent (10%) of the Project LOC Amount to Lender, by establishing the Interest Reserve (as hereinafter defined) and the ICA (as hereinafter defined), collectively, (the "**Interest Reserve Account**"), within seven (7) calendar days after the fully executed LOC Documents (as hereinafter defined) are received by Lender.

D.      The Borrower has agreed to pay, pursuant to Section 3.6 hereof, the aggregate amount of Two Hundred Fifty  Thousand  Dollars and No Cents Dollars ($250,000), (the "**ICA Payment**"), by bank wire to Lender. An account on the books and records of Lender shall be created to serve as an Interest Credit Account (the "**ICA**"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

E.       Lender has agreed to make Advances (as hereinafter defined) under the LOC to Borrower in an aggregate amount, according to **Exhibit B**, amount not to exceed the Maximum Amount for the purposes set forth in these recitals and the Promissory Note attached hereto as **Exhibit** A and upon the terms and subject to theconditions hereinafter set forth.

**NOW THEREFORE**, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1. **Certain Defined Terms**. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed in accordance with generally accepted accounting principles consistently applied.  As used in this

Initials: _____

Agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

**"Advance(s)"** means any loan advance made by Lender in accordance with the terms and conditions of this Agreement.

**"Applicable Interest Rate"** means the fixed interest rate specified in the Promissory Note.

**"Borrower"** means that term as defined in the first paragraph of this Agreement.

**"Business Expansion"** means any transaction or use, including for working capital, that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business(other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

**"Business Plan"** means the document(s) outlining the accurate and up to date business operations of the End-Borrower, as previously provided by End-Borrower, substantially in the form set forth in EXHIBIT D, and subject to review by Lender's Capital Partners as described in Section 8.1 of this Agreement.

**"Closing Date"** means the last date of signed execution of this Agreement by Lender and Borrower.

**"Collateral"** means any and all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements and proceeds, thereof.

**"Event(s) of Default"** means any event or condition that shall constitute an event of default as described in Article 13 of this Agreement.

**"ICA"** means the definition given in Recital D of this Agreement.

**"ICA Payment"** means the amount remitted pursuant to Recital D of this Agreement.

Initials: _____

"**Interest Reserve**" means credit on the books and records of Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from a Borrower JV Partner, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"**Interest Reserve Account**" means the definition given in Recital C of this

Agreement.

 "**Lender**" means that term as defined in the first paragraph of this

Agreement.

"**Lender's Capital Partners**" means the one or more lender-clients of Lender

providing funding towards the LOC.

"**LOC**" means that term as defined in Recital A of this Agreement.

"**LOC Disbursement Account**" means that term as defined in Section 3.12 hereof.

"**LOC Document(s)**" means, collectively, this Agreement, the Promissory Note and each Security Document, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced, and any other document delivered pursuant thereto.

"**Maximum Amount**" means Two Million Six Hundred Thousand  Dollars and No Cents ($2,600,000). The Maximum Amount is the Project LOC Amount plus all fees, costs and expenses which are the Borrower's responsibility to pay.

"**Organizational Documents**" means, with respect to any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"**Other Taxes**" means any and all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other LOC Document.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority or any other entity.

Initials: _____

"**Project**" means that term as defined in Recital B of this Agreement.

"**Project Costs**" means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by Borrower for the purpose of implementation or execution of the Project (including but not limited to payment of taxes, insurance and all items reasonably necessary for the successful execution of the Project), as more specifically set forth in the Project budget set forth on **Exhibit C** attached hereto.

"**Project LOC Amount**" means Two Million Five Hundred Thousand Dollars and No Cents Dollars ($2,500,000).

"**Property**" means that term as defined in Recital B of this Agreement.

"**Promissory Note**" means the Promissory Note, in the form attached hereto as **Exhibit A**.

"**Security Agreement**" means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as **Exhibit E**.

"**Security Document**" means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each U.C.C. Financing Statement or similar filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or under the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

"**Scheduled Maturity Date**" means the 10th year anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

"**Subsidiary**" means any entity (other than the Borrower) in an unbroken chain of entities beginning with the Borrower if each of the entities owns stock, units or other interests that represent fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain

"**Taxes**" means any and all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, with respect to those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender with respect to the LOC.

"**Term Sheet**" means that document(s) dated as of 1/5/2023 between Borrower and

Lender, setting forth a general summary of the terms of agreement memorializedmore fully herein in final form.

**"Tranche Schedule"** means the schedule of Advances to Borrower from the Lender, based upon the dates of the disbursements attached hereto as **Exhibit B**; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder do not exceed the Maximum Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

**"UCC"** means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

## ARTICLE 2
## THE CREDIT

**Section 2.1.  Line of Credit Amount**. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

**Section 2.2.  Line of Credit Documents**. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note, this Agreement and each Security Document. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to Lender and its counsel.

## ARTICLE 3
## TERM, INTEREST AND PAYMENTS

**Section 3.1.  Initial Term**. The initial term of the LOC is Ten (10) years and shall commence on the Closing Date and expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full thereon and all other amounts due and owing hereunder and under the Promissory Note shall be repaid by Borrower on the Scheduled Maturity Date.

**Section 3.2.  Extended Term.** At the end of the initial term set forth in Section 3.1 hereof, and at the end of each Extended Term (as defined below, if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, through the passage of time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty-four (24) month period, up to a total of one (1) such additional consecutive periods (separately, **"Extended Term"**; collectively, the **"Extended Terms"**). In connection with Lender's granting of each Extended Term, (a) Borrower

Initials: _____

shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorneys' fees, as a one (1)-time fee equal to one percent (1%) of the Project LOC Amount.

Section 3.3. **Applicable Interest Period.** The interest period with respect to each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full.

Section 3.4. **Interest Rate Calculation**. Interest shall be calculated on the basis of a 365-day year and the actual number of days elapsed in a 365-day year and at the rate set forth in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "**Maximum Interest Rate**"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to the unpaid principal balance outstanding under the Promissory Note or, if it exceeds such unpaid principal, refunded to the Borrower.

Section 3.5. **Interest Payments**. Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times set forth in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

Section 3.6.  **Reserves**. Following the signing of this Agreement, the Borrower shall remit Two Hundred Fifty  Thousand  Dollars and No Cents Dollars ($250,000) as the ICA Payment in accordance with the terms and the time period set forth in Recital D of this Agreement. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and not refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable.

Section 3.7. **Prepayment**. Borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC.

Section 3.8.  **Interest Credit Account**. If, at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which notice shall be delivered to and received by Borrower no less than thirty (30) days prior to the date of the next interest payment date, Borrower shall remit into the ICA the funds necessary to make such interest payment prior to the date such interest payment is due and payable.

Section 3.9.  **Fees.**

    (a)  **LOC Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable fee for the LOC in an aggregate amount equal to Four

percent (4%) multiplied by the Project LOC Amount, which is equal to One Hundred Thousand Dollars and No Cents ($100,000) (the "**LOC Fee**"). The LOC Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

(b) **Promote Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable success fee in an aggregate amount equal to Two percent (2%) multiplied by the Project LOC Amount, which is Fifty Thousand Dollars and No Cents ($50,000) (the "**Promote Fee**"). The Promote Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

(c) **ICA Advance Fee**. To the extent the Borrower used Lender to provide the ICA Payment, at Closing and out of the initial Advance, the Borrower shall reimburse Lender in an amount equal to the ICA Payment advanced by Lender plus a nonrefundable fee in an aggregate amount equal to Zero percent (0%) of the ICA Payment, which is No Dollars and No Cents Dollars ($-) (the "**ICA Advance Fee**"). The ICA Advance Fee has been fully earned by Lender and is due and payable in full toLender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition. Borrower will take the Project LOC Amount in full on the closing of the first tranche.

Section 3.10. **Line of Credit Extension Fees**. Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a nonrefundable LOC extension fee for each extension in an aggregate amount equal to two percent (2%) multiplied by the Maximum Amount.

Section 3.11. **Legal and Incidental Fees, Charges and Costs**. Borrower shall pay at Closing, all reasonable out of pocket and up to Twelve Thousand, Five Hundred U.S. Dollars ($12,500) for legal fees, recording and filing fees, documentary stamps, taxes, service charges, credit reports, UCC search costs, title company fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial proceeding; provided that Lender will provide Borrower ten (10) days' advance notice of any legal fees pursuant to this Section 3.11 that will exceed Twelve Thousand, Five Hundred U.S. Dollars ($12,500). Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from any and all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be

Initials: _____

indemnified under this Section 3.11 for its own gross negligence or willful misconduct.

**Section 3.12. Line of Credit Disbursement Account**. The proceeds of each Advance under the LOC shall be advanced into the LOC Disbursement Account with Lender to be used by Borrower for payment of the Borrower's Project Costs, solely for the purposes and in the manner set forth in this Agreement. The LOC Disbursement Account will be held jointly in the name of Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights and interest in and to the LOC Disbursement Account, which assignment will be effective only upon the occurrence and continuation of an Event of Default, subject to an applicable Default Cure Period (as hereinafter defined).

**Section 3.13. Taxes**.

(a)    All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after deducting, withholding and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

(b)    Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to Lender.  If the Borrower shall fail to pay any Taxes or OtherTaxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result ofany such failure.

(c)    The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

## ARTICLE 4
## CONDITIONS TO CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing:

**Section 4.1.    Delivery of the LOC Documents**.

(a)    As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

Initials: _____

(b)      The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Payment Account and Security Account (both as defined under UCC § 9-102 and as further defined in the Security Agreement) maintained by the Borrower.

(c)      Contemporaneously with Borrower's acquisition of the Property, Borrower shall have delivered an executed and notarized mortgage or deed of trust in form and substance required by Lender granting Lender a first priority lien and security interest in and to the Property (the "**Security Instrument**"), and such Security Instrument shall be promptly recorded in the real property records of the county in which such real property is located.  If required by Lender, (i) the closing of such Advance and recording of the Security Instrument shall be completed through services of a title company chosen by Lender, and (ii) such title company shall issue, at Borrower's expense and for the benefit of Lender, a loan policy of title insurance with respect to the Property. For the avoidance of doubt, this Section 4.1(c) shall not operate to preclude any Advances to Borrower to fund pre-acquisition costs.

**Section 4.2.  Authority**. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery and performance of the LOC Documents and the consummation of the transactions contemplated thereby, (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners or members of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing with regard to the Borrower.

**Section 4.3.  Liens**. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions or restrictions. At the request of Lender, the Borrower shall (i) deliver to the Lender the results of UCC lien searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) UCC or other lien termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project or any Collateral without the express written permission of Lender.

**Section 4.4.  Litigation**. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

**Section 4.5.  Events of Default**. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in

Initials: _____

full compliance with the terms and provisions of this Agreement.

**Section 4.6. <u>Purchase and Agreement Contracts</u>.** Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

**Section 4.7. <u>Compliance with Certain Requirements</u>**. Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) under local, state, federal and international laws, procedures, statutes, regulations, and ordinances, conditions applicable to the Project.

**Section 4.8.    <u>Evidence of Insurance</u>**.

(a)    For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for and will keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders' loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of similar size and character that of the business of the Borrower, and Borrower shall furnish Lender with the satisfactory evidence of such underlying Borrower insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

(b)    Within five (5) business of receipt of End-Borrower insurance pursuant to Section 4.8(a), Lender shall acknowledge receipt and communicate to Borrower the approval and sufficiency of such End-Borrowers certificate of insurance.

**Section 4.9. <u>Financial Statements</u>**. Lender shall have received all financial reports required by Section 8.6 hereof.

**Section 4.10. <u>Business Pro Forma</u>**. Lender shall receive a pro forma income and expense statement annually in connection with the Project.

**Section 4.11. <u>Management Plan</u>**. Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of Borrower's business.

**Section 4.12. <u>Material Change</u>.** Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower's ability to perform under this Agreement or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent, and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.

**Section 4.13. <u>Non-Subordination</u>.** Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such Subsidiary (excepting interim obligations for labor and materials incurred in the normal course of

Initials: _____

development and construction of the Project, which obligations will be timely satisfied in the normal and reasonable management of the Project).

**Section 4.14. Securitization.** Lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or reasonable due diligence required by the insurer.

# ARTICLE 5
# USE OF LINE OF CREDIT PROCEEDS

**Section 5.1.    Project Costs: Business Expansion Costs**.

(a)      Proceeds of Advances under the LOC shall be utilized by Borrower solely for the purpose of financing the Project Costs, as more fully described on the attached **Exhibit C,** in connection with Borrower Business Expansion as further detailed in the Business Plan, updated yearly by Borrower.

(b)      The proceeds of the LOC shall be used exclusively for the purposes set forth in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family or household purposes.  Borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of sanctions, or (ii) in any other manner that would result in a violation of sanctions by any Person.

# ARTICLE 6
# INSPECTIONS

**Section 6.1. Project Inspection**. Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days' prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

**Section 6.2. Books and Records**. Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower pertaining to the Project, the Property, and the Borrower and to make extracts therefrom or copies thereof.

**Section 6.3. Force Majeure Event Inspection Right.** In the event of a Force Majeure Event (as hereinafter defined) which interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until such time as Lender is satisfied of Borrower's ability to resume operations to develop

Initials: _____

the Project. Following a Force Majeure Event, Lender has the right to modify the terms upon which future Advances may be made as a result of a change in circumstances as determined by Lender in Lender's sole discretion, that the Borrower has ability to perform or continue to perform the Project scope of work. Borrower shall execute any additional documents, amendments or other agreement of terms required by Lender, before Lender's obligation to continue to make Advances shall resume.

## ARTICLE 7
## ADVANCE OF FUNDS

**Section 7.1. <u>Timing and Advances to Payee</u>**. Advances will be made as set forth in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance have been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than seventy-five (75) calendar days following the opening of the ICA by the Lender with its wholesale lender. Lender shall deliver written notice to Borrower via the ZOOMERAL messaging system of the commencement of such seventy-five (75)-day period.

**Section 7.2. <u>Conditions Precedent to Advance of Funds</u>**. Lender's obligation to make Advances hereunder shall be conditioned upon fulfillment of the terms set forth in Article 4 hereof.

**Section 7.3. <u>Unpaid Lien Claims.</u>** If Lender receives notice of nonpayment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, in accordance with applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower; or (b) withhold one hundred percent (100%) of the lien amount claimed from future Advances.

**Section 7.4. <u>Mandatory Advances</u>**. Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.

## ARTICLE 8
## BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing:

**Section 8.1. <u>Project</u>**. (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is counterparty to each material

Initials: _____

primary contract and agreement related to (i) the Project and (ii) the development, construction, operation and management of the Project.

Section 8.2. **Compliance with Laws**. Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

Section 8.3. **Compliance with Documents**. Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

Section 8.4. **Books and Records**. Keep and maintain complete and accurate books of account, in accordance with generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

Section 8.5. **Payment of Obligations**. Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established in accordance with generally accepted accounting principles).

