## EXHIBIT COVER SHEET

**Exhibit**

Party Submitting:      **Mary Ida Townson, U.S. Trustee for Region 21**

Admitted:          **YES      or    NO      (circle one)**          **10**

Chapter 11 Debtor:     **Genie Investments NV, Inc.**

Case No.          **3:24−bk−00496−BAJ**

Nature of Hearing:     **Trial on**

**U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**

**Debtor's Response Thereto (Doc. No. 34)**

**U.S. Trustee's Reply (Doc. No. 38)**

Trial Date:        **April 9, 2024, at 9:00 a.m.**

**United States Bankruptcy Court
Middle District of Florida**

**Dated:_____, 2024.**

**By: _____, Deputy Clerk**

## BRIDGE LOAN AGREEMENT

This Bridge Loan Agreement (this **"Agreement"**) is made and entered into as of January 5, 2023 (the **"Effective Date"**), between GENIE INVESTMENTS (the **"Lender"**), and Rolling by the Dozen RV Park LLC (**"Borrower"**).

### ARTICLE I
### DEFINITIONS AND INTERPRETATIONS

**Section 1.01**        **Definitions.**

**"Affiliate"** as to any Person, means any other Person that, directly or indirectly through one or more intermediaries, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

**"Business Day"** means (a) for all purposes other than as covered by subsection (b) below, a day other than a Saturday, Sunday, or other day on which commercial banks in Delaware are authorized or required by law to close.

**"Default"** means any of the events specified in Article 7 which constitutes an Event of Default or which, upon the giving of notice, the lapse of time, or both pursuant to Article 7 would, unless cured or waived, become an Event of Default.

**"Event of Default"** has the meaning set forth in Article 7.

**"Governmental Authority"** means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal, or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of, or pertaining to, government.

**"Lien"** means any mortgage, pledge, hypothecation, assignment (as security), Payment arrangement, encumbrance, lien (statutory or other), charge, or other security interest, or any preference, priority, or other security agreement or preferential arrangement of any kind or nature whatsoever having substantially the same economic effect as any of the foregoing

Initials:

(including any conditional sale or other title retention agreement and any capital lease).

"**Loan**" means the Bridge Loan.

"**Loan Documents**" means, collectively, this Agreement, the Security Agreement, the Promissory Note, the Intercreditor Agreement and all other agreements, documents, certificates, and instruments executed and delivered to the Lender by any Loan Party in connection therewith.

"**Loan Parties**" means the Borrower.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, properties, liabilities (actual or contingent), operations, or condition (financial or otherwise) or prospects of the Borrower, individually, or the Borrower and its Subsidiaries taken as a whole, (b) the validity or enforceability of any Loan Document, (c) the perfection or priority of any material Lien purported to be created by any Loan Document, (d) the rights or remedies of the Lender under any Loan Document, or (e) the ability of any Loan Party to perform any of its material payment obligations under any Loan Document to which it is a party.

"**Material Litigation**" has the meaning set forth in Section 8.04.

"**Maturity Date**" means 4/5/2023.

"**Person**" means any individual, corporation, limited liability Borrower, trust, joint venture, association, Borrower, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

"**Security Agreement**" means the Security Agreement made by the Borrower and in favor of the Lender, dated as of January 5, 2023.

**Section 1.02 Interpretation.** With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument, or other document shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth herein or in any other

Initials: _KS KS_

Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof," and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified, or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights.

(b) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c) Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds.

(d) All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP as in effect from time to time, and applied on a consistent basis in a manner consistent with that used in preparing the Borrower's audited financial statements, except as otherwise specifically prescribed herein.

### ARTICLE II
### AMOUNT AND TERMS OF LOAN

#### Section 2.01 Bridge Loan Commitment.

(a) Subject the terms and conditions of this Agreement, the Lender agrees to make:

(i) on the Effective Date, a Bridge Loan in an amount equal to One Hundred Seventy Eight Thousand Seven Hundred  Dollars and No Cents ($178,000) (the "**Bridge Loan**" or "**Loan**");

(b) Amounts borrowed under Section 2.01(a) and repaid or prepaid may not be reborrowed.

#### Section 2.02 Procedures for Loan Borrowing.

Initials: KS RS

(a) <u>Bridge Loan</u>. On the Effective Date, the Lender shall hold Bridge Loan in Lender's account on behalf of the Borrower.

**Section 2.03 Interest.**

(a) <u>Computation of Interest</u>. Interest on the outstanding principal amount of the Loan shall accrue at an interest rate of Four percent (4%) per month. All computations of interest for Loan shall be made on the basis of a year or 365 or 366 days, as applicable, and the actual number of days elapsed. In no event shall any interest charged collected or reserved in respect of a Loan exceed the maximum a rate then permitted by applicable laws, and if any payment of interest made by the Borrower in respect of a Loan exceeds such maximum rate, then such excess sum shall be credited by the Lender as a payment of principal.

(b) <u>Payment of Interest</u>. Pre-paid interest on the outstanding principal amount of the Loan shall be paid in kind and capitalized on this Business Day and shall be paid in cash in full upon acceptance of this agreement. Borrower understands that this payment is fully non-refundable.

