## <u>EXHIBIT COVER SHEET</u>

<u>**Exhibit**</u>

Party Submitting:     **Mary Ida Townson, U.S. Trustee for Region 21**

Admitted:           **YES     or    NO      (circle one)**              <u>**130**</u>

Chapter 11 Debtor:    **Genie Investments NV, Inc.**

Case No.            **3:24−bk−00496−BAJ**

Nature of Hearing:    **Trial on**

**U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**

**Debtor's Response Thereto (Doc. No. 34)**

**U.S. Trustee's Reply (Doc. No. 38)**

Trial Date:          **April 9, 2024, at 9:00 a.m.**

**United States Bankruptcy Court
Middle District of Florida**

**Dated:_____, 2024.**


**By: _____, Deputy Clerk**

# GENIE INVESTMENTS

February 9, 2024

Re:     *Genie Investments – Update on Refund Delays*

Dear Borrower,

Here is the update that you have been patiently waiting for: Although many settlements have been offered and agreed upon by our capital provider between May 2023 and today, for various amounts owed. Our capital provider has failed, every-time, to deliver funds. Most recently, a settlement was accepted by Genie on December 22nd, 2023, but unfortunately, our capital provider failed to deliver yet again. So, this update is to inform you of significant new steps Genie is now comfortable taking and how you can participate in the steps with Genie.

First, Genie filed a Federal Fraud suit this week. Until now, the identity of Genie's capital provider has been withheld due to our contractual obligations and for everyone's protection, however, due to the filing of the suit, it is now public information. This is another suit entirely which represents another potential pathway to recover funds. Here is the case name and number: Genie Investments NV, LLC v. Joshua Wearmouth, James William Byrd and Nordic Trust Alliance KB, LLC 6:24-cv-00271. Please see **Exhibit A**, the Federal filing. Keep in mind, we still have our ongoing arbitration suit in tandem with this one.  **Exhibit B** is the original Arbitration filing.

Second, Genie will be taking the first legal steps to reach a financial settlement with the law firm we engaged to conduct due diligence/vet the capital provider and oversee contract negotiations for Genie. Our legal counsel has informed us that a mal-practice suit is called for. Genie will be seeking a new legal team that specializes in legal malpractice suits. Regarding the engagement with the firm, first there must be three attempts at mediation to settle the case prior to an arbitration being filed. Of course, you will be informed along the way.

### SUMMARY OF PRIOR EVENTS

Genie is a Nevada corporation that provides capital to small and medium-sized businesses through lines of credit. It obtains capital from "warehouse lenders/capital providers" and other sources and, in turn, lends those funds to borrowers at marginally higher rates.

In late 2022, following failures by its previous warehouse lender, Genie sought new sources of affordable capital. At the time, Genie worked with a network of finders who introduced Genie to potential borrowers. One of those finders was Will Byrd.[1] Upon learning that Genie wanted to find new sources of capital to lend, Byrd introduced Genie to Josh Wearmouth and Velanos in October 2022.

---

[1]     Our investigation indicates that Will Byrd's actual name might be James Byrd and that he lives or has recently lived in Dallas, Texas.

Wearmouth told Genie that he used capital from business partners to monetize SBLCs by buying them at a discount and then selling them at a profit. He proposed a business relationship wherein Velanos would use capital supplied by Genie to complete a series of prearranged trades of SBLCs. Wearmouth further represented that this would pose no risk to Genie's capital. Byrd, who has frequently acted as Wearmouth's spokesperson in communications with Genie, vouched for Wearmouth and supported his assertions. Wearmouth provided Genie with a draft Joint Venture Agreement (JVA) that called for Genie to contribute capital, for Velanos to use those capital contributions to trade SBLCs, and for Velanos to return the capital contributions and distribute resulting profits to Genie within 60 days.

After Genie's then-lawyer reviewed the contract and supposedly vetted the underlying trading program, Genie and Velanos signed the JVA in October 2022. In November 2022, upon invitations from Wearmouth and Byrd, Genie contributed an additional $6.0 million in capital. In exchange, Velanos agreed to provide Genie a total of $75 million ($9.0 million in capital contributions and $66.0 million in profits) within 60 days.

The JVA, a copy of which is attached as **Exhibit C**, also required Velanos to deploy Genie's capital contributions "strategically and with discretion, including facilitating a systematic purchase and sale of financial instruments routine." Elsewhere, the JVA identified "SBLC (Standby Letter of Credit) HSBC London/Top Rated Issuer" as the "Transacting asset(s)." The JVA also included nondisclosure and non-circumvention clauses. Genie did not know at the time that these and many other aspects of the JVA and Wearmouth's description of the putative trading program were hallmarks of a type of fraudulent scheme well-known to law enforcement and securities regulators.[2]

Almost immediately, Wearmouth and Byrd began making false promises of imminent payments, followed by bogus excuses when those payments did not happen. When making those promises and excuses, Wearmouth and Byrd often invoked terms that Genie later learned were hallmarks of SBLC and similar scams.

In a letter to Genie dated December 30, 2022, Velanos claimed "that the $75,000,000.00 USD owed to you will be available on or before January 15th, 2023." The same letter identified an account Velanos purportedly had with HSBC Bank and asserted that the account held nearly 350 million Euros. Wearmouth also provided a screenshot of an email that he supposedly received from a representative of HSBC Bank "confirming" that Velanos "with accounts at HSBC bank located 79 Piccadilly, Mayfair, London are the lawful and legal owner of funds on deposit in the amount of…€ 349,220,053.20…as of this date 19th of December, 2022." The document identified the supposed account number in which the funds were held, and stated:

> …these funds have been earned, being good, clean, and of a non-criminal
> origin, being free of and clear of any and all liens and encumbrances, and are

---

[2]    *See, e.g.,* https://www.fbi.gov/contact-us/field-offices/honolulu/news/press-releases/fbi-warns-public-about-platform-trading-investment-scams; https://www.treasurydirect.gov/laws-and-regulations/fraud/prime-bank-fraud/; https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-57.

freely assignable and transferable upon the instruction of the authorized
account signatory.

The phrase "good, clean, and of a non-criminal original" closely resembles language that law-
enforcement agencies have identified as emblematic of "prime bank" or advance-fee frauds. In January
2023, Wearmouth told Genie that Velanos had wired $10.0 million from a Scotiabank account to Genie's
account with Chase bank. Wearmouth provided Genie's lawyer with a screenshot that purported to
show tracking details for the wire transfer. Genie, however, never received any portion of that supposed
transfer. As of late March 2023, Wearmouth claimed that the transferred funds were and had been held
by the "corresponding [sic] bank" – later identified as Wells Fargo – since January 2023.

It is our understanding, based on consultations with banking experts, that correspondent
banks cannot simply hold wire transfers on their whim. To the contrary, if a bank receives wire
instructions and funds are available in the account, then the wire goes through almost
immediately. The only thing that should hold up a wire transfer is if a party to the transfer is
listed on the Sanctions list maintained by the Office of Foreign Asset Control. Neither Genie nor
any of its principals is on that list.

In March 2023, Wearmouth sent Genie a letter stating that trade profits (ostensibly from
trades effected with Genie's $9MM) were being held at HSBC in a "sub account." The letter
outlined a supposed strategy for accessing those funds. One aspect of the strategy Wearmouth
described was that "a major top 25 bank will open a line of credit…" This phrase is yet another
hallmark of prime-bank and advance-fee scams.

In April 2023, Wearmouth forwarded an email that he represented was from Lia
Monteiro, whom he described as a "banker that has the contacts at HSBC to get us a Master
TRA," which would supposedly allow Velanos to access the trading profits held in a
subaccount.[3] A red flag concerning this representation was the email from Monteiro was
addressed to Lucia Alves of Sensus International Group. Sensus International Group
(www.sensusintgr.com) has almost no online presence aside from a bare-bones website that bears
many similarities to Velanos' website and a similarly uninformative LinkedIn page. Notably,
however:

- Sensus and Velanos have the same address in Toronto.

- Lucia Alves is listed on some of Velanos' Canadian corporate filings as a director.

- Sensus' LinkedIn page identifies its CEO and Managing Director as Lucia Harris and
  Jason Harris, who were co-directors of Velanos (Canada) with Wearmouth between
  2018 and early 2023.

As of June 2023, Velanos still had not paid Genie any of the amounts due under the JVA.
Wearmouth, who continued to blame various banks for his failure to deliver promised payments
to Genie, proposed the following: Velanos would facilitate the creation of a commercial bank
account in Genie's name at Nordic Trust Alliance KB in Miami, Florida, where Velanos also had

---

[3]     This type of garbled jargon is typical of communications from Wearmouth and Velanos to Genie.

an account, and subsequently deposit $9.5 million into the newly established Genie account by June 15, 2023, and an additional $50 million by June 30, 2023.

Thereafter, Genie submitted an account application to Nordic Trust and received notification that an account in its name had been established. Genie received access to an online account portal. The online portal showed a $9.5 million credit to Velanos' account on June 20, 2023. When Genie attempted to transfer that amount or any portion of it to its account at Chase Bank, however, no money ever reached the Chase account. When Genie asked Nordic Trust to explain why it couldn't access the funds in its account, it received vague responses. At one-point, Nordic Trust asserted that Genie's outgoing wire transfer was awaiting ECB (European Central Bank) approval, despite the fact that its account with Nordic Trust – a Swedish company – was ostensibly created through a Florida-based branch. Eventually, Nordic Trust stopped responding to any inquiries from Genie.

Subsequent investigation indicates that Nordic Trust is not authorized to conduct banking activities in Florida. Given its conduct and its negligible online presence, we suspect that it is a front created or used to facilitate Wearmouth's SBLC fraud.

As of August 2023, Will Byrd told Genie's legal counsel that Genie's money was still held up at HSBC. He further claimed to know that the money in Genie's Nordic Trust "account" was held up because there were red flags associated with one of Genie's principals. Byrd claimed to have this information because Velanos had a contract with Nordic Trust and could therefore obtain information.

### IF GENIE HAS A DIRECT CONTRACT  WITH YOU

It is important to recognize that, under section 13.7 of the LOCA, the present situation constitutes a so-called "force majeure" event – i.e., a situation in which events beyond Genie's control prevent it from providing advances to borrowers. The LOCA's force majeure provision, section 13.7, specifically includes a failure by Genie's capital provider – referred to in the LOCA as its "wholesale lender" – to perform its obligations to Genie. As such, the delays you have experienced do not constitute a breach of contract by Genie and the "Refund Period" set forth in the LOCA (forty international business-banking days) does not apply while the force majeure event is ongoing.

