## EXHIBIT COVER SHEET

**Exhibit**

Party Submitting:      **Mary Ida Townson, U.S. Trustee for Region 21**

Admitted:              **YES     or    NO      (circle one)**                    **173**

Chapter 11 Debtor:     **Genie Investments NV, Inc.**

Case No.               **3:24−bk−00496−BAJ**

Nature of Hearing:     **Trial on**

                       **U.S. Trustee's Motion to Appoint Chapter 11
                       Trustee, or, in the Alternative, Appoint
                       Examiner, Dismiss Case, or Convert Case to
                       Chapter 7 (Doc. No. 20)**

                       **Debtor's Response Thereto (Doc. No. 34)**

                       **U.S. Trustee's Reply (Doc. No. 38)**

Trial Date:            **April 9, 2024, at 9:00 a.m.**


**United States Bankruptcy Court
Middle District of Florida**

**Dated:_____, 2024.**


**By: _____, Deputy Clerk**

| | |
|---|---|
| **From:** | Shailesh Patel |
| **To:** | Morris, Benjamin J.; Cade, Steve; aditi.patel@sbmhospitality.com; Vinay Patel; Preet Patel |
| **Subject:** | Fw: Wire confirmation (2) - Genie Investments NV North Haven |
| **Date:** | Thursday, October 19, 2023 6:34:29 PM |
| **Attachments:** | image001.jpg |
| | Termination Agreement .pdf |
| | Business Expansion Line of Credit.pdf |
| | Promissory Note.pdf |
| | Security Agreement.pdf |

___

**\*\* EXTERNAL EMAIL MESSAGE \*\***

Ben,
See below the wire confirmation and also find attached the contracts signed and termination letters.
Thanks.


**Shailesh Patel**

**SBM Hospitality LLC**

**3705 W Avera Dr**

**Sioux Falls. SD 57108**

**605-376-9509 (cell)**

**888-711-0240 (Fax)**

**Shailesh.Patel@SBMHospitality.com**


*-Success or achievement is not the final goal. It is the spirit in which you act that makes your life beautiful and worth living.*
*- Learn to live selflessly and do your duties stay calm in success and despairs do not let Happiness and sorrow bother you or deviate your righteousness*
*-Neither in this world nor elsewhere is there any happiness in store for him who always doubts.*
*- Man is made by his belief. As he believes, so he is.*
*Famous verses from  a Bhagvad Geeta*


**From:** Kari Borns <kborns@loftadvisors.com>
**Sent:** Wednesday, May 3, 2023 3:18 PM
**To:** Shailesh Patel <shailesh.patel@sbmhospitality.com>
**Cc:** Rocky Rehfeldt <rrehfeldt@loftadvisors.com>
**Subject:** Wire confirmation (2) - Genie Investments NV

Hi Shailesh,
The wire confirmation information is below for your records:

NOTICE OF OUTGOING WIRE TRANSFER
First Dakota National Bank Wire Date: 5/03/23
IMAD: ███████████████
OMAD : ███████████████████
Funds in the amount of $ 1,800,075.00 have been wired to
Genie Investments NV
from account Acct Ending ███
North Haven Lodging Partners LLC

NOTICE OF OUTGOING WIRE TRANSFER
First Dakota National Bank Wire Date: 5/03/23
IMAD: ███████████████
OMAD : ███████████████████
Funds in the amount of $ 1,800,075.00 have been wired to
Genie Investments NV
from account Acct Ending ███
Wallingford Lodging Partners LLC



This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the original recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error, and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you received this email in error, please immediately notify postmaster@firstdakota.com.

If any personal views or opinions are contained in this email, those views or opinions are solely those of the author and do not necessarily represent those of First Dakota National Bank.

## EXHIBIT F
## FORM TERMINATION LETTER

McMann Commercial Lending LLC
205 N Michigan Avenue, Ste 810
Chicago, Illinois 60601

Re: North Haven Lodging Partners LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above-referenced transaction according to the terms of the LOC Agreement dated April 10, 2023.

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for a refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER: North Haven Lodging Partners LLC

By:

Name: Shailesh Patel and Vihang Patel
Title:

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 29th day of
Aug _____, 20 23

Adam Price
NOTARY PUBLIC
In and for the State of   SD

My Commission Expires:

ADAM PRICE
Notary Public
SEAL
South Dakota

4-27-29

Please confirm your Wiring Instructions:
Account Title:
Address on Account:
Bank Name:
Bank Address:
Routing #:
Account #:

Initials: _____

## EXHIBIT F
## FORM TERMINATION LETTER

McMann Commercial Lending LLC
205 N Michigan Avenue, Ste 810
Chicago, Illinois 60601

Re: Wallingford Lodging Partners LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above-referenced transaction according to the terms of the LOC Agreement dated April 10, 2023.

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for a refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER: Wallingford Lodging Partners LLC

By: _____
Name: Shailesh Patel and Vihang Patel
Title: _____President / Manager_____

**SUBSCRIBED AND SWORN TO BEFORE ME** on this _17th_ day of
_Aug_____, 2023

_____
NOTARY PUBLIC
In and for the State of _SD_____

ADAM PRICE
Notary Public
SEAL
South Dakota

My Commission Expires:

_4-27-29_____

Please confirm your Wiring Instructions:
Account Title:
Address on Account:
Bank Name:
Bank Address:
Routing #:
Account #:

Initials: _____

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

among

## MCMANN COMMERCIAL LENDING LLC

as Lender

and

## North Haven Lodging Partners LLC
as Borrower

_____

dated as of

April 10, 2023

_____

Initials: *VP  SP*

## BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated, or otherwise modified, this "**Agreement**") is made and entered as of April 10, 2023, between McMann Commercial Lending LLC (the "**Lender**"), and North Haven Lodging Partners LLC., a Connecticut Limited Liability Company ("**Borrower**").

## RECITALS

**A.**      The Borrower desires to obtain from Lender an asset-backed line of credit loan (the "**LOC**") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

**B.**      The Borrower desires to obtain the LOC from Lender for Business Expansion for construction of a 105-room limited-service hotel (as more fully described in **Exhibit D** attached hereto the "**Project**"). Acquired assets will be legally described on **Exhibit E** attached hereto (the "**Property**").

**C.**      The Borrower has agreed to pay a minimum contribution of the Project LOC Amount to Lender, by establishing the Interest Reserve (as hereinafter defined) and the ICA (as hereinafter defined), collectively,(the "**Interest Reserve Account**"), within seven (7) calendar days after the fully executed LOC Documents (as hereinafter defined) are received by Lender.

**D.**      The Borrower has agreed to pay, pursuant to Section 3.6 hereof, the aggregate amount of One Million Eight Hundred Thousand Dollars and No Cents Dollars ($1,800,000), (the "**ICA Payment**"), by bank wire to Lender. An account on the books and records of the Lender shall be created to serve as an Interest Credit Account (the "**ICA**"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

**E.**      Lender has agreed to make Advances (as hereinafter defined) under the LOC to Borrower in an aggregate amount, according to **Exhibit B**, an amount not to exceed the Maximum Amount for the purposes outlined in these recitals and the Promissory Note attached hereto as **Exhibit** A and upon the terms and subject to the conditions hereinafter set forth.

**NOW THEREFORE**, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1. Certain Defined Terms**. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed per generally accepted accounting principles consistently applied. As used in this

Initials: _____ _____

agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

**"Advance(s)"** means any loan advance made by the Lender per the terms and conditions of this Agreement.

"**Applicable Interest Rate**" means the fixed interest rate specified in the Promissory Note.

**"Borrower"** means that term as defined in the first paragraph of this Agreement.

**"Business Expansion"** means any transaction or use, including for working capital, that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business (other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

"**Business Plan**" means the document(s) outlining the accurate and up-to-date business operations of the End-Borrower, as previously provided by End-Borrower, substantially in the form outlined in EXHIBIT D, and subject to review by Lender's Capital Partners as described in Section 8.1 of this Agreement.

