## EXHIBIT COVER SHEET

**Exhibit**

Party Submitting:      **Mary Ida Townson, U.S. Trustee for Region 21**

Admitted:              **YES    or    NO      (circle one)**              **194**

Chapter 11 Debtor:     **Genie Investments NV, Inc.**

Case No.               **3:24−bk−00496−BAJ**

Nature of Hearing:     **Trial on**

                       **U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**

                       **Debtor's Response Thereto (Doc. No. 34)**

                       **U.S. Trustee's Reply (Doc. No. 38)**

Trial Date:            **April 9, 2024, at 9:00 a.m.**


**United States Bankruptcy Court
Middle District of Florida**

**Dated:_____, 2024.**


**By: _____, Deputy Clerk**



500 SKOKIE BLVD., SUITE 600
NORTHBROOK, ILLINOIS 60062
(224) 260-3090

ATTORNEYS AT LAW

DANIEL S. KLAPMAN
(224) 260-3087
dklapman@swkattorneys.com

October 24, 2023

VIA U.S. Mail and Certified Mail
Adam Walker
Walker Law Office, LLC
4050 Pennsylvania Ave., Suite 115-10
Kansas City, Missouri 64111

VIA U.S. Mail, Certified Mail, and Facsimile
Courtney Riordan
9 E. Loockerman Street, Suite 202
Dover, Delaware 19901
302-674-2100

VIA Email, U.S. Mail and Certified Mail
David Hughes
John Michael Cohan
Genie Investments NV
P.O. Box 60443
Jacksonville, Florida
david@zoomeral.com
dhughes@genieinvestments.com

VIA U.S. Mail and Certified Mail
Attn: GENIE INVESTMENTS NV
C/O SPIEGEL & UTRERA.P.A.
1840 Coral Way, 4th Floor
Miami, FL 33145

VIA U.S. Mail, Certified Mail and Facsimile
Jeff Beck
Spiegel & Ultrera, P.A.
2545 Chandler Ave., Suite 4
Las Vegas, Nevada 89120
702-458-2100

Re:    McMann Commercial Lending LLC n/k/a McMann Professional Services LLC
       d/b/a McMann Capital ("McMann") and ICA Payment Refund Demands

Dear Genie Investments:

Be advised that our firm represents McMann. This letter is primarily intended to demand that Genie Investments NV ("Genie") immediately provide refunds to both Wallingford Lodging Partners LLC and North Haven Lodging Partners LLC, two (2) borrowers under Business Expansion Line of Credit Agreements ("BELOCS"), recognized by Genie as User ID's 2815 and 2816. The two (2) BELOCS are enclosed herewith as **Exhibits A and B**, respectively. On May 3, 2023, Wallingford and North Haven each wired separate ICA Payments of $1,800,000.00 (together, totaling $3,600,000.00) to Genie per Genie's wiring instructions. Confirmation of both wires is enclosed herewith as **Exhibit C**. This letter also addresses additional failures of Genie regarding its relationship with McMann, including, *inter alia*, Genie's failure to fund these BELOCS, and dozens of other loans to which it committed, as well as its failures to issue refunds per the terms of the said loans.

As you are aware, due to Genie's inability to fund these and other BELOCS brought to Genie by McMann (due to a purported failure of Genie's "capital provider"), both Wallingford and North Haven have terminated their respective BELOCS pursuant to the terms of Section 13.7 of the BELOCS and both properly demanded the refund of their ICA Payments. To be clear, their demands complied with each and every term of the BELOCS. Copies of their respective termination notices and demands for refunds are enclosed herewith as **Exhibit D**.

As evidenced by Genie's Zoomeral communications with McMann, Wallingford and North Haven:

    (i)     Genie acknowledged receipt of the respective wires on May 4, 2023;

    (ii)    Genie acknowledged receipt of both termination requests on August 18, 2023;

    (iii)   Genie responded to requests for an update on refund dates on September 14, 2023;

    (iv)   Genie acknowledged its obligation to refund the ICA Payments; and

    (v)    Genie stated that both refunds were expected to be wired on October 13, 2023.

Copies of these communications are enclosed herewith as **Exhibit E**.

On October 13, 2023, rather than make its agreed upon refund of the ICA Payments, Genie instead issued letters to both borrowers claiming that due to a "force majeure" it could not make either of such refunds. These letters were sent by attorney Adam Walker, formerly of My RIA Lawyer, and currently of Walker Law Office, LLC (the "Walker Law Office", formed on September 16, 2023). Copies of these letters are attached hereto as **Exhibit F and G**, respectively.

As Genie well knows, any issues Genie may have with its purported "capital provider" are wholly irrelevant to the refund of ICA Payments. Genie received the funds at issue from each respective borrower on May 3, 2023. Genie was required to hold said funds in trust to cover interest due under the respective BELOCS as it accrued, once (and if) funded. *These refunds are in no way dependent on outside capital or the availability of funds from any third-party, including Genie's purported and yet to be identified wholesale lender*. It appears this "force majeure" explanation – the purported reason Genie was unable to fund these and various other BELOCS procured by McMann - is an obvious attempt to fabricate an otherwise non-existent basis for Genie's current and wholly unjustified refusal to issue refunds of ICA Payments received directly from prospective borrowers. No such basis exists, as the refunds are wholly unrelated to Genie's inability to fund these BELOCS, and in fact, are specifically required upon receipt of the termination notices, including those issued as a result of Genie's inability to fund the respective loans.

Accordingly, McMann demands the immediate refund of the two (2) deposits. McMann further demands that Genie identify the location of the funds deposited by Wallingford and North Haven from the time they were wired on May 3, 2023 to the present, as well as a full explanation as to each and every reason Genie has failed to this point make these and any other properly requested refunds. It is our understanding that Genie has provided refunds to at least five (5) borrowers procured by McMann in amounts ranging from $30,000.00 to $1,100,000.00. Why

exactly are these refunds to Wallingford and North Haven being treated any differently?

Moreover, in multiple communications, including the October 13, 2023 letters to borrowers, Genie stated it is participating in settlement discussions with its "capital provider" and relying on efforts of Adam Walker and the Walker Law Office "on multiple fronts to compel the capital provider to deliver the funds it owes, so that Genie can, in turn, provide refunds to its borrowers" including "preparing legal action against the capital provider and its associates, which [Genie] will file at [its] earliest opportunity unless [it] reaches a satisfactory settlement first." [*See* **Exhibits F and G** hereto.] As noted in the letters, "Genie will make every reasonable effort to keep you informed of the progress of its efforts doing this process" and that borrowers "can expect further correspondence from [the Walker Law Office] with updates regarding the settlement negotiations or the status of any legal action filed against the capital provider." McMann demands such an update including the identity of this capital provider, as well as the identity of who, in addition to the Walker Law Office, is participating in these discussions on Genie's behalf. If in fact Genie has proceeded to litigation, please provide a copy of any filed complaints, including the identity of the forum in which the litigation is proceeding, all case identifying information, and counsel of record for all parties. Please also explain why Genie must receive any funds in order to process the refunds.

McMann is also aware of several instances in which Genie has approached borrowers procured by McMann, offering to provide alternative funding under similar terms to loans that failed to close, again, due to Genie's failure to fund. *Genie is to cease and desist any such activity, as it clearly constitutes tortious interference with McMann's business with its customers*. Additionally, McMann has suffered extensive damages resulting from Genie's conduct relating to many of the borrowers it has procured for Genie, beyond just Wallingford and North Haven as mentioned above, including, *inter alia*, borrowers that intended to make their ICA Payments by way of bridge loan agreements made directly with Genie. Genie is clearly attempting to hide behind its purported claims directed to its as of yet unidentified "capital provider" but such tactics do not excuse Genie's conduct. To be clear, McMann reserves and any and all rights, claims and/or demands McMann has or may have against Genie pursuant to any and all agreements and/or applicable law.

As to Wallingford and North Haven, we expect Genie to issue the refunds and provide a comprehensive response to this letter on or before the close of business on Friday, October 27, 2023. Short of full refunds to both Wallingford and North Haven *and* satisfactory responses to the questions presented above, McMann will not only take action on its own behalf, but will cooperate with and support any legal action taken by either Wallingford and/or North Haven not to mention others that are likely to arise in the future. Govern yourself accordingly.

Additionally, since this matter appears to be heading towards litigation, we hereby demand you preserve all relevant evidence as set forth below.

October 24, 2023
Page 4

## DEMAND FOR EVIDENCE PRESERVATION

Given the prospect of litigation, we demand that Genie immediately take all steps necessary to preserve all evidence, documents and communications in Genie's possession, custody or control concerning the above-described matters, including, without limitation, all evidence, documents and communications in any way related to McMann and any applicant, borrower, or prospective borrower, as well as Genie's relationship with McMann.  Please provide a copy of this letter to the persons whose job responsibilities cover the matters addressed herein.   The above-listed information should be preserved and handled in the manner set forth in this letter.

We believe electronically stored information ("ESI") to be an important and irreplaceable source of discovery and/or evidence in the event of litigation. The current dispute therefore requires preservation of all information from your computer systems, removable electronic media, and other locations. This includes, but is not limited to, email and other electronic communications, including on the Zoomeral platform owned and controlled by David Hughes, word processing documents, spreadsheets, databases, calendars, telephone logs, contact information, internet usage files, and network access information.

You should also preserve the following platforms in your possession and control (such as, and including, the Zoomeral platform): databases, networks, computer systems, including legacy systems (hardware and software), servers, archives, backup or disaster recovery systems, discs, drives, USB devices, external hard drives, and other storage media, laptops, personal computers, Internet data, mobile telephones, paging devices, audio systems (including voicemail), and any other electronic device capable of containing or storing ESI.

Unless described otherwise below, all of the information described in this letter should be preserved since the inception of your dealings with McMann (the "Relevant Time Period").

## PRESERVATION OBLIGATIONS

The laws and rules prohibiting destruction of evidence apply to electronically stored information in the same manner that they apply to other evidence. Due to its format, electronic information is easily deleted, modified, or corrupted. Accordingly, you must take every reasonable step to preserve this information until the final resolution of this matter. This includes, but is not limited to, an obligation to:

- discontinue all data destruction and backup storage recycling policies;
- preserve and not dispose of relevant hardware unless an exact replica (a mirror image) is made;
- preserve and not destroy passwords, decryption procedures (and accompanying software), network access codes, ID names, manuals, tutorials, written instructions, and decompression or reconstruction software; and
- maintain all other pertinent information and tools needed to access, review, and reconstruct all requested or potentially relevant electronic data.

October 24, 2023
Page 5

## DESCRIPTION OF DATA SOUGHT

This dispute requires preservation of all information from your computer systems, removable electronic media, and other locations relating in any way to McMann and its applicants, borrowers, and prospective borrowers, including but not limited to the vehicles leased under said VLSA, and Penske's relationship with A&M. This includes, but is not limited to, email and other electronic communications, word processing documents, spreadsheets, databases, calendars, telephone logs, contact manager information, Internet usage files, and network access information.

I.    Electronic Files. You have an obligation to preserve all digital or analog electronic files in electronic format, regardless of whether hard copies of the information exist. This includes preserving

- a.  active data (i.e., that which is immediately and easily accessible on your systems today);
- b.  archived data (i.e., that which resides on backup tapes or other storage media);
- c.  deleted data (i.e., that which has been deleted from a computer hard drive but is recoverable through computer forensic techniques; and
- d.  legacy data (i.e., that which was created on old or obsolete hardware or software).

You must preserve active, archived, and legacy data, including but not limited to:

- a.  word processed files, including drafts and revisions;
- b.  spreadsheets, including drafts and revisions;
- c.  databases;
- d.  electronic communications and logs of same;
- e.  computer-aided design (CAD) files, including drafts and revisions;
- f.  presentation data or slide shows produced by presentation software (such as Microsoft PowerPoint);
- g.  graphs, charts, and other data produced by project management software (such as Microsoft Project);
- h.  data generated by calendaring, task management, and personal information manager (PIM) software (such as Microsoft Outlook);
- i.  data created with the use of mobile phones or other portable electronic devices;
- j.  data created with the use of document management software;
- k.  data created with the use of paper and electronic mail logging and routing software; and
- l.  animations, images, audio, video, and audiovisual recordings, MP3 players, and voicemail files.

