## <u>EXHIBIT COVER SHEET</u>

<u>**Exhibit**</u>

Party Submitting:      **Mary Ida Townson, U.S. Trustee for Region 21**

Admitted:          **YES     or   NO      (circle one)**                    <u>**203**</u>

Chapter 11 Debtor:     **Genie Investments NV, Inc.**

Case No.          **3:24−bk−00496−BAJ**

Nature of Hearing:     **Trial on**

**U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**

**Debtor's Response Thereto (Doc. No. 34)**

**U.S. Trustee's Reply (Doc. No. 38)**

Trial Date:         **April 9, 2024, at 9:00 a.m.**

**United States Bankruptcy Court
Middle District of Florida**

**Dated:_____, 2024.**

**By: _____, Deputy Clerk**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| NORTH HAVEN LODGING PARTNERS LLC, a South Dakota limited liability company, and WALLINGFORD LODGING PARTNERS LLC, a South Dakota limited liability company,<br><br>               Plaintiffs,<br><br>    vs.<br><br>MCMANN COMMERCIAL LENDING LLC n/k/a MCMANN PROFESSIONAL SERVICES LLC and/or MCMANN CAPITAL, an Illinois limited liability company, and GENIE INVESTMENTS NV, a Nevada corporation,<br><br>               Defendants. | Case No. 1:23-cv-16264 |

## COMPLAINT

Plaintiffs, NORTH HAVEN LODGING PARTNERS LLC, a South Dakota limited liability company ("North Haven"), and WALLINGFORD LODGING PARTNERS LLC, a South Dakota limited liability company ("Wallingford", together with North Haven, the "Plaintiffs"), for their complaint against Defendants, MCMANN COMMERCIAL LENDING LLC n/k/a MCMANN PROFESSIONAL SERVICES LLC and/or MCMANN CAPITAL, an Illinois limited liability company ("McMann"), and GENIE INVESTMENTS NV, a Nevada corporation ("Genie"),  together with McMann, the "Defendants"), states as follows:

## NATURE OF ACTION

1.      Plaintiffs bring this action to recover $3,600,000 in funds that the Defendants have wrongfully withheld and willfully refused to return to the Plaintiffs despite both Defendants acknowledging orally and in writing that Plaintiffs are entitled to a return of the funds.  At issue

are two $18,000,000 lines of credits made by McMann to the Plaintiffs.  As part of the lines of credit, the Plaintiffs were obligated to, and did, prepay $1,800,000 in interest under each line of credit.  At the direction of McMann, the Plaintiffs wired the prepaid interest directly to Genie to be held in trust and accounted for pursuant to the loan documents as prepaid interest to be applied against each of the lines of credit. No other use of the deposit funds was authorized by Plaintiffs. Pursuant to the loan documents, McMann and/or Genie was obligated to fund each of the lines of credit, yet McMann and/or Genie failed to do so.  Pursuant to the loan documents, McMann and/or Genie was obligated to refund the prepaid interest payments if the lines of credit were not funded. The Plaintiffs have demanded return of the prepaid interest.  Both Defendants have acknowledged orally and in writing that Genie received the funds and that the Plaintiffs are entitled to a return of the funds, yet each of the Defendants have failed to return any of the $3,600,000 to the Plaintiffs in an effort to defraud Plaintiffs.

## THE PARTIES

2.      North Haven is a South Dakota limited liability company with its principal place of business located at 2517 West Brentridge Circle, Sioux Falls, South Dakota. The members of North Haven are PB Corporation TN, a Georgia corporation with its principal place of business in Athens, Georgia, Hari Har Management, Inc. a South Dakota corporation with its principal place of business in Sioux Falls, South Dakota, and two individuals, who are residents of and domiciled in Connecticut.

3.      Wallingford is a South Dakota limited liability company with its principal place of business located at 2517 West Brentridge Circle, Sioux Falls, South Dakota.  The sole member of Wallingford is an individual who is a resident of and domiciled in South Dakota.

4.      McMann is an Illinois limited liability company with its principal place of business located at 205 N. Michigan Ave., Ste. 810, Chicago Illinois 60601 and its registered agent located

4889-8151-4893

at 500 Skokie Blvd., Ste. 600, Northbrook, IL 60062.  According to the Illinois Secretary of State records McMann changed its name to McMann Professional Services LLC and/or McMann Capital on or about August 4, 2023.  Upon information and belief, none of the members of McMann are residents of, or domiciled in, Georgia, South Dakota, or Connecticut.

5.     Genie is a Nevada corporation with its principal address in Reno, Nevada.

## JURISDICTION AND VENUE

6.     This Court has diversity subject matter jurisdiction over this lawsuit under 28 U.S.C. §§ 1332(a)(1) as this action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.     Plaintiffs are South Dakota limited liability companies whose members are citizens of Georgia, South Dakota, and/or Connecticut.

8.     Defendant McMann is an Illinois limited liability company and upon information and belief, and based upon a reasonable pre-suit investigation, none of the members of McMann are citizens of Georgia, South Dakota, or Connecticut.

9.     Defendant Genie is a Nevada corporation with its principal place of business in Reno, Nevada.

10.     This Court has personal jurisdiction over each of the parties to this matter.  The Plaintiffs have conducted business with McMann, an Illinois limited liability company.  The Defendants have conducted and presently conduct business in Illinois.  McMann is an Illinois limited liability with its principal place of business in this state and in this district.  Genie has conducted and presently conducts business in this state and in this district by conducting business for and on behalf of McMann both as related to the two lines of credit at issue and, upon information and belief, as to other loans made by McMann to other McMann borrowers.  One of

3

Genie's officers, David Hughes, who has directly interacted with Plaintiffs related to the lines of credit at issue, resides in the state of Illinois and has conducted business within this state as related to the two lines of credit, and upon information and belief related to other transactions with McMann. Genie is subject to personal jurisdiction in accordance with Illinois' long-arm statute, which provides, in relevant part:

> Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person . . . to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts: (1) The transaction of any business within this State . . . .

735 ILCS 5/2-209(a).

11.     This Court is the proper venue for this lawsuit under 28 U.S.C. § 1391(a) because the events giving rise to Plaintiff's claim against the Defendants occurred in this judicial district.

## FACTS

### Loan to North Haven

12.     On or about April 10, 2023, McMann, through Walter Trock, Michael Lanza, and others, agreed to make a loan to North Haven in the form of a $18,000,000 line of credit, with a maximum amount of $18,600,000 ("North Haven Loan").

13.     The purpose of the line of credit was for the construction of a 105-room limited-service hotel.

14.     The North Haven Loan is governed by that certain Business Expansion Line of Credit Agreement ("North Haven BELOC") dated April 10, 2023 made by and between North Haven and McMann. Walter Trock executed the North Haven BELOC for McMann.  A copy of the North Haven BELOC is attached as **Exhibit 1**.

4889-8151-4893

15.     The North Haven Loan is evidenced by that certain Promissory Note dated April 10, 2023 in the principal amount of $18,600,000 ("North Haven Note") made by North Haven in favor of McMann.  The North Haven Note is attached to the North Haven BELOC as Exhibit A. *See* Ex. 1 North Haven BELOC, Ex. A.

16.     The North Haven Loan is secured by that certain Security Agreement dated April 10, 2023 made by North Haven in favor of McMann ("North Haven Security Agreement").  The North Haven Security Agreement is attached to the North Haven BELOC as Exhibit E. *See* Ex. 1 North Haven BELOC, Ex. E.

17.     The North Haven BELOC required North Haven to pay $1,800,000 to McMann as prepaid interest for the North Haven Loan ("North Haven ICA Payment").

18.     The North Haven BELOC required McMann to establish on McMann's books and records an interest credit account for the North Haven ICA Payment ("North Haven ICA") so that interest payments on the North Haven Loan would first be satisfied by using the North Haven ICA Payment.  *See* Ex. 1, North Haven BELOC, Recitals C, D; §3.5.

19.     The North Haven BELOC required McMann to fund the advances under the North Haven Loan pursuant to the parties' agreed upon schedule, with the first funding advance to occur within seventy-five (75) days of the ICA Payment. *See* Ex. 1, North Haven BELOC, §7.1 and Ex. B, Tranche Schedule.

20.     The Plaintiffs reasonably relied on McMann's, Trock's, and Lanza's promises, agreement, and statements to fund the North Haven Loan in accordance with the parties' agreements.

21.     In reliance on McMann's, Trock's, and Lanza's assurances, the Plaintiffs paid the North Haven ICA Payment.

5

22.     On April 10, 2023, McMann directed North Haven to wire the North Haven ICA Payment to a bank account at Chase Bank, Account Number xxxxx8502, titled in the name "Genie Investments NV."

23.     On April 10, 2023, North Haven wired the North Haven ICA Payment as instructed by McMann to the Chase Bank Account, Account Number xxxxx8502.

24.     Both McMann and Genie have confirmed in writing that Genie received the North Haven ICA Payment.

**Loan to Wallingford**

25.     On or about April 10, 2023, McMann, through Walter Trock, Michael Lanza, and others,  agreed to make a loan to Wallingford in the form of a $18,000,000 line of credit, with a maximum amount of $18,600,000 ("Wallingford Loan").

26.     The purpose of the line of credit was for the construction of a 105-room limited-service hotel.

27.     The Wallingford Loan is governed by that certain Business Expansion Line of Credit Agreement ("Wallingford BELOC" together with the North Haven BELOC, the "BELOCs") dated April 10, 2023 made by and between Wallingford and McMann. Walter Trock executed the Wallingford BELOC for McMann. A copy of the Wallingford BELOC is attached as **Exhibit 2**.

28.     The Wallingford Loan is evidenced by that certain Promissory Note dated April 10, 2023 in the principal amount of $18,600,000 ("Wallingford Note") made by Wallingford in favor of McMann.  The Wallingford Note is attached to the Wallingford BELOC as Exhibit A. *See* Ex. 2, Wallingford BELOC, Ex. A.

29.     The Wallingford Loan is secured by that certain Security Agreement dated April 10, 2023 made by Wallingford in favor of McMann ("Wallingford Security Agreement").  The

Wallingford Security Agreement is attached to the Wallingford BELOC as Exhibit E. *See* Ex. 2, Wallingford BELOC, Ex. E.

30.     The Wallingford BELOC required North Haven to pay $1,800,000 to McMann as prepaid interest for the Wallingford Loan ("Wallingford ICA Payment" together with the North Haven ICA Payment, the "ICA Payments").

31.     The Wallingford BELOC required McMann to establish on McMann's books and records an interest credit account for the Wallingford ICA Payment ("Wallingford ICA") so that interest payments on the Wallingford Loan would first be satisfied by using the Wallingford ICA Payment.  *See* Ex. 2, Wallingford BELOC, Recitals C, D; §3.5.

32.     The Wallingford BELOC required McMann to fund the advances under the Wallingford Loan pursuant to the parties' agreed upon schedule, with the first funding advance to occur within seventy-five (75) days of the ICA Payment. *See* Ex. 2, Wallingford BELOC, §7.1 and Ex. B, Tranche Schedule.

33.     The Plaintiffs reasonably relied on McMann's, Trock's, and Lanza's promises, agreement, and statements to fund the Wallingford Loan in accordance with the parties' agreements.

34.     In reliance on McMann's, Trock's, and Lanza's assurances, the Plaintiffs paid the Wallingford ICA Payment.

35.     On April 10, 2023, McMann directed Wallingford to wire the Wallingford ICA Payment to a bank account at Chase Bank, Account Number xxxxx8502, titled in the name "Genie Investments NV."

36.     On April 10, 2023, Wallingford wired the Wallingford ICA Payment as instructed by McMann to the Chase Bank Account, Account Number xxxxx8502.

37.    Both McMann and Genie have confirmed in writing that Genie received the Wallingford ICA Payment.

**McMann's Breach of the North Haven Loan and Wallingford Loan and Plaintiffs' Demand for Refund**

38.    McMann failed to fund both the North Haven Loan and Wallingford Loan as required by the BELOCs.

39.    The North Haven BELOC provides North Haven the right to terminate the agreement and demand refund of the North Haven ICA Payment in the event that McMann fails to timely fund the North Haven Loan.  Specifically, Section 13.7(a) of the North Haven BELOC provides:

> Upon the occurrence of such default, Borrower shall deliver a written notice in the form of a notarized termination letter, a copy of which is attached hereto as Exhibit F ("the Termination Letter"), to Lender by certified mail. Upon receipt of such notice, **Lender shall have forty (40) international business-banking days from the date of receipt ("Refund Period") within which to return the ICA Payment to the Borrower**….

Exhibit 1, §13.7(a) (emphasis added).

40.    The Wallingford BELOC provides Wallingford the right to terminate the agreement and demand refund of the Wallingford ICA Payment in the event that McMann fails to timely fund the Wallingford Loan.  Specifically, Section 13.7(a) of the Wallingford BELOC provides:

> Upon the occurrence of such default, Borrower shall deliver a written notice in the form of a notarized termination letter, a copy of which is attached hereto as Exhibit F ("the Termination Letter"), to Lender by certified mail. Upon receipt of such notice, **Lender shall have forty (40) international business-banking days from the date of receipt ("Refund Period") within which to return the ICA Payment to the Borrower**….

8

Exhibit 2, §13.7(a) (emphasis added).

41.     On August 17, 2023, North Haven and Wallingford each tendered a Termination Letter for each of the North Haven Loan and Wallingford Loan pursuant to the BELOCs and demanded a refund of each of the ICA Payments (the "Termination Notices").  A copy of each of the Termination Letters is attached as **Exhibit 3.** The Termination Notices were provided to both McMann and Genie via a communication platform utilized by McMann and Genie called Zoomeral.

42.     Pursuant to the BELOCs, McMann was obligated to refund the ICA Payments on or before October 17, 2023.

43.     Upon information and belief, McMann did not have the loan funds to fund either the North Haven Loan or Wallingford Loan when it entered into the BELOCs.

44.     To date, McMann has failed to refund the North Haven ICA Payment and the Wallingford ICA Payment.

**McMann Provides False Oral and Written Information to Plaintiffs**

45.     Instead of refunding the ICA Payments as required by the loan documents, McMann has engaged in a series of false oral and written statements.

46.     On or about October 16, 2023, Walter Trock, Senior Managing Partner of McMann sent a series of text messages to Preet Patel, a representative of the Plaintiffs, in which Mr. Trock assured the Plaintiffs that McMann would obtain a refund from Genie for the Plaintiffs despite McMann's own obligation to provide a refund to Plaintiffs.

47.     Mr. Trock also falsely stated to the Plaintiffs that this is the first time Genie has refused to refund money to a McMann borrower.  As the Plaintiffs unfortunately learned later,

McMann and Genie have engaged in similar misconduct and apparent fraud for a host of other borrowers.

48.     The Plaintiffs reasonably relied on McMann's and Mr. Trock's representations and actions and believed that McMann would obtain a refund of the ICA Payments.

49.     On October 24, 2023, counsel for McMann sent a demand letter to Genie demanding that Genie immediately refund the ICA Payments to Plaintiffs.  A copy of the October 24, 2023 letter is attached as **Exhibit 4.**

50.     The October 24, 2023 letter also makes a series of admissions that confirm Plaintiffs' entitlement to the return of the ICA Payments and confirm McMann's and Genie's liability to the Plaintiffs.

51.     Specifically, McMann admits:

    a.     Genie received payment of each of the ICA Payments on May 3, 2023;

    b.     Genie was obligated to hold the ICA Payments in trust for the benefit of the Plaintiffs;

    c.     The Plaintiffs properly terminated the BELOCs;

    d.     The Plaintiffs properly exercised their rights under Section 13.7 of the BELOCs and demanded refund of the ICA Payments;

    e.     The Plaintiffs have complied with every term of the BELOCs;

    f.     Genie properly received notice of the Plaintiffs' termination of the BELOCs and demand of refund of the ICA Payments;

    g.     Genie admitted that the Plaintiffs' are entitled to a refund of the ICA Payments;

    h.     Genie promised to refund the refund of the ICA Payments on or before October 13, 2023; and

    i.     The Plaintiffs are entitled to the immediate return of the ICA Payments and there is no legal or good faith basis that these funds should not be returned.

52.      McMann has falsely stated orally and in writing that it will refund ICA Payments.

53.      Despite McMann's written and oral representations, statements, assurances, and promises, McMann continues to refuse to refund the ICA Payments.

54.      The Plaintiffs reasonably relied on McMann's continued assurances and promises that it will refund the ICA Payments and the Plaintiffs believed that McMann would obtain and issue a refund of the ICA Payments.

**Genie and David Hughes Provides False Oral and Written Information to Plaintiffs**

55.      Genie has admitted and acknowledged orally and in writing that it received the ICA Payments.

56.      On August 18, 2023, the Plaintiffs provided Genie notice that the Plaintiffs exercised their rights under the BELOCs and terminated the agreements.

57.      On August 18, 2023, the Plaintiffs demanded a refund of the ICA Payments.

58.      Instead of refunding the ICA Payments as required, Genie, through its Director, David Hughes has engaged in a series of oral and written false statements to induce the Plaintiffs into believing that Genie will refund the ICA Payments.

59.      On September 14, 2023, Genie represented, in writing via Zoomeral, that it would refund the ICA Payments on October 13, 2023.  *See* Exhibit E to Complaint Exhibit 4.

60.      Additionally, on October 11, 2023 David Hughes confirmed to Plaintiffs there was "nothing" to be done when asked by Preet Patel (representative of Plaintiffs) "nothing on our end left to do re: refund this week correct?"

61.      Genie and David Hughes also orally confirmed to the Plaintiffs that the Plaintiffs were entitled to the refund of the ICA Payments during multiple telephone discussions. The most recent confirmation of entitlement to a refund was provided during a October 17, 2023 telephone

11

discussion with David Hughes wherein Hughes assured Plaintiffs that Genie had never failed to make an ICA refund in the past. As the Plaintiffs unfortunately learned later, McMann and Genie have engaged in similar misconduct and apparent fraud for a host of other borrowers.

62.    Genie knew these representations were materially false when made because Genie did not have the funds to refund the ICA Payments. As the Plaintiffs unfortunately learned later, McMann and Genie have engaged in similar misconduct and apparent fraud for a host of other borrowers.

63.    The Plaintiffs reasonably relied on Genie's representations that it would refund the ICA Payments on October 13, 2023.

64.    Instead of refunding the payments on October 13, 2023, Genie, through its counsel Adam Walker of Walker Law Office, LLC sent a letter to the Plaintiffs for each of the loans alleging it is unable to refund the ICA Payments at this time because of "the ongoing failure of its capital provider to comply with its contractual obligations to provide funds to Genie."   A copy of the October 13, 2023 letters are attached as **Group Exhibit 5**.

65.    Genie's October 13, 2023 letter is an admission that it unlawfully transferred the ICA Payments and did not hold those funds in trust for the benefit of the Plaintiffs are required by the BELOC and obligations delegated to Genie by McMann related to the ICA Payments.

66.    Specifically, Genie stated that it is working to "compel the capital provider to deliver the funds it owes, so that Genie can, in turn, provide refunds to its borrowers." Ex. 5.

67.    In other words, Genie admitted that it no longer has the ICA Payments in its possession and control.  Instead, Genie admits that it used the ICA Payments for an unauthorized purpose and was apparently relying on another third-party to pay funds to Genie and Genie would

then in turn pay those funds to the Plaintiffs for refund of the ICA Payments. Plaintiffs never authorized any other use of their funds other than to be held in trust pursuant to the BELOCs.

### McMann Misappropriates the ICA Payments and Violates its Fiduciary Duties to the Plaintiffs

68.     The BELOCs require McMann to hold the ICA Payments in trust to be used to repay the Loans pursuant to each of the BELOC agreements.

69.     Specifically, the BELOCs required McMann to establish an Interest Reserve Account and to account for the ICA Payments on McMann's books and records and apply a credit equal to the amount of each payment "purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein" Exs. 1 and 2, Recitals C, D.

70.     Likewise, Section 3.5 of the BELOCs required McMann to pay interest on the Loans directly from the ICA Payments. Exs. 1 and 2, §3.5.

71.     McMann agreed to repay the ICA Payments within 40 business days of its default under the Loans. Exs. 1 and 2, §13.7(b).

72.     McMann owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

73.     McMann owed a fiduciary duty to the Plaintiffs to act in accordance with the BELOCs, including to hold the funds in trust, apply the funds pursuant to the parties' agreement, and return the funds as required by the BELOCs.

74.     McMann breached its fiduciary duties and misappropriated the ICA Payments by, among other breaches:

      a.     Failing to hold the ICA Payments in trust and safeguard those funds;

      b.     Failing to establish the Interest Reserve Accounts;

      c.     Failing to account for the ICA Payments on McMann's books and records;

      d.      Failing to comply with the terms of the BELOCs; and

      e.      Failing to return the ICA Payments as required by the BELOCs.

75.     McMann also violated its fiduciary duties to the Plaintiffs and the terms of the BELOCs by sending the ICA Payments to Genie when it knew Genie was not a trustworthy fiduciary of those funds, thus diverting and converting those funds.

76.     McMann was aware, prior to the transfer of the ICA Payments, that Genie was not a trustworthy fiduciary because, upon information and belief, Genie and McMann previously refused and were unable to fund other loans and previously refused and were unable to refund other similar prepaid interest payments for other McMann borrowers.

77.     The Plaintiffs reasonably relied on McMann and reasonably believed that McMann would honor its fiduciary duties to the Plaintiffs.

78.     As a result of the Plaintiffs' reliance and beliefs, the Plaintiffs have suffered damages.

**Genie Misappropriates the ICA Payments and Violates its Fiduciary Duties to the Plaintiffs**

79.     Upon information and belief, Genie drafted and provided to McMann the loan documents for each of the North Haven and Wallingford Loans and directed McMann on how to use the loan documents. McMann and Genie were effectively partners in issuing the loans to Plaintiffs.

80.     Upon information and belief, Genie was aware of the terms of each of the Loans.

81.     Upon information and belief, Genie was aware that the ICA Payments were to be held in trust and safeguarded so the funds could be applied pursuant to the BELOCs and Genie directed that wiring instructions state that the ICA Payments were to be wired directly to Genie.

82.     Upon information and belief, Genie agreed to hold the ICA Payments in trust and safeguard those funds for the benefit of Plaintiffs.

83.     Genie received each of the ICA Payments into Genie's Chase Bank Account Number xxxxx8502 on or about May 3, 2023.

84.     Genie owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

85.     Upon information and belief, Genie transferred the ICA Payments from its Chase Bank Account Number xxxxx8502 to another location, thus diverting and converting those funds.

86.     Genie did not hold the ICA Payments in trust so the funds could be applied pursuant to the BELOCs.

87.     Genie admits that it is obligated to return the ICA Payments to the Plaintiffs.

88.     Plaintiffs (and McMann) has demanded that Genie return the ICA Payments to the Plaintiffs.

89.     Genie promised to refund the ICA Payments by October 13, 2023.

90.     Genie breached its fiduciary duties and misappropriated the ICA Payments by, among other breaches:

> a.     Failing to hold the ICA Payments in trust and safeguard those funds; and
>
> b.     Failing to return the ICA Payments as it agreed to do and as directed by McMann.

91.     The Plaintiffs reasonably relied on Genie and reasonably believed that Genie would honor its fiduciary duties to the Plaintiffs.

92.     As a result of the Plaintiffs' reliance and beliefs, the Plaintiffs have suffered damages.

4889-8151-4893

## COUNT I
## BREACH OF CONTRACT
**(against McMann)**

93.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

94.    The BELOCs and Loan Documents are legally valid, binding and enforceable agreements.

95.    Pursuant to the BELOCs, McMann agreed to provide the Loans to the Plaintiffs in exchange for, among other consideration, payment of the ICA Payments.

96.    The Plaintiffs paid the ICA Payments pursuant to the BELOCs.

97.    Pursuant to the BELOCs, McMann agreed to refund the ICA Payments within 40 business days of receipt of the Termination Notices.

98.    McMann admits that the BELOCs are valid and binding agreements.

99.    McMann defaulted under the terms of the BELOCs.

100.    The Plaintiffs properly exercised their rights to terminate the BELOCs, properly provided the Termination Notices, and are entitled to the immediate refund of the ICA Payments.

101.    The Plaintiffs have fully performed all obligations under the BELOCs.

102.    McMann has no legally recognized justification or excuse for breaching the BELOCs and Loan Documents.

103.    McMann has no legally recognized justification or excuse for refusing to refund the ICA Payments.

104.    The Plaintiffs are entitled to a return of the ICA Payments.

105.    McMann has breached the BELOCs and Loan Documents by, among other breaches:

a.      Failing to fund each of the Loans;

b.      Failing to hold the ICA Payments in trust and safeguard those funds;

c.      Failing to establish the Interest Reserve Accounts;

d.      Failing to account for the ICA Payments on McMann's books and records;

e.      Failing to comply with the terms of the BELOCs; and

f.      Failing to refund the ICA Payments within 40 business days from receipt of the Termination Notices.

106.    The Plaintiffs have been damaged as a result of each and every breach of the BELOCs and Loan Documents in an amount not less than $3,600,000.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

A.      Awarding the Plaintiffs $3,600,000 for McMann's breach of the BELOCs and Loan Documents;

B.      Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.      Awarding the Plaintiffs their costs and attorney's fees, as provided by the BELOCs and applicable law; and

D.      Grant the Plaintiffs such other relief as this Court deems just.

### COUNT II
### CONVERSION
### (against McMann)

107.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

108.    The BELOCs and Loan Documents are legally valid, binding and enforceable agreements.

109.    Pursuant to the BELOCs, McMann agreed to provide the Loans to the Plaintiffs in exchange for, among other consideration, payment of the ICA Payments.

4889-8151-4893

110.    The Plaintiffs paid the ICA Payments pursuant to the BELOCs.

111.    The BELOCs require McMann to hold the ICA Payments in trust to be used solely to repay the Loans pursuant to each of the BELOC agreements.

112.    Specifically, the BELOCs required McMann to establish an Interest Reserve Account and to account for the ICA Payments on McMann's books and records and apply a credit equal to the amount of each payment for the "purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein" Exs. 1 and 2, Recitals C, D.

113.    Likewise, Section 3.5 of the BELOCs required McMann to pay interest on the Loans directly from the ICA Payments. Exs. 1 and 2, §3.5.

114.    Pursuant to the BELOCs, McMann agreed to refund the ICA Payments within 40 business days of receipt of the Termination Notices.

115.    McMann admits that the BELOCs are valid and binding agreements.

116.    McMann admits that the Plaintiffs properly and fully paid the ICA Payments.

117.    McMann defaulted under the terms of the BELOCs.

118.    McMann has no legally recognized justification or excuse for breaching the BELOC and Loan Documents.

119.    McMann has no legally recognized justification or excuse for refusing to refund the ICA Payments.

120.    The Plaintiffs properly exercised their rights to terminate the BELOCs, properly provided the Termination Notices, and are entitled to the immediate refund of the ICA Payments.

121.    The Plaintiffs have fully performed all obligations under the BELOCs.

122.    The Plaintiffs are entitled to a return of the ICA Payments.

123.    The Plaintiffs demanded return of the ICA Payments.

18

124.    McMann is obligated to return the ICA Payments within 40 days of receipt of the Termination Notices.

125.    McMann has exercised unauthorized and wrongful assumption of control, dominion, or ownership of the ICA Payments.

126.    McMann has wrongfully refused to return the ICA Payments.

127.    The ICA Payments are the Plaintiffs lawful property.

128.    The Plaintiffs are absolutely and unconditionally entitled to the immediate possession of the ICA Payments.

129.    McMann has unlawfully converted the ICA Payments. McMann's conduct as alleged herein was willful and wanton and McMann acted with actual malice, fraud, and/or gross negligence.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

A.    Awarding the Plaintiffs $3,600,000 for McMann's conversion of the ICA Payments;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding punitive damages in an amount to be proven at trial;

D.    Awarding the Plaintiffs their costs and attorney's fees, as provided by the BELOCs and applicable law; and

E.    Grant the Plaintiffs such other relief as this Court deems just.

## COUNT III
## TO AVOID AND RECOVER ACTUAL FRAUDULENT TRANSFER
### (against McMann)

130.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

4889-8151-4893

131.    On or about May 3, 2023, McMann caused the ICA Payments to be transferred to Genie into Chase Bank Account Number xxxxx8502.

132.    After May 3, 2023, upon information and belief the ICA Payments were transferred from the Chase Bank Account Number xxxxx8502 to another source.

133.    740 ILCS 160/5 provides, in relevant part:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) with actual intent to hinder, delay, or defraud any creditor of the debtor . . .
> >      . . . .
>
> (b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:
>
> > (1) the transfer or obligation was to an insider;
> >
> > (2) the debtor retained possession or control of the property transferred after the transfer;
> >
> > (3) the transfer or obligation was disclosed or concealed;
> >
> > (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> >
> > (5) the transfer was of substantially all the debtor's assets;
> >
> > (6) the debtor absconded;
> >
> > (7) the debtor removed or concealed assets;
> >
> > (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> >
> > (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> >
> > (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> >
> > (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

134.    740 ILCS 106/8 provides:

(a) In an action for relief against a transfer or obligation under this Act, a creditor, subject to the limitations in Section 9, may obtain:

(1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;

(2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by the Code of Civil Procedure;

(3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure,

(A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(C) any other relief the circumstances may require.

(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

135.    McMann's transfer of the ICA Payments was a fraudulent conveyance because, among other reasons:

a.    The transfer was made with actual intent to hinder, delay, or defraud McMann's creditors, namely the Plaintiffs;

b.    Genie is an insider of McMann;

c.    The transfer was concealed from the Plaintiffs;

d.    The transfer was intended to conceal or remove McMann's assets;

e.    Upon information and belief the value of the consideration received by McMann in exchange for the transfer to Genie was not reasonably equivalent to the assets transferred; in fact, McMann received no consideration for the transfer; and

f.    McMann was insolvent or became insolvent shortly after the transfer as evidenced by its inability to funds the Loans and return the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

A.      Avoiding the $3,600,000 transfer from Genie to an unknown source to the extent necessary to satisfy the Plaintiffs' claim;

B.      Permitting an attachment or other provisional remedy against the transferred funds or other property of McMann in accordance with the procedure prescribed by the Illinois Code of Civil Procedures;

C.      Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

D.      Awarding punitive damages in an amount to be proven at trial as McMann's conduct as alleged herein was willful and wanton and McMann acted with actual malice, fraud, and/or gross negligence;

E.      Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

F.      Grant the Plaintiffs such other relief as this Court deems just.

## COUNT IV
## TO AVOID AND RECOVER CONSTRUCTIVE FRAUDULENT TRANSFER
### (against McMann)

136.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

137.    On or about May 3, 2023, McMann caused the ICA Payments to be transferred to Genie into Chase Bank Account Number xxxxx8502.

138.    After May 3, 2023, upon information and belief, the ICA Payments were transferred from the Chase Bank Account Number xxxxx8502 to another source.

139.    740 ILCS 160/5(a)(2) provides, in relevant part:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

* * *

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

22

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they become due.

140.    740 ILCS 106/6(a) provides:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

141.    The Plaintiffs' claim arose before the transfer was made.

142.    Upon information and belief, the value of the consideration received by McMann in exchange for the transfer to Genie was not reasonably equivalent to the assets transferred; in fact, McMann received no consideration for the transfer.

143.    Upon information and belief, the transfer occurred shortly after the Plaintiffs made the ICA Payments.

144.    McMann believed, or reasonably should have believed that it would incur debts beyond its ability to repay because McMann knew it could not fund the Loans and knew that Genie was an untrustworthy custodian of the ICA Payments.

145.    McMann was insolvent or became insolvent shortly after the transfer as evidenced by its inability to fund the Loans and return the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

A.    Avoiding the $3,600,000 transfer from Genie to an unknown source to the extent necessary to satisfy the Plaintiffs' claim;

B.      Permitting an attachment or other provisional remedy against the transferred funds or other property of McMann in accordance with the procedure prescribed by the Illinois Code of Civil Procedures;

C.      Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

D.      Awarding punitive damages in an amount to be proven at trial as McMann's conduct as alleged herein was willful and wanton and McMann acted with actual malice, fraud, and/or gross negligence;

E.      Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

F.      Grant the Plaintiffs such other relief as this Court deems just.


## COUNT V
## FRAUD AND FRAUDULENT MISREPRESENTATIONS
### (against McMann)

146.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

147.    As alleged above, McMann entered into the BELOCs and Loan Documents and obtained payment of the ICA Payments by use of false oral and written statements that were materially false, including but not limited to:

a.      McMann's ability to fund the Loans;

b.      McMann's agreement to hold in trust and safeguard the ICA Payments; and

c.      McMann's ability and agreement to refund the ICA Payments, if and when required.

148.    The statements amounted to false pretenses, were false representations, were false when made, and were in service of an actual fraud.

149.    McMann knew that the aforesaid misrepresentations were untrue and omissions misleading.

24

150.    Each of the aforesaid misrepresentations and omissions were made with the intent that the Plaintiffs would rely on them to enter into the Loans and pay the ICA Payments.

151.    The Plaintiffs did in fact rely on each of the alleged omissions and misrepresentations in entering into the Loans and paying the ICA Payments.

152.    But for McMann's material omissions and misrepresentations as alleged above, the Plaintiffs would not have entered into the Loans and would not have paid the ICA Payments.

153.    The Plaintiffs justifiably relied upon McMann's material omissions and misrepresentations of fact.

154.    As a direct and proximate result of McMann's material omissions and misrepresentations of fact, the Plaintiffs have been damaged in an amount in excess of $3,600,000. McMann's conduct as alleged herein was willful and wanton and McMann acted with actual malice, fraud, and/or gross negligence.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

A.    Awarding the Plaintiffs $3,600,000;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding punitive damages in an amount to be proven at trial;

D.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

E.    Grant the Plaintiffs such other relief as this Court deems just.

### COUNT VI
### BREACH OF FIDUCIARY DUTY
**(against McMann)**

155.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

156.     The BELOCs and Loan Documents are legally valid, binding and enforceable agreements.

157.     Pursuant to the BELOCs, McMann agreed to provide the Loans to the Plaintiffs in exchange for, among other consideration, payment of the ICA Payments.

158.     The Plaintiffs paid the ICA Payments pursuant to the BELOCs.

159.     Pursuant to the BELOCs, McMann agreed to refund the ICA Payments within 40 business days of receipt of the Termination Notices.

160.     McMann owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

161.     McMann owed a fiduciary duty to the Plaintiffs to act in accordance with the BELOCs, including to hold the funds in trust, apply the funds pursuant to the parties' agreement, and return the funds as required by the BELOCs.

162.     McMann breached its fiduciary duties and misappropriated the ICA Payments by, among other breaches:

      a.     Failing to hold the ICA Payments in trust and safeguard those funds;

      b.     Failing to establish the Interest Reserve Accounts;

      c.     Failing to account for the ICA Payments on McMann's books and records;

      d.     Failing to comply with the terms of the BELOCs; and

      e.     Failing to return the ICA Payments as required by the BELOCs.

163.     McMann also violated its fiduciary duties to the Plaintiffs and the terms of the BELOCs by sending the ICA Payments to Genie when it knew Genie was not a trustworthy fiduciary of those funds, thus diverting and converting those funds.

