UNITED STATES BANKRUPTCY COURT

MIDDLE DISTRICT OF FLORIDA

--oOo--

|  |  |
|---|---|
| IN RE: | ) Case No. 24-00496-BAJ |
|  | ) Chapter 11 |
| GENIE INVESTMENTS NV INC., | ) |
|  | ) |
|  | ) Jacksonville, Florida |
| Debtor. | ) Tuesday, April 9, 2024 |
|  | ) 9:08 a.m. |
| _____ | ) |

TRIAL OF EXPEDITED MOTION TO
APPOINT CHAPTER 11 TRUSTEE OR, IN
THE ALTERNATIVE, APPOINT AN
EXAMINER, DISMISS THIS CASE, OR
CONVERT THIS CASE TO CHAPTER 7

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JASON A. BURGESS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Mickler & Mickler
                          By:  BRYAN K. MICKLER, ESQ.
                          5452 Arlington Expressway
                          Jacksonville, FL 32211
                          (904) 725-0822

For the United States     Department of Justice
Trustee:                  By:  SCOTT E. BOMKAMP, ESQ.
                          400 W. Washington Street, Suite 1100
                          Orlando, FL 32801
                          (407) 648-6069

Audio Operator:           Kate Menard, ECR

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46048
                          (855) 873-2223
                          www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

I N D E X
4/9/24

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE U.S. TRUSTEE: | | | | |
| Kristin Stegent | 8 | 23 | -- | -- |
| Charles Blake Stringer | 37 | 52 | 65 | -- |
| Lisa Butkiewicz | 78 | 91 | 101 | -- |
| Adam Foster | 104 | 114 | -- | -- |
| Daniel Munoz | 122 | 128 | -- | -- |
| Rejoe Joy | 131 | 138 | 144 | -- |
| Lea Muse | 148 | 169 | -- | -- |
| Shailesh Patel | 185 | 196 | 200 | -- |
| Prett Patel | 201 | -- | -- | -- |
| Kim Nash | 210 | 222 | -- | -- |

| 1 | JACKSONVILLE, FLORIDA, TUESDAY, APRIL 9, 2024 9:08 A.M. |
|---|---|
| 2 | --oOo-- |
| 3 | (Call to order of the Court.) |
| 4 | THE CLERK:  All rise.  The United States Bankruptcy |
| 5 | Court for the Middle District of Florida is now in session, the |
| 6 | Honorable Jason A. Burgess presiding.  God save the United |
| 7 | States and this Honorable Court. |
| 8 | THE COURT:  Thank you.  Please be seated. |
| 9 | All right.  First we'll start with the case of |
| 10 | Genie Investments NV, Inc.  First we'll take appearances in the |
| 11 | courtroom on behalf of the debtor. |
| 12 | MR. MICKLER:  Good morning, Your Honor.  Bryan |
| 13 | Mickler on behalf of Genie Investments.  Mr. David Hughes is to |
| 14 | my right, and to the far end of the table is Mr. John Cohan. |
| 15 | THE COURT:  David Hughes.  And what's the other? |
| 16 | John? |
| 17 | MR. MICKLER:  Cohan. |
| 18 | THE COURT:  Cohan.  Got it. |
| 19 | Other appearances in the courtroom? |
| 20 | MR. BOMKAMP:  Good morning, Your Honor.  Scott |
| 21 | Bomkamp for U.S. -- the United States Trustee. |
| 22 | THE COURT:  Thank you.  Mr. Bomkamp, are we taking |
| 23 | any appearances via Zoom, or are they all witnesses? |
| 24 | MR. BOMKAMP:  I believe it's all witnesses.  And |
| 25 | we've reached some stipulations that I think will be helpful to |

1    the Court just to -- primarily trial-procedure-based

2    stipulations to move things along quickly.

3          THE COURT:  All right.  If you'll take the podium and

4    walk me through some of those maybe.

5          MR. BOMKAMP:  Yes, Your Honor.  Your Honor, I think,

6    most significantly, the parties have agreed to the admission of

7    each other's exhibits.

8          THE COURT:  That will certainly help.

9          MR. BOMKAMP:  The other -- we've agreed to forgo an

10   opening statement in light of the briefing that's been made.

11         And we've agreed to call each witness sequentially,

12   given everybody appearing by Zoom and the difficult logistics

13   of it, and to simply ask all of our questions of each witness

14   as they're up, be it direct or cross.  With regard to Genie's

15   customers, I was going to ask the questions first.  And with

16   regard to the principals of Genie, Mr. Mickler is going to ask

17   the questions first.

18         THE COURT:  That'd be fine.  And I'll allow more

19   cross and re-cross than I normally would.  Because if you're

20   going to go ahead and do your direct and cross together, I'll

21   make sure to give plenty of brevity to that.

22         Anything else, Mr. Bomkamp?

23         MR. BOMKAMP:  I believe that's it.

24         THE COURT:  Mr. Mickler?

25         MR. MICKLER:  No, Your Honor.  I appreciate

1    Mr. Bomkamp working with us, trying to make this as smooth as

2    possible.

3           THE COURT:  As efficient as possible.  I like to hear

4    it.

5           MR. BOMKAMP:  So as a housekeeping matter then, I

6    would move to admit all of the parties' exhibits, Your Honor.

7           THE COURT:  They are -- any objection?

8           MR. MICKLER:  No, Your Honor.

9           THE COURT:  They are all so admitted.

10      (All exhibits admitted into evidence)

11           Do you have that, Kate?

12           THE CLERK:  Yes.  Thank you.

13           THE COURT:  All right.  You may proceed, Mr. Bomkamp.

14           MR. MICKLER:  Your Honor, I would ask that -- as we

15    go through this that the witnesses who are set to testify be

16    excluded from hearing the testimony of the prior witnesses

17    while they're --

18           THE COURT:  All right.  Let me see how I can do that.

19           MR. BOMKAMP:  Your Honor, we anticipated this

20    somewhat, and I do have cell phone numbers.  And I have -- if

21    Your Honor has waiting rooms within Zoom, obviously that's

22    ideal.

23           THE COURT:  I do.

24           MR. BOMKAMP:  But --

25           THE COURT:  Just give me a second to set it up.

1            MR. BOMKAMP:  If that doesn't work, I have cell phone

2  numbers, Your Honor.

3            THE COURT:  I do.  I can do it.

4            MR. BOMKAMP:  All right.  Give me one second,

5  everybody.  All right.  When we're ready, I can go ahead and

6  assign them to other rooms.

7       (Counsel confer)

8            MR. BOMKAMP:  Oh, yes.  We do have one witness

9  physically in person here, so.  Yes.  During

10  the -- Mr. Stringer is going second, so he'll need to wait

11  outside during the --

12            THE COURT:  That's right.

13            MR. BOMKAMP:  -- during the --

14            THE COURT:  If you'll just stay outside?  We have

15  some benches to the right.  And then when it's your time,

16  they'll come get you.

17            MR. STRINGER:  Okay.  Thank you.

18            THE COURT:  Who are you calling first?

19            MR. BOMKAMP:  All right.  The first witness we are

20  calling is Kristin Stegent of Rolling by the Dozen RV Park,

21  LLC.

22            THE COURT:  Ms. Stegent, can you hear us?  Kristin?

23            MS. STEGENT:  Yes.  Sure can.

24            THE COURT:  All right.  If you'll just turn your

25  camera on, I'll get everybody else -- so everyone else, if

 1  you're listening, I'm going to push you to a breakout room.

 2  Your screen will have a little box come up that says join

 3  breakout room.  If you hit yes, it'll take you to the breakout

 4  room.  For a second, your screen will go black, and it will

 5  look like you have been cut off.  But don't be afraid.  It will

 6  pop you into that assigned breakout room momentarily.

 7          You may be in there for a while, because they've

 8  invoked the rule of sequestering, meaning witnesses can't hear

 9  other witnesses' testimony, because we don't want certain

10  testimony to influence other testimony.  So don't go anywhere.

11  You're going to be in Zoom purgatory for a little bit, but we

12  promise we'll come get you out as soon as it's your time.

13  Okay?  Everybody got that?

14          All right.  I'm going to assign everybody now.

15      (Court and Clerk confer)

16          THE COURT:  Give them one second to join their

17  breakout rooms, Mr. Bomkamp, and then we'll be ready.

18          MR. BOMKAMP:  No problem.  Your Honor, I apologize if

19  I underestimated the sheer mass of the exhibits.

20          THE COURT:  That's all right.  Look at the stack

21  beside you.  That was from last week.

22          All right.  The only one we have left is Ms. Stegent.

23          Can you hear us just fine, Ms. Stegent?

24          MS. STEGENT:  Yes, I can.  Thank you.

25          THE COURT:  All right.  Kate, you want to go ahead

1  and swear her in.

2          THE CLERK:  Yes, Your Honor.

3          Please raise your right hand.

4        KRISTIN STEGENT, U.S. TRUSTEE'S WITNESS, SWORN

5          THE COURT:  You go right ahead.  As people join, I'm

6  going to push them over to a breakout room.

7          THE CLERK:  Okay.

8          MR. BOMKAMP:  All right.  I see that's --

9          THE CLERK:  Please state your name and address for

10 the record, including city and state.

11         THE WITNESS:  It's Kristin Stegent, P.O. Box 184,

12 Snook, Texas, 77878.

13         THE CLERK:  Okay.  Thank you.  You can lower your

14 hand.

15         THE COURT:  Mr. Mickler, if you'll help me keep an

16 eye.  And, Kate, if you'll help me keep an eye to see if

17 anybody else joins.  As they join, I'll push them over to the

18 waiting room.

19         You may proceed, Mr. Bomkamp.

20         MR. BOMKAMP:  All right.

21                    DIRECT EXAMINATION

22 BY MR. BOMKAMP:

23 Q    Good morning, Ms. Stegent.  What business are you in?

24 A    We own an RV park called Rolling by the Dozen RV Park.

25 Q    All right.  And you own the RV park?

1  A    Yes.

2  Q    All right.  And is the name of the place, Rolling by the

3  Dozen, a reference to anything in particular?

4  A    Yes.  We are a family of 12.  My husband and I have 10

5  kids.  We sold our house a few years ago and -- well, I think

6  about five years ago (audio interference) in our RV for a

7  couple of years.  And so then we bought an RV park and called

8  it Rolling by the Dozen after our adventures.

9  Q    All right.  And you have an RV park.  Do you have -- do

10  people travel there on vacation?  Do you have permanent

11  residents?  A little bit of both?

12  A    We have both.  The majority of people are looking for

13  lower-cost living, and so the majority of people at our park

14  are people that live there.

15  Q    Okay.  And is the continued existence of your business

16  important?

17  A    Very.  Yes.

18  Q    From the perspective of the people who live there, is it

19  important?

20  A    Absolutely.

21  Q    All right.  And from the perspective of your family of 12,

22  is it important?

23  A    Very.

24  Q    All right.  Did you -- were you looking for a loan within

25  the last several years?

1    A     Yes.  We were looking to refinance our RV park and pull

2    out some cash.  We had personally put 250,000 into renovations

3    of the park when we purchased it, and we were looking to pay

4    ourselves back out of that and then also do a few more

5    upgrades.  We were going to add covered sites, because it gets

6    really hot in Texas.  And that was going to help our park stand

7    out among -- we're surrounded by a lot of other parks in our

8    area.  And we were going to add covers to some of our sites, if

9    not all of them.

10   Q    All right.  And how did you go about looking for a loan?

11   A    My dad was a great businessman.  He owned motels and such.

12   And he hooked us up with his favorite hotel broker who hooked

13   us up with his best loan guy.

14        And we originally were looking to get the SBA 504.  That's

15   what we specifically asked about with the lender.  And he said,

16   you could do that or this other loan, and introduced us to the

17   McMann/Genie loan.

18        And we liked that because of the (audio interference) time

19   frame.  We were wanting to get covers up before summer hit

20   again.  And we would receive that first tranche within 75 days,

21   and we could go ahead and start putting covers up.  So that's

22   why we went with that option over the SBA 504.

23   Q    So as opposed to the 504 loan, you were able to get the

24   money faster --

25   A    Yep.

1   Q     -- if it had worked out?

2   A     Yeah, it was a (audio interference).

3   Q     And did the product -- the McCann/Genie loan, as you refer

4   to it, did it include a personal guarantee?

5   A     They were going to take a -- they called it take a lien on

6   our LLC.

7   Q     Okay.  All right.  And what was your first step in getting

8   the McCann/Genie loan?

9   A     First, we applied, and we were approved pretty quickly.

10  And then we were sent over from McMann all the paperwork for

11  both McMann and Genie.  And they (audio interference) --

12  Q     Who did you go to?  I'm sorry.

13  A     Michael Lanza is who we were working with.  He's a loan

14  officer with McMann.  Or was.

15  Q     Okay.  So initially you were talking to McMann Capital --

16  A     Yeah.

17  Q     -- McMann Capital?  Okay.

18  A     It was named Commercial Lending at the time.  I believe

19  they changed names.

20  Q     And did McMann Capital require you to pay a fee?

21  A     Yeah.  They required a $7,900 application fee.

22  Q     Okay.  And if you would refer to Exhibit Number 7, which

23  you've been provided.

24  A     Yes.

25  Q     And is that the wire to McMann?

1    A    Yes.

2    Q    Okay.  Now, if you look at United States Trustee Exhibit

3    8 -- do you have it there?  Do you have it in front of you

4    there?

5    A    I (audio interference).

6    Q    Okay.  This is a -- it's called a due diligence fee

7    agreement with Genie Investments, correct?

8    A    Yes, it is.

9    Q    All right.  And what did you understand this document to

10   be?

11   A    Well, originally I was told by the lender out of Louisiana

12   that brought me into this that this was a McMann fee.  So I was

13   a bit confused when I found that it was Genie Investments.  But

14   I thought maybe he just didn't really know the process for

15   McMann.  I understood this to be sort of a processing fee of

16   the loan.  I thought it was kind of odd, because it was for the

17   small loan.  It was for 10 (audio interference) big loan --

18   Q    All right.  And --

19   A    -- that amount, but --

20   Q    And how much was this processing fee?

21   A    $35,000.

22   Q    $35,000.  And who did you pay that to?

23   A    Genie Investments.

24   Q    Okay.  And if we look at United States Trustee Exhibit

25   Number 9, is that the wire of the $35,000 to Genie Investments?

1   A     Yes.

2   Q     Okay.  And where did you get the money to pay that?

3   A     We borrowed $60,000 from my mother and father-in-law who

4   we had a great financial trusting relationship with at the

5   time.  And they were getting ready to renovate their house, but

6   they did the loan knowing that they would receive the money

7   back within 75 days.

8   Q     Okay.  And why did you think you'd be able to pay the

9   money back quickly?

10  A     In the (audio interference) contract, the first tranche

11  was going to be provided no more than 75 calendar days from the

12  time I paid in (audio interference) what you'll get to, the

13  $26,000.

14  Q     Okay.  And were you -- did -- we'll get there, but did the

15  tranche come through?  Was your loan funded?

16  A     No, it did not.

17  Q     What's that?

18  A     No.

19  Q     Okay.  And do you think you'll be able to pay your

20  father-in-law back?

21  A     We -- it's been over a year now, and we have not paid them

22  back.

23  Q     Is he still living?

24  A     I will definitely -- he is.

25  Q     Okay.

1  A    And we will definitely pay them back, but that hasn't

2  happened yet.

3  Q    Okay.  All right.  And if you turn to United States

4  Trustee Exhibit 10.  Do you see that?  It's a bridge loan

5  agreement?

6  A    Yes.

7  Q    Could you briefly explain how the -- what the bridge loan

8  is in relationship to the main loan or the BELOC, how that

9  works?

10 A    Sure.  So, you know, oftentimes you have to put about a

11 20 percent down payment on things -- or loans.  And so this was

12 no different.  It was a 10 percent down payment.  But Genie was

13 providing that 10 percent down payment for the big loan with

14 this bridge loan.

15 Q    Okay.  And how much were you trying to borrow total?

16 A    1.78 million.

17 Q    Okay.  And that was on the BELOC loan, correct?

18 A    So this was for 178 --

19 Q    Ma'am, if you could just verbally answer the questions.

20 You're shaking your head and stuff a lot.  If you could just

21 answer verbally, that'd be --

22        THE COURT:  What was the question again?  If you'll

23 re-ask it Mr. Bomkamp.

24        THE WITNESS:  Sure.  Sorry.

25 BY MR. BOMKAMP:

1    Q    Well, first I asked how much you were trying to borrow

2    through the BELOC loan.

3    A    Yes.  1.78 million.

4    Q    Okay.  And how much did the BELOC loan require you to

5    prepay?

6    A    178,000.

7    Q    Okay.

8    A    Which was 10 percent, this bridge loan.

9    Q    But did you have $178,000?

10   A    No.

11   Q    So what did you do to pay that $178,000 under the BELOC

12   loan?  How did you get that money?

13   A    Genie Investments.  Or they were supposed to (audio

14   interference) the loan with them.

15   Q    Okay.  And as a condition of getting that $178,000 to pay

16   the BELOC, did you have to make any prepaid interest to Genie

17   Investments?

18   A    Yes.

19   Q    How much was that?

20   A    It was 20 -- well, they broke it down.  It was -- I paid

21   $26,805, and that was broken down to $21,444 for the prepaid

22   bridge loan interest and a ZOOMERAL origination fee of $5,361.

23   Q    Okay.  So we already discussed that you paid Genie

24   Investments -- was it 30,000 that we just -- what's that?

25   A    35,000.

1   Q    35-.

2   A    35-.

3   Q    And that -- was that the due diligence fee?

4   A    Yes, sir.

5   Q    Okay.  Was there a separate payment that you made to Genie

6   Investments on account of prepaid interest?

7   A    Yes.  26,000 --

8   Q    How much was that?

9   A    26,805.

10  Q    Okay.  And that was the prepaid interest under the bridge

11  loan agreement, was the idea?

12  A    Yes.

13  Q    Okay.  And if we look at United States Trustee Exhibit 11,

14  was that the $26,000 in addition to the $35,000 that you paid

15  to Genie Investments?

16  A    Yes.

17  Q    Okay.  All right.  And if we look at United States Trustee

18  Exhibit 12, is that the BELOC agreement?

19  A    Yes.

20  Q    So that's for the big amount of money, the 1.78 million?

21  A    Yes.

22  Q    Okay.  All right.  So when was your loan supposed to fund?

23  A    Our loan was supposed to fund in March of 2023.

24  Q    Okay.  And when did you first make payments to --

25  A    (Audio interference) 75 calendar days from January 10th, I

1    believe.

2    Q    Okay.  And is January 10th when you initiated the process?

3    A    That's when I paid my ICA payment which was supposed to

4    start those 75 calendar days.

5    Q    Okay.  So that's when you paid the 25,000 to Genie

6    Investments that was supposed to start the 75 calendar days for

7    you to get the first tranche of your loan?

8    A    Correct.

9    Q    All right.  And did you get the money?

10   A    No.

11   Q    When did you first realize things were going wrong?

12   A    It was probably around 70 days.  Michael Lanza, the loan

13   officer with McMann, started saying pretty odd or outlandish

14   sounding excuses to me about funds.  I immediately started

15   feeling like I was a part of a scam but was hoping that I was

16   wrong about that.  And as -- after the 75 days, the excuses got

17   more and more extreme or outlandish, and I knew pretty quickly

18   that I was either part of a scam or that they got in over their

19   heads and could not fund these loans.

20   Q    Okay.  And did you do anything to express your

21   dissatisfaction with the Genie loan product?

22   A    Yes.  Initially, I dealt only with McMann.  I didn't

23   really know who Mr. Hughes was or all of that.  But I let

24   McMann know that I was, you know, going to leave a review as an

25   unsatisfied customer or client if I wasn't funded.  Since I

1   hadn't been by the 75 days, I did go ahead and do that.

2          And I found out about David Hughes.  I called him.  We had

3   several phone conversations and emails back and forth.  And I

4   also let him know that I would be leaving a review on ZOOMERAL

5   as well if my contract wasn't fulfilled.

6   Q    Okay.

7   A    And then I did that.

8   Q    So you left an online review as people do.  Were there any

9   consequences from that?

10  A    Yes.  Just me saying that I was going to, he told me there

11  would be legal -- David Hughes told me there would be

12  repercussions.  He advised me against being a part of any group

13  or grouping together with what I would call other victims but

14  he would call sort of a mob mentality, is what he said.

15         And then I told him I was comfortable leaving my review.

16  I did so, to which he called and angrily wanted me to take it

17  down and threatened litigation and then called and also pleaded

18  with me to take my review down.  And I respectfully told him

19  that I was comfortable leaving my review up, and I thought that

20  my review was very important so that other people did not get

21  into a situation of putting in money and not having the loan

22  funded.

23  Q    Was there any legal action taken against you?

24  A    Yes.

25  Q    What?

1  A    There is currently a (audio interference) case against me

2  from Genie Investments.  It was put on hold because of this

3  bankruptcy.

4  Q    Okay.  Was that a case in arbitration?

5  A    Yes.

6  Q    Okay.  All right.  If you'd turn to United States Trustee

7  Exhibit 17.

8            THE COURT:  What was that?  17?

9            MR. BOMKAMP:  Yeah.  Yes, Your Honor.

10           THE WITNESS:  (Audio interference).

11 BY MR. BOMKAMP:

12 Q    What is this letter?  What does this pertain to?

13 A    This is pertaining to my reviews that I left, and it's a

14 cease and desist letter requesting that I take down my reviews

15 or -- and also that I pay them, I believe.  I don't know if

16 that was this one or a different one, but they requested that I

17 pay them another $26,805 for the damages I had caused them.

18 Q    Okay.  Who is that letter from?

19 A    It is from Genie Investments' lawyer at the time

20 (indiscernible).

21 Q    All right.  And if you would, turn to United States

22 Trustee Exhibit 18.

23 A    Okay.

24 Q    What is this document?

25 A    This is a document that Genie Investments sent through

1   email not just to me, to other borrowers.  It was sort of

2   a -- well, it's called a refund opt-in agreement.  And,

3   basically, we may or may not get our money back if we agreed to

4   remove all negative comments and all these other stipulations.

5   And if I were to sign this then maybe I would have a chance at

6   getting my money back, to which I said absolutely not.   I'm

7   not signing any (audio interference) with you.

8   Q    Okay.  All right.

9   A    Which they said -- I got a (audio interference) response

10  that I would not be (audio interference) opt-in and would not

11  be getting a refund.

12  Q    Okay.  If you would turn to United States Trustee Exhibit

13  22.

14  A    Okay.

15  Q    If you'd look at the page that has your Google review on

16  it.  Or I think it's a Yelp review.  A Yelp review.  Do you see

17  the Yelp review?

18  A    Yes.

19  Q    Do you regard this review that you wrote as particularly

20  aggressive or defamatory?

21  A    No.  I was extremely careful in how I worded it.  I really

22  don't have any desire to harm or hurt anyone, just to tell the

23  truth.

24  Q    All right.  And how has this situation, this loss of

25  funds, how has it affected your life?

Stigent - Direct                                    21

1   A    It has very negatively impacted mine and my family's lives

2   in really many ways.  But one thing that is very important for

3   me to say today is my dad, he was a great businessman

4   (indiscernible) was.  And he helped us get this RV park.  It

5   was his highest goal.  His parents had been poor, and he grew

6   up with them struggling.  He wanted to provide well for us, and

7   he would help all of his children, his three children become

8   successful business people and be successful financially.

9        And when this loan did not come through -- you know, my

10  dad was the one who helped us go through his hotel broker and

11  stuff -- it was very devastating to my dad.  He stepped in to

12  the point of helping us with groceries over the past year and

13  loaning us money.  He loaned us money to put up some covers at

14  the RV park and things like that to try to help us through this

15  time.

16       And then my dad had a leg artery surgery, and they

17  accidentally nicked his aorta, and he did not make it.  And the

18  last thing -- one of the last things I said to my dad, which I

19  think is really sad that I was in this situation to say this,

20  was, Dad, I told God I don't want an inheritance; I told him I

21  just wanted my dad, and I wanted my dad to see him pay me

22  back -- pay him back the money that he loaned me this year.

23  And so my dad died not feeling like he had accomplished his

24  goal --

25  Q    All right.

1  A    -- for his children.

2  Q    And have you --

3  A    So that was one way.

4  Q    Have you struggled at all to provide for your family?

5  A    Yes.  We had to start homeschooling, because we could not

6  afford the curriculum.  I had to save up for that.  We

7  struggled to buy groceries.  And my husband has had to work

8  really long plumbing hours and be away from us far more than

9  ever.  My kids hate the word "tranche."  They hate the word

10  "loan."  They make up songs like we don't talk about David, no,

11  no; he said Friday was our payday, but was it, no, no.

12       And it's just been a very, very difficult situation.  We

13  got into credit card debt.  We've never even owned a credit

14  card until this situation.  But we thought we'd be able to pay

15  it off when we -- after the 75 calendar days.  So now we have

16  bad credit for the first time ever and are unable to

17  legitimately refinance the RV park and get into a better

18  situation.

19  Q    All right.

20  A    It's been (audio interference).

21  Q    And did you have any notion that the -- you getting a loan

22  was in any way dependent on the success of a speculative

23  investment?

24  A    No.  I did not expect my money to be gambled.  I thought

25  it was secure.

1          MR. BOMKAMP:  All right.  No further questions for

2   this witness, Your Honor.

3          THE COURT:  Thank you.

4          Mr. Mickler?

5          MR. MICKLER:  Thanks, Your Honor.

6          THE WITNESS:  Thank you.

7          THE COURT:  And, again, feel free to go outside the

8   scope of direct.

9          MR. MICKLER:  Thank you, Your Honor.

10                        CROSS-EXAMINATION

11  BY MR. MICKLER:

12  Q    Ms. Stegent, my name is Bryan Mickler.  I'm one of the

13  attorneys for Genie.  And I would like to kind of review one of

14  the last things that you said.  You stated that you had no

15  desire to harm or hurt anyone in this transaction.  Is that

16  correct?

17  A    That is correct.

18  Q    Okay.  Do you remember sending an email to David Hughes

19  where you threatened him with:

20      "You're going to end up in a big lawsuit and possibly in

21      prison.  I'm not sure why you are risking that with your

22      business practices, but shutting me up would certainly

23      give you more time."

24      Do you remember sending him that, a threat of the criminal

25  prosecution?

1  A    That was not a threat.  And if you read the email in its

2  entirety, it was because I had heard his children in the

3  background on the phone with him.  And mom to dad -- you know,

4  I'm a mom of ten kids.  I genuinely did believe and still

5  believe that he could end up in jail because of his practices.

6  And I hoped that he would turn that around.

7  Q    And so you ended up bringing his kids into the email also,

8  and you said,

9        "Don't lose being there for your kids and let them see

10       their dad end up in prison for unfair and deceptive

11       practices.  It will devastate your children and you.  On

12       your deathbed, your family members are what will matter to

13       you."

14       Is that what you told him --

15  A    Yes.

16  Q    -- about going to prison?

17  A    Yes.

18  Q    Okay.

19  A    And that is genuinely out of a place of empathy.  I know

20  it wasn't received that way, but it was.

21  Q    So do you think that statements like that were warranted

22  and warranted a response from an attorney where you were

23  threatening someone with criminal prosecution?

24  A    I have no idea what that warrants.  I didn't intend it --

25  Q    Okay.

1   A    -- in any harmful way, though I understand it was taken

2   differently than I intended it.

3   Q    Let's go over some more of your testimony.  You sound like

4   you're a sophisticated businessperson.  You learned a lot from

5   your father?

6   A    I hope so.

7   Q    And it looks like you've owned about maybe at least 5

8   pieces of property in your life?

9   A    Okay.  The houses.  Not --

10  Q    Okay.  So you're a multi-time homeowner, at least 5 times?

11  A    Probably.  We moved around a bit.

12  Q    You want me to go through the addresses, or is that an

13  accurate number?

14  A    Well, let me think.  There are one, two, three,

15  four -- yes, we're on our fifth --

16  Q    Okay.

17  A    -- home.

18  Q    And you've owned businesses, obviously.  There's the RV

19  park.  And it looked like you had an interest in a previous

20  plumbing operation.  Is that true?

21  A    My husband is -- does own a plumbing company.  He is --

22  Q    Okay.

23  A    -- a master plumber.  Yes.

24  Q    And you were involved in that?

25  A    Not really, no.

1   Q    Okay.  As a sophisticated businessperson, you would have

2   read the contract that you signed with Genie Investments,

3   correct?

4   A    Number one, you're calling me a sophisticated

5   businessperson.  I'm pretty humble.  I was -- I mean, I do the

6   best I can.  So number two, I've never read any word of every

7   loan contract that I've signed.  However, I have now read every

8   word of that contract, and I will from this day forward, I

9   believe.

10  Q    So you signed a multipage loan agreement with McMann and

11  Genie for millions of dollars and did not read the agreements?

12  A    Absolutely did not read every page.  I checked all the

13  numbers.  I checked all sorts of things, but I did not read

14  every word of a hundred and something pages of those documents.

15  Q    Did you sign the agreement?

16  A    Yes, I did.

17  Q    Okay.  Let's turn to what the Trustee marked as Number 8

18  on your list.

19  A    Got it.

20  Q    Great.  And turn to the second page under payment, number

21  two.  Do you see that?

22  A    Yes.

23  Q    And you said that you signed this agreement, correct?

24  A    Yes.

25  Q    Okay.  And you would have initialed down on the bottom of

1   Page Number 2 on the right-hand side?

2   A    Yes.

3   Q    Okay.  Let's read number two.

4        "As a material inducement to company," which is Genie, "to

5        commence the services, the borrower shall pay company a

6        non-accountable and non-refundable fee of $35,000 payable

7        prior to the commencement of the services."

8        Do you see non-accountable and non-refundable in that

9   language?

10  A    Yes.  And we did read that --

11  Q    Okay.

12  A    -- and we did question, my husband and I, when we read it.

13  Q    But you --

14  A    But we chose to (audio interference).

15  Q    But you -- you questioned it, but you still took the steps

16  to go through with the loan and sign the agreement, correct?

17  A    We did, because we trusted --

18  Q    Okay.

19  A    -- the line of people we (audio interference) to get this

20  loan.

21  Q    And you actually wired the money in to Genie at that

22  point?

23  A    I did.

24  Q    Okay.

25  A    Which Genie requested the wire to them, not --

1  Q    I'll ask -- I -- just a yes or no question there.  Let's

2  look at the next paragraph here under number two.  "Payment of

3  the diligence fee is not a guarantee that company will offer

4  funding to borrower or that any offer will be on the terms and

5  conditions acceptable to borrower."

6       Do you see that?

7  A    Yes.

8  Q    And so that means that you were not guaranteed any type of

9  loan either through Genie or McMann as a result of this bridge

10  loan, doesn't it?

11  A    No.  I disagree with that.  I was -- there actually says

12  in the contract within three banking business days my loan

13  would be provided from the time I sent my ICA payment.

14  Q    Which contract are you referring to?  The McMann contract?

15  A    No.  I'm referring to the bridge loan contract with Genie

16  Investments.  The bridge agreement.

17  Q    We'll get to the bridge loan contract in just a minute.

18  I'm asking you about this due diligence agreement.  This due

19  diligence agreement for your $35,000 payment says that you are

20  not guaranteed a loan in that paragraph, correct?

21  A    In that paragraph.  It says I am --

22  Q    Thank you.

23  A    -- in other paragraphs, though.

24  Q    Prior to signing this due diligence agreement, you had the

25  opportunity to review it with either an attorney or your family

1   or maybe your father at that time.  You had the opportunity to

2   do that, didn't you?

3   A    I did.

4   Q    Okay.  And you still went ahead and signed it and sent the

5   money off?

6   A    We did.  We trusted the line of people we went through.

7   Q    All right.  Let's turn over to the bridge loan agreement,

8   which is Number 10.

9   A    Yes.

10  Q    If you could go to Section 2.03.  It looks like it is

11  about the back of the third page.

12  A    Where?

13  Q    2.03.

14  A    Got it.

15  Q    Okay.  And if you could go down to Paragraph B under that

16  subsection there.  I'm going to read this out to you.

17       "Prepaid interest on the outstanding principal amount of

18       the loan shall be paid in kind and capitalized on this

19       business day and shall be paid in cash and full upon

20       acceptance of this agreement.  Borrower understands that

21       this payment is fully non-refundable."

22       Did you sign that?

23  A    Yes, I did.  And I knew that.

24  Q    And did you initial on the bottom here?

25  A    Yes, I did.

1   Q    All right.  Now, I'd like you to go back up to just above

2   2.03 on bridge loan where it says A right there.  Do you see

3   that?

4   A    Uh-huh.  Yes.

5   Q    "On the effective date, the lender shall hold bridge loan

6   in lender's account on behalf of the borrower."

7        Did you sign that also?

8   A    Yes.

9   Q    And you initialed that?

10  A    I did.

11  Q    Okay.  So you were never going to get any funds from this

12  loan, were you?

13  A    I mean, why would a person initiate getting a loan if they

14  were not going to get any funds from it?

15  Q    Well, what this says is that the lender is going to hold

16  the funds until your big loan with McMann was going to close.

