UNITED STATES BANKRUPTCY COURT

MIDDLE DISTRICT OF FLORIDA

--oOo--

|  |  |
|---|---|
| IN RE: | Case No. 24-00496-BAJ |
|  | Chapter 11 |
| GENIE INVESTMENTS NV INC., |  |
|  |  |
|  | Jacksonville, Florida |
| Debtor. | Wednesday, April 10, 2024 |
|  | 10:59 a.m. |

TRIAL OF EXPEDITED MOTION TO
APPOINT CHAPTER 11 TRUSTEE OR, IN
THE ALTERNATIVE, APPOINT AN
EXAMINER, DISMISS THIS CASE, OR
CONVERT THIS CASE TO CHAPTER 7

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JASON A. BURGESS
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Mickler & Mickler
                           By:  BRYAN K. MICKLER, ESQ.
                           5452 Arlington Expressway
                           Jacksonville, FL 32211
                           (904) 725-0822

For the United States      Department of Justice
Trustee:                   By:  SCOTT E. BOMKAMP, ESQ.
                           400 W. Washington Street, Suite 1100
                           Orlando, FL 32801
                           (407) 648-6069

Audio Operator:            Kate Menard, ECR

Transcription Company:     Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46048
                           (855) 873-2223
                           www.accesstranscripts.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

I N D E X
4/10/24

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| FOR THE DEBTOR: | | | | |
| Adam Walker | 8 | 25 | -- | -- |
| David Hughes | 35 | 60 | 102 | -- |
| John Cohan | 106 | 117 | -- | -- |

| | Page |
|---|---|
| CLOSING ARGUMENT BY MR. BOMKAMP | 124 |
| CLOSING ARGUMENT BY MR. MICKLER | 128 |

```
 1    JACKSONVILLE, FLORIDA, WEDNESDAY, APRIL 10, 2024 10:59 A.M.

 2                              --oOo--

 3        (Call to order of the Court.)

 4            THE CLERK:  All rise.  The United States Bankruptcy

 5    Court for the Middle District of Florida is now in session, the

 6    Honorable Jason A. Burgess presiding.  God save the United

 7    States and this Honorable Court.

 8            THE COURT:  Thank you.  Please be seated.

 9            We'll recall the case of Genie Investments NV Inc.

10    First, we'll take appearances in the courtroom on behalf of the

11    debtor.

12            MR. MICKLER:  Good morning, Your Honor.  Bryan

13    Mickler on behalf of Genie Investments.  Mr. John Cohan and

14    Mr. David Hughes are with me today again.

15            THE COURT:  Good to see you.

16            Mr. Bomkamp.

17            MR. BOMKAMP:  Good morning, Your Honor.  Scott

18    Bomkamp, U.S. Trustee.

19            THE COURT:  All right.  And then do we have anybody

20    via Zoom today?  Did your witness -- were they able to get in?

21            MR. MICKLER:  It should be Adam Walker, Your Honor.

22    He should be in there already.

23            THE COURT:  I don't see an Adam Walker, but I do see

24    an (806) area code.

25            MR. MICKLER:  That should be him, yes.
```

```
 1            THE COURT:  Okay.  All right.  Any -- you're the one
 2   that invoked the rule.  Is it okay if we leave him in or do I
 3   need to put him in his own --
 4            MR. MICKLER:  I was planning on calling him first,
 5   Your Honor.
 6            THE COURT:  Okay.  All right.
 7            MR. MICKLER:  And then I think he'll just drop off.
 8            THE COURT:  You're okay, Mr. Bomkamp, with him
 9   staying in the Zoom and hearing everything?  He's an attorney.
10            MR. BOMKAMP:  He's testifying first, so I don't think
11   it implicates --
12            THE COURT:  Okay.  You're not calling the debtors
13   yourself?
14            MR. BOMKAMP:  And they're parties, so they could
15   stay.
16            THE COURT:  Okay.  All right.
17            MR. BOMKAMP:  So I think it's fine.
18            THE COURT:  So everybody else can stay in.  We won't
19   put anybody sequestered today.
20            All right.  So who's taking the lead today?  You,
21   Mr. Mickler?
22            MR. MICKLER:  I believe the way we had set out the
23   court procedures, Your Honor, was I would call my witnesses and
24   same procedure as yesterday.  Cross, direct --
25            THE COURT:  Outside the direct?
```

1          MR. MICKLER:  Yes.

2          THE COURT:  That will work.  Let's get started.  You

3  may proceed.

4          And I appreciate the 7,000 exhibits I had to go

5  through last night.  I appreciate that.  Just wanted to get

6  that on the record.

7          Go right ahead, Mr. Mickler.

8          MR. MICKLER:  Your Honor, we would call Adam Walker.

9          THE COURT:  If you'll just take the stand -- oh.  And

10 you think it's the (806) phone number?

11         MR. MICKLER:  I believe that's him.

12         THE COURT:  I've asked him to unmute.

13         MR. BOMKAMP:  That's also the area code is Mr. Blake

14 Stringer, so it possibly be him as well.

15         THE COURT:  This one looks like a business number.

16 It's 676-4888.

17         UNIDENTIFIED:  My apologies, Your Honor.  I don't

18 have my cell phone to check his numbers on me.

19         MR. MICKLER:  He should be 816.

20         THE COURT:  That's not him then.  Wait.  What's the

21 name?

22         MR. MICKLER:  Adam Walker.

23         THE COURT:  Yeah, we don't have an Adam Walker yet.

24         MR. MICKLER:  I just talked to him.  Okay.

25         THE COURT:  We've got a John Young (phonetic), Kim

1  Nash, Kristin Stegent, Lea Muse, Mark Anderson (phonetic),

2  Melanie Prinslow (phonetic), Nathan Price (phonetic), and then

3  (806) 676-4888.

4             MR. MICKLER:  Okay.  Can we --

5             THE COURT:  You want to give him a call?

6             MR. MICKLER:  Can I, Your Honor?  Yes.

7             THE COURT:  Yeah, go right ahead.  I waited on

8  Mr. Bomkamp yesterday, if you recall.  He kept us waiting.  So

9  I figure you can even it up by keeping me waiting.

10            Take your time.  I'm just giving you a hard time.

11 I've got to get my computer set up anyway.

12     (Pause)

13            THE COURT:  Thank you for being timely today.

14            MR. BOMKAMP:  I didn't have to play Mario Kart with

15 five boxes of documents today, so --

16            THE COURT:  The Court will note that you were on

17 time --

18            MR. BOMKAMP:  Thank you, Your Honor.

19            THE COURT:  -- for the first time in a while.

20     (Pause)

21            THE COURT:  Did y'all get a flight out today?

22            MR. HUGHES:  Yes, sir.

23            THE COURT:  All right.

24            MR. HUGHES:  Was able to push mine to same time

25 tomorrow morning, so not a problem at all.

1           THE COURT:  Good.

2       (Pause)

3           THE COURT:  Adam Walker has joined.  We ready?

4           MR. MICKLER:  Thank you for your patience.  Yes,

5   Your Honor.

6           THE COURT:  Of course.

7           Kate, you want to swear him in?

8           THE CLERK:  Sure.

9           THE COURT:  Mr. Walker, if you could unmute.

10          THE CLERK:  Please raise your right hand.

11             ADAM WALKER, DEBTOR'S WITNESS, SWORN

12          THE CLERK:  Do you declare under penalty of perjury

13  that the testimony you're about to give will be the truth?

14      (No audible response)

15          THE CLERK:  I can't hear you.

16          THE COURT:  Can't hear you, Mr. Walker.

17          THE WITNESS:  I'm sorry about that.

18          THE COURT:  There we go.  We hear you now.

19          THE WITNESS:  Okay.  I do agree.  I swear to the

20  oath.

21          THE CLERK:  Okay.  Please --

22          THE WITNESS:  If you want to repeat it.

23          THE CLERK:  Please state your name and address,

24  including city and state, for the record.

25          THE WITNESS:  My name is Adam Walker.  Can I give my

1   office address?

2              THE COURT:  That's fine.

3              THE WITNESS:  It's 4050 Pennsylvania Avenue, Suite

4   115-10, Kansas City, Missouri, 64111.

5              THE COURT:  You may proceed, Mr. Mickler.

6              MR. MICKLER:  Thank you, Your Honor.

7                        DIRECT EXAMINATION

8   BY MR. MICKLER:

9   Q    Good morning, Mr. Walker.  My name is Bryan Mickler.  I'm

10  the attorney for Genie, as you're aware.  Can you tell us in

11  the courtroom what your profession is?

12  A    I'm a lawyer.

13  Q    Okay.  Are you representing Genie at this point?

14  A    Yes, I've been representing Genie Investments since

15  approximately July of 2023, in connection with the various

16  issues, most of which relate to its core business and also a

17  dispute between Genie Investments and a company known as

18  Velanos Principal Capital.

19  Q    All right.  And we spent a great deal of time yesterday

20  about Velanos.  Could you briefly describe how Genie reached

21  out to you and what you've been doing for Genie since July of

22  2023?

23  A    Beginning sometime in the spring of 2023, I started doing

24  work for a company called Zoomeral, which I believe is spelled

25  Z-O-O-M-E-R-A-L.  And I was working with David Hughes, who was

1   one of the principals of Zoomeral at that time.  And in July,

2   he asked me to -- and that work was really unrelated to

3   anything that's happened with Genie since then.  But in July or

4   so of 2023, he asked me if I'd be able to help them put a

5   demand letter together on Genie's behalf, to Velanos, regarding

6   an outstanding debt.  So that's when I first got involved with

7   Genie.  I had heard of it before as an entity, but I hadn't

8   done any work for it until that time.

9   Q    And as you --

10  A    And --

11  Q    -- prepared for the demand letter to go out, what type of

12  research or kind of looking around did you do as far as the

13  transaction that Genie and Velanos had entered into?

14  A    Well, Mr. Hughes and John Michael Cohan and Caleb Davis

15  were the three people that I dealt with who were involved with

16  Genie at that time.  They provided me a written narrative of

17  kind of the timeline of Genie's involvement with Velanos, which

18  I understood to date back to approximately October of 2022.

19        And they also provided me with a variety of documents,

20  including something called a joint venture agreement, which was

21  executed between -- by Genie and Velanos in October of 2022.

22  And there was also some correspondence that they provided at

23  that time.

24        The joint venture agreement and the description that I

25  received from Genie talked about investments or a trading

1  program involving something called standby letters of credit.

2  So I started to look into standby letters of credit.  And I

3  also read the joint venture agreement and was concerned by the

4  fact that it was -- it appeared to me to be very poorly

5  written.  It seemed to leave out some important details, and

6  just the syntax was very strange and included some things that

7  I had not seen in a contract before.  And so I had some

8  questions about that.

9       I knew that Genie had not been paid other than a half -- a

10  $500,000 payment in May of 2023.  They were waiting on payments

11  of (audio interference) $75 million and had been given a string

12  of excuses for why those payments weren't coming through.

13       So I began looking into standby letters of credit.  And

14  within probably, I don't know, less than an hour of reading and

15  research, I became convinced that the entire transaction was

16  very likely fraudulent because the information I was finding

17  from U.S. government sources, such as the SEC and the FBI,

18  contained a number of warnings and a number of press releases

19  about legal actions taken against persons and entities who had

20  offered for sale very similar trading programs involving

21  standby letters of credit and other variations on the same sort

22  of theme, which is what's often referred to as prime banking or

23  advanced fee scams, where someone is asked to come up with a

24  large portion of money up front and is promised huge returns on

25  that within a very short time, often advertised as being low

1  risk or (audio interference) risk.  And there were a lot of

2  other characteristics of the things that these law enforcement

3  and regulatory agencies were warning the public about that I

4  saw reflected in the documents that I had reviewed.

5  Q    Do you have a background in this type of financial

6  criminal activity or some type of financial regulation?

7  A    I do.  I spent 12 years as an enforcement lawyer with

8  FINRA, which is the Financial Industry Regulatory Authority.

9  And among the various rules and regulations that FINRA has

10 jurisdiction to enforce are variations on securities fraud, as

11 defined by the Securities Exchange Act of 1934 and SEC Rule

12 10b-5, as well as various FINRA rules.

13      So one of the things that I did in my capacity as

14 enforcement counsel for FINRA was investigate and bring charges

15 for securities fraud, which is (audio interference) different

16 from prime banking and advanced fee fraud, although there could

17 be some overlap.

18      So I had not specifically looked into standby letter of

19 credit related fraud in my professional capacity before this,

20 but I was very familiar with other forms of financial fraud.

21 Q    What was the basic promise to Genie from Velanos as far as

22 putting X amount of dollars in and what they would ultimately

23 pay out to Genie as the standby letter of credit agreement?

24 A    Well, it changed over the course of several weeks.  So

25 the original agreement, which I believe was dated October 20th,

1    2022, called for Genie to make a capital investment of

2    $3 million.  And then it would -- that money would be used to

3    buy and sell -- I guess, used to purchase one or more standby

4    letters of credit, which would then be sold, according to

5    Velanos, presumably for a profit.

6         And that cycle may have been repeated multiple times.  It

7    wasn't spelled out in the agreement.  But the idea was that

8    Genie would put in $3 million of capital.  Velanos would use

9    that in a trading program involving standby letters of credit,

10   and it would generate large amounts of profit.

11        Genie's capital or Genie's profit participation is

12   described in the initial version of the joint venture agreement

13   as, quote -- I think I'm getting this right -- (audio

14   interference) 25 million dollars.

15        And that was -- so that was October 20th or so of 2022.

16   And then the parties subsequently agreed to have Genie increase

17   its capital contribution on two subsequent occasions, both in

18   the second half of November of 2022.  The first of those

19   amendments was reduced to writing, and I don't know the exact

20   date of it offhand.  But that written agreement, written

21   amendment of the joint venture agreement, specified that Genie

22   would contribute an additional $3 million and that its profit

23   participation would, therefore, be increased to $50 million.

24   At that point, it wasn't even described as up to $50 million.

25   It was written as you'll receive $50 million.

1        And then, close to the end of November 2022, Genie

2   contributed an additional $3 million in exchange for a total

3   profit participation of $66 million.  So, in the end, Genie

4   contributed $9 million and was promised to receive its capital

5   return plus $66 million in profit.  And although that second

6   amendment, whereby Genie put in the final $3 million portion of

7   its capital contribution, wasn't reduced to writing, subsequent

8   communication, written communication between Genie and Velanos,

9   confirmed those terms.  That's how I view those pieces of

10  correspondence.  And it was also confirmed by Velanos's owner

11  and CEO in a deposition that I took from him in February of

12  this year.

13  Q    Thank you.  With respect to the putting in $9 million and

14  obtaining $66 million in profits, certainly that's a large

15  return.  Were you aware of any type of due diligence or

16  cautiousness on behalf of Genie prior to entering into this

17  transaction?

18  A    Well, they did hire an attorney named Scott Oh, and the

19  last name is spelled O-H, to advise them with respect to what

20  was then a proposed transaction between Genie and Velanos.  And

21  I know that that engagement was finalized sometime in October

22  20 -- excuse me, October of 2022.

23       It was probably a week or two before they -- before Genie

24  signed the joint venture agreement, but they did hire Mr. Oh

25  and his law firm, which is called the Warren Law Group, to do

1    that.  And based on my review of billing records, Mr. Oh agreed

2    to conduct his review of the transaction and the joint venture

3    agreement for a flat fee of $5,000.

4    Q    Were you familiar with the Warren Law Group through your

5    prior employment prior to October of 2022?

6    A    Yeah, I had actually dealt with two lawyers from the

7    Warren Law Group in the course of my work for FINRA.  I had an

8    enforcement case, and they represented a respondent against

9    whom we were bringing charges.

10        It's completely unrelated to anything in this case, but I

11   did have occasion to work with two lawyers from that firm in

12   probably 2020 and 2021.  I'm going from memory here, and I

13   wouldn't -- I can't guarantee the accuracy of that, but it was

14   not very long in relative terms before I had started working

15   for Genie.

16        And I -- you know, based on that experience, I had a -- I

17   had a positive impression of that law firm and the two lawyers

18   that I worked with from that firm.  And that's really all I

19   knew about the firm at that time.  But when I heard that Genie

20   had been represented by Scott Oh of the Warren Law Group, I

21   thought to myself that that was probably a reasonable choice

22   for a firm to represent you in this type of situation because I

23   knew that they -- that the firm was at least fairly -- at least

24   fairly well versed in financial transactions and investment

25   products.

1  Q    Did you ever find out through your research or discovery

2  how Scott Oh and the Warren Law Group became recommended to

3  Genie?

4  A    My understanding, and I believe it is based on information

5  that was told to me by Mr. Hughes and/or Mr. Cohan of Genie,

6  was that they had been working with an individual named Will

7  Byrd, who I think acted at some times at least as a -- I don't

8  know if a broker is the right term, but someone who would

9  direct potential clients to Genie and who also was instrumental

10 in introducing Genie to Velanos, I believe also recommended

11 Scott Oh to Genie.

12     That's about as much as I -- you know, my understanding of

13 it is fairly limited because I wasn't part of the process.  And

14 I don't think any of the documents that I've reviewed elucidate

15 that beyond the understanding I have from Mr. Hughes and

16 Mr. Cohan.

17 Q    Based on your research and discovery, did Warren Law Group

18 ever warn Genie about this transaction with Velanos and tell

19 them not to enter into it?

20 A    (Audio interference) no indication that Mr. Oh or anybody

21 else from Warren Law Group ever did that.  Like I said, I've

22 reviewed what has been represented to me as the entire file

23 that Warren Law Group maintained from (audio interference)

24 representation of Genie investments.  And there's nothing in

25 that file to indicate either that Mr. Oh had any concerns about

1   the risks or the potential risks of the transaction or that he

2   voiced any such concerns to Genie.  And that is consistent with

3   what Genie has -- has represented, I believe, throughout the

4   process to its -- to its borrowers and to me as well.

5   Q    You mentioned that you were able to obtain the entire file

6   from the Warren Law Group and Scott Oh.  What other impressions

7   of the Warren Law Group representation did you take from

8   reviewing the entire file?

9   A    I was immediately concerned.  I should back up a little

10  bit.  You know, at the outset of my representation of Genie in

11  the second half of July, probably into early August of 2023, I

12  was concerned about just the quality of the joint venture

13  agreement as a contract document.

14       The fact that they had hired a reputable law firm to

15  review it and that it was still in the condition that it was in

16  troubled me.  Obviously, the fact that they -- that Genie

17  agreed to go into this transaction, given what I had found out

18  about the rampant amount of fraud in the world involving

19  standby letters of credit, troubled me as well.

20       So I wanted to know what exactly Mr. Oh had done in

21  exchange for that flat fee of $5,000 that he charged to review

22  the transaction and the document.  I did have an interview --

23  or I did have a phone call with him where I asked him a variety

24  of questions --

25            MR. BOMKAMP:  Your Honor, I'd object to this on basis

1  of hearsay.

2          THE COURT:  He's not an expert, or you haven't

3  qualified him as an expert.

4          MR. MICKLER:  Understood.

5          THE COURT:  We kind of let him go and -- that's all

6  right.  I'll sustain the objection.

7  BY MR. MICKLER:

8  Q    Let me get back to my original question, Mr. Walker.  When

9  you reviewed the file of Warren Law Group and Scott Oh, had

10  there been the amount of work that you would have considered

11  appropriate for a transaction of this type performed?

12  A    Not that I could glean from the documents that I had

13  available to me.

14  Q    Did you see any type of correspondence between Scott Oh

15  and Velanos related to the transaction?

16  A    No.  At no time did I see any correspondence except with

17  the exception of some text messages that I received from either

18  David Hughes or one of the other principals at Genie or Scott

19  Oh and --

20          MR. BOMKAMP:  I'm going to object to that as hearsay,

21  Your Honor.

22          THE COURT:  I'll sustain.

23          MR. MICKLER:  I believe he's talking about a text

24  message from one of the principals, Your Honor.  It would be an

25  admission.

1          MR. BOMKAMP:  I heard a text message from Scott Oh.

2          THE COURT:  Yeah.  Who's the text message from again,

3   Mr. Walker?

4          THE WITNESS:  I don't know exactly who it was from,

5   but my point was -- was going to be that there were some group

6   messages on which Scott Oh's name -- Scott Oh was a -- either a

7   recipient or a sender and Velanos -- Velanos's CEO, Joshua

8   Wearmouth, was also on the text chain.  So I can't remember

9   offhand.  I'd have to go back and look at them to know exactly

10  who --

11         THE COURT:  You can tell me about --

12         THE WITNESS:  -- the communication was --

13         THE COURT:  -- your general impressions about it.

14  Just don't testify as to exactly what was said for the truth of

15  the matter asserted.

16         THE WITNESS:  Sure.  And to go back to Mr. Mickler's

17  original question about whether I'd seen communication between

18  Scott Oh and Velanos, I never saw any one-to-one communication

19  between him and Velanos.  The only thing I saw where he was

20  potentially communicating with Velanos directly was in the

21  context of these group text messages.

22         THE COURT:  Thank you.

23         You may proceed, Mr. Mickler.

24  BY MR. MICKLER:

25  Q    So that would exclude formal letters questioning the

1  investment, due diligence, any type of what would be considered

2  legal due diligence.

3  A    I think that's right.  And to be clear, those

4  communications that I mentioned, the group text messages where

5  Scott Oh and Mr. Wearmouth were involved, I believe all came

6  well into 2023.

7  Q    Okay.

8  A    So I didn't see any communication of the type that you're

9  asking about from a time that was contemporaneous to when you

10 would expect due diligence to be conducted, i.e. before the

11 contract was signed.

