UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE: GENIE INVESTMENTS NV, INC.

CASE NO.: 3:24-bk-00496-BAJ

Debtor (s).

_____/

**OPPOSITION TO SECOND MOTION TO APPOINT CHAPTER 11 TRUSTEE OR IN THE ALTERNATIVE, APPOINT AN EXAMINER, DISMISS THIS CASE OR CONVERT THIS CASE TO CHAPTER 7 FILED BY UNITED STATES TRUSTEE**

GENIE INVESTMENTS NV (GENIE or Debtor), in opposition to the above-referenced motion filed by United States Trustee (Doc. No. 154), states:

**INTRODUCTION**

GENIE vehemently disputes the factual and legal basis upon which the Trustee relied in its Second Motion to Appoint a Trustee or Convert this case. The Trustee's Motion makes no attempt to justify the appointment of a Trustee except by recitations of selected portions of the Examiner's Report. As seen below, the Report by the Examiner was flawed due to the incorrect financial assumptions and speculative nature of any future actions by GENIE and/or its Principals.

On March 5, 2024, the U.S. Trustee (Trustee) filed it's first Motion in this case seeking various forms of relief, including appointment of a Chapter 11 trustee. In that motion, the Trustee has falsely asserted that Genie was a fraudulent enterprise that "simply stole" money from its customers and other ostensible creditors and invested $9.0 million of "other people's money" in an "obviously suspect" transaction. See Doc. 20 ¶¶ 16-17. The Trustee based these false allegations solely on the misguided statements of 18 small-business owners. Following a two day trial on the motion, the Court granted only the request to appoint an Examiner.

1

The Trustee subsequently selected and appointed an Examiner. After a lengthy investigation, the Examiner issued a Report. According to the UST, the Examiner's Report ("Report") (Doc. 146) fully supports the UST's earlier allegations. The Trustee then filed it's Second Motion to Appoint a Chapter 11 Trustee or Convert at Doc. No. 154 and claimed that the Examiner's Report showed that an appointment of a Trustee or conversion to a Chapter 7 would be appropriate. Nothing could be further from the truth.

The Trustee has relied upon the findings of the Examiner without any inquiry into the veracity of the Report. The Report is rife with inaccuracies, unsupported conclusions, and omissions of material and pertinent evidence. Among other things, the Report inaccurately describes fundamental aspects of Genie's business. It falsely states, for example, that Genie required a borrower seeking a Business Expansion Line of Credit ("BELOC") to enter a separate Due Diligence Agreement and that, "In some instances, borrowers paid McMann [Commercial Lending] an upfront initial application fee related to a loan with Genie NV." Report ¶¶ 20, 37. In addition, despite noting that fees charged pursuant to the Due Diligence Agreement were non-refundable, the Report improperly conflates the BELOC Agreement and Due Diligence Agreement by stating that customers whose BELOCs were not funded "did not receive a refund of their Due Diligence Fees or ICA funding." Report ¶ 38.

The Report contains numerous other errors, many of them attributable to the Examiner's decision to ignore foundational documents (e.g., contracts) and other evidence that would be crucial to any reasonable analysis. As a result, the Report persistently mischaracterizes Genie's operating history, revenues, management, the terms of its relationships with borrowers and business partners, and its future prospects. This taints the entire Report and undermines the instant motion. The Trustee's Motion simply cherry-picks snippets that support the appointment of a

Trustee without bothering to determine whether the Examiner correctly based such passages on relevant documentary evidence or analysis.

The UST's false insistence that the Report "confirms" key allegations from its initial motion shows that the Trustee's investigative and analytical rigor is lacking due to the numerous errors and omissions contained in the Report. This is most notable in connection with the UST's allegations of fraud. At the very outset of its motion, the Trustee claims that the Report "confirms" that a trustee "must be appointed in this case because the Debtor engaged in fraud and gross mismanagement…" Second Motion, at 2. But nowhere in the 51-page Report is there any finding or conclusion that Genie engaged in fraud. The Trustee simply invented this "confirmation" and attributed it to its hand-selected Examiner.

## I. THE BELOC AGREEMENT MAKES CLEAR THAT ICA PAYMENTS RECEIVED BY GENIE WERE NOT REQUIRED TO BE HELD IN TRUST AND THEREFORE DID NOT CONSTITUTE "CUSTOMER FUNDS."

Much of the Report proceeds from a false premise: that Genie was required to hold ICA Payments in trust for the borrowers who paid them. It is indisputable that the BELOC Agreement between Genie and its borrowers governs what ICA Payments are and how they are treated. Nowhere in that agreement does it require or suggest that ICA Payments will be held in escrow or in trust. The Report and the Trustee's Motion offer no analysis of the relevant portions of the BELOC Agreement to support the above allegation.

The Report instead cites an email, a demand letter, and a borrower affidavit as support for the perfunctory conclusion that ICA Payments remained "customer funds" after their receipt by Genie. Report ¶¶ 81, 39, 82. It should go without saying that the opinions of interested parties cannot override the unambiguous language of a written contract. As already noted, the Report simply ignores the actual contract language. Worse yet, the Report attempts to support its flawed

premise by inventing and repeating improper terminology – i.e., "ICA reserves" and "ICA deposits" – despite the fact that those terms never appear in the BELOC Agreement in connection with ICA Payments. *See, e.g.*, Report ¶¶ 25, 29, 39, 77, 79, 80. In this way, Genie is no different from a retail store or service provider which promises refunds to unsatisfied purchasers. Nordstrom and Wal-Mart do not have to set aside money received from customers until all opportunity for a refund has passed and neither did Genie. Thus, the funds Genie received in the form of ICA Payments were its own funds, not "customer funds," as the Examiner asserts.

This shoddy methodology results in a fatally flawed Report. Because Genie was never required to hold ICA Payments in trust for customers, those payments constituted revenue realized by Genie much like any other business which takes in customer money and later issues refunds from a pool of revenue. The possibility that ICA Payments could later become refundable does not change the nature of the transaction or the contractual language.

Based on the wrongful interpretation of the contractual obligations by the Examiner, the Trustee continued to ignore the relevant contractual language when its motion stated that the Examiner, "*found* that the purpose of the ICA funds was to pre-pay interest amounts on customer loans." Second Mot., at 5 (¶ 11) (emphasis added). Discerning the "purpose" of ICA Payments[1] is, however, purely a matter of contract interpretation. Because the instant motion does not address the relevant contract language or question the wrongful conclusion of the Examiner, it offers no basis for determining that Genie had an obligation to hold ICA Payments in trust as customer funds.

---

[1] The term "ICA funds" is a misnomer – that phrase never appears in the BELOC Agreement – and presumably refers to "ICA Payments."

4

## II. THE REPORT EXCLUDES EVIDENCE THAT GENIE HAD A GOOD-FAITH BELIEF, BASED ON GUIDANCE AND ADVICE FROM A REPUTABLE LAW FIRM, THAT THE VELANOS TRANSACTION WAS A SOUND INVESTMENT.

In October 2022, Genie received an offer to enter into a joint venture with Velanos Principal Capital (Velanos). The proposal called for Genie to provide $3.0 million in capital that Velanos, the joint venture's manager, would use to purchase and sell standby letters of credit (SBLCs) at a substantial profit. Before deciding whether to accept the offer, Genie engaged Scott Oh of Warren Law Group (WLG) to perform due diligence on the proposed deal, advise Genie on risks associated with it, and, if necessary, review and revise the joint-venture agreement. According to WLG's website, Oh "often advise[d] and facilitate[d] his clients in identifying, analyzing, and structuring…private placement opportunities, joint ventures, and other private capital transactions, conventional/unconventional asset-based credit facilities, credit enhancements, and corporate debt transactions."

Oh represented Genie from October 2022 to July 2023. During that time, he regularly consulted with Genie about the joint venture, reviewed multiple amendments to the Joint Venture Agreement, and communicated frequently with Velanos on Genie's behalf. At no time did Oh express to Genie any concern that the joint venture was fraudulent. In fact, Oh advised Genie that SBLC trading was legitimate and that he was familiar with at least one person for whom Velanos and/or its CEO syndicated. In late 2022, when Genie twice increased its capital contribution to the joint venture to a total of $9.0 million, Oh did not advise Genie against doing so. And when Velanos failed to make the payments required under the Joint Venture Agreement, Oh never told Genie that Velanos' various excuses were dubious.

Although the Report states that the Examiner reviewed WLG's bank records, it does not appear that the Examiner interviewed Oh or WLG regarding the substance of Oh's work for Genie. The Report castigates Genie for entering into the joint venture with Velanos but does not

acknowledge that Genie hired a professional to apprise it of risks and concerns raised by the joint venture. Instead, the Examiner lays all the blame for the Velanos transaction at the feet of Genie and simply concludes that Genie's decision to enter the joint venture constituted "gross mismanagement." The Trustee not only seizes on this incorrect conclusion, but expands on it, stating that "Debtor engaged in gross mismanagement, *at a minimum*, in its dealings with Velanos…" Second Mot., at 2.

### III. THE TRUSTEE CANNOT MEET ITS BURDEN OF DEMONSTRATING THAT GENIE'S LOANS TO AFFILIATED ENTITIES CONSTITUTED EITHER FRAUD OR GROSS MISMANAGEMENT.

The Trustee starts its argument by stating that the transfers to the insider entities are presumptively fraudulent despite there being no financial backing to support such a premise. See Doc. No. 154; Page 7 of 13; Subsection A. The Trustee's argument is devoid of any financial information save for the value of the insider loans made by GENIE in the amount of $3,697,681.00 See Page 5 of 13. No court has conducted a trial or any analysis to determine whether those loans should be avoided under section 548 at this point. Asking the Court to appoint a trustee only because a trustee *might* be expected to pursue some transfers that *might* be avoidable is premature and not supported by any findings of actual fraud committed by GENIE.

Instead, the Trustee recites the "badges of fraud" often employed by Federal courts in determining, for purposes of 11 U.S.C. § 548, whether a debtor "intended to hinder, delay, or defraud" creditors. The UST's motion only addresses some of those factors, however, and does so in an extremely cursory fashion. Nonetheless, the Trustee declares that all of the alleged badges of fraud are present in the affiliate-loan transactions.

The only "badge of fraud" correctly noted by the Trustee is that the underlying transactions were to insider corporations. GENIE did not, as the Trustee alleges, retain control over the funds

after transferring them; the recipients used those funds for legitimate business purposes. Nor did GENIE conceal any of the transfers but, in fact, documented them in writing, recorded them in its books, and disclosed them in its initial Chapter 11 filings and subsequent amendments.

The Trustee asserts that "Debtor's funds were transferred (1) to insiders or affiliates; (2) while the Debtor was being sued or under threat of suit for failing to fund loans…" Second Mot. ¶ 19. This is statement is false and ignores the undisputed facts that have been testified to and supported by documentary evidence at trial. The affiliate transfers identified in the Report were all made pursuant to loan agreements executed in September 2022. At that time, Genie had successfully funded dozens of loans, had never failed to issue a properly requested refund of an ICA Payment, had not agreed to contribute any money to the joint venture with Velanos, and had never been sued or threatened with suit related to an alleged breach of a BELOC Agreement.

Further, as detailed in the Report, these transfers happened piecemeal over the course of many months, with nearly all of them taking place between September 2022 and July 2023. Report, Exh. 4, ¶¶ 147, 159. The schedules contained in the Report show that nearly all of Genie's transfers to affiliated entities occurred before Genie was insolvent, before it had any reason to believe that it would soon become insolvent,[2] and before any putative creditor had sued Genie or threatened suit against it.

Conveniently, while examining the insider transactions, the Trustee ignores the value of the underlying GENIE loan portfolio of approximately $4M in non-insider loans that existed on the date of the transfers, the $15M settlement against Velanos and other related claims against former attorneys for GENIE related to the Velanos transaction that could result in recovery of $1M as

---

[2] As discussed above, Genie had a good-faith belief until at least July 2023 that it would shortly receive a payment of at least $9.5 million from Velanos pursuant to the Joint Venture Agreement.

estimated. This nearly $20M in assets is not mentioned in relation to the alleged fraudulent transfers badges as listed by the Trustee. There is also no evidence that the insider loans will not be paid back to GENIE.

The Trustee further alleges that Genie transferred funds to affiliates "for less than the equivalent value based on the non-market nature of the loans." Second Motion ¶ 19. In doing so, the Trustee fails to note that each of the loans at issue requires repayment in full of the loan's principal amount and that the loans are not forgivable.

It is common in any industry that shareholder loans are made to insiders on favorable terms and later repaid with minimal interest. See https://www.walzgroupcpa.com/post/how-to-avoid-tax-pitfalls-when-making-corporate-loans-to-shareholders/ (discussing "when a corporation loans money to a shareholder at what the tax law considers an inadequate interest rate — meaning below the applicable federal rate (AFR) — additional interest generally must be "imputed" under the below-market loan rules set forth in the federal tax code.") The insider or corporate entity may face an additional tax consequence as a result of the below market loan rate charged, but such a low rate in no way makes the loan fraudulent from a tax perspective. The Examiner (herself a CPA) never bothers to discuss such tax issues in her Report. Instead, the loans are immediately described as potentially avoidable due to the low interest rate charged.

Moreover, even assuming that the loan terms were more favorable than the affiliate borrowers could have found elsewhere, this fact alone cannot prove that Genie received less than "reasonably equivalent value" in exchange for the money lent. When evaluating the value received in exchange for allegedly fraudulent transfers, Courts recognize various "indirect" benefits – i.e., benefits that may not be easily reduced to a specific dollar value. Here, the indirect benefits of the affiliate loans are real and were shared with the Examiner. Zoomeral, for example, used the funds

borrowed from Genie to hire programmers to improve its software platform, which was central to Genie's communication with potential borrowers, ongoing client management, education, reporting, and data storage and to create an advertising campaign. Genie reasonably expected these improvements to Zoomeral's technical abilities would result in increased growth and better overall customer experience for Genie.

Finally, the Examiner pointed out that a $5M refund payment was made to 1P Ventures, LLC in May of 2023. See Examiner Report at page 28. The Examiner has attempted to portray that customer refund as further evidence of fraud by stating, "We have been unable to locate a corresponding deposit in the amount of $5,000,000 for 1P Ventures, LLC. According to Cohan and Hughes, this investor is related to Paul Kirkoff, who connected Genie NV to potential borrowers. According to Cohan, "In some instances, entities were created for the purposes of our program. It was very common for companies to send in their funds from a different company that they own or from a personal account. They also sometimes received their refunds in different accounts as well." Examiner Report pages 28-29.

This is simply another example of the Examiner reaching a conclusion by either ignoring facts or fabricating facts in order to justify that conclusion. Again, the Trustee has failed to investigate or even question the motives and/or facts related to the conclusion by the Examiner. In the case of 1P Ventures, the customer by the name of DC1 Labs is Yumi, 1P Ventures and Caer Inc. DC1 Labs deposited $5M into the account of Genie at Chase Bank (Genie Investments NV Chase ***8502). The Examiner was provided with the corresponding contract for the -payment of $5M from 1P Ventures, LLC (Through DC1 Labs) to substantiate the fact that this refund was a legitimate customer refund and not an indication of fraud as alluded to by the Examiner. Genie has no connection to DC1 Labs, 1P Ventures, Plutus or any of the individuals associated with those

9

entities.

## IV. GENIE IS THE ONLY ENTITY THAT WILL BE ABLE TO PURSUE VELANOS WITHOUT INCURRING EXCESSIVE ADMINISTRATIVE COSTS.

Pending before the Court is the Debtor's Motion to Approve the Velanos settlement in the amount of $15M (Doc. No. 107). The settlement was the result of almost two years of effort and litigation by the principals of GENIE and its legal team to recover $9.0 million that GENIE had transferred to Velanos in 2022.

In hindsight, Genie determined that the Velanos transaction was a fraud, but that was not evident to GENIE or its Directors in 2022. GENIE had enlisted a reputable attorney and firm to conduct due diligence related to the transaction. GENIE then took extraordinary steps to attempt to recover the funds from Velanos during 2023 and 2024. The steps taken by GENIE have resulted in a secured $15 million settlement with Velanos. Moreover, the settlement agreement provides various incentives for Velanos to comply, including that Velanos stipulated to a $20 million arbitration judgment, which GENIE shall have the right to enforce in the event Velanos defaults on its payment obligations. None of the above was given more than a cursory dismissal by the Report.

The settlement agreement requires Velanos to make an initial installment payment of $50,000.00 upon signing. That payment was made to Genie. The initial payment was to be followed by quarterly payments of significantly larger amounts beginning June 30, 2024. Velanos recently made the second installment payment in full, bringing its total settlement payments to date to $550,000.00. The third installment, in the amount of $1,000,000.00, is due by September 30, 2024.

Moreover, the Settlement Agreement would be voided if the Court appointed a Chapter 11 Trustee or converted the case to a Chapter 7 case. Paragraph 15 of the Settlement Agreement states:

> Pendency of Bankruptcy Proceedings. The Parties acknowledge that this Settlement Agreement is contingent upon the approval of this Settlement Agreement and confirmation of the Genie Chapter 11 plan in case number 3:24-bk-00496-BAJ pending in the Middle District of Florida Jacksonville Division of the United States Bankruptcy Court. To the extent that there is a Trustee appointed in that bankruptcy case, the Settlement Agreement is not approved by the Court, and/or Genie's Chapter 11 Plan is not confirmed with the essential terms of this Settlement Agreement incorporated into such confirmation, then the Settlement Agreement shall be voided as to any remaining obligations by all parties.

*See* Doc. No. 107; Page 15 of 18.

Any Chapter 11 or Chapter 7 Trustee would have to start the entire Velanos litigation over if the court granted the relief requested in the instant motion based on the above explicit contractual language. Doing so would take significant time and would involve enormous administrative expenses charged to the bankruptcy estate – all with no guarantee that the trustee would obtain a favorable result, much less an outcome as favorable as the settlement agreement already in place. To date, the Chapter 11 estate has already incurred nearly $200,000.00 in administrative costs for examiner fees, creditor committee fees, and related expenses. Any further increase in the costs of administration would greatly diminish the prospective recovery of any creditors of the estate.

In contrast to the above, GENIE has already recovered the $15M sum from Velanos and has agreed to continue to work on any pursuit of assets from Velanos for no salary during the course of the Chapter 11 Plan.

**V.    GENIE HAS A VIABLE PLAN FOR REORGANIZATION UNDER CHAPTER 11.**

Genie has a viable reorganization plan to repay 100% of all legitimate creditors' claims in this case. Genie would fund this plan with (1) the $8 million currently in its loan portfolio, (2) the $15 million settlement with Velanos, payable in quarterly installments through June 2026, and (3) any recovery obtained in a malpractice claim against GENIE's former attorney. These sources are more than sufficient to fund the legitimate claims, which total approximately $9 million, and Genie

11

expects that the creditors would be paid in full within thirty-six months of any confirmation based on the Velanos payment schedule and other avenues of recovery.

Moreover, Genie will emerge from Chapter 11 as a sound and profitable business. Although the Trustee alleges that Genie "does not have a legitimate business model" and, therefore, is not a legitimate business, *see* Doc. 20 ¶¶ 26, 29, this allegation relies on inaccuracies in the Report and speculation. The Report states, for example, that Genie's "principals have failed to obtain third party funding which they admit is required for operation of [Genie]," but this is false. As Genie's principals informed the Examiner, they financed several loans using third-party funding in 2021 and 2022.

The Report also states, "It is unlikely that future borrowers…would enter into a lending relationship with [Genie] after the substantial amount of reputational damage" done to it. Report ¶ 225. This is pure speculation and entirely inaccurate. In recent weeks, multiple former borrowers – who are fully informed about the ongoing bankruptcy and the events that led to it – have contacted Genie about borrowing substantial amounts of new funds. In addition, Genie's Principals have access to an extensive database containing tens of thousands of family offices, accredited investors, and other potential sources of funding for future loans.

The Trustee's most egregious statement regarding Genie's future viability is that its "only business consists of taking deposits from customers and using those deposits to fund loans." This, as discussed in Section I, is simply incorrect. Such a statement ignores the clear contractual language of the BELOC Agreement in order to allege that Genie took "deposits" from customers.

The Report makes a speculative assertion that a trustee may be necessary to "pursue avoidance of *potential* preference actions and *potential* fraudulent transfers against insiders to maximize recoveries for the creditors of the estate." Report ¶ 234. This, too, is built on a host of

incorrect assumptions and unwarranted conclusions. For example, it assumes that the total dollar amount of claims filed in this case -- $30.9 million – is accurate. Report ¶ 226. It is indisputable, however, that many creditors have filed inflated claims that include alleged speculative damages. Such speculative damages are never appropriate in a Chapter 11 claim. The prime example of this is Claim 5 of Blake Stringer. After originally filing a claim for $400,000 – the amount of funds he provided to GENIE prior to its Chapter 11 petition, Stringer recently amended his claim to over $14 million based upon unsupported documents alleging a loss of value in the sale of his real estate. There are multiple other examples of speculative and inflated claims that the Debtor has filed objections to which have no basis in any financial reality. In short, a single individual's wildly inflated claim, which accounts for nearly half of the $30.9 million total claimed against the bankruptcy estate, is self-evidently invalid. Yet the Examiner and the Trustee rely on these fanciful figures to denigrate Genie's ability to pay legitimate claims and emerge from reorganization as a viable business.

## CONCLUSION

The Trustee and the Examiner have both endeavored to portray GENIE in the worst possible light by alleging that GENIE willfully committed fraud against it's customers. This is entirely untrue and based upon no sound financial data. Instead, GENIE filed this case in good faith as an attempt by GENIE to pay back 100% of its obligations to customers and other parties affected by a fraud perpetrated on GENIE by unscrupulous third parties. GENIE is the best positioned party to pursue the multiple avenues of recovery against the third parties in order to recover funds that may be turned over to the customers as a 100% distribution under the terms of any confirmed plan.

Law Offices of Mickler & Mickler, LLP

By:__/s/ Bryan K. Mickler_____
    Bryan K. Mickler
Florida Bar No. 091790
Attorney for the Debtor(s)
5452 Arlington Expressway
Jacksonville, FL 32211
(904) 725-0822
(904) 725-0855 FAX
bkmickler@planlaw.com

## CERTIFICATE OF SERVICE

I DO HEREBY CERTIFY that a copy of the foregoing was furnished to the United States Trustee and all creditors by CM/ECF filing this __26____ day of July, 2024.


    Bryan K. Mickler
    Attorney

docs\bankrupt\chap 11\genie\response to trustee motion