# UNITED STATES BANKRUPTCY COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

IN RE: GENIE INVESTMENTS NV, INC.

        CASE NO.: 3:24-bk-00496-BAJ

        Debtor (s).

_____/

### SUPPLEMENT TO RESPONSE TO SECOND MOTION TO APPOINT CHAPTER 11 TRUSTEE OR IN THE ALTERNATIVE, APPOINT AN EXAMINER, DISMISS THIS CASE OR CONVERT THIS CASE TO CHAPTER 7 FILED BY UNITED STATES TRUSTEE

GENIE INVESTMENTS NV, INC (GENIE or Debtor) in the above case supplements it's prior response (Doc. No. 182) to the Second Motion to Appoint Chapter 11 Trustee or in the Alternative, Appoint an Examiner, Dismiss This Case, or Convert This Case to Chapter 7 Filed by United States Trustee (Doc. No. 154), and would state:

1. In the Examiner's Report at Page 51; ¶ 225 the Examiner states, "There does not appear to be an ongoing viable business of Genie NV. It is unlikely that future borrowers and customers would enter into a lending relationship with the Debtor after the substantial amount of reputational damage incurred by the Debtor.;

2. This "conclusion" of the Examiner was based on pure speculation and without any inquiry into the ongoing business of the Debtor by the Examiner;

3. In fact, the Debtor has a current lending customer which is seeking $3.6M and a current lender which is willing to contribute the sum of up to $5M to the Debtor in order to fund the loan. See attached Composite Exhibit 1;

4. Any suggestion or conclusion by the Examiner that Genie will not be able to continue as a going concern is further evidence that the Examiner reached her conclusion in the report

1

without consideration of all relevant and available information. Such conclusions do not

warrant consideration by the Court if unsupported by evidence.

## CONCLUSION

GENIE filed this case in good faith as an attempt by GENIE to pay back 100% of it's

obligations to customers and other parties affected by a fraud perpetrated on GENIE by

unscrupulous third parties. GENIE is the best positioned party to pursue the multiple avenues of

recovery against the third parties in order to recover funds that may be turned over to the customers

as a 100% distribution under the terms of any confirmed plan.


Law Offices of Mickler & Mickler, LLP


By:__/s/ Bryan K. Mickler_____
  Bryan K. Mickler
Florida Bar No. 091790
Attorney for the Debtor(s)
5452 Arlington Expressway
Jacksonville, FL 32211
(904) 725-0822
(904) 725-0855 FAX
bkmickler@planlaw.com

## CERTIFICATE OF SERVICE

I DO HEREBY CERTIFY that a copy of the foregoing was furnished to the United States

Trustee and all creditors per the attached matrix by CM/ECF filing this ___7____ day of August,

2024.


Bryan K. Mickler
Attorney

docs\bankrupt\chap 11\genie\response to trustee motion

2

# EXHIBIT 1

## PURCHASE AND SALE AGREEMENT

**THIS AGREEMENT** (this "***Agreement***") is entered into as of the 22nd day of July, 2024 (the "***Effective Date***"), between (i) ▊▊▊▊▊▊▊▊ a Utah limited liability company ("***Seller***"), whose address is ▊▊▊▊▊ Holladay, Utah 84117, Attention: ▊▊▊▊▊▊▊, and (ii) ▊▊▊▊▊▊▊▊ a Utah limited liability company ▊▊▊▊▊▊), and ▊▊▊▊▊▊▊▊▊▊, a Utah limited liability company ("▊▊▊▊"; together with ▊▊▊▊, "***Buyer***"), whose address is ▊▊▊▊▊▊▊▊▊ Farmington, Utah 84025, Attention: ▊▊▊▊▊▊▊l. (Seller and Buyer are referred to in this Agreement collectively as the "***Parties***" and individually as a "***Party***.")

**FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which are acknowledged, the Parties agree as follows:

1.      <u>Definitions</u>. As used in this Agreement, each of the following terms shall have the indicated meaning:

"***Bill of Sale***" means a bill of sale in the form attached as <u>Exhibit A</u>, dated as of the Closing Date and transferring the Personal Property to Buyer.

"***business day***" means any day other than a Saturday, Sunday or legal holiday on which banks in Utah are authorized by law to close, but where there is a reference to "days," such reference shall be deemed to be to "calendar days."

"***Buyer's Broker***" means Jared Thompson / EXP Commercial, LLC.

"***Closing***" means the closing of the purchase and sale of the Property between the Parties pursuant to the provisions of this Agreement.

"***Closing Date***" means the date on which the Closing actually occurs.

"***Code***" means the Internal Revenue Code, as amended, and the regulations promulgated thereunder.

"***Deed***" means a special warranty deed in the form attached as <u>Exhibit B</u>, dated as of the Closing Date, conveying the Real Property to Buyer, and terminating the Lease.

"***Due Diligence Period***" means the period commencing on the Effective Date and expiring at 5:00 p.m. MT on the date that is thirty (30) days after the Effective Date.

"***Earnest Money***" means $20,000.

"***Lease***" means the Lease with Option to Purchase, dated June 9, 2022, as amended by the First Amendment to Lease Agreement, dated May 1, 2024, both entered into between Seller, as landlord, and Maxfield, as tenant.

"***Property***" means (i) the real property (the "***Real Property***") located in Salt Lake County, described on the attached <u>Exhibit C</u>, including all buildings, structures and other improvements located on, and all easements, rights-of-way, benefits and appurtenances appurtenant to, such real property, including all water rights appurtenant to such real property, and (ii) all furniture, fixtures, equipment and other personal property located on the Real Property, excluding one creek painting and one bronze statue (named, "In Search of Gold"), to be retained by Seller (with such exclusions, the "***Personal Property***").

"***Purchase Price***" means $3,600,000.

"***Title Commitment***" means an ALTA commitment for title insurance covering the Real Property, with typical hyperlinks for all exceptions to title referred to therein.

"***Title Company***" means First American Title Insurance Company, a Nebraska corporation, whose address is 215 South State Street, Suite 380, Salt Lake City, Utah 84111, Attention: Alisha White, telephone: (801) 578-8838, email: awhite@firstam.com.

"***Title Policy***" means an ALTA owner's title insurance policy, issued by the Title Company pursuant to the Title Commitment, having liability limits equal to the Purchase Price and covering the Real Property.

"***Transaction***" means the purchase and sale transaction contemplated by this Agreement.

2.      <u>Agreement of Sale; Earnest Money</u>.

2.1.     <u>Agreement of Sale</u>. Seller shall sell to Buyer and Buyer shall purchase from Seller the Property, subject to all provisions of this Agreement. Maxfield currently occupies the Real Property under the Lease. Further, Buyer has conducted, or prior to the Closing will conduct, such investigations with respect to the Property as Buyer deems advisable, and has satisfied, or prior to the Closing will satisfy, itself with respect to the Property and the Transaction. Except as expressly provided in this Agreement, the Deed

or any other document delivered by Seller to Buyer at the Closing, (a) Seller has not made any representation or warranty with respect to the Property or any other matter related to the Transaction, (b) Buyer shall accept the Property in the condition in which it now exists (that is, "as is" and "where is," with all faults) without any representation or warranty, express or implied, in fact or by law, and without any recourse against Seller, (c) Buyer waives any claim of liability against Seller based on any statement, representation, warranty, covenant, undertaking or agreement that may have been made by Seller or any person representing or purporting to represent Seller in connection with the Property or the Transaction, and (d) Buyer releases Seller from any obligation, claim, liability, loss, damage, action, cost or expense (including, without limitation, attorneys' fees) related to any hazardous substances, hazardous wastes, pollutants or contaminants (collectively, "***Hazardous Materials***") at any time used, deposited, stored, disposed of, placed or otherwise located in or on, or released from, the Real Property or any facility operated on the Real Property, unless actually used, deposited, stored, disposed of, placed or released by Seller.

2.2.    <u>Earnest Money</u>. Within three (3) business days after the full execution and delivery of this Agreement, Buyer shall deposit the Earnest Money in an escrow established at the Title Company. If Buyer does not sooner terminate this Agreement in accordance with <u>Paragraph 3</u>, the Title Company shall, without the need of any other consent or writing, disburse the Earnest Money directly to Seller on the first business day following the expiration of the Due Diligence Period. At the Closing, the Earnest Money shall be credited against the Purchase Price. The escrow for the Earnest Money shall be opened and maintained solely for the purpose of holding and disbursing the Earnest Money, and the Title Company is directed to disburse the Earnest Money in accordance with the provisions of this Agreement or as otherwise directed in a writing signed by both Parties.

3.    <u>Due Diligence</u>. Buyer shall have access to the Real Property from time to time during regular business hours for the purpose of making surveys, studies and inspections of the Property as reasonably requested by Buyer. Buyer shall repair any damage to the Property caused by any tests, surveys, inspections and studies, or reimburse Seller for all reasonable expenses incurred by Seller in repairing such damage if Buyer does not promptly repair such damage after written notice of such damage has been delivered by Seller to Buyer. Buyer shall indemnify, defend and hold harmless Seller from and against all losses, damages, claims, liens, liabilities, costs and expenses (including, without limitation, attorneys' fees) caused by Buyer's exercise of its rights under this Paragraph. If not previously delivered, Seller shall deliver or cause to be delivered to Buyer, at no cost or expense to Buyer, within five (5) business days after the full execution and delivery of this Agreement (subject to any delay by the Title Company in producing the Title Commitment), legible copies of the following: (a) the Title Commitment; (b) the most recent survey of the Real Property in Seller's possession or control, if any; (c) the most recent Phase One Environmental Report and any soils, seismic, flood or engineering reports in Seller's possession or control, if any; and (d) any construction drawings for the Real Property in Seller's possession or control, including mechanical, electrical, plumbing, structural, civil, etc.; *provided,* that at Seller's election, these may be made available for review by Buyer at Seller's offices, and delivered to Buyer at the Closing. Buyer may at any time or from time to time during the Due Diligence Period give Seller written or oral notice of any concerns Buyer may have regarding the Property, including, without limitation, title and survey issues. Seller shall in good faith and in a commercially reasonable manner address such concerns with Buyer, but without any obligation to resolve such concerns. In no event will such process extend the Due Diligence Period. Prior to the expiration of the Due Diligence Period, Buyer may give Seller and the Title Company written notice (the "***Termination Notice***") that Buyer desires to terminate this Agreement, *which Buyer may do in its sole and absolute discretion*. If Buyer gives the Termination Notice in a timely manner: this Agreement shall terminate; Buyer shall concurrently deliver to Seller copies of all surveys, working drawings, studies and reports prepared or caused to be prepared by Buyer in connection with the Property; neither Party shall have any further obligation to the other Party other than obligations that by their express terms survive the termination of this Agreement; and Buyer shall receive a return of the Earnest Money. If Buyer fails to give Seller and the Title Company the Termination Notice timely, Buyer shall be deemed to have waived such termination right and shall be bound to consummate the Closing subject to the terms of this Agreement, and the Earnest Money shall become nonrefundable except in the event of a Seller default under this Agreement.

4.    <u>Closing</u>. The Closing shall occur on or before the date that is ten (10) days after the expiration of the Due Diligence Period, and shall be held at or through the offices of the Title Company. At the Closing, Seller shall deliver or cause to be delivered to Buyer the following: (a) the Deed, duly executed and acknowledged by Seller; (b) an affidavit in the form attached as <u>Exhibit D</u>, dated as of the Closing Date and establishing that Seller is not a "foreign person" within the meaning of Section 1445 of the Code, duly executed and acknowledged by Seller; and (c) the Bill of Sale, duly executed by Seller. At the Closing, Buyer shall deliver or cause to be delivered to Seller the Purchase Price and the Deed, duly executed and acknowledged by Buyer, and Buyer may, at its sole cost and expense, obtain the Title Company's unconditional commitment at the Closing to issue the Title Policy within a reasonable time after the Closing. The Parties shall deliver to the Title Company such further documents and instruments as may be reasonably necessary or appropriate to consummate the Transaction. At the Closing, the Parties shall instruct the Title Company to record the Deed. In connection with the Closing, the Parties shall provide to the Title Company any information and materials reasonably necessary to enable the Title Company to comply with the real estate transaction reporting requirements of Section 6045 of the Code. Real property taxes and assessments and other amounts typically prorated shall <u>*not*</u> be prorated as of the Closing Date as those are payable pre-Closing under the Lease. Buyer shall pay for the Title Policy, all escrow and recording costs and any other costs of the Closing, and Seller shall have no obligation to pay for any of such costs.

Purchase and Sale Agreement

5.    General Provisions.

5.1.    1031 Exchange. If either Party desires to structure the Transaction as a tax-deferred exchange of like-kind property within the meaning of Section 1031 of the Code, the other Party agrees to cooperate reasonably in effecting such exchange; *provided, however,* that (a) the cooperating Party shall not, in connection with such exchange, be required to incur any additional obligation, liability, cost, expense or fee, enter into any additional agreement other than typical consents and related agreements, or acquire or take title to any property other than the Property, (b) the effectuating Party shall be responsible for making all determinations as to the legal sufficiency of, and all tax and other considerations relating to, such exchange and any exchange documentation, and (c) the cooperating Party shall in no event be responsible for, or in any way be deemed to warrant or represent, any tax or other consequences of such exchange.

5.2.    Possession. Possession of the Property shall be transferred by Seller to Buyer on the Closing Date.

5.3.    Brokers. Seller represents and warrants to Buyer that Seller has not retained a broker or real estate agent in connection with the Transaction. Buyer represents and warrants to Seller that Buyer has not retained a broker or real estate agent in connection with the Transaction, other than Buyer's Broker. Buyer shall pay Buyer's Broker any commission due at or in connection with the Closing. Seller shall indemnify, defend and hold harmless Buyer against any claim for a brokerage commission or similar fee in connection with the Transaction based on an actual or alleged agreement made by Seller. Buyer shall indemnify, defend and hold harmless Seller against any claim for a brokerage commission or similar fee in connection with the Transaction based on an actual or alleged agreement made by Buyer. Neither Buyer's Broker nor any other person is a third-party beneficiary of this Paragraph 5.3 or any other provision of this Agreement. The provisions of this Paragraph 5.3 shall survive the Closing.

5.4.    Attorneys' Fees. If either Party brings suit to enforce or interpret this Agreement, the prevailing Party shall be entitled to recover from the other Party the prevailing Party's reasonable attorneys' fees and costs incurred in any such action or in any appeal from such action, in addition to the other relief to which the prevailing Party is entitled. The provisions of this Paragraph 5.4 shall survive the Closing.

5.5.    Default. If Seller defaults in any of its obligations under this Agreement, and such default is not cured within five (5) business days after written notice is given by Buyer to Seller of such default, Buyer may, as Buyer's sole and exclusive remedy, either (i) terminate this Agreement on written notice to Seller and the Title Company, and receive a refund of the Earnest Money, or (ii) receive specific performance from Seller of the obligation concerned. If Buyer defaults in any of its obligations under this Agreement, and such default is not cured within five (5) business days after written notice is given by Seller to Buyer of such default, Seller may, as Seller's sole and exclusive remedy, terminate this Agreement on written notice to Buyer and the Title Company, and receive the Earnest Money as liquidated damages and not as a penalty. Otherwise, in no event shall either Party be entitled to seek damages in the event of the default of the other Party under this Agreement, including, without limitation, any consequential, indirect, special, exemplary, punitive or similar damages. Notwithstanding the provisions of this Paragraph 5.5, the Parties shall nevertheless be entitled to the benefits set forth in Paragraph 5.4. The provisions of this Paragraph 5.5 shall survive the termination of this Agreement.

5.6.    Notices. Any notice or demand to be given by either Party to the other Party shall be given in writing by personal service, express mail, FedEx, DHL or any other similar form of courier or delivery service, mailing in the United States mail, postage prepaid, certified and return receipt requested, and addressed to such Party at the address set forth at the outset of this Agreement. Either Party may change the address at which such Party desires to receive notice on written notice of such change to the other Party. Any such notice shall be deemed to have been given, and shall be effective, on delivery to the notice address then applicable for the Party to which the notice is directed; *provided, however,* that refusal to accept delivery of a notice or the inability to deliver a notice because of an address change that was not properly communicated shall not defeat or delay the giving of a notice.

5.7.    Time of Essence. Time is of the essence with respect to each provision of this Agreement. If the date on which any payment or performance is due under this Agreement is not a business day, such payment or performance shall be due on the following business day. If the date on which the Due Diligence Period expires is a not a business day, such date shall be extended to the following business day.

5.8.    Modification. A modification of, or amendment to, any provision contained in this Agreement shall be effective only if the modification or amendment is in writing and signed by both Parties. Any oral representation or modification concerning this Agreement shall be of no force or effect.

5.9.    Successors and Assigns. This Agreement shall inure to the benefit of, and be binding on, the Parties and their respective successors and assigns, but may not be assigned by Buyer except to a qualified intermediary in accordance with Paragraph 5.1 or the following sentence. Buyer may assign this Agreement to an entity affiliated with Buyer or comprised of one or more of the direct or indirect principals of Buyer without the prior written consent of Seller, provided that Buyer concurrently provides to Seller and the Title Company a fully executed copy of the assignment and assumption agreement entered into between Buyer and such assignee, with the assignee assuming all obligations of Buyer under this Agreement.

Purchase and Sale Agreement

5.10.    Applicable Law; Jurisdiction; Construction. This Agreement shall be governed by, and construed and interpreted in accordance with, the laws (excluding the choice of laws rules) of the state of Utah. The Parties subject themselves to the exclusive jurisdiction of the courts of the state of Utah and agree to commence and maintain any lawsuit related to this Agreement in such courts. The Parties further agree that such courts are a convenient forum. Unless otherwise provided, references in this Agreement to Paragraphs are to Paragraphs in this Agreement. This Agreement shall be construed according to its fair meaning and not strictly for or against either Party, as if both Parties had prepared it. The failure on the part of either Party to promptly enforce any right under this Agreement shall not operate as a waiver of such right, and the waiver of any default shall not constitute a waiver of any subsequent or other default.

5.11.    Integration of Other Agreements. This Agreement, together with any exhibits attached to this Agreement, constitutes the entire agreement of the Parties and supersedes all previous contracts, correspondence and documentation relating to the subject matter of this Agreement.

5.12.    Counterparts. This Agreement may be executed in any number of duplicate originals or counterparts, each of which when so executed shall constitute in the aggregate but one and the same document. Signature pages may be detached from the counterparts and attached to a single copy of this Agreement to physically form one document.

5.13.    Titles and Headings. Titles and headings of Paragraphs of this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement.

5.14.    Pronouns. All pronouns shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person to whom reference is made may require.

5.15.    Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be valid under applicable law; but, if any provision of this Agreement shall be invalid or prohibited under applicable law, such provision shall be ineffective to the extent of such invalidity or prohibition without invalidating the remainder of such provision or the remaining provisions of this Agreement.

5.16.    Authorization. Each Party represents and warrants that (a) such Party was duly formed and is validly existing and in good standing under the laws of the state of its formation, (b) such Party has the requisite power and authority under applicable law and its governing documents to execute, deliver and perform its obligations under this Agreement, (c) the individual executing this Agreement on behalf of such Party has full power and authority under such Party's governing documents to execute and deliver this Agreement in the name of, and on behalf of, such Party and to cause such Party to perform its obligations under this Agreement, (d) this Agreement has been duly authorized, executed and delivered by such Party, and (e) this Agreement is the legal, valid and binding obligation of such Party, and is enforceable against such Party in accordance with its terms. The provisions of this Paragraph 5.16 shall survive the Closing.

5.17.    Form of Funds. Funds to be delivered under this Agreement shall be in the form of same day federal funds wire transferred.

5.18.    Exhibits. Each exhibit referred to in, and attached to, this Agreement is an integral part of this Agreement and is incorporated in this Agreement by this reference.

5.19.    No Recording. Buyer shall not record this Agreement or a memorandum or notice of this Agreement.

5.20.    Electronic Mail or Electronic Signatures. Signatures to this Agreement transmitted by electronic mail shall be valid and effective to bind the Party so signing, it being expressly agreed that each Party to this Agreement shall be bound by its own electronically mailed signature and shall accept the electronically mailed signature of the other Party to this Agreement. The execution of this Agreement may be accomplished by electronic signature utilizing DocuSign or any other technology, and any electronic signature (meaning any electronic symbol, designation or process), whether digital or encrypted, used by either Party shall authenticate this Agreement and have the same force and effect as a manual signature.

*[Remainder of page intentionally left blank; signatures on following pages]*

**THE PARTIES** have executed this Agreement below, to be effective as of the Effective Date.

*SELLER*:

████████████████████

a Utah limited liability company

DocuSigned by:

By _____
   D4F250CDD0ED471...

████████████████████████

***BUYER***:



a Utah limited liability company

By _____

a Utah limited liability company

By _____

## CONSENT OF TITLE COMPANY

**THE UNDERSIGNED**, **FIRST AMERICAN TITLE INSURANCE COMPANY**, a Nebraska corporation, agrees to act as the escrow agent for the "Earnest Money," as defined in, and in accordance with, the foregoing Purchase and Sale Agreement.

**FIRST AMERICAN TITLE INSURANCE COMPANY**,
a Nebraska corporation

By _____

Alisha White, Escrow Officer

**EXHIBIT A**

**to**

**PURCHASE AND SALE AGREEMENT**

**FORM OF BILL OF SALE**

(See attached)

## BILL OF SALE

_____ / _____

**THIS INSTRUMENT** is executed as of the ___ day of _____, 20__, by _____ ("**Seller**"), in favor of _____ ("**Buyer**").

**FOR GOOD AND VALUABLE CONSIDERATION**, the receipt and sufficiency of which are acknowledged, Seller grants, bargains and sells to Buyer, without any representation, warranty or recourse whatsoever (as-is, where-is and with all faults), all furniture, fixtures, equipment and other personal property owned by Seller and located on the land in Salt Lake County, Utah, and described on the attached <u>Exhibit A</u>, but <u>*excluding*</u> one creek painting and one bronze statue (named, "In Search of Gold"), which may be removed and retained by Seller on or after the date of this instrument. This instrument shall be governed by, and construed and interpreted in accordance with, the laws (excluding the choice of laws rules) of the state of Utah.

*SELLER* has executed this instrument in favor of Buyer below, to be effective as of the date first set forth above.

*SELLER*:

_____,

a _____

By_____

Print or Type Name of Signatory:

_____

Its_____

Purchase and Sale Agreement

**<u>EXHIBIT A</u>**

**to**

**BILL OF SALE**

---

**LAND**

Purchase and Sale Agreement

**<u>EXHIBIT B</u>**

**to**

**PURCHASE AND SALE AGREEMENT**

**FORM OF DEED**

(See attached)

*WHEN RECORDED RETURN TO,*
*AND SEND TAX NOTICES TO*:

_____
_____
_____
_____

Tax Parcel Nos. _____

---

## SPECIAL WARRANTY DEED
### (with quitclaim of water rights and termination of lease)
_____ / _____

    **THIS INSTRUMENT** is effective as of the _____ day of _____, 20___, and entered into between _____ ("*Grantor*"), whose address is _____, and _____ ("*Grantee*"), whose address is _____.

    **FOR THE SUM OF TEN DOLLARS ($10.00)** and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, Grantor hereby conveys and warrants to Grantee against all who claim by, through or under Grantor, but not otherwise, certain real property (the "*Property*") located in Salt Lake County, Utah, described as follows:

    *[insert legal description]*

    **SUBJECT TO** (i) current taxes and assessments, (ii) rights-of-way, easements, covenants, restrictions, reservations and other matters of record or enforceable at law or in equity, other than any mortgage, judgment or mechanic's lien created by, through or under Grantor, (iii) facts, rights, interests or claims that could be ascertained by an inspection of the Property or by making inquiry of persons in possession of the Property, and (iv) discrepancies, conflicts in boundary lines, shortages in area, encroachments or other facts that a correct survey would disclose.

    **GRANTOR** hereby quitclaims to Grantee all water rights appurtenant to or used on the Property, together with all applications pertaining thereto, including, without limitation, the following described water rights diverted and used in Salt Lake County, State of Utah, as identified of record with the Utah Division of Water Rights:

    Water right numbers 57-8681, 57-10101, 57-10102, 57-10103, 57-10104, 57-10827 and 57-10828, together with all applications, water user's claims, and objections pertaining thereto.

All water rights are quitclaimed (i) without any representation, warranty or recourse, (ii) as-is, where-is and with all faults, and (iii) subject to a currently pending water rights adjudication, Civil No. 365729835 (57-18).

    The terms of the purchase agreement pursuant to which this instrument is delivered are merged into this instrument pursuant to applicable law.  See, e.g., Mason v. Loveless, 24 P.3d. 997 (Ut. App. 2001).

    **GRANTOR AND GRANTEE** hereby terminate the Lease with Option to Purchase, dated June 9, 2022, as amended by the First Amendment to Lease Agreement, dated May 1, 2024, both entered into between Grantor as landlord, and [Historic Maxfield Lodge LLC, a Utah limited liability company], as tenant, which shall have no further force or effect whatsoever.

    *[Remainder of page intentionally left blank; signatures and acknowledgments on following pages]*

**GRANTOR AND GRANTEE** have executed this instrument below, to be effective as of the date first set forth above.

*GRANTOR*:

_____,

a _____

By_____

Print or Type Name of Signatory:

_____

Its_____

State of _____)
                          ) ss.
County of _____)

    The foregoing instrument was acknowledged before me this _____ day of _____, 20___, by _____, _____ of _____.

_____
                    Notary Public

My Commission Expires:        Residing at:

_____     _____

***GRANTEE***:

_____,
a _____


By_____

Print or Type Name of Signatory:

_____

Its_____


State of _____)
                        ) ss.
County of _____)

      The foregoing instrument was acknowledged before me this \_\_\_\_ day of _____, 20\_\_\_, by _____, _____ of _____.


_____
Notary Public

My Commission Expires:               Residing at:

_____      _____

**EXHIBIT C**

to

**PURCHASE AND SALE AGREEMENT**

---

**REAL PROPERTY**

The Real Property is located in Salt Lake County, Utah, and is described as follows:

Parcel 1:

Parcel "F", STORM MOUNTAIN ESTATES (an irregular/unrecorded subdivision), more particularly described as follows: Lots 19 and 20, CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof on file and of record in the Salt Lake County Recorder's Office.

Parcel 2:

Lot 21, CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof on file and of record in the Salt Lake County Recorder's Office.

ALSO: Commencing at the most southerly corner of said Lot 21 (also being the most southerly corner of Lot 22) and running thence North 12°59'00" East 110.52 feet; thence North 84°24' West 55.64 feet (per said plat along the subdivision northerly line North 84°24'20" West 55.64 feet); thence South 15°06'26" East 117.175 feet to the point of beginning. (Said legal description being a portion of Lot 22, Canyon Enterprises Subdivision #1.)

Parcel 3:

All of Parcel "C" and the westerly portion of Parcel "D", STORM MOUNTAIN ESTATES (an irregular/unrecorded subdivision), more particularly described as follows: Commencing at the most southerly corner of Lot 22, CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof on file and of record in the Salt Lake County Recorder's Office, running thence South 12°59'00" West 55.00 feet; thence North 77°01'00" West 110.505 feet; thence North 23°33'00" East 101.68 feet; thence North 45°06'00" East 69.00 feet; thence southerly along a straight line 115.5 feet, more or less, to the point of beginning (being the northerly one-half of Lot 24, all of Lot 23, and the westerly portion of Lot 22, said Canyon Enterprises Subdivision No. 1.)

Parcel 4:

Beginning South 12°59' West 25 feet from the Northeast corner of Lot 24, CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof on file and of record in the Salt Lake County Recorder's Office; thence South 12°59' West 5 feet; thence North 77°01' West 111.439 feet; thence North 23°33' East 5 feet; thence South 77°01' East 110.505 feet to beginning.

Parcel 5:

Parcel "T", STORM MOUNTAIN ESTATES (an irregular/unrecorded subdivision), more particularly described as follows: Lot 30, CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof on file and of record in the Salt Lake County Recorder's Office.

ALSO: That portion of Lot 31, of said Canyon Enterprises Subdivision No. 1 as described as follows: BEGINNING at the Northeast corner of Lot 31, CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof, on file and recorded January 6, 1964 as Entry No. 1970853 in Book AA of Plats at Page 78 in the Office of the Recorder of Salt Lake County, State of Utah, and running thence South 7°00'00" East 18.0 feet; thence North 57°08'30" West 147.102 feet; thence North 29° East 15.0 feet; thence South 56°39'35" East 136.58 feet to the point of beginning.

Parcel 6:

Parcel "S", STORM MOUNTAIN ESTATES (an irregular/unrecorded subdivision), more particularly described as follows: Beginning at a point 115.00 feet South 29° West from the Northwest corner of Lot 30, CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof, on file and recorded January 6, 1964 as Entry No. 1970853 in Book AA of Plats at Page 78 in the Office of the Recorder of Salt Lake County, State of Utah; said point of beginning also being South 563.50 feet and West 443.77 feet from the East 1/4 corner of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian; thence South 57°08'31" East 147.1 feet; thence South 7° East 15.12 feet; thence southerly and westerly 43.92 feet along the arc of a 106.20 foot radius curve to the right; thence North 65°21'48" West 167.4 feet; thence North 23° East 63.00 feet; thence North 29° East 12.00 feet to the point of Beginning

Parcel 7:

A part of the Southeast Quarter of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian: Beginning at a point which is North 84°24'20" West 279.00 feet from the East Quarter corner of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian, said point also being the center of Big Cottonwood Creek and the Northwest corner of the CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof, on file and recorded January 6, 1964 as Entry No. 1970853 in Book AA of Plats at Page 78 in the Office of the Recorder of Salt Lake County, State of Utah, and also being South 23°45'36" West 224.29 feet from an existing right-of-way monument on the northerly line of State Route #152, Centerline Station 142+47.2; and running thence South 45°06'00" West along said center of creek 69.00 feet; thence South 23°33'00" West along said center of creek 182.00 feet; thence South 38°33'00" West along said center of creek 52.31 feet; thence South 11°38'00" West along said center of creek 138.00 feet; thence South 40°36'31" West 37.55 feet; thence South 38°33'30" East 51.00 feet, more or less, to a point which is South 21°12'26" East of an existing right-of-way monument on the northerly line of State Route #152 at Center Line Station 137+25.0 AHD. 135+79.3 BK., and continuing thence South 24°08'30" West 64.50 feet; thence South 65°30'30" East 58.45 feet, more or less, to the Center of Maxfield Drive; thence South 29°00'00" West 61.85 feet; thence South 23°00'00" West 48.00 feet; thence North 67°00'00" West 70.00 feet, more or less, to the northernmost corner of Lot 36, Canyon Enterprises Subdivision No. 1; thence South 79°13'00" West 89.91 feet, more or less, to the West line of Canyon Enterprises Subdivision No. 1; thence South 0°03'00" East along said West boundary of said Canyon Enterprises Subdivision No. 1 (a distance of) 127.95 feet; thence North 32°23'00" West 84.10 feet; thence West 68.44 feet; thence North 697.78 feet more or less, to the North line of the Southeast Quarter of said Section 20; thence East along said North line 396.57 feet; thence South 84°24'20" East 60.50 feet, more or less, to the point of beginning.

ALSO: Beginning at the Southwest corner of Lot 29, CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof, on file and recorded January 6, 1964 as Entry No. 1970853 in Book AA of Plats at Page 78 in the Office of the Recorder of Salt Lake County, State of Utah, said point being 368.52 feet South and 453.746 feet West from the East quarter corner of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian, and running thence South 57° East 105 feet to the center of Maxfield Drive; thence South 33° West 20.5 feet; thence South 29° West 88.15 feet; thence North 65°30'30" West 58.45 feet; thence North 24°08'30" East 64.5 feet; thence North 38°33'30" West 51 feet; thence North 40°36'21" East 37.55 feet to the point of beginning.

LESS AND EXCEPTING THEREFROM the following: Beginning at a point which is South 79°13'00" West 97.00 feet from the northernmost corner of Lot 36, CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof, on file and recorded January 6, 1964 as Entry No. 1970853 in Book AA of Plats at Page 78 in the Office of the Recorder of Salt Lake County, State of Utah, and running thence North 73°22'00" West 68.80 feet; thence North 43°31'15" East 155.30 feet; thence South 39°01'30" East 68.00 feet; thence South 46°32'30" West 115.50 feet to the point of beginning.

ALSO LESS AND EXCEPTING THEREFROM the following: Beginning at a point which is North 84°24'20" West 279.00 feet from the East Quarter corner of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian, said point also being the center of Big Cottonwood Creek and the Northwest corner of the CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof, on file and recorded January 6, 1964 as Entry No. 1970853 in Book AA of Plats at Page 78 in the Office of the Recorder of Salt Lake County, State

of Utah, and also being South 23°45'36" West 224.29 feet from an existing right-of-way monument on the northerly line of State Route #152, Centerline Station 142+47.2 and running thence South 45°06'00" West along said center of creek 69.00 feet; thence South 23°33'00" West along said center of creek 182.00 feet; thence South 11°38'00" West along said center of creek 50.48 feet; thence South 43°48'29" West 183.45 feet; thence North 46°11'51" West 102.49 feet to the southeasterly right-of-way line of said State Route #152 being a point on a 676.77 foot radius curve to the right (radius point bears South 56°08'30" East); thence northeasterly along the arc of said curve 151.86 feet (Delta= 12°51'23"); thence North 46°42'53" East 308.92 feet; thence South 84°24'20" East 9.92 feet to the point of beginning.

ALSO LESS AND EXCEPTING THEREFROM the following: Beginning at a point on the northwesterly boundary of CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof, on file and recorded January 6, 1964 as Entry No. 1970853 in Book AA of Plats at Page 78 in the Office of the Recorder of Salt Lake County, State of Utah, also being the center of Big Cottonwood Creek said point being North 84°24'20" West 279.00 feet; South 45°06'00" West 69.00 feet; South 23°33'00" West 182.00 feet and South 11°38'00" West 50.48 feet from the East Quarter corner of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian, said point also being South 54°32'52" East 193.75 feet from an existing right-of-way monument on the northerly line of State Road No. 152, Centerline Station 137+25.0 and running thence along said Subdivision boundary and center of said creek the following three (3) courses: 1) South 11°38'00" West 87.52 feet; 2) South 30°38'00" West 52.31 feet; and 3) South 40°36'21" West 37.55 feet; thence South 53°45'37" West 21.27 feet along said creek; thence North 46°11'51" West 56.95 feet; thence North 43°48'29" East 183.45 feet to the point of beginning.

ALSO LESS AND EXCEPTING THEREFROM any portion lying within State Road No. 152.

ALSO LESS AND EXCEPTING THEREFROM any portion located within the Bounds of MAXFIELD DRIVE.

ALSO LESS AND EXCEPTING THEREFROM roadway and highway.

Parcel 9:

BEGINNING at a point which is North 84°24'20" West 279.00 feet from the East Quarter corner of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian, said point also being the center of Big Cottonwood Creek and the Northwest corner of the CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof, on file and recorded January 6, 1964 as Entry No. 1970853 in Book AA of Plats at Page 78 in the Office of the Recorder of Salt Lake County, State of Utah, and also being South 23°45'36" West 224.29 feet from an existing right-of-way monument on the northerly line of State Route #152, Centerline Station 142+47.2 and running thence South 45°06'00" West along said center of creek 69.00 feet; thence South 23°33'00" West along said center of creek 182.00 feet; thence South 11°38'00" West along said center of creek 10.48 feet (record states South 11°38'00" West 50.48 feet and North 11°38'00" East (some deeds of record state North 11°38'00" West) 40 feet); thence South 43°48'29" West 90 feet; thence South 11°38' West 40 feet; thence South 43°48'29" West 93.45 feet more or less; thence North 46°11'51" West 102.49 feet to the southeasterly right-of-way line of said State Route #152 being a point on a 676.77 foot radius curve to the right (radius point bears South 56°08'30" East); thence northeasterly along the arc of said curve 151.86 feet (Delta=12°51'23"); thence North 46°42'53" East 308.92 feet; thence South 84°24'20" East 9.92 feet (some deeds of records state South 84°24'20" East 60.5 FEET) to the point of beginning.

Parcel 10:

A part of the Southeast Quarter of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian: Beginning at a point which is South 79°13'00" West 97.00 feet from the northernmost corner of Lot 36, CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof, on file and recorded January 6, 1964 as Entry No. 1970853 in Book AA of Plats at Page 78 in the Office of the Recorder of Salt Lake County, State of Utah, and running thence North 73°22'00" West 68.80 feet; thence North 43°31'15" East 155.30 feet; thence South 39°01'30" East 68.00 feet; thence South 46°32'30" West 115.50 feet to the point of beginning.

Parcel 10A:

The easement and right-of-way for foot and vehicular traffic as set forth by that certain Access Agreement, recorded August 27, 1990 as Entry No. 4958176 in Book 6247 at page 2285 of Official Records.

Parcel 10B:

The easement and right-of-way for foot and vehicular traffic as set forth by that certain Road Easement, recorded August 27, 1990 as Entry No. 4958177 in Book 6247 at page 2287 of Official Records.

Parcel 11:

Beginning at a point on the northwesterly boundary of CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof, on file and recorded January 6, 1964 as Entry No. 1970853 in Book AA of Plats at Page 78 in the Office of the Recorder of Salt Lake County, State of Utah, also being the center of Big Cottonwood Creek, said point being North 84°24'20" West 279.00 feet; South 45°06'00" West 69.00 feet; South 23°33'00" West 182.00 feet and South 11°38'00" West 50.48 feet from the East Quarter corner of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian, said point also being South 54°32'52" East 193.75 feet from an existing right-of-way monument on the northerly line of State Road No. 152, Centerline Station 137+25.0 and running thence along said Subdivision boundary and center of said creek the following three (3) courses: 1) South 11°38'00" West 87.52 feet; 2) thence South 30°38'00" West 52.31 feet; and 3) thence South 40°36'21" West 37.55 feet; thence South 53°45'37" West 21.27 feet along said creek; thence North 46°11'51" West 56.95 feet; thence North 43°48'29" East 93.45 feet; thence North 11°38'00" East 40.00 feet; thence North 43°28'29" East 90.00 feet; thence South 11°38'00" West 40.00 feet to the point of beginning.

Parcel 11A:

An easement for ingress and egress for the purpose of permitting access to the up-stream side as disclosed in Warranty Deed, recorded February 23, 1984 as Entry No. 3908066 in Book 5533 at Page 1395 of Official Records.

Parcel 12:

The North 575.0 feet of the West 105.0 feet of the Southwest Quarter of the Northwest Quarter of Section 21, Township 2 South, Range 2 East, Salt Lake Base and Meridian.

LESS AND EXCEPTING from the foregoing Parcels 1 through 7, inclusive, and Parcels 9 through 12, inclusive, the following Parcels 8-1, 8-2 and 8-3:

Parcel 8-1: Any portion located within the bounds of MAXFIELD DRIVE, located within the following land: A part of the Southeast Quarter of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian: Beginning at a point which is North 84°24'20" West 279.00 feet from the East Quarter corner of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian, said point also being the center of Big Cottonwood Creek and the Northwest corner of the CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof, on file and recorded January 6, 1964 as Entry No. 1970853 in Book AA of Plats at Page 78 in the Office of the Recorder of Salt Lake County, State of Utah, and also being South 23°45'36" West 224.29 feet from an existing right-of-way monument on the northerly line of State Route #152, Centerline Station 142+47.2; and running thence South 45°06'00" West along said center of creek 69.00 feet; thence South 23°33'00" West along said center of creek 182.00 feet; thence South 30°38'00" West along said center of creek 52.31 feet; thence South 11°38'00" West along said center of creek 138.00 feet; thence South 40°36'31" West 37.55 feet; thence South 38°33'30" East 51.00 feet, more or less, to a point which is South 21°12'26" East of an existing right-of-way monument on the northerly line of State Route #152 at Center Line Station 137+25.0 AHD. 135+79.3 BK., and continuing thence South 24°08'30" West 64.50 feet; thence South 65°30'30" East 58.45 feet, more or less, to the Center of Maxfield Drive; thence South 29°00'00" West 61.85 feet; thence South 23°00'00" West 48.00 feet; thence North 67°00'00" West 70.00 feet, more or less, to the northernmost corner

of Lot 36, Canyon Enterprises Subdivision No. 1; thence South 79°13'00" West 89.91 feet, more or less, to the West line of Canyon Enterprises Subdivision No. 1; thence South 0°03'00" East along said West boundary of said Canyon Enterprises Subdivision No. 1, 127.95 feet; thence North 32°23'00" West 84.10 feet; thence West 68.44 feet; thence North 697.78 feet more or less, to the North line of the Southeast Quarter of said Section 20; thence East along said North line 396.57 feet; thence South 84°24'20" East 60.50 feet, more or less, to the point of beginning.

Parcel 8-2: Any portion located within the bounds of MAXFIELD DRIVE, located within the following land: Beginning at the Southwest corner of Lot 29, CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof, on file and recorded January 6, 1964 as Entry No. 1970853 in Book AA of Plats at Page 78 in the Office of the Recorder of Salt Lake County, State of Utah, said point being 368.52 feet South and 453.746 feet West from the East quarter corner of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian, and running thence South 57° East 105 feet to the center of Maxfield Drive; thence South 33° West 20.5 feet; thence South 29° West 88.15 feet; thence North 65°30'30" West 58.45 feet; thence North 24°08'30" East 64.5 feet; thence North 38°33'30" West 51 feet; thence North 40°36'21" East 37.55 feet to the point of beginning.

Parcel 8-3: Any portion located within the bounds of Highway 190 AKA Highway UT-152, also known as BIG COTTONWOOD CANYON ROAD, located within the following land: A part of the Southeast Quarter of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian: Beginning at a point which is North 84°24'20" West 279.00 feet from the East Quarter corner of Section 20, Township 2 South, Range 2 East, Salt Lake Base and Meridian, said point also being the center of Big Cottonwood Creek and the Northwest corner of the CANYON ENTERPRISES SUBDIVISION NO. 1, according to the official plat thereof, on file and recorded January 6, 1964 as Entry No. 1970853 in Book AA of Plats at Page 78 in the Office of the Recorder of Salt Lake County, State of Utah, and also being South 23°45'36" West 224.29 feet from an existing right-of-way monument on the northerly line of State Route #152, Centerline Station 142+47.2; and running thence South 45°06'00" West along said center of creek 69.00 feet; thence South 23°33'00" West along said center of creek 182.00 feet; thence South 30°38'00" West along said center of creek 52.31 feet; thence South 11°38'00" West along said center of creek 138.00 feet; thence South 40°36'31" West 37.55 feet; thence South 38°33'30" East 51.00 feet, more or less, to a point which is South 21°12'26" East of an existing right-of-way monument on the northerly line of State Route #152 at Center Line Station 137+25.0 AHD. 135+79.3 BK., and continuing thence South 24°08'30" West 64.50 feet; thence South 65°30'30" East 58.45 feet, more or less, to the Center of Maxfield Drive; thence South 29°00'00" West 61.85 feet; thence South 23°00'00" West 48.00 feet; thence North 67°00'00" West 70.00 feet, more or less, to the northernmost corner of Lot 36, Canyon Enterprises Subdivision No. 1; thence South 79°13'00" West 89.91 feet, more or less, to the West line of Canyon Enterprises Subdivision No. 1; thence South 0°03'00" East along said West boundary of said Canyon Enterprises Subdivision No. 1,127.95 feet; thence North 32°23'00" West 84.10 feet; thence West 68.44 feet; thence North 697.78 feet more or less, to the North line of the Southeast Quarter of said Section 20; thence East along said North line 396.57 feet; thence South 84°24'20" East 60.50 feet, more or less, to the point of beginning.

## __EXHIBIT D__

**to**

**PURCHASE AND SALE AGREEMENT**

---

**FORM OF NON-FOREIGN AFFIDAVIT**

(See attached)

### CERTIFICATION

_____ / _____

      Section 1445 of the Internal Revenue Code (the "**Code**") provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform _____, a Utah limited liability company ("**Transferee**"), that withholding of tax is not required on the disposition of a U.S. real property interest by _____, a Utah limited liability company ("**Transferor**"), the undersigned certifies the following on behalf of Transferor: (i) Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code and Income Tax Regulations); (ii) Transferor is not a disregarded entity as defined in 26 CFR §1.1445-2(b)(2)(iii); (iii) Transferor's U.S. employer identification number is _____; and (iv) Transferor's office address is _____.

      Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

      Under penalties of perjury, I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.


_____       _____
_____, _____       Date


**SUBSCRIBED AND SWORN TO** before me this ____ day of _____, 20__, by _____, _____ of _____.


       _____
       NOTARY PUBLIC
       Residing in _____

My Commission Expires:

_____

# Bridge funding request for $3,000,000 over 12 mo., payments deferred

## Company Background

███████████████ a startup company (2024) formed to profitably acquire and re-deploy valuable natural resources to better align with their highest and best use, thus serving the community while also profiting from the value increase inherent in the redeployment (resale).   A significant percentage of real property in the Western US is underutilizing the valuable water rights, mineral rights, timber, pasture land, etc., so potential deals are plentiful if one knows what to look for. The net result of the work that WRG does allows communities to break through self-imposed restrictions on residential development, ultimately benefitting the US homeowner.

## Project Overview

WRG is acquiring 5.7 acres of land in Big Cottonwood Canyon, Utah (Salt Lake City Metro) comprised of 9 different parcels for the purchase price of $2.6M.   Included in the purchase are a 7,193 sf lodge (Maxfield Lodge), a 2,900 sf cabin, 7 vacant lots, and 17-acre feet of very valuable water (being undervalued by seller).  After acquisition, we will immediately begin selling the pieces, including the water, which should bring in $6.244M in total sales price, generating a gross profit of $3.644M. We expect to have all real property resold within 12 months.

## Property Detail

The following is a detailed breakdown of the real property being acquired and the estimated fair market value.

- 2.71 acre parcel #23204280060000 Estimated Selling Price $1.9M (contains Maxfield Lodge and Cabin)
- 1.03 acre parcel #23204280040000 Estimated Selling Price $300K
- 0.57 acre parcel #23204310020000 Estimated Selling Price $ 49K
- 0.30 acre parcel #23204310030000 Estimated Selling Price $ 39K
- 0.27 acre parcel #23204300010000 Estimated Selling Price $ 39K
- 0.27 acre parcel #23204300100000 Estimated Selling Price $ 39K
- 0.27 acre parcel #23204310010000 Estimated Selling Price $ 39K
- 0.27 acre parcel #23204290020000 Estimated Selling Price $ 39K
- 0.01 acre parcel #23204290030000 (to be sold with 23204290020000)
- 17 acre feet of water = 38 EDU's   Est. Selling Price $100K per EDU

**TOTAL Estimated resale price of $6,244,000**



Parcels Being Acquired

## Funding Breakdown

| | |
|---|---|
| Acquisition of Real Property | $2,600,000 |
| Legal Fees and Closing Costs | $ 100,000 |
| Property Improvements | $   300,000 |
| **TOTAL** | **$3,000,000** |





Salt Lake County

## ROI & Cash Flow

WRG will execute nightly rentals on the lodge and cabin, generating $10,000/mo. until sold, but this would not cover debt service on a traditional loan.

**CONFIDE** ████████████████

$6.244M resale – $3.0M cost - $300,000 loan interest = $2,944,000 net profit. $2.944M profit = **98% return on capital**

## Timing

This property is in contract with a planned closing date of August 31, 2024. WRG will immediately begin reselling the water and the real property with the goal of fully realizing the $2.944M net profit within 12 months of acquisition.

**CONFIDENTIAL**



Avenue STE 104C

Jacksonville, Florida

Date: 08/06/2024

Subject: Contingent Commitment for Funding

Dear Genie Investments NV.

After the review of your project(s), we are pleased to confirm that ▓▓▓▓▓▓ is committed to supporting the funding of your private equity project(s) up to Five Million Dollars and no Cents ($5,000,000.00), subject to the successful completion of our due diligence process.

▓▓▓▓▓▓ is a reputable firm with a substantial real estate portfolio, and we specialize in funding projects across various sectors. Depending on the specific requirements of the project, we are prepared to either utilize our own capital or broker the deal through one of our trusted financial partners.

Please note that our commitment to fund this project is contingent upon the completion of a comprehensive due diligence review. This review will include, but is not limited to, an assessment of the project's viability, risk factors, and compliance with applicable regulations.

We are confident in our ability to deliver the financial resources necessary to realize the successful completion of your project, and we look forward to working closely with you to achieve this goal.

Should you have any questions or require further information, please do not hesitate to contact us at contact@▓▓▓▓▓▓com

Sincerely,