Section 8.6. **Financial Reports**. Deliver to Lender, with respect to Borrower as soon as available and in any event (a) within sixty (60) days after the end of each calendar quarter during the term of the LOC, financial statements of Borrower for such quarter and (b) within ninety (90) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower, in each case of the foregoing, certified as true and correct (which reports shall be prepared in accordance with generally accepted accounting principles consistently applied) and operating statements in form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender. Borrower must also complete their ZOOMERAL business profile and keep the business profile up to date throughout the term of this agreement.

Section 8.7. **Notification to Lender**. Promptly after learning thereof, notify Lender of: (a) the details of any material action, proceeding, investigation or claim against or affecting the Borrower, the Property, or the Project instituted before any court, arbitrator or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Property or the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower or the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

Section 8.8. **Partnership/Corporate Existence**. Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

**ARTICLE 9**

Initials: _____

## BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing Borrower shall not:

**Section 9.1. <u>Liquidation, Merger and Sale of Assets</u>.** Liquidate, merge or consolidate with any other Person or otherwise transfer to an unrelated Person fifteen percent (15%) or more of the equity securities of Borrower, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business. Notwithstanding, any initial public offering or acquisition by another company will require Lender's approval or full payment of outstanding loan balance.

**Section 9.2. <u>Liens</u>.** Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such liens, shall not be increased).

**Section 9.3.    <u>Indebtedness</u>.** Create, incur or have outstanding any indebtedness of any kind, other than (a) indebtedness owing to the Lender under this Agreement and the other LOC Documents, and (b) indebtedness of the Borrower existing as of the Closing Date as disclosed to and approved by Lender (and any extension, renewal or refinancing thereof but only to the extent that the principal amount thereof does not increase after the Closing Date).

**Section 9.4. <u>Investments, Loans and Guarantees</u>**. (a) Create, acquire or hold any subsidiary, (b) make or hold any investment in any stocks, bonds or securities of any kind (c) be or become a party to any joint venture or other partnership, or (d) make or keep outstanding any advance or loan to any Person, or (e) be or become a guarantor of any kind.

**Section 9.5. <u>Acquisitions</u>.** Enter into any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another Person by a merger, amalgamation or consolidation or any other combination with such Person, unless specifically stated and approved prior to execution of this Agreement.

Initials: _____

**Section 9.6. <u>Organizational Documents</u>**. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

**Section 9.7.    <u>Project and Project Documents</u>**. Willfully or voluntarily abandon the Project or its activities to develop, construct, operate or maintain the Project. If the same would (i) be a major decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and isnot necessary or desirable for continued development of the Project.

(a)  terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance of a material obligation by any other Person under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the development, construction, operation and maintenance of the Project, in each case that would have an adverse effect on the Lender; or

(b)    sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation and maintenance of the Project without Lender's consent, which consent shall not be unreasonably withheld.

## Article 10
## REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender that:

**Section 10.1. <u>Validity of Agreement</u>**. The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents. The LOC and the execution, delivery and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable in accordance with their terms. The execution, delivery and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than liens permitted under Section 9.2 hereof) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

**Section 10.2. <u>Existing Defaults</u>**. As of the date of execution of this Agreement, Borrower (or any subsidiary of Borrower) is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other agreement or instrument to which Borrower (or any subsidiary of Borrower) is a party or by which it, or any of its properties, subsidiaries, partners or other related entities may be bound.

Initials: _____

Section 10.3. **No Default in Other Agreements**. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a party or by which it or any of its properties, subsidiaries, partners or other related entities may be bound, or result in the violation by it of any law, order, rule, ordinance, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties, subsidiaries, partners or other related entities.

Section 10.4. **No Consents**. No consent, approval, authorization, or other acknowledgment of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

Section 10.5. **Litigation**. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to Borrower's knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.

Section 10.6. **Financial Statements**. Any and all balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared in accordance with generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

Section 10.7. **Legal Requirements**. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to environmental protection, occupational safety and health, zoning and equal employment practices.

Section 10.8. **Taxes**. The Borrower has filed all tax returns and reports required of it, has paid all taxes which are due and payable, and has provided adequate reserves for payment of any

Initials: _____

tax whose payment is being contested; the charges, accruals and reserves on the books of the Borrower in respect of taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority with respect to any taxes except as otherwise previously disclosed to the Lender in writing.

**Section 10.9. Organization and Good Standing**. The Borrower is a duly formed or organized, validly existing and in good standing under the laws of the State of its formation or organization as set forth in the first paragraph of this Agreement, and is qualified as a foreign entity and in good standing in each jurisdiction where the Property and the Project are located.

**Section 10.10. Insurance**. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

**Section 10.11. Accurate and Complete Statements**. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

**Section 10.12. Timing of Lender Funding.** Provided Borrower has met the conditions to Advances in this Agreement, including without limitation the timing for requests set forth in this Section, Lender shall fund Advances in accordance with under the Tranche Schedule, but in no event anymore frequently than every sixty (60) day, unless otherwise consented to in writing by Lender. Borrower must deliver Advance requests to Lender thirty (30) business-banking days prior to the week represented on the Tranche Schedule for which Borrower wishes to receive the proceeds of such Advance from the LOC Disbursement Account. Upon notice of an Advance Request from Borrower, Lender has a forty (40) international business-banking day window based on the Tranche Schedule (with the exception of the first Advance according to Section 7.1) to Payment the requested Advance into the LOC Disbursement Account. Absent a written Advance request from Borrower, in accordance with the conditions and requirements set forth herein, Lender is not obligated to disburse the next scheduled Advance under the Tranche Schedule.

## ARTICLE 11
## NATURE OF REPRESENTATIONS AND WARRANTIES

**Section 11.1. Generally.** The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date thereof, except for any representations

Initials: _____

and warranties that are made as of a specific date. All representations andwarranties made in any document delivered to Lender by or on behalf of Borrower pursuant to orin connection with the LOC shall be deemed to have been relied upon by Lender.


# ARTICLE 12
# EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "**Event of Default**"):

**Section 12.1. <u>Nonpayment</u>**. Failure to make any payment required by the Promissory Note, this Agreement or any other LOC Documents, and such failure continues for a period of thirty (30) days after notice of such default is sent by Lender to Borrower.

**Section 12.2. <u>Other Covenants and Agreements</u>.** Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not have been fully corrected, by performance of or compliance with such covenants or agreements, within twenty (20) days after notice of such default is sent by Lender to Borrower.


**Section 12.3. <u>Representations and Warranties</u>.** If any representation, warranty or statement made in or pursuant to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made. Such Event of Default can be corrected by presentation of accurate and current material information furnished by the Borrower to the Lender to correct the false or erroneous representation, warranty or statement within ten (10) days after notice of such default is sent by Lender to Borrower.

**Section 12.4. <u>Security</u>.** If any lien granted in this Agreement or any other LOC Document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute, but in no event more than five (5) business days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of Collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute, but in no event more than five (5) business days from the date such change in the lien statusoccurs appropriate documents to correct such matters.

**Section 12.5. <u>Validity of LOC Documents</u>.** If (a) any material provision, in the sole opinion of the Lender, of any LOC Document shall at any time cease to be valid, binding and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or

Initials: _____

in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

**Section 12.6. Petition for Bankruptcy, Insolvency**. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as theycome due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for a period of ninety (90) days; or the taking of action by Borrower to authorize any of the actions set forth in this Section 12.6.

**Section 12.7. Material Litigation**. Any action, suit, proceeding or investigation of any kind involving, or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof of any Litigation , Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, partners, or other related entities, or the Project and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, partners, or other related entities, or the Project of the disclosed Litigation.

# ARTICLE 13
# REMEDIES

**Section 13.1. General**. Following the occurrence of one (1) or more Events of Default, a default cure period of sixty (60) days begins ("Default Cure Period"), except as otherwise provided in Section 13.3 or Section 13.4. If Borrower fails to cure the Event of Default (in the manner specified for each Event of Default pursuant to Article 12) within the Default Cure Period, then the Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies set forth in the Promissory Note, in the LOC Documents, or in any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or in equity, including such rights as are provided in this Article 13. If a Bankruptcy Event referred to in Section 12.6 hereof occurs, (i) all obligations of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Initials: _____

Upon the occurrence of any Event of Default hereunder pursuant to Section 12.1 whereby Borrower has missed more than two (2) scheduled payments, if Borrower does not have any interest reserve account established for the benefit of the Lender, Borrower shall have a) sixty (60) days Default Cure Period to cure the Event of Default and must (b) Payment an additional one year's worth of interest payments into the Interest Reserve Account.

**Section 13.2. <u>Default and Right to Acquire</u>.**

In the event the Borrower is unable to cure the Event of Default (in the manner specified to correct each Event of Default pursuant to Article 12 or within the Default Cure Period,

(a)    Upon the occurrence of an Event of Default hereunder Lender shall have the right, in person or by agent, in addition to all other rights and remedies available to Lender hereunder or under the LOC documents, to enter into possession of the Project and perform or cause enforce any liquidity plan.

(b)    Lender may enter into possession of the Project and perform or cause to be performed any and all work and labor necessary to complete the Project, to operate and maintain the Project and/or to otherwise run the business of the Borrower. All sums expended by the Lender in doing so, together with interest on such total amount at the default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured by the LOC documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

(c)    Borrower thereby, following such Bankruptcy Event or relevant cure periods pursuant to Section 13.2 constitutes and appoints the Lender as its true and lawful attorney-in-fact, with full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys to do as follows:

(i)    to enter and endorse all agreements, instruments, and documents in connection therewith.

(ii)    to use any unadvanced proceeds of the LOC for the purpose of completing, operating, or maintaining the Project.

(iii)    to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

(iv)    to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

(v)    to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security satisfactory to the Lender has been provided.

(vi)    to execute applications and certificates in the name of the Borrower which

Initials: _____

reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

(vii)    to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

(viii)    to do any and every act which the Borrower might do on its behalf with respect to the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be (A) irrevocable, (B) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (C) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

Section 13.3. **Curing of Defaults by Advances**. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which Lender may have by reason of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender in accordance with the terms hereof before any additional proceeds of the LOC are disbursed.

Section 13.4. **Remedies Are Cumulative**. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of anyrights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidateany act done pursuant to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

Section 13.5. **Offsets**. If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC documents is accelerated pursuant to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, any and all of such obligations then owing by the Borrower, whether or not the same shall then have matured, any andall Payment (general or special) balances, and any and all balances in the Interest

Initials: _____

Reserve Accountand all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

**Section 13.6. <u>Collateral</u>**. The Lender shall at all times have the rights and remedies of a secured party under the UCC, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Documents executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC documents, which the Borrower agrees to do, and make it available to the Lender at a reasonably convenient place to be designated by the Lender. The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC document, each of which findings shall be considered to be an accession to and a partof such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower.  After any deliveryor taking of possession of the Collateral securing the obligations under the LOC documents, or any portion thereof, pursuant to this Agreement, then, with or without resort to the Borrower personally or any other Person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. Noprior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case the Lender shall give the Borrower not fewer than ten (10) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made.  The Borrower waives advertisement of any such sale and (exceptto the extent specifically required by the preceding sentence) waives notice of any kind in respectof any such sale.  At any such public sale, Lender may purchase such Collateral, including by creditbid, or any part thereof, free from any right of redemption, all of which rights the Borrower herebywaives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, theLender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC documents, the cost of which shall be paid by Borrower.

**Section 13.7. <u>Default by Lender and Borrower's Sole Remedy.</u>**

(a)        Provided Borrower has fully satisfied and complied with all conditions to Advance, if Lender fails to provide the first (1st) Advance when due, pursuant to the Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and

Initials: _____

request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver written notice in the form of a notarized termination letter, a copy of which is attached hereto as **<u>Exhibit F</u>** ("the **Termination Letter**"), to Lender by certified mail. Upon receipt of such notice, Lender shall have forty (40) international business-banking days from the date of receipt ("**Refund Period**") within which to return the ICA Payment to Borrower.

(b)      If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice to Lender in the form of a notarized Termination Letter to Lender by certified mail. Within forty (40) international business-banking days from the date of receipt of such notice by Lender, Borrower shall be entitled to (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) termination of Borrower's obligations to Lender hereunder with the exception of Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall ceaseto accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person,Borrower's subsidiaries, partners or other related entities, for any indirect, special,incidental or consequential damages, losses or expenses in connection with Borrower's oranother Person's activities related to, or otherwise by reason of, the LOC, the Advances, the Agreement or the other LOC documents.

(c)      Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances pursuant to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, act of civil disobedience, act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from preforming under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower

Initials: _____

within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period of time the occurrence is expected to continue. Lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. Lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

**Section 13.8** <u>**Binding Arbitration.**</u> Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one (1) arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

## ARTICLE 14
## GENERAL PROVISIONS

**Section 14.1.** <u>**Disclaimer of Liability**</u>. Lender has no liability or obligation in connection with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith. No claim may be made by the Borrower or any other Person against the Lender or the Affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event

Initials: _____

occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision  is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

**Section 14.2.  Publicity**.  Lender and Borrower shall have the right to issue periodic news releases concerning the Project and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. Lender shall have the right indicating that it has provided the financing for the Project.

**Section 14.3.  Confidentiality.**  Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary in nature, and Borrower hereby agrees to maintain confidential this Agreement, the LOC documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place. Borrower's disclosure of a confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative in nature.

**Section 14.4.  Responsibility for Application of Funds**.  Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced pursuant to this Agreement. Lender may rely solely upon Borrower's requests for Advances, affidavits, statements and reports in making said Advances and Borrower does hereby release and indemnify Lender and hold Lender harmless from any and all losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final and non-appealable decision).

**Section 14.5.  Non-Disparagement**.  Borrower agrees and covenants that Borrower shall not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory, maliciously false, or disparaging remarks, comments, or statements concerning the Lender or its businesses, or any of its employees, officers, or directors and its existing and prospective clients, suppliers, investors, and other associated third parties, now or in the future. For the avoidance of doubt, breach of this Section 10.04 shall constitute an Event of Default pursuant to Section 7.02 under which Lender has the right to terminate all obligations under the Loan Documents pursuant to Section 9.01(b).

Initials: _____

**Section 14.6** **Opportunity to Consult with Counsel**. Borrower acknowledges that it has had an opportunity to consult with and be represented by counsel of Borrower's choosing in the review of the Loan Documents, that it has been advised by Lender to do so, that the Borrower is fully aware of the contents of the  Loan Documents and of its legal effect, and that Borrower enters into these Loan Documents freely, without duress or coercion, and based on Borrower's own judgment and wishes and not in reliance upon any representation or promise made by the Lender, other than those contained herein.

**Section 14.7** **Notices**. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety six (96) hours after deposit in first class certified United States mail, postage prepaid, return receipt requested, or two (2) business days if sent by pre-paid nationally recognized overnight courier service,sent to the Party at its address set forth below, or such other address as a Party may designate fromtime to time by written notice given pursuant to this paragraph:

To Borrower:        A Complete Home Inspecton, LLC
                    110 Velsco Lane
                    Port Sulphur, LA 70083

To Lender:          McMann Commercial Lending, LLC
                    205 N Michigan Avenue, Ste 810
                    Chicago, Illinois 60601

**Section 14.8.** **Applicable Law**. This Agreement and, unless otherwise specifically provided for therein, each other LOC document, shall be governed by and construed in accordance with the laws of the State of Illinois and the United States.

**Section 14.9.** **Successors and Assigns**. The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

**Section 14.10.** **Severability**. The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition. In the event of any conflict or inconsistency between the terms and provisions of this Agreement and any of the LOC Documents, the terms and provisions of this Agreement shall control.

**Section 14.11.** **Amendments**. This Agreement may not be modified or amended except by written agreement signed by the Borrower and Lender.

**Section 14.12.** **Headings; Attachments**. The several headings to articles, sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the

Initials: _____

provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part hereof.

Section 14.13. **No Third-Party Rights**. This Agreement is made entirely for the benefit of Borrower, the Lender, and their successors in interest (including any participants). No third party shall have any rights hereunder.

Section 14.14. **Indemnification**. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys 'fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement. The Borrower hereby agrees to indemnify, defend and hold harmless Lender, the managers of Lender, and all of their members, managers, affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Borrower's failure to fulfill all of the terms and conditions of this Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs and expenses (including attorneys' fees and costs) incurred by Lender, the managing members of Lender, or any of its members, managers, affiliates or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished in connection with this transaction.

Section 14.15. **General Limitation of Liability**. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. In addition to the tolling provided under Section 6.3, Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this

Initials: _____

provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

Section 14.16. **Entire Agreement**. This Agreement, the Promissory Note and any other LOC Document or other agreement, document or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings with respect to the subject matter hereof.

Section 14.17. **Execution in Counterparts**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute one and the same Agreement.

Section 14.18. **Legal Representation of the Parties**. The LOC Documents were negotiated by the Parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

Section 14.19. **JURY TRIAL WAIVER**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.


*[Signature page follows]*


IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.


**LENDER:** MCMANN COMMERCIAL LENDING, LLC

Initials: _____

By:

Name: Walter P Trock III on behalf of McMann Commercial

**BORROWER:** A Complete Home Inspection, LLC

By: _____

Name: Kipp John Nash

Title: _____

          **SUBSCRIBED AND SWORN TO BEFORE ME** on this____day of

_____, 20__.

_____

NOTARY PUBLIC

In and for the State of _____

My Commission Expires:

_____

Initials: _____

**EXHIBIT A**
**PROMISSORY NOTE**

$2,600,000 – Maximum Principal Amount                                January 10, 2023

FOR VALUE RECEIVED, A Complete Home Inspection, LLC, a Louisiana Limited Liability Company (the **"Maker"**), hereby promises to pay to McMann Commercial Lending, LLC or any subsequent holder of this Promissory Note (the **"Payee"**), at such place as Payee may designate, the principal sum of Two Million Five Hundred Thousand Dollars and No Cents and 00/100 ($2,500,000) or the aggregate unpaid principal amount of all Advances, plus the Fees set forth in Section 3.9 of the LOC Agreement, as such terms are defined in the LOC Agreement (as hereinafter defined) and the other LOC Documents, made by Payee to Maker pursuant to the LOC Agreement, whichever is greater, plus interest on the principal sum and all unpaid balances and all other amounts owed by Maker to Payee at the interest rate set forth below, payment of principal and interest to be made in lawful money of the United States in immediately available funds, as set forth below. Capitalized terms used herein and defined in the LOC Agreement, but not otherwise defined herein, shall have the meaning given such term in the LOC Agreement; and

    (a)       Maker shall make payments under this Master Promissory Note (as the same may from time to time be amended, restated or otherwise modified, this **"Note"**) as follows: (i) simple interest payments on the outstanding principal amount of the Advances, at a fixed rate equal to Five percent (5%) per annum, which interest payments shall be due and payable to Payee quarterly in arrears, on the first (1st) business day of each January, April, June and September of each year, with the first payment due on the first such date immediately following the date of the first Advance hereunder; and (ii) the outstanding principal balance of the Note, and all remaining accrued and unpaid interest, late charges and all other amounts due to Payee pursuant to this Note and the LOC Documents shall be due and payable in full no later than the Scheduled Maturity Date.

    (b)       Except for the quarterly payments set forth above, this Note may be prepaid in whole or in part, as provided in the LOC Agreement.

    (c)       All payments made will be applied first to any late charges or other accrued fees and charges, then to accrued interest, and then to the principal amount of the Note. Maker shall make each payment hereunder to the Payee without any deduction, offset, abatement, recoupment, counterclaim or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on account until such payment is honored when presented for payment at the drawee bank. Whenever any payment to be made hereunder, including, without limitation, any payment to be made on any Advance, shall be stated to be due on a day that is not a business day, such payment shall be made on the next business day and such extension of time shall in each case be included in the computation of the interest payable on such Advance. The aggregate unpaid amount of Advances and similar information with respect to the LOC set forth on the records of Payee shall be rebuttably presumptive evidence with respect to such information, including the amounts of principal, interest and fees owing to Payee.

Initials: _____

(d)      Maker shall pay all amounts due under this Note to  McMann Commercial, Corporate Office at the address provided under Section 14.5 of the LOC Agreement or such other offices as may be designated by Payee from time to time.

(e)      All amounts owed by Maker pursuant to this Note shall be collectively referred to herein as the **"Obligation"** of Maker.

In addition, the following provisions shall govern this Note:

1.      **LINE OF CREDIT AGREEMENT AND LINE OF CREDIT DOCUMENTS.**This Note is made and delivered to Payee pursuant to and is subject to all terms and conditions set forth in the that certain Business Expansion Line of Credit Agreement of even dateherewith between Maker and Payee (as the same may from time to time be amended, restated or otherwise modified, the "**LOC Agreement**"). This Note is secured by certain Collateral, as evidenced by the LOC Documents, covering the personal and/or real propertydescribed therein.

2.      **LATE CHARGES.** If any amount payable under this Note is paid more than ten (10) business days after the due date thereof, then late charges (the **"Late Charges"**) shall be added to the delinquent payment in an amount equal to five percent (5.00%) of such late payment for the extra expense in handling past due payments. Any such Late Charges shall be due and payable without demand, and Payee, at its option, may (i) refuse any late payment or any subsequent payment unless accompanied by the applicable Late Charge, (ii) add the Late Charges to the principal balance of this Note, and (iii) treat the failure to pay the Late Charges as demanded as an Event of Default under this Note. If Late Charges are added to the principal balance of this Note, those Late Charges shall bear interest at the same rate as the principal balance under this Note. Any payment to Payee by check, draft or other item shall be received by Payee subject to collection and will constitute payment only when collected and not when received.

3.      **DEFAULT, CROSS-DEFAULT AND ACCELERATION.** Time is of the essence. If Maker fails to make any payment of principal, interest or any other Obligation on the date the same is due and payable under this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or Maker or any other party fails to meet or perform any other obligation under any term or condition of this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or an Event of Default occurs under the LOC Agreement or any of the other LOC Documents, and subject to any applicable notice and cure periods set forth in the LOC Agreement or any other LOC Documents, such Event of Default is not cured, then this Note shall be in default ("Default"). Upon Default, Payee shall provide written notice to Maker specifying the nature of the Default and directing that it be remedied within the applicable notice and cure period as set forth in the LOC Agreement. Upon Default, the interest rate provided for in this Note shall immediately increase to eighteen percent (18%) per annum (the "Default Rate"), unless and until cured by Maker, and upon Maker's failure to cure any default, the entire unpaid amount of this Note shall be immediately due and payable without further notice or demand from Payee. Until cured, interest shall accrue daily after default with daily interest being added to principal on the last day of each calendar month

Initials: _____

and thereafter compounded to calculate interest on the amounts owed pursuant to this Note, and Maker shall thereafter be liable for all costs of collection, including reasonable attorneys' fees and costs, in addition to the payment of principal, interest and any other amount.

Should there be a material misappropriation of more than ten (10%) percent of the proceeds of the Advances which causes anEvent of Default, the Borrower shall immediately surrender controlling management interest in A-Complete Home Inspection, LLC and the Project to McMann Commercial Lending, LLC.

4.    **COSTS, FEES AND COMPENSATION.** Maker further promises to pay all amounts owed under this Note, the LOC Agreement and the other LOC Documents, and all Obligations owed pursuant to this Note, the LOC Agreement and the LOC Documents, and shall pay all such amounts as specified therein.

5.    **WAIVER.** Maker and all endorsers, guarantors and all Persons liable or to become liable on this Note waive presentment, demand, notice of dishonor, notice of default or delinquency, notice of acceleration, notice of nonpayment, notice of costs, expenses or losses and interest thereon, and any and all other notices or matters of a like nature, other than notices required pursuant to this Note, the LOC Agreement or the other LOC Documents.

6.    **SUCCESSOR AND ASSIGNS.** The terms of this Note shall apply to, inure to the benefit of, and bind all Parties hereto and their respective successors, and assigns.

7.    **CUMULATIVE REMEDIES.** Upon the occurrence of any default under this Note, the LOC Agreement, or any of the other LOC Documents, or an Event of Default occurs, Payee shall have all rights specified therein and as provided under relevant law. No remedy or election hereunder shall be deemed exclusive but shall wherever possible, be cumulative with all other remedies at law or equity.

8.    **GOVERNING LAW; VENUE AND JURISDICTION; BINDING ARBITRATION; WAIVER OF TRIAL BY JURY.** This Note shall be governed by and construed in accordance with the laws of the State of Illinois and the United States.

**BINDING ARBITRATION**: Any dispute, claim or controversy arising out of or relating to this Note, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 of the LOC Agreement. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an

Initials: _____

arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Note, this agreement to arbitrate, or any of the LOC Documents.

**<u>JURY TRIAL WAIVER</u>**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

9.      **AUTHORIZATION.** To induce Payee to enter into this Note and extend and advance funds to Maker pursuant to the terms contained herein and pursuant to the LOC Agreement, Maker hereby represents and warrants as follows, acknowledging that Payee is relying on the truth and accuracy of the following representations and warranties in entering into this Note:

(a)      That the undersigned is the authorized representative of Maker and has the authority to bind Maker; and

(b)      that Maker is  duly organized and validly existing and in good standing under the laws of the State of its formation, and duly qualified to transact business and in good standing in any United States state where the nature of its business or properties requires such qualification, with full power and authority, corporate or otherwise, to enter into and perform this Note; that Maker has taken all actions required to be taken in connection herewith; and

(c)      that upon execution of this Note by the undersigned, this Note will constitute a legal, valid, and binding Obligation of Maker and will be enforceable against Maker as set forth herein, except as enforceability thereof may be limited by bankruptcy, insolvency, moratorium and similar laws and by equitable principles, whether considered at law or in equity.

10.      **ATTORNEY FEES AND COSTS OF COLLECTION.**  Maker shall pay Payee all reasonable expenses, attorney fees and costs incurred in any action or proceeding by Payee to enforce the terms of this Note, the LOC Agreement and/or any of the LOC Documents, including, without limitation, all reasonable expenses, attorney fees and costs on appeal.

11.      **MISCELLANEOUS PROVISIONS.**

(a)      No delay or omission on the part of the Payee in exercising any rights hereunder or under the terms of any Security Agreement, pledge agreement, any guaranty made to guarantee payment of this Note or any other Security Document given to secure this Note, shall operate as a waiver of such rights or of any other right hereunder or under said security agreements, pledge agreements, guaranties or other documents.

(b)      The invalidity or unenforceability of any provision hereof, of this Note, the LOC Agreement or any of the other LOC Documents, or of any other instrument, agreement or document now or hereafter executed in connection with the loan made pursuant thereto, or any Obligation created thereunder shall not impair or vitiate any other provision of any of such instruments, agreements and documents, all of which provisions shall be enforceable to the fullest extent now or hereafter permitted by law.

(c)      This Note, the LOC Agreement and the other LOC Documents may only be amended, terminated, extended, or otherwise modified by a writing signed by the Party against which enforcement is sought. In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealing, or the like be effective to amend, terminate, extend, or otherwise modify any of same.

(d)      This Note and the rights and remedies provided for herein may be enforced by Payee or any subsequent holder hereof. Wherever the context permits, each reference to the term "holder" herein shall mean and refer to Payee or the then subsequent holder of this Note.

(e)      Maker agrees that the holder of this Note may, without notice to Maker and without affecting the liability of Maker, accept security for this Note and any additional or substitute security, if any, or release any security or any party liable for this Note, including any guarantor, or extend or renew this Note.

*[Signature page follows]*

Initials: _____

IN WITNESS WHEREOF, the Maker has duly executed and delivered this Promissory Note as of the date first set forth above.

**MAKER**

A Complete Home Inspection, LLC

By: _____

Name: Kipp John Nash

Title: _____

Address: 110 Velsco Lane, Port Sulphur, LA 70083

                    **SUBSCRIBED AND SWORN TO BEFORE ME** on this_____day of _____, 20__.

                                                                    _____
                                                                    NOTARY PUBLIC
                                                                    In and for the State of _____

                                                                    My Commission Expires:

                                                                    _____

Initials: _____

**EXHIBIT B**
**TRANCHE SCHEDULE**

| Tranche 1 | Within 75 calendar days of confirmation of the clearing of the funds remitted by Borrower being funded to the wholesale lender by Lender pursuant to Section 7.1 | $500,000 |
|---|---|---|
| Tranche 2 | 75 calendar days after the date of the funding of Tranche 1 | $2,000,000 |
| Tranche 3 | N/A | |
| Tranche 4 | N/A | |

**EXHIBIT C**
**PROJECT COSTS**



Initials: _____

**EXHIBIT D**
**THE PROJECT**

## EXHIBIT E
## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of January 10, 2023   (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this **"Agreement"**), is made by A Complete Home Inspection, LLC (the **"Grantor"**), in favor of McMann Commercial Lending LLC (the **"Secured Party"**).

WHEREAS, the Grantor and the Secured Party are entering into that certain Business Expansion LOC Agreement, dated of even date herewith (as amended, supplemented, or otherwise modified from time to time, the **"LOC Agreement"**).

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all the Secured Obligations (as hereinafter defined); and

WHEREAS, it is a condition to the obligation of the Lender to make the LOC under the LOC Agreement that the Grantor execute and deliver this Agreement, and this Agreement is being executed and delivered in consideration of the Secured Party entering into the LOC Agreement and each financial accommodation granted to the Secured Party by the Lender  .

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    <u>Definitions</u>.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the LOC Agreement. Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement. Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9. For purposes of this Agreement, the following terms shall have the following meanings:

**"Collateral"** has the meaning set forth in Section 2 hereof.

"**Control Agreement**" means (a) with respect to a Payment account, each Payment Account Control Agreement (or similar agreement with respect to a Payment Account) among the Grantor,the Lender and a depository institution, to be in form and substance satisfactory to the Lender, and
(b) with respect to a Securities Account, each Securities Account Control Agreement (or similar agreement with respect to a Securities Account) among the Grantor, the Lender and a securities intermediary, to be in form and substance satisfactory to the Lender; as any of the foregoing may from time to time be amended, restated or otherwise modified.

"**Payment Account**" means a Payment account, as that term is defined in the

UCC."**Event of Default**" has the meaning set forth in the LOC Agreement.

**"First Priority"** means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the LOC Agreement).

Initials: _____

"**Proceeds**" means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.

"**Secured Obligation(s)**" has the meaning set forth in Section 3 hereof.

"**Securities Account**" means a securities account, as that term is defined in the UCC.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.    Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of Grantor's right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**"):

(a)    all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, Payment accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

(b)    all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

3.    Secured Obligations. The Collateral secures the due and prompt payment and performance of:

(a)    the obligations of the Grantor from time to time arising under the LOC Agreement, this Agreement, any other LOC Document or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the LOC (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, reasonable attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or

Initials: _____

contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the LOC Agreement, this Agreement and the other LOC Documents; and

(b)    all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the LOC Agreement, this Agreement, the other LOC Documents or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in this Section 3 being herein collectively called the "**Secured Obligations**").

4.    <u>Perfection of Security Interest and Further Assurances</u>.

(a)    The Grantor shall, from time to time, as may be required by the Secured Party with respect to all Collateral, promptly take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable, the Grantor shall promptly take all actions as may be requested from time to time by the Secured Party so that the security interest in the Collateral granted hereunder is obtained and at all times held by the Secured Party. All the foregoing shall be at the sole cost and expense of the Grantor.

(b)    The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section 4 promptly to the Secured Party upon request. The Grantor also hereby ratifies any and all financing statements or amendments previously filed by the Secured Party in any jurisdiction

(c)    The Grantor hereby further authorizes the Secured Party to file with the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any state of the United States or in any other country) this Agreement and other documents for the purpose of perfecting, confirming,

Initials: _____

continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

(d)      If the Grantor shall at any time hold or acquire any certificated securities, promissory notes, tangible chattel paper, negotiable documents or warehouse receipts relating to the Collateral, then the Grantor shall promptly endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.

(e)      If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (i) promptly notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

(f)      If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

(g)      The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

5.      <u>Representations and Warranties</u>. The Grantor represents and warrants as follows:

(a)      (i) the Grantor's exact legal name is correctly stated in the first paragraph of this Agreement and on the signature page hereof, and (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the first paragraph of this Agreement.

(b)      The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes, or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state, or local statute or rule in respect of such Collateral. The Grantor has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and

Initials: _____

ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

(c)      At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the LOC Agreement.

(d)      The pledge of the Collateral pursuant to this Agreement creates a valid andperfected First Priority security interest in the Collateral, securing the payment andperformance when due of the Secured Obligations.

(e)      Grantor has full power, authority, and legal right to borrow the Advances under the LOC and pledge the Collateral pursuant to this Agreement.

(f)      Each of this Agreement, the LOC Agreement, and the LOC Documents has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

(g)      No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Advances under the LOC and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor or the performance by the Grantor of its obligations thereunder.

(h)      The execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(i)      The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

(j)      Schedule 2 hereto lists all banks, other financial institutions and securities intermediaries at which the Grantor maintains Payment Accounts or Securities Accounts as of the Closing Date, and Schedule 2 hereto correctly identifies the name, address and telephone number of each such financial institution or securities intermediary, the name in

Initials: _____

which the account is held, a description of the purpose of the account, and the complete account number therefor.

(k)    Schedule 3 hereto lists all intellectual property and rights which Grantor holds an interest, ownership, or other right.

6.    Receivables. If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.    Covenants. The Grantor covenants as follows:

(a)    The Grantor will not, without providing at least thirty (30) days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b)    The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4 hereof, will be kept at those locations of the Grantor previously disclosed to the Secured Party and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c)    The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d)    The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the LOC Agreement or herein or with the prior written consent of the Secured Party.

(e)    The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located pursuant to the provisions of the LOC Agreement.

Initials: _____

(f)     The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

(g)     The Grantor will continue to operate its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

(h)     The Grantor shall promptly notify the Secured Party in writing upon the acquisition or creation by the Grantor of a Payment Account or Securities Account not listed on Schedule 2 hereto, and, prior to or simultaneously with the creation of such Payment Account or Securities Account, provide for the execution of a Control Agreement with respect thereto, if required by the Secured Party.

(i)     The Grantor shall provide the Secured Party with prompt written notice with respect to any material real or personal property (other than property acquired in the ordinary course of business) acquired by the Grantor subsequent to the Closing Date. In addition to any other right that the Secured Party may have pursuant to this Agreement or otherwise, upon written request of the Secured Party, whenever made, the Grantor shall grant to the Secured Party, as additional security for the Secured Obligations, a First Priority lien on any real or personal property of the Grantor (other than for leased equipment or equipment subject to a purchase money security interest in which the lessor or purchase money lender of such equipment holds a first priority security interest, in which case, the Secured Party shall have the right to obtain a security interest junior only to such lessor or purchase money lender), including, without limitation, such property acquired subsequent to the Closing Date, in which the Secured Party does not have a First Priority lien. The Grantor agrees that, within thirty (30) days after the date of such written request, to secure all of the Secured Obligations by delivering to the Secured Party security agreements, intellectual property security agreements, pledge agreements, mortgages (or deeds of trust, if applicable) or other documents, instruments or agreements or such thereof as the Secured Party may require.  The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

(j)     At the request of the Secured Party, the Grantor shall, with respect to any real property owned by the Grantor or any real property on which the Project is located, provide, or cause to be provided, to the Secured Party, (a) a mortgage (or comparable document) relating to such real property, in form and substance satisfactory to Secured Party, (b) title and lien searches with respect to such real property and such other information, documents or agreements as may be deemed necessary or advisable by the Secured Party r in connection with such mortgage, and (c) such corporate governance and authorization documents and an opinion of counsel with respect to such mortgage as may be deemed necessary or advisable by the Secured Party. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

8.     Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party as the Grantor's attorney-in-fact, with full authority in the place and stead of

Initials: _____

the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9.      <u>Secured Party May Perform</u>. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10.     <u>Reasonable Care</u>. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11.     <u>Remedies Upon Default</u>.

(a)     If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days prior to the date of such disposition shall constitute reasonable notice. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law,

Initials: _____

the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages and demands Grantor may acquire against the Secured Party arising out of the exercise by Secured Party of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

(b)      If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the reasonable fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(c)      If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section 11, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.      No Waiver and Cumulative Remedies. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14 hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

Initials: _____

13.   SECURITY INTEREST ABSOLUTE. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon, and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)   any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument.

(b)   any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the LOC Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)   any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver, or other modification of any guaranty, for all or any of the Secured Obligations.

(d)   any manner of sale, disposition, or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations.

(e)   any default, failure, or delay, willful or otherwise, in the performance of the Secured Obligations.

(f)   any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

(g)   any other circumstance (including, without limitation, any statute of limitations) or manner of administering the LOC or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14.   Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15.   Addresses for Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the LOC Agreement, and addressed to the respective parties at their addresses as specified in the LOC Agreement or as to either Party at such other address as shall be designated by such Party in a written notice to each other Party.

Initials: _____

16.    <u>Continuing Security Interest; Further Actions</u>. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 17 hereof, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

17.    <u>Termination; Release</u>. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18.    <u>GOVERNING LAW</u>. This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Illinois and the United States.

19.    <u>Binding Arbitration.</u> Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, atthe election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forthin Section 14.5 of the LOC Agreement. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available

remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

**20.** **JURY TRIAL WAIVER. EACH PARTY HERETO, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE GRANTOR AND THE SECURED PARTY, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH THIS AGREEMENT, THE LOC AGREEMENT, ANY OTHER LOC DOCUMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.**

21.    Counterparts. This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other LOC Documents constitute the entire contract among the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

[*Signatures Page Follows*]

IN WITNESS WHEREOF, the Grantor hereto has executed this Security Agreement as of the date first set forth above.

**GRANTOR**
A Complete Home Inspection, LLC

By:_____

Name: Kipp John Nash

Title: _____

**SUBSCRIBED AND SWORN TO BEFORE ME** on this____day of
_____, 20__.

_____
NOTARY PUBLIC
In and for the State of
_____

My Commission Expires:

_____

Initials: _____

**EXHIBIT F**
**FORM TERMINATION LETTER**


McMann Commercial Lending, LLC
205 N Michigan Avenue, Ste 810
Chicago, Illinois 60601


Re: A Complete Home Inspection, LLC

To Whom it May Concern:
　　The undersigned Borrower has decided to exercise its rights to terminate the above referenced transaction pursuant to the terms of the LOC Agreement dated January 10, 2023.
　　　　Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.


BORROWER:  A Complete Home Inspection, LLC

By: _____

Name: Kipp John Nash
Title: _____

　　　　　**SUBSCRIBED AND SWORN TO BEFORE ME** on this____day of
_____, 20__.



_____
　　　　NOTARY PUBLIC
　　　In and for the State of _____

　　　　My Commission Expires:



_____



Please confirm your Wiring Instructions:
Account Title:
Address on Account:
Bank Name:
Bank Address:
Routing #:　　　　　　　　　　　　　　　Initials: _____
Account #:

# EXHIBIT 3



**519 8TH AVENUE, 25TH FLOOR**
**NEW YORK, NY 10018**
**866.928.5838 • warren.law**

October 14, 2022

<u>**VIA E-MAIL**</u>

Caleb Michael Davis, Managing Partner
Genie Investments NV, LLC
11064 Lothmore Rd.
Jacksonville, FL 32221
calebdavis8@gmail.com

<u>**Re: Letter of Engagement ; Joint Venture with Velano Principal Capital, Inc.**</u>

Dear Caleb:

Thank you for selecting the Warren Law Group ("we", "us", or the "Firm") to represent and advise Genie Investments NV, LLC and you ("You" or the "Client") with respect to the proposed joint venture with Velanos Principal Capital, Inc. ("Matter"). This engagement shall include but may not be limited to: general counsel/advice, contract/legal document preparation and or review, transaction structuring, strategic planning & asset protection, escrow/paymaster services. Please note that escrow and paymaster services may be provided under a separate engagement addendum with different terms, conditions, and fee structure which the Firm will provide for your review and approval at the appropriate time. You explicitly authorize the Firm to undertake any other matters that relate to or flow from these issues at its discretion. This engagement does not include representation in litigation or arbitration proceedings but may be included herein by separate signed addendum. This document is a privileged and confidential agreement for legal services ("Agreement") that states the terms of our representation. Please read it carefully.

1.      <u>**Professional Undertaking**</u>

The Firm has undertaken to advise you and provide you representation in the Matter. If You desire to retain the Firm for services outside the scope of the above, you and the Firm will enter into a separate Letter of Engagement for those matters. While our representation will include post-trial or arbitration motions on the Matter, this Agreement does not include re-trial or appeals on any judgment or award that may be obtained by or against You, unless we otherwise agree in a subsequent writing.

Either at the commencement or during the course of our representation, we may express opinions or beliefs concerning various courses of action to be taken and the results that might be anticipated. You acknowledge that any such statement made by any attorney or employee of the



**519 8TH AVENUE, 25TH FLOOR**
**NEW YORK, NY 10018**
**866.928.5838 • warren.law**

Firm is intended to be an expression of opinion only, based on information available to us at the time, and should not be construed as a promise or guarantee, nor as an attorney opinion letter unless the words "attorney opinion letter" appear on the document.

**2.    Client's Duties**

To enable us to represent You in the Matter effectively, You agree to be truthful and to cooperate fully with the Firm in all matters related to the negotiation of the Matter and preparation and presentation of Client's claims or defenses in the Matter. You agree to keep us informed of any information or developments that may come to your attention, to abide by this Agreement, to pay the Firm's statements for services on time and as set forth in this Agreement, and to keep the Firm advised of Your address, telephone number and whereabouts (if called for in the representation), as well as any potential conflicts of interest. You agree to assist the Firm by timely providing necessary information and documents. You agree to advise the Firm of any potential or actual conflicts of interest. Subject to separate agreed addendum if applicable, You also agree to appear at all legal proceedings when we deem it necessary and generally to cooperate fully with the Firm in all matters related to the preparation and presentation of Your claims and defenses, as well as continuing to pay your invoices in a timely fashion. You also represent that you have not engaged any other attorney or agreed to pay another attorney or person a contingency or success-based fee with respect to this Matter.

**3.    Retainer Fee & Flat or Contingency Fee Interest**

In consideration for the Firm's services, You agree to pay our hourly rates as set forth in Schedule A annexed hereto (the "Fee"). We will require an initial retainer of **$10,000**, which we will bill against as we work on your matters. The initial retainer shall be allocated into two segments: (i) joint venture transaction review and engagement for $5,000 flat fee; and (ii) ongoing representation post transaction commencement, which may include strategic planning/asset protection, tax services, and other required services which shall be billed against the remaining balance of the initial retainer until exhausted. We will inform you monthly of Your remaining retainer amount, and when the retainer is nearing depletion, we may ask that You replenish the retainer, and you agree to do so. No attorney-client relationship will exist concerning this matter until this retainer has been paid, and until this engagement letter has been executed by both parties. You specifically authorize and agree that any attorney, investigator, paralegal, secretary, or another person in the Firm, or an associated counsel in another Firm, may, at our professional discretion, perform necessary services under the direction of the attorney designated as lead counsel by the Firm.

You authorize the Firm to withdraw the funds from the Firm's Attorney Trust Account to pay the Firm's fees. If the Firm receives a written objection from You within 10 days of sending



Your bill, the Firm shall consider that amount in dispute and will return those escrow funds to the Attorney Trust Account until the dispute is resolved. The Firm will cease all work on your Matter until the dispute is resolved.

With respect to litigation/arbitration matters, the Firm may request additional retainer deposits within 90 days of the date set for a trial or arbitration hearing. You shall, upon the Firm's request, deposit all fees and costs the Firm reasonably expects will be incurred to prepare for and complete the trial or arbitration hearing (the "Trial Deposit"), unless You decide not to continue the representation and the Firm is able to withdraw from the engagement. If there is any remaining retainer funds in the Firm's Attorney Trust Account at the end of this engagement, and the Firm's final bill is satisfied, those funds shall be promptly refunded to You.

4.    **Costs and Expenses**

The Firm will incur various costs and expenses in performing legal services under this Agreement. Client agrees to pay for all costs, disbursements and expenses in addition to the hourly fees. Client shall pay for all costs incurred for each engagement, either directly or to the Firm if the Firm has paid the costs. In this Agreement, "costs" mean any charge, disbursement, expense, fee, or other debt incurred by the Firm for Client's engagement. For the avoidance of doubt, "costs" are not limited to court costs and are intended only to exclude Firm's legal fees.

Costs commonly include: service of process charges; filing fees; court and deposition reporters' fees; legal research fees; translator/interpreter fees; jury fees; notary fees; deposition costs; international telephone charges; messenger and other delivery fees; postage; professional photocopying and other reproduction costs; e-discovery processing and data-hosting expenses; travel costs, airfare (business class for flights longer than 1,200 miles, or first-class if no business-class seats are available), ride-sharing or taxi services, meals, and lodging costs; investigation expenses; consultants' fees; and expert witness, professional, mediator, arbitrator and/or special master fees. Any cost above $500 will be pre-authorized by you before you are charged. The exception are any filing fees, which will be due upon filing.

Client understands that if the Client's case proceeds to court action or arbitration, the court may award attorneys' fees as well as some or all of the type of costs enumerated herein to the other party/parties. Payment of such attorneys' fees and costs shall be the sole responsibility of Client.

Separately, any order entered awarding payment of attorneys' fees and/or costs to you, or any settlement between the parties in the Matter awarding you attorneys' fees and/or costs, does not affect your obligation to pay the Firm's attorneys' fees, costs, and other charges under the terms of this Agreement. Any such amounts received by the Firm, however, will be credited against



519 8TH AVENUE, 25TH FLOOR<br/>NEW YORK, NY 10018<br/>866.928.5838 • warren.law

the attorneys' fees, costs and other charges incurred by you. Client acknowledges that any such determination that fees are owed to you by another party, does not in and of itself affect the amount of the fees and costs to be paid by Client to the Firm pursuant to this Agreement.

### 5.    Termination and Withdrawal

You have the right to discharge the Firm at any time. We also have the right to withdraw from this representation for any other reason for which withdrawal is authorized or required by the New York Rules of Professional Conduct of the State Bar of New York and/or applicable law. Among the circumstances under which the Firm may withdraw are: (a) with the consent of Client; (b) Client's conduct renders it unreasonably difficult for the Firm to carry out the Agreement effectively; and/or (c) Client fails to pay the Firm's fees, retainer, or costs as required by this Agreement.

Notwithstanding the discharge, the Client will remain obligated to pay the Firm at the agreed rates for all services provided prior to the discharge and to reimburse the Firm for all costs advanced. You expressly acknowledge that Client's failure to pay the Firm's invoiced amounts due in a prompt manner shall be grounds for the Firm's withdrawal from any representation(s) the Firm has undertaken of Client, and Client will not oppose any such effort to withdraw by the Firm in such a "failure to pay" situation.

Should you breach this Agreement in such a manner that we are reasonably required to withdraw or to terminate the Agreement, we will attempt to accommodate new counsel should you choose to hire new counsel, but while we may choose to do so, under no circumstances are we required to relinquish any part of the Fee earned or any Contingency Fee Interest in order to make that accommodation.

### 6.    Record Retention Policy

The Firm maintains case files electronically using Clio and other software programs. During the normal course of representation, both paper and electronic files are collected. Upon the conclusion of the Matter, the Firm may retain portions of the case file pursuant to our Firm's record retention policy and any applicable confidentiality agreement or protective order. To reduce costs, the Firm recycles paper products and may discard old case files. If you want the Firm to return original client documents or send you any portion of the case file, you agree to let us know in writing within 30 days of the conclusion of the Matter. The Firm will not be responsible for file materials that you do not request in writing within 30 days and which are eventually destroyed under our record retention policy.



**WARREN**
LAW GROUP

519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 • warren.law

**7.**     **Option to Pay via Cryptocurrency**

Please be advised that you have the option, at your sole and absolute discretion, to pay for any legal services which the Firm earns upon receipt of payment (*i.e.*, flat fees and payment on invoices for services already rendered by the Firm) with Firm Accepted Cryptocurrencies ("FACs"). Currently the only FACs are Bitcoin and Ethereum; however, the Firm reserves the right to change the FACs at any time in its sole discretion. The Firm does not hold FACs in trust for its clients in retainer to bill against on a later date. You agree that any FACs, or other funds, received by the Firm as payment for a Flat Fee or for services previously rendered are considered "earned" by the Firm upon receipt.

If you wish to use FACs to pay your retainer for our services, you agree that the Firm will, as soon as practicable, exchange the FACs it receives from you into U.S. dollars ("Fiat") and you will be credited the amount of Fiat received by the Firm after its processing costs. The Firm will provide you with a statement as soon as practicable after it receives the Fiat detailing the exchange used, exchange rate, costs, and received Fiat value. Please be advised that the value of any cryptocurrency, including FACs, can change rapidly based upon market conditions. Please make sure to take that into consideration in making your decision. We require that a test transfer be completed and confirmed by the Client and the Firm. After that confirmation, the Client agrees to transfer FAC at a specific time requested by the Firm as to be sure to convert the FACs into Fiat as quickly as possible to avoid unnecessary market risk.

If you do choose to pay the Firm in Accepted Cryptocurrencies, you agree to transfer the applicable cryptocurrency into the Firm's designated cryptocurrency wallet from a cryptocurrency wallet over which you have sole ownership and control. You also represent and warrant to the Firm that any cryptocurrencies you send to the Firm are of non-criminal origin and are free and clear of liens or other encumbrances.

For more information about your rights related to the use of cryptocurrencies for the payment of legal services, please see (as applicable) NYCBA formal opinion 2019-5[1], D.C. Bar Ethics Opinion 378[2], and/or the CA Committee on Professional Responsibility and Conduct discussion regarding unpublished opinion 21-0007[3]. The Firm reserves the right to change its payment policies and procedures at any time, upon written notice, based on any changes in the prevailing interpretation of the applicable Rules of Professional Conduct pertaining to the same.

**8.**     **Integration, Choice of Law, Rules of Professional Conduct**

---

[1] https://www.nycbar.org/member-and-career-services/committees/reports-listing/reports/detail/formal-opinion-2019-5-requiring-cryptocurrency-in-payment-for-legal-services

[2] https://dcbar.org/For-Lawyers/Legal-Ethics/Ethics-Opinions-210-Present/Ethics-Opinion-378

[3] https://board.calbar.ca.gov/docs/agendaItem/Public/agendaitem1000028381.pdf



**WARREN** LAW GROUP

519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 • warren.law

This Agreement represents the entire Agreement between us. In entering this Agreement, the Firm has not made, and you are not relying upon, any representations or promises other than those contained in writing in this Agreement. To avoid any misunderstanding over the terms of this representation, this Agreement shall not be modified or waived in any respect except in writing signed by both parties.

This Agreement shall be construed under and in accordance with the laws of the state of New York, excluding any conflicts of law, rule or principle that might otherwise refer to the substantive law of another jurisdiction.

It is our intention to follow the New York Rules of Professional Conduct.[4] If, despite that intent and endeavor, any part of this Agreement shall for any reason be found to be unenforceable, the parties agree that: all other portions shall nevertheless remain valid and enforceable; and a provision most similar to the stricken provision but otherwise complying with applicable law shall be substituted.

### 9.    Mediation and Arbitration

The Firm is required by New York law to inform You that in the unlikely event of a disagreement with respect to legal fees, Part 137 of the Rules of the Chief Administrator of the New York Courts ("Part 137") provides that certain fee disputes are subject to arbitration at Client's option. The Firm will provide You with a copy of the Rule upon request. Information may also be obtained at www.courts.state.ny.us/admin/feedispute/index.shtml.

If any dispute ("Dispute") arises between You and the Firm, including, but not limited to, disputes over billing, fees, malpractice, fraud-based claims, breach of professional duties (including fiduciary duty), or any other complaints, and if the Dispute cannot be settled through negotiation (or for fee disputes under Part 137), then the parties agree to try in good faith to settle the Dispute promptly by mediation administered by the New York, New York branch of the Judicial Arbitration and Mediation Service ("JAMS") within 60 days after either party sends written notice of its intent to mediate. The cost of mediation shall be borne equally by the parties.

If the Dispute cannot be settled by mediation, the Dispute shall be settled by arbitration. The arbitration must: (a) be administered by the Judicial Arbitration and Mediation Service ("JAMS"); (b) occur in New York, NY; (c) be governed, for purposes of procedure, by the JAMS' Comprehensive Arbitration Rules and Procedures in effect at the time the parties executed the

---

[4] Available at https://nysba.org/app/uploads/2020/02/NEW-YORK-RULES-OF-PROFESSIONAL-CONDUCT.pdf



**519 8TH AVENUE, 25TH FLOOR**
**NEW YORK, NY 10018**
866.928.5838 • warren.law

Agreement, the Federal Arbitration Act (9 U.S.C. §§ 1–16), and for substantive purposes, the laws of the State of New York; and (d) occur no later than 60 days after either party sends written notice that it believes the parties' private negotiations have reached an impasse, or as soon thereafter as the selected arbitrator is available.

A written, reasoned opinion must accompany any award issued by the arbitrator. The opinion must state that the Firm, the Client, or neither party prevailed. If the arbitrator determines that one party prevailed, the arbitrator shall award to the prevailing party its legal expenses reasonably incurred related to the claims made in the arbitration. The parties shall maintain the confidential nature of the arbitration proceeding and the award, including the hearing, except as necessary (1) to prepare for or conduct the hearing on the merits; (2) to challenge or enforce an award; or (3) to comply with any law or government order.

The Parties adopt and agree to implement the JAMS Optional Arbitration Appeal Procedure (as it exists on the effective date of this Agreement) with respect to any final award in an arbitration arising out of or related to this Agreement. Judgment on the arbitration award may be entered in any court having jurisdiction. Client and the Firm confirm that they have read and understand the forgoing paragraph, and voluntarily agree to binding arbitration.

10.    **Judgment Lien**

You agree that, in the event that the Firm obtains a monetary award for You as part of this Matter, or any matters that flow from it, any outstanding amounts owed under the Firm's invoices by You will be immediately payable out of such monetary award. This monetary award includes *any* affirmative recovery on your behalf as part of the Matter, including, but not limited to, actual damages, punitive damages, attorneys' fees, or costs. You are therefore advised of the consequence of not paying any invoices when the Firm obtains a money judgment or other relief on Your behalf.

[ Signature Page to Follow ]



**WARREN**
LAW GROUP

519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 • warren.law

If the foregoing correctly reflects your understanding of the terms and conditions of our representation, please indicate your acceptance by executing this letter in the space provided below and returning it to the Firm, as well as making the required retainer payments.

For future retainer or bill payments, please forward payment to the Firm's client trust account at the address below. Please contact us if you wish to pay by another method, such as credit card. In the event of a credit card payment, a 3% service charge will be incurred and added to the charged amount.

**Bank Name:** Signature Bank

**Bank Address:** 565 Fifth Avenue, 12th Floor, New York, NY 10017

**ABA #:** 026013576

**Account Name:** Warren Law Group (IOLA)

**Account Number:** 1504601990

**SWIFT Code:** SIGNUS33

Very truly yours,

**WARREN LAW GROUP**

*/s/ Christopher D. Warren*

Christopher D. Warren

Caleb Michael Davis, on behalf of Genie Investments NV, LLC, requests representation in accordance with the terms outlined above:

By: _____

Caleb Michael Davis, LLC



**519 8TH AVENUE, 25TH FLOOR**
**NEW YORK, NY 10018**
**866.928.5838 • warren.law**

SCHEDULE A – HOURLY RATES[5]

| Legal Professional | Hourly Rate |
|---|---|
|  |  |
| Partners |  |
| Christopher Warren | $825 |
| David Rosenfield | $675 |
| Jon-Jorge Aras | $650 |
| Paul Share | $650 |
| Scott Oh | $650 |
| Tom McCabe | $675 |
| John Keenan | $650 |
|  |  |
| Associates |  |
| Brittany Hulbert* | $450 |
| Jorge Marquez | $450 |
| David Szalyga | $450 |
| Other Associates | $450 |
|  |  |
| Of Counsel |  |
| Todd Kulkin | $600 |
| Carol Williams | $550 |
| Dan Alper | $550 |
| Dan Kolber | $550 |
| Dan Podhaskie | $550 |
| Jorge Salva | $550 |

---

[5] Hourly rates are subject to change on the anniversary of this engagement and each year subsequent by no more than 10% to keep pace with cost-of-living adjustments and inflation.

*Pending Admission



519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 • warren.law

| | |
|---|---|
| Max Travis | $550 |
| C.A. Morrison | $550 |
| Stephen Reich | $550 |
| Other Of Counsel | $550 |
| | |
| Paraprofessionals | |
| Law Clerks | $250 |
| Paralegals | $175 |
| Interns | $125 |

# EXHIBIT 4

# UNITED STATES BANKRUPTCY COURT

## MIDDLE DISTRICT OF FLORIDA

### JACKSONVILLE DIVISION

In re:

GENIE INVESTMENTS NV, INC.

        Debtor.

Case No.: 3:24-bk-00496-BAJ

Chapter 11

## DECLARATION OF ADAM B. WALKER

STATE OF MISSOURI

COUNTY OF JACKSON

The undersigned, ADAM B. WALKER, declares as follows:

1.   I, ADAM B. WALKER, am an attorney licensed to practice in Missouri. I am the owner and manager of Walker Law Office, LLC d/b/a AW Securities Law. I previously worked for more than 12 years as an enforcement lawyer for the Financial Industry Regulatory Authority (FINRA), where I routinely investigated fraudulent and potentially fraudulent investment activity.

2.   I began representing Genie Investments in or around July 2023 at the request of one of its owners, David Hughes. I had previously done legal work for another business in which Mr. Hughes also has an ownership interest. Before July 2023 I was aware that Genie existed and that it was in the lending business, but I had no other knowledge of or involvement with Genie.

3.   In July 2023, Genie asked me to help resolve a contract dispute between it and Velanos Principal Capital. I learned that Genie and Velanos had executed a "Joint Venture Agreement" (JVA) in October 2022 and subsequently amended it three times. Through conversations with

Genie's principals and review of the JVA and its amendments, I learned the essential terms of the agreement, which were:

- Genie and Velanos agreed to form a joint venture.

- Genie agreed to contribute $9.0 million in capital to the joint venture.

- Velanos agreed to use the $9.0 million capital contribution to buy and sell standby letters of credit (SBLCs).

- Velanos agreed to distribute profits from the SBLC transactions to Genie within 60 days of Genie's capital contributions.

- The JVA, as amended, stated that Velanos would return a total of $75 million to Genie, consisting of the $9.0 million capital contribution and $66 million in profits.

4. As of July 2023, Velanos had not distributed any profits to Genie and had returned only $500,000 of its capital contributions. Velanos was, therefore, in material breach of the JVA.

5. I also learned that Genie, shortly before executing the JVA, retained an attorney, referred to herein as "SO," to represent it with respect to what was then the "proposed joint venture" between Genie and Velanos. SO was and still is a partner with an established New York-based law firm.

6. Almost immediately after talking with Genie about the Velanos transaction and reviewing the JVA, I strongly suspected that the SBLC-trading program offered by Velanos was fraudulent. With minimal research, I found numerous judicial opinions, press releases, and other materials supporting my suspicions. The U.S. Securities and Exchange Commission, Federal Bureau of Investigation, Federal Trade Commission, and U.S. Department of Treasury, in addition to other regulators and law-enforcement agencies, have in recent years issued warnings to the public about fraudulent prime-banking scams, including many involving fictitious SBLC trading.

7. On or about July 24, 2023, I spoke with SO by telephone for approximately one hour to talk, among other things, about his review of the JVA, his knowledge of and experience with

SBLC trading, and whether he viewed the investments as potentially fraudulent or had any other reservations about Genie entrusting its capital to Velanos for the purposes described in the JVA.

8.  SO told me that he had extensive background with SBLCs, which he characterized as a legitimate investment used in "high level trade finance." He described SBLC trading as a "financing mechanism" that arose from the 1944 Bretton-Woods agreement, which created the World Bank and the International Monetary Fund.

9.  SO represented that Velanos, as promised, had used the $9.0 million in capital that Genie contributed to the joint venture to make profitable SBLC trades. SO acknowledged, however, that he had never received detailed information about any SBLC transactions that Velanos supposedly made.

10. I asked SO to describe how SBLC trading could generate massive profits in a matter of weeks. His response lacked detail. He stated only that it was a "rinse and repeat" process of buying SBLCs at a discount with ensuing profitable sales already prearranged. SO also repeatedly stated that there is "just a lot of leverage that's involved" or some variation thereof.

11. I asked SO if he was aware that SBLC trading was a frequent subject of fraud alerts and enforcement actions, both civil and criminal, by the federal government; he said that he was, but contended nonetheless that what Velanos promised Genie was not fraud. When I asked him how he knew that what Velanos promised was different from the numerous and well-publicized instances of fraud involving SBLCs, he stated that Velanos had "syndicated" the funds. He added, however, that he did not know the particulars of Velanos' ostensible syndication arrangement.

12. I have conducted extensive research into SBLC and other "prime banking" scams. In doing so, I learned that certain phrases, terms, and references are common among SBLC scams. The JVA contains several such phrases and terms. Likewise, SO described SBLC trading to me as

3

"royal-family type stuff" that happens every day, although not in the United States. According to SO, the U.S. government does not want its citizens involved in SBLC trading. Such assertions are often cited by law enforcement and regulators as markers of SBLC and other varieties of prime-banking fraud.

13. The JVA contains other "red flags" of fraud. For example, Velanos promised to generate an extremely high rate of return – more than 800% – in a matter of weeks. It is also, in my professional opinion, very poorly drafted, with some passages best described as gibberish.

14. Genie terminated its representation by SO and his law firm on or around July 24, 2023. On Genie's behalf, I requested all records from SO's representation of Genie. After several weeks' delay, SO provided what he described as the complete client file. That file, which I have reviewed, contains no documentation indicating that SO:

- conducted any meaningful investigation into Velanos, its principals, or its affiliates,

- noted any red flags in the JVA or any potential that the proposed investment was fraudulent,

- advised Genie of any appreciable risk of losing all or a portion of its principal, or

- mentioned to Genie that the transaction bore similarities to a well-known and heavily publicized type of investment fraud.

15. Based on my investigation and analysis of the JVA and my research into prime-banking fraud, I believe the SBLC trading Velanos promised to conduct with Genie's money was at all times fictitious and blatantly fraudulent.

16. Based on my communications with SO and my review of the client file obtained from him, I believe that SO's review of the JVA was inadequate; that he failed to conduct an appropriate and thorough investigation of the transaction, Velanos, and/or its principals and affiliates; and that, as a result, he likely did not discharge his professional obligations to Genie. For these reasons, it

4

is my opinion that Genie has a colorable claim against its former lawyer and law firm for professional malpractice. I am not equipped, however, to estimate any potential recovery if Genie were to pursue such an action.

17. Although many outside observers now impugn Genie's business judgment and competence for having invested in a fraudulent enterprise, it is critical to acknowledge that Genie did so only after receiving the advice of a licensed attorney from a well-regarded law firm, which it retained specifically to guard against placing its money in an illegitimate investment. Whatever one might say with the benefit of hindsight, the proper lens for evaluating Genie's competence to manage its affairs requires consideration of its entire operating history and the fact that it sought, paid for, and relied on the assistance of legal counsel that, by all appearances, had the experience and knowledge to advise it appropriately.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 14, 2024.

_____

Adam B. Walker

WALKER LAW OFFICE, LLC d/b/a AW
SECURITIES LAW

# EXHIBIT 5

## BRIDGE LOAN AGREEMENT

This Bridge Loan Agreement (this **"Agreement"**) is made and entered into as of January 5, 2023 (the **"Effective Date"**), between GENIE INVESTMENTS (the **"Lender"**), and Rolling by the Dozen RV Park LLC (**"Borrower"**).

## ARTICLE I
## DEFINITIONS AND INTERPRETATIONS

### Section 1.01    Definitions.

**"Affiliate"** as to any Person, means any other Person that, directly or indirectly through one or more intermediaries, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

**"Business Day"** means (a) for all purposes other than as covered by subsection (b) below, a day other than a Saturday, Sunday, or other day on which commercial banks in Delaware are authorized or required by law to close.

**"Default"** means any of the events specified in Article 7 which constitutes an Event of Default or which, upon the giving of notice, the lapse of time, or both pursuant to Article 7 would, unless cured or waived, become an Event of Default.

**"Event of Default"** has the meaning set forth in Article 7.

**"Governmental Authority"** means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal, or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of, or pertaining to, government.

**"Lien"** means any mortgage, pledge, hypothecation, assignment (as security), Payment arrangement, encumbrance, lien (statutory or other), charge, or other security interest, or any preference, priority, or other security agreement or preferential arrangement of any kind or nature whatsoever having substantially the same economic effect as any of the foregoing

Initials:

(including any conditional sale or other title retention agreement and any capital lease).

"**Loan**" means the Bridge Loan.

"**Loan Documents**" means, collectively, this Agreement, the Security Agreement, the Promissory Note, the Intercreditor Agreement and all other agreements, documents, certificates, and instruments executed and delivered to the Lender by any Loan Party in connection therewith.

"**Loan Parties**" means the Borrower.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, properties, liabilities (actual or contingent), operations, or condition (financial or otherwise) or prospects of the Borrower, individually, or the Borrower and its Subsidiaries taken as a whole, (b) the validity or enforceability of any Loan Document, (c) the perfection or priority of any material Lien purported to be created by any Loan Document, (d) the rights or remedies of the Lender under any Loan Document, or (e) the ability of any Loan Party to perform any of its material payment obligations under any Loan Document to which it is a party.

"**Material Litigation**" has the meaning set forth in Section 8.04.

"**Maturity Date**" means 4/5/2023.

"**Person**" means any individual, corporation, limited liability Borrower, trust, joint venture, association, Borrower, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

"**Security Agreement**" means the Security Agreement made by the Borrower and in favor of the Lender, dated as of January 5, 2023.

**Section 1.02 Interpretation.** With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument, or other document shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth herein or in any other

Initials: _ZS RJ_

Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof," and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified, or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights.

(b)  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)  Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds.

(d)  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP as in effect from time to time, and applied on a consistent basis in a manner consistent with that used in preparing the Borrower's audited financial statements, except as otherwise specifically prescribed herein.

## ARTICLE II
## AMOUNT AND TERMS OF LOAN

### Section 2.01 Bridge Loan Commitment.

(a)  Subject the terms and conditions of this Agreement, the Lender agrees to make:

(i) on the Effective Date, a Bridge Loan in an amount equal to One Hundred Seventy Eight Thousand Seven Hundred  Dollars and No Cents ($178,000) (the "**Bridge Loan**" or "**Loan**");

(b)  Amounts borrowed under Section 2.01(a) and repaid or prepaid may not be reborrowed.

### Section 2.02 Procedures for Loan Borrowing.

Initials: _KG RJ_

(a) <u>Bridge Loan</u>. On the Effective Date, the Lender shall hold Bridge Loan in Lender's account on behalf of the Borrower.

**Section 2.03 Interest.**

(a) <u>Computation of Interest</u>. Interest on the outstanding principal amount of the Loan shall accrue at an interest rate of Four percent (4%) per month. All computations of interest for Loan shall be made on the basis of a year or 365 or 366 days, as applicable, and the actual number of days elapsed. In no event shall any interest charged collected or reserved in respect of a Loan exceed the maximum a rate then permitted by applicable laws, and if any payment of interest made by the Borrower in respect of a Loan exceeds such maximum rate, then such excess sum shall be credited by the Lender as a payment of principal.

(b) <u>Payment of Interest</u>. Pre-paid interest on the outstanding principal amount of the Loan shall be paid in kind and capitalized on this Business Day and shall be paid in cash in full upon acceptance of this agreement. Borrower understands that this payment is fully non-refundable.

**2.04. Security Interest.** The Loan shall be secured in accordance with the provisions of a Security Agreement with Borrower, in the form attached hereto as <u>Exhibit A</u> (the "**Security Agreement**"), the provisions of a Promissory Note with Borrower, in the form attached hereto as <u>Exhibit B</u> and shall be subject to an Intercreditor Agreement between the Lender and Borrower, in the form attached hereto Exhibit C (the "**Intercreditor Agreement**").

**2.05  Repayment.**  The aggregate principal amount outstanding and accrued and unpaid interest of the Loan shall be due and payable by the Borrower on the Maturity Date. The Borrower may at any time and from time to time prepay the Loan, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Lender no later than 11:00 AM at least three (3) Business Days prior thereto.

**2.06 Payments.** All payments shall be made in lawful money of the United States of America in the manner designated by Lender in writing to the Borrower. Payment shall be credited first to accrued interest due and payable, with any remainder to principal.

**ARTICLE III**
**CONDITIONS PRECEDENT TO BRIDGE LOAN**

**3.01 Conditions to Lender's Obligations.** The obligations of the Lender to make the Loan is subject to the fulfillment or waiver of each of the following conditions:

(a) <u>Representations and Warranties</u>. Each of the representations and warranties of the Borrower contained in Section 4 shall be true and correct in

Initials: _KS RD_

all material respects on the Effective Date except for (i) representations and warranties made as of a particular date, which shall be true and correct in all material respects on and as of that particular date, and (ii) representations and warranties that are qualified as to "materiality", "Material Adverse Effect" or similar language, which shall be true and correct in all respects on and as of the Effective Date or such earlier date as the case may be.

(b)  Loan Documents. The Borrower shall deliver to the Lender:

(i) a duly executed copy of this Agreement;

(ii) a duly executed copy of the Security Agreement;

(iii) a duly executed copy of the Note;

(iii) duly executed copies of the ancillary documents required to perfect the Lender's security interests in the collateral contemplated by the Security Agreement;

(iv) a duly executed copy of the Intercreditor Agreement.

(c)  Qualifications. All authorizations, approvals or permits, if any of any Governmental Authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance of the Loan pursuant to this Agreement shall be obtained and effective as of the Effective Date or Borrowing Date, as applicable.

(d)  Certificates and Documents. The Borrower shall deliver to Lender:

(i)  The Certificate of Incorporation of the Borrower, certified as of a recent date by the Secretary of State of Texas;

(ii) A certificate of good standing issued by the Secretary of State of Texas; and

(iv) A customary certificate of the Secretary of the Borrower, dated as of the Effective Date, in the form reasonably approved by Lender, certifying:

a. True and correct copies of the Borrower's BYLAWS or OPERATING AGREEMENT; and

b. True and correct copies of the resolutions of the Borrower's Board of Directors approving the transactions contemplated thereby.

**ARTICLE IV**

Initials: _KS RJ_

## REPRESENTATIONS AND WARRANTIES OF THE BORROWER

**Section 4.01 Representations and Warranties of the Borrower**. The Borrower represents and warrants to the Lender, the following representations and warranties are true and complete as of the Effective Date and as of the date of each borrowing of the Loan hereunder.

**Section 4.02 Organization, Qualifications and Corporate Power**. The Borrower is a Limited Liability Company duly, incorporated, validly existing and in good standing under the laws of the State of Texas.

**Section 4.03 Authorization.** All corporate action on the part of the Borrower, and its officers, directors, and stockholders necessary for the authorization, execution and delivery of this Agreement and the Security Agreement and the performance of the obligations of the Borrower hereunder and thereunder has been taken.

**Section 4.04 Governmental Consents and Filings.** No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with any federal, state or local Governmental Authority is required on the part of the Borrower in connection with the transactions contemplated by this Agreement.

**Section 4.05 Enforceability.** This Agreement and the Security Agreement constitute valid and legally binding obligations of the Borrower, enforceable in accordance with their respective terms.

**Section 4.06 Noncontravention.** The execution, delivery and performance by the Borrower of this Agreement and the security Agreement, will not cause a default under, or otherwise breach, its BYLAWS, OPERATING AGREEMENT or any other document or agreement to which Borrower is a party or by which it is bound, or any laws, rule or regulation applicable to the Borrower or its assets which such default or breach would have a Material Adverse Effect on the Borrower.

## ARTICLE V
## AFFIRMATIVE COVENANTS OF THE BORROWER

**Section 5.01 Affirmative Covenants of the Borrower**. The Borrower covenants and agrees with the Lender that until all principal of an interest on the Loan and all other amounts due or which become due hereunder are repaid in full and performance of all other obligations of Borrower, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing:

**Section 5.02 Compliance with Laws.** Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations.

Initials: _ZS RD_

**Section 5.03  Compliance with Documents.** Perform and comply with all the terms and conditions of this Agreement and the other Loan Documents.

**Section 5.04 Books and Records.** Keep and maintain complete and accurate books of account, in accordance with generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower.

**Section 5.05 Payment Obligations.** Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established in accordance with generally accepted accounting principles).

**Section 5.06 Financial Reports.** Deliver to Lender, with respect to Borrower as soon as available and in any event (a) within twenty (20) days after the end of each calendar [month] during the term of the Loan, financial statements of Borrower for such [month], certified as true and correct (which reports shall be prepared in accordance with generally accepted accounting principles consistently applied) and operating statements in form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender.

**Section 5.07 Notification to Lender.** Promptly after learning thereof, notify Lender of:

(a) the details of any material action, proceeding, investigation or claim against or affecting the Borrower instituted before any court, arbitrator or Governmental Authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a Material Adverse Effect on the business of the Borrower; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or any application for any refinancing of the Loan.

**Section 5.08  Partnership/Corporate Existence.** Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

## ARTICLE VI
## NEGATIVE CONVENANTS OF THE BORROWER

**Section 6.01 Negative Covenants of the Borrower.** The Borrower covenants and agrees with the Lender that until all principal of an interest on

Initials: _____

the Loan and all other amounts due or which become due hereunder are repaid in full and performance of all other obligations of Borrower, Borrower shall note:

**Section 6.02. Liquidation, Merger and Sale of Assets**. Liquidate, merge or consolidate with any other Person, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business.

**Section 6.03 Liens.** Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or any portion thereof other than (a) any lien securing indebtedness owing to Lender.

**Section 6.04 Investments, Loan and Guaranties.** (a) be or become a party to any joint venture or other partnership, or (b) be or become a guarantor of any kind.

**Section 6.05 Acquisitions.** Enter into any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another Person by a merger, amalgamation or consolidation or any other combination with such Person.

**Section 6.06 Organizational Documents**. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

## ARTICLE VII
## EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "**Event of Default**"):

**Section 7.01 Nonpayment.** Failure to make any payment required by the Promissory Note, this Agreement or any other loan documents, and such failure continues for a period of thirty (30) days after notice of such default is sent by Lender to Borrower.

**Section 7.02 Other Covenants and Agreements.** Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement, or any of the Loan Documents and such failure shall nothave been fully corrected within twenty (20) days after notice of such default is sent by Lender toBorrower.

Initials: _____

**Section    7.03    Representations and Warranties.** If any representation, warranty or statement made in or pursuant to this Agreement or any other loan document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made.

## ARTICLE VIII
## SECURITY

**Section 8.01  Security.** If any lien granted in this Agreement or any other loan document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute within thirty (30) calendar days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute within three (3) calendar days from the date of such change in the lien status occurs appropriate documents to correct such matters.

**Section 8.02  Validity of Loan Documents.** If (a) any material provision, in the sole opinion of the Lender, of any Loan Document shall at any time cease to be valid, binding and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any loan document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any loan document; or (d) any loan document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

**Section 8.03  Petition for Bankruptcy, Insolvency.** The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any Governmental Authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for a period of ninety (90) days; or the taking of action by Borrower to authorize any of the actions set forth in this Section 8.03.

Initials: _KS PS_

**Section 8.04  Material Litigation.** Any action, suit, proceeding or investigation of any kind involving, or threatened in writing against, Borrower or any subsidiary thereof, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a Material Adverse Effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any Loan Documents. Promptly after the commencement thereof, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, of the disclosed litigation.

### ARTICLE IX
### REMEDIES

**Section 9.01 General.** Following the occurrence of one or more Events of Default, Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b) terminate all obligations under the loan documents; and (c) pursue and enforce, either successively or concurrently, all rights and remedies set forth in the Promissory Note, in the loan documents, or in any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or in equity, including such rights as are provided in this Article 9. If an Event of Default referred to in Section 6 hereof occurs, (i) all obligations of the Lender under the Loan Documents shall automatically and immediately terminate, if not previously terminated, and (ii) the principal of and interest then outstanding on the Loan, and all of the other obligations owing under the loan documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

### ARTICLE X
### GENERAL PROVISION

**Section 10.01  Disclaimer of Liability.** Lender has no liability or obligations except those under the terms of the Loan Documents and makes no warranties or representations in connection therewith.

**Section 10.02 Confidentiality.** Borrower agrees that the specific terms of this Agreement, and Borrower hereby agrees to maintain confidential this Agreement, and any information disclosed by Lender related to the terms upon which funding of the Bridge Loan is to take place. Borrower's disclosure of a confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are

Initials: _____

cumulative in nature.

**Section 10.03  Responsibility for Application of Funds.** Lender shall have no obligation to see that funds advanced under the Bridge Loan are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement. Lender may rely solely upon Borrower's statements and reports in making said Bridge Loan and Borrower does hereby release and indemnify Lender and hold Lender harmless from any and all losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the Bridge Loan by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final and non-appealable decision).

**Section 10.04  Notices.** All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent certified mail upon the first to occur of receipt by the addressee or the expiration of ninety six (96) hours after deposit in first class certified United States mail, postage prepaid, return receipt requested, or two business days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given pursuant to this paragraph:

To Borrower:      Rolling by the Dozen RV Park LLC
                  40 Country Road 267
                  Somervillle, TX 77879

To Lender:        Genie Investments
                  P.O. Box 5886
                  Wilmington, Delaware 19808

**Section 10.05 Applicable Law.** This Agreement and, unless otherwise specifically provided for therein, shall be governed by and construed in accordance with the laws of the State of Delaware and the United States.

**Section 10.06  Successors and Assigns.** The terms of this Agreement will bind and benefit the successors and assigns of the Parties. Borrower may not assign this Agreement or any proceeds from the Bridge Loan or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

Initials: _KS RJ_

**Section 10.07 Severability.** The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision.

**Section 10.08 Amendments.** This Agreement may not be modified or amended except by written agreement signed by the Borrower and Lender.

**Section 10.09 Headings; Attachments.** The several headings to articles, sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part hereof.

**Section 10.10   No Third-Party Rights.** This Agreement is made entirely for the benefit of Borrower, the Lender, and their successors in interest (including any participants). No third Person shall have any rights hereunder.

**Section 10.11 Indemnification.** The Borrower agrees to defend, indemnify and hold harmless the Lender (and its Affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys 'fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Loan Documents or any actual or proposed use of proceeds of the Loan, or any activities of the Borrower or its Affiliates; provided that the Lender shall not have the right to be indemnified under this Section 10.11 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by final non-appealable judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 10.11 shall survive any termination of this Agreement. The Borrower hereby agrees to indemnify, defend and hold harmless the Lender, the Manager of Lender, and all of their members, managers, Affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Borrower's failure to fulfill all of the terms and conditions of this Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs and expenses (including attorneys' fees and costs) incurred by Lender, the managing member of Lender, or any of its members, managers, Affiliates or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the

Initials: _ZSP_

Borrower has furnished in connection with this transaction. The Lender hereby agrees to indemnify, defend and hold harmless the Borrower, the officers of Lender, and all of their shareholders, managers, Affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs)that they may incur by reason of Lender's default of its obligations under this Agreement.

**Section 10.12  General Limitation of Liability.** No claim may be made by the Borrower or any other Person against the Lender or the Affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accruedand whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

**Section 10.13  Legal Representation of the Parties.** The Loan Documents were negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other Loan Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

**Section 10.14  JURY TRIAL WAIVER.** THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

Initials: _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

GENIE INVESTMENTS

By ___*Genie Investments*___

Rolling by the Dozen RV Park LLC

By *Kristin Stegent Ry Stegent*
Name: Kristin & Ryan Stegent
Title: *Managing Members*

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 6 day of
January___, 2023

_____
NOTARY PUBLIC
In and for the State of Texas___

My Commission Expires:

___2/23/2026___

LISBET ORTIZ
Notary ID #133608489
My Commission Expires
February 23, 2026

Initials: *KS RS*

EXHIBIT A

# SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of January 5, 2023 (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**"), made by and among Rolling by the Dozen RV Park LLC, a Texas Limited Liability Company (the "**Grantor**"), in favor of Genie Investments (the "**Secured Party**").

WHEREAS, on the date hereof, the Secured Party has made a loan to the Grantor in an aggregate unpaid principal amount not exceeding One Hundred Seventy Eight Thousand Seven Hundred Dollars and No Cents ($178,000) (the "**Loan**"), evidenced by that certain Bridge Loan Agreement of even date herewith (as amended, supplemented or otherwise modified from time to time, the "**Loan Agreement**") made by the Grantor and payable to the order of the Secured Party. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement;

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations; and

WHEREAS, it is a condition to the obligations of the Lender to make the Loans under the Loan Agreement that the Grantor execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Definitions</u>.

(a)    Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement.

(b)    Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

(c)    For purposes of this Agreement, the following terms shall have the following meanings:

"**Collateral**" has the meaning set forth in Section 2.

"**Event of Default**" has the meaning set forth in the Loan Agreement.

"**First Priority**" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security

Initials: _____

interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the Loan Agreement or Intercreditor Agreement).

**"Perfection Certificate"** has the meaning set forth in Section 5.

**"Proceeds"** means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.

**"Secured Obligations"** has the meaning set forth in Section 3.

**"UCC"** means the Uniform Commercial Code as in effect from time to time in the State of Delaware or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.      Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of its right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the **"Collateral"**):

(a)      all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims, general intangibles (including all payment intangibles), money, Payment accounts, and any other contract rights or rights to the payment of money; and

(b)      all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

3.      Secured Obligations. The Collateral secures the due and prompt payment and performance of:

(a)      the obligations of the Grantor from time to time arising under the Loan Agreement, this Agreement or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the Loans (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the Loan Agreement and this Agreement; and

(b)      all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the Loan Agreement, this Agreement or any other document made,

Initials: _KCRJ_

delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in Section 3 being herein collectively called the **"Secured Obligations"**).

4.      Perfection of Security Interest and Further Assurances.

(a)      The Grantor shall, from time to time, as may be required by the Secured Party with respect to all Collateral, immediately take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable, the Grantor shall immediately take all actions as may be requested from time to time by the Secured Party so that control of such Collateral is obtained and at all times held by the Secured Party. All of the foregoing shall be at the sole cost and expense of the Grantor.

(b)      The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section promptly to the Secured Party upon request.

(c)      The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

5.      Representations and Warranties. The Grantor represents and warrants as follows:

(a)      It has previously delivered to the Secured Party a certificate signed by the Grantor and entitled "Perfection Certificate" (**"Perfection Certificate"**), and that: (i) the Grantor's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof, (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the Perfection Certificate, (iii) the Perfection Certificate accurately sets forth, the Grantor's place of business (or, if more than one, its chief executive office), and its mailing address, (iv) all other information set forth on the Perfection Certificate relating to the Grantor is accurate and complete and (v) there has been no change in any such information since the date on which the Perfection Certificate was signed by the Grantor.

Initials: _KS PJ_

(b)      All information set forth on the Perfection Certificate relating to the Collateral is accurate and complete and there has been no change in any such information since the date on which the Perfection Certificate was signed by the Grantor.

(c)      At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the Loan Agreement.

(d)      The pledge of the Collateral pursuant to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(e)      It has full power, authority and legal right to borrow the Loans and pledge the Collateral pursuant to this Agreement.

(f)      Each of this Agreement and the Loan Agreement has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

(g)      No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Loans and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the Loan Agreement and this Agreement by the Grantor or the performance by the Grantor of its obligations thereunder.

(h)      The execution and delivery of the Loan Agreement and this Agreement by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(i)      The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

6.      Voting, Distributions and Receivables.

(a)      The Secured Party agrees that unless an Event of Default shall have occurred and be continuing, the Grantor may, to the extent the Grantor has such right as a holder of the Collateral consisting of securities, or indebtedness owed by any obligor, vote and give consents, ratifications and waivers with respect thereto, except to the extent that, in the Secured Party's reasonable judgment, any such vote, consent, ratification or waiver would detract from the value thereof as Collateral or which would be inconsistent with or result in any violation of any provision of the Loan Agreement or this Agreement.

(b)      If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any

Initials: _____

account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.    <u>Covenants</u>. The Grantor covenants as follows:

(a)    The Grantor will not, without providing at least 30 days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b)    The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4, will be kept at those locations listed on the Perfection Certificate and the Grantor will not remove the Collateral from such locations without providing at least 30 days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c)    The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d)    The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the Loan Agreement/herein or with the prior written consent of the Secured Party.

(e)    The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located.

(f)    The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

8.    <u>Secured Party Appointed Attorney-in-Fact</u>. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9.    <u>Secured Party May Perform</u>. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the

Initials: _KCRD_

expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10.    Reasonable Care. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11.    Remedies Upon Default.

(a)    If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten days prior to the date of such disposition shall constitute reasonable notice, but notice given in any other reasonable manner shall be sufficient. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. To the extent permitted by applicable law, the Grantor waives all claims, damages and demands it may acquire against the Secured Party arising out of the exercise by it of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

(b)    If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or

Initials: _KS RJ_

cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(c)    If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.    <u>No Waiver and Cumulative Remedies</u>. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

13.    <u>SECURITY INTEREST ABSOLUTE</u>. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)    any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument;

(b)    any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the Loan Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)    any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Secured Obligations;

(d)    any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

(e)    any default, failure or delay, willful or otherwise, in the performance of the Secured Obligations;

(f)    any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

(g)    any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loans or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14.    <u>Amendments</u>. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom

Initials: _____

shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15.    Addresses For Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the Loan Agreement, and addressed to the respective parties at their addresses as specified on the signature pages hereof or as to either party at such other address as shall be designated by such party in a written notice to each other party.

16.    Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 16, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party.

17.    Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18.    GOVERNING LAW. This Agreement and the Loan Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or the Loan Agreement (except, as to the Loan Agreement, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Delaware.

19.    Counterparts. This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the Loan Agreement constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

*[Signature Page Follows]*

Initials: _____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

GENIE INVESTMENTS

By _Genie Investments_

Rolling by the Dozen RV Park LLC

By _Kristin Stegent  Ryan Stegent_
Name: Kristin & Ryan Stegent
Title: _Managing Members_

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 6 day of January , 2023

NOTARY PUBLIC
In and for the State of _Texas_

My Commission Expires:

_2/23/2026_

LISBET ORTIZ
Notary ID #133608489
My Commission Expires
February 23, 2026

Initials: KS RS

# Perfection Certificate

Reference is hereby made to that certain Security Agreement (the "**Security Agreement**"), dated as of January 5, 2023, between Rolling by the Dozen RV Park LLC, (the "**Company**"), in favor of Genie Investments (the "**Lender**"). Capitalized terms used but not defined herein have the meanings assigned to them in the Security Agreement.

The undersigned hereby certifies to the Lender:

1.   Name.

(a)   The exact legal name of the Company, as such name appears in its respective certificate of incorporation or any other formation or organizational document, is as follows:

ROLLING BY THE DOZEN RV PARK LLC

(b)   The following are any other legal names that the Company has had in the past four months, together with the date of the relevant change:

N/A

(c)   The following are any other names (including trade names) used by the Company, or any other business or organization to which the Company became the successor by merger, consolidation, acquisition, change in form, nature or jurisdiction of organization or otherwise, now or at any time during the past four months:

N/A

2.   Other Identifying Factors.

(a)   The Company is the type of entity described next to its name below:

LLC

(b)   The jurisdiction of organization or formation of the Company is as follows:



Kristin Stegent - Managing Member 60%

Ryan Stegent - Managing Member 40%   Initials: KS RS

(c)     The Company has not changed its jurisdiction of organization or formation at any time during the past four months, except as set forth below:

_____N/A_____

(d)     The federal taxpayer identification number of the Company is:

87-2519274

3.     Current Locations.

(a)     The chief executive office of the Company is located at the following address:

40 County Road 267
Somerville, TX 77879

(b)     The principal mailing address of the Company is the following address, if different from the Chief Executive office:

If principal mailing address is the same as the Chief Executive office please put an "X" this box: [X]

N/A

4.     Fixtures.

Listed below is the information required by UCC § 9-502(b) of each state in which any of the Collateral consisting of fixtures is or is to be located and the name and address of each real estate recording office where a mortgage on the real estate on which such fixtures are or are to be located would be recorded:

N/A

5.     Real Property.

(a)     The following is a list of real property owned or leased by the Company:

Rolling by the Dozen RV Park

Initials: KJR

_____

6.    Stock Ownership and Other Equity Interests.

The following is a list of all of the authorized, and the issued and outstanding, stock, partnership interests, limited liability company membership interests or other equity interests of the Company, the record and beneficial owners of such stock, partnership interests, membership interests or other equity interests and whether such interests are certificated or non-certificated:

Kristin Stegent – 60%
Ryan Stegent – 40%

_____

_____

_____

7.    Instruments and Tangible Chattel Paper.

The following is a list of all instruments (other than checks to be deposited in the ordinary course of business), promissory notes, tangible chattel paper and other evidence of indebtedness held by the Company:

N/A

8.    Commercial Tort Claims.

The following is a list of all Commercial Tort Claims held by the Company, including a brief description thereof:

N/A

Initials: 



9.    <u>Deposit Accounts and Securities Accounts</u>.

(a)    The following is a list of all deposit accounts and securities accounts maintained by the Company, including the name of each institution where each such account is held, the name and account number of each such account and the name of each entity that holds each account:

Rolling by the Dozen RV Park LLC

Chase Bank

Account # 768192772

(b)    If the Company maintains a securities account with a securities intermediary, (i) the account agreement is not governed by the law of a foreign country and does not provide that the issues governed by Article 2(1) of the Hague Securities Convention are determined by the law of a foreign country, and (ii) the securities intermediary maintains an office in the United States that qualifies under the second sentence of Article 4(1) of the Hague Securities Convention.

10.    <u>Letter-of-Credit-Rights</u>.

The following is a list of all Letters of Credit issued in favor of the Company as beneficiary thereunder:



N/A

11.    <u>Extraordinary Transactions</u>.

All of the Collateral has been originated by the Company in the ordinary course of business or consists of goods which have been acquired by the Company in the ordinary course of business from a person in the business of selling goods of that kind, except for those purchases, acquisitions and other transactions listed below:

Initials: _____

N/A

*[Signature Page Follows]*


IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.


GENIE INVESTMENTS

By *Genie Investments*


Rolling by the Dozen RV Park LLC

By *Kristin Stegent Ryan Stegent*
Name: Kristin & Ryan Stegent
Title: *Managing Members*

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 6 day of January , 20 23


NOTARY PUBLIC
In and for the State of Texas

My Commission Expires:

2/23/2026

LISBET ORTIZ
Notary ID #133608489
My Commission Expires
February 23, 2026

Rolling by the Dozen RV Park LLC
By *Kristin Stegent Ryan Stegent*
Name: Kristin & Ryan Stegent
Title: *Managing Members*


Initials: ZS RS

EXHIBIT B

# Promissory Note

January 5, 2023

FOR VALUE RECEIVED, the undersigned, Rolling by the Dozen RV Park LLC, a Texas Limited Liability Company, (the **"Borrower"**), hereby promises to pay Genie Investments, (the **"Lender"**) the principal amount of One Hundred Seventy Eight Thousand Seven Hundred  Dollars and No Cents ($178,000) (the **"Loan"**) in accordance with the provisions of the Loan Agreement, dated as of January 5, 2023, among the Borrower and the Lender (the **"Loan Agreement"**). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Loan Agreement.

    (a)    The Borrower promises to pay interest on the unpaid principal amount of Loan from the date of such Loan until such principal amount is paid in full, at the interest rates and at the times provided in the Loan Agreement. All payments of principal and interest shall be made to the Lender in Dollars in immediately available funds by a method designated in writing by Lender.

    (b)    This Note is secured by the Collateral. Upon the occurrence and continuation of any Event of Default under the Loan Agreement, all principal and all accrued interest then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided in the Loan Agreement.

    (c)    The Loan made by the Lender shall be evidenced by one or more records or accounts maintained by the Lender in the ordinary course of business.

    (d)    The Borrower hereby waives diligence, presentment, demand, protest, notice of intent to accelerate, notice of acceleration, and any other notice of any kind. No failure on the part of the holder hereof to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof or a consent thereto; nor shall a single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

    THIS NOTE AND THE OBLIGATIONS OF THE BORROWER HEREUNDER SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE.

Initials:

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Rolling by the Dozen RV Park LLC

By _~Kristin Stegent Ry Stegent~_
Name: Kristin & Ryan Stegent
Title: _Managing Members_

**SUBSCRIBED AND SWORN TO BEFORE ME** on this ⌊6⌋ day of January , 20⌊23⌋

_~signature~_
NOTARY PUBLIC
In and for the State of  Texas

My Commission Expires:

2/23/26

LISBET ORTIZ
Notary ID #133608489
My Commission Expires
February 23, 2026

Initials: _KS RS_

EXHIBIT C

## INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT, dated as of January 5, 2023 this "Agreement"), is made by and between Rolling by the Dozen RV Park LLC, (the "Debtor"), Genie Investments, (the "LOC Lender"), herein referred to each as a "Party" and together, the "Parties."

## RECITALS

A.    The LOC Lender has approved the Debtor for a Line of Credit in the amount of 1,787,000 ((the "LOC") pursuant to the LOC Lender's Business Expansion Line of Credit Agreement (the "LOCA") in the dated January 5, 2023.

B.    The executed LOCA requires the Debtor to deposit with the LOC Lender Twenty Six Thousand Eight Hundred Five Dollars and No Cents ($26,805), representing 1.5% of the LOC, (the "Debtor Deposit") into an Interest Credit Account (the "ICA") maintained by the LOC Lender for the benefit of Debtor.

C.    Five Thousand Three Hundred Sixty One Dollars and No Cents ($5,361) of the Debtor's Deposit, shall be paid to ZOOMERAL, Inc. for the purpose of an origination fee (the "Origination Fee").

D.    Twenty One Thousand Four Hundred Forty Four Dollars and No Cents ($21,444) of the Debtor's Deposit, for the purpose of Debtor's payment of interest, due and payable prior to the Bridge Term (as defined herein) of the LOCA.

E.    The Debtor has requested and LOC Lender has agreed to provide an ICA for bridge funding in the amount of One Hundred Seventy Eight Thousand Seven Hundred Dollars and No Cents ($178,000) plus interest reserve and fees (the "Bridge Loan"). The Bridge Loan Bridge is subject to the terms and conditions set forth in the Promissory Note (the "Note").

Initials: _KC RN_

Security Agreement, Guaranty, and this Agreement, of even date herewith executed by and between the Debtor and LOC Lender (collectively, the "Loan Documents")

F.      LOC Lender will provide the Bridge Loan on behalf of the Debtor to the ICA to enable the Debtor to secure the LOC from the LOC Lender.  Upon execution of the Loan Documents, LOC Lender will fund the ICA within three (3) Banking days.

G.      Commencing January 5, 2023, LOC Lender shall receive full payment of all interest from the ICA in the amount of Twenty One Thousand Four Hundred Forty Four Dollars and No Cents ($21,444).

H.      Debtor shall have the right to extend the Bridge Term for an additional term of thirty (30) days (the "Extension Option"). If Debtor wishes to extend the Bridge Term, Debtor shall notify LOC Lender in writing of its intention to exercise the Extension Option no later than five (5) business days prior to the end of the Bridge Term. If Debtor exercises the Extension Option, the Bridge Term shall continue month-to-month until Debtor notifies LOC Lender, in writing, of its intention to terminate the then-existing Bridge Term no later than five (5) business days prior to then-existing Bridge Term.

I.      The Bridge Loan will be secured by, inter alia, a security interest in the LOC Lender Collateral senior to any security interest therein held by LOC Lender.

J.      The LOC Lender holds or will hold a security interest in the LOC Lender Collateral.

K.      The Creditors are executing this Agreement to set forth their lien and security priorities with respect to the Debtor transaction.

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the Parties hereby agree as follows:

1.  <u>DEFINITIONS</u>. The following terms used herein shall have the following meaning. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code:

1.1.    "Bankruptcy Code" - Title 11 of the United Sates Code.

1.2.     "Bridge Loan" – See Recital C. & D.

1.3.    "Bridge Term" – Ninety (90) calendar days from the date of agreement execution

1.4.    "Chosen State" – Delaware

1.5.     "Creditor(s)" - The LOC Lender

Initials: _ZS RS_

1.6.    "Debtor" – See preamble.

1.7.    "Default Notice" – See section 4.2

1.8.    "LOC Lender" - See Preamble.

1.9.    "LOC Lender Collateral" – All collateral which now or hereafter secures the LOC Lender Obligations.

1.10.   "LOC Lender Obligations" – Indebtedness owed by the Debtor to the LOC Lender.

1.11.   "LOC Lender Collateral "—All collateral which now or hereafter secures the LOC Lender obligations pursuant to the Security Agreement.

1.12.   "LOC Lender Obligations" – All obligations of the Debtor to LOC Lender under the Note or any other agreement between Debtor and LOC Lender.

1.13.   "Party" – Each of the LOC Lender and the Debtor.

2.  PRIORITY.

2.1.    Notwithstanding the terms or provisions of any agreement or arrangement which either Creditor may now or hereafter have with the Debtor or any rule of law, and irrespective of the time, order, or method of attachment or perfection of any security interest or the recordation or other filing in any public record of any financing statement, any security interests now or hereafter held by LOC Lender in any and all assets of the Debtor, is and shall remain senior to any security interest therein now or hereafter held by the LOC Lender.

3.  BRIDGE LOAN REPAYMENT TO LOC LENDER.

3.1.    The Parties acknowledge and agree that the LOC Lender Obligations shall be due and payable to LOC Lender on Debtor's first draw from the Debtor's LOC. The LOC Lender affirms and warrants that no draw request from the Debtor shall be accepted if the LOC Lender Obligations have not been satisfied or the full amount of the LOC Lender Obligations isn't included in the draw request.  The first draw from the LOC shall be at a minimum sufficient to satisfy the LOC Lender Obligations, and no other payment from the Debtor's LOC availability shall be disbursed unless and until the full amount of the LOC Lender Obligations have been paid. The Parties' additionally agree that the first LOC draw request must occur within ninety banking days from the date of the opening of the Debtor's ICA with the Lender (the "Bridge Loan Term").

3.2.    In the event the first draw request is not made and the LOC Lender Obligations are not satisfied within the Bridge Loan Term, or Debtor otherwise defaults in the performance of the LOC Lender Obligations, LOC Lender may send a Default Notice to LOC Lender demanding the full payment of the LOC Lender Obligations from the ICA.

3.3.    Within one Business Day of the Default Notice, LOC Lender shall retain the full amount of the LOC Lender Obligations from the funds held in the Debtor's ICA.

Initials: _____

3.4.  The Debtor understands that payments to LOC Lender hereunder by LOC Lender shall be deemed to be payments to the Debtor under the LOCA.

3.5.  All payments to LOC Lender shall be made as follows (or in accordance with such other instructions as may be advised in writing by LOC Lender to Borrower):

Bank Name: Chase Bank
Bank Address: 1515 Atlantic Boulevard, Jacksonville, Florida 32207
ABA #: 021000021
Account Name: Genie Investments NV
Account Address: 401 Ryland Street Suite 200-A, Reno, Nevada 89502
Account #: 4012372222

4.  <u>LOC LENDER COVENANTS AND WARRANTIES.</u>

4.1.  LOC Lender shall not transfer, assign, withdraw, or otherwise disburse to the LOC Lender, the Debtor, or any other person, any funds from the ICA unless and until all LOC Lender Obligations are fully satisfied in accordance with the Note and this Agreement.

5.  <u>CHOICE OF LAW.</u>

5.1.  This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Delaware.

6.  JURISIDCTION; VENUE.

6.1. Jurisdiction. The Parties agree that any legal action, suit, or proceeding arising out of or relating to this Agreement may be brought in a state or federal court located in Delaware. The Parties submit to the exclusive jurisdiction of any such court in any such action, suit, or proceeding.

6.2. <u>Venue</u>. The Parties irrevocably and unconditionally waive to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in **Error! Bookmark not defined.**6.1 and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

7.  <u>Waiver of Jury Trial</u>. THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

8.  <u>BENEFITS OF THE AGREEMENT.</u>

Initials: _____

8.1.   This Agreement is solely for the benefit of and shall bind the Parties and their respective successors and assigns and no other entity shall have any right, benefit, priority, or interest hereunder.

9. TERM.

9.1.   This Agreement may be terminated by the parties only upon full payment to LOC Lender of the LOC Lender Obligations by Debtor and/or the LOC Lender.

10. ATTORNEYS FEES.

10.1.   In the event that any Party retains counsel in connection with the interpretation, defense, or enforcement of this agreement, the prevailing Party shall recover its reasonable attorney's fees and expenses from the unsuccessful Party.

11. COUNTERPARTS.

11.1.   This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any Party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other Party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other Party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

12. NOTICE.

10.1   All notices required to be given to either Party hereunder shall be sent to the Parties at their respective addresses listed below and shall be deemed given upon the first to occur of: (a) deposit thereof, postage prepaid, in a receptacle under the control of the United States Postal Service; (b) the first business day following transmittal by electronic mail ; or (c) actual receipt by the Party to whom notice is being given, or an employee or agent of thereof.

**LOC Lender**

Name:      Genie Investments
Address:   PO Box 5886
           Wilmington, Delaware 19808

Initials: _____

**Debtor**

Name:        Rolling by the Dozen RV Park LLC

Address:     40 Country Road 267
             Somervillle, TX 77879
Attention:   Kristin & Ryan Stegent

13.    <u>Amendments and Waivers</u>. No term of this Agreement may be waived, modified, or amended except by an instrument in writing signed by both of the Parties. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

14.    <u>Headings</u>. The headings of the various Sections and subsections herein are for reference only and shall not define, modify, expand, or limit any of the terms or provisions hereof.

15.    <u>No Waiver; Cumulative Remedies</u>. No failure to exercise, and no delay in exercising on the part of LOC Lender, of any right, remedy, power, or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

16.    <u>Electronic Execution</u>. The words "execution," "signed," "signature," and words of similar import in this Agreement shall be deemed to include electronic or digital signatures or electronic records, each of which shall be of the same effect, validity, and enforceability as manually executed signatures or a paper-based record-keeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. §§ 7001 to 7031), the Uniform Electronic Transactions Act (UETA), or any Delaware state law.

17.    <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Note so as to affect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

*[Signature Page Follows]*

Initials: _____

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

**LOC Lender:**  Genie Investments

By: *Genie Investments*

**Debtor:**  Rolling by the Dozen RV Park LLC

By: _Krstn Stewt Ry Stegnt_
Name: Kristin & Ryan Stegent
    Title: _Managing Members_

**SUBSCRIBED AND SWORN TO BEFORE ME** on this ⎴ day of _January_, 20 23

_____
NOTARY PUBLIC
In and for the State of _Texas_

My Commission Expires:

_2/23/2026_

LISBET ORTIZ
Notary ID #133608489
My Commission Expires
February 23, 2026

Initials: _KS RS_