**2.04. Security Interest.** The Loan shall be secured in accordance with the provisions of a Security Agreement with Borrower, in the form attached hereto as <u>Exhibit A</u> (the "**Security Agreement**"), the provisions of a Promissory Note with Borrower, in the form attached hereto as <u>Exhibit B</u> and shall be subject to an Intercreditor Agreement between the Lender and Borrower, in the form attached hereto Exhibit C (the "**Intercreditor Agreement**").

**2.05 Repayment.** The aggregate principal amount outstanding and accrued and unpaid interest of the Loan shall be due and payable by the Borrower on the Maturity Date. The Borrower may at any time and from time to time prepay the Loan, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Lender no later than 11:00 AM at least three (3) Business Days prior thereto.

**2.06 Payments.** All payments shall be made in lawful money of the United States of America in the manner designated by Lender in writing to the Borrower. Payment shall be credited first to accrued interest due and payable, with any remainder to principal.

### ARTICLE III
### CONDITIONS PRECEDENT TO BRIDGE LOAN

**3.01 Conditions to Lender's Obligations.** The obligations of the Lender to make the Loan is subject to the fulfillment or waiver of each of the following conditions:

(a) <u>Representations and Warranties</u>. Each of the representations and warranties of the Borrower contained in Section 4 shall be true and correct in

Initials: _KS RD_

all material respects on the Effective Date except for (i) representations and warranties made as of a particular date, which shall be true and correct in all material respects on and as of that particular date, and (ii) representations and warranties that are qualified as to "materiality", "Material Adverse Effect" or similar language, which shall be true and correct in all respects on and as of the Effective Date or such earlier date as the case may be.

      (b) Loan Documents. The Borrower shall deliver to the Lender:

        (i) a duly executed copy of this Agreement;

        (ii) a duly executed copy of the Security Agreement;

        (iii) a duly executed copy of the Note;

        (iii) duly executed copies of the ancillary documents required to perfect the Lender's security interests in the collateral contemplated by the Security Agreement;

        (iv) a duly executed copy of the Intercreditor Agreement.

    (c) Qualifications. All authorizations, approvals or permits, if any of any Governmental Authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance of the Loan pursuant to this Agreement shall be obtained and effective as of the Effective Date or Borrowing Date, as applicable.

    (d) Certificates and Documents. The Borrower shall deliver to Lender:

        (i) The Certificate of Incorporation of the Borrower, certified as of a recent date by the Secretary of State of Texas;

        (ii) A certificate of good standing issued by the Secretary of State of Texas; and

        (iv) A customary certificate of the Secretary of the Borrower, dated as of the Effective Date, in the form reasonably approved by Lender, certifying:

        a. True and correct copies of the Borrower's BYLAWS or OPERATING AGREEMENT; and

        b. True and correct copies of the resolutions of the Borrower's Board of Directors approving the transactions contemplated thereby.

**ARTICLE IV**

Initials: _KS RD_

## REPRESENTATIONS AND WARRANTIES OF THE BORROWER

**Section 4.01 Representations and Warranties of the Borrower**. The Borrower represents and warrants to the Lender, the following representations and warranties are true and complete as of the Effective Date and as of the date of each borrowing of the Loan hereunder.

**Section 4.02 Organization, Qualifications and Corporate Power**. The Borrower is a Limited Liability Company duly, incorporated, validly existing and in good standing under the laws of the State of Texas.

**Section 4.03 Authorization.** All corporate action on the part of the Borrower, and its officers, directors, and stockholders necessary for the authorization, execution and delivery of this Agreement and the Security Agreement and the performance of the obligations of the Borrower hereunder and thereunder has been taken.

**Section 4.04 Governmental Consents and Filings.** No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with any federal, state or local Governmental Authority is required on the part of the Borrower in connection with the transactions contemplated by this Agreement.

**Section 4.05 Enforceability.** This Agreement and the Security Agreement constitute valid and legally binding obligations of the Borrower, enforceable in accordance with their respective terms.

**Section 4.06    Noncontravention**. The execution, delivery and performance by the Borrower of this Agreement and the security Agreement, will not cause a default under, or otherwise breach, its BYLAWS, OPERATING AGREEMENT or any other document or agreement to which Borrower is a party or by which it is bound, or any laws, rule or regulation applicable to the Borrower or its assets which such default or breach would have a Material Adverse Effect on the Borrower.

## ARTICLE V
## AFFIRMATIVE COVENANTS OF THE BORROWER

**Section 5.01 Affirmative Covenants of the Borrower**. The Borrower covenants and agrees with the Lender that until all principal of an interest on the Loan and all other amounts due or which become due hereunder are repaid in full and performance of all other obligations of Borrower, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing:

**Section 5.02 Compliance with Laws.** Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations.

Initials: ZS PJ

**Section 5.03  Compliance with Documents.** Perform and comply with all the terms and conditions of this Agreement and the other Loan Documents.

**Section 5.04  Books and Records.** Keep and maintain complete and accurate books of account, in accordance with generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower.

**Section 5.05  Payment Obligations.** Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established in accordance with generally accepted accounting principles).

**Section 5.06  Financial Reports.** Deliver to Lender, with respect to Borrower as soon as available and in any event (a) within twenty (20) days after the end of each calendar [month] during the term of the Loan, financial statements of Borrower for such [month], certified as true and correct (which reports shall be prepared in accordance with generally accepted accounting principles consistently applied) and operating statements in form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender.

**Section 5.07  Notification to Lender.** Promptly after learning thereof, notify Lender of:

(a) the details of any material action, proceeding, investigation or claim against or affecting the Borrower instituted before any court, arbitrator or Governmental Authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a Material Adverse Effect on the business of the Borrower; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or any application for any refinancing of the Loan.

**Section 5.08  Partnership/Corporate Existence.** Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

### ARTICLE VI
### NEGATIVE CONVENANTS OF THE BORROWER

**Section 6.01  Negative Covenants of the Borrower.** The Borrower covenants and agrees with the Lender that until all principal of an interest on

Initials: _ZS RS_

the Loan and all other amounts due or which become due hereunder are repaid in full and performance of all other obligations of Borrower, Borrower shall note:

**Section 6.02. Liquidation, Merger and Sale of Assets**. Liquidate, merge or consolidate with any other Person, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business.

**Section 6.03 Liens.** Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or any portion thereof other than (a) any lien securing indebtedness owing to Lender.

**Section 6.04 Investments, Loan and Guaranties.** (a) be or become a party to any joint venture or other partnership, or (b) be or become a guarantor of any kind.

**Section 6.05 Acquisitions.** Enter into any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another Person by a merger, amalgamation or consolidation or any other combination with such Person.

**Section 6.06 Organizational Documents**. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

## ARTICLE VII
## EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "**Event of Default**"):

**Section 7.01 Nonpayment.** Failure to make any payment required by the Promissory Note, this Agreement or any other loan documents, and such failure continues for a period of thirty (30) days after notice of such default is sent by Lender to Borrower.

**Section 7.02 Other Covenants and Agreements.** Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement, or any of the Loan Documents and such failure shall nothave been fully corrected within twenty (20) days after notice of such default is sent by Lender toBorrower.

Initials: _K_ _P_

**Section 7.03    Representations and Warranties.** If any representation, warranty or statement made in or pursuant to this Agreement or any other loan document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made.

## ARTICLE VIII
## SECURITY

**Section 8.01  Security.** If any lien granted in this Agreement or any other loan document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute within thirty (30) calendar days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute within three (3) calendar days from the date of such change in the lien status occurs appropriate documents to correct such matters.

**Section 8.02  Validity of Loan Documents.** If (a) any material provision, in the sole opinion of the Lender, of any Loan Document shall at any time cease to be valid, binding and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any loan document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any loan document; or (d) any loan document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

**Section 8.03  Petition for Bankruptcy, Insolvency.** The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any Governmental Authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for a period of ninety (90) days; or the taking of action by Borrower to authorize any of the actions set forth in this Section 8.03.

Initials: KS PS

**Section 8.04  Material Litigation.** Any action, suit, proceeding or investigation of any kind involving, or threatened in writing against, Borrower or any subsidiary thereof, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a Material Adverse Effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any Loan Documents. Promptly after the commencement thereof, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation and proceedings before any court or governmental department, commission, board, bureau, agency orinstrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, of the disclosed litigation.

### ARTICLE IX
### REMEDIES

**Section 9.01 General.** Following the occurrence of one or more Events of Default, Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b) terminate all obligations under the loan documents; and (c) pursue and enforce, either successively or concurrently, all rights and remedies set forth in the Promissory Note, in the loan documents, or in any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or in equity, including such rights as are provided in this Article 9. If an Event of Default referred to in Section 6 hereof occurs, (i) all obligations of the Lender under the Loan Documents shall automatically and immediately terminate, if not previously terminated, and (ii) the principal of and interest then outstanding on the Loan, and all of the other obligations owing under the loan documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without anypresentment, demand or notice of any kind, which are hereby waived by the Borrower.

### ARTICLE X
### GENERAL PROVISION

**Section 10.01  Disclaimer of Liability.** Lender has no liability or obligations except those under the terms of the Loan Documents and makes no warranties or representations in connection therewith.

**Section 10.02 Confidentiality.** Borrower agrees that the specific terms of this Agreement,and Borrower hereby agrees to maintain confidential this Agreement, and any information disclosed by Lender related to the terms upon which funding of the Bridge Loan is to take place. Borrower's disclosure of a confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are

Initials:

cumulative in nature.

**Section 10.03 Responsibility for Application of Funds.** Lender shall have no obligation to see that funds advanced under the Bridge Loan are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement. Lender may rely solely upon Borrower's statements and reports in making said Bridge Loan and Borrower does hereby release and indemnify Lender and hold Lender harmless from any and all losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the Bridge Loan by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final andnon-appealable decision).

**Section 10.04 Notices.** All notices given under this Agreement, unless otherwise specifiedherein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent certified mail upon the first to occur of receipt by the addressee or the expiration of ninety six (96) hours after deposit in first class certified United States mail, postage prepaid, return receipt requested, or two business days if sent by pre-paid nationally recognized overnight courier service,sent to the Party at its address set forth below, or such other address as a Party may designate fromtime to time by written notice given pursuant to this paragraph:

To Borrower:   Rolling by the Dozen RV Park LLC

To Lender:   Genie Investments

**Section 10.05 Applicable Law.** This Agreement and, unless otherwise specifically provided for therein, shall be governed by and construed in accordancewith the laws of the State of Delaware and the United States.

**Section 10.06 Successors and Assigns.** The terms of this Agreement will bind and benefitthe successors and assigns of the Parties. Borrower may not assign this Agreement or any proceeds from the Bridge Loan or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

Initials: KSR

**Section 10.07 Severability.** The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision.

**Section 10.08 Amendments.** This Agreement may not be modified or amended except by written agreement signed by the Borrower and Lender.

**Section 10.09 Headings; Attachments.** The several headings to articles, sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part hereof.

**Section 10.10 No Third-Party Rights.** This Agreement is made entirely for the benefit of Borrower, the Lender, and their successors in interest (including any participants). No third Person shall have any rights hereunder.

**Section 10.11 Indemnification.** The Borrower agrees to defend, indemnify and hold harmless the Lender (and its Affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys 'fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated  a party thereto) or any other claim by any Person relating to or arising out of the Loan Documents or any actual or proposed use of proceeds of the Loan, or any activities of the Borrower or its Affiliates; provided that the Lender shall not have the right to be indemnified under this Section 10.11 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by final non-appealable judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 10.11 shall survive any termination of this Agreement. The Borrower hereby agrees to indemnify, defend and hold harmless the Lender, the Manager of Lender, and all of their members, managers, Affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Borrower's failure to fulfill all of the terms and conditions of this Agreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs and expenses (including attorneys' fees and costs) incurred by Lender, the managing member of Lender, or any of its members, managers, Affiliates or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the

Initials: _KSR_

Borrower has furnished in connection with this transaction. The Lender hereby agrees to indemnify, defend and hold harmless the Borrower, the officers of Lender, and all of their shareholders, managers, Affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs)that they may incur by reason of Lender's default of its obligations under this Agreement.

**Section 10.12  General Limitation of Liability.** No claim may be made by the Borrower or any other Person against the Lender or the Affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

**Section 10.13  Legal Representation of the Parties.** The Loan Documents were negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other Loan Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

**Section 10.14  JURY TRIAL WAIVER.** THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

Initials:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

GENIE INVESTMENTS

By _____ *Genie Investments* _____

Rolling by the Dozen RV Park LLC

By _Kristin Stegk By Stegert_
Name: Kristin & Ryan Stegent
Title: _Managing Members_

**SUBSCRIBED AND SWORN TO BEFORE ME** on this _6_ day of _January_ , 20_23_

_____
NOTARY PUBLIC
In and for the State of _Texas_

LISBET ORTIZ
Notary ID #133608489
My Commission Expires
February 23, 2026

My Commission Expires:

_2/23/2026_

Initials: _KS RS_

EXHIBIT A

# SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of January 5, 2023 (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**"), made by and among Rolling by the Dozen RV Park LLC, a Texas Limited Liability Company (the "**Grantor**"), in favor of Genie Investments (the "**Secured Party**").

WHEREAS, on the date hereof, the Secured Party has made a loan to the Grantor in an aggregate unpaid principal amount not exceeding One Hundred Seventy Eight Thousand Seven Hundred Dollars and No Cents ($178,000) (the "**Loan**"), evidenced by that certain Bridge Loan Agreement of even date herewith (as amended, supplemented or otherwise modified from time to time, the "**Loan Agreement**") made by the Grantor and payable to the order of the Secured Party. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement;

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations; and

WHEREAS, it is a condition to the obligations of the Lender to make the Loans under the Loan Agreement that the Grantor execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Definitions.

(a)    Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement.

(b)    Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

(c)    For purposes of this Agreement, the following terms shall have the following meanings:

"**Collateral**" has the meaning set forth in Section 2.

"**Event of Default**" has the meaning set forth in the Loan Agreement.

"**First Priority**" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security

Initials: _____

interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the Loan Agreement or Intercreditor Agreement).

**"Perfection Certificate"** has the meaning set forth in Section 5.

**"Proceeds"** means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.

**"Secured Obligations"** has the meaning set forth in Section 3.

**"UCC"** means the Uniform Commercial Code as in effect from time to time in the State of Delaware or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.    Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of its right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the **"Collateral"**):

(a)    all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims, general intangibles (including all payment intangibles), money, Payment accounts, and any other contract rights or rights to the payment of money; and

(b)    all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

3.    Secured Obligations. The Collateral secures the due and prompt payment and performance of:

(a)    the obligations of the Grantor from time to time arising under the Loan Agreement, this Agreement or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the Loans (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the Loan Agreement and this Agreement; and

(b)    all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the Loan Agreement, this Agreement or any other document made,

Initials: _KCRS_

delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in Section 3 being herein collectively called the **"Secured Obligations"**).

4.      Perfection of Security Interest and Further Assurances.

(a)     The Grantor shall, from time to time, as may be required by the Secured Party with respect to all Collateral, immediately take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable, the Grantor shall immediately take all actions as may be requested from time to time by the Secured Party so that control of such Collateral is obtained and at all times held by the Secured Party. All of the foregoing shall be at the sole cost and expense of the Grantor.

(b)     The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section promptly to the Secured Party upon request.

(c)     The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

5.      Representations and Warranties. The Grantor represents and warrants as follows:

(a)     It has previously delivered to the Secured Party a certificate signed by the Grantor and entitled "Perfection Certificate" (**"Perfection Certificate"**), and that: (i) the Grantor's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof, (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the Perfection Certificate, (iii) the Perfection Certificate accurately sets forth, the Grantor's place of business (or, if more than one, its chief executive office), and its mailing address, (iv) all other information set forth on the Perfection Certificate relating to the Grantor is accurate and complete and (v) there has been no change in any such information since the date on which the Perfection Certificate was signed by the Grantor.

Initials: _KS RS_

(b)     All information set forth on the Perfection Certificate relating to the Collateral is accurate and complete and there has been no change in any such information since the date on which the Perfection Certificate was signed by the Grantor.

(c)     At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the Loan Agreement.

(d)     The pledge of the Collateral pursuant to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(e)     It has full power, authority and legal right to borrow the Loans and pledge the Collateral pursuant to this Agreement.

(f)     Each of this Agreement and the Loan Agreement has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

(g)     No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Loans and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the Loan Agreement and this Agreement by the Grantor or the performance by the Grantor of its obligations thereunder.

(h)     The execution and delivery of the Loan Agreement and this Agreement by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(i)     The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

6.     Voting, Distributions and Receivables.

(a)     The Secured Party agrees that unless an Event of Default shall have occurred and be continuing, the Grantor may, to the extent the Grantor has such right as a holder of the Collateral consisting of securities, or indebtedness owed by any obligor, vote and give consents, ratifications and waivers with respect thereto, except to the extent that, in the Secured Party's reasonable judgment, any such vote, consent, ratification or waiver would detract from the value thereof as Collateral or which would be inconsistent with or result in any violation of any provision of the Loan Agreement or this Agreement.

(b)     If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any

Initials: ⟋⟍⟍

account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.    Covenants. The Grantor covenants as follows:

(a)    The Grantor will not, without providing at least 30 days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b)    The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4, will be kept at those locations listed on the Perfection Certificate and the Grantor will not remove the Collateral from such locations without providing at least 30 days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c)    The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d)    The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the Loan Agreement/herein or with the prior written consent of the Secured Party.

(e)    The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located.

(f)    The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

8.    Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9.    Secured Party May Perform. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the

Initials: ZCRD

expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10.    Reasonable Care. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11.    Remedies Upon Default.

(a)    If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten days prior to the date of such disposition shall constitute reasonable notice, but notice given in any other reasonable manner shall be sufficient. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. To the extent permitted by applicable law, the Grantor waives all claims, damages and demands it may acquire against the Secured Party arising out of the exercise by it of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

(b)    If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or

Initials: _KS RJ_

cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(c)     If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.     No Waiver and Cumulative Remedies. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

13.     SECURITY INTEREST ABSOLUTE. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)     any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument;

(b)     any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the Loan Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)     any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Secured Obligations;

(d)     any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

(e)     any default, failure or delay, willful or otherwise, in the performance of the Secured Obligations;

(f)     any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

(g)     any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loans or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14.     Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom

Initials: _____

shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15.    Addresses For Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the Loan Agreement, and addressed to the respective parties at their addresses as specified on the signature pages hereof or as to either party at such other address as shall be designated by such party in a written notice to each other party.

16.    Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 16, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party.

17.    Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18.    GOVERNING LAW. This Agreement and the Loan Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or the Loan Agreement (except, as to the Loan Agreement, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Delaware.

19.    Counterparts. This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the Loan Agreement constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

*[Signature Page Follows]*

Initials:

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

GENIE INVESTMENTS

By _Genie Investments_

Rolling by the Dozen RV Park LLC

By _Kristin Stegent Ryan Stegent_
Name: Kristin & Ryan Stegent
Title: _Managing Members_

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 6 day of _January_, 2023

_____
NOTARY PUBLIC
In and for the State of _Texas_

My Commission Expires:

_2/23/2026_

LISBET ORTIZ
Notary ID #133608489
My Commission Expires
February 23, 2026

Initials: KS RS

# Perfection Certificate

Reference is hereby made to that certain Security Agreement (the "**Security Agreement**"), dated as of January 5, 2023, between Rolling by the Dozen RV Park LLC, (the "**Company**"), in favor of Genie Investments (the "**Lender**). Capitalized terms used but not defined herein have the meanings assigned to them in the Security Agreement.

The undersigned hereby certifies to the Lender:

1.    <u>Name</u>.

      (a)    The exact legal name of the Company, as such name appears in its respective certificate of incorporation or any other formation or organizational document, is as follows:

<u>ROLLING BY THE DOZEN RV PARK LLC</u>

      (b)    The following are any other legal names that the Company has had in the past four months, together with the date of the relevant change:



N/A

      (c)    The following are any other names (including trade names) used by the Company, or any other business or organization to which the Company became the successor by merger, consolidation, acquisition, change in form, nature or jurisdiction of organization or otherwise, now or at any time during the past four months:



N/A

2.    <u>Other Identifying Factors</u>.

      (a)    The Company is the type of entity described next to its name below:

LLC

      (b)    The jurisdiction of organization or formation of the Company is as follows:

Kristin Stegent - Managing Member 60%

Ryan Stegent - Managing Member 40%    Initials: KS RS

(c)     The Company has not changed its jurisdiction of organization or formation at any time during the past four months, except as set forth below:



(d)     The federal taxpayer identification number of the Company is:

87-2519274

3.     Current Locations.

(a)     The chief executive office of the Company is located at the following address:

(b)     The principal mailing address of the Company is the following address, if different from the Chief Executive office:

If principal mailing address is the same as the Chief Executive office please put an "X" this box: [X]



4.     Fixtures.

Listed below is the information required by UCC § 9-502(b) of each state in which any of the Collateral consisting of fixtures is or is to be located and the name and address of each real estate recording office where a mortgage on the real estate on which such fixtures are or are to be located would be recorded:



5.     Real Property.

(a)     The following is a list of real property owned or leased by the Company:

Rolling by the Dozen RV Park

Initials: 

6.    <u>Stock Ownership and Other Equity Interests</u>.

The following is a list of all of the authorized, and the issued and outstanding, stock, partnership interests, limited liability company membership interests or other equity interests of the Company, the record and beneficial owners of such stock, partnership interests, membership interests or other equity interests and whether such interests are certificated or non-certificated:

Kristin Stegent - 60%
Ryan Stegent - 40%

7.    <u>Instruments and Tangible Chattel Paper</u>.

The following is a list of all instruments (other than checks to be deposited in the ordinary course of business), promissory notes, tangible chattel paper and other evidence of indebtedness held by the Company:



N/A

8.    <u>Commercial Tort Claims</u>.

The following is a list of all Commercial Tort Claims held by the Company, including a brief description thereof:

N/A

Initials: KS RS



9.     Deposit Accounts and Securities Accounts.

(a)     The following is a list of all deposit accounts and securities accounts maintained by the Company, including the name of each institution where each such account is held, the name and account number of each such account and the name of each entity that holds each account:

Rolling by the Dozen RV Park LLC
Chase Bank
Account # ███████ 2772

_____

_____

_____

(b)     If the Company maintains a securities account with a securities intermediary, (i) the account agreement is not governed by the law of a foreign country and does not provide that the issues governed by Article 2(1) of the Hague Securities Convention are determined by the law of a foreign country, and (ii) the securities intermediary maintains an office in the United States that qualifies under the second sentence of Article 4(1) of the Hague Securities Convention.

10.     Letter-of-Credit-Rights.

The following is a list of all Letters of Credit issued in favor of the Company as beneficiary thereunder:



N/A

11.     Extraordinary Transactions.

All of the Collateral has been originated by the Company in the ordinary course of business or consists of goods which have been acquired by the Company in the ordinary course of business from a person in the business of selling goods of that kind, except for those purchases, acquisitions and other transactions listed below:

Initials: ZSRJ



_____N/A_____

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

GENIE INVESTMENTS

By ___Genie Investments___

Rolling by the Dozen RV Park LLC

By _Kristin Stegent Ryn Stegent_
Name: Kristin & Ryan Stegent
Title: _Managing Members_

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 6 day of January, 2023

_____
NOTARY PUBLIC
In and for the State of _Texas_

My Commission Expires:

___2/23/2026___

LISBET ORTIZ
Notary ID #133608489
My Commission Expires
February 23, 2026

Rolling by the Dozen RV Park LLC
By _Kristin Stegent Ryn Stegent_
Name: Kristin & Ryan Stegent
Title: _Managing Members_

Initials: _KS RS_

EXHIBIT B

# Promissory Note

January 5, 2023

FOR VALUE RECEIVED, the undersigned, Rolling by the Dozen RV Park LLC, a Texas Limited Liability Company, (the "**Borrower**"), hereby promises to pay Genie Investments, (the "**Lender**") the principal amount of One Hundred Seventy Eight Thousand Seven Hundred Dollars and No Cents ($178,000) (the "**Loan**") in accordance with the provisions of the Loan Agreement, dated as of January 5, 2023, among the Borrower and the Lender (the "**Loan Agreement**"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Loan Agreement.

(a) The Borrower promises to pay interest on the unpaid principal amount of Loan from the date of such Loan until such principal amount is paid in full, at the interest rates and at the times provided in the Loan Agreement. All payments of principal and interest shall be made to the Lender in Dollars in immediately available funds by a method designated in writing by Lender.

(b) This Note is secured by the Collateral. Upon the occurrence and continuation of any Event of Default under the Loan Agreement, all principal and all accrued interest then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided in the Loan Agreement.

(c) The Loan made by the Lender shall be evidenced by one or more records or accounts maintained by the Lender in the ordinary course of business.

(d) The Borrower hereby waives diligence, presentment, demand, protest, notice of intent to accelerate, notice of acceleration, and any other notice of any kind. No failure on the part of the holder hereof to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof or a consent thereto; nor shall a single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

THIS NOTE AND THE OBLIGATIONS OF THE BORROWER HEREUNDER SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE.

Initials: _____

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Rolling by the Dozen RV Park LLC

By _Kristin Stent    Ry Stegent_

Name: Kristin & Ryan Stegent

Title: _Managing Members_

**SUBSCRIBED AND SWORN TO BEFORE ME** on this _6_ day of _January_, 20_23_

_____

NOTARY PUBLIC

In and for the State of _Texas_

My Commission Expires:

_2/23/26_

LISBET ORTIZ
Notary ID #133608489
My Commission Expires
February 23, 2026

Initials: _KS RS_

EXHIBIT C

## INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT, dated as of January 5, 2023 this "Agreement"), is made by and between Rolling by the Dozen RV Park LLC, (the "Debtor"), Genie Investments, (the "LOC Lender"), herein referred to each as a "Party" and together, the "Parties."

### RECITALS

A.      The LOC Lender has approved the Debtor for a Line of Credit in the amount of 1,787,000 ((the "LOC") pursuant to the LOC Lender's Business Expansion Line of Credit Agreement (the "LOCA") in the dated January 5, 2023.

B.      The executed LOCA requires the Debtor to deposit with the LOC Lender Twenty Six Thousand Eight Hundred Five Dollars and No Cents ($26,805), representing 1.5% of the LOC, (the "Debtor Deposit") into an Interest Credit Account (the "ICA") maintained by the LOC Lender for the benefit of Debtor.

C.      Five Thousand Three Hundred Sixty One Dollars and No Cents ($5,361) of the Debtor's Deposit, shall be paid to ZOOMERAL, Inc. for the purpose of an origination fee (the "Origination Fee").

D.      Twenty One Thousand Four Hundred Forty Four Dollars and No Cents ($21,444) of the Debtor's Deposit, for the purpose of Debtor's payment of interest, due and payable prior to the Bridge Term (as defined herein) of the LOCA.

E.      The Debtor has requested and LOC Lender has agreed to provide an ICA for bridge funding in the amount of One Hundred Seventy Eight Thousand Seven Hundred Dollars and No Cents ($178,000) plus interest reserve and fees (the "Bridge Loan"). The Bridge Loan Bridge is subject to the terms and conditions set forth in the Promissory Note (the "Note"),

Initials: _____

Security Agreement, Guaranty, and this Agreement, of even date herewith executed by and between the Debtor and LOC Lender (collectively, the "Loan Documents")

F.   LOC Lender will provide the Bridge Loan on behalf of the Debtor to the ICA to enable the Debtor to secure the LOC from the LOC Lender.  Upon execution of the Loan Documents, LOC Lender will fund the ICA within three (3) Banking days.

G.   Commencing January 5, 2023, LOC Lender shall receive full payment of all interest from the ICA in the amount of Twenty One Thousand Four Hundred Forty Four Dollars and No Cents ($21,444).

H.   Debtor shall have the right to extend the Bridge Term for an additional term of thirty (30) days (the "Extension Option"). If Debtor wishes to extend the Bridge Term, Debtor shall notify LOC Lender in writing of its intention to exercise the Extension Option no later than five (5) business days prior to the end of the Bridge Term. If Debtor exercises the Extension Option, the Bridge Term shall continue month-to-month until Debtor notifies LOC Lender, in writing, of its intention to terminate the then-existing Bridge Term no later than five (5) business days prior to then-existing Bridge Term.

I.   The Bridge Loan will be secured by, inter alia, a security interest in the LOC Lender Collateral senior to any security interest therein held by LOC Lender.

J.   The LOC Lender holds or will hold a security interest in the LOC Lender Collateral.

K.   The Creditors are executing this Agreement to set forth their lien and security priorities with respect to the Debtor transaction.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the Parties hereby agree as follows:

1.   <u>DEFINITIONS</u>. The following terms used herein shall have the following meaning. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code:

1.1.   "Bankruptcy Code" - Title 11 of the United Sates Code.

1.2.   "Bridge Loan" – See Recital C. & D.

1.3.   "Bridge Term" – Ninety (90) calendar days from the date of agreement execution

1.4.   "Chosen State" – Delaware

1.5.   "Creditor(s)" - The LOC Lender

Initials: _ZSRd_

1.6.    "Debtor" – See preamble.

1.7.    "Default Notice" – See section 4.2

1.8.    "LOC Lender" - See Preamble.

1.9.    "LOC Lender Collateral" – All collateral which now or hereafter secures the LOC Lender Obligations.

1.10.    "LOC Lender Obligations" – Indebtedness owed by the Debtor to the LOC Lender.

1.11.    "LOC Lender Collateral "—All collateral which now or hereafter secures the LOC Lender obligations pursuant to the Security Agreement.

1.12.    "LOC Lender Obligations" – All obligations of the Debtor to LOC Lender under the Note or any other agreement between Debtor and LOC Lender.

1.13.    "Party" – Each of the LOC Lender and the Debtor.

2. PRIORITY.

2.1.    Notwithstanding the terms or provisions of any agreement or arrangement which either Creditor may now or hereafter have with the Debtor or any rule of law, and irrespective of the time, order, or method of attachment or perfection of any security interest or the recordation or other filing in any public record of any financing statement, any security interests now or hereafter held by LOC Lender in any and all assets of the Debtor, is and shall remain senior to any security interest therein now or hereafter held by the LOC Lender.

3. BRIDGE LOAN REPAYMENT TO LOC LENDER.

3.1.    The Parties acknowledge and agree that the LOC Lender Obligations shall be due and payable to LOC Lender on Debtor's first draw from the Debtor's LOC. The LOC Lender affirms and warrants that no draw request from the Debtor shall be accepted if the LOC Lender Obligations have not been satisfied or the full amount of the LOC Lender Obligations isn't included in the draw request. The first draw from the LOC shall be at a minimum sufficient to satisfy the LOC Lender Obligations, and no other payment from the Debtor's LOC availability shall be disbursed unless and until the full amount of the LOC Lender Obligations have been paid. The Parties' additionally agree that the first LOC draw request must occur within ninety banking days from the date of the opening of the Debtor's ICA with the Lender (the "Bridge Loan Term").

3.2.    In the event the first draw request is not made and the LOC Lender Obligations are not satisfied within the Bridge Loan Term, or Debtor otherwise defaults in the performance of the LOC Lender Obligations, LOC Lender may send a Default Notice to LOC Lender demanding the full payment of the LOC Lender Obligations from the ICA.

3.3.    Within one Business Day of the Default Notice, LOC Lender shall retain the full amount of the LOC Lender Obligations from the funds held in the Debtor's ICA.

Initials: _____

3.4.     The Debtor understands that payments to LOC Lender hereunder by LOC Lender shall be deemed to be payments to the Debtor under the LOCA.

3.5.     All payments to LOC Lender shall be made as follows (or in accordance with such other instructions as may be advised in writing by LOC Lender to Borrower):

Bank Name: Chase Bank
Bank Address: ███████████████████████████████
ABA #: ████████
Account Name: Genie Investments NV
Account Address: ███████████████████████████████
Account #: ████ 2222

## 4.  LOC LENDER COVENANTS AND WARRANTIES.

4.1.     LOC Lender shall not transfer, assign, withdraw, or otherwise disburse to the LOC Lender, the Debtor, or any other person, any funds from the ICA unless and until all LOC Lender Obligations are fully satisfied in accordance with the Note and this Agreement.

## 5.  CHOICE OF LAW.

5.1.     This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Delaware.

## 6.  JURISIDCTION; VENUE.

6.1. Jurisdiction. The Parties agree that any legal action, suit, or proceeding arising out of or relating to this Agreement may be brought in a state or federal court located in Delaware. The Parties submit to the exclusive jurisdiction of any such court in any such action, suit, or proceeding.

6.2. Venue. The Parties irrevocably and unconditionally waive to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in **Error! Bookmark not defined.**6.1 and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

## 7.  Waiver of Jury Trial. THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

## 8.  BENEFITS OF THE AGREEMENT.

Initials: ZSRJ

8.1.   This Agreement is solely for the benefit of and shall bind the Parties and their respective successors and assigns and no other entity shall have any right, benefit, priority, or interest hereunder.

9. TERM.

9.1.   This Agreement may be terminated by the parties only upon full payment to LOC Lender of the LOC Lender Obligations by Debtor and/or the LOC Lender.

10. ATTORNEYS FEES.

10.1.   In the event that any Party retains counsel in connection with the interpretation, defense, or enforcement of this agreement, the prevailing Party shall recover its reasonable attorney's fees and expenses from the unsuccessful Party.

11. COUNTERPARTS.

11.1.   This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any Party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other Party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other Party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

12. NOTICE.

10.1   All notices required to be given to either Party hereunder shall be sent to the Parties at their respective addresses listed below and shall be deemed given upon the first to occur of: (a) deposit thereof, postage prepaid, in a receptacle under the control of the United States Postal Service; (b) the first business day following transmittal by electronic mail ; or (c) actual receipt by the Party to whom notice is being given, or an employee or agent of thereof.

**LOC Lender**

Name:      Genie Investments
Address:   ████████████
           Wilmington, Delaware 19808

Initials: _KL RJ_

**Debtor**

Name:     Rolling by the Dozen RV Park LLC

Address:    ███████████████

Attention:   Kristin & Ryan Stegent

13.    <u>Amendments and Waivers</u>. No term of this Agreement may be waived, modified, or amended except by an instrument in writing signed by both of the Parties. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

14.    <u>Headings</u>. The headings of the various Sections and subsections herein are for reference only and shall not define, modify, expand, or limit any of the terms or provisions hereof.

15.    <u>No Waiver; Cumulative Remedies</u>. No failure to exercise, and no delay in exercising on the part of LOC Lender, of any right, remedy, power, or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

16.    <u>Electronic Execution</u>. The words "execution," "signed," "signature," and words of similar import in this Agreement shall be deemed to include electronic or digital signatures or electronic records, each of which shall be of the same effect, validity, and enforceability as manually executed signatures or a paper-based record-keeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. §§ 7001 to 7031), the Uniform Electronic Transactions Act (UETA), or any Delaware state law.

17.    <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Note so as to affect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

*[Signature Page Follows]*

Initials: ZS RS

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

**LOC Lender:** Genie Investments

By: _Genie Investments_

**Debtor:** Rolling by the Dozen RV Park LLC

By: _Krish Stewt Ry Stegent_
Name: Kristin & Ryan Stegent
Title: _Managing Members_

**SUBSCRIBED AND SWORN TO BEFORE ME** on this _6_ day of
_January_, 20_23_

_[signature]_
NOTARY PUBLIC
In and for the State of _Texas_

My Commission Expires:

_2/23/2026_

LISBET ORTIZ
Notary ID #133608489
My Commission Expires
February 23, 2026

Initials: _KS RS_