Instead, the LOCA requires Genie to use "reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized." As described above, Genie is currently and actively doing so. We have filed another legal action against the capital provider and will prosecute the action aggressively, either to a judgment or until Genie reaches a satisfactory settlement. In any outcome, Genie's highest priority is providing refunds to its borrowers.

Genie will make every reasonable effort to keep you informed of the progress of its efforts during this process. In addition, you can expect further correspondence from with updates regarding settlement negotiations or the status of any legal actions filed against the capital provider. _While Genie's efforts are underway, you must direct any inquiries to Genie through the Zoomeral messaging system._

Genie understands that you want this situation resolved as quickly as possible, which is why it is taking the steps laid out above. Please understand, however, that legal actions of this magnitude require significant time and resources, and we ask your continued patience throughout the remainder of this process.

Further, we ask you to be mindful of other provisions of the LOCA. For example, Section 14.3 requires you to keep the terms of the LOCA confidential. This provision is deeply important to Genie. Please understand that violating this section would constitute a breach of the agreement and could impair or prevent your participation in the remedies Genie is pursuing. Moreover, failing to comply with this provision could adversely affect Genie's efforts to obtain the recovery that would then flow to borrowers to whom refunds are due.

In short, we are working diligently to enable Genie to fulfill its obligations to its borrowers. Although we never expected to have to confront this situation, we intend to emerge better for it. In the meantime, we appreciate your patience as we continue our efforts.

<u>**CONCLUSION**</u>

The conduct described in this letter strongly suggests a coordinated fraud by Wearmouth, Byrd, Velanos, Nordic Trust, and Lucia Harris (aka Lucia Alves)/Sensus International Group. The scam has wreaked massive financial harm on Genie. Genie is inviting our "Good Standing" Clients," to participate in a settlement to recover funds through our legal remedies.

 Along with this letter, Genie has requested some days and times for a conference call with you by the end of next week to discuss your participation to recover your outstanding funds. For those of you who have remained professional and patient in this matter, we thank you and look forward to speaking with you shortly.

<u>**A CAUTIONARY WARNING**</u>

As you are probably already aware, there are many parties that are providing gross misinformation and antisemitism. For example, there is a gentleman that has created a misinforming website. This same gentleman found it humorous to deface and distribute a profile picture of a lender by putting devil horns and a Hitler mustache on their face. He also included a picture of the lender's personal residence in the same correspondence. Another instance we have been made aware of is that one of the parties has allegedly impersonated a judge. A separate party threatened our attorney with a personal visit to his home. Genie Investments condemns these actions and wants to caution everyone regarding communications with groups of people who do not have the facts as this can be quite dangerous. To the point, one of the brokers involved was reported to be physically attacked. Please be advised that we are taking the appropriate legal action. If anyone has any questions feel free to message Genie in the ZOOMERAL messaging system, so you can be provided with accurate information.

Sincerely,

*Genie Investments*

GENIE INVESTMENTS

# EXHIBIT A

**UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

**GENIE INVESTMENTS NV, LLC,**

**Plaintiff,**

**v.**                                    **Civil Action No.**

**JOSHUA WEARMOUTH, JAMES**        **[Jury Trial Demanded]**
**WILLIAM BYRD, and NORDIC**
**TRUST ALLIANCE KB, LLC,**

**Defendants.**

## COMPLAINT

Plaintiff Genie Investments NV (Genie), by and through its attorneys, Spiegel & Utrera, P.A., files this Complaint against Defendants Joshua Wearmouth, James William Byrd, and Nordic Trust Alliance KB, LLC (Nordic Trust) and alleges, on knowledge at to its own actions, and otherwise upon information and belief, that:

## SUMMARY

1.      In 2022 and 2023, Respondents Joshua Wearmouth and James Byrd, directly and through Velanos Principal Capital (Velanos), an entity that Wearmouth controlled, defrauded Plaintiff Genie Investments NV (Genie) out of

1

$9.0 million using a type of scheme commonly referred to as a "prime bank" or "advanced-fee" fraud.

2.     Wearmouth and Byrd represented to Genie verbally and in writing that Wearmouth, through Velanos, could procure one or more standby letters of credit (SBLCs), which Wearmouth would then sell at a significant profit in pre-arranged trades. Wearmouth and Byrd told Genie that Wearmouth would use this trading profit to procure one or more additional SBLCs, which Wearmouth would again sell in pre-arranged trades, again at a significant profit.

3.     In October 2022, Wearmouth and Byrd told Genie that, if Genie contributed $3.0 million to a joint venture with Velanos, Wearmouth would use Genie's capital to generate profits of many times the amount of the capital contribution within 60 days. Wearmouth and Byrd subsequently told Genie that it could increase its profit by making additional capital contributions.

4.     Based on these representations, Genie invested a total of $9 million in a joint venture with Velanos. Wearmouth and Byrd represented that Genie would receive a total of $75.0 million – comprising a return of its $9 million in capital contributions plus $66 million in profit – by the end of 2022.

5.     Wearmouth and Byrd represented to Genie that the SBLC trading presented no risk of loss to Genie's capital contribution.

6.     Wearmouth and Velanos never obtained SBLCs with Genie's capital, never earned any of the promised returns in a trading program, never paid any profits to Genie, and never intended to do so. To date, Velanos has returned only $500,000 of the $9 million invested by Genie.

7.     To keep the scheme going and to forestall legal action against them and Velanos, Wearmouth, Byrd, and Defendant Nordic Trust Alliance KB (Nordic Trust) made lulling statements to Genie, representing falsely that the trading program was successful and/or that payments to Genie were imminent or had been made.

## PARTIES

8.     Plaintiff Genie Investments NV (Genie) is a closely held corporation organized and existing under the laws of the state of Nevada, with its principal place of business in Reno, Nevada. Since 2021, Genie has been in the business of providing financing to small and medium-sized businesses through lines of credit.

9.     Defendant Joshua Wearmouth is an individual who, on information and belief, resides in Newport Beach, California, and is a citizen of the state of California.

10.     Defendant James William Byrd is an individual who, on information and belief, resides in Dallas, Texas, and is a citizen of the state of Texas.

11.    Defendant Nordic Trust Alliance KB is a limited-liability company that is organized under the laws of the state of Florida and that has its principal place of business in Miami, Florida.

## JURISDICTION AND VENUE

12.    This Court has original subject-matter jurisdiction of this action pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because it concerns violations of the Securities Act of 1933 ("the '33 Act"), the Securities Exchange Act of 1934 ("the '34 Act"), and Exchange Act Rule 10b-5.

13.    This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiff and the Defendants.

14.    This Court has jurisdiction over Plaintiff's related state-law claims pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

15.    Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mail in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

16.    Venue in this district is proper pursuant to Section 22(a) of the '33 Act, 15 U.S.C. § 77v(a), and Section 27(a) of the '34 Act, 15 U.S.C. § 78aa. Among other things, certain of the acts, practices, and courses of business

constituting the violations of the federal securities laws alleged herein occurred

within this district, including that Defendants directed misrepresentations and

deceptive conduct toward Genie representatives residing within this district.

17.    This Court has personal jurisdiction over Defendant Wearmouth

because Wearmouth purposefully directed actions at this forum in furtherance of

the SBLC scheme.

18.    This Court has personal jurisdiction over Defendant Byrd because

Byrd purposefully directed actions at this forum with respect to the SBLC Scheme.

19.    This Court has personal jurisdiction over Defendant Nordic Trust

Alliance because Nordic Trust Alliance maintains a place of business within this

district and purposefully directed its conduct at this forum with respect to the

SBLC Scheme.

## **DEFENDANTS' PRIME BANK SCHEME**

20.    In late 2023, Genie was seeking capital to lend to customers. Byrd,

who had previously acted as a finder for Genie, introduced Genie to Wearmouth,

who ran a business called Velanos Principal Capital (Velanos).

21.    Wearmouth and Byrd represented to Genie both verbally and in

writing that Wearmouth, through Velanos, regularly used financial instruments

known as standby letters of credit (SBLCs) to raise capital.

22.    Wearmouth and Byrd told Genie that Wearmouth had specialized experience, knowledge, and connections through allowed him to purchase SBLCs at a discount and immediately sell them at a large profit in pre-arranged transactions.

23.    Wearmouth proposed a joint venture between Genie and Velanos whereby Velanos, using capital supplied by Genie, would initiate a series of SBLC trades that would generate massive profits for Genie and Velanos (the SBLC scheme).

24.    Byrd regularly acted as Wearmouth's go-between in communications with Genie concerning the SBLC scheme.

25.    Wearmouth and Byrd told Genie that Velanos would return Genie's principal and distribute profits to Genie of up to 800% of the principal investment within 60 days.

26.    Wearmouth and Byrd assured Genie that the SBLC scheme posed no risk of loss to Genie's capital.

27.    Wearmouth also introduced Genie to a lawyer who, according to Byrd, had experience with financing arrangements similar to the SBLC scheme. Genie retained the lawyer to advise them about the proposed joint venture.

28.    On or about October 19, 2022, Velanos and Genie executed a Joint Venture Agreement (JVA) concerning the SLBC scheme. Wearmouth executed the JVA on behalf of Velanos.

29.    The JVA required Genie to contribute $3.0 million in capital to the joint venture, which Velanos would use to engage in a "Strategic Capital/Systematic Purchase and Sell Transaction" involving SBLCs issued by HSBC or other "Top Rated" issuers.

30.    The JVA also required Velanos to return Genie's capital contribution, plus half the profits generated through the transactions, within 60 days.

31.    Shortly after Genie and Velanos executed the JVA, Wearmouth and Byrd told Genie that it could increase its capital contribution by an additional $3 million and, in exchange, would receive a guaranteed profit distribution of $50 million. Genie agreed and, on November 21, 2022, Genie and Velanos executed an amendment to the JVA (First JVA Amendment) providing that Genie would increase its capital contribution to $6.0 million and that, in return, Velanos would increase Genie's profit to $50 million dollars.

32.    The First JVA Amendment did not change any terms of the JVA besides the amounts of (a) Genie's capital contribution and (b) its profit participation.

7

33.    Shortly after the First JVA Amendment, Wearmouth and Byrd again offered to increase Genie's profit from the JVA, to a total of $66 million, in exchange for an additional $3 million capital contribution.

34.    Genie agreed and provided Velanos an additional $3 million, bringing its total capital contribution to the joint venture to $9.0 million.

35.    Although the parties did not memorialize Genie's third $3 million payment with a formal amendment to the JVA, correspondence from both Wearmouth and Byrd reflected the updated terms of the agreement – namely, that Genie would receive a total of $66 million in profits, in addition to the return of its $9 million in capital, by mid-January 2023.

36.    Velanos and Wearmouth never paid Genie any of the profits promised in the JVA and has returned barely 5% of Genie's capital contributions.

37.    Since January 2023, Wearmouth and Byrd have repeatedly and falsely represented that Wearmouth transferred or initiated transfers of multimillion-dollar payments to Genie.

38.    On or about January 24, 2023, Wearmouth provided Genie with a screenshot of an email that Wearmouth supposedly received from a person identified only as "Simon," who, according to Wearmouth, was a banker with HSBC Bank. The email stated that Velanos had more than 349 million Euros on account with HSBC Bank in London and provided an account number. Wearmouth

asserted that this amount included the profits realized from the Genie-Velanos joint venture's trading activity.

39.    Approximately three days later, Velanos provided Genie with photographs and a screenshot that appeared to show a $10.0 million wire transfer from a ScotiaBank account to Genie's account at Chase Bank.

40.    In March 2023, Wearmouth falsely told Genie in writing that the $10.0 million wire transfer he supposedly initiated on January 27, 2023, was being held up by Wells Fargo Bank, which he described as the "corresponding bank" for the wire transfer.

41.    In the same letter, Wearmouth falsely claimed that profits from trading conducted using Genie's $9.0 million in capital were "being held at HSBC, UK under a sub account…" and that Velanos would need to open a "master" account with HSBC to access the trading profits in the subaccount.

42.    In early June 2023, Wearmouth and Byrd proposed that Genie agree to an amendment of the JVA. The proposal, as memorialized in a "Second Amendment to Joint Venture Agreement" (Second JVA Amendment), was for Velanos to (1) "facilitate the opening of a commercial bank account" in Genie's name at Nordic Trust Alliance KB (Nordic Trust) in Miami, Florida, (2) deposit $9.5 million into Genie's Nordic Trust account on or before June 15, 2023, and (3)

deposit an additional $50.0 million into Genie's Nordic Trust account on or before June 30, 2023.

43.    The parties executed the Second JVA Amendment on June 3, 2023. Shortly afterward, Genie received notice that its Nordic Trust account had been established and that it had access to an online account portal (Portal). On June 20, 2023, according to the Portal, Velanos transferred $9.5 million into Genie's Nordic Trust Account. Genie promptly instructed Nordic to wire the $9.5 million to its checking account at Chase Bank. That transfer never happened, however, and the Portal showed that Nordic Trust canceled the request as of June 29, 2023.

44.    On June 30, 2023, Genie attempted to initiate a transfer of $9.4 million from its Nordic Trust account to its Chase account. Although the Portal showed that this transaction was executed – the Portal thereafter reflected a remaining balance of $100,000 in Genie's account – no money ever transferred to Genie's Chase account from Nordic Trust.

45.    Genie sent multiple requests through the Portal for information from Nordic Trust about the status of its outgoing wire transfers. The only responses it received were non-substantive. When Genie asked to speak with an individual so that it could arrange to visit Nordic in Florida and withdraw the money in person, it received no reply at all. Shortly thereafter, Genie lost its ability to view account-related information through the Portal.

46.    On information and belief, Nordic Trust is not a legitimate bank, never held any funds in Genie's name, and knowingly participated in Wearmouth's and Byrd's efforts to forestall legal action against Wearmouth, Byrd, and others by convincing Genie that it would imminently receive a portion of the promised SBLC scheme proceeds.

47.    From late 2022 to mid-2023, Genie entered various agreements to provide lines of credit to customers and did so in reliance on Defendants' false promises and misrepresentations that Genie would soon receive some or all of the promised proceeds from the SBLC scheme.

48.    Genie's reliance on these false statements and misrepresentations was reasonable given the lengths Defendants went to give their false statements and misrepresentations an air of legitimacy. In addition, Genie's attorney at the time did not advise Genie that there was any reason to question the validity of either the SBLC scheme or any of the Defendants' subsequent statements about Velanos' ability and intention to distribute profits to Genie and return its capital contributions.

49.    Genie relied on Defendants' false statements and misrepresentations to its substantial detriment, in that it was ultimately unable to provide the financing it had promised to numerous customers, which in turn led to an avalanche of terminations, refund requests, demand letters, disparaging public statements, and

legal actions against Genie. In addition, Defendants' false statements and

misrepresentations, and Genie's detrimental reliance on them, have made it

impossible for Genie to enter into new lending arrangements with customers.

50.    Other than a $500,000 payment it received in or about May 2023,

Genie has never received any return of its capital contributions. It has never

received any of the promised profits from the joint venture.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and
### Exchange Act Rules 10b-5(a) and (c) – All Defendants

51.    Genie realleges and incorporates by reference its allegations in

Paragraphs 1 through 50.

52.    During 2022 and 2023, Defendants Wearmouth, Byrd, and Nordic

Trust, in the purchase or sale of the securities described herein, by the use of means

and instruments of transportation and communication in interstate commerce and

by use of the mail, directly and indirectly:

    a.    employed devices, schemes, and artifices to defraud,

    b.    made untrue statements of material facts and/or omitted to state

material facts necessary in order to make the statements made, in light of the

circumstances under which they were made, not misleading, and

c.     engaged in acts, practices, and courses of business which would

and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

53.    Defendants Wearmouth, Byrd, and Nordic Trust made these

misrepresentations and omissions of material fact with scienter – that is, with an

intent to deceive, manipulate, or defraud, or with a severely reckless disregard for

the truth by inducing Genie's investment in the SBLC scheme while having no

intention of using Genie's funds to carry out any legitimate trading of securities or

other financial instruments.

54.    Genie relied on the misrepresentations and omissions of Wearmouth,

Byrd, and Nordic Trust, both in contributing capital to the putative Genie-Velanos

joint venture and in delaying legal action against the Defendants and others.

55.    Defendants carried out their fraudulent and deceptive acts using

means or instrumentalities of interstate commerce. Defendants used interstate

electronic messages and telephone communication to propose the SBLC scheme,

to induce Genie's participation in the joint venture, and to communicate with

Genie about why Genie did not receive either the promised profits or a return of its

capital contributions.

56.     As a direct and proximate result of the Defendants' conduct described herein, Genie has suffered economic loss in that it has been deprived of the benefit of its bargain and has suffered lost profits and consequential damages.

57.     Through the Defendants' conduct described herein, Wearmouth, Byrd, and Nordic Trust willfully violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

## SECOND CLAIM FOR RELIEF

**California Corp. Code § 25401 – Against Wearmouth and Byrd**

58.     Genie realleges and incorporates by reference its allegations in Paragraphs 1 through 50.

59.     During 2022 and 2023, Defendants Wearmouth and Byrd, in the offer and sale of the securities described herein in and/or from the State of California, made untrue statements and/or misrepresentations of material fact to Genie. The false statements and misrepresentations included, without limitation:

a.     Wearmouth and Byrd falsely stated that SBLCs were tradable instruments and that the SBLC scheme was a legitimate investment program that presented no risk of loss to Genie's capital,

b.     Wearmouth and Byrd represented that Genie's capital contributions would be returned after the contributions were used to

purchase and trade SBLCs, when in fact, Defendants never returned Genie's

investment principal and, on information and belief, never used Genie's

capital contributions to purchase and trade SBLCs, and

     c.     Wearmouth and Byrd represented that the SBLC scheme would

generate significant profits and that Genie would receive a guaranteed profit

of $66.0 million in addition to the return of its capital contributions.

60.     The misstatements and omissions referred to herein concerned

"material facts" within the meaning of the California Corporations Code section

25401.

61.     As a result of the Defendants' conduct described herein, Genie has

been damaged in an amount to be determined at trial, but not less than $10 million.

62.     Through the conduct described herein, Defendants Wearmouth and

Byrd violated California Corporations Code section 25401.

### **THIRD CLAIM FOR RELIEF**

### **Common-Law Fraud – Against All Defendants**

63.     Genie realleges and incorporates by reference its allegations in

Paragraphs 1 through 50.

64.     As alleged above, Defendants Wearmouth, Byrd, and Nordic Trust

made false written and verbal statements and/or material omissions of material fact

to Genie, including but not limited to:

a.    Wearmouth's ability to purchase SBLCs and resell them for a profit;

b.    The legitimacy of any investment strategy involving trading SBLCs;

c.    Wearmouth's intention to pay Genie the promised profits and to return Genie's capital contributions;

d.    Wearmouth's knowledge and experience trading SBLCs;

e.    Attempts by Wearmouth/Velanos to issue payments to Genie between January 2023 and the present;

f.    Nordic Trust's legitimacy as a bank and its ability to accept deposits and process withdrawals.

65.    The statements and/or omissions were false when made and were in service of an actual fraud.

66.    Wearmouth and Byrd knew that the representations were untrue and/or that the omissions were misleading.

67.    Wearmouth and Byrd made each of the aforementioned misrepresentations and omissions with the intent that Genie would rely on them in deciding to contribute capital to the joint venture and/or to refrain from bringing legal action against Velanos, Wearmouth, Byrd, and others.

68.    Genie did, in fact, rely on the aforementioned misrepresentations and omissions when it contributed $9.0 million in capital to the joint venture and when it refrained from bringing legal action for several months after Wearmouth and Velanos failed to return those capital contributions and distribute promised profits on schedule.

69.    But for Wearmouth's and Byrd's material omissions and misrepresentations alleged above, Genie would not have contributed capital to the joint venture with Velanos and would have brought legal action against Wearmouth, Byrd, and others long ago.

70.    Genie's reliance upon Wearmouth's and Byrd's material omissions and misrepresentations of fact was reasonable.

71.    Wearmouth's and Byrd's material omissions and misrepresentations of fact have damaged Genie in an amount in excess of $10 million, with the exact amount of damages to be determined at trial.

72.    Wearmouth's and Byrd's conduct alleged herein was willful and wanton and they acted with actual malice, fraud, and/or gross negligence.

## **PRAYER FOR RELIEF**

WHEREFORE, Genie respectfully requests that this Court enter a judgment against Defendants, granting Plaintiff the following relief:

- The entry of judgment in favor of the Genie on each and every cause of action;

- The award of actual, consequential, and statutory damages in an amount to be established at trial, but not less than $10 million;

- The award of punitive damages in an amount to be established at trial;

- The award of costs of the suit and attorney's fees; and

- Such other relief as the Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Genie demands a trial by jury on all issues that are so triable.

Dated: 2-6-2024

Respectfully submitted,


/s/ *Michael Faragalla*
Michael Faragalla  (Bar No. 1014235)
Spiegel & Utrera P.A

1840 Coral Way Fl 4
Miami, FL 33145-2748
Telephone: (800) 603-3900, x204
Facsimile: (800) 520-7800
Email:
attorneyfaragalla@amerilawyer.com CC:
litassistant@amerilawyer.com
Attorneys for Plaintiff Genie Investments
NV

# CERTIFICATE OF SERVICE

# EXHIBIT B

**DEMAND FOR ARBITRATION**

GENIE INVESTMENTS NV,

      Claimant,

v.                                  Case No. _____

VELANOS PRINCIPAL CAPITAL, INC.,

      Respondent.

---

## I.    **INTRODUCTION**

In 2022 and 2023, the Respondent, Velanos Principal Capital (Velanos) induced Genie Investments NV (Genie) to participate in and fund a joint venture. Through its president and sole owner, Joshua Wearmouth, Velanos represented to Genie both verbally and in writing that it was in the business of purchasing financial instruments know as standby letters of credit (SBLCs) at a discount and immediately selling them at a large profit in pre-arranged transactions. Wearmouth claimed that he was able to generate these profits because of his specialized experience, knowledge, and connections. He told Genie that, if it supplied him with capital, he could use it complete a series of SBLC trades that would generate massive profits, and that he would return Genie's principal and distribute significant profits within 60 days. Wearmouth assured Genie that the SBLC trading posed no risk of loss to Genie's capital.

On or about October 19, 2022, Velanos and Genie executed a Joint Venture Agreement (JVA) to effectuate the SBLC transactions Velanos had described. The initial version of the JVA

required Genie to contribute $3.0 million to the joint venture, which Velanos would use to engage in a "Strategic Capital/Systematic Purchase and Sell Transaction" involving SBLCs issued by HSBC or other "Top Rated" issuers. The JVA also required Velanos to return Genie's capital contribution, plus half the profits generated through the transactions, within 60 days. The parties subsequently amended the agreement to increase both Genie's investment and the profits Velanos would pay Genie. Ultimately, pursuant to the original JVA and subsequent amendments, Genie invested a total of $9.0 million and Velanos agreed to pay Genie $66.0 million in profits, in addition to the return of its principal.

Although Genie fully performed its obligations under the JVA and the amendments thereto, Velanos has never paid Genie any of the $66.0 million in profits due to it and has returned only $500,000 of Genie's $9.0 million in capital contributions. Thus, Velanos has materially breached its contract with Genie. Genie's contractual damages are in excess of $74.5 million.

## II.   <u>PARTIES</u>

Genie Investments NV (Genie) is a closely held corporation formed under the laws of the state of Nevada. Since 2021, Genie has provided loans to businesses through lines of credit and other instruments. Genie is represented in this proceeding by the undersigned law firm.

Velanos Principal Capital (Velanos) is a corporation registered in Wyoming. On information and belief, Velanos conducted the majority of its activities related to the instant dispute from California.

## III.   <u>STATEMENT OF FACTS</u>

In October 2022, Genie was seeking capital to support its business of providing financing to businesses (Genie's "borrowers") through lines of credit and other arrangements. At the time,

Genie had recently become acquainted with James "Will" Byrd, who provided Genie with leads on potential sources of capital. Within a few weeks of his first contact with Genie, Byrd suggested that Genie meet with Josh Wearmouth, who, according to Byrd, had a profitable investment opportunity that Genie could potentially use to fund its operations.

Byrd introduced Genie's principals to Wearmouth in early October 2022. In telephone conversations and written communications with Genie, Wearmouth stated that he routinely traded a type of financial instrument called a standby letter of credit, and that he, acting through Velanos, could use Genie's money to purchase one or more SBLCs and subsequently sell them at substantial mark-ups in pre-arranged trades. Wearmouth told Genie that this type of trading occurred frequently in the world of high finance and that Velanos could generate huge returns in a matter of weeks, with no risk of loss to Genie's principal.

### A. Genie and Velanos entered into the Joint Venture Agreement in October 2022 and subsequently amended its terms so that Genie invested a total of $9.0 million in exchange for a guaranteed return of $66.0 million in profit, plus a return of its capital contributions.

In October 2022, Velanos provided a draft Joint Venture Agreement to Genie. Following review and negotiation of certain changes by Genie's legal counsel at the time, Genie executed the JVA with Velanos on October 19, 2022.

The JVA initially required Genie to contribute $3.0 million, which Velanos agreed to deploy, "strategically and with discretion," in purchases and sales of SBLCs. The JVA further stated that Velanos would provide Genie with "a rolling profit participation in the [joint venture] activities up to $25,000,000." The JVA required Velanos to make a first profit distribution 30 days "post commencement," with the "commencement date" defined as within 10 days of Genie's capital contribution, and to distribute all profits within 60 days "post commencement."

Velanos also agreed to provide Genie with account statements "showing the relevant [SBLC] trade transactions every 30 days during [Genie's] participation in the JV."

In accordance with the JVA, Genie sent $3.0 million to Velanos by wire transfer on October 20, 2022. Approximately 30 days later, at or near the time the JVA required Velanos to make its first distribution of profits, Will Byrd contacted Genie and relayed an offer from Velanos to increase Genie's profit to $50.0 million if Genie would double its capital contribution. Genie and Velanos thus executed an amendment to the JVA (the First JVA Amendment) on November 21, 2022.

A recital to the First JVA Amendment states that Velanos "desires to amend the JVA to better facilitate the delivery of [Genie's] Profit in a more efficient and expedient manner." The First JVA Amendment provided:

1. In consideration of Party A's increase in the Contribution of three million dollars ($3,000,000.00), Party B has agreed to increase Party A's Profit to fifty million dollars ($50,000,000.00) for the Transaction.

2. All other terms and conditions of the JVA shall remain in full force and effect.

Genie and Velanos were identified in the First JVA Amendment as Party A and Party B, respectively. Besides these adjustments, the First JVA Amendment stated, "all other terms and conditions of the JVA shall remain in full force and effect." On November 21, 2022, as required by the First JVA Amendment, Genie sent Velanos an additional $3.0 million by wire transfer.

Shortly thereafter, the parties agreed that Genie would increase its capital contribution by another $3.0 million in exchange for Velanos's agreement to increase Genie's total profit participation to $66.0 million. Genie agreed and sent an additional $3.0 million to Velanos by wire transfer on November 30, 2022. In subsequent correspondence with Genie, Byrd relayed

assurances from Wearmouth that Velanos would pay Genie $9.0 million on or before December 5, 2022, and the remaining $66.0 million on December 20, 2022.

    **B.**    **Velanos has failed to pay any profits due under the amended JVA and has returned only a small portion of Genie's principal.**

Velanos failed to meet either of the December 2022 payment deadlines and, in fact, has returned only a small fraction of Genie's $9.0 million in principal and has never made any of the profit distributions required under the JVA. The only thing Velanos has delivered since the parties executed the JVA is a string of bogus excuses for its failure to pay Genie what it is owed.

In a letter to Genie dated December 30, 2022, Velanos claimed "that the $75,000,000.00 USD owed to you will be available on or before January 15th, 2023." The same letter identified an account Velanos purportedly had with HSBC Bank and asserted that the account held nearly 350 million Euros. The letter further stated that Wearmouth would "provide a copy of the wire transfer as soon as it has been submitted."

In January 2023, Wearmouth told Genie that Velanos had wired $10.0 million from a Scotiabank account to Genie's account with Chase bank. Wearmouth provided Genie's lawyer with a screenshot that purported to show tracking details for the wire transfer. Genie, however, never received any portion of the putative wire transfer.

In March 2023, Velanos again told Genie that it had wired $10.0 million to Genie's Chase account. Again, Genie never received any portion of the supposed wire transfer.

As the weeks and months passed, Velanos's failure to return Genie's principal or make profit payments to Genie had harmful spillover effects on Genie's business. Genie had contracted to provide borrowers with lines of credit totaling more than $150 million. Its ability to fund those lines of credit depended, in turn, on Velanos performing its contractual obligations to Genie. When Velanos failed to do so, Genie was unable to satisfy its borrowers' demands. Consequently,

many borrowers canceled their agreements with Genie and demanded refunds of fees they had paid in connection with their loans/lines of credit. Some borrowers have threatened legal action against Genie and/or have posted highly negative statements about Genie and its principals on public websites. To allay borrowers' concerns and to protect its business reputation, Genie has promised refunds of fees paid by borrowers – including fees designated as non-refundable in borrower agreements – upon the resolution of its dispute with Velanos. In short, Velanos's actions have damaged Genie not only by depriving it of the amounts due under the contract, but by causing Genie to incur substantial costs to deal with resulting customer fallout.

    **C.**    **Another JVA Amendment, which would have reduced the amount owed to Genie, has no continuing effect because Velanos failed to perform its obligations thereunder.**

In June 2023, while Genie was dealing with an influx of queries, terminations, and refund requests from borrowers, Velanos proposed an amendment to the JVA that was supposed to provide Genie prompt payment of approximately 80% of the amount owed by Velanos under the JVA as previously amended. The terms of the June 2023 amendment are set forth in a document entitled "Second JVA Amendment," which the parties executed on June 3, 2023.

Under the Second JVA Amendment, Velanos agreed to "facilitate the opening of a commercial bank account" in Genie's name at Nordic Trust Alliance, KB ("Nordic Trust"), in Miami, Florida, and to deposit $9.5 million into Genie's Nordic Trust account "on or before June 15, 2023." The Second JVA Amendment called for Genie to then immediately transfer the $9.5 million to its account at Chase bank. The Second JVA Amendment also required Velanos to deposit an additional $50 million (fifty million) into Genie's Nordic Trust account on or before June 30, 2023.

Velanos's stated reason for establishing an account for Genie at Nordic Trust was that Velanos already had an account there and could easily transfer money to Genie's Nordic Trust account without encountering the kinds of difficulties that had supposedly prevented Velanos from sending Genie money via wire transfer for the previous six months.

Shortly after the parties executed the Second JVA Amendment, Wearmouth and/or Byrd informed Genie that a Nordic Trust account had been established for Genie. Genie subsequently received access to an online portal (the "Portal") through which Genie would manage the account. The Portal appeared to show that Velanos had transferred $9.5 million to Genie's Nordic Trust Account on June 20, 2023. On June 29, 2023, however, when Genie instructed Nordic to wire the $9.5 million to its checking account at Chase bank, Nordic canceled the request. On June 30, 2023, Genie attempted to initiate a transfer of $9.4 million to its Chase account. Although the Portal showed that this transaction was executed – the Portal subsequently reflected a balance of $100,000 in Genie's Nordic Trust account – no money ever transferred to Genie's Chase account from Nordic Trust.

When its attempts to send outgoing wire transfers from its putative Nordic Trust account failed, Genie sent multiple requests through the Portal for information from Nordic Trust about the status of its outgoing wire. Genie typically received non-substantive responses to these requests. When Genie asked to speak with an individual to arrange to come to Nordic in Florida and withdraw the money in person, it received no reply at all. Shortly thereafter, Nordic removed Genie's ability to view account-related information through the Portal.

Although there is a business entity registered in Florida under the name "Nordic Trust Alliance KB," it is not registered as a bank with the state of Florida. Further, no entity with the name Nordic Trust Alliance or anything similar is reflected on the websites of the FDIC, the

federal Office of the Comptroller of Currency, or the Federal Reserve Board as a regulated financial institution, and no entity with the name Nordic Trust Alliance is FDIC-insured.

On information and belief, Nordic Trust is not a legitimate financial institution, but a sham entity created and used to convince Genie that delivery of its funds was imminent and to forestall legal action against Velanos and others.

## IV.    **ARBITRATION AGREEMENT**

This arbitration is initiated pursuant to the arbitration agreement in paragraph 6 of the JVA, which states that "all disputes between the parties shall be resolved by arbitration at the New York International Arbitration Center." Although the New York International Arbitration Center provides space for international arbitrations, it does not administer arbitration proceedings. Thus, although the JVA evinces the parties' agreement to submit any disputes to arbitration, it does not specify an arbitration provider or set of rules to govern any arbitrated disputes. For these reasons, it is appropriate for Genie to submit this demand for arbitration through JAMS.

## V.    **GOVERNING LAW**

Paragraph 6 of the JVA states, "This agreement shall be governed by the law of New York, NY, United States."

## VI.    **PLACE OF HEARING**

Genie proposes that any hearing in this arbitration take place in New York, New York. This proposal is consistent with the intent of paragraph 6 of the JVA.

**VII.    ELECTION FOR EXPEDITED PROCEDURES**

Claimant proposes that this arbitration be conducted in accordance with the Expedited Procedures of Rule 16.2 of JAMS Comprehensive Arbitration Rules & Procedures.

**VIII.   CAUSES OF ACTION**

Based on the foregoing factual allegations, Claimant asserts the following causes of action against Velanos:

**A.    Velanos has materially breached the Joint Venture Agreement, as amended, and the attendant covenant of good faith and fair dealing.**

The JVA and its amendments constituted a valid and binding agreement between Velanos and Genie. Whereas Genie has fully performed all of its obligations under the JVA, as amended, other than any obligations whose performance has been waived or legally excused, Velanos has breached the Agreement repeatedly and in multiple material respects, including, without limitation:

- Failing to use Genie's capital contributions in the purchase and sale of SBLCs or any other financial instruments, as required by Section 2.4 and Appendix I of the JVA.

- Failing to pay profits to Genie within 60 days after Genie made its initial capital contribution, as required by paragraph 6 of the JVA.

- Failing to provide account statements showing that Velanos conducted any SBLC trading in furtherance of the JVA, as required by Appendix I to the JVA.

- Failing to make any portion of the $59.5 million payment due by June 30, 2023, as required by the Second JVA Amendment.

Implicit in the JVA, as amended, is a covenant of good faith and fair dealing obligating the parties to act towards each other in good faith, to deal fairly with one another, to make all material disclosures, and to abstain from any actions that might deprive the other of the

expectations and benefits of the JVA, and obligating each party to do everything that the JVA presupposes to accomplish its purposes. For the reasons stated herein, Velanos has breached this obligation of good faith and fair dealing.

As a direct and proximate result of the breaches described herein, Genie has been damaged in an amount to be proved at hearing, but not less than $74,500,000, plus interest, attorneys' fees, and other costs as provided by law and/or contract, for which sum Velanos is liable to Genie.

### B.  Unjust enrichment

By reason of the conduct described above – including fraudulently inducing Genie to enter into the JVA and the amendments thereof, deliberately breaching the JVA, and failing and refusing to honor their legal and contractual obligations to return Genie's capital contribution – Velanos has profited and enriched itself unjustly at Genie's expense and to its detriment. Velanos should not be permitted, in equity and good conscience, to retain money that rightfully belongs to Genie.

By reason of the foregoing, Genie has been injured in an amount to be determined at trial, but not less than $8.5 million, plus interest, for which sum Velanos is liable to Genie.

### C.   Conversion

Velanos is liable to Genie for conversion. Genie had a legal and possessory right and interest in the $9.0 million in total capital contributions it provided to Velanos through the joint venture. After a brief period during which Velanos would supposedly use those funds to engage in SBLC trading, the amended JVA required Velanos to return Genie's $9.0 million.

Although Velanos was required to remit this money to Genie in December 2022, it has, to date, returned only $500,00 of it. Despite multiple requests by Genie for Velanos to refund the

remainder of its capital contributions, Velanos has failed to do so and, on information and belief, has used Genie's $8.5 million for its own benefit.

These acts of conversion, which were committed with malice and with reckless and willful disregard of Genie's rights, have damaged Genie in an amount to be proved at trial, but not less than $8.5 million, plus interest, for which amount Velanos is liable to Genie.

IX.    **<u>CONCLUSION</u>**

For the reasons set forth above, the Claimant, Genie Investments NV, requests an order requiring the Respondent, Velanos Principal Capital, to pay damages in an amount to be proved at a hearing in this matter, together with prejudgment interest as allowed by law, attorney's fees, arbitration fees and costs of this action, and such other and further relief as the panel deems just and proper.

Respectfully submitted,

Adam Walker
Walker Law Office, LLC
4050 Pennsylvania Ave., Suite 115-10
Kansas City, Missouri 64111
(816) 226-6476
adam@awsecuritieslaw.com

**TRANSACTION CODE: JVA/VPCL-GINV-I-10142022**

**VELANOS** PRINCIPAL CAPITAL

# EXHIBIT C

## JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT (HEREINAFTER REFERRED TO AS ("**AGREEMENT**" OR "**JVA**") IS EXECUTED WITHOUT PREJUDICE OR CONFLICT OF INTEREST, DULY UNDERSTOOD AND SIGNED BY BOTH PARTIES ACTING AT THEIR OWN ACCORD ON THIS DAY, OCTOBER 19TH, 2022, BY AND BETWEEN:

## THE  REFERRING  PARTNER ("PARTY  A")

| | |
|---|---|
| **COMPANY NAME** | GENIE INVESTMENTS NV, LLC |
| **REGISTERED ADDRESS** | 11064 Lothmore Rd, Jacksonville, FL 32221 |
| **REGISTRATION NUMBER** | |
| **REPRESENTED BY** | CALEB MICHAEL DAVIS |
| **POSITION** | MANAGING PARTNER |
| **PASSPORT NUMBER** | |
| **COUNTRY OF ISSUE** | UNITED STATES OF AMERICA |
| **TELEPHONE** | +1 (904) 487-8650 |
| **EMAIL** | calebmdavis8@gmail.com |

**AND**

## THE MANAGING PARTNER ("PARTY B")

| | |
|---|---|
| **COMPANY NAME** | **VELANOS PRINCIPAL CAPITAL INC.** |
| **REGISTERED ADDRESS** | 120 Adelaide Street West, Suite 2500, Toronto ON, M5H 1T1, Canada |
| **REGISTRATION NUMBER** | 4 |
| **REPRESENTED BY** | **JOSHUA M. WEARMOUTH** |
| **POSITION** | **MANAGING PARTNER** |
| **PASSPORT NUMBER** | |
| **COUNTRY OF ISSUE** | UNITED STATES OF AMERICA |
| **TELEPHONE** | +1 949-220-3555 |
| **EMAIL** | **JMW@VELANOS.ORG** |

EACH OF THE PARTIES, AS THE CONTEXT MAY REQUIRE, MAY SOMETIMES HEREAFTER BE REFERRED TO AS COLLECTIVELY AS THE "**PARTIES**".



**Initials**

**VELANOS PRINCIPAL CAPITAL**

## RECITALS:

I.    WHEREAS THE PARTIES WISH TO FORM A JOINT VENTURE IN ORDER TO PARTICIPATE IN ONE OR MORE PRIVATE BUSINESS OPPORTUNITIES, INCLUDING BUT NOT LIMITED TO THE TRADING OF CURRENCY, NOTES, BONDS, FINANCIAL INSTRUMENTS, PHYSICAL COMMODITIES, PRECIOUS METALS, AND PROJECT FINANCING INITIATIVES(EACH A "**TRANSACTION(S)**" OR "**TRADE(S)**", AND HAVING THE SAME MEANING HEREIN); AND

II.   WHEREAS PARTY B IS EXPERIENCED IN AND WILL PROVIDE THE STRUCTURING TO GENERATE LIQUIDITY AND RETURNS AND PROJECT FINANCING FROM ASSETS AND CASH THROUGH COLLATERALISATION, SECURITISATION, MANAGING TRADES AND TRANSACTIONS, AND STRUCTURING AND ADMINISTERING JOINT VENTURES; AND

III.  WHEREAS PARTY A IS PREPARED TO MAKE AVAILABLE A FINANCIAL INSTRUMENT(S) FOR MONETIZATION, AND/OR CASH TO PUT ON TRADE OR TO FACILITATE TRANSACTIONS, (THE "**CASH/ASSET**") TO PROVIDE THE JOINT VENTURE PARTNER WITH INITIAL CAPITAL RESOURCES; AND

IV.   WHEREAS PARTY A HEREBY CONFIRMS, WITH FULL LEGAL RESPONSIBILITY, UNDER PENALTY OF PERJURY OF LAW THAT IT IS READY, WILLING AND ABLE TO DELIVER A FULLY CASH BACKED STANDBY LETTER OF CREDIT (SBLC) AND/OR CASH FUNDS, UNDER THE TERMS AND CONDITIONS DESCRIBED BELOW, BASED ON GOOD, CLEAN, CLEAR UNENCUMBERED FUNDS OF NON-CRIMINAL ORIGIN; AND

V.    WHEREAS PARTY B IS PREPARED TO DIRECT AND MANAGE THE PLACEMENT OF THE CASH/ASSET(S) INTO ONE OR MORE TRADES, AND/OR FACILITATE AND/OR EXECUTE ONE OR MORE TRANSACTIONS TO ACCOMPLISH THE OBJECTIVES OF THE JOINT VENTURE (THE "**PURPOSE**"),

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS HEREBY ACKNOWLEDGED, THE PARTIES AGREE IN-PRINCIPLE TO THE FOLLOWING:

1.  **JOINT VENTURE:** THE PARTIES AGREE TO ENTER INTO THIS JOINT VENTURE (THE "**JV**") ON THE TERMS AND CONDITIONS SET FORTH HEREIN. THE JV SHALL NOT BE A NEW CORPORATE, LEGAL, OR SPECIAL PURPOSE VEHICLE / ENTITY, BUT INSTEAD BE CREATED BY THIS AGREEMENT AND MANIFESTED THROUGH THE MUTUAL COOPERATION OF THE EXISTING TWO ENTITIES ACCORDING TO THEIR SPECIFIC CONTRIBUTIONS AS DETAILED HEREIN ("**ACTIVITIES**"), AND THE SHARING OF PROFITS THAT RESULT FROM THE JV ACTIVITIES AND ARE CONTRACTUALLY FOR THE BENEFIT OF THE JV ("**PROFITS**"). THE JV SHALL COMMENCE OPERATIONS AS OF THE EFFECTIVE DATE OF EACH TRANSACTION WHICH WILL BE BASED ON THE DATE OF THE CASH/ASSET CONTRIBUTION AND ADVISED BY PARTY B TO PARTY A ON A CASE-BY-CASE BASIS.

2.  **BUSINESS PURPOSE / CONTRIBUTIONS / PROFIT SHARING:** THE PARTIES ARE ENTERING INTO THIS JV TO COLLECTIVELY PURSUE PRIVATE BUSINESS OPPORTUNITIES FOR THEIR MUTUAL BENEFIT CONSISTENT WITH THE PURPOSE AND ACTIVITIES. THE PARTIES' CONTRIBUTIONS AND ROLES IN THE JV SHALL BE AS FOLLOWS:

    2.1.  PARTY A SHALL CONTRIBUTE THE CASH/ASSET FOR TRANSACTION/TRADE ACCORDING TO THE TERMS AND CONDITIONS BELOW AND THE SCHEDULE ATTACHED HEREIN.

    2.2.  PARTY A SHALL BE CONSIDERED TO HAVE DONE SO BY SIGNING THIS AGREEMENT AND WILL SERVE AS THE CAPITAL PARTNER TO THE JV.

    2.3.  REGARDING THE CONTRIBUTED ASSET, PARTY A REPRESENTS AND WARRANTS THAT:



Initials

**VELANOS** PRINCIPAL CAPITAL

2.3.1. IT OWNS, CONTROLS, AND/OR HAS BEEN GRANTED NECESSARY AUTHORITY OVER THE CASH/ASSET THROUGH ANOTHER AGREEMENT THAT IS OUTSIDE OF THIS AGREEMENT AND TO WHICH THE MANAGING PARTNER IS NOT A PARTY, AND IT WILL TAKE FULL AND SOLE RESPONSIBILITY AND LIABILITY FOR ITS PROPER AND TIMELY DELIVERY AS REQUIRED BY THE TERMS AND CONDITIONS BELOW AND PROCEDURES DESCRIBED HEREIN; AND

2.3.2. THE CASH/ASSET IS FREE AND CLEAR OF ANY AND ALL LIENS AND ENCUMBRANCES AND COMPOSED OF GOOD, CLEAR, CLEAN FUNDS OF NON-CRIMINAL ORIGIN; AND

2.3.3. IT HAS SUCCESSFULLY COMPLETED RIGOROUS DUE DILIGENCE ON THE CASH/ASSET AND ANY ASSOCIATED PARTIES AND CONFIRMS THEIR CREDIBILITY AND LEGITIMACY.

2.4. PARTY B SHALL CONTRIBUTE ITS EXPERIENCE, INTELLECTUAL PROPERTY, CONTACTS, RELATIONSHIPS AND STRUCTURAL RESOURCES, PROFESSIONAL SERVICE PROVIDERS, AND FACILITIES TO THE JV AND SERVE AS THE MANAGING PARTNER OF THE JV AS SET FORTH BELOW. PARTY B SHALL HAVE THE AUTHORITY TO STRUCTURE AND EXECUTE ASSET LIQUIDITY AND PROJECT FINANCING STRATEGIES, PLACE CASH/ASSET(S) INTO OR TO FACILITATE ONE OR MORE TRANSACTION/TRADE(S) AND TO MANAGE, DIRECT, AND OVERSEE SUCH TRANSACTION/TRADE(S).

2.5 PARTY B SHALL NOT BE CONSTRUED AS AN INVESTMENT OR FUND MANAGER OR ADVISOR, OR IN ANY WAY BE CONSIDERED TO BE CONDUCTING ANY FINANCIAL OR OTHER ACTIVITY WHATSOEVER WHERE A REGULATORY LICENSE WOULD BE REQUIRED.

3. **COMPENSATION:** THE PARTIES SHALL BE COMPENSATED HEREUNDER ON A PROFIT-SHARING BASIS.
THE COMPENSATION SHALL BE DISTRIBUTED TO THE PARTIES ACCORDING TO THE SPECIFIC SCHEDULE FOR EACH TRANSACTION (DETAILED IN THE **"PROFIT SHARING SCHEDULE"** IN APPENDIX I HEREIN), EACH WITH ITS OWN UNIQUE REFERENCE CODE. FOR PURPOSES HEREIN, PROFITS SHALL BE DEFINED AS THE GROSS PROFITS RESULTING FROM THE ACTIVITIES WHICH ARE CONTRACTUALLY FOR THE BENEFIT OF THE JV PARTNERS AS DETAILED IN THE PROFIT SHARING SCHEDULE I, LESS ANY BANKING, LEGAL, ADMINISTRATIVE, OR PROFESSIONAL SERVICES COSTS INCURRED BY THE JV IN THE COURSE OF CONDUCTING THE ACTIVITIES.

4. **JOINT VENTURE GOVERNANCE:** PARTY B SHALL MANAGE THE BUSINESS AFFAIRS OF THE JV FOR THE BENEFIT OF THE PARTIES IN ITS REASONABLE BUSINESS JUDGMENT AND SHALL CONFER WITH THE PARTY A ON A REGULAR BASIS WITH REGARD TO JV MATTERS.

5. **COSTS AND EXPENSES:** EACH PARTY SHALL BE RESPONSIBLE FOR ITS OWN COSTS IN CONNECTION WITH THE PREPARATION, NEGOTIATION OF THE FORMATION OF THE JOINT VENTURE AND THE EXECUTION OF THIS AGREEMENT.

6. **BREACH, LAW, JURISDICTION AND REMEDIES:** PARTY B'S FAILURE TO PAY PROFITS TO PARTY A WITHIN 60 DAYS OF ITS CONTRIBUTION OF ASSETS SHALL CONSTITUTE A MATERIAL BREACH OF CONTRACT. IN THE EVENT OF MATERIAL BREACH BY PARTY B, PARTY A MAY TERMINATE THIS AGREEMENT AND DECLARE THE SAME NULL AND VOID BY WRITTEN NOTICE DELIVERED TO PARTY B BY EMAIL, WHICH SHALL BE EFFECTIVE UPON DELIVERY. UPON RECEIVING PARTY A'S NOTICE OF BREACH, PARTY B SHALL IMMEDIATELY RELEASE AND RETURN PARTY A'S ASSETS TO PARTY A BY WIRE TRANSFER TO PARTY A'S DESIGNATED BANK COORDINATES. PARTY A'S FAILURE TO CONTRIBUTE ASSETS AS REQUIRED BY THE AGREEMENT SHALL CONSTITUTE A MATERIAL BREACH WHICH SHALL ENTITLE PARTY B TO TERMINATE THIS AGREEMENT BY WRITTEN NOTICE AS DESCRIBED HEREINABOVE. THIS AGREEMENT SHALL BE GOVERNED BY THE LAW OF NEW YORK, NY, UNITED STATES. ALL DISPUTES BETWEEN THE PARTIES SHALL BE RESOLVED BY ARBITRATION AT THE NEW YORK INTERNATIONAL ARBITRATION CENTER. THE PARTIES HEREBY AGREE AND ADMIT TO THE PERSONAL JURISDICTION OF, AS APPLICABLE, THE NEW YORK INTERNATIONAL ARBITRATION CENTER. THE PARTIES AGREE THAT THE LOSING PARTY IN ANY SUCH ARBITRATION HEARING HEREUNDER SHALL HOLD THE PREVAILING PARTY HARMLESS FROM ALL COST, DAMAGE AND EXPENSE INCURRED AS A RESULT OF THE APPLICABLE CLAIM OR ACTION.



Initials

TRANSACTION CODE: JVA/VPCL-GINV-I-10142022

**VELANOS** PRINCIPAL CAPITAL

7. **LEGAL ADVICE:** EACH PARTY HAS HAD THE OPPORTUNITY TO RECEIVE BUSINESS, FINANCIAL AND LEGAL ADVICE WITH RESPECT TO THIS AGREEMENT, AND/OR HAS THE REQUISITE EXPERIENCE AND SOPHISTICATION TO UNDERSTAND, INTERPRET AND AGREE TO THE TERMS AND PROVISIONS HEREOF AND HAVE VOLUNTARILY WAIVED THEIR RIGHT TO RECEIVE INDEPENDENT COUNSEL AND ADVICE WITH RESPECT THERETO.

8. **ENTIRE AGREEMENT / ASSIGNMENT / RECITALS:** THIS AGREEMENT CONTAINS THE ENTIRE UNDERSTANDING AND AGREEMENT BETWEEN THE PARTIES HERETO WITH RESPECT TO THE SUBJECT MATTER HEREOF, SUPERSEDING ALL NEGOTIATIONS, PRIOR DISCUSSIONS, PRELIMINARY AGREEMENTS AND ALL PRIOR AGREEMENTS BETWEEN THE PARTIES AND THEIR AFFILIATES MADE PRIOR TO THE DATE HEREOF, AND SHALL NOT BE CHANGED EXCEPT BY AN INSTRUMENT SIGNED BY THE PARTIES HERETO. THIS AGREEMENT MAY NOT BE ASSIGNED WITHOUT THE EXPRESS, WRITTEN PERMISSION OF THE NON-ASSIGNING PARTIES. THE RECITALS TO THIS AGREEMENT SHALL BE DEEMED TO BE PART OF THE AGREEMENT.

9. **NOTICES:** ALL NOTICES HEREUNDER SHALL BE IN WRITING, ADDRESSED TO THE PARTY AT THE ADDRESS SET FORTH HEREIN, AND SHALL BE SENT, WITH PROOF OF DELIVERY, BY ELECTRONIC, CERTIFIED OR REGISTERED MAIL, OR BY COURIER. IN THE EVENT THAT THE ADDRESS OR CONTACT INFORMATION FOR ANY PARTY CHANGES, SUCH PARTY SHALL PROMPTLY PROVIDE NOTICE TO THE OTHER PARTY OF SUCH CHANGE(S).

10. **CONFIDENTIAL INFORMATION:** BY VIRTUE OF THIS AGREEMENT, EACH PARTY MAY OBTAIN CERTAIN CONFIDENTIAL OR PROPRIETARY INFORMATION. FOR PURPOSES OF THIS AGREEMENT, THE TERM "**CONFIDENTIAL INFORMATION**" MEANS ALL INFORMATION WHICH IS DELIVERED BY ANY PARTY, THEIR AFFILIATES OR THEIR REPRESENTATIVES IN CONNECTION WITH THIS AGREEMENT, WHICH IS NON- PUBLIC AND IDENTIFIED AS BEING CONFIDENTIAL OR PROPRIETARY. THE PARTIES AGREE THAT THEY AND THEIR RESPECTIVE REPRESENTATIVES WILL NOT USE ANY CONFIDENTIAL INFORMATION FOR ANY PURPOSE OTHER THAN TO FULFILL THEIR UNDERTAKINGS PURSUANT TO THIS AGREEMENT FOR A PERIOD OF FIVE YEARS FROM TERMINATION OF THIS AGREEMENT. THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES WILL KEEP THE CONFIDENTIAL INFORMATION COMPLETELY CONFIDENTIAL; PROVIDED, HOWEVER, THAT THE CONFIDENTIAL INFORMATION MAY BE DISCLOSED TO THEIR REPRESENTATIVES OR AFFILIATES WHO NEED TO REVIEW THE CONFIDENTIAL INFORMATION (IT BEING UNDERSTOOD THAT THEIR REPRESENTATIVES SHALL BE INFORMED OF THE CONFIDENTIAL NATURE OF SUCH CONFIDENTIAL INFORMATION AND SHALL BE DIRECTED TO TREAT THE CONFIDENTIAL INFORMATION IN ACCORDANCE WITH THIS AGREEMENT). THE PARTIES SHALL TREAT AS CONFIDENTIAL ALL NAMES, TELEPHONE NUMBERS, EMAIL ADDRESSES, TELEX NUMBERS, FACSIMILE NUMBERS AND ANY OTHER FORM OF CONTACT COORDINATES AS WELL AS ANY OTHER INFORMATION EXCHANGED BETWEEN THE PARTIES, EACH PLEDGING NOT TO DISCLOSE TO ANY OTHER ENTITY OR INDIVIDUALS, EXCEPT WHEN REQUIRED FOR THE PURPOSE OF THE JV TRANSACTION(S), ANY SUCH INFORMATION, WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE NON-DISCLOSING PARTY. SHOULD THE NON-DISCLOSING PARTY OR ANY RELATED INDIVIDUALS, CORPORATIONS, DIVISIONS, ASSOCIATES, THIRD PARTIES OR OTHER FORM OF ENTITY RELATED IN ANY WAY TO THE NON-DISCLOSING PARTY ATTEMPT TO PARTICIPATE IN A SUBSEQUENT TRANSACTION INVOLVING THE OF THE SAME INDIVIDUALS OR ENTITIES DISCLOSED BY THE DISCLOSING PARTY DURING THE TERM OF THIS AGREEMENT AND DURING THE THREE (3) YEARS THEREAFTER IN RESPECT OF INTRODUCTIONS, INFORMATION, RECOMMENDATIONS, DATA OR OTHER KNOWLEDGE ACQUIRED FROM THE DISCLOSING PARTY, THE DISCLOSING PARTY SHALL BE ENTITLED TO COMPENSATION IN AN AMOUNT EQUAL TO ALL PROCEEDS PAID TO THE NON-DISCLOSING PARTY OR ITS RELATED PARTIES OR AFFILIATES.

11. **REQUIRED DISCLOSURE:** IN THE EVENT THAT A PARTY OR ANY OF THEIR REPRESENTATIVES RECEIVES A REQUEST, OR IS REQUIRED (BY DEPOSITION, INTERROGATORY, REQUEST FOR DOCUMENTS, SUBPOENA, CIVIL INVESTIGATIVE DEMAND OR SIMILAR PROCESS) TO DISCLOSE CONFIDENTIAL INFORMATION, THE PARTIES AGREE TO (I) IMMEDIATELY NOTIFY THE OTHER PARTY OF THE EXISTENCE, TERMS AND CIRCUMSTANCES SURROUNDING SUCH A REQUEST; (II) CONSULT WITH THE OTHER PARTY ON THE ADVISABILITY OF TAKING LEGALLY AVAILABLE STEPS TO RESIST OR NARROW SUCH REQUEST; AND (III) ASSIST THE OTHER PARTY IN SEEKING A PROTECTIVE ORDER OR OTHER APPROPRIATE REMEDY. IN THE EVENT THAT SUCH PROTECTIVE ORDER OR OTHER REMEDY IS NOT OBTAINED, OR THE OTHER PARTY WAIVES COMPLIANCE WITH THE PROVISIONS HEREOF, (I) A PARTY OR THEIR REPRESENTATIVES MAY DISCLOSE TO ANY TRIBUNAL ONLY THAT PORTION OF SUCH CONFIDENTIAL INFORMATION WHICH THEY ARE ADVISED BY COUNSEL IS LEGALLY REQUIRED TO BE DISCLOSED, AND SHALL EXERCISE THEIR BEST EFFORTS TO OBTAIN ASSURANCE THAT CONFIDENTIAL TREATMENT WILL BE ACCORDED SUCH CONFIDENTIAL



**Initials**

**VELANOS** **PRINCIPAL CAPITAL**

INFORMATION; AND (II) THEY SHALL NOT BE LIABLE FOR SUCH DISCLOSURE UNLESS DISCLOSURE TO ANY SUCH TRIBUNAL WAS CAUSED BY OR RESULTED FROM A PREVIOUS DISCLOSURE BY A PARTY OR THEIR REPRESENTATIVES NOT PERMITTED BY THIS AGREEMENT.

13. **NON-CIRCUMVENTION:** WITH RESPECT TO ANY INTRODUCTIONS MADE BY THE PARTIES TO EACH OTHER HEREUNDER, THE PARTIES AGREE THAT THEY SHALL EACH NOT: (I) CIRCUMVENT, OR ATTEMPT TO CIRCUMVENT, THE OTHER PARTY FOR THE PURPOSE OF DEPRIVING THE OTHER PARTY OF ANY COMPENSATION TO WHICH THE OTHER PARTY IS OR WOULD BE ENTITLED TO HEREUNDER; AND (II) SOLICIT ANY PARTY INTRODUCED BY THE OTHER PARTY FOR THE PURPOSE OF ANY TRANSACTION, DEAL OR OPPORTUNITY FOR A PERIOD OF FIVE (5) YEARS FROM THE DATE OF ANY SUCH INTRODUCTION, WITHOUT THE EXPRESS WRITTEN CONSENT OF THE INTRODUCING PARTY. THE PARTIES FURTHER AGREE THAT IN THE EVENT THAT A PARTY CIRCUMVENTS OR ATTEMPTS TO CIRCUMVENT THE OTHER PARTY, THE NON-CIRCUMVENTING PARTY SHALL BE ENTITLED TO LIQUIDATED DAMAGES EQUAL TO THE TOTAL COMPENSATION RECEIVED BY THE CIRCUMVENTING PARTY FROM THE TRANSACTION IN WHICH THE ATTEMPTED CIRCUMVENTION OR ACTUAL CIRCUMVENTION OCCURS.

14. **REPRESENTATIONS AND WARRANTIES:** THE PARTIES REPRESENT AND WARRANT AS FOLLOWS:

    14.1.    THE PARTIES ARE NOT REGISTERED AND ARE NOT REQUIRED TO BE REGISTERED AS INVESTMENT ADVISERS.

    14.2.    THE INDIVIDUAL PERSONS EXECUTING THIS AGREEMENT ON BEHALF OF EACH RESPECTIVE PARTY ARE DULY AUTHORIZED TO ENTER INTO THIS AGREEMENT BY AND ON BEHALF OF EACH RESPECTIVE PARTY.

    14.3.    THE PARTIES ARE DULY FORMED, VALIDLY EXISTING AND IN GOOD STANDING UNDER THE REGISTRAR OF COMPANIES IN THEIR JURISDICTION OF FORMATION AND ARE QUALIFIED TO DO BUSINESS IN ALL OTHER JURISDICTIONS WHERE THEIR BUSINESS REQUIRES THEM TO BE QUALIFIED.

15. **BINDING EFFECT:** THIS AGREEMENT SHALL BE BINDING UPON THE PARTIES HERETO AND UPON THEIR RESPECTIVE HEIRS, SUCCESSORS, LEGATEES, EXECUTORS, ADMINISTRATORS AND PERMITTED ASSIGNS, AND WILL INURE TO THEIR BENEFIT.

16. **WARRANTIES / DISCLAIMER:** THE PARTIES MUTUALLY WARRANT AND REPRESENT TO EACH OTHER THAT THEY EACH HAVE THE FULL RIGHT, POWER, AND AUTHORITY TO ENTER INTO THIS AGREEMENT AND TO FULLY PERFORM THEIR OBLIGATIONS HEREUNDER.

17. **BENEFICIARIES:** THE BENEFIT OF THIS AGREEMENT AFTER EXECUTED BY THE PARTIES HEREIN SHALL BE INCLUSIVE TO THE HEIRS OF THE ESTATES OF THE NAMED PARTIES/BENEFICIARIES ANDTHE PARTIES' ASSIGNS.

18. **TAXES:** NO REPRESENTATIONS ARE HEREBY MADE OR IMPLIED WITH REGARD TO THE TAX IMPLICATIONS, IF ANY, IN RESPECT OF ANY TRANSACTIONS HEREUNDER. THE PARTIES INDIVIDUALLY AND SEPARATELY ACCEPT THEIR OWN RESPONSIBILITIES AND LIABILITIES FOR ANY TAXES, IMPOSTS, LEVIES, DUTIES OR CHARGES THAT MAY ARISE FROM THEIR RESPECTIVE INTERESTS IN THE JOINT VENTURE AND ITS ACTIVITIES.

19. **FORCE MAJEURE:** THIS AGREEMENT SHALL BE SUBJECT TO THE GENERAL RULES OF "FORCE MAJEURE" AS ESTABLISHED BY THE LAW OF THE STATE OF NEW YORK, NY, UNITED STATES AND RESOLVED BY ARBITRATION AT THE NEW YORK INTERNATIONAL ARBITRATION CENTER. FURTHER, SHOULD ANY ACT OF GOD, WAR, BANK OR GOVERNMENT COMPUTER FAILURE, INSURRECTION OR CIVIL DISTURBANCE OCCUR IN ANY COUNTRY WHERE THE JOINT VENTURE IS ACTIVE, IN WHOLE OR IN PART, THEREBY DELAYING OR MAKING PERFORMANCE BY ANY OF THE PARTIES AND/OR COUNTER PARTIES IMPOSSIBLE, THEN THIS AGREEMENT SHALL BE EXTENDED FOR SUCH TERM, AS IS REASONABLY DETERMINED BY THE NATURE OF THE OCCURRENCE.

20. **COUNTERPARTS / SIGNATURES:** THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS, EACH OF WHICH SHALL BE DEEMED TO BE AN ORIGINAL, AND ALL OF WHICH TAKEN TOGETHER SHALL CONSTITUTE ONE AND THE SAME DOCUMENT. A DIGITAL OR FACSIMILE SIGNATURE ON THIS AGREEMENT SHALL BE THE EQUIVALENT OF AN ORIGINAL SIGNATURE AND SUCH AGREEMENT SHALL BE DEEMED AN ORIGINAL AND SHALL BE FULLY ADMISSIBLE AND ENFORCEABLE IN ALL PROCEEDINGS.



Initials

TRANSACTION CODE: JVA/VPCL-GINV-I-10142022

**VELANOS PRINCIPAL CAPITAL**

21. **EXCLUSIVITY / ADDITIONAL TRANSACTIONS:** THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS JV IS EXCLUSIVE. IN THE EVENT THAT THE PARTIES MUTUALLY AGREE FOR ADDITIONAL ASSETS TO BE INVESTED INTO THE JV (THE"NEWINVESTMENT"), THEN THEY SHALL AMEND THIS AGREEMENT BY A WRITTEN AMENDMENT, SIGNED BY THE AUTHORIZED SIGNATORIES OF PARTY A AND THE TERMS AND CONDITIONS HEREOF SHALL APPLY TO ANY SUCH NEW TRANSACTION.

**WHEREUPON** THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED BY THEIR RESPECTIVE DULY AUTHORIZED SIGNATORIES AS OF THE EFFECTIVE DATE HEREOF.

**SIGNED ON THIS DAY, OCTOBER 19TH, 2022**

**FOR AND BEHALF OF PARTY A:**

DocuSigned by:

Caleb Davis

568FFB8F31644BD...

**NAME: MR. CALEB MICHAEL DAVIS**
**TITLE: MANAGING PARTNER**

**FOR AND BEHALF OF PARTNER B:**

DocuSigned by:

6BD0F535F3B84AC...

**NAME: MR. JOSHUA MATTHEW WEARMOUTH**
**TITLE: MANAGING PARTNER**

Initials

**VELANOS PRINCIPAL CAPITAL**

## APPENDIX I:

### TRANSACTION PROFIT SHARING SCHEDULE

| | |
|---|---|
| **TRANSACTION CODE** | JVA/VPCL-GINV-I-10142022 |
| **TRANSACTION TYPE** | Strategic Capital/Systematic Purchase and Sell Transaction |
| **TRANSACTING ASSET(S)** | SBLC (Standby Letter of Credit) HSBC London/Top Rated Issuer |
| **CAPITAL PARTY CONTRIBUTION** | Liquid Cash Funds |
| **CAPITAL PARTY INSTRUMENT** | Rolling Strategic Participation |
| **CAPITAL PARTY CONTRIBUTION SIZE** | $3,000,000.00 USD (Three Million US Dollars) |
| **CAPITAL PARTY CONTRIBUTION DATE** | $2,100,000.00 within Twenty-Four (24) Hours of the JVA Execution for; and within seven (7) days for the remaining balance |
| **INSTRUMENT COMMENCEMENT DATE** | Within Ten (10) Banking Days, post contribution |
| **INSTRUMENT TERM** | Sixty (60) Banking Days |
| **INSTRUMENT RETURN CALCULATION PEROID** | Monthly |
| **TARGET RETURN PERIOD** | One Hundred Percent (100%) in Thirty (30) days; remaining within Sixty (60) days, post commencement |
| **PROFIT DISTRIBUTION FREQUENCY** | Thirty (30) days post commencement |
| **CAPITAL PARTY CONTINUATION TERMS** | Subject to opportunity and mutual agreement |
| **TRANSACTIONAL BANK(S)** | HSBC London / Barclays London |
| **SPECIAL NOTES** | 1. PARTY A WILL RETURN THE DULY EXECUTED JOINT VENTURE AGREEMENT WITH DUE DILIGENCE DOCUMENTS AS REQUIRED BY PARTY B. 2. PARTY A WILL REMIT THE CAPITAL PARTNER CONTRIBUTION TO PARTYB'SRECEIVINGBANKCOORDINATES. 3. PARTY B WILL DEPLOY THE CONTRIBUTED CASH/ASSET STRATEGICALLY AND WITH DISCRETION, INCLUDING FACILITATING A SYSTEMATIC PURCHASE AND SALE OF FINANCIAL NSTRUMENTS ROUTINE. 4. PARTY B WILL PROVIDE PARTY A WITH A ROLLING PROFIT PARTICIPATION IN THE JV ACTIVITIES UP TO $**25,000,000.00**. 5. PARTY A MAY CHOOSE TO RECEIVE PROFITS DISTRIBUTIONS TO ANY OF ITS NOMINATED BANK COORDINATES. 6. PARTY A MAY DECIDE TO WITHDRAW ITS CONTRIBUTED ASSET PLUS ANY ACCRUED PROFITS ENTITLEMENT AND EXIT THE JV AT ANY TIME AFTER THE FIRST DISTRIBUTION. 7. SUBJECT TO OPPORTUNITY AND MUTUAL AGREEMENT, AT THE END OF THE INSTRUMENT TERM, PARTY A MAY CONTINUE ITS ROLLING STRATEGIC PARTICIPATION. 8. AFTER PARTY A CONTRIBUTES ITS ASSETS, PARTY B SHALL PROVIDE PARTY A COPIES OF THE CURRENT TRANSACTIONAL BANK ACCOUNT STATEMENT SHOWING THE RELEVANT TRADE TRANSACTIONS EVERY THIRTY (30) DAYS DURING PARTY A'S PARTICIPATION IN THE JV. |

**ACKNOWLEDGED, ACCEPTED, AND SIGNED ON THIS DAY: OCTOBER 19TH 2022,**

**FOR AND BEHALF OF PARTY A:**

DocuSigned by:

*Caleb Davis*

**NAME: MR. CALEB MICHAEL DAVIS**
**TITLE: MANAGING MEMBER**



**VELANOS** PRINCIPAL CAPITAL

## APPENDIX II:

**PARTY A BANKING COORDINATES FOR SENDING CONTRIBUTED CASH/ASSET**

| BANK NAME | JP Morgan Chase |
|---|---|
| BANK ADDRESS | 7301 Baymeadows Way, Jacksonville, FL 32256 |
| SWIFT CODE | |
| SORT CODE | N/A |
| EUR ACCOUNT NUMBER | N/A |
| USD ACCOUNT NUMBER | |
| IBAN | N/A |
| ACCOUNT NAME | Genie Investments NV, LLC |
| BANK OFFICER | Stephen Massicotte |
| BANK TELEPHONE | Office: 904-462-1016 | Cell: 904-536-7959 |
| BANK OFFICER EMAIL | stephen.m.massicotte@chase.com |
| SPECIAL INSTRUCTIONS | |

**PARTY B BANKING COORDINATES FOR RECEIVING CONTRIBUTED CASH/ASSET**

| BANK NAME | Scotiabank / Bank of Nova Scotia |
|---|---|
| BANK ADDRESS | 3401 Dufferin St Mail Box 54, Toronto, Ontario, Canada M6A 2T9 |
| SWIFT CODE | T |
| SORT CODE | N/A |
| EUR ACCOUNT NUMBER | N/A |
| USD ACCOUNT NUMBER | |
| IBAN | N/A |
| ACCOUNT NAME | VELANOS PRINCIPAL CAPITAL INC. |
| BANK OFFICER | Jasotha Ulaganathan |
| BANK TELEPHONE | 416-784-5126 x4300 |
| BANK OFFICER EMAIL | jasotha.ulaganathan@scotiabank.com |
| SPECIAL INSTRUCTIONS | |

**Initials**