**"Closing Date"** means the last date of signed execution of this Agreement by Lender and Borrower.

**"Collateral"** means all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements, and proceeds, thereof.

**"Event(s) of Default"** means any event or condition that shall constitute an event of default as described in Article 13 of this Agreement.

"**ICA**" means the definition given in Recital D of this Agreement.

"**ICA Payment**" means the amount remitted pursuant to Recital D of this Agreement.

Initials: ___ ___

"**Interest Reserve**" means credit on the books and records of the Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from a Borrower JV Partner, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"**Interest Reserve Account**" means the definition given in Recital C of this

Agreement.

"**Lender**" means that term as defined in the first paragraph of this Agreement.

"**Lender's Capital Partners**" means one or more lender-clients of the Lender

providing funding towards the LOC.

"**LOC**" means that term as defined in Recital A of this Agreement.

"**LOC Disbursement Account**" means that term as defined in Section 3.12 hereof.

"**LOC Document(s)**" means, collectively, this Agreement, the Promissory Note, and each Security Document, as any of the foregoing may from time to time be amended, restated, or otherwise modified or replaced, and any other document delivered pursuant thereto.

"**Maximum Amount**" means Eighteen Million Nine Hundred Thousand Dollars and No Cents ($18,900,000). The Maximum Amount is the Project LOC Amount plus all fees, costs, and expenses which are the Borrower's responsibility to pay.

"**Organizational Documents**" means, concerning any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise concerning, this Agreement or any other LOC Document.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority, or any other entity.

"**Project**" means that term as defined in Recital B of this Agreement.

Initials: _____

**"Project Costs"** means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by the Borrower for implementation or execution of the Project (including but not limited to the payment of taxes, insurance, and all items reasonably necessary for the successful execution of the Project), as more specifically outlined in the Project budget set forth on **Exhibit C** attached hereto.

**"Project LOC Amount"** means Eighteen Million Dollars and No Cents ($18,000,000).

**"Property"** means that term as defined in Recital B of this Agreement.

**"Promissory Note"** means the Promissory Note, in the form attached hereto as **Exhibit A**.

**"Security Agreement"** means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as **Exhibit E**.

**"Security Document"** means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each U.C.C. Financing Statement or similar filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

**"Scheduled Maturity Date"** means the 10th anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

**"Subsidiary"** means any entity (other than the Borrower) in an unbroken chain of entities beginning with the Borrower if each of the entities owns stock, units, or other interests that represent fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain

**"Taxes"** means all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, concerning those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender concerning the LOC.

**"Term Sheet"** means that document(s) dated as of 3/14/2023 between Borrower and Lender, setting forth a general summary of the terms of agreement memorialized more fully herein in final form.

**"Tranche Schedule"** means the schedule of Advances to Borrowers from the Lender, based

Initials: _____

upon the dates of the disbursements attached hereto as **Exhibit B**; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder does not exceed the Maximum Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

## ARTICLE 2
## THE CREDIT

**Section 2.1. Line of Credit Amount**. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to the Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

**Section 2.2. Line of Credit Documents**. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note, this Agreement, and each Security Document. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to the Lender and its counsel.

## ARTICLE 3
## TERM, INTEREST, AND PAYMENTS

**Section 3.1. Initial Term**. The initial term of the LOC is Ten (10) years and shall commence on the Closing Date and expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full thereon and all other amounts due and owing hereunder and under the Promissory Note shall be repaid by Borrower on the Scheduled Maturity Date.

**Section 3.2. Extended Term**. At the end of the initial term outlined in Section 3.1 hereof, and at the end of each Extended Term (as defined below, if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, over time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty-four (24) month period, up to a total of one (1) such additional consecutive periods (separately, "**Extended Term**"; collectively, the "**Extended Terms**"). In connection with Lender's granting of each Extended Term, (a) Borrower shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorney's fees, as a one (1)-time fee equal to one percent (1%) of the Project LOC Amount.

Initials: _____

**Section 3.3. Applicable Interest Period.** The interest period concerning each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full.

**Section 3.4. Interest Rate Calculation**. Interest shall be calculated based on a 365-day year and the actual number of days elapsed in a 365-day year and at the rate outlined in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "**Maximum Interest Rate**"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to the unpaid principal balance outstanding under the Promissory Note or, if it exceeds such unpaid principal, refunded to the Borrower.

**Section 3.5. Interest Payments**. Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times outlined in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

**Section 3.6. Reserves**. Following the signing of this Agreement, the Borrower shall remit One Million Eight Hundred Thousand Dollars and No Cents ($1,800,000) as the ICA Payment per the terms and the time outlined in Recital D of this Agreement. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and not refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable.

**Section 3.7. Prepayment**. The borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC.

**Section 3.8. Interest Credit Account**. If at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which notice shall be delivered to and received by Borrower no less than thirty (30) days before the date of the next interest payment date, Borrower shall remit into the ICA the funds necessary to make such interest paid before the date such interest payment is due and payable**Section 3.9. Fees.**

      (a) **LOC Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable fee for the LOC in an aggregate amount equal to Five percent (5%) multiplied by the Project LOC Amount, which is equal to Nine Hundred Thousand Dollars and No Cents ($900,000) (the "**LOC Fee**"). The LOC Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

Initials: _____

(b) **Promote Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable success fee in an aggregate amount equal to One percent (1%) multiplied by the Project LOC Amount, which is One Hundred Eighty Thousand Dollars and No Cents ($180,000) (the "**Promote Fee**"). The Promote Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

(c) **ICA Advance Fee**. To the extent the Borrower used Lender to provide the ICA Payment, at Closing and out of the initial Advance, the Borrower shall reimburse Lender in an amount equal to the ICA Payment advanced by Lender plus a nonrefundable fee in an aggregate amount equal to Zero percent (0%) of the ICA Payment, which is No Dollars and No Cents Dollars ($-) (the "**ICA Advance Fee**"). The ICA Advance Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition. The borrower will take the Project LOC Amount in full on the closing of the first tranche.

**Section 3.10. Line of Credit Extension Fees.** Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a nonrefundable LOC extension fee for each extension in an aggregate amount equal to one percent (1%) multiplied by the Maximum Amount.

**Section 3.11. Legal and Incidental Fees, Charges, and Costs.** Borrower shall pay at Closing, all reasonable out of pocket and up to Twelve Thousand, Five Hundred U.S. Dollars ($12,500) for legal fees, recording and filing fees, documentary stamps, taxes, service charges, credit reports, UCC search costs, title company fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial proceeding; provided that Lender will provide Borrower ten (10) days' advance notice of any legal fees pursuant to this Section 3.11 that will exceed Twelve Thousand, Five Hundred U.S. Dollars ($12,500). Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or willful misconduct.

**Section 3.12. Line of Credit Disbursement Account.** The proceeds of each Advance under the LOC shall be advanced into the LOC Disbursement Account with Lender to be used by Borrower for payment of the Borrower's Project Costs, solely for the purposes and in the manner

Initials: _JA_ _SP_

outlined in this Agreement. The LOC Disbursement Account will be held jointly in the name of the Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights and interest in and to the LOC Disbursement Account, which assignment will be effective only upon the occurrence and continuation of an Event of Default, subject to an applicable Default Cure Period (as hereinafter defined).

### Section 3.13. <u>Taxes</u>.

(a)     All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to the Lender (after deducting, withholding, and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

(b)     Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to the Lender. If the Borrower shall fail to pay any Taxes or OtherTaxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result of any such failure.

(c)     The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

### ARTICLE 4
### CONDITIONS FOR CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing:

### Section 4.1.    <u>Delivery of the LOC Documents</u>.

(a)     As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

Initials: _____

(b)     The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Payment Account and Security Account (both as defined under UCC § 9-102 and as further defined in the Security Agreement) maintained by the Borrower.

(c)     Contemporaneously with Borrower's acquisition of the Property, Borrower shall have delivered an executed and notarized mortgage or deed of trust in form and substance required by Lender granting Lender a priority lien and security interest in and to the Property (the "**Security Instrument**"), and such Security Instrument shall be promptly recorded in the real property records of the county in which such real property is located. If required by Lender, (i) the closing of such Advance and recording of the Security Instrument shall be completed through the services of a title company chosen by Lender, and (ii) such title company shall issue, at Borrower's expense and for the benefit of Lender, a loan policy of title insurance concerning the Property. For the avoidance of doubt, this Section 4.1(c) shall not operate to preclude any Advances to the Borrower to fund pre-acquisition costs.

**Section 4.2.  Authority**. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members, or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery, and performance of the LOC Documents and the consummation of the transactions contemplated thereby, (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners or members of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing concerning the Borrower.

**Section 4.3.  Liens**. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions, or restrictions. At the request of the Lender, the Borrower shall (i) deliver to the Lender the results of UCC lien searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) UCC or other lien termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project, or any Collateral without the express written permission of Lender.

**Section 4.4.  Litigation**. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

**Section 4.5.  Events of Default**. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in

Initials: _____ _____

full compliance with the terms and provisions of this Agreement.

**Section 4.6. Purchase and Agreement Contracts.** Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

**Section 4.7. Compliance with Certain Requirements.** Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) under local, state, federal, and international laws, procedures, statutes, regulations, and ordinances, conditions applicable to the Project.

**Section 4.8.   Evidence of Insurance.**

(a)   For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for, and will keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders' loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of similar size and character that of the business of the Borrower, and Borrower shall furnish Lender with the satisfactory evidence of such underlying Borrower insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

(b)   Within five (5) business of receipt of End-Borrower insurance pursuant to Section 4.8(a), Lender shall acknowledge receipt and communicate to Borrower the approval and sufficiency of such End-Borrowers certificate of insurance.

**Section 4.9. Financial Statements.** The lender shall have received all financial reports required by Section 8.6 hereof.

**Section 4.10. Business Pro Forma.** The lender shall receive a pro forma income and expense statement annually in connection with the Project.

**Section 4.11. Management Plan.** Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of Borrower's business.

**Section 4.12. Material Change.** Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower's ability to perform under this Agreement or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.

**Section 4.13. Non-Subordination.** Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such Subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the

Initials: _____

normal and reasonable management of the Project).

**Section 4.14. Securitization.** The lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or reasonable due diligence required by the insurer.

## ARTICLE 5
## USE OF LINE OF CREDIT PROCEEDS

**Section 5.1.    Project Costs: Business Expansion Costs**.

(a)    Proceeds of Advances under the LOC shall be utilized by Borrower solely to finance the Project Costs, as more fully described in the attached **Exhibit C,** in connection with Borrower Business Expansion as further detailed in the Business Plan, updated yearly by Borrower.

(b)    The proceeds of the LOC shall be used exclusively for the purposes outlined in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family, or household purposes. The borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute, or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

## ARTICLE 6
## INSPECTIONS

**Section 6.1. Project Inspection**. Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

**Section 6.2. Books and Records**. Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower about the Project, the Property, and the Borrower and to make extracts therefrom or copies thereof.

**Section 6.3. Force Majeure Event Inspection Right.** In the event of a Force Majeure Event (as hereinafter defined) which interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until Lender is satisfied with Borrower's ability to resume operations to develop the Project. Following a Force Majeure Event, Lender has the right to modify the terms upon which future Advances may be made as a result of a change in circumstances as determined by the Lender

Initials: _____

in Lender's sole discretion, that the Borrower can perform or continue to perform the Project scope of work. Borrower shall execute any additional documents, amendments, or other agreement of terms required by Lender, before Lender's obligation to continue to make Advances shall resume.

## ARTICLE 7
## ADVANCE OF FUNDS

**Section 7.1. Timing and Advances to Payee**. Advances will be made as outlined in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance has been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than seventy-five (75) calendar days following the opening of the ICA by the Lender with its wholesale lender. Lender shall deliver the written notice to Borrower of the commencement of such seventy-five (75)-day period. Lender shall deliver the written notice to Borrower via the ZOOMERAL messaging system of the commencement of such seventy-five (75)-day period.

**Section 7.2. Conditions Precedent to Advance Funds**. Lender's obligation to make Advances hereunder shall be conditioned upon fulfillment of the terms outlined in Article 4 hereof.

**Section 7.3. Unpaid Lien Claims.** If Lender receives notice of nonpayment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, per applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower, or (b) withhold one hundred percent (100%) of the lien amount claimed from future Advances.

**Section 7.4. Mandatory Advances**. Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.

## ARTICLE 8
## BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing:

**Section 8.1. Project.** (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is the counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation, and management of the Project.

Initials: _____

**Section 8.2. Compliance with Laws**. Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

**Section 8.3. Compliance with Documents**. Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

**Section 8.4. Books and Records**. Keep and maintain complete and accurate books of account, per generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

**Section 8.5. Payment of Obligations**. Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established per generally accepted accounting principles).

**Section 8.6. Financial Reports**. Deliver to Lender, concerning Borrower as soon as available and in any event (a) within sixty (60) days after the end of each calendar quarter during the term of the LOC, financial statements of Borrower for such quarter and (b) within ninety (90) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower, in each case of the foregoing, certified as true and correct (which reports shall be prepared per generally accepted accounting principles consistently applied) and operating statements in a form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender. The borrower must also complete their ZOOMERAL business profile and keep the business profile up to date throughout the term of this agreement.

**Section 8.7. Notification to Lender**. Promptly after learning thereof, notify Lender of: (a) the details of any material action, proceeding, investigation, or claim against or affecting the Borrower, the Property, or the Project instituted before any court, arbitrator, or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Property or the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower of the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

**Section 8.8. Partnership/Corporate Existence**. Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

Initials: ___

## ARTICLE 9
## BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing Borrower shall not:

**Section 9.1. Liquidation, Merger, and Sale of Assets.** Liquidate, merge, or consolidate with any other Person or otherwise transfer to an unrelated Person fifteen percent (15%) or more of the equity securities of Borrower, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business. Notwithstanding, any initial public offering or acquisition by another company will require the Lender's approval or full payment of the outstanding loan balance.

**Section 9.2. Liens.** Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such liens, shall not be increased).

Section 9.3. **Indebtedness.** Create, incur, or have outstanding any indebtedness of any kind, other than (a) indebtedness owing to the Lender under this Agreement and the other LOC Documents, and (b) indebtedness of the Borrower existing as of the Closing Date as disclosed to and approved by the Lender (and any extension, renewal, or refinancing thereof but only to the extent that the principal amount thereof does not increase after the Closing Date).

**Section 9.4. Investments, Loans, and Guarantees.** (a) Create, acquire, or hold any subsidiary, (b) make or hold any investment in any stocks, bonds, or securities of any kind (c) be or become a party to any joint venture or other partnership, (d) make or keep outstanding any advance or loan to any Person, or (e) be or become a guarantor of any kind.

**Section 9.5. Acquisitions.** Enter into any transaction or series of related transactions for or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another

Initials: _9/_ _SP_

Person by a merger, amalgamation, or consolidation or any other combination with such Person, unless specifically stated and approved before execution of this Agreement.

**Section 9.6. Organizational Documents**. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

**Section 9.7.    Project and Project Documents**. Willfully or voluntarily abandon the Project or its activities to develop, construct, operate, or maintain the Project. If the same would (i) be a major decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

(a)  terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance of a material obligation by any other Person under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the development, construction, operation, and maintenance of the Project, in each case that would have an adverse effect on the Lender; or

(b)     sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation, and maintenance of the Project without Lender's consent, which consent shall not be unreasonably withheld.

### Article 10
### REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender that:

**Section 10.1. Validity of Agreement**. The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents. The LOC and the execution, delivery, and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable per their terms. The execution, delivery, and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than liens permitted under Section 9.2 hereof) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

**Section 10.2. Existing Defaults**. As of the date of execution of this Agreement, Borrower (or any subsidiary of Borrower) is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other

Initials: 2A  SP

agreement or instrument to which Borrower (or any subsidiary of Borrower) is a party or by which it or any of its properties, subsidiaries, partners, or other related entities may be bound.

**Section 10.3. No Default in Other Agreements**. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a party or by which it or any of its properties, subsidiaries, partners or other related entities may be bound, or result in the violation by it of any law, order, rule, ordinance, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties, subsidiaries, partners or other related entities.

**Section 10.4. No Consents**. No consent, approval, authorization, or other acknowledgment of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

**Section 10.5. Litigation**. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to Borrower's knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened, or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from the performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.

**Section 10.6. Financial Statements**. All balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared per generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

**Section 10.7. Legal Requirements**. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to

Initials: _JA_  _SP_

environmental protection, occupational safety and health, zoning, and equal employment practices.

**Section 10.8. Taxes**. The Borrower has filed all tax returns and reports required of it, has paid all taxes which are due and payable, and has provided adequate reserves for payment of any tax whose payment is being contested; the charges, accruals, and reserves on the books of the Borrower in respect of taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority concerning any taxes except as otherwise previously disclosed to the Lender in writing.

**Section 10.9. Organization and Good Standing**. The Borrower is a duly formed or organized, validly existing, and in good standing under the laws of the State of its formation or organization as outlined in the first paragraph of this Agreement, and is qualified as a foreign entity and in good standing in each jurisdiction where the Property and the Project are located.

**Section 10.10. Insurance**. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

**Section 10.11. Accurate and Complete Statements**. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

**Section 10.12. Timing of Lender Funding.** Provided Borrower has met the conditions to Advances in this Agreement, including without limitation the timing for requests outlined in this Section, Lender shall fund Advances per under the Tranche Schedule, but in no event anymore frequently than every sixty (60) day, unless otherwise consented to in writing by Lender. The borrower must deliver Advance requests to Lender thirty (30) business-banking days before the week represented on the Tranche Schedule for which the Borrower wishes to receive the proceeds of such Advance from the LOC Disbursement Account. Upon notice of an Advance Request from the Borrower, Lender has a forty (40) international business-banking day window based on the Tranche Schedule (except for the first Advance according to Section 7.1) to Payment the requested Advance into the LOC Disbursement Account. Absent a written Advance request from Borrower, per the conditions and requirements set forth herein, Lender is not obligated to disburse the next scheduled Advance under the Tranche Schedule.

## ARTICLE 11
## NATURE OF REPRESENTATIONS AND WARRANTIES

**Section 11.1. Generally.** The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive

Initials: _____

so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date hereof, except for any representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower according to or in connection with the LOC shall be deemed to have been relied upon by Lender.

## ARTICLE 12
## EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "**Event of Default**"):

    **Section 12.1. <u>Nonpayment</u>.** Failure to make any payment required by the Promissory Note, this Agreement, or any other LOC Documents and such failure continues for thirty (30) days after notice of such default is sent by Lender to Borrower.

    **Section 12.2. <u>Other Covenants and Agreements</u>.** Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not have been fully corrected, by the performance of or compliance with such covenants or agreements, within twenty (20) days after notice of such default is sent by Lender to Borrower.

    **Section 12.3. <u>Representations and Warranties</u>.** If any representation, warranty, or statement made in or according to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made. Such Event of Default can be corrected by the presentation of accurate and current material information furnished by the Borrower to the Lender to correct the false or erroneous representation, warranty, or statement within ten (10) days after notice of such default is sent by Lender to Borrower.

    **Section 12.4. <u>Security</u>.** If any lien granted in this Agreement or any other LOC Document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of Collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in the lien status occurs appropriate documents to correct such matters.

    **Section 12.5. <u>Validity of LOC Documents</u>.** If (a) any material provision, in the sole opinion of the Lender, of any LOC Document, shall at any time cease to be valid, binding, and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC

Initials: _____ _____

Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

**Section 12.6. <u>Petition for Bankruptcy, Insolvency</u>**. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation, or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for ninety (90) days; or the taking of the action by Borrower to authorize any of the actions outlined in this Section 12.6.

**Section 12.7. <u>Material Litigation</u>**. Any action, suit, proceeding, or investigation of any kind involving or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof of any Litigation, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation, and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, partners, or other related entities, or the Project and promptly after the occurrence thereof, a notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, partners, or other related entities, or the Project of the disclosed Litigation.

**ARTICLE 13**
**REMEDIES**

**Section 13.1. <u>General</u>**. Following the occurrence of one (1) or more Events of Default, a default cure period of sixty (60) days begins ("Default Cure Period"), except as otherwise provided in Section 13.3 or Section 13.4. If Borrower fails to cure the Event of Default (in the manner specified for each Event of Default according to Article 12) within the Default Cure Period, then the Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies outlined in the Promissory Note, in the LOC Documents, or any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or equity, including such rights as are provided in this Article 13. If a Bankruptcy Event referred to in Section 12.6 hereof occurs, (i) all obligations

Initials: _____

of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Upon the occurrence of any Event of Default hereunder under Section 12.1 whereby Borrower has missed more than two (2) scheduled payments if Borrower does not have any interest reserve account established for the benefit of the Lender, Borrower shall have a) sixty (60) days Default Cure Period to cure the Event of Default and must (b) Payment an additional one year's worth of interest payments into the Interest Reserve Account.

### Section 13.2. **Default and Right to Acquire.**

In the event, the Borrower is unable to cure the Event of Default (in the manner specified to correct each Event of Default according to Article 12 or within the Default Cure Period,

(a)     Upon the occurrence of an Event of Default, Lender shall have the right, in person or by agent, in addition to all other rights and remedies available to Lender hereunder or under the LOC documents, to enter into possession of the Project and perform or cause enforce any liquidity plan.

(b)     The lender may enter into possession of the Project and perform or cause to be performed all work and labor necessary to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower. All sums expended by the Lender in doing so, together with interest on such total amount at the Default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured by the LOC documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

(c)     Borrower thereby, following such Bankruptcy Event or relevant cure periods under Section 13.2 constitutes and appoints the Lender as its true and lawful attorney-in-fact, with the full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

(i)     to enter and endorse all agreements, instruments, and documents in connection therewith.

(ii)     to use any unadvanced proceeds of the LOC to complete, operate, or maintain the Project.

(iii)     to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

Initials: _JN SP_

(iv)     to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

(v)     to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security satisfactory to the Lender has been provided.

(vi)     to execute applications and certificates in the name of the Borrower which reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

(vii)     to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

(viii)     to do any and every act which the Borrower might do on its behalf concerning the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be (A) irrevocable, (B) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (C) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

**Section 13.3. <u>Curing of Defaults by Advances</u>**. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which Lender may have because of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender per the terms hereof before any additional proceeds of the LOC are disbursed.

**Section 13.4. <u>Remedies Are Cumulative</u>**. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of any rights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidate any act done according to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

Initials: _____

**Section 13.5. Offsets**. If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC documents is accelerated according to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, all of such obligations then owing by the Borrower, whether or not the same shall then have matured, all Payment (general or special) balances, and all balances in the Interest Reserve Account and all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

**Section 13.6. Collateral**. The Lender shall at all times have the rights and remedies of a secured party under the UCC, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Documents executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC documents, which the Borrower agrees to do, and make it available to the Lender at a reasonable convenient place to be designated by the Lender. The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC document, each of which findings shall be considered to be an accession to and a part of such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any delivery or taking of possession of the Collateral securing the obligations under the LOC documents, or any portion thereof, under this Agreement, then, with or without resort to the Borrower personally or any other person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. No prior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that the Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case, the Lender shall give the Borrower not fewer than ten (10) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made. The Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Lender may purchase such Collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower hereby waives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC documents, the cost of which shall be paid by the Borrower.

Initials: _____

**Section 13.7. <u>Default by Lender and Borrower's Sole Remedy.</u>**

(a)      Provided Borrower has fully satisfied and complied with all conditions to Advance if Lender fails to provide the first (1st) Advance when due, under the Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver a written notice in the form of a notarized termination letter, a copy of which is attached hereto as **<u>Exhibit F</u>** ("the **Termination Letter**"), to Lender by certified mail. Upon receipt of such notice, Lender shall have forty (40) international business-banking days from the date of receipt ("**Refund Period**") within which to return the ICA Payment to the Borrower.

(b)      If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice in the form of a notarized Termination Letter to the Lender by certified mail. Within forty (40) international business-banking days from the date of receipt of such notice by Lender, Borrower shall be entitled to (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) termination of Borrower's obligations to Lender hereunder except Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners, or other related entities, for any indirect, special, incidental, or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise because of, the LOC, the Advances, the Agreement or the other LOC documents.

(c)      Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances according to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, an act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, an act of civil disobedience, an act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew

Initials: _____

restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages, or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from performing under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period the occurrence is expected to continue. The lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. The lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

**Section 13.8 <u>Binding Arbitration.</u>** Any dispute, claim, or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one (1) arbitrator. The arbitration shall be administered by JAMS under its Comprehensive Arbitration Rules and Procedures or by ADR Services under its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand according to the notice requirements outlined in Section 14.5 herein. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach an agreement on an arbitrator, then the arbitration shall be selected under the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for the production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any discovery disputes shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising concerning the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

**ARTICLE 14**
**GENERAL PROVISIONS**

**Section 14.1. <u>Disclaimer of Liability</u>**. Lender has no liability or obligation in connection

Initials: _____

with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith. No claim may be made by the Borrower or any other Person against the Lender or the Affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

Section 14.2. **Publicity**. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. The lender shall have the right to indicate that it has provided the financing for the Project.

Section 14.3. **Confidentiality.** Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary, and Borrower hereby agrees to maintain confidential this Agreement, the LOC documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place. Borrower's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative.

Section 14.4. **Responsibility for Application of Funds**. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose outlined in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced under this Agreement. The lender may rely solely upon the Borrower's requests for Advances, affidavits, statements, and reports in making said Advances, and the Borrower does hereby release and indemnify the Lender and hold the Lender harmless from any losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final and non-appealable decision).

Section 14.5. **Non-Disparagement**. Borrower agrees and covenants that Borrower shall not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory, maliciously false, or disparaging remarks, comments, or statements concerning the

Initials: _____

The lender or its businesses, or any of its employees, officers, or directors, and its existing and prospective clients, suppliers, investors, and other associated third parties, now or in the future. For the avoidance of doubt, a breach of this Section 10.04 shall constitute an Event of Default under Section 7.02 under which Lender has the right to terminate all obligations under the Loan Documents under Section 9.01(b).

**Section 14.6 Opportunity to Consult with Counsel**. Borrower acknowledges that it has had an opportunity to consult with and be represented by counsel of Borrower's choosing in the review of the Loan Documents, that it has been advised by Lender to do so, that the Borrower is fully aware of the contents of the Loan Documents and its legal effect, and that Borrower enters into these Loan Documents freely, without duress or coercion, and based on Borrower's judgment and wishes and not in reliance upon any representation or promise made by the Lender, other than those contained herein.

**Section 14.7 Notices**. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent by certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety-six (96) hours after deposit in first-class certified United States mail, postage prepaid, return receipt requested, or two (2) business days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given according to this paragraph:

To Borrower:     North Haven Lodging Partners LLC


To Lender:       McMann Commercial Lending LLC
                 205 N Michigan Avenue, Ste 810
                 Chicago, Illinois 60601

**Section 14.8. Applicable Law**. This Agreement and, unless otherwise specifically provided for therein, each other LOC document, shall be governed by and construed per the laws of the State of Illinois and the United States.

**Section 14.9. Successors and Assigns**. The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

**Section 14.10. Severability**. The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition. In the event of any conflict or inconsistency between the terms and provisions of this Agreement and any of the LOC Documents, the terms and provisions of this Agreement shall control.

Initials: ____ ____

**Section 14.11. Amendments**. This Agreement may not be modified or amended except by a written agreement signed by the Borrower and Lender.

**Section 14.12. Headings; Attachments**. The several headings to articles, sections, and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part thereof.

**Section 14.13. No Third-Party Rights**. This Agreement is made entirely for the benefit of the Borrower, the Lender, and their successors in interest (including any participants). No third party shall have any rights hereunder.

**Section 14.14. Indemnification**. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement. The Borrower hereby agrees to indemnify, defend and hold harmless the Lender, the managers of the Lender, and all of their members, managers, affiliates, and advisors, from any damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees and costs) that they may incur because Borrower failed to fulfill all of the terms and conditions of this agreement or because of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs, and expenses (including attorneys' fees and costs) incurred by Lender, the managing members of Lender, or any of its members, managers, affiliates, or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished in connection with this transaction.

**Section 14.15. General Limitation of Liability**. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the

Initials: _UP_ _SP_

transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission, or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. In addition to the tolling provided under Section 6.3, Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

**Section 14.16. <u>Entire Agreement</u>**. This Agreement, the Promissory Note, and any other LOC Document or other agreement, document, or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings concerning the subject matter hereof.

**Section 14.17. <u>Execution in Counterparts</u>**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute the same Agreement.

**Section 14.18. <u>Legal Representation of the Parties</u>**. The LOC Documents were negotiated by the Parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

**Section 14.19. <u>JURY TRIAL WAIVER</u>**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

[Remainder of page intentionally left blank; Signatures follow]

Initials: _____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**LENDER:** MCMANN COMMERCIAL LENDING LLC

By:

Name: Walter P Trock III

**BORROWER:** North Haven Lodging Partners LLC

By:

Name: Shailesh Patel    Vihang Patel

Title: Manger    Member

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 14th day of

April , 2023

In and for the State of    NOTARY PUBLIC
South Dakota    In and for the State of Connecticut

My Commission Expires:

ADAM PRICE
Notary Public
SEAL
South Dakota

BENNETT BUFFALO
NOTARY PUBLIC, STATE OF CONNECTICUT
My Commission Expires January 31, 2026

My Commission Expires:
4-27-23

Initials:

**EXHIBIT A**
**PROMISSORY NOTE**

$18,900,000 – Maximum Principal Amount                        April 10, 2023

FOR VALUE RECEIVED, North Haven Lodging Partners LLC., a Connecticut Limited Liability Company (the "**Maker**"), hereby promises to pay to McMann Commercial Lending, or any subsequent holder of this Promissory Note (the "**Payee**"), at such place as Payee may designate, the principal sum of Eighteen Million Dollars and No Cents ($18,000,000) or the aggregate unpaid principal amount of all Advances, plus the Fees outlined in Section 3.9 of the LOC Agreement, as such terms are defined in the LOC Agreement (as hereinafter defined) and the other LOC Documents, made by Payee to Maker according to the LOC Agreement, whichever is greater, plus interest on the principal sum and all unpaid balances and all other amounts owed by Maker to Payee at the interest rate set forth below, payment of principal and interest to be made in lawful money of the United States in immediately available funds, as set forth below. Capitalized terms used herein and defined in the LOC Agreement, but not otherwise defined herein, shall have the meaning given such term in the LOC Agreement; and

(a)     Maker shall make payments under this Master Promissory Note (as the same may from time to time be amended, restated, or otherwise modified, this **"Note"**) as follows: (i) simple interest payments on the outstanding principal amount of the Advances, at a fixed rate equal to Four point seven five percent (4.75%) per annum, which interest payments shall be due and payable to Payee quarterly in arrears, on the first (1st) business day of each January, April, June and September of each year, with the first payment due on the first such date immediately following the date of the first Advance hereunder; and (ii) the outstanding principal balance of the Note, and all remaining accrued and unpaid interest, late charges and all other amounts due to Payee according to this Note and the LOC Documents shall be due and payable in full no later than the Scheduled Maturity Date.

(b)     Except for the quarterly payments set forth above, this Note may be prepaid in whole or in part, as provided in the LOC Agreement.

(c)     All payments made will be applied first to any late charges or other accrued fees, then to accrued interest, and then to the principal amount of the Note. Maker shall make each payment hereunder to the Payee without any deduction, offset, abatement, recoupment, counterclaim, or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on the account until such payment is honored when presented for payment at the drawee bank. Whenever any payment to be made hereunder, including, without limitation, any payment to be made on any Advance, shall be stated to be due on a day that is not a business day, such payment shall be made on the next business day and such extension of time shall in each case be included in the computation of the interest payable on such Advance. The aggregate unpaid amount of Advances and similar information concerning the LOC set forth on the records of Payee shall be rebuttable presumptive evidence for such information, including the amounts of principal, interest, and fees owing to Payee.

Initials: _VP_ _SP_

(d)     Maker shall pay all amounts due under this Note to McMann Commercial Lending, Corporate Office at the address provided under Section 14.5 of the LOC Agreement or such other offices as may be designated by Payee from time to time.

(e)     All amounts owed by Maker according to this Note shall be collectively referred to herein as the **"Obligation"** of Maker.

In addition, the following provisions shall govern this Note:

1.      **LINE OF CREDIT AGREEMENT AND LINE OF CREDIT DOCUMENTS.** This Note is made and delivered to Payee according to and is subject to all terms and conditions outlined in the Business Expansion Line of Credit Agreement of even date herewith between Maker and Payee (as the same may from time to time be amended, restated or otherwise modified, the **"LOC Agreement"**). This Note is secured by certain Collateral, as evidenced by the LOC Documents, covering the personal and/or real property described therein.

2.      **LATE CHARGES.** If any amount payable under this Note is paid more than ten (10) business days after the due date thereof, then late charges (the **"Late Charges"**) shall be added to the delinquent payment in an amount equal to five percent (5.00%) of such late payment for the extra expense in handling past due payments. Any such Late Charges shall be due and payable without demand, and Payee, at its option, may (i) refuse any late payment or any subsequent payment unless accompanied by the applicable Late Charge, (ii) add the Late Charges to the principal balance of this Note, and (iii) treat the failure to pay the Late Charges as demanded as an Event of Default under this Note. If Late Charges are added to the principal balance of this Note, those Late Charges shall bear interest at the same rate as the principal balance under this Note. Any payment to Payee by check, draft, or other items shall be received by Payee subject to collection and will constitute payment only when collected and not when received.

3.      **DEFAULT, CROSS-DEFAULT, AND ACCELERATION.** Time is of the essence. If Maker fails to make any payment of principal, interest, or any other Obligation on the date the same is due and payable under this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or Maker or any other party fails to meet or perform any other obligation under any term or condition of this note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or an Event of Default occurs under the LOC Agreement or any of the other LOC Documents, and subject to any applicable notice and cure periods outlined in the LOC Agreement or any other LOC Documents, such Event of Default is not cured, then this Note shall be in default ("Default"). Upon Default, Payee shall provide written notice to Maker specifying the nature of the Default and directing that it be remedied within the applicable notice and cure period as outlined in the LOC Agreement. Upon Default, the interest rate provided for in this Note shall immediately increase to eighteen percent (18%) per annum (the "Default Rate"), unless and until cured by Maker, and upon Maker's failure to cure any default, the entire unpaid amount of this Note shall be immediately due and payable without further notice or

Initials: _____

demand from Payee. Until cured, interest shall accrue daily after default with daily interest being added to the principal on the last day of each calendar month and thereafter compounded to calculate interest on the amounts owed according to this Note, and Maker shall thereafter be liable for all costs of collection, including reasonable attorneys' fees and costs, in addition to the payment of principal, interest and any other amount.

Should there be a material misappropriation of more than ten (10%) percent of the proceeds of the Advances which causes an Event of Default, the Borrower shall immediately surrender controlling management interest in North Haven Lodging Partners LLC and the Project to McMann Commercial Lending LLC.

4.    **COSTS, FEES, AND COMPENSATION.** Maker further promises to pay all amounts owed under this Note, the LOC Agreement, and the other LOC Documents, and all Obligations owed according to this Note, the LOC Agreement, and the LOC Documents, and shall pay all such amounts as specified therein.

5.    **WAIVER.** Maker and all endorsers, guarantors and all Persons liable or to become liable on this Note waive presentment, demand, a notice of dishonor, notice of default or delinquency, a notice of acceleration, notice of nonpayment, a notice of costs, expenses or losses and interest thereon, and all other notices or matters of a like nature, other than notices required according to this Note, the LOC Agreement or the other LOC Documents.

6.    **SUCCESSOR AND ASSIGNS.** The terms of this Note shall apply to, inure to the benefit of, and bind all Parties hereto and their respective successors, and assigns.

7.    **CUMULATIVE REMEDIES.** Upon the occurrence of any default under this Note, the LOC Agreement, or any of the other LOC Documents, or an Event of Default occurs, Payee shall have all rights specified therein and as provided under relevant law. No remedy or election hereunder shall be deemed exclusive but shall wherever possible, be cumulative with all other remedies at law or equity.

8.    **GOVERNING LAW; VENUE AND JURISDICTION; BINDING ARBITRATION; WAIVER OF TRIAL BY JURY.** This Note shall be governed by and construed per the laws of the State of Illinois and the United States.

**BINDING ARBITRATION:** Any dispute, claim, or controversy arising out of or relating to this Note, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one arbitrator. The arbitration shall be administered by JAMS according to its Comprehensive Arbitration Rules and Procedures or by ADR Services under its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand under the notice requirements outlined in Section 14.5 of the LOC Agreement. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach an agreement on an

Initials: _9P_ _SP_

arbitrator, then the arbitration shall be selected according to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for the production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any discovery disputes shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising concerning the enforcement or interpretation of this Note, this agreement to arbitrate, or any of the LOC Documents.

**JURY TRIAL WAIVER**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

9.  **AUTHORIZATION.** To induce Payee to enter into this Note and extend and advance funds to Maker under the terms contained herein and according to the LOC Agreement, Maker hereby represents and warrants as follows, acknowledging that Payee is relying on the truth and accuracy of the following representations and warranties in entering into this Note:

(a)  That the undersigned is the authorized representative of Maker and has the authority to bind Maker; and

(b)  that Maker is duly organized and validly existing and in good standing under the laws of the State of its formation, and duly qualified to transact business and in good standing in any United States state where the nature of its business or properties requires such qualification, with full power and authority, corporate or otherwise, to enter into and perform this Note; that Maker has taken all actions required to be taken in connection herewith; and

Initials: _____ _____

(c)    that upon execution of this Note by the undersigned, this Note will constitute a legal, valid, and binding obligation of Maker and will be enforceable against Maker as set forth herein, except as enforceability thereof may be limited by bankruptcy, insolvency, moratorium, and similar laws and by equitable principles, whether considered at law or in equity.

10.    **ATTORNEY FEES AND COSTS OF COLLECTION.** Maker shall pay Payee all reasonable expenses, attorney fees, and costs incurred in any action or proceeding by Payee to enforce the terms of this Note, the LOC Agreement, and/or any of the LOC Documents, including, without limitation, all reasonable expenses, attorney fees, and costs on appeal.

11.    **MISCELLANEOUS PROVISIONS.**

(a)    No delay or omission on the part of the Payee in exercising any rights hereunder or under the terms of any Security Agreement, pledge agreement, any guarantee made to guarantee payment of this Note, or any other Security Document given to secure this Note, shall operate as a waiver of such rights or any other right hereunder or under said security agreements, pledge agreements, guaranties or other documents.

(b)    The invalidity or unenforceability of any provision hereof, of this Note, the LOC Agreement or any of the other LOC Documents, or of any other instrument, agreement, or document now or hereafter executed in connection with the loan made pursuant thereto, or any Obligation created thereunder shall not impair or vitiate any other provision of any of such instruments, agreements, and documents, all of which provisions shall be enforceable to the fullest extent now or hereafter permitted by law.

(c)    This Note, the LOC Agreement, and the other LOC Documents may only be amended, terminated, extended, or otherwise modified by a written signed by the Party against which enforcement is sought. In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealing, or the like be effective to amend, terminate, extend, or otherwise modify any of same.

(d)    This Note and the rights and remedies provided for herein may be enforced by Payee or any subsequent holder hereof. Wherever the context permits, each reference to the term "holder" herein shall mean and refer to Payee or the then subsequent holder of this Note.

(e)    Maker agrees that the holder of this Note may, without notice to Maker and without affecting the liability of Maker, accept security for this Note and any additional or substitute security, if any, or release any security or any party liable for this Note, including any guarantor, or extend or renew this Note.

[Remainder of page intentionally left blank; Signature page follows]

Initials: _____

IN WITNESS WHEREOF, the Maker has duly executed and delivered this Promissory Note as of the date first set forth above.

**MAKER**

North Haven Lodging Partners LLC

By: _[signature]_

Name: Shailesh Patel and Vihang Patel

Title: Manager / _[signature]_ VP

Address: 2517 W Brentridge Street, Sioux Falls, SD 57108

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 14th day of April , 20__.

In and for the State of South Dakota

NOTARY PUBLIC
In and for the State of Connecticut

My Commission Expires:

BENNETT BUFFALO
NOTARY PUBLIC, STATE OF CONNECTICUT
My Commission Expires January 31, 2026

ADAM PRICE
Notary Public
SEAL
South Dakota

My Commission Expires:
4-27-23

Initials: _[signature]_ SP

**EXHIBIT B**
**TRANCHE SCHEDULE**

| Tranche 1 | Within 75 calendar days of confirmation of the clearing of the funds remitted by the Borrower being funded to the wholesale lender by the Lender under Section 7.1 | $3,600,000 |
| Tranche2 | 75 calendar days after the date of the funding of Tranche 1 | $14,400,000 |
| Tranche 3 | N/A | |
| Tranche 4 | N/A | |

Initials: _____

**EXHIBIT C**
**PROJECT COSTS**

(Please explain the use of the funds below per the project. Please see "Project Costs" defined in Article 1 of this agreement.)

Initials: _____

**EXHIBIT D**
**THE PROJECT**

(Please attach a copy of your Business Plan, Executive Summary, and/or Slide Deck.)

Initials: _____

## EXHIBIT   E
## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of April 10, 2023 (as amended, supplemented, or otherwise modified from time to time per the provisions hereof, this "**Agreement**"), is made by North Haven Lodging Partners LLC (the "**Grantor**"), in favor of McMann Commercial Lending LLC (the "**Secured Party**").

WHEREAS, the Grantor and the Secured Party are entering into that certain Business Expansion LOC Agreement, dated of even date herewith (as amended, supplemented, or otherwise modified from time to time, the "**LOC Agreement**").

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all the Secured Obligations (as hereinafter defined); and

WHEREAS it is a condition to the obligation of the Lender to make the LOC under the LOC Agreement that the Grantor execute and deliver this Agreement, and this Agreement is being executed and delivered in consideration of the Secured Party entering into the LOC Agreement and each financial accommodation granted to the Secured Party by the Lender.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.     Definitions. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the LOC Agreement. Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement. Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9. For purposes of this Agreement, the following terms shall have the following meanings:

"**Collateral**" has the meaning outlined in Section 2 hereof.

"**Control Agreement**" means (a) concerning a Payment account, each Payment Account Control Agreement (or similar agreement concerning a Payment Account) among the Grantor, the Lender, and a depository institution, to be in form and substance satisfactory to the Lender, and (b) for a Securities Account, each Securities Account Control Agreement (or similar agreement for a Securities Account) among the Grantor, the Lender, and a securities intermediary, to be in form and substance satisfactory to the Lender; as any of the foregoing may from time to time be amended, restated or otherwise modified.

"**Payment Account**" means a Payment account, as that term is defined in the

UCC."**Event of Default**" has the meaning outlined in the LOC Agreement.

"**First Priority**" means, concerning any lien and security interest purported to be created in any Collateral according to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the LOC Agreement).

Initials: _____  _____

"**Proceeds**" means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon, or distributions with respect thereto.

"**Secured Obligation(s)**" has the meaning outlined in Section 3 hereof.

"**Securities Account**" means a securities account, as that term is defined in the UCC.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.      Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of the Grantor's right, title, and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**"):

(a)      all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party under Section 4(e) hereof, general intangibles (including all payment intangibles), money, Payment accounts, and any other contractual rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

(b)      all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time concerning any of the foregoing.

3.      Secured Obligations. The Collateral secures the due and prompt payment and performance of:

(a)      the obligations of the Grantor from time to time arising under the LOC Agreement, this Agreement, any other LOC Document or otherwise for the due and prompt payment of (i) the principal of and premium, if any, and interest on the LOC (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, reasonable attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or

Initials: _____ _____

contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership, or other similar proceedings, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the LOC Agreement, this Agreement and the other LOC Documents; and

(b)    all other covenants, duties, debts, obligations, and liabilities of any kind of the Grantor under or in respect of the LOC Agreement, this Agreement, the other LOC Documents, or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceedings, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses outlined in this Section 3 being herein collectively called the **"Secured Obligations"**).

4.    <u>Perfection of Security Interest and Further Assurances</u>.

(a)    The Grantor shall, from time to time, as may be required by the Secured Party for all Collateral, promptly take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, concerning all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable, the Grantor shall promptly take all actions as may be requested from time to time by the Secured Party so that the security interest in the Collateral granted hereunder is obtained and at all times held by the Secured Party. All the foregoing shall be at the sole cost and expense of the Grantor.

(b)    The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents to perfect, confirm, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party under this Section 4 promptly to the Secured Party upon request. The Grantor also hereby ratifies any financing statements or amendments previously filed by the Secured Party in any jurisdiction

(c)    The Grantor hereby further authorizes the Secured Party to file with the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any state of the United States or any other country) this Agreement and other documents to perfect, confirm,

Initials: _JB_

continuing, enforcing, or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

(d)     If the Grantor shall at any time hold or acquire any certificated securities, promissory notes, tangible chattel paper, negotiable documents, or warehouse receipts relating to the Collateral, then the Grantor shall promptly endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.

(e)     If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (i) promptly notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

(f)     If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

(g)     The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement concerning any Collateral.

5.     <u>Representations and Warranties</u>. The Grantor represents and warrants as follows:

(a)     (i) the Grantor's exact legal name is correctly stated in the first paragraph of this Agreement and on the signature page hereof, and (ii) the Grantor is an organization of the type and is organized in the jurisdiction, outlined in the first paragraph of this Agreement.

(b)     The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral. The Grantor has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state, and local statutes and

Initials: _____

ordinances dealing with the control, shipment, storage, or disposal of hazardous materials or substances.

(c)     At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal, and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the LOC Agreement.

(d)     The pledge of the Collateral according to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(e)     Grantor has full power, authority, and legal right to borrow the Advances under the LOC and pledge the Collateral according to this Agreement.

(f)     Each of this Agreement, the LOC Agreement, and the LOC Documents has been duly authorized, executed, and delivered by the Grantor and constitutes a legal, valid, and binding obligation of the Grantor enforceable by its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

(g)     No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Advances under the LOC and the pledge by the Grantor of the Collateral according to this Agreement or for the execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor or the performance by the Grantor of its obligations thereunder.

(h)     The execution and delivery of the LOC Agreement, this Agreement, and the other LOC Documents by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(i)     The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106, and 9-107 of the UCC, as applicable) to have been obtained by the Secured Party over all Collateral concerning which such control may be obtained under the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

(j)     Schedule 2 hereto lists all banks, other financial institutions, and securities intermediaries at which the Grantor maintains Payment Accounts or Securities Accounts as of the Closing Date, and Schedule 2 hereto correctly identifies the name, address, and telephone number of each such financial institution or securities intermediary, the name in

Initials: _____

which the account is held, a description of the purpose of the account, and the complete account number therefore.

(k)     Schedule 3 hereto lists all intellectual property and rights to which Grantor holds an interest, ownership, or other rights.

6.      Receivables. If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangibles, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.      Covenants. The Grantor covenants as follows:

(a)     The Grantor will not, without providing at least thirty (30) days prior written notice to the Secured Party, change its legal name, identity, type of organization, the jurisdiction of organization, corporate structure, location of its chief executive officer, or its principal place of business or its organizational identification number. The Grantor will, before any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b)     The Collateral, to the extent not delivered to the Secured Party under Section 4 hereof, will be kept at those locations of the Grantor previously disclosed to the Secured Party and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days prior written notice to the Secured Party. The Grantor will, before any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c)     The Grantor shall, at its own cost and expense, defend the title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d)     The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option to, restrict, or grant, create, permit, or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the LOC Agreement or herein or with the prior written consent of the Secured Party.

(e)     The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located according to the provisions of the LOC Agreement.

Initials: _DP_____

(f)     The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

(g)     The Grantor will continue to operate its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state, and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

(h)     The Grantor shall promptly notify the Secured Party in writing upon the acquisition or creation by the Grantor of a Payment Account or Securities Account not listed on Schedule 2 hereto, and, before or simultaneously with the creation of such Payment Account or Securities Account, provide for the execution of a Control Agreement with respect thereto, if required by the Secured Party.

(i)     The Grantor shall provide the Secured Party with prompt written notice concerning any material real or personal property (other than property acquired in the ordinary course of business) acquired by the Grantor after the Closing Date. In addition to any other right that the Secured Party may have according to this Agreement or otherwise, upon written request of the Secured Party, whenever made, the Grantor shall grant to the Secured Party, as additional security for the Secured Obligations, a First Priority lien on any real or personal property of the Grantor (other than for leased equipment or equipment subject to a purchase money security interest in which the lessor or purchase money lender of such equipment holds a priority security interest, in which case, the Secured Party shall have the right to obtain a security interest junior only to such lessor or purchase money lender), including, without limitation, such property acquired after the Closing Date, in which the Secured Party does not have a First Priority lien. The Grantor agrees that, within thirty (30) days after the date of such written request, to secure all of the Secured Obligations by delivering to the Secured Party security agreements, intellectual property security agreements, pledge agreements, mortgages (or deeds of trust, if applicable) or other documents, instruments or agreements or such thereof as the Secured Party may require. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

(j)     At the request of the Secured Party, the Grantor shall, concerning any real property owned by the Grantor or any real property on which the Project is located, provide, or cause to be provided, to the Secured Party, (a) a mortgage (or comparable document) relating to such real property, in form and substance satisfactory to Secured Party, (b) title and lien searches concerning such real property and such other information, documents or agreements as may be deemed necessary or advisable by the Secured Party r in connection with such mortgage, and (c) such corporate governance and authorization documents and an opinion of counsel for such mortgage as may be deemed necessary or advisable by the Secured Party. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

8.     Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party as the Grantor's attorney-in-fact, with full authority in the place and stead of

Initials: _UV_____

the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9.      Secured Party May Perform. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause the performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10.     Reasonable Care. The Secured Party shall have no duty concerning the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its property, it is understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action concerning any claims, the nature or sufficiency of any payment or performance by any party under or according to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to know such matters, or (b) taking any necessary steps to preserve rights against any parties concerning any Collateral. Nothing outlined in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11.     Remedies Upon Default.

(a)     If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice before disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days before the date of such disposition shall constitute reasonable notice. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of a similar property. At any sale of the Collateral, if permitted by applicable law,

Initials: _UH_

the Secured Party may be the purchaser, licensee, assignee, or recipient of the Collateral or any part thereof and shall be entitled, to bidding and making the settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned, or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages, and demands the Grantor may acquire against the Secured Party arising out of the exercise by the Secured Party of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption concerning the Collateral, whether before or after sale hereunder, and all rights, if any, of marshaling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean- up or otherwise prepare the Collateral for sale.

(b)     If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the reasonable fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(c)     If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral under this Section 11, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.     <u>No Waiver and Cumulative Remedies</u>. The Secured Party shall not by any act (except by a written instrument under Section 14 hereof), delay, indulgence, omission, or otherwise, be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

Initials: _____

13.   <u>SECURITY INTEREST ABSOLUTE</u>. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, a notice of loans made, credit extended, Collateral received or delivered, or other action taken in reliance thereon, and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)   any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument.

(b)   any change in the time, place, or manner of payment of, or any other term of, the Secured Obligations, or any rescission, waiver, amendment, or other modification of the LOC Agreement, this Agreement, or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)   any taking, exchange, substitution, release, impairment, or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver, or other modification of any guaranty, for all or any of the Secured Obligations.

(d)   any manner of sale, disposition, or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations.

(e)   any default, failure, or delay, willful or otherwise, in the performance of the Secured Obligations.

(f)   any defense, set-off, or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

(g)   any other circumstance (including, without limitation, any statute of limitations) or manner of administering the LOC or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14.   <u>Amendments</u>. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated, or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15.   <u>Addresses for Notices</u>. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as outlined in the LOC Agreement, and addressed to the respective parties at their addresses as specified in the LOC Agreement or as to either Party at such other address as shall be designated by such Party in a written notice to each other Party.

Initials: _____

16.    Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 17 hereof, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees, and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment, become vested with all the benefits granted to the Secured Party herein concerning such Secured Obligations.

17.    Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer, and deliver to or at the direction of the Grantor (without recourse and any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18.    GOVERNING LAW. This Agreement and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed per, the laws of the State of Illinois and the United States.

19.    Binding Arbitration. Any dispute, claim, or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one arbitrator. The arbitration shall be administered by JAMS according to its Comprehensive Arbitration Rules and Procedures or by ADR Services according to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand under the notice requirements outlined in Section 14.5 of the LOC Agreement. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach an agreement on an arbitrator, then the arbitration shall be selected according to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for the production of documents. The requests in each set shall not number more than twenty- five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any discovery disputes shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available

Initials: ___

remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising concerning the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

20.    **JURY TRIAL WAIVER. EACH PARTY HERETO, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE GRANTOR AND THE SECURED PARTY, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH THIS AGREEMENT, THE LOC AGREEMENT, ANY OTHER LOC DOCUMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.**

21.    Counterparts. This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other LOC Documents constitute the entire contract among the Parties concerning the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

*Signatures Follow on Next Page*

Initials: _____

IN WITNESS WHEREOF, the Grantor hereto has executed this Security Agreement as of the date first set forth above.

**GRANTOR**
North Haven Lodging Partners LLC.

By: _____

Name: Shailesh Patel and Vihang Patel

Title: **Manager / Member**

SUBSCRIBED AND SWORN TO BEFORE ME on this 4th day of April, 2023

In and for the State of South Dakota

NOTARY PUBLIC
In and for the State of Connecticut

My Commission Expires:

BENNETT BUFFALO
NOTARY PUBLIC, STATE OF CONNECTICUT
My Commission Expires January 31, 2026

ADAM PRICE
Notary Public
SEAL
South Dakota

My Commission Expires:
4-27-23

Initials: _____