You must preserve media used by your computers, including but not limited to:

- a.  all storage media, including the hard drives, CD's, DVD's, USB devices, and all internal or external drives and storage devices used at any time with your computers;
- b.  backup media and the software necessary to reconstruct the data contained on the media; and
- c.  a mirror image copy of any media no longer in service but used during the Relevant Time Period.

October 24, 2023
Page 6

II.　Hardware. You have an obligation to preserve all electronic processing systems, even if they are replaced. This includes computer servers, stand-alone personal computers, hard drives, laptops, and other electronic devices capable of storing ESI. You should retain copies of any hardware no longer in service but used during the Relevant Time Period.

III.　Emails. You have an obligation to preserve all potentially relevant internal and external emails and communications that were sent or received, including via the Zoomeral platform owned and controlled by David Hughes. Email and Zoomeral messages must be preserved in native electronic format, regardless of whether hard copies of the information exist.

IV.　Internet Web Activity. You have an obligation to preserve all records of Internet and Web browser generated files in electronic format, regardless of whether hard copies of the information exist. This includes Internet and Web browser generated history files, caches, and "cookies" files stored on backup media or generated by you or an individual employed by you.

V.　Activity Logs. You must preserve all hard copy or electronic logs documenting computer use and electronic communications by you.

VI.　Supporting Information. You must preserve all supporting information relating to the requested electronic data and/or media including codebooks, keys, data dictionaries, diagrams, handbooks, or other supporting documents that aid in reading or interpreting database, media, email, hardware, software, or activity log information.

VII.　Information for Employees. For each employee that has worked for you during the Relevant Time Period in relation to any loans brought to Genie by McMann, and/or Genie's relationship with McMann, you should preserve all data that contains the following information:

a. basic employee information, including name, date of birth, social security number, employee identification number, race, date hired (or rehired), and educational background;
b. employment performance evaluations or reviews;
c. for each position held by the employee during the Relevant Time Period, the job title/position, salary level, function or description, location, division, department, subsidiary, time in position, job status (covered or not covered), and whether the employee was full-time, part-time, or temporary;
d. any disciplinary action or employment contract violations; and
e. if the individual is a former employee, the date of departure and the reason for leaving.

VIII.　Data Storage Devices.

a. If you use online storage and/or direct access storage devices, you must immediately cease modifying or deleting any electronic data unless a computer forensics expert makes a mirror image of the electronic file, follows proper preservation protocols for assuring the accuracy of the file (i.e., chain of custody), and makes the file available in the event of litigation.

b. You should immediately suspend all activity that might result in destruction or modification of all of the data stored on any offline media, which includes, but is not limited to, backup and archival media, DVDs, CD-ROMs, USB devices, external drives, and other removable media. This includes overwriting, recycling, or erasing all or part of the media. This request

October 24, 2023
Page 7

includes, but is not limited to, media used to store data from personal computers, laptops, desktop computers, and servers.

c. If you replace any electronic data storage devices, you may not dispose of the storage devices.

d. You may not modify, delete, or otherwise alter any electronic data, whether by data compression, defragmentation, or optimization routines, unless a computer forensics expert makes a mirror image of the electronic file, follows proper preservation protocols for assuring the accuracy of the file (i.e., chain of custody). The expert must make a mirror image of active files, restored versions of deleted files, and restored versions of deleted file fragments, hidden files, and directory listings. This includes, but is not limited to, preserving electronic data (stored on online or offline storage devices) that came from the following hardware or software applications:

1. fixed and external drives on stand-alone personal computers or laptops;
2. network servers and workstations; and
3. software application programs and utilities.

IX. Electronic Data Created After Receipt of This Letter. For any electronic data created after this letter or for any electronic processing systems used after receipt of this letter, you must take the proper steps to avoid destroying potentially relevant evidence. This includes following the above preservation protocols.

Compliance with your preservation obligations includes forwarding a copy of this letter to all individuals or organizations that are responsible for any of the items referred to in this letter. If this correspondence is in any respect unclear, please call me immediately.

If Genie or its counsel wish to discuss the matters raised herein, please contact the undersigned. Again, this letter is without prejudice to, and is not a waiver of, any and all rights, claims and/or demands McMann has or may have against Genie pursuant to any agreements and/or applicable law. We look forward to your timely response.

Very truly yours,

Daniel S. Klapman

cc: Walter Trock
    Robert S. Strauss, Esq.
    Joey B. Waldman, Esq.

# EXHIBIT A

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

among

## MCMANN COMMERCIAL LENDING LLC

as Lender

and

## North Haven Lodging Partners LLC
as Borrower

_____

dated as of

April 10, 2023

_____

Initials: _VP_ _SP_

## BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated, or otherwise modified, this "**Agreement**") is made and entered as of April 10, 2023, between McMann Commercial Lending LLC (the "**Lender**"), and North Haven Lodging Partners LLC., a Connecticut Limited Liability Company ("**Borrower**").

## RECITALS

A.    The Borrower desires to obtain from Lender an asset-backed line of credit loan (the "**LOC**") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

B.    The Borrower desires to obtain the LOC from Lender for Business Expansion for construction of a 105-room limited-service hotel (as more fully described in **Exhibit D** attached hereto the "**Project**"). Acquired assets will be legally described on **Exhibit E** attached hereto (the "**Property**").

C.    The Borrower has agreed to pay a minimum contribution of the Project LOC Amount to Lender, by establishing the Interest Reserve (as hereinafter defined) and the ICA (as hereinafter defined), collectively,(the "**Interest Reserve Account**"), within seven (7) calendar days after the fully executed LOC Documents (as hereinafter defined) are received by Lender.

D.    The Borrower has agreed to pay, pursuant to Section 3.6 hereof, the aggregate amount of One Million Eight Hundred Thousand Dollars and No Cents Dollars ($1,800,000), (the "**ICA Payment**"), by bank wire to Lender. An account on the books and records of the Lender shall be created to serve as an Interest Credit Account (the "**ICA**"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

E.    Lender has agreed to make Advances (as hereinafter defined) under the LOC to Borrower in an aggregate amount, according to **Exhibit B**, an amount not to exceed the Maximum Amount for the purposes outlined in these recitals and the Promissory Note attached hereto as **Exhibit** A and upon the terms and subject to the conditions hereinafter set forth.

**NOW THEREFORE**, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1. Certain Defined Terms**. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed per generally accepted accounting principles consistently applied. As used in this

Initials: _____ _____

agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

**"Advance(s)"** means any loan advance made by the Lender per the terms and conditions of this Agreement.

"**Applicable Interest Rate**" means the fixed interest rate specified in the Promissory Note.

**"Borrower"** means that term as defined in the first paragraph of this Agreement.

**"Business Expansion"** means any transaction or use, including for working capital, that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business (other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

"**Business Plan**" means the document(s) outlining the accurate and up-to-date business operations of the End-Borrower, as previously provided by End-Borrower, substantially in the form outlined in EXHIBIT D, and subject to review by Lender's Capital Partners as described in Section 8.1 of this Agreement.

**"Closing Date"** means the last date of signed execution of this Agreement by Lender and Borrower.

**"Collateral"** means all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements, and proceeds, thereof.

**"Event(s) of Default"** means any event or condition that shall constitute an event of default as described in Article 13 of this Agreement.

"**ICA**" means the definition given in Recital D of this Agreement.

"**ICA Payment**" means the amount remitted pursuant to Recital D of this Agreement.

Initials: _JP_ _SP_

"**Interest Reserve**" means credit on the books and records of the Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from a Borrower JV Partner, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"**Interest Reserve Account**" means the definition given in Recital C of this

Agreement.

"**Lender**" means that term as defined in the first paragraph of this Agreement.

"**Lender's Capital Partners**" means one or more lender-clients of the Lender

providing funding towards the LOC.

"**LOC**" means that term as defined in Recital A of this Agreement.

"**LOC Disbursement Account**" means that term as defined in Section 3.12 hereof.

"**LOC Document(s)**" means, collectively, this Agreement, the Promissory Note, and each Security Document, as any of the foregoing may from time to time be amended, restated, or otherwise modified or replaced, and any other document delivered pursuant thereto.

"**Maximum Amount**" means Eighteen Million Nine Hundred Thousand Dollars and No Cents ($18,900,000). The Maximum Amount is the Project LOC Amount plus all fees, costs, and expenses which are the Borrower's responsibility to pay.

"**Organizational Documents**" means, concerning any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise concerning, this Agreement or any other LOC Document.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority, or any other entity.

"**Project**" means that term as defined in Recital B of this Agreement.

Initials: _____

**"Project Costs"** means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by the Borrower for implementation or execution of the Project (including but not limited to the payment of taxes, insurance, and all items reasonably necessary for the successful execution of the Project), as more specifically outlined in the Project budget set forth on **Exhibit C** attached hereto.

**"Project LOC Amount"** means Eighteen Million Dollars and No Cents ($18,000,000).

**"Property"** means that term as defined in Recital B of this Agreement.

**"Promissory Note"** means the Promissory Note, in the form attached hereto as **Exhibit A**.

**"Security Agreement"** means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as **Exhibit E**.

**"Security Document"** means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each U.C.C. Financing Statement or similar filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

**"Scheduled Maturity Date"** means the 10th anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

**"Subsidiary"** means any entity (other than the Borrower) in an unbroken chain of entities beginning with the Borrower if each of the entities owns stock, units, or other interests that represent fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain

**"Taxes"** means all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, concerning those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender concerning the LOC.

**"Term Sheet"** means that document(s) dated as of 3/14/2023 between Borrower and Lender, setting forth a general summary of the terms of agreement memorialized more fully herein in final form.

**"Tranche Schedule"** means the schedule of Advances to Borrowers from the Lender, based

Initials: _____ _____

upon the dates of the disbursements attached hereto as **Exhibit B**; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder does not exceed the Maximum Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

## ARTICLE 2
## THE CREDIT

**Section 2.1. Line of Credit Amount**. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to the Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

**Section 2.2. Line of Credit Documents**. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note, this Agreement, and each Security Document. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to the Lender and its counsel.

## ARTICLE 3
## TERM, INTEREST, AND PAYMENTS

**Section 3.1. Initial Term**. The initial term of the LOC is Ten (10) years and shall commence on the Closing Date and expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full thereon and all other amounts due and owing hereunder and under the Promissory Note shall be repaid by Borrower on the Scheduled Maturity Date.

**Section 3.2. Extended Term.** At the end of the initial term outlined in Section 3.1 hereof, and at the end of each Extended Term (as defined below, if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, over time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty-four (24) month period, up to a total of one (1) such additional consecutive periods (separately, "**Extended Term**"; collectively, the "**Extended Terms**"). In connection with Lender's granting of each Extended Term, (a) Borrower shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorney's fees, as a one (1)-time fee equal to one percent (1%) of the Project LOC Amount.

Initials: _____

**Section 3.3. <u>Applicable Interest Period</u>.** The interest period concerning each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full.

**Section 3.4. <u>Interest Rate Calculation</u>.** Interest shall be calculated based on a 365-day year and the actual number of days elapsed in a 365-day year and at the rate outlined in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "**Maximum Interest Rate**"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to the unpaid principal balance outstanding under the Promissory Note or, if it exceeds such unpaid principal, refunded to the Borrower.

**Section 3.5. <u>Interest Payments</u>.** Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times outlined in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

**Section 3.6. <u>Reserves</u>.** Following the signing of this Agreement, the Borrower shall remit One Million Eight Hundred Thousand Dollars and No Cents ($1,800,000) as the ICA Payment per the terms and the time outlined in Recital D of this Agreement. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and not refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable.

**Section 3.7. <u>Prepayment</u>.** The borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC.

**Section 3.8. <u>Interest Credit Account</u>.** If at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which notice shall be delivered to and received by Borrower no less than thirty (30) days before the date of the next interest payment date, Borrower shall remit into the ICA the funds necessary to make such interest paid before the date such interest payment is due and payable**Section 3.9. <u>Fees</u>.**

  (a) **<u>LOC Fee</u>.** At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable fee for the LOC in an aggregate amount equal to Five percent (5%) multiplied by the Project LOC Amount, which is equal to Nine Hundred Thousand Dollars and No Cents ($900,000) (the "**LOC Fee**"). The LOC Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

Initials: _____

(b) **Promote Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable success fee in an aggregate amount equal to One percent (1%) multiplied by the Project LOC Amount, which is One Hundred Eighty Thousand Dollars and No Cents ($180,000) (the "**Promote Fee**"). The Promote Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

(c) **ICA Advance Fee**. To the extent the Borrower used Lender to provide the ICA Payment, at Closing and out of the initial Advance, the Borrower shall reimburse Lender in an amount equal to the ICA Payment advanced by Lender plus a nonrefundable fee in an aggregate amount equal to Zero percent (0%) of the ICA Payment, which is No Dollars and No Cents Dollars ($-) (the "**ICA Advance Fee**"). The ICA Advance Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition. The borrower will take the Project LOC Amount in full on the closing of the first tranche.

Section 3.10. **Line of Credit Extension Fees.** Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a nonrefundable LOC extension fee for each extension in an aggregate amount equal to one percent (1%) multiplied by the Maximum Amount.

Section 3.11. **Legal and Incidental Fees, Charges, and Costs**. Borrower shall pay at Closing, all reasonable out of pocket and up to Twelve Thousand, Five Hundred U.S. Dollars ($12,500) for legal fees, recording and filing fees, documentary stamps, taxes, service charges, credit reports, UCC search costs, title company fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial proceeding; provided that Lender will provide Borrower ten (10) days' advance notice of any legal fees pursuant to this Section 3.11 that will exceed Twelve Thousand, Five Hundred U.S. Dollars ($12,500). Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or willful misconduct.

Section 3.12. **Line of Credit Disbursement Account**. The proceeds of each Advance under the LOC shall be advanced into the LOC Disbursement Account with Lender to be used by Borrower for payment of the Borrower's Project Costs, solely for the purposes and in the manner

Initials: _____

outlined in this Agreement. The LOC Disbursement Account will be held jointly in the name of the Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights and interest in and to the LOC Disbursement Account, which assignment will be effective only upon the occurrence and continuation of an Event of Default, subject to an applicable Default Cure Period (as hereinafter defined).

### Section 3.13. Taxes.

(a)       All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to the Lender (after deducting, withholding, and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

(b)       Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to the Lender. If the Borrower shall fail to pay any Taxes or OtherTaxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result of any such failure.

(c)       The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

### ARTICLE 4
### CONDITIONS FOR CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing:

### Section 4.1.    Delivery of the LOC Documents.

(a)       As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

Initials: _____

(b)      The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Payment Account and Security Account (both as defined under UCC § 9-102 and as further defined in the Security Agreement) maintained by the Borrower.

(c)      Contemporaneously with Borrower's acquisition of the Property, Borrower shall have delivered an executed and notarized mortgage or deed of trust in form and substance required by Lender granting Lender a priority lien and security interest in and to the Property (the "**Security Instrument**"), and such Security Instrument shall be promptly recorded in the real property records of the county in which such real property is located. If required by Lender, (i) the closing of such Advance and recording of the Security Instrument shall be completed through the services of a title company chosen by Lender, and (ii) such title company shall issue, at Borrower's expense and for the benefit of Lender, a loan policy of title insurance concerning the Property. For the avoidance of doubt, this Section 4.1(c) shall not operate to preclude any Advances to the Borrower to fund pre-acquisition costs.

**Section 4.2. Authority**. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members, or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery, and performance of the LOC Documents and the consummation of the transactions contemplated thereby, (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners or members of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing concerning the Borrower.

**Section 4.3. Liens**. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions, or restrictions. At the request of the Lender, the Borrower shall (i) deliver to the Lender the results of UCC lien searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) UCC or other lien termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project, or any Collateral without the express written permission of Lender.

**Section 4.4. Litigation**. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

**Section 4.5. Events of Default**. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in

Initials: _____

full compliance with the terms and provisions of this Agreement.

**Section 4.6. <u>Purchase and Agreement Contracts</u>.** Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

**Section 4.7. <u>Compliance with Certain Requirements</u>**. Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) under local, state, federal, and international laws, procedures, statutes, regulations, and ordinances, conditions applicable to the Project.

**Section 4.8.   <u>Evidence of Insurance</u>**.

(a)     For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for, and will keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders' loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of similar size and character that of the business of the Borrower, and Borrower shall furnish Lender with the satisfactory evidence of such underlying Borrower insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

(b)     Within five (5) business of receipt of End-Borrower insurance pursuant to Section 4.8(a), Lender shall acknowledge receipt and communicate to Borrower the approval and sufficiency of such End-Borrowers certificate of insurance.

**Section 4.9. <u>Financial Statements</u>**. The lender shall have received all financial reports required by Section 8.6 hereof.

**Section 4.10. <u>Business Pro Forma</u>**. The lender shall receive a pro forma income and expense statement annually in connection with the Project.

**Section 4.11. <u>Management Plan</u>**. Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of Borrower's business.

**Section 4.12. <u>Material Change</u>.** Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower's ability to perform under this Agreement or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.

**Section 4.13. <u>Non-Subordination</u>.** Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such Subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the

Initials: _____ _____

normal and reasonable management of the Project).

      **Section 4.14. Securitization.** The lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or reasonable due diligence required by the insurer.

**ARTICLE 5**
**USE OF LINE OF CREDIT PROCEEDS**

      **Section 5.1.    Project Costs: Business Expansion Costs.**

      (a)    Proceeds of Advances under the LOC shall be utilized by Borrower solely to finance the Project Costs, as more fully described in the attached **Exhibit C,** in connection with Borrower Business Expansion as further detailed in the Business Plan, updated yearly by Borrower.

      (b)    The proceeds of the LOC shall be used exclusively for the purposes outlined in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family, or household purposes. The borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute, or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

**ARTICLE 6**
**INSPECTIONS**

      **Section 6.1. Project Inspection.** Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

      **Section 6.2. Books and Records.** Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower about the Project, the Property, and the Borrower and to make extracts therefrom or copies thereof.

      **Section 6.3. Force Majeure Event Inspection Right.** In the event of a Force Majeure Event (as hereinafter defined) which interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until Lender is satisfied with Borrower's ability to resume operations to develop the Project. Following a Force Majeure Event, Lender has the right to modify the terms upon which future Advances may be made as a result of a change in circumstances as determined by the Lender

Initials: _____ _____

in Lender's sole discretion, that the Borrower can perform or continue to perform the Project scope of work. Borrower shall execute any additional documents, amendments, or other agreement of terms required by Lender, before Lender's obligation to continue to make Advances shall resume.

## ARTICLE 7
## ADVANCE OF FUNDS

**Section 7.1. Timing and Advances to Payee**. Advances will be made as outlined in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance has been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than seventy-five (75) calendar days following the opening of the ICA by the Lender with its wholesale lender. Lender shall deliver the written notice to Borrower of the commencement of such seventy-five (75)-day period. Lender shall deliver the written notice to Borrower via the ZOOMERAL messaging system of the commencement of such seventy-five (75)-day period.

**Section 7.2. Conditions Precedent to Advance Funds**. Lender's obligation to make Advances hereunder shall be conditioned upon fulfillment of the terms outlined in Article 4 hereof.

**Section 7.3. Unpaid Lien Claims.** If Lender receives notice of nonpayment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, per applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower, or (b) withhold one hundred percent (100%) of the lien amount claimed from future Advances.

**Section 7.4. Mandatory Advances**. Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.

## ARTICLE 8
## BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing:

**Section 8.1. Project.** (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is the counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation, and management of the Project.

Initials: _____

**Section 8.2. Compliance with Laws**. Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

**Section 8.3. Compliance with Documents**. Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

**Section 8.4. Books and Records**. Keep and maintain complete and accurate books of account, per generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

**Section 8.5. Payment of Obligations**. Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established per generally accepted accounting principles).

**Section 8.6. Financial Reports**. Deliver to Lender, concerning Borrower as soon as available and in any event (a) within sixty (60) days after the end of each calendar quarter during the term of the LOC, financial statements of Borrower for such quarter and (b) within ninety (90) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower, in each case of the foregoing, certified as true and correct (which reports shall be prepared per generally accepted accounting principles consistently applied) and operating statements in a form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender. The borrower must also complete their ZOOMERAL business profile and keep the business profile up to date throughout the term of this agreement.

**Section 8.7. Notification to Lender**. Promptly after learning thereof, notify Lender of: (a) the details of any material action, proceeding, investigation, or claim against or affecting the Borrower, the Property, or the Project instituted before any court, arbitrator, or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Property or the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower of the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

**Section 8.8. Partnership/Corporate Existence**. Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

Initials: _____

## ARTICLE 9
## BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing Borrower shall not:

**Section 9.1. Liquidation, Merger, and Sale of Assets.** Liquidate, merge, or consolidate with any other Person or otherwise transfer to an unrelated Person fifteen percent (15%) or more of the equity securities of Borrower, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business. Notwithstanding, any initial public offering or acquisition by another company will require the Lender's approval or full payment of the outstanding loan balance.

**Section 9.2. Liens.** Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such liens, shall not be increased).

**Section 9.3.   Indebtedness.** Create, incur, or have outstanding any indebtedness of any kind, other than (a) indebtedness owing to the Lender under this Agreement and the other LOC Documents, and (b) indebtedness of the Borrower existing as of the Closing Date as disclosed to and approved by the Lender (and any extension, renewal, or refinancing thereof but only to the extent that the principal amount thereof does not increase after the Closing Date).

**Section 9.4. Investments, Loans, and Guarantees.** (a) Create, acquire, or hold any subsidiary, (b) make or hold any investment in any stocks, bonds, or securities of any kind (c) be or become a party to any joint venture or other partnership, (d) make or keep outstanding any advance or loan to any Person, or (e) be or become a guarantor of any kind.

**Section 9.5. Acquisitions.** Enter into any transaction or series of related transactions for or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or equity interest) of any Person, or (c) the acquisition of another

Initials: _9/_ _SP_

Person by a merger, amalgamation, or consolidation or any other combination with such Person, unless specifically stated and approved before execution of this Agreement.

   **Section 9.6. Organizational Documents**. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

   **Section 9.7.   Project and Project Documents**. Willfully or voluntarily abandon the Project or its activities to develop, construct, operate, or maintain the Project. If the same would (i) be a major decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

        (a)  terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance of a material obligation by any other Person under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the development, construction, operation, and maintenance of the Project, in each case that would have an adverse effect on the Lender; or

        (b)    sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation, and maintenance of the Project without Lender's consent, which consent shall not be unreasonably withheld.

## Article 10
## REPRESENTATIONS AND WARRANTIES

   Borrower hereby represents and warrants to Lender that:

   **Section 10.1. Validity of Agreement**. The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents. The LOC and the execution, delivery, and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable per their terms. The execution, delivery, and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than liens permitted under Section 9.2 hereof) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

   **Section 10.2. Existing Defaults**. As of the date of execution of this Agreement, Borrower (or any subsidiary of Borrower) is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other

Initials: 24  SP

agreement or instrument to which Borrower (or any subsidiary of Borrower) is a party or by which it or any of its properties, subsidiaries, partners, or other related entities may be bound.

**Section 10.3. No Default in Other Agreements**. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a party or by which it or any of its properties, subsidiaries, partners or other related entities may be bound, or result in the violation by it of any law, order, rule, ordinance, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties, subsidiaries, partners or other related entities.

**Section 10.4. No Consents**. No consent, approval, authorization, or other acknowledgment of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

**Section 10.5. Litigation**. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to Borrower's knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened, or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from the performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.

**Section 10.6. Financial Statements**. All balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared per generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

**Section 10.7. Legal Requirements**. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to

Initials: _JM_  _SP_

environmental protection, occupational safety and health, zoning, and equal employment practices.

**Section 10.8. Taxes**. The Borrower has filed all tax returns and reports required of it, has paid all taxes which are due and payable, and has provided adequate reserves for payment of any tax whose payment is being contested; the charges, accruals, and reserves on the books of the Borrower in respect of taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority concerning any taxes except as otherwise previously disclosed to the Lender in writing.

**Section 10.9. Organization and Good Standing**. The Borrower is a duly formed or organized, validly existing, and in good standing under the laws of the State of its formation or organization as outlined in the first paragraph of this Agreement, and is qualified as a foreign entity and in good standing in each jurisdiction where the Property and the Project are located.

**Section 10.10. Insurance**. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

**Section 10.11. Accurate and Complete Statements**. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

**Section 10.12. Timing of Lender Funding.** Provided Borrower has met the conditions to Advances in this Agreement, including without limitation the timing for requests outlined in this Section, Lender shall fund Advances per under the Tranche Schedule, but in no event anymore frequently than every sixty (60) day, unless otherwise consented to in writing by Lender. The borrower must deliver Advance requests to Lender thirty (30) business-banking days before the week represented on the Tranche Schedule for which the Borrower wishes to receive the proceeds of such Advance from the LOC Disbursement Account. Upon notice of an Advance Request from the Borrower, Lender has a forty (40) international business-banking day window based on the Tranche Schedule (except for the first Advance according to Section 7.1) to Payment the requested Advance into the LOC Disbursement Account. Absent a written Advance request from Borrower, per the conditions and requirements set forth herein, Lender is not obligated to disburse the next scheduled Advance under the Tranche Schedule.

## ARTICLE 11
## NATURE OF REPRESENTATIONS AND WARRANTIES

**Section 11.1. Generally.** The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive

Initials: _____

so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date hereof, except for any representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower according to or in connection with the LOC shall be deemed to have been relied upon by Lender.

## ARTICLE 12
## EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "**Event of Default**"):

        **Section 12.1. Nonpayment.** Failure to make any payment required by the Promissory Note, this Agreement, or any other LOC Documents and such failure continues for thirty (30) days after notice of such default is sent by Lender to Borrower.

        **Section 12.2. Other Covenants and Agreements.** Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not have been fully corrected, by the performance of or compliance with such covenants or agreements, within twenty (20) days after notice of such default is sent by Lender to Borrower.

        **Section 12.3. Representations and Warranties.** If any representation, warranty, or statement made in or according to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made. Such Event of Default can be corrected by the presentation of accurate and current material information furnished by the Borrower to the Lender to correct the false or erroneous representation, warranty, or statement within ten (10) days after notice of such default is sent by Lender to Borrower.

        **Section 12.4. Security.** If any lien granted in this Agreement or any other LOC Document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of Collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in the lien status occurs appropriate documents to correct such matters.

        **Section 12.5. Validity of LOC Documents.** If (a) any material provision, in the sole opinion of the Lender, of any LOC Document, shall at any time cease to be valid, binding, and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC

Initials: _____  _____

Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

**Section 12.6. Petition for Bankruptcy, Insolvency**. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation, or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for ninety (90) days; or the taking of the action by Borrower to authorize any of the actions outlined in this Section 12.6.

**Section 12.7. Material Litigation**. Any action, suit, proceeding, or investigation of any kind involving or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof of any Litigation, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation, and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, partners, or other related entities, or the Project and promptly after the occurrence thereof, a notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, partners, or other related entities, or the Project of the disclosed Litigation.

### ARTICLE 13
### REMEDIES

**Section 13.1. General**. Following the occurrence of one (1) or more Events of Default, a default cure period of sixty (60) days begins ("Default Cure Period"), except as otherwise provided in Section 13.3 or Section 13.4. If Borrower fails to cure the Event of Default according to Article 12) within the Default Cure Period, then the Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies outlined in the Promissory Note, in the LOC Documents, or any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or equity, including such rights as are provided in this Article 13. If a Bankruptcy Event referred to in Section 12.6 hereof occurs, (i) all obligations

Initials: _____  _____

of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Upon the occurrence of any Event of Default hereunder under Section 12.1 whereby Borrower has missed more than two (2) scheduled payments if Borrower does not have any interest reserve account established for the benefit of the Lender, Borrower shall have a) sixty (60) days Default Cure Period to cure the Event of Default and must (b) Payment an additional one year's worth of interest payments into the Interest Reserve Account.

### Section 13.2. **Default and Right to Acquire.**

In the event, the Borrower is unable to cure the Event of Default (in the manner specified to correct each Event of Default according to Article 12 or within the Default Cure Period,

(a)     Upon the occurrence of an Event of Default, Lender shall have the right, in person or by agent, in addition to all other rights and remedies available to Lender hereunder or under the LOC documents, to enter into possession of the Project and perform or cause enforce any liquidity plan.

(b)     The lender may enter into possession of the Project and perform or cause to be performed all work and labor necessary to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower. All sums expended by the Lender in doing so, together with interest on such total amount at the Default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured by the LOC documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

(c)     Borrower thereby, following such Bankruptcy Event or relevant cure periods under Section 13.2 constitutes and appoints the Lender as its true and lawful attorney-in-fact, with the full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

(i)     to enter and endorse all agreements, instruments, and documents in connection therewith.

(ii)     to use any unadvanced proceeds of the LOC to complete, operate, or maintain the Project.

(iii)     to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

Initials: _____

(iv)    to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

(v)    to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security satisfactory to the Lender has been provided.

(vi)    to execute applications and certificates in the name of the Borrower which reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

(vii)    to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

(viii)    to do any and every act which the Borrower might do on its behalf concerning the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be (A) irrevocable, (B) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (C) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

Section 13.3. **Curing of Defaults by Advances**. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which Lender may have because of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender per the terms hereof before any additional proceeds of the LOC are disbursed.

Section 13.4. **Remedies Are Cumulative**. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of any rights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidate any act done according to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

Initials: ___

**Section 13.5. Offsets**. If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC documents is accelerated according to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, all of such obligations then owing by the Borrower, whether or not the same shall then have matured, all Payment (general or special) balances, and all balances in the Interest Reserve Account and all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

**Section 13.6. Collateral**. The Lender shall at all times have the rights and remedies of a secured party under the UCC, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Documents executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC documents, which the Borrower agrees to do, and make it available to the Lender at a reasonable convenient place to be designated by the Lender. The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC document, each of which findings shall be considered to be an accession to and a part of such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any delivery or taking of possession of the Collateral securing the obligations under the LOC documents, or any portion thereof, under this Agreement, then, with or without resort to the Borrower personally or any other person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. No prior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that the Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case, the Lender shall give the Borrower not fewer than ten (10) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made. The Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Lender may purchase such Collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower hereby waives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC documents, the cost of which shall be paid by the Borrower.

Initials: _____

**Section 13.7.  Default by Lender and Borrower's Sole Remedy.**

(a)        Provided Borrower has fully satisfied and complied with all conditions to Advance if Lender fails to provide the first (1st) Advance when due, under the Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver a written notice in the form of a notarized termination letter, a copy of which is attached hereto as **Exhibit F** ("the **Termination Letter**"), to Lender by certified mail. Upon receipt of such notice, Lender shall have forty (40) international business-banking days from the date of receipt ("**Refund Period**") within which to return the ICA Payment to the Borrower.

(b)        If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice in the form of a notarized Termination Letter to the Lender by certified mail. Within forty (40) international business-banking days from the date of receipt of such notice by Lender, Borrower shall be entitled to (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) termination of Borrower's obligations to Lender hereunder except Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners, or other related entities, for any indirect, special, incidental, or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise because of, the LOC, the Advances, the Agreement or the other LOC documents.

(c)        Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances according to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, an act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, an act of civil disobedience, an act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew

Initials: _____

restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages, or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from performing under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period the occurrence is expected to continue. The lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. The lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

**Section 13.8 Binding Arbitration.** Any dispute, claim, or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one (1) arbitrator. The arbitration shall be administered by JAMS under its Comprehensive Arbitration Rules and Procedures or by ADR Services under its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand according to the notice requirements outlined in Section 14.5 herein. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach an agreement on an arbitrator, then the arbitration shall be selected under the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for the production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any discovery disputes shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising concerning the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

### ARTICLE 14
### GENERAL PROVISIONS

**Section 14.1. Disclaimer of Liability**. Lender has no liability or obligation in connection

Initials: _U_ _SP_

with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith. No claim may be made by the Borrower or any other Person against the Lender or the Affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

Section 14.2. **Publicity**. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. The lender shall have the right to indicate that it has provided the financing for the Project.

Section 14.3. **Confidentiality.** Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary, and Borrower hereby agrees to maintain confidential this Agreement, the LOC documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place. Borrower's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative.

Section 14.4. **Responsibility for Application of Funds**. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose outlined in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced under this Agreement. The lender may rely solely upon the Borrower's requests for Advances, affidavits, statements, and reports in making said Advances, and the Borrower does hereby release and indemnify the Lender and hold the Lender harmless from any losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final and non-appealable decision).

Section 14.5. **Non-Disparagement**. Borrower agrees and covenants that Borrower shall not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory, maliciously false, or disparaging remarks, comments, or statements concerning the

Initials: _____

The lender or its businesses, or any of its employees, officers, or directors, and its existing and prospective clients, suppliers, investors, and other associated third parties, now or in the future. For the avoidance of doubt, a breach of this Section 10.04 shall constitute an Event of Default under Section 7.02 under which Lender has the right to terminate all obligations under the Loan Documents under Section 9.01(b).

**Section 14.6 Opportunity to Consult with Counsel**. Borrower acknowledges that it has had an opportunity to consult with and be represented by counsel of Borrower's choosing in the review of the Loan Documents, that it has been advised by Lender to do so, that the Borrower is fully aware of the contents of the Loan Documents and its legal effect, and that Borrower enters into these Loan Documents freely, without duress or coercion, and based on Borrower's judgment and wishes and not in reliance upon any representation or promise made by the Lender, other than those contained herein.

**Section 14.7 Notices**. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent by certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety-six (96) hours after deposit in first-class certified United States mail, postage prepaid, return receipt requested, or two (2) business days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given according to this paragraph:

To Borrower:    North Haven Lodging Partners LLC

To Lender:    McMann Commercial Lending LLC
              205 N Michigan Avenue, Ste 810
              Chicago, Illinois 60601

**Section 14.8. Applicable Law**. This Agreement and, unless otherwise specifically provided for therein, each other LOC document, shall be governed by and construed per the laws of the State of Illinois and the United States.

**Section 14.9. Successors and Assigns**. The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

**Section 14.10. Severability**. The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition. In the event of any conflict or inconsistency between the terms and provisions of this Agreement and any of the LOC Documents, the terms and provisions of this Agreement shall control.

Initials: _VV_ _SP_

**Section 14.11. Amendments**. This Agreement may not be modified or amended except by a written agreement signed by the Borrower and Lender.

**Section 14.12. Headings; Attachments**. The several headings to articles, sections, and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part thereof.

**Section 14.13. No Third-Party Rights**. This Agreement is made entirely for the benefit of the Borrower, the Lender, and their successors in interest (including any participants). No third party shall have any rights hereunder.

**Section 14.14. Indemnification**. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement. The Borrower hereby agrees to indemnify, defend and hold harmless the Lender, the managers of the Lender, and all of their members, managers, affiliates, and advisors, from any damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees and costs) that they may incur because Borrower failed to fulfill all of the terms and conditions of this agreement or because of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs, and expenses (including attorneys' fees and costs) incurred by Lender, the managing members of Lender, or any of its members, managers, affiliates, or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished in connection with this transaction.

**Section 14.15. General Limitation of Liability**. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the

Initials: *VP* *SP*

transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission, or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. In addition to the tolling provided under Section 6.3, Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

**Section 14.16. <u>Entire Agreement</u>**. This Agreement, the Promissory Note, and any other LOC Document or other agreement, document, or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings concerning the subject matter hereof.

**Section 14.17. <u>Execution in Counterparts</u>**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute the same Agreement.

**Section 14.18. <u>Legal Representation of the Parties</u>**. The LOC Documents were negotiated by the Parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

**Section 14.19. <u>JURY TRIAL WAIVER</u>**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

[Remainder of page intentionally left blank; Signatures follow]

Initials: _____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**LENDER:** MCMANN COMMERCIAL LENDING LLC

By:

     Name: Walter P Trock III

**BORROWER:** North Haven Lodging Partners LLC

By:

Name: Shailesh Patel    Vihang Patel

Title: Manger / Member

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 14th day of

April , 20 23

In and for the State of South Dakota

NOTARY PUBLIC
In and for the State of Connecticut

My Commission Expires:

ADAM PRICE
Notary Public
SEAL
South Dakota

BENNETT BUFFALO
NOTARY PUBLIC, STATE OF CONNECTICUT
My Commission Expires January 31, 2026

My Commission Expires:
4 - 27 - 23

Initials: VP SP

# EXHIBIT B

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

among

## MCMANN COMMERCIAL LENDING LLC

as Lender

and

## Wallingford Lodging Partners LLC
as Borrower

_____

dated as of

April 10, 2023

_____

Initials: _VW_  _SP_

## BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated, or otherwise modified, this "**Agreement**") is made and entered as of April 10, 2023, between McMann Commercial Lending LLC (the "**Lender**"), and Wallingford Lodging Partners LLC., a Connecticut Limited Liability Company ("**Borrower**").

## RECITALS

**A.**    The Borrower desires to obtain from Lender an asset-backed line of credit loan (the "**LOC**") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

**B.**    The Borrower desires to obtain the LOC from Lender for Business Expansion for construction of a 105-room limited-service hotel (as more fully described in **Exhibit D** attached hereto the "**Project**"). Acquired assets will be legally described on **Exhibit E** attached hereto (the "**Property**").

**C.**    The Borrower has agreed to pay a minimum contribution of the Project LOC Amount to Lender, by establishing the Interest Reserve (as hereinafter defined) and the ICA (as hereinafter defined), collectively,(the "**Interest Reserve Account**"), within seven (7) calendar days after the fully executed LOC Documents (as hereinafter defined) are received by Lender.

**D.**    The Borrower has agreed to pay, pursuant to Section 3.6 hereof, the aggregate amount of One Million Eight Hundred Thousand Dollars and No Cents Dollars ($1,800,000), (the "**ICA Payment**"), by bank wire to Lender. An account on the books and records of the Lender shall be created to serve as an Interest Credit Account (the "**ICA**"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

**E.**    Lender has agreed to make Advances (as hereinafter defined) under the LOC to Borrower in an aggregate amount, according to **Exhibit B**, an amount not to exceed the Maximum Amount for the purposes outlined in these recitals and the Promissory Note attached hereto as **Exhibit A** and upon the terms and subject to the conditions hereinafter set forth.

**NOW THEREFORE**, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1. <u>Certain Defined Terms</u>**. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed per generally accepted accounting principles consistently applied.  As used in this

Initials: _____

agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

**"Advance(s)"** means any loan advance made by the Lender per the terms and conditions of this Agreement.

"**Applicable Interest Rate**" means the fixed interest rate specified in the Promissory Note.

**"Borrower"** means that term as defined in the first paragraph of this Agreement.

**"Business Expansion"** means any transaction or use, including for working capital, that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business (other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

"**Business Plan**" means the document(s) outlining the accurate and up-to-date business operations of the End-Borrower, as previously provided by End-Borrower, substantially in the form outlined in EXHIBIT D, and subject to review by Lender's Capital Partners as described in Section 8.1 of this Agreement.

**"Closing Date"** means the last date of signed execution of this Agreement by Lender and Borrower.

**"Collateral"** means all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements, and proceeds, thereof.

**"Event(s) of Default"** means any event or condition that shall constitute an event of default as described in Article 13 of this Agreement.
**"ICA"** means the definition given in Recital D of this Agreement.

**"ICA Payment"** means the amount remitted pursuant to Recital D of this Agreement.

Initials: _⫽_ _SP_

"**Interest Reserve**" means credit on the books and records of the Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from a Borrower JV Partner, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"**Interest Reserve Account**" means the definition given in Recital C of this

Agreement.

"**Lender**" means that term as defined in the first paragraph of this Agreement.

"**Lender's Capital Partners**" means one or more lender-clients of the Lender

providing funding towards the LOC.

"**LOC**" means that term as defined in Recital A of this Agreement.

"**LOC Disbursement Account**" means that term as defined in Section 3.12 hereof.

"**LOC Document(s)**" means, collectively, this Agreement, the Promissory Note, and each Security Document, as any of the foregoing may from time to time be amended, restated, or otherwise modified or replaced, and any other document delivered pursuant thereto.

"**Maximum Amount**" means Eighteen Million Nine Hundred Thousand Dollars and No Cents ($18,900,000). The Maximum Amount is the Project LOC Amount plus all fees, costs, and expenses which are the Borrower's responsibility to pay.

"**Organizational Documents**" means, concerning any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise concerning, this Agreement or any other LOC Document.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority, or any other entity.

"**Project**" means that term as defined in Recital B of this Agreement.

Initials: *UR*  *SS*

**"Project Costs"** means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by the Borrower for implementation or execution of the Project (including but not limited to the payment of taxes, insurance, and all items reasonably necessary for the successful execution of the Project), as more specifically outlined in the Project budget set forth on **Exhibit C** attached hereto.

**"Project LOC Amount"** means Eighteen Million Dollars and No Cents ($18,000,000).

**"Property"** means that term as defined in Recital B of this Agreement.

**"Promissory Note"** means the Promissory Note, in the form attached hereto as **Exhibit A**.

**"Security Agreement"** means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as **Exhibit E**.

**"Security Document"** means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each U.C.C. Financing Statement or similar filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

**"Scheduled Maturity Date"** means the 10th anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

**"Subsidiary"** means any entity (other than the Borrower) in an unbroken chain of entities beginning with the Borrower if each of the entities owns stock, units, or other interests that represent fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain

**"Taxes"** means all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, concerning those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender concerning the LOC.

**"Term Sheet"** means that document(s) dated as of 3/14/2023 between Borrower and Lender, setting forth a general summary of the terms of agreement memorialized more fully herein in final form.

**"Tranche Schedule"** means the schedule of Advances to Borrowers from the Lender, based

Initials: _7/8_    _SR_

upon the dates of the disbursements attached hereto as **Exhibit B**; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder does not exceed the Maximum Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

## ARTICLE 2
## THE CREDIT

**Section 2.1. Line of Credit Amount**. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to the Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

**Section 2.2. Line of Credit Documents**. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note, this Agreement, and each Security Document. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to the Lender and its counsel.

## ARTICLE 3
## TERM, INTEREST, AND PAYMENTS

**Section 3.1. Initial Term**. The initial term of the LOC is Ten (10) years and shall commence on the Closing Date and expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full thereon and all other amounts due and owing hereunder and under the Promissory Note shall be repaid by Borrower on the Scheduled Maturity Date.

**Section 3.2. Extended Term.** At the end of the initial term outlined in Section 3.1 hereof, and at the end of each Extended Term (as defined below, if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, over time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty-four (24) month period, up to a total of one (1) such additional consecutive periods (separately, "**Extended Term**"; collectively, the "**Extended Terms**"). In connection with Lender's granting of each Extended Term, (a) Borrower shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorney's fees, as a one (1)-time fee equal to one percent (1%) of the Project LOC Amount.

Initials: _VX_   _SR_

**Section 3.3. Applicable Interest Period.** The interest period concerning each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full.

**Section 3.4. Interest Rate Calculation**. Interest shall be calculated based on a 365-day year and the actual number of days elapsed in a 365-day year and at the rate outlined in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "**Maximum Interest Rate**"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to the unpaid principal balance outstanding under the Promissory Note or, if it exceeds such unpaid principal, refunded to the Borrower.

**Section 3.5. Interest Payments**. Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times outlined in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

**Section 3.6. Reserves**. Following the signing of this Agreement, the Borrower shall remit One Million Eight Hundred Thousand Dollars and No Cents ($1,800,000) as the ICA Payment per the terms and the time outlined in Recital D of this Agreement. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and not refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable.

**Section 3.7. Prepayment**. The borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC.

**Section 3.8. Interest Credit Account**. If at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which notice shall be delivered to and received by Borrower no less than thirty (30) days before the date of the next interest payment date, Borrower shall remit into the ICA the funds necessary to make such interest paid before the date such interest payment is due and payable**Section 3.9.   Fees.**

      (a) **LOC Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable fee for the LOC in an aggregate amount equal to Five percent (5%) multiplied by the Project LOC Amount, which is equal to Nine Hundred Thousand Dollars and No Cents ($900,000) (the "**LOC Fee**"). The LOC Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

Initials: 🖊️  SP

(b) **Promote Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable success fee in an aggregate amount equal to One percent (1%) multiplied by the Project LOC Amount, which is One Hundred Eighty Thousand Dollars and No Cents ($180,000) (the "**Promote Fee**"). The Promote Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

(c) **ICA Advance Fee**. To the extent the Borrower used Lender to provide the ICA Payment, at Closing and out of the initial Advance, the Borrower shall reimburse Lender in an amount equal to the ICA Payment advanced by Lender plus a nonrefundable fee in an aggregate amount equal to Zero percent (0%) of the ICA Payment, which is No Dollars and No Cents Dollars ($-) (the "**ICA Advance Fee**"). The ICA Advance Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition. The borrower will take the Project LOC Amount in full on the closing of the first tranche.

Section 3.10. **Line of Credit Extension Fees.** Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a nonrefundable LOC extension fee for each extension in an aggregate amount equal to one percent (1%) multiplied by the Maximum Amount.

Section 3.11. **Legal and Incidental Fees, Charges, and Costs**. Borrower shall pay at Closing, all reasonable out of pocket and up to Twelve Thousand, Five Hundred U.S. Dollars ($12,500) for legal fees, recording and filing fees, documentary stamps, taxes, service charges, credit reports, UCC search costs, title company fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial proceeding; provided that Lender will provide Borrower ten (10) days' advance notice of any legal fees pursuant to this Section 3.11 that will exceed Twelve Thousand, Five Hundred U.S. Dollars ($12,500). Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or willful misconduct.

Section 3.12. **Line of Credit Disbursement Account**. The proceeds of each Advance under the LOC shall be advanced into the LOC Disbursement Account with Lender to be used by Borrower for payment of the Borrower's Project Costs, solely for the purposes and in the manner

Initials: _____ _____

outlined in this Agreement. The LOC Disbursement Account will be held jointly in the name of the Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights and interest in and to the LOC Disbursement Account, which assignment will be effective only upon the occurrence and continuation of an Event of Default, subject to an applicable Default Cure Period (as hereinafter defined).

### Section 3.13. Taxes.

(a)     All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to the Lender (after deducting, withholding, and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

(b)     Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to the Lender. If the Borrower shall fail to pay any Taxes or OtherTaxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result of any such failure.

(c)     The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

### ARTICLE 4
### CONDITIONS FOR CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing:

### Section 4.1.   Delivery of the LOC Documents.

(a)     As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

Initials: ____  ____

(b)     The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Payment Account and Security Account (both as defined under UCC § 9-102 and as further defined in the Security Agreement) maintained by the Borrower.

(c)     Contemporaneously with Borrower's acquisition of the Property, Borrower shall have delivered an executed and notarized mortgage or deed of trust in form and substance required by Lender granting Lender a priority lien and security interest in and to the Property (the "**Security Instrument**"), and such Security Instrument shall be promptly recorded in the real property records of the county in which such real property is located. If required by Lender, (i) the closing of such Advance and recording of the Security Instrument shall be completed through the services of a title company chosen by Lender, and (ii) such title company shall issue, at Borrower's expense and for the benefit of Lender, a loan policy of title insurance concerning the Property. For the avoidance of doubt, this Section 4.1(c) shall not operate to preclude any Advances to the Borrower to fund pre-acquisition costs.

**Section 4.2. Authority**. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members, or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery, and performance of the LOC Documents and the consummation of the transactions contemplated thereby, (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners or members of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing concerning the Borrower.

**Section 4.3. Liens**. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions, or restrictions. At the request of the Lender, the Borrower shall (i) deliver to the Lender the results of UCC lien searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) UCC or other lien termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project, or any Collateral without the express written permission of Lender.

**Section 4.4. Litigation**. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

**Section 4.5. Events of Default**. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in

Initials: _____

full compliance with the terms and provisions of this Agreement.

      **Section 4.6. Purchase and Agreement Contracts.** Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

      **Section 4.7. Compliance with Certain Requirements**. Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) under local, state, federal, and international laws, procedures, statutes, regulations, and ordinances, conditions applicable to the Project.

      **Section 4.8.   Evidence of Insurance**.

      (a)     For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for, and will keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders' loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of similar size and character that of the business of the Borrower, and Borrower shall furnish Lender with the satisfactory evidence of such underlying Borrower insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

      (b)     Within five (5) business of receipt of End-Borrower insurance pursuant to Section 4.8(a), Lender shall acknowledge receipt and communicate to Borrower the approval and sufficiency of such End-Borrowers certificate of insurance.

      **Section 4.9. Financial Statements**. The lender shall have received all financial reports required by Section 8.6 hereof.

      **Section 4.10. Business Pro Forma**. The lender shall receive a pro forma income and expense statement annually in connection with the Project.

      **Section 4.11. Management Plan**. Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of Borrower's business.

      **Section 4.12. Material Change.** Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower's ability to perform under this Agreement or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.

      **Section 4.13. Non-Subordination.** Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such Subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the

Initials: _____  _____

normal and reasonable management of the Project).

      **Section 4.14. Securitization.** The lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or reasonable due diligence required by the insurer.

**ARTICLE 5**
**USE OF LINE OF CREDIT PROCEEDS**

      **Section 5.1.    Project Costs: Business Expansion Costs**.

      (a)     Proceeds of Advances under the LOC shall be utilized by Borrower solely to finance the Project Costs, as more fully described in the attached **Exhibit C,** in connection with Borrower Business Expansion as further detailed in the Business Plan, updated yearly by Borrower.

      (b)     The proceeds of the LOC shall be used exclusively for the purposes outlined in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family, or household purposes. The borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute, or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

**ARTICLE 6**
**INSPECTIONS**

      **Section 6.1. Project Inspection**. Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

      **Section 6.2. Books and Records**. Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower about the Project, the Property, and the Borrower and to make extracts therefrom or copies thereof.

      **Section 6.3. Force Majeure Event Inspection Right.** In the event of a Force Majeure Event (as hereinafter defined) which interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until Lender is satisfied with Borrower's ability to resume operations to develop the Project. Following a Force Majeure Event, Lender has the right to modify the terms upon which future Advances may be made as a result of a change in circumstances as determined by the Lender

Initials: _____  _____

in Lender's sole discretion, that the Borrower can perform or continue to perform the Project scope of work. Borrower shall execute any additional documents, amendments, or other agreement of terms required by Lender, before Lender's obligation to continue to make Advances shall resume.

## ARTICLE 7
## ADVANCE OF FUNDS

**Section 7.1. Timing and Advances to Payee**. Advances will be made as outlined in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance has been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than seventy-five (75) calendar days following the opening of the ICA by the Lender with its wholesale lender. Lender shall deliver the written notice to Borrower of the commencement of such seventy-five (75)-day period. Lender shall deliver the written notice to Borrower via the ZOOMERAL messaging system of the commencement of such seventy-five (75)-day period.

**Section 7.2. Conditions Precedent to Advance Funds**. Lender's obligation to make Advances hereunder shall be conditioned upon fulfillment of the terms outlined in Article 4 hereof.

**Section 7.3. Unpaid Lien Claims.** If Lender receives notice of nonpayment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, per applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower, or (b) withhold one hundred percent (100%) of the lien amount claimed from future Advances.

**Section 7.4. Mandatory Advances**. Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.

## ARTICLE 8
## BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing:

**Section 8.1. Project.** (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is the counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation, and management of the Project.

Initials: _____

**Section 8.2. Compliance with Laws**. Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

**Section 8.3. Compliance with Documents**. Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

**Section 8.4. Books and Records**. Keep and maintain complete and accurate books of account, per generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

**Section 8.5. Payment of Obligations**. Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established per generally accepted accounting principles).

**Section 8.6. Financial Reports**. Deliver to Lender, concerning Borrower as soon as available and in any event (a) within sixty (60) days after the end of each calendar quarter during the term of the LOC, financial statements of Borrower for such quarter and (b) within ninety (90) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower, in each case of the foregoing, certified as true and correct (which reports shall be prepared per generally accepted accounting principles consistently applied) and operating statements in a form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender. The borrower must also complete their ZOOMERAL business profile and keep the business profile up to date throughout the term of this agreement.

**Section 8.7. Notification to Lender**. Promptly after learning thereof, notify Lender of: (a) the details of any material action, proceeding, investigation, or claim against or affecting the Borrower, the Property, or the Project instituted before any court, arbitrator, or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Property or the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower of the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

**Section 8.8. Partnership/Corporate Existence**. Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

Initials: _VP_  _SP_

## ARTICLE 9
## BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing Borrower shall not:

**Section 9.1. <u>Liquidation, Merger, and Sale of Assets</u>.** Liquidate, merge, or consolidate with any other Person or otherwise transfer to an unrelated Person fifteen percent (15%) or more of the equity securities of Borrower, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business. Notwithstanding, any initial public offering or acquisition by another company will require the Lender's approval or full payment of the outstanding loan balance.

**Section 9.2. <u>Liens</u>.** Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such liens, shall not be increased).

**Section 9.3.    <u>Indebtedness</u>.** Create, incur, or have outstanding any indebtedness of any kind, other than (a) indebtedness owing to the Lender under this Agreement and the other LOC Documents, and (b) indebtedness of the Borrower existing as of the Closing Date as disclosed to and approved by the Lender (and any extension, renewal, or refinancing thereof but only to the extent that the principal amount thereof does not increase after the Closing Date).

**Section 9.4. <u>Investments, Loans, and Guarantees</u>.** (a) Create, acquire, or hold any subsidiary, (b) make or hold any investment in any stocks, bonds, or securities of any kind (c) be or become a party to any joint venture or other partnership, (d) make or keep outstanding any advance or loan to any Person, or (e) be or become a guarantor of any kind.

**Section 9.5. <u>Acquisitions</u>.** Enter into any transaction or series of related transactions for or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another

Initials: _VP_  _JP_

Person by a merger, amalgamation, or consolidation or any other combination with such Person, unless specifically stated and approved before execution of this Agreement.

**Section 9.6. Organizational Documents**. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

**Section 9.7.    Project and Project Documents**. Willfully or voluntarily abandon the Project or its activities to develop, construct, operate, or maintain the Project. If the same would (i) be a major decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

(a)    terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance of a material obligation by any other Person under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the development, construction, operation, and maintenance of the Project, in each case that would have an adverse effect on the Lender; or

(b)    sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation, and maintenance of the Project without Lender's consent, which consent shall not be unreasonably withheld.

### Article 10
### REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender that:

**Section 10.1. Validity of Agreement**. The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents. The LOC and the execution, delivery, and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable per their terms. The execution, delivery, and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than liens permitted under Section 9.2 hereof) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

**Section 10.2. Existing Defaults**. As of the date of execution of this Agreement, Borrower (or any subsidiary of Borrower) is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other

Initials: _____

agreement or instrument to which Borrower (or any subsidiary of Borrower) is a party or by which it or any of its properties, subsidiaries, partners, or other related entities may be bound.

**Section 10.3. No Default in Other Agreements**. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a party or by which it or any of its properties, subsidiaries, partners or other related entities may be bound, or result in the violation by it of any law, order, rule, ordinance, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties, subsidiaries, partners or other related entities.

**Section 10.4. No Consents**. No consent, approval, authorization, or other acknowledgment of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

**Section 10.5. Litigation**. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to Borrower's knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened, or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from the performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.

**Section 10.6. Financial Statements**. All balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared per generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

**Section 10.7. Legal Requirements**. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to

Initials: _____

environmental protection, occupational safety and health, zoning, and equal employment practices.

**Section 10.8. Taxes**. The Borrower has filed all tax returns and reports required of it, has paid all taxes which are due and payable, and has provided adequate reserves for payment of any tax whose payment is being contested; the charges, accruals, and reserves on the books of the Borrower in respect of taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority concerning any taxes except as otherwise previously disclosed to the Lender in writing.

**Section 10.9. Organization and Good Standing**. The Borrower is a duly formed or organized, validly existing, and in good standing under the laws of the State of its formation or organization as outlined in the first paragraph of this Agreement, and is qualified as a foreign entity and in good standing in each jurisdiction where the Property and the Project are located.

**Section 10.10. Insurance**. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

**Section 10.11. Accurate and Complete Statements**. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

**Section 10.12. Timing of Lender Funding.** Provided Borrower has met the conditions to Advances in this Agreement, including without limitation the timing for requests outlined in this Section, Lender shall fund Advances per under the Tranche Schedule, but in no event anymore frequently than every sixty (60) day, unless otherwise consented to in writing by Lender. The borrower must deliver Advance requests to Lender thirty (30) business-banking days before the week represented on the Tranche Schedule for which the Borrower wishes to receive the proceeds of such Advance from the LOC Disbursement Account. Upon notice of an Advance Request from the Borrower, Lender has a forty (40) international business-banking day window based on the Tranche Schedule (except for the first Advance according to Section 7.1) to Payment the requested Advance into the LOC Disbursement Account. Absent a written Advance request from Borrower, per the conditions and requirements set forth herein, Lender is not obligated to disburse the next scheduled Advance under the Tranche Schedule.

### ARTICLE 11
### NATURE OF REPRESENTATIONS AND WARRANTIES

**Section 11.1. Generally.** The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive

Initials: _N_  _SP_

so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date hereof, except for any representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower according to or in connection with the LOC shall be deemed to have been relied upon by Lender.

## ARTICLE 12
## EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "**Event of Default**"):

**Section 12.1. Nonpayment**. Failure to make any payment required by the Promissory Note, this Agreement, or any other LOC Documents and such failure continues for thirty (30) days after notice of such default is sent by Lender to Borrower.

**Section 12.2. Other Covenants and Agreements.** Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not have been fully corrected, by the performance of or compliance with such covenants or agreements, within twenty (20) days after notice of such default is sent by Lender to Borrower.

**Section 12.3. Representations and Warranties.** If any representation, warranty, or statement made in or according to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made. Such Event of Default can be corrected by the presentation of accurate and current material information furnished by the Borrower to the Lender to correct the false or erroneous representation, warranty, or statement within ten (10) days after notice of such default is sent by Lender to Borrower.

**Section 12.4. Security.** If any lien granted in this Agreement or any other LOC Document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of Collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in the lien status occurs appropriate documents to correct such matters.

**Section 12.5. Validity of LOC Documents.** If (a) any material provision, in the sole opinion of the Lender, of any LOC Document, shall at any time cease to be valid, binding, and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC

Initials: _VS_ _SP_

Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

Section 12.6. **Petition for Bankruptcy, Insolvency**. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation, or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for ninety (90) days; or the taking of the action by Borrower to authorize any of the actions outlined in this Section 12.6.

Section 12.7. **Material Litigation**. Any action, suit, proceeding, or investigation of any kind involving or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof of any Litigation, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation, and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, partners, or other related entities, or the Project and promptly after the occurrence thereof, a notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, partners, or other related entities, or the Project of the disclosed Litigation.

## ARTICLE 13
## REMEDIES

Section 13.1. **General**. Following the occurrence of one (1) or more Events of Default, a default cure period of sixty (60) days begins ("Default Cure Period"), except as otherwise provided in Section 13.3 or Section 13.4. If Borrower fails to cure the Event of Default (in the manner specified for each Event of Default according to Article 12) within the Default Cure Period, then the Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies outlined in the Promissory Note, in the LOC Documents, or any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or equity, including such rights as are provided in this Article 13. If a Bankruptcy Event referred to in Section 12.6 hereof occurs, (i) all obligations

Initials: ꓕꓵ    SP

of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Upon the occurrence of any Event of Default hereunder under Section 12.1 whereby Borrower has missed more than two (2) scheduled payments if Borrower does not have any interest reserve account established for the benefit of the Lender, Borrower shall have a) sixty (60) days Default Cure Period to cure the Event of Default and must (b) Payment an additional one year's worth of interest payments into the Interest Reserve Account.

### Section 13.2. Default and Right to Acquire.

In the event, the Borrower is unable to cure the Event of Default (in the manner specified to correct each Event of Default according to Article 12 or within the Default Cure Period,

(a)    Upon the occurrence of an Event of Default, Lender shall have the right, in person or by agent, in addition to all other rights and remedies available to Lender hereunder or under the LOC documents, to enter into possession of the Project and perform or cause enforce any liquidity plan.

(b)    The lender may enter into possession of the Project and perform or cause to be performed all work and labor necessary to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower. All sums expended by the Lender in doing so, together with interest on such total amount at the Default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured by the LOC documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

(c)    Borrower thereby, following such Bankruptcy Event or relevant cure periods under Section 13.2 constitutes and appoints the Lender as its true and lawful attorney-in-fact, with the full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

(i)    to enter and endorse all agreements, instruments, and documents in connection therewith.

(ii)    to use any unadvanced proceeds of the LOC to complete, operate, or maintain the Project.

(iii)    to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

Initials: W   SP

(iv)    to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

(v)    to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security satisfactory to the Lender has been provided.

(vi)    to execute applications and certificates in the name of the Borrower which reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

(vii)    to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

(viii)    to do any and every act which the Borrower might do on its behalf concerning the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be (A) irrevocable, (B) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (C) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

**Section 13.3. Curing of Defaults by Advances**. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which Lender may have because of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender per the terms hereof before any additional proceeds of the LOC are disbursed.

**Section 13.4. Remedies Are Cumulative**. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of any rights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidate any act done according to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

Initials: _____  _____

**Section 13.5. Offsets**. If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC documents is accelerated according to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, all of such obligations then owing by the Borrower, whether or not the same shall then have matured, all Payment (general or special) balances, and all balances in the Interest Reserve Account and all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

**Section 13.6. Collateral**. The Lender shall at all times have the rights and remedies of a secured party under the UCC, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Documents executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC documents, which the Borrower agrees to do, and make it available to the Lender at a reasonable convenient place to be designated by the Lender. The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC document, each of which findings shall be considered to be an accession to and a part of such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any delivery or taking of possession of the Collateral securing the obligations under the LOC documents, or any portion thereof, under this Agreement, then, with or without resort to the Borrower personally or any other person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. No prior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that the Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case, the Lender shall give the Borrower not fewer than ten (10) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made. The Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Lender may purchase such Collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower hereby waives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC documents, the cost of which shall be paid by the Borrower.

Initials: ____ ____

**Section 13.7. <u>Default by Lender and Borrower's Sole Remedy.</u>**

(a)    Provided Borrower has fully satisfied and complied with all conditions to Advance if Lender fails to provide the first (1st) Advance when due, under the Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver a written notice in the form of a notarized termination letter, a copy of which is attached hereto as **<u>Exhibit F</u>** ("the **Termination Letter**"), to Lender by certified mail. Upon receipt of such notice, Lender shall have forty (40) international business-banking days from the date of receipt ("**Refund Period**") within which to return the ICA Payment to the Borrower.

(b)    If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice in the form of a notarized Termination Letter to the Lender by certified mail. Within forty (40) international business-banking days from the date of receipt of such notice by Lender, Borrower shall be entitled to (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) termination of Borrower's obligations to Lender hereunder except Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners, or other related entities, for any indirect, special, incidental, or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise because of, the LOC, the Advances, the Agreement or the other LOC documents.

(c)    Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances according to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, an act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, an act of civil disobedience, an act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew

Initials: _JM_  _SP_

restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages, or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from performing under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period the occurrence is expected to continue. The lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. The lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

**Section 13.8 <u>Binding Arbitration.</u>** Any dispute, claim, or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one (1) arbitrator. The arbitration shall be administered by JAMS under its Comprehensive Arbitration Rules and Procedures or by ADR Services under its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand according to the notice requirements outlined in Section 14.5 herein. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach an agreement on an arbitrator, then the arbitration shall be selected under the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for the production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any discovery disputes shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising concerning the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

**ARTICLE 14**
**GENERAL PROVISIONS**

**Section 14.1. <u>Disclaimer of Liability</u>**. Lender has no liability or obligation in connection

Initials: _M_ _SP_

with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith. No claim may be made by the Borrower or any other Person against the Lender or the Affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

Section 14.2. **Publicity**. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. The lender shall have the right to indicate that it has provided the financing for the Project.

Section 14.3. **Confidentiality.** Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary, and Borrower hereby agrees to maintain confidential this Agreement, the LOC documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place. Borrower's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative.

Section 14.4. **Responsibility for Application of Funds**. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose outlined in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced under this Agreement. The lender may rely solely upon the Borrower's requests for Advances, affidavits, statements, and reports in making said Advances, and the Borrower does hereby release and indemnify the Lender and hold the Lender harmless from any losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final and non-appealable decision).

Section 14.5. **Non-Disparagement**. Borrower agrees and covenants that Borrower shall not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory, maliciously false, or disparaging remarks, comments, or statements concerning the

Initials: _JP_  _SP_

The lender or its businesses, or any of its employees, officers, or directors, and its existing and prospective clients, suppliers, investors, and other associated third parties, now or in the future. For the avoidance of doubt, a breach of this Section 10.04 shall constitute an Event of Default under Section 7.02 under which Lender has the right to terminate all obligations under the Loan Documents under Section 9.01(b).

**Section 14.6 Opportunity to Consult with Counsel.** Borrower acknowledges that it has had an opportunity to consult with and be represented by counsel of Borrower's choosing in the review of the Loan Documents, that it has been advised by Lender to do so, that the Borrower is fully aware of the contents of the Loan Documents and its legal effect, and that Borrower enters into these Loan Documents freely, without duress or coercion, and based on Borrower's judgment and wishes and not in reliance upon any representation or promise made by the Lender, other than those contained herein.

**Section 14.7 Notices.** All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent by certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety-six (96) hours after deposit in first-class certified United States mail, postage prepaid, return receipt requested, or two (2) business days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given according to this paragraph:

To Borrower:       Wallingford Lodging Partners LLC

To Lender:         McMann Commercial Lending LLC
                   205 N Michigan Avenue, Ste 810
                   Chicago, Illinois 60601

**Section 14.8. Applicable Law.** This Agreement and, unless otherwise specifically provided for therein, each other LOC document, shall be governed by and construed per the laws of the State of Illinois and the United States.

**Section 14.9. Successors and Assigns.** The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

**Section 14.10. Severability.** The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition. In the event of any conflict or inconsistency between the terms and provisions of this Agreement and any of the LOC Documents, the terms and provisions of this Agreement shall control.

Initials: _UP_  _SP_

**Section 14.11. Amendments**. This Agreement may not be modified or amended except by a written agreement signed by the Borrower and Lender.

**Section 14.12. Headings; Attachments**. The several headings to articles, sections, and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part thereof.

**Section 14.13. No Third-Party Rights**. This Agreement is made entirely for the benefit of the Borrower, the Lender, and their successors in interest (including any participants). No third party shall have any rights hereunder.

**Section 14.14. Indemnification**. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement. The Borrower hereby agrees to indemnify, defend and hold harmless the Lender, the managers of the Lender, and all of their members, managers, affiliates, and advisors, from any damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees and costs) that they may incur because Borrower failed to fulfill all of the terms and conditions of this agreement or because of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs, and expenses (including attorneys' fees and costs) incurred by Lender, the managing members of Lender, or any of its members, managers, affiliates, or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished in connection with this transaction.

**Section 14.15. General Limitation of Liability**. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the

Initials: _JP  SP_

transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission, or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. In addition to the tolling provided under Section 6.3, Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

**Section 14.16. Entire Agreement**. This Agreement, the Promissory Note, and any other LOC Document or other agreement, document, or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings concerning the subject matter hereof.

**Section 14.17. Execution in Counterparts**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute the same Agreement.

**Section 14.18. Legal Representation of the Parties**. The LOC Documents were negotiated by the Parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

**Section 14.19. JURY TRIAL WAIVER**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

[Remainder of page intentionally left blank; Signatures follow]

Initials: _JP_ _SP_

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**LENDER:** MCMANN COMMERCIAL LENDING LLC

By:

    Name: Walter P Trock III

**BORROWER:** Wallingford Lodging Partners LLC

By:

Name: Shailesh Patel    Vihang Patel

Title: Manager Member

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 4th day of

April , 2023

NOTARY PUBLIC

In and for the State of Connecticut

My Commission Expires:

> BENNETT BUFFALO
> NOTARY PUBLIC, STATE OF CONNECTICUT
> My Commission Expires January 31, 2026

In and for the State of South Dakota.

My Commission Expires:
4-27-23

> ADAM PRICE
> Notary Public
> SEAL
> South Dakota

Initials:

# EXHIBIT C

## Fwd: Wire confirmation (2)    Genie Investments NV

Shailesh Patel <shailesh.patel@sbmhospitality.com>

Wed 5/3/2023 4:38 PM

To: Ritesh Katwala   ritesh@citycapitaloffice.com  ;Brijesh patel   smgroupconsultingg@gmail.com  ;Rene
Jamulitrat <rJamulitrat@mcmanncommerciallending.com>;Michael Lanza
<mlanza@mcmanncommerciallending.com>;Vinay Patel <vinaypatel@sbmhospitality.com>

📎  2 attachments (17 KB)
Kari Borns.vcf; image001.jpg;

FYI.

Sent from my iPhone

Begin forwarded message:

> **From:** Kari Borns   kborns@loftadvisors.com
> **Date:** May 3, 2023 at 3:18:15 PM CDT
> **To:** Shailesh Patel   shailesh.patel@sbmhospitality.com
> **Cc:** Rocky Rehfeldt   rrehfeldt@loftadvisors.com
> **Subject: Wire confirmation (2)    Genie Investments NV**

Hi Shailesh,
The wire confirmation information is below for your records:

NOTICE OF OUTGOING WIRE TRANSFER
First Dakota National Bank Wire Date: 5/03/23
IMAD:
OMAD :
Funds in the amount of $ 1,800,075.00 have been wired to
Genie Investments NV
from account Acct Ending
North Haven Lodging Partners LLC

NOTICE OF OUTGOING WIRE TRANSFER
First Dakota National Bank Wire Date: 5/03/23
IMAD:
OMAD :
Funds in the amount of $ 1,800,075.00 have been wired to
Genie Investments NV
from account Acct Ending
Wallingford Lodging Partners LLC

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the original recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error, and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you received this email in error, please immediately notify postmaster@firstdakota.com.

If any personal views or opinions are contained in this email, those views or opinions are solely those of the author and do not necessarily represent those of First Dakota National Bank.

# EXHIBIT D

**EXHIBIT F**
**FORM TERMINATION LETTER**

McMann Commercial Lending LLC
205 N Michigan Avenue, Ste 810
Chicago, Illinois 60601

Re: North Haven Lodging Partners LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above-referenced transaction according to the terms of the LOC Agreement dated April 10, 2023.

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for a refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER: North Haven Lodging Partners LLC

By: _____

Name: Shailesh Patel and Vihang Patel
Title: _Member_

SUBSCRIBED AND SWORN TO BEFORE ME on this _16_ day of

_August_, 20_23_

Notary for Vihangkumar Patel only

NOTARY PUBLIC
In and for the State of ___CT___

My Commission Expires:

_09-30-27_

BLERINA BOBI
Notary Public
Connecticut
My Commission Expires Sep 30, 2027

Please confirm your Wiring Instructions:
Account Title: North haven Lodging Partners LLC
Address on Account: █████████████████████████████
Bank Name: First █████
Bank Address: █████
Routing #: █████████████████████
Account #: █████████████████

Initials: _____

**EXHIBIT F**
**FORM TERMINATION LETTER**

McMann Commercial Lending LLC
205 N Michigan Avenue, Ste 810
Chicago, Illinois 60601

Re: Wallingford Lodging Partners LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above-referenced transaction according to the terms of the LOC Agreement dated April 10, 2023.

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for a refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER: Wallingford Lodging Partners
LLC

By: _____
Name: Shailesh Patel and Vihang Patel
Title: Member

**SUBSCRIBED AND SWORN TO BEFORE ME** on this _16_ day of
August, 202.3

Notary for Vihangkumar Patel only

_____
NOTARY PUBLIC
In and for the State of _CT_

BLERINA BOBI
Notary Public
Connecticut
My Commission Expires Sep 30, 2027

My Commission Expires:

_09-30-27_

Please confirm your Wiring Instructions:
Account Title: Wallingford Lodging Partners LLC
Address on Account:
Bank Name: First Dakota
Bank Address:
Routing #:
Account #:

Initials: _____

# EXHIBIT E

## GENIE MESSAGES ON WALLINGFORD (2815) & NORTH HAVEN (2816) LODGINGS

Genie issues loan documents for Wallingford Lodging:

| | | |
|---|---|---|
| Wait,<br><br>Please see attached Loan Agreements in Word form for White Labeling. Their User ID is on the bottom of each page.<br><br>1. Present the client with a Term Sheet and collect the activation fee. If the client has already paid the activation fee, see step two.<br><br>2. After they have paid for activation, deliver the remaining documents.<br><br>3. Make sure to offer the Deposit Assistance Program (Due Diligence) to each client.<br><br>4. (a) Execute a copy of this document and upload it into the system. (b) Upload a copy of your white labeled documents from your client as well.<br><br>5. Do NOT change the Wiring Instructions. You may only change the Logo.<br><br>Thank you!<br><br>- Genie Investments | 3/13/2023 | Genie Investments - Wiring Instructions - Term Sheet - Business Expansion LOC Agreement - G Wait Inc.docx |

Genie issues loan documents for North Haven Lodging:

| | | |
|---|---|---|
| Wait,<br><br>Please see attached Loan Agreements in Word form for White Labeling. Their User ID is on the bottom of each page.<br><br>1. Present the client with a Term Sheet and collect the | 3/13/2023 | Genie Investments - Wiring Instructions - Term Sheet - Business Expansion LOC Agreement - G Wall Inc.docx |

activation fee. If the client has already paid the activation fee, see step two.

2. After they have paid for activation, deliver the remaining documents.

3. Make sure to offer the Deposit Assistance Program (Due Diligence) to each client.

4. (a) Execute a copy of this document and upload it into the system. (b) Upload a copy of your white labeled documents from your client as well.

5. Do NOT change the Wiring Instructions. You may only change the Logo.

Thank you!

- Genie Investments

## Term sheets and requested documents submitted to Genie:

| | | |
|---|---|---|
| USER 2815 (Wallingford Lodging)<br><br>Attached is the signed term sheet for this deal. | 3/20/2023 | Signed Wallingford Lodging (user 2815) Terms & Commitment.pdf |

| | | |
|---|---|---|
| USER ID 2815 (Wallingford Lodging Partners)<br><br>Attached are the IDs and bank letters for this deal. | 3/20/2023 | USER ID 2815 IDs and bank references.zip |
| USER ID 2816 (North Haven)<br><br>Attached are the executed term sheet and requested documents for this deal.<br><br>Regards, | 3/20/2023 | USER ID 2815 Term sheet and documents. |

Genie's message:

| | |
|---|---|
| Walt,<br><br>Regarding USER ID 2816, Genie received documents for a different business, please resend. Thank you. | 3/22/2023 |

McMann's responses to previous message:

| | | | |
|---|---|---|---|
| USER ID 2816 (North Haven)<br><br>File with documents for North Haven (USER ID 2816) attached | 3/22/2023 | USER ID 2816 Term sheet and documents.zip | |
| USER ID 2815 (Wallingford)<br><br>Documents in file attached | 3/22/2023 | USER ID 2815 IDs and bank references_1.zip | |

Messages from Genie re receipt of ICA deposits:

| | |
|---|---|
| **Walt,**<br><br>**Genie received two payments of $1,800,000 from User IDs 2815 and 2816. This does match the numbers Genie has on file. Please upload their agreements and advise at your earliest convenience. Thank you.** | **5/4/2023** |
| **Walt,**<br><br>**Genie received two payments of $1,800,000 from User IDs 2815 and 2816. This does match the numbers Genie has on file. Please upload their agreements and advise at your earliest convenience. Thank you.** | **5/5/2023** |

Submission of signed loan agreements and requested documentation to Genie:

| | | |
|---|---|---|
| USER ID 2816 (North Haven Lodging) submission for funding | 5/7/2023 | USER ID 2816 Funding submission.zip |
| USER ID 2815 (Wallingford Lodging) submission for funding | 5/7/2023 | USER ID 2815 Funding submission.zip |

Loan cancellation message to Genie:

| | |
|---|---|
| USER ID 2815 (Wallingford Lodging LLC) and USER ID 2816 (North Haven Lodging) are cancelling their loans and are requesting their ICA be returned.<br><br>The termination link has been emailed to both for them to submit their requests.<br><br>Regards. | 8/18/2023 |

Message to Genie requesting an update on the ICA refund:

| | |
|---|---|
| USER IDs 2815 and 2816 submitted their termination letter August 19, 2023. Kindly provide an update on their refund dates.<br><br>Regards | 9/14/2023 |

Genie's response:

| | |
|---|---|
| **Walt,**<br><br>**Regarding 2815 and 2816, the expected refund date is 10/13/2023.** | **9/14/2023** |

Messages sent to Genie for confirmation of the ICA refunds:

| | |
|---|---|
| About loan #'s 2815 & 2816 return of the ICA deposits have been confirmed by Genie to be wired tomrrow please confirm that this commitment is still on target for funds to be wired tomorrow.. Walt | 10/12/2023 |
| USER ID 2815 and 2816 have requested updates on their refunds | 10/12/2023 |

Genie's response:

| | |
|---|---|
| **Walt,**<br><br>**Regarding User ID 2629, 2815 and 2816, please make sure that they have access to their account, so that Genie can communicate with them directly. A message has been sent to them already. Thanks.** | **10/13/2023** |

## **The following are direct messages between Genie and the client:**

| | | | |
|---|---|---|---|
| **Wallingford Lodging Partners LLC,**<br><br>**Please see attached letter from Genie's attorney. Genie is working diligently to get your refund to you as quickly as possible and will be in touch with you by the end of next week. If you have any questions, all communications must be here in writing, so please do not hesitate to ask if you do. In the meantime, Genie would like to set up a conference call with you to make sure you fully understand this letter provided to you. Please provide 3 times for Tuesday and Wednesday of next week to discuss this matter. Genie appreciates your understanding.** | **10/13/2023** | [Borrower letter re ICA refund - Oct. 2023 Walker Law - Wallingford Lodging.pdf](#) | [Mark as read](#) |
| Hey David,<br><br>We are available for a call:<br>Tuesday 10/17:<br>9am CST<br>10am CST<br>11am CST<br>1pm (preferred) CST<br>or 2pm CST<br>for both North Haven and Wallingford projects to be discussed. Please confirm what time works for you at your earliest convenience. | 10/16/2023 | | |

| | | |
|---|---|---|
| North Haven Lodging Partners LLC,<br><br>Please see attached letter from Genie's attorney. Genie is working diligently to get your refund to you as quickly as possible and will be in touch with you by the end of next week. If you have any questions, all communications must be here in writing, so please do not hesitate to ask if you do. In the meantime, Genie would like to set up a conference call with you to make sure you fully understand this letter provided to you. Please provide 3 times for Tuesday and Wednesday of next week to discuss this matter. Genie appreciates your understanding in this matter. | 10/13/2023 | [Borrower letter re ICA refund - Oct. 2023 Walker Law - North Haven Lodging.pdf](#) |
| Hey David,<br><br>We are available for a call:<br>Tuesday 10/17:<br>9am CST<br>10am CST<br>11am CST<br>1pm (preferred) CST<br>or 2pm CST<br>for both North Haven and Wallingford projects to be discussed. Please confirm what time works for you at your earliest convenience. | 10/16/2023 | |

# EXHIBIT F

# WALKER LAW OFFICE, LLC

4050 Pennsylvania Ave., Suite 115-10
Kansas City, Missouri 64111
(816) 226-6476

October 13, 2023

Re:    **Genie Investments – Update on Funding Delays**

Dear Wallingford Lodging Partners LLC,

This letter concerns the 8/19/2023 termination of your Letter of Credit Agreement (LOCA) with Genie Investments and your request for a refund of the $1,800,000 ICA payment.

As you know from previous communications, Genie Investments has been working to address the ongoing failure of its capital provider to comply with its contractual obligations to provide funds to Genie. It is important to recognize that, under section 13.7 of the LOCA, the present situation constitutes a so-called "force majeure" event – i.e., a situation in which events beyond Genie's control prevent it from providing advances to borrowers. The LOCA's force majeure provision, section 13.7, specifically includes a failure by Genie's capital provider – referred to in the LOCA as its "wholesale lender" – to perform its obligations to Genie. As such, the delays you have experienced do not constitute a breach of contract by Genie and the "Refund Period" set forth in the LOCA (forty international business-banking days) does not apply while the force majeure event is ongoing.

Instead, the LOCA requires Genie to use "reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized," and Genie is currently doing so. This law firm, which Genie recently engaged to help resolve the situation, is working on multiple fronts to compel the capital provider to deliver the funds it owes, so that Genie can, in turn, provide refunds to its borrowers. We are preparing a legal action against the capital provider and its associates, which we will file at our earliest opportunity unless we reach a satisfactory settlement first. In hopes of refunding money to you as soon as possible, we will simultaneously pursue legal action and engage in settlement negotiations.

Genie will make every reasonable effort to keep you informed of the progress of its efforts during this process. In addition, you can expect further correspondence from this law firm with updates regarding settlement negotiations or the status of any legal action filed against the capital provider. While Genie's efforts are underway, you must direct any inquiries to Genie through the Zoomeral messaging system.

Genie understands that you want this situation resolved as quickly as possible, which is why it is taking the steps laid out above. Please understand, however, that legal actions of this

magnitude require significant time and resources, and we ask your continued patience throughout the process.

Further, we ask you to be mindful of other provisions of the LOCA. For example, Section 14.3 requires you to keep the terms of the LOCA confidential and section 14.5 prohibits disparagement of Genie or of persons or entities affiliated with it. Both provisions are deeply important to Genie. Please understand that violating either section would constitute a breach of the agreement and could impair or prevent your participation in the remedies Genie is pursuing. Moreover, failing to comply with these provisions could adversely affect Genie's efforts to obtain the recovery that would then flow to borrowers to whom refunds are due.

In short, we are working diligently to enable Genie to fulfill its obligations to its borrowers. Although we never expected to have to confront this situation, we intend to emerge better for it. In the meantime, we appreciate your patience as we continue our efforts.


Sincerely,


Adam Walker
Walker Law Office, LLC

# EXHIBIT G

# WALKER LAW OFFICE, LLC

4050 Pennsylvania Ave., Suite 115-10
Kansas City, Missouri 64111
(816) 226-6476

October 13, 2023

    Re:    Genie Investments – Update on Funding Delays

Dear North Haven Lodging Partners LLC,

    This letter concerns the 8/19/2023 termination of your Letter of Credit Agreement (LOCA) with Genie Investments and your request for a refund of the $1,800,000 ICA payment.

    As you know from previous communications, Genie Investments has been working to address the ongoing failure of its capital provider to comply with its contractual obligations to provide funds to Genie. It is important to recognize that, under section 13.7 of the LOCA, the present situation constitutes a so-called "force majeure" event – i.e., a situation in which events beyond Genie's control prevent it from providing advances to borrowers. The LOCA's force majeure provision, section 13.7, specifically includes a failure by Genie's capital provider – referred to in the LOCA as its "wholesale lender" – to perform its obligations to Genie. As such, the delays you have experienced do not constitute a breach of contract by Genie and the "Refund Period" set forth in the LOCA (forty international business-banking days) does not apply while the force majeure event is ongoing.

    Instead, the LOCA requires Genie to use "reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized," and Genie is currently doing so. This law firm, which Genie recently engaged to help resolve the situation, is working on multiple fronts to compel the capital provider to deliver the funds it owes, so that Genie can, in turn, provide refunds to its borrowers. We are preparing a legal action against the capital provider and its associates, which we will file at our earliest opportunity unless we reach a satisfactory settlement first. In hopes of refunding money to you as soon as possible, we will simultaneously pursue legal action and engage in settlement negotiations.

    Genie will make every reasonable effort to keep you informed of the progress of its efforts during this process. In addition, you can expect further correspondence from this law firm with updates regarding settlement negotiations or the status of any legal action filed against the capital provider. While Genie's efforts are underway, you must direct any inquiries to Genie through the Zoomeral messaging system.

    Genie understands that you want this situation resolved as quickly as possible, which is why it is taking the steps laid out above. Please understand, however, that legal actions of this

magnitude require significant time and resources, and we ask your continued patience throughout the process.

Further, we ask you to be mindful of other provisions of the LOCA. For example, Section 14.3 requires you to keep the terms of the LOCA confidential and section 14.5 prohibits disparagement of Genie or of persons or entities affiliated with it. Both provisions are deeply important to Genie. Please understand that violating either section would constitute a breach of the agreement and could impair or prevent your participation in the remedies Genie is pursuing. Moreover, failing to comply with these provisions could adversely affect Genie's efforts to obtain the recovery that would then flow to borrowers to whom refunds are due.

In short, we are working diligently to enable Genie to fulfill its obligations to its borrowers. Although we never expected to have to confront this situation, we intend to emerge better for it. In the meantime, we appreciate your patience as we continue our efforts.


Sincerely,


Adam Walker
Walker Law Office, LLC