164.    McMann was aware, prior to the transfer of the ICA Payments, that Genie was not a trustworthy fiduciary because, upon information and belief, Genie and McMann previously refused and were unable to fund other loans and previously refused and were unable to refund other similar prepaid interest payments for other McMann borrowers.

165.    The Plaintiffs properly exercised their rights to terminate the BELOCs, properly provided the Termination Notices, and are entitled to the immediate refund of the ICA Payments.

166.    The Plaintiffs have fully performed all obligations under the BELOCs.

167.    The Plaintiffs are entitled to a return of the ICA Payments.

168.    McMann has failed to return the ICA Payments.

169.    The Plaintiffs have been damaged as a result of McMann's breaches of its fiduciary duties in the amount not less than $3,600,000.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

A.    Awarding judgment in the amount of $3,600,000;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

D.    Grant the Plaintiffs such other relief as this Court deems just.

### COUNT VII
### CONSTRUCTIVE TRUST
**(against McMann)**

170.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-54, 68-78 of the Complaint as if fully set forth herein.

171.    The BELOCs and Loan Documents are legally valid, binding and enforceable agreements.

4889-8151-4893

172.    Pursuant to the BELOCs, McMann agreed to provide the Loans to the Plaintiffs in exchange for, among other consideration, payment of the ICA Payments.

173.    The Plaintiffs paid the ICA Payments pursuant to the BELOCs.

174.    Pursuant to the BELOCs, McMann agreed to refund the ICA Payments within 40 business days of receipt of the Termination Notices.

175.    McMann owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

176.    McMann owed a fiduciary duty to the Plaintiffs to act in accordance with the BELOCs, including to hold the funds in trust, apply the funds pursuant to the parties' agreement, and return the funds as required by the BELOCs.

177.    McMann breached its fiduciary duties and misappropriated the ICA Payments by, among other breaches:

   a.    Failing to hold the ICA Payments in trust and safeguard those funds;

   b.    Failing to establish the Interest Reserve Accounts;

   c.    Failing to account for the ICA Payments on McMann's books and records;

   d.    Failing to comply with the terms of the BELOCs; and

   e.    Failing to return the ICA Payments as required by the BELOCs.

178.    McMann also violated its fiduciary duties to the Plaintiffs and the terms of the BELOCs by sending the ICA Payments to Genie when it knew Genie was not a trustworthy fiduciary of those funds, thus diverting and converting those funds.

179.    McMann was aware, prior to the transfer of the North Haven ICA Payment and the Wallingford ICA Payment, that Genie was not a trustworthy fiduciary because, upon information and belief, Genie and McMann previously refused and were unable to fund other loans and

previously refused and were unable to refund other similar prepaid interest payments for other McMann borrowers.

180.   McMann engaged in actual and constructive fraud that justifies imposition of a constructive trust.

181.   As alleged above, McMann entered into the BELOCs and Loan Documents and obtained payment of the ICA Payments by use of false oral and written statements that were materially false, including but not limited to:

a.   McMann's ability to fund the Loans;

b.   McMann's agreement to hold in trust and safeguard the ICA Payments; and

c.   McMann's ability and agreement to refund the ICA Payments, if and when required.

182.   The statements amounted to false pretenses, were false representations, were false when made, and were in service of an actual fraud.

183.   McMann knew that the aforesaid misrepresentations were untrue and omissions misleading.

184.   Each of the aforesaid misrepresentations and omissions were made with the intent that the Plaintiffs would rely on them to entered into the Loans and pay the ICA Payments.

185.   The Plaintiffs did in fact rely on each of the alleged omissions and misrepresentations in entering into the Loans and paying the ICA Payments.

186.   But for McMann's material omissions and misrepresentations as alleged above, the Plaintiffs would not have entered into the Loans and would not have paid the ICA Payments.

187.   The Plaintiffs justifiably relied upon McMann's material omissions and misrepresentations of fact.

4889-8151-4893

188.    The Plaintiffs properly exercised their rights to terminate the BELOCs, properly provided the Termination Notices, and are entitled to the immediate refund of the ICA Payments.

189.    The Plaintiffs have fully performed all obligations under the BELOCs.

190.    The Plaintiffs are entitled to a return of the ICA Payments.

191.    McMann has failed to return the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against McMann:

A.    Establishing a constructive trust for the ICA Payments in the amount of $3,600,000;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

D.    Grant the Plaintiffs such other relief as this Court deems just.

**COUNT VIII**
**BREACH OF CONTRACT**
**(against Genie)**

192.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

193.    Genie drafted the BELOCs and Loan Documents.

194.    Genie provided drafts of the BELOCs and Loan Documents to McMann.

195.    Genie knew of and understood the terms of the BELOCs and Loan Documents.

196.    At the direction of Genie and McMann, the Plaintiffs paid the ICA Payments into Genie's Chase Bank Account Number xxxxx8502.

197.    Genie received payment of the ICA Payments.

198.    Genie knew of its duty and obligation to, and agreed to, hold the ICA Payments in trust for the benefit of the Plaintiffs to be used in accordance with the BELOCs and Loan Documents.

199.    Following receipt of the ICA Payments, Genie received copies of the Termination Notices.

200.    Genie knew and currently knows that the Plaintiffs exercised their rights to terminate the BELOCs and Loan Documents and that the Plaintiffs are entitled to the immediate return of the ICA Payments.

201.    The Plaintiffs made demand on Genie for a return of the ICA Payments.

202.    McMann made demand on Genie for a return of the ICA Payments.

203.    Genie, through oral and written agreements, agreed to return the ICA Payments to the Plaintiffs no later than October 13, 2023.

204.    The oral and written agreements to refund the ICA Payments are legally valid, binding and enforceable agreements.

205.    The Plaintiffs have performed all of their obligations under the oral and written agreements.

206.    Genie materially breached the oral and written agreements by failing to return the ICA Payments.

207.    Genie has no legally recognized justification or excuse for breaching the oral and written agreements.

208.    The Plaintiffs have been damaged as a result of Genie's breach of the oral and written agreements in an amount not less than $3,600,000.

31

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.    Awarding the Plaintiffs $3,600,000 for Genie's breach of the oral and written agreements;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

D.    Grant the Plaintiffs such other relief as this Court deems just.

**COUNT IX**
**CONVERSION**
**(against Genie)**

209.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

210.    Genie drafted the BELOCs and Loan Documents.

211.    Genie provided drafts of the BELOCs and Loan Documents to McMann.

212.    Genie knew of and understood the terms of the BELOCs and Loan Documents.

213.    At the direction of Genie and McMann, the Plaintiffs paid the ICA Payments into Genie's Chase Bank Account Number xxxxx8502.

214.    Genie received payment of the ICA Payments.

215.    Genie owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

216.    Genie owed a fiduciary duty to the Plaintiffs to act in accordance with the BELOCs, including to hold the funds in trust, apply the funds pursuant to the parties' agreement, and return the funds as required by the BELOCs.

217.    Genie knew of its duty and obligation to, and agreed to, hold the ICA Payments in trust for the benefit of the Plaintiffs to be used in accordance with the BELOCs and Loan Documents.

218.    Following receipt of the ICA Payments, Genie received copies of the Termination Notices.

219.    Genie knew and currently knows that the Plaintiffs exercised their rights to terminate the BELOCs and Loan Documents and that the Plaintiffs are entitled to the immediate return of the ICA Payments.

220.    The Plaintiffs made demand on Genie for a return of the ICA Payments.

221.    McMann made demand on Genie for a return of the ICA Payments.

222.    Genie, through oral and written agreements, agreed to return the ICA Payments to the Plaintiffs no later than October 13, 2023.

223.    The oral and written agreements to refund the ICA Payments are legally valid, binding and enforceable agreements.

224.    The Plaintiffs have performed all of their obligations under the oral and written agreements.

225.    Genie materially breached the oral and written agreements by failing to return the ICA Payments.

226.    The Plaintiffs are entitled to a return of the ICA Payments.

227.    The Plaintiffs demanded return of the ICA Payments.

228.    Genie is obligated to return the ICA Payments.

229.    Genie has exercised unauthorized and wrongful assumption of control, dominion, or ownership of the ICA Payments.

230.    Genie has wrongfully refused to return the ICA Payments.

231.    The ICA Payments are the Plaintiffs lawful property.

232.    The Plaintiffs are absolutely and unconditionally entitled to the immediate possession of the ICA Payments.

233.    Genie has unlawfully converted the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.    Awarding the Plaintiffs $3,600,000 for Genie's conversion of the ICA Payments;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding punitive damages in an amount to be proven at trial as Genie's conduct as alleged herein was willful and wanton and Genie acted with actual malice, fraud, and/or gross negligence;

D.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

E.    Grant the Plaintiffs such other relief as this Court deems just.

## COUNT X
## TO AVOID AND RECOVER ACTUAL FRAUDULENT TRANSFER
### (against Genie)

234.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

235.    On or about May 3, 2023, Genie caused or directed the ICA Payments to be transferred to Genie into Chase Bank Account Number xxxxx8502.

236.    After May 3, 2023, upon information and belief, Genie transferred or caused the ICA Payments to be transferred from the Chase Bank Account Number xxxxx8502 to another source.

237.    740 ILCS 160/5 provides, in relevant part:

34

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor . . .
>
> . . . .

(b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:

> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after the transfer;
>
> (3) the transfer or obligation was disclosed or concealed;
>
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) the transfer was of substantially all the debtor's assets;
>
> (6) the debtor absconded;
>
> (7) the debtor removed or concealed assets;
>
> (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
>
> (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
>
> (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
>
> (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

238.    740 ILCS 106/8 provides:

(a) In an action for relief against a transfer or obligation under this Act, a creditor, subject to the limitations in Section 9, may obtain:

> (1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim;
>
> (2) an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the procedure prescribed by the Code of Civil Procedure;
>
> (3) subject to applicable principles of equity and in accordance with applicable rules of civil procedure,

4889-8151-4893

(A) an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property;

(B) appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or

(C) any other relief the circumstances may require.

(b) If a creditor has obtained a judgment on a claim against the debtor, the creditor, if the court so orders, may levy execution on the asset transferred or its proceeds.

239.    Genie's transfer of the ICA Payments was a fraudulent conveyance because, among other reasons:

a.    The transfer was made with actual intent to hinder, delay, or defraud Genie's creditors, namely the Plaintiffs;

b.    Genie is an insider of McMann;

c.    The transfer was concealed from the Plaintiffs;

d.    The transfer was intended to conceal or remove Genie's assets;

e.    Upon information and belief the value of the consideration received by Genie in exchange for the transfer to Genie was not reasonably equivalent to the assets transferred; in fact, Genie received no consideration for the transfer; and

f.    Genie was insolvent or became insolvent shortly after the transfer as evidenced by its inability to return the ICA Payments and the apparent necessity of a third-party to pay Genie so Genie can refund the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.    Avoiding the $3,600,000 transfer from Genie to an unknown source to the extent necessary to satisfy the Plaintiffs' claim;

B.    Permitting an attachment or other provisional remedy against the transferred funds or other property of Genie in accordance with the procedure prescribed by the Illinois Code of Civil Procedures;

C.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

4889-8151-4893

D.      Awarding punitive damages in an amount to be proven at trial as Genie's conduct as alleged herein was willful and wanton and Genie acted with actual malice, fraud, and/or gross negligence;

E.      Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

F.      Grant the Plaintiffs such other relief as this Court deems just.

## COUNT XI
## TO AVOID AND RECOVER CONSTRUCTIVE FRAUDULENT TRANSFER
### (against Genie)

240.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

241.    On or about May 3, 2023, Genie caused and directed the ICA Payments to be transferred to Genie into Chase Bank Account Number xxxxx8502.

242.    After May 3, 2023, upon information and belief, Genie transferred or caused the ICA Payments to be transferred from the Chase Bank Account Number xxxxx8502 to another source.

243.    740 ILCS 160/5(a)(2) provides, in relevant part:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
            * * *
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they become due.

244.    740 ILCS 106/6(a) provides:

4889-8151-4893

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

245.    The Plaintiffs' claim arose before the transfer was made.

246.    Upon information and belief, the value of the consideration received by Genie in exchange for the transfer from Genie to an unknown source was not reasonably equivalent to the assets transferred; in fact, Genie received no consideration for the transfer.

247.    Upon information and belief, the transfer occurred shortly after the Plaintiffs made the ICA Payments.

248.    Genie believed, or reasonably should have believed that it would incur debts beyond its ability to repay because Genie knew it could not refund the ICA Payments when the transfer was made.

249.    Genie was insolvent or became insolvent shortly after the transfer as evidenced by its inability to return the ICA Payments and the apparent necessity of a third-party to pay Genie so Genie can refund the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.    Avoiding the $3,600,000 transfer from Genie to an unknown source to the extent necessary to satisfy the Plaintiffs' claim;

B.    Permitting an attachment or other provisional remedy against the transferred funds or other property of Genie in accordance with the procedure prescribed by the Illinois Code of Civil Procedures

C.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

38

D.      Awarding punitive damages in an amount to be proven at trial as Genie's conduct as alleged herein was willful and wanton and Genie acted with actual malice, fraud, and/or gross negligence;

E.      Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

F.      Grant the Plaintiffs such other relief as this Court deems just.

**COUNT XII**
**FRAUD AND FRAUDULENT MISREPRESENTATIONS**
**(against Genie)**

250.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

251.    As alleged above, Genie induced the Plaintiffs to transfer the ICA Payments to Genie at the direction of Genie (through McMann) by use of false representations, including terms included in the BELOCs provided by Genie to McMann, that were materially false, including but not limited to:

        a.      Genie's agreement to hold in trust and safeguard the ICA Payments; and

        b.      Genie's ability and agreement to refund the ICA Payments, if and when required.

252.    The statements amounted to false pretenses, were false representations, were false when made, and were in service of an actual fraud.

253.    Genie knew that the aforesaid misrepresentations were untrue and omissions misleading.

254.    Each of the aforesaid misrepresentations and omissions were made with the intent that the Plaintiffs would rely on them to enter into the Loans and pay the ICA Payments.

255.    The Plaintiffs did in fact rely on each of the alleged omissions and misrepresentations in paying the ICA Payments.

4889-8151-4893

256. But for Genie's material omissions and misrepresentations as alleged above, the Plaintiffs would not have entered into the Loans and would not have paid the ICA Payments.

257. The Plaintiffs justifiably relied upon Genie's material omissions and misrepresentations of fact.

258. As a direct and proximate result of Genie's material omissions and misrepresentations of fact, the Plaintiffs have been damaged in an amount in excess of $3,600,000. Genie's conduct as alleged herein was willful and wanton and Genie acted with actual malice, fraud, and/or gross negligence.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A. Awarding the Plaintiffs $3,600,000;

B. Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C. Awarding punitive damages in an amount to be proven at trial;

D. Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

E. Grant the Plaintiffs such other relief as this Court deems just.

### COUNT XIII
### BREACH OF FIDUCIARY DUTY
#### (against Genie)

259. The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

260. Genie drafted the BELOCs and Loan Documents.

261. Genie provided drafts of the BELOCs and Loan Documents to McMann.

262. Genie knew of and understood the terms of the BELOCs and Loan Documents.

263.    At the direction of Genie and McMann, the Plaintiffs paid the ICA Payments into Genie's Chase Bank Account Number xxxxx8502.

264.    Genie received payment of the ICA Payments.

265.    Genie owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

266.    Genie owed a fiduciary duty to the Plaintiffs to act in accordance with the BELOCs, including to hold the funds in trust, apply the funds pursuant to the parties' agreement, and return the funds as required by the BELOCs.

267.    Genie knew of its duty and obligation to, and agreed to, hold the ICA Payments in trust for the benefit of the Plaintiffs to be used in accordance with the BELOCs and Loan Documents.

268.    Following receipt of the ICA Payments, Genie received copies of the Termination Notices.

269.    Genie knew and currently knows that the Plaintiffs exercised their rights to terminate the BELOCs and Loan Documents and that the Plaintiffs are entitled to the immediate return of the ICA Payments.

270.    The Plaintiffs made demand on Genie for a return of the ICA Payments.

271.    McMann made demand on Genie for a return of the ICA Payments.

272.    Genie, through oral and written agreements, agreed to return the ICA Payments to the Plaintiffs no later than October 13, 2023.

273.    The oral and written agreements to refund the ICA Payments are legally valid, binding and enforceable agreements.

4889-8151-4893

274.    Genie breached its fiduciary duties and misappropriated the ICA Payments by, among other breaches:

      a.     Failing to hold the ICA Payments in trust and safeguard those funds; and

      b.     Failing to return the ICA Payments as required by the BELOCs.

275.    The Plaintiffs properly exercised their rights to terminate the BELOCs, properly provided the Termination Notices, and are entitled to the immediate refund of the ICA Payments.

276.    The Plaintiffs have fully performed all obligations under the oral and written agreements.

277.    The Plaintiffs are entitled to a return of the ICA Payments.

278.    Genie has failed to return the ICA Payments.

279.    The Plaintiffs have been damaged as a result of Genie's breaches of its fiduciary duties in the amount not less than $3,600,000.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.     Awarding judgment in the amount of $3,600,000;

B.     Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.     Awarding the Plaintiffs their costs and attorney's fees, as provided by law;

D.     Grant the Plaintiffs such other relief as this Court deems just.

**COUNT XIV**
**CONSTRUCTIVE TRUST**
**(against Genie)**

280.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

281.    Genie drafted the BELOCs  and Loan Documents.

282.    Genie provided drafts of the BELOCs and Loan Documents to McMann.

283.    Genie knew of and understood the terms of the BELOCs and Loan Documents.

284.    At the direction of Genie and McMann, the Plaintiffs paid the ICA Payments into Genie's Chase Bank Account Number xxxxx8502.

285.    Genie received payment of the ICA Payments.

286.    Genie knew of its duty and obligation to, and agreed to, hold the ICA Payments in trust for the benefit of the Plaintiffs to be used in accordance with the BELOCs and Loan Documents.

287.    Following receipt of the ICA Payments, Genie received copies of the Termination Notices.

288.    Genie knew and currently knows that the Plaintiffs exercised their rights to terminate the BELOCs and Loan Documents and that the Plaintiffs are entitled to the immediate return of the ICA Payments.

289.    The Plaintiffs made demand on Genie for a return of the ICA Payments.

290.    McMann made demand on Genie for a return of the ICA Payments.

291.    Genie, through oral and written agreements, agreed to return the ICA Payments to the Plaintiffs no later than October 13, 2023.

292.    The oral and written agreements to refund the ICA Payments are legally valid, binding and enforceable agreements.

293.    The Plaintiffs have performed all of their obligations under the oral and written agreements.

294.    Genie materially breached the oral and written agreements by failing to return the ICA Payments.

295.    Genie has no legally recognized justification or excuse for breaching the oral and written agreements.

296.    Genie owed a fiduciary duty to the Plaintiffs to hold the ICA Payments in trust and safeguard those funds so the funds could be applied pursuant to the BELOCs.

297.    Genie owed a fiduciary duty to the Plaintiffs to act in accordance with the BELOCs, including to hold the funds in trust, apply the funds pursuant to the parties' agreement, and return the funds as required by the BELOCs.

298.    Genie knew of its duty and obligation to, and agreed to, hold the ICA Payments in trust for the benefit of the Plaintiffs to be used in accordance with the BELOCs and Loan Documents.

299.    Genie breached its fiduciary duties and misappropriated the ICA Payments by, among other breaches:

      a.    Failing to hold the ICA Payments in trust and safeguard those funds; and

      b.    Failing to return the ICA Payments as required by the BELOCs.

300.    Genie engaged in actual and constructive fraud that justifies imposition of a constructive trust.

301.    As alleged above, Genie obtained payment of the ICA Payments by use of false oral and written statements that were materially false, including but not limited to:

      a.    Genie's agreement to hold in trust and safeguard the ICA Payments; and

      b.    Genie's ability and agreement to refund the ICA Payments, if and when required.

302.    The statements amounted to false pretenses, were false representations, were false when made, and were in service of an actual fraud.

4889-8151-4893

303.    Genie knew that the aforesaid misrepresentations were untrue and omissions misleading.

304.    Each of the aforesaid misrepresentations and omissions were made with the intent that the Plaintiffs would rely on them to pay the ICA Payments.

305.    The Plaintiffs did in fact rely on each of the alleged omissions and misrepresentations in paying the ICA Payments.

306.    But for Genie's material omissions and misrepresentations as alleged above, the Plaintiffs would not have entered into the Loans and would not have paid the ICA Payments.

307.    The Plaintiffs justifiably relied upon Genie's material omissions and misrepresentations of fact.

308.    The Plaintiffs properly exercised their rights to terminate the BELOCs, properly provided the Termination Notices, and are entitled to the immediate refund of the ICA Payments.

309.    The Plaintiffs have fully performed all obligations under the oral and written agreements with Genie.

310.    The Plaintiffs are entitled to a return of the ICA Payments.

311.    Genie has failed to return the ICA Payments.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.    Establishing a constructive trust for the ICA Payments in the amount of $3,600,000;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

D.    Grant the Plaintiffs such other relief as this Court deems just.

4889-8151-4893

## COUNT XV
## UNJUST ENRICHMENT
### (against Genie)

312.    The Plaintiffs restate and incorporate the allegations of Paragraphs 1-37, 55-67, 79-92 of the Complaint as if fully set forth herein.

313.    Genie drafted the BELOCs  and Loan Documents.

314.    Genie provided drafts of the BELOCs  and Loan Documents to McMann.

315.    Genie knew of and understood the terms of the BELOCs  and Loan Documents.

316.    At the direction of Genie and McMann, the Plaintiffs paid the ICA Payments into Genie's Chase Bank Account Number xxxxx8502.

317.    Genie received payment of the ICA Payments.

318.    Genie knew of its duty and obligation to, and agreed to, hold the ICA Payments in trust for the benefit of the Plaintiffs to be used in accordance with the BELOCs  and Loan Documents.

319.    Following receipt of the ICA Payments, Genie received copies of the Termination Notices.

320.    Genie knew and currently knows that the Plaintiffs exercised their rights to terminate the BELOCs and Loan Documents and that the Plaintiffs are entitled to the immediate return of the ICA Payments.

321.    The Plaintiffs made demand on Genie for a return of the ICA Payments.

322.    McMann made demand on Genie for a return of the ICA Payments.

323.    Genie has refused to return the ICA Payments.

324.    By retaining the funds, Genie has unjustly retained the benefit of those funds to the detriment of the Plaintiffs.

4889-8151-4893

325.    The Plaintiffs are entitled to a return of the ICA Payments.

326.    The Plaintiffs demanded return of the ICA Payments.

327.    Genie is obligated to return the ICA Payments and has no legal or colorable right to keep the ICA Payments.

328.    Genie has wrongfully refused to return the ICA Payments.

329.    The ICA Payments are the Plaintiffs lawful property.

330.    Genie's retention of the ICA Payments violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Genie:

A.    Awarding the Plaintiffs $3,600,000 for Genie's unjust enrichment related to retention of the ICA Payments;

B.    Awarding the Plaintiffs prejudgment interest and post-judgment interest, as permitted by Illinois law;

C.    Awarding the Plaintiffs their costs and attorney's fees, as provided by law; and

D.    Grant the Plaintiffs such other relief as this Court deems just.

4889-8151-4893

Dated: November 27, 2023

Respectfully submitted,

NORTH HAVEN LODGING PARTNERS
LLC and WALLINGFORD LODGING
PARTNERS LLC

By:_____/s/ *William J. McKenna*_____
       One of Its Attorneys

William J. McKenna (IL Bar No. 3124753)
Andrew T. McClain (IL Bar No. 6313453)
Foley & Lardner LLP
321 North Clark Street, Suite 3000
Chicago, Illinois 60654
Telephone:  312.832.4500
Fax:  312.832.4700
wmckenna@foley.com
amcclain@foley.com

48

JS 44  (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

North Haven Lodging Partners, LLC, and Wallingford Lodging Partners, LLC,

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Andrew T. McClain, Foley & Lardner LLP, 321 N. Clark St., Ste. 3000, Chicago, IL 60654 (312) 832-4500

## DEFENDANTS

McMann Commercial Lending LLC n/k/a McMann Professional Services, LLC, and/or McMann Capital, et al.

County of Residence of First Listed Defendant   Cook County, IL
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [ ] 2  U.S. Government Defendant
- [ ] 3  Federal Question *(U.S. Government Not a Party)*
- [x] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [x] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [x] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | Personal Injury Product Liability | | [ ] 820 Copyrights | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product | | [ ] 830 Patent | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | Liability | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 840 Trademark | [ ] 460 Deportation |
| | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | **SOCIAL SECURITY** | [ ] 485 Telephone Consumer Protection Act |
| [x] 190 Other Contract | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 861 HIA (1395ff) | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | | | [ ] 790 Other Labor Litigation | [ ] 862 Black Lung (923) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 791 Employee Retirement Income Security Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 446 Amer. w/Disabilities - Other | **Other:** | **IMMIGRATION** | | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | | |
| | | [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
U.S.C. § 1332

Brief description of cause:
breach of contract, fraudulent transfer, conversion, constructive trust

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $   $3,600,000

CHECK YES only if demanded in complaint:
JURY DEMAND:   [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
Nov 27, 2023

SIGNATURE OF ATTORNEY OF RECORD
/s/William J. McKenna

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# EXHIBIT 1

## BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

among

## MCMANN COMMERCIAL LENDING LLC

as Lender

and

## North Haven Lodging Partners LLC
as Borrower

_____

dated as of

April 10, 2023

_____

Initials: _VP_ _SP_ ____

## BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated, or otherwise modified, this "**Agreement**") is made and entered as of April 10, 2023, between McMann Commercial Lending LLC (the "**Lender**"), and North Haven Lodging Partners LLC., a Connecticut Limited Liability Company ("**Borrower**").

## RECITALS

**A.**    The Borrower desires to obtain from Lender an asset-backed line of credit loan (the "**LOC**") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

**B.**    The Borrower desires to obtain the LOC from Lender for Business Expansion for construction of a 105-room limited-service hotel (as more fully described in **Exhibit D** attached hereto the "**Project**"). Acquired assets will be legally described on **Exhibit E** attached hereto (the "**Property**").

**C.**    The Borrower has agreed to pay a minimum contribution of the Project LOC Amount to Lender, by establishing the Interest Reserve (as hereinafter defined) and the ICA (as hereinafter defined), collectively,(the "**Interest Reserve Account**"), within seven (7) calendar days after the fully executed LOC Documents (as hereinafter defined) are received by Lender.

**D.**    The Borrower has agreed to pay, pursuant to Section 3.6 hereof, the aggregate amount of One Million Eight Hundred Thousand Dollars and No Cents Dollars ($1,800,000), (the "**ICA Payment**"), by bank wire to Lender. An account on the books and records of the Lender shall be created to serve as an Interest Credit Account (the "**ICA**"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

**E.**    Lender has agreed to make Advances (as hereinafter defined) under the LOC to Borrower in an aggregate amount, according to **Exhibit B**, an amount not to exceed the Maximum Amount for the purposes outlined in these recitals and the Promissory Note attached hereto as **Exhibit A** and upon the terms and subject to the conditions hereinafter set forth.

**NOW THEREFORE**, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1. Certain Defined Terms**. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed per generally accepted accounting principles consistently applied. As used in this

Initials: _____ _____

agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

**"Advance(s)"** means any loan advance made by the Lender per the terms and conditions of this Agreement.

"**Applicable Interest Rate**" means the fixed interest rate specified in the Promissory Note.

**"Borrower"** means that term as defined in the first paragraph of this Agreement.

**"Business Expansion"** means any transaction or use, including for working capital, that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business (other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

**"Business Plan"** means the document(s) outlining the accurate and up-to-date business operations of the End-Borrower, as previously provided by End-Borrower, substantially in the form outlined in EXHIBIT D, and subject to review by Lender's Capital Partners as described in Section 8.1 of this Agreement.

**"Closing Date"** means the last date of signed execution of this Agreement by Lender and Borrower.

**"Collateral"** means all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements, and proceeds, thereof.

**"Event(s) of Default"** means any event or condition that shall constitute an event of default as described in Article 13 of this Agreement.

"**ICA**" means the definition given in Recital D of this Agreement.

"**ICA Payment**" means the amount remitted pursuant to Recital D of this Agreement.

Initials: _____ _____

"**Interest Reserve**" means credit on the books and records of the Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from a Borrower JV Partner, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"**Interest Reserve Account**" means the definition given in Recital C of this

Agreement.

"**Lender**" means that term as defined in the first paragraph of this Agreement.

"**Lender's Capital Partners**" means one or more lender-clients of the Lender

providing funding towards the LOC.

"**LOC**" means that term as defined in Recital A of this Agreement.

"**LOC Disbursement Account**" means that term as defined in Section 3.12 hereof.

"**LOC Document(s)**" means, collectively, this Agreement, the Promissory Note, and each Security Document, as any of the foregoing may from time to time be amended, restated, or otherwise modified or replaced, and any other document delivered pursuant thereto.

"**Maximum Amount**" means Eighteen Million Nine Hundred Thousand Dollars and No Cents ($18,900,000). The Maximum Amount is the Project LOC Amount plus all fees, costs, and expenses which are the Borrower's responsibility to pay.

"**Organizational Documents**" means, concerning any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise concerning, this Agreement or any other LOC Document.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority, or any other entity.

"**Project**" means that term as defined in Recital B of this Agreement.

Initials: _____

"**Project Costs**" means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by the Borrower for implementation or execution of the Project (including but not limited to the payment of taxes, insurance, and all items reasonably necessary for the successful execution of the Project), as more specifically outlined in the Project budget set forth on **Exhibit C** attached hereto.

"**Project LOC Amount**" means   Eighteen Million Dollars and No Cents ($18,000,000).

"**Property**" means that term as defined in Recital B of this Agreement.

"**Promissory Note**" means the Promissory Note, in the form attached hereto as **Exhibit A**.

"**Security Agreement**" means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as **Exhibit E**.

"**Security Document**" means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each U.C.C. Financing Statement or similar filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

"**Scheduled Maturity Date**" means the 10th anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

"**Subsidiary**" means any entity (other than the Borrower) in an unbroken chain of entities beginning with the Borrower if each of the entities owns stock, units, or other interests that represent fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain

"**Taxes**" means all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, concerning those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender concerning the LOC.

"**Term Sheet**" means that document(s) dated as of 3/14/2023 between Borrower and Lender, setting forth a general summary of the terms of agreement memorialized more fully herein in final form.

"**Tranche Schedule**" means the schedule of Advances to Borrowers from the Lender, based

Initials: ___

upon the dates of the disbursements attached hereto as **Exhibit B**; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder does not exceed the Maximum Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

## ARTICLE 2
## THE CREDIT

**Section 2.1. Line of Credit Agreement**. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to the Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

**Section 2.2. Line of Credit Documents**. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note, this Agreement, and each Security Document. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to the Lender and its counsel.

## ARTICLE 3
## TERM, INTEREST, AND PAYMENTS

**Section 3.1. Initial Term**. The initial term of the LOC is Ten (10) years and shall commence on the Closing Date and expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full thereon and all other amounts due and owing hereunder and under the Promissory Note shall be repaid by Borrower on the Scheduled Maturity Date.

**Section 3.2. Extended Term.** At the end of the initial term outlined in Section 3.1 hereof, and at the end of each Extended Term (as defined below, if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, over time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty-four (24) month period, up to a total of one (1) such additional consecutive periods (separately, "**Extended Term**"; collectively, the "**Extended Terms**"). In connection with Lender's granting of each Extended Term, (a) Borrower shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorney's fees, as a one (1)-time fee equal to one percent (1%) of the Project LOC Amount.

Initials: _____

**Section 3.3. Applicable Interest Period.** The interest period concerning each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full.

**Section 3.4. Interest Rate Calculation.** Interest shall be calculated based on a 365-day year and the actual number of days elapsed in a 365-day year and at the rate outlined in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "**Maximum Interest Rate**"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to the unpaid principal balance outstanding under the Promissory Note or, if it exceeds such unpaid principal, refunded to the Borrower.

**Section 3.5. Interest Payments.** Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times outlined in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

**Section 3.6. Reserves.** Following the signing of this Agreement, the Borrower shall remit One Million Eight Hundred Thousand Dollars and No Cents ($1,800,000) as the ICA Payment per the terms and the time outlined in Recital D of this Agreement. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and not refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable.

**Section 3.7. Prepayment.** The borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC.

**Section 3.8. Interest Credit Account.** If at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which notice shall be delivered to and received by Borrower no less than thirty (30) days before the date of the next interest payment date, Borrower shall remit into the ICA the funds necessary to make such interest paid before the date such interest payment is due and payable **Section 3.9. Fees.**

        (a) **LOC Fee.** At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable fee for the LOC in an aggregate amount equal to Five percent (5%) multiplied by the Project LOC Amount, which is equal to Nine Hundred Thousand Dollars and No Cents ($900,000) (the "**LOC Fee**"). The LOC Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

Initials: _____

(b) **Promote Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable success fee in an aggregate amount equal to One percent (1%) multiplied by the Project LOC Amount, which is One Hundred Eighty Thousand Dollars and No Cents ($180,000) (the "**Promote Fee**"). The Promote Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

(c) **ICA Advance Fee**. To the extent the Borrower used Lender to provide the ICA Payment, at Closing and out of the initial Advance, the Borrower shall reimburse Lender in an amount equal to the ICA Payment advanced by Lender plus a nonrefundable fee in an aggregate amount equal to Zero percent (0%) of the ICA Payment, which is No Dollars and No Cents Dollars ($-) (the "**ICA Advance Fee**"). The ICA Advance Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition. The borrower will take the Project LOC Amount in full on the closing of the first tranche.

**Section 3.10. Line of Credit Extension Fees.** Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a nonrefundable LOC extension fee for each extension in an aggregate amount equal to one percent (1%) multiplied by the Maximum Amount.

**Section 3.11. Legal and Incidental Fees, Charges, and Costs**. Borrower shall pay at Closing, all reasonable out of pocket and up to Twelve Thousand, Five Hundred U.S. Dollars ($12,500) for legal fees, recording and filing fees, documentary stamps, taxes, service charges, credit reports, UCC search costs, title company fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial proceeding; provided that Lender will provide Borrower ten (10) days' advance notice of any legal fees pursuant to this Section 3.11 that will exceed Twelve Thousand, Five Hundred U.S. Dollars ($12,500). Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or willful misconduct.

**Section 3.12. Line of Credit Disbursement Account**. The proceeds of each Advance under the LOC shall be advanced into the LOC Disbursement Account with Lender to be used by Borrower for payment of the Borrower's Project Costs, solely for the purposes and in the manner

Initials: _____

outlined in this Agreement. The LOC Disbursement Account will be held jointly in the name of the Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights and interest in and to the LOC Disbursement Account, which assignment will be effective only upon the occurrence and continuation of an Event of Default, subject to an applicable Default Cure Period (as hereinafter defined).

### Section 3.13. Taxes.

(a)     All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to the Lender (after deducting, withholding, and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

(b)     Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to the Lender. If the Borrower shall fail to pay any Taxes or OtherTaxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result of any such failure.

(c)     The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

### ARTICLE 4
### CONDITIONS FOR CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing:

### Section 4.1.   Delivery of the LOC Documents.

(a)     As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

Initials: _____

(b)    The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Payment Account and Security Account (both as defined under UCC § 9-102 and as further defined in the Security Agreement) maintained by the Borrower.

(c)    Contemporaneously with Borrower's acquisition of the Property, Borrower shall have delivered an executed and notarized mortgage or deed of trust in form and substance required by Lender granting Lender a priority lien and security interest in and to the Property (the "**Security Instrument**"), and such Security Instrument shall be promptly recorded in the real property records of the county in which such real property is located. If required by Lender, (i) the closing of such Advance and recording of the Security Instrument shall be completed through the services of a title company chosen by Lender, and (ii) such title company shall issue, at Borrower's expense and for the benefit of Lender, a loan policy of title insurance concerning the Property. For the avoidance of doubt, this Section 4.1(c) shall not operate to preclude any Advances to the Borrower to fund pre-acquisition costs.

Section 4.2. **Authority**. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members, or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery, and performance of the LOC Documents and the consummation of the transactions contemplated thereby, (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners or members of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing concerning the Borrower.

Section 4.3. **Liens**. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions, or restrictions. At the request of the Lender, the Borrower shall (i) deliver to the Lender the results of UCC lien searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) UCC or other lien termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project, or any Collateral without the express written permission of Lender.

Section 4.4. **Litigation**. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

Section 4.5. **Events of Default**. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in

Initials: _____ _____

full compliance with the terms and provisions of this Agreement.

**Section 4.6. <u>Purchase and Agreement Contracts</u>.** Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

**Section 4.7. <u>Compliance with Certain Requirements</u>.** Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) under local, state, federal, and international laws, procedures, statutes, regulations, and ordinances, conditions applicable to the Project.

**Section 4.8.    <u>Evidence of Insurance</u>.**

(a)    For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for, and will keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders' loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of similar size and character that of the business of the Borrower, and Borrower shall furnish Lender with the satisfactory evidence of such underlying Borrower insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

(b)    Within five (5) business of receipt of End-Borrower insurance pursuant to Section 4.8(a), Lender shall acknowledge receipt and communicate to Borrower the approval and sufficiency of such End-Borrowers certificate of insurance.

**Section 4.9. <u>Financial Statements</u>.** The lender shall have received all financial reports required by Section 8.6 hereof.

**Section 4.10. <u>Business Pro Forma</u>.** The lender shall receive a pro forma income and expense statement annually in connection with the Project.

**Section 4.11. <u>Management Plan</u>.** Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of Borrower's business.

**Section 4.12. <u>Material Change</u>.** Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower's ability to perform under this Agreement or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.

**Section 4.13. <u>Non-Subordination</u>.** Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such Subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the

Initials: _____

normal and reasonable management of the Project).

**Section 4.14. <u>Securitization.</u>** The lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or reasonable due diligence required by the insurer.

## ARTICLE 5
## USE OF LINE OF CREDIT PROCEEDS

**Section 5.1.     <u>Project Costs: Business Expansion Costs</u>**.

(a)       Proceeds of Advances under the LOC shall be utilized by Borrower solely to finance the Project Costs, as more fully described in the attached **<u>Exhibit C,</u>** in connection with Borrower Business Expansion as further detailed in the Business Plan, updated yearly by Borrower.

(b)       The proceeds of the LOC shall be used exclusively for the purposes outlined in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family, or household purposes. The borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute, or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

## ARTICLE 6
## INSPECTIONS

**Section 6.1. <u>Project Inspection</u>**. Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

**Section 6.2. <u>Books and Records</u>**. Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower about the Project, the Property, and the Borrower and to make extracts therefrom or copies thereof.

**Section 6.3. <u>Force Majeure Event Inspection Right.</u>** In the event of a Force Majeure Event (as hereinafter defined) which interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until Lender is satisfied with Borrower's ability to resume operations to develop the Project. Following a Force Majeure Event, Lender has the right to modify the terms upon which future Advances may be made as a result of a change in circumstances as determined by the Lender

Initials: _____

in Lender's sole discretion, that the Borrower can perform or continue to perform the Project scope of work. Borrower shall execute any additional documents, amendments, or other agreement of terms required by Lender, before Lender's obligation to continue to make Advances shall resume.

## ARTICLE 7
## ADVANCE OF FUNDS

**Section 7.1. Timing and Advances to Payee**. Advances will be made as outlined in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance has been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than seventy-five (75) calendar days following the opening of the ICA by the Lender with its wholesale lender. Lender shall deliver the written notice to Borrower of the commencement of such seventy-five (75)-day period. Lender shall deliver the written notice to Borrower via the ZOOMERAL messaging system of the commencement of such seventy-five (75)-day period.

**Section 7.2. Conditions Precedent to Advance Funds**. Lender's obligation to make Advances hereunder shall be conditioned upon fulfillment of the terms outlined in Article 4 hereof.

**Section 7.3. Unpaid Lien Claims.** If Lender receives notice of nonpayment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, per applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower, or (b) withhold one hundred percent (100%) of the lien amount claimed from future Advances.

**Section 7.4. Mandatory Advances**. Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.

## ARTICLE 8
## BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing:

**Section 8.1. Project.** (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is the counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation, and management of the Project.

Initials: _____

**Section 8.2. Compliance with Laws.** Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

**Section 8.3. Compliance with Documents.** Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

**Section 8.4. Books and Records.** Keep and maintain complete and accurate books of account, per generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

**Section 8.5. Payment of Obligations.** Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established per generally accepted accounting principles).

**Section 8.6. Financial Reports.** Deliver to Lender, concerning Borrower as soon as available and in any event (a) within sixty (60) days after the end of each calendar quarter during the term of the LOC, financial statements of Borrower for such quarter and (b) within ninety (90) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower, in each case of the foregoing, certified as true and correct (which reports shall be prepared per generally accepted accounting principles consistently applied) and operating statements in a form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender. The borrower must also complete their ZOOMERAL business profile and keep the business profile up to date throughout the term of this agreement.

**Section 8.7. Notification to Lender.** Promptly after learning thereof, notify Lender of: (a) the details of any material action, proceeding, investigation, or claim against or affecting the Borrower, the Property, or the Project instituted before any court, arbitrator, or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Property or the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower of the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

**Section 8.8. Partnership/Corporate Existence.** Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

Initials: _____

## ARTICLE 9
### BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing Borrower shall not:

**Section 9.1. Liquidation, Merger, and Sale of Assets.** Liquidate, merge, or consolidate with any other Person or otherwise transfer to an unrelated Person fifteen percent (15%) or more of the equity securities of Borrower, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business. Notwithstanding, any initial public offering or acquisition by another company will require the Lender's approval or full payment of the outstanding loan balance.

**Section 9.2. Liens.** Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such liens, shall not be increased).

**Section 9.3.    Indebtedness.** Create, incur, or have outstanding any indebtedness of any kind, other than (a) indebtedness owing to the Lender under this Agreement and the other LOC Documents, and (b) indebtedness of the Borrower existing as of the Closing Date as disclosed to and approved by the Lender (and any extension, renewal, or refinancing thereof but only to the extent that the principal amount thereof does not increase after the Closing Date).

**Section 9.4. Investments, Loans, and Guarantees.** (a) Create, acquire, or hold any subsidiary, (b) make or hold any investment in any stocks, bonds, or securities of any kind (c) be or become a party to any joint venture or other partnership, (d) make or keep outstanding any advance or loan to any Person, or (e) be or become a guarantor of any kind.

**Section 9.5. Acquisitions.** Enter into any transaction or series of related transactions for or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another

Initials: _9(  SP_

Person by a merger, amalgamation, or consolidation or any other combination with such Person, unless specifically stated and approved before execution of this Agreement.

**Section 9.6. Organizational Documents**. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

**Section 9.7.    Project and Project Documents**. Willfully or voluntarily abandon the Project or its activities to develop, construct, operate, or maintain the Project. If the same would (i) be a major decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

(a)  terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance of a material obligation by any other Person under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the development, construction, operation, and maintenance of the Project, in each case that would have an adverse effect on the Lender; or

(b)  sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation, and maintenance of the Project without Lender's consent, which consent shall not be unreasonably withheld.

## Article 10
## REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender that:

**Section 10.1. Validity of Agreement**. The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents. The LOC and the execution, delivery, and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable per their terms. The execution, delivery, and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than liens permitted under Section 9.2 hereof) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

**Section 10.2. Existing Defaults**. As of the date of execution of this Agreement, Borrower (or any subsidiary of Borrower) is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other

Initials: _____  _____

agreement or instrument to which Borrower (or any subsidiary of Borrower) is a party or by which it or any of its properties, subsidiaries, partners, or other related entities may be bound.

**Section 10.3. No Default in Other Agreements**. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a party or by which it or any of its properties, subsidiaries, partners or other related entities may be bound, or result in the violation by it of any law, order, rule, ordinance, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties, subsidiaries, partners or other related entities.

**Section 10.4. No Consents.** No consent, approval, authorization, or other acknowledgment of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

**Section 10.5. Litigation**. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to Borrower's knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened, or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from the performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.

**Section 10.6. Financial Statements**. All balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared per generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

**Section 10.7. Legal Requirements**. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to

Initials: _JA_ _SP_

environmental protection, occupational safety and health, zoning, and equal employment practices.

Section 10.8. <u>Taxes</u>. The Borrower has filed all tax returns and reports required of it, has paid all taxes which are due and payable, and has provided adequate reserves for payment of any tax whose payment is being contested; the charges, accruals, and reserves on the books of the Borrower in respect of taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority concerning any taxes except as otherwise previously disclosed to the Lender in writing.

Section 10.9. <u>Organization and Good Standing</u>. The Borrower is a duly formed or organized, validly existing, and in good standing under the laws of the State of its formation or organization as outlined in the first paragraph of this Agreement, and is qualified as a foreign entity and in good standing in each jurisdiction where the Property and the Project are located.

Section 10.10. <u>Insurance</u>. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

Section 10.11. <u>Accurate and Complete Statements</u>. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

Section 10.12. <u>Timing of Lender Funding.</u> Provided Borrower has met the conditions to Advances in this Agreement, including without limitation the timing for requests outlined in this Section, Lender shall fund Advances per under the Tranche Schedule, but in no event anymore frequently than every sixty (60) day, unless otherwise consented to in writing by Lender. The borrower must deliver Advance requests to Lender thirty (30) business-banking days before the week represented on the Tranche Schedule for which the Borrower wishes to receive the proceeds of such Advance from the LOC Disbursement Account. Upon notice of an Advance Request from the Borrower, Lender has a forty (40) international business-banking day window based on the Tranche Schedule (except for the first Advance according to Section 7.1) to Payment the requested Advance into the LOC Disbursement Account. Absent a written Advance request from Borrower, per the conditions and requirements set forth herein, Lender is not obligated to disburse the next scheduled Advance under the Tranche Schedule.

### ARTICLE 11
### NATURE OF REPRESENTATIONS AND WARRANTIES

Section 11.1. <u>Generally</u>. The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive

Initials: _____

so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date hereof, except for any representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower according to or in connection with the LOC shall be deemed to have been relied upon by Lender.

## ARTICLE 12
## EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "**Event of Default**"):

**Section 12.1. Nonpayment**. Failure to make any payment required by the Promissory Note, this Agreement, or any other LOC Documents and such failure continues for thirty (30) days after notice of such default is sent by Lender to Borrower.

**Section 12.2. Other Covenants and Agreements.** Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not have been fully corrected, by the performance of or compliance with such covenants or agreements, within twenty (20) days after notice of such default is sent by Lender to Borrower.

**Section 12.3. Representations and Warranties.** If any representation, warranty, or statement made in or according to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made. Such Event of Default can be corrected by the presentation of accurate and current material information furnished by the Borrower to the Lender to correct the false or erroneous representation, warranty, or statement within ten (10) days after notice of such default is sent by Lender to Borrower.

**Section 12.4. Security.** If any lien granted in this Agreement or any other LOC Document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of Collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in the lien status occurs appropriate documents to correct such matters.

**Section 12.5. Validity of LOC Documents.** If (a) any material provision, in the sole opinion of the Lender, of any LOC Document, shall at any time cease to be valid, binding, and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC

Initials: _____ _____

Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

Section 12.6. **Petition for Bankruptcy, Insolvency**. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation, or reorganization, seeking,

consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for ninety (90) days; or the taking of the action by Borrower to authorize any of the actions outlined in this Section 12.6.

Section 12.7. **Material Litigation**. Any action, suit, proceeding, or investigation of any kind involving or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof of any Litigation, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation, and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, partners, or other related entities, or the Project and promptly after the occurrence thereof, a notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, partners, or other related entities, or the Project of the disclosed Litigation.

## ARTICLE 13
## REMEDIES

Section 13.1. **General**. Following the occurrence of one (1) or more Events of Default, a default cure period of sixty (60) days begins ("Default Cure Period"), except as otherwise provided in Section 13.3 or Section 13.4. If Borrower fails to cure the Event of Default (in the manner specified for each Event of Default according to Article 12) within the Default Cure Period, then the Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies outlined in the Promissory Note, in the LOC Documents, or any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or equity, including such rights as are provided in this Article 13. If a Bankruptcy Event referred to in Section 12.6 hereof occurs, (i) all obligations

Initials:

of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Upon the occurrence of any Event of Default hereunder under Section 12.1 whereby Borrower has missed more than two (2) scheduled payments if Borrower does not have any interest reserve account established for the benefit of the Lender, Borrower shall have a) sixty (60) days Default Cure Period to cure the Event of Default and must (b) Payment an additional one year's worth of interest payments into the Interest Reserve Account.

### Section 13.2. <u>Default and Right to Acquire.</u>

In the event, the Borrower is unable to cure the Event of Default (in the manner specified to correct each Event of Default according to Article 12 or within the Default Cure Period,

(a)    Upon the occurrence of an Event of Default, Lender shall have the right, in person or by agent, in addition to all other rights and remedies available to Lender hereunder or under the LOC documents, to enter into possession of the Project and perform or cause enforce any liquidity plan.

(b)    The lender may enter into possession of the Project and perform or cause to be performed all work and labor necessary to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower. All sums expended by the Lender in doing so, together with interest on such total amount at the Default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured by the LOC documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

(c)    Borrower thereby, following such Bankruptcy Event or relevant cure periods under Section 13.2 constitutes and appoints the Lender as its true and lawful attorney-in-fact, with the full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

(i)    to enter and endorse all agreements, instruments, and documents in connection therewith.

(ii)    to use any unadvanced proceeds of the LOC to complete, operate, or maintain the Project.

(iii)    to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

Initials: _____

(iv)    to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

(v)    to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security satisfactory to the Lender has been provided.

(vi)    to execute applications and certificates in the name of the Borrower which reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

(vii)    to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

(viii)    to do any and every act which the Borrower might do on its behalf concerning the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be (A) irrevocable, (B) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (C) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

**Section 13.3.  Curing of Defaults by Advances**. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which Lender may have because of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender per the terms hereof before any additional proceeds of the LOC are disbursed.

**Section 13.4.  Remedies Are Cumulative**. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of any rights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidate any act done according to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

Initials: _____

**Section 13.5. Offsets**. If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC documents is accelerated according to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, all of such obligations then owing by the Borrower, whether or not the same shall then have matured, all Payment (general or special) balances, and all balances in the Interest Reserve Account and all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

**Section 13.6. Collateral**. The Lender shall at all times have the rights and remedies of a secured party under the UCC, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Documents executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC documents, which the Borrower agrees to do, and make it available to the Lender at a reasonable convenient place to be designated by the Lender. The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC document, each of which findings shall be considered to be an accession to and a part of such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any delivery or taking of possession of the Collateral securing the obligations under the LOC documents, or any portion thereof, under this Agreement, then, with or without resort to the Borrower personally or any other person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. No prior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that the Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case, the Lender shall give the Borrower not fewer than ten (10) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made. The Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Lender may purchase such Collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower hereby waives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC documents, the cost of which shall be paid by the Borrower.

Initials: _JP_  _SP_

**Section 13.7.  Default by Lender and Borrower's Sole Remedy.**

(a)      Provided Borrower has fully satisfied and complied with all conditions to Advance if Lender fails to provide the first (1st) Advance when due, under the Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver a written notice in the form of a notarized termination letter, a copy of which is attached hereto as **Exhibit F** ("the **Termination Letter**"), to Lender by certified mail. Upon receipt of such notice, Lender shall have forty (40) international business-banking days from the date of receipt ("**Refund Period**") within which to return the ICA Payment to the Borrower.

(b)      If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice in the form of a notarized Termination Letter to the Lender by certified mail. Within forty (40) international business-banking days from the date of receipt of such notice by Lender, Borrower shall be entitled to (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) termination of Borrower's obligations to Lender hereunder except Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners, or other related entities, for any indirect, special, incidental, or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise because of, the LOC, the Advances, the Agreement or the other LOC documents.

(c)      Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances according to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, an act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, an act of civil disobedience, an act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew

Initials: _____

restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages, or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from performing under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period the occurrence is expected to continue. The lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. The lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

Section 13.8 **Binding Arbitration.** Any dispute, claim, or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one (1) arbitrator. The arbitration shall be administered by JAMS under its Comprehensive Arbitration Rules and Procedures or by ADR Services under its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand according to the notice requirements outlined in Section 14.5 herein. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach an agreement on an arbitrator, then the arbitration shall be selected under the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for the production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any discovery disputes shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising concerning the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

### ARTICLE 14
### GENERAL PROVISIONS

Section 14.1. **Disclaimer of Liability**. Lender has no liability or obligation in connection

Initials: _____ _____

with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith. No claim may be made by the Borrower or any other Person against the Lender or the Affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

Section 14.2. **Publicity**. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. The lender shall have the right to indicate that it has provided the financing for the Project.

Section 14.3. **Confidentiality.** Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary, and Borrower hereby agrees to maintain confidential this Agreement, the LOC documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place. Borrower's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative.

Section 14.4. **Responsibility for Application of Funds**. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose outlined in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced under this Agreement. The lender may rely solely upon the Borrower's requests for Advances, affidavits, statements, and reports in making said Advances, and the Borrower does hereby release and indemnify the Lender and hold the Lender harmless from any losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final and non-appealable decision).

Section 14.5. **Non-Disparagement**. Borrower agrees and covenants that Borrower shall not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory, maliciously false, or disparaging remarks, comments, or statements concerning the

Initials: _____

The lender or its businesses, or any of its employees, officers, or directors, and its existing and prospective clients, suppliers, investors, and other associated third parties, now or in the future. For the avoidance of doubt, a breach of this Section 10.04 shall constitute an Event of Default under Section 7.02 under which Lender has the right to terminate all obligations under the Loan Documents under Section 9.01(b).

**Section 14.6 <u>Opportunity to Consult with Counsel</u>**. Borrower acknowledges that it has had an opportunity to consult with and be represented by counsel of Borrower's choosing in the review of the Loan Documents, that it has been advised by Lender to do so, that the Borrower is fully aware of the contents of the Loan Documents and its legal effect, and that Borrower enters into these Loan Documents freely, without duress or coercion, and based on Borrower's judgment and wishes and not in reliance upon any representation or promise made by the Lender, other than those contained herein.

**Section 14.7 <u>Notices</u>**. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent by certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety-six (96) hours after deposit in first-class certified United States mail, postage prepaid, return receipt requested, or two (2) business days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given according to this paragraph:

| | |
|---|---|
| To Borrower: | North Haven Lodging Partners LLC<br>2517 W Brentridge Street<br>Sioux Falls, SD 57108 |
| To Lender: | McMann Commercial Lending LLC<br>205 N Michigan Avenue, Ste 810<br>Chicago, Illinois 60601 |

**Section 14.8. <u>Applicable Law</u>**. This Agreement and, unless otherwise specifically provided for therein, each other LOC document, shall be governed by and construed per the laws of the State of Illinois and the United States.

**Section 14.9. <u>Successors and Assigns</u>**. The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

**Section 14.10. <u>Severability</u>**. The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition. In the event of any conflict or inconsistency between the terms and provisions of this Agreement and any of the LOC Documents, the terms and provisions of this Agreement shall control.

Initials: ___ ___

**Section 14.11. Amendments**. This Agreement may not be modified or amended except by a written agreement signed by the Borrower and Lender.

**Section 14.12. Headings; Attachments**. The several headings to articles, sections, and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part thereof.

**Section 14.13. No Third-Party Rights**. This Agreement is made entirely for the benefit of the Borrower, the Lender, and their successors in interest (including any participants). No third party shall have any rights hereunder.

**Section 14.14. Indemnification**. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement. The Borrower hereby agrees to indemnify, defend and hold harmless the Lender, the managers of the Lender, and all of their members, managers, affiliates, and advisors, from any damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees and costs) that they may incur because Borrower failed to fulfill all of the terms and conditions of this agreement or because of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs, and expenses (including attorneys' fees and costs) incurred by Lender, the managing members of Lender, or any of its members, managers, affiliates, or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished in connection with this transaction.

**Section 14.15. General Limitation of Liability**. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the

Initials: _VP_  _SP_

transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission, or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. In addition to the tolling provided under Section 6.3, Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

**Section 14.16. <u>Entire Agreement</u>**. This Agreement, the Promissory Note, and any other LOC Document or other agreement, document, or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings concerning the subject matter hereof.

**Section 14.17. <u>Execution in Counterparts</u>**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute the same Agreement.

**Section 14.18. <u>Legal Representation of the Parties</u>**. The LOC Documents were negotiated by the Parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

**Section 14.19. <u>JURY TRIAL WAIVER</u>**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

[Remainder of page intentionally left blank; Signatures follow]

Initials: _____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**LENDER:** MCMANN COMMERCIAL LENDING LLC

By:

Name: Walter P Trock III

**BORROWER:** North Haven Lodging Partners LLC

By:

Name: Shailesh Patel      Vihang Patel

Title: Manger      Member

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 4th day of

April , 20 23

In and for the State of South Dakota

NOTARY PUBLIC
In and for the State of Connecticut

My Commission Expires:

ADAM PRICE
Notary Public
SEAL
South Dakota

BENNETT BUFFALO
NOTARY PUBLIC, STATE OF CONNECTICUT
My Commission Expires January 31, 2026

My Commission Expires:
4-27-23

Initials:

**EXHIBIT A**
**PROMISSORY NOTE**

$18,900,000 – Maximum Principal Amount        April 10, 2023

    FOR VALUE RECEIVED, North Haven Lodging Partners LLC., a Connecticut Limited Liability Company (the **"Maker"**), hereby promises to pay to McMann Commercial Lending, or any subsequent holder of this Promissory Note (the **"Payee"**), at such place as Payee may designate, the principal sum of Eighteen Million Dollars and No Cents ($18,000,000) or the aggregate unpaid principal amount of all Advances, plus the Fees outlined in Section 3.9 of the LOC Agreement, as such terms are defined in the LOC Agreement (as hereinafter defined) and the other LOC Documents, made by Payee to Maker according to the LOC Agreement, whichever is greater, plus interest on the principal sum and all unpaid balances and all other amounts owed by Maker to Payee at the interest rate set forth below, payment of principal and interest to be made in lawful money of the United States in immediately available funds, as set forth below. Capitalized terms used herein and defined in the LOC Agreement, but not otherwise defined herein, shall have the meaning given such term in the LOC Agreement; and

    (a)    Maker shall make payments under this Master Promissory Note (as the same may from time to time be amended, restated, or otherwise modified, this **"Note"**) as follows: (i) simple interest payments on the outstanding principal amount of the Advances, at a fixed rate equal to Four point seven five percent (4.75%) per annum, which interest payments shall be due and payable to Payee quarterly in arrears, on the first (1st) business day of each January, April, June and September of each year, with the first payment due on the first such date immediately following the date of the first Advance hereunder; and (ii) the outstanding principal balance of the Note, and all remaining accrued and unpaid interest, late charges and all other amounts due to Payee according to this Note and the LOC Documents shall be due and payable in full no later than the Scheduled Maturity Date.

    (b)    Except for the quarterly payments set forth above, this Note may be prepaid in whole or in part, as provided in the LOC Agreement.

    (c)    All payments made will be applied first to any late charges or other accrued fees, then to accrued interest, and then to the principal amount of the Note. Maker shall make each payment hereunder to the Payee without any deduction, offset, abatement, recoupment, counterclaim, or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on the account until such payment is honored when presented for payment at the drawee bank. Whenever any payment to be made hereunder, including, without limitation, any payment to be made on any Advance, shall be stated to be due on a day that is not a business day, such payment shall be made on the next business day and such extension of time shall in each case be included in the computation of the interest payable on such Advance. The aggregate unpaid amount of Advances and similar information concerning the LOC set forth on the records of Payee shall be rebuttable presumptive evidence for such information, including the amounts of principal, interest, and fees owing to Payee.

Initials: _VP_ _SP_ ___

(d)    Maker shall pay all amounts due under this Note to McMann Commercial Lending, Corporate Office at the address provided under Section 14.5 of the LOC Agreement or such other offices as may be designated by Payee from time to time.

(e)    All amounts owed by Maker according to this Note shall be collectively referred to herein as the **"Obligation"** of Maker.

In addition, the following provisions shall govern this Note:

1.    **LINE OF CREDIT AGREEMENT AND LINE OF CREDIT DOCUMENTS.** This Note is made and delivered to Payee according to and is subject to all terms and conditions outlined in the Business Expansion Line of Credit Agreement of even date herewith between Maker and Payee (as the same may from time to time be amended, restated or otherwise modified, the **"LOC Agreement"**). This Note is secured by certain Collateral, as evidenced by the LOC Documents, covering the personal and/or real property described therein.

2.    **LATE CHARGES.** If any amount payable under this Note is paid more than ten (10) business days after the due date thereof, then late charges (the **"Late Charges"**) shall be added to the delinquent payment in an amount equal to five percent (5.00%) of such late payment for the extra expense in handling past due payments. Any such Late Charges shall be due and payable without demand, and Payee, at its option, may (i) refuse any late payment or any subsequent payment unless accompanied by the applicable Late Charge, (ii) add the Late Charges to the principal balance of this Note, and (iii) treat the failure to pay the Late Charges as demanded as an Event of Default under this Note. If Late Charges are added to the principal balance of this Note, those Late Charges shall bear interest at the same rate as the principal balance under this Note. Any payment to Payee by check, draft, or other items shall be received by Payee subject to collection and will constitute payment only when collected and not when received.

3.    **DEFAULT, CROSS-DEFAULT, AND ACCELERATION.** Time is of the essence. If Maker fails to make any payment of principal, interest, or any other Obligation on the date the same is due and payable under this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or Maker or any other party fails to meet or perform any other obligation under any term or condition of this note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or an Event of Default occurs under the LOC Agreement or any of the other LOC Documents, and subject to any applicable notice and cure periods outlined in the LOC Agreement or any other LOC Documents, such Event of Default is not cured, then this Note shall be in default ("Default"). Upon Default, Payee shall provide written notice to Maker specifying the nature of the Default and directing that it be remedied within the applicable notice and cure period as outlined in the LOC Agreement. Upon Default, the interest rate provided for in this Note shall immediately increase to eighteen percent (18%) per annum (the "Default Rate"), unless and until cured by Maker, and upon Maker's failure to cure any default, the entire unpaid amount of this Note shall be immediately due and payable without further notice or

Initials: _VP_ _SS_

demand from Payee. Until cured, interest shall accrue daily after default with daily interest being added to the principal on the last day of each calendar month and thereafter compounded to calculate interest on the amounts owed according to this Note, and Maker shall thereafter be liable for all costs of collection, including reasonable attorneys' fees and costs, in addition to the payment of principal, interest and any other amount.

Should there be a material misappropriation of more than ten (10%) percent of the proceeds of the Advances which causes an Event of Default, the Borrower shall immediately surrender controlling management interest in North Haven Lodging Partners LLC and the Project to McMann Commercial Lending LLC.

4.    **COSTS, FEES, AND COMPENSATION.** Maker further promises to pay all amounts owed under this Note, the LOC Agreement, and the other LOC Documents, and all Obligations owed according to this Note, the LOC Agreement, and the LOC Documents, and shall pay all such amounts as specified therein.

5.    **WAIVER.** Maker and all endorsers, guarantors and all Persons liable or to become liable on this Note waive presentment, demand, a notice of dishonor, notice of default or delinquency, a notice of acceleration, notice of nonpayment, a notice of costs, expenses or losses and interest thereon, and all other notices or matters of a like nature, other than notices required according to this Note, the LOC Agreement or the other LOC Documents.

6.    **SUCCESSOR AND ASSIGNS.** The terms of this Note shall apply to, inure to the benefit of, and bind all Parties hereto and their respective successors, and assigns.

7.    **CUMULATIVE REMEDIES.** Upon the occurrence of any default under this Note, the LOC Agreement, or any of the other LOC Documents, or an Event of Default occurs, Payee shall have all rights specified therein and as provided under relevant law. No remedy or election hereunder shall be deemed exclusive but shall wherever possible, be cumulative with all other remedies at law or equity.

8.    **GOVERNING LAW; VENUE AND JURISDICTION; BINDING ARBITRATION; WAIVER OF TRIAL BY JURY.** This Note shall be governed by and construed per the laws of the State of Illinois and the United States.

**BINDING ARBITRATION:** Any dispute, claim, or controversy arising out of or relating to this Note, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one arbitrator. The arbitration shall be administered by JAMS according to its Comprehensive Arbitration Rules and Procedures or by ADR Services under its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand under the notice requirements outlined in Section 14.5 of the LOC Agreement. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach an agreement on an

Initials: _____

arbitrator, then the arbitration shall be selected according to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for the production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any discovery disputes shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising concerning the enforcement or interpretation of this Note, this agreement to arbitrate, or any of the LOC Documents.

**JURY TRIAL WAIVER**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

9.    **AUTHORIZATION.** To induce Payee to enter into this Note and extend and advance funds to Maker under the terms contained herein and according to the LOC Agreement, Maker hereby represents and warrants as follows, acknowledging that Payee is relying on the truth and accuracy of the following representations and warranties in entering into this Note:

(a)    That the undersigned is the authorized representative of Maker and has the authority to bind Maker; and

(b)    that Maker is duly organized and validly existing and in good standing under the laws of the State of its formation, and duly qualified to transact business and in good standing in any United States state where the nature of its business or properties requires such qualification, with full power and authority, corporate or otherwise, to enter into and perform this Note; that Maker has taken all actions required to be taken in connection herewith; and

Initials: _____ _____

(c)     that upon execution of this Note by the undersigned, this Note will constitute a legal, valid, and binding obligation of Maker and will be enforceable against Maker as set forth herein, except as enforceability thereof may be limited by bankruptcy, insolvency, moratorium, and similar laws and by equitable principles, whether considered at law or in equity.

10.     **ATTORNEY FEES AND COSTS OF COLLECTION.** Maker shall pay Payee all reasonable expenses, attorney fees, and costs incurred in any action or proceeding by Payee to enforce the terms of this Note, the LOC Agreement, and/or any of the LOC Documents, including, without limitation, all reasonable expenses, attorney fees, and costs on appeal.

11.     **MISCELLANEOUS PROVISIONS.**

(a)     No delay or omission on the part of the Payee in exercising any rights hereunder or under the terms of any Security Agreement, pledge agreement, any guarantee made to guarantee payment of this Note, or any other Security Document given to secure this Note, shall operate as a waiver of such rights or any other right hereunder or under said security agreements, pledge agreements, guaranties or other documents.

(b)     The invalidity or unenforceability of any provision hereof, of this Note, the LOC Agreement or any of the other LOC Documents, or of any other instrument, agreement, or document now or hereafter executed in connection with the loan made pursuant thereto, or any Obligation created thereunder shall not impair or vitiate any other provision of any of such instruments, agreements, and documents, all of which provisions shall be enforceable to the fullest extent now or hereafter permitted by law.

(c)     This Note, the LOC Agreement, and the other LOC Documents may only be amended, terminated, extended, or otherwise modified by a written signed by the Party against which enforcement is sought. In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealing, or the like be effective to amend, terminate, extend, or otherwise modify any of same.

(d)     This Note and the rights and remedies provided for herein may be enforced by Payee or any subsequent holder hereof. Wherever the context permits, each reference to the term "holder" herein shall mean and refer to Payee or the then subsequent holder of this Note.

(e)     Maker agrees that the holder of this Note may, without notice to Maker and without affecting the liability of Maker, accept security for this Note and any additional or substitute security, if any, or release any security or any party liable for this Note, including any guarantor, or extend or renew this Note.

[Remainder of page intentionally left blank; Signature page follows]

Initials: _____

IN WITNESS WHEREOF, the Maker has duly executed and delivered this Promissory Note as of the date first set forth above.

**MAKER**

North Haven Lodging Partners LLC

By: _____

Name: Shailesh Patel and Vihang Patel

Title: _Manager_ / _____ VP

Address: 2517 W Brentridge Street, Sioux Falls, SD 57108

**SUBSCRIBED AND SWORN TO BEFORE ME** on this ____ day of April ____, 20__

In and for the State of South Dakota

NOTARY PUBLIC
In and for the State of Connecticut

My Commission Expires: _____

BENNETT BUFFALO
NOTARY PUBLIC STATE OF CONNECTICUT
My Commission Expires January 31, 2026

ADAM PRICE
Notary Public
SEAL
South Dakota

My Commission Expires:
4-27-23

Initials: ___ ___

**EXHIBIT B**
**TRANCHE SCHEDULE**

| Tranche 1 | Within 75 calendar days of confirmation of the clearing of the funds remitted by the Borrower being funded to the wholesale lender by the Lender under Section 7.1 | $3,600,000 |
|---|---|---|
| Tranche2 | 75 calendar days after the date of the funding of Tranche 1 | $14,400,000 |
| Tranche 3 | N/A | |
| Tranche 4 | N/A | |

Initials: _____

**EXHIBIT C**
**PROJECT COSTS**
(Please explain the use of the funds below per the project. Please see "Project Costs" defined in Article 1 of this agreement.)

Initials: _____

**EXHIBIT D**
**THE PROJECT**
(Please attach a copy of your Business Plan, Executive Summary, and/or Slide Deck.)

Initials: _____

**EXHIBIT        E**
**SECURITY AGREEMENT**

This SECURITY AGREEMENT, dated as of April 10, 2023 (as amended, supplemented, or otherwise modified from time to time per the provisions hereof, this "**Agreement**"), is made by North Haven Lodging Partners LLC (the "**Grantor**"), in favor of McMann Commercial Lending LLC (the "**Secured Party**").

WHEREAS, the Grantor and the Secured Party are entering into that certain Business Expansion LOC Agreement, dated of even date herewith (as amended, supplemented, or otherwise modified from time to time, the "**LOC Agreement**").

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all the Secured Obligations (as hereinafter defined); and

WHEREAS it is a condition to the obligation of the Lender to make the LOC under the LOC Agreement that the Grantor execute and deliver this Agreement, and this Agreement is being executed and delivered in consideration of the Secured Party entering into the LOC Agreement and each financial accommodation granted to the Secured Party by the Lender.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  Definitions. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the LOC Agreement. Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement. Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9. For purposes of this Agreement, the following terms shall have the following meanings:

"**Collateral**" has the meaning outlined in Section 2 hereof.

"**Control Agreement**" means (a) concerning a Payment account, each Payment Account Control Agreement (or similar agreement concerning a Payment Account) among the Grantor, the Lender, and a depository institution, to be in form and substance satisfactory to the Lender, and (b) for a Securities Account, each Securities Account Control Agreement (or similar agreement for a Securities Account) among the Grantor, the Lender, and a securities intermediary, to be in form and substance satisfactory to the Lender; as any of the foregoing may from time to time be amended, restated or otherwise modified.

"**Payment Account**" means a Payment account, as that term is defined in the

UCC."**Event of Default**" has the meaning outlined in the LOC Agreement.

"**First Priority**" means, concerning any lien and security interest purported to be created in any Collateral according to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the LOC Agreement).

Initials: _____  _____

"**Proceeds**" means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon, or distributions with respect thereto.

"**Secured Obligation(s)**" has the meaning outlined in Section 3 hereof.

"**Securities Account**" means a securities account, as that term is defined in the UCC.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.    Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of the Grantor's right, title, and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**"):

(a)    all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party under Section 4(e) hereof, general intangibles (including all payment intangibles), money, Payment accounts, and any other contractual rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

(b)    all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time concerning any of the foregoing.

3.    Secured Obligations. The Collateral secures the due and prompt payment and performance of:

(a)    the obligations of the Grantor from time to time arising under the LOC Agreement, this Agreement, any other LOC Document or otherwise for the due and prompt payment of (i) the principal of and premium, if any, and interest on the LOC (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, reasonable attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or

Initials: _9/1_  _SP_

contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership, or other similar proceedings, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the LOC Agreement, this Agreement and the other LOC Documents; and

(b)      all other covenants, duties, debts, obligations, and liabilities of any kind of the Grantor under or in respect of the LOC Agreement, this Agreement, the other LOC Documents, or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceedings, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses outlined in this Section 3 being herein collectively called the "**Secured Obligations**").

4.      Perfection of Security Interest and Further Assurances.

(a)      The Grantor shall, from time to time, as may be required by the Secured Party for all Collateral, promptly take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, concerning all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable, the Grantor shall promptly take all actions as may be requested from time to time by the Secured Party so that the security interest in the Collateral granted hereunder is obtained and at all times held by the Secured Party. All the foregoing shall be at the sole cost and expense of the Grantor.

(b)      The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents to perfect, confirm, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party under this Section 4 promptly to the Secured Party upon request. The Grantor also hereby ratifies any financing statements or amendments previously filed by the Secured Party in any jurisdiction

(c)      The Grantor hereby further authorizes the Secured Party to file with the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any state of the United States or any other country) this Agreement and other documents to perfect, confirm,

Initials: _____

continuing, enforcing, or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

(d)     If the Grantor shall at any time hold or acquire any certificated securities, promissory notes, tangible chattel paper, negotiable documents, or warehouse receipts relating to the Collateral, then the Grantor shall promptly endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.

(e)     If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (i) promptly notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

(f)     If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

(g)     The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement concerning any Collateral.

5.     Representations and Warranties. The Grantor represents and warrants as follows:

(a)     (i) the Grantor's exact legal name is correctly stated in the first paragraph of this Agreement and on the signature page hereof, and (ii) the Grantor is an organization of the type and is organized in the jurisdiction, outlined in the first paragraph of this Agreement.

(b)     The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral. The Grantor has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state, and local statutes and

Initials: _____

ordinances dealing with the control, shipment, storage, or disposal of hazardous materials or substances.

(c)     At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal, and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the LOC Agreement.

(d)     The pledge of the Collateral according to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(e)     Grantor has full power, authority, and legal right to borrow the Advances under the LOC and pledge the Collateral according to this Agreement.

(f)     Each of this Agreement, the LOC Agreement, and the LOC Documents has been duly authorized, executed, and delivered by the Grantor and constitutes a legal, valid, and binding obligation of the Grantor enforceable by its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

(g)     No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Advances under the LOC and the pledge by the Grantor of the Collateral according to this Agreement or for the execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor or the performance by the Grantor of its obligations thereunder.

(h)     The execution and delivery of the LOC Agreement, this Agreement, and the other LOC Documents by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(i)     The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106, and 9-107 of the UCC, as applicable) to have been obtained by the Secured Party over all Collateral concerning which such control may be obtained under the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

(j)     Schedule 2 hereto lists all banks, other financial institutions, and securities intermediaries at which the Grantor maintains Payment Accounts or Securities Accounts as of the Closing Date, and Schedule 2 hereto correctly identifies the name, address, and telephone number of each such financial institution or securities intermediary, the name in

Initials: _____

which the account is held, a description of the purpose of the account, and the complete account number therefore.

(k)     Schedule 3 hereto lists all intellectual property and rights to which Grantor holds an interest, ownership, or other rights.

6.     Receivables. If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangibles, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.     Covenants. The Grantor covenants as follows:

(a)     The Grantor will not, without providing at least thirty (30) days prior written notice to the Secured Party, change its legal name, identity, type of organization, the jurisdiction of organization, corporate structure, location of its chief executive officer, or its principal place of business or its organizational identification number. The Grantor will, before any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b)     The Collateral, to the extent not delivered to the Secured Party under Section 4 hereof, will be kept at those locations of the Grantor previously disclosed to the Secured Party and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days prior written notice to the Secured Party. The Grantor will, before any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c)     The Grantor shall, at its own cost and expense, defend the title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d)     The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option to, restrict, or grant, create, permit, or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the LOC Agreement or herein or with the prior written consent of the Secured Party.

(e)     The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located according to the provisions of the LOC Agreement.

Initials: _DP_____

(f)     The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

(g)     The Grantor will continue to operate its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state, and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

(h)     The Grantor shall promptly notify the Secured Party in writing upon the acquisition or creation by the Grantor of a Payment Account or Securities Account not listed on Schedule 2 hereto, and, before or simultaneously with the creation of such Payment Account or Securities Account, provide for the execution of a Control Agreement with respect thereto, if required by the Secured Party.

(i)     The Grantor shall provide the Secured Party with prompt written notice concerning any material real or personal property (other than property acquired in the ordinary course of business) acquired by the Grantor after the Closing Date. In addition to any other right that the Secured Party may have according to this Agreement or otherwise, upon written request of the Secured Party, whenever made, the Grantor shall grant to the Secured Party, as additional security for the Secured Obligations, a First Priority lien on any real or personal property of the Grantor (other than for leased equipment or equipment subject to a purchase money security interest in which the lessor or purchase money lender of such equipment holds a priority security interest, in which case, the Secured Party shall have the right to obtain a security interest junior only to such lessor or purchase money lender), including, without limitation, such property acquired after the Closing Date, in which the Secured Party does not have a First Priority lien. The Grantor agrees that, within thirty (30) days after the date of such written request, to secure all of the Secured Obligations by delivering to the Secured Party security agreements, intellectual property security agreements, pledge agreements, mortgages (or deeds of trust, if applicable) or other documents, instruments or agreements or such thereof as the Secured Party may require. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

(j)     At the request of the Secured Party, the Grantor shall, concerning any real property owned by the Grantor or any real property on which the Project is located, provide, or cause to be provided, to the Secured Party, (a) a mortgage (or comparable document) relating to such real property, in form and substance satisfactory to Secured Party, (b) title and lien searches concerning such real property and such other information, documents or agreements as may be deemed necessary or advisable by the Secured Party r in connection with such mortgage, and (c) such corporate governance and authorization documents and an opinion of counsel for such mortgage as may be deemed necessary or advisable by the Secured Party. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

8.     Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party as the Grantor's attorney-in-fact, with full authority in the place and stead of

Initials: _U_ _ _ _

the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9.    Secured Party May Perform. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause the performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10.    Reasonable Care. The Secured Party shall have no duty concerning the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its property, it is understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action concerning any claims, the nature or sufficiency of any payment or performance by any party under or according to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to know such matters, or (b) taking any necessary steps to preserve rights against any parties concerning any Collateral. Nothing outlined in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11.    Remedies Upon Default.

(a)    If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice before disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days before the date of such disposition shall constitute reasonable notice. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of a similar property. At any sale of the Collateral, if permitted by applicable law,

Initials: _UA_

the Secured Party may be the purchaser, licensee, assignee, or recipient of the Collateral or any part thereof and shall be entitled, to bidding and making the settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned, or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages, and demands the Grantor may acquire against the Secured Party arising out of the exercise by the Secured Party of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption concerning the Collateral, whether before or after sale hereunder, and all rights, if any, of marshaling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean- up or otherwise prepare the Collateral for sale.

(b)     If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the reasonable fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(c)     If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral under this Section 11, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.     No Waiver and Cumulative Remedies. The Secured Party shall not by any act (except by a written instrument under Section 14 hereof), delay, indulgence, omission, or otherwise, be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

Initials: _____

13.   SECURITY INTEREST ABSOLUTE. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, a notice of loans made, credit extended, Collateral received or delivered, or other action taken in reliance thereon, and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)   any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument.

(b)   any change in the time, place, or manner of payment of, or any other term of, the Secured Obligations, or any rescission, waiver, amendment, or other modification of the LOC Agreement, this Agreement, or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)   any taking, exchange, substitution, release, impairment, or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver, or other modification of any guaranty, for all or any of the Secured Obligations.

(d)   any manner of sale, disposition, or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations.

(e)   any default, failure, or delay, willful or otherwise, in the performance of the Secured Obligations.

(f)   any defense, set-off, or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

(g)   any other circumstance (including, without limitation, any statute of limitations) or manner of administering the LOC or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14.   Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated, or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15.   Addresses for Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as outlined in the LOC Agreement, and addressed to the respective parties at their addresses as specified in the LOC Agreement or as to either Party at such other address as shall be designated by such Party in a written notice to each other Party.

Initials: _____ _____ _____

16.    Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 17 hereof, remain in full force and effect until payment and performance in full of the Secured Obligations, (be be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees, and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment, become vested with all the benefits granted to the Secured Party herein concerning such Secured Obligations.

17.    Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer, and deliver to or at the direction of the Grantor (without recourse and any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18.    GOVERNING LAW. This Agreement and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed per, the laws of the State of Illinois and the United States.

19.    Binding Arbitration. Any dispute, claim, or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one arbitrator. The arbitration shall be administered by JAMS according to its Comprehensive Arbitration Rules and Procedures or by ADR Services according to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand under the notice requirements outlined in Section 14.5 of the LOC Agreement. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach an agreement on an arbitrator, then the arbitration shall be selected according to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for the production of documents. The requests in each set shall not number more than twenty- five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any discovery disputes shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available

Initials: _____

remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising concerning the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

**20.    JURY TRIAL WAIVER.** **EACH PARTY HERETO, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE GRANTOR AND THE SECURED PARTY, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH THIS AGREEMENT, THE LOC AGREEMENT, ANY OTHER LOC DOCUMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.**

21.    <u>Counterparts</u>. This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other LOC Documents constitute the entire contract among the Parties concerning the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

*Signatures Follow on Next Page*

Initials: _____

IN WITNESS WHEREOF, the Grantor hereto has executed this Security Agreement as of the date first set forth above.

**GRANTOR**

North Haven Lodging Partners LLC.

By:

Name: Shailesh Patel and Vihang Patel

Title: Manager / Member

SUBSCRIBED AND SWORN TO BEFORE ME on this 4th day of April, 2023

In and for the State of South Dakota

NOTARY PUBLIC

In and for the State of Connecticut

My Commission Expires:

```
ADAM PRICE
Notary Public
SEAL
South Dakota
```

BENNETT BUFFALO
NOTARY PUBLIC, STATE OF CONNECTICUT
My Commission Expires January 31, 2026

My Commission Expires:

4-27-23

Initials:

**EXHIBIT F**
**FORM TERMINATION LETTER**

McMann Commercial Lending LLC
205 N Michigan Avenue, Ste 810
Chicago, Illinois 60601

Re: North Haven Lodging Partners LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above-referenced transaction according to the terms of the LOC Agreement dated April 10, 2023.

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for a refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER: North Haven Lodging Partners LLC

By: _____

Name: Shailesh Patel and Vihang Patel
Title: _Member_

**SUBSCRIBED AND SWORN TO BEFORE ME** on this _16_ day of
_August_, 20_23_

Notary for Vihangkumar Patel only

BLERINA BOBI
Notary Public
Connecticut
My Commission Expires Sep 30, 2027

NOTARY PUBLIC
In and for the State of _CT_

My Commission Expires:

_09-30-27_

Please confirm your Wiring Instructions:
Account Title: North haven Lodging Partners LLC
Address on Account: 2517 W Brent Ridge St Sioux Falls SD 57108
Bank Name: First Dakota
Bank Address: 6100 E Silver Maple cir Sioux Falls SD 57108
Routing #: ▮▮▮▮▮
Account #: ▮▮▮▮▮722

Initials: _VP_

Case: 1:23-cv-16264 Document #: 1-3 Filed: 11/27/23 Page 1 of 54 PageID #:104

# EXHIBIT 2

### BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

among

### MCMANN COMMERCIAL LENDING LLC

as Lender

and

### Wallingford Lodging Partners LLC
as Borrower

---

dated as of

April 10, 2023

---

Initials: _VA  SP_____

## BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated, or otherwise modified, this "**Agreement**") is made and entered as of April 10, 2023, between McMann Commercial Lending LLC (the "**Lender**"), and Wallingford Lodging Partners LLC., a Connecticut Limited Liability Company ("**Borrower**").

## RECITALS

**A.**    The Borrower desires to obtain from Lender an asset-backed line of credit loan (the "**LOC**") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

**B.**    The Borrower desires to obtain the LOC from Lender for Business Expansion for construction of a 105-room limited-service hotel (as more fully described in **Exhibit D** attached hereto the "**Project**"). Acquired assets will be legally described on **Exhibit E** attached hereto (the "**Property**").

**C.**    The Borrower has agreed to pay a minimum contribution of the Project LOC Amount to Lender, by establishing the Interest Reserve (as hereinafter defined) and the ICA (as hereinafter defined), collectively,(the "**Interest Reserve Account**"), within seven (7) calendar days after the fully executed LOC Documents (as hereinafter defined) are received by Lender.

**D.**    The Borrower has agreed to pay, pursuant to Section 3.6 hereof, the aggregate amount of One Million Eight Hundred Thousand Dollars and No Cents Dollars ($1,800,000), (the "**ICA Payment**"), by bank wire to Lender. An account on the books and records of the Lender shall be created to serve as an Interest Credit Account (the "**ICA**"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

**E.**    Lender has agreed to make Advances (as hereinafter defined) under the LOC to Borrower in an aggregate amount, according to **Exhibit B**, an amount not to exceed the Maximum Amount for the purposes outlined in these recitals and the Promissory Note attached hereto as **Exhibit A** and upon the terms and subject to the conditions hereinafter set forth.

**NOW THEREFORE**, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1. Certain Defined Terms**. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed per generally accepted accounting principles consistently applied. As used in this

Initials: _____

agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

**"Advance(s)"** means any loan advance made by the Lender per the terms and conditions of this Agreement.

"**Applicable Interest Rate**" means the fixed interest rate specified in the Promissory Note.

**"Borrower"** means that term as defined in the first paragraph of this Agreement.

**"Business Expansion"** means any transaction or use, including for working capital, that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business (other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

"**Business Plan**" means the document(s) outlining the accurate and up-to-date business operations of the End-Borrower, as previously provided by End-Borrower, substantially in the form outlined in EXHIBIT D, and subject to review by Lender's Capital Partners as described in Section 8.1 of this Agreement.

**"Closing Date"** means the last date of signed execution of this Agreement by Lender and Borrower.

**"Collateral"** means all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements, and proceeds, thereof.

**"Event(s) of Default"** means any event or condition that shall constitute an event of default as described in Article 13 of this Agreement.

"ICA" means the definition given in Recital D of this Agreement.

**"ICA Payment"** means the amount remitted pursuant to Recital D of this Agreement.

Initials: _U_  _SP_ ___

"**Interest Reserve**" means credit on the books and records of the Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from a Borrower JV Partner, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"**Interest Reserve Account**" means the definition given in Recital C of this

Agreement.

"**Lender**" means that term as defined in the first paragraph of this Agreement.

"**Lender's Capital Partners**" means one or more lender-clients of the Lender

providing funding towards the LOC.

"**LOC**" means that term as defined in Recital A of this Agreement.

"**LOC Disbursement Account**" means that term as defined in Section 3.12 hereof.

"**LOC Document(s)**" means, collectively, this Agreement, the Promissory Note, and each Security Document, as any of the foregoing may from time to time be amended, restated, or otherwise modified or replaced, and any other document delivered pursuant thereto.

"**Maximum Amount**" means Eighteen Million Nine Hundred Thousand Dollars and No Cents ($18,900,000). The Maximum Amount is the Project LOC Amount plus all fees, costs, and expenses which are the Borrower's responsibility to pay.

"**Organizational Documents**" means, concerning any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise concerning, this Agreement or any other LOC Document.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority, or any other entity.

"**Project**" means that term as defined in Recital B of this Agreement.

Initials: _____

"**Project Costs**" means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by the Borrower for implementation or execution of the Project (including but not limited to the payment of taxes, insurance, and all items reasonably necessary for the successful execution of the Project), as more specifically outlined in the Project budget set forth on **Exhibit C** attached hereto.

"**Project LOC Amount**" means Eighteen Million Dollars and No Cents ($18,000,000).

"**Property**" means that term as defined in Recital B of this Agreement.

"**Promissory Note**" means the Promissory Note, in the form attached hereto as **Exhibit A**.

"**Security Agreement**" means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as **Exhibit E**.

"**Security Document**" means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each U.C.C. Financing Statement or similar filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

"**Scheduled Maturity Date**" means the 10th anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

"**Subsidiary**" means any entity (other than the Borrower) in an unbroken chain of entities beginning with the Borrower if each of the entities owns stock, units, or other interests that represent fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain

"**Taxes**" means all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, concerning those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender concerning the LOC.

"**Term Sheet**" means that document(s) dated as of 3/14/2023 between Borrower and Lender, setting forth a general summary of the terms of agreement memorialized more fully herein in final form.

"**Tranche Schedule**" means the schedule of Advances to Borrowers from the Lender, based

Initials: _U_  _SP_

upon the dates of the disbursements attached hereto as **Exhibit B**; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder does not exceed the Maximum Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

**ARTICLE 2**
**THE CREDIT**

**Section 2.1. Line of Credit Amount**. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to the Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

**Section 2.2. Line of Credit Documents**. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note, this Agreement, and each Security Document. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to the Lender and its counsel.

**ARTICLE 3**
**TERM, INTEREST, AND PAYMENTS**

**Section 3.1. Initial Term**. The initial term of the LOC is Ten (10) years and shall commence on the Closing Date and expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full thereon and all other amounts due and owing hereunder and under the Promissory Note shall be repaid by Borrower on the Scheduled Maturity Date.

**Section 3.2. Extended Term.** At the end of the initial term outlined in Section 3.1 hereof, and at the end of each Extended Term (as defined below, if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, over time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty-four (24) month period, up to a total of one (1) such additional consecutive periods (separately, "**Extended Term**"; collectively, the "**Extended Terms**"). In connection with Lender's granting of each Extended Term, (a) Borrower shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorney's fees, as a one (1)-time fee equal to one percent (1%) of the Project LOC Amount.

Initials: ___ ___

Section 3.3. **Applicable Interest Period.** The interest period concerning each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full.

Section 3.4. **Interest Rate Calculation**. Interest shall be calculated based on a 365-day year and the actual number of days elapsed in a 365-day year and at the rate outlined in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "**Maximum Interest Rate**"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to the unpaid principal balance outstanding under the Promissory Note or, if it exceeds such unpaid principal, refunded to the Borrower.

Section 3.5. **Interest Payments**. Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times outlined in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

Section 3.6. **Reserves**. Following the signing of this Agreement, the Borrower shall remit One Million Eight Hundred Thousand Dollars and No Cents ($1,800,000) as the ICA Payment per the terms and the time outlined in Recital D of this Agreement. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and not refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable.

Section 3.7. **Prepayment**. The borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC.

Section 3.8. **Interest Credit Account**. If at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which notice shall be delivered to and received by Borrower no less than thirty (30) days before the date of the next interest payment date, Borrower shall remit into the ICA the funds necessary to make such interest paid before the date such interest payment is due and payable Section 3.9. **Fees.**

        (a) **LOC Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable fee for the LOC in an aggregate amount equal to Five percent (5%) multiplied by the Project LOC Amount, which is equal to Nine Hundred Thousand Dollars and No Cents ($900,000) (the "**LOC Fee**"). The LOC Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

Initials: JA    SP

(b) **Promote Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable success fee in an aggregate amount equal to One percent (1%) multiplied by the Project LOC Amount, which is One Hundred Eighty Thousand Dollars and No Cents ($180,000) (the "**Promote Fee**"). The Promote Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

(c) **ICA Advance Fee**. To the extent the Borrower used Lender to provide the ICA Payment, at Closing and out of the initial Advance, the Borrower shall reimburse Lender in an amount equal to the ICA Payment advanced by Lender plus a nonrefundable fee in an aggregate amount equal to Zero percent (0%) of the ICA Payment, which is No Dollars and No Cents Dollars ($-) (the "**ICA Advance Fee**"). The ICA Advance Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition. The borrower will take the Project LOC Amount in full on the closing of the first tranche.

**Section 3.10. Line of Credit Extension Fees.** Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a nonrefundable LOC extension fee for each extension in an aggregate amount equal to one percent (1%) multiplied by the Maximum Amount.

**Section 3.11. Legal and Incidental Fees, Charges, and Costs**. Borrower shall pay at Closing, all reasonable out of pocket and up to Twelve Thousand, Five Hundred U.S. Dollars ($12,500) for legal fees, recording and filing fees, documentary stamps, taxes, service charges, credit reports, UCC search costs, title company fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial proceeding; provided that Lender will provide Borrower ten (10) days' advance notice of any legal fees pursuant to this Section 3.11 that will exceed Twelve Thousand, Five Hundred U.S. Dollars ($12,500). Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or willful misconduct.

**Section 3.12. Line of Credit Disbursement Account**. The proceeds of each Advance under the LOC shall be advanced into the LOC Disbursement Account with Lender to be used by Borrower for payment of the Borrower's Project Costs, solely for the purposes and in the manner

Initials: _____

outlined in this Agreement. The LOC Disbursement Account will be held jointly in the name of the Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights and interest in and to the LOC Disbursement Account, which assignment will be effective only upon the occurrence and continuation of an Event of Default, subject to an applicable Default Cure Period (as hereinafter defined).

**Section 3.13. <u>Taxes</u>.**

(a)     All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to the Lender (after deducting, withholding, and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

(b)     Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to the Lender. If the Borrower shall fail to pay any Taxes or OtherTaxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result of any such failure.

(c)     The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

**ARTICLE 4**
**CONDITIONS FOR CLOSING AND DISBURSEMENT**

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing:

**Section 4.1.     <u>Delivery of the LOC Documents</u>.**

(a)     As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

Initials: _____

(b)      The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Payment Account and Security Account (both as defined under UCC § 9-102 and as further defined in the Security Agreement) maintained by the Borrower.

(c)      Contemporaneously with Borrower's acquisition of the Property, Borrower shall have delivered an executed and notarized mortgage or deed of trust in form and substance required by Lender granting Lender a priority lien and security interest in and to the Property (the "**Security Instrument**"), and such Security Instrument shall be promptly recorded in the real property records of the county in which such real property is located. If required by Lender, (i) the closing of such Advance and recording of the Security Instrument shall be completed through the services of a title company chosen by Lender, and (ii) such title company shall issue, at Borrower's expense and for the benefit of Lender, a loan policy of title insurance concerning the Property. For the avoidance of doubt, this Section 4.1(c) shall not operate to preclude any Advances to the Borrower to fund pre-acquisition costs.

**Section 4.2. <u>Authority</u>**. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members, or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery, and performance of the LOC Documents and the consummation of the transactions contemplated thereby, (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners or members of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing concerning the Borrower.

**Section 4.3. <u>Liens</u>**. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions, or restrictions. At the request of the Lender, the Borrower shall (i) deliver to the Lender the results of UCC lien searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) UCC or other lien termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project, or any Collateral without the express written permission of Lender.

**Section 4.4. <u>Litigation</u>**. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

**Section 4.5. <u>Events of Default</u>**. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in

Initials: ____  ____

full compliance with the terms and provisions of this Agreement.

       **Section 4.6.  Purchase and Agreement Contracts.** Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

       **Section 4.7.  Compliance with Certain Requirements.** Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) under local, state, federal, and international laws, procedures, statutes, regulations, and ordinances, conditions applicable to the Project.

       **Section 4.8.   Evidence of Insurance.**

       (a)     For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for, and will keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders' loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of similar size and character that of the business of the Borrower, and Borrower shall furnish Lender with the satisfactory evidence of such underlying Borrower insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

       (b)     Within five (5) business of receipt of End-Borrower insurance pursuant to Section 4.8(a), Lender shall acknowledge receipt and communicate to Borrower the approval and sufficiency of such End-Borrowers certificate of insurance.

       **Section 4.9.  Financial Statements.** The lender shall have received all financial reports required by Section 8.6 hereof.

       **Section 4.10.  Business Pro Forma.** The lender shall receive a pro forma income and expense statement annually in connection with the Project.

       **Section 4.11.  Management Plan.** Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of Borrower's business.

       **Section 4.12.  Material Change.** Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower's ability to perform under this Agreement or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.

       **Section 4.13.  Non-Subordination.** Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such Subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the

Initials: _____  _____

normal and reasonable management of the Project).

**Section 4.14. Securitization.** The lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or reasonable due diligence required by the insurer.

## ARTICLE 5
## USE OF LINE OF CREDIT PROCEEDS

**Section 5.1.    Project Costs: Business Expansion Costs**.

(a)      Proceeds of Advances under the LOC shall be utilized by Borrower solely to finance the Project Costs, as more fully described in the attached **Exhibit C**, in connection with Borrower Business Expansion as further detailed in the Business Plan, updated yearly by Borrower.

(b)      The proceeds of the LOC shall be used exclusively for the purposes outlined in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family, or household purposes. The borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute, or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

## ARTICLE 6
## INSPECTIONS

**Section 6.1. Project Inspection**. Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

**Section 6.2. Books and Records**. Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower about the Project, the Property, and the Borrower and to make extracts therefrom or copies thereof.

**Section 6.3. Force Majeure Event Inspection Right.** In the event of a Force Majeure Event (as hereinafter defined) which interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until Lender is satisfied with Borrower's ability to resume operations to develop the Project. Following a Force Majeure Event, Lender has the right to modify the terms upon which future Advances may be made as a result of a change in circumstances as determined by the Lender

Initials: _U_   _SP_

in Lender's sole discretion, that the Borrower can perform or continue to perform the Project scope of work. Borrower shall execute any additional documents, amendments, or other agreement of terms required by Lender, before Lender's obligation to continue to make Advances shall resume.

## ARTICLE 7
## ADVANCE OF FUNDS

**Section 7.1. <u>Timing and Advances to Payee</u>.** Advances will be made as outlined in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance has been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than seventy-five (75) calendar days following the opening of the ICA by the Lender with its wholesale lender. Lender shall deliver the written notice to Borrower of the commencement of such seventy-five (75)-day period. Lender shall deliver the written notice to Borrower via the ZOOMERAL messaging system of the commencement of such seventy-five (75)-day period.

**Section 7.2. <u>Conditions Precedent to Advance Funds</u>.** Lender's obligation to make Advances hereunder shall be conditioned upon fulfillment of the terms outlined in Article 4 hereof.

**Section 7.3. <u>Unpaid Lien Claims.</u>** If Lender receives notice of nonpayment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, per applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower, or (b) withhold one hundred percent (100%) of the lien amount claimed from future Advances.

**Section 7.4. <u>Mandatory Advances</u>.** Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.

## ARTICLE 8
## BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing:

**Section 8.1. Project.** (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is the counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation, and management of the Project.

Initials: _____

**Section 8.2. Compliance with Laws**. Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

**Section 8.3. Compliance with Documents**. Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

**Section 8.4. Books and Records**. Keep and maintain complete and accurate books of account, per generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

**Section 8.5. Payment of Obligations**. Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established per generally accepted accounting principles).

**Section 8.6. Financial Reports**. Deliver to Lender, concerning Borrower as soon as available and in any event (a) within sixty (60) days after the end of each calendar quarter during the term of the LOC, financial statements of Borrower for such quarter and (b) within ninety (90) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower, in each case of the foregoing, certified as true and correct (which reports shall be prepared per generally accepted accounting principles consistently applied) and operating statements in a form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender. The borrower must also complete their ZOOMERAL business profile and keep the business profile up to date throughout the term of this agreement.

**Section 8.7. Notification to Lender**. Promptly after learning thereof, notify Lender of: (a) the details of any material action, proceeding, investigation, or claim against or affecting the Borrower, the Property, or the Project instituted before any court, arbitrator, or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Property or the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower of the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

**Section 8.8. Partnership/Corporate Existence**. Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

Initials: _____

## ARTICLE 9
## BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing Borrower shall not:

**Section 9.1. Liquidation, Merger, and Sale of Assets.** Liquidate, merge, or consolidate with any other Person or otherwise transfer to an unrelated Person fifteen percent (15%) or more of the equity securities of Borrower, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business. Notwithstanding, any initial public offering or acquisition by another company will require the Lender's approval or full payment of the outstanding loan balance.

**Section 9.2. Liens.** Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such liens, shall not be increased).

**Section 9.3.    Indebtedness.** Create, incur, or have outstanding any indebtedness of any kind, other than (a) indebtedness owing to the Lender under this Agreement and the other LOC Documents, and (b) indebtedness of the Borrower existing as of the Closing Date as disclosed to and approved by the Lender (and any extension, renewal, or refinancing thereof but only to the extent that the principal amount thereof does not increase after the Closing Date).

**Section 9.4. Investments, Loans, and Guarantees**. (a) Create, acquire, or hold any subsidiary, (b) make or hold any investment in any stocks, bonds, or securities of any kind (c) be or become a party to any joint venture or other partnership, (d) make or keep outstanding any advance or loan to any Person, or (e) be or become a guarantor of any kind.

**Section 9.5. Acquisitions.** Enter into any transaction or series of related transactions for or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another

Initials: _VP   JP_

Person by a merger, amalgamation, or consolidation or any other combination with such Person, unless specifically stated and approved before execution of this Agreement.

Section 9.6. **Organizational Documents**. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

Section 9.7.    **Project and Project Documents**. Willfully or voluntarily abandon the Project or its activities to develop, construct, operate, or maintain the Project. If the same would (i) be a major decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

(a)    terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance of a material obligation by any other Person under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the development, construction, operation, and maintenance of the Project, in each case that would have an adverse effect on the Lender; or

(b)    sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation, and maintenance of the Project without Lender's consent, which consent shall not be unreasonably withheld.

### Article 10
### REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender that:

Section 10.1. **Validity of Agreement**. The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents. The LOC and the execution, delivery, and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable per their terms. The execution, delivery, and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than liens permitted under Section 9.2 hereof) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

Section 10.2. **Existing Defaults**. As of the date of execution of this Agreement, Borrower (or any subsidiary of Borrower) is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other

Initials: _____ _____

agreement or instrument to which Borrower (or any subsidiary of Borrower) is a party or by which it or any of its properties, subsidiaries, partners, or other related entities may be bound.

**Section 10.3. No Default in Other Agreements**. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a party or by which it or any of its properties, subsidiaries, partners or other related entities may be bound, or result in the violation by it of any law, order, rule, ordinance, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties, subsidiaries, partners or other related entities.

**Section 10.4. No Consents**. No consent, approval, authorization, or other acknowledgment of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

**Section 10.5. Litigation**. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to Borrower's knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened, or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from the performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.

**Section 10.6. Financial Statements**. All balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared per generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

**Section 10.7. Legal Requirements**. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to

Initials: _____

environmental protection, occupational safety and health, zoning, and equal employment practices.

Section 10.8. **Taxes**. The Borrower has filed all tax returns and reports required of it, has paid all taxes which are due and payable, and has provided adequate reserves for payment of any tax whose payment is being contested; the charges, accruals, and reserves on the books of the Borrower in respect of taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority concerning any taxes except as otherwise previously disclosed to the Lender in writing.

Section 10.9. **Organization and Good Standing**. The Borrower is a duly formed or organized, validly existing, and in good standing under the laws of the State of its formation or organization as outlined in the first paragraph of this Agreement, and is qualified as a foreign entity and in good standing in each jurisdiction where the Property and the Project are located.

Section 10.10. **Insurance**. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

Section 10.11. **Accurate and Complete Statements**. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

Section 10.12. **Timing of Lender Funding.** Provided Borrower has met the conditions to Advances in this Agreement, including without limitation the timing for requests outlined in this Section, Lender shall fund Advances per under the Tranche Schedule, but in no event anymore frequently than every sixty (60) day, unless otherwise consented to in writing by Lender. The borrower must deliver Advance requests to Lender thirty (30) business-banking days before the week represented on the Tranche Schedule for which the Borrower wishes to receive the proceeds of such Advance from the LOC Disbursement Account. Upon notice of an Advance Request from the Borrower, Lender has a forty (40) international business-banking day window based on the Tranche Schedule (except for the first Advance according to Section 7.1) to Payment the requested Advance into the LOC Disbursement Account. Absent a written Advance request from Borrower, per the conditions and requirements set forth herein, Lender is not obligated to disburse the next scheduled Advance under the Tranche Schedule.

## ARTICLE 11
## NATURE OF REPRESENTATIONS AND WARRANTIES

Section 11.1. **Generally.** The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive

Initials: _VI_  _SP_

so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date hereof, except for any representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower according to or in connection with the LOC shall be deemed to have been relied upon by Lender.

### ARTICLE 12
### EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "**Event of Default**"):

**Section 12.1. Nonpayment**. Failure to make any payment required by the Promissory Note, this Agreement, or any other LOC Documents and such failure continues for thirty (30) days after notice of such default is sent by Lender to Borrower.

**Section 12.2. Other Covenants and Agreements.** Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not have been fully corrected, by the performance of or compliance with such covenants or agreements, within twenty (20) days after notice of such default is sent by Lender to Borrower.

**Section 12.3. Representations and Warranties.** If any representation, warranty, or statement made in or according to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made. Such Event of Default can be corrected by the presentation of accurate and current material information furnished by the Borrower to the Lender to correct the false or erroneous representation, warranty, or statement within ten (10) days after notice of such default is sent by Lender to Borrower.

**Section 12.4. Security.** If any lien granted in this Agreement or any other LOC Document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of Collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in the lien status occurs appropriate documents to correct such matters.

**Section 12.5. Validity of LOC Documents.** If (a) any material provision, in the sole opinion of the Lender, of any LOC Document, shall at any time cease to be valid, binding, and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC

Initials: _VB_ _SP_

Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

**Section 12.6. <u>Petition for Bankruptcy, Insolvency</u>**. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation, or reorganization, seeking,

consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for ninety (90) days; or the taking of the action by Borrower to authorize any of the actions outlined in this Section 12.6.

**Section 12.7. <u>Material Litigation</u>**. Any action, suit, proceeding, or investigation of any kind involving or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof of any Litigation, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation, and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, partners, or other related entities, or the Project and promptly after the occurrence thereof, a notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, partners, or other related entities, or the Project of the disclosed Litigation.

**ARTICLE 13**
**REMEDIES**

**Section 13.1. <u>General</u>**. Following the occurrence of one (1) or more Events of Default, a default cure period of sixty (60) days begins ("Default Cure Period"), except as otherwise provided in Section 13.3 or Section 13.4. If Borrower fails to cure the Event of Default (in the manner specified for each Event of Default according to Article 12) within the Default Cure Period, then the Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies outlined in the Promissory Note, in the LOC Documents, or any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or equity, including such rights as are provided in this Article 13. If a Bankruptcy Event referred to in Section 12.6 hereof occurs, (i) all obligations

Initials: _____

of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Upon the occurrence of any Event of Default hereunder under Section 12.1 whereby Borrower has missed more than two (2) scheduled payments if Borrower does not have any interest reserve account established for the benefit of the Lender, Borrower shall have a) sixty (60) days Default Cure Period to cure the Event of Default and must (b) Payment an additional one year's worth of interest payments into the Interest Reserve Account.

### Section 13.2. Default and Right to Acquire.

In the event, the Borrower is unable to cure the Event of Default (in the manner specified to correct each Event of Default according to Article 12 or within the Default Cure Period,

(a)    Upon the occurrence of an Event of Default, Lender shall have the right, in person or by agent, in addition to all other rights and remedies available to Lender hereunder or under the LOC documents, to enter into possession of the Project and perform or cause enforce any liquidity plan.

(b)    The lender may enter into possession of the Project and perform or cause to be performed all work and labor necessary to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower. All sums expended by the Lender in doing so, together with interest on such total amount at the Default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured by the LOC documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

(c)    Borrower thereby, following such Bankruptcy Event or relevant cure periods under Section 13.2 constitutes and appoints the Lender as its true and lawful attorney-in-fact, with the full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

(i)    to enter and endorse all agreements, instruments, and documents in connection therewith.

(ii)    to use any unadvanced proceeds of the LOC to complete, operate, or maintain the Project.

(iii)    to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

Initials: VI  SP

(iv)     to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

(v)     to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security satisfactory to the Lender has been provided.

(vi)     to execute applications and certificates in the name of the Borrower which reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

(vii)     to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

(viii)     to do any and every act which the Borrower might do on its behalf concerning the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be (A) irrevocable, (B) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (C) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

**Section 13.3.  Curing of Defaults by Advances**. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which Lender may have because of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender per the terms hereof before any additional proceeds of the LOC are disbursed.

**Section 13.4.  Remedies Are Cumulative**. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of any rights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidate any act done according to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

Initials: _W_  _SP_

**Section 13.5. Offsets**. If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC documents is accelerated according to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, all of such obligations then owing by the Borrower, whether or not the same shall then have matured, all Payment (general or special) balances, and all balances in the Interest Reserve Account and all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

**Section 13.6. Collateral**. The Lender shall at all times have the rights and remedies of a secured party under the UCC, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Documents executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC documents, which the Borrower agrees to do, and make it available to the Lender at a reasonable convenient place to be designated by the Lender. The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC document, each of which findings shall be considered to be an accession to and a part of such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any delivery or taking of possession of the Collateral securing the obligations under the LOC documents, or any portion thereof, under this Agreement, then, with or without resort to the Borrower personally or any other person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. No prior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that the Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case, the Lender shall give the Borrower not fewer than ten (10) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made. The Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Lender may purchase such Collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower hereby waives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC documents, the cost of which shall be paid by the Borrower.

Initials: _U_  _SP_

**Section 13.7. Default by Lender and Borrower's Sole Remedy.**

(a)       Provided Borrower has fully satisfied and complied with all conditions to Advance if Lender fails to provide the first (1st) Advance when due, under the Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver a written notice in the form of a notarized termination letter, a copy of which is attached hereto as **Exhibit F** ("the **Termination Letter**"), to Lender by certified mail. Upon receipt of such notice, Lender shall have forty (40) international business-banking days from the date of receipt ("**Refund Period**") within which to return the ICA Payment to the Borrower.

(b)       If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice in the form of a notarized Termination Letter to the Lender by certified mail. Within forty (40) international business-banking days from the date of receipt of such notice by Lender, Borrower shall be entitled to (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) termination of Borrower's obligations to Lender hereunder except Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners, or other related entities, for any indirect, special, incidental, or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise because of, the LOC, the Advances, the Agreement or the other LOC documents.

(c)       Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances according to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, an act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, an act of civil disobedience, an act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew

Initials: _____

restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages, or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from performing under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period the occurrence is expected to continue. The lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. The lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall he tolled during the pendency of a Force Majeure Event.

**Section 13.8 Binding Arbitration.** Any dispute, claim, or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one (1) arbitrator. The arbitration shall be administered by JAMS under its Comprehensive Arbitration Rules and Procedures or by ADR Services under its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand according to the notice requirements outlined in Section 14.5 herein. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach an agreement on an arbitrator, then the arbitration shall be selected under the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for the production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any discovery disputes shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising concerning the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

**ARTICLE 14**
**GENERAL PROVISIONS**

**Section 14.1. Disclaimer of Liability.** Lender has no liability or obligation in connection

Initials: _____

with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith. No claim may be made by the Borrower or any other Person against the Lender or the Affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

Section 14.2. **Publicity**. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. The lender shall have the right to indicate that it has provided the financing for the Project.

Section 14.3. **Confidentiality.** Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary, and Borrower hereby agrees to maintain confidential this Agreement, the LOC documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place. Borrower's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative.

Section 14.4. **Responsibility for Application of Funds**. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose outlined in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced under this Agreement. The lender may rely solely upon the Borrower's requests for Advances, affidavits, statements, and reports in making said Advances, and the Borrower does hereby release and indemnify the Lender and hold the Lender harmless from any losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final and non-appealable decision).

Section 14.5. **Non-Disparagement**. Borrower agrees and covenants that Borrower shall not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory, maliciously false, or disparaging remarks, comments, or statements concerning the

Initials: _____ _____

The lender or its businesses, or any of its employees, officers, or directors, and its existing and prospective clients, suppliers, investors, and other associated third parties, now or in the future. For the avoidance of doubt, a breach of this Section 10.04 shall constitute an Event of Default under Section 7.02 under which Lender has the right to terminate all obligations under the Loan Documents under Section 9.01(b).

Section 14.6 **Opportunity to Consult with Counsel**. Borrower acknowledges that it has had an opportunity to consult with and be represented by counsel of Borrower's choosing in the review of the Loan Documents, that it has been advised by Lender to do so, that the Borrower is fully aware of the contents of the Loan Documents and its legal effect, and that Borrower enters into these Loan Documents freely, without duress or coercion, and based on Borrower's judgment and wishes and not in reliance upon any representation or promise made by the Lender, other than those contained herein.

Section 14.7 **Notices**. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent by certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety-six (96) hours after deposit in first-class certified United States mail, postage prepaid, return receipt requested, or two (2) business days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given according to this paragraph:

To Borrower:  Wallingford Lodging Partners LLC
 4 Miles Drive
 Wallingford, Connecticut 06492

To Lender:  McMann Commercial Lending LLC
 205 N Michigan Avenue, Ste 810
 Chicago, Illinois 60601

Section 14.8. **Applicable Law**. This Agreement and, unless otherwise specifically provided for therein, each other LOC document, shall be governed by and construed per the laws of the State of Illinois and the United States.

Section 14.9. **Successors and Assigns**. The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

Section 14.10. **Severability**. The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition. In the event of any conflict or inconsistency between the terms and provisions of this Agreement and any of the LOC Documents, the terms and provisions of this Agreement shall control.

Initials: _____

**Section 14.11. Amendments**. This Agreement may not be modified or amended except by a written agreement signed by the Borrower and Lender.

**Section 14.12. Headings; Attachments**. The several headings to articles, sections, and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part thereof.

**Section 14.13. No Third-Party Rights**. This Agreement is made entirely for the benefit of the Borrower, the Lender, and their successors in interest (including any participants). No third party shall have any rights hereunder.

**Section 14.14. Indemnification**. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement. The Borrower hereby agrees to indemnify, defend and hold harmless the Lender, the managers of the Lender, and all of their members, managers, affiliates, and advisors, from any damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees and costs) that they may incur because Borrower failed to fulfill all of the terms and conditions of this agreement or because of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs, and expenses (including attorneys' fees and costs) incurred by Lender, the managing members of Lender, or any of its members, managers, affiliates, or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished in connection with this transaction.

**Section 14.15. General Limitation of Liability**. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the

Initials: _JP_ _SP_

transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission, or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. In addition to the tolling provided under Section 6.3, Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

**Section 14.16. <u>Entire Agreement</u>**. This Agreement, the Promissory Note, and any other LOC Document or other agreement, document, or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings concerning the subject matter hereof.

**Section 14.17. <u>Execution in Counterparts</u>**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute the same Agreement.

**Section 14.18. <u>Legal Representation of the Parties</u>**. The LOC Documents were negotiated by the Parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

**Section 14.19. <u>JURY TRIAL WAIVER</u>**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

[Remainder of page intentionally left blank; Signatures follow]

Initials: _JP__ SP_____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**LENDER:** MCMANN COMMERCIAL LENDING LLC

By:

Name: Walter P Trock III

**BORROWER:** Wallingford Lodging Partners LLC

By:

Name: Shailesh Patel        Vihang Patel

Title:        Managing Member

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 4th day of

April , 2023

NOTARY PUBLIC

In and for the State of Connecticut

My Commission Expires:

BENNETT BUFFALO
NOTARY PUBLIC, STATE OF CONNECTICUT
My Commission Expires January 31, 2026

In and for the State of South Dakota.

My Commission Expires
4-27-23

ADAM PRICE
Notary Public
SEAL
South Dakota

Initials:

**EXHIBIT A**
**PROMISSORY NOTE**

$18,900,000 – Maximum Principal Amount                      April 10, 2023

FOR VALUE RECEIVED, Wallingford Lodging Partners LLC., a Connecticut Limited Liability Company (the "**Maker**"), hereby promises to pay to McMann Commercial Lending, or any subsequent holder of this Promissory Note (the "**Payee**"), at such place as Payee may designate, the principal sum of Eighteen Million Dollars and No Cents ($18,000,000) or the aggregate unpaid principal amount of all Advances, plus the Fees outlined in Section 3.9 of the LOC Agreement, as such terms are defined in the LOC Agreement (as hereinafter defined) and the other LOC Documents, made by Payee to Maker according to the LOC Agreement, whichever is greater, plus interest on the principal sum and all unpaid balances and all other amounts owed by Maker to Payee at the interest rate set forth below, payment of principal and interest to be made in lawful money of the United States in immediately available funds, as set forth below. Capitalized terms used herein and defined in the LOC Agreement, but not otherwise defined herein, shall have the meaning given such term in the LOC Agreement; and

    (a)    Maker shall make payments under this Master Promissory Note (as the same may from time to time be amended, restated, or otherwise modified, this "**Note**") as follows: (i) simple interest payments on the outstanding principal amount of the Advances, at a fixed rate equal to Four point seven five percent (4.75%) per annum, which interest payments shall be due and payable to Payee quarterly in arrears, on the first (1st) business day of each January, April, June and September of each year, with the first payment due on the first such date immediately following the date of the first Advance hereunder; and (ii) the outstanding principal balance of the Note, and all remaining accrued and unpaid interest, late charges and all other amounts due to Payee according to this Note and the LOC Documents shall be due and payable in full no later than the Scheduled Maturity Date.

    (b)    Except for the quarterly payments set forth above, this Note may be prepaid in whole or in part, as provided in the LOC Agreement.

    (c)    All payments made will be applied first to any late charges or other accrued fees, then to accrued interest, and then to the principal amount of the Note. Maker shall make each payment hereunder to the Payee without any deduction, offset, abatement, recoupment, counterclaim, or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on the account until such payment is honored when presented for payment at the drawee bank. Whenever any payment to be made hereunder, including, without limitation, any payment to be made on any Advance, shall be stated to be due on a day that is not a business day, such payment shall be made on the next business day and such extension of time shall in each case be included in the computation of the interest payable on such Advance. The aggregate unpaid amount of Advances and similar information concerning the LOC set forth on the records of Payee shall be rebuttable presumptive evidence for such information, including the amounts of principal, interest, and fees owing to Payee.

Initials: _____

(d)    Maker shall pay all amounts due under this Note to McMann Commercial Lending, Corporate Office at the address provided under Section 14.5 of the LOC Agreement or such other offices as may be designated by Payee from time to time.

(e)    All amounts owed by Maker according to this Note shall be collectively referred to herein as the **"Obligation"** of Maker.

In addition, the following provisions shall govern this Note:

1.    **LINE OF CREDIT AGREEMENT AND LINE OF CREDIT DOCUMENTS.** This Note is made and delivered to Payee according to and is subject to all terms and conditions outlined in the Business Expansion Line of Credit Agreement of even date herewith between Maker and Payee (as the same may from time to time be amended, restated or otherwise modified, the "**LOC Agreement**"). This Note is secured by certain Collateral, as evidenced by the LOC Documents, covering the personal and/or real property described therein.

2.    **LATE CHARGES.** If any amount payable under this Note is paid more than ten (10) business days after the due date thereof, then late charges (the **"Late Charges"**) shall be added to the delinquent payment in an amount equal to five percent (5.00%) of such late payment for the extra expense in handling past due payments. Any such Late Charges shall be due and payable without demand, and Payee, at its option, may (i) refuse any late payment or any subsequent payment unless accompanied by the applicable Late Charge, (ii) add the Late Charges to the principal balance of this Note, and (iii) treat the failure to pay the Late Charges as demanded as an Event of Default under this Note. If Late Charges are added to the principal balance of this Note, those Late Charges shall bear interest at the same rate as the principal balance under this Note. Any payment to Payee by check, draft, or other items shall be received by Payee subject to collection and will constitute payment only when collected and not when received.

3.    **DEFAULT, CROSS-DEFAULT, AND ACCELERATION.** Time is of the essence. If Maker fails to make any payment of principal, interest, or any other Obligation on the date the same is due and payable under this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or Maker or any other party fails to meet or perform any other obligation under any term or condition of this note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or an Event of Default occurs under the LOC Agreement or any of the other LOC Documents, and subject to any applicable notice and cure periods outlined in the LOC Agreement or any other LOC Documents, such Event of Default is not cured, then this Note shall be in default ("Default"). Upon Default, Payee shall provide written notice to Maker specifying the nature of the Default and directing that it be remedied within the applicable notice and cure period as outlined in the LOC Agreement. Upon Default, the interest rate provided for in this Note shall immediately increase to eighteen percent (18%) per annum (the "Default Rate"), unless and until cured by Maker, and upon Maker's failure to cure any default, the entire unpaid amount of this Note shall be immediately due and payable without further notice or

Initials: _U_   _SP_

demand from Payee. Until cured, interest shall accrue daily after default with daily interest being added to the principal on the last day of each calendar month and thereafter compounded to calculate interest on the amounts owed according to this Note, and Maker shall thereafter be liable for all costs of collection, including reasonable attorneys' fees and costs, in addition to the payment of principal, interest and any other amount.

Should there be a material misappropriation of more than ten (10%) percent of the proceeds of the Advances which causes an Event of Default, the Borrower shall immediately surrender controlling management interest in Wallingford Lodging Partners LLC and the Project to McMann Commercial Lending LLC.

4. **COSTS, FEES, AND COMPENSATION.** Maker further promises to pay all amounts owed under this Note, the LOC Agreement, and the other LOC Documents, and all Obligations owed according to this Note, the LOC Agreement, and the LOC Documents, and shall pay all such amounts as specified therein.

5. **WAIVER.** Maker and all endorsers, guarantors and all Persons liable or to become liable on this Note waive presentment, demand, a notice of dishonor, notice of default or delinquency, a notice of acceleration, notice of nonpayment, a notice of costs, expenses or losses and interest thereon, and all other notices or matters of a like nature, other than notices required according to this Note, the LOC Agreement or the other LOC Documents.

6. **SUCCESSOR AND ASSIGNS.** The terms of this Note shall apply to, inure to the benefit of, and bind all Parties hereto and their respective successors, and assigns.

7. **CUMULATIVE REMEDIES.** Upon the occurrence of any default under this Note, the LOC Agreement, or any of the other LOC Documents, or an Event of Default occurs, Payee shall have all rights specified therein and as provided under relevant law. No remedy or election hereunder shall be deemed exclusive but shall wherever possible, be cumulative with all other remedies at law or equity.

8. **GOVERNING LAW; VENUE AND JURISDICTION; BINDING ARBITRATION; WAIVER OF TRIAL BY JURY.** This Note shall be governed by and construed per the laws of the State of Illinois and the United States.

**BINDING ARBITRATION**: Any dispute, claim, or controversy arising out of or relating to this Note, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one arbitrator. The arbitration shall be administered by JAMS according to its Comprehensive Arbitration Rules and Procedures or by ADR Services under its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand under the notice requirements outlined in Section 14.5 of the LOC Agreement. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach an agreement on an

Initials: _JM_  _SP_

arbitrator, then the arbitration shall be selected according to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for the production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any discovery disputes shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising concerning the enforcement or interpretation of this Note, this agreement to arbitrate, or any of the LOC Documents.

**JURY TRIAL WAIVER**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

9.    **AUTHORIZATION.** To induce Payee to enter into this Note and extend and advance funds to Maker under the terms contained herein and according to the LOC Agreement, Maker hereby represents and warrants as follows, acknowledging that Payee is relying on the truth and accuracy of the following representations and warranties in entering into this Note:

(a)    That the undersigned is the authorized representative of Maker and has the authority to bind Maker; and

(b)    that Maker is duly organized and validly existing and in good standing under the laws of the State of its formation, and duly qualified to transact business and in good standing in any United States state where the nature of its business or properties requires such qualification, with full power and authority, corporate or otherwise, to enter into and perform this Note; that Maker has taken all actions required to be taken in connection herewith; and

Initials: _JI_  _SP_

(c)     that upon execution of this Note by the undersigned, this Note will constitute a legal, valid, and binding obligation of Maker and will be enforceable against Maker as set forth herein, except as enforceability thereof may be limited by bankruptcy, insolvency, moratorium, and similar laws and by equitable principles, whether considered at law or in equity.

10.     **ATTORNEY FEES AND COSTS OF COLLECTION.**  Maker shall pay Payee all reasonable expenses, attorney fees, and costs incurred in any action or proceeding by Payee to enforce the terms of this Note, the LOC Agreement, and/or any of the LOC Documents, including, without limitation, all reasonable expenses, attorney fees, and costs on appeal.

11.     **MISCELLANEOUS PROVISIONS.**

(a)     No delay or omission on the part of the Payee in exercising any rights hereunder or under the terms of any Security Agreement, pledge agreement, any guarantee made to guarantee payment of this Note, or any other Security Document given to secure this Note, shall operate as a waiver of such rights or any other right hereunder or under said security agreements, pledge agreements, guaranties or other documents.

(b)     The invalidity or unenforceability of any provision hereof, of this Note, the LOC Agreement or any of the other LOC Documents, or of any other instrument, agreement, or document now or hereafter executed in connection with the loan made pursuant thereto, or any Obligation created thereunder shall not impair or vitiate any other provision of any of such instruments, agreements, and documents, all of which provisions shall be enforceable to the fullest extent now or hereafter permitted by law.

(c)     This Note, the LOC Agreement, and the other LOC Documents may only be amended, terminated, extended, or otherwise modified by a written signed by the Party against which enforcement is sought. In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealing, or the like be effective to amend, terminate, extend, or otherwise modify any of same.

(d)     This Note and the rights and remedies provided for herein may be enforced by Payee or any subsequent holder hereof. Wherever the context permits, each reference to the term "holder" herein shall mean and refer to Payee or the then subsequent holder of this Note.

(e)     Maker agrees that the holder of this Note may, without notice to Maker and without affecting the liability of Maker, accept security for this Note and any additional or substitute security, if any, or release any security or any party liable for this Note, including any guarantor, or extend or renew this Note.

[Remainder of page intentionally left blank; Signature page follows]

Initials: _IP_  _SP_

**EXHIBIT B**
**TRANCHE SCHEDULE**

| Tranche 1 | Within 75 calendar days of confirmation of the clearing of the funds remitted by the Borrower being funded to the wholesale lender by the Lender under Section 7.1 | $3,600,000 |
| Tranche 2 | 75 calendar days after the date of the funding of Tranche 1 | $14,400,000 |
| Tranche 3 | N/A | |
| Tranche 4 | N/A | |

Initials: _____ _____

**EXHIBIT C**
**PROJECT COSTS**
(Please explain the use of the funds below per the project. Please see "Project Costs" defined in Article 1 of this agreement.)

Initials: _W SP_

**EXHIBIT D**
**THE PROJECT**
(Please attach a copy of your Business Plan, Executive Summary, and/or Slide Deck.)

Initials: _V/8_  _SP_

IN WITNESS WHEREOF, the Grantor hereto has executed this Security Agreement as of the date first set forth above.


**GRANTOR**
Wallingford Lodging Partners LLC.

By:
Name: Shailesh Patel and Vihang Patel

Title: Manager / Member


April _____, 2023    **SUBSCRIBED AND SWORN TO BEFORE ME** on this 4th day of

_____
NOTARY PUBLIC
In and for the State of
Connecticut

My Commission Expires:

BENNETT BUFFALO
NOTARY PUBLIC, STATE OF CONNECTICUT
My Commission Expires January 31, 2026


In and for the State of South Dakota.


My Commission Expires:
4·27·23

ADAM PRICE
Notary Public
SEAL
South Dakota

Initials: _____ SP

**EXHIBIT E**
**SECURITY AGREEMENT**

This SECURITY AGREEMENT, dated as of April 10, 2023 (as amended, supplemented, or otherwise modified from time to time per the provisions hereof, this "**Agreement**"), is made by Wallingford Lodging Partners LLC (the "**Grantor**"), in favor of McMann Commercial Lending LLC (the "**Secured Party**").

WHEREAS, the Grantor and the Secured Party are entering into that certain Business Expansion LOC Agreement, dated of even date herewith (as amended, supplemented, or otherwise modified from time to time, the "**LOC Agreement**").

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all the Secured Obligations (as hereinafter defined); and

WHEREAS it is a condition to the obligation of the Lender to make the LOC under the LOC Agreement that the Grantor execute and deliver this Agreement, and this Agreement is being executed and delivered in consideration of the Secured Party entering into the LOC Agreement and each financial accommodation granted to the Secured Party by the Lender.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    Definitions. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the LOC Agreement. Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement. Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9. For purposes of this Agreement, the following terms shall have the following meanings:

"**Collateral**" has the meaning outlined in Section 2 hereof.

"**Control Agreement**" means (a) concerning a Payment account, each Payment Account Control Agreement (or similar agreement concerning a Payment Account) among the Grantor, the Lender, and a depository institution, to be in form and substance satisfactory to the Lender, and (b) for a Securities Account, each Securities Account Control Agreement (or similar agreement for a Securities Account) among the Grantor, the Lender, and a securities intermediary, to be in form and substance satisfactory to the Lender; as any of the foregoing may from time to time be amended, restated or otherwise modified.

"**Payment Account**" means a Payment account, as that term is defined in the

UCC."**Event of Default**" has the meaning outlined in the LOC Agreement.

"**First Priority**" means, concerning any lien and security interest purported to be created in any Collateral according to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the LOC Agreement).

Initials: _U_ _SP_

"**Proceeds**" means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon, or distributions with respect thereto.

"**Secured Obligation(s)**" has the meaning outlined in Section 3 hereof.

"**Securities Account**" means a securities account, as that term is defined in the UCC.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.      Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of the Grantor's right, title, and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**"):

(a)      all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party under Section 4(e) hereof, general intangibles (including all payment intangibles), money, Payment accounts, and any other contractual rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

(b)      all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time concerning any of the foregoing.

3.      Secured Obligations. The Collateral secures the due and prompt payment and performance of:

(a)      the obligations of the Grantor from time to time arising under the LOC Agreement, this Agreement, any other LOC Document or otherwise for the due and prompt payment of (i) the principal of and premium, if any, and interest on the LOC (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceedings, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, reasonable attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or

Initials: _J_ _SP_

contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership, or other similar proceedings, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the LOC Agreement, this Agreement and the other LOC Documents; and

(h)      all other covenants, duties, debts, obligations, and liabilities of any kind of the Grantor under or in respect of the LOC Agreement, this Agreement, the other LOC Documents, or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceedings, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses outlined in this Section 3 being herein collectively called the "**Secured Obligations**").

4.      Perfection of Security Interest and Further Assurances.

(a)      The Grantor shall, from time to time, as may be required by the Secured Party for all Collateral, promptly take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, concerning all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable, the Grantor shall promptly take all actions as may be requested from time to time by the Secured Party so that the security interest in the Collateral granted hereunder is obtained and at all times held by the Secured Party. All the foregoing shall be at the sole cost and expense of the Grantor.

(b)      The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents to perfect, confirm, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party under this Section 4 promptly to the Secured Party upon request. The Grantor also hereby ratifies any financing statements or amendments previously filed by the Secured Party in any jurisdiction

(c)      The Grantor hereby further authorizes the Secured Party to file with the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any state of the United States or any other country) this Agreement and other documents to perfect, confirm,

Initials: VP   SR

continuing, enforcing, or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

(d)       If the Grantor shall at any time hold or acquire any certificated securities, promissory notes, tangible chattel paper, negotiable documents, or warehouse receipts relating to the Collateral, then the Grantor shall promptly endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.

(e)       If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (i) promptly notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

(f)       If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

(g)       The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement concerning any Collateral.

5.     Representations and Warranties. The Grantor represents and warrants as follows:

(a)       (i) the Grantor's exact legal name is correctly stated in the first paragraph of this Agreement and on the signature page hereof, and (ii) the Grantor is an organization of the type and is organized in the jurisdiction, outlined in the first paragraph of this Agreement.

(b)       The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state or local statute or rule in respect of such Collateral. The Grantor has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state, and local statutes and

Initials: _____  _____

ordinances dealing with the control, shipment, storage, or disposal of hazardous materials or substances.

(c)    At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal, and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the LOC Agreement.

(d)    The pledge of the Collateral according to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(e)    Grantor has full power, authority, and legal right to borrow the Advances under the LOC and pledge the Collateral according to this Agreement.

(f)    Each of this Agreement, the LOC Agreement, and the LOC Documents has been duly authorized, executed, and delivered by the Grantor and constitutes a legal, valid, and binding obligation of the Grantor enforceable by its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

(g)    No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Advances under the LOC and the pledge by the Grantor of the Collateral according to this Agreement or for the execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor or the performance by the Grantor of its obligations thereunder.

(h)    The execution and delivery of the LOC Agreement, this Agreement, and the other LOC Documents by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(i)    The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106, and 9-107 of the UCC, as applicable) to have been obtained by the Secured Party over all Collateral concerning which such control may be obtained under the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

(j)    Schedule 2 hereto lists all banks, other financial institutions, and securities intermediaries at which the Grantor maintains Payment Accounts or Securities Accounts as of the Closing Date, and Schedule 2 hereto correctly identifies the name, address, and telephone number of each such financial institution or securities intermediary, the name in

Initials: _____

which the account is held, a description of the purpose of the account, and the complete account number therefore.

(k)    Schedule 3 hereto lists all intellectual property and rights to which Grantor holds an interest, ownership, or other rights.

6.    Receivables. If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangibles, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.    Covenants. The Grantor covenants as follows:

(a)    The Grantor will not, without providing at least thirty (30) days prior written notice to the Secured Party, change its legal name, identity, type of organization, the jurisdiction of organization, corporate structure, location of its chief executive officer, or its principal place of business or its organizational identification number. The Grantor will, before any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b)    The Collateral, to the extent not delivered to the Secured Party under Section 4 hereof, will be kept at those locations of the Grantor previously disclosed to the Secured Party and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days prior written notice to the Secured Party. The Grantor will, before any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c)    The Grantor shall, at its own cost and expense, defend the title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d)    The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option to, restrict, or grant, create, permit, or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the LOC Agreement or herein or with the prior written consent of the Secured Party.

(e)    The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located according to the provisions of the LOC Agreement.

Initials: _____  SP

(f)     The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

(g)     The Grantor will continue to operate its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state, and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

(h)     The Grantor shall promptly notify the Secured Party in writing upon the acquisition or creation by the Grantor of a Payment Account or Securities Account not listed on Schedule 2 hereto, and, before or simultaneously with the creation of such Payment Account or Securities Account, provide for the execution of a Control Agreement with respect thereto, if required by the Secured Party.

(i)     The Grantor shall provide the Secured Party with prompt written notice concerning any material real or personal property (other than property acquired in the ordinary course of business) acquired by the Grantor after the Closing Date. In addition to any other right that the Secured Party may have according to this Agreement or otherwise, upon written request of the Secured Party, whenever made, the Grantor shall grant to the Secured Party, as additional security for the Secured Obligations, a First Priority lien on any real or personal property of the Grantor (other than for leased equipment or equipment subject to a purchase money security interest in which the lessor or purchase money lender of such equipment holds a priority security interest, in which case, the Secured Party shall have the right to obtain a security interest junior only to such lessor or purchase money lender), including, without limitation, such property acquired after the Closing Date, in which the Secured Party does not have a First Priority lien. The Grantor agrees that, within thirty (30) days after the date of such written request, to secure all of the Secured Obligations by delivering to the Secured Party security agreements, intellectual property security agreements, pledge agreements, mortgages (or deeds of trust, if applicable) or other documents, instruments or agreements or such thereof as the Secured Party may require. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

(j)     At the request of the Secured Party, the Grantor shall, concerning any real property owned by the Grantor or any real property on which the Project is located, provide, or cause to be provided, to the Secured Party, (a) a mortgage (or comparable document) relating to such real property, in form and substance satisfactory to Secured Party, (b) title and lien searches concerning such real property and such other information, documents or agreements as may be deemed necessary or advisable by the Secured Party r in connection with such mortgage, and (c) such corporate governance and authorization documents and an opinion of counsel for such mortgage as may be deemed necessary or advisable by the Secured Party. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

8.     Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party as the Grantor's attorney-in-fact, with full authority in the place and stead of

Initials: _____

the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9.      Secured Party May Perform. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause the performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10.     Reasonable Care. The Secured Party shall have no duty concerning the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its property, it is understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action concerning any claims, the nature or sufficiency of any payment or performance by any party under or according to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to know such matters, or (b) taking any necessary steps to preserve rights against any parties concerning any Collateral. Nothing outlined in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11.     Remedies Upon Default.

(a)     If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice before disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days before the date of such disposition shall constitute reasonable notice. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of a similar property. At any sale of the Collateral, if permitted by applicable law,

Initials: _U_ _SP_

the Secured Party may be the purchaser, licensee, assignee, or recipient of the Collateral or any part thereof and shall be entitled, to bidding and making the settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned, or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages, and demands the Grantor may acquire against the Secured Party arising out of the exercise by the Secured Party of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption concerning the Collateral, whether before or after sale hereunder, and all rights, if any, of marshaling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean- up or otherwise prepare the Collateral for sale.

(b)      If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the reasonable fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(c)      If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral under this Section 11, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.      No Waiver and Cumulative Remedies. The Secured Party shall not by any act (except by a written instrument under Section 14 hereof), delay, indulgence, omission, or otherwise, be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

Initials: _____ _____

13.   SECURITY INTEREST ABSOLUTE. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, a notice of loans made, credit extended, Collateral received or delivered, or other action taken in reliance thereon, and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)   any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument.

(b)   any change in the time, place, or manner of payment of, or any other term of, the Secured Obligations, or any rescission, waiver, amendment, or other modification of the LOC Agreement, this Agreement, or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)   any taking, exchange, substitution, release, impairment, or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver, or other modification of any guaranty, for all or any of the Secured Obligations.

(d)   any manner of sale, disposition, or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations.

(e)   any default, failure, or delay, willful or otherwise, in the performance of the Secured Obligations.

(f)   any defense, set-off, or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

(g)   any other circumstance (including, without limitation, any statute of limitations) or manner of administering the LOC or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14.   Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated, or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15.   Addresses for Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as outlined in the LOC Agreement, and addressed to the respective parties at their addresses as specified in the LOC Agreement or as to either Party at such other address as shall be designated by such Party in a written notice to each other Party.

Initials: ____  ____

16.    Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral shall (a) subject to Section 17 hereof, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees, and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment, become vested with all the benefits granted to the Secured Party herein concerning such Secured Obligations.

17.    Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer, and deliver to or at the direction of the Grantor (without recourse and any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18.    GOVERNING LAW. This Agreement and any claim, controversy, dispute, or cause of action (whether in contract or tort or otherwise) based upon, arising out of, or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed per, the laws of the State of Illinois and the United States.

19.    Binding Arbitration. Any dispute, claim, or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one arbitrator. The arbitration shall be administered by JAMS according to its Comprehensive Arbitration Rules and Procedures or by ADR Services according to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand under the notice requirements outlined in Section 14.5 of the LOC Agreement. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach an agreement on an arbitrator, then the arbitration shall be selected according to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for the production of documents. The requests in each set shall not number more than twenty- five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any discovery disputes shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available

Initials:  _____  _____

remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising concerning the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

**20.    JURY TRIAL WAIVER. EACH PARTY HERETO, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE GRANTOR AND THE SECURED PARTY, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH THIS AGREEMENT, THE LOC AGREEMENT, ANY OTHER LOC DOCUMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.**

21.    Counterparts. This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other LOC Documents constitute the entire contract among the Parties concerning the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

*Signatures Follow on Next Page*

Initials: _____  _____

IN WITNESS WHEREOF, the Maker has duly executed and delivered this Promissory Note as of the date first set forth above.

**MAKER**

Wallingford Lodging Partners LLC

By: _____

Name: Shailesh Patel and Nihang Patel

Title: _Manager_        Member

Address: 4 Miles Drive. Wallingford, Connecticut 06492

SUBSCRIBED AND SWORN TO BEFORE ME on this 4th day of

April ___, 20 23

_____
NOTARY PUBLIC
In and for the State of Connecticut

My Commission Expires:

BENNETT BUFFALO
NOTARY PUBLIC, STATE OF CONNECTICUT
My Commission Expires January 31, 2026

Initials: _____

**EXHIBIT F**
**FORM TERMINATION LETTER**

McMann Commercial Lending LLC
205 N Michigan Avenue, Ste 810
Chicago, Illinois 60601

Re: Wallingford Lodging Partners LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above-referenced transaction according to the terms of the LOC Agreement dated April 10, 2023.
    Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for a refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER: Wallingford Lodging Partners LLC

By: _____

Name: Shailesh Patel and Vihang Patel

Title: _Member_

**SUBSCRIBED AND SWORN TO BEFORE ME** on this _16_ day of _August_, 202_3_.

Notary for Vihangkumar Patel only

_____
NOTARY PUBLIC
In and for the State of _CT_

My Commission Expires:

_09-30-27_

BLERINA BOBI
Notary Public
Connecticut
My Commission Expires Sep 30, 2027

Please confirm your Wiring Instructions:
Account Title: _Wallingford Lodging Partners LLC_
Address on Account: _2517 W BrentRidge St Sioux Falls SD 57108_
Bank Name: _First Dakota_
Bank Address: _6100 E Silver Maple Cir, Sioux Falls, SD 57108_
Routing #: ███████
Account #: ███████ _0765_

Initials: _VP_

# EXHIBIT 3

**EXHIBIT F**
**FORM TERMINATION LETTER**

McMann Commercial Lending LLC
205 N Michigan Avenue, Ste 810
Chicago, Illinois 60601

Re: North Haven Lodging Partners LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above-referenced transaction according to the terms of the LOC Agreement dated April 10, 2023.

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for a refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER: North Haven Lodging Partners LLC

By: _____

Name: Shailesh Patel and Vihang Patel
Title: _Member_

**SUBSCRIBED AND SWORN TO BEFORE ME** on this _16_ day of
_August_, 20_23_

Notary for Vihangkumar Patel only

NOTARY PUBLIC
In and for the State of _CT_

BLERINA BOBI
Notary Public
Connecticut
My Commission Expires Sep 30, 2027

My Commission Expires:

_09-30-27_

Please confirm your Wiring Instructions:
Account Title: North Haven Lodging Partners LLC
Address on Account: 2517 W Brent Ridge St Sioux Falls SD 57108
Bank Name: First Dakota
Bank Address: 6100 E Silver Maple cir Sioux Falls SD 57108
Routing #: ████████
Account #: ████████722

Initials: _VP_

**EXHIBIT F**
**FORM TERMINATION LETTER**

McMann Commercial Lending LLC
205 N Michigan Avenue, Ste 810
Chicago, Illinois 60601

Re: Wallingford Lodging Partners LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above-referenced
transaction according to the terms of the LOC Agreement dated April 10, 2023.
    Please consider this letter as notice of Borrower's termination of the LOC Agreement and
request for a refund of Borrower's ICA payment, less any amounts due and owed to Lender
under Section 13.7 of the LOC Agreement.

BORROWER: Wallingford Lodging Partners
LLC

By: _____ _____

Name: Shailesh Patel and Vihang Patel

Title: Member

**SUBSCRIBED AND SWORN TO BEFORE ME** on this _16_ day of
_August_ , 202_3_

Notary for Vihangkumar Patel only

NOTARY PUBLIC
In and for the State of ___CT___

My Commission Expires:

_09-30-27_

BLERINA BOBI
Notary Public
Connecticut
My Commission Expires Sep 30, 2027

Please confirm your Wiring Instructions:

Account Title: Wallingford Lodging Partners LLC
Address on Account: 2517 W Brentridge St Sioux Falls SD 57108
Bank Name: First Dakota
Bank Address: 6100 E Silver Maple Cir, Sioux Falls, SD 57108
Routing #: ████████
Account #: ████████ 0765

Initials: _____

# EXHIBIT 4

## Part I of II



500 SKOKIE BLVD., SUITE 600
NORTHBROOK, ILLINOIS 60062
(224) 260-3090

ATTORNEYS AT LAW

DANIEL S. KLAPMAN
(224) 260-3087
dklapman@swkattorneys.com

October 24, 2023

VIA U.S. Mail and Certified Mail
Adam Walker
Walker Law Office, LLC
4050 Pennsylvania Ave., Suite 115-10
Kansas City, Missouri 64111

VIA U.S. Mail, Certified Mail, and Facsimile
Courtney Riordan
9 E. Loockerman Street, Suite 202
Dover, Delaware 19901
302-674-2100

VIA Email, U.S. Mail and Certified Mail
David Hughes
John Michael Cohan
Genie Investments NV
P.O. Box 60443
Jacksonville, Florida
david@zoomeral.com
dhughes@genieinvestments.com

VIA U.S. Mail and Certified Mail
Attn: GENIE INVESTMENTS NV
C/O SPIEGEL & UTRERA.P.A.
1840 Coral Way, 4th Floor
Miami, FL 33145

VIA U.S. Mail, Certified Mail and Facsimile
Jeff Beck
Spiegel & Ultrera, P.A.
2545 Chandler Ave., Suite 4
Las Vegas, Nevada 89120
702-458-2100

Re:   McMann Commercial Lending LLC n/k/a McMann Professional Services LLC
d/b/a McMann Capital ("McMann") and ICA Payment Refund Demands

Dear Genie Investments:

Be advised that our firm represents McMann. This letter is primarily intended to demand that Genie Investments NV ("Genie") immediately provide refunds to both Wallingford Lodging Partners LLC and North Haven Lodging Partners LLC, two (2) borrowers under Business Expansion Line of Credit Agreements ("BELOCS"), recognized by Genie as User ID's 2815 and 2816. The two (2) BELOCS are enclosed herewith as **Exhibits A and B**, respectively. On May 3, 2023, Wallingford and North Haven each wired separate ICA Payments of $1,800,000.00 (together, totaling $3,600,000.00) to Genie per Genie's wiring instructions. Confirmation of both wires is enclosed herewith as **Exhibit C**. This letter also addresses additional failures of Genie regarding its relationship with McMann, including, *inter alia*, Genie's failure to fund these BELOCS, and dozens of other loans to which it committed, as well as its failures to issue refunds per the terms of the said loans.

October 24, 2023
Page 2

As you are aware, due to Genie's inability to fund these and other BELOCS brought to Genie by McMann (due to a purported failure of Genie's "capital provider"), both Wallingford and North Haven have terminated their respective BELOCS pursuant to the terms of Section 13.7 of the BELOCS and both properly demanded the refund of their ICA Payments. To be clear, their demands complied with each and every term of the BELOCS. Copies of their respective termination notices and demands for refunds are enclosed herewith as **Exhibit D**.

As evidenced by Genie's Zoomeral communications with McMann, Wallingford and North Haven:

(i)     Genie acknowledged receipt of the respective wires on May 4, 2023;
(ii)    Genie acknowledged receipt of both termination requests on August 18, 2023;
(iii)   Genie responded to requests for an update on refund dates on September 14, 2023;
(iv)    Genie acknowledged its obligation to refund the ICA Payments; and
(v)     Genie stated that both refunds were expected to be wired on October 13, 2023.

Copies of these communications are enclosed herewith as **Exhibit E**.

On October 13, 2023, rather than make its agreed upon refund of the ICA Payments, Genie instead issued letters to both borrowers claiming that due to a "force majeure" it could not make either of such refunds. These letters were sent by attorney Adam Walker, formerly of My RIA Lawyer, and currently of Walker Law Office, LLC (the "Walker Law Office", formed on September 16, 2023). Copies of these letters are attached hereto as **Exhibit F and G**, respectively.

As Genie well knows, any issues Genie may have with its purported "capital provider" are wholly irrelevant to the refund of ICA Payments. Genie received the funds at issue from each respective borrower on May 3, 2023. Genie was required to hold said funds in trust to cover interest due under the respective BELOCS as it accrued, once (and if) funded. *These refunds are in no way dependent on outside capital or the availability of funds from any third-party, including Genie's purported and yet to be identified wholesale lender*. It appears this "force majeure" explanation – the purported reason Genie was unable to fund these and various other BELOCS procured by McMann - is an obvious attempt to fabricate an otherwise non-existent basis for Genie's current and wholly unjustified refusal to issue refunds of ICA Payments received directly from prospective borrowers. No such basis exists, as the refunds are wholly unrelated to Genie's inability to fund these BELOCS, and in fact, are specifically required upon receipt of the termination notices, including those issued as a result of Genie's inability to fund the respective loans.

Accordingly, McMann demands the immediate refund of the two (2) deposits. McMann further demands that Genie identify the location of the funds deposited by Wallingford and North Haven from the time they were wired on May 3, 2023 to the present, as well as a full explanation as to each and every reason Genie has failed to this point make these and any other properly requested refunds. It is our understanding that Genie has provided refunds to at least five (5) borrowers procured by McMann in amounts ranging from $30,000.00 to $1,100,000.00. Why

October 24, 2023
Page 3

exactly are these refunds to Wallingford and North Haven being treated any differently?

     Moreover, in multiple communications, including the October 13, 2023 letters to borrowers, Genie stated it is participating in settlement discussions with its "capital provider" and relying on efforts of Adam Walker and the Walker Law Office "on multiple fronts to compel the capital provider to deliver the funds it owes, so that Genie can, in turn, provide refunds to its borrowers" including "preparing legal action against the capital provider and its associates, which [Genie] will file at [its] earliest opportunity unless [it] reaches a satisfactory settlement first." [*See* **Exhibits F and G** hereto.] As noted in the letters, "Genie will make every reasonable effort to keep you informed of the progress of its efforts doing this process" and that borrowers "can expect further correspondence from [the Walker Law Office] with updates regarding the settlement negotiations or the status of any legal action filed against the capital provider." McMann demands such an update including the identity of this capital provider, as well as the identity of who, in addition to the Walker Law Office, is participating in these discussions on Genie's behalf. If in fact Genie has proceeded to litigation, please provide a copy of any filed complaints, including the identity of the forum in which the litigation is proceeding, all case identifying information, and counsel of record for all parties. Please also explain why Genie must receive any funds in order to process the refunds.

     McMann is also aware of several instances in which Genie has approached borrowers procured by McMann, offering to provide alternative funding under similar terms to loans that failed to close, again, due to Genie's failure to fund. ***Genie is to cease and desist any such activity, as it clearly constitutes tortious interference with McMann's business with its customers***. Additionally, McMann has suffered extensive damages resulting from Genie's conduct relating to many of the borrowers it has procured for Genie, beyond just Wallingford and North Haven as mentioned above, and including, *inter alia*, borrowers that intended to make their ICA Payments by way of bridge loan agreements made directly with Genie. Genie is clearly attempting to hide behind its purported claims directed to its as of yet unidentified "capital provider" but such tactics do not excuse Genie's conduct. To be clear, McMann reserves and any and all rights, claims and/or demands McMann has or may have against Genie pursuant to any and all agreements and/or applicable law.

     As to Wallingford and North Haven, we expect Genie to issue the refunds and provide a comprehensive response to this letter on or before the close of business on Friday, October 27, 2023. Short of full refunds to both Wallingford and North Haven *and* satisfactory responses to the questions presented above, McMann will not only take action on its own behalf, but will cooperate with and support any legal action taken by either Wallingford and/or North Haven not to mention others that are likely to arise in the future. Govern yourself accordingly.

     Additionally, since this matter appears to he heading towards litigation, we hereby demand you preserve all relevant evidence as set forth below.

October 24, 2023
Page 4

## DEMAND FOR EVIDENCE PRESERVATION

Given the prospect of litigation, we demand that Genie immediately take all steps necessary to preserve all evidence, documents and communications in Genie's possession, custody or control concerning the above-described matters, including, without limitation, all evidence, documents and communications in any way related to McMann and any applicant, borrower, or prospective borrower, as well as Genie's relationship with McMann. Please provide a copy of this letter to the persons whose job responsibilities cover the matters addressed herein. The above-listed information should be preserved and handled in the manner set forth in this letter.

We believe electronically stored information ("ESI") to be an important and irreplaceable source of discovery and/or evidence in the event of litigation. The current dispute therefore requires preservation of all information from your computer systems, removable electronic media, and other locations. This includes, but is not limited to, email and other electronic communications, including on the Zoomeral platform owned and controlled by David Hughes, word processing documents, spreadsheets, databases, calendars, telephone logs, contact information, internet usage files, and network access information.

You should also preserve the following platforms in your possession and control (such as, and including, the Zoomeral platform): databases, networks, computer systems, including legacy systems (hardware and software), servers, archives, backup or disaster recovery systems, discs, drives, USB devices, external hard drives, and other storage media, laptops, personal computers, Internet data, mobile telephones, paging devices, audio systems (including voicemail), and any other electronic device capable of containing or storing ESI.

Unless described otherwise below, all of the information described in this letter should be preserved since the inception of your dealings with McMann (the "Relevant Time Period").

## PRESERVATION OBLIGATIONS

The laws and rules prohibiting destruction of evidence apply to electronically stored information in the same manner that they apply to other evidence. Due to its format, electronic information is easily deleted, modified, or corrupted. Accordingly, you must take every reasonable step to preserve this information until the final resolution of this matter. This includes, but is not limited to, an obligation to:

- discontinue all data destruction and backup storage recycling policies;
- preserve and not dispose of relevant hardware unless an exact replica (a mirror image) is made;
- preserve and not destroy passwords, decryption procedures (and accompanying software), network access codes, ID names, manuals, tutorials, written instructions, and decompression or reconstruction software; and
- maintain all other pertinent information and tools needed to access, review, and reconstruct all requested or potentially relevant electronic data.

October 24, 2023
Page 5

## DESCRIPTION OF DATA SOUGHT

This dispute requires preservation of all information from your computer systems, removable electronic media, and other locations relating in any way to McMann and its applicants, borrowers, and prospective borrowers, including but not limited to the vehicles leased under said VLSA, and Penske's relationship with A&M. This includes, but is not limited to, email and other electronic communications, word processing documents, spreadsheets, databases, calendars, telephone logs, contact manager information, Internet usage files, and network access information.

I.    Electronic Files. You have an obligation to preserve all digital or analog electronic files in electronic format, regardless of whether hard copies of the information exist. This includes preserving

  a. active data (i.e., that which is immediately and easily accessible on your systems today);
  b. archived data (i.e., that which resides on backup tapes or other storage media);
  c. deleted data (i.e., that which has been deleted from a computer hard drive but is recoverable through computer forensic techniques; and
  d. legacy data (i.e., that which was created on old or obsolete hardware or software).

You must preserve active, archived, and legacy data, including but not limited to:

  a. word processed files, including drafts and revisions;
  b. spreadsheets, including drafts and revisions;
  c. databases;
  d. electronic communications and logs of same;
  e. computer-aided design (CAD) files, including drafts and revisions;
  f. presentation data or slide shows produced by presentation software (such as Microsoft PowerPoint);
  g. graphs, charts, and other data produced by project management software (such as Microsoft Project);
  h. data generated by calendaring, task management, and personal information manager (PIM) software (such as Microsoft Outlook);
  i. data created with the use of mobile phones or other portable electronic devices;
  j. data created with the use of document management software;
  k. data created with the use of paper and electronic mail logging and routing software; and
  l. animations, images, audio, video, and audiovisual recordings, MP3 players, and voicemail files.

You must preserve media used by your computers, including but not limited to:

  a. all storage media, including the hard drives, CD's, DVD's, USB devices, and all internal or external drives and storage devices used at any time with your computers;
  b. backup media  and the software necessary to reconstruct the data contained on the media; and
  c. a mirror image copy of any media no longer in service but used during the Relevant Time Period.

October 24, 2023
Page 6

II.    <u>Hardware</u>. You have an obligation to preserve all electronic processing systems, even if they are replaced. This includes computer servers, stand-alone personal computers, hard drives, laptops, and other electronic devices capable of storing ESI. You should retain copies of any hardware no longer in service but used during the Relevant Time Period.

III.    <u>Emails</u>. You have an obligation to preserve all potentially relevant internal and external emails and communications that were sent or received, including via the Zoomeral platform owned and controlled by David Hughes. Email and Zoomeral messages must be preserved in native electronic format, regardless of whether hard copies of the information exist.

IV.    <u>Internet Web Activity</u>. You have an obligation to preserve all records of Internet and Web browser generated files in electronic format, regardless of whether hard copies of the information exist. This includes Internet and Web browser generated history files, caches, and "cookies" files stored on backup media or generated by you or an individual employed by you.

V.    <u>Activity Logs</u>. You must preserve all hard copy or electronic logs documenting computer use and electronic communications by you.

VI.    <u>Supporting Information</u>. You must preserve all supporting information relating to the requested electronic data and/or media including codebooks, keys, data dictionaries, diagrams, handbooks, or other supporting documents that aid in reading or interpreting database, media, email, hardware, software, or activity log information.

VII.    <u>Information for Employees</u>. For each employee that has worked for you during the Relevant Time Period in relation to any loans brought to Genie by McMann, and/or Genie's relationship with McMann, you should preserve all data that contains the following information:

    a. basic employee information, including name, date of birth, social security number, employee identification number, race, date hired (or rehired), and educational background;
    b. employment performance evaluations or reviews;
    c. for each position held by the employee during the Relevant Time Period, the job title/position, salary level, function or description, location, division, department, subsidiary, time in position, job status (covered or not covered), and whether the employee was full-time, part-time, or temporary;
    d. any disciplinary action or employment contract violations; and
    e. if the individual is a former employee, the date of departure and the reason for leaving.

VIII.    <u>Data Storage Devices</u>.

    a. If you use online storage and/or direct access storage devices, you must immediately cease modifying or deleting any electronic data unless a computer forensics expert makes a mirror image of the electronic file, follows proper preservation protocols for assuring the accuracy of the file (i.e., chain of custody), and makes the file available in the event of litigation.

    b. You should immediately suspend all activity that might result in destruction or modification of all of the data stored on any offline media, which includes, but is not limited to, backup and archival media, DVDs, CD-ROMs, USB devices, external drives, and other removable media. This includes overwriting, recycling, or erasing all or part of the media. This request

October 24, 2023
Page 7

includes, but is not limited to, media used to store data from personal computers, laptops, desktop computers, and servers.

    c.  If you replace any electronic data storage devices, you may not dispose of the storage devices.

    d.  You may not modify, delete, or otherwise alter any electronic data, whether by data compression, defragmentation, or optimization routines, unless a computer forensics expert makes a mirror image of the electronic file, follows proper preservation protocols for assuring the accuracy of the file (i.e., chain of custody). The expert must make a mirror image of active files, restored versions of deleted files, and restored versions of deleted file fragments, hidden files, and directory listings. This includes, but is not limited to, preserving electronic data (stored on online or offline storage devices) that came from the following hardware or software applications:

    1.    fixed and external drives on stand-alone personal computers or laptops;
    2.    network servers and workstations; and
    3.    software application programs and utilities.

IX.    <u>Electronic Data Created After Receipt of This Letter</u>. For any electronic data created after this letter or for any electronic processing systems used after receipt of this letter, you must take the proper steps to avoid destroying potentially relevant evidence. This includes following the above preservation protocols.

    Compliance with your preservation obligations includes forwarding a copy of this letter to all individuals or organizations that are responsible for any of the items referred to in this letter. If this correspondence is in any respect unclear, please call me immediately.

    If Genie or its counsel wish to discuss the matters raised herein, please contact the undersigned.  Again, this letter is without prejudice to, and is not a waiver of, any and all rights, claims and/or demands McMann has or may have against Genie pursuant to any agreements and/or applicable law. We look forward to your timely response.

    Very truly yours,

    Daniel S. Klapman

cc: Walter Trock
    Robert S. Strauss, Esq.
    Joey B. Waldman, Esq.

# EXHIBIT A

## BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

among

## MCMANN COMMERCIAL LENDING LLC

as Lender

and

## North Haven Lodging Partners LLC
as Borrower

dated as of

April 10, 2023

Initials: _VP_  _SP_

## BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated, or otherwise modified, this **"Agreement"**) is made and entered as of April 10, 2023, between McMann Commercial Lending LLC (the "**Lender**"), and North Haven Lodging Partners LLC., a Connecticut Limited Liability Company ("**Borrower**").

## RECITALS

**A.**  The Borrower desires to obtain from Lender an asset-backed line of credit loan (the **"LOC"**) in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

**B.**  The Borrower desires to obtain the LOC from Lender for Business Expansion for construction of a 105-room limited-service hotel (as more fully described in **Exhibit D** attached hereto the **"Project"**). Acquired assets will be legally described on **Exhibit E** attached hereto (the **"Property"**).

**C.**  The Borrower has agreed to pay a minimum contribution of the Project LOC Amount to Lender, by establishing the Interest Reserve (as hereinafter defined) and the ICA (as hereinafter defined), collectively,(the **"Interest Reserve Account"**), within seven (7) calendar days after the fully executed LOC Documents (as hereinafter defined) are received by Lender.

**D.**  The Borrower has agreed to pay, pursuant to Section 3.6 hereof, the aggregate amount of One Million Eight Hundred Thousand Dollars and No Cents Dollars ($1,800,000), (the **"ICA Payment"**), by bank wire to Lender. An account on the books and records of the Lender shall be created to serve as an Interest Credit Account (the "**ICA**"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

**E.**  Lender has agreed to make Advances (as hereinafter defined) under the LOC to Borrower in an aggregate amount, according to **Exhibit B**, an amount not to exceed the Maximum Amount for the purposes outlined in these recitals and the Promissory Note attached hereto as **Exhibit A** and upon the terms and subject to the conditions hereinafter set forth.

**NOW THEREFORE**, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1. Certain Defined Terms**. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed per generally accepted accounting principles consistently applied.  As used in this

Initials: _____  _____

agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

**"Advance(s)"** means any loan advance made by the Lender per the terms and conditions of this Agreement.

"**Applicable Interest Rate**" means the fixed interest rate specified in the Promissory Note.

**"Borrower"** means that term as defined in the first paragraph of this Agreement.

**"Business Expansion"** means any transaction or use, including for working capital, that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business (other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

**"Business Plan**" means the document(s) outlining the accurate and up-to-date business operations of the End-Borrower, as previously provided by End-Borrower, substantially in the form outlined in EXHIBIT D, and subject to review by Lender's Capital Partners as described in Section 8.1 of this Agreement.

**"Closing Date"** means the last date of signed execution of this Agreement by Lender and Borrower.

**"Collateral"** means all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements, and proceeds, thereof.

**"Event(s) of Default"** means any event or condition that shall constitute an event of default as described in Article 13 of this Agreement.

**"ICA"** means the definition given in Recital D of this Agreement.

**"ICA Payment"** means the amount remitted pursuant to Recital D of this Agreement.

Initials: _____

"**Interest Reserve**" means credit on the books and records of the Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from a Borrower JV Partner, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"**Interest Reserve Account**" means the definition given in Recital C of this

Agreement.

"**Lender**" means that term as defined in the first paragraph of this Agreement.

"**Lender's Capital Partners**" means one or more lender-clients of the Lender

providing funding towards the LOC.

"**LOC**" means that term as defined in Recital A of this Agreement.

"**LOC Disbursement Account**" means that term as defined in Section 3.12 hereof.

"**LOC Document(s)**" means, collectively, this Agreement, the Promissory Note, and each Security Document, as any of the foregoing may from time to time be amended, restated, or otherwise modified or replaced, and any other document delivered pursuant thereto.

"**Maximum Amount**" means Eighteen Million Nine Hundred Thousand Dollars and No Cents ($18,900,000). The Maximum Amount is the Project LOC Amount plus all fees, costs, and expenses which are the Borrower's responsibility to pay.

"**Organizational Documents**" means, concerning any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise concerning, this Agreement or any other LOC Document.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority, or any other entity.

"**Project**" means that term as defined in Recital B of this Agreement.

Initials: _____

"**Project Costs**" means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by the Borrower for implementation or execution of the Project (including but not limited to the payment of taxes, insurance, and all items reasonably necessary for the successful execution of the Project), as more specifically outlined in the Project budget set forth on **Exhibit C** attached hereto.

"**Project LOC Amount**" means   Eighteen Million Dollars and No Cents ($18,000,000).

"**Property**" means that term as defined in Recital B of this Agreement.

"**Promissory Note**" means the Promissory Note, in the form attached hereto as **Exhibit A**.

"**Security Agreement**" means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as **Exhibit E**.

"**Security Document**" means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each U.C.C. Financing Statement or similar filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

"**Scheduled Maturity Date**" means the 10th anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

"**Subsidiary**" means any entity (other than the Borrower) in an unbroken chain of entities beginning with the Borrower if each of the entities owns stock, units, or other interests that represent fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain

"**Taxes**" means all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, concerning those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender concerning the LOC.

"**Term Sheet**" means that document(s) dated as of 3/14/2023 between Borrower and Lender, setting forth a general summary of the terms of agreement memorialized more fully herein in final form.

"**Tranche Schedule**" means the schedule of Advances to Borrowers from the Lender, based

Initials: _____ _____

upon the dates of the disbursements attached hereto as **Exhibit B**; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder does not exceed the Maximum Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

## ARTICLE 2
## THE CREDIT

**Section 2.1. Line of Credit Amount**. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to the Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

**Section 2.2. Line of Credit Documents**. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note, this Agreement, and each Security Document. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to the Lender and its counsel.

## ARTICLE 3
## TERM, INTEREST, AND PAYMENTS

**Section 3.1. Initial Term**. The initial term of the LOC is Ten (10) years and shall commence on the Closing Date and expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full thereon and all other amounts due and owing hereunder and under the Promissory Note shall be repaid by Borrower on the Scheduled Maturity Date.

**Section 3.2. Extended Term.** At the end of the initial term outlined in Section 3.1 hereof, and at the end of each Extended Term (as defined below, if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, over time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty-four (24) month period, up to a total of one (1) such additional consecutive periods (separately, "**Extended Term**"; collectively, the "**Extended Terms**"). In connection with Lender's granting of each Extended Term, (a) Borrower shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorney's fees, as a one (1)-time fee equal to one percent (1%) of the Project LOC Amount.

Initials: 9/8  SP

**Section 3.3. Applicable Interest Period.** The interest period concerning each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full.

**Section 3.4. Interest Rate Calculation.** Interest shall be calculated based on a 365-day year and the actual number of days elapsed in a 365-day year and at the rate outlined in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "**Maximum Interest Rate**"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to the unpaid principal balance outstanding under the Promissory Note or, if it exceeds such unpaid principal, refunded to the Borrower.

**Section 3.5. Interest Payments.** Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times outlined in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

**Section 3.6. Reserves.** Following the signing of this Agreement, the Borrower shall remit One Million Eight Hundred Thousand Dollars and No Cents ($1,800,000) as the ICA Payment per the terms and the time outlined in Recital D of this Agreement. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and not refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable.

**Section 3.7. Prepayment.** The borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC.

**Section 3.8. Interest Credit Account.** If at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which notice shall be delivered to and received by Borrower no less than thirty (30) days before the date of the next interest payment date, Borrower shall remit into the ICA the funds necessary to make such interest paid before the date such interest payment is due and payable **Section 3.9. Fees.**

      (a) **LOC Fee.** At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable fee for the LOC in an aggregate amount equal to Five percent (5%) multiplied by the Project LOC Amount, which is equal to Nine Hundred Thousand Dollars and No Cents ($900,000) (the "**LOC Fee**"). The LOC Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

Initials: _____

(b) **Promote Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable success fee in an aggregate amount equal to One percent (1%) multiplied by the Project LOC Amount, which is One Hundred Eighty Thousand Dollars and No Cents ($180,000) (the "**Promote Fee**"). The Promote Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

(c) **ICA Advance Fee**. To the extent the Borrower used Lender to provide the ICA Payment, at Closing and out of the initial Advance, the Borrower shall reimburse Lender in an amount equal to the ICA Payment advanced by Lender plus a nonrefundable fee in an aggregate amount equal to Zero percent (0%) of the ICA Payment, which is No Dollars and No Cents Dollars ($-) (the "**ICA Advance Fee**"). The ICA Advance Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition. The borrower will take the Project LOC Amount in full on the closing of the first tranche.

**Section 3.10. Line of Credit Extension Fees.** Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a nonrefundable LOC extension fee for each extension in an aggregate amount equal to one percent (1%) multiplied by the Maximum Amount.

**Section 3.11. Legal and Incidental Fees, Charges, and Costs**. Borrower shall pay at Closing, all reasonable out of pocket and up to Twelve Thousand, Five Hundred U.S. Dollars ($12,500) for legal fees, recording and filing fees, documentary stamps, taxes, service charges, credit reports, UCC search costs, title company fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial proceeding; provided that Lender will provide Borrower ten (10) days' advance notice of any legal fees pursuant to this Section 3.11 that will exceed Twelve Thousand, Five Hundred U.S. Dollars ($12,500). Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or willful misconduct.

**Section 3.12. Line of Credit Disbursement Account**. The proceeds of each Advance under the LOC shall be advanced into the LOC Disbursement Account with Lender to be used by Borrower for payment of the Borrower's Project Costs, solely for the purposes and in the manner

Initials: _____

Case: 1:23-cv-16264 Document #: 1-5 Filed: 11/27/23 Page 18 of 39 PageID #:178

outlined in this Agreement. The LOC Disbursement Account will be held jointly in the name of the Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights and interest in and to the LOC Disbursement Account, which assignment will be effective only upon the occurrence and continuation of an Event of Default, subject to an applicable Default Cure Period (as hereinafter defined).

### Section 3.13. Taxes.

(a)    All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to the Lender (after deducting, withholding, and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

(b)    Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to the Lender. If the Borrower shall fail to pay any Taxes or OtherTaxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result of any such failure.

(c)    The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

### ARTICLE 4
### CONDITIONS FOR CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing:

### Section 4.1.    Delivery of the LOC Documents.

(a)    As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

Initials: _____ _____

(b)    The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Payment Account and Security Account (both as defined under UCC § 9-102 and as further defined in the Security Agreement) maintained by the Borrower.

(c)    Contemporaneously with Borrower's acquisition of the Property, Borrower shall have delivered an executed and notarized mortgage or deed of trust in form and substance required by Lender granting Lender a priority lien and security interest in and to the Property (the "**Security Instrument**"), and such Security Instrument shall be promptly recorded in the real property records of the county in which such real property is located. If required by Lender, (i) the closing of such Advance and recording of the Security Instrument shall be completed through the services of a title company chosen by Lender, and (ii) such title company shall issue, at Borrower's expense and for the benefit of Lender, a loan policy of title insurance concerning the Property. For the avoidance of doubt, this Section 4.1(c) shall not operate to preclude any Advances to the Borrower to fund pre-acquisition costs.

**Section 4.2. Authority**. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members, or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery, and performance of the LOC Documents and the consummation of the transactions contemplated thereby, (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners or members of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing concerning the Borrower.

**Section 4.3. Liens**. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions, or restrictions. At the request of the Lender, the Borrower shall (i) deliver to the Lender the results of UCC lien searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) UCC or other lien termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project, or any Collateral without the express written permission of Lender.

**Section 4.4. Litigation**. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

**Section 4.5. Events of Default**. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in

Initials: _____  _____

full compliance with the terms and provisions of this Agreement.

**Section 4.6. Purchase and Agreement Contracts.** Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

**Section 4.7. Compliance with Certain Requirements.** Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) under local, state, federal, and international laws, procedures, statutes, regulations, and ordinances, conditions applicable to the Project.

**Section 4.8.    Evidence of Insurance.**

(a)    For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for, and will keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders' loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of similar size and character that of the business of the Borrower, and Borrower shall furnish Lender with the satisfactory evidence of such underlying Borrower insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

(b)    Within five (5) business of receipt of End-Borrower insurance pursuant to Section 4.8(a), Lender shall acknowledge receipt and communicate to Borrower the approval and sufficiency of such End-Borrowers certificate of insurance.

**Section 4.9. Financial Statements.** The lender shall have received all financial reports required by Section 8.6 hereof.

**Section 4.10. Business Pro Forma.** The lender shall receive a pro forma income and expense statement annually in connection with the Project.

**Section 4.11. Management Plan.** Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of Borrower's business.

**Section 4.12. Material Change.** Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower's ability to perform under this Agreement or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.

**Section 4.13. Non-Subordination.** Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such Subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the

Initials: _____

normal and reasonable management of the Project).

**Section 4.14. Securitization.** The lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or reasonable due diligence required by the insurer.

## ARTICLE 5
## USE OF LINE OF CREDIT PROCEEDS

**Section 5.1.    Project Costs: Business Expansion Costs**.

(a)    Proceeds of Advances under the LOC shall be utilized by Borrower solely to finance the Project Costs, as more fully described in the attached **Exhibit C**, in connection with Borrower Business Expansion as further detailed in the Business Plan, updated yearly by Borrower.

(b)    The proceeds of the LOC shall be used exclusively for the purposes outlined in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family, or household purposes. The borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute, or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

## ARTICLE 6
## INSPECTIONS

**Section 6.1. Project Inspection**. Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

**Section 6.2. Books and Records**. Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower about the Project, the Property, and the Borrower and to make extracts therefrom or copies thereof.

**Section 6.3. Force Majeure Event Inspection Right.** In the event of a Force Majeure Event (as hereinafter defined) which interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until Lender is satisfied with Borrower's ability to resume operations to develop the Project. Following a Force Majeure Event, Lender has the right to modify the terms upon which future Advances may be made as a result of a change in circumstances as determined by the Lender

Initials: _____

in Lender's sole discretion, that the Borrower can perform or continue to perform the Project scope of work. Borrower shall execute any additional documents, amendments, or other agreement of terms required by Lender, before Lender's obligation to continue to make Advances shall resume.

## ARTICLE 7
## ADVANCE OF FUNDS

**Section 7.1. Timing and Advances to Payee**. Advances will be made as outlined in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance has been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than seventy-five (75) calendar days following the opening of the ICA by the Lender with its wholesale lender. Lender shall deliver the written notice to Borrower of the commencement of such seventy-five (75)-day period. Lender shall deliver the written notice to Borrower via the ZOOMERAL messaging system of the commencement of such seventy-five (75)-day period.

**Section 7.2. Conditions Precedent to Advance Funds**. Lender's obligation to make Advances hereunder shall be conditioned upon fulfillment of the terms outlined in Article 4 hereof.

**Section 7.3. Unpaid Lien Claims.** If Lender receives notice of nonpayment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, per applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower, or (b) withhold one hundred percent (100%) of the lien amount claimed from future Advances.

**Section 7.4. Mandatory Advances**. Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.

## ARTICLE 8
## BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing:

**Section 8.1. Project.** (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is the counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation, and management of the Project.

Initials: _____

**Section 8.2. Compliance with Laws.** Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

**Section 8.3. Compliance with Documents.** Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

**Section 8.4. Books and Records.** Keep and maintain complete and accurate books of account, per generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

**Section 8.5. Payment of Obligations.** Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established per generally accepted accounting principles).

**Section 8.6. Financial Reports.** Deliver to Lender, concerning Borrower as soon as available and in any event (a) within sixty (60) days after the end of each calendar quarter during the term of the LOC, financial statements of Borrower for such quarter and (b) within ninety (90) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower, in each case of the foregoing, certified as true and correct (which reports shall be prepared per generally accepted accounting principles consistently applied) and operating statements in a form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender. The borrower must also complete their ZOOMERAL business profile and keep the business profile up to date throughout the term of this agreement.

**Section 8.7. Notification to Lender.** Promptly after learning thereof, notify Lender of: (a) the details of any material action, proceeding, investigation, or claim against or affecting the Borrower, the Property, or the Project instituted before any court, arbitrator, or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Property or the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower of the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

**Section 8.8. Partnership/Corporate Existence.** Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

Initials: _____

## ARTICLE 9
## BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing Borrower shall not:

**Section 9.1. Liquidation, Merger, and Sale of Assets.** Liquidate, merge, or consolidate with any other Person or otherwise transfer to an unrelated Person fifteen percent (15%) or more of the equity securities of Borrower, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business. Notwithstanding, any initial public offering or acquisition by another company will require the Lender's approval or full payment of the outstanding loan balance.

**Section 9.2. Liens.** Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such liens,shall not be increased).

**Section 9.3. Indebtedness.** Create, incur, or have outstanding any indebtedness of any kind, other than (a) indebtedness owing to the Lender under this Agreement and the other LOC Documents, and (b) indebtedness of the Borrower existing as of the Closing Date as disclosed to and approved by the Lender (and any extension, renewal, or refinancing thereof but only to the extent that the principal amount thereof does not increase after the Closing Date).

**Section 9.4. Investments, Loans, and Guarantees.** (a) Create, acquire, or hold any subsidiary, (b) make or hold any investment in any stocks, bonds, or securities of any kind (c) be or become a party to any joint venture or other partnership, (d) make or keep outstanding any advance or loan to any Person, or (e) be or become a guarantor of any kind.

**Section 9.5. Acquisitions.** Enter into any transaction or series of related transactions for or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another

Initials: _9l_ _SP_

Person by a merger, amalgamation, or consolidation or any other combination with such Person, unless specifically stated and approved before execution of this Agreement.

**Section 9.6. Organizational Documents.** (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

**Section 9.7.    Project and Project Documents.** Willfully or voluntarily abandon the Project or its activities to develop, construct, operate, or maintain the Project. If the same would (i) be a major decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

(a)    terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance of a material obligation by any other Person under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the development, construction, operation, and maintenance of the Project, in each case that would have an adverse effect on the Lender; or

(b)    sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation, and maintenance of the Project without Lender's consent, which consent shall not be unreasonably withheld.

### Article 10
### REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender that:

**Section 10.1. Validity of Agreement.** The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents. The LOC and the execution, delivery, and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable per their terms. The execution, delivery, and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than liens permitted under Section 9.2 hereof) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

**Section 10.2. Existing Defaults.** As of the date of execution of this Agreement, Borrower (or any subsidiary of Borrower) is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other

Initials: _____ _____

agreement or instrument to which Borrower (or any subsidiary of Borrower) is a party or by which it or any of its properties, subsidiaries, partners, or other related entities may be bound.

**Section 10.3. No Default in Other Agreements**. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a party or by which it or any of its properties, subsidiaries, partners or other related entities may be bound, or result in the violation by it of any law, order, rule, ordinance, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties, subsidiaries, partners or other related entities.

**Section 10.4. No Consents**. No consent, approval, authorization, or other acknowledgment of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

**Section 10.5. Litigation**. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to Borrower's knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened, or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from the performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.

**Section 10.6. Financial Statements**. All balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared per generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

**Section 10.7. Legal Requirements**. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to

Initials: _____ _____

environmental protection, occupational safety and health, zoning, and equal employment practices.

**Section 10.8. Taxes**. The Borrower has filed all tax returns and reports required of it, has paid all taxes which are due and payable, and has provided adequate reserves for payment of any tax whose payment is being contested; the charges, accruals, and reserves on the books of the Borrower in respect of taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority concerning any taxes except as otherwise previously disclosed to the Lender in writing.

**Section 10.9. Organization and Good Standing**. The Borrower is a duly formed or organized, validly existing, and in good standing under the laws of the State of its formation or organization as outlined in the first paragraph of this Agreement, and is qualified as a foreign entity and in good standing in each jurisdiction where the Property and the Project are located.

**Section 10.10. Insurance**. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

**Section 10.11. Accurate and Complete Statements**. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

**Section 10.12. Timing of Lender Funding.** Provided Borrower has met the conditions to Advances in this Agreement, including without limitation the timing for requests outlined in this Section, Lender shall fund Advances per under the Tranche Schedule, but in no event anymore frequently than every sixty (60) day, unless otherwise consented to in writing by Lender. The borrower must deliver Advance requests to Lender thirty (30) business-banking days before the week represented on the Tranche Schedule for which the Borrower wishes to receive the proceeds of such Advance from the LOC Disbursement Account. Upon notice of an Advance Request from the Borrower, Lender has a forty (40) international business-banking day window based on the Tranche Schedule (except for the first Advance according to Section 7.1) to Payment the requested Advance into the LOC Disbursement Account. Absent a written Advance request from Borrower, per the conditions and requirements set forth herein, Lender is not obligated to disburse the next scheduled Advance under the Tranche Schedule.

## ARTICLE 11
## NATURE OF REPRESENTATIONS AND WARRANTIES

**Section 11.1. Generally.** The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive

Initials: _____ _____

so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date hereof, except for any representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower according to or in connection with the LOC shall be deemed to have been relied upon by Lender.

## ARTICLE 12
## EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "**Event of Default**"):

Section 12.1. **Nonpayment**. Failure to make any payment required by the Promissory Note, this Agreement, or any other LOC Documents and such failure continues for thirty (30) days after notice of such default is sent by Lender to Borrower.

Section 12.2. **Other Covenants and Agreements.** Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not have been fully corrected, by the performance of or compliance with such covenants or agreements, within twenty (20) days after notice of such default is sent by Lender to Borrower.

Section 12.3. **Representations and Warranties.** If any representation, warranty, or statement made in or according to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made. Such Event of Default can be corrected by the presentation of accurate and current material information furnished by the Borrower to the Lender to correct the false or erroneous representation, warranty, or statement within ten (10) days after notice of such default is sent by Lender to Borrower.

Section 12.4. **Security.** If any lien granted in this Agreement or any other LOC Document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of Collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in the lien status occurs appropriate documents to correct such matters.

Section 12.5. **Validity of LOC Documents.** If (a) any material provision, in the sole opinion of the Lender, of any LOC Document, shall at any time cease to be valid, binding, and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC

Initials: _____ _____

Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

Section 12.6. **Petition for Bankruptcy, Insolvency**. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation, or reorganization, seeking,

consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for ninety (90) days; or the taking of the action by Borrower to authorize any of the actions outlined in this Section 12.6.

Section 12.7. **Material Litigation**. Any action, suit, proceeding, or investigation of any kind involving or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof of any Litigation, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation, and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, partners, or other related entities, or the Project and promptly after the occurrence thereof, a notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, partners, or other related entities, or the Project of the disclosed Litigation.

## ARTICLE 13
## REMEDIES

Section 13.1. **General**. Following the occurrence of one (1) or more Events of Default, a default cure period of sixty (60) days begins ("Default Cure Period"), except as otherwise provided in Section 13.3 or Section 13.4. If Borrower fails to cure the Event of Default (in the manner specified for each Event of Default according to Article 12) within the Default Cure Period, then the Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies outlined in the Promissory Note, in the LOC Documents, or any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or equity, including such rights as are provided in this Article 13. If a Bankruptcy Event referred to in Section 12.6 hereof occurs, (i) all obligations

Initials: _____ _____

of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Upon the occurrence of any Event of Default hereunder under Section 12.1 whereby Borrower has missed more than two (2) scheduled payments if Borrower does not have any interest reserve account established for the benefit of the Lender, Borrower shall have a) sixty (60) days Default Cure Period to cure the Event of Default and must (b) Payment an additional one year's worth of interest payments into the Interest Reserve Account.

**Section 13.2.** <u>**Default and Right to Acquire.**</u>

In the event, the Borrower is unable to cure the Event of Default (in the manner specified to correct each Event of Default according to Article 12 or within the Default Cure Period,

(a)     Upon the occurrence of an Event of Default, Lender shall have the right, in person or by agent, in addition to all other rights and remedies available to Lender hereunder or under the LOC documents, to enter into possession of the Project and perform or cause enforce any liquidity plan.

(b)     The lender may enter into possession of the Project and perform or cause to be performed all work and labor necessary to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower. All sums expended by the Lender in doing so, together with interest on such total amount at the Default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured by the LOC documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

(c)     Borrower thereby, following such Bankruptcy Event or relevant cure periods under Section 13.2 constitutes and appoints the Lender as its true and lawful attorney-in-fact, with the full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

(i)     to enter and endorse all agreements, instruments, and documents in connection therewith.

(ii)     to use any unadvanced proceeds of the LOC to complete, operate, or maintain the Project.

(iii)     to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

Initials: _____

(iv)    to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

(v)    to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security satisfactory to the Lender has been provided.

(vi)    to execute applications and certificates in the name of the Borrower which reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

(vii)    to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

(viii)    to do any and every act which the Borrower might do on its behalf concerning the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be (A) irrevocable, (B) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (C) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

**Section 13.3. Curing of Defaults by Advances**. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which Lender may have because of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender per the terms hereof before any additional proceeds of the LOC are disbursed.

**Section 13.4. Remedies Are Cumulative**. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of any rights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidate any act done according to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

Initials: _____

**Section 13.5. <u>Offsets</u>**. If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC documents is accelerated according to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, all of such obligations then owing by the Borrower, whether or not the same shall then have matured, all Payment (general or special) balances, and all balances in the Interest Reserve Account and all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

**Section 13.6. <u>Collateral</u>**. The Lender shall at all times have the rights and remedies of a secured party under the UCC, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Documents executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC documents, which the Borrower agrees to do, and make it available to the Lender at a reasonable convenient place to be designated by the Lender. The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC document, each of which findings shall be considered to be an accession to and a part of such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any delivery or taking of possession of the Collateral securing the obligations under the LOC documents, or any portion thereof, under this Agreement, then, with or without resort to the Borrower personally or any other person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. No prior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that the Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case, the Lender shall give the Borrower not fewer than ten (10) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made. The Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Lender may purchase such Collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower hereby waives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC documents, the cost of which shall be paid by the Borrower.

Initials: _____

**Section 13.7. <u>Default by Lender and Borrower's Sole Remedy.</u>**

(a)     Provided Borrower has fully satisfied and complied with all conditions to Advance if Lender fails to provide the first (1st) Advance when due, under the Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver a written notice in the form of a notarized termination letter, a copy of which is attached hereto as **<u>Exhibit F</u>** ("the **Termination Letter**"), to Lender by certified mail. Upon receipt of such notice, Lender shall have forty (40) international business-banking days from the date of receipt ("**Refund Period**") within which to return the ICA Payment to the Borrower.

(b)     If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice in the form of a notarized Termination Letter to the Lender by certified mail. Within forty (40) international business-banking days from the date of receipt of such notice by Lender, Borrower shall be entitled to (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) termination of Borrower's obligations to Lender hereunder except Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners, or other related entities, for any indirect, special, incidental, or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise because of, the LOC, the Advances, the Agreement or the other LOC documents.

(c)     Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances according to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, an act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, an act of civil disobedience, an act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew

Initials: _____

restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages, or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from performing under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period the occurrence is expected to continue. The lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. The lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

**Section 13.8 Binding Arbitration.** Any dispute, claim, or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one (1) arbitrator. The arbitration shall be administered by JAMS under its Comprehensive Arbitration Rules and Procedures or by ADR Services under its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand according to the notice requirements outlined in Section 14.5 herein. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach an agreement on an arbitrator, then the arbitration shall be selected under the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for the production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any discovery disputes shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising concerning the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

**ARTICLE 14**
**GENERAL PROVISIONS**

**Section 14.1. Disclaimer of Liability.** Lender has no liability or obligation in connection

Initials: _____ _____

with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith. No claim may be made by the Borrower or any other Person against the Lender or the Affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

Section 14.2. **Publicity**. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. The lender shall have the right to indicate that it has provided the financing for the Project.

Section 14.3. **Confidentiality.** Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary, and Borrower hereby agrees to maintain confidential this Agreement, the LOC documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place. Borrower's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative.

Section 14.4. **Responsibility for Application of Funds**. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose outlined in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced under this Agreement. The lender may rely solely upon the Borrower's requests for Advances, affidavits, statements, and reports in making said Advances, and the Borrower does hereby release and indemnify the Lender and hold the Lender harmless from any losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final and non-appealable decision).

Section 14.5. **Non-Disparagement**. Borrower agrees and covenants that Borrower shall not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory, maliciously false, or disparaging remarks, comments, or statements concerning the

Initials: _____

The lender or its businesses, or any of its employees, officers, or directors, and its existing and prospective clients, suppliers, investors, and other associated third parties, now or in the future. For the avoidance of doubt, a breach of this Section 10.04 shall constitute an Event of Default under Section 7.02 under which Lender has the right to terminate all obligations under the Loan Documents under Section 9.01(b).

 **Section 14.6 <u>Opportunity to Consult with Counsel</u>**. Borrower acknowledges that it has had an opportunity to consult with and be represented by counsel of Borrower's choosing in the review of the Loan Documents, that it has been advised by Lender to do so, that the Borrower is fully aware of the contents of the Loan Documents and its legal effect, and that Borrower enters into these Loan Documents freely, without duress or coercion, and based on Borrower's judgment and wishes and not in reliance upon any representation or promise made by the Lender, other than those contained herein.

 **Section 14.7 <u>Notices</u>**. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent by certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety-six (96) hours after deposit in first-class certified United States mail, postage prepaid, return receipt requested, or two (2) business days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given according to this paragraph:

| | |
|---|---|
| To Borrower: | North Haven Lodging Partners LLC<br>2517 W Brentridge Street<br>Sioux Falls, SD 57108 |
| To Lender: | McMann Commercial Lending LLC<br>205 N Michigan Avenue, Ste 810<br>Chicago, Illinois 60601 |

 **Section 14.8. <u>Applicable Law</u>**. This Agreement and, unless otherwise specifically provided for therein, each other LOC document, shall be governed by and construed per the laws of the State of Illinois and the United States.

 **Section 14.9. <u>Successors and Assigns</u>**. The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

 **Section 14.10. <u>Severability</u>**. The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition. In the event of any conflict or inconsistency between the terms and provisions of this Agreement and any of the LOC Documents, the terms and provisions of this Agreement shall control.

Initials: _____

**Section 14.11. Amendments**. This Agreement may not be modified or amended except by a written agreement signed by the Borrower and Lender.

**Section 14.12. Headings; Attachments**. The several headings to articles, sections, and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part thereof.

**Section 14.13. No Third-Party Rights**. This Agreement is made entirely for the benefit of the Borrower, the Lender, and their successors in interest (including any participants). No third party shall have any rights hereunder.

**Section 14.14. Indemnification**. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement. The Borrower hereby agrees to indemnify, defend and hold harmless the Lender, the managers of the Lender, and all of their members, managers, affiliates, and advisors, from any damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees and costs) that they may incur because Borrower failed to fulfill all of the terms and conditions of this agreement or because of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs, and expenses (including attorneys' fees and costs) incurred by Lender, the managing members of Lender, or any of its members, managers, affiliates, or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished in connection with this transaction.

**Section 14.15. General Limitation of Liability**. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the

Initials: _UP_  _SP_

transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission, or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. In addition to the tolling provided under Section 6.3, Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

Section 14.16. **Entire Agreement**. This Agreement, the Promissory Note, and any other LOC Document or other agreement, document, or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings concerning the subject matter hereof.

Section 14.17. **Execution in Counterparts**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute the same Agreement.

Section 14.18. **Legal Representation of the Parties**. The LOC Documents were negotiated by the Parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

Section 14.19. **JURY TRIAL WAIVER**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

[Remainder of page intentionally left blank; Signatures follow]

Initials:

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**LENDER:** MCMANN COMMERCIAL LENDING LLC

By:

Name: Walter P Trock III

**BORROWER:** North Haven Lodging Partners LLC

By:

Name: Shailesh Patel          Vihang Patel

Title: Manger                 Member

April , 20___   **SUBSCRIBED AND SWORN TO BEFORE ME** on this 4th day of

In and for the State of
South Dakota

NOTARY PUBLIC
In and for the State of Connecticut

My Commission Expires:

ADAM PRICE
Notary Public
SEAL
South Dakota

BENNETT BUFFALO
NOTARY PUBLIC, STATE OF CONNECTICUT
My Commission Expires January 31, 2026

My Commission Expires:
4-27-23

Initials:

# EXHIBIT 4
## Part II of II

# EXHIBIT B

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

among

## MCMANN COMMERCIAL LENDING LLC

as Lender

and

### Wallingford Lodging Partners LLC
as Borrower

dated as of

April 10, 2023

Initials: _____

Case: 1:23-cv-16264 Document #: 1-6 Filed: 11/27/23 Page 4 of 51 PageID #:203

## BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated, or otherwise modified, this "**Agreement**") is made and entered as of April 10, 2023, between McMann Commercial Lending LLC (the "**Lender**"), and Wallingford Lodging Partners LLC., a Connecticut Limited Liability Company ("**Borrower**").

## RECITALS

**A.**     The Borrower desires to obtain from Lender an asset-backed line of credit loan (the "**LOC**") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

**B.**     The Borrower desires to obtain the LOC from Lender for Business Expansion for construction of a 105-room limited-service hotel (as more fully described in **Exhibit D** attached hereto the "**Project**"). Acquired assets will be legally described on **Exhibit E** attached hereto (the "**Property**").

**C.**     The Borrower has agreed to pay a minimum contribution of the Project LOC Amount to Lender, by establishing the Interest Reserve (as hereinafter defined) and the ICA (as hereinafter defined), collectively,(the "**Interest Reserve Account**"), within seven (7) calendar days after the fully executed LOC Documents (as hereinafter defined) are received by Lender.

**D.**     The Borrower has agreed to pay, pursuant to Section 3.6 hereof, the aggregate amount of One Million Eight Hundred Thousand Dollars and No Cents Dollars ($1,800,000), (the "**ICA Payment**"), by bank wire to Lender. An account on the books and records of the Lender shall be created to serve as an Interest Credit Account (the "**ICA**"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

**E.**     Lender has agreed to make Advances (as hereinafter defined) under the LOC to Borrower in an aggregate amount, according to **Exhibit B**, an amount not to exceed the Maximum Amount for the purposes outlined in these recitals and the Promissory Note attached hereto as **Exhibit A** and upon the terms and subject to the conditions hereinafter set forth.

**NOW THEREFORE**, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1. Certain Defined Terms**. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed per generally accepted accounting principles consistently applied.  As used in this

Initials: _____

agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

**"Advance(s)"** means any loan advance made by the Lender per the terms and conditions of this Agreement.

"**Applicable Interest Rate**" means the fixed interest rate specified in the Promissory Note.

**"Borrower"** means that term as defined in the first paragraph of this Agreement.

**"Business Expansion"** means any transaction or use, including for working capital, that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business (other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

"**Business Plan**" means the document(s) outlining the accurate and up-to-date business operations of the End-Borrower, as previously provided by End-Borrower, substantially in the form outlined in EXHIBIT D, and subject to review by Lender's Capital Partners as described in Section 8.1 of this Agreement.

**"Closing Date"** means the last date of signed execution of this Agreement by Lender and Borrower.

**"Collateral"** means all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements, and proceeds, thereof.

**"Event(s) of Default"** means any event or condition that shall constitute an event of default as described in Article 13 of this Agreement.

"**ICA**" means the definition given in Recital D of this Agreement.

"**ICA Payment**" means the amount remitted pursuant to Recital D of this Agreement.

Initials: _U_ _SP_

"**Interest Reserve**" means credit on the books and records of the Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from a Borrower JV Partner, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"**Interest Reserve Account**" means the definition given in Recital C of this Agreement.

"**Lender**" means that term as defined in the first paragraph of this Agreement.

"**Lender's Capital Partners**" means one or more lender-clients of the Lender providing funding towards the LOC.

"**LOC**" means that term as defined in Recital A of this Agreement.

"**LOC Disbursement Account**" means that term as defined in Section 3.12 hereof.

"**LOC Document(s)**" means, collectively, this Agreement, the Promissory Note, and each Security Document, as any of the foregoing may from time to time be amended, restated, or otherwise modified or replaced, and any other document delivered pursuant thereto.

"**Maximum Amount**" means Eighteen Million Nine Hundred Thousand Dollars and No Cents ($18,900,000). The Maximum Amount is the Project LOC Amount plus all fees, costs, and expenses which are the Borrower's responsibility to pay.

"**Organizational Documents**" means, concerning any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"**Other Taxes**" means all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise concerning, this Agreement or any other LOC Document.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority, or any other entity.

"**Project**" means that term as defined in Recital B of this Agreement.

Initials: _UR_ _ST_

"**Project Costs**" means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by the Borrower for implementation or execution of the Project (including but not limited to the payment of taxes, insurance, and all items reasonably necessary for the successful execution of the Project), as more specifically outlined in the Project budget set forth on **Exhibit C** attached hereto.

"**Project LOC Amount**" means Eighteen Million Dollars and No Cents ($18,000,000).

"**Property**" means that term as defined in Recital B of this Agreement.

"**Promissory Note**" means the Promissory Note, in the form attached hereto as **Exhibit A**.

"**Security Agreement**" means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as **Exhibit E**.

"**Security Document**" means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each U.C.C. Financing Statement or similar filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

"**Scheduled Maturity Date**" means the 10th anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

"**Subsidiary**" means any entity (other than the Borrower) in an unbroken chain of entities beginning with the Borrower if each of the entities owns stock, units, or other interests that represent fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other corporations in such chain

"**Taxes**" means all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, concerning those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender concerning the LOC.

"**Term Sheet**" means that document(s) dated as of 3/14/2023 between Borrower and Lender, setting forth a general summary of the terms of agreement memorialized more fully herein in final form.

"**Tranche Schedule**" means the schedule of Advances to Borrowers from the Lender, based

Initials: _JN_  _SP_

upon the dates of the disbursements attached hereto as **Exhibit B**; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder does not exceed the Maximum Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

## ARTICLE 2
## THE CREDIT

**Section 2.1. Line of Credit Amount**. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to the Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

**Section 2.2. Line of Credit Documents**. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note, this Agreement, and each Security Document. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to the Lender and its counsel.

## ARTICLE 3
## TERM, INTEREST, AND PAYMENTS

**Section 3.1. Initial Term**. The initial term of the LOC is Ten (10) years and shall commence on the Closing Date and expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full thereon and all other amounts due and owing hereunder and under the Promissory Note shall be repaid by Borrower on the Scheduled Maturity Date.

**Section 3.2. Extended Term.** At the end of the initial term outlined in Section 3.1 hereof, and at the end of each Extended Term (as defined below, if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, over time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty-four (24) month period, up to a total of one (1) such additional consecutive periods (separately, "**Extended Term**"; collectively, the "**Extended Terms**"). In connection with Lender's granting of each Extended Term, (a) Borrower shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorney's fees, as a one (1)-time fee equal to one percent (1%) of the Project LOC Amount.

Initials: _____ _____

Section 3.3. **Applicable Interest Period.** The interest period concerning each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full.

Section 3.4. **Interest Rate Calculation**. Interest shall be calculated based on a 365-day year and the actual number of days elapsed in a 365-day year and at the rate outlined in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "**Maximum Interest Rate**"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to the unpaid principal balance outstanding under the Promissory Note or, if it exceeds such unpaid principal, refunded to the Borrower.

Section 3.5. **Interest Payments**. Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times outlined in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

Section 3.6. **Reserves**. Following the signing of this Agreement, the Borrower shall remit One Million Eight Hundred Thousand Dollars and No Cents ($1,800,000) as the ICA Payment per the terms and the time outlined in Recital D of this Agreement. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and not refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable.

Section 3.7. **Prepayment**. The borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC.

Section 3.8. **Interest Credit Account**. If at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which notice shall be delivered to and received by Borrower no less than thirty (30) days before the date of the next interest payment date, Borrower shall remit into the ICA the funds necessary to make such interest paid before the date such interest payment is due and payable. **Section 3.9.** **Fees.**

> (a) **LOC Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable fee for the LOC in an aggregate amount equal to Five percent (5%) multiplied by the Project LOC Amount, which is equal to Nine Hundred Thousand Dollars and No Cents ($900,000) (the "**LOC Fee**"). The LOC Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

Initials: _____  SP

(b) **Promote Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable success fee in an aggregate amount equal to One percent (1%) multiplied by the Project LOC Amount, which is One Hundred Eighty Thousand Dollars and No Cents ($180,000) (the "**Promote Fee**"). The Promote Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

(c) **ICA Advance Fee**. To the extent the Borrower used Lender to provide the ICA Payment, at Closing and out of the initial Advance, the Borrower shall reimburse Lender in an amount equal to the ICA Payment advanced by Lender plus a nonrefundable fee in an aggregate amount equal to Zero percent (0%) of the ICA Payment, which is No Dollars and No Cents Dollars ($-) (the "**ICA Advance Fee**"). The ICA Advance Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition. The borrower will take the Project LOC Amount in full on the closing of the first tranche.

**Section 3.10. Line of Credit Extension Fees.** Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a nonrefundable LOC extension fee for each extension in an aggregate amount equal to one percent (1%) multiplied by the Maximum Amount.

**Section 3.11. Legal and Incidental Fees, Charges, and Costs.** Borrower shall pay at Closing, all reasonable out of pocket and up to Twelve Thousand, Five Hundred U.S. Dollars ($12,500) for legal fees, recording and filing fees, documentary stamps, taxes, service charges, credit reports, UCC search costs, title company fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial proceeding; provided that Lender will provide Borrower ten (10) days' advance notice of any legal fees pursuant to this Section 3.11 that will exceed Twelve Thousand, Five Hundred U.S. Dollars ($12,500). Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or willful misconduct.

**Section 3.12. Line of Credit Disbursement Account**. The proceeds of each Advance under the LOC shall be advanced into the LOC Disbursement Account with Lender to be used by Borrower for payment of the Borrower's Project Costs, solely for the purposes and in the manner

Initials: _____  _____

outlined in this Agreement. The LOC Disbursement Account will be held jointly in the name of the Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights and interest in and to the LOC Disbursement Account, which assignment will be effective only upon the occurrence and continuation of an Event of Default, subject to an applicable Default Cure Period (as hereinafter defined).

**Section 3.13. Taxes.**

(a)    All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to the Lender (after deducting, withholding, and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

(b)    Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to the Lender. If the Borrower shall fail to pay any Taxes or OtherTaxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result of any such failure.

(c)    The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

### ARTICLE 4
### CONDITIONS FOR CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing:

**Section 4.1.    Delivery of the LOC Documents.**

(a)    As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

Initials: _____

(b)      The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Payment Account and Security Account (both as defined under UCC § 9-102 and as further defined in the Security Agreement) maintained by the Borrower.

(c)      Contemporaneously with Borrower's acquisition of the Property, Borrower shall have delivered an executed and notarized mortgage or deed of trust in form and substance required by Lender granting Lender a priority lien and security interest in and to the Property (the "**Security Instrument**"), and such Security Instrument shall be promptly recorded in the real property records of the county in which such real property is located. If required by Lender, (i) the closing of such Advance and recording of the Security Instrument shall be completed through the services of a title company chosen by Lender, and (ii) such title company shall issue, at Borrower's expense and for the benefit of Lender, a loan policy of title insurance concerning the Property. For the avoidance of doubt, this Section 4.1(c) shall not operate to preclude any Advances to the Borrower to fund pre-acquisition costs.

Section 4.2. **Authority**. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members, or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery, and performance of the LOC Documents and the consummation of the transactions contemplated thereby, (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners or members of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing concerning the Borrower.

Section 4.3. **Liens**. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions, or restrictions. At the request of the Lender, the Borrower shall (i) deliver to the Lender the results of UCC lien searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) UCC or other lien termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project, or any Collateral without the express written permission of Lender.

Section 4.4. **Litigation**. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

Section 4.5. **Events of Default**. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in

Initials: ___

full compliance with the terms and provisions of this Agreement.

**Section 4.6. Purchase and Agreement Contracts.** Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

**Section 4.7. Compliance with Certain Requirements**. Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) under local, state, federal, and international laws, procedures, statutes, regulations, and ordinances, conditions applicable to the Project.

**Section 4.8. Evidence of Insurance**.

(a)     For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for, and will keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders' loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of similar size and character that of the business of the Borrower, and Borrower shall furnish Lender with the satisfactory evidence of such underlying Borrower insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

(b)     Within five (5) business of receipt of End-Borrower insurance pursuant to Section 4.8(a), Lender shall acknowledge receipt and communicate to Borrower the approval and sufficiency of such End-Borrowers certificate of insurance.

**Section 4.9. Financial Statements**. The lender shall have received all financial reports required by Section 8.6 hereof.

**Section 4.10. Business Pro Forma**. The lender shall receive a pro forma income and expense statement annually in connection with the Project.

**Section 4.11. Management Plan**. Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of Borrower's business.

**Section 4.12. Material Change.** Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower's ability to perform under this Agreement or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.

**Section 4.13. Non-Subordination.** Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such Subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the

Initials: _____  _____

normal and reasonable management of the Project).

**Section 4.14. Securitization.** The lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or reasonable due diligence required by the insurer.

## ARTICLE 5
## USE OF LINE OF CREDIT PROCEEDS

Section 5.1.    **Project Costs: Business Expansion Costs**.

(a)    Proceeds of Advances under the LOC shall be utilized by Borrower solely to finance the Project Costs, as more fully described in the attached **Exhibit C**, in connection with Borrower Business Expansion as further detailed in the Business Plan, updated yearly by Borrower.

(b)    The proceeds of the LOC shall be used exclusively for the purposes outlined in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family, or household purposes. The borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute, or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

## ARTICLE 6
## INSPECTIONS

**Section 6.1. Project Inspection**. Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

**Section 6.2. Books and Records**. Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower about the Project, the Property, and the Borrower and to make extracts therefrom or copies thereof.

**Section 6.3. Force Majeure Event Inspection Right.** In the event of a Force Majeure Event (as hereinafter defined) which interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until Lender is satisfied with Borrower's ability to resume operations to develop the Project. Following a Force Majeure Event, Lender has the right to modify the terms upon which future Advances may be made as a result of a change in circumstances as determined by the Lender

Initials: _____  _____

in Lender's sole discretion, that the Borrower can perform or continue to perform the Project scope of work. Borrower shall execute any additional documents, amendments, or other agreement of terms required by Lender, before Lender's obligation to continue to make Advances shall resume.

## ARTICLE 7
## ADVANCE OF FUNDS

**Section 7.1. Timing and Advances to Payee**. Advances will be made as outlined in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance has been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than seventy-five (75) calendar days following the opening of the ICA by the Lender with its wholesale lender. Lender shall deliver the written notice to Borrower of the commencement of such seventy-five (75)-day period. Lender shall deliver the written notice to Borrower via the ZOOMERAL messaging system of the commencement of such seventy-five (75)-day period.

**Section 7.2.    Conditions Precedent to Advance Funds**. Lender's obligation to make Advances hereunder shall be conditioned upon fulfillment of the terms outlined in Article 4 hereof.

**Section 7.3. Unpaid Lien Claims.** If Lender receives notice of nonpayment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, per applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower, or (b) withhold one hundred percent (100%) of the lien amount claimed from future Advances.

**Section 7.4. Mandatory Advances**. Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.

## ARTICLE 8
## BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing:

**Section 8.1. Project.** (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is the counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation, and management of the Project.

Initials: _____

**Section 8.2. Compliance with Laws**. Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

**Section 8.3. Compliance with Documents**. Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

**Section 8.4. Books and Records**. Keep and maintain complete and accurate books of account, per generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

**Section 8.5. Payment of Obligations**. Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established per generally accepted accounting principles).

**Section 8.6. Financial Reports**. Deliver to Lender, concerning Borrower as soon as available and in any event (a) within sixty (60) days after the end of each calendar quarter during the term of the LOC, financial statements of Borrower for such quarter and (b) within ninety (90) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower, in each case of the foregoing, certified as true and correct (which reports shall be prepared per generally accepted accounting principles consistently applied) and operating statements in a form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender. The borrower must also complete their ZOOMERAL business profile and keep the business profile up to date throughout the term of this agreement.

**Section 8.7. Notification to Lender**. Promptly after learning thereof, notify Lender of: (a) the details of any material action, proceeding, investigation, or claim against or affecting the Borrower, the Property, or the Project instituted before any court, arbitrator, or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Property or the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower of the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

**Section 8.8. Partnership/Corporate Existence**. Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

Initials: _V P    S P_

## ARTICLE 9
## BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing Borrower shall not:

**Section 9.1. Liquidation, Merger, and Sale of Assets.** Liquidate, merge, or consolidate with any other Person or otherwise transfer to an unrelated Person fifteen percent (15%) or more of the equity securities of Borrower, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business. Notwithstanding, any initial public offering or acquisition by another company will require the Lender's approval or full payment of the outstanding loan balance.

**Section 9.2. Liens.** Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (hut only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such liens, shall not be increased).

**Section 9.3.   Indebtedness.** Create, incur, or have outstanding any indebtedness of any kind, other than (a) indebtedness owing to the Lender under this Agreement and the other LOC Documents, and (b) indebtedness of the Borrower existing as of the Closing Date as disclosed to and approved by the Lender (and any extension, renewal, or refinancing thereof but only to the extent that the principal amount thereof does not increase after the Closing Date).

**Section 9.4. Investments, Loans, and Guarantees.** (a) Create, acquire, or hold any subsidiary, (b) make or hold any investment in any stocks, bonds, or securities of any kind (c) be or become a party to any joint venture or other partnership, (d) make or keep outstanding any advance or loan to any Person, or (e) be or become a guarantor of any kind.

**Section 9.5. Acquisitions.** Enter into any transaction or series of related transactions for or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another

Initials: _VP_ _JP_

Person by a merger, amalgamation, or consolidation or any other combination with such Person, unless specifically stated and approved before execution of this Agreement.

Section 9.6. **Organizational Documents**. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

Section 9.7. **Project and Project Documents**. Willfully or voluntarily abandon the Project or its activities to develop, construct, operate, or maintain the Project. If the same would (i) be a major decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

(a) terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance of a material obligation by any other Person under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the development, construction, operation, and maintenance of the Project, in each case that would have an adverse effect on the Lender; or

(b) sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation, and maintenance of the Project without Lender's consent, which consent shall not be unreasonably withheld.

### Article 10
### REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender that:

Section 10.1. **Validity of Agreement**. The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents. The LOC and the execution, delivery, and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable per their terms. The execution, delivery, and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than liens permitted under Section 9.2 hereof) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

Section 10.2. **Existing Defaults**. As of the date of execution of this Agreement, Borrower (or any subsidiary of Borrower) is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other

Initials: JK  SK

agreement or instrument to which Borrower (or any subsidiary of Borrower) is a party or by which it or any of its properties, subsidiaries, partners, or other related entities may be bound.

**Section 10.3. No Default in Other Agreements**. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a party or by which it or any of its properties, subsidiaries, partners or other related entities may be bound, or result in the violation by it of any law, order, rule, ordinance, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties, subsidiaries, partners or other related entities.

**Section 10.4. No Consents**. No consent, approval, authorization, or other acknowledgment of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

**Section 10.5. Litigation**. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to Borrower's knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened, or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from the performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.

**Section 10.6. Financial Statements**. All balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared per generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

**Section 10.7. Legal Requirements**. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to

Initials: _____

environmental protection, occupational safety and health, zoning, and equal employment practices.

Section 10.8. **Taxes**. The Borrower has filed all tax returns and reports required of it, has paid all taxes which are due and payable, and has provided adequate reserves for payment of any tax whose payment is being contested; the charges, accruals, and reserves on the books of the Borrower in respect of taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority concerning any taxes except as otherwise previously disclosed to the Lender in writing.

Section 10.9. <u>**Organization and Good Standing**</u>. The Borrower is a duly formed or organized, validly existing, and in good standing under the laws of the State of its formation or organization as outlined in the first paragraph of this Agreement, and is qualified as a foreign entity and in good standing in each jurisdiction where the Property and the Project are located.

Section 10.10. <u>Insurance</u>. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

Section 10.11. <u>**Accurate and Complete Statements**</u>. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

Section 10.12. <u>**Timing of Lender Funding.**</u> Provided Borrower has met the conditions to Advances in this Agreement, including without limitation the timing for requests outlined in this Section, Lender shall fund Advances per under the Tranche Schedule, but in no event anymore frequently than every sixty (60) day, unless otherwise consented to in writing by Lender. The borrower must deliver Advance requests to Lender thirty (30) business-banking days before the week represented on the Tranche Schedule for which the Borrower wishes to receive the proceeds of such Advance from the LOC Disbursement Account. Upon notice of an Advance Request from the Borrower, Lender has a forty (40) international business-banking day window based on the Tranche Schedule (except for the first Advance according to Section 7.1) to Payment the requested Advance into the LOC Disbursement Account. Absent a written Advance request from Borrower, per the conditions and requirements set forth herein, Lender is not obligated to disburse the next scheduled Advance under the Tranche Schedule.

### ARTICLE 11
### NATURE OF REPRESENTATIONS AND WARRANTIES

Section 11.1. <u>**Generally.**</u> The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive

Initials: _____

so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date hereof, except for any representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower according to or in connection with the LOC shall be deemed to have been relied upon by Lender.

## ARTICLE 12
## EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "**Event of Default**"):

Section 12.1. **Nonpayment**. Failure to make any payment required by the Promissory Note, this Agreement, or any other LOC Documents and such failure continues for thirty (30) days after notice of such default is sent by Lender to Borrower.

Section 12.2. **Other Covenants and Agreements.** Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not have been fully corrected, by the performance of or compliance with such covenants or agreements, within twenty (20) days after notice of such default is sent by Lender to Borrower.

Section 12.3. **Representations and Warranties.** If any representation, warranty, or statement made in or according to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made. Such Event of Default can be corrected by the presentation of accurate and current material information furnished by the Borrower to the Lender to correct the false or erroneous representation, warranty, or statement within ten (10) days after notice of such default is sent by Lender to Borrower.

Section 12.4. **Security.** If any lien granted in this Agreement or any other LOC Document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of Collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute, but in no event, more than five (5) business days from the date such change in the lien status occurs appropriate documents to correct such matters.

Section 12.5. **Validity of LOC Documents.** If (a) any material provision, in the sole opinion of the Lender, of any LOC Document, shall at any time cease to be valid, binding, and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC

Initials: _VB_  _SP_

Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

**Section 12.6. <u>Petition for Bankruptcy, Insolvency</u>**. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation, or reorganization, seeking,

consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for ninety (90) days; or the taking of the action by Borrower to authorize any of the actions outlined in this Section 12.6.

**Section 12.7. <u>Material Litigation</u>**. Any action, suit, proceeding, or investigation of any kind involving or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof of any Litigation, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation, and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, partners, or other related entities, or the Project and promptly after the occurrence thereof, a notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, partners, or other related entities, or the Project of the disclosed Litigation.

**ARTICLE 13**
**REMEDIES**

**Section 13.1. <u>General</u>**. Following the occurrence of one (1) or more Events of Default, a default cure period of sixty (60) days begins ("Default Cure Period"), except as otherwise provided in Section 13.3 or Section 13.4. If Borrower fails to cure the Event of Default (in the manner specified for each Event of Default according to Article 12) within the Default Cure Period, then the Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies outlined in the Promissory Note, in the LOC Documents, or any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or equity, including such rights as are provided in this Article 13. If a Bankruptcy Event referred to in Section 12.6 hereof occurs, (i) all obligations

Initials: _____ _____

of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Upon the occurrence of any Event of Default hereunder under Section 12.1 whereby Borrower has missed more than two (2) scheduled payments if Borrower does not have any interest reserve account established for the benefit of the Lender, Borrower shall have a) sixty (60) days Default Cure Period to cure the Event of Default and must (b) Payment an additional one year's worth of interest payments into the Interest Reserve Account.

### Section 13.2. <u>Default and Right to Acquire.</u>

In the event, the Borrower is unable to cure the Event of Default (in the manner specified to correct each Event of Default according to Article 12 or within the Default Cure Period,

(a)    Upon the occurrence of an Event of Default, Lender shall have the right, in person or by agent, in addition to all other rights and remedies available to Lender hereunder or under the LOC documents, to enter into possession of the Project and perform or cause enforce any liquidity plan.

(b)    The lender may enter into possession of the Project and perform or cause to be performed all work and labor necessary to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower. All sums expended by the Lender in doing so, together with interest on such total amount at the Default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured by the LOC documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

(c)    Borrower thereby, following such Bankruptcy Event or relevant cure periods under Section 13.2 constitutes and appoints the Lender as its true and lawful attorney-in-fact, with the full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

(i)    to enter and endorse all agreements, instruments, and documents in connection therewith.

(ii)    to use any unadvanced proceeds of the LOC to complete, operate, or maintain the Project.

(iii)    to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

Initials: VI  SP

(iv)   to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

(v)   to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security satisfactory to the Lender has been provided.

(vi)   to execute applications and certificates in the name of the Borrower which reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

(vii)   to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

(viii)   to do any and every act which the Borrower might do on its behalf concerning the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be (A) irrevocable, (B) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (C) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

**Section 13.3.** **Curing of Defaults by Advances.** Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which Lender may have because of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender per the terms hereof before any additional proceeds of the LOC are disbursed.

**Section 13.4.** **Remedies Are Cumulative.** No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of any rights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidate any act done according to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

Initials: _W_  _SP_

**Section 13.5. Offsets.** If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC documents is accelerated according to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, all of such obligations then owing by the Borrower, whether or not the same shall then have matured, all Payment (general or special) balances, and all balances in the Interest Reserve Account and all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

**Section 13.6. Collateral.** The Lender shall at all times have the rights and remedies of a secured party under the UCC, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Documents executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC documents, which the Borrower agrees to do, and make it available to the Lender at a reasonable convenient place to be designated by the Lender. The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC document, each of which findings shall be considered to be an accession to and a part of such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any delivery or taking of possession of the Collateral securing the obligations under the LOC documents, or any portion thereof, under this Agreement, then, with or without resort to the Borrower personally or any other person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. No prior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that the Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case, the Lender shall give the Borrower not fewer than ten (10) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made. The Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Lender may purchase such Collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower hereby waives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC documents, the cost of which shall be paid by the Borrower.

Initials: ___ ___

**Section 13.7.  Default by Lender and Borrower's Sole Remedy.**

(a)      Provided Borrower has fully satisfied and complied with all conditions to Advance if Lender fails to provide the first (1st) Advance when due, under the Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver a written notice in the form of a notarized termination letter, a copy of which is attached hereto as **Exhibit F** ("the **Termination Letter**"), to Lender by certified mail. Upon receipt of such notice, Lender shall have forty (40) international business-banking days from the date of receipt ("**Refund Period**") within which to return the ICA Payment to the Borrower.

(b)      If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice in the form of a notarized Termination Letter to the Lender by certified mail. Within forty (40) international business-banking days from the date of receipt of such notice by Lender, Borrower shall be entitled to (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) termination of Borrower's obligations to Lender hereunder except Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners, or other related entities, for any indirect, special, incidental, or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise because of, the LOC, the Advances, the Agreement or the other LOC documents.

(c)      Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances according to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, an act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, an act of civil disobedience, an act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew

Initials: _____

restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages, or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from performing under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period the occurrence is expected to continue. The lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. The lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

**Section 13.8 Binding Arbitration.** Any dispute, claim, or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation, or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one (1) arbitrator. The arbitration shall be administered by JAMS under its Comprehensive Arbitration Rules and Procedures or by ADR Services under its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand according to the notice requirements outlined in Section 14.5 herein. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach an agreement on an arbitrator, then the arbitration shall be selected under the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for the production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any discovery disputes shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising concerning the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

## ARTICLE 14
## GENERAL PROVISIONS

**Section 14.1. Disclaimer of Liability.** Lender has no liability or obligation in connection

Initials: _____

with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith. No claim may be made by the Borrower or any other Person against the Lender or the Affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

Section 14.2. **Publicity**. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. The lender shall have the right to indicate that it has provided the financing for the Project.

Section 14.3. **Confidentiality.** Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary, and Borrower hereby agrees to maintain confidential this Agreement, the LOC documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place. Borrower's disclosure of confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative.

Section 14.4. **Responsibility for Application of Funds**. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose outlined in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced under this Agreement. The lender may rely solely upon the Borrower's requests for Advances, affidavits, statements, and reports in making said Advances, and the Borrower does hereby release and indemnify the Lender and hold the Lender harmless from any losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final and non-appealable decision).

Section 14.5. **Non-Disparagement**. Borrower agrees and covenants that Borrower shall not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory, maliciously false, or disparaging remarks, comments, or statements concerning the

Initials: _VP_  _SP_

The lender or its businesses, or any of its employees, officers, or directors, and its existing and prospective clients, suppliers, investors, and other associated third parties, now or in the future. For the avoidance of doubt, a breach of this Section 10.04 shall constitute an Event of Default under Section 7.02 under which Lender has the right to terminate all obligations under the Loan Documents under Section 9.01(b).

Section 14.6 **Opportunity to Consult with Counsel**. Borrower acknowledges that it has had an opportunity to consult with and be represented by counsel of Borrower's choosing in the review of the Loan Documents, that it has been advised by Lender to do so, that the Borrower is fully aware of the contents of the Loan Documents and its legal effect, and that Borrower enters into these Loan Documents freely, without duress or coercion, and based on Borrower's judgment and wishes and not in reliance upon any representation or promise made by the Lender, other than those contained herein.

Section 14.7 **Notices**. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent by certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety-six (96) hours after deposit in first-class certified United States mail, postage prepaid, return receipt requested, or two (2) business days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given according to this paragraph:

To Borrower:    Wallingford Lodging Partners LLC
                4 Miles Drive
                Wallingford, Connecticut 06492

To Lender:      McMann Commercial Lending LLC
                205 N Michigan Avenue, Ste 810
                Chicago, Illinois 60601

Section 14.8. **Applicable Law**. This Agreement and, unless otherwise specifically provided for therein, each other LOC document, shall be governed by and construed per the laws of the State of Illinois and the United States.

Section 14.9. **Successors and Assigns**. The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

Section 14.10. **Severability**. The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition. In the event of any conflict or inconsistency between the terms and provisions of this Agreement and any of the LOC Documents, the terms and provisions of this Agreement shall control.

Initials: _____ _____

Section 14.11. **Amendments**. This Agreement may not be modified or amended except by a written agreement signed by the Borrower and Lender.

Section 14.12. **Headings; Attachments**. The several headings to articles, sections, and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part thereof.

Section 14.13. **No Third-Party Rights**. This Agreement is made entirely for the benefit of the Borrower, the Lender, and their successors in interest (including any participants). No third party shall have any rights hereunder.

Section 14.14. **Indemnification**. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement. The Borrower hereby agrees to indemnify, defend and hold harmless the Lender, the managers of the Lender, and all of their members, managers, affiliates, and advisors, from any damages, losses, liabilities, costs, and expenses (including reasonable attorneys' fees and costs) that they may incur because Borrower failed to fulfill all of the terms and conditions of this agreement or because of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs, and expenses (including attorneys' fees and costs) incurred by Lender, the managing members of Lender, or any of its members, managers, affiliates, or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished in connection with this transaction.

Section 14.15. **General Limitation of Liability**. No claim may be made by the Borrower or any other Person against the Leuder or the affiliates, directors, officers, employees, attorneys, or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the

Initials: _JP_ _SP_

transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission, or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. In addition to the tolling provided under Section 6.3, Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

**Section 14.16. <u>Entire Agreement</u>**. This Agreement, the Promissory Note, and any other LOC Document or other agreement, document, or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings concerning the subject matter hereof.

**Section 14.17. <u>Execution in Counterparts</u>**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute the same Agreement.

**Section 14.18. <u>Legal Representation of the Parties</u>**. The LOC Documents were negotiated by the Parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

**Section 14.19. <u>JURY TRIAL WAIVER</u>**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

[Remainder of page intentionally left blank; Signatures follow]

Initials: _____

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**LENDER:** MCMANN COMMERCIAL LENDING LLC

By:

Name: Walter P Trock III

**BORROWER:** Wallingford Lodging Partners LLC

By:

Name: Shailesh Patel          Vihang Patel

Title:

**SUBSCRIBED AND SWORN TO BEFORE ME** on this ___ day of

April ___, 20__

NOTARY PUBLIC

In and for the State of Connecticut

My Commission Expires:

BENNETT BUFFALO
NOTARY PUBLIC, STATE OF CONNECTICUT
My Commission Expires January 31, 2026

In and for the State of South Dakota.

My Commission Expires:
4-27-23

ADAM PRICE
Notary Public
SEAL
South Dakota

Initials: ___ SP ___

# EXHIBIT C

## Fwd: Wire confirmation (2)   Genie Investments NV

**Shailesh Patel** <shailesh.patel@sbmhospitality.com>
Wed 5/3/2023 4:38 PM

To: Ritesh Katwala   ritesh@citycapitaloffice.com  ;Brijesh patel   smgroupconsultingg@gmail.com  ;Rene Jamulitrat <rJamulitrat@mcmanncommerciallending.com>;Michael Lanza <mlanza@mcmanncommerciallending.com>;Vinay Patel <vinaypatel@sbmhospitality.com>

📎 2 attachments (17 KB)
Kari Borns.vcf; image001.jpg;

FYI.

Sent from my iPhone

Begin forwarded message:

> **From:** Kari Borns   kborns@loftadvisors.com
> **Date:** May 3, 2023 at 3:18:15 PM CDT
> **To:** Shailesh Patel   shailesh.patel@sbmhospitality.com
> **Cc:** Rocky Rehfeldt   rrehfeldt@loftadvisors.com
> **Subject: Wire confirmation (2)   Genie Investments NV**
>
>
> Hi Shailesh,
> The wire confirmation information is below for your records:
>
> NOTICE OF OUTGOING WIRE TRANSFER
> First Dakota National Bank Wire Date: 5/03/23
> IMAD: ▮▮▮▮▮▮▮▮▮▮
> OMAD : ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> Funds in the amount of $ 1,800,075.00 have been wired to
> Genie Investments NV
> from account Acct Ending 0722
> North Haven Lodging Partners LLC
>
> NOTICE OF OUTGOING WIRE TRANSFER
> First Dakota National Bank Wire Date: 5/03/23
> IMAD: ▮▮▮▮▮▮▮▮▮▮
> OMAD : ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
> Funds in the amount of $ 1,800,075.00 have been wired to
> Genie Investments NV
> from account Acct Ending 0803
> Wallingford Lodging Partners LLC

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. If you are not the original recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error, and that any use, dissemination, forwarding, printing, or copying of this email is strictly prohibited. If you received this email in error, please immediately notify postmaster@firstdakota.com.

If any personal views or opinions are contained in this email, those views or opinions are solely those of the author and do not necessarily represent those of First Dakota National Bank.

# EXHIBIT D

**EXHIBIT F**
**FORM TERMINATION LETTER**

McMann Commercial Lending LLC
205 N Michigan Avenue, Ste 810
Chicago, Illinois 60601

Re: North Haven Lodging Partners LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above-referenced transaction according to the terms of the LOC Agreement dated April 10, 2023.

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for a refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER: North Haven Lodging Partners LLC

By: _____

Name: Shailesh Patel and Vihang Patel
Title: _____

SUBSCRIBED AND SWORN TO BEFORE ME on this _16_ day of _August_, 20_23_

Notary for Vihangkumar Patel only

BLERINA BOBI
Notary Public
Connecticut
My Commission Expires Sep 30, 2027

NOTARY PUBLIC
In and for the State of _CT_

My Commission Expires:

_09-30-27_

Please confirm your Wiring Instructions:
Account Title: North Haven Lodging Partners LLC
Address on Account: 2517 W Brentridge St Sioux Falls SD 57108
Bank Name: First Dakota
Bank Address: 6100 E Silver Maplecir Sioux Falls SD 57108
Routing #: ███████
Account #: ███████ 0722

Initials: _____

**EXHIBIT F**
**FORM TERMINATION LETTER**

McMann Commercial Lending LLC
205 N Michigan Avenue, Ste 810
Chicago, Illinois 60601

Re: Wallingford Lodging Partners LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above-referenced transaction according to the terms of the LOC Agreement dated April 10, 2023.

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for a refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER: Wallingford Lodging Partners LLC

By: _____

Name: Shailesh Patel and Vihang Patel

Title: Member

SUBSCRIBED AND SWORN TO BEFORE ME on this _16_ day of

_August_ , 202_3_

Notary for Vihangkumar Patel only

NOTARY PUBLIC
In and for the State of _CT_

BLERINA BOBI
Notary Public
Connecticut
My Commission Expires Sep 30, 2027

My Commission Expires:

_09-30-27_

Please confirm your Wiring Instructions:

Account Title: Wallingford Lodging Partners LLC
Address on Account: 2517 W BrentRidge st Sioux Falls SD 1708
Bank Name: First Dakota
Bank Address: 6100 E Silver Maple Cir, Sioux Falls, SD 57108
Routing #: ███████
Account #: ███████ 0765

Initials: _SP_

# EXHIBIT E

## <u>GENIE MESSAGES ON WALLINGFORD (2815) & NORTH HAVEN (2816) LODGINGS</u>

Genie issues loan documents for Wallingford Lodging:

| | | |
|---|---|---|
| Walt, | 3/13/2023 | Genie Investments - Wiring Instructions - Term Sheet - Business Expansion LOC Agreement - G Walt Inc.docx |
| Please see attached Loan Agreements in Word form for White Labeling. Their User ID is on the bottom of each page. | | |

1. Present the client with a Term Sheet and collect the activation fee. If the client has already paid the activation fee, see step two.

2. After they have paid for activation, deliver the remaining documents.

3. Make sure to offer the Deposit Assistance Program (Due Diligence) to each client.

4. (a) Execute a copy of this document and upload it into the system. (b) Upload a copy of your white labeled documents from your client as well.

5. Do NOT change the Wiring Instructions. You may only change the Logo.

Thank you!

- Genie Investments

Genie issues loan documents for North Haven Lodging:

| | | |
|---|---|---|
| Walt, | 3/13/2023 | Genie Investments - Wiring Instructions - Term Sheet - Business Expansion LOC Agreement - G Wall Inc.docx |
| Please see attached Loan Agreements in Word form for White Labeling. Their User ID is on the bottom of each page. | | |

1. Present the client with a Term Sheet and collect the

activation fee. If the client has already paid the activation fee, see step two.

2. After they have paid for activation, deliver the remaining documents.

3. Make sure to offer the Deposit Assistance Program (Due Diligence) to each client.

4. (a) Execute a copy of this document and upload it into the system. (b) Upload a copy of your white labeled documents from your client as well.

5. Do NOT change the Wiring Instructions. You may only change the Logo.

Thank you!

- Genie Investments

## Term sheets and requested documents submitted to Genie:

| | | |
|---|---|---|
| USER ██ (Wallingford Lodging) | 3/20/2023 | Signed Wallingford Lodging (user ██) Terms & Commitment.pdf |
| Attached is the signed term sheet for this deal. | | |
| | | |
| USER ID ██ (Wallingford Lodging Partners) | 3/20/2023 | USER ID ██ IDs and bank references.zip |
| Attached are the IDs and bank letters for this deal. | | |
| USER ID ██ (North Haven) | 3/20/2023 | USER ID ██ Term sheet and documents. |
| Attached are the executed term sheet and requested documents for this deal. | | |
| Regards, | | |

**Genie's message:**

Walt,                                                                                                      3/22/2023

Regarding USER ID ▇▇, Genie received documents for a different business, please resend. Thank you.

**McMann's responses to previous message:**

| | | |
|---|---|---|
| USER ID ▇▇ (North Haven) | 3/22/2023 | USER ID ▇▇ Term sheet and documents.zip |
| File with documents for North Haven (USER ID ▇▇) attached | | |
| USER ID ▇▇ (Wallingford) | 3/22/2023 | USER ID ▇▇ IDs and bank references_1.zip |
| Documents in file attached | | |

**Messages from Genie re receipt of ICA deposits:**

Walt,                                                                                                      **5/4/2023**

**Genie received two payments of $1,800,000 from User IDs ▇▇▇▇▇▇. This does match the numbers Genie has on file. Please upload their agreements and advise at your earliest convenience. Thank you.**

Walt,                                                                                                      **5/5/2023**

**Genie received two payments of $1,800,000 from User IDs ▇▇▇▇▇▇. This does match the numbers Genie has on file. Please upload their agreements and advise at your earliest convenience. Thank you.**

**Submission of signed loan agreements and requested documentation to Genie:**

| | | |
|---|---|---|
| USER ID ▇▇ (North Haven Lodging) submission for funding | 5/7/2023 | USER ID ▇▇ Funding submission.zip |
| USER ID ▇▇ (Wallingford Lodging) submission for funding | 5/7/2023 | USER ID ▇▇ Funding submission.zip |

Loan cancellation message to Genie:

USER ID ▇▇▇ (Wallingford Lodging LLC) and USER ID ▇▇▇ (North Haven Lodging) are cancelling their loans and are requesting their ICA be returned.                8/18/2023

The termination link has been emailed to both for them to submit their requests.

Regards.

Message to Genie requesting an update on the ICA refund:

USER IDs ▇▇▇▇▇ submitted their termination letter August 19, 2023. Kindly provide an update on their refund dates.                9/14/2023

Regards

Genie's response:

**Walt,**                                                                **9/14/2023**

**Regarding ▇▇▇▇▇, the expected refund date is 10/13/2023.**

Messages sent to Genie for confirmation of the ICA refunds:

About loan #'s ▇▇▇▇▇ return of the ICA deposits have been confirmed by Genie to be wired tomrrow please confirm that this commitment is still on target for funds to be wired tomorrow.. Walt                10/12/2023

USER ID ▇▇▇▇▇ have requested updates on their refunds                10/12/2023

Genie's response:

**Walt,**                                                                                    10/13/2023

**Regarding User ID** ███████████ **, please make sure that they have access to their account, so that Genie can communicate with them directly. A message has been sent to them already. Thanks.**

## The following are direct messages between Genie and the client:

**Wallingford Lodging Partners LLC,**            10/13/2023    Borrower letter re ICA       Mark
                                                              refund - Oct. 2023          as
**Please see attached letter from Genie's attorney. Genie is working**     Walker Law -                 read
**diligently to get your refund to you as quickly as possible and will be in**   Wallingford
**touch with you by the end of next week. If you have any questions, all**    Lodging.pdf
**communications must be here in writing, so please do not hesitate to**
**ask if you do. In the meantime, Genie would like to set up a conference**
**call with you to make sure you fully understand this letter provided to**
**you. Please provide 3 times for Tuesday and Wednesday of next week**
**to discuss this matter. Genie appreciates your understanding.**

Hey David,                                                                                  10/16/2023

We are available for a call:
Tuesday 10/17:
9am CST
10am CST
11am CST
1pm (preferred) CST
or 2pm CST
for both North Haven and Wallingford projects to be discussed. Please confirm what time
works for you at your earliest convenience.

North Haven Lodging Partners LLC,

Please see attached letter from Genie's attorney. Genie is working diligently to get your refund to you as quickly as possible and will be in touch with you by the end of next week. If you have any questions, all communications must be here in writing, so please do not hesitate to ask if you do. In the meantime, Genie would like to set up a conference call with you to make sure you fully understand this letter provided to you. Please provide 3 times for Tuesday and Wednesday of next week to discuss this matter. Genie appreciates your understanding in this matter.

10/13/2023

Borrower letter re ICA refund - Oct. 2023 Walker Law - North Haven Lodging.pdf

Hey David,

10/16/2023

We are available for a call:
Tuesday 10/17:
9am CST
10am CST
11am CST
1pm (preferred) CST
or 2pm CST
for both North Haven and Wallingford projects to be discussed. Please confirm what time works for you at your earliest convenience.

# EXHIBIT F

# WALKER LAW OFFICE, LLC

**4050 Pennsylvania Ave., Suite 115-10**
**Kansas City, Missouri 64111**
**(816) 226-6476**

October 13, 2023

      **Re:    Genie Investments – Update on Funding Delays**

Dear Wallingford Lodging Partners LLC,

      This letter concerns the 8/19/2023 termination of your Letter of Credit Agreement (LOCA) with Genie Investments and your request for a refund of the $1,800,000 ICA payment.

      As you know from previous communications, Genie Investments has been working to address the ongoing failure of its capital provider to comply with its contractual obligations to provide funds to Genie. It is important to recognize that, under section 13.7 of the LOCA, the present situation constitutes a so-called "force majeure" event – i.e., a situation in which events beyond Genie's control prevent it from providing advances to borrowers. The LOCA's force majeure provision, section 13.7, specifically includes a failure by Genie's capital provider – referred to in the LOCA as its "wholesale lender" – to perform its obligations to Genie. As such, the delays you have experienced do not constitute a breach of contract by Genie and the "Refund Period" set forth in the LOCA (forty international business-banking days) does not apply while the force majeure event is ongoing.

      Instead, the LOCA requires Genie to use "reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized," and Genie is currently doing so. This law firm, which Genie recently engaged to help resolve the situation, is working on multiple fronts to compel the capital provider to deliver the funds it owes, so that Genie can, in turn, provide refunds to its borrowers. We are preparing a legal action against the capital provider and its associates, which we will file at our earliest opportunity unless we reach a satisfactory settlement first. In hopes of refunding money to you as soon as possible, we will simultaneously pursue legal action and engage in settlement negotiations.

      Genie will make every reasonable effort to keep you informed of the progress of its efforts during this process. In addition, you can expect further correspondence from this law firm with updates regarding settlement negotiations or the status of any legal action filed against the capital provider. While Genie's efforts are underway, you must direct any inquiries to Genie through the Zoomeral messaging system.

      Genie understands that you want this situation resolved as quickly as possible, which is why it is taking the steps laid out above. Please understand, however, that legal actions of this

magnitude require significant time and resources, and we ask your continued patience throughout the process.

Further, we ask you to be mindful of other provisions of the LOCA. For example, Section 14.3 requires you to keep the terms of the LOCA confidential and section 14.5 prohibits disparagement of Genie or of persons or entities affiliated with it. Both provisions are deeply important to Genie. Please understand that violating either section would constitute a breach of the agreement and could impair or prevent your participation in the remedies Genie is pursuing. Moreover, failing to comply with these provisions could adversely affect Genie's efforts to obtain the recovery that would then flow to borrowers to whom refunds are due.

In short, we are working diligently to enable Genie to fulfill its obligations to its borrowers. Although we never expected to have to confront this situation, we intend to emerge better for it. In the meantime, we appreciate your patience as we continue our efforts.


Sincerely,


Adam Walker
Walker Law Office, LLC

# EXHIBIT G

# WALKER LAW OFFICE, LLC

**4050 Pennsylvania Ave., Suite 115-10**
**Kansas City, Missouri 64111**
**(816) 226-6476**

October 13, 2023

**Re:    Genie Investments – Update on Funding Delays**

Dear North Haven Lodging Partners LLC,

This letter concerns the 8/19/2023 termination of your Letter of Credit Agreement (LOCA) with Genie Investments and your request for a refund of the $1,800,000 ICA payment.

As you know from previous communications, Genie Investments has been working to address the ongoing failure of its capital provider to comply with its contractual obligations to provide funds to Genie. It is important to recognize that, under section 13.7 of the LOCA, the present situation constitutes a so-called "force majeure" event – i.e., a situation in which events beyond Genie's control prevent it from providing advances to borrowers. The LOCA's force majeure provision, section 13.7, specifically includes a failure by Genie's capital provider – referred to in the LOCA as its "wholesale lender" – to perform its obligations to Genie. As such, the delays you have experienced do not constitute a breach of contract by Genie and the "Refund Period" set forth in the LOCA (forty international business-banking days) does not apply while the force majeure event is ongoing.

Instead, the LOCA requires Genie to use "reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized," and Genie is currently doing so. This law firm, which Genie recently engaged to help resolve the situation, is working on multiple fronts to compel the capital provider to deliver the funds it owes, so that Genie can, in turn, provide refunds to its borrowers. We are preparing a legal action against the capital provider and its associates, which we will file at our earliest opportunity unless we reach a satisfactory settlement first. In hopes of refunding money to you as soon as possible, we will simultaneously pursue legal action and engage in settlement negotiations.

Genie will make every reasonable effort to keep you informed of the progress of its efforts during this process. In addition, you can expect further correspondence from this law firm with updates regarding settlement negotiations or the status of any legal action filed against the capital provider. While Genie's efforts are underway, you must direct any inquiries to Genie through the Zoomeral messaging system.

Genie understands that you want this situation resolved as quickly as possible, which is why it is taking the steps laid out above. Please understand, however, that legal actions of this

magnitude require significant time and resources, and we ask your continued patience throughout the process.

Further, we ask you to be mindful of other provisions of the LOCA. For example, Section 14.3 requires you to keep the terms of the LOCA confidential and section 14.5 prohibits disparagement of Genie or of persons or entities affiliated with it. Both provisions are deeply important to Genie. Please understand that violating either section would constitute a breach of the agreement and could impair or prevent your participation in the remedies Genie is pursuing. Moreover, failing to comply with these provisions could adversely affect Genie's efforts to obtain the recovery that would then flow to borrowers to whom refunds are due.

In short, we are working diligently to enable Genie to fulfill its obligations to its borrowers. Although we never expected to have to confront this situation, we intend to emerge better for it. In the meantime, we appreciate your patience as we continue our efforts.


Sincerely,


Adam Walker
Walker Law Office, LLC

# EXHIBIT 5

Case: 1:23-cv-16264 Document #: 1-7 Filed: 11/27/23 Page 2 of 5 PageID #:252

# WALKER LAW OFFICE, LLC

**4050 PENNSYLVANIA AVE., SUITE 115-10**
**KANSAS CITY, MISSOURI 64111**
**(816) 226-6476**

October 13, 2023

**Re:    Genie Investments – Update on Funding Delays**

Dear North Haven Lodging Partners LLC,

This letter concerns the 8/19/2023 termination of your Letter of Credit Agreement (LOCA) with Genie Investments and your request for a refund of the $1,800,000 ICA payment.

As you know from previous communications, Genie Investments has been working to address the ongoing failure of its capital provider to comply with its contractual obligations to provide funds to Genie. It is important to recognize that, under section 13.7 of the LOCA, the present situation constitutes a so-called "force majeure" event – i.e., a situation in which events beyond Genie's control prevent it from providing advances to borrowers. The LOCA's force majeure provision, section 13.7, specifically includes a failure by Genie's capital provider – referred to in the LOCA as its "wholesale lender" – to perform its obligations to Genie. As such, the delays you have experienced do not constitute a breach of contract by Genie and the "Refund Period" set forth in the LOCA (forty international business-banking days) does not apply while the force majeure event is ongoing.

Instead, the LOCA requires Genie to use "reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized," and Genie is currently doing so. This law firm, which Genie recently engaged to help resolve the situation, is working on multiple fronts to compel the capital provider to deliver the funds it owes, so that Genie can, in turn, provide refunds to its borrowers. We are preparing a legal action against the capital provider and its associates, which we will file at our earliest opportunity unless we reach a satisfactory settlement first. In hopes of refunding money to you as soon as possible, we will simultaneously pursue legal action and engage in settlement negotiations.

Genie will make every reasonable effort to keep you informed of the progress of its efforts during this process. In addition, you can expect further correspondence from this law firm with updates regarding settlement negotiations or the status of any legal action filed against the capital provider. While Genie's efforts are underway, you must direct any inquiries to Genie through the Zoomeral messaging system.

Genie understands that you want this situation resolved as quickly as possible, which is why it is taking the steps laid out above. Please understand, however, that legal actions of this

magnitude require significant time and resources, and we ask your continued patience throughout the process.

Further, we ask you to be mindful of other provisions of the LOCA. For example, Section 14.3 requires you to keep the terms of the LOCA confidential and section 14.5 prohibits disparagement of Genie or of persons or entities affiliated with it. Both provisions are deeply important to Genie. Please understand that violating either section would constitute a breach of the agreement and could impair or prevent your participation in the remedies Genie is pursuing. Moreover, failing to comply with these provisions could adversely affect Genie's efforts to obtain the recovery that would then flow to borrowers to whom refunds are due.

In short, we are working diligently to enable Genie to fulfill its obligations to its borrowers. Although we never expected to have to confront this situation, we intend to emerge better for it. In the meantime, we appreciate your patience as we continue our efforts.


Sincerely,


Adam Walker
Walker Law Office, LLC

# WALKER LAW OFFICE, LLC

**4050 Pennsylvania Ave., Suite 115-10**
**Kansas City, Missouri 64111**
**(816) 226-6476**

October 13, 2023

> **Re:    Genie Investments – Update on Funding Delays**

Dear Wallingford Lodging Partners LLC,

This letter concerns the 8/19/2023 termination of your Letter of Credit Agreement (LOCA) with Genie Investments and your request for a refund of the $1,800,000 ICA payment.

As you know from previous communications, Genie Investments has been working to address the ongoing failure of its capital provider to comply with its contractual obligations to provide funds to Genie. It is important to recognize that, under section 13.7 of the LOCA, the present situation constitutes a so-called "force majeure" event – i.e., a situation in which events beyond Genie's control prevent it from providing advances to borrowers. The LOCA's force majeure provision, section 13.7, specifically includes a failure by Genie's capital provider – referred to in the LOCA as its "wholesale lender" – to perform its obligations to Genie. As such, the delays you have experienced do not constitute a breach of contract by Genie and the "Refund Period" set forth in the LOCA (forty international business-banking days) does not apply while the force majeure event is ongoing.

Instead, the LOCA requires Genie to use "reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized," and Genie is currently doing so. This law firm, which Genie recently engaged to help resolve the situation, is working on multiple fronts to compel the capital provider to deliver the funds it owes, so that Genie can, in turn, provide refunds to its borrowers. We are preparing a legal action against the capital provider and its associates, which we will file at our earliest opportunity unless we reach a satisfactory settlement first. In hopes of refunding money to you as soon as possible, we will simultaneously pursue legal action and engage in settlement negotiations.

Genie will make every reasonable effort to keep you informed of the progress of its efforts during this process. In addition, you can expect further correspondence from this law firm with updates regarding settlement negotiations or the status of any legal action filed against the capital provider. While Genie's efforts are underway, you must direct any inquiries to Genie through the Zoomeral messaging system.

Genie understands that you want this situation resolved as quickly as possible, which is why it is taking the steps laid out above. Please understand, however, that legal actions of this

magnitude require significant time and resources, and we ask your continued patience throughout the process.

Further, we ask you to be mindful of other provisions of the LOCA. For example, Section 14.3 requires you to keep the terms of the LOCA confidential and section 14.5 prohibits disparagement of Genie or of persons or entities affiliated with it. Both provisions are deeply important to Genie. Please understand that violating either section would constitute a breach of the agreement and could impair or prevent your participation in the remedies Genie is pursuing. Moreover, failing to comply with these provisions could adversely affect Genie's efforts to obtain the recovery that would then flow to borrowers to whom refunds are due.

In short, we are working diligently to enable Genie to fulfill its obligations to its borrowers. Although we never expected to have to confront this situation, we intend to emerge better for it. In the meantime, we appreciate your patience as we continue our efforts.


Sincerely,


Adam Walker
Walker Law Office, LLC