17  Isn't that correct?

18  A    Oh, no.  It says that in three banking business days it

19  will be supplied.  It also says in Section 4.1, "LOC lender

20  shall not transfer, assign, withdraw, or otherwise disburse to

21  the LOC lender, the debtor, or any other person any funds from

22  the ICA unless --

23  Q    Do --

24  A    -- and until all LOCs --

25  Q    Excuse me.  Excuse me.

1   A    -- (audio interference) --

2   Q    Ms. Stegent?

3          THE COURT:  Let her finish, Mr. Mickler.

4          THE WITNESS:  -- until all other lender obligations

5   are fully satisfied in accordance with this note and this

6   agreement."

7          THE COURT:  All right.  Go ahead, Mr. Mickler.

8   BY MR. MICKLER:

9   Q    So let's go back to this bridge loan here.  "On the

10  effective date, the lender shall hold bridge loan in lender's

11  account on behalf of the borrower."

12       That seems fairly clear to me that you are not going to be

13  provided the funds.  It was going to be held in an account of

14  the lender, correct?

15  A    So three banking business days then --

16  Q    Okay.

17  A    -- where does that come into play?

18  Q    So if the funds were in the lender's account within three

19  business days, Genie would have complied with the terms of this

20  loan, correct?

21  A    No.  Genie was supposed to supply the loan to McMann

22  within three banking business days (audio interference) their

23  account.

24  Q    Well, let's go back to who lender is in this agreement.

25  A    You're not going to convince me that I signed for a loan

1   that I wasn't --

2   Q    Let's go back to Page 1, okay?  I'm going to ask you the

3   questions.  Let's go back to Page 1 of the agreement.  Do you

4   see the bridge loan agreement on Page 1?

5   A    Yes, sir, I do.

6   Q    Look in that second sentence there.  It says Genie

7   Investments is the lender, correct?

8   A    Yes.

9   Q    Okay.  We're not talking about McMann with this loan.

10  We're talking about Genie holding your bridge loan in their

11  account for a period of 90 days, waiting for --

12  A    No, no.  Three banking business days.  So we can agree to

13  disagree on that.

14  Q    So but if the money was in Genie's account within three

15  days, they would have complied with the agreement, correct?

16  A    No.  Genie was supposed to supply that with -- to McMann

17  within three banking business days.

18          THE COURT:  Hold on one second, Mr. Mickler.

19          This Mr. Nathan Price (phonetic) just won't stop, so

20  give me one second.

21          Mr. Nathan Price, can you hear me?  Mr. Price?

22          MR. PRICE:  Yes, sir.  Yes, Your Honor.

23          THE COURT:  I am putting you into a room, a waiting

24  room.  You need to wait there until you are called back out,

25  okay?

1          MR. BOMKAMP:  Just for the record, Your Honor --

2          MR. PRICE:  Okay.  thank you.

3          MR. BOMKAMP:  -- we're not going to call him as a

4    witness.

5          THE COURT:  Okay.  I apologize.  You may proceed.

6          MR. MICKLER:  No problem.

7    BY MR. MICKLER:

8    Q    We'll move on from that.  Let's talk about what you called

9    the financial repercussions from this transaction.  You

10   borrowed the $60,000, correct?

11   A    Correct.

12   Q    And you borrowed the $60,000 in order to borrow the bridge

13   loan, correct?

14   A    Correct.

15   Q    And you were borrowing the bridge loan in order to obtain

16   the big loan from McMann, correct?

17   A    Yes.

18   Q    I couldn't hear you.

19   A    Yes.

20   Q    Okay.  So none of your money was ever spent on this.  All

21   of these funds were either borrowed or were going to be

22   borrowed in order to obtain a loan?

23   A    About $10,000 of -- 9- or 10-, whatever it was, my

24   personal money was put in.

25   Q    Why didn't you talk to that?

1   A    And --

2   Q    Why didn't you mention that to the trustee?  You said you

3   borrowed $60,000 from your father.

4   A    I did.  But I (audio interference).

5   Q    Are you changing your testimony now?

6   A    68 -- 69,805 or something with the McMann fee.  So, no,

7   I'm not changing my testimony.

8   Q    All right.  And you said that you hadn't paid your father

9   back at all any of the money that you had borrowed?

10  A    My father-in-law?  No, I have not.

11           MR. MICKLER:  Okay.  Give me just one minute, Your

12  Honor.

13           THE COURT:  Take your time.

14  BY MR. MICKLER:

15  Q    Ms. Stegent, can I have you go to what's been marked as

16  Number 3 in the trustee's exhibits?

17  A    I don't have a 3.  Mine starts at 6, I think.

18  Q    Okay.

19  A    Yeah, mine starts at 6.

20  Q    All right.  I'm going to read it out to you.  When

21  you -- Number 3 is the trustee's motion that we're on here

22  today.  And I believe you filed a statement in support of that

23  motion.  Do you remember writing out a statement?

24  A    Let's see.  And I think I have that as -- that's -- I

25  mean, this -- are you talking about Exhibit 6?  March 1, 2024.

```
 1              MR. BOMKAMP:  Your Honor, I think she does have that
 2    as Exhibit 6.
 3              MR. MICKLER:  Is that 6?  Okay.
 4              THE COURT:  Yeah.  Separate exhibit.  Yeah.
 5              MR. MICKLER:  Okay.
 6              THE COURT:  Yeah.  If you'll turn to Exhibit 6.
 7              MR. MICKLER:  My apologies.
 8              THE COURT:  That's all right.  U.S. trustee's Exhibit
 9    6.
10              THE WITNESS:  I have (audio interference).
11              THE COURT:  All right.  You got that, Mr. Mickler?
12              MR. MICKLER:  Yes, Your Honor.  Thank you.
13              THE COURT:  You may proceed.
14    BY MR. MICKLER:
15    Q    Let's go down to Paragraph 4 here where it starts off:
16    "We wired a $7,900 application fee to McMann."  And the next
17    sentence said, we -- "Then we wired a $35,000 non-refundable
18    due diligence fee to Genie Investments."
19    A    Yes.
20    Q    So you're stating on your statement that you understood it
21    was non-refundable when you sent it in.  Is that correct?
22    A    I did.
23    Q    Okay.
24    A    100 percent.  It does not change not being funded a loan.
25    Q    Okay.  All right.  Two paragraphs down from there, it
```

1  says, "The contract with McMann stated we'd receive 20 percent

2  of our BELOC loan within 75 calendar days of wiring."  So you

3  were expecting the money from McMann, not from Genie.  Isn't

4  that correct?  The 20 percent tranche.

5  A    Correct.  But McMann was expecting the payments from

6  Genie, which they did not -- the loan -- bridge loan from

7  Genie, which they did not receive.

8  Q    We've been over that.  The contract specifically says that

9  the loan was going to be held in Genie's account.  So the

10  question is, you were expecting your 20 percent tranche from

11  McMann, according to your statement?

12  A    Yes, I did.

13          MR. MICKLER:  Okay.  Nothing further, Your Honor.

14          THE COURT:  Thank you.

15          Mr. Bomkamp?

16          MR. BOMKAMP:  No further questions of the witness.

17  I'd get Mr. Stringer.

18          THE COURT:  You are done for the day.  Thank you so

19  much.

20          THE WITNESS:  All right.  Thank you, Your Honor.

21          THE COURT:  And you can disconnect.  You don't have

22  to sit in a waiting room with nothing.

23          THE WITNESS:  Is it okay for me to listen in since

24  I've already done my testimony?

25          MR. BOMKAMP:  I don't think there would be any risk

1  of her contaminating her testimony since she's already

2  testified, Your Honor.

3          THE COURT:  Any problem with that, Mr. Mickler?

4          MR. MICKLER:  No, Your Honor.

5          THE COURT:  You may.  Just turn your camera off for

6  me.

7          THE WITNESS:  Will do.  Thank you, sir.

8      (Witness excused)

9          MR. BOMKAMP:  Your Honor, may I retrieve

10 Mr. Springer -- Stringer?

11         THE COURT:  Please do.

12     (Pause)

13         THE COURT:  If you'll take the stand over here.

14         THE CLERK:  Please raise your right hand.

15     CHARLES BLAKE STRINGER, U.S. TRUSTEE'S WITNESS, SWORN

16         THE CLERK:  You may be seated.  Please state your

17 name and address, including city and state, for the record.

18         THE WITNESS:  My name is Charles Blake Stringer.  My

19 address is 149 South Shore Drive, Amarillo, Texas.

20         THE COURT:  You may proceed, Mr. Bomkamp.

21         MR. BOMKAMP:  All right.

22                        DIRECT EXAMINATION

23 BY MR. BOMKAMP:

24 Q   Good morning, Mr. Stringer.  What is it that you do for a

25 living?

1  A    I am a farmer.

2  Q    Have you always been a farmer?

3  A    Pretty well always been a farmer.

4  Q    All right.  Can you describe your farming operation?

5  A    I farm a little over 7,000 acres in the Texas panhandle.

6  My family came from Georgia into Texas.  My dad was the first

7  Texan to ever farm in Texas and was born in Texas during the

8  Depression.  And so we started a family farm.  And I took over

9  my dad's family farm.  And, you know, I've grown it since my

10 parents' passing and my brother's passing.

11      And, you know, I've just been trying to do different

12 things in the farming operations and agriculture.  And I

13 decided a few years ago to transition into organic.  And now

14 I'm one of the largest family organic owned farms in Texas.

15 Q    All right.  And why was it -- or first of all, have you

16 recently sought a loan?

17 A    Recently.  Yes.

18 Q    All right.  And, actually, let me back up just a little

19 bit.  This may seem like a self-evident question, but does your

20 farm provide benefits to society?  Do you employ people?

21 A    I do.

22 Q    And does your farm directly or indirectly feed people?

23 A    Absolutely.

24 Q    All right.

25 A    If you've ever had Fairlife milk in the last eight or ten

1  years, you've had a direct correlation with some of the organic

2  grains that I provide to Fairlife milk, which is the largest

3  organic milk producer in the United States.  They're basically

4  owned now by the Coca-Cola Corporation, but the family farm

5  that started them is my next door neighbor.

6  Q    All right.  And I'll re-ask the question I just asked.

7  Have you recently sought a loan?

8  A    Yes.

9  Q    And why were you interested in getting a loan?

10  A    If we're referring to the loan here with McMann and Genie,

11  the BELOC loan that I had applied for starting at the end of

12  '22 and the early part of '23, I was in the process of

13  restructuring everything I had in debt.  I had three different

14  banks, three different lenders, very complicated structure,

15  priming liens, first and second liens coinciding to each other,

16  different entities.  And I wanted to get it under one house,

17  one shelter, and bring together some extra operating capital.

18  And the BELOC loan program was a good fit.

19  A    All right.  And what was appealing to you about the BELOC,

20  perhaps compared to other sorts of loans?

21  A    Well, again, I could restructure everything with a new

22  entity, and I could pull it all into one house under one loan,

23  one loan payment.  It had a good interest rate at the time,

24  what we felt like was a good interest.  It was somewhat

25  forgiving with some of the terms and everything compared to a

Stringer - Direct                                    40

1    lot of other bank-type loans that we had seen.

2    Q    Okay.  And did you have an incentive -- was part of your

3    incentive to refinance based on having a bit of a distressed

4    situation with your three current lenders?

5    A    Yes, it was.

6    Q    All right.

7    A    Definitely.

8    Q    All right.  So you were -- would it be an exaggeration to

9    say you were looking to refinance to save the family farm?

10   A    I don't know about to save the family farm.  I had several

11   lenders on the table.  I had several term sheets signed, some

12   of them committed different things and different options that I

13   was working with my current lenders to try to work out a deal

14   to get a restructure.  I just happened to, you know, weigh the

15   odds of what I thought would be the best, and I went with the

16   BELOC loan, because that seemed to be the best thing out there.

17   Q    So you had other options for refinancing?

18   A    Absolutely.

19   Q    And we'll talk about this more later, but do you have

20   those other options now?

21   A    I do not.

22   Q    Okay.  Who did you first approach about getting a BELOC

23   loan?

24   A    I had a broker that I was working with.  I had a couple

25   different brokers that I was working with throughout the time

1   frame.  My broker's name was Clyde Allsop.  He's out of New

2   York, and he runs a capital and brokerage firm.  He had

3   stumbled onto a fellow named Walter Trock who runs McMann

4   Commercial Lending.  And now it's named McMann Capital.  But he

5   knew of Walter through other organizations and had kind of

6   vetted the deal to see if they were legit, and, you know, he's

7   the one that brought me to McMann.

8   Q    Okay.  And how much were you hoping to loan through the

9   BELOC product?

10  A    I got approved for a $24 million loan.

11  Q    Okay.  And were there any unusual conditions of that loan

12  in terms of prepaid amounts?

13  A    Well, there was a different structure of having to pay

14  down, you know, a percentage through what I kind of considered

15  a lock-in to buy into the loan and to lock up our interest

16  rates for a time frame until we got funded.  That was a little

17  different than a lot of, you know, what I'd call conventional

18  type loans.

19  Q    Okay.  So you had to make a payment to get the BELOC?

20  A    That's correct.

21  Q    And how much would that payment have been?

22  A    Well, my total payment that I put out, if you --

23  Q    Well, I'm not talking about how much you paid, but how

24  much would -- if you just had the BELOC, how much would your

25  payment have been?

1  A    I believe it would be $2.4 million.  It's 10 percent of

2  the entirety of the loan amount.

3  Q    Okay.  And did you have $2.4 million?

4  A    I did not.

5  Q    Okay.  And so what was your solution to that?

6  A    McMann had several conversations with my lenders and

7  myself, attorneys and several others online, doing some

8  explaining of how the system and the program worked.  And I

9  went ahead and, you know, put everybody together.  We decided

10 that it would make sense to get a release for me to --

11 Q    Oh, I think you misunderstood my question.  Were you going

12 to finance the 2.4 million?

13 A    Yes.  I was getting a release from my lenders to go ahead

14 and put up as a -- a finance piece for a bridge loan to Genie.

15 Q    Okay.  So you were seeking a bridge loan with Genie.

16 A    Correct.

17 Q    And for the whole McMann/Genie transaction, did you need

18 the cooperation of your current lenders?

19 A    I sure did.

20 Q    And why is that?

21 A    Well, because basically everything I had was somewhat

22 encumbered.  I had lenders of operating and lenders of real

23 estate, and everybody had to pull together to allow for some of

24 my cash flow to come out of my business and capital that -- I

25 had to go back to those lenders and say, hey, here's the

1  program.  They listened to all the spiel, and they said, yes,

2  sounds okay; let's make it happen.  In fact, they said if this

3  works, we want to come to the table.  And at the end of the

4  day, they allowed me to take out $400,000 to go ahead and put

5  down as part of my payment and do the bridge loan.

6  Q    Okay.  And they did that with the hope of being bought out

7  eventually --

8  A    Correct.

9  Q    -- through the financing?

10 A    To be completely cleaned up.

11 Q    Okay.  If you would turn to United States Trustee

12 Exhibit --

13 A    I don't have an exhibit book.

14 Q    Oh, I'm so sorry.  I do.  Hold on.

15          MR. BOMKAMP:  31.

16          THE COURT:  Exhibit 31?

17          MR. BOMKAMP:  Yes, Your Honor.  Let me make sure

18 that's where I want to start.  Okay.

19 BY MR. BOMKAMP:

20 Q    And when you get there, what is Exhibit Number 31?

21 A    I believe this is the document that was provided to me by

22 McMann for the Genie BELOC bridge loan that they were going to

23 provide in order to do the BELOC loan.

24 Q    Okay.  And this -- how -- and this is -- this document

25 sets forth a due diligence fee?

Stringer - Direct                                                    44

1   A    I believe this had the due diligence fee in it.  Yes.

2   Q    And how much did you pay on account of a due diligence

3   fee?

4   A    I paid $40,000.

5   Q    And who did you pay that to?

6   A    Directly to Genie.

7   Q    Okay.  And how did you pay it?

8   A    I wired the money.

9   Q    Okay.  And is that all the money that you paid to Genie

10  Investments?

11  A    No.  I paid the additional interest that was needed in the

12  contract.  On the -- under the payment schedule, there was an

13  interest formulation, I guess we could call it.  It says 15,000

14  per 100,000.  And my original understanding of that, and the

15  representative at McMann never corrected it, so I sent in what

16  I thought was the right amount of $115,000.  Because when we

17  read that, we maybe misinterpreted it --

18  Q    And --

19  A    -- but I sent that in.

20  Q    This is to Genie on account of prepaid interest now?

21  A    That is correct.

22  Q    Okay.  Now is that all the money you sent to Genie, the --

23  A    No.  I --

24  Q    What other --

25  A    After we realized that that was a mistake, I went ahead

Stringer - Direct                                    45

1   and -- that's when I went to the lenders and continued to ask

2   for the money.  And I got another $245,000 payment that I made

3   after that.  It was a considerable amount of time, I want to

4   say two months or so, before I could raise that much capital to

5   get it paid up.

6   Q    Okay.  And when did you make these payments?

7   A    The beginning payments were in -- the very first one, I

8   believe, was around February of '23.

9   Q    Uh-huh.

10  A    And then later -- my last payment -- there was one in

11  between, but my last payment was around mid -- late March of

12  '23.

13  Q    Okay.  All right.  And, again, these are payments that you

14  made with the express permission of your secured creditors

15  under the understanding that they would be paid with the

16  proceeds --

17  A    That is correct.

18  Q    -- of the loan?

19  A    The Genie group and the McMann group provided me a letter

20  that said, you know, the tranching period of the loan would be

21  between 15 and 75 days after the last executed payment of the

22  ICA account.  And that payment would have been -- on May the

23  8th would have been the payment that I would have got --

24  Q    Are we in 2023?

25  A    Of '23.

1   Q    Okay.  And did you loan fund on May the 8th?

2   A    No, it did not.

3   Q    What were your first warning signs?

4   A    Just prior to May the 8th, I was really nervous, because,

5   you know, I was getting a lot of feedback from the

6   representation of McMann, the agency, with Genie.  They said,

7   you know, listen, this is -- we got some problems.  You know,

8   this might not fund right at the right time.  They even wrote

9   letters to my lenders that I provided to my lenders stating

10  that there was some delays and that there was problems and that

11  they were going to try to do their best to get me over the hump

12  with those lenders and provide me an additional bridge loan on

13  top of that.  And that never happened either.

14  Q    Okay.  Did you advance any money on account of that

15  additional bridge loan?

16  A    No, I did not.

17  Q    Okay.  All right.  And did your loan, in fact, fund on

18  time on October 8th?

19  A    No, it did not.

20  Q    Okay.  And --

21  A    No funding ever took place to me.

22  Q    All right.  And how have your current secured lenders

23  reacted to the loss of their collateral?

24  A    Well, shortly after May the 8th, when it didn't fund, the

25  lenders started squabbling.  And, you know, we tried to work

1   with them in any way we could.  We had payments that were

2   coming due.  Of course, some of those payments we didn't have

3   the money to pay, because we'd already paid out to Genie.  And

4   those were secured payments that were going to continue to keep

5   a loan moving forward.

6       But because we couldn't make those payments, they were

7   squabbling back and forth, kind of jockeying for position.  The

8   first lender, we did some forbearance agreements.  And, you

9   know, there were some things that we did to try to, you know,

10  clean up.  And one of the problems that we had is one of my

11  loans was coming up for maturity, and they ended up posting me

12  for a foreclosure.

13  Q    All right.  And have you had to file personal bankruptcy?

14  A    Since then, I went through four months of postings of

15  foreclosure and forbearance agreements, putting up different

16  amounts of money.  But it continued to go forward, because I

17  couldn't get any other financing because of this scheme of

18  problems we had going on.  And, yes, at the beginning of the

19  year, 2024, I had to file for protection in bankruptcy.

20  Q    Does it appear at this time that you're going to be

21  successful in reorganization of the farm through the

22  bankruptcy?

23  A    No, it does not.

24  Q    What's happened in the bankruptcy case?

25  A    They lifted my stay about 30 days ago.

1   Q    All right.  And so at this point, does it appear that

2   you'll lose your farm at foreclosure?

3   A    In less than 30 days.

4   Q    Do you have any skills other than the farming?

5   A    Not really.  I do some brokering.  I've done quite a bit

6   of brokering.

7   Q    Okay.  Did you -- and how old are you, sir?

8   A    Pardon?

9   Q    How old are you?

10  A    I am 56 years old.

11  Q    Okay.  And did you pay an attorney to try and intervene

12  with Genie?

13  A    I did.  Shortly after the funding date went by, I kept

14  getting all these excuses.  I reached out to Genie.  I reached

15  out to different people through McMann.  Made a call to

16  Mr. Hughes here in the courtroom.  Kept getting excuses and

17  decided, look, you know, it's time to take action.

18       I went and talked to a bankruptcy attorney in Fort Worth,

19  Texas by the name of Jeff Prostok.  He's a very well-known

20  bankruptcy attorney in the State of Texas.  Pretty

21  high-powered.  He handled the Texas Rangers and George Bush's

22  case at one point.  You know, he's kind of a powerhouse guy.

23       And I went to him, and he wrote a letter.  He actually got

24  on the phone with Genie's attorney at the time and walked in

25  the office and said, this guy hung up on me; let's go ahead and

1    serve him with some notices.  And so we did.

2         And we never heard anything back of any -- anything really

3    of relevance that helped anything.  You know, all we got was a

4    comment that -- send your documents to a PO box here in

5    Florida.

6    Q    And --

7    A    I mean, I hired another attorney at a later date to make

8    another approach to a collection.

9    Q    How much were those attorney fees?

10   A    A lot.  I can't tell you off the top of my head right now,

11   but tens of thousands of dollars.

12   Q    And did Genie take any action against you on account of

13   this noise that you were making?

14   A    Yes.

15   Q    What happened?

16   A    Well, I went out and found some people in multimedia on

17   the internet that had not been funded and very similar story to

18   mine.  And they were six months prior to me, and they hadn't

19   been funded.  And their excuses and everything they were

20   hearing were the very same thing I was hearing.  And we kind of

21   started coming together and comparing notes.

22        I started blistering the phone, trying to dial Genie, dial

23   McMann, get people -- you know, get their attention, trying to

24   get some answers.  You know, I'm getting posted for

25   foreclosure.  You know, I was fixing to have to file bankruptcy

1   in the later part of the summer.

2        So, you know, I went to the internet and started trying to

3   find people.  And I found a lot of factual evidence that kind

4   of led me to different things of what was going on inside of

5   the Genie organization and the McMann organization.  I went

6   ahead and, you know, pulled some people together, made quite a

7   few comments on a forum called BiggerPockets.  We all started

8   comparing notes, and our stories were the same, just different

9   numbers.

10  Q    All right.  And what sort of legal action did Genie take

11  against you?

12  A    After that, Genie -- it was quite a while after.

13  Actually, after the non-funding portion of all the loans, they,

14  you know, sent me some letters and -- I finally heard from an

15  attorney after all this time and no funding took place.  And

16  we'd been begging attorneys to respond to us.  But we finally

17  got some response.

18       And they came in and said, you know, quit talking about us

19  on the internet and quit posting stuff.  And we're -- sent us a

20  cease and desist order and basically just said we're coming

21  after you in arbitration if you don't quit.

22  Q    And did they come after you in arbitration?

23  A    They did.  Twice.

24  Q    Why twice?

25  A    Well, the first time they tried to file arbitration with a

1   group called -- I believe it was AAA Arbitration Group,

2   American Arbitration, and that wasn't even in the contract.  It

3   wasn't something that was agreed to in the beginning.  It

4   wasn't part of their contract.  So we objected and tried to,

5   you know, put our thoughts into that, that, you know, this was

6   not something that we had agreed to in the contract.

7       So they finally came back and said we'll just go ahead and

8   do it under the contract agreement of JAMS, which is -- I don't

9   know what it stands for, but another arbitration group.  And so

10  we got served a second time in a second arbitration after

11  months and months of squabbling.

12  Q    Okay.  And if you'll turn to United States Trustee Exhibit

13  47.

14  A    Yes.

15  Q    Is this representative of the kind of thing you

16  received --

17  A    Yes.  It was always --

18  Q    -- regarding arbitration?

19  A    -- some kind of threatening letter that -- you know,

20  basically coming after me, you know, stop.  And this was -- if

21  you'll notice, the date was in November.  I mean, this was well

22  after either funding of -- any time my funding was supposed to

23  take place.  I was already posted twice in foreclosure by this

24  time, maybe the third time.

25  Q    Did you ever receive an opt-in agreement?

1    A    You know, I can't say whether I did receive it directly.

2    I saw it.  They sent it out to several people.  I'm not sure if

3    I saw it through internet or if it was actually sent to me.  It

4    could have been.  I'm not saying I didn't see it -- or see it

5    by that time.

6         But, you know, everything to this point was just big fairy

7    dust stories, so I didn't care.  They wouldn't even answer my

8    federal attorney's letters or anything else.  You know?  So I

9    didn't care what they had to say about their attorneys, you

10   know, threatening me or wanting to opt out and start trying to

11   renegotiate the contract.

12   Q    All right.  And did you in any way think that the funding

13   of your loan was based on the success of a speculative

14   investment?

15   A    Absolutely not.

16             MR. BOMKAMP:  All right.  No further questions for

17   this witness at this time, Your Honor.

18             THE COURT:  Thank you.

19             Mr. Mickler?  And, again, you may go outside the

20   scope of direct.

21                         CROSS-EXAMINATION

22   BY MR. MICKLER:

23   Q    Good morning, Mr. Stringer.

24   A    Good morning.  And I'm sorry.  Your name again?

25   Q    I'm Bryan Mickler.  I'm the attorney for Genie.

1  A    Oh, okay.  Thank you.

2  Q    I've represented several farmers in bankruptcy, and they

3  often describe it as legalized gambling.  Would you agree with

4  that statement?

5  A    It is risky, for sure.

6  Q    So the fact that you ended up in financial trouble is not

7  something that you're surprised about, are you?

8  A    By the way of not being funded by a lender, yes, it is

9  something very surprising.

10  Q    Did that happen back in 2016 when you filed your first

11  Chapter 11?

12  A    That is correct.  I had the rug pulled out from underneath

13  me on a operating loan with Wells Fargo.

14  Q    Okay.  And did it happen back in 2003 when you filed your

15  Chapter 12 bankruptcy?

16  A    I sure did.  And that was from a hometown lender that

17  committed fraud against me and had a verdict placed against

18  them.

19  Q    All right.  So you've been in financial trouble because of

20  speculative loans or loans for the last 20-something years?

21  A    22 years.  I've had two bad lenders.  Now I've had a

22  third.

23  Q    Okay.  And looks like you've owned multiple companies over

24  the years, 15 or more it looks like.

25  A    I don't think there's been 15.

1    Q    Dos Ex Cattle Company.  Is that you?

2    A    That would be me.

3    Q    Commodity Brokerage Services.  Is that you?

4    A    That is me.

5    Q    Texiana Hemp Company (phonetic)?

6    A    Was a name that I filed, but it never --

7    Q    Okay.

8    A    -- was a company, never went into business.

9    Q    You want me to go through all 15 of these or --

10   A    If there's 15, there is.  But, yes --

11   Q    Okay.

12   A    -- I've had multiple businesses.

13   Q    All right.

14   A    Didn't realize it's been 15, though, over the last --

15   Q    And --

16   A    -- 40 years of business.

17   Q    And at this point, you own, looks like, 29 pieces of real

18   estate.  Is that correct?

19   A    I don't know what you're calling 29 pieces.  I own roughly

20   7,000 acres.

21   Q    Okay.  And those are parceled together over time?

22   A    Yes, it has been.

23   Q    Okay.  And there would be -- other than the 7,000 acres,

24   it looks like you've owned even more property than that prior

25   to the current property that you have, maybe another 17 pieces?

1  A     That would be -- I don't know what you're talking about.

2  Q     Okay.

3  A     I've owned property, yes.

4  Q     Okay.

5  A     I've owned property, but I don't know what you're talking

6  about, 17 pieces.

7  Q     Well, my point is, you've taken multiple loans.  You've

8  operated multiple businesses.  You're familiar with legal

9  contracts.  You're familiar with taking out loans, mortgages,

10 any type of secured loans, unsecured loans.

11 A     Yes, sir.

12 Q     Perfect.  When you went to McMann to take out this

13 $24 million loan, you didn't have the 10 percent down payment.

14 You testified to that, correct?

15 A     That is correct.

16 Q     Okay.  So --

17 A     Not at the time.

18 Q     All right.  So you had to borrow the 10 percent down

19 payment?

20 A     That would be correct.

21 Q     Okay.  So you didn't put your money into it other than the

22 fact that you borrowed it against your collateral, correct?

23 A     I did borrow it against my collateral and my capital.

24 Yes.

25 Q     Okay.

1   A    With my capital lender.

2   Q    When you went through McMann, and they referred you over

3   to Genie, did you have the opportunity to review the contract

4   with Genie for the bridge loan and the due diligence that you

5   were entering into?

6   A    I did not.

7   Q    You didn't review the contract at all?

8   A    Not what you asked with Genie.  And I did not review it

9   with Genie.  I reviewed it --

10  Q    That's what I'm asking.

11  A    -- with people from McMann.

12  Q    Pardon my --

13  A    I never knew who Genie was.

14  Q    Okay.  And that's important to understand, too.

15  A    Correct.

16  Q    So McMann presented you the due diligence contract.  Is

17  that correct?

18  A    That would be correct.

19  Q    McMann presented you with the bridge loan contract?

20  A    That is correct.

21  Q    And with McMann, you had the opportunity to review both

22  the due diligence and the bridge loan contracts?

23  A    We did.  Multiple times with multiple people and multiple

24  lenders and multiple attorneys after I had already signed.

25  Q    Okay.  But you did have the opportunity prior to signing

1    it to take it to all these additional people also, didn't you?

2    A    I did not take it to those people.  I just signed it.

3    Q    But you could have taken it to --

4    A    I could have, yes.

5    Q    Let's turn in your book there -- and I'm going to make

6    sure I get the right number this time -- Number 31, please.  I

7    believe you've previously testified that this is the due

8    diligence fee agreement that you entered into with Genie.

9    A    I believe this is right.

10   Q    Okay.  And I'd like you to look down.

11   A    There was an additional -- I'm sorry to interrupt.

12   Q    Oh, just --

13   A    For the record, there was an additional contract that I

14   got that had a lot of this that's in 31, but there was a lot

15   more behind it that also came from Genie.  And it's in the

16   record.  I've noticed it being circulated in the schedules

17   that's been filed.

18   Q    Understood.  For now, we'll just focus on this one.

19   A    Okay.

20   Q    So you would have -- you testified that you had the

21   opportunity to review this contract and could have taken it

22   anywhere to have it reviewed by an attorney or your friends or

23   family, things like that, correct?

24   A    Yes.

25   Q    And on Page 2 of the contract -- if you could flip over to

1    that.  This is -- on the top, it says, "Due diligence fee

2    agreement."  Do you see that?

3    A    Yes.

4    Q    Okay.  And Paragraph Number 2, is that your initial down

5    on the bottom right-hand corner down there?

6    A    I believe it is.

7    Q    All right.  I'm going to read out to you what Paragraph

8    Number 2 says.

9        "As a material inducement to company to commence services,

10       the borrower shall pay company a non-accountable and

11       non-refundable fee of $40,000 payable prior to the

12       commencement of services."

13       Do you see that non-accountable and non-refundable there?

14   A    Yes, I do.

15   Q    And you signed this agreement after you read that?

16   A    I'm not sure if I signed this agreement, but, yes, I did

17   sign an agreement.  Again, I believe the one you've got here is

18   not the same agreement that I originally signed.

19   Q    Is this --

20   A    The longer version of this contract is in our documents

21   somewhere.

22   Q    Okay.  Well, let's turn to Page 7.  And I don't want

23   there to be any confusion.  Is that your signature?

24   A    I believe that is a DocuSign signature.  I'm fairly

25   certain.

1    Q    Okay.  And underneath it on the bottom right-hand corner

2    would have been your initials again?

3    A    Yes, I believe.  And, again, I think that's --

4    Q    All right.

5    A    -- a DocuSign signature.

6    Q    All right.  So let's go back to Page 2.  And the next

7    paragraph down says, "Payment of the diligence fee is not a

8    guarantee that company will offer funding to borrower or that

9    any offer will be on the terms and conditions acceptable to

10   borrower."

11        Did you read that before you signed this contract,

12   Mr. Stringer?

13   A    Yes.

14   Q    Okay.  And you appear -- when you talked about

15   understanding the correct arbitration panel to go before, you

16   appear that you thoroughly read things and understand them

17   prior to signing them or at least have the capacity to do that.

18   A    I believe I've got the capacity to do it, yes.

19   Q    Okay.  So with that capacity, you signed this agreement

20   saying that these fees are non-accountable and non-refundable.

21   Is that correct?

22   A    It is.

23   Q    Okay.  Let's go over to the bridge loan agreement.  And

24   pardon me for one second while I get the correct number.

25              THE COURT:  Take your time, Mr. Mickler.

1  BY MR. MICKLER:

2  Q    Number 34, please.

3  A    This is the one I was talking about earlier.

4  Q    Right.

5  A    The bridge loan agreement.

6  Q    Okay.

7  A    For the record, I'd like to make a couple of statements on

8  this particular agreement.

9  Q    I'll --

10        THE COURT:  You can only answer --

11        MR. MICKLER:  I'll ask the --

12        THE COURT:  -- the questions you're asked.

13        THE WITNESS:  Okay.  Yes, sir.

14        THE COURT:  And then Mr. Bomkamp, should he choose

15  to, may ask you additional questions that you may answer.

16        THE WITNESS:  Okay.

17        THE COURT:  Go ahead, Mr. Mickler.

18  BY MR. MICKLER:

19  Q    Now, let's get just the initial preliminary things

20  straight.  Is that your signature down on the bottom right-hand

21  corner down there, your initials?

22  A    That's what I was about to interject here for the record.

23  Q    Well --

24  A    This is not my final executed agreement.  And the reason I

25  know that is because there was not a notary.  And I

1    notarized -- I had everything notarized.  And what has been

2    turned in here for the Court has not been notarized, and it

3    doesn't have any attachments.  And if you'll see back here

4    where it talks about attachments, there's no attachments to

5    this particular document.

6    Q    Do you believe that there would be material alterations

7    other than a notary on the last page to this contract?

8    A    I have no idea.

9    Q    Okay.  For now, we'll use this copy.  This is what you

10   provided to the trustee it looks like.  And it has a DocuSign

11   envelope up on the top left-hand corner.

12   A    This came from McMann, I believe.

13   Q    All right.

14   A    And I gave everything to McMann, not to Genie.  And that's

15   what it looks like here.

16   Q    Let's go over to Article 2, Section 2.02.  I believe it's

17   going to be about the third page in on the contract.

18   A    Yes.

19   Q    And you see the very bottom of the page, Paragraph A down

20   here, it says, "Bridge loan."  It says, "On the effective date,

21   the lender shall hold bridge loan in lender's account on behalf

22   of the borrower."

23   A    Yes.

24   Q    And that's your initial right next to it?

25   A    It is.

1    Q    Okay.  So the lender, in this case, was going to be

2    holding your bridge loan in their account.  Is that what this

3    states?  It is what this states, correct?

4    A    From my understanding, what this states is, yes, you are

5    telling me that what this says is there's going to be money

6    held in a bridge loan account that we put our money into.

7    Q    Okay.

8    A    And that's what I was explained to by McMann and their

9    representatives.  And here today, the documents that I have

10   seen don't exclusively show me that.

11   Q    Okay.  Well, we'll get over to that.  But assuming that

12   there was money in the Genie account that was set up for your

13   bridge loan, that's what this agreement provides, correct?

14   A    I believe that's right.

15   Q    All right.

16   A    But I don't think that the money that was put into that

17   account was my money.  And I can go through that with the dates

18   and the timing of all your documents that you've got in front

19   of me that's incorrect.

20   Q    Okay.  We'll have that opportunity later on.  But per this

21   contract, Genie was going to hold your bridge loan in their

22   account pending the completion of the McMann loan, correct?

23   A    I believe --

24   Q    Okay.

25   A    -- from what you're stating here, that is correct.  Yes.

 1   Q    I'd like you to flip over to the next page under 2.03,

 2   Paragraph B.  And that paragraph says --

 3   A    I'm sorry.  Give me one second.

 4   Q    Take your time.

 5   A    2 --

 6            THE COURT:  It's the next page, the back of that

 7   page.

 8            MR. MICKLER:  2.03.

 9            THE WITNESS:  Okay.

10            THE COURT:  2.03, section B.

11            THE WITNESS:  Okay.

12            THE COURT:  Go ahead, Mr. Mickler.

13   BY MR. MICKLER:

14   Q    And that paragraph provides that:

15        "Prepaid interest on the outstanding principal amount of

16        the loan shall be paid in kind and capitalized on this

17        business day and shall be paid in cash in full upon

18        acceptance of this agreement.  Borrower," that's you,

19        Mr. Stringer, "understands that this payment is fully

20        non-refundable."

21        You signed this agreement again, didn't you?

22   A    I did.  And I'd like to make a note for the record that

23   this was on February the 7th prior to anything that I put out,

24   anything that I put up for payment.

25   Q    Understood.  But you signed this agreement, expecting a

1  bridge loan?

2  A    I did.

3  Q    Okay.  And you signed the agreement that said that

4  whatever you had paid in was fully non-refundable?

5  A    I did.

6            MR. MICKLER:  No further questions, Your Honor.

7            THE COURT:  Thank you.

8            Mr. Bomkamp, any redirect?  If so, please take the

9  podium.

10           MR. BOMKAMP:  Yes.

11           Mr. Mickler, do you have the debtor's exhibit that

12 pertains to Mr. Stringer?

13           MR. MICKLER:  I believe it is --

14           MR. BOMKAMP:  That would be Number --

15      (Counsel confer)

16           THE COURT:  For the record, it has already been

17 admitted, as all other documents have been admitted as well.

18           MR. BOMKAMP:  All right.  I'll pull it up on the

19 computer.

20           THE COURT:  Don't take it out of the clips, or we'll

21 never get it back in the same clips.

22           THE WITNESS:  Okay.

23           THE COURT:  You may proceed, Mr. Bomkamp.

24           MR. BOMKAMP:  It's upside down, too, so -- and on the

25 back of pages.  Okay.

1                       REDIRECT EXAMINATION

2    BY MR. BOMKAMP:

3    Q    Mr. Stringer, were you able to review this document prior

4    to the hearing today?

5    A    Not the paper document.  I saw it online with some of the

6    documents that were presented, I believe, through the Genie

7    case -- or bankruptcy that they had filed.

8    Q    All right.  And --

9    A    And I'm sure I've --

10   Q    And in --

11   A    -- seen it before, but I'm not positive.

12   Q    In your opinion, do you think this document in any way

13   demonstrates the funding of your bridge loan?

14   A    No, because -- and I'm sorry I'm fumbling here, but

15   there's a section in this document somewhere that is talking

16   about -- first off, it's talking about the account that the

17   bridge loan was supposed to be going into.  If you give me one

18   second.  I think I'm getting close.  Here it is.

19        One thing that -- for the record, I'm not real sure, but

20   the account and everything that's on this document here is not

21   the account that I know of that I sent my money into or nor any

22   of the other people.  And that's part of the bankruptcy

23   schedules.  The document that we -- or the account we sent our

24   money into from Chase Bank was not the account that ended in

25   722222.  It was an account that ended in 8522, I believe, in

1  Chase Bank.

2      And they've got an attachment here of a Morgan Stanley

3  financial account.  And if I understand it right, this is an

4  account that they had set up for investing.  And the time frame

5  doesn't add up, and it's incorrect.  Because this is a January

6  statement.  So my money didn't finalize and come in until

7  March.

8      So this doesn't prove to me anything of what happened in

9  March after I had given my money up to see if I got a bridge

10 loan or not.  And I constantly asked by email and through the

11 phone conversation with Mr. Hughes trying to get some kind of

12 proof that I had a bridge loan that was booked, and that that

13 money was segregated.  And at one time he said he would provide

14 that, and he never did, and I never got it.  And we actually

15 asked it multiple times, trying to get that proven to us that

16 the money wasn't commingled as it was.  And we found out now

17 through this document and all the filings of Mr. Hughes and his

18 companies that everything had been commingled and shoved into

19 one interest-bearing account or Morgan Stanley account.

20 Q    Okay.

21 A    And I'd like to point out for the --

22 Q    If --

23 Q    -- for the record that this document also states

24 that -- and if you want me to find it, it -- I'm going to

25 paraphrase this, but we can find it.  It says that that money

1   that I give in for the bridge loan cannot be assigned, it

2   cannot have a lien against it, it cannot be transferred.  And

3   all that happened.  It got transferred out of this bank

4   account, Chase into Morgan Stanley as an interest-bearing

5   investment account.

6       It's my understanding in the testimony of David Hughes

7   during the 341 trial and hearing -- or hearing was that that

8   money then had a lien placed against it.  They borrowed money

9   on what I'm going to call an SBLOC, securities-backed line of

10  credit.  And I don't know if that's exactly what they did, but

11  they did a line of credit with Morgan Stanley, borrowed all the

12  creditors' money, myself included, took our money, put it into

13  Morgan Stanley, took another loan out on it, put a -- placed a

14  lien on it, which was my money that was supposed to be secured,

15  for a bridge loan.  And then it was shipped off to this group

16  called Velanos and a guy named Wearmouth to generate some

17  ginormous 800 percent return to start --

18  Q     All right.

19  A     -- this whole BELOC.

20  Q     If you look at this bank account, if you look toward just

21  the very end of it, you can see the -- I believe there is some

22  March activity in there.  But if you see like the activity

23  register.  To the very end of the document.

24  A     Oh, the very, very end of this?

25  Q     Yeah.  The exhibit.

1    A    Or the bank account?

2    Q    The bank account.  The bank account.

3    A    The Morgan Stanley?

4    Q    Yes.

5    A    Okay.  It's got the 5 -- or 5 million number?

6    Q    Well, it's with all the transactions, 127 of 129.  About

7    third from the last page.

8    A    Oh.

9    Q    The Morgan Stanley account.

10   A    I'm not sure here.  Can you give me the title of

11   the -- what it's looking like here?  I don't have --

12   Q    It'll be the third --

13   A    I've got page -- I've only got 28 in that page.

14         MR. BOMKAMP:  Your Honor, may I approach the witness?

15         THE COURT:  You may.

16         THE WITNESS:  Please.  Thank you, Your Honor.  I'm

17   not sure which one you're looking for.

18   BY MR. BOMKAMP:

19   Q    Okay.  This page will do.

20   A    Okay.

21   Q    Would you agree that there are a lot of securities

22   transactions going in and out of that account?

23   A    Yes, there is.

24         MR. BOMKAMP:  All right.  I have no further

25   questions, Your Honor.

```
1                THE COURT:  Thank you.

2                Mr. Mickler?

3                MR. MICKLER:  Nothing else from this witness, Your

4    Honor.

5                THE COURT:  You're through.  You may step down.

6                THE WITNESS:  Thank you.

7         (Witness excused)

8                THE COURT:  Mr. Bomkamp?

9                MR. BOMKAMP:  Your Honor, we're on to Binder 2.  Does

10   Your Honor have that handy?  I can give it up to you if not.

11               THE COURT:  Kate is going to hand it to me right now.

12   Thank you.

13        (Counsel confer)

14               THE COURT:  Who are we calling next?  Let me make

15   sure they're here.

16               MR. BOMKAMP:  I think I saw her.  Ms. Butkiewicz.

17               THE COURT:  I don't see her in here currently.  I've

18   got a Adam Foster, Arnold Ainsley, Chase Buxton, Kim Nash, Lea

19   Muse, Melanie Prinslow (phonetic), Rejoe Joy, and Shailesh

20   Patel.

21               MR. BOMKAMP:  Okay.  I did tell Ms. Butkiewicz that I

22   would be texting her.

23               THE COURT:  Yeah.  Give her a heads up.  Because I've

24   been moving people around --

25               MR. BOMKAMP:  All right.  I did see her --
```

1           THE COURT:  -- for infinity and beyond.

2           MR. BOMKAMP:  -- at one point.  Worst case, I can

3   call one of the other people.

4           THE COURT:  That's all right.  How about this?  We'll

5   take a seven-minute break.  Everybody can use the restroom and

6   stretch while you're doing that.  I'll be back at 10:55.

7       (Recess taken at 10:48 a.m.)

8       (Proceedings resumed at 10:55 a.m.)

9           THE CLERK:  All rise.  The United States Bankruptcy

10  Court for the Middle District of Florida continues in session.

11          THE COURT:  Thank you.

12          Any luck?

13          MR. BOMKAMP:  I believe they shared a link, and

14  Ms. Butkiewicz is under Ms. Nash's link.

15          THE COURT:  All right.  So I've got two Kim Nashes.

16          MR. BOMKAMP  Definitely one of them.

17          THE COURT:  All right.  All right, I'll take the top

18  one first.  Let's see.  And what was the last name?

19  Butkiewicz?

20          MR. BOMKAMP  Butkiewicz, yeah.

21          THE COURT:  All right.  Let's see if one of these

22  will do it.

23          MS. STEGENT:  Your Honor?

24          THE COURT:  Yes.

25          MS. STEGENT:  This is Kristin Stegent.  We've got two

1   people, Chase B. and Nate Price, that are requesting if they

2   can join.  They're not witnesses, and they thought it was a

3   public trial that they could listen in on.

4           MR. BOMKAMP  Those aren't witnesses, Your Honor.

5           THE COURT:  Not witnesses?

6           MR. BOMKAMP:  Yeah, so there are some nonwitness --

7           MS. STEGENT:  They're in.

8           MR. BOMKAMP:  -- customers who are interested in

9   listening, listen-only -- being listen-only parties.

10           THE COURT:  What were those names?

11           MS. STEGENT:  Chase B. and Nate Price.

12           THE COURT:  Chase B.  All right, I see that one.  So

13   you're not calling Mr. Buxton?

14           MR. BOMKAMP:  No, Your Honor.

15           THE COURT:  Mr. Mickler, are you calling a

16   Mr. Buxton?

17           MR. MICKLER:  I didn't plan on that, Your Honor.

18           THE COURT:  Thank you.

19           And Ms. Stegent, what was the other person's name?

20           MS. STEGENT:  Nate Price.

21           THE COURT:  I think he's already disconnected.  I

22   don't see a Nate Price.  But if he jumps back in, I'll --

23           MS. STEGENT:  We'll --

24           THE COURT:  -- I'll keep an eye out for him.

25           You're not calling a Nate Price?

```
1                MR. BOMKAMP:  No, sir.

2                THE COURT:  Mr. Mickler, are you planning on calling

3    a Nate Price?

4                MR. MICKLER:  No, Your Honor.

5                THE COURT:  Thank you.

6                MR. BOMKAMP:  All right.

7                THE COURT:  All right, Ms. -- which -- do we have --

8    is that you, Ms. Buckholtz [sic]?  You are muted.

9                MS. STEGENT:  That's Kim.  So it would be the other

10   one.

11               THE COURT:  So it's the one not joined in.

12               MS. STEGENT:  Yes.

13               THE COURT:  I've reassigned them to this room.

14         Ms. Nash, we're trying to get Ms. Buckholtz on.

15               MS. NASH:  Okay.

16               THE COURT:  Did you see Ms. Buckholtz in the other

17   room?  It looks like she's over there under Kim Nash, as well.

18               MS. NASH:  Yeah, she couldn't get in, so she logged

19   in under my name, as well.

20               THE COURT:  I'm going to put you back in the breakout

21   room.  If you can have her --

22               MS. NASH:  Okay.

23               THE COURT:  -- jump over to the main room, that would

24   be very helpful.

25               MS. NASH:  Okay, I'll let her know.
```

1            THE COURT:  Thank you.

2            MS. NASH:  You're welcome.

3            MR. BOMKAMP:  Your Honor, if this goes on more than

4    another minute, I'll just call Mr. Foster.

5            THE COURT:  It's okay.  Here's what I'm going to do.

6    I'm going to close all breakout rooms and give another

7    announcement.  Stay here, Ms. Nash.

8            MS. NASH:  Okay.

9            THE COURT:  Hopefully that pulls everybody in.  Give

10   them one minute.  I'll pull everybody back in and then I'll

11   kick everybody out besides the nonreal Kim Nash.

12           All right, I'll mute you real fast, and I'll see if I

13   can get the other Ms. Nash out.

14           MS. NASH:  Okay.

15           THE COURT:  They close in 33 seconds.  Let's give

16   them 33 seconds.

17           Aren't you glad you have a tech-savvy judge?  Judge

18   Funk would be throwing a fit right now.

19           MR. BOMKAMP:  It's definitely helped.  We'd be on

20   CourtCall right now, Your Honor.

21           THE COURT:  Yeah, CourtCall.  It'd be useless.

22   Couldn't hear anybody.  Good luck muting them.

23           All right.  Ten seconds, and then it'll be closed.

24           All right, they're all getting booted back here now.

25           MR. BOMKAMP:  Does Your Honor have the second binder?

1          THE COURT:  I do.

2          MR. BOMKAMP:  Okay.

3          THE COURT:  Looks like the other Kim Nash -- she's in

4  the waiting room.  Here we go.

5          All right.  Is that you, Ms. Buckholtz?

6          MS. BUTKIEWICZ:  Yes, good morning.  It's Lisa

7  Butkiewicz.

8          THE COURT:  Butkiewicz.  That's right.  Give me one

9  second.  Let's see if I can --

10          MS. BUTKIEWICZ:  No problem.

11          THE COURT:  -- rename you real fast so I don't get

12  confused.  And that was Lisa?

13          MS. BUTKIEWICZ:  Lisa, yeah.

14          THE COURT:  Can you spell your last name?

15          MS. BUTKIEWICZ:  It's B-U-T-K-I-E-W-I-C-Z.

16          THE COURT:  All right.

17          All right, everybody.  We're moving along quite

18  nicely.  We're have some technological slowdown, but we're

19  doing just fine.  I wanted to bring everybody back in to let

20  you know I haven't forgot about you.

21          We're still under the same rule to where witnesses

22  can't hear other witnesses before they testify.  So if you're a

23  witness that's going to be called later, unfortunately, you'll

24  have to continue to sit in that waiting room for just a little

25  bit longer.  I haven't forgot about you.  We will get to you.

1    I promise.  But it's just taking us a little bit longer, and

2    we're wanting to make sure everybody gets a chance to talk if

3    they want to talk, and both sides are asking all sorts of

4    questions.

5              So again, we haven't forgot about you.  We appreciate

6    you all being here, and we promise we will get back to you.

7    All right?

8              Can you tell me which of these on this -- well, I've

9    got a list here.  Let me read the list.

10             MR. BOMKAMP:  Sure.

11             THE COURT:  And then you tell me which ones will be

12   witnesses.

13             Mr. Mickler, if you can listen, as well, because if

14   they're not going to be witnesses, I'm just going to leave them

15   in.  if they're going to be witnesses, though, I'm going to

16   kick them out to the waiting room.  All right?  So everybody

17   listen.  Here we go.

18             Adam Foster.

19             MR. BOMKAMP:  Witness.

20             THE COURT:  Will be a witness.  All right, Mr. --

21   well, he just -- Mr. Foster, I'm about to kick you into the

22   waiting room.  If you'll just wait there until your name is

23   called.

24             MR. BOMKAMP:  And he's next.

25             THE COURT:  And you'll -- I've heard that you're

1  next, so as soon Ms. Butkiewicz gets done, you'll be right in

2  there.  Okay, Mr. Foster?  Do you have that?

3           MR. FOSTER:  Yes, thank you.

4           THE COURT:  All right.  So you'll be in a waiting

5  room.  Give me one second.

6           Got to get it all cleaned up.  Putting him in the

7  waiting room.  All right.

8           Arnold Ainsley.

9           MR. BOMKAMP:  Not a witness.

10          THE COURT:  Are you, Mr. Mickler, going to call

11 Arnold Ainsley?

12          MR. MICKLER:  Your Honor, I wasn't planning on

13 calling anybody on the trustee's list.

14          THE COURT:  Okay, thank you.  And we already

15 established Chase Buxton you will not be calling.

16          MR. BOMKAMP:  Correct.

17          THE COURT:  Ms. -- the real Ms. Kim Nash.

18          MR. BOMKAMP:  Yes.

19          THE COURT:  She will be a witness?

20          MR. BOMKAMP:  Yes, Your Honor.

21          THE COURT:  All right.  So I'm going to go ahead and

22 kick you to the waiting room, as well.

23          Shailesh Patel?

24          MR. BOMKAMP:  Yes.

25          MR. PATEL:  Yes.

```
 1                THE COURT:  Witness.  All right, Mr. Patel.  I'm
 2     going to kick you to the waiting room.  Don't go anywhere.
 3                Kristin, we've already dealt with.
 4                Lea Muse.
 5                MR. BOMKAMP:  Witness.
 6                THE COURT:  Witness.  All right.  Going out.
 7                Ms. Muse, you're on your way to purgatory.
 8                We are on Lisa now.  How about Rejoe Joy?
 9                MR. BOMKAMP:  Witness.
10                THE COURT:  Witness.  Is that a Ms. or Mr.?  I can't
11     see.
12                MR. BOMKAMP:  It's mister.
13                MR. JOY:  It's a mister.
14                THE COURT:  Ah.  Mr. Joy, you are also going to
15     purgatory.
16                MR. JOY:  Yes.  Okay, thank you.
17                THE COURT:  And I think that's it.  All right.  I
18     think we're cleaned up now.
19                MR. BOMKAMP:  All right.
20                THE COURT:  And let me just confirm, Arnold Ainsley?
21                MR. BOMKAMP:  Not a witness.
22                THE COURT:  Not a witness.  All right.  Perfect.
23                All right.  Oh, wait.  Now we're getting another one
24     joined.  Melanie Prinslow?
25                MR. BOMKAMP:  Not a witness.
```

1          THE COURT:  Not a witness.  Not a -- all right.

2          Ms. Prinslow, if you'll just turn off your camera and

3   keep it muted, we want to make sure Ms. Butkiewicz is the star

4   witness right now.

5          All right, you may proceed, Mr. Bomkamp.

6          MR. BOMKAMP:  All right.  Good -- good morning,

7   Ms. Butkiewicz.

8          What business are you in?

9          THE COURT:  Oh, wait.  He needs to -- she needs to be

10  sworn in.

11         MR. BOMKAMP:  Oh, of course.  I'm sorry.

12         THE CLERK:  Hi.  Please raise your right hand.

13       LISA BUTKIEWICZ, U.S. TRUSTEE'S WITNESS, SWORN

14         THE CLERK:  Okay.  Please state your name and address

15  for the record, including city and state.

16         THE WITNESS:  Lisa Butkiewicz, 5434 East Kathleen

17  Road, Scottsdale, Arizona 85254.

18         THE COURT:  You may proceed.

19                     DIRECT EXAMINATION

20  BY MR. BOMKAMP:

21  Q    All right.  Good morning, Ms. Butkiewicz.  I'll start with

22  the same question I've asked everyone.  What is your line of

23  business?  What business are you in?

24  A    I have a mental health technology called Meetopolis.

25  Q    What's it called?

1   A    It's called Meetopolis.  It's an app for people to get

2   together around virtual support groups.

3   Q    Okay.  And what sort of benefit does your app provide to

4   people?

5   A    It allows people to connect that have struggles with

6   anything from anxiety to depression, going through divorce,

7   looking for support for that.  It could be rehab; we're

8   marketing it to a lot of substance abuse/AA groups, that type

9   of thing so people in rural communities can meet with each

10  other that wouldn't have, maybe, the opportunity that you do in

11  cities to have that support you need.

12  Q    Okay.  And were you, in the last several years, looking

13  for a loan?

14  A    Yes.

15  Q    And for what purpose were you seeking capital?

16  A    Basically to build out the app and largely to market it.

17  I had a lot of people in place.  I used to work in the

18  entertainment industry in L.A., and so I had relationships with

19  celebrities, and we were working on onboarding celebrities to

20  be spokespeople for the app, certain ones that have struggled

21  with different addictions or mental health issues.  So there

22  was a great need for capital because in technology, it really

23  is about how much money you raise and, you know, the number of

24  users you can acquire and how quickly you can get to market.

25  Q    Okay, and how did you learn about the BELOC?

1  A    I learned about the BELOC through a woman in Scottsdale

2  named Jessica Seithel who was working with or for David,

3  bringing him a variety of clients.  And she vouched for him.

4  She vouched for these type of loans, saying that they happen

5  all the time and they're extremely safe, and there's basically

6  no risk to it.

7  Q    Okay.  And was the BELOC your only possibility for

8  obtaining capital?

9  A    Yes, at that time, that was what I was completely focused

10 on.

11 Q    Okay.  Okay, and did you deal with McMann at all?

12 A    No.

13 Q    Okay, so you dealt directly with Genie Investments through

14 your -- Jessica Keitel [sic]?

15 A    Yes.  Correct.

16 Q    Okay.  So did you have both a BELOC and a bridge loan?

17 A    Yes, I took out the bridge loan.

18 Q    In your particular case, were both of those documents with

19 Genie Investments?

20 A    Yes.

21 Q    Okay.  So it's not a situation where one entity has the

22 BELOC and another entity has the bridge loan.  In your case,

23 both Genie?

24 A    Yes.

25 Q    Okay.  So how did you -- did you reach out to Ms. -- is it

1  Keitel?

2  A    Seithel.

3  Q    -- Seithel regarding getting your business financed?

4  A    I did.  Yeah, we were in contact I think initially through

5  LinkedIn, and you know, she took me to Genie.  They -- you

6  know, I sent her the business plan.  She said she could get it

7  approved.  You know, she had meetings with David regarding it,

8  and then she quickly sent me the term sheet.  And I wired her

9  the money for the due diligence which, in my case, was $15,000.

10      A couple days later, she came back and she said they did,

11 supposedly, a background search and everything got approved.

12 Q    Can I just -- the $15,000 you're talking about, did that

13 go to Genie Investments or Ms. Seithel?  The 15,000 you --

14 A    It went to --

15 Q    -- that you just mentioned.

16 A    It went to Genie.

17 Q    Okay.  Okay.

18 A    Yeah, all the money went to Genie.

19 Q    So the due -- so you sent a $15,000 due diligence fee to

20 Genie?

21 A    Correct.

22 Q    Okay.  And did you separately send money to Ms. Seithel?

23 Just so we're clear.

24 A    I sent -- on November 3rd of '22, I sent to Genie an

25 additional $45,000.

1    Q    Okay.  So that -- and that was on account -- was that on

2    account of pre-paid interest?

3    A    Yes.

4    Q    Okay.  And around what time frame are you sending this

5    money?

6    A    The second wire was sent November 3rd of '22.

7    Q    Okay.

8              MR. BOMKAMP:  Sorry.  Bear with me just a moment.

9              THE COURT:  Take your time.

10   BY MR. BOMKAMP:

11   Q    All right.  And if you'll turn to United States Trustee

12   Exhibit 62?

13   A    62.  Okay.

14             THE COURT:  What binder's that in?

15             MR. BOMKAMP:  2.  We're all in Binder 2 right now.

16             THE COURT:  Kate, you've given me Binder 5.

17             THE CLERK:  Oh, that's all I have.

18             MR. BOMKAMP:  Oh.  Probably --

19             THE COURT:  So we'll need 2, 3, and 4.

20             MR. BOMKAMP:  Okay.  Here is 2, Your Honor.

21             THE COURT:  Thank you.  Sorry about that.  You may

22   proceed.

23   BY MR. BOMKAMP:

24   Q    All right.  And what is this document at Document Number

25   62?

1   A      62 is the fully executed BELOC agreement with Genie.

2   Q      Okay.  And so are you familiar with the fact that many

3   customers had a BELOC with McMann and a bridge loan with Genie?

4   A      Yes.

5   Q      But you had the bridge loan and the BELOC with Genie,

6   correct?

7   A      Correct.

8   Q      Okay.

9   A      They represented to be the lender.

10  Q      Okay.  And just if you turn to the very last page of

11  Exhibit 62, what -- who has signed that document as the lender?

12  A      Genie Investments.

13  Q      All right.  And when was your loan supposed to fund?

14  A      It was supposed to fund in January of '23.  I was told it

15  would be 60 to 90 days maximum, average of 75 days from the

16  time that I wired the money.

17  Q      Okay.  And how much were you supposed to receive?

18  A      I was supposed to receive -- the total BELOC was for

19  $3 million.

20  Q      Okay.  Okay, and that was supposed to fund in January,

21  correct?

22  A      The first tranche was January, and the second tranche and

23  the final tranche was supposed to be $2.4 million in April of

24  '23.

25  Q      Okay.  And did you receive any money?

1  A    No.

2  Q    Did you get your money back?

3  A    No.

4  Q    Okay.  And did you have communications with Genie

5  regarding the ongoing failure to fund your loan?

6  A    Yeah, I had conversations with them almost weekly for a

7  year.

8  Q    Okay.

9  A    And every week to two weeks, it would be another excuse.

10  Q    Okay.  If you look at United States Trustee Exhibit 63?

11  A    Mm-hmm.

12  Q    Are you there?  Is this representative of the sort of

13  excuses that you would get from Genie?

14  A    Mm-hmm, yes.  Exactly.

15  Q    All right.

16  A    It was just -- it just never ended.  Every two weeks was

17  truly another excuse for an entire year.  And that's all

18  represented in the communication portal.  Every last bit of it

19  is there --

20  Q    Okay.  And if you look at --

21  A    -- through ZOOMERAL.

22  Q    -- Exhibit 64?

23  A    Mm-hmm.  Yes.

24  Q    And do you see in the second paragraph where it references

25  delays from Genie's capital provider?

1    A    Yes.

2    Q    And do you now understand who that capital provider was

3    supposed to be?

4    A    Yes.

5    Q    And what's your understanding about that?

6    A    Well, apparently, the capital provider was supposed to be

7    a group that -- I mean, my capital provider was Genie.  So that

8    was who was supposed to provide me the capital.

9    Q    Right.  But do you know -- do you understand who Genie is

10   referencing when Genie says their capital provider?  I know

11   that shouldn't be your problem --

12   A    Yes.

13   Q    -- but who do you think they're referencing?

14   A    I guess at this point they're referencing the Velanos

15   group.

16   Q    Yeah.  If you knew that the success of your loan was

17   dependent on that investment, would you have gotten into this

18   loan?

19   A    Never.

20   Q    Why?

21   A    It's a high risk.  It's a gamble.  I would be better off

22   just going to Las Vegas at that point.  I mean, when you say a

23   loan is approved, a loan is approved.  It's not pre-approved.

24   It was approved.  So that means the funds are forthcoming.  In

25   any sense of getting a car loan or a house loan, it means

Butkiewicz - Direct                                    86

1  you're approved.  It means you can go ahead and plan on that

2  money being there.

3  Q    Right.  If you look at --

4  A    There was no --

5  Q    -- United States Trustee Exhibit 65?

6  A    Okay.

7  Q    What is that document?

8  A    This was sent I believe late last year, and it was an opt-

9  in for -- if I signed it, I was going to be first in line to

10 supposedly get my money back.

11 Q    All right.  And did you sign it?

12 A    No.

13 Q    Why not?

14 A    Because it was absolutely ludicrous, and at that point, I

15 realized that David never had any intention of doing honest or

16 ethical business and actually giving us loans -- giving me a

17 loan.  So what was the point of believing anything further?

18     I was told that there was an order -- there was a line of

19 people and that I was in queue according to when I paid my

20 deposit.  So I found out that there were loans back to 2020

21 that he had not funded.  So obviously, there was no order.

22 They were just -- people were left in a wake of financial ruin.

23 So I was not interested in engaging any further in his

24 promises.  That's why I didn't sign it.

25 Q    All right.  And if we look at United States Trustee

1   Exhibit Number 67 --

2   A     Mm-hmm.

3   Q     -- what is this?  Like, what app or -- is this from?

4   A     It's from the ZOOMERAL portal that is David's

5   communication portal that he continually told us we needed to

6   communicate through.

7   Q     Okay.

8   A     So -- yeah.

9   Q     So instead of just, like, email or phone call or text, he

10  would prefer that you --

11  A     Mm-hmm.

12  Q     -- communicated through a website called ZOOMERAL?

13  A     Correct.

14  Q     Okay.  And these are your conversations with Mr. Hughes --

15  A     Yes.

16  Q     -- through ZOOMERAL?

17  A     Yes.

18  Q     And in your opinion, do these messages attempt to explain

19  the lack of funding?

20  A     I guess in his point of view, he was trying to explain it

21  without giving any information, but in my opinion, (audio

22  interference) course of error that was just high level and just

23  stringing us along, at best, where literally I wasted a year of

24  time where I could have been focused on, you know, raising

25  money or getting funding through grants or different things

1  that I could've done instead of just believing a lie.

2  Q    Okay.  If you look at the second to last page of those

3  messages --

4  A    Mm-hmm.

5  Q    -- there's a message on 2/9/2024 that references your

6  participation -- "discuss your participation to recover your

7  outstanding funds".

8  A    What page are you on?

9  Q    Second to last page of -- they're double-sided pages --

10  of -- well, actually, you're probably looking at it on a PDF,

11  but 67, second to last page.

12  A    Second-last page of 67.  Okay, yes.

13  Q    Yeah, and do you see -- do you see the -- I believe the

14  second to last message from David Hughes on that page where it

15  asks you if you're available to "discuss your participation to

16  recover your outstanding funds"?

17  A    Yes.

18  Q    What do you understand that to be a reference to?

19  A    That at that point, he was going to attempt to get us our

20  money back, but when I asked for a phone conversation, I never

21  got it.  So I gave him some times, and I never got a phone

22  conversation with him at that point.

23  Q    Were you ever solicited for additional money to pay for

24  Genie's lawyers?

25  A    Oh, yeah.  Yeah.  He came back and --

1  Q    Will you describe that, please?

2  A    Yeah, he sent us an agreement that basically asked us to

3  sign it, and if we signed it, we would have a better

4  opportunity of recouping our funds, and -- and in addition, he

5  was asking us to give money to fight Velanos.  So he was asking

6  for more money for his lawsuit for the mistakes that he made

7  gambling my money.

8  Q    And so as an incentive to pay more money, and this is

9  after the loan has gone bad, to pay Genie's attorneys' fees,

10 you were promised to be first in line to get your money back or

11 to get your loan funded?

12 A    Yes, exactly, just like I was promised to have a place in

13 line initially.  But that didn't happen either, so.

14 Q    All right.  Did you send money on account of that?

15 A    No.

16 Q    What impact has the nonfunding of your loan and the loss

17 of your $60,000 had on your business?

18 A    Oh, it's been a tremendous stress and strain.  The money,

19 I actually borrowed from a very dear friend, and I am on the

20 hook for it now personally because I did personally guarantee

21 it.

22      And I had a lot of contracts with people and had

23 developers set up, and I had discussions with celebrities

24 ongoing to retain them for the app, as I mentioned earlier.  I

25 had social media and marketing groups and salespeople, business

Butkiewicz - Direct                                    90

1   development people, operations, everything in queue to pull the

2   trigger.

3        So it's put a tremendous strain on me financially

4   personally, and it set the business back a whole year because I

5   had to completely pivot and go in a different direction where

6   we started a nonprofit so we can hire grant writers and apply

7   for grant funding.

8        And I could've used that $60,000 to retain an amazing

9   grant writing group that actually costs about $60,000 a year

10  and -- to write some federal and state grants where we could

11  have legitimately raised at least $4- to $5 million.  Instead,

12  we're sitting here, and that 60,000 that could've been put to

13  really good use to help a lot of people.

14  Q    Okay, and did you say you borrowed the $60,000 that you

15  gave to Genie from someone in the business community?

16  A    Yeah, I borrowed it from a gentleman in Phoenix that's a

17  very prominent businessman who's involved in a lot of good work

18  in Phoenix, as well, with hospitals and community centers and a

19  lot of stuff.  So I'm on the hook for that money.

20  Q    Was that someone who was a friend at the time?

21  A    Yes.

22  Q    Was that somebody who has a lot of pull in the Phoenix

23  business community?

24  A    Yes, a ton of pull.

25  Q    And has that relationship been soured?

1   A     It's definitely not helped.  Yes.

2   Q     And is -- are technology businesses difficult to begin

3   with?

4   A     Yeah, they're extremely difficult, and again, it's largely

5   about raising the capital so you can, you know, do marketing,

6   so you can get to market and saturate the market, and it takes

7   a lot of money.

8              MR. BOMKAMP:  All right.  I don't have anything

9   further, Your Honor.

10             THE COURT:  Mr. Mickler?

11             Let me just confirm, you're not -- neither party's

12  calling a Rustin Smith (phonetic) or a Garrett Callaway

13  (phonetic)?

14             MR. BOMKAMP:  No, Your Honor.  I believe these are

15  customers who are nonwitnesses.

16             MR. MICKLER:  No, Your Honor.

17             THE COURT:  All right.  You may proceed, Mr. Mickler.

18             MR. MICKLER:  Thank you.

19                       CROSS-EXAMINATION

20  BY MR. MICKLER:

21  Q     Good morning, Ms. Butkiewicz.  My name is Bryan Mickler.

22  I'm the attorney for Genie.  Appreciate you coming down today.

23       One of the things I was confused about with your testimony

24  was that you said that you had dealt with Genie exclusively,

25  and that's not true, is it?  You originally had contracted your

1  loan through Knights Lending.  Isn't that correct?

2  A    That's correct, but they wired the money to Genie, and

3  they dropped out three weeks after.  I was not told they were

4  going to be dropping out until they dropped out.  So they wired

5  the money to Genie as is represented in the ZOOMERAL portal.

6  Q    So what was the name of your broker again, your loan

7  broker?  Ms. Statori [sic]?

8  A    Seithel.  Jessica Seithel.

9  Q    Seithel.  So Ms. Seithel originally put you in touch with

10  Knights Lending?  Is that what happened?

11  A    Yes.  Knights Lending was supposedly in relationship with

12  Genie, again, for three weeks, and I never got the full story

13  why Knights Lending went away and the money was then

14  transferred to Genie.

15  Q    So your prior testimony that you dealt exclusively with

16  Genie is -- was not correct?

17  A    That's not true.  I did deal exclusively with Genie.

18  Jessica was the one that was dealing with Knight.  I never -- I

19  never dealt with Knight.  I never talked to them.

20  Q    Well, you certainly seemed to know who they were, so you

21  must have known about them.

22  A    Well, I -- of course I knew about them.

23  Q    Okay.  So your understanding of the initial transaction

24  was that you were going to obtain a loan through Knights

25  Lending?

1   A    Yes.

2   Q    Okay.  And that loan eventually fell through, correct?

3   A    That loan -- the relationship with Knights, like I just

4   said, went away three weeks after.  So the money was then

5   transferred to Genie.

6   Q    Let me ask a simpler question.  Did your loan with Knights

7   Lending ever go through?  Did you obtain funds from Knights

8   Lending?

9   A    No.

10  Q    Okay.  So you understood that there were risks associated

11  with attempting to borrow money and that sometimes loans don't

12  go through, based on that transaction, correct?

13  A    That was not my understanding.  No.

14  Q    But it happened, right?

15  A    Knights moved out of the picture, and they're still doing

16  it, is what I was told, that I got to now deal direct with the

17  lender, which was a better thing.

18  Q    Did you obtain a loan from Knights Lending?

19  A    No.

20  Q    Did you originally think that you were going to obtain a

21  loan from Knights Lending?

22  A    For three weeks, yes.

23  Q    Okay.  I want to direct your attention back to Trustee's

24  Number 62 that you looked at prior to --

25  A    Okay.

1  Q    And if you could turn to Article 7.  I believe it's about

2  maybe ten pages in.

3  A    Okay, let me get there.  Article 7.  Are you talking -- so

4  what section would it be?

5  Q    Article 7.

6            THE COURT:  Advance of funds.

7            THE WITNESS:  Okay, Article --

8            THE COURT:  Bottom-right corner is 2641.  Is that

9  right, Mr. Mickler?

10            MR. MICKLER:  They're all 2641.

11            THE COURT:  Oh.  Well, that's not very helpful.

12            THE WITNESS:  Article 7 -- okay, Article 7, I'm

13  there.  Advance of funds.

14            MR. MICKLER:  Thank you.

15            THE COURT:  Go ahead, Mr. Mickler.

16  BY MR. MICKLER:

17  Q    And you see Section 7.1 here?

18  A    Yes.

19  Q    Very first one.  I'm going to start about three sentences

20  in and read this to you.  "Lender agrees that first advance

21  will be funded no later than 75 calendar days following the

22  opening of the ICA by the lender with its wholesale lender."

23  Do you see that?

24  A    Mm-hmm.

25  Q    So I'm going to ask you, did you sign this agreement?

1    A    Yes.

2    Q    Okay.  And did you have the opportunity to review the

3    agreement prior to signing it?

4    A    Yes.

5    Q    Did you have the opportunity to take it to your friends or

6    an attorney or anything you needed to review it?

7    A    Yes.

8    Q    Okay.  And what this sentence says directly contradicts

9    what you stated earlier where you had no idea that there was a

10   wholesale lender involved in this.  Doesn't it?

11   A    I had no idea there's a wholesale lender?  I always knew

12   there was a wholesale lender.  What do you -- I don't

13   understand what you're saying.

14   Q    Well, you're saying Genie was my lender, and I was

15   borrowing money from Genie.  I didn't expect anybody else to

16   come in.

17   A    I was told by Jessica that Genie was the lender.

18   Q    Okay.  So that came from your broker who's trying to sell

19   you a loan and make a commission?

20   A    Yes, that Genie was the lender.  Where they get their

21   money, I don't know.

22   Q    Okay.

23   A    I mean, that's like I don't know where -- if I go to the

24   bank, where -- I mean, I don't know where that money comes

25   from.  But my deal was with Genie to get the money.  Yeah.

1    Q    And according to the contract that you signed, Genie would

2    have had no obligation to make any advance until at least 75

3    days after they opened up an account with their wholesale

4    lender.  Is that what this says?

5    A    Yes.

6    Q    Okay.  So Genie never notified you that they had set up an

7    account with their wholesale lender, did they?

8    A    No.

9    Q    So there's no obligation to make a loan to you under this

10   agreement, correct?

11   A    The bottom line is --

12            THE COURT:  I think it calls for a legal conclusion.

13            You may proceed, Mr. Mickler.

14            MR. MICKLER:  Thank you.

15   BY MR. MICKLER:

16   Q    We'll move on.  We'll let the document speak for itself.

17            THE COURT:  It is admitted.

18   BY MR. MICKLER:

19   Q    And I want to go back to some of your statements that you

20   were connected with celebrities and high-powered people in the

21   Arizona region.  You've been involved in multiple businesses

22   over the years, correct?

23   A    Correct.

24   Q    And I count 17 companies that you've either started or

25   been involved with over the past few years?

1  A    No.  I don't -- not 17 over the past few years, no.

2  Q    How about Fortitude Merchandise.  Is that you?

3  A    That was about 20-some years ago.

4  Q    Okay.

5  A    15, 20 years ago.

6  Q    So you've been in business for yourself for a long time,

7  opening up and closing businesses down?

8  A    I wouldn't say opening and closing businesses, no.

9  Q    How about Fordyce (phonetic) LLC?

10  A    I've owned -- I'm sorry?

11  Q    How about Fordyce LLC?  Is that you?

12  A    That was something in the film industry that was never

13  used for a film.

14  Q    Faith Funder, Inc. (phonetic), is that you?

15  A    Yes.

16  Q    Okay.  There were multiple Meetopolis companies that

17  you've set up:  Meetopolis Media, Meetopolis Wellness --

18  A    Mm-hmm.

19  Q    -- Meetopolis Helps.  Is that correct?

20  A    That's correct.

21  Q    And you filed bankruptcy back in 2008?

22  A    Yup.

23  Q    So you've been in financial trouble before, and you know

24  the ins and outs of the bankruptcy system and the financial

25  system, it sounds like, based on your experience?

1   A    I don't know the ins and outs of it, no.

2   Q    Okay.

3              MR. MICKLER:  Let me find my next exhibit, Your

4   Honor.  Give me one minute.

5              THE COURT:  Take your time.

6   BY MR. MICKLER:

7   Q    Ms. Butkiewicz, if you could turn to what's been marked as

8   Trustee's Number 57, 5-7?

9   A    Mm-hmm.

10  Q    Looks like this has a Knights Lending email on it.  Is

11  that who you were originally attempting to go through with --

12  for your loan, as we discussed earlier?

13  A    As we discussed earlier, yes.

14  Q    Okay.

15       (Pause)

16  BY MR. MICKLER:

17  Q    Okay.  And let's go back to Document Number 62.

18  A    Mm-hmm.

19  Q    And it's about halfway through here.  It looks like

20  everything's been combined, but can you find the part where the

21  bridge loan agreement starts?  It's all 2641, so --

22  A    The Exhibit C, Intercreditor Agreement?  Is that what

23  you're asking for?

24  Q    No, it's got a title on the top that says Bridge Loan

25  Agreement.

1  A    I would have to go through the whole thing to find where

2  that's at.

3          THE COURT:  It's closer to the back.

4  BY MR. MICKLER:

5  Q    It's after -- it's after Exhibit F.

6  A    Okay.  I've got Bridge Loan Agreement --

7  Q    Perfect.

8  A    -- January 10th, 20 --

9  Q    Let's have you look at Section 2.02.

10  A    Okay.

11  Q    And this section says that "On the effective date, the

12  Lender shall hold Bridge Loan in Lender's account on behalf of

13  the Borrower."  Do you see that?

14  A    Mm-hmm, yes.

15  Q    So you were never entitled to any funds pursuant to this

16  agreement.  The money was going to be held by Genie in its

17  account, correct?

18  A    The bridge -- yeah, the bridge.

19  Q    Yes.  Okay.

20  A    Mm-hmm.

21  Q    And then let's go to 2.03(b) here.  You see "Payment of

22  Interest"?

23  A    Mm-hmm.

24  Q    "Pre-paid interest on the outstanding principal amount of

25  the loan shall be paid in kind and capitalized on this business

1    day and shall be paid in cash in full upon acceptance of this

2    agreement.  Borrower understands that this payment is fully

3    nonrefundable."  Did you sign that contract?

4    A    Yes.

5    Q    Okay.  And the contract says that the bridge loan interest

6    that you paid in for 90 days of interest was nonrefundable,

7    correct?

8    A    Correct, but that doesn't take away the fact he didn't

9    deliver what he was supposed to deliver, so I'm not sure what

10   we were bridging.

11           THE COURT:  That's separate from contract damages.

12           You may proceed, Mr. Mickler.

13   BY MR. MICKLER:

14   Q    And under the terms of the bridge loan agreement, if he

15   had no obligation to deliver any funds to you but tied up the

16   Genie funds for 90 days, you would have pre-paid that interest,

17   correct?

18   A    Based on this agreement, yeah.

19   Q    Okay.

20   A    I find --

21   Q    You also understood from the contracts that you signed

22   that your due diligence agreement payments would be

23   nonrefundable, as well?

24   A    Yes.

25           MR. MICKLER:  Okay.  Nothing further, Your Honor.

1           THE COURT:  Thank you.

2           Mr. Bomkamp, anything in addition?

3                   REDIRECT EXAMINATION

4   BY MR. BOMKAMP:

5   Q    Just one brief --

6           THE COURT:  If you'll pull the microphone just a

7   little bit closer to you.

8           MR. BOMKAMP:  Oh, sure.

9           THE COURT:  Thank you.

10  BY MR. BOMKAMP:

11  Q    Just one brief clarification.  If the bridge loan payments

12  were supposed to go to the BELOC lender, who would they have

13  gone to?

14  A    If the bridge loan went to the -- say that again?

15  Q    So if the bridge loan payment was paid to the BELOC

16  lender, who was the BELOC lender for you?

17  A    Genie.

18  Q    Genie.  And who was supposed to fund your loan?

19  A    Genie.

20          MR. BOMKAMP:  Okay.  Nothing further.

21          THE COURT:  Thank you.

22      (Witness excused)

23          THE COURT:  Anything additional, Mr. Mickler?

24          MR. MICKLER:  No, thank you, Your Honor.

25          THE COURT:  Mr. Bomkamp, are we going to be able to

1  get this done in four hours?

2          MR. BOMKAMP:  I -- it's going --

3          THE COURT:  Even with all the stipulations, we're not

4  flying through this.

5          MR. BOMKAMP:  Yeah.  Your Honor, the debtor certainly

6  has the right to conduct cross-examination.  It's been more

7  extensive than I anticipated.  We're moving more slowly than I

8  thought we would.  So I think -- I think it's going to be a

9  challenge, just the way it's going, to get everybody in for

10 today, and I'm reluctant to cut witnesses because they've

11 all --

12         THE COURT:  Sure.

13         MR. BOMKAMP:  -- really wanted to be heard for quite

14 a while, Your Honor.

15         THE COURT:  Yeah, and I certainly need to hear from

16 the debtors.

17         MR. BOMKAMP:  Obviously, and I know people have flown

18 in for this, and so obviously, anybody who's flown in should be

19 heard from today.

20         THE COURT:  I'm not wanting to put you on the spot.

21 I'm not wanting to limit your time.  I just want to make sure

22 we're using it wisely --

23         MR. BOMKAMP:  Yeah, I think it's --

24         THE COURT:  -- and we get done what we need to get

25 done.

1          MR. BOMKAMP:  Yeah, I think it's important to make

2    sure that the folks who -- whether or not we finish today, that

3    the folks who flew in for this get their testimony in.

4          THE COURT:  I agree.

5          MR. BOMKAMP:  And I'm not sure what Your Honor's

6    point of view is about scheduling additional trial time on

7    this.

8          THE COURT:  Well, I'm at -- my Friday is open.  I'll

9    be short --

10          You're here.  Are you here, Kate, Friday?

11          She takes the most Fridays off, for the record, so.

12          THE CLERK:  I'm here, this one.

13          THE COURT:  I know Kristyn's out, but.

14          MR. BOMKAMP:  I do --

15          THE COURT:  It's an important matter.  You -- it's an

16    emergency.

17          MR. BOMKAMP:  We're, unfortunately, trending that

18    way, I think, and I'm reluctant to deny anybody their time to

19    speak --

20          THE COURT:  I agree.

21          MR. BOMKAMP:  -- because they've waited for it for a

22    long time.

23          THE COURT:  All right.  Let's get going.

24          MR. BOMKAMP:  All right.

25          MS. STEGENT:  Was my name mentioned?  I heard, but I

1    was out of the room.  Sorry.  This is Kristin Stegent.

2              THE COURT:  No, we were just discussing procedural

3    issues.

4              MS. STEGENT:  Okay, sorry.  I just heard my name.

5              THE COURT:  Who are we calling next?

6              MR. BOMKAMP:  Mr. Foster.

7              THE COURT:  I'm bringing him in.

8              Ms. Butkiewicz, you are completely done.  You're free

9    to stay or you may log off, up to you.

10             MS. BUTKIEWICZ:  Thank you.

11             THE COURT:  All right, Mr. Foster.  Can you hear me?

12             MR. FOSTER:  Yes, I can.

13             THE COURT:  All right.

14             If you could swear him in?

15             THE CLERK:  Please raise your right hand.

16             ADAM FOSTER, U.S. TRUSTEE'S WITNESS, SWORN

17             THE CLERK:  Okay.  Please state your name and address

18   for the record, including city and state.

19             THE WITNESS:  Adam Foster, 2539 North 300 East, Lehi,

20   Utah 84043.

21             THE COURT:  You may proceed.

22                          DIRECT EXAMINATION

23   BY MR. BOMKAMP:

24   Q    All right.  Good morning -- I think it's still morning --

25   Mr. Foster.  What do you do for a living?

1   A    I'm a small business owner.  I also am a business

2   management professor at a local college here in Utah.

3   Q    Okay.  And within the last couple of years, have you

4   sought financing for your business interests?

5   A    Yes, I have.

6   Q    And can you explain the circumstances under which you

7   sought that financing?  Why were you looking to receive a

8   business loan?

9   A    So in January of 2023, I was laid off from a position I

10  held at Adobe.  We have a big campus here in Utah.  I was part

11  of the HR team.  And they had a big layoff.  And so instead of

12  going back to find another corporate job, I decided to venture

13  out and become an entrepreneur.  And so I was seeking for a

14  loan to purchase a small business that I could fulfill that

15  dream.

16  Q    Okay.

17  A    I looked at various options.

18  Q    So would it be fair to say you took a flying leap at

19  becoming an entrepreneur?

20  A    Absolutely.  It was a big risk to myself and my family,

21  but we wanted to live the American dream.  So --

22  Q    Right.

23  A    -- we decided to go for it.

24  Q    And given your family obligations, was it important that

25  you were successful in that?

1   A      Absolute -- absolutely.  I have five children, and we had

2   just bought a house a couple years before, and so very

3   important that that venture be successful.

4   Q    Okay.  And how did you go about looking for business

5   capital?

6   A     Well, I went online, and I researched different options.

7   I looked at SBA loans.  I saw the interest rates were rather

8   high and the terms were not the best.  And so I was looking for

9   something that had better options, better terms, better rates.

10        As I was looking on a website that lists -- it's a popular

11  website called BizQuest.com which lists different businesses

12  that are for sale -- I reached out to the booker and he

13  mentioned that there was a new product out there, a financial

14  product that he knew about.  He would get me in touch with

15  someone that had better rates than an SBA.

16  Q    All right.  In retrospect, do you wish you had pursued the

17  SBA or some other alternative kind of financing?

18  A     Yeah.  Absolutely.  I realize now why the SBA is out

19  there.  It exists to protect people from predatory lending.

20  Q    All right.  Who did you first approach about the BELOC

21  product?

22  A     So the broker got me in touch with a man named Jeff Kly

23  (phonetic) who I reached out to.  He gave me his contact

24  information.  Jeff Kly and I had a conversation over the phone.

25  He told me about the BELOC, that it was a much better interest

1  rate, and we could get higher amounts than through an SBA loan.

2  Q     Did --

3  A     And so --

4  Q     Did anything make you suspicious about Mr. Kly?

5  A     Yeah, he -- he was a little bit pushy with the time frame.

6  He said if you want to get the best rates, you've got to get it

7  locked in now.  Otherwise, the interest rates will go up.  And

8  so that made me a little bit suspicious.

9       And so I looked through his documents, and I found that

10  there was a testimonial from a company called McMann, a man

11  named Walt Trock.  And so I looked him up, just to see if he

12  had success with the BELOC program, and to my surprise, McMann

13  Commercial offered their own BELOC program.

14  Q     Okay.

15  A     When I asked --

16  Q     So was Mr. Kly -- was he repurposing the McMann materials?

17  A     That's what it appeared to me and is why I stopped dealing

18  with Jeff Kly and I reached out to McMann Commercial Lending.

19  Q     Okay.  And how much money were you seeking to borrow?

20  A     At first, I was looking for a $2 million loan.  But after

21  speaking with Michael Lanza, he told me about the bridge loan

22  option with Genie Investments.  And through that bridge loan, I

23  would qualify for an $11 million loan, and so I started looking

24  for companies to buy within that range.

25  Q     All right.  Did you have any that looked appealing to you

1    as your potential adventure into entrepreneurship?

2    A    Absolutely.  There were several businesses that fit that

3    criteria.  I worked -- I did a lot of due diligence trying to

4    figure out if those businesses would be good investments, and

5    the math worked out really well with the BELOC program, a lot

6    better than it would with an SBA loan.

7    Q    Okay, and is that because of the relationship of interest

8    to profits and what you would net?

9    A    Correct.

10   Q    Yeah.  Just as an example, what's a business you seriously

11   considered purchasing?

12   A    There was a clothing store that I was looking at.  There

13   was also a leadership development consulting firm for sale, and

14   that's my background is leadership development with -- through

15   HR.  And so those were the two that I was looking heavily into

16   investing in.

17   Q    Okay.  And what payments did you make to advance the

18   bridge loan with Genie?

19   A    Yeah, so the first payment I made, the $7,900 fee to

20   McMann, which I was told later was a -- to gain access to the

21   ZOOMERAL portal owned by David Hughes.  And so I sent McMann

22   the $7,900 by bank wire in February of 2023.  I then sent a

23   $30,000 bridge loan fee, a due diligence fee, on March 29th of

24   2023 to Genie Investments.

25   Q    All right.  And was there an additional amount that you

1   sent?

2   A    Yes.  In June of 2023, I sent $165,000 which was the

3   remaining amount to qualify for the loan to McMann.  In my --

4   Q    Now, were you originally told to send that to Genie?

5   A    Correct.  In fact, in my --

6   Q    And who told you to send it to McMann instead?

7   A    Yeah, so in my contract, it says -- it has Genie listed as

8   where I should send it to with their bank information.  After I

9   signed the agreement on May 5th, Michael Lanza from McMann told

10  me that the bank account information had changed and that I

11  needed to wait to send the 165,000.

12      I waited about six weeks, and then he finally got back to

13  me with the new bank account information.  That bank account

14  information was McMann Commercial Lending.  It was their bank

15  account.  And so that's where I sent the money.

16  Q    All right.  And when was your loan supposed to fund?

17  A    It was supposed to be funded -- I was supposed to receive

18  my first tranche on September 3rd, 2023.  And the second

19  tranche was supposed to come on November 17th, 2023.

20  Q    And I'm sorry, what was those months again?

21  A    The first tranche was supposed to be on September 3rd.

22  Q    2023?  And then --

23  A    Correct.

24  Q    -- November 2023?  And just for reference, when did you

25  initiate your conversations with McMann?  Around what time?

1  A     I started those conversations in January of 2023.  I'm

2  sorry, February.

3  Q     February of 2023?  Okay.  And where did you get the money

4  to put up the 30,000, the 7,900, and I believe you said the

5  165,000?

6  A     Correct.

7  Q     Where did that money come from?

8  A     So total, that amounts to 202,900.  I pulled the money out

9  of a second mortgage out of my home.

10 Q     And do you -- I mean, do you owe the mortgage company that

11 amount, regardless of what happens in terms of -- in terms of

12 your funding?

13 A     Correct.  I have been making extra payments on that --

14 it's called a HELOC, a home equity line of credit -- making

15 extra payments with a variable interest rate anywhere between

16 2,000 to $2,600 every month since that time.

17 Q     Is that sustainable for you?

18 A     No.  In fact --

19 Q     Is the fact that it's not sustainable for you aggravated

20 by the fact that you were unable to buy the business that you

21 wanted?

22 A     Yes.  The whole purpose of buying that business was to pay

23 back that HELOC, to have enough money to support my family, and

24 to ultimately pay off all my existing debt.

25 Q     Because of the failure of this funding, what consequences

1  are you facing right now?

2  A    Well, I'm at extreme risk of losing everything, so my

3  house, my business, everything.  And we will be homeless.  In

4  fact, because of this, if we don't get that money back, we have

5  a high likelihood of declaring bankruptcy both with my small

6  business and my -- my home, so.

7  Q    Are you actively exploring that?

8  A    I have reached out to a lawyer to determine my options for

9  that.

10  Q    Okay.  Did you receive an opt-in agreement from Genie?

11  A    Yes, I did.

12  Q    And what did you understand that to be?

13  A    I got a phone call from David Hughes on November 1st, and

14  he stated that although the $30,000 that I sent him was

15  nonrefundable -- actually, it was on September 11th I first got

16  an email from David Hughes stating that as a gesture of good

17  will, that I would be refunded the $30,000 because the BELOC

18  program did not prove successful.

19       And so I got a phone call from him on November 1st.  Well,

20  they -- in the email, they asked for my documents.  So I

21  emailed them back in September my documents.  Here's my signed

22  agreement, here's the proof of -- my receipt from my deposit

23  from the bank for the wire transfer.  So I sent them all the

24  proof that I had actually sent the $30,000.

25       And then in November 1st, I got an email -- or I got a

1   phone call from David Hughes, and he told me that he never

2   received the $165,000 from McMann.  McMann was supposed to

3   forward them -- him that money.  He also told me that there was

4   a lawsuit going on between Genie and McMann.  McMann was

5   supposed to send Genie all the bridge loan funds they received,

6   but Genie has not received any funds from McMann from any of

7   the clients involved in the BELOC since the start of their

8   agreement together.  That is what he told me on the phone.

9        He told me the $7,900 is nonrefundable because it's part

10  of the ZOOMERAL portal fee.  He reiterated that the $30,000 was

11  nonrefundable, but now Genie would reimburse everyone's funds

12  that have participated in the BELOC program.  He also stated

13  that he got a letter that morning stating that the funds would

14  now be ready to be reimbursed from whatever source that those

15  funds were located in, that his lawyer needs to do some

16  paperwork, but he estimates that he would be able to send me a

17  check for the $30,000 the next week.

18  Q    Did that happen?

19  A    No.

20  Q    Okay.

21  A    As a condition of receiving that money, he said that I

22  needed to sign what's called an opt-in agreement.

23  Q    Could you turn to United States Trustee Exhibit 85,

24  please?

25  A    Yes, I have it here.

Foster - Direct                                                    113

1   Q    All right.  Is that the opt-in agreement that you're

2   referencing?

3   A    Yes.

4   Q    And what -- I see that you signed it.  What were you

5   hoping to accomplish here?

6   A    I was told that if I signed the agreement, that I would

7   receive the $30,000.  That's what I was told by David Hughes

8   over the phone.  I then received an email from his lawyer, and

9   when I read the agreement, it -- I was a bit surprised because

10  it reads more like a nondisparagement agreement which I was not

11  told over the phone.  But I was told that if I signed this,

12  that it was a very high likelihood that I would get my -- that

13  I would be put on the list of people to be refunded.  And so I

14  signed it under that pretense that I would be refunded the full

15  $30,000.

16  Q    Did you really need the money?

17  A    Yeah.  Yeah.  Absolutely.  Our business is going under,

18  and I can't afford my house payments anymore.

19  Q    All right.  And at some point, did you retain a lawyer in

20  this matter?

21  A    So I hired a lawyer, one of those, you know, pay $50 a

22  month kind of things, and they sent -- they sent a letter to

23  McMann demanding the money back per our agreement, that it

24  should be refunded, which it still has not been.  But I did not

25  retain that lawyer's services after that because I can't afford

1  it.  I have no money to litigate because that money is with

2  Genie and with McMann.

3          MR. BOMKAMP:  All right.  I have no further

4  questions, Your Honor.

5          THE COURT:  Thank you.

6          Mr. Mickler?

7                    CROSS-EXAMINATION

8  BY MR. MICKLER:

9  Q    Good morning, Mr. Foster.  My name is Bryan Mickler.  I'm

10 the attorney for Genie.  And you've told us a lot about the bad

11 actor McMann.  Did you ever receive any type of refund from

12 McMann?  I believe you said no?

13 A    I did not receive any refund from McMann.

14 Q    Okay.  And you've never received any type of documentation

15 or confirmation that McMann passed on this $165,000 to Genie,

16 have you?

17 A    That's correct.

18 Q    In fact, you've been told just the opposite, that McMann

19 kept the money and didn't forward it on to Genie?

20 A    I did not receive any confirmation about that.  They just

21 said that they sent the money to Genie.

22 Q    Okay.  But Mr. David Hughes has told you personally that

23 Genie didn't receive the money?

24 A    Correct.

25 Q    Okay.  And your wire went directly to McMann and your

1  attorney's letter went directly to McMann to demand the return

2  of the $165,000, correct?

3  A    That is correct.

4  Q    Okay.  Did you have the opportunity to review your bridge

5  loan agreement and due diligence agreements with Genie that you

6  had signed?

7  A    I did not review them with Genie, but I did review them

8  before I signed them.

9  Q    Okay.  And were you able to determine, through the review

10 of your documents, that your due diligence fee of $30,000 was

11 nonrefundable?

12 A    That -- yes, that is correct.

13 Q    Okay.

14          MR. MICKLER:  Nothing further, Your Honor.

15          THE COURT:  Thank you.

16          Anything in addition, Mr. Bomkamp?

17          MR. BOMKAMP:  No, Your Honor.

18          THE COURT:  Thank you.

19          Mr. Foster, you are done.  You are more than welcome

20 to stay digitally on here with your camera off and muted, or

21 you may get back to your day.  It's completely up to you.

22          THE WITNESS:  Thank you, Your Honor.  Appreciate it.

23          THE COURT:  Thank you.

24     (Witness excused

25          THE COURT:  Do we need a lunch break, or are we going

1  to be able to push through?  I mean, I can push through.  My

2  staff can come in and out.  But you guys --

3          MR. BOMKAMP:  If it were looking likely that pushing

4  through would actually get us done today, I would push through.

5  But I don't think we're on track for that.  So --

6          THE COURT:  Okay.

7          MR. BOMKAMP:  -- maybe we should just take a lunch

8  break.

9          THE COURT:  30 minutes enough time?

10          MR. BOMKAMP:  Yes, Your Honor.

11          MR. MICKLER:  This is the most important thing on my

12  calendar today, Your Honor, but I do have a five-minute 1:30

13  across the hall.  I was kind of trying to time the lunch with

14  that.

15          MR. BOMKAMP:  Oh, no objection to that, Your Honor.

16          THE COURT:  I can give you another break at 1:30 --

17          MR. MICKLER:  Okay, thank you.

18          THE COURT:  -- for -- is it Judge Funk?

19          MR. MICKLER:  It's Judge Brown.

20          THE COURT:  Oh, well, no.  I can't give it to you.

21  Yeah, just give me a heads up.  I won't be watching the clock,

22  but we'll take a break around 1:20, and we'll give you a

23  20-minute break there to handle that.

24          MR. MICKLER:  Thank you.

25          THE COURT:  So let's take a 30-minute recess --

1  34-minute recess.  We'll come back at 12:40.

2         (Recess taken at 12:06 p.m.)

3         (Proceedings resumed at 12:39 p.m.)

4             THE BAILIFF:  All rise.  The United States Bankruptcy

5  Court for the Middle District of Florida continues in session.

6             THE COURT:  Mr. Mickler, do you have your calendar

7  available?

8             MR. MICKLER:  I can, sure.

9             THE COURT:  If you can grab it while they're coming

10 in, let's go over dates to finish up before I get caught off

11 guard.  I always seem to be waiting on the U.S. Trustee's

12 Office.

13            MR. BOMKAMP:  My apologies, Your Honor, I thought it

14 was 12:50, for some reason.

15            THE COURT:  Do you have your calendar available?

16            MR. BOMKAMP:  What's that?

17            THE COURT:  Do you have your calendar available --

18            MR. BOMKAMP:   Yes, sir.

19            THE COURT:  -- for your sanction hearing?

20            MR. BOMKAMP:  Oh.

21            THE COURT:  I meant for a continued hearing date.  So

22 I believe I can move things around, and I could make it work as

23 soon as tomorrow, beginning at 10.  I could also make it work

24 Friday, beginning at 8:30.  So tomorrow at 10, which is my

25 preference, but I understand parties have things going on, or

1    Friday at 8:30.

2              Mr. Mickler?

3              MR. MICKLER:  I'm open either day, Your Honor.

4              THE COURT:  Mr. Bomkamp?

5              MR. BOMKAMP:  Would --

6              THE COURT:  And we're not done for today, obviously.

7              MR. BOMKAMP:  Yeah, would -- so I have a 341 at 10

8    a.m. that's been once continued.  Would it be possible to start

9    -- and it's just a Sub V.  Would it be possible to start at,

10   say, 10:30 or 10:45?

11             THE COURT:  What's the Sub V at 10?

12             MR. BOMKAMP:  Insta Mobility.

13             THE COURT:  That one's not too messy yet.

14             MR. BOMKAMP:  No, not too bad.  I can finish that in

15   less than an hour, Your Honor.

16             THE COURT:  Eleven o'clock tomorrow?

17             MR. HUGHES:  I'll cancel my flight.  Whatever this

18   Court wants, we'll do.

19             THE COURT:  Well, I mean, if you can get the ones

20   that --

21             MR. BOMKAMP:  No, we can do everybody in person who's

22   in person.

23             THE COURT:  That would be perfect, and then I don't

24   have to worry about travel arrangements.  I can make

25   Mr. Mickler be here any time I want.  You, too.  I mean, I just

1  don't want to -- people that have traveled, I don't want to

2  make them come back at all.  So if we can move on to -- and I

3  know that that's not the preference, but if we can make sure we

4  get the live witnesses done today that have traveled --

5          MR. BOMKAMP:  Yeah.

6          THE COURT:  -- then we can get the Zoomers in as

7  quickly and efficiently as possible, hopefully, tomorrow.

8  Because the problem is, is on Thursday, I have another really

9  messy trial that's scheduled for all day.  And I hate splitting

10  it up to where then I have tons of binders mixed together, and

11  in my head's a little mixed up.  And this is a very important

12  matter that I'd like to resolve as quickly and efficiently as

13  possible.  So I could start at 11 tomorrow, assuming we can get

14  the live witnesses done today.

15          MR. BOMKAMP:  And, Your Honor, Mr. Hughes can move

16  his flight back one day and be here live tomorrow.

17          MR. HUGHES:  If -- if needed.

18          THE COURT:  Okay.  Okay.  And it's your motion,

19  Mr. Bomkamp.  I'm not rushing you.  I'm not telling you how to

20  do your job.

21          MR. BOMKAMP:  I'm happy to allow Mr. Hughes to

22  testify today.  I don't know if we -- I don't know if he would

23  cancel his flight anyway, even if he testified today, but if it

24  would save him from canceling his flight --

25          THE COURT:  Yeah, we don't want to call you out of

1  order and then you show up.

2          MR. HUGHES:  Understood.  My flight, in the morning,

3  is six o'clock, Your Honor.

4          THE COURT:  Okay.

5          MR. HUGHES:  But whatever this Court needs me to do,

6  I'll be flexible.

7          THE COURT:  Well, if he can get you in today, I

8  expect you to get out of here in the morning.

9          MR. BOMKAMP:  Yeah, because you could be wherever

10  you're going and get on a Zoom link by trial time, which is 11.

11          MR. HUGHES:  No, actually --

12          THE COURT:  Well, he wouldn't be -- he's not worried.

13  I don't think he's worried about that part, as long as he gets

14  to testify.

15          MR. HUGHES:  Yeah, I'd be flying all day, and then I

16  wouldn't be wheels up at home till around five o'clock, but

17  that's okay.

18          THE COURT:  All right.  So travel arrangements, take

19  a minute, talk to Mr. Mickler, determine whether you want to

20  delay or whether you'd like to go ahead and be called.  And

21  that's completely up to you.  I'm not pressuring anyone.  You

22  do what's best for you guys.  I plan on going today to four

23  o'clock, so we'll have a hard stop around 4, and then I'll pick

24  it back up.  It sounds like, Mr. Bomkamp, you can be done by 11

25  tomorrow.

1        MR. BOMKAMP:  Yes, Your Honor.

2        THE COURT:  Okay.  And that way, we don't have to

3   bifurcate these trials.  And again, you're welcome to stay.  We

4   have a nice beach in this area.  And --

5        MR. MICKLER:  Mr. Hughes is just going to wait till

6   tomorrow, Your Honor.

7        THE COURT:  Go ahead and bump it.  Okay.  All right.

8        You may proceed, Mr. Bomkamp.

9        So we'll plan on going hard through four o'clock,

10   with a brief break for Mr. Mickler to do his 1:30 status

11   conference with Judge Brown, and then we'll pick back up at 11

12   a.m., until we finish.

13        MR. BOMKAMP:  All right.  I think that would be fine.

14        THE COURT:  But --

15        MR. BOMKAMP:  And at this time, because Mr. Munoz is

16   here, I'll call him.

17        THE COURT:  Okay.  All right.  Let's go.

18        MR. BOMKAMP:  We'll need -- he's going to be

19   testifying from Binder Number 5.

20        THE COURT:  5, I've got 5.

21        MR. BOMKAMP:  You got 5.  Okay.

22        THE COURT:  All right.  I hope everybody on the Zoom

23   heard me.  We're going to push through to at least four o'clock

24   today, and then we'll regroup again tomorrow at 11.

25        Kate, do we have a registration already set up for

1  tomorrow?

2          THE CLERK:  No.  I'll have to go in and do that, but

3  I'll have till -- if I do that now, would it interfere with

4  this Zoom?

5          THE COURT:  Yeah.  Okay.

6          THE CLERK:  I'll do it as soon as we finish.

7          THE COURT:  All right.  So you'll need to re-register

8  -- if you can hear me via Zoom, you'll need to re-register once

9  we update the link tonight.  All right.

10         You may proceed, Mr. Bomkamp.

11         THE CLERK:  Please raise your right hand.

12         DANIEL MUNOZ, U.S. TRUSTEE'S WITNESS, SWORN

13         THE CLERK:  Please state your name and address for

14 the record, including city and state.

15         THE WITNESS:  My name is Daniel Munoz, M-U-N-O-Z.  My

16 address is 400 West Washington Street, Suite 1100, Orlando,

17 Florida, 32801.

18         THE CLERK:  Thank you.

19         THE COURT:  You may proceed.

20         MR. BOMKAMP:  All right

21                      DIRECT EXAMINATION

22 BY MR. BOMKAMP:

23 Q   Good afternoon, Mr. Munoz.  Just for the record, where do

24 you work?

25 A   I work for the United States Trustee out of the Orlando

1   office.

2   Q    And what do you do?

3   A    My title is auditor.

4   Q    Okay.  In connection with this case, were you requested to

5   look at whether there had been any significant transfers from

6   Genie Investments in the time period before bankruptcy?

7   A    Yes.

8   Q    Based on your review, did you find any such transfers?

9   A    I did.

10          MR. BOMKAMP:  All right.  Could we look at United

11  State's Trustee Exhibit 211 in Exhibit Binder 5?

12          THE COURT:  Okay.

13  BY MR. BOMKAMP:

14  Q    All right.  And what is this exhibit here?

15  A    This document is a Morgan Stanley statement.  It looks --

16  it is a combined statement that includes both what is known as

17  the portfolio active assets account -- excuse me -- portfolio

18  management active assets account, which is a deposit account,

19  as well as a liquidity access line, which is a loan.

20  Q    All right.  And as of January 1st, 2024, what was the

21  balance in the debtor's Morgan Stanley account?

22  A    So the -- the beginning value was $10,566,138.

23  Q    All right.  As of later in the same month,

24  January 31st, 2024, what was the balance of the Morgan Stanley

25  account?

1  A    $2,516.80.

2  Q    All right.  So the balance is reduced from an excess of 10

3  million to between $2- and $3,000.

4  A    That's correct.

5  Q    Okay.  Within this exhibit, do you see detail regarding

6  that transfer?

7  A    Yes, and it was more than one transfer.

8  Q    Regarding the transfers, where do you see that?

9  A    If you're looking at the statement on the top right, the

10  page numbers are -- are denoted.  On Page 10 of 16 of the

11  statement, this is still the portion of the statement that's

12  for the portfolio management active assets account.  There are

13  lists of transactions.  It specifically says "activity," and

14  under cash flow, "activity by date."

15  Q    All right.  And were there any transfers that you saw here

16  to affiliates of the debtor?

17  A    Yes.  There was a transfer which occurred on

18  January the 4th, 2024.  The transfer was made to -- or rather,

19  the beneficiary, as shown on the statement, is Genie

20  Investments II, and the dollar amount was $644,606.44.

21  Q    All right.  And were you able to confirm that that was an

22  affiliate of the debtor and this isn't just a strange

23  coincidence that it's a similar name?

24  A    Well, right.  At the 341 meeting, it was confirmed that

25  this is a -- a related entity.

1    Q    Okay.  And so we've accounted for, I believe, $644,000 of

2    the 10 million.  What about the rest of the 10 million?  Where

3    did that go?

4    A    The day prior, January the 3rd, 2024, there was a transfer

5    in the amount of $9,935,236.73, which was made to pay off the

6    liquidity access line.

7    Q    Okay.  And that was a loan held by what entity?

8    A    Morgan Stanley.

9    Q    Okay.  And that's how we got from $10.5 million to $2,000

10   within a month?

11   A    That is the vast majority of the transactions.  There were

12   other smaller transactions for less than $10,000.  But yes,

13   that is the -- the -- the bulk of the -- of the transfers.

14   Q    All right.  Could you turn to Exhibit 213?

15   A    Yes.

16   Q    What is this document?

17   A    This is Docket Number 40 on the -- the bankruptcy main

18   case.  It is a notice of filing, statement of financial

19   affairs --

20   Q    Okay.

21   A    -- filed by the debtor.

22   Q    And other than the lengthy table that's a part of this

23   document, has this statement of financial affairs been amended?

24   A    I -- I have not seen a -- well, there was one amendment

25   made as to the format of the transactions.  But apart from

1   that, no, I have not seen any other amendments on the docket.

2   Q    So if you kind of turn into the middle of the exhibit,

3   you'll see a lengthy transaction register.

4   A    Yes.

5   Q    Is that what was reformatted?

6   A    Yes, that's correct.

7   Q    Okay.  But other than that, has this been amended?

8   A    No.

9   Q    Okay.  Could you turn to Question 4, which is on the

10  second page of the statement of financial affairs?

11  A    Okay.

12  Q    And are there any insider transactions that are listed

13  here?

14  A    Yes.  In Item Number 4 of the statement of financial

15  affairs, there are three.

16  Q    And what are those?

17  A    Number 1 is a transfer or -- excuse me -- transfer or

18  transfers made to Cald, C-A-L-D, Holdings/Caleb Davis, made

19  during 2023, total amount of $500,000.  And the reason listed

20  was loan/compensation to Caleb Davis as former director.

21  Q    Okay.  And what about other insider transactions?

22  A    Item Number 2 is a transfer to -- or transfer or transfers

23  to John Cohan/Capitulo, C-A-P-I-T-U-L-O, made in 2023, also in

24  the amount of $500,000.  And the reason for payments was

25  loan/compensation to John Cohan as director.

1  Q    All right.  And are there any others?

2  A    Yes.  The final one, also the largest one, is Item Number

3  3 of Question 4, made to David Hughes/ZOOMERAL,

4  Z-O-O-M-E-R-A-L, also in 2023, in the amount of $1.9 million.

5  And the reason is the same, loan/compensation to David Hughes

6  as director.

7  Q    Okay.  And is it your understanding that 2023 was a time

8  period during which the debtor was having trouble with Velanos?

9  A    Yes.

10  Q    All right.  And do we know with any certainty whether

11  these are gratuitous transfers or loans?

12  A    Not certain.  No.

13  Q    Okay.  If they're loans, are they somehow different than

14  all the other loans that we've talked about today or that

15  Genie's various customers have?

16  A    The difference between the other loans that have been

17  discussed or testified to is that those were borrowers or

18  potential borrowers.  And in the case of these three items

19  listed on number four of the SOFA is that these are loans

20  and/or compensation made to directors or -- or companies owned

21  by the directors of the debtor.

22  Q    And were these funded?

23  A    Yes.

24         MR. BOMKAMP:  Nothing further, Your Honor.

25         THE COURT:  Mr. Mickler.

1                          CROSS-EXAMINATION

2    BY MR. MICKLER:

3    Q    Good afternoon, Mr. Munoz.

4    A    Good afternoon.

5    Q    With respect to the three transactions to Mr. Cohan and

6    Mr. Hughes and Caleb Davis, if they were loans which were

7    properly documented and provided to the United States Trustees,

8    they wouldn't necessarily be compensation at that point, would

9    they?

10   A    I'd have to verify -- I'd have to look at the document to

11   verify.  But again, it's either a loan or it's compensation or

12   a combination.  I -- I just -- I don't know.

13   Q    Okay.  But assuming there's a proper loan document, it

14   would be most likely a loan.

15   A    If there's a loan document, and it appears to be an

16   appropriate document and properly funded, then it would be, you

17   know, a properly funded loan.

18   Q    Okay.  And that would be something that would generally be

19   considered an asset of the debtor in the case?

20   A    Correct.  If -- if loans are made to individuals with a

21   promise to pay back, then the debtor may have, or should have,

22   an expectation to be repaid on those loans.

23   Q    Thank you.  Nothing further.

24   A    Yes, sir.

25            THE COURT:  Anything in addition, Mr. Bomkamp?

1           MR. BOMKAMP:  No, Your Honor.

2           THE COURT:  Thank you.

3           Mr. Munoz, you are done.

4           THE WITNESS:  Thank you, Your Honor.

5      (Witness excused)

6           THE COURT:  Where are we going next, Mr. Bomkamp?

7           MR. BOMKAMP:  All right.  So we concluded with

8  Mr. Foster.

9           THE COURT:  That's correct.

10          MR. BOMKAMP:  All right.

11          THE COURT:  I'll tell you who I've got in the waiting

12 room.  I've got a Rejoe Joy, Lea Muse, The Real Kim Nash, and

13 then a 603 phone number.

14          MR. BOMKAMP:  Okay.  Let's see.

15          THE COURT:  Mr. Patel has logged in and out and is

16 currently out.

17          MR. BOMKAMP:  Okay.  And we'll be on Volume 3 now, so

18 let me make sure everybody has that.

19          THE COURT:  I will need that one.  And who do you

20 want me to call in?

21          MR. BOMKAMP:  The exhibit list is Volume 3.

22          THE COURT:  Oh, okay.  Sorry.

23          MR. BOMKAMP:  All right.  Is Rejoe Joy available?

24          THE COURT:  They are.

25          MR. BOMKAMP:  All right.

1            THE COURT:  Pull him in.

2            Mr. Joy, can you hear me, and are you with us?  Rejoe

3   Joy.

4            MR. JOY:  Yes, Your Honor.  Do you hear me?

5            THE COURT:  I do.  If you could turn on your camera,

6   you are now the prize witness.

7            MR. JOY:  Okay.

8            THE CLERK:  Hi.

9            THE COURT:  Hold on one second.  Let him get his

10  camera on.

11           THE CLERK:  Okay.

12           THE COURT:  All right.  You may swear him in.

13           THE CLERK:  Please raise your right hand.

14            REJOE JOY, U.S. TRUSTEE'S WITNESS, SWORN

15           THE CLERK:  Okay.  Please state your name and

16  address, including city and state, for the record.

17           THE WITNESS:  Rejoe Joy, 1709 Vintage Lane, Wylie,

18  Texas, 75098.

19           THE COURT:  And if you could, speak into the

20  microphone as much as you can.  You're very faint, and I know

21  Mr. Bomkamp's ears --

22           THE WITNESS:  Okay.

23           THE COURT:  -- are bad, so he may not hear what your

24  answer is.

25           THE WITNESS:  Okay.  I'm going to hold the phone

1    closer.

2              THE COURT:  That works.

3              THE WITNESS:  Rejoe Joy.  It works?  Rejoe Joy, 1709

4    Vintage Lane, Wylie, Texas, 75098.

5              THE COURT:  You may proceed, Mr. Bomkamp.

6              MR. BOMKAMP:  All right.

7                        DIRECT EXAMINATION

8    BY MR. BOMKAMP:

9    Q    Good afternoon, Mr. Joy.

10   A    Good afternoon.

11   Q    What is it that you do for a living?

12   A    I am just a private equity holder now, where I kind of

13   invest into properties.

14   Q    All right.

15   A    That's basically what I do.

16   Q    Okay.  And so you own and try and make money from real

17   properties?

18   A    Correct.

19   Q    All right.  And why were you recently seeking a loan?

20   A    After I decided I wanted to kind of leave the corporate

21   world and find out a couple of things about some personal

22   things that were going on with my family -- my three -- out of

23   my three children, two of them have been diagnosed with

24   muscular dystrophy.  And I wanted to grow my business much

25   faster, so when this opportunity came about, I decided to jump

1    -- jump on it.

2    Q    Okay.  And so your goal was to leave your day job,

3    essentially, and become a full-time property investor/landlord?

4    A    Correct.

5    Q    Okay.  And is it fair to say that it was very important to

6    you, given the circumstances that you just described, that this

7    work out?

8    A    Yes.

9    Q    All right.  And what kind of job did you leave?

10   A    I used to be an accountant.

11   Q    Okay.  And when did you hear -- what sort of options did

12   you explore for a business loan?

13   A    I went to banks, tried to get some loans, which I did.  I

14   -- I started buying one or two properties at a time, but they

15   had to be seasoned.  So you couldn't buy one property after the

16   other unless you had huge down payments.  That's when I was

17   starting to search for some other options on being able to buy

18   properties at a larger count.

19   Q    Okay.  And how did you find the BELOC product?

20   A    So I was introduced to a -- a man named Larry Roche

21   (phonetic), who was, I guess, the middleman here, who did the

22   introduction to McMann, probably in October of 2022.

23   Q    Okay.  In October of 2022.  And how much money did you

24   anticipate getting through the BELOC product?

25   A    3,575,000.

1  Q    Okay.  And did you have a particular idea what you wanted

2  to buy with that capital?

3  A    Yes.

4  Q    What was that?

5  A    I did.  It was supposed to be about 25 units.

6  Q    Okay.  Like a multifamily, 25-unit apartment?

7  A    A combination of single families, multifamilies, and

8  larger units.

9  Q    Okay.  And you think if you would have been able to buy

10  that, you would have had a chance of essentially making an

11  adequate living as an entrepreneur?

12  A    Yes.

13  Q    Okay.  Did you have -- in addition to the BELOC, did you

14  have a bridge loan with Genie Investments?

15  A    I did.

16  Q    Okay.  If you could turn to United States Trustee Exhibit

17  94.

18  A    Yes.

19  Q    All right.  And is this the due diligence agreement that

20  you signed with Genie Investments?

21  A    Yes.

22  Q    And how much did you pay in connection with this

23  agreement?

24  A    50,000.

25  Q    Okay.  And where did the money come from?

```
 1  A     So I had a combination of my own money, my HELOC, and then
 2  my father and my brother.
 3  Q     Okay.  So you had some savings.
 4  A     Yes.
 5  Q     You took a loan out against your house.
 6  A     Yes.
 7  Q     And you borrowed money from your father and your brother.
 8  A     Correct.
 9  Q     Is that correct?
10  A     That is correct.
11  Q     You got to speak.  Can't hear you nod.
12        THE COURT:  He did.  It just kind of cut him off.
13        THE WITNESS:  That is correct.  Sorry.
14  BY MR. BOMKAMP:
15  Q     Okay.
16  A     Yes.  Correct.
17  Q     And was the plan to pay them back promptly upon the
18  funding of the Genie Investment loan or of the --
19  A     That is correct.
20  Q     -- McCann-Genie loan?  All right.
21  A     That is correct.
22  Q     And --
23  A     I was hoping this would be all finished, you know, within
24  45 to, you know, 75 days, that I can get that money, return
25  their money, and you know --
```

1   Q    Sure.

2   A    -- start building out my portfolio.

3   Q    And have you been able to do so?

4   A    No.  It's -- it's been a struggle.  I have a --

5   Q    Has that created tension within your family?

6   A    -- tremendous amount of debt.

7   Q    Has that created tension within your family?

8   A    Yeah, there is some.  I've been able to make them

9   understand what I'm trying to do here.  Hopefully, you know, I

10  can somehow repay them.  I am doing my best to try to create a

11  plan on returning those funds in the coming years, I guess.

12  Q    Okay.  And so was the $50,000, was that -- that you paid

13  to Genie, was that the due diligence fee?

14  A    That is correct.

15  Q    Did you pay any additional monies to Genie?

16  A    Yes.  45,000 for prepaid interest.

17  Q    Okay.  And in connection with the prepaid interest to

18  Genie, did that also come from the HELOC, your brother, your

19  dad, and your savings?

20  A    That is correct.

21  Q    Okay.  And around when did you make those payments?

22  A    The prepaid interest was done in February of 2023.

23  Q    Okay.  If you don't mind, please turn to United States

24  Trustee Exhibit 95.

25  A    Yes.

1    Q    And is that your payment of the due diligence fee to Genie

2    Investments, NV?

3    A    That is.

4    Q    All right.  And then you've got a bank account here also

5    that shows the debit.

6    A    Yes, correct.  That is my bank statement.

7    Q    All right.  When was your loan supposed to fund?

8    A    It was supposed to be funded 45 days to 75 days from the

9    prepaid interest period, which was February of 2023.  I was

10   hoping I'd be funded by, worst case, April of 2023.

11   Q    Okay.  And when did you realize there was trouble?

12   A    I guess I didn't really realize it as long as they kept

13   saying that, you know, the funding is in place.  We just

14   haven't been able to disperse it, just because of some things

15   that they're trying to make sure all of the people that have

16   asked for these loans get funded.  So, you know, I waited till

17   October of 2023, where we finally realized that, you know, I

18   was never going to get the funding.

19   Q    Okay.  And what steps did you take once you discovered

20   that the loan was bad, that you weren't getting paid?

21   A    I emailed both McMann and Genie and their other parties,

22   like Larry Roche, who is the broker, I guess, in the deal, and

23   I guess the office manager, Sandra Colthirst, to try to see if

24   we can start the process of a refund.  And I also sent a demand

25   letter to McMann for the refund of all those monies.  But the

1  only response given to me is that I needed to reach out to

2  Genie, which also I sent an email.  And the response from them,

3  or from McMann, was that, potentially, they can do up to a 50

4  percent refund if I signed an opt-in agreement.

5  Q    Okay.  Okay.  And this is jumping backwards a little bit,

6  but could you please turn to Exhibit 99.

7  A    Yes.  I'm here.

8  Q    Is that your payment of prepaid interest to Genie?

9  A    That is correct.

10 Q    Okay.

11          MR. BOMKAMP:  Okay.  Bear with me just a moment.

12          THE COURT:  Take your time, Mr. Bomkamp.

13 BY MR. BOMKAMP:

14 Q    All right.  Well, did you testify that you were offered to

15 -- that Genie offered you to sign the opt-in agreement to get

16 you 50 percent of your money back?

17 A    Yes.  So the way it worked was I never really got that

18 from Genie.  Genie had sent something to Walter Trock, I guess

19 the owner of McMann, and Walter Trock is the one who sent me

20 that opt-in agreement.

21 Q    So was it something he forwarded from -- it was from Genie

22 to McMann, and then it was forwarded from McMann to you.

23 A    Correct.

24          MR. BOMKAMP:  Okay.  All right.  I don't have

25 anything further, Your Honor.

```
1            THE COURT:  Mr. Mickler.

2                        CROSS-EXAMINATION

3   BY MR MICKLER:

4   Q    Good afternoon, Mr. Joy.  My name is Bryan Mickler.  I'm

5   the attorney for Genie.  I wanted to direct your --

6   A    Good afternoon.

7   Q    -- attention to the United States Trustee's Exhibit Number

8   94, if you can look at that, please.

9   A    Okay.  I'm on it.  I'm on it.

10           THE COURT:  You may proceed.  He said he's on it.

11           MR. MICKLER:  Oh, he's there?  Okay.

12  BY MR. MICKLER:

13  Q    If you could look at Page 2, Paragraph 2 of that exhibit.

14  Do you see where it says "payment" there?

15  A    Yes.

16  Q    Okay.  And are those your initials on the bottom right-

17  hand corner of this page?

18  A    That is.

19  Q    All right.  And the last sentence -- the first sentence of

20  Paragraph 2 says, "As a material inducement to company to

21  commence the services, the borrower shall pay company a non-

22  accountable and non-refundable fee of $50,000, payable prior to

23  the commencement of services."  Did you have a chance to read

24  that prior to signing the agreement?

25  A    I did.
```

1  Q    Okay.  And you understand what "non-accountable" and "non-

2  refundable" mean?

3  A    I do.

4  Q    Let's go to the next paragraph.  "Payment of the diligence

5  fee is not a guarantee that company will offer funding to

6  borrower or that any offer will be on the terms and conditions

7  acceptable to borrower."  So you understood, from this

8  paragraph in the contract that you signed, that you were not

9  guaranteed a loan?

10 A    I understand.

11 Q    And it looks like you're a fairly sophisticated real

12 estate lender.  I found at least five properties under your

13 name, so you're familiar with how real estate closings go and

14 the charges and title costs and diligence fees that go into

15 something like that, correct?

16 A    That is correct.

17 Q    Okay.  And it looks like you've operated several

18 companies, Global Verse, JAA Real Estate Holdings, Why Pay More

19 Services.  So you've had the opportunity to sign loan

20 agreements in the past?

21 A    Just for Global Verse.  The other two are brand-new

22 entities.

23 Q    Okay.  Let's turn to what is marked the bridge loan

24 agreement, which is the Trustee's Number 98.

25 A    Yes, I'm here.

1    Q    If you can go to Section 2.02 on that.

2    A    Which number?  I'm sorry.

3    Q    2.02.

4              THE COURT:  2.02.

5              THE WITNESS:  On Exhibit 98, you said?

6              MR. MICKLER:  Yes.

7              THE COURT:  That is correct.

8              THE WITNESS:  Okay.  And which -- which exhibit am I

9    looking at?

10             MR. MICKLER:  98, 2.02.

11             THE COURT:  Section 2.02 on Exhibit 98.

12             THE WITNESS:  Okay.  Okay.  I am here.

13   BY MR MICKLER:

14   Q    Okay.  And you would have had the opportunity to review

15   this agreement and sign the agreement prior to going through

16   all of the loan documents with Genie?

17   A    Yes.

18   Q    And on this 2.02, it says, "On the effective date, the

19   lender shall hold bridge loan in lender's account on behalf of

20   the borrower."  So based upon that, you understood that Genie

21   was going to hold your bridge loan in its account until the

22   larger loan with McMann was funded and paid out, correct?

23   A    Correct.

24   Q    And so you were never promised any money as a normal loan.

25   You were never going to receive a large chunk of money from

1   Genie.  It was just going to be held in their account, correct?

2   A    No.  There was, I believe, a tranche schedule.

3   Q    The tranche is with the McMann loan.  Isn't that correct?

4   A    So as per my understanding was, Genie was going to be the

5   line of credit lender.

6   Q    My understanding, from your testimony, was that you were

7   going to obtain a BELOC through McMann.

8   A    Yes.  But if you look at all the documents I signed, 98 is

9   one of yours -- or one of the ones.  But there's also an

10  intercredit agreement that states that Genie will be the line

11  of credit lender.

12  Q    Show me where you're looking, please.

13  A    Yes.  It is, I believe, the same document, 98.  You'll

14  have to scroll down to --

15  Q    I see it.  It's the intercreditor agreement?

16  A    Correct.

17  Q    Okay.  And that's related to the bridge loan that we're

18  talking about.  It's attached to the bridge loan.

19  A    That is correct.

20  Q    Okay.  So let me go back to my question.

21  A    Yes.

22  Q    You weren't going to receive a chunk of money, $3.5

23  million, or even $357,000 from Genie.  Based on this 2.02, it

24  was going to be held in Genie's account until your McMann loan

25  closed.

1   A    My understanding was, on the first tranche, they were

2   going to be deducting the ICA account payment, which was

3   357,000, and I get a certain amount of that after.

4   Q    Correct.  McMann --

5   A    So they'll keep --

6   Q    -- was going to fund that first tranche at some point in

7   the future.

8   A    Correct.

9   Q    Okay.  Let's flip over to the next page, under

10  Section 2.03.  Now, your understanding of this, I believe you

11  testified, was that you were going to prepay 90 days of

12  interest with this bridge loan prior to the closing of the

13  loan.

14  A    Correct.

15  Q    Okay.  And you understood that McMann was going to --

16  based on what they had told you, they were going to fund your

17  loan sometime within 75 days, is what they were hoping for.

18  Was that your testimony?

19  A    Yes.  The -- yes.  They told me, at most, it would have

20  taken 75 days, but most of them had been funded in 45 days.

21  Q    All right.  So during that 75-day period, this bridge loan

22  agreement was in place.  And let's look at 2.03, Subsection B

23  here.  Tell me when you're there.

24  A    Yep, I'm here.

25  Q    Okay.  Subsection B says, "Prepaid interest on the

1   outstanding principal amount of the loan shall be paid in kind

2   and capitalized on this business day and shall be paid in cash

3   in full upon this acceptance of this agreement.  Borrower

4   understands that this payment is fully nonrefundable."  So

5   based on this agreement that you signed, you would have

6   understood that your 90 days of prepaid interest for the

7   waiting period for the McMann loan was fully nonrefundable,

8   correct?

9   A    But I never received any of the principal amount.  I

10  haven't received anything.  So how could -- I was just trying

11  to understand how the clock started.

12  Q    Well, let's go back to 2.02, which is what I was getting

13  to before.  You were never due to receive any of the funds,

14  were you?  It was going to be held in Genie's account, correct?

15  A    So just the ICA payment of -- of the 10 percent, and then

16  I was supposed to get a difference.

17  Q    Correct.  That's --

18  A    It was supposed to be a 20 percent -- yeah, it was

19  supposed to be a 20 percent amount paid out on the first

20  tranche --

21  Q    Okay.  And --

22  A    -- of the 3,575,000.

23  Q    And that was a loan that you were applying for through

24  McMann?

25  A    Correct.

Joy - Cross                                            144

1   Q    All right.  And I read your statement to the United States

2   Trustee, and throughout -- part of it says, "January through

3   October 2023, Michael kept saying the loan is about to be

4   funded, then more delays and excuses."  Does that refer to

5   Michael Lanza with McMann?

6   A    Yes, correct.

7   Q    And he's the one that you were dealing with through McMann

8   and kept sort of stringing you along during these ten months,

9   it looks like.

10  A    That is correct.

11          MR. MICKLER:  Nothing further, Your Honor.

12          THE COURT:  Anything in addition, Mr. Bomkamp?

13          MR. MICKLER:  Actually, Your Honor, I do have one

14  more quick question.  I'm sorry.

15          THE COURT:  I'll allow it.

16          MR. MICKLER:  Thank you, Your Honor.

17  BY MR. MICKLER:

18  Q    Did Genie ever take a fourth month or a fifth month or six

19  months of any type of prepaid interest from you after this

20  bridge loan agreement had expired?

21  A    No.

22          MR. MICKLER:  That's all, Your Honor.

23          THE COURT:  Mr. Bomkamp.

24          MR. BOMKAMP:  Just one question that I forgot to ask.

25                      REDIRECT EXAMINATION

1  BY MR. BOMKAMP:

2  Q    Mr. Joy, did you understand that the funding of your

3  bridge loan or any of your loans was dependent upon the success

4  of a speculative investment?

5  A    I did not.

6           MR. BOMKAMP:  All right.  Nothing further.

7           THE COURT:  Mr. Mickler.

8           MR. MICKLER:  Nothing further.

9           THE COURT:  Mr. Joy, you are done.  We appreciate you

10 taking the time today.  You're more than welcome to stay and

11 watch.  If you decide to do that, turn off your camera, as well

12 as your microphone.  If not, you're free to go.  Good to see

13 you today.

14          THE WITNESS:  Okay.  Thank you.

15          THE COURT:  Thank you.

16      (Witness excused)

17          THE COURT:  Where are we going next, Mr. Bomkamp?

18          MR. BOMKAMP:  All right.  And I believe the

19 understanding was that -- are Mr. Hughes and Mr. Cohan -- are

20 they staying for tomorrow and testifying then?

21          THE COURT:  They're going to go ahead and stay.

22          MR. BOMKAMP:  They're going to stay.  Okay.  So in

23 that case, I'll go ahead and call --

24          THE COURT:  We've got Lea Muse --

25          MR. BOMKAMP:  Call Ms. Muse.

```
1              THE COURT:  -- The Real Kim Nash, and Carla Harrison.

2              MR. BOMKAMP:  All right.  Okay.  I'll call Ms. Muse,

3    and then I'll need to -- then we'll go Nash, and I'll get the

4    Patels back on.

5              MR. MICKLER:  Yeah, could this be a good time for a

6    quick, five-minute break for me?

7              THE COURT:  Oh, yes.

8              MR. MICKLER:  Thank you.

9              THE COURT:  We'll take a quick ten-minute break.

10   We'll come back at 1:35.

11       (Recess taken at 1:24 p.m.)

12       (Proceedings resumed at 1:38 p.m.)

13             THE COURT:  Mr. Bomkamp, just to confirm, Carla

14   Harrison?

15             MR. BOMKAMP:  Bear with me.  I'm just getting the

16   Patels on the line for --

17             THE COURT:  Carla Harrison, is she a witness?

18             MR. BOMKAMP:  She is not a witness.

19             THE COURT:  For your side, Mr. Mickler, no?

20             MR. BOMKAMP:  Is Ms. Muse on the line?

21             THE COURT:  Ms. Muse is in, and Kim Nash is in.

22             MR. BOMKAMP:  All right.  Let's go with Ms. Muse.

23             THE COURT:  And I think your light is on.  Your

24   flashlight has been on all day.

25             MR. BOMKAMP:  Oh, so sorry.
```

1           THE COURT:  Oh, I don't care.  It's just your battery

2    that cares.

3           MR. BOMKAMP:  I'm not trying to blind Your Honor.

4    Okay.  There we go.

5           THE COURT:  So who do you want, Ms. Muse?

6           MR. BOMKAMP:  Yes, Ms. Muse.  And that's just the

7    next section of Volume 2.

8           THE COURT:  Perfect.  Looks like we may can get

9    through everybody via Zoom today.  We're making good progress.

10          MR. BOMKAMP:  Yeah.  I want to make sure to get

11   through the Patels, because I know Preet is a medical resident.

12          THE COURT:  Okay.

13          MR. BOMKAMP:  So we'll go back to --

14          THE COURT:  Well, he's been on and off.

15          MR. BOMKAMP:  Yeah, okay.

16          THE COURT:  Ms. Muse?

17          MS. MUSE:  Yes, I'm here.

18          THE COURT:  It's your time to shine.

19          Ms. Menard, if you'll please --

20          MS. MUSE:  Okay.

21          THE COURT:  -- swear her in.

22          THE CLERK:  Okay.  Please raise your right hand.

23            LEA MUSE, U.S. TRUSTEE'S WITNESS, SWORN

24          THE CLERK:  Please state your name and address,

25   including city and state.

```
 1              THE WITNESS:  My name is Lea Muse.  My address is
 2   1133 East 83rd Street, 171, Chicago, Illinois, 60619.
 3              THE COURT:  And that's a great tone and volume.  If
 4   you could keep that up through the whole thing, we'll all be
 5   able to hear you --
 6              THE WITNESS:  Sure.
 7              THE COURT:  -- just fine.
 8              You may proceed --
 9              THE WITNESS:  Great.
10              THE COURT:  -- Mr. Bomkamp.
11              MR. BOMKAMP:  All right.
12                         DIRECT EXAMINATION
13   BY MR. BOMKAMP:
14   Q    Good afternoon, Ms. Muse.
15   A    Hello.
16   Q    I'll begin with the question I've asked everyone.  What is
17   it that you do for a living?
18   A    Currently, what I do for a living is I am a business
19   analyst for a large bank.  I've been in corporate America for
20   the past over seven years, and I was looking to get back into
21   real estate.  I was a real estate agent several years ago.
22   Q    Okay.  And to accomplish that, were you looking for a loan
23   of some kind?
24   A    Yes, I was looking for a loan to -- to go into an
25   investment of a 16 to 21-unit apartment complex.  And my
```

1  requested loan was $3 million.

2  Q    And was this part of your plan to transition from a

3  corporate job to a self-employed job?

4  A    Yes, absolutely, yes.

5  Q    Okay.  And was your desire to resume as a realtor, was

6  that tied into this as well?

7  A    It -- it is, yes, exactly.  I was looking to -- to get my

8  real estate license again and reinstated here in -- in the

9  state of Illinois.

10 Q    Okay.  And were you looking for capital to start your real

11 estate, restart your real estate career?

12 A    Yes.

13 Q    All right.  And what options did you consider in terms of

14 getting a loan?

15 A    I did consider other options like the -- the traditional

16 method of Citibank and Chase and those type of large banks.

17 But what I -- the frustration I encountered with those is that

18 they required much more experience, or I guess I would say much

19 more experience or already had real estate to begin with.  See,

20 I'm starting with no real estate.  So because of that, it was

21 kind of the -- why I was turned away from a lot of those larger

22 banks.

23 Q    All right.  So you were looking for someone who would take

24 a chance on your entrepreneurial ambitions?

25 A    Yes.

1  Q    And did you think you found such a loan product?

2  A    I did.  I did.  When I -- when I found McMann Commercial

3  Lending, I -- I -- I spoke to Walter Trock initially, and

4  then -- then he forwarded me to Michael Lanza.

5  Q    All right.  All right.  And how much again were you

6  looking to borrow?

7  A    I was looking to borrow $3 million.

8  Q    Okay.  And did you have both a BELOC loan and a bridge

9  loan?

10 A    I did.  I -- I signed a BELOC -- I signed a -- a bridge

11 loan initially.  It was dated -- my bridge loan was dated

12 February 3rd, and -- and I signed that and I sent it back to

13 McMann Commercial Lending on February 11th.

14 Q    Okay.  And did you make any payments in connection with

15 either the bridge loan or the BELOC loan?

16 A    Yes.  I started -- well, the -- the -- the initial payment

17 was a $7,800 due diligence fee to McMann Commercial Lending.

18 And once I completed a series of what they called the, you

19 know, the background checks and things like that, at least I

20 thought that's what they did.  And then they instructed me to

21 wire a $25,000 due diligence fee to -- to Genie Investments.

22 Q    And if you look at United States Trustee Document 113.

23 A    Just give me one minute so I can get there.

24 Q    Okay.  Take them on.

25        THE COURT:  Take your time.

```
 1              THE WITNESS:  Okay.  Thank you.  You said that was
 2   115?
 3   BY MR. BOMKAMP:
 4   Q    113.
 5   A    Oh, I'm sorry.  Yes.  Okay.  Yes, I'm here.
 6   Q    Okay.  And is that your due diligence agreement with Genie
 7   Investments?
 8   A    Yes, it is.  Yes.
 9   Q    And did you in fact wire Genie Investments $25,000?
10   A    I did.  Yes.
11   Q    Okay.  And did you wire them any other monies?
12   A    Yes, I did.  I -- I --
13   Q    Or actually, hold that question just a sec.  If you look
14   at United States Trustee --
15   A    Okay.
16   Q    -- Exhibit 114, is that the $25,000 wire?
17   A    Okay.  Hold on a second.  I'm sorry.  Let me go back
18   there.  114.  Yes.  Let me see.  Hold on.  Hold on.  I said yes
19   that I found it, but hold on.  Yes, that is.  Yes, that's
20   correct.
21   Q    All right.  And all right.  And did you wire any
22   additional funds to Genie Investments?
23   A    I -- yes, I did wire $45,000 for prepaid interest.
24   Q    Okay.  And if you look at United States Trustee Document
25   116.
```

1  A    Yes, hold on.  I'm going to get there.  Oh, okay.  Yes,

2  I'm here.

3  Q    Is that the bridge loan agreement pursuant to which you

4  wired the prepaid interest?

5  A    Yes.

6  Q    All right.  And what were your expectations for when the

7  loan would close?

8  A    My expectation was that when I initially wired my $25,000

9  due diligence fee to Genie Investments, that that was going to

10  start the services in order for me to -- in order for the -- I

11  guess I can say, like, the wheels would be turning in order for

12  my -- for my ICA to be funded.  There were no services.

13  Q    Okay.  And when was it supposed to fund?

14  A    Well, once my ICA was funded, it was supposed to be funded

15  within the three business days on the loan once I -- once they

16  received my loan -- my -- my completed loan documents.

17  Q    Okay.  And so, like, what date did you actually expect

18  your first tranche of the $3 million?

19  A    Oh, well, the first tranche, well, that would have been

20  after -- hold on a second.  That would have been -- the first

21  tranche, it was 75 days.  Let me make sure I got those dates

22  right.  So it says here my first tranche within 75 calendar

23  days of confirmation of the clearing of the funds remitted by

24  the borrower being -- being funded to the wholesale lender

25  pursuant to Section 7.1.

1   Q    Okay.  And where would that put you in terms of calendar

2   date?  Like what calendar date were you expecting to get the

3   money approximately?

4   A    Okay.  So if -- if that was February, then perhaps that

5   would have been 75 days, the first 75 days.  April.

6   Q    Okay.

7   A    On April --

8   Q    Did you get --

9   A    -- or May.

10  Q    Did you say April or May?

11  A    Yes.

12  Q    And did you get the money?

13  A    No, I did not.

14  Q    Okay.  Have you gotten the money?

15  A    Never.

16  Q    Okay.

17  A    No one sent.

18  Q    And so you sent over the -- was it 25 plus 45 to Genie?

19  A    Yes.  Yes, I did.  Both -- yes.  Both were wired directly

20  to Genie.

21  Q    And where did those funds come from?

22  A    Those were my own personal funds from working and I had

23  saved over the years.

24  Q    How many years of savings was that for you?

25  A    It was about two years.  It was -- it was a great time

1  during the pandemic.

2  Q    Okay.  All right.  And did you take out any high interest

3  loans in connection with this?

4  A    I did.  I did.  Because initially what McMann Commercial

5  Lending instructed me was that I needed $120,000 in order to

6  secure the, I guess, I guess, like the down payment to the

7  bridge loan.  So I needed 120,000.  Well, I had 70,000 and I

8  guess they needed -- they needed me to have -- come up with

9  another 60,000.

10      So I -- I took out -- they -- they forwarded me to this

11 group called Preferred Lending.  And the Preferred Lending

12 group is kind of a middleman to other big name funding sources,

13 like for mine was Happy Money and the other one was Rocket --

14 Rocket Loans.  It was Happy Money, Rocket Loans.  So I spent

15 about $10,000 to obtain these two loans, one loan for 40 and

16 the other one for 20.

17 Q    Okay.  And you paid those back?

18 A    Yes.  Because fortunately, throughout -- through the --

19 the confusion and the lies, the -- the -- McMann didn't -- had

20 forgotten that -- that I had taken out those loans and did not

21 instruct me to take those loans and wire them to Genie.

22 Q    Okay.

23 A    So when I saw everything -- yeah.  So I'm sorry.

24 Q    All right.  And I apologize for taking this a little out

25 of order, but if you turn to United States Trustee Exhibit 123.

1   A    Okay.  Hold on while I get there.  Okay.  Yes, I'm there.

2   Q    Is that the $45,000 prepaid interest that you wired to

3   Genie Investments?

4   A    Yes.  Yes.

5   Q    All right.  And so April/May rolls around.  The loan

6   doesn't fund.  What actions do you take?

7   A    I started to -- well, before leading up to that, I was in

8   communication with Michael Lanza the whole entire time.

9   Michael Lanza assured me that there were some delays in funding

10  with the capital provider.  That was the excuse.  The -- the --

11  the capital provider had some delays in funding and he went on

12  to explain something about the bond markets and the -- some of

13  the reserves, federal reserve things and so forth.  And that's

14  why the -- the -- the loan wasn't funding on time.

15  Q    Okay.  Could you turn to United States Trustee Exhibit

16  126?

17  A    Yep.  Here.  Yes, I'm here.

18  Q    Okay.  Who is this letter from?

19  A    This is from Genie Investments updating --

20  Q    And who is this letter to?  Who is this letter to?

21  A    Well, it's a general letter.  I think he -- he just kind

22  of copied and pasted and sent it to everyone, but it wasn't

23  completely directed to me because I don't -- I don't see my

24  name, my company's name on it.

25  Q    I think it's --

1  A    Oh, I'm sorry.  I do see my company's name on it, but it

2  says, yeah, Dear McMann Commercial Lending and -- and my

3  company Belle Maison Realty.

4  Q    Okay.  What is Genie explaining in this letter?

5  A    That there's some delays in funding, but this is -- this

6  is beyond the scope.  If -- if you could see -- if you look at

7  the date, it's -- it's dated August 23, 2023.

8  Q    Mm-hmm.

9  A    And this is beyond the -- the period of -- of when I

10 should have been funded.  This is --

11 Q    Sure, sure.

12 A    This is --

13 Q    But my point is --

14 A    Yeah.

15 Q    -- do you read this letter as an admission that Genie

16 didn't fund it, your loan?

17 A    Exactly.  Yes.  Yes.

18 Q    Okay.  Could you look at the second to last paragraph of

19 this letter?

20 A    Okay.  Hold on.  Let me -- let me see if I can get there.

21 Okay, second to last, would that be starting with in addition?

22 Q    Yeah.  Yes.

23 A    Yeah.  Yeah.  Okay.  Yes.  I see that.

24 Q    And you see here that they're invoking force majeure.

25 Lord, I don't know how to say that.  Force majeure.

1   A    I think force majeure.  Right.  Yeah.

2   Q    Yeah.

3          THE COURT:  How was that, Mr. -- hold on, for the

4   record, was that force [ma-ho]?

5          MR. BOMKAMP:  Yeah.  Well, that's my Duolingo Spanish

6   coming through.  I think it's majeure though.

7          THE COURT:  Okay.  Go right ahead.  I was confused by

8   your terminology.

9   BY MR. BOMKAMP:

10  Q    Have they referenced force majeure to you and -- well --

11  A    Not --

12  Q    Well, do they reference it in this letter?

13  A    I'm sorry.  Okay.  So -- so I see here that their --

14  their -- their failure to provide advances to borrowers does

15  not constitute a breach of contract.  That's what they're

16  saying.  So they're saying that in reference to, I don't know.

17  I was going to -- 13.7(d) within the contract, but let me see

18  the force majeure referred to.  It's failed to perform its

19  obligations to Genie under the circumstances that it was due to

20  reasonable -- okay.  And Genie is currently doing so.  So at

21  this point, the -- they -- they're -- they're announcing a

22  force majeure.  But however, if I go to my BELOC agreement --

23  Q    I think that's Exhibit 120.

24  A    -- BELOC agreement, it says --

25  Q    I think it's Exhibit 120.

1   A     Yes.  The Exhibit 120.  And I'm looking at Section 13.7.

2   That's 13.7(c).  I guess (audio interference) what they're

3   referencing here, which is the 13.7(d).

4   Q     All right.  Well, let's move on from that.

5   A     Well, I just wanted to state with that, it's that they

6   were supposed to -- the lender shall give notice of a force

7   majeure event to the borrower -- borrower within a reasonable

8   period from the date the lender realizes such a force majeure

9   event or will have an impact on the lender's ability to fund.

10  There was no reasonable -- there was no notice of a force

11  majeure event with the reasonable time that Genie's -- there

12  was no force -- there was no reasonable time within the -- the

13  force majeure event.  Genie did not provide a (audio

14  interference) of the other borrower's time of force majeure

15  event.

16  Q     All right.  And let's have a look at United States Trustee

17  Exhibit 128.

18  A     Okay.  Hold on while I get there.  Okay.  Yes, I'm here.

19  Q     What is this?  What is ZOOMERAL?

20  A     ZOOMERAL is -- ZOOMERAL is a portal that was instructed by

21  McMann Commercial Lending that this would be a portal where you

22  would find your loan information.  And if you had documents to

23  upload, your -- I guess any kind of, you know, loan

24  documentation or things like that would be uploaded to this

25  ZOOMERAL website.

1  Q    All right.  Is it also where you were able to talk to

2  David Hughes?

3  A    Right, right.  Because you would -- you would send emails

4  and send the messaging on ZOOMERAL.

5  Q    All right.  And I'm going to hope the Court indulges me.

6  And if you could, could you -- this entire communication from

7  Genie that's dated 10/25/2023 that begins Lea.

8  A    Hold on.

9  Q    Do you see that?  Notice of agreement termination.

10  A    Hold on a second.  Hold on.  Let me go down.  Is it in the

11  same 128?

12  Q    Yes, it's like the next page.  You have actually --

13  A    Okay.

14  Q    -- the messages within the ZOOMERAL portal.

15  A    Yeah.

16         THE COURT:  For which date, Mr. Bomkamp?

17         MR. BOMKAMP:  It's 10/25/2023.  It's a bit of a

18  lengthy message from Genie.

19         THE WITNESS:  Oh, yes, yes, yes.  I'm looking at it.

20         THE COURT:  She sees it.

21         THE WITNESS:  Yes, yes.

22         MR. BOMKAMP:  All right.

23  BY MR. BOMKAMP:

24  Q    Ms. Muse, could you, could you read that?

25         THE COURT:  Mr. Bomkamp, how about you read that into

1  the record?

2          MR. BOMKAMP:  I'd be happy to do so.

3          THE COURT:  That'd be fine.

4          MR. BOMKAMP:  All right.  This says, Lea, Genie

5  Investments hope this message finds you well.  As you may

6  already be aware, Genie has recently encountered an unforeseen

7  challenge with one of Genie's capital providers that is outside

8  of Genie's control.  Consequently, pursuant to Section 13.7 of

9  the agreement, your agreement with Genie Investments is hereby

10 terminated effectively -- effective immediately.  Please be

11 advised that confidentiality indemnification, non-

12 disparagement, and publicity clauses remain in full force and

13 effect.  Consider this communication as the official notice of

14 the termination of your agreement with Genie Investments.

15 However, this setback does not close the doors for future

16 collaborations.  Genie invites you to apply for a new loan when

17 the time is right for you.  Should you choose to do so, Genie

18 will take a fresh look at your business profile.

19          THE COURT:  Hold on one second.  Mr. Patel has popped

20 on.  Let me -- Mr. Patel, can you hear me?  We have two

21 Mr. Patels.  Which one do you need as a witness?

22          MR. BOMKAMP:  It'll be both of them, Shailesh first.

23          THE COURT:  Okay.  So gentlemen, since you're

24 witnesses, I'm going to put you in the waiting room, but you

25 are next.  Both of you are next, so do not go anywhere.  As

1  soon as Ms. Muse is done, we will get both of you out here as

2  quickly as possible.  So don't go anywhere, so we don't have to

3  call you another day.  Does that work, Mr. -- both Mr. Patels?

4            MR. PATEL:  It does.

5            THE COURT:  All right.  Perfect.

6            All right.  You may proceed.

7            MR. BOMKAMP:  All right.

8            THE COURT:  Sorry about that.

9            MR. BOMKAMP:  And then the message goes on.

10 BY MR. BOMKAMP:

11 Q    What did you take that message to signify, or mean?

12 A    It signified that were -- they had cut me off before I

13 even had a chance.  They -- this is dated -- when was this --

14 is this -- it's dated October of 2023, when my loan started in

15 February of 2023.

16 Q    All right.  All right.  And then I see that there's a

17 message in February 16th, 2024, that references a settlement

18 agreement and a reward schedule.

19 A    Yes.  Yes.

20 Q    And is that -- and what was the substance of that?

21 A    The substance of that was they -- well, Genie Investments,

22 in order to obtain a higher chance of receiving any funds

23 returned, signing the settlement agreement would agree to, I

24 think it was some money -- it -- it -- some money, like a

25 reward, in addition to the funds that were going to be returned

1   to you.

2   Q    So were they asking you to put in more money?

3   A    Yes.

4   Q    And was that to fund the Velanos litigation?

5   A    I -- I'm not sure.  I can't say, but --

6   Q    Okay.  But they were asking you to put in more money so

7   you'd have higher priority whenever they got money.

8   A    Right.

9   Q    Okay.

10  A    Exactly.

11  Q    Okay.

12  A    Yes, yes.

13  Q    Did you do it?

14  A    No.

15  Q    All right.  Let's have a look at United States Trustee

16  Exhibit 130.  Do you have that there?

17  A    I'm here.  Yes.

18  Q    And is this letter generally advising you that Genie has

19  not funded its loans because of the situation with Velanos?

20  A    That's correct.

21  Q    All right.  And -- okay.  I'm sorry to do this to everyone

22  again, but if we look at the second to last page, under if

23  Genie has a direct contract with you --

24  A    Oh, is that in the same 130 --

25  Q    Yeah.

1   A    -- document?

2   Q    Mm-hmm.

3   A    Okay.  So, would you say it's -- when is -- where?

4   Q    If -- the subheading, if Genie has a direct contract with

5   you.

6            THE COURT:  Where was that located at, Mr. Bomkamp?

7            MR. BOMKAMP:  It is in United States Trustee Exhibit

8   130.

9            THE COURT:  All right.

10           MR. BOMKAMP:  And there are various subheadings.

11           THE COURT:  Oh, okay.

12           MR. BOMKAMP:  The third to the last is if Genie has a

13  direct contract with you.  It's, like --

14           THE COURT:  It's in the letter, Ms. Muse, on Page --

15  one, two, three, four --

16           THE WITNESS:  Okay.  Oh, okay.  Hold on.  Let me get

17  there.

18           THE COURT:  And the title of it is if Genie has a

19  direct contract with you.

20           THE WITNESS:  Okay.  Let me see.  Hold on.  And which

21  paragraph is that?

22  BY MR. BOMKAMP:

23  Q    First one, under if Genie has a direct contract with you.

24           THE COURT:  That's the heading.

25           THE WITNESS:  Oh, that's the heading.

1  BY MR. BOMKAMP:

2  Q    It begins, it is important to recognize.

3           THE COURT:  That's Page 4.

4           THE WITNESS:  Right.  I'm on Page 4, but --

5  BY MR. BOMKAMP:

6  Q    Document 130.

7           THE COURT:  It may be Page 5 if the exhibit tab is

8  Page 1.

9           THE WITNESS:  Okay.  That's what -- it -- okay.

10          THE COURT:  You can't miss it.  Right in the middle

11 of the paragraph -- right in the middle of the page.  In bold

12 and underlined.

13          THE WITNESS:  Ah, there it is.  I see it.  I see it.

14 I see it.  Yep.  Sorry about that.  Yep.  I see it.  Yep.

15          THE COURT:  Go ahead, Mr. Bomkamp.

16          MR. BOMKAMP:  Okay.

17 BY MR. BOMKAMP:

18 Q    In this paragraph, do you see that they are expressly

19 stating that the failure of Velanos to fund Genie is a force

20 majeure event?

21 A    Right.

22 Q    Okay.

23 A    Which I was not informed of, this force majeure event.

24 Q    Okay.  And if we turn the page to where the complaint

25 begins.

1  A    And that's on the next page?

2  Q    Yes.  It's Exhibit A to the letter.

3  A    I see.  Yeah.  I see.  I see it.  Yes.

4  Q    Okay.  All right.   And if you look at really the summary

5  of --

6  A    Yes.

7  Q    -- what the Velanos investment is, is in Paragraphs 2,

8  3 --

9  A    Right.

10  Q    -- and 4 of this complaint.  Okay.

11  A    Yes.

12  Q    Do you see that they would -- that they were told that

13  Velanos would trade standby letters of credit.  And by doing

14  so, they could turn $3 million into many times $3 million

15  within 60 days.  And so they put in 9 million --

16  A    Right.

17  Q    -- to get 75 million?

18  A    Yes.  Right.  Yes.  The whole -- that's --

19  Q    As a seasoned business person, does that sound --

20  A    Yes.

21  Q    -- like a prudent investment to you?

22  A    Not at all.

23  Q    All right.  And does the failure of such an investment, in

24  your mind, constitute a force majeure event on the order of a

25  fire, an earthquake, or a comet falling from the sky?

1          MR. MICKLER:  Objection, Your Honor.  Calls for a

2    legal conclusion.

3          THE COURT:  I'll sustain the objection.  You don't

4    have to answer Ms. Muse.

5    BY MR. BOMKAMP:

6    Q    All right.

7    A    Okay.

8    Q    Is it surprising that this investment failed to you?

9    A    I -- I never knew about the investment.

10   Q    Well, based on what you're reading here --

11   A    When I -- right.  But -- so I've read this several times,

12   and Genie Investments at the end of 2022, they should have been

13   funded by Velanos.  Well, that was the end of 2022.  I had

14   nothing to do with Genie at that time because my loan wasn't --

15   I -- I didn't sign loan documents until February 2023.  At that

16   point, they would have been well aware of their lack of funding

17   from Velanos.

18   Q    Okay.  Well, you raise a good point.  Okay.  Because it

19   says that in October 2022 --

20   A    Yes.

21   Q    Yeah.  So it says in Paragraph 4 that it would -- that

22   Velanos would return $9 million in capital plus $66 million in

23   profit by the end of 2022.  Is that what you see there?

24   A    Exactly.  And that's what I read.

25   Q    All right.

```
 1  A    So my --

 2  Q    When were all your contacts with Genie?

 3  A    My -- my contact -- well, my -- my -- my initial contact

 4  was in the bridge loan when I signed the bridge loan in

 5  February of 2023.

 6  Q    Okay.  So Genie was still offering the bridge loan product

 7  after they knew --

 8  A    Exactly.

 9  Q    -- that the Velanos --

10  A    After they knew --

11  Q    -- investment had failed.

12  A    Exactly.  Right.  Right.

13  Q    How has the non-funding of this loan and the loss of your

14  money affected your life?

15  A    It has affected me a great deal.  I have a son going to

16  college next year.  I was hoping to relieve him of any of the

17  strains of an education here in the United States where you

18  have to take thousands of dollars of loans out to get an

19  education and be a productive person of society, I guess.  But

20  you know, I was trying to relieve himself and myself of any

21  student loans.

22  Q    All right.  And I want to go over one more, I believe, one

23  more document with you, and that is Document Number 131.

24  A    Okay.  Let me go there.  131.  I am there.

25  Q    Okay.  And so, you remember from the ZOOMERAL messages,
```

1   there was a reference to the --

2   A    Yes.

3   Q    -- settlement and the reward schedule?

4   A    Right.

5   Q    That you were saying.

6   A    Yes.

7   Q    Is that this document?

8   A    Yes.

9   Q    Okay.  And what does this document set forth, as you

10  understand it?

11  A    As I understand it is that Genie is stating that because

12  of their provider and their -- their inability to fund.  See

13  here, they -- they mentioned Velanos.  But again, like I said,

14  I didn't -- I did not know of Velanos until far, far later into

15  the following -- I would say like, because this is 2016 now,

16  the following year.  So I went a whole year where I started my

17  original agreement, and a year later, I'm just finding out

18  about this Velanos and this capital --

19  Q    Okay.

20  A    -- provider.  And then, be able to find --

21  Q    Let's turn to Page 11 of the same document.

22  A    Okay.  Okay.  So -- so 11 would be -- does it start with

23  that --

24  Q    Reward schedule.  It might be 12 if --

25  A    Oh, I'm sorry.

1  Q    -- you're counting the exhibit tab.

2  A    Got it.  Yes.  Yeah.  I'm there.

3  Q    Okay.  Okay.  Now, does this say, so if you -- in the

4  example here, do you see the example near the top?

5  A    Yes.

6  Q    So if you lost $100,000 with Genie, and you throw them an

7  extra $10,000, you can get --

8  A    Right.

9  Q    - $110,000 with a priority payment.  Is that what that

10 represents to you?

11 A    Exactly.  Right.  Right.

12 Q    Okay.  And you didn't go in for that?

13 A    No, I did not.

14 Q    Why not?

15 A    Genie had already -- Genie had already defaulted on the

16 loan by not funding my ICA account, and then turning around and

17 saying that my loan was terminated.  At this point, why would I

18 have given Genie further funds to be on a reward schedule when

19 I was entitled to have a refund, especially of my ICA account?

20 Q    All right.

21         MR. BOMKAMP:  I have nothing further for this

22 witness, Your Honor.

23         THE COURT:  Thank you.

24         Mr. Mickler?

25                         CROSS-EXAMINATION

1  BY MR. MICKLER:

2  Q    Good afternoon, Ms. Muse.  My name is Bryan Mickler.  I'm

3  the attorney for Genie.

4  A    Hello.

5  Q    Have you talked to other witnesses today since the Court

6  has begun?

7  A    I have talked to one or two.

8  Q    Who did you talk to?

9  A    I believe it was Kim Nash.

10  Q    Anybody else?

11  A    And I'd like to say Lisa -- Lisa B.

12  Q    Okay.  And you talked to Lisa B. after she testified?

13  A    No, before.

14  Q    Before?  Okay.  Have you talked to anybody after they've

15  testified today?

16  A    No.  Well, no, hold on.  I did -- no, I -- I -- no, I spoke

17  to Lisa B. after.  I spoke to her before and after.

18  Q    Okay.  So you've been prepped by Lisa B as to what my

19  questions are?

20  A    Absolutely not.  I am very -- I understand contracts.  As

21  I stated earlier, I was a real estate agent for several years,

22  and my understanding of contracts is very good.

23  Q    Okay.

24  A    I don't need to -- I don't need (audio interference).

25            THE COURT:  Walk her through it, Mr. Mickler.

1   BY MR. MICKLER:

2   Q    We'll just go right to the contract.  Let's take a look at,

3   since you're so familiar with contracts, let's take a look at

4   Trustee's Number 120.

5   A    Okay.  Let me get there.

6            THE COURT:  You said 120?

7            MR. MICKLER:  120

8            THE COURT:  Thank you.

9            MR. MICKLER:  I'm sorry.

10           THE WITNESS:  Let me --

11           THE COURT:  121?

12           MR. MICKLER:  Excuse me.  Yes, Your Honor, 121.

13           THE COURT:  Ms. Muse, 121.

14           MR. MICKLER:  Okay, hold on.  Okay.  I'm back.  Hold

15   on.  Okay, I'm here.

16   BY MR. MICKLER:

17   Q    Okay.  And I want you to look at the first page of the

18   actual exhibit, which is the business expansion line of credit

19   agreement.

20   A    Yes, I'm looking at that.

21   Q    Okay.  Who's the lender?

22   A    Okay.  The -- the business expansion line of credit, this

23   lender says -- oh, sorry, McMann Commercial.

24   Q    Okay.  So Genie didn't make this loan to you, did they?

25   Or purport to make this loan to you?

1    A    In this sentence, they're making it appear that they did

2    not.  So when I referred to my intercreditor agreement, they

3    clearly appear as the lender.

4    Q    Well, we'll get to the intercreditor agreement later on.

5    But in your BELOC loan, lender is defined as McMann Commercial

6    Lending, LLC, correct?

7    A    Correct.

8    Q    Okay.  So when we look at 13.7.

9    A    Okay.  Hold on.  Let me get there.  Hold on a second,

10   because my screen --

11   Q    Well, let me just read it out to you.  Let me just read

12   one word, or a couple words here.  Lender shall not be liable

13   or responsible to borrower nor deemed to have defaulted.  And

14   this goes through the force majeure language.  So again, McMann

15   was your lender, correct?

16   A    Well, with my intercreditor agreement I understood it --

17   Q    That's a yes or no in this agreement, Ms. Muse.  McMann

18   was your lender under this 13.7 language.

19   A    Yes.

20   Q    And you're familiar with contracts.  You are a seasoned

21   business person.  Is that what you called yourself?

22   A    I'm an experienced business person, yes.

23   Q    Okay.  And you cast doubt on the ability of someone to go

24   out and speculate, as you called it, you called it speculative,

25   for Genie to go out and put $9 million in and multiply that

1   money, didn't you?

2   A    Yes, I did call that speculative --

3   Q    Okay.  What did --

4   A    -- because I did not agree to that.

5   Q    Would it also be speculative to lend somebody $3 million

6   with no assets to their name, no real estate assets to secure

7   the loan?  Wouldn't that be speculative as well?

8   A    So that's the same way as a credit card or a home or a

9   car.  That's -- everyone borrows money.  Everyone borrows

10  money.  That's the way our society works.

11  Q    But you had no --

12  A    So if we stop loaning (audio interference) --

13  Q    But Ms. Muse, you stated you had no collateral for a $3

14  million loan, correct?  You were going to take that --

15  A    I did not.

16  Q    -- money and go out and -- you were going to take that

17  money and go out and buy real estate and speculate.

18  A    Yes, but -- but --

19  Q    Okay.

20  A    -- I did not do a -- I did -- I didn't -- I didn't -- it

21  wasn't a -- a -- real estate is far different than just like a

22  stocks or purchasing stock on, you know -- and -- and -- and

23  hoping that your stock hits.  Real estate is a solid asset

24  that -- that holds value throughout the years.  Now, there

25  might be some fluctuations in the market where real estate

1    might go down a bit, but, you know, you still have this

2    valuable asset.  You don't just lose it unless it, like, burns

3    up in a fire.

4    Q    I appreciate your financial lesson to us all here.  Let's

5    move on to your contract, your actual contract with Genie.

6    A    Yes.

7    Q    Document Number 113, please.

8    A    Okay.  Let me get there.  Okay.  I am there.

9    Q    All right.  This is your due diligence fee agreement with

10   Genie?

11   A    Yes.

12   Q    And this was part of your bridge loan agreement where you

13   were going to borrow money in order to borrow --

14   A    Yes.

15   Q    -- $3 million from McMann, correct?

16   A    Hold on.  I'm sorry.  Can you rephrase that?

17   Q    This due diligence agreement is basically part of your

18   bridge loan agreement where you were going to borrow the 10

19   percent or the 20 percent or whatever McMann had told you was

20   needed to fund the BELOC agreement?

21   A    This is a due diligence fee agreement.

22   Q    Okay.  Was --

23   A    So this is some -- it -- the due diligence fee is -- is a

24   service.

25   Q    My question was, was this part of your bridge loan

1   package?

2   A    I don't believe -- I think it was separated from the

3   bridge loan --

4   Q    Okay.

5   A    -- package because it's dated December 16th, 2022.  My

6   bridge loan is dated February 2023.

7   Q    Okay.  Fair enough.  Let's turn to what's going to be the

8   second page of this agreement, Paragraph Number 2.

9   A    Hold on.  Let me get there.  So the second page?

10  Q    Yes.  Page 2 of the due diligence fee agreement or it's

11  Number 2 on the bottom.

12  A    Okay.  Oh, two on the bottom.  Okay.  Hold on.  Two on the

13  bottom.  Yes, I see.

14  Q    Okay.  Do you see Paragraph 2 there?

15  A    Yes.

16  Q    And it says, as a material inducement to company to

17  commence the services, the borrower shall pay company a non-

18  accountable and non-refundable fee of $25,000 payable prior to

19  the commencement of the services.  So as a seasoned business

20  professional, you understand what non-accountable and non-

21  refundable meant, didn't you?

22  A    Right.  Yes.  And then it was paid prior to the

23  commencement of services.  However, it's right underneath that

24  is the term and termination 3(a).  The agreement shall commence

25  as of the effective date and shall continue thereafter until

1  the completion of the services unless soon or terminated

2  pursuant to the section.  So there was -- there was -- up --

3  this shall continue thereafter until the completion of the

4  services.  I never received any service from Genie Investments.

5  I sent $25,000 as a due diligence fee and never received a --

6  an acknowledgement letter to say, we've received your funds for

7  your due diligence fee.  There was no accounting for the

8  $25,000.  I sent my $25,000.  They did not -- I did not hear a

9  word from Genie Investments.

10 Q    And honestly, Ms. Muse, you don't know what Genie did with

11 the $25,000, do you?  You don't know if they've done background

12 checks on you or title searches or anything.  You don't know.

13 A    No, I don't have any idea because nothing's ever

14 communicated to me.

15 Q    So --

16 A    I wired $25,000 to Genie and there was no -- no word from

17 them afterwards.

18 Q    And you don't know the value of the services that they put

19 in there and you signed a contract that said it was non-

20 accountable and non-refundable, correct?

21 A    Right.

22 Q    Okay.  Thank you.  Let's go to the next paragraph down.

23 A    Okay.

24 Q    Under 2, it says payment of the --

25 A    Okay.

1  Q    -- of the diligence fee is not a guarantee that company

2  will offer funding to borrower or that any offer will be on the

3  terms and conditions acceptable to borrower.  So again, as a

4  seasoned business professional, you understood that paying them

5  the due diligence as a non-refundable, non-accountable payment

6  would not guarantee you a loan, correct?

7  A    That's -- that's correct, but then I -- but when I signed

8  my bridge loan agreement in February 2023, I would think that

9  when someone sends you an agreement, you are approved for the

10 loan.  No one sends you an agreement if you are not approved.

11 Q    Well, let's turn to Trustee's Number 116, which is the

12 actual bridge loan agreement.

13 A    Okay, hold on.  Let's see how I get there.  So that's 116.

14 Okay, I am there.

15 Q    All right.  So two months after you paid the $25,000 due

16 diligence agreement, you were actually provided with this

17 bridge loan agreement, correct?

18 A    Yes.

19 Q    Okay.  So there was some, looks like there was some work

20 done on your behalf by Genie at this point, correct?

21 A    It appears that they tried to do something, yes.

22 Q    Let's go to Subsection 2.02.

23 A    In the same document?

24 Q    Yes.

25 A    116?

1   Q    It's going to be a couple pages over.

2   A    Okay.  And what --

3   Q    2.02.

4   A    Okay.  Hold on while I get there.  2.02.  Okay, I'm here.

5   Q    Okay.  So under 2.02, it says that on the effective date,

6   the lender shall bridge -- shall hold bridge loan in lender's

7   account on behalf of the borrower.  So according to this

8   contract, which you signed, Genie was going to hold the bridge

9   loan in its account on your behalf, correct?

10  A    Well, one moment, please.  That's -- it's kind of vague to

11  tell you the truth, because the -- officially it was supposed

12  to be held in an ICA account.

13  Q    Now, your --

14  A    And I don't know if they're referring to that ICA account.

15  Q    Your ICA account is with --

16  A    Are they referring --

17  Q    -- excuse me, your ICA account is with McMann, and that

18  was the purpose of the bridge loan, correct?

19  A    The -- that was the BELOCK loan, and the -- hold on while

20  I gather myself here.  Okay.  So -- so here, the lender shall

21  hold bridge loan in lender's account on behalf of the borrower.

22  The lender's account would be the ICA account.

23  Q    I believe you're --

24  A    Because that was the account that they established.

25  Q    I believe you're conflating the terms ICA and this bridge

1    loan, but assuming this is the bridge loan agreement, Genie was

2    going to hold the bridge loan amount in its account on your

3    behalf.  That's what this document says, correct?

4    A    It's vague, because the lender's account was established

5    as an ICA account for the bridge loan.

6    Q    That -- that's not --

7              THE COURT:  Let's move along.

8              MR. MICKLER:  Yeah.

9              THE COURT:  Look, the contract says what it says.  It

10   says only effective date the lender shall hold bridge loan in

11   lender's account on behalf of the borrower and does not appear

12   in this agreement to actually define lender's account.

13             MR. MICKLER:  Okay.

14             THE COURT:  You may proceed, Mr. Mickler.

15             MR. MICKLER:  Thank you, Your Honor.

16   BY MR. MICKLER:

17   Q    And Ms. Muse, if you could flip over to Section 2.03.

18   A    Yes, I'm here.

19   Q    Okay.  And you had stated earlier that McMann had made

20   promises to you that they were going to try and fund your loan

21   within 75 days of the ICA being funded, correct?

22   A    Well, that -- can you repeat that?  Because that -- that's

23   a lot of.

24   Q    McMann --

25   A    There's so many loans involved (audio interference).  I'm

1   sorry.  There's -- there's so many loans involved.  There's the

2   bridge loan, and then there's the BELOC loan.  I want to be

3   clear, like, which one we're talking about.

4   Q    Well, you were talking earlier that you were hoping to

5   have your loan funded within 75 days of, I believe it was

6   February or March.

7   A    Right.

8   Q    Okay.

9   A    Yes.

10  Q    So 75 days, assuming that the bridge loan was made, it

11  would have been approximately 75 days after that date that you

12  were expecting your loan proceeds from McMann.

13  A    Okay.  I apologize.  Can you -- can you repeat that just

14  one more time?

15  Q    You were hoping that McMann would close your BELOC loan

16  within 75 days and provide the funds to you once the bridge

17  loan was set up.  I believe that's what you testified to.

18  A    Right, right, that's correct.

19  Q    Okay.  So during that 75 days, if Genie's holding money in

20  its account as a bridge loan and not able to use it, there

21  would have been a loss of use of those funds, correct?

22  A    That's not my concern.  That -- that -- that -- that's --

23  Q    Okay.

24  A    -- that's Genie -- whatever Genie's business practices are

25  behind the scenes, I -- I -- I -- that -- that has nothing to

1  do with me as a borrower.

2  Q    Okay.  Well, let's look at you as a borrower then under

3  2.03 --

4  A    Okay.

5  Q    -- as B, Paragraph B.

6  A    Okay.  Yes, I see that.

7  Q    All right, and this paragraph says that prepaid interest

8  on the outstanding principal amount of the loan shall be paid

9  in kind and capitalized on this business day and shall be paid

10 in cash in full upon acceptance of this agreement.  Borrower

11 understands that this payment is fully non-refundable.  So when

12 you paid your $45,000 worth of bridge interest for Genie to

13 hold those funds for 90 days, you understood that that was non-

14 refundable, correct?

15 A    Give me a moment to respond.  Okay.  So it says here the

16 prepaid interest on the outstanding principle of the amount of

17 the loan.  What outstanding principle?  There was nothing

18 outstanding.  I did not receive any type of loan.  If I had

19 received a loan that was outstanding, I would have understood

20 that my payment of interest was non-refundable.

21 Q    Let's go back to Section 2.01.

22 A    Hold on.

23 Q    We're going to walk you right through this.  You were

24 taking out a bridge loan for $300,000 according to this

25 contract, correct?  Under --

1  A    Hold on, I'm not there yet.  I'm not there.  Hold on.

2  Where's -- I'm sorry.  Where's --

3  Q    2.01.

4  A    Okay, hold on.  Okay.  I am there.

5  Q    All right.  So 2.01 says that there's going to be a bridge

6  loan in the amount of $300,000 to you as the borrower.

7  A    Yes.

8  Q    Correct?

9         THE COURT:  She said yes.

10        MR. MICKLER:  Okay.

11 BY MR. MICKLER:

12 Q    And 2.02 says that Genie is going to hold that bridge

13 amount loan in its account on your behalf, correct?

14 A    In ICA's account, yes.

15 Q    All right.  And then 2.03 says that you're going to prepay

16 the interest on the $300,000 for a 90-day period, which is what

17 that works out to, as a non-refundable payment, correct?

18 A    Right, because the computation of interest I did not

19 receive anything.  My bridge loan should have been funded

20 within three business days.  There was nothing to computate

21 because I did not receive a loan.

22 Q    And you weren't entitled to receive any funds of money.

23 All that you were entitled to in this contract is for Genie to

24 set aside those funds in some account.  Is that correct?

25 A    Genie was supposed to set aside funds in an interest

1    credit account in order for me to secure the $3 million.

2    Q    Okay.  And if Genie put those funds aside under the terms

3    of this contract, you would have had to pay non-refundable

4    interest for a 90-day period?

5    A    If I had received a loan, but I did not receive -- I did

6    not receive --

7    Q    All right.

8    A    -- a bridge loan.

9    Q    I'm dizzy going in circles, Your Honor, so I'm finished.

10   Thank you.

11              THE COURT:  Thank you.

12              Mr. Bomkamp?

13              MR. BOMKAMP:  Nothing further to this witness, Your

14   Honor.

15              THE COURT:  All right, Ms. Muse, you are done for the

16   day.  I haven't given --

17              THE WITNESS:  Thank you.

18              THE COURT:  -- other witnesses the warning because I

19   didn't think about it with it being on Zoom, but do not speak

20   to any other witness that's going to testify about anything you

21   were asked or answered while the trial is still ongoing.  And

22   you're welcome to stay now if you'd like to, just make sure to

23   mute and turn off your camera or you're free to go.

24              THE WITNESS:  Okay.  Thank you.

25              THE COURT:  Good to see you.

```
 1       (Witness excused)

 2            THE COURT:  All right.  Which Mr. Patel do you want

 3   first --

 4            MR. BOMKAMP:  I think --

 5            THE COURT:  -- or are they together?

 6            MR. BOMKAMP:  They are together in the sense that

 7   it's one transaction.  Shailesh was more on the front end of

 8   the transaction.  Preet was more trying to clean it up on the

 9   backend.

10            THE COURT:  So you want Shailesh first?

11            MR. BOMKAMP:  Yes.

12            THE COURT:  All right.

13            Mr. Patel, Mr. Shailesh Patel, can you hear me?  All

14   right, you're first.

15            Kate, would you swear in the witness?  If you could

16   unmute your microphone, please.  There we go.  You can swear

17   him in, Kate.

18            THE CLERK:  Please raise your right hand.

19            SHAILESH PATEL, U.S. TRUSTEE'S WITNESS SWORN

20            THE CLERK:  Okay.  Please state your name and

21   address, including city and state, for the record.

22            THE WITNESS:  Shailesh Patel, 2517 West Brentridge

23   Street, Sioux Falls, South Dakota 57108.

24            THE COURT:  If you could speak a little louder or

25   into the microphone.  We're having -- you don't have to repeat
```

1   yourself, but going forward just speak up a little bit so we

2   can hear you a little bit better.

3              THE WITNESS:  Okay.

4              THE COURT:  You can put your hand down.

5              Mr. Bomkamp, go right ahead.

6              MR. BOMKAMP:  All right.

7                          DIRECT EXAMINATION

8   BY MR. BOMKAMP:

9   Q    Good afternoon, Mr. Patel.  Thank you for your patience.

10  I'll begin this the way I begin with everyone.  What do you do

11  for a living?

12  A    I'm a hotel -- hotel developer who runs and builds hotels.

13             THE COURT:  If you could, I had a little trouble

14  hearing you.  I think you develop hotels, but let's see if we

15  can get it a little bit clearer.

16             THE WITNESS:  I'm a hotel developer and -- and -- and

17  an operator, so I operate and -- own and operate hotels and

18  develop hotels too.

19             THE COURT:  He owns and operates hotels.  Go right

20  ahead.

21             MR. BOMKAMP:  All right.

22  BY MR. BOMKAMP:

23  Q    And how did you first get into the hotel business?

24  A    I came to this country with about $1,000 in my pocket in

25  1994 and started my, you know, was working like three jobs.

1    And with my brother-in-law, I basically loaned some money and

2    stuff and bought my first hotel in 1994, a small Super 8 motel

3    in Brewster, Minnesota.  And that's how I started my American

4    dream.

5    Q    All right.  And as we sit here today, how many hotels do

6    you own directly or indirectly through LLCs and other

7    businesses?

8    A    About nine.

9    Q    All right.  So you sort of, in a manner of speaking, live

10   the American dream.  You came here with nothing in your pockets

11   and --

12   A    Yes.

13   Q    -- built a considerable business.  Is that a fair

14   statement?

15   A    Yes, I did.  Yes.

16   Q    All right.  And why were you seeking a loan?

17   A    We were trying to develop two hotels on the East Coast.

18   We had bought the land pre-COVID, and we were going to develop

19   that.  But then when the COVID hit, everything kind of shut

20   down.  And then when things started getting better, we thought

21   it was time for us to kind of break the ice for those hotels

22   and, you know, get the financing started so we can start the

23   construction.

24   Q    Okay.  Did you consider various financing sources?

25   A    Yes, we did with the banks.  And, you know, with

1  everything else going on, the banks were -- the banks were a

2  little tight, you know, with COVID and stuff like that.  So we

3  were looking at some -- we had some banks which we were

4  interested, but then we also did some, you know, unconventional

5  financing too, you know, when -- when this -- when this thing

6  came up.

7  Q    Okay.  And how did you discover the BELOC product?

8  A    Well, Ritesh Kotwal (phonetic), the friend of Vijesh

9  (phonetic) -- Vijesh Patel, who is one of -- one of my partners

10 and friends, he introduced Ritesh Kotwal.  And Ritesh Kotwal

11 basically -- and Ritesh Kotwal and -- introduced this product

12 to us and, you know, he swore that it was a good product and he

13 does, you know, people have kind of done deals with this before

14 and stuff like that.  So that's how we -- we got introduced to

15 it.

16 Q    Okay.  I apologize.  I didn't completely follow you.  Was

17 there like a trusted family business broker that you went to?

18 A    No, no family -- I -- I -- I don't know Ritesh personally,

19 but he -- he was introduced to me -- to us by -- by our friend,

20 you know, who -- who has known him.  He's a friend too.  So

21 he's a friend of a friend.  That's how we -- we heard about it.

22 Q    All right.  So you found him as like a second-degree

23 business contact kind of --

24 A    Yeah.

25 Q    -- thing.

1    A     Yes.

2    Q     Okay.  And did he send you to McCann Capital?

3    A     Yes.

4    Q     All right.  And what was -- how much were you hoping to

5    borrow from McCann Capital?

6    A     $18 million for -- for -- for one -- it'd be one hotel.

7    So total of about $36 million for two hotels.

8    Q     Okay.  And did this loan proposal have any prepayment

9    requirements?

10   A     No.  There -- there was -- there's 10 percent prepayment

11   requirement, but we don't (audio interference) so we had to

12   send about -- we send about $1.8 million each for the -- so

13   total $3.6 million to -- to McCann to secure this -- this --

14   this loan.  There were two options that we were given.

15   Q     Okay.

16   A     One was --

17   Q     Just to back up a little bit, the two parcels that you

18   have, was it in Connecticut?

19   A     Yes.

20   Q     Okay.

21   A     The North --

22   Q     They're owned by different LLCs?

23   A     Yes.

24   Q     And what are those LLCs?

25   A     North Haven Lodging Partners, LLC, and the other one is

1  Wallingford Lodging Partners, LLC.

2  Q    Okay.  So they both have lodging partners in the name.

3  A    Yep.  Yep.  Yep.

4  Q    All right.  So we'll refer to them collectively as the

5  lodging partners.

6  A    Yeah.

7  Q    And each of the -- you say that each of the lodging

8  partners would have to come up with $1.8 million?

9  A    Yes.

10  Q    For a total of $3.6 million.

11  A    Correct.

12  Q    And did you actually pay that full amount out of your

13  personal resources?

14  A    The money was wired on May 3rd into his account.

15  Q    May 3rd --

16  A    Florida account.

17  Q    -- of what year?

18  A    '3.

19  Q    2023?  And to what entity was the money wired?

20  A    Genie.

21  Q    To Genie Investments, NV LLC, this debtor.

22  A    Yes.

23  Q    So on May 3rd, 2023, you wired $3.6 million to Genie

24  Investments.

25  A    Totally $1.845,075 times three.  Total 3.6, 101.

1  Q    Total of $3.6 million?

2  A    $3.6 million.  3.61, 101.5.

3  Q    Okay.  And did you have any understanding about why it was

4  being wired to this entity, Genie Investments?

5  A    Well, we -- we -- we asked -- when we got this wiring

6  instruction, I did call Michael Lanza and ask him.  And they

7  said that they had agreement with Genie, where, you know,

8  they -- they -- they are the -- they -- they would be the ones

9  who get the loan, so the money has to be wired into their

10 account.

11 Q    So the idea, according to your understanding, was that

12 Genie was like the wholesale lender providing money to McCann

13 Capital to do your loans?

14 A    Yes.  Yes.

15 Q    Okay.  Okay.  If you look at United States Trustee Exhibit

16 170.

17        THE COURT:  Mr. Bomkamp, what book is this in?

18        MR. BOMKAMP:  Oh, I'm sorry.  We're on to --

19        THE COURT:  If it's Book 4, I'll need it.

20        MR. BOMKAMP:  We're in Book 4.  Do you have Book 4?

21        THE COURT:  I do not.

22        MR. BOMKAMP:  I am sorry.

23        THE COURT:  It looks like Mr. Mickler is going to

24 help you out since you lost Mr. Munoz.  You'll owe him a coffee

25 tomorrow morning.  Thank you.  That was 170?

1          MR. BOMKAMP:  Yeah.  Yes, Your Honor.

2          THE COURT:  Mr. Patel, do you have the exhibits?

3          THE WITNESS:  Yes, I'm looking at it right now.  170,

4    yes.

5          THE COURT:  All right.  Go right ahead, Mr. Bomkamp.

6          MR. BOMKAMP:  All right.

7    BY MR. BOMKAMP:

8    Q    And are these the instructions given to you by McCann to

9    wire the money to Genie --

10   A    Yes.

11   Q    -- that, according to your understanding, was the

12   wholesale lender?

13   A    Yes.

14   Q    Okay.  And then this next document, this is actually the

15   BELOC agreement, correct?

16   A    Yes.

17         THE COURT:  He said yes.  But Mr. Patel, if you could

18   still speak up and lean into that camera.

19         THE WITNESS:  Yep.  Yeah, the BELOC agreement, yes.

20   BY MR. BOMKAMP:

21   Q    All right.  And then if we look at Exhibit 171, that's the

22   same instructions and a comparable BELOC agreement for the

23   other lodging partner, correct?

24   A    Yes.

25   Q    All right.  And please turn to Exhibits 173 and the last

1  page there.

2  A    Last, did you say?

3  Q    Well, actually, not the last page, the second page that

4  shows the wire transfers.

5  A    Yes.

6  Q    And is that the confirmation that you wired $3.6 million

7  to Genie Investments, NV, the debtor in this bankruptcy case?

8  A    Yes, we did, yes.

9  Q    Okay.  Did your loan fund as you expected it to?

10  A    Never, no, it didn't.

11  Q    All right.  And what does this termination letter here

12  pertain to?

13  A    We -- we've been talking to Michael Lanza, you know, and

14  he kept kind of giving us a runaround, like, you know, it's --

15  the money's coming, it's, you know, we have this issue, this

16  issue.  And finally around, you know, maybe I think it went on

17  for almost like three, four weeks, five weeks after

18  termination, our deadline ended.  We finally figured out that

19  the money is not coming.  We filed this termination letter to

20  terminate our agreement.  And we talked to -- Michael informed

21  that we're going to terminate this agreement.  So on 17th of

22  August, we just said, you know, no more, just give us our money

23  back, we're out of here.

24  Q    Okay.  And when did you expect your loan to fund?

25  A    It was supposed to fund within -- within -- within four

1    weeks of, you know, the -- the wire going -- first tranche was

2    in four weeks, and then this -- and this -- and the other after

3    the four weeks, but they're -- they were going to do it -- do

4    it in two tranches.  The first tranche would -- would --

5    would -- would include like 2 percent of the total loan, and

6    the second tranche would be the remaining amount.

7    Q    All right.  So it's around what calendar date did you

8    expect the money?

9    A    When we signed the agreement on -- on -- on -- back in

10   May -- May 3rd, yeah, we -- we should have -- we should have

11   gotten the first -- the first tranche somewhere in the -- in --

12   in the end of -- end of March.

13   Q    All right.  And what impact -- has the loan ever funded?

14   Have you ever gotten your $3.6 million back?

15   A    No, it -- no, we did not.

16   Q    And what impact has that had on your business?

17   A    A lot.  3.6 million is a lot of money.  I -- I know that

18   it's -- it's -- it's been very, very hard on me and my family,

19   had a lot of stressful days.  You know, I had to take a HELOC

20   to get (audio interference) you know, to get expenses by.

21   We're selling two hotels right now, into -- in which we would

22   have not normally sold -- sell, if selling two businesses in

23   order to make this money up.  (Audio interference).  But the

24   total money, $3.6 million, we had -- we had borrowed $2.5

25   million on a credit line, which is accruing interest of about

S. Patel - Direct                                    194

1   $22,000 each month.  And it is just draining us so badly right

2   now.  We -- we -- so we want to pay -- we want to pay that --

3   that -- the credit line off, so we can, you know, so we just

4   need to sell two -- two of the -- two of our businesses.  So we

5   can -- we can maybe sell -- maybe close the credit line, and

6   stop paying the interest each month.  But have almost, like --

7   Q    Again, I didn't completely follow you, but did you take

8   out higher interest credit to finance the $3.6 million?

9   A    Yes, because, you know, it was -- it was only short term.

10  So I thought maybe I'll, you know, just take a credit line, you

11  know, out from one of my, you know, from -- from one of my

12  businesses, and then I'll pay it back within a month or so.

13  But that did not happen.  So we have accrued more than $300,000

14  in interest from -- from last May through now.  And I think

15  it's still accruing.  We're trying to sell our businesses.  If

16  we sell the businesses, we'll try to pay down the credit line

17  to kind of -- it's, you know, we are -- it is -- it is -- it is

18  very, very nerve-wracking, very, very frustrating.  My entire

19  family, you know, has suffered a lot.  And, you know, it's

20  just -- just nerve-wracking.

21  Q    All right.  And do you think your business is going to

22  survive?

23  A    I will.  But, you know, it's -- I -- I -- it -- you know,

24  all of my saving is gone.  Because $2.5 million was -- was --

25  was from the credit line.  The remaining $1.1 million was my

1   personal saving.  And I had -- that -- that was my personal

2   saving, and it's all gone now.  So I -- I'm -- it's basically a

3   big setback of seven, eight years now.  So you know, it's just

4   like, you know, our -- our clock just reset by almost seven,

5   eight, ten years now.  So you have to kind of rebuild it again.

6   Q    And is what you do, providing lodging, does that provide a

7   benefit to people?

8   A    Yes.

9   Q    And do you employ people?

10  A    What is it?  Sorry.

11  Q    Do you employ people through your hotels?

12  A    Yes, I do.  Yes, I do.

13  Q    All right.  And did you have any notion that the funding

14  of your loan was conditioned on any kind of speculative

15  investment?

16  A    No, I -- I -- at the start -- the way it was presented to

17  me and the way, you know, everything was said, I -- I don't --

18  I didn't think it was -- it was -- it was speculative.  Because

19  we had an agreement which said clearly, which was drafted by

20  the -- by the attorneys, and then signed by -- signed by both

21  sides, which said that it's a non -- it's a -- it's a

22  refundable deposit.  So if -- if the loan doesn't fund, you

23  know, that money should -- is -- is going to get back to us.

24  And then our money is going to sit in a -- in a -- in a deposit

25  account, which -- which -- which would not be, you know, which

1  would not be (audio interference) by Genie or McMann, or

2  anybody else.  And it was a deposit.  And, you know, so I was

3  under that impression that that money would -- would be safe.

4  And then once -- if they did not fund the loan, that money

5  would come back to us.

6  Q   All right.

7            MR. BOMKAMP:  I have nothing further of this witness,

8  Your Honor.

9            THE COURT:  Mr. Mickler?

10                        CROSS-EXAMINATION

11 BY MR. MICKLER:

12 Q   Good afternoon, Mr. Patel.  My name is Bryan Mickler.  I'm

13 the attorney for Genie.  I appreciate you joining us today.

14 When I looked at your BELOC contracts, it was clear to me that

15 McMann was the lender for these contracts, correct?

16 A   McMann, yes, McMann, we signed the documents with McMann.

17 But all along our -- our -- our communication was with David

18 Hughes, and -- and then he wanted, he -- he -- he told us

19 that -- that he had the money, and Genie -- and Genie -- Genie

20 would be responsible for it.

21 Q   Okay.  But the two BELOC agreements, Number 170 and 171,

22 that you referred to earlier, those were actually through

23 McMann funding as the lender?

24 A   Yes.

25 Q   All right.  And it sounded as if when you started this

S. Patel - Cross                                    197

1   process through McMann in April of 2023, that McMann is the

2   company which directed you to wire the funds to Genie.  They

3   kind of kept stringing you along for a period of time until the

4   termination was done.  And my question relates to, was it

5   McMann who was communicating with you almost solely until this

6   termination letter?

7   A     No, we -- we -- we also -- when -- when we did not get --

8   it is -- you know, when we were getting no good answers from

9   McMann, we got -- we -- we -- we started talking to David

10  Hughes, and then he started -- he -- he started saying, you

11  know, we started committing with him too.  And we told him

12  directly that we're going to -- we are entering ourselves into

13  that.  He wanted to -- he --- he at one point in time told us

14  that, no, if -- if we wish, we could probably, you know, we can

15  take this over because we got the money anyway.  We -- we

16  can -- we can can pull the McMann -- McMann out, and then Genie

17  would step in and we would be able to (audio interference).

18            MR. MICKLER:  May I have one moment, Your Honor?

19            THE COURT:  You may.

20  BY MR. MICKLER:

21  Q    So when you started talking to David Hughes, it would have

22  been sometime around the same time as this termination letter,

23  which you provided to McMann?

24  A    Yes, about -- about -- about maybe two or three weeks

25  before the termination letter went out, we started talking with

1  David Hughes.

2  Q    All right.  And by then, you had entered into the BELOC

3  agreements with McMann, and you had been strung along for

4  several months by Michael Lanza and the other McMann partners,

5  correct?

6  A    Yes.  We -- we -- we -- we we kept getting -- we kept

7  getting told that the money will be there this week, next week,

8  this week, next week.  And then there's always some kind of

9  excuse that the money was, you know, the -- the money didn't --

10  didn't make it.  The wire -- wire came in, but the timing was

11  wrong.  And I think David Hughes told the same thing.  That,

12  you know, we didn't get the money, the wire -- the wire -- the

13  wire went bad because there -- there was no -- the -- the wire

14  issue to connect to the bank, had some issue with it or

15  whatever.  So those were all the stories we've been -- we've

16  been hearing.

17  Q    And when you entered into your two BELOC contracts with

18  McMann in April of 2023, did McMann ever communicate to you

19  that they had been having problems funding loans through Genie?

20  A    No, never.

21  Q    So if you had been aware that McMann had had problems for,

22  let's say, five months with Genie loans, would you have wired

23  funds to Genie?

24  A    No.

25  Q    But --

1    A    I wouldn't (audio interference) either.

2    Q    But McMann never communicated that to you, did they?

3    A    No, they did not.

4    Q    And eventually you hired a law firm and you sued McMann,

5    did you?  Did you not do that?

6    A    Yes.

7    Q    Okay.  And you sued Genie as well, but your contracts were

8    with McMann and you sued them based on those contracts.

9    A    Actually, I'm -- we have a lawsuit against McMann and

10   Genie both.

11   Q    All right.  And as a result of that lawsuit, has McMann

12   paid you any money or your companies --

13   A    No.

14   Q    -- any money?

15   A    No.  It's -- I think the lawsuit is ongoing.

16   Q    Okay.  Would it be a fair statement to say that at this

17   point, you just want your $3.6 million back?

18   A    Yes.

19   Q    Okay.  And if Genie put together a plan to pay back your

20   $3.6 million over some period of time and they could prove that

21   that was feasible, would you be happy with that?

22   A    Yes, but it all depends on what -- what term and what

23   time.

24   Q    I understand, but assuming that they can prove it and that

25   it's going to happen, you would be happy with getting your 3.6

1  million back?

2  A    Yes.

3  Q    Okay.

4         MR. MICKLER:  Nothing further, Your Honor.

5         THE COURT:  Thank you.

6         Anything further?  Mr. Bomkamp?

7         MR. BOMKAMP:  Yes, Your Honor.

8                    REDIRECT EXAMINATION

9  BY MR. BOMKAMP:

10 Q    Actually, I'm sorry, Mr. Patel, do you have United States

11 Trustee Exhibit 186?

12 A    186.  No, 186, did you say

13 Q    186, yes.

14 A    No, that's not in mine.  That's, I think, that's my son's.

15 Q    No problem.  I'll talk to --

16        MR. BOMKAMP:  No questions, Your Honor.  I'll talk to

17 Preet about it.

18        THE COURT:  All right, Mr. Patel.  You're done for

19 now.  You are free to go back to work or you are free to stay

20 and watch, but if so, please turn off your camera as well as

21 your microphone.  We will get your son in now.

22        THE WITNESS:  Thank you very much, Your Honor.

23        THE COURT:  Thank you for your patience today.

24     (Witness excused)

25        THE COURT:  Ready for the other, Mr. Patel?

1        MR. BOMKAMP:  Yes.

2        THE COURT:  I'll bring in Preet now.

3        All right.  Shailesh Patel, if you'll just turn your

4   camera off for me, that would be very helpful.  There we go.

5        All right.  Mr. Patel, if you could -- Kate, if

6   you'll just swear in Preet.

7        THE CLERK:  Please raise your right hand.

8        PREET PATEL, U.S. TRUSTEE'S WITNESS, SWORN

9        THE CLERK:  Okay.  Please state your name and

10  address, including city and state, for the record.

11        THE WITNESS:  Yep.  Preet Shailesh Patel, 2313

12  Timberview Drive, Durham, North Carolina, 27705.

13        THE COURT:  You may proceed.

14                    DIRECT EXAMINATION

15  BY MR. BOMKAMP:

16  Q    And just one point of clarification, are you also named

17  Shailesh, but go by Preet?

18  A    Correct.

19  Q    Okay.

20  A    Well, Shailesh is my middle name, but yeah.

21  Q    Okay, okay.  Thank you for coming here.  Did you have to

22  take off work today?

23  A    I did.  I'm a -- I'm a resident physician.  Yes, I took a

24  day off of work to be here for this.

25  Q    And as a resident doctor, is that a difficult thing to do?

P. Patel - Direct                              202

1   A    Yeah.  We get about 12 to 15 vacation days a year.  We get

2   about two wellness days a year.  I had to use one of my

3   wellness days for this.

4   Q    Okay.  When did you become involved with McMann and Genie?

5   A    So I'd kind of known from -- by -- from association, just

6   by talking to my dad and uncle about them back in April.  But

7   my primarily -- my primary involvement really came in August

8   once our loan had been (audio interference).  And so I kind of

9   took a more active approach to try to figure out why that

10  wasn't happening.  So primarily about August after everything

11  had been submitted and everything was now overdue based on the

12  contract.

13  Q    Okay.  So is it fair to say that you became involved kind

14  of after things went bad?

15  A    Yes.  So I guess I kind of became involved and discovered

16  that things were going bad and -- and becoming worse, I

17  suppose.

18  Q    All right.  And in your course of following up on this,

19  did you have contacts with  Genie Investments?

20  A    Prior to August?

21  Q    No, whenever you became involved in August.

22  A    I did, yeah.  That's kind of primarily who I interfaced

23  with, kind of to figure out what was going on.

24  Q    All right.  And do you have Exhibit 186?

25  A    I do.

1    Q    All right.  And do you have it open in front of you there?

2    A    I do.

3    Q    And is this a letter from Genie Investments' lawyer Adam

4    Walker?

5    A    Correct.

6    Q    Okay.  And is it explaining that Genie has been unable to

7    make your loan because of problems with its capital provider?

8    A    Yes.  This was -- this was sent to us the day that our

9    refund was due after they had spent about three months

10   reassuring us saying that they, quote, "had never not refunded

11   people their money who would come in with their own capital for

12   their contractual stipulations."

13   Q    Okay.  Would it make sense for them to send you this

14   letter unless they were funding the loan?  Unless they were

15   the --

16   A    No.

17   Q    Okay.

18   A    No.  And this -- the letter was also sent at the end of,

19   if not after, business hours the day that our loan was supposed

20   to be due.  So this letter was sent to us once we were

21   officially in breach of contract.

22   Q    All right.  And is it fair to say that you sent numerous

23   emails to David Hughes?

24   A    I sent emails, but I think I primarily interfaced with him

25   via phone calls, and then in text messages, which should --

1  which are exhibits to this case.

2  Q    Okay.  If you look at Exhibit 184.

3  A    Mm-hmm.  Yep.

4  Q    Yeah.  If you see the update on your refunds from Genie,

5  kind of the middle email on the first page.

6  A    Correct.  That Sandra sent to me.

7  Q    Right.  And was this clipped from ZOOMERAL, the expected

8  refund --

9  A    Correct.

10 Q    -- date of being October 13th, 2023?

11 A    Correct.

12 Q    Okay.  So Genie had promised you a refund as of October

13 13th, 2023, and instead of a refund, they sent you a letter,

14 more or less.

15 A    Mm-hmm.

16 Q    Okay.  And if you could just answer in words, because this

17 might be transcribed.

18 A    Oh, I apologize.  Yes.

19 Q    Not a problem.

20 A    I'm sorry.  Did you ask me a question?

21 Q    I'm sorry.  I am -- I will in a moment.

22        THE COURT:  Dr. Patel, he's been going all day.  He's

23 doing an okay job at this point.

24        THE WITNESS:  No, no.  I just wanted to make sure I

25 wasn't keeping you guys all waiting if he said something and I

 1   didn't --

 2            MR. BOMKAMP:  No, no.  You're good.

 3            THE COURT:  He was hot and heavy at 9:10 when he

 4   finally showed up for the nine o'clock trial.

 5   BY MR. BOMKAMP:

 6   Q    You're fine.  Could I direct your attention to United

 7   States Trustee Exhibit 189?

 8   A    189.  Yep.

 9   Q    All right.  And is this an email from Genie Investments?

10   A    Yes.

11   Q    And what does this pertain to, as you understand it?

12   A    So this, I think, was an email that Walter Trock McMann

13   had sent to Genie Investments and cc'd me.  And -- or -- that

14   was kind of what -- what he had sent, but he forwarded me an

15   email about a communication between McMann and Genie, basically

16   saying that, you know, they knew -- so they needed to, they're

17   trying to proceed with settlement and refund discussions.  This

18   didn't pertain to us, which is why -- which is what my response

19   kind of focused on.  If you look at the second email that --

20   that was sent, it basically said -- I basically say that, you

21   know, the communication that they -- that Walter forwarded me

22   was a discussion about them trying to refund clients who had --

23   who had basically signed contracts for non-refundable deposits.

24   And I don't know why he sent that to me because I basically

25   kind of reminded him of the fact that --

1   Q    All right.

2   A    -- our -- our -- our --

3   Q    We'll move on from that.  Okay.  And if you look at --

4   let's look at United States Trustee Exhibit 194, and it's going

5   to be -- this is kind of a long one, but I want to look at

6   Exhibit E.

7   A    Exhibit E.  Do you know what page that's on?

8   Q    It's kind of lengthy, but --

9   A    Oh, I see.  It's right here on that page.  Let's see.  It

10  might be on the second PDF.  Yeah, it's right there.  I see --

11  okay.  It's on the other sheet.  Give me a second.

12  Q    Okay.  And these are ZOOMERAL communications, correct?

13  A    Yes.

14  Q    All right.

15  A    Yes, they are.

16  Q    And you see that Genie acknowledged the receipt of the

17  deposits, of the $1.8 million deposits?

18  A    1.8 for each account.

19  Q    Yes, for each LLC, yes.

20  A    Yep.

21  Q    Okay.  And there's also, if you look, the following are

22  direct messages between Genie and the client.  It states

23  that -- do you see where it states that Genie is working to get

24  you your refund as quickly as possible?

25  A    Mm-hmm.

1  Q    All right.  Did they --

2  A    Yeah.

3  Q    -- ever get you your refund?

4  A    They absolutely did not.

5  Q    Okay.  And there's one ZOOMERAL message basically

6  promising a refund for each of the lodging partners, correct,

7  in Exhibit E there?

8  A    Correct.  And then that -- we talked about, well stated

9  that date to be October 13th.

10 Q    All right.  And at some point, your family hired

11 attorneys, correct?

12 A    Correct.  We had -- these were the attorneys that helped

13 us construct the contract up or a conception as well.

14 Q    All right.  The Foley & Lardner?

15 A    Mm-hmm.

16 Q    All right.

17 A    Yes.

18 Q    And you're currently suing both Genie and McMann in

19 connection with these, the non-refund of the ZOOMERAL deposits,

20 correct?

21 A    That is my understanding.

22 Q    I beg your pardon?

23 A    That is my understanding, correct.

24 Q    All right.  Did you in any way suspect or did your family

25 suspect that the success of your loan depended on Genie's

1  success with the speculative investment?

2          MR. MICKLER:  Objection, Your Honor.  He's already

3  testified to this.

4          THE WITNESS:  Absolutely not.

5          THE COURT:  Hold on one second, Dr. Patel.

6          MR. MICKLER:  He's already testified that he wasn't

7  present for the loan discussions back in April.  He didn't

8  become involved until August.

9          THE COURT:  I'll sustain the objection.

10         MR. BOMKAMP:  All right.  All right.  Nothing further

11 for this witness, Your Honor.

12         THE COURT:  Mr. Mickler?

13         MR. MICKLER:  I have no cross for this witness, Your

14 Honor.

15         THE COURT:  Dr. Patel, you are free for today.  We

16 thank you for taking the time to be with us.  We appreciate you

17 dealing with being sequestered for most of the day.  And I am

18 absolutely sure that your family is very thankful for you doing

19 this time.  You are free to go now for the day.  Or you are

20 also free to stay on and watch the remainder of the trial or

21 today's portion of the trial.  If you decide to do that, please

22 mute your microphone and turn off your camera.

23         THE WITNESS:  Understood.  Judge Burgess, would that

24 be okay for me to make a brief statement just kind of outlining

25 (audio interference)?

```
1                THE COURT:  Unfortunately, it's not, Dr. Patel.  If

2    you weren't asked about it, you can't speak about it.

3                THE WITNESS:  Okay.  No worries.

4                THE COURT:  You have a great afternoon.

5                THE WITNESS:  Yep.  Thank you.

6          (Witness excused)

7                THE COURT:  Are we ready for the real Kim Nash?

8                MR. BOMKAMP:  Yes.  I believe that's the last --

9                THE COURT:  I think we can get it done.  I'm telling

10   you.

11               MR. BOMKAMP:  -- Zoom witness, I think.

12               THE COURT:  I think we can push this through today.

13   And then we'll just have them tomorrow.  Look at this.

14   Efficiency.

15               MR. BOMKAMP:  All right.  Yes, we can call Ms. Kim

16   Nash, the real Kim Nash.

17               THE COURT:  All right.  Will the real Kim Nash please

18   stand up?  And if you can unmute yourself, you are likely our

19   last witness for today.

20               MS. NASH:  Hello.

21               THE COURT:  There we go.

22               MS. NASH:  And --

23               THE COURT:  Kate, if you'll go ahead --

24               MS. NASH:  Okay.

25               THE COURT:  -- and swear in Ms. Nash.
```

1        THE CLERK:  Okay.  Please raise your right hand.

2           KIM NASH, U.S. TRUSTEE'S WITNESS, SWORN

3        THE CLERK:  Okay.  Please state your name and

4   address, including city and state, for the record.

5        THE WITNESS:  Kim Nash, 110 Velsco Lane, Port

6   Sulphur, Louisiana, 70083.

7        THE COURT:  And which book are we going to be in?

8        MR. BOMKAMP:  This is the beginning of the Book

9   Number 4.

10        THE COURT:  4?  All right.

11        MR. BOMKAMP:  Yeah.  Front end of 4.

12        THE COURT:  You may proceed, Mr. Bomkamp.

13        MR. BOMKAMP:  All right.

14                    DIRECT EXAMINATION

15   BY MR. BOMKAMP:

16   Q    Good afternoon, Ms. Nash.

17   A    Hello.

18   Q    What is it that you do for a living?

19   A    Well, we own a home inspection business.  So I basically

20   stay home and my husband does the home inspections.

21   Q    All right.  All right.  And you provide administrative

22   support for that business?

23   A    Yes.  Yes.

24   Q    Okay.  And --

25   A    I'm the secretary.

1    Q    And for what reason were you recently looking for a loan?

2    A    He deals with realtors.  So we were going to do a flip

3    home.  We were trying to find something to, you know, flip.

4    And a realtor told us about Larry Roche and that he can get

5    this line of credit.  So that's how on December 11th, we had

6    our first conversation with Larry.  And since -- and from

7    there, we had a group conference call with Larry, Walt,

8    Michael, and -- there was another gentleman, which now I'm

9    assuming it may have been David, I'm not really sure.  And so

10   we didn't sign papers for about six weeks until December 19th,

11   because I was skeptical, but --

12   Q    Okay.  Let me slow you down just a little bit.  Let me

13   slow you down just a little bit.  So --

14   A    Okay.

15   Q    So as part of your business activities, you do home

16   inspections.  Is part of the business also rehabbing and

17   flipping houses?

18   A    It is, but we don't do it often.

19   Q    Okay.  Okay.  So an infrequent part of your business is

20   rehabbing and flipping properties?  And was that the objective

21   for which you were seeking financing?

22   A    Yes.

23   Q    Okay.

24   A    We were looking to purchase an apartment complex.

25   Q    Okay.  With the idea of turning it around and selling it?

1    Or were you going to keep it and use it for a company?

2    A    No.  At that time, no.  We were going to keep -- we were

3    going to keep the apartment complex.

4    Q    Okay.  Okay.  And how did you -- what sort of loan

5    products did you consider in seeking financing to buy an

6    apartment complex?

7    A    None.  This was the -- this was the only thing that was --

8    we -- we thought it was out of our reach because our business

9    was slow.  So we were trying to look to find something else

10   that we can do.  So when they introduced us to this, we were

11   like, wow, you know, we would love to do this.  So that's how

12   we got involved in this.  So we were not looking to get a loan

13   because we knew we couldn't get approved.

14   Q    Okay.  Okay.  But you were looking to supplement your

15   income from the home inspection business by maintaining --

16   A    Yes.

17   Q    -- and operating an apartment building.

18   A    The market had gotten really slow.

19   Q    Okay.

20   A    Correct.

21   Q    All right.  And how did you hear about the BELOC product?

22   A    A realtor had told my husband and referred him to Larry

23   Roche.  And Larry Roche, in return, referred him to Michael

24   Lanza at McMann Commercial Lending.

25   Q    Okay.  And how much money were you trying to borrow?

1   A    2.5 million.

2   Q    Okay.  And what do you remember about the proposed terms

3   of the loan?

4   A    Meaning, like, we were supposed to put up a percent, which

5   is -- first, we put up 7,900 for the application fee to McMann

6   that said it was for ZOOMERAL to open a ZOOMERAL.  And that

7   was -- that was December 19th.  Then on January 4th, we sent

8   $20,000 --

9   Q    And does years -- ma'am, is that January 4th, 2023?

10  A    Yes, January '23.

11  Q    Okay.

12  A    December 19th was on 22nd, you know, 2022.  And then

13  January 4th was on 23.  20,000 was for the BELOC.  And then on

14  January 11th, we sent $37,500 for the bridge loan ICA.

15  Q    Okay.  So was 20,000 the due diligence fee?

16  A    Yes.

17  Q    And who was that sent to?  Where did that go?

18  A    Genie Investments.

19  Q    Okay.  And did you have a bridge loan with Genie

20  Investments?

21  A    Yes, I did.

22  Q    Okay.  And let's turn to United States Trustee Exhibit

23  141.

24  A    Okay.  Hold on one sec.  It's opening.  Okay.

25  Q    Is that your due diligence fee agreement with Genie

1    Investments in the wiring instructions?

2    A    Yes.  Yeah.

3    Q    Okay.  And if we look at the next exhibit, which is

4    Exhibit 142, is that where you wired $20,000 to Genie

5    Investments NV on account of the due diligence fee?

6    A    Yes.

7    Q    All right.  And so was it 20,000 and then 37 and a half on

8    the prepaid interest?

9    A    Yes.  Mm-hmm.

10   Q    Okay.  And where did you get the money?

11   A    From my mother-in-law.  And that's what kept me from

12   signing at the beginning was when we started out October 5th

13   with meeting with him.  I had to be sure that I knew before I

14   borrowed my mother-in-law's money because she's a single 86-

15   year-old woman.  And Michael built a -- they built a

16   relationship with me where I thought I could trust them and

17   believe everything that they were saying.  So we went to my

18   mother-in-law and she wanted to help her son out.  So in

19   return, she gives him what she's got in her bank account.

20   Because we are being told in 75 days, you will get this loan.

21   So she wants to help her son out like any mom does.  Well,

22   that's what she did and that's where we got the money from.

23   Q    Okay.  All right.  If you turn -- and have you been able

24   to pay her back?

25   A    No.  What we did was we took a second mortgage and we're

1   helping her pay her bills.  And I have my house up for sale

2   right now because of this, so I can pay her back.  She doesn't

3   want us to do that, but I'm not going to -- that -- I'm not

4   doing that because she -- I'm not going to watch her have to

5   live.  She has so much stress and so much anxiety now because

6   she has no money and she don't want to ask us for any money to

7   live off of, but we have to pay her.  So I took a second

8   mortgage to help her.  I mean, try to, you know, pay her bills

9   every month.  And as we speak right now, she is in the

10  hospital, supposed to have open heart surgery this morning.

11  And I know it's all related to stress and -- and -- and anxiety

12  and worry, you know.  So it goes beyond just the money for me.

13  It -- it's -- it's a -- it's what it's done mentally and

14  emotionally to my household.

15  Q    Sure.  And has that caused any rifts within the family?

16  A    Yes, absolutely.  His daughters, you know, my husband's

17  sisters.  I mean, we've had a peaceful family and now here it

18  is that now we -- we -- they thought -- they didn't know that

19  we were doing this.  This was all going to be secret because we

20  were going to give her her money back in 75 days.  She didn't

21  want everybody knowing her business.  Well, we had to tell

22  everybody.  So yeah, it -- it was -- we didn't even spend

23  Thanksgiving together because of this.

24  Q    All right.  And could you refer to United States Trustee

25  Exhibit 143?

1    A    Okay.

2    Q    All right.  Is that your bridge loan agreement with with

3    Genie?

4    A    One second.  Let me go up to the top.  Yeah.

5    Q    All right.  And is that the document that you paid 37 and

6    a half thousand dollars of prepaid interest in connection with?

7    A    Yes.  Mm-hmm.

8    Q    All right.  And when was your loan supposed to fund?

9    A    It was supposed to fund on March, around March 15th.

10   Q    Of 2023, correct?

11   A    Correct.

12   Q    All right.  And what were the first signs of trouble?

13   When did --

14   A    Well, okay.  So from March 15th, I kept calling Michael

15   Hughes and Walt Trock and they just kept leaving, you know,

16   giving me all kind of -- mostly they tried to act like they had

17   the money.  It was just being held up in banks and they need

18   compliance.  It's having compliance issues.  The bank's holding

19   it -- has a hold on it because of the large amount.  It's going

20   to be next week.  It's going to be next week.  It was always

21   next week, so you were on these highs and lows thinking, is it

22   coming?  Is it not coming?  And it was -- it was never that we

23   don't have the money.  It was from -- at least from March to

24   August.

25        Then on August 18th, that's when McMann admitted to me,

1   there was no BELOC loan.  There was no line of credit.  He

2   even -- it started in Exhibit 162.  And so from there, I told

3   him, and I was like, what the heck are you talking about?  And

4   he proceeded to tell me that you need to call David Hughes.  I

5   have nothing to do with this anymore.  He -- and he gave me

6   David's number.

7           So I immediately called David Hughes and the first 15

8   minutes of our conversation was him trying to figure out how I

9   got his number because he doesn't have his number anywhere on

10  social media, not on ZOOMERAL and Genie Investments and nowhere

11  can I -- how in the world did I get his telephone number?  So

12  in order, before he would proceed to speak to me, I had to tell

13  him that Walt Trock gave me his number or he wasn't going to

14  talk to me.

15      Now granted, since March, it was threatening after

16  threatening after threatening.  If you -- because I would say

17  Michael or Walt or whoever, you know, if -- if you do this,

18  we're cutting your loan off.  If you go say this, we're cutting

19  your loan off.  So you'd live constant fear that they were

20  going to turn, they're going to cut the loan off.

21      So on August 30th in Exhibit 162, that's when he started

22  kind of telling me what was going on.  So he gave me Walt's

23  number and -- I mean, excuse me, David Hughes's number.  When I

24  called him after we got past how I got the number, he -- I

25  pleaded with him.  I was crying.  He said, don't raise your

1  voice to me.  And he was arrogant.  And I said, you have to

2  understand, this is not my money.  And I'm talking like I'm

3  talking to you.  And so he says, well, I'll tell you what I can

4  do for you.  I'll give -- if you send me --

5  Q    Who is talking here?

6  A    Okay.  David Hughes.

7  Q    Okay.  Go ahead.

8  A    David Hughes told me if you send me $3,000, I will get you

9  another lender.  And I said, absolutely not, not sending you no

10 more money.  And so then it got ugly.  He said, I'm blocking

11 you from that.  And that's on September 1st is when I went on

12 bigger pockets and I put a review of everything that took place

13 only because I was trying to help everybody else's families not

14 to have to deal -- go through this.

15      Then November 8th is when I got an arbitration.  He was

16 taking me to arbitration.  So in his files that he sent to

17 arbitration was the BELOC loan.

18 Q    And I want to be clear here, who took you to arbitration?

19 A    David Hughes.

20 Q    Okay.

21 A    Or his attorneys.

22 Q    Genie Investments, the debtor in this case?

23 A    Genie Investments.

24 Q    All right.

25 A    Genie's Investments.  So they take me to arbitration.

1  They send in the documents and the paperwork.  And when I go to

2  my BELOC loan, I noticed it's been changed.  So I have a -- my

3  correct BELOC loan sitting in front of me.  And then I have

4  another BELOC loan that's been changed to everything that says

5  Genie Investments.  It even -- and you have a copy -- that's in

6  the exhibit as well.  And it says Genie Investments.  So I

7  immediately contacted JAMS and told them, this is -- they

8  forged my contract.  So --

9  Q    Wait, I --

10  A    -- they never did get to that.

11  Q    So could I just slow you down a little bit?  So is what

12  you're saying is that the BELOC that was in the name of McMann,

13  Genie put their name on it instead and then used it to invoke

14  the arbitration clause and hauled you --

15  A    Correct.

16  Q    -- into arbitration?  Okay.

17  A    Correct.  And then from there, from there, that was on

18  November 8th.  So I sent over the correct document, BELOC loan.

19  I mean, I put that in the arbitration file.  So on -- then we,

20  you know, time goes by and we find out he's filing bankruptcy.

21  So they -- March 1st, Jason Hooter (phonetic) calls me on the

22  phone, his attorney, and offers me 20 -- well, first he offers

23  me $10,000 if I would take my review offline and give him the

24  names and tell him what's going on in the group.

25  Q    Okay.  Again, again, let's back up a little bit.  So are

1  you in a social media group involving other unhappy customers

2  of Genie Investments?

3  A    I'm going to call it a sanity group because we help each

4  other.  So yes.

5  Q    Okay.  All right.  And what did Genie Investments offer

6  you and what did they want?

7  A    Okay.  They offered me -- he -- David -- I mean, sorry,

8  Jason Hooter called and said, I'll give you $10,000 if you give

9  me the list of names of who's in the group, tell me about the

10 group and take your -- take your -- take review down.  I said,

11 you cannot take reviews down off of bigger pockets, but I told

12 him no.  So basically you want me to be your rep.  And he

13 laughed and said in so many ways.  And I said, no.

14      So we got past that.  Then all of a sudden, April 9th, we

15 get a notification from JAMS, which was just last week that he

16 wants to move -- they want to move forward with this case.

17 They do not want me to have any time because they gave me an

18 extra week because my daddy passed away.  And so they gave --

19 they don't want to move forward.  And she replied back and

20 said, you're in stay, you're in bankruptcy.  So they still was

21 trying to move forward with this arbitration on April 9th.

22 Q    All right.  Did you have any notion that the funding of

23 your loan had anything to do with a speculative investment by

24 Genie?

25 A    Absolutely not.  I don't gamble and I would have never

1   gambled my mother-in-law's money away.

2   Q    All right.

3   A    They miss -- they miss -- when I -- when I got my -- even

4   my bridge loan document and I called them and I said, you know,

5   there's a lot of stuff in here.  And I just, like I said, I

6   built a friendship -- I thought I built a friendship with them.

7   And so yes, I'm naive that I trusted them.  They were my

8   bankers.  I believed that what -- you know, I believed McMann

9   Commercial Lending, Walt Trock, Michael Lanza, and David Hughes

10  was all under one umbrella because I was sending my money to

11  David -- I was sending my money to David Hughes, I mean to

12  Genie Investments.

13  Q    All right.

14  A    So I'm thinking we're all under one umbrella.  We're all

15  working together and we have never -- this is what he said when

16  I questioned him about -- I questioned him about, you know, the

17  bridge loan, non-refundable, all that kind of stuff.  And he

18  said that, oh, that's just on there just, you know, in case

19  some, you know, you decide to back out.  And I'm like, you

20  know, so I'm thinking, well, I'm not going to, I'm not going to

21  back out, you know?  And that's how they just -- they just let

22  me to believe.

23         I was never told that they didn't -- they had

24  contracts out there since 2020.  And I even asked that, did

25  everybody get funded?  Yes.  Nobody's had to wait past 75 days.

1  Everybody has gotten funded.  Well, they misrepresented me.  So

2  here I'm signing documents thinking, oh, this is just

3  contracts, this is normal procedure.

4          MR. BOMKAMP:  Your Honor, no further questions for

5  this witness.

6          THE COURT:  Thank you.

7          Mr. Mickler?

8          MR. MICKLER:  I'll try not to use the whole 20

9  minutes, Your Honor.

10         THE COURT:  Let's get it done, Mr. Mickler.  You may

11 proceed.

12         MR. MICKLER:  Thank you, Your Honor.

13                    CROSS-EXAMINATION

14 BY MR. MICKLER:

15 Q   Ms. Nash, good afternoon.  My name is Bryan Mickler.  I'm

16 the attorney for Genie.

17 A    Uh-huh.

18 Q    You spent a couple of minutes going over sort of a

19 timeline at the end of your testimony related to they told me

20 this, they told me that, they -- I trusted them, I trusted them

21 about this and that, and they told me about the contract.

22 You're referring to what McMann told you while you were going

23 through the loan process, right?

24 A    Correct.  McMann and Walt Trock.

25 Q    Gotcha.

1    A    Yes.

2    Q    So until McMann gave you David Hughes' phone number in

3    August of 2023, you had no contact with Genie at all, correct?

4    A    I -- I'm not going to say no because I -- I believe in

5    that first conversation when they were trying to convince us

6    there wasn't even a man in there and I -- I believe it was

7    David Hughes.

8    Q    All right.  But you don't know that for a fact.

9    A    But I can't 100 percent say it was not.  But no, I didn't

10   even know -- when you go for a loan, well, when I go for a

11   loan, I apply for the loan, I don't speak to the people behind,

12   behind, behind, behind the scenes that's -- that's giving a

13   loan.  I only talk to my lenders, which is supposed to be

14   working with them.  So to me, yeah, I do believe that they're

15   all in the same umbrella.

16   Q    Okay.  And your lender was McMann, correct?

17   A    Well, it depends on which contract you want to look at.

18   Q    Well, well --

19   A    If you want to look at the BELOC loan --

20   Q    We're talking about the --

21   A    -- that they said to arbitration, then it says in here,

22   Genie Investments is my lender.  So which contract do you want

23   to look at?  The original one where -- or the one that they

24   changed in front of it?

25   Q    I'd like to look at the one that you signed.

1   A    Because the one that they changed in fraud, it says --

2   Q    Excuse me, Ms. Nash?

3   A    Yes.

4   Q    I'd like to look at the one that you signed with McMann.

5              THE COURT:  I think she's referring to Docket 144,

6   shows a McMann contract signed by her on January 10th, 2023.

7   And then Docket 145 -- or Exhibit 145, shows a Genie

8   Investments as lender, dated January 10th, 2023, also signed by

9   her.

10             MR. MICKLER:  Understood, Your Honor.  Her testimony,

11  as I understood it, was that she had nothing to do with 145.

12  BY MR. MICKLER:

13  Q    Is that correct, Ms. Nash?

14  A    What?  Say that again.

15             THE COURT:  Your testimony is you had no knowledge of

16  Exhibit 145.

17             THE WITNESS:  That's the one -- I'd have to get it.

18  That's the one that says Genie Investments?

19             THE COURT:  That's correct.

20             THE WITNESS:  None.  Not until arbitration.

21             THE COURT:  All right, so --

22             THE WITNESS:  And what caught me, this is what caught

23  me --

24             THE COURT:  All right.

25             MR. MICKLER:  -- was --

```
1              THE COURT:  Ms. Nash, we have to stick to the
2    question.
3              THE WITNESS:  Okay.
4              THE COURT:  So Mr. Mickler is referring to docket or
5    Exhibit 144.
6    BY MR. MICKLER:
7    Q    So when you were --
8    A    Okay.
9    Q    When you were entering into contract represented here with
10   144 with McMann, it was McMann who was providing you with all
11   of the due diligence language that you were looking at and
12   telling you don't worry about it, it's just if you pull out.
13   It was McMann doing all of those things, correct?
14   A    Correct.  McMann and -- yeah.  Mm-hmm.
15   Q    Okay.  And McMann explained to you that your bridge loan
16   agreement and your due diligence agreement were both non-
17   refundable, correct?
18   A    Not at -- well, when I called them back, they didn't --
19   they kind of made -- persuaded me to think that this could
20   never happen because it never happens.
21   Q    Okay.  But --
22   A    It's been -- no loan has waited past 75 days.  So, yes, I
23   did initial it.
24   Q    Okay.
25   A    Because I trusted them.
```

1    Q    And you trusted McMann when they told you that it wouldn't

2    happen and you -- and this due diligence and bridge loan non-

3    refundable portion would never come into effect.  Is that your

4    testimony?

5    A    They -- are you talking about when I signed the paper?

6    Q    I'm talking about --

7    A    When I signed the BELOC?

8    Q    -- either when you signed it or prior to signing the due

9    diligence and the bridge loan, McMann had told you that those

10   non-refundable clauses would not come into effect.

11   A    Well, we never really -- when I called him and said, what

12   does this mean?  We never really talked on it.  It was more of

13   a, you know, we -- that's just kind of like procedure kind of a

14   thing.  They have to put that in contracts.  And I, you know,

15   what I know, I didn't know no better.  So I'm like, you want

16   this.  You know that this could change your life.  So I wanted

17   to believe everything he was saying.  And I'm just being

18   honest.

19   Q    Okay.  And when you say what they were saying, this is

20   McMann talking to you?

21   A    Correct, who was, to me, was representing Genie.  Because

22   you can't sell loans for him for years and years and not have

23   communication with him and know what you're selling, your

24   product.  This is the product that McMann was selling me.  Yes.

25   Q    Did McMann, when you went in to do your BELOC loan in

1    Number 144 in January of 2023, did McMann ever communicate to

2    you that for the past couple of months or maybe longer, they

3    had been having problems funding Genie's loans?

4    A    Never.  I would have never -- I would have never put my

5    mother-in-law's, not a dime of her money --

6    Q    Well that --

7    A    -- on the line.

8    Q    That was my next question.  So if McMann had stated that

9    to you and warned you that Genie loans weren't funding, your

10   testimony would be that you wouldn't have gone through with the

11   McMann BELOC loan or any of the other loan agreements with

12   Genie?

13   A    Correct.  100 percent.

14   Q    Okay.  And some of your money went to McMann, correct?

15   A    7,900 of it went to open a ZOOMERAL, and I think that's in

16   an email --

17   Q    Okay.

18   A    -- which that I could never get in until like the last

19   week.

20   Q    So McMann was financially invested in keeping you on the

21   hook and trying to get these loans going?

22   A    Oh, absolutely.  I mean, and every time you asked

23   something, it was threatening me, threatening me.  If you put

24   something on social media, if you do this, if you do that, if

25   you do this, if you do that, same thing when I talked to David

1    Hughes.  It was threatening, threatening, threatening,

2    threatening.

3              MR. MICKLER:  Nothing further, Your Honor.  Thank

4    you.

5              THE COURT:  Thank you.

6              Mr. Bomkamp?

7              MR. BOMKAMP:  Nothing further, Your Honor.

8              THE COURT:  Thank you.

9              Thank you, Ms. Nash.  Thank you for your patience.

10   We kept you in purgatory for most of the day, but you finished

11   the day up strong.  We appreciate the Louisiana accent as we

12   were moving forward.  You're more than welcome to stay on the

13   line.  We're going to do a couple of procedural issues.  We are

14   going to continue over until tomorrow, but if you would, mute

15   yourself and turn your camera off.

16             THE WITNESS:  Okay.  Let me find it.

17        (Witness excused)

18             THE COURT:  All right.  All right.  Is this a good

19   place to stop?  All right.  Is this a good place to stop for

20   the day, or can you get something done in 13 minutes?

21             MR. BOMKAMP:  I think it's just the Genie principals

22   who are left and it's going --

23             THE COURT:  All right.

24             MR. BOMKAMP:  -- to be more than 13 minutes, Your

25   Honor.

1           THE COURT:   Okay.  So we'll start back up at 11.

2    I'll expect you to be here at 11, not 11:05 or 11:02.  All

3    right.  Every minute you're late, I may impose a $1,000

4    sanction.

5           MR. BOMKAMP:  Yes, Your Honor.

6           THE COURT:  It's payable to technology or something

7    for the courtroom.

8           MR. MICKLER:  Genie.

9           THE COURT:  Payable to the debtor.  Is this -- is the

10   ore tenus motion is to pay the sanctions to the debtor's

11   counsel, I believe.  Anything else we can get accomplished

12   today, procedurally or non-procedurally?  Mr. Bomkamp?

13          MR. BOMKAMP:  I don't think, Your Honor, it might not

14   be a bad thing to look forward to whether we're going to do

15   oral closings.

16          THE COURT:  I think that would be appropriate.  I

17   want to rule on this one very quickly.  I'm kind of glad we

18   have a night in between.  I've got about 1,000 exhibits I need

19   to look through because the quicker we can get this resolved,

20   the quicker this case can get moving forward in the right

21   direction.  So yes, a brief oral closing would be helpful.

22          My thought right now, depending on how tomorrow goes,

23   is we'll take a brief oral closing.  I'll take an hour in

24   chambers, maybe less.  Hopefully, put my thoughts together and

25   pull a Judge Glenn and do an oral ruling from the bench with

1  the caveat that I can change my mind at any time and take it

2  under advisement.  But that's the thought as of now on how I

3  intend to proceed.

4          Any other questions, Mr. Bomkamp?

5          MR. BOMKAMP:  No, Your Honor.

6          THE COURT:  Mr. Mickler?

7          MR. MICKLER:  Your Honor, we are planning on having

8  one Zoom witness tomorrow.  There's an attorney from Missouri

9  that would like to Zoom in.

10          THE COURT:  That would be just fine.  I am

11 actually -- so we are already set up for Zoom tomorrow.  We

12 have a messy status conference at 9 a.m.  So they'll just need

13 to sign up for Zoom.  And anyone on Zoom that can hear me now

14 is more than free to sign up for the Zoom tomorrow through my

15 regular registration process on my website, at the Court's

16 website.  But make sure you sign up for tomorrow.  And so that

17 link will go out to your witness or whoever needs it and

18 they'll just log in that way.  So we already have that Zoom set

19 up.

20          MR. MICKLER:  Yes, Your Honor.  Thank you.

21          MR. BOMKAMP:  Right, and just repeat it for the

22 benefit of who's listening, today's Zoom link will not work

23 tomorrow.

24          THE COURT:  Correct.

25          MR. BOMKAMP:  So go back to the website and get the

1  Zoom link for tomorrow.

2            THE COURT:  Do not use today's Zoom link.  You will

3  click it and you will go nowhere and you will be upset and

4  angry at the Court.  And it's not us.  Zoom handles all that.

5  So make sure to re-register for tomorrow if you'd like to

6  listen.

7            You only have two more witnesses, right?

8            MR. BOMKAMP:  I -- well --

9            THE COURT:  And then a surprise witness that he has

10 in his pocket.

11           MR. BOMKAMP:  Your Honor, I think --

12           THE COURT:  You don't need -- I'm saying you won't

13 need any more Zoom?

14           MR. BOMKAMP:  That's correct, Your Honor.

15           THE COURT:  Okay.  All right.

16           MR. BOMKAMP:  Yes.

17           THE COURT:  All right.  Anything else, Mr. Mickler?

18           MR. MICKLER:  Not from me.

19           THE COURT:  All right.  Good job today.  You've moved

20 as expeditiously as possible through a mess and you've both

21 done a wonderful job.  I'm very happy we have two very high-end

22 competent bankruptcy attorneys.  That is not always the case.

23 It's often not the case.  So I appreciate both of you.

24           I'll see you both at eleven o'clock sharp tomorrow.

25 And don't wait on me.  You're excused.

1           MR. BOMKAMP:  Can I keep the exhibits here?

2           THE COURT:  Leave everything exactly where it is.

3  Our nine o'clock is all Zoom.

4           MR. BOMKAMP:  Okay.

5           THE COURT:  So you don't have to move anything.  You

6  can even leave the boxes there.

7      (Proceedings concluded.)

8                          *  *  *  *  *

9

10

11

12

13

14                  **C E R T I F I C A T I O N**

15

16           I, Alicia Jarrett, court-approved transcriber, hereby

17  certify that the foregoing is a correct transcript from the

18  official electronic sound recording of the proceedings in the

19  above-entitled matter.

20  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

21

22  *alicia F. Jarrett*

23  _____

24  ALICIA JARRETT, AAERT NO. 428     DATE: May 6, 2024

25  ACCESS TRANSCRIPTS, LLC