12 Q    All right.  Let's move on to after the transaction.  Once

13 the transaction between Genie and Velanos didn't pay out as

14 anticipated in December of 2022, were there instances where --

15 during your research into this, were there instances where it

16 appeared that Genie was under the impression that they were

17 going to receive their money?

18 A    Several times, yes.  I believe in -- it was December of

19 2022.  The documents I reviewed contained statements from

20 Mr. Wearmouth regarding when Genie could and should expect to

21 receive payment of the profits described in the joint venture

22 agreement and the amendments to it.

23      Initially, those representations were that money would be

24 arriving sometime in December of 2022.  That didn't happen.

25 And there was -- there are documents showing communication back

1   and forth between Genie, I believe primarily from David Hughes

2   to Mr. Wearmouth and possibly Mr. Byrd as well, saying we

3   really need the money, we need payments to be coming shortly.

4   And it seemed like they were, you know, working cordially

5   toward that.

6        In January of 2023, there was communication from

7   Mr. Wearmouth -- actually, I believe from Mr. Byrd directly,

8   that contained something that purported to be a screenshot of a

9   wire transfer confirmation for $10 million from, I believe it

10  was Velanos's Scotiabank account to Genie Investments' checking

11  account at JPMorgan Chase Bank.  That wire transfer never

12  arrived.  And that again was for only $10 million.

13       And there were similar communications throughout much if

14  not all of 2023, both before and after I became involved, where

15  Velanos would say, yeah, there's been a hangup of some sort.

16  And they typically blamed a bank or some investigation

17  involving the bank account from which the money was supposed to

18  come that, for reasons that don't necessarily make sense to me,

19  were held up.

20       But yeah, that happened multiple times throughout 2023.

21  So my understanding -- I don't want to step out of the bounds

22  of what I should be talking about here, but it appeared to me

23  that Velanos was providing a lot of information designed to

24  convince Genie that payment -- at least a partial payment of a

25  significant amount was always just right around the corner.

1   Q    Was one of those instances some information from a Nordic

2   Trust bank?

3   A    Yes, in June of 2023, Velanos and Genie amended the joint

4   venture agreement again.  Again, I don't have that document in

5   front of me, so I don't know the exact date.  I do know that it

6   was June, 2023.  And the ostensible reason as recited in that

7   amendment was to facilitate easier payment from Velanos to

8   Genie.

9        So what the parties agreed was that Velanos would

10  facilitate the establishment of a -- I don't know if it was --

11  specified what type of account it was, but it was a bank

12  account with entity called Nordic Trust KB, which I don't know

13  if this is stated in the amendment to the joint venture

14  agreement or if it's something that I found out subsequently.

15  But Nordic Trust KB represents itself as a Swedish entity that

16  has offices in Florida, among other places around the world.

17       And so the point of the second amendment, that's how

18  it's -- it's actually the third amendment to the joint venture

19  agreement, but the title on the document said the second

20  amendment, provided for the establishment of this account in

21  Genie's name at Nordic Trust and the deposit by Velanos

22  initially of $9.5 million into that account, which Genie would

23  then be able to transfer to whatever other account it needed

24  to, and a subsequent deposit of $50 million into the account by

25  Velanos on or before, I believe, June 30th, 2023.

1   Q    Did you see a bank statement from the purported Nordic

2   Trust account with $9.5 million in it?

3   A    I don't think I would call it a bank statement, but I saw

4   documents from what appeared to be an online banking portal of

5   some sort, which on its face represented that it was Nordic

6   Trust's customer portal, something like that.  And it had a

7   history of activity in the account.

8        And among the first things that showed up in the account

9   history was a deposit, a supposed deposit of $9.5 million by

10  Velanos into the putative account established in Genie's name.

11  Q    Are you aware if Genie ever tried to wire those funds into

12  its own account?

13  A    The documents I've seen and the information I've obtained

14  from Genie tells me, yes, they did immediately try to -- within

15  a day, I think, try to transfer that money into an account at

16  another bank.  I believe it was maybe (audio interference) Bank

17  still at that time.  But yes, they did try to.

18  Q    To your knowledge, did the wire ever go through?

19  A    It did not.  And the customer account portal document that

20  I referenced a minute ago later indicated that the wire

21  transfer had been canceled.  And it did not -- I don't believe

22  it explained why.

23  Q    Was there one instance where Velanos actually, to your

24  knowledge, provided funds to Genie?

25  A    Yes.  I believe it was in May 2023, although I don't have

1   a specific date for it.  But my recollection is that it was

2   shortly before the parties entered the so-called second

3   amendment to the joint venture agreement.  Velanos paid Genie

4   $500,000.

5   Q   And those were real funds which were received by Genie and

6   subsequently used?

7   A   That's my understanding.  Again, I wasn't in the -- on the

8   scene at the time, but that's my understanding from what I've

9   learned from Genie.

10  Q   Based on all of the foregoing information, did you

11  eventually file an arbitration action against Velanos and its

12  principals?

13  A   Yes, I did on behalf of Genie in October of 2023 file an

14  arbitration claim through JAMS, the arbitration provider, JAMS.

15  And the demand for arbitration alleges primarily breach of

16  contract.  I believe there are also claims in there for unjust

17  enrichment and conversion, but it's primarily a breach of

18  contract action.

19  Q   What's the current status of that arbitration?

20  A   We've completed discovery.  There was a hearing scheduled

21  for May 20th and 21st of this year.  But after the arbitrator

22  received notification that this bankruptcy proceeding had been

23  initiated, she unilaterally entered an administrative stay.

24  And, you know, I promptly (audio interference) motion to lift

25  the stay on the grounds that it wasn't necessary, wasn't

1  required (audio interference).

2      She eventually did agree to lift the stay, but it has

3  caused the schedule to be temporarily put on hold.  So we have

4  a conference, a status conference scheduled for April 15th.

5  And at that time, I expect to discuss a schedule for finishing

6  out the case.

7      Essentially what's left due in the case, we could file a

8  dispositive motion.  We were gearing up to do that, and it is

9  mostly written at this point.  But there need to be -- there

10 needs to be new dates added to the schedule for both filing

11 that motion and getting the other side's response to it, and

12 then finding a new hearing schedule and setting in place all of

13 the pre-hearing submission dates that go before that.

14 Q    Has there been any --

15 A    So that's a long answer to a short question, but it's

16 essentially in limbo until we get a new schedule put in place.

17 Q    Has there been any finding of liability at this point?

18 A    No.

19      MR. MICKLER:  Okay.  Your Honor, that's all I have at

20 this point.

21      THE COURT:  Thank you.

22      Mr. Bomkamp.

23      MR. BOMKAMP:  All right.

24      THE COURT:  And again, based upon the agreement, you

25 may go outside the scope of the direct.

1              MR. BOMKAMP:  Yes, Your Honor.  I should be brief.  I

2    just -- I have things from disparate notebooks here, so --

3              THE COURT:  Can't wait.

4              THE WITNESS:  Can I have one moment to plug in my

5    computer so I don't -- I don't want to lose power.

6              THE COURT:  Take a minute.  Take your time,

7    Mr. Walker.  Tell me when you're ready.

8          (Pause)

9              THE WITNESS:  I'm ready.

10             THE COURT:  All right, Mr. Bomkamp.  You may proceed.

11             MR. BOMKAMP:  All right.

12                        CROSS-EXAMINATION

13   BY MR. BOMKAMP:

14   Q   Good morning, Mr. Walker.  With regard to your ability to

15   determine that Velanos was not a good investment, you stated

16   that it took you one hour and that you used very public

17   sources.  Can you explain to me what sources you used?

18   A   I don't have a perfect memory of what I initially looked

19   at.  I know that I -- when I first voiced my concerns to the

20   principals at Genie, I sent them an email saying that in my

21   opinion this was almost certainly a scam.  And I included some

22   links to publicly available -- some website links to publicly

23   available sources about similar frauds that had been detected,

24   I believe by the SEC.

25         The SEC has been active in this area bringing civil cases

1   against people who offer and, you know, conduct standby letter

2   of credit related frauds.  So I believe the SEC website was one

3   source and various press releases available through that.

4   Q    All right.  And --

5   A    And then I believe also the FBI's website was part of that

6   process.

7   Q    Sure.  And you mentioned that you were immediately

8   concerned about the substance of the joint venture agreement.

9   What concerned you about it?

10  A    Primarily, it was the very high rate of return in a very

11  short amount of time.  That seems -- you know, it seemed like a

12  red flag to me.  The fact that it did not describe any risks

13  was of concern to me because I believe every -- almost every

14  investment involves risk.  And typically the higher the rate of

15  expected return, the greater the risk involved.  So it

16  concerned me that the document didn't get into that.

17       The document has a lengthy confidentiality clause.  And a

18  lot of contracts have confidentiality provisions, but this one

19  seemed to be extreme in my view.  And as I said before, the

20  syntax used writing the agreement was just very often

21  non-standard or kind of broken.  And it seemed like there were

22  phrases that kind of tailed off and didn't go anywhere or were

23  just ultimately meaningless.

24       And I would say the last item, as I'm thinking about it

25  now, that stands out was the vagueness with which the document

1    described what the supposed trading activity would involve.  I

2    think the most generous reading is that it specifies that

3    Velanos has discretion to trade -- to conduct essentially

4    whatever trading it wanted to, but it did identify that it

5    would (audio interference) intended to use standby letters of

6    credit issued by a -- I think it's -- I think it refers to a

7    top 25 bank or something like that.

8    Q    All right.

9    A    But that (audio interference) --

10   Q    And I just want to make sure I didn't miss it.  Is that

11   document in front of you with an exhibit tab on it?

12   A    It's not.

13   Q    Okay.

14   A    I've looked at it a million times, so I'm pretty familiar

15   with it, but it's not in front of me.

16   Q    Okay.  And you referenced that Genie had some connections

17   with a lawyer named Mr. Oh.  Are any of those communications or

18   any of that documentation in front of you with an exhibit tab

19   in this case on it?

20   A    No.

21   Q    All right.  And so when you filed the lawsuit in the

22   Middle District of Florida, did you draft the complaint?

23   A    Well, I didn't file that lawsuit.  If you're referring to

24   the suit by Genie against Joshua Wearmouth and others --

25   Q    No, that's Mr. Faragalla --

Walker - Cross                                    28

1   A    -- I did not.

2   Q    Okay.  All right.  But you filed --

3   A    I was involved --

4   Q    -- you filed the arbitration.

5   A    -- in drafting the complaint.  Yes.

6   Q    Okay.  So, in the arbitration document, which I believe is

7   attached as Exhibit B to a letter that is Exhibit 130 in the

8   bankruptcy case, you mentioned that Velanos failed to meet

9   payment deadlines in December of 2022.  Is that your

10  understanding?

11  A    I'm not sure exactly what document you're referring to

12  because I don't have it.  Nobody's presented an exhibit to me,

13  but --

14  Q    Well --

15  A    -- I would say -- I can try to answer without the document

16  in front of me or if there's a way I can look at it --

17  Q    Okay.  Well --

18  A    -- I can do it that way.

19  Q    -- with respect to the demand for arbitration that you

20  drafted on behalf of Genie Investments, do you believe the

21  information in that document to be accurate to the best of your

22  knowledge?

23  A    Yes.

24  Q    All right.  And I have -- I wanted to ask you one question

25  just about your participation in the general business

1    activities of Genie.  And again, I understand that you don't

2    have an exhibit.  But did you -- do you recall drafting a

3    letter to Wallingford Lodging Partners explaining delays with

4    funding loans and refunding payments?

5    A    I'm familiar with the name Wallingford Lodging Partners as

6    a -- as an entity that claims that it's owed money by Genie.  I

7    don't know that I -- I don't know that I wrote a letter

8    directly to Wallingford Lodging Partners, but I did draft or

9    helped to draft at least -- at least one, I think probably more

10   than one, what we referred to kind of colloquially among

11   ourselves as borrower update letters, where -- where they did

12   include the types of information that you're referring to,

13   reasons why Genie was unable to refund certain payments.

14           THE COURT:  Mr. Bomkamp, if you can give me an

15   exhibit number, I likely can share it with Mr. Walker.

16           MR. BOMKAMP:  Your Honor, it's 186.

17           THE COURT:  Give me one second.  186?

18           MR. BOMKAMP:  Yes.  It's in the Patel documents.

19           THE COURT:  And it should come up on the screen once

20   I do that.  Give me one second.  Assuming I can make this work.

21           Can you see that, Mr. Walker?

22           THE WITNESS:  I can.  I see an exhibit cover sheet.

23   BY MR. BOMKAMP:

24   Q    All right.  Is that something that you sent as a borrower

25   update letter to Wallingford Lodging Partners?

1  A    Yeah, I recognize the content of the letter.  That's

2  obviously -- at the time, my firm was doing business under the

3  name Walker Law Office, LLC.  So that was my letterhead at the

4  time.  But I believe the way this worked is that the letter

5  went out to a number of different recipients.

6  Q    All right.  Well, --

7  A    And so it was essentially --

8  Q    -- this particular letter went out to Wallingford Lodging

9  Partners.  Is that correct?

10 A    Yeah.  And my point is only that I -- I don't -- I did not

11 mail this myself.  I didn't send it myself.  I believe it was

12 provided to Wallingford Lodging Partners and other recipients

13 through the messaging system that Genie used.

14 Q    Okay.  So it was provided by Genie.

15 A    I believe that's correct.

16 Q    Ah, okay.  And this letter is, generally, would you

17 fair -- say it's a fair characterization -- I can read it into

18 evidence if you want.  It's explaining that basically the loans

19 have been held up due to the non-funding by Velanos.  Is that

20 the upshot of it?

21 A    That's correct.

22 Q    Okay.

23        MR. BOMKAMP:  Your Honor, I don't have anything

24 further.

25        THE COURT:  Did you want to show him the other

1  exhibit that you referred to that he didn't have in front of

2  him?

3          MR. BOMKAMP:  I could probably do that.  Sure.

4          THE COURT:  I don't care.  I just -- I have it up.

5  And Mr. Walker can't go blind.

6          MR. BOMKAMP:  All right.  That is -- that one is a --

7  it's an addendum to Exhibit 130.  Exhibit 130 is a letter that

8  includes the demand for arbitration as an attachment.

9          THE COURT:  All right.  Give me one second to get

10  130.

11          MR. BOMKAMP:  Sure.

12          THE COURT:  Is this the right one?

13          MR. BOMKAMP:  It is.  Although the actual demand for

14  arbitration is -- that's a letter by Mr. Wallingford, but --

15  attached as Exhibit B to Mr. Wallingford's letter is the demand

16  for arbitration.

17          THE COURT:  Is Exhibit B?

18          MR. BOMKAMP:  Yeah.  It's like marked Exhibit B at

19  the top of the page.

20      (Pause)

21          MR. BOMKAMP:  Yeah.  Okay.

22  BY MR. BOMKAMP:

23  Q    Mr. Walker, is this familiar to you?  Is this the demand

24  for arbitration that you prepared?

25  A    It appears to be.  I mean, obviously, I'm just looking at

1  the first page of it, but it appears to be the --

2  Q     Sure.

3  A     -- the document that I filed.  Obviously, I'm not going to

4  go through -- you probably don't want me to go through word for

5  word and compare it, but it appears to be the same document.

6  And that's my signature at the bottom.

7  Q     All right.  And let me find the spot I was looking at

8  prior.

9           MR. BOMKAMP:  Okay.  Let's go to Page 5 of this

10  document within the document.

11           THE COURT:  All right.

12  BY MR. BOMKAMP:

13  Q     All right.  And so the first paragraph under Subpart B

14  states that Velanos failed to meet either of the December '22

15  payment deadlines.  Is it accurate that Velanos missed December

16  payment deadlines from 2022?

17  A     The way this reads, it seems to refer back to something

18  stated earlier in the document.  So I'm not sure exactly what

19  that refers back to.  But based on my recollection, the first

20  payment was originally supposed to happen on December 5th,

21  2022.

22      When that didn't happen, my recollection is that

23  Mr. Wearmouth made another promise to deliver funds by the end

24  of December of that year, and also failed to do that.  So --

25  Q     Okay.  So the first --

1  A    -- and these are not necessarily deadlines --

2  Q    So the first nonperformance of Velanos under their

3  agreement with Genie was in December of 2022.  Is that correct?

4  Or was it earlier?

5  A    That's my understanding.  Yes.  And that's --

6  Q    Okay.

7  A    No, it was not earlier.  It was --

8  Q    Okay.

9  A    My understanding, the information I have, is that it was

10 first supposed to be paid on or around December 5th, 2022.

11 Q    Okay.  And that didn't happen?

12 A    Correct.

13 Q    Okay.  Just one last question.  You mentioned that there

14 were amendments to the Velanos agreement, and that there was a

15 $3 million additional transfer -- to the joint venture

16 agreement, rather.  There was a $3 million transfer from Genie

17 to Velanos that was completely undocumented at the time of

18 transfer.  Is that correct?

19 A    No, the transfer is documented.

20 Q    Pursuant to an --

21 A    There are (audio interference) --

22 Q    -- amendment to the joint venture agreement.  Was it

23 documented pursuant to an amendment to the joint venture

24 agreement?

25 A    It was not memorialized in a separate amendment.  I

 1  believe that's what I was trying to make clear earlier in my

 2  testimony.  And I think that's responsive to your question.

 3  But if it's not, please let me know.  But yes --

 4  Q    No, that's --

 5            THE COURT:  It is.

 6            MR. BOMKAMP:  It is responsive.  I have no further

 7  questions.

 8            THE COURT:  Thank you, Mr. Walker.

 9            Anything further, Mr. Mickler?

10            MR. MICKLER:  No.  Thank you, Your Honor.  I

11  appreciate Mr. Walker's time.

12            THE COURT:  Thank you, Mr. Walker.  You are through

13  for the day.

14            THE WITNESS:  Thank you.

15            THE COURT:  You are free to get back to real work.

16            THE WITNESS:  Thank you.

17       (Witness excused)

18            THE COURT:  Let's take a seven-minute break and we'll

19  be back at twelve o'clock for the next witness.

20       (Recess taken at 11:53 a.m.)

21       (Proceedings resumed at 12:00 p.m.)

22            THE CLERK:  All rise.  The United States Bankruptcy

23  Court for the Middle District of Florida continues in session.

24            THE COURT:  Thank you.

25            All right.  Mr. Mickler, where do we go next?

1          MR. MICKLER:  Mr. David Hughes is our next witness,

2   Your Honor.

3          THE COURT:  All right.  Mr. Hughes,  if you'll take

4   the witness stand, please.

5          MR. HUGHES:  Yes, sir.

6          THE COURT:  Go ahead and swear him in.

7          THE CLERK:  All right.  Please raise your right hand.

8              DAVID HUGHES, DEBTOR'S WITNESS, SWORN

9          THE CLERK:  Please state your name and address

10   including city and state.

11          THE WITNESS:  David Hughes, 2812 Pat Tillman Drive,

12   Springfield, Illinois, 62711.

13          THE COURT:  You may proceed.

14          MR. MICKLER:  Thank you, Your Honor

15                     DIRECT EXAMINATION

16   BY MR. MICKLER:

17   Q   Mr. Hughes, we've heard a lot about you.  It's nice to

18   finally have you on the stand.  Can you tell us what your

19   position is with Genie Investments NV?

20   A   I am one of the owners and operators of the company.

21   Q   Okay.  And the other owner is Mr. Cohan at this point?

22   A   Correct.  John Cohan.

23   Q   What's the basic division of how Genie operates between

24   the two of you?

25   A   I think it's fair to say that I would be one that

1  interfaces with our clients the most verbally on conference

2  calls, sales, updates that need to be verbalized, and comfort

3  calls, I would say.  John does some of that as well, but

4  his -- his main duties are contracts, operating our bank

5  accounts, verifying wires in and out, as well as the messaging

6  system on ZOOMERAL, which is the official communication between

7  borrower and lender directly.  And I think that's a fair

8  assessment.

9  Q    All right.  And ZOOMERAL is your company which you use in

10 conjunction with Genie at this point as a messaging service?

11 A    It is.  ZOOMERAL is a -- is a software as a service

12 company.  It is not a lender.

13 Q    Okay.  As sort of the face of Genie, are you familiar with

14 the past history of Genie as -- since it's been started?

15 A    I am.

16 Q    Okay.  And how long has Genie been in operation?

17 A    Two years.  A little over two years, approximately.

18 Q    During the last two years, has Genie had the opportunity

19 to actually close loans with customers?

20 A    It has.

21 Q    Approximately how many would you estimate?

22 A    A little over eight million approximately.

23 Q    And number of loans?

24 A    I believe over 50.  John would be better to ask that

25 question, but I believe over 50.

Hughes - Direct                                        37

1  Q    Your understanding is over 50?

2  A    Yes, sir.

3  Q    And these loans, they're not to insider -- not all of them

4  are to insider companies or principals of genie.  They would be

5  third parties?

6  A    Correct.  Yes, sir.

7  Q    Okay.  Certainly with respect to -- we've heard a lot

8  about Velanos, but prior to November of 2022, did you have a

9  capital provider which allowed you to fund the 50 loans that

10  you talked about?

11  A    At -- we had tried a -- a few times with a couple

12  different companies and failed, and some of other others had

13  succeeded, kind of a mixed bag.

14  Q    All right.  So is that what led you to seek out Velanos

15  and their investment?

16  A    Absolutely.  Yeah, we were always looking for a good

17  funding source that would provide us capital so that we could

18  turn around and make loans.

19  Q    All right.

20  A    We were always looking for that.

21  Q    And we sort of went through the history of the transaction

22  with Mr. Walker.  Is what Mr. Walker testified to, is that

23  fairly accurate as far as how the transaction transpired?

24  A    Yes, it was.

25  Q    Okay.  And prior to entering into that transaction,

1  Mr. Walker mentioned a Warren law group and a Scott Oh.  How

2  did they come to be in your sort of, you know, employment at

3  that point?

4  A    Will Byrd, a broker or a finder -- I'm not sure his

5  technical licensing.  But he knew that we were looking for an

6  investment opportunity.  He introduced us to a friend of his,

7  or associate of his, Joshua Wearmouth and he said he had known

8  him for years.  And we then had one conversation with

9  Mr. Wearmouth.  And then we engaged Scott Oh and Warren Law

10 Group for the specific purposes of doing the due diligence and

11 advising us on everything that Josh did.

12 Q    Who recommended Warren Law Group to you?

13 A    Will Byrd did.

14 Q    Okay.  And that's the person who put you in touch with

15 Wearmouth and Velanos?

16 A    That is correct.

17 Q    All right.  Did -- through the course of your employment

18 of Warren Law Group, did you ever receive from them any type of

19 warning that this was a fraud transaction or a scam or anything

20 like that with relationship to Velanos?

21 A    Never.  The opposite.

22 Q    Okay.  And did you pay the fee that was owed to Warren Law

23 Group as far as their retention fee and whatever they billed to

24 you?

25 A    Before the first phone call, we paid them in full.

 1  Q    All right.  And eventually, you ended up obtaining your

 2  entire file from Warren Law Group through Mr. Walker?

 3  A    Respectfully, what was there of it, which Adam was not

 4  really happy with what they turned over to him.

 5  Q    Okay.

 6  A    So I did not personally receive it.  Adam requested it and

 7  Adam received it --

 8  Q    Okay.

 9  A     -- when we switched everything over to Adam.

10  Q    We've heard the transaction as in relation to around

11  December of 2023, you were supposed to receive some money.

12  What was your understanding of what was going to happen in

13  December of 2023 with respect to the Velanos transaction?

14  A    Genie was supposed to receive $75 million no later than

15  December 5th.  And -- and we were going to, at that point,

16  close some loans, make any refunds we needed to make, and put

17  some capital back to work into Velanos's platform.  That was

18  our intention at the time.

19            THE COURT:  Let me clarify.  Is that 2022 or 2023?

20  It's my recollection that it was 2022.

21            THE WITNESS:  Correct.

22            MR. MICKLER:  2.

23            THE WITNESS:  It was.  Excuse me.

24            MR. MICKLER:  Did I misstate it, Your Honor?

25            THE COURT:  You said 2023.  So that's a big

```
 1  difference.

 2            MR. MICKLER:  My apologies.  My apologies, Your

 3  Honor.

 4            THE COURT:  All right.  Sorry about that.  But it was

 5  important for me.

 6            THE WITNESS:  Correct.  Yes, sir.  December 5th,

 7  2022.

 8            THE COURT:  Thank you.

 9            THE WITNESS:  Yes, sir.  We were supposed to receive

10  $75 million.  And we were very excited about it, of course.  We

11  do thing -- great things for our company.  And does that answer

12  your question?

13  BY MR. MICKLER:

14  Q    Yes.  Mr. Walker had testified that you would put in sort

15  of three different tranches of money, about $3 million each.

16  Is that accurate to your recollection?

17  A    Yes, sir.

18  Q    So $9 million total?

19  A    Correct.

20  Q    All right.  When the $75 million did not come in in

21  December of 2022, was Genie still actively sort of in business

22  of making loans and using brokers and things like that to

23  conduct business?

24  A    Generally, yes.

25  Q    All right.
```

1  A    Yes.

2  Q    After the $75 million did not come in, what steps did you

3  take as sort of the face of Genie to alert the brokers who were

4  sending you business that there may be a problem?

5  A    Actually, probably a few days before December 5th or

6  December 5th, every day after that, I was on the phone with

7  brokers explaining that funds did not come in on December 5th

8  as expected.  I relayed information that was given to me by

9  Josh Wearmouth that money was just on the way.  The bank was

10 maybe asking a few questions, right, with their internal

11 processes before they'd release wires.  But we're confident and

12 we're being told that our funds will for sure be delivered in

13 December.  There was -- there was no concern about that from

14 Josh Velanos [sic].

15 Q    With respect to the brokers, did you specifically sort of

16 put McMann on notice as a broker that there might be a problem

17 with your wholesale lending capabilities?

18 A    Every one of them, to the best of my recollection, we'd

19 left no one out.  We try to overcommunicate in situations like

20 that where -- where -- where something is going awry.

21 Q    After December of 2022, did you continue that

22 communication to McMann that you were not able to fund loans as

23 of that time as a wholesale lender?

24 A    That was our number one priority, was communicating

25 and -- and trying to understand when funds would be

1    come -- coming over and communicating that to all parties

2    involved so that everybody had the latest information or

3    expectations.

4    Q    So it leads me to two questions, and we'll kind of take

5    them in parts.  The first one is why did McMann keep sending

6    you clients, borrowers, and why did you keep accepting the

7    money?  So let's talk about McMann.  Why did they keep sending

8    you borrowers at that time?

9    A    McMann Commercial Lending is a completely separate entity,

10   separate business.  I don't know.  They ran their -- their own

11   business.  We never interacted with their customers at all.  He

12   was always worried about circumvention, his customers might try

13   to go directly to us.  That's common in the industry.  So we

14   never -- we never interacted with his customers.  So I don't

15   know why he kept sending business, over other than just, I

16   guess, for -- he felt it was the thing -- thing to do for his

17   own business.

18   Q    Did McMann have a financial incentive to keep funneling

19   loans through you?

20   A    I do not know his -- his revenue streams and models other

21   than I could guess it at -- at them.  I know that ZOOMERAL

22   would charge $5,000 for an account for our software for ten

23   years, okay?  That would allow the business to get in there and

24   maybe get something of value in loan and then communicate

25   covenants throughout the term of the loan.  So it was a $5,000

1  charge we -- we had for software, for messaging, document

2  storage.  I believe he marked that up.  So we've heard the

3  numbers of 7,900, 7,500.  We were hands-off with that.  We

4  would never get involved in his pricing.  We just knew that our

5  price was 5,000.

6       I believe diligence also, he would set that price himself

7  every time.  We never had any involvement with that whatsoever,

8  and we wouldn't dare touch that.  So he would -- he would

9  message in the system to John that he would need a diligence

10 agreement to be sent to him for a certain amount of money, and

11 then John would put that amount of money on the contract and

12 send it to McMann.

13 Q    With respect to the borrowers, did Genie have an online

14 presence where it was actively seeking out borrowers?

15 A    Never.  Non-solicitation rules and regs, per the SEC,

16 someone had to apply to Genie, apply electronically, and then

17 Genie would get a message that there was a new applicant.  Only

18 then would Junie -- Genie communicate back.  We never had a

19 website, whatsoever, and we tried to play by the rules, I

20 guess.

21 Q    With respect to the McMann customers who came in after

22 December of 2022, did Genie actively solicit any of those

23 borrowers?

24 A    Never in any way.

25 Q    Okay.  So you mentioned that McMann would just send you

1  something to say that I need a due diligence agreement or I

2  need a loan agreement, a bridge loan agreement.  Walk me

3  through that process about how that would look and what

4  interaction you would have with the borrower at that point.

5  Q    We would have no interaction with the borrower at all.

6  McMann would open up an account at ZOOMERAL and pay for it,

7  $5,000.  That would activate that piece of software, and that

8  gave him access to the communications portal, our messaging

9  system, which is behind the firewalls of Caspio.  They do a lot

10  of work for the Department of Defense, and they put a lot of

11  money into security firewalls.  So the messaging system is

12  there to communicate between a borrower and a lender and also

13  safely exchange documents back and forth.

14      After McMann would purchase the account, McMann would

15  message Genie of what they needed, whether it was a due

16  diligence agreement, the amount of it, and who it was to be

17  for, it -- one of his customer's names, as well as anything

18  else, including a bridge loan, for example.  And then John or

19  anybody working with John would respond back to what McMann

20  needed.

21      I do not believe, to the best of my knowledge, there was

22  ever a time that we ever had any contact at all, not email,

23  phone, with any of his clients.  He didn't want that, and we

24  didn't want to interfere with his business either.

25  Q    So with respect to any loans that came in from McMann

1  after December of 2022, would it be a fair statement, based on

2  your testimony, to say that Genie did not set due diligence

3  amounts, did not set bridge loans amounts, and did not set

4  a -- what McMann was calling a initiation fee or setup fee?

5  A    One hundred percent correct.  We had no involvement.

6  Q    Okay.  With respect to the loans that McMann would send

7  over, how was the money supposed to come into Genie for any

8  type of due diligence or bridge loan interest, anything like

9  that?

10  A    We saw a little bit of both.  That would be a good

11  question probably for John.  But I believe he sent in both ICA

12  payments himself as McMann on behalf of his customers.  So I

13  believe his customer would pay him, McMann, and then McMann

14  would pay us for his customer.

15      We also saw that -- I guess because of inconvenience is my

16  guess, or convenience I should say, he would just have his

17  customers wire us directly.  When that happened, he would go

18  into the messaging system and say hey, Genie, I have a wire

19  coming in today for a client, please confirm receipt.  And then

20  we would always try to do that, you know, and just confirm

21  receipt whether we got it or not just to make sure money was

22  being handled in the right way with the right accounts.

23  Q    Which leads me to the second question.  So after December

24  of 2022, Genie kept accepting these funds from McMann, despite

25  the fact that the Velanos loan had not gone through.  What were

1  the reasons behind Genie continuing to think that it could fund

2  these loans?

3  A    We thought we were okay.  We hired Scott Oh very early.  I

4  want to say it was probably December 10th I called him and said

5  we need to send you some more money, I need you to get in here

6  and help out with Velanos, discuss with their attorneys, you

7  know, what's going on.

8       Every step of the way, whether it was reassurance because

9  they gave us a proof of funds, like in December they showed us,

10 here's the account unredacted at HSBC, here's the routing

11 number, here's the banking number, letters from banks,

12 reassurances from Scott Oh -- there was a wire that they sent

13 us from Scotiabank January for 10 million.  Then there was a

14 trace report run on wire that -- why that wire didn't show up.

15 Scott said that's a good trace report, so we could -- felt

16 confident in February, March we're okay.

17      And then we still were like hey, we need some more -- we

18 need some more help here, if we got to jump in and help pay

19 some professional fees, we're happy to do that.  We need to put

20 some pressure on HSBC to release these funds.

21      He wrote a demand letter in April to HSBC Bank -- this was

22 Joshua Wearmouth -- wrote a demand letter and provided us a

23 copy with it saying he was going to handle the legal until this

24 was resolved.  After that 30-day period of the demand letter,

25 we were like hey, we need to have another conference call, and

1  he goes no problem, because I have this solved.  And then he

2  put $500,000 in our bank account.  That was -- we felt very

3  good about that.

4      And then he said we need to amend the agreement.  I have

5  two tranches coming to you in June to clean everything up to

6  59 million instead of 75.  Are you willing to take the loss of

7  10 or 15 thousand -- million dollars?  We said absolutely on

8  that same phone call, absolutely, we'll reduce the amount you

9  owe, let's just solve this and get some money in here right

10 away.  So at that point we felt good.

11      And then, Scott Oh made that amendment with Velanos.  We

12 were careful in that amendment and we communicated to Josh,

13 we're not going to give you more time to cure, if this does not

14 come in with these two tranches, we can go right to

15 arbitration.  So we tried to do a good job in doing that.

16      The first tranche showed up which was 9,500,000 in the

17 Nordic account.  We -- big sigh of relief at that point.  I

18 mean, because that's refunds.  That -- that's the ICA refund

19 amount.  And then we were excited, of course, and we were

20 looking for the second -- second tranche.

21      So I know I'm long-winded.  I apologize.  But between

22 December and June, I think it is fair to say we were nervous,

23 but at the same time we had professionals working on it the

24 entire time, looking into proof of funds, wires, why were wires

25 not showing up.  But we were getting other good statements to

1   look at that gave us confidence that things were just fine.

2           THE COURT:  And you said the 9.5 gave you comfort?

3           THE WITNESS:  Mm-hmm.

4           THE COURT:  But is that -- that's what you felt like

5   you owed in refunds.  Is that --

6           THE WITNESS:  Yeah, that's the ICA, sir.  That is the

7   principal.  We sent nine million over, and you want to talk

8   about a -- a sigh of relief, you better believe it.

9           THE COURT:  Okay.

10          THE WITNESS:  June when we got that in from Nordic

11  and we got our password for the account and we were messaging

12  what we thought were bankers and wiring that to our JPMorgan

13  Chase account here in the U.S., we were extremely excited

14  because that's like, okay, you know, that's refunds at

15  the -- at the very least that's covered.

16          THE COURT:  Thank you.

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  Go ahead, Mr. Mickler.

19          MR. MICKLER:  Thank you, Your Honor.

20  BY MR. MICKLER:

21  Q    So after the Nordic Trust incident fell through, is that

22  when you hired Mr. Walker in around July of 2023?

23  A    Yeah, you better believe it.  After the second -- after

24  the second tranche came through, because we -- we were very

25  hesitant to communicate.  Our customers wanted communications,

Hughes - Direct                                              49

1   and rightly so, and transparency, rightly so.  We were

2   hesitant, but we did call him after we received the 9.5, McMann

3   and everyone else, and we said hey, we're hopeful, we're -- we

4   believe that we're going to be able to close some loans; we

5   need to wait until the funds come in, June 30th or -- or

6   before, but it looks like our capital provider has solved their

7   problem.  Okay?  And we were excited about that.  And -- but we

8   didn't guarantee any payments out.  Okay?  But we said we think

9   we have it resolved.

10      After we did not get the payment in, I tried to reach out

11  to Josh, very persistently, every day or every other day

12  that -- with text messages, emails, phone calls.  He ghosted me

13  for about 20 days.  I communicated with Will Byrd,

14  periodically, and he would just say he was traveling back and

15  forth to England, or -- I can't say that's exactly what he

16  said.  But he was just making excuses for why Josh couldn't get

17  on the phone, but he was trying to solve this situation.

18      At that point I called Adam and I said Adam, we need your

19  help.  And then -- originally I had hired Adam to look at

20  things for ZOOMERAL, for SEC standards, rules, and regs,

21  commercials, advertising materials, are we doing everything

22  right, you know, as far as ZOOMERAL?  Now, I'd mentioned to

23  him, hey, I might need to call you in the spring.  At that

24  point I did call him and I said I need your help, we need to

25  engage you to please dig into everything regarding Velanos.

1    And that's when we started turning documents over to him and he

2    started his investigation.

3    Q    After June of 2023, did Genie either accept any more money

4    or take any steps to fund any loans?

5    A    Very little.  We had no advertisement going on.  We didn't

6    want it.  We've never done any pay-per-clicks ads at all.  And

7    really, our time was consumed in trying to solve this problem.

8         So at that time, June, July, very little was coming in

9    from McMann anyway.  We were not having any applicants on

10   ZOOMERAL applying.  So we really didn't need to stop or address

11   anything at that time.  A few things came in here and there,

12   but after July, that's when we kind of -- after July, early

13   August, that's when we said, okay.  And we were a little bit

14   more alerted, I guess, that it was going to still be a drag.

15   Q    With -- after hiring Adam Walker, has he attempted to

16   collect from Velanos the money that was owed to you, at least

17   the principal balance of what was put in?

18   A    Yes, sir.  All of it.  Adam helped facilitate

19   communications with Will Byrd and Joshua Wearmouth, and then

20   good -- I believed at the time, excuse me -- good faith

21   negotiations were still ongoing.  This was August and

22   September.

23        So to give an example, we knew that we were going to pull

24   the trigger on arbitration with Josh.  We told him, you know,

25   time's up, we got to get moving.  So he hosted a call with -- a

1  recorded phone call -- a recorded phone call with Adam Walker

2  and myself whereby he admitted to the breach.  He told us that

3  he owed us --

4          MR. BOMKAMP:  Your Honor, we're deep into hearsay.  I

5  object.

6          MR. MICKLER:  Sorry.  And --

7          THE COURT:  Sustained.

8          MR. MICKLER:  Thank you.

9  BY MR. MICKLER:

10 Q    Again, Mr. Hughes, try not to talk about what other people

11 have said out of court.

12 A    Adam helped facilitate a lot of communications, sir --

13 Q    Okay.

14 A     -- with Joshua Wearmouth and he tried --

15 Q    All right.

16 A     -- to collect money many times.

17 Q    And has your communication with Adam Walker and the

18 arbitration and Velanos and all of these entities, has it

19 continued, as Mr. Walker stated, throughout the date of this

20 hearing at least?

21 A    Even as of this morning, I texted Will Byrd and I said I'm

22 still in, you know, bankruptcy court, I'll call you tomorrow

23 and we can talk about, you know -- they made -- Velanos made

24 another offer to settle for 15 million, which they've been

25 doing since December.  And I just told him we needed to

1  collateralize that and make sure that's supported by some real

2  assets.

3  Q    Okay.

4  A    And so we're still working on it.  And yes, we're -- we're

5  actively working on it.

6  Q    All right.  With respect to the Chapter 11 filing that

7  Genie ended up filing pro se, can you briefly discuss why both

8  you and Mr. Cohan made a decision to file the Chapter 11 case?

9  A    Absolutely.  For our clients.  If somebody wrote us a

10 check for $1,000, we want to get $1,000 back in their pocket.

11 We don't care whether it's a -- it's an ICA or a nonrefundable

12 bridge loan or due diligence.  We could care less.  Those

13 things are immaterial.  There's been a failure here,

14 tremendous, by a capital provider, and we looked at the

15 resources.  We still have resources within the company funds.

16 And we -- we wanted to make sure, and I still believe, truly,

17 this is where we need to be at this moment because we need to

18 spend our money on professional fees on offense to get funds in

19 here for our clients.  They're -- they're our number one

20 priority, always have been and will -- always will continue to

21 be.  We want to make them whole.

22 Q    What was preventing you from completing making the clients

23 whole outside of bankruptcy?

24 A    We have many wonderful businesses and people that are

25 upset and they've taken actions.  They filed cases instead of

1  arbitration at times because we weren't able to tell them who

2  our capital provider was.  There was always some questions in

3  their mind whether we actually had one.  This goes back to

4  during the summer.  But we couldn't get sued by letting them

5  know who Velanos was.

6      So with some cases that were filed against Genie, we had

7  to spend, my guess is -- and this is just a guess -- probably

8  between 80,000 and 150,000 on defensive professional fees and

9  expenses to -- to -- to defend against those cases.  And

10 we -- we took it to the point where we filed for -- to compel

11 arbitration in Chicago with -- with the Patels, okay, North

12 Haven, or to dismiss, and neither one of those things happened.

13 And then we knew, okay, we've got a lot more funds that are

14 going to be going into Chicago, and it's something that, you

15 know, we had not planned for that big of a professional fee

16 budget.

17     We had spent a lot more money, but rightly so, on

18 professionals December 5th all the way through '23.  But then

19 it was like okay, we got to get ready and load forebear because

20 we had filed the case in Florida as well.  And we knew we

21 needed to file against Warren Law Group as well.  We hadn't

22 done that yet.  So we were like, okay, we need to -- we need to

23 go after every possible checkbook we can to make everybody

24 whole.

25 Q   And you stated earlier that the intention in the

1  Chapter 11 is to -- if somebody put in $1,000, you're going to

2  give them $1,000 back.  Is it your intention to attempt to pay

3  everybody back in full through your Chapter 11 plan?

4  A    Absolutely, always has been.  That's what our efforts

5  are -- are there for.  And that's what they're going to

6  continue to be.  We will put a plan in place and we have a

7  sketch of it here -- a gross sketch of it here, of -- of what

8  that looks like.  But it absolutely involves everybody.  It

9  leaves no one out, everybody to be made whole, yes.

10 Q    Tell me a little bit about some of the funding sources for

11 the plan that you anticipate will come to fruition in the near

12 future.

13 A    Mm-hmm.  We've gotten a good amount of cooperation since

14 we filed for this 11.  I had a good conversation with Walter

15 Trock of McMann, and I told him that I needed him to work out a

16 payment plan for all funds received.

17 Q    Well, let me kind of -- talk to me just about some of the

18 sources, not necessarily every conversation you've had.  But

19 what do you anticipate doing in the future against certain

20 entities?

21 A    McMann Commercial Lending has volunteered to contribute

22 and pay back half a million dollars.  We're not sure if that's

23 enough yet.  We might need to file a cause with McMann

24 Commercial Lending, but 500,000 is already on the table.

25      Fifteen million is on the table from the Velanos.  That

1    has consistently been on the table since December 22nd and

2    agreed to.  It's just, again, getting those funds into our

3    account.

4        We do believe that there will be something coming in from

5    Velanos, and I believe this is material because in his

6    deposition, Mr. Wearmouth stated that he lives in a

7    verifiable --

8                MR. BOMKAMP:  Your Honor, objection to hearsay.

9                THE COURT:  Sustained.

10   BY MR. MICKLER:

11   Q    Again no out-of-court statements.

12   A    Velanos understood.  Yes, sir.  Velanos would be

13   15 million.

14   Q    Let me ask you -- okay.  Does Genie have assets of its own

15   at this point?

16   A    It does.  It does.  Over the next, say, seven to eight

17   years, we've got assets -- good assets of business loans we've

18   made around 8 million.  Add interest to that.  That would bring

19   in around 10 million.

20   Q    Okay.  And part of that $10 million of loan, as we heard

21   yesterday, includes a $1.2 million loan to ZOOMERAL?

22   A    Correct.  Yesterday, it was stated 1.9 million, but we

23   did -- I forgot the meeting that was -- that we had with

24   Mr. -- Mr. Scott, the U.S. Trustee.

25                THE COURT:  The 341 meeting?

1          THE WITNESS:  341.  Thank you, sir.  It was stated

2   yesterday, 1.9.  We objected to that during the meeting.  That

3   was not a correct number on the schedule.  It's 1.2 to

4   ZOOMERAL.  Again, that was not compensation.  That's -- that

5   was made as a loan to ZOOMERAL, not me as an individual, David

6   Hughes, as an obligation that ZOOMERAL has.  That's 1.2.  Cald

7   Holdings, 500,000, and another 500,000, approximately, to

8   Capitulum Homes, those were the insider ones.

9   BY MR. MICKLER:

10  Q    With respect to those loans, are they papered up as true

11  loans to Genie -- from Genie?

12  A    Yes, they are.

13  Q    Okay.  And would they be enforceable with a promissory

14  note?

15  A    Yes.

16  Q    Okay.  Are you willing -- or do you believe that the

17  entities, ZOOMERAL and Capitulum and Cald Holdings, are able to

18  pay those loans back?

19  A    Yes.

20  Q    With respect to ZOOMERAL, what you're familiar with, how

21  does ZOOMERAL make its money and how could it pay back that

22  amount?

23  A    ZOOMERAL is a -- in my humble opinion, a very nice piece

24  of -- of software, very valuable for businesses.  We charge

25  $5,000 per account.  Two years ago, we had many hundreds of

1  thousands of dollars in revenue in ZOOMERAL.  Not in '23,

2  because we kind of shut everything down and this has been our

3  focus, collecting money.  But in our -- in our height of making

4  money with ZOOMERAL, many hundreds of thousands of dollars

5  were -- were paid by businesses just for software, so we would

6  use that to repay our loan back.

7  Q    All right.  And you stated that there were approximately

8  $10 million of outstanding Genie loans at this point?

9  A    Correct.  Between the principal balances owed and the

10 interest that would be collected over the period of time

11 correct, yes.

12 Q    So -- and if we add up the Cald Holdings and the Capitulum

13 and the ZOOMERAL loans, that's approximately 2.2 million, so

14 there's 6 million of outstanding loans from third parties?

15 A    Approximately, the best -- that would be best asked to

16 John, but yes, to my understanding, to the best my

17 recollection, yes, somewhere around that number.

18 Q    And as those mature, those funds would be collected from

19 the borrowers and used to repay some of the people affected by

20 the Velanos incident here?

21 A    We would take every dollar coming into ZOOMERAL

22 regardless -- excuse me -- of Genie regardless of where it was

23 coming in from and put it into one account to take care of

24 everybody being whole.  Further, John and I do not need a

25 salary out of Genie.  Everything that comes in will come back

1    to -- will be going out to people that wrote us a check.

2    Q    Well, that was my next question.  Have you requested a

3    salary in this case?

4    A    No, absolutely not.  Wouldn't take one.

5    Q    Do you anticipate taking one?

6    A    Under no scenario.

7    Q    Okay.

8    A    Not until everybody's made whole.

9              MR. MICKLER:  That's all for me, Your Honor.

10             THE COURT:  One question, in order to make everybody

11   whole, what number do you think?

12             THE WITNESS:  Fifteen, approximately.

13             THE COURT:  Thank you.

14             Any additional questions?

15             MR. MICKLER:  No, Your Honor.  Thank you.

16             THE COURT:  Mr. Bomkamp.

17             MR. BOMKAMP:  All right.  What exhibit books does the

18   witness have right now?  Do you have any?

19             THE WITNESS:  No, sir.

20             MR. BOMKAMP:  Okay.  Let me get those to you.

21             THE COURT:  Take your time.

22             I was about to ask if you had a water.

23             THE WITNESS:  Yeah, thank you.  I do.

24             THE COURT:  The Court provided that, not Mr. Mickler.

25   He wanted you to sweat it out.

```
 1                THE WITNESS:  Understood.

 2                MR. BOMKAMP:  I'm just going to be primarily working

 3      with 5 here.

 4                THE WITNESS:  Okay.

 5                THE COURT:  Exhibit Book 5?

 6                MR. BOMKAMP:  Yes, that's going to be our workhorse.

 7      And I am going to reference a couple of documents in Book 4,

 8      and a document in Book 1.

 9                THE COURT:  1?

10                MR. BOMKAMP:  Okay.

11                THE COURT:  Actually, let's take a five-minute recess

12      to get everything set up.

13                I'll warn you, don't speak to your attorney about any

14      of your testimony, about anything regarding the case

15      whatsoever.  Simply use the bathroom and head right back.

16                THE WITNESS:  I'll stay right here.

17                THE COURT:  All right.  I'll be back at 12:40.  Feel

18      free to --

19           (Recess taken at 12:35 p.m.)

20           (Proceedings resumed at 12:39 p.m.)

21                THE CLERK:  All rise.  The United States Bankruptcy

22      Court for the Middle District of Florida continues in session.

23                THE COURT:  Thank you.  Please be seated.

24                Just a reminder, you're still under oath.

25                THE WITNESS:  Yes, sir.
```

1          THE COURT:  Mr. Bomkamp, you may proceed.

2          MR. BOMKAMP:  All right.

3                      CROSS-EXAMINATION

4   BY MR. BOMKAMP:

5   Q    Good afternoon, Mr. Hughes.  Do you have Exhibit Binder 5

6   in front of you there?

7   A    I do.

8   Q    All right.  If you could turn to Exhibit 206.

9   A    I am there.

10  Q    All right.  Now, sir, did you file personal bankruptcy in

11  2019 -- 2020?

12  A    I did.

13  Q    All right.  Did you get a discharge in that case?

14  A    I got two, I believe.

15  Q    Beg your pardon.

16  A    I got two discharges, I believe.  The first one was the

17  trustee approved and the judge approved and granted me a

18  discharge with relief after going through the entire process of

19  the BK.  And the U.S. Attorney, after that, filed a motion to

20  deny that.  And my attorney said if I fought it, that the

21  U.S. Trustee was going to make a referral and put me right back

22  in the court, and it would just continue.  And he felt like I

23  had filed a false bankruptcy.

24  Q    Okay.

25  A    So we decided not to show up to that hearing.  The

1  U.S. Trustee agreed to not make a referral if I didn't show up.

2  Q    Okay.

3  A    So I decided not to show up at advice of counsel.

4  Q    Okay.  So -- all right.  So according to your testimony,

5  in 2020, your personal discharge was denied because you didn't

6  attend a hearing on a default judgment in your adversary case.

7  A    That's correct.

8  Q    Okay.  And can we look at Exhibit 206?

9  A    Yep.

10         THE COURT:  And that's Binder 5?

11         MR. BOMKAMP:  Yeah, by Binder 5.

12  BY MR. BOMKAMP:

13  Q    All right.  And if we look at Count 1 in Exhibit 206, what

14  would it -- what is Count 1 of the complaint?

15  A    Forgive me.  Can you point me to Count 1?  Page --

16  Q    Page 5 of 7.

17  A    Okay.  Thank you.

18  Q    It's in bold.  It's the bit in bold.

19  A    Okay.  Count 1, false oath in signing his schedules.

20  Q    Okay.  Now, if you would, turn with me to Exhibit 208.

21  A    Okay.  I'm there.

22  Q    Okay.  And you do see, what is this document?  What's the

23  heading on the document?

24  A    Exhibit cover sheet.

25  Q    No, sir.  The substantive document.  Turn the page.

1 | A    This is a default judgment on complaint to deny discharge.

2 | Q    Okay.  And let's just skip to the last paragraph.  That's

3 | the next page, Page 2 of 2.  And -- all right.  Do you see the

4 | last paragraph there?

5 | A    I do.

6 | Q    Okay.  I'll read it to you:  "It is therefore ordered and

7 | adjudged that the discharge is denied in the underlying

8 | bankruptcy case of David C. Hughes, II, Case Number 19-71781,

9 | for the reasons alleged in Count 1 ORC and Count 2 of the

10 | United States Trustee's complaint."  Do you read that?

11 | A    I do.

12 | Q    So would you agree that you were adjudged -- it was

13 | adjudged that you committed a false oath in your personal

14 | bankruptcy.

15 | A    That's what this states, yes.

16 | Q    All right.  So given that you had a personal bankruptcy in

17 | which you committed a false oath, and you're testifying to a

18 | bankruptcy judge right now, how can you be credible?

19 | A    The truth is my attorney, in -- in filling out my -- my

20 | bankruptcy petition or filing, said -- was going through my

21 | assets.  And this was on a phone call.  And he goes, okay,

22 | approximately what are all your assets worth?  We used one

23 | number.  We did not -- my attorney did not show them line item

24 | by line item.  And that's the big problem that the

25 | U.S. Attorney said, was everything's not separated out.  He

1 │ wasn't happy with that.  And I just did not tell the truth.  I

2 │ couldn't go back and amend that filing with my attorney.  He

3 │ was very unhappy with my attorney's work and -- in how he put

4 │ that together.  He filled it out for me, and his assistant did.

5 │ And he -- and he wasn't happy about it.

6 │      So I would say that I made it through the entire process,

7 │ which was an extensive process over a year and a half

8 │ approximately, of a -- of a -- of a bankruptcy filing.  And I

9 │ made it through successfully with a sitting judge and a

10 │ trustee, and in good faith that entire way for the value of all

11 │ of my assets and all of my debts.  You can't fake those

12 │ numbers.  And I was honest with the U.S. Trustee, as well as my

13 │ trustee and the honorable court the entire time.  At no time

14 │ did I give a false testimony.  That was what the court decided,

15 │ I guess, because it did not show up.  I understand that.

16 │      I did not know that would be written by not showing up.

17 │ The first time I read this was last week when it showed up as

18 │ an exhibit that you -- that you put in that I'd have to read

19 │ through.  So --

20 │ Q    All right.  So we'll move on.

21 │ A    So he can test -- trust my testimony because I

22 │ successfully made it through a BK.

23 │ Q    Your attorney can ask you further questions about it if he

24 │ wants.

25 │ A    Okay.

1   Q    I have nothing further about that.

2   A    Okay.

3   Q    Now, would you agree that it is important to accurately

4   list all of your assets and liabilities in your bankruptcy

5   filing under penalty of perjury?

6   A    Absolutely.

7   Q    All right.  Can we turn to Exhibit 212?

8   A    I'm there.

9   Q    All right.  And again, the substantive exhibit, not the

10  exhibit tab, you can turn the page.  All right.  And what is

11  this document?

12  A    Notice of filing schedules, summary schedules, and list

13  largest unsecured creditors.

14  Q    Okay.  So these are your schedules in the bankruptcy case.

15  A    Okay.

16  Q    Okay.  We can turn the page here.  Why is it stamped

17  "draft"?

18  A    I have no idea.  I was in Illinois.

19  Q    Okay.

20  A    This is the first time I've ever seen this piece of paper.

21  Q    You've never seen your bankruptcy schedules before?

22  A    I have never seen this piece of paper.

23  Q    Okay.  What about the next sheet of paper?  Turn the page.

24  Those are also stamped "draft".  Have you seen that piece of

25  paper?

Hughes - Cross                              65

1   A    No, I have not.

2   Q    Okay.  Is -- and -- well, maybe turn to Page 16 of 45 of

3   this document.

4   A    I'm there.

5   Q    Okay.  And are -- or is this document stamped "draft" as

6   well?

7   A    It is.

8   Q    Did you file it this way to create plausible deniability

9   if any of the representations in these schedules was dishonest?

10  A    I don't even know what that means.

11  Q    Okay.  Well, why did you file it this way?

12  A    I did not file this.

13  Q    Okay.  Genie Investments is your company?

14  A    Yes.

15  Q    Is this Genie Investments's bankruptcy?

16  A    This is, yes.

17  Q    Is this Genie Investments's schedules?

18  A    I've never seen this piece of paper before.

19  Q    These are your bankruptcy schedules, sir.  You've never

20  seen your bankruptcy schedules?

21  A    John Cohan filled this out here in Florida and walked it

22  into the courthouse.  I was in Illinois, sir.  So I may have

23  seen this and gone over it with the computer with -- with John

24  Cohan on a -- on a meeting, but I did not know the word "draft"

25  was there.  And it's the first time I've seen it in this

1  format, to the best of my recollection.

2  Q    Okay.  So let's stay on this page.  This is the

3  schedule -- the subpart of your bankruptcy schedules that lists

4  the debt that Genie owes.  Would you agree with that statement?

5  A    Page 16 of 45?

6  Q    Yes.

7  A    Yeah, it is -- it is blank.  So party, creditor's

8  name -- it does say date or dates debt was incurred.  So

9  there's nothing there.

10 Q    Right.  That part is blank.  Why is that part blank?

11 A    Because we knew we would be getting counsel and we knew we

12 would be submitting everything that this Honorable Court would

13 need for our bankruptcy.  Our -- we just needed to file and get

14 protection for BK11 for Genie Investments.

15 Q    Okay.  Let's look at Number 3.2 there, the debt for

16 A-Complete Home Inspection, LLC.

17 A    Okay.

18 Q    Would you agree that that pertains to Kim Nash -- Kim and

19 Kipp Nash?

20 A    A-Complete Home Inspection is a business, it's my

21 understanding, that Kim and her husband own.

22 Q    Yeah.  What -- why did you list this debt as contingent,

23 unliquidated, and disputed?

24 A    Because the language in our agreements protect us from a

25 third-party failure in a force majeure event.  We knew that

1  this process that we would be going through would ultimately

2  determine whether those funds would be owed or -- or whether

3  that she was a creditor or the business was a creditor, not us.

4  It was -- it was only our opinion, our humble opinion, that

5  that would be disputed per our agreements to protect the

6  company, however, this process and this Honorable Court would

7  ultimately decide that.

8  Q    All right.  And in fact, you've listed essentially all of

9  your customers.

10            THE COURT:  Not -- just to be clear, not essentially.

11 Every person listed on Schedule F is disputed, contingent, and

12 unliquidated.  Not one single creditor is not disputed,

13 unliquidated, and contingent.  So go ahead, Mr. Bomkamp.

14 BY MR. BOMKAMP:

15 Q    So is it your opinion that the Genie Investments simply

16 owes no money to anyone?

17 A    It's my opinion that this process and this Honorable Court

18 and Bankruptcy 11 itself, which I've never been through with a

19 business, will determine all of those things.  It is only our

20 opinion, the company's opinion, and mine, okay, because of our

21 contractual language and at the advice of all of our counsel,

22 that we have used beyond reasonable efforts, even to the point

23 of management putting the own -- their own company, okay, into

24 BK11, that we've not been able to remove the force -- we've not

25 been able to remedy the force majeure event, thus we cannot

1  resume our duties of -- of making a refund, if a refund was

2  due.

3      So we've been told by our counsel that contractually,

4  legally, we do not have any creditors, and that's our position,

5  but it's our humble position, and then one that we don't get to

6  determine.  This process and this Court does.

7  Q    So you object to the notion that you have any creditors?

8  A    I believe asked and answered as disputed as our position.

9  However, we realize that's our humble position.  This process

10 and this Court will determine who's a creditor and who's not.

11 It -- it's not up to me to determine that, especially the legal

12 definitions between the two.

13     Our position is, regardless of any of that, we could care

14 less.  If somebody wrote us a check for $1,000, whether it's a

15 nonrefundable due diligence, we could care less.  We want

16 $1,000 back in their pocket, and we are absolutely going to put

17 a responsible plan in place and submit it to this Honorable

18 Court by June to accomplish just that.

19 Q    But who are you going to repay if you have no creditors?

20 A    In speaking with counsel, there are gift programs that can

21 be put together that -- that can -- that can make sure funds

22 get to -- get into the proper hands.

23 Q    All right.  So if we're going to talk about any of the

24 customers that we heard from yesterday, perhaps Ms. Stegent,

25 for example, your position is that although you don't owe her

1   any money, you would like to give her a gift?

2   A    One hundred percent of everything she wrote in that we put

3   in our bank accounts, absolutely.  And that goes for every

4   other customer of ours, too.

5   Q    All right.  All right.  Let's have a look at United States

6   Trustee Exhibit -- bear with me -- Exhibit 213.

7   A    I'm there.

8   Q    Okay.  So if we have a look at Page 2 of the Statement of

9   Financial Affairs, the little number in the lower right

10  corner --

11  A    I believe I'm -- wait, Page 2, lower right.  Yes, I got

12  it.  I'm there.

13  Q    So this lists some of the transfers that you've made in

14  the lead up to the bankruptcy filing, correct?  You see some of

15  these here?

16  A    Correct.

17  Q    Okay.  And you've not actually amended this document, have

18  you?

19  A    No, we have to amend it.  We stated that during, I

20  believe, the 351 or the 341, forgive me.

21  Q    Right.  And --

22  A    We have not -- we have not amended it yet.

23  Q    Okay.  So you didn't amend it before this trial?

24  A    I be -- it could have been.  I'm not sure.  I was flying

25  down.

1          THE COURT:  For the record, the Court will take

2    judicial notice that there was an amended Statement of

3    Financial Affairs filed, however, only to change the formatting

4    and the attachment.

5          MR. BOMKAMP:  Yeah, that -- I believe that's correct.

6    BY MR. BOMKAMP:

7    Q    Would you agree, Mr. Hughes?

8          THE COURT:  He doesn't have to agree.  The docket

9    says that.  It's clear.

10          MR. BOMKAMP:  Yes, Your Honor.

11          THE COURT:  I'll take judicial notice of that.

12   BY MR. BOMKAMP:

13   Q    Okay.  So the first transfer here that's listed is a

14   transfer to Morgan Stanley of $10 million on -- in January of

15   2024.  What -- why did the debtor make that transfer?

16   A    At that point, we had decided to -- that it would probably

17   be best to clear out the Morgan Stanley account.

18   Q    Okay.  How did you decide to pay Morgan Stanley as opposed

19   to the various people -- your various customers who lost money?

20   A    Because it was a line of credit associated with this

21   account, so we actually wouldn't even have a choice.  We would

22   have to pay off Morgan Stanley what we owed Morgan Stanley on

23   the line of credit, and -- and then we would be able to advance

24   out extra funds above and beyond that.

25   Q    Okay.  And now -- and I want to -- I want to go down here

1   to payments or transfers of property made within one year that

2   benefited any insider.  All right?  Let's look at the first

3   one.  It says, Cald Holdings/Caleb Davis, and it was a transfer

4   in 2023 for $500,000.  Now, just to be clear, is Caleb Davis

5   the former officer of the debtor?

6   A    He is.

7   Q    Okay.  And what does it say under reasons for payment or

8   transfer?  Just read that whole thing.

9   A    It says loan compensation to Caleb Davis as former

10  director.

11  Q    I think it says loan/compensation to Caleb Davis as former

12  director.  What portion of that was a loan and what portion of

13  that was compensation?

14  A    One hundred percent of it was a loan.  None of it was

15  compensation.

16  Q    And can you point to any loan documents that were admitted

17  for this trial that demonstrate that that was a loan?

18  A    No, we have them at your request.  We can easily provide

19  them.

20  Q    Okay.

21  A    We've never been asked for them.

22  Q    Why did you choose to fund this loan to an insider in 2023

23  when you had non-insider loans that had yet to be funded?

24  A    The general consensus was if our companies

25  are -- are -- are strong and growing, then we can all continue

 1 to grow and -- and all become stronger, Genie, ZOOMERAL, all of

 2 us.

 3 Q    But, Your Honor -- or -- I'm sorry -- but, sir, Genie

 4 Investments isn't strong and growing.  It's in bankruptcy

 5 court.  Why would you -- why would you make this transfer from

 6 the debtor when it was so deeply insolvent?

 7 A    At the time, we were not in bankruptcy court, respectfully

 8 Q    All right.  But this is -- this was after 2023.  This is

 9 after December 5th, 2022, correct?

10 A    Correct.

11 Q    When you knew you had a financial problem, correct?

12 A    No.  Incorrect.

13 Q    The Velanos not paying you was not a financial problem?

14 A    We were looking at statements and relying upon counsel.

15 We were confident at that time that we had plenty of funds

16 coming in for all of our obligations and all of our operations.

17 We had no concern at that time at all of insolvency or BK11,

18 not at all.

19 Q    Okay.  Let's have a look at John Cohan/Capitulo [sic].

20 And is that the John Cohan over there?

21 A    Yes, it is.

22 Q    Okay.  And what is Capitulo [sic]?  What is that business?

23 A    It's a business that John Cohan owns.

24 Q    What does it do, do you know?

25 A    I don't -- I'm not an officer in the company.  I'm -- I've

1    never been involved in his company's operations.

2    Q    Okay.  And what does the explanation for this transfer

3    say?

4    A    It says loan compensation to John Cohan as director.

5    Q    Okay.  And what portion of that's loan and what portion of

6    that is compensation?

7    A    One hundred percent of it is a loan.  None of it is

8    compensation, is our position.  We've been trying to amend this

9    since the first hearing.

10   Q    Well, you were trying to -- what, you tried and failed to

11   amend it?

12   A    We worked with our counsel, Bryan, to amend this.  It was

13   to take off compensation and our personal names because all of

14   these transactions, even the subsequent transaction to

15   ZOOMERAL, is a loan.  It is a liability to the companies.  It

16   is not compensation, and it is not made to us personally.

17   These need to be amended.  We've said that from day one.

18   Q    Well, but you haven't, correct?  You haven't amended it.

19   A    I don't know.  Bryan could have filed something.  I flew

20   down from Illinois, respectfully.  I don't -- I don't -- I

21   don't know if he filed anything to correct those or not.  I

22   don't know.

23   Q    Okay.  Why did you make this loan to an insider when you

24   already knew there was trouble with Velanos and when you had

25   outstanding loans with customers?

Hughes - Cross                                        74

1  A    I did not know there was trouble with Velanos.  We were

2  confident with our attorneys that we were in good shape with

3  Velanos.  Absolutely, we were.  Velanos admitted to owing the

4  money.  It was simply they needed to give it to us.  So we were

5  not concerned at that point when we made these loans.

6  Q    Okay.  And -- we're getting to the end of this.  So the

7  next one is a transfer to -- according to the SOFA David

8  Hughes/ZOOMERAL and the listed amount of $1.9 million.  What

9  was that transfer on account of?

10 A    The same as Capitulum and Cald Holdings, which was insider

11 loan to the corporation, not compensation, for David Hughes,

12 not a loan made to David Hughes as an individual, only to

13 ZOOMERAL the corporation itself.

14 Q    Okay.  And what does the explanation say on the paper

15 though?

16 A    Forgive me.  I need to go back.  Forgive me.

17 Q    It's right in front of you, sir.

18 A    I know.  Forgive me.  I need to go back.  The other

19 amendment was 1.2 instead of 1.9 that we've been trying to

20 make.  What it states here is loan compensation to David Hughes

21 as -- as director.

22 Q    Right.  So if you're aware of these problems with your

23 schedules, how can we trust any of your schedules?

24 A    I've never filled these schedules out or seen them.  John

25 has been working with Bryan, is my answer, here in Florida

 1   face-to-face.  And I've -- I've not seen this paperwork in

 2   front of my face until right now.  When -- when we first had

 3   the hearings, the 341 hearings I believe they were, this was

 4   immediately -- you brought this up.  And we did say no, those

 5   need to be amended.  No, those are not correct.  And we've been

 6   working on schedules to make the amendments, and I believe you

 7   scheduled another meeting for a week or two from now to

 8   actually review the amendments of these.  I believe that was

 9   part of our conversation that was recorded.

10   Q    It was stated that any amendments that you need to make

11   you should make.

12   A    And I believe there was another meeting scheduled.

13             THE COURT:  Mr. Hughes?

14             THE WITNESS:  Yes, sir.

15             THE COURT:  If you'll turn to Page 18 on the

16   top -- see here on the top -- 18 of 194.

17             THE WITNESS:  I'm there.

18             THE COURT:  I assume that is not your signature at

19   the bottom.  Is that Mr. Cohan's signature?

20             THE WITNESS:  That is not my signature.

21             THE COURT:  Thank you.

22             THE WITNESS:  Yes, sir.

23             THE COURT:  You may proceed, Mr. Bomkamp.

24   BY MR. BOMKAMP:

25   Q    All right.  What is Better Method [sic]?  Can you explain

1   what that entity is?

2   A    That's a company we established, John and I, to just be

3   another corporation that we might use to offer loans to

4   consumers inside of ZOOMERAL or to work with any of our other

5   companies to -- to act as an asset protection company perhaps,

6   or anything to benefit Genie.

7   Q    What -- why would Genie need an asset protection company?

8   A    Well, in June, we had approximately three to four -- I

9   know it was three, it might have been four, of our clients that

10  had sent in nonrefundable funds to JP Morgan Chase.  They all

11  got together and within a matter of days, they reported fraud

12  to Chase -- Chase -- and they wanted their money back.  They

13  tried to reclaim wires from our account.

14        So we quickly went to Chase, showed them the agreements

15  where the funds that were sent in were owned by us.  They were

16  nonrefundable.  They said okay, and they agreed, but they

17  closed out our accounts and they launched an investigation for

18  fraud.  And that really shocked us because Chase Bank stopped

19  communicating with us.

20        We got a call from one of our customers that they

21  reclaimed a wire from a -- from a loan we had funded two months

22  prior.  So we worked with Chase for -- for months, including

23  Adam and counsel, to remedy the situation, which they closed

24  the chapter -- there was no fraud.  They closed the

25  investigation.

1       But the result was we -- they were -- Chase was pulling

2   back wires from customers.  They took 1.2 million out of our

3   account and refunded a client that we had another 50 days

4   to -- to refund them with, and they just sent it back to them,

5   1.2 million.  And so we were kind of set back from that.  We

6   were like look, we need to open up some different bank accounts

7   and place money in different accounts.

8       Even Chase tried to draw back a wire from -- from ZOOMERAL

9   for, I believe it was $70,000.  My bank declined it.  We showed

10  all the proper paperwork to the banks.  They declined it.  It

11  did not go back to Chase.  But we just didn't have a comfort

12  feeling about making sure that our funds were secure when we

13  were being accused of -- of fraud, which we were not

14  fraudulent.

15  Q   So when the accusations of fraud started, customers took

16  actions to get their money back by reversing their wires, Genie

17  transferred money to affiliate companies to act as asset

18  protection entities for that money.

19  A   Yes, sir.  That's a very fair statement.

20  Q   Okay.  And this was -- when was the transfer to Better

21  Methods in particular?

22  A   I do not remember, respectfully, the date of it.  It would

23  have been --

24  Q   It's on here as August 2023.  Does that sound plausible?

25  A   It does.  Yes, sir.

1  Q    Okay.  And you transferred $80,000 to that particular

2  entity?

3  A    Yeah.  Yes, sir.  John handled the wires, but yes, that

4  sounds right.

5  Q    Okay.  And it's -- it doesn't appear to be on the

6  schedules as far as I can find, but you also transferred 600

7  and some thousand dollars to Genie Investments II?

8  A    Correct.  Yes, sir.

9  Q    Okay.  And we found that.  Mr. -- I believe Mr. Munoz

10 discovered that -- in the Morgan Stanley Bank account, right?

11 A    Yes, sir.  I believe so.

12 Q    Okay.  And what -- first of all, what is Genie Investments

13 II?

14 A    It's another entity, a separate entity from Genie, just as

15 if you would have a real estate corporation that might try to

16 diversify for asset protection.  It was just we wanted to place

17 money of Genie's in different accounts in the form of loans

18 that we owe back to Genie, okay, but to use them for

19 professional fees because we know we're in a fight.  We've got

20 five or six open active lawsuits at the moment.

21 Q    Right.  Right.

22 A    So we had to make sure we did not run out of -- of -- of

23 fees for professional fees.

24 Q    So these transfers were made with the intent to keep the

25 money away from your creditors.

1   A    No, no, absolutely not.  Those funds were sent to

2   different areas so that we could actually take care of everyone

3   involved, including every single person that ever wrote us a

4   check and put forth the money towards offensive professional

5   fees to solve this problem instead of defensive professional

6   fees that would drain our -- our -- our financial resources

7   quicker, and that was happening in Chicago.  That would be my

8   fair answer to that.

9            MR. BOMKAMP:  Okay.  I'll move on from this line of

10  questioning.  Just give me just a moment.

11           THE COURT:  Take your time.

12  BY MR. BOMKAMP:

13  Q    All right.  Okay.  If you would turn to United States

14  Trustee Exhibit 209

15  A    I'm there.

16           THE COURT:  And that's in Book 5?

17           MR. BOMKAMP:  Yes.  Yeah, we're still in Book 5.

18           THE COURT:  Thank you.  You may proceed.

19  BY MR. BOMKAMP:

20  Q    All right.  Do you recognize this spreadsheet?  You gave

21  it to as -- it's an Excel -- it's a PDF version of an Excel

22  spreadsheet that Genie gave us.  Do you recognize it?

23  A    Well, I do, but this would be -- I'll answer anything

24  you -- you want of this, of course, but this is John's area of

25  expertise with the company.  He holds, we call it, the -- you

1  know, the tablet, if you will, the -- of -- of every

2  transaction that we have, loan agreements, wires, everything.

3  So this is his spreadsheet.

4  Q   Okay.  I won't dwell on it too long.

5           THE COURT:  Hold on one second, Mr. Bomkamp.

6           Is this where you kind of came up -- you -- earlier

7  you testified that 9.5 made you feel more comfortable because

8  that was the refund amounts?

9           THE WITNESS:  You better believe it, yep.

10          THE COURT:  And I see that the ICA total is about

11  9.7.  Was that --

12          THE WITNESS:  Yes, sir.

13          THE COURT:  And then you testified that you think you

14  owe around 15, but this only shows about 14,148.  Does that

15  sound about right?

16          THE WITNESS:  Yes, Your Honor, it does.

17          THE COURT:  Okay.  Go right ahead, Mr. Bomkamp.

18  BY MR. BOMKAMP:

19  Q   Okay.  So I won't dwell on this sheet too long, but you

20  see the 1.8 million that's on here, for example, owed to

21  Wallingford Lodging Partners and North Haven Lodging Partners

22  for $1.8 million each?

23  A   I do not know where the number is.  I'm looking for it,

24  but yes, from memory I know that.  Yes, I see it now.

25  Q   Okay.  What column -- what's the column name where

Hughes - Cross                          81

1    that -- where those listings are?

2    A    ICA refundable.

3    Q    Okay.  And given that you've listed this money as

4    refundable on the spreadsheet that you gave our office, why

5    does it appear in the bankruptcy schedules as contingent,

6    unliquidated, and disputed?

7    A    Because that's our -- our position is that it is.  Now,

8    again, that's our humble position.  This process will determine

9    that.  This document was given to Bryan -- Bryan Mickler,

10   our -- our counsel, by John Cohan, it was my understanding, and

11   did not even know this was getting turned in.  If we knew this

12   was getting turned in, then refundable would have been redacted

13   from it.  However, I will -- I will say that, at the time when

14   John created this document, okay, it -- still was.  We

15   were -- we were trying to use reasonable efforts and beyond

16   reasonable efforts to refund those ICAs, so that word is

17   appropriate.

18   Q    Okay.  All right.  And if we look over in the far-right

19   column, do you see a figure that says total refundable?

20   A    I do.

21   Q    All right.  What is that figure?

22   A    That figure is a total amount of the ICAs that had been

23   sent into Genie Investments.

24   Q    Okay.  And what is the exact number?

25   A    The exact number is $9,727,644.

1  Q    Okay.  And that is a pretty exact number, would you agree?

2  A    I believe so, yes.

3  Q    Okay.  And perhaps more in bankruptcy terminology, is that

4  a liquidated number?

5  A    I don't know the answer to that.

6  Q    Okay.  I'll move on, that's fine.

7          THE COURT:  I'm not sure most bankruptcy attorneys

8  know what that means.

9          MR. BOMKAMP:  Probably not, Your Honor.

10         THE COURT:  Including Mr. Johnson, who's walking out

11 now.

12 BY MR. BOMKAMP:

13 Q    So with respect to the Velanos investment, I -- would you

14 agree that we heard your attorney, Mr. Walker, state that he

15 was aware of the fraud within an hour?

16 A    Yes, that was his testimony.

17 Q    Okay.  And so we have one attorney's testimony.  Now, you

18 said you had another attorney.  What was -- who was that?

19 A    Scott Oh --

20 Q    Yeah?

21 A    -- with the Warren Law Group -- the Warren Law Group.

22 Q    And in terms of advice of counsel letters or other

23 documentation from him, did you bring any of that to court?

24 A    I believe there's quite a bit in our exhibits.  There's an

25 update letter that Scott Oh from Warren Law Group gave to

1  our -- our customers on -- on the status of his communications

2  with the Velanos attorney and the expected date that money

3  could be coming back over from Velanos.  There's other exhibits

4  from Scott Oh, I believe, that are -- that are in the -- in the

5  evidence here, which is Adam's opinion letter, his attestation.

6  Q     Wait, wait, wait.  No, that's for Mr. Adams.  Or --

7  A     I'm sorry, please restate your question.

8  Q     I'm sorry.  I'm -- never mind.  Go ahead.

9  A     Okay.  As far as all the documents that I know that are

10 here for evidence, Adam wrote an attestation to his

11 communications with Warren Law Group with his investigation and

12 his opinions now.  Additionally, our engagement letter with

13 Warren Law Group was submitted to the Court for evidence.

14 Let's see.  I believe that all of our amendments that we made

15 with Genie and Velanos, that was by Scott Oh and Warren Law

16 Group.  And there's also a text message statement between

17 myself and Scott Oh where he is telling me, yes, that's

18 a -- that's a good trace report on the 10 million wire.

19 Q     That -- now, is that in the evidence file with this court,

20 or is that in the evidence file with the litigation that

21 Mr. Walker is doing?

22 A     I'm not -- well, I believe it's been provided to this

23 Court for the purposes of the Bankruptcy 11, for example.  We

24 filed the petition.  You've -- you then came behind and filed a

25 position of where you wanted the case to go in statements and

1  claims.  We responded to those with a lot of documents and

2  evidence, so all that was submitted with -- with a lot of those

3  responses.  So I would think they would be available to the

4  Court to be exhibits.

5  Q    Okay.  Okay.  Did you bring any satisfied customers to

6  court today?

7  A    I did not bring any customer to court today.

8  Q    All right.

9  A    I could have.

10 Q    So, again, why is it that you continued to lend money

11 after December 5, 2022?

12 A    The -- the -- the largest amounts of money that were lent

13 were, again, for asset protection, for -- for professional fees

14 and attorneys and clearing out the Morgan Stanley account.  We

15 made very few -- we made refunds because refunds were due.  In

16 fact, we had never -- we had never not made a refund of an ICA

17 in full on time until August of '23.  So we continued to make

18 refunds, as course -- as we had the ability to do.  We did not

19 fund many loans.

20      We -- we were working on funding loans when we got the

21 funds in in July.  But when we -- we didn't receive the second

22 tranche, that's when we backed up and we called Adam and said,

23 that's it, we've got to get into this.  And then -- but we

24 weren't advertising.  We weren't asking for business.  We

25 were -- really had our hands full, taking care of the most

1  important thing, which is trying to get $9 million back into

2  this company and -- and then get Velanos to perform.

3  That's -- that was where our attention was focused.

4  Q    Okay.  If you would, look at Exhibit 62, and that's in one

5  of the other notebooks.  Hold on.  I'll direct you to the right

6  one.

7  A    Okay.

8          THE COURT:  What exhibit?

9          MR. BOMKAMP:  It's 62, and I am -- now I am

10 perceiving that it's --

11         THE COURT:  That would be Book 2.

12         MR. BOMKAMP:  Book 2.  Did I give you Book 2?

13         THE WITNESS:  No, I have Volume 1 and 4.

14         MR. BOMKAMP:  Okay.  That was my oversight.

15         THE COURT:  And you said 63?

16         MR. BOMKAMP:  62.

17         THE COURT:  62.  All right.  Thank you.

18         THE WITNESS:  Thank you.  62.  Is that right?

19 BY MR. BOMKAMP:

20 Q    Yes.

21 A    Okay.  I'm there.

22 Q    All right.  So what's the date of this document?

23 A    January 10th, 2023.

24 Q    All right.  And would you agree that that's -- oh, okay.

25 Okay.  The date that Velanos failed to perform, was it December

1   5th, 2022?

2   A    Yes, sir, it was.

3   Q    Okay.  So can we agree that January 10th, 2023 was after

4   December 5th, 2022?

5   A    Yes.

6   Q    And can we agree that in the case of Ms. Butkiewicz, there

7   was no involvement of McMann Capital?

8   A    There was no involvement with McMann --

9   Q    The BELOC was with Genie directly.

10  A    Okay.  This is Lisa.  I'm just looking at the front page.

11  Q    Mm-hmm.

12  A    This is with Lisa Berkowicz [sic].

13  Q    Mm-hmm.

14  A    Yes, we had -- at that time, Lisa had come in through

15  another white labeler, just like McMann, but their name was

16  Knights Bank, Knights Lending.  And we terminated -- Genie

17  terminated all agreements with Knights Lending.  And we looked

18  at their customers, and we said we'd like to paper up with you

19  directly.

20  Q    But why did you do that with Ms. Butkiewicz after December

21  5th, 2022?

22  A    Okay.  Good question.  We heard from someone within

23  Knights Lending that there was -- there was a problem with

24  Knights Lending.  One of the owners, it was discovered, had

25  a -- had a past fraudulent something on his record.  And so I

1   called Knights -- I first got with John, and we looked at the

2   application from Knights Lending and the ownership.  We run

3   background checks on management.  And we had run a background

4   check on Brendan from Knights Lending, and it came back clean.

5   He was 100 percent owner.  But it was found that he had an

6   agreement with another owner to come in and purchase shares,

7   and that one had some type of discrepancy in his background

8   that had something related to fraud.

9        So his name was Dustin, the one that had something in his

10  background.  So I called Dustin and I said, is this true?  He

11  said yes.  We got with our counsel, did a very quick

12  investigation.  And then we called Knights Bank.  We said,

13  we're terminating all your agreements effective immediately.

14  And then we got --

15  Q   I don't -- forgive me.  I don't see how what you're saying

16  is responsive.  What I'm asking you is why you did business

17  with Ms. Butkiewicz after December 5th, 2022.

18  A   Because we did not want Genie terminating Knights Lending

19  to affect a borrower that had no knowledge of that.  She had

20  already previously sent money in to us, so we wanted to make

21  sure that she was in the queue for her loan to receive the

22  product she wanted to get.

23  Q   Well, why didn't you send the money back?

24  A   Huh?

25  Q   Why didn't you send the money back to her when you knew

1  you had problems with your funder?

2  A    It never came up.

3  Q    Never?  You were never asked for a refund?

4  A    Never.

5  Q    Never?  You've never by -- these customers haven't been

6  asking you for refunds?

7  A    Customers have terminated and requested refunds, I think

8  practically almost all of them.  Very few have not.  But at

9  that time, if she -- if she would have said, okay -- if

10 Ms. Butkiewicz had said, I would like to receive a refund, we

11 would absolutely send her money back.  Not a problem at all.

12 Immediately.

13 Q    Okay.  All right.  You've initiated arbitration against

14 several of your customers based on bad online reviews.  Is that

15 a fair statement?

16 A    Yes.

17 Q    Okay.  And what in your mind has been the basis for that

18 arbitration?

19 A    The basis was -- my personal humble belief, you know, this

20 country is good faith and due process.  And I tried to speak

21 with all individuals.  I tried my best to explain the

22 situation, that we had a capital provider.  They asked who it

23 was.  I couldn't tell them.

24 Q    All right.  Let me give you a more concrete example.

25 A    Okay.

1   Q    If you would, look in Volume 1, Document 22.  And what I'm

2   looking at is not -- the first couple of pages look like

3   Facebook posts, but I'm talking about the Yelp review.

4             THE COURT:  Is that the one at the top left?  It says

5   1209.

6             MR. BOMKAMP:  Yes, that's the one.

7             THE WITNESS:  1209, I'm there.

8   BY MR. BOMKAMP:

9   Q    Yeah.

10  A    With McMann Commercial.

11  Q    Right.  So here is a concrete example of a bad online

12  review left by one of your customers.

13  A    Uh-huh.

14  Q    What, in your opinion, is so unfair or disparaging in this

15  online review that warranted you taking Ms. Stegent to

16  arbitration?

17  A    First, Ms. Stegent had created an account on ZOOMERAL.  We

18  have a confidentiality agreement with our terms of use policy

19  for good reason, and she breached that.  We have

20  confidentiality in all of our agreements with Genie

21  Investments, strict confidentiality.  She breached all of

22  those.  She turned us in to Chase Bank for fraud and tried to

23  reclaim a wire from our account.  And she also tried --

24  extortion is my word, okay?  She said, you can either fund my

25  loan or I'm starting my posts, and I'm going to stop your

1  growth, and I'm going to gather up as many people as I can.

2  It's going to take me a while, but I'm going to -- I believe,

3  in her words, were burn your house down.

4  Q    All right.  Well, she was out of a lot of money, wasn't

5  she?

6  A    Absolutely, yes, respected.

7  Q    So do you feel like her anger was unjustified?

8  A    I don't think it was my place to say at that time.  What I

9  -- at the -- Kristin and Mr. Stringer, Blake Stringer, were

10 really the first ones to reach out to me, and it -- and it

11 became apparent that McMann was not servicing his clients

12 anymore.  He just gave them my phone number, and they were

13 calling me at dinner.

14      So, at first, when they would call, I would say, you know,

15 I need to verify who you are.  Do you have any contracts with

16 me?  And they were just asking me questions.  And so I would

17 say, look, I can't speak to you unless we understand who the

18 parties are.  So then she gave me the documents, as well as

19 Blake, later, that she had with McMann.  Then I understood

20 more.  And from what I heard from Blake Stringer and Kristin,

21 and all the other wonderful businesses out there and

22 individuals, was a disaster of complaints about how they did

23 not get any information from McMann Commercial Lending.  They

24 didn't get updates, return phone calls.

25      So, I'm sorry for the background and being long-winded,

1  but they had evidently all been through a very negative

2  experience in not getting updates from McMann that -- and

3  passing them on that we were giving McMann.

4      At that time, I just tried to reiterate to them that we

5  had attorneys.  I told the truth.  We had a failing capital

6  provider at the moment.  However, funds were on the way.  They

7  asked if they could still get their loans, and I said, yes, you

8  can.  I can't guarantee that we can give you a loan.  I can't

9  guarantee what's going to happen tomorrow, but we are in

10 negotiations with our capital provider that has created this

11 problem.  Our attorneys are on it, and we're working on

12 remedies.  They did not want to hear that.

13     They said, who is your capital provider?  I said, I can't

14 respectfully tell you that because then they could bring a case

15 against us for breach of -- breach of confidentiality.  There

16 were maybe one or two conversations that I had with them in

17 email exchanges.  It became apparent to me, in my humble

18 opinion and out of respect for all of these wonderful

19 individuals and businesses, that they were simply there to

20 gather a few pieces of information from me, and then they were

21 going to start their campaign together, and they were all very

22 well-organized.

23     For example, Blake Stringer sent me a text message and

24 said, you have until five o'clock, I've just launched my

25 website, Victims BELOC Scam Report, and put all of our logos,

 1  names, personal names, all over the website.

 2  Q    Well, sir, but --

 3  A    So that was -- that would be my justification for why we

 4  brought arbitration against Kristin, and we gave her several

 5  opportunities.  We said, look, please take your posting down,

 6  and let's talk and work this out.  We don't have the answers

 7  right now, but every problem can be solved.  She said,

 8  absolutely not.  We then sent her a demand letter, again, and

 9  said, please take your postings down, and let's try to work

10  this out.  We sent her attestation letter at great cost to

11  Genie that we do indeed have a capital provider, we do indeed

12  have a history of making loans and refunds.  She said

13  attestation letters from attorneys don't really matter.

14      We then put together a letter from Adam Walker stating

15  that -- trying to comfort everyone, if you send in

16  nonrefundable funds, we're going to make them refundable.  I

17  looked at Velanos.  I said, you're paying for this.  You're

18  late.  He said, absolutely.  On top of it, we're going to pay

19  your brokers some money, too, for mis-commissions.  He was very

20  cooperative at that time.  That was June, July, and August.

21      Then our last-ditch effort was to put together a opt-in

22  refund program with all parties involved because Adam, myself,

23  and Josh with Velanos were in settlement discussions in

24  September.  He showed us a proof of funds for $19 million.

25  He admitted to the breach.  He told us we'd have $59 million

 1  within 60 days, so we sent out the opt-in agreements to all

 2  parties involved to basically say, hey, please stand down.

 3  We're in negotiations and here's our attorneys, and we can't

 4  guarantee you what's going to happen tomorrow, but we've got

 5  your best interest in mind.

 6  Q    All right.  I think we're way beyond the scope of the

 7  question Mr. Mickler.

 8  A    I'm sorry.

 9          THE COURT:  All right.  And, Mr. Bomkamp, I think you

10  have a 1:30.  Do you as well have a 1:30?

11          MR. BOMKAMP:  Oh, my goodness.  Okay.  Thank you so

12  much.

13          THE COURT:  And do you have one as well.

14          MR. MICKLER:  I just need to pop down to talk to

15  Mr. (indiscernible), Your Honor.

16          MR. BOMKAMP:  I thought you were standing up to

17  object.  You were standing to save me.  I'll be right back.

18          THE COURT:  We will take a brief recess before Judge

19  Funk kills him.

20          You may step -- you may go do what you need to do as

21  well.

22          Ignore me.  We'll take a break until either one of

23  y'all gets back.  Have some water.

24          THE WITNESS:  Thank you.

25          THE COURT:  And you can go to the bathroom.  Just

1  don't talk to your attorney about anything you testified as to.

2          THE WITNESS:  I'm okay.  Thank you, Your Honor,

3  though.

4          THE COURT:  You can sneak out too if you need.  I'm

5  just making some notes.

6          You can get up move your legs around.  You'll be

7  fine.

8          THE WITNESS:  Thanks.

9      (Pause)

10         THE COURT:  Well, that was brief.  Everybody good?

11         MR. MICKLER:  Yes, Your Honor.

12         THE COURT:  You had two cases.  They're good?

13         MR. MICKLER:  Mine were both continued.  I just had

14  to confirm.

15         THE COURT:  Good to hear.

16         You ready to proceed?

17         MR. BOMKAMP:  Yes, Your Honor.

18         THE COURT:  All right.  You may sit down.  You're

19  still under oath.

20         THE WITNESS:  Yes, sir.

21         THE COURT:  And now you have a very flustered

22  Mr. Bomkamp.  I've never seen him move that quick for me.  I'll

23  let Judge Funk know of the respect you have for his court, much

24  more than the respect you have for mine.  Go right ahead.

25         MR. BOMKAMP:  It's not respect, Your Honor.  It's

1   fear.

2          All right.  So we are in Binder 3 now, which the

3   witness has.

4          THE COURT:  Volume 3.  You may proceed.

5                  CROSS-EXAMINATION CONTINUED

6   BY MR. BOMKAMP:

7   Q    All right.  And hopefully I'm going to refer to the very

8   last exhibit of Binder 3, which is Exhibit 131.

9   A    Second to the last?

10  Q    Very -- I think there's -- oh, yeah.  Maybe second to

11  last.  Yes, sir.

12  A    Okay.

13         THE COURT:  What was the exhibit again?  I'm sorry,

14  Mr. Bomkamp.

15         MR. BOMKAMP:  131.  Second to last exhibit in Binder

16  3.

17         THE COURT:  Thank you.  I'm there.  You may proceed.

18  BY MR. BOMKAMP:

19  Q    All right.  So, Mr. Hughes, what is this document?

20  A    This is a settlement agreement and general release

21  agreement that we had our attorneys prepare for Genie

22  Investments to go to all the parties involved, our clients.

23  Q    Okay.  And there's an attachment here at the back of this

24  agreement.  That's a reward schedule.  Can you explain to me

25  how the reward schedule works?

1   A    Yes.  If you would put in and contribute, which was --

2   which was an option.  I asked no one for money.  I just

3   delivered this document and explained it to people.  If someone

4   wanted to put in $100,000 for the purposes of professional

5   fees, attorneys, if you will, to help us in our -- in our -- in

6   our budget for professionals, then they would become first on

7   the list of any -- of any -- of any funds that came into Genie

8   that they could refund or gift to one of our customers.

9   Q    Okay.

10  A    First in, first out.

11  Q    All right.  So this document was distributed to your

12  customers.

13  A    Mm-hmm.

14  Q    And is it plausible that Lea Muse would have received this

15  document?

16  A    We tried to make sure everybody received it and that

17  everybody received it around the same time.  It was -- we tried

18  to --

19  Q    Okay.  And so the offer here was that if a customer paid

20  in additional money -- and how much money are they paying in in

21  the example?  Is that the 10,000 or 100,000?

22  A    They weren't -- this is just an example contribution of

23  $10,000.  Correct.

24  Q    Okay.  All right.  Then -- and because these are customers

25  who are waiting on refunds, they would be bumped to the top of

1  the list of people who would receive refunds and receive their

2  contribution in addition to their refund back.

3  A    Correct.  The money they contributed towards legal

4  professional fees would be coming back into their pocket first,

5  and then their original refund amount would be -- would follow

6  that, yes.

7  Q    Right.  And to be clear, these are folks who have already

8  lost their money who haven't had their loans funded.

9  A    I would not agree with "lost."  They were involved parties

10 that sent money into Genie, whether it was the nonrefundable or

11 the -- or the ICAs.  It was open to anyone's participation that

12 wanted to do this.

13 Q    Okay.  All right.

14 A    This was -- oh, go ahead.  I'm sorry.

15 Q    No, that was the only thing I want to talk about there.

16      Ms. Nash, in her testimony, made a couple of statements of

17 interest.  One was that you offered her funds to disclose the

18 identity of her internet group of customers.  Is that true or

19 is that false?

20 A    Our attorney, Jason, had a conversation with her.  We have

21 not verbally spoken to her.  Jason with Spiegel & Utrera has

22 Q    Did he make her that offer?

23 A    It's my understanding that he made her an offer to settle

24 and provide her with some capital, and in exchange, we

25 wanted -- we wanted information from her on who were making

1  anonymous posts on the internet, basically attempting to really

2  harm us.

3      If you look up, for example, David Hughes, ZOOMERAL, you

4  will -- you will immediately see a ripoff report on me, which

5  is, you know, a lot of untrue statements.  It was uploaded by

6  an individual in Scottsdale, Arizona, but they said they lived

7  in Springfield, Illinois.  So there were many, many postings

8  out there by anonymous, made-up names, so -- and it's just

9  doing lots of harm.  We had three brokers, for example, that

10 looked through our software.  They were very impressed and due

11 diligence.  They looked me up.  They looked up ZOOMERAL and

12 they said -- they called John back and said, yeah, we're not

13 comfortable with this.  So there was a lot of damage being done

14 on the internet with inaccurate information.

15 Q    Okay.  So Ms. Nash was offered money to give you the

16 actual identities of people that you felt were unfairly and

17 honestly posting against ZOOMERAL or Genie.

18 A    In general, it was to give us information about -- that

19 might be useful to Genie and to all of our -- all of our -- all

20 of our clients because these things were hurting Genie in many

21 ways and hurting ZOOMERAL, too.  So --

22 Q    Okay.

23 A    So we needed to be healthy.  We needed to be strong.  We

24 needed to bring in revenue.  We needed to go on with our

25 business.  So we believed it would be beneficial for all

1  parties if that type of activity were to cease.

2  Q    Okay.  And Ms. Nash also alleged that Genie submitted --

3  that she signed a BELOC agreement that was in the name of

4  McMann Capital and that Genie submitted an altered version of

5  that document with Genie Investments on it instead of McMann

6  Capital in order to -- as part of arbitration.  Is that true or

7  is that false?

8  A    I did hear that.  Yes, sir.

9  Q    I believe that you heard me, but did that happen?

10 A    Could you repeat the question, please?

11 Q    Did you do it?

12 A    No.  I believe what happened is John provided a document

13 that was not our document to Spiegel & Utrera for the

14 arbitration case with Mrs. Nash.  And it was a fraudulent

15 document whereby her signature was copy and pasted onto a loan

16 agreement directly with Genie, and McMann, we believe, is the

17 one that fraudulently placed her signature on a loan agreement

18 with Genie.  And we have found other agreements that that has

19 happened to as well, where McMann took literally his customer's

20 signature and copy and pasted it onto a direct contract with

21 Genie and his customer who we had never spoken to.  It was

22 fraud.

23 Q    Well, why did you use that document to invoke arbitration

24 against Mrs. Nash?

25 A    I think it was human error, clerical error.  I believe

 1  that John pulled down a document from our CRM system in good

 2  faith, handed it to Spiegel & Utrera, our attorneys, for

 3  background materials about her being in business with McMann.

 4  I don't think he looked at the signatures.

 5  Q   Okay.  So obviously, Genie is in litigation with Velanos.

 6  Does Genie have a functional capital provider right now?

 7  A   Yeah, we could if we chose to, but we don't have time to

 8  right now.  We've been consumed with legal efforts for good --

 9  for the right reasons and what we're doing here today.  We're

10  not really in a sales mode.

11  Q   Right.

12  A   But, for example, we have many credited investors, many

13  resellers that would provide Genie with capital if we wanted

14  to.  We do not deal with anyone other than an accredited

15  investor or a private equity group that we would vet.  But yes,

16  we do.

17  Q   Okay.  So if Genie were to continue as a going concern,

18  what capital provider would you use?

19  A   Accredited investors, many of them that we've built

20  relationships with in -- over the years, for example.  In any

21  given time, it's hard to tell how much capital they would have

22  at any given time.  But we would use them, as well as we would

23  use family offices.  There's many different lenders we can use

24  that will white label their services to us, like factory

25  companies.

1    Q    Well, why haven't you used them already to fund these

2    loans?

3    A    We have, in fact, in a few instances used accredited

4    investors to fund a bridge loan, for example, and we've written

5    them an interest check to -- to lock up their money for 90

6    days.

7    Q    Well, why don't you use it to fund the outstanding loans,

8    the people that are waiting for loans?

9    A    We have -- good question.  We have never put together a

10   capital raise for ZOOMERAL or for Genie.  We've never had

11   investors where we've sold equity to in exchange for equity.

12   We could do that.  We could absolutely do that.  We have good

13   assets in the books and these loans.  I believe that selling

14   them right now would produce the worst fruit.  We need to let

15   them continue to mature, sell some more loans.  And there's any

16   number of things we can do with Genie to raise money, bring in

17   partners to clean up any situation.  We would absolutely do all

18   those efforts.  Any and all.

19              MR. BOMKAMP:  All right.  Just make sure I have

20   anything further.  All right.  Your Honor, I don't have any

21   further questions for this witness.

22              THE COURT:  Thank you.

23              Any redirect, or are we ready to go to Mr. Cohan?

24              MR. MICKLER:  Just briefly, Your Honor, if I may.

25              THE COURT:  Go right ahead.  You may.

1                        REDIRECT EXAMINATION

2      BY MR. MICKLER:

3      Q    Mr. Hughes, you sat through yesterday's session, and you

4      heard me question each customer of Genie with respect to the

5      due diligence and the bridge loans -- bridge loan agreements.

6      Did you hear that yesterday?

7      A    Yes, I did.  Yes, sir.

8      Q    And in each instance there was Section 2.02 and Section

9      2.03 where we were looking at a situation where those fees

10     would be, per the contract, nonrefundable, correct?

11     A    That's correct.

12     Q    Okay.  And you also sat through yesterday with some of the

13     ICA agreements, and we talked about the potential of a force

14     majeure under the BELOC agreements that Genie had.  Did you

15     hear those yesterday?

16     A    I did.  Yes, sir.

17     Q    Has -- to your knowledge, has this Court or any court

18     really had the opportunity to rule on the validity or

19     invalidity of those contractual provisions?

20     A    No, not to my knowledge.

21     Q    So with respect to each creditor listed in your schedules,

22     do you know how much you actually owe them at this point?

23     A    We do.  We don't believe there's any errors.  We have good

24     records that we kept with John.  We believe we know the number

25     for everyone.  There could be an error, but if we were to find

1  that there is an error, we would quickly fix it.

2  Q    And at the time of the filing, based on the contractual

3  language, was there a legitimate dispute about whether that

4  money would be owed or not?

5  A    I can only say that with all discussions with many of our

6  counsel, yes, the dispute is absolutely there.

7  Q    Okay.  But your intention with the plan is to do what?

8  A    100 percent, our intention is do everything we've been

9  trying to do all year.  We are going to fight to get every

10 dollar back to people that wrote us a dollar because it's the

11 right thing to do.  Ethics, you name it.  Customers are number

12 one.  That's our position.  We're going to continue to do that.

13 We're going to use all the resources within the company to do

14 those efforts.  It's a balance between bringing in some new

15 revenue and then probably learning more information over the

16 next 30 to 60 days, like arbitration with Velanos, to always

17 take a look at it to determine where we need to put our

18 financial resources together professionally for all the

19 different parties that can be bringing money in to go back in

20 their pockets.  That is our customers.  That is our clients.

21 Q    And you mentioned the Velanos litigation.  But there are

22 other potential sources beyond Velanos and maybe some future

23 loans from Genie.  Can you name off, from your list up there,

24 what potential revenue sources that Genie would look at?

25 A    Correct.  I've had some initial discussions with Knights

1  Bank.  I told them that we would --

2  Q    Well, let's just go through the list of -- without

3  naming --

4          THE COURT:  Yeah, don't give us specifics, just

5  generically.

6          THE WITNESS:  Okay.  The -- a number of --

7  BY MR. MICKLER:

8  Q    No, no.  I just want to know who you feel like Genie would

9  be able to go to in order to help fund its plan.

10  A    First, ourselves and our loans, our assets.  And we're

11  going to throw the kitchen sink of every asset in Genie at

12  this.  Number two would be Warren Law Group.  I think they have

13  tremendous exposure.  McMann Commercial Lending, Knights Bank,

14  Velanos themselves, as well as Will Byrd as an individual, as

15  well as Joshua Wearmouth as an individual.  And we feel very

16  good about we're going to get some checks from those groups.

17  It's just a matter of how much and when.

18          MR. MICKLER:  Okay.  Nothing further, Your Honor.

19          THE COURT:  Thank you.  You're done.

20          THE WITNESS:  Thank you.

21          THE COURT:  You may step down.

22          THE WITNESS:  I'm just going to retrieve my laptop.

23      (Witness excused)

24          THE COURT:  Mr. Mickler?

25          MR. MICKLER:  The last witness, Your Honor, would be

1   Mr. John Cohan.

2            THE COURT:  Come on up.  Let's see if we can get this

3   done well early of four o'clock.  Can you do it, Mr. Mickler?

4            MR. MICKLER:  This is the easy one, I hope.

5            THE COURT:  I figured this was the easy one.  The

6   beard made me see that.

7            Can you get it done, Mr. Bomkamp?

8            MR. BOMKAMP:  I am optimistic, Your Honor.

9            THE COURT:  All right.  If you'll please raise your

10  right hand.

11            JOHN COHAN, DEBTOR'S WITNESS, SWORN

12            THE COURT:  All right.  please state your name and

13  address with city and state.

14            THE WITNESS:  Sure.  It's a John Michael Cohan, and

15  it's 103 Century 21 Drive, Jacksonville, Florida, 32216.

16  That's Suite 100, Number 4.

17            THE COURT:  Thank you.  And if you can pull that

18  microphone a little bit up closer to you.  You're a little

19  taller.

20            You may proceed, Mr. Mickler.

21            MR. MICKLER:  I need one second, Your Honor.

22            THE COURT:  Take your time, but not too much time.

23  You look much more comfortable in that chair over there.

24            MR. HUGHES:  I am.

25            THE COURT:  Just like our Zoomers, who are much more

1  comfortable in their houses.  That seat's pretty hot over

2  there.

3           THE WITNESS:  He kept it warm for me.

4           MR. HUGHES:  I'm a team player, Your Honor.

5           MR. MICKLER:  May I approach the witness, Your Honor?

6           THE COURT:  You may.

7           THE WITNESS:  Thank you.

8                       DIRECT EXAMINATION

9  BY MR. MICKLER:

10  Q Good Afternoon, Mr. Cohan.  You were here previously for

11  Mr. Hughes's testimony.  Could you again state what your role

12  in Genie as -- is as of this point?

13  A    Sure.  I'm labeled as a director.  That's my title.  And I

14  control most of the contracts and communications inside the

15  ZOOMERAL system for Genie.

16  Q    And with respect to Genie, are you also sort of the person

17  who would be the number person as far as bank accounts and

18  ingoing and outgoing transfers, things like that?

19  A    That's correct.

20  Q    Okay.  Do you keep all of the books and records of Genie

21  at this point?

22  A    Yes.

23  Q    With respect to the Debtor's Exhibits 1 through 8 that you

24  have in front of you, can you tell me what you put together for

25  the United States Trustee and this Court in order to kind of go

1  through each of the names that we had testimony from yesterday,

2  each customer?

3  A    Sure.  These are -- these are all the same pretty much,

4  right?  Yeah.  These are the bridge loans that were at -- that

5  were -- that were provided to our customers.  And the first

6  document or the first page shows the amount of the bridge

7  interest that came in and the bridge amount that was required

8  for that particular loan and which account those funds were

9  held in.  And let's just look at what's been marked with you as

10 Number 1.

11 A    Sure.

12 Q    Which would be Kristin Stegent.

13 A    Yep.

14 Q    And there are multiple documents in there.  Can you kind

15 of take the Court and everybody through what you composed and

16 what each document represents.

17 A    Sure.  The first document is as I described.  That's just

18 basically just a basic breakdown of the transaction itself and

19 where funds are located for that particular bridge.  The next

20 is the actual bridge loan agreement itself.  And then, after

21 the bridge loan agreement is the account statements where the

22 money was being held.

23 Q    And you have two account statements in there.  You have a

24 Chase Bank account and a Morgan Stanley, correct?

25 A    Throughout all these documentations, yes.  That's --

1  that's true.  Those are the two accounts.

2  Q    All right.  And what is the point of attaching the account

3  statements to each package that you have there?

4  A    To verify that the funds were being held on behalf of that

5  customer for a bridge loan.

6  Q    Okay.  And we heard a lot of testimony yesterday about the

7  section where, I believe it's 2.01 or 2.02 in the bridge loan

8  agreements where it would be Genie's responsibility to hold the

9  bridge loan until the BELOC loan was completed with McMann.  Is

10 that correct?

11 A    Yes, that's correct.

12 Q    Okay.  And with respect to the -- what we see here in 1

13 through 8, the Stegent, the Muse, the Blake Stringer, the Kim

14 Nash, the Rejoe Joy, Christopher Lovett, Nicholas Virthe, and

15 Lisa Butkiewicz, do you have all of their bridge loan

16 agreements and the account statements related to those bridge

17 loan agreements in those exhibits?

18 A    Yes.

19 Q    And have you been able to determine approximately what

20 amount of bridge loans would have been made to those customers

21 with respect to what they testified about yesterday?

22 A    Sure.  It was roughly $5.5 million in bridges.

23 Q    Okay.  With $5.5 million, let's just take a hypothetical.

24 With Ms. Stegent, let's say it was $300,000.  Hypothetically,

25 what would you do with respect to her bridge loan for $300,000

1   once she had paid her due diligence and the bridge interest?

2   A    We recorded it on the books, and we documented where the

3   funds would be at that time.

4   Q    Would you make a notation in your books for the amount of

5   Ms. Stegent's loan?

6   A    That's correct.  That -- that was -- would be the first

7   page.

8   Q    And then. the time period of any type of prepaid bridge

9   loan interest was supposed to be what time period?

10  A    Ninety days.

11  Q    During the 90-day time period, would your bank records up

12  there reflect that there were funds available to cover

13  Ms. Stegent's loan during that time?

14  A    At all times, yes.

15  Q    And would there be enough funds to cover five and a

16  half million dollars if we went through all of these, through

17  these customers?

18  A    Yes.

19  Q    And generally speaking, in the Morgan Stanley account, how

20  much was there at any one time?

21  A    Roughly $10 million.

22  Q    Okay.  And that was liquid through a line of credit that

23  Morgan Stanley had provided to Genie?

24  A    The funds were in an account that stayed in the account.

25  There were some securities attached to them that were -- that

1   was put together by the Morgan Stanley representative as,

2   quote/unquote, "safe investments."  And then, we -- we also

3   took -- we took a line of credit against those funds.

4   Q    Okay.  But --

5            THE COURT:  And that was a money market fund?

6            THE WITNESS:  Correct.

7            THE COURT:  Just a standard Morgan Stanley?

8            THE WITNESS:  Yeah, nothing.

9            THE COURT:  Same risk as every normal fund?

10           THE WITNESS:  Correct.  Yeah.

11           THE COURT:  Thank you.

12  BY MR. MICKLER:

13  Q    When was the Morgan Stanley account closed out?

14  A    January -- either January or February.  I think it was

15  officially -- what month are we in now, March?  I think we got

16  the closing letter from Morgan Stanley in March.

17  Q    Okay.  And that's 2024?

18  A    Correct.

19  Q    So we're talking about at the end of 2022 and in early

20  2023, at the -- at that time, when all these bridge loans are

21  in kind of process for the period of the 90-day bridge loans,

22  there would have been approximately $9- to $10 million in a

23  Morgan Stanley account?

24  A    Or Chase.  Yes.

25  Q    Okay.  If somebody had asked you at that point, could you

1  point -- at the point of any bridge loan, could you point them

2  to where the funds were segregated on your books so that there

3  wasn't any type of discrepancy as far as what amount of bridge

4  loan was being held for that customer?

5  A    We could have, but we did not.  We didn't want to share

6  the bank balances with our -- with the public.

7  Q    Did Genie ever accept what we would call a fourth bridge

8  loan payment, if somebody prepaid for 90 days of interest?  Did

9  anybody? prepay for another month or any type of further

10 payments on bridge loans?

11 A    No, absolutely not.  We didn't feel like that would have

12 been the right decision for our customers.  We had -- we

13 understood that we were having issues getting the money from

14 the capital provider.  We didn't have a set date where we can

15 say hey, we're going to close your loan on this particular

16 date.  So we didn't feel comfortable taking additional interest

17 from our customers.  We -- and we -- we told our customers that

18 even though your bridge has expired, even though you did not

19 extend your bridge, we're going to keep you in the queue until

20 we -- until we finish -- until we resolve the situation.

21 Q    And during that 90-day period, did -- when Genie

22 segregated the funds and Morgan Stanley, did it lose the

23 ability to take those funds and go out and make new investments

24 with those funds?

25 A    Correct.

1  Q    You didn't do that.

2  A    No, we did not.

3  Q    I want to go over the insider loans.  And when -- let's

4  back up a little bit.  When you filled out the paperwork in my

5  office, did you physically sign the paperwork?

6  A    Yes, I did.

7  Q    Okay.  And did we go over everything to the best of your

8  recollection at that time?

9  A    At that time, yes.

10  Q    Okay.  And admittedly, it's -- there are some changes that

11  need to be made at this point?

12  A    Absolutely.

13  Q    When do you think that the loans to Cald Holdings and

14  Capitulum and David Hughes -- or not David Hughes, but ZOOMERAL

15  were made from Genie?

16  A    The very last transfer was in July.

17  Q    Of what year?

18  A    Of 2023.

19  Q    Okay?  So during that time, Genie was involved in, we'll

20  call it the Velanos issue at that point, correct?

21  A    Correct.

22  Q    Okay.  Was there ever a point where you made those loans

23  to the insider corporations that you felt, on behalf of Genie,

24  that you were not going to receive at least your capital back

25  from Velanos?

1    A    That's correct.  At all times, we believed that we would

2    at the very least get our principal payment back of 9 million.

3    Q    And --

4    A    Through -- that was through July -- after July, after

5    seeing the Nordic account.  We didn't get the money into our

6    Chase account, the 9.5 million, that's when we -- that's when

7    we knew that we had a legitimate problem that we needed to move

8    forward with and take -- and handle.  That's why we hired Adam.

9    Q    Okay.  And prior to that we heard some testimony about a

10   $10 million wire that was supposed to come in from Chase.  Did

11   you have the opportunity to see that wire proof?

12   A    The wire trace report?  Yes.  There was also a screenshot

13   that he sent us of us initiating -- of him initiating the wire.

14   And when we asked Scott Oh, you know, does this look like a

15   real wire transfer report, he replied yes.

16   Q    Were you also aware of the half-million-dollar payment

17   which came in from Velanos at some point in May of 2023?

18   A    Yeah, that was in May.  Correct.

19   Q    Okay.  And that was something that Genie actually

20   received?

21   A    That's correct, and it gave us a lot of confidence.  We

22   thought that if they were complete cons, they would have just

23   ran off with all the money.  You know, why bother paying 500?

24   It seemed to us that they were trying to work out the

25   situation.

1  Q    Let's talk about the Patels' money that came in around

2  April of 2023.  Do you remember how much the Patels sent in to

3  Genie?

4  A    In total, $3.6 million.

5  Q    And what happened to those funds?

6  A    They were refunded to customers.

7  Q    Do you remember how much and to whom?

8  A    There was 2.2 million, roughly, or maybe 2 million to one

9  customer.  I don't remember the name of that one offhand, but

10 then there was also the $1.1 million refund whereby Linger Chu

11 sent in a wire recall to Chase Bank, and based on the Bank of

12 America hold harmless agreement that Chase Bank has with Bank

13 of America, I guess, they released the funds to Bank of America

14 and stated they were closing our account based on the deposit

15 agreement that we had with Chase Bank that states that they can

16 close the account for any reason whatsoever.

17 Q    All right.  So out of the $3.6 million, if we kind of add

18 up what you just said, around 3.1 or so actually went back to

19 customers of Genie?

20 A    That's correct.

21 Q    All right.  So as a broad statement, is it -- would it be

22 true that Genie insiders didn't run off with the Patels' money?

23 A    Correct.  We did not.

24 Q    Would you consider, during the course of late 2022 and

25 2020 -- and early 2023 until July time period where Genie

1   stopped, that Genie actually did make bridge loans to

2   customers?

3   A    Yes.

4   Q    And why would you say that?

5   A    Could you repeat the first part of the question?

6   Q    Did Genie actually make bridge loans to customers?

7   A    Yes.

8   Q    Okay.  And is that the segregation that you talked about

9   earlier?

10  A    Based on this paperwork earlier, yes.  Yes.

11  Q    Okay.  When we look at the insider loans that were made to

12  Capitulum, ZOOMERAL, Cald Holdings, Genie II, those insider

13  loans, are those on the books right now for Genie Investments?

14  A    Yes.  Yes, they are.  And there's -- there was one more to

15  Genie's Angels as well in the amount of 25 grand.

16  Q    All right.  And would those be assets that would be able

17  to be either liquidated or called in by Genie upon the maturity

18  of those loans?

19  A    Correct.

20  Q    Have you actually seen loan agreements?

21  A    Yes.

22  Q    Did you sign a loan agreement with Genie on behalf of

23  Capitulum?

24  A    I didn't -- I did not sign the agreement on behalf of

25  Genie for the loan with Capitulum.  I signed on behalf of

1  Capitulum.  David Hughes signed on behalf of Genie.

2  Q    And that was my question.

3  A    Okay.

4  Q    I -- sorry for my confusion.  But as the debtor, you would

5  have signed on behalf of Capitulum?

6           THE COURT:  He means debtor as to that contract, not

7  as to the debtor in the bankruptcy case.

8           THE WITNESS:  Okay.  Yes.  Yes.

9  BY MR. MICKLER:

10 Q    Okay.

11 A    Yes.  Thank you.

12 Q    Do you feel that -- what's the term of the loan as far as

13 when the Capitulum loan is going to either mature or expire?

14 A    It matures in 2029.

15 Q    All right.  Do you feel that at that point, Capitulum will

16 have the ability to either pay it at that time or prior to that

17 date?

18 A    Yes, absolutely.

19          MR. MICKLER:  Okay.  No further questions, Your

20 Honor.

21          THE COURT:  Thank you.

22          Mr. Bomkamp?

23          MR. BOMKAMP:  Your Honor, could I have just -- I

24 wanted to get to my binder, but I didn't want to disrupt Court.

25 Could I have just two minutes to check on something?

1               THE COURT:  You may.

2          (Pause)

3               THE COURT:  Let's do this.  Let's take a brief recess

4     to 2:15, so that's a five-minute break, so Mr. Bomkamp can get

5     situated.

6               MR. BOMKAMP:  All right.  Sorry, I'll be --

7               THE COURT:  I'll be back.  I'll be back at 2:15.

8          (Recess taken at 2:10 p.m.)

9          (Proceedings resumed at 2:15 p.m.)

10              THE CLERK:  All rise.  The United States Bankruptcy

11    Court for the Middle District of Florida continues in session.

12              THE COURT:  Thank you.  Please be seated.

13              Just a reminder, you're still under oath.

14              Mr. Bomkamp, you may proceed.

15                          CROSS-EXAMINATION

16    BY MR. BOMKAMP:

17    Q    All right.  Good afternoon, Mr. Cohan.  With respect to

18    the various customer exhibits that you provided, they generally

19    consist of a one-page document that says Genie Investment on

20    it, a bridge loan agreement, and a Morgan Stanley bank account,

21    right?

22    A    That's correct.  There's also a Chase bank account in one

23    of those exhibits, as well.

24    Q    All right.  And the Morgan Stanley bank account, it's not

25    a segregated account, correct?

 1  A    If you're saying that each -- each customer's segregated

 2  into different accounts, no.

 3  Q    Okay.  Because you'll agree there's all kinds of things

 4  going on in that account in terms of the securities

 5  transactions and so forth?

 6  A    Agreed, yes.

 7  Q    Okay.  Now, so the only indication that we have of a

 8  customer's money being in that account at any given time is

 9  this one-page document, correct?

10  A    That's correct.

11  Q    All right.  So based on this -- based upon this one-page

12  document -- how did you prepare this one-page document?

13  A    I looked at the contract and looked at the numbers and the

14  dates, and I corresponded that to the bank accounts.

15  Q    Okay.  So your position is that because on a contract --

16  particular contract date Genie had more money in its general

17  operating account than was the bridge amount of the loan, that

18  the bridge loan was, in fact, provided?

19  A    Correct.

20  Q    Okay.  Let me ask you this.  If the debtor had the money

21  and the loan was unable to fund, why didn't the debtor just

22  give the money back to the customer?

23  A    The bridge loan was funded.

24  Q    I mean the BELOC.

25  A    Understood.  The bridge loan was funded, and it was a

1   nonrefundable agree -- nonrefundable fees for the bridge loan.

2   Q    All right.  So we had a due diligence fee --

3   A    Correct.

4   Q    -- correct?  And then we had pre-paid interest?

5   A    Correct.

6   Q    Right.  So you're saying that the -- they both were

7   nonrefundable?

8   A    The due diligence and the -- and the bridge agreement,

9   correct, were both nonrefundable, correct.

10  Q    Okay.  And so in preparation for your testimony, you

11  looked up the date of the bridge loan agreement, the amount of

12  interest that was paid, the bridge amount, and assigned bank

13  account --

14  A    Where it was.

15  Q    -- and you created these one-page documents?

16  A    That's correct.

17  Q    Okay.  And what was the date on those documents intended

18  to correspond to?

19  A    The date of the agreement.

20  Q    Of the BELOC agreement?

21  A    Of the bridge agreement.

22  Q    Of the bridge agreement.  Pardon me.

23       (Pause)

24  BY MR. BOMKAMP:

25  Q    Okay, so if we look at the very first one, if we look

1   at -- that's Ms. Stegent's documents.

2   A    Yes, sir.

3   Q    All right, so the one-page document here says January 3rd,

4   2023.  Is that correct?

5   A    That's correct.

6   Q    All right, and if we go down to the bridge loan, it looks

7   like it was notarized January 6, 2023.  Is there a reason for

8   that discrepancy?

9   A    A clerical error on my part.

10  Q    Okay.  So you created this one-page summary for the

11  purposes of this trial, and in at least in this case, you

12  committed a clerical error?

13  A    In this particular one, yes.

14  Q    Okay.  All right.  Would you like to comment on why the

15  schedules were filed with "Draft" stamped on them?

16  A    I did not approve a draft page on there.  And if it's --

17  my recollection is correct, Mr. Mickler apologized at one of

18  the trustee meetings in saying that was -- that was his error.

19  Q    Have you at least read the schedules?

20  A    Yes.

21  Q    Okay.  With regard to certain transfers that the debtor

22  made, did you agree that there are inaccuracies that need to be

23  corrected?

24  A    That there are inaccuracies, yes.

25  Q    Okay.

1          THE COURT:  One second.  Mr. Cohan, just because it

2   says "Draft" on it, did you intend that to be your schedules

3   that were filed that you reviewed with your attorney?

4          THE WITNESS:  Yeah.  The "Draft" has nothing to do

5   with it, yes.

6          THE COURT:  So you're not doing that to try to get

7   around any rules or regulations?

8          THE WITNESS:  No.

9          THE COURT:  Okay.  So those, as you sit here today,

10  were intended to be your statement of financial affairs with no

11  "gotchas".

12         THE WITNESS:  To the best of my knowledge, yes.

13         THE COURT:  Thank you.

14         You may proceed, Mr. Bomkamp.

15  BY MR. BOMKAMP:

16  Q    And you -- but you agree that there's errors in those

17  documents such as the omission of the transfer to Genie

18  Investments II?

19  A    If you're talking about Schedule 4 --

20  Q    Mm-hmm.

21  A    -- then yes, that would be correct.  That would be -- have

22  to be something that needs to be added.

23  Q    Okay.  All right.

24         THE COURT:  And real quick, Mr. --

25         MR. BOMKAMP:  Your Honor --

1           THE COURT:  One second.  Mr. Mickler, I assume the

2  draft was a software problem?

3           MR. MICKLER:  If the Court wants the real

4  explanation, Your Honor, I didn't file the case, so it didn't

5  unlock on my system because I didn't file the petition, and so

6  when I --

7           THE COURT:  It was a software issue.

8           MR. MICKLER:  It was my error not to press the button

9  that clicked it from draft because I didn't file the petition.

10          THE COURT:  I've -- I'll take judicial notice that

11  that often happens.  I've filed hundreds, if not thousands of

12  bankruptcy cases myself, and I know the issue with "Draft".

13          MR. BOMKAMP:  All right.  Fair enough, Your Honor.

14          THE COURT:  You may proceed, Mr. Bomkamp.

15          MR. BOMKAMP:  All right.

16          THE COURT:  And he's testified that those are his

17  intended statement of financial affairs with the need to amend.

18  BY MR. BOMKAMP:

19  Q    What does Capitulo [sic] do?

20  A    It's a real estate investment and syndication entity.

21  Q    Okay, so Capitulo received --

22  A    Capitulum.

23  Q    -- a loan from Genie in 2023?

24  A    Correct.

25  Q    Why did you take out a loan from Genie when you had other

1  loans that you hadn't fulfilled?

2  A    Because we thought that if -- like David stated, if all of

3  our -- if we're all healthy, our companies are healthy, then

4  Genie would be healthier, and we'd be able to make more loans

5  for our customers.

6  Q    All right.

7             MR. BOMKAMP:  Your Honor, I don't have any further

8  questions.

9             THE COURT:  Thank you.

10            Anything else, Mr. Mickler?

11            MR. MICKLER:  No, thank you, Your Honor.

12            THE COURT:  Mr. Cohan, you are done.  And is it Cohan

13 or Cohan?

14            THE WITNESS:  Cohan.

15            THE COURT:  Cohan.  Got it.

16            THE WITNESS:  Depends who you ask, I guess.

17            THE COURT:  That -- I'm sure.

18            THE WITNESS:  Yeah.

19            THE COURT:  You may step down.

20       (Witness excused)

21            THE COURT:  Anything additional, Mr. Mickler?

22            MR. MICKLER:  No further evidence on behalf of the

23 debtor, Your Honor.

24            THE COURT:  Any additional evidence, Mr. Bomkamp?

25            MR. BOMKAMP:  No, Your Honor.  My recollection is

1 | that everyone's exhibits have been admitted --

2 | THE COURT:  They have been.

3 | MR. BOMKAMP:  -- and I have no further evidence.

4 | THE COURT:  Then evidence is closed.  Now, I'm going

5 | to let you do a brief closing, and by brief, I mean brief.  I

6 | don't need an hour-long explanation of why your argument is

7 | correct.  I've read all of the motions.  I'm familiar with the

8 | case law.  I'm familiar with the evidence that's been allowed

9 | in.  I've listened to every witness.  I've listened to -- last

10 | night, I went through volumes of documents in preparation for

11 | today.  But briefly, I'll let you have a closing.

12 | It's your motion.  You go first.

13 | And I don't need grandstanding from either side.  I

14 | need actual pointing to evidence as to why your argument is

15 | correct.  Got it, Mr. Bomkamp?

16 | MR. BOMKAMP:  Yes, Your Honor.

17 | THE COURT:  Mr. Mickler?

18 | MR. MICKLER:  Absolutely, Your Honor.  Yes.

19 | THE COURT:  Thank you.  You may proceed.

20 | CLOSING ARGUMENT ON BEHALF OF THE TRUSTEE

21 | MR. BOMKAMP:  All right.  The Bankruptcy Code calls

22 | for appointment of a Chapter 11 trustee for cause, including

23 | fraud, dishonesty, incompetence, or gross mismanagement of the

24 | affairs of the debtor.

25 | All of these elements are present here, Your Honor.

1  The debtor promised loans and took people's money without an

2  adequate funding source.  And when the debtor was unable to

3  make the loans, it did everything that it could to quiet its

4  unfulfilled customers and subsequently made transfers of those

5  customers' money, both to itself and to an entity -- itself in

6  the form of its affiliates when it wasn't funding other loans.

7  And the debtor also made an investment in an entity known as

8  Velanos.

9          The debtor has tried to explain its conduct in

10  various ways.  The debtor has tried to explain that the --

11  that -- essentially tried to raise an advice of counsel defense

12  with respect to the investment in Velanos, but it was really

13  advice of counsel by proxy since we never really heard from

14  that counsel, we never really were presented with anything from

15  that counsel.  And the one lawyer for the debtor who was here

16  said, to paraphrase, he was able to immediately spot the fact

17  that that investment was problematic, if not fraudulent.  And

18  that certainly shows incompetence and gross mismanagement.

19          And when you look at the totality of the conduct of

20  the debtor, making loans while it didn't have a reliable

21  capital funding source, attempting to silence its customers,

22  attempting to manipulate arbitration documents, as admitted by

23  Mr. Cohan, attempting to get more money from people who had

24  already been victimized by asking for additional money to fund

25  the litigation with the entity in which they foolishly lost all

1  the money, all of that, put together, also provides the Court

2  with a showing of fraud.

3          And the schedules, we've established, are not

4  accurate.  The debtor's principal, Mr. Hughes, he has a history

5  of dishonesty in front of the Bankruptcy Court.  We -- he

6  cannot be trusted to really run this case as a fiduciary of the

7  creditors, of the debtor.  He can't be trusted to take -- to

8  pursue the possible fraudulent transfer targets in this case,

9  the insider entities in which he also has an interest.

10          The standard for -- the proper standard for

11  appointment of a Chapter 11 trustee is preponderance of the

12  evidence, and in support of that, I would cite the Supreme

13  Court case of Grogan v. Garner which is about a different

14  bankruptcy --

15          THE COURT:  I'm familiar with the case.

16          MR. BOMKAMP:  All right.  And in the alternative,

17  this case should be converted to Chapter 7 for cause.  And that

18  is undoubtedly a preponderance of the evidence standard.

19          And there's a further reason beyond all the

20  aforementioned things to convert this case to Chapter 7 for

21  cause, and that's that the debtor doesn't really have a way --

22  or at least hasn't demonstrated a way to go forward as a going

23  concern and to continue to operate its business.  The debtor

24  has litigation targets, perhaps, but it doesn't have a reliable

25  way to fund its continued existence.  And the only way the

1  debtor has right now to bring in money is to take these

2  downpayments to people and to reimburse people with those

3  downpayments, but that creates more victims at roughly a rate

4  of ten-to-one.  And so there's no reason beyond the fraud, the

5  dishonesty, and the gross mismanagement for this case to

6  continue as a going concern.

7        The -- in the alternative, there should be an

8  examiner appointed in this case, and I really don't favor that

9  alternative because of the layer of administrative expense it

10 would add to the case, but it -- the debtor does have over $5

11 million in liquidated debt as evidenced by the very precise

12 numbers set forth on the debtor's own spreadsheet, and surely

13 the many stories of harm that have been brought forward before

14 this Court would warrant an examiner, if a Chapter 7 or Chapter

15 11 trustee is not appropriate.

16       But we -- United States Trustee does believe that a

17 Chapter 11 trustee or Chapter 7 trustee is warranted at this

18 time because of the debtor's continuous collection of money

19 from its customers, even when it knew or should have known that

20 it couldn't fund loans, and it's warranted because the debtor

21 took that money and put it into an investment that the debtor's

22 own attorney, Your Honor, determined within an hour was an

23 obvious fraud based on publicly available sources.

24       Nothing further.

25       THE COURT:  Thank you.

1          Mr. Mickler?  Brief response.

2              CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

3          MR. MICKLER:  Thank you, Your Honor, and when you

4   look at the standards for appointing a trustee or converting

5   the case to a 7 as Trustee pointed out, you're looking at some

6   type of gross mismanagement or cause here.  And the question

7   is --

8          THE COURT:  I want you to, if you can, focus on why I

9   should not --

10         MR. MICKLER:  And I --

11         THE COURT:  -- invoke some trustee to come and take

12  over this business?

13         MR. MICKLER:  Well, that requires a finding by the

14  Court that there's been gross mismanagement.  And the question

15  that I've always had in looking at the evidence here is:  is it

16  gross mismanagement for someone to go out and try to make more

17  money through an investment after they've had an attorney

18  review this investment and tell them it's okay?

19         And that's really the genesis -- when you look at the

20  evidence that was before the Court for the last couple days --

21  that's really the genesis of this claim of gross mismanagement.

22  They took it to an attorney.  They were introduced to this

23  person.  They went out and tried to make an investment, took it

24  to an attorney, and they were given the okay.  So if that's

25  gross mismanagement, then sure, there's cause.  But we don't

1  feel that that's an appropriate standard for the Court to apply

2  to this instance.

3         What you see is after there's a realization that

4  there's trouble, two things continued to happen.  First, they

5  communicate to McMann that we're having problems with our

6  wholesale lender, our capital provider, and McMann keeps

7  funneling customers over to them, keeps giving out the wire

8  instructions where the money comes into Genie.  So you have

9  McMann perpetuating this problem without really any active

10  participation in that by Genie.  McMann's the one who's driving

11  the customers in.  McMann's signing them up.  McMann's got a

12  financial incentive to do that.  And they continue to do that.

13         The other part of that is we're talking about a very

14  brief period of time:  from December of 2022 until maybe the

15  early summer of 2023, about five or six months of time where

16  this problem kind of really became set in stone, where Genie

17  knew it couldn't correct it.  As you went along, why don't

18  you -- why don't you stop taking the money?  Well, we were

19  promised $10 million in this Scotiabank transfer.  Well, we

20  received $500,000 from Velanos in May, right in the middle of

21  the time period.  Well, here's another bank statement that

22  shows $9.5 million actually sitting in an account, and we were

23  trying to wire it to us.

24         So you have this -- and it's a sophisticated con.  It

25  really was.  It had all of the elements that would be required

 1  to fool someone who's been in lending and finance for many

 2  years.  And it served its purpose, which was to extract the

 3  $9 million from Genie and buy enough time during this six-month

 4  period where Genie felt like, okay, we can continue to lend

 5  money.

 6          So that standard of gross mismanagement, when you

 7  look at the real three things that were going on during that

 8  time period, why the Court should not appoint a trustee.

 9          They went out and sought an attorney.

10          McMann is really the driver of these loans that are

11  coming in, and really, as soon as Genie realized that there was

12  a problem, they stopped after six months, and they shut down

13  the lending, essentially, at that point.  They can pick it up

14  again at any time if Mr. Hughes' testimony is to be believed.

15          And I want to go beyond just what Genie did or didn't

16  do with respect to converting the case or appointing a Chapter

17  11 trustee.  I sat up here, and I'm a jerk.  I took these

18  victims, and I took them through their contracts, and I pointed

19  out, hey, you've got a real problem here.  This says it's

20  nonrefundable.  This other part says it's nonrefundable.

21          You know, eventually, appointment of a Chapter 11

22  trustee or a Chapter 7 conversion, these customers are going to

23  end right back up here with that trustee throwing that contract

24  in front of them, in front of the Court, saying I'm objecting

25  to your claim.  You signed this.  You're a sophisticated

1    businessperson.  You don't have a claim in this case.

2             And what Genie is offering to do at this point is to

3    look beyond that and say, we may not have a legal obligation.

4    In some cases, we owe McMann the money pursuant to the ICA

5    agreement.  In some cases, we can hold up our contract and say

6    we don't owe you any bridge interest.  We don't owe you any due

7    diligence money.  That's all in the evidence.  That's clear

8    signed contracts which say we don't owe you due diligence money

9    or bridge loan interest.

10            We've taken that and thrown it out.  We are going to

11   propose a plan that is going to pay everybody back in full.

12   These are disputed claims.  If they file a claim as required

13   under the Chapter 11 provisions, if they file a claim in the

14   case and it matches up with the amount that's on our money owed

15   spreadsheet, Genie intends to pay that money out through a

16   combination of many things -- not only as a going concern where

17   it's got loans maturing going forward, but --

18            THE COURT:  And those were previous loans --

19            MR. MICKLER:  Previous --

20            THE COURT:  -- that were already out there?

21            MR. MICKLER:  Previous loans in -- you know,

22   noninsider loans, $6 million or so, let's say.  So those are

23   real funds which are available as they mature for a going

24   concern.  There may be an opportunity to lend out more money

25   and start bringing in true loans in the future.  There is also

1  the opportunity for multiple lawsuits which would supplement

2  the going-concern money that's coming in.

3          So what they're asking, Your Honor, is that you don't

4  victimize these customers again by placing an examiner -- not

5  an examiner, but a Chapter 11 trustee or Chapter 7 trustee

6  who's really going to go after these customers based on the

7  contractual language.

8          We're going to look past that.  They're going to work

9  for free.  There's no 25 percent to a Chapter 7 trustee.

10 There's no tremendous hourly rate for a Chapter 11 trustee to

11 come in and liquidate these things.  All of those

12 administrative costs are another reason why this Court can look

13 at this company, these two people, and say that this is a

14 better alternative than putting these customers through what's

15 surely going to happen.

16         And I'm -- you know, they're never going to believe

17 me, the customers.  They'll never believe it in a million

18 years, but I am as much an advocate for them as I am for Genie

19 because I see what's coming down the road for them if a Chapter

20 7 trustee or a Chapter 11 trustee starts objecting to a lot of

21 these due diligence and bridge interest claims which come in.

22         So we want to make that an impossibility.  They've

23 told me that they are going to propose a plan which is 100

24 percent, will not file a plan in this court that's less than

25 100 percent of filed claims, and we're going to make our best

1  efforts to pay people back.

2          THE COURT:  Thank you.

3          MR. MICKLER:  Thank you.

4          THE COURT:  Gentlemen, you're not making it easy on

5  me.  I'm going to take a few minutes.  I have notes all over

6  the place.  I'm probably not as good at it as Judge Glenn was

7  because he was on the bench for like 25 years.  But I'm going

8  to take some time up here.  I'm going to get my notes gathered

9  together, and I'm going to rule here today.

10          Everybody was great.  The -- everybody on Zoom

11  testified wonderfully.  Both of you gentlemen testified very

12  well.  Everybody on the screen and everybody here seemed very

13  credible.

14          We've got a lot of -- a lot -- I've never seen the

15  United States Trustee, at least in my division, bring in boxes

16  and boxes and boxes of exhibits.  Mr. Bomkamp, you've done a

17  wonderful job.

18          Mr. Mickler, it's a tough case.  You jumped into it

19  late.  It's never easy jumping into a case late.  I've done it.

20  I've hated it.  I only did it under very rare circumstances,

21  and you've done an amazing job putting forth the best defense

22  you could have to this motion.

23          So while I'm taking my notes and putting things

24  together, feel free to run around, go in and out of the

25  bathroom.  It's going to take me a little while to get this

```
 1  together, but I'd like to do it right here because this is

 2  where all my stuff is.  All right?

 3              So we'll take an official recess until I tell you

 4  we're ready.  All right?

 5              MR. MICKLER:  Yes, Your Honor.  Thank you for your

 6  time.

 7              THE COURT:  And y'all can run around.  You don't have

 8  to make sure you're here.  Go right ahead.

 9       (Recess taken at 2:43 p.m.)

10       (Proceedings resumed at 3:11 p.m.)

11              THE COURT:  Well, this is a close case.  This is a

12  tough case.  We've got great attorneys on both sides.  I've

13  bragged about you both earlier.  Mr. Mickler, you were -- you

14  came in late to try to clean up a mess because any pro se

15  filing is always a mess.

16              Mr. Bomkamp, you represent interests far greater than

17  yours, and you've done it very well.  I've never personally

18  seen you with that many boxes, and I don't take that lightly,

19  and I don't say it jokingly.  I've joked a lot during this

20  hearing, not that this is not a very serious hearing with very

21  serious consequences, but to help move the case along.  And I

22  appreciate both parties, both sides.

23              You picked a good attorney.  You certainly did, and

24  he's put forward the best case he can for you.

25              And Mr. Bomkamp, you always do a wonderful job, so I
```

1 | appreciate that.

2 |        Yesterday -- yesterday was terrible, and yet it was

3 | wonderful at the same time.  I value all the testimony that was

4 | taken yesterday.  I find every witness that testified yesterday

5 | very credible.  There are no winners in this situation.  I have

6 | inherited a terrible situation where everyone, including the

7 | debtor, is a loser, meaning you haven't made any money.  You've

8 | lost money.  It's a terrible situation.  And I'm stuck with it,

9 | and we've got to resolve it.  I don't see any winners,

10 | certainly not on Zoom.

11 |        I also find Mr. Hughes' testimony very credible.  I

12 | was afraid you were going to come in and take Mr. Mickler's

13 | approach of dissecting and killing the potential victims, but

14 | you didn't.  You came in, you immediately took the stand, and

15 | you apologized for what had happened.  You -- I don't want to

16 | say the word bad, but you manned up.  You said, hey, look.

17 | We've done wrong and we want to do it right.  So I'm going to

18 | find that very credible.  I believed you.  You convinced me.

19 |        You said you were going to propose a plan that paid

20 | 100 cents on the dollar.  You said you're going to do

21 | everything possible to do that.

22 |        Regarding the appointment of a trustee, though, I'm

23 | troubled.  I'm very troubled by this case, by the beginning of

24 | the case and what happened before the case.  But Mr. Mickler

25 | brings a good point.  The appointment of a trustee or the

1    conversion to a Chapter 7 I'm not sure benefits anyone at this

2    time.  It adds a layer -- not one layer of administrative

3    expense where there's a trustee fee, but a second layer that

4    the trustee will have to hire counsel, and that counsel will be

5    paid.

6             Mr. Mickler brings up a good point.  Contracts are

7    what they are.  Are there defenses to contracts?  Sure.  Does

8    it cost money to litigate contracts?  Sure.  Right?  So any

9    trustee worth his weight in gold or her weight in gold will

10   come in, analyze the contracts, and may potentially sue or

11   countersue or object to claims of potential victims.  It's a

12   great point, not to mention the administrative expense, which I

13   just said.

14            But again, I'm -- I highly considered it, and I

15   stayed up last night thinking about it, and the testimony today

16   really helped me with that because the speculative nature of

17   the investment on top of the large transfers to insiders and

18   affiliates after problems occurred -- maybe not when you were

19   100 percent insolvent, but certainly when there were tea leaves

20   blowing a certain way that there were problems, those two

21   things kept me up last night because those are terrible things

22   together.  Separately, it's probably okay.  Right?  But we've

23   got two of them.

24            But for now, I find that the U.S. Trustee has failed

25   to meet their burden for the appointment of a Chapter 7 trustee

1  or a Chapter 11 trustee, and I mean for now because I'm not

2  done.

3         However, there's just too much evidence, and it's

4  undoubtedly in the best interest of the estate to appoint an

5  examiner in this case.  One, I think it's mandated because it

6  says once I determine it's in the best interest of the estate,

7  I shall appoint a trustee.  And I undoubtedly, based upon the

8  evidence presented before me, including the testimony of

9  everyone we heard today and yesterday, will appoint an examiner

10  under 1104(c)(1) because I find it is in the best interest of

11  the estate, and once I made that finding, I shall appoint the

12  examiner.

13         But just to be safe, additionally -- again, I'll take

14  Mr. Hughes' testimony as truth.  He first testified that Genie

15  will pay back 100 cents on the dollar to everyone that they

16  took money from.  He constantly referred to them in his

17  testimony as customers and/or clients.  He then later testified

18  that the Walker letter, in his opinion, made nonrefundable

19  obligations refundable and that the reward program that was

20  admitted into evidence clearly shows that they believed at some

21  point that they owed this money.

22         Now, based upon the Hughes testimony and the

23  wonderful spreadsheet prepared -- now, I'm not going to

24  consider it where it said refundable.  Even ignoring that --

25  even ignoring that, the records of the amount due and owing

1    were impeccable.  They were perfect.  They couldn't be argued.

2    It showed -- and Mr. Hughes testified -- that they believe they

3    owe between 9.7 million and 15 million depending on how you

4    looked at it.  All right?  That's clearly laid out in that

5    spreadsheet, as well as Mr. Hughes' testimony.  I find those to

6    be liquidated.

7            Now, they may be disputed.  They may be rightfully

8    disputed.  They may be crazily disputed.  However, I have

9    already dealt with that in my opinion, In re: Hall.  That's at

10   650 B.R. 595.  I looked at a very similar situation, and I went

11   into very great detail about why, when there's a contract

12   involved, debts can be liquidated, even if they're disputed.

13           And I look at 1104, and I look at (c)(2), and it

14   says, the debtor's fixed, liquidated, unsecured debts, if they

15   exceed five million, I shall appoint an examiner if I don't

16   appoint a trustee.  It says "shall".  It doesn't say I can or I

17   may.  It says I shall.  And it doesn't say anything about

18   disputed, so I don't exclude disputed debts.

19           So I find, based upon the admission of Mr. Hughes, as

20   well as the impeccable records of Genie regarding the amounts,

21   I have to appoint a trustee or an examiner under 1104(c)(2).

22           And again, that's consistent with a very good case,

23   In re: FTX from the Third Circuit that's at 91 F.4th 148.  And

24   they went into the language of 1104(c)(2) and why it's mandated

25   that if your debts exceed five million in liquidated -- again,

1  ignoring disputed -- that I must appoint an examiner.

2        And I think that's important in this case because the

3  examiner does something that the debtor-in-possession can't and

4  that even a creditors' committee can't.  They're a completely

5  disinterested person that investigates what I tell them to

6  investigate, and the most important thing about it is their

7  findings are public.  They put them on the docket.  People can

8  read them.  Everybody that testified yesterday, people sitting

9  in this courtroom, will have those findings.  And it will be

10  clear from a neutral third party what happened, because we all

11  need answers.  All of us.  And it's either going to clear you

12  100 percent or it's going to sink the ship.  So once that

13  examiner gets the report in, we're either home free or here

14  comes a new motion to appoint a trustee.

15        And that is so important in this case because I

16  believe you, Mr. Hughes.  I believe you.  I believe that you're

17  going to do the best you can to get everybody paid back.  But

18  they need answers.  That's a lot of money.  I mean,

19  Mr. Patel -- I don't know how Mr. Patel has survived.  I don't.

20  I don't know how he's made it.  And that's just picking one.

21  That just happens to be the biggest one I remember.  And all of

22  these people have suffered.  They've went into their own

23  bankruptcy cases.  They may have to go into their own

24  bankruptcy cases.  So they need answers.  And if an examiner

25  comes in and says I don't know who this McMann guy is, had

 1  nothing to do with Genie, that closes the loop for them.  It

 2  should give them the satisfaction that the Court has went above

 3  and beyond to try to figure out what went wrong.  So you should

 4  want that as well.

 5          Sorry, I'm fired up.  I haven't written this much

 6  since the bar exam, probably.

 7          So here's what I'm going to appoint the examiner to

 8  investigate.  Now, it can be amended or changed if somebody

 9  feels like it needs to be investigated more, so if one

10  investigation leads to something else that leads to something

11  else, any party-in-interest can certainly move to do that, but

12  for now, I find that the examiner should investigate -- they

13  should look into the alleged fraud including but not limited to

14  the following:

15          The connection, if any, between the debtor or its

16  affiliates and McMann and its affiliates.  That's the number

17  one thing on the examiner's list.  What connection, if any, the

18  debtor's affiliate -- the debtor and its affiliates have with

19  McMann and its affiliates.

20          Two, the alleged fraud agreement with Velanos.  That

21  should help you in your future case.

22          The connection and transfers between the debtor and

23  any affiliates or Genie's entities, including I think I saw a

24  $5.6 million transfer on May 5th, and it was noted "Genie

25  entities".

1          It should also investigate any transfer between

2   debtor, directors and officers, or insiders and affiliates for

3   two years.

4          And I think that should cover it because we don't

5   want to run up costs too much because that money needs to go to

6   whoever it needs to go to.

7          That gives us one additional layer of administrative

8   expense that's not ideal.  But it doesn't give us two

9   additional layers of administrative expense, and it doesn't rip

10  the power of the company from you at this time.  But it gives

11  answers to the people on Zoom, and they deserve answers.  And I

12  can't make heads or tails out of it.  There's been a lot --

13  there's boxes of evidence.  And I don't know the connection.  I

14  can't tell what the connection is.  Hopefully, the examiner

15  will tell us.

16         Mr. Bomkamp, I have personally never had an examiner

17  appointed.  What do you need from me?

18         MR. BOMKAMP:  Your Honor, you would enter an order

19  directing the United States Trustee to appoint an examiner to

20  investigate the debtor's conduct including the aforementioned

21  issues, Your Honor.

22         THE COURT:  That's what I thought.  And it needs to

23  happen quickly and expeditiously.

24         MR. BOMKAMP:  Yes, Your Honor.  And one issue, of

25  course, an examiner can't go get money, and the debtor is

1  pretty empty right now.  It would be incumbent upon the

2  debtor's principals to pay the examiner's fees.

3           THE COURT:  If they want to continue to survive.  I

4  mean, the alternative is it goes administratively insolvent and

5  the case must convert.  But I'll leave that to the debtor.

6           MR. BOMKAMP:  Yes.  Yes, Your Honor.

7           THE COURT:  So I would entertain a motion of any

8  examiner for a -- just like Mr. Mickler did -- a post-petition

9  retainer.  But that's up to them.  But if it goes

10  administratively insolvent, that answers all the problems

11  because it converts.

12           MR. BOMKAMP:  Yes, Your Honor.

13           THE COURT:  Anything else, Mr. Bomkamp?

14           MR. BOMKAMP:  Your Honor, one issue that's creeping

15  up in this case, we just got schedules.  We just got a 20

16  largest list, and the -- I believe the claims bar date as set

17  by the Court is May 1st, 2024.  And I think it might be

18  warranted in this case to extend the claims bar date.

19           THE COURT:  I would entertain that motion.

20           MR. BOMKAMP:  Yes, Your Honor.

21           THE COURT:  Please paper it up.

22           MR. BOMKAMP:  Yes, Your Honor.

23           THE COURT:  Anything else?  I know it's not the

24  result you wanted.

25           MR. BOMKAMP:  Would -- will the Court prepare the

1   order or --

2           THE COURT:  We'll prepare the order.

3           MR. BOMKAMP:  Yes, Your Honor.  And your second point

4   pertained to the alleged connection -- or it was something with

5   Velanos.  I didn't catch the words.

6           THE COURT:  The alleged fraudulent agreement with

7   Velanos.

8           MR. BOMKAMP:  Okay.  Thank you, Your Honor.

9           THE COURT:  Mr. Mickler, I know this isn't the result

10  you wanted, either.  I think somehow I've determined and

11  allowed both parties to lose.  Anything from you?

12          MR. MICKLER:  No, Your Honor.  I appreciate the

13  Court's time.  My only thoughts were related to, Mr. Bomkamp

14  had said it, how that plays into a plan that needs to be filed.

15  So I'd be happy to consent to any type of claims deadline

16  extension so that these people can get their claims in, and

17  we'll set up the plan immediately after that.

18          THE COURT:  Any date you have in your mind to save

19  costs?

20          MR. BOMKAMP:  I thought an additional 60 days, Your

21  Honor.

22          THE COURT:  I think that --

23          MR. BOMKAMP:  Or to make it an even --

24          THE COURT:  Well, I like dates.

25          MR. BOMKAMP:  July 1st, perhaps.

1          THE COURT:  Any objection to a claims bar date of

2   July 1st?

3          MR. MICKLER:  That would give plenty of time, Your

4   Honor.

5          THE COURT:  Your ore tenus motion to push the claims

6   bar date up and through July 1st of 2024 is granted.  If you'll

7   prepare the appropriate order?

8          MR. BOMKAMP:  Yes, Your Honor.

9          THE COURT:  Anything else, Mr. Mickler?

10          MR. MICKLER:  No, Your Honor.  Thank you.

11          THE COURT:  You both did a great job.  And again, I

12   want to express all of my appreciation for everyone in here, as

13   well as via Zoom, that has dedicated so much time to this

14   trial.  I wanted to get this dealt with very expeditiously, and

15   I think we were able to get that accomplished.

16          Good luck to you, and get to work.  This hearing is

17   concluded.

18          MR. MICKLER:  Thank you, Your Honor.

19      (Proceedings concluded.)

20                          *  *  *  *  *

21

22

23

24

25

1                    **C E R T I F I C A T I O N**

2

3          I, Alicia Jarrett, court-approved transcriber, hereby

4  certify that the foregoing is a correct transcript from the

5  official electronic sound recording of the proceedings in the

6  above-entitled matter.

7

8  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

9

10

11  _____

12  ALICIA JARRETT, AAERT NO. 428     DATE: May 6, 2024

13  ACCESS TRANSCRIPTS, LLC

14

15

16

17

18

19

20

21

22

23

24

25