# EXHIBIT J

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:                                                          Case No.:  3:24-bk-00496-BAJ
                                                                Chapter 11
GENIE INVESTMENTS NV INC.,

                Debtor.
_____/

## NOTICE OF FILING OF EXAMINER'S REPORT

        Maria M. Yip, as Examiner, by and through her undersigned counsel, gives notice of the

filing of her *Examiner's Report* attached hereto.

                                                */s/ Ryan E. Davis*
                                                RYAN E. DAVIS
                                                Florida Bar No. 0179851
                                                davis@whww.com
                                                **WINDERWEEDLE, HAINES, WARD
                                                & WOODMAN, P.A.**
                                                Post Office Box 880
                                                Winter Park, FL 32790-0880
                                                Telephone:  (407) 423-4246
                                                Facsimile:  (407) 645-3728

## CERTIFICATE OF SERVICE

        I HEREBY CERTIFY that on June 28, 2024, a copy of the foregoing has been furnished

via:

**CM/ECF to:**

Bryan K. Mickler, Esq.
Mickler & Mickler
5452 Arlington Expressway
Jacksonville, FL 32211
Email: court@planlaw.com

Scott E Bomkamp, Esq.
DOJ-Ust
United States Trustee

400 W. Washington St., Suite 1100
Orlando, FL 32801
Email: scott.e.bomkamp@usdoj.gov

United States Trustee
George C Young Federal Building
400 West Washington Street, Suite 1100
Orlando, FL 32801

All those registered to receive CM/ECF on this case.

**US Mail to:**

Debtor
Genie Investments NV Inc.
PO Box 60443
Jacksonville, FL 32236

Local Rule 1007-2 parties in interest listed on the attached mailing matrix.

*/s/ Ryan E. Davis*
RYAN E. DAVIS

2

Label Matrix for local noticing
113A-3
Case 3:24-bk-00496-BAJ
Middle District of Florida
Jacksonville
Fri Jun 28 16:54:01 EDT 2024

Archer Capital Investments
Attn: Michael Thompson
1448 W. Salmon Caddis Drive
Bluffdale, UT 84065-5122

Autonomous Drone Solutions LLC
dba Calaway Solutions
Attn: Garrett Calaway
7180 S Hudson Circle
Centennial, CO 80122-2553

(p)BELLE MAISON REALTY  LLC
ATTN LEA MUSE
1133 E 83RD ST
171
CHICAGO IL 60619-6455

Meetopolis LLC
Attn: Lisa Butkiewicz
5434 E Kathleen Road
Scottsdale, AZ 85254-1759

North Haven Lodging Partners, LLC
Attn: Benjamin Morris, Esq.
Foley & Lardner LLP
11988 El Camino Real, Suite 400
San Diego, CA 92130-2594

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Belle Maison Realty, LLC
Attn: Lea Muse
1133 E 83rd Street 171
Chicago, IL 60619

End of Label Matrix
Mailable recipients     5
Bypassed recipients     0
Total                   5

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:

Genie Investments NV, Inc.,                              Case No. 3:24-bk-00496-BAJ

Debtor.                                                          Chapter 11

_____/


## EXAMINER'S REPORT

Maria M. Yip, the Court appointed Examiner of Genie Investments NV, Inc., a Chapter 11

case, in accordance with the *Order Approving Selection of Chapter 11 Examiner* (Doc. No. 68)

files this Report.


Served and filed on June 28, 2024.


By: _____

**Maria M. Yip, Examiner**
2 S. Biscayne Blvd., Suite 2690
Miami, FL 33131
Ph. (305) 787-3750   Fax: 1 (888) 632-2672
Email: myip@yipcpa.com

# Table of Contents

I.     INTRODUCTION ............................................................................................ 3

II.    BACKGROUND ON DEBTOR............................................................................ 5

III.   CONNECTION BETWEEN THE DEBTOR OR ITS AFFILIATES AND MCMANN COMMERCIAL LENDING OR ITS AFFILIATES........................................................ 10

IV.   ALLEGED FRAUDULENT AGREEMENT WITH VELANOS PRINCIPAL CAPITAL............................................................................................................. 13

V.   CONNECTION AND TRANSFERS BETWEEN DEBTOR AND ANY AFFILIATES OR DEBTOR RELATED ENTITIES............................................................................. 25

VI.   TRANSFERS BETWEEN DEBTOR, INCLUDING ITS DIRECTORS, OFFICERS, INSIDERS, OR AFFILIATES OVER LAST TWO YEARS ......................................... 29

VII.   LIMITATIONS IN FINDINGS BASED ON AVAILABLE RECORDS......................... 46

VIII.  OBSERVATIONS AND CONCLUSIONS .......................................................... 48

## I.   **INTRODUCTION**

### History of the Chapter 11 Case and Examiner's Charge

1. On February 21, 2024, (the "Petition Date"), Genie Investments NV, Inc. ("Genie NV" or the "Debtor") filed a voluntary Chapter 11 bankruptcy petition commencing the bankruptcy case (Doc. No. 1) (the "Case").

2. On April 11, 2024, after a two-day trial, the Court entered an *Order Granting in Part and Denying in Part United States Trustee's Expedited Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint an Examiner, Dismiss the Case, or Convert the Case to Chapter 7* (the "Order") (Doc. No. 60.) The Order directed the Examiner to investigate the alleged fraud in this Case, including but not limited to:

   a. the connection, if any, between the Debtor or its affiliates, and McMann Commercial Lending or its affiliates;

   b. the alleged fraudulent agreement with Velanos Principal Capital;

   c. the connection and transfers between the Debtor and any affiliates or Debtor entities;

   d. any transfers between the Debtor, including its directors, officers, insiders, or affiliates over the last two years.

3. Additionally, pursuant to the Order, the Debtor in Possession must fully and transparently cooperate with the entirety of the investigation conducted by the Examiner.

4. On April 16, 2024, I was appointed Examiner pursuant to the *Appointment of Chapter 11 Examiner* (Doc. No. 63).

5. I hereby present my observations in the form of this report (the "Report"). I have prepared schedules with detailed information pertaining to the issues contained in this Report which

3

are attached as exhibits. These exhibits are an integral part of this Report and should be relied upon accordingly.

6. This Report is based on the best information available to me as of the writing of this Report, including a review of:

    a. Debtor's bankruptcy petition, schedules and statement of financial affairs ("SOFA");

    b. the recordings from the meetings of the creditors held on the following dates:

        i. March 27, 2004;

        ii. April 3, 2024 (part 1 and part 2); and

        iii. April 17, 2024.

    c. several communications with the Debtor's principals;

    d. bank statements;

    e. brokerage statements;

    f. deposition transcripts;

    g. loan agreements;

    h. QuickBooks exports provided by the Debtor;

    i. contracts;

    j. Affidavits filed by creditors in the Case;

    k. documents provided by third parties; and

    l. available public records.

7. On April 26, 2024, I conducted a two hour interview of the Debtor's principals, with their counsel, to better understand the Debtor's business operations and the relationships between the parties in the case.

4

8. At the April interview, the Debtor's principals agreed to provide relevant banking and business records immediately after the interview. My team set up a Sharefile for the immediate transfer of records. However, records were not provided by the Debtor's principals until the week of May 13, 2024, on a rolling basis, after a hearing with the Court on May 13, 2024. Since that date, the Debtor's principals have been cooperative in providing the records requested.

9. On June 10, 2024, I conducted a second interview of the Debtor's principals. This interview lasted approximately 90 minutes.

10. On June 25, 2024, I conducted a third interview of the Debtor's principals.

11. Based on my review of the Debtor's schedules, bank records requested and transactions in those bank accounts, I have identified five bank accounts, one brokerage account, and a loan account in the Debtor's name. Additionally, I have identified and analyzed three bank accounts of companies related to Genie NV based on common ownership. The eight bank accounts, one brokerage account and loan account reviewed are reflected in **Exhibit 1.**

## II.    **BACKGROUND ON DEBTOR**

### **Genie Investments NV**

12. Genie NV was formed in Nevada on December 17, 2021. As of September 14, 2022, the company had the following officers:

   a.   Michael Connor ("Connor"), President;

   b.   David Hughes ("Hughes"), Secretary;

   c.   Caleb Davis ("Davis"), Treasurer; and

5

d. John Cohan ("Cohan"), Other.[1]

13. According to the Debtor's SOFA (Doc. No. 40), Hughes and Cohan each own 50% of Genie NV.

14. During the 341(a) meetings of creditors, Hughes provided the following information:

a. Genie NV was formed to make good, friendly, fair loans to businesses.[2]

b. When Genie NV was formed, Connor was invited to do legal work for the Debtor. Connor then left Genie NV for personal reasons in August 2022 or September 2022. Connor was apparently indicted during that time frame and separated from Genie NV.[3]

c. Referral agents, promoters, and brokers across the country connected potential borrowers to Genie NV, as a potential lender.[4]

d. Genie NV maintained an office in Florida and did not have any employees other than management.[5]

15. Based on my review of the Nevada Secretary of State website, Connor was no longer listed as an officer of the Debtor as of February 8, 2023. In addition, as of August 29, 2023, Hughes was no longer listed as an officer of the Debtor.

**The Debtor's Business**

16. Genie NV was engaged in the lending business in a number of ways. Potential borrowers or customers would be connected with Genie NV through referral sources, including through Zoomeral, Inc. ("Zoomeral"). Borrowers would pay Zoomeral an origination fee

---

[1] Nevada Secretary of State Website. www.nvsilverflume.gov/home.
[2] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 10:13-16.
[3] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.
[4] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.
[5] Ibid.

for connecting the borrower with Genie NV. Zoomeral is owned by Hughes and Cohan and will be covered in further detail later in the Report.

17. Small business owners and potential borrowers looking to obtain a line of credit facility for their respective companies contacted Genie NV who offered customers a low interest, non-recourse loan referred to as a Business Expansion Line of Credit ("BELOC").[6]

18. The BELOC agreement defines Lender Capital Partners ("Lender Capital Partners") as the one or more lender-clients of Genie NV providing funding towards the BELOC.[7]

19. According to Hughes and Cohan, none of Genie NV's customers had loans funded by Genie NV's Lender Capital Partners. Genie NV attempted to locate potential Lender Capital Partners, however none of the Lender Capital Partners came to fruition and provided funding.[8]

20. As part of the process of obtaining the BELOC loan, Genie NV would require the borrower to enter into a due diligence fee agreement and pay fees to Genie NV ("Due Diligence Agreement" and "Due Diligence Fees") to conduct certain due diligence services. According to the Due Diligence Agreement, potential borrowers were required to also pay Genie NV "a non-accountable and non-refundable fee" and payment of the Due Diligence Fees was not a guarantee that Genie NV would offer funding to the borrower.[9]

21. As part of the Due Diligence Agreement, Borrowers were required to provide Genie NV with financial statements, bank records and a business plan.[10]

---

[6] Genie Investments Terms and Contingent Commitment Letter, dated March 9, 2023.
[7] Business Expansion Line of Credit Agreement, dated March 9, 2023.
[8] Interview of Cohan and Hughes, dated June 25, 2024.
[9] Genie Investments, NV Due Diligence Fee Agreement.
[10] Ibid.

7

22. According to the BELOC Loan Agreement, Genie NV would require their borrowers to establish an interest reserve account ("ICA"), and to pay a "minimum contribution"[11] of the total loan amount within 7 calendar days after the fully executed LOC (Asset backed Line of Credit Loan) documents were received by Genie NV.[12]

23. If the borrower established the ICA and complied with the conditions of the BELOC and Genie failed to provide the first loan advance when due, the borrower would have the option to terminate the agreement and request a full refund of the ICA. The borrower was required to deliver written notice in the form of a notarized termination letter to Genie NV by certified mail. Upon receipt of the notice, Genie NV would have forty (40) international business-banking days from the date of receipt within which to return the ICA to the borrower.[13]

24. In certain instances, Genie NV would provide a bridge loan for the borrower to fund the ICA. The borrower on the bridge loan was typically required to prepay 15% of the ICA payment related to the loan in the form of a bridge interest payment prior to receiving the bridge loan ("Bridge Interest Fees").

25. Genie NV and Zoomeral (owned by Cohan and Hughes) were to be paid:

   a. Zoomeral - a fee as the originator for the loan;

   b. Genie NV - a Due Diligence Fee for doing the requisite research and approval of the loan;

   c. Genie NV - the ICA reserves due to the lender as part of the BELOC loan; and

   d. Genie NV - the interest due as the lender on the loan.

---

[11] The contribution amount ranged from 10% to 15%.
[12] Business Expansion Line of Credit Agreement between Genie Investments as Lender and McMann Commercial Lending LLC.
[13] Business Expansion Line of Credit Agreement, dated March 9, 2023. Section 13.7.

8

26. In many instances, Genie NV collected the fees reflected above in (b) and (c) even though the borrowers did not receive funding.

27. According to Cohan, during the time the Debtor was in business, the Debtor closed over 50 loans to customers.[14] Based on an excel schedule provided by the Debtor titled, "Loan Closing Dates", Genie NV closed approximately 44 loans totaling $4,061,000 in loans to customers. The average amount of the loan closed was $92,000.

28. Based on my analysis of the eight bank accounts for which I received records, I have been able to identify with a few exceptions, 44 loans reflected on the Loan Closing Dates excel schedule provided by the Debtor that were funded.

29. According to the Debtor's QuickBooks, from August 31, 2021 to May 1, 2024, the Debtor collected funds from customers for ICA Reserves, Due Diligence Fees, and Bridge Interest as reflected in the table below:

| Category | Amount |
|----------|--------|
| ICA Reserves | $ 13,217,477.00 |
| Bridge Interest | 6,417,480.00 |
| Due Diligence Fees | 1,162,225.00 |
| TOTAL | $ 20,797,182.00 |

30. Additionally, according to the Debtor's QuickBooks, from August 31, 2021 to May 1, 2024, the Debtor refunded 15 customers refunds of $10,545,130. It is unclear from the Debtor's QuickBooks how much of the refunds pertain to customers' ICA or bridge loans.

---

[14] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 11:4-17.

31. Based on my review of the Debtor's books and records, I have identified some instances where the source of funds for a borrower's termination refund was another borrower's ICA deposit.

### III. CONNECTION BETWEEN THE DEBTOR OR ITS AFFILIATES AND MCMANN COMMERCIAL LENDING OR ITS AFFILIATES

#### McMann Commercial Lending / McMann Capital LLC

32. McMann Commercial Lending ("McMann") was incorporated in Illinois on June 14, 2018 by Walter P. Trock ("Trock"). Trock is listed as its Manager.[15] On August 14, 2023, McMann registered with the Illinois Secretary of State to conduct business under the name of McMann Capital LLC ("McMann Capital").

33. McMann Capital is a national commercial mortgage banker that provides mortgage brokers, community bankers, commercial bankers, and borrowers access to the secondary market for long-term, fixed-rate, non-recourse, and recourse commercial real estate mortgage loans.[16]

34. According to Hughes, the Debtor and McMann Capital were 100% separate businesses.[17]

35. According to Hughes, the Debtor had its customers/ borrowers with whom they dealt with directly. In addition, according to Hughes in some instances, the Debtor was the lender and McMann was the borrower. According to the agreement between McMann and Genie NV ("McMann Agreement"), the Debtor was to loan funds to McMann to be used as funding for loans to McMann's customers.

---

[15] Office of the Illinois Secretary of State. https://apps.ilsos.gov/businessentitysearch .
[16] https://mcmanncapital.com/about/
[17] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 13:4-11.

36. According to Hughes, McMann would instruct its clients to send the payments for the Due Diligence Fees and ICA funds directly to Genie NV out of convenience.[18]

37. In some instances, borrowers paid McMann an upfront initial application fee related to a loan with Genie NV.[19] These were also referred to as due diligence fees for McMann.[20]

38. Ultimately, many of McMann's customers/borrowers transferred funds to the Debtor for Due Diligence Fees and to fund the ICA, however, the customer's loans were not funded by McMann or the Debtor. McMann's customers did not receive a refund of their Due Diligence Fees or ICA funding.

39. On October 24, 2023, SWK Attorneys at Law, on behalf of McMann sent a letter to Genie NV demanding that it immediately provide refunds to two borrowers under BELOC agreements that previously funded ICA reserves.[21] According to the letter, McMann states the following regarding the ICA funds to be returned to borrowers:

> As Genie well knows, any issues Genie may have with its purported "capital provider" are wholly irrelevant to the refund of ICA Payments. Genie received the funds at issue from each respective borrower on May 3, 2023. Genie was required to hold said funds in trust to cover interest due under the respective BELOCS as it accrued, once (and if) funded. *These refunds are in no way dependent on outside capital or the availability of funds from any third-party, including Genie's purported and yet to be identified wholesale lender.* It appears this "force majeure" explanation – the purported reason Genie was unable to fund these and various other BELOCS procured by McMann - is an obvious attempt to fabricate an otherwise non-existent basis for Genie's current and wholly unjustified refusal to issue refunds of ICA Payments received directly from prospective borrowers. No such basis exists, as the refunds are wholly unrelated to Genie's inability to fund these BELOCS, and in fact, are specifically required upon receipt of the termination notices, including those issued as a result of Genie's inability to fund the respective loans.

---

[18] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 16:3-17.

[19] Affidavit of Rejoe Joy, dated February 29, 2024, Affidavit of Kristin Stegent, dated March 1, 2024 and Affidavit of Blake Stringer, dated, February 28, 2024..

[20] Affidavit of L. Muse, dated February 28, 2024.

[21] Letter from SWK Attorneys at Law to David Hughes, John Michael Cohan, and Genie Investments NV, dated October 24, 2023.

40. According to Hughes, the Debtor does not have an obligation to the McMann customers/borrowers.[22] Notwithstanding, Hughes has stated that the Debtor wants to have McMann's customers repaid and has scheduled them as creditors of the Debtor.

41. Based on our review of the Debtor's bank accounts, we traced 21 transfers from the Debtor to McMann during the period May 2022 through August 2023 totaling $289,550. In addition we traced three transfers from McMann to the Debtor on November 15, 2022, May 31, 2023, and June 1, 2023 totaling $232,575. Below are the transfers from the Debtor to McMann:

| Account Name | Account No. | Date | Payee | Amount |
|---|---|---|---|---|
| Genie Investments NV | x8502 | 09/16/22 | Mcmann Commercial Lending LLC | S (16,000) |
| Genie Investments NV | x8502 | 10/07/22 | Mcmann Commercial Lending LLC | (18,750) |
| Genie Investments NV | x8502 | 10/18/22 | Mcmann Commercial Lending LLC | (16,000) |
| Genie Investments NV | x8502 | 10/18/22 | Mcmann Commercial Lending LLC | (20,000) |
| Genie Investments NV | x8502 | 11/14/22 | Mcmann Commercial Lending LLC | (12,000) |
| Genie Investments NV | x8502 | 11/16/22 | Mcmann Commercial Lending LLC | (16,000) |
| Genie Investments NV | x8502 | 01/04/23 | Mcmann Commercial Lending LLC | (22,000) |
| Genie Investments NV | x8502 | 01/12/23 | Mcmann Commercial Lending LLC | (8,000) |
| Genie Investments NV | x8502 | 01/30/23 | Mcmann Commercial Lending LLC | (12,000) |
| Genie Investments NV | x8502 | 02/01/23 | Mcmann Commercial Lending LLC | (10,000) |
| Genie Investments NV | x8502 | 02/06/23 | Mcmann Commercial Lending LLC | (16,000) |
| Genie Investments NV | x8502 | 02/08/23 | Mcmann Commercial Lending LLC | (6,000) |
| Genie Investments NV | x8502 | 02/15/23 | Mcmann Commercial Lending LLC | (16,000) |
| Genie Investments NV | x8502 | 03/02/23 | Mcmann Commercial Lending LLC | (12,000) |
| Genie Investments NV | x8502 | 03/27/23 | Mcmann Commercial Lending LLC | (10,000) |
| Genie Investments NV | x8502 | 03/27/23 | Mcmann Commercial Lending LLC | (10,000) |
| Genie Investments NV | x8502 | 04/24/23 | Mcmann Commercial Lending LLC | (12,000) |
| Genie Investments NV | x8502 | 04/26/23 | Mcmann Commercial Lending LLC | (14,800) |
| Genie Investments NV | x8502 | 04/26/23 | Mcmann Commercial Lending LLC | (18,000) |
| Genie Investments NV | x8502 | 05/03/23 | Mcmann Commercial Lending LLC | (12,000) |
| Genie Investments NV | x8502 | 05/05/23 | Mcmann Commercial Lending LLC | (12,000) |
| | | | **TOTAL** | S(289,550) |

42. Based on our discussions with Cohan and Hughes, these payments were related to Due Diligence Fees earned by McMann related to loans on which it performed due diligence

---

[22] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.

12

services.  McMann would receive 40% of the Due Diligence Fees and Genie NV would receive 60%.

## IV.  ALLEGED FRAUDULENT AGREEMENT WITH VELANOS PRINCIPAL CAPITAL

43. I have analyzed the Debtor's connection to Velanos Principal Capital ("Velanos") in two ways.  First, the Debtor's capital contributions to Velanos and secondly, the current proposed settlement with Velanos.

### Debtor's Multiple Capital Contributions to Velanos

44. By way of background, Velanos was formed in Wyoming on April 15, 2022[23] and Joshua Wearmouth ("Wearmouth") is the sole owner of Velanos.[24] Neither Velanos or Wearmouth are registered investment advisers.[25] According to Hughes, Will Byrd ("Byrd") introduced the Debtor to Velanos. Hughes hoped that the investment in Velanos would have provided the funds needed by the Debtor to fund its customers' loans.[26]

45. The Debtor's Chapter 11 Case Management Summary refers to Velanos as a capital provider of the Debtor (Doc. No. 63).

46. On October 19, 2022, the Debtor[27] entered into a Joint Venture Agreement with Velanos (the "Velanos JVA").  The Velanos JVA states that it was formed to participate in one or more private business opportunities, including but not limited to the trading of currency,

---

[23] Wyoming Secretary of State website, https://wyobiz.wyo.gov/Business/Default.aspx
[24] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 17:5-6.
[25] Joint Venture Agreement between Genie Investments NV, LLC and Velanos Principal Capital Inc. dated October 19, 2022, para. 14.1.
[26] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 21:14-17.
[27] It should be noted that the Velanos JVA reflects the parties as Velanos Principal Capital, Inc. and Genie Investments NV, LLC, not Genie Investments NV, Inc.  We researched Genie Investments NV, LLC in both Nevada and Florida and were unable to locate a company with that name.  According to Cohan, there is no entity with the name Genie Investments NV, LLC and that the Velanos JVA has a spelling error.

notes, bonds, financial instruments, physical commodities, precious metals, and project financing initiatives.[28]

47. Genie NV retained The Warren Law Group ("Warren Law") "to serve as general counsel/advice, contract/legal document preparation and or review, transaction structuring, strategic planning & asset protection escrow/paymaster services in connection with the Debtor's joint venture with Velanos Principal Capital, Inc." [29]

48. On October 28, 2022, $10 million was wired from the Debtor's JPMorgan Chase account ending x8502 to Warren Law. According to Christopher D. Warren with the Warren Law Group, those funds were disbursed accordingly:

    a. $3 million to Velanos on November 22, 2022;

    b. $5 million to customer Plutus Financial Inc on November 22, 2022;

    c. $1.95 million returned to Genie NV's JPMorgan Chase account ending x8502 on November 22, 2022; and

    d. $50,000 to the Warren Law Group on November 22, 2022 as an escrow fee approved by Davis.

49. I have reviewed the bank account records of Warren Law and confirmed the transactions above.

50. The Debtor also transferred $100,000 to the Law Offices of Scott J. Oh LLC ("Scott Oh") on October 12, 2022, and $21,600 on October 19, 2022.

51. According to the Velanos JVA, Genie NV was to provide Velanos with initial capital resources, and Velanos was to "provide the structuring to generate liquidity and returns

---

[28] Joint Venture Agreement between Genie Investments NV, LLC and Velanos Principal Capital, Inc. dated October 19, 2022, para. I.

[29] Letter of Engagement between Warren Law Group and Genie Investments NV, LLC dated October 14, 2022.

14

and project financing from assets and cash through collateralization, securitization, managing trades, and transactions, and structuring and administering joint ventures."[30]

52. Both Genie NV and Velanos were to be compensated on a profit-sharing basis.[31]

53. According to the deposition of Wearmouth, based on the structure of the Velanos JVA, Velanos had autonomy and rights to use or invest the funds how they saw fit.[32]

54. The Velanos JVA was categorized as a strategic capital/systematic purchase and sell transaction, and the asset being purchased and sold were Standby Letters of Credit ("SBLC") from HSBC London described as a top rated issuer.[33]

55. Velanos was to provide Genie NV with a rolling profit participation in the joint venture activities of up to $25,000,000. The joint venture was to generate 100% returns in 30 days, and the remaining return of up to $25,000,000 within 60 days, post commencement of the Velanos JVA.[34]

56. According to the Velanos JVA, after Genie NV contributed its assets (pursuant to the agreement), Velanos shall provide Genie NV copies of the current transactional bank account statement showing the relevant trade transactions every 30 days during Genie NV's participation in the Velanos JVA.[35]

57. However, Velanos did not provide the Debtor with current transactional bank account statements showing the relevant trade transactions.[36]

---

[30] Joint Venture Agreement between Genie Investments NV, LLC and Velanos Principal Capital, Inc. dated October 19, 2022, para. II and III.

[31] Joint Venture Agreement between Genie Investments NV, LLC and Velanos Principal Capital, Inc. dated October 19, 2022, para. III.

[32] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 120:12-17.

[33] Appendix to the Joint Venture Agreement between Genie Investments NV, LLC and Velanos Principal Capital, Inc. dated October 19, 2022.

[34] Ibid.

[35] Appendix to the Joint Venture Agreement between Genie Investments NV, LLC and Velanos Principal Capital, Inc. dated October 19, 2022.

[36] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 131:10-13.

58. Wearmouth testified that it would constitute a material breach of contract if profits were not paid to Genie NV within 60 days of the contribution of assets. In the event of material breach by Velanos, Genie NV could terminate the Velanos JVA and declare it null and void.[37]

59. As part of the Velanos JVA, Genie NV wired $3,000,000 to Velanos on October 20, 2022.

60. According to Wearmouth, Velanos purchased one or more SBLCs with the $3,000,000 transferred by Genie NV and with Velanos' existing capital position.[38] Those SBLCs were subsequently sold.[39]

61. According to Wearmouth, Genie NV's $3,000,000 capital contribution was part of an overall $25,000,000 investment that was to return $349,000,000 in net profit to Velanos.[40]

62. On November 21, 2022, Genie NV and Velanos amended the Velanos JVA ("First Amendment"), whereby Genie NV made an additional $3,000,000[41] capital contribution and Velanos agreed to increase Genie NV's profit participation to $50,000,000.[42]

63. According to Wearmouth, the First Amendment was prompted by his understanding that Genie NV had additional capital to invest.[43]

64. Sixty days after entering into the Velanos JVA in October 2022, Velanos had not distributed any profits to Genie NV.[44] Similarly, Velanos had not distributed any profits to Genie NV 60 days after the First Amendment in November 2022.

---

[37] Ibid.
[38] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 144-145:24-1.
[39] Ibid.
[40] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 145:18-22.
[41] On November 30, 2022, Genie NV wired an additional $3,000,000 pursuant to the First Amendment
[42] Amendment to Joint Venture Agreement, dated November 21, 2022.
[43] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 149:15-18.
[44] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 126:14-17.

65. On November 21, 2022, the Warren Law Group wired an additional $3,000,000 to Velanos on behalf of Genie NV.

66. On May 2, 2023, Velanos wired $499,975 to the Debtor. This has been the only transfer from Velanos to the Debtor as of the date of this Report. According to Cohan, this was to "represent a good faith down payment towards the repayment of Genie's funds."

67. According to Hughes, the ultimate source of the funds transferred to Velanos was funds that customers paid to Genie NV.[45]

68. On June 3, 2023, Genie NV and Velanos amended the Velanos JVA ("Second Amendment"), whereby Genie NV and Velanos incorporated new deadlines for the return of Genie NV's contributions and for payout of Genie NV's profit allocation.[46]

69. Pursuant to the Second Amendment, Velanos was to facilitate the opening of a commercial bank account titled in the name of Genie NV, as the sole account owner and signatory, at Nordic Trust Alliance KB ("Nordic Trust") in Miami. Velanos was not to have any access to or control over this account.[47]

70. Additionally, according to the Second Amendment, the following terms were to be met:

   a. on or before June 15, 2023, Velanos was to deposit the sum of $9,500,000 into Genie NV's Nordic Trust account, free and clear of all encumbrances, liens, and holds/restrictions. Immediately thereafter, Genie NV shall send by wire transfer $9,500,000 to the Genie NV account held at JP Morgan Chase bank;

   b. on or before June 30, 2023, Velanos was to deposit an additional $50,000,000 into Genie NV's Nordic's Trust account, free and clear of all encumbrances, liens, and

---

[45] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 20:5-12.
[46] Second Amendment to Joint Venture Agreement, dated June 3, 2023.
[47] Second Amendment to Joint Venture Agreement, dated June 3, 2023, para. 1.

17

holds/restrictions. Immediately thereafter, Genie NV shall send by wire transfer the sum of $6,000,000 to Genie NV's account held at JP Morgan Chase bank; and

    c.  the remaining $44,000,000 held in Genie NV's Nordic Trust account was intended for future allocation to a new trade program offered by Velanos and to be provided under a new contract having the same terms, conditions, returns, and deadlines as the original contract.[48]

71. According to the terms of the Second Amendment if the terms were not met, Velanos would be in breach of contract, without an opportunity to cure.[49]

72. As previously stated, Genie NV received $499,975 from Velanos on May 2, 2023. With the exception of this payment, as of the date of this Report, the Debtor has not received a return of its contributions nor a payout of Genie NV's profit allocation in accordance with the Velanos JVA, First Amendment or Second Amendment.

73. According to Wearmouth, the funds were in a bank account; however, there was a hold put on the funds in the account. In addition, there was an investigation within the bank. The account was locked by the bank subsequently.[50]

74. According to Cohan, the source of the $9,000,000 in capital contributions to Velanos was "income earned by Genie during the period of 2021 and 2022 prior to the transfer to Velanos." This was income from "ICA payments by customers, bridge loan interest by customers and due diligence payments by customers during this time period."

---

[48] Second Amendment to Joint Venture Agreement, dated June 3, 2023, para. 2, 3, and 4.
[49] Second Amendment to Joint Venture Agreement, dated June 3, 2023, para. 5.
[50] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 177:2-23.

75. Based on our analysis of the Debtor's general ledger and its Morgan Stanley brokerage account, the Debtor;

    a. had at best purportedly earned Due Diligence Fees in 2022 of $360,150; and

    b. had interest in the Morgan Stanley Brokerage account in 2022 of $7,295.

76. The Debtor stated in its SOFA and Amended SOFA that its gross revenues in calendar year 2022 of $399,195.[51] These revenues of less than $400,000 could not have been the source of the $9,000,000 contributed Velanos.

77. According to Hughes, the customer's ICA deposit and Bridge Interest was income earned by the Debtor, even if ultimately the customer's loan was never funded. However, Hughes also stated that up until August 2023, Genie NV had always refunded the ICA deposits and Bridge Interest if requested by the customer in accordance with the terms of the BELOC Agreement or Bridge Loan Agreement.

**[INTENTIONALLY LEFT BLANK]**

---

[51] Statement of Financial Affairs (DE 40) and Amended Statement of Financial Affairs (DE61-1).

78. Although the Debtor received funding from its customers (including McMann customers) for ICAs, these amounts were to be held as a reserve for future interest payments. Clearly, the source of the capital contributions to Velanos totaling $9,000,000 in the October through December 2022 time frame could not have been funded from the customers payments to the Debtor but rather from the customer's ICA and Bridge Interest deposits.

79. Additionally, the Debtor continued to accept deposits for ICA deposits and Bridge Interest after the Velanos default in December 2022, despite likely not being able to fund any of those loans.

80. According to the Debtor's QuickBooks, from April 1, 2023 through June 30, 2023, months after the default on the Velanos JVA, Genie NV received approximately $4,967,975 in ICA deposits and $192,575 in bridge interest.

81. According to an email from Trock to McMann borrowers, he stated that "the ICA is pre paid interest account that belongs to you that is used to pay the monthly interest due on the loan until the ICA account is exhausted."[52]

82. Customers believed that the ICA account was a "trust account set up for the pre-payment of interest on the total of the bridge loan."[53]

83. The Debtor's use of customer funds as the source for the joint venture with Velanos demonstrates gross mismanagement of the customer's funds. In particular. Neither Velanos nor Wearmouth were registered investment advisors and the returns promised by Velanos pursuant to the Velanos JVA were 100% in 30 days and profit participation that would have resulted in a 900% return, which should have raised a red flag.

---

[52] Email from Walt Trock to customer, dated February 8, 2023.
[53] Affidavit of Blake Stringer, dated February 28, 2024.

## Debtor's Litigation Against Velanos

84. On October 25, 2023, Genie NV commenced an arbitration proceeding against Velanos, seeking a determination that Velanos materially breached the Velanos JVA and an award of damages.[54]

85. According to the deposition of Wearmouth, in December 2023, Velanos purportedly agreed to pay Genie NV $15 million to settle the dispute with Genie NV. According to Wearmouth, the funds were not made available yet because Genie NV and Velanos were negotiating the dates, times, and terms of how the funds were to be received.[55]

86. Since the Debtor was unable to consummate an agreement with Velanos, on February 6, 2024, Genie Investments NV, LLC[56] filed a lawsuit in the U.S. District Court for the Middle District of Florida, case number 6:24-cv-00271, in which it asserted claims related to the Velanos JVA for:

    a.  Violations of Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5(a) and (c);

    b.  California corp. CORP § 25401 – unlawful acts in connection with offer, sale, or purchase of a security; and

    c.  Common-Law Fraud

87. On May 23, 2024, Velanos and Genie NV entered into a proposed settlement ("Proposed Settlement"), pending Court approval whereby the Debtor is to be paid $15,000,000 according to a payment plan comprised of ten installment payments as detailed below:[57]

---

[54] Settlement Agreement between Velanos Principal Capital, Inc. and Genie Investments NV, LLC dated May 16, 2024.
[55] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 213:1-10.
[56] As previously stated Hughes stated that the entity in the Agreement does not exist and that it was spelling error.
[57] Ibid.

21

| Installment Payment | Amount | Terms |
|---|---|---|
| 1 | $50,000 | Within two (2) business days of the effective date of the Settlement Agreement |
| 2 | $500,000 | On or before June 30, 2024 |
| 3 | $1,000,000 | On or before September 30, 2024 |
| 4 | $2,000,000 | On or before December 31, 2024 |
| 5 | $2,000,000 | On or before March 31, 2025 |
| 6 | $2,000,000 | On or before June 30, 2025 |
| 7 | $2,000,000 | On or before September 30, 2025 |
| 8 | $2,000,000 | On or before December 31, 2025 |
| 9 | $2,000,000 | On or before March 31, 2026 |
| 10 | $1,450,000 | On or before June 30, 2026 |
|  | $15,000,000 | |

88. I am skeptical about this Proposed Settlement between the Debtor and Velanos for the following reasons: the Debtor has had an on-going relationship with Velanos since the Velanos JVA in October 2022 and during this time Velanos has failed to make its payments to the Debtor for numerous reasons. The following are some of these instances:

   a. Wearmouth previously committed to repaying the Debtor since the initial default on the Velanos JVA in December 2022. Despite repeated promises of repayment by Wearmouth and Velanos through letters, proof of funds communications, correspondences to and from banks, no repayment to the Debtor has materialized.

   b. Letter from Wearmouth to Genie Investments NV, LLC, dated December 30, 2022, stating:

   > "This letter is to inform you that the $75,000,000 USD owed to you will be available on or before January 15th, 2023."[58]

   c. Email from Wearmouth to David Hughes, dated January 27, 2023, claiming that $10 million has been wired to Genie NV and another $39 million would be forthcoming.[59] The email included a screenshot that purportedly supporting

---

[58] Letter from Joshua Wearmouth to Genie Investments NV, LLC dated December 30, 2022.
[59] Email from Joshua Wearmouth to David Hughes dated January 27, 2023.

22

Velanos' statement that it had initiated a $10,000,000 wire transfer from a ScotiaBank account to Genie NV's checking account at JPMorgan Chase.[60] Genie NV however, did not receive the funds reflected on the screen shot.

d.  Letter from Wearmouth to Genie Investments NV, LLC, dated March 24, 2023, stating that $10,000,000 has been wired to Genie NV and that a wire transfer receipt and tracer report will be provided, demonstrating proof of funds.[61] Again, Genie NV did not receive these funds.

e.  Letter from Wearmouth to the Walker Law Office, dated October 13, 2023, stating:

> "We intend to remedy the situation by providing capital returns from the JVA, or through the creation of capital funds through a new joint venture within 60 banking days or less."[62]

f.  Text message from Wearmouth to Hughes, dated November 1, 2023, which included a screenshot illustrating $19.8 million in available funds to be transmitted to the Debtor.[63]

## ISSUES WITH COLLECTIBILITY IF VELANOS DEFAULTS AGAIN

89. Based on our research, prior to owning Velanos, Wearmouth owned a company similar to Velanos called S.S.O. Capital ("SSO").  SSO was no longer in business at the time of Wearmouth's deposition.[64]

90. On September 18, 2023, the Honorable Peter H. Froelicher entered a judgment in favor of Four Thirteen, LLC ("413 LLC") against S.S.O. Global Group, Inc., S.S.O. Capital Inc., S.S.O. International Capital PLC, Joshua Wearmouth, Larry Stephens, Adriana E.

---

[60] Exhibit 3 to the Declaration of David Hughes in Support of Motion for Preliminary Injunctive Relief, dated December 13, 2023.
[61] Letter from Joshua Wearmouth to Genie Investments NV, LLC dated March 24, 2023.
[62] Letter from Joshua Wearmouth to the Walker Law Office dated October 13, 2023.
[63] Exhibit 8 to the Declaration of David Hughes in Support of Motion for Preliminary Injunctive Relief, dated December 13, 2023.
[64] Deposition transcript of Joshua Matthew Wearmouth dated February 8, 2024, pp. 15-16.

Dominguez, David C. Norton, Edmund Moriniere, and Ronald G. Meyers ("413 Litigation"). A judgment was awarded (the "413 Judgment") against S.S.O. Capital Inc. for the following counts:

    a.  Breach of Contract of the JPA;

    b.  Breach of Contract for the Promissory Note;

    c.  Breach of the Covenant of Good Faith and Fair Dealing;

    d.  Breach of Fiduciary Duties;

    e.  Fraud;

    f.  Constructive Fraud;

    g.  Negligent Misrepresentation;

    h.  Conversion;

    i.  Unjust Enrichment;

    j.  Violation of the Wyoming Securities Act; and

    k.  Alter Ego piercing the Corporate Veil.[65]

91. The defendants were held jointly and severally liable. More specifically, the Court entered a judgment against Wearmouth in the amount of $1,000,000 in damages plus attorney's fees of $150,000 for the following according to the 413 Judgment:

    a.  Breach of Contract of the Promissory Note;

    b.  Breach of the Covenant of Good Faith and Fair Dealing of the Promissory Note;

    c.  Breach of Fiduciary Duty of the Promissory Note;

    d.  Fraud;

    e.  Constructive Fraud;

---

[65] Judgment ordered against SSO, filed September 19, 2023.

    f.  Negligent Misrepresentation;

    g.  Civil Conspiracy;

    h.  Conversion – Promissory Note;

    i.  Unjust Enrichment – Promissory Note; and

    j.  Violation of the Wyoming Securities Act.[66]

92. On May 1, 2024, 413, LLC, a judgment creditor, filed an Affidavit in Florida to domesticate the judgment against SSO and Wearmouth in Florida in connection with the 413 Judgment described in the preceding paragraphs.

93. Should Velanos default on the Proposed Settlement, any judgement obtained in favor of Genie NV against Velanos and/or Wearmouth may be subordinated to judgment creditor, 413 LLC.

94. Based on Velanos' history of defaulting on its previous commitments to Genie NV, should the Debtor receive Court approval for the Proposed Settlement, it should require that the Debtor obtain a secured interest with a priority lien on assets of both Velanos and/or Wearmouth for full amount of the settlement.

V.   **CONNECTION AND TRANSFERS BETWEEN DEBTOR AND ANY**
    **AFFILIATES OR DEBTOR RELATED ENTITIES**

**Genie Investments NV, Inc.**

95. I analyzed bank records for the following accounts held in the name of Genie NV:

    a.  JPMorgan Chase Bank account ending x8502;

    b.  JPMorgan Chase Bank account ending x2222;

---

[66] Judgment ordered against Wearmouth, filed September 19, 2023.

      c.  JPMorgan Chase Bank account ending x9701; and

      d.  JPMorgan Chase Bank account ending x3350.

96.  Attached as **Exhibit 2** is a schedule of the flow of funds into Genie NV bank accounts.
Attached as **Exhibit 3** is a schedule of the flow of funds out of Genie NV bank accounts.
I have assigned customers a unique identifier in order to protect any personally identifiable
information (PII) or potentially sensitive customer information.

97.  I also analyzed the following brokerage and loan accounts held in the name of Genie NV:

      a.  Morgan Stanley Portfolio Management Active Assets account ending x2290
("Genie Brokerage Account"); and

      b.  Morgan Stanley Liquidity Access Line account ending x1290 ("Genie Line of
Credit").

### Genie Brokerage Account

98.  The Genie Brokerage Account was opened in November 2022.  The investment objectives
were capital appreciation, income, aggressive income and speculation.[67]

99.  This account was opened with an initial $3,700,000 transfer from Genie NV's JPMorgan
Chase account ending x8502.

100.  On January 3, 2023, Genie NV transferred $1,450,000 from its JPMorgan Chase account
ending x8502 to the Genie Brokerage Account.

101.  On May 5, 2023, Genie NV transferred another $5,600,000 from JPMorgan Chase account
ending x8502, increasing the ending balance in the account to $11,942,263.18 as of May

---

[67] Morgan Stanley account in the name of MSL FBO Genie Investments NV C/O Caleb Michael Davis, November
2022.

31, 2023. The source of the funds for the $5,600,000 transferred by Genie NV into the brokerage account is detailed below:

    a. $1,800,075 deposit from customer #58 related to a bridge loan;

    b. $1,800,075 deposit from customer #81 related to a bridge loan; and

    c. $1,118,592 deposit from a Michael Connor Esq. account at Wells Fargo Bank. According to Hughes, customers previously deposited funds into the Michael Connor Esq. account when obtaining loans from Genie.

102. On September 20, 2023, Genie NV transferred $600,000 from the Genie Brokerage Account to an account at TD Bank held in the name of Genie Investments II, LLC ("Genie II"). Genie II will be discussed later in the Report.

103. On January 3, 2024, Genie NV transferred $9,935,237 from the Genie Brokerage Account to the Genie Line of Credit to pay off the outstanding loan as detailed.

104. Clearly, Genie's customer's funds were used to pay off the Genie Line of Credit as opposed to the obligations owed to Genie NV's borrowers.

105. On January 4, 2024, approximately two months before the bankruptcy filing, Genie NV transferred another $644,606.44 from the Genie Brokerage Account to Genie II.

106. There is minimal activity in the Genie Brokerage Account after the transfer to Genie II and the repayment of the Genie Line of Credit.

### Genie Line of Credit

107. The Genie Line of Credit was opened in November 2022.

108. The Debtor borrowed $3,000,000 from the Genie Line of Credit on November 29, 2022. Those funds were transferred to the Genie NV JPMorgan Chase account ending x8502 on the same day. One day later, on November 30, 2022, $3,000,000 was transferred from

27

Genie NV JPMorgan Chase account ending x8502 to Velanos account at Bank of Nova Scotia. Prior to this transfer, Genie NV's JPMorgan Chase account ending x8502 had a balance of $711,242 as illustrated further in the diagram below:



109. On May 31, 2023, the Debtor borrowed another $5,735,000 from the Genie Line of Credit and transferred those funds to the Genie NV JPMorgan Chase account ending x8502 on the same day. On the following day, Genie NV transferred $5,000,000 to 1P Ventures, LLC, a customer for a "termination refund" according to Cohan and the Debtor's QuickBooks records. Immediately prior to the transfer from the Genie Line of Credit, Genie NV's JPMorgan Chase account ending x8502 had a balance of $106,812.54 as illustrated further in the diagram below:



110. We have been unable to locate a corresponding deposit in the amount of $5,000,000 for 1P Ventures, LLC. According to Cohan and Hughes, this investor is related to Paul Kurkoff,

28

who connected Genie NV to potential borrowers.[68]  According to Cohan, "In some instances, entities were created for the purposes of our program. It was very common for companies to send in their funds from a different company that they own or from a personal account. They also sometimes received their refunds in different accounts as well."

111. As previously noted, On January 3, 2024, approximately two months before the filing of the bankruptcy petition, Genie NV transferred $9,935,237 from the Genie Brokerage Account to the Genie Line of Credit as payment in full. Repayment of the Genie Line of Credit at Morgan Stanley was not made in the ordinary course and no new value was provided to the Debtor.

## VI.  TRANSFERS BETWEEN DEBTOR, INCLUDING ITS DIRECTORS, OFFICERS, INSIDERS, OR AFFILIATES OVER LAST TWO YEARS

112. The Debtor's principals, Cohan, Hughes, and Davis owned companies that received significant transfers from the Debtor in the two years prior to the bankruptcy filing. Genie NV's initial SOFA listed these payments as "Loan/Compensation to Directors", however, the SOFA was amended on April 12, 2024 and categorized these payments as "Loans to insider corporations."

113. The companies and the payments to the companies owned by Hughes, Cohan, and Davis are described in the following sections.

### Zoomeral, Inc.

114. Zoomeral, Inc. ("Zoomeral") was formed in Delaware on March 6, 2018.[69] Hughes owns 82.5% and Cohan owns 17.5%.[70]

---

[68] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.
[69] State of Delaware Department of State: Division of Corporations.  https://icis.corp.delaware.gov/
[70] Interview of Cohan and Hughes, dated June 24, 2024.

115. Zoomeral is a "directory that is designed to create maximum competition for capital while its borrowing subscribers remain safe and anonymous." Zoomeral states that it aims to put an end to predatory lending and lender discrimination, believing that everyone and every business should have equal access to the money they need at the very best rates and terms.[71]

116. Potential borrowers would apply through Zoomeral and be connected to potential lenders.[72]

117. Zoomeral earned commissions upon loans closing from Genie NV.[73]

118. According to a loan agreement dated September 5, 2022, between the Debtor and Zoomeral, the Debtor was to loan up to $3,000,000 in the form of a non-recourse unsecured line of credit to Zoomeral and Zoomeral promised to repay this principal amount to the lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance.[74]

119. The loan was to be repaid in the form of one (1) balloon payment due on December 5, 2029.[75]

120. Additionally, Zoomeral had the sole right and decision making authority to be granted an extension of the loan agreement for up to ten (10) additional years upon the request of the borrower.[76]

121. The loan is an unsecured, non-recourse, loan, with no personal guarantee by the officers of Zoomeral.[77]

122. According to the loan agreement, Zoomeral was to use the funds in accordance with a business plan provided by Zoomeral and attached to the loan agreement. According to the

---

[71] https://zoomeral.com/our-story/
[72] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.
[73] Ibid.
[74] Loan agreement between Genie Holdings NV and Zoomeral, Inc. dated September 5, 2022, para. 1.
[75] Loan agreement between Genie Holdings NV and Zoomeral, Inc. dated September 5, 2022, para. 2.
[76] Loan agreement between Genie Holdings NV and Zoomeral, Inc. dated September 5, 2022, para. 4.
[77] Loan agreement between Genie Holdings NV and Zoomeral, Inc. dated September 5, 2022, para. 24, 25 and 26.

30

executive summary attached to the loan agreement, Zoomeral is a pioneering SaaS company focused on delivering innovative educational materials to the financial industry. Their mission is to enhance productivity and streamline operations through advanced technology, intuitive design, and scalable features.

123. Hughes executed the loan agreement on behalf of Zoomeral and Cohan executed the agreement on behalf of the Debtor.

124. According to Cohan, the loans to Zoomeral were not for the benefit of the Debtor, but were to operate Zoomeral's business.[78]

125. According to Hughes, Genie NV loaned Zoomeral a line of credit "like all other businesses get loans." [79]

126. The terms of the loan to Zoomeral are under extremely favorable terms to the borrower and far outside the ordinary course of what Zoomeral would receive from a standard loan at the time.

127. During the period May 2022 through August 2023, the Debtor transferred approximately $2,189,818 to Zoomeral.

128. During the same period, Zoomeral transferred approximately $496,763 to the Debtor. Therefore, Zoomeral received approximately $1,693,056 in excess of what it transferred to the Debtor. **Exhibit 4** details the total transfers between Zoomeral and the Debtor.

129. According to the Debtor's SOFA (Doc. No. 40.), the Debtor paid $1,900,000 to Zoomeral as a "Loan/Compensation to David Hughes as Director." However, the Debtor's Amended SOFA (Doc. No. 61-1), was amended to reflect that the Debtor transferred $1,380,590.24 to Zoomeral as an "insider corporation loan".

---

[78] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.
[79] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.

130. According to my review of the Debtor's bank records, there does not appear to have been any repayments of the loans by Zoomeral to the Debtor to date.

131. Additionally, Genie II transferred $979,250 to Zoomeral during the period January 2023 to April 2024 as reflected in the table below:

| Account Name | Account No. | Date | Payee | Amount |
|---|---|---|---|---|
| Genie Investments II LLC | x4873 | 04/24/23 | Zoomeral Inc | $ (22,500.00) |
| Genie Investments II LLC | x4873 | 05/22/23 | Zoomeral Inc | (15,000.00) |
| Genie Investments II LLC | x4873 | 06/23/23 | Zoomeral Inc | (3,750.00) |
| Genie Investments II LLC | x4873 | 09/05/23 | Zoomeral Inc | (3,000.00) |
| Genie Investments II LLC | x4873 | 09/22/23 | Zoomeral Inc | (230,000.00) |
| Genie Investments II LLC | x4873 | 11/21/23 | Zoomeral Inc | (70,000.00) |
| Genie Investments II LLC | x4873 | 12/12/23 | Zoomeral Inc | (40,000.00) |
| Genie Investments II LLC | x4873 | 01/05/24 | Zoomeral Inc | (60,000.00) |
| Genie Investments II LLC | x4873 | 01/08/24 | Zoomeral Inc | (500,000.00) |
| Genie Investments II LLC | x4873 | 02/05/24 | Zoomeral Inc | (35,000.00) |
| | | | TOTAL | $(979,250.00) |

132. Genie II transferred $979,250 to Zoomeral within the one-year period preceding Genie NV's bankruptcy filing.

133. Genie II was formed on September 14, 2022 in Delaware.[80]

134. Genie II is owned 50% by Hughes and 50% by Cohan.[81]

135. Based on my analysis, the source of funds for the payments by Genie II to Zoomeral was the Debtor's Morgan Stanley accounts and customer deposits as reflected in **Exhibit 5** (Summary of Inflows for Genie II).

136. The Debtor's loan to Zoomeral remain outstanding.[82]

---

[80] State of Delaware Department of State: Division of Corporations. https://icis.corp.delaware.gov/
[81] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.
[82] Ibid.

32

## Capitulum Homes / Capitulum LLC

137. Capitulum LLC ("Capitulum") was formed on January 11, 2017 in New York.[83]

138. Capitulum is owned solely by Cohan.[84]

139. According to a loan agreement, dated September 5, 2022, between the Debtor and Capitulum, the Debtor was to loan up to $1,500,000 in the form of a non-recourse unsecured line of credit to Capitulum and Capitulum promised to repay this principal amount to the lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance.[85]

140. The loan was to be repaid in the form of one (1) balloon payment due on December 5, 2029.[86]

141. Additionally, Capitulum had the sole right and decision making authority to be granted an extension of the loan agreement for up to ten (10) additional years upon the request of Capitulum.[87]

142. The loan is an unsecured, non-recourse, loan, with no personal guarantee by the officers of Capitulum.[88]

143. According to the loan agreement, Capitulum was to use the funds in accordance with a business plan provided by Capitulum and attached to the loan agreement. According to the executive summary attached to the loan agreement, Capitulum is a real estate

---

[83] New York Department of State Division of Corporations. https://apps.dos.ny.gov/publicInquiry/#search
[84] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.
[85] Loan agreement between Genie Holdings NV and Capitulum dated September 5, 2022, para. 1.
[86] Loan agreement between Genie Holdings NV and Capitulum, LLC dated September 5, 2022, para. 2.
[87] Loan agreement between Genie Holdings NV and Capitulum, LLC dated September 5, 2022, para. 4.
[88] Loan agreement between Genie Holdings NV and Capitulum, LLC dated September 5, 2022, para. 24, 25 and 26.

investment firm with a mission to transform undervalued properties into desirable homes, creating value for communities and returns for investors.[89]

144. Cohan executed the loan agreement on behalf of Capitulum and Hughes executed the agreement on behalf of the Debtor.

145. According to Cohan, the loans to Capitulum, were not for the benefit of the Debtor, but were to operate the Capitulum's business.[90]

146. The terms of the loan to Capitulum are under extremely favorable terms to the borrower and far outside the ordinary course of what Capitulum would receive from a standard loan at the time.

147. During the period May 2022 through August 2023, the Debtor transferred $517,110 to Capitulum as detailed in the table below:

**[INTENTIONALLY LEFT BLANK]**

---

[89] Exhibit A (Executive Summary) to the Loan agreement between Genie Holdings NV and Capitulum, LLC dated September 5, 2022, para. 24, 25 and 26.
[90] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.

34

| Account Name | Account No. | Date | Payee | Amount |
|---|---|---|---|---|
| Genie Investments NV | x8502 | 09/16/22 | Capitulum LLC | $ (2,437.00) |
| Genie Investments NV | x8502 | 09/22/22 | Capitulum LLC | (16,667.00) |
| Genie Investments NV | x8502 | 10/03/22 | Capitulum LLC | (20,000.00) |
| Genie Investments NV | x8502 | 10/19/22 | Capitulum LLC | (162,063.17) |
| Genie Investments NV | x8502 | 10/19/22 | Capitulum LLC | (10,800.00) |
| Genie Investments NV | x8502 | 10/20/22 | Capitulum LLC | (33,333.34) |
| Genie Investments NV | x8502 | 11/02/22 | Capitulum LLC | (4,666.66) |
| Genie Investments NV | x8502 | 11/04/22 | Capitulum LLC | (5,000.00) |
| Genie Investments NV | x8502 | 11/14/22 | Capitulum LLC | (35,320.83) |
| Genie Investments NV | x8502 | 11/16/22 | Capitulum LLC | (7,250.00) |
| Genie Investments NV | x8502 | 11/29/22 | Capitulum LLC | (10,000.00) |
| Genie Investments NV | x8502 | 12/06/22 | Capitulum LLC | (83,875.00) |
| Genie Investments NV | x8502 | 12/12/22 | Capitulum LLC | (2,812.50) |
| Genie Investments NV | x8502 | 12/13/22 | Capitulum LLC | (2,812.50) |
| Genie Investments NV | x8502 | 12/16/22 | Capitulum LLC | (15,000.00) |
| Genie Investments NV | x8502 | 12/16/22 | Capitulum LLC | (100.00) |
| Genie Investments NV | x8502 | 12/23/22 | Capitulum LLC | (5,250.00) |
| Genie Investments NV | x8502 | 01/04/23 | Capitulum LLC | (8,250.00) |
| Genie Investments NV | x8502 | 01/12/23 | Capitulum LLC | (3,000.00) |
| Genie Investments NV | x8502 | 01/20/23 | Capitulum LLC | (2,437.50) |
| Genie Investments NV | x8502 | 01/30/23 | Capitulum LLC | (4,500.00) |
| Genie Investments NV | x8502 | 02/01/23 | Capitulum LLC | (3,750.00) |
| Genie Investments NV | x8502 | 03/01/23 | Capitulum LLC | (20,000.00) |
| Genie Investments NV | x8502 | 04/11/23 | Capitulum LLC | (5,534.37) |
| Genie Investments NV | x8502 | 06/13/23 | Capitulum LLC | (2,000.00) |
| Genie Investments NV | x8502 | 07/03/23 | Capitulum LLC | (50,000.00) |
| Genie Investments NV | x8502 | 07/28/23 | Capitulum LLC | (250.00) |
| | | | **TOTAL** | $(517,109.87) |

148. According to Cohan and Hughes, the loans to Capitulum remains outstanding.[91]

149. According to the Debtor's SOFA (Doc. No. 40.), Cohan is affiliated with Capitulum and received $500,000 from the Debtor as a "Loan/Compensation to John Cohan as director." The Debtor's Amended SOFA (Doc. No. 61-1), were amended to reflect that the Debtor transferred $517,409.70 to Capitulum as an "insider corporation loan".

150. According to my review of the Debtor's bank records, there does not appear to have been any repayments of the loan by Capitulum to the Debtor to date.

---

[91] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.

## Cald Holdings LLC

151. Cald Holdings LLC ("Cald") was formed on June 22, 2020 in Florida. Davis is listed as the president of Cald Holdings.[92]

152. According to Cohan, Cald is an investment company operated by Davis.[93]

153. According to a loan agreement, dated September 5, 2022, between the Debtor and Cald, the Debtor was to loan up to $1,500,000 in the form of a non-recourse unsecured line of credit to Cald and Cald promised to repay this principal amount to the Debtor, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance.[94]

154. The loan was to be repaid in the form of one (1) balloon payment due on December 5, 2029.[95]

155. Additionally, Cald had the sole right and decision making authority to be granted an extension of the loan agreement for up to ten (10) additional years upon the request of the borrower.[96]

156. The loan is an unsecured, non-recourse loan, with no personal guarantee by the Cald's officers.[97]

157. According to the loan agreement, the borrower was to use the funds in accordance with a business plan provided by the borrower and attached to the loan agreement. According to the business plan, Cald is an independent investment firm with a focus on managing our own capital through strategic investments in stocks and bonds and their investment strategy

---

[92] State of Florida Division of Corporations.  https://search.sunbiz.org/Inquiry/CorporationSearch/ByName.
[93] Audio recording from the Section 341 Meeting of Creditors dated April 17, 2024.
[94] Loan agreement between Genie Holdings NV and CALD Holdings dated September 5, 2022, para. 1.
[95] Loan agreement between Genie Holdings NV and CALD Holdings dated September 5, 2022, para. 2.
[96] Loan agreement between Genie Holdings NV and CALD Holdings dated September 5, 2022, para. 4.
[97] Loan agreement between Genie Holdings NV and CALD Holdings dated September 5, 2022, para. 25 and 26.

was capital allocation. Cald allocated capital across a diversified portfolio of stocks and bonds with a focus on value investing and income generation.[98]

158. Davis executed the loan agreement on behalf of Cald and Cohan executed the agreement on behalf of the Debtor.[99]

159. The Debtor transferred $517,108.87 to Cald during the period May 2022 through August 2023 as detailed in the table below:

| Account Name | Account No. | Date | Payee | Amount |
|---|---|---|---|---|
| Genie Investments NV | x8502 | 09/16/22 | Cald Holdings LLC | $ (2,437.00) |
| Genie Investments NV | x8502 | 09/22/22 | Cald Holdings LLC | (16,666.00) |
| Genie Investments NV | x8502 | 10/03/22 | Cald Holdings LLC | (20,000.00) |
| Genie Investments NV | x8502 | 10/19/22 | Cald Holdings LLC | (172,863.17) |
| Genie Investments NV | x8502 | 10/20/22 | Cald Holdings LLC | (33,333.33) |
| Genie Investments NV | x8502 | 11/02/22 | Cald Holdings LLC | (4,666.66) |
| Genie Investments NV | x8502 | 11/04/22 | Cald Holdings LLC | (5,000.00) |
| Genie Investments NV | x8502 | 11/14/22 | Cald Holdings LLC | (35,320.83) |
| Genie Investments NV | x8502 | 11/16/22 | Cald Holdings LLC | (7,250.00) |
| Genie Investments NV | x8502 | 11/29/22 | Cald Holdings LLC | (10,000.00) |
| Genie Investments NV | x8502 | 12/07/22 | Cald Holdings LLC | (83,875.00) |
| Genie Investments NV | x8502 | 12/12/22 | Cald Holdings LLC | (2,812.50) |
| Genie Investments NV | x8502 | 12/13/22 | Cald Holdings LLC | (2,812.50) |
| Genie Investments NV | x8502 | 12/16/22 | Cald Holdings LLC | (15,000.00) |
| Genie Investments NV | x8502 | 12/16/22 | Cald Holdings LLC | (100.00) |
| Genie Investments NV | x8502 | 12/23/22 | Cald Holdings LLC | (5,250.00) |
| Genie Investments NV | x8502 | 01/04/23 | Cald Holdings LLC | (8,250.00) |
| Genie Investments NV | x8502 | 01/12/23 | Cald Holdings LLC | (3,000.00) |
| Genie Investments NV | x8502 | 01/20/23 | Cald Holdings LLC | (2,437.50) |
| Genie Investments NV | x8502 | 01/30/23 | Cald Holdings LLC | (4,500.00) |
| Genie Investments NV | x8502 | 02/01/23 | Cald Holdings LLC | (3,750.00) |
| Genie Investments NV | x8502 | 03/01/23 | Cald Holdings LLC | (20,000.00) |
| Genie Investments NV | x8502 | 04/11/23 | Cald Holdings LLC | (5,534.38) |
| Genie Investments NV | x8502 | 06/13/23 | Cald Holdings LLC | (2,000.00) |
| Genie Investments NV | x8502 | 07/03/23 | Cald Holdings LLC | (50,000.00) |
| Genie Investments NV | x8502 | 07/28/23 | Cald Holdings LLC | (250.00) |
| | | | **TOTAL** | $ (517,108.87) |

160. According to Cohan, the loans to Cald were not for the benefit of the Debtor, but were to operate Cald's business.

---

[98] Loan agreement between Genie Holdings NV and CALD Holdings dated September 5, 2022 – Business Plan of Cald Holdings.

[99] Loan agreement between Genie Holdings NV and CALD Holdings dated September 5, 2022, pp. 9.

161. Once again, the terms of the loan to Cald were under extremely favorable terms to the borrower and far outside the ordinary course of what Cald would receive from a standard loan at the time.

162. Davis does not appear to be currently affiliated with the Debtor.

163. According to Cohan and Hughes, the loans to Cald remains outstanding.[100]

164. According to the Debtor's SOFA (Doc. No. 40.), Davis is affiliated with Cald and the Debtor transferred $500,000 to Cald as a "Loan/Compensation to Caleb Davis as former director." The Debtor's Amended SOFA (Doc. No. 61-1), were amended to reflect that the Debtor transferred $516,358.87 to Cald as a "Loan to an insider corporation controlled by Former Director."

165. According to my review of the Debtor's bank records, there does not appear to have been any repayments of the loan by Cald to the Debtor to date.

## Genie Investments II, LLC

166. As previously stated, Genie II was formed on September 14, 2022 in Delaware and is owned 50% by Hughes and 50% by Cohan.[101][102]

167. The Debtor entered into a loan agreement dated August 15, 2023 with Genie Investments II. The Debtor was to loan up to $2,000,000 in the form of a non-recourse unsecured line of credit to the Genie II and Genie II promised to repay this principal amount to the lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance.[103]

---

[100] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.
[101] State of Delaware Department of State: Division of Corporations.  https://icis.corp.delaware.gov/
[102] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.
[103] Loan agreement between Genie Holdings NV and Genie Investments II, LLC dated August 15, 2023, para. 1.

168. The loan was to be repaid in the form of one balloon payment due on August 15, 2030.

169. Additionally, Genie II had the sole right and decision making authority to be granted an extension of the loan agreement for up to ten (10) additional years upon the request of the borrower.[104]

170. The loan is an unsecured, non-recourse loan, with no personal guarantee by the officers of the Genie II.

171. According to the loan agreement, Genie II was to use the funds in accordance with a business plan provided by Genie II and attached to the loan agreement. According to the executive summary attached to the loan agreement, Genie II operates as a lending company, specializing in providing a range of investment and loan products to corporate clients. Genie II's mission is to empower financial growth and stability for their clients through innovative lending solutions and investment opportunities, while maintaining transparency about the risks and rewards associated with financial activities.[105]

172. Cohan executed the loan agreement on behalf of Genie II and Hughes executed the agreement on behalf of the Debtor.

173. According to Cohan, the loans were not for the benefit of the Debtor, but were to operate Genie II's business.[106]

174. The terms of the loans to Genie II are under extremely favorable terms to the borrower and far outside the ordinary course of what Genie II would receive from a standard loan at the time.

175. According to Cohan and Hughes, the loans to Genie II remain outstanding.[107]

---

[104] Loan agreement between Genie Holdings NV and Genie Investments II, LLC dated August 15, 2023, para. 4.
[105] Genie Investments II LLC, Executive Summary, dated August 15, 2023.
[106] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.
[107] Audio recording from the Section 341 Meeting of Creditors held on April 3, 2024.

39

176. According to my review of the Debtor's bank records, there does not appear to have been any repayments of the loans by Genie II to the Debtor to date.

177. Genie II opened a bank account at TD Bank in January 2023, account x4873.

178. Based on my review of the Debtor's brokerage accounts for the period November 2022 through January 2024, Genie NV transferred $1,244,606 from its Genie Brokerage Account to Genie II.

179. Additionally, from my review of the Genie II bank records, it also appears that certain of the Debtor's creditors and customers deposited approximately $392,000 into Genie II's TD Bank account ending x4873. Genie NV's customers did not have a relationship with Genie II to justify depositing funds to a Genie II account.

180. Attached as **Exhibit 5** is a summary of the inflow of funds into the Genie II bank account and **Exhibit 6** is a summary of the outflow of funds out of the same Genie II account.

181. As reflected in **Exhibit 5,** the majority of the deposits in the Genie II account were from Genie NV customers or directly from the Genie Brokerage Account.

182. As reflected in **Exhibit 6,** and summarized in the table below, Genie II paid $1,079,250 to other businesses owned by the Debtor principals:

| Payee | Amount |
|---|---|
| Zoomeral Inc. | $   (979,250.00) |
| Better Methods I LLC | (100,000.00) |
| **TOTAL** | **$(1,079,250.00)** |

183. According to the Debtor's Amended SOFA (Doc. No. 61-1), the Debtor transferred $1,085,073 to Genie II as a "loan to an insider corporation".

40

184. As also reflected in **Exhibit 6,** and summarized in the table below, Genie II paid $222,381 to several law firms.

| Payee | Amount |
|-------|--------|
| Walker Law Office LLC | $ (103,316.89) |
| Spiegel and Utrera | (59,426.13) |
| Shaver Law Group | (57,238.00) |
| Warren Law Group | (2,400.00) |
| **TOTAL** | $ (222,381.02) |

## Better Methods I LLC

185. Better Methods I LLC ("Better Methods") was formed in Wyoming on October 18, 2023. Cohan is the managing member.[108]

186. Better Methods is owned 50% by Hughes and 50% by Cohan.[109]

187. Cohan controls the bank account for Better Methods.[110]

188. According to Cohan, Better Methods is an asset management company set up to protect the Debtor's assets and the assets of the Debtor's clients.[111]

189. The Debtor entered into a loan agreement dated January 3, 2023 with Better Methods. The Debtor was to loan up to $500,000 in the form of a non-recourse unsecured line of credit to Better Methods and Better Methods promised to repay this principal amount to the lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance.[112]

190. The loan was to be repaid in the form of one (1) balloon payment due on January 3, 2030.[113]

---

[108] Wyoming Secretary of State.  https://wyobiz.wyo.gov/Business/Default.aspx
[109] Audio recording from the Section 341 Meeting of Creditors dated April 17, 2024.
[110] Ibid.
[111] Section 341 Meeting of Creditors transcript dated March 27, 2024, pp. 27:12-20.
[112] Loan Agreement between Genie Investments NV and Better Methods LLC, dated January 3, 2003.
[113] Loan Agreement between Genie Investments and Better Methods LLC, para. 2.

191. Additionally, Better Methods had the sole right and decision making authority to be granted an extension of the loan agreement for up to ten (10) additional years upon the request of the borrower.

192. The loan is an unsecured, non-recourse, loan, with no personal guarantee by the officers of the Better Methods.

193. According to the loan agreement, the Borrower was to use the funds in accordance with a business plan provided by the Borrower and attached to the loan agreement. According to the executive summary attached to the loan agreement, Better Methods specializes in investments and asset management, offering innovative financial strategies and solutions to their clients. Their mission is to leverage unique market opportunities to provide substantial returns on their investments.[114]

194. The terms of the loan to Better Methods are under extremely favorable terms to the borrower and far outside the ordinary course of what Better Methods would receive from a standard loan at the time.

195. Cohan executed the loan agreement on behalf of Better Methods and Hughes executed the agreement on behalf of the Debtor.


**[INTENTIONALLY LEFT BLANK]**

---

[114] Executive Summary of Better Methods.

196. Better Methods received funds from and disbursed funds to Genie NV and Genie II as detailed in the following table:

| Account Name | Account No. | Date | Payee | Amount |
|---|---|---|---|---|
| Genie Investments NV | x8502 | 01/06/23 | Better Methods | $ (100,000.00) |
| Genie Investments NV | x8502 | 03/07/23 | Better Methods | (450,000.00) |
| Genie Investments NV | x8502 | 03/08/23 | Better Methods | (100,000.00) |
| Genie Investments NV | x8502 | 07/12/23 | Better Methods | 520,000.00 |
| | | | Subtotal | $ (130,000.00) |
| Genie Investments II LLC | x4873 | 01/08/24 | Better Methods | (100,000.00) |
| | | | Subtotal | $ (100,000.00) |
| | | | TOTAL | $ (230,000.00) |

197. As reflected in the table, Better Methods received $130,000 in net transfers from the Debtor and $100,000 from Genie II for total transfers of $230,000 to Better Methods.

198. According to the Debtor's Amended SOFA (Doc. No. 61-1), the Debtor transferred $81,500 to Better Methods as an insider corporate loan.

199. According to Cohan, "all funds transferred to Better Methods ultimately were used for Genie legal fees and other Genie expenses (i.e. Adam Walker's office, Bryan Mickler's office, arbitration costs, other attorney fees, accounting fees, etc.)"

### Genie's Angels

200. Genie's Angels LLC ("Genie's Angels") was formed in Delaware.[115]

201. Genie's Angels was set up to be a non-profit entity established by the principals of the Debtor to help people pay off their credit cards.[116]

202. I was unable to locate incorporation or formation documents for Genie's Angels.

---

[115] Interview of David Hughes and John Cohan, held on June 10, 2024.
[116] Audio recording from the Section 341 Meeting of Creditors held on April 17, 2024.

203. The Debtor entered into a loan agreement dated June 1, 2023 with Genie's Angels (Borrower). The Debtor was to loan up to $50,000 in the form of a non-recourse unsecured line of credit to Genie's Angels and Genie's Angels promised to repay this principal amount to the lender, with any accrued interest payable on the unpaid principal at the rate of 0.1 percent (.1%) per annum, calculated yearly not in advance.[117]

204. The loan was to be repaid in the form of one (1) balloon payment due on June 1, 2030.[118]

205. Additionally, Genie's Angels had the sole right and decision making authority to be granted an extension of the loan agreement for up to ten (10) additional years upon the request of the borrower.[119]

206. The loan is an unsecured, non-recourse, loan, with no personal guarantee by the officers of the Genie's Angels.

207. According to the loan agreement, the Borrower was to use the funds in accordance with a business plan provided by the Borrower and attached to the loan agreement. According to the executive summary attached to the loan agreement, Genie's Angels is a financial services startup dedicated to providing innovative solutions for consumers seeking to efficiently manage and pay off their credit card debt.[120]

208. The loan was executed by Cohan on behalf of Genie's Angels and Hughes on behalf of the Debtor.

209. The Debtor transferred $25,000 to Genie's Angels on June 9, 2023.

---

[117] Loan agreement, dated June 1, 2023 between Genie Investments NV and Genie's Angels LLC, para. 1.
[118] Loan agreement, dated June 1, 2023 between Genie Investments NV and Genie's Angels LLC, para. 2.
[119] Loan agreement, dated June 1, 2023 between Genie Investments NV and Genie's Angels LLC, para. 4.
[120] Genie's Angels Executive Summary.

210. The terms of the loan to Genie's Angels are under extremely favorable terms to the borrower and far outside the ordinary course of what Genie's Angels would receive from a standard loan at the time.

211. There does not appear to have been any repayments of the loans by Genie's Angels to the Debtor to date.

212. According to the Debtor's Amended SOFA (Doc. No. 61-1), the Debtor transferred $25,000 to Genie's Angels as a "loan to an insider corporation".

### Genie Investments NV, Inc. (Florida)

213. Genie Investments NV, Inc. was incorporated in April 2024 in Florida by Hughes and Cohan ("Genie Florida).[13]

214. I was provided with and analyzed bank records for Wells Fargo account ending x9881 held in the name of Genie Florida. According to Hughes and Cohen, this was the only account in the name of Genie Florida.

215. The Debtor transferred $11,275,000 from its JPMorgan Chase account ending x8502 on July 28, 2022 to Genie Florida's Wells Fargo account ending x9881. On September 22, 2022, Genie Florida transferred the exact same amount back to the Debtor's JPMorgan Chase account ending x8502. There is no other activity in the Genie Florida Wells Fargo other than interest earned during this time period.

216. According to Cohan, the Genie Investments NV Inc., Wells Fargo account was opened because "we wanted to have multiple bank accounts open to diversify our banking relationships."

## Genie Investments LLC

217. Genie Investments LLC ("Genie Investments") was incorporated in 2020 in Delaware.[121]

218. I analyzed the bank records for two bank accounts held at TD Bank in the name of Genie Investments, TD Bank account ending x2343 for the period February 2024 through May 2024 and TD Bank account ending x2998 for the period February 2021 through January 2024. Both of these accounts had minimal activity during this period.

## VII.   LIMITATIONS IN FINDINGS BASED ON AVAILABLE RECORDS

219. Based on my communications with creditors and a review of Affidavits filed by customers, it appears that at times customers did not remit funds directly to the Debtor for ICA payments, Due Diligence Fees, or other payments related to loans, but rather to accounts that according to Hughes and Cohan are held in the name of third parties.  Below is a list of non-debtor bank accounts that customers remitted funds to and the name of the account holder according to communications with Hughes and Cohan:

    a.   HomeStreet Bank account ending x1792 – "IOTA account for an attorney named Michael Connor for which Genie NV has no access";

    b.   First Merchant Bank account ending x7536 – "McMann account for which Genie NV has no access";

    c.   JPMorgan Chase account ending x1287 – "Knights Bank account for which Genie has no access";

    d.   Wells Fargo Bank account ending x9842 – "IOTA account for an attorney named Michael Connor for which Genie NV has no access"; and

---

[121] State of Delaware Department of State: Division of Corporations. https://icis.corp.delaware.gov/

  e.  Old Plank Trail Community Bank account ending x6406 – According to Cohan, "to the best of his knowledge, this is a McMann account."

220.  In addition, based on my review of the bank records, we noted transfers from another account in the name of Michael Connor IOTA Account ending x7497 at Wells Fargo.

221.  As of the writing of this Report, I have not reviewed records for these accounts.

222.  Of specific importance are the Michael Connor IOTA accounts identified at Wells Fargo. During the period May 2022 through August 2023, the Debtor received approximately $15 million from these accounts which were deposited in the Debtor's JPMorgan Chase account ending x8502. As of the writing of this Report, we have not obtained records for these accounts. The table below summarizes the transfers from these accounts to the Debtor:

| Payor | Date | Amount |
|-------|------|--------|
| Michael Connor Esq | 06/08/22 | $ 5,027,000.00 |
| Michael Connor Esq | 07/12/22 | 6,250,000.00 |
| Michael Connor Esq | 10/14/22 | 2,073,184.67 |
| Michael Connor Esq | 11/02/22 | 505,030.00 |
| Michael Connor Esq | 05/04/23 | 1,118,592.88 |
| TOTAL | | $ 14,973,807.55 |

223.  According to Hughes, there was a time during which customers made payments to the Michael Connor IOTA account(s). I am unable to determine which customers these funds belong to without having access to the Michael Connor IOTA account.

224.  According to Hughes and public record information, Connor was arrested in August 2022 and indicted in April 2023. It is my understanding that Connor is incarcerated for the foreseeable future.

## VIII.  **OBSERVATIONS AND CONCLUSIONS**

### Current Conditions

225. There does not appear to be an ongoing viable business of Genie NV.  It is unlikely that future borrowers and customers would enter into a lending relationship with the Debtor after the substantial amount of reputational damage incurred by the Debtor.

226. There have been approximately $30.9 million in claims filed in this case.

227. The most recent monthly operating report ("MOR") filed by the Debtor on April 30, 2024 (Doc. No. 106), includes a profit and loss statement that lists total income of $0. Additionally, the Debtor attached its Morgan Stanley statement to the April MOR reflecting an ending balance of $0.96 as of April 30, 2024, so there is no cash on hand. The balance sheet lists its primary asset as $83,500,025 in accounts receivable from Velanos.

228. The balance sheet attached to the April MOR also lists $8,110,700 in loans receivable.  I have reviewed a loan schedule provided by the Debtor, titled, "Principal Due" and reconciled the loans on that schedule against the loans reflected on the Debtor's April 30, 2024 balance sheet.  Approximately $3.6 million of the loans receivables are loans to the related businesses of Cohan, Hughes, and Davis.  Therefore, there remains approximately $4.5 million in non-insider loans receivables as of April 30, 2024.

### [INTENTIONALLY LEFT BLANK]

229. The table below provides the total amount of balloon payments by year for the non-insider loans. The majority of the funds are not due to come in until 2032.

| Term End Year | Amount |
|---|---|
| 2026 | $ 518,500.00 |
| 2027 | 191,000.00 |
| 2029 | – |
| 2030 | – |
| 2032 | 3,340,600.00 |
| 2033 | 530,000.00 |
| 2038 | 20,000.00 |
| **TOTAL** | **$4,600,100.00** |

## Related Transactions

230. According to my review of the Debtor's books and records, significant transfers occurred between the Debtor and related companies within two years and one year of the filing of the bankruptcy petition as shown in the table below

| (Payee) / Payor | 1-Year Period Net Amount | 2-Year Period Net Amount |
|---|---|---|
| Zoomeral Inc | $    (534,381) | $    (1,771,556) |
| Genie Investments II | (736,606) | (736,606) |
| Capitulum LLC | (77,784) | (517,410) |
| Cald Holdings LLC | (77,784) | (517,109) |
| Better Methods | (30,000) | (130,000) |
| Genies Angels | (25,000) | (25,000) |
| **TOTAL** | **$   (1,481,556)** | **$   (3,697,681)** |

231. The Debtor has classified the payments to these companies as loans in its books and records. As previously stated, the terms of the loans to these entities are far outside the ordinary course that the respective companies would obtain through traditional loans. As of the date of this Report, these loans remain outstanding.

49

232. In addition, funds were transferred from Genie II to other businesses owned by Hughes and Cohan as summarized in the table below:

| (Payee)/Payor | Net Amount |
|---|---|
| Zoomeral Inc | $ (979,250) |
| Better Methods I LLC | (100,000) |
| Genie Investments LLC / TD Bank x2998 | (500) |
| **TOTAL** | **$ (1,079,750)** |

233. It appears that potential distributions for the creditors of this estate may result from the avoidance of potential preferential transfers and potential fraudulent transfers to insiders and potential claims against professionals.

234. Without the appointment of an independent fiduciary, it is unlikely that the Debtor-in-Possession can independently pursue avoidance of potential preference actions and potential fraudulent transfers against insiders to maximize recoveries for the creditors of the estate.

## Funding From Third Parties

235. As previously stated, none of Genie NV's customers had loans funded by Genie NV's Lender Capital Partners. Genie NV attempted to locate potential Lender Capital Partners, however none of the Lender Capital Partners came to fruition and provided funding.

236. The Debtor entered an agreement with Velanos in which the Debtor proceeded to transfer $9,000,000 on the promise that Velanos would provide a 100% return in 30 days and profit participation up to approximately 900% in total.

50

237. The Debtor's use of customer funds as contributions to Velanos demonstrates gross mismanagement of the customer's funds. Neither Velanos nor Wearmouth were registered investment advisors and Velanos failed to meet its obligations to the Debtor.

238. To date, the Debtor's principals have failed to obtain third party funding which they admit is required for the operation of the Debtor.

### Proposed Settlement

239. Based on my investigation and the findings detailed throughout the Report, it would be detrimental to creditors of the estate to continue in a chapter 11 bankruptcy proceeding that solely relies on the Proposed Settlement and Velanos's commitment to make the payments in accordance with the Proposed Settlement.

240. As discussed earlier in this Report, Velanos has failed to meet its obligations to return millions of dollars of funds to the Debtor on numerous instances since at least December 30, 2022. The history of Velanos's default should weigh heavily on any consideration of the Proposed Settlement provided and ultimate distribution to the creditors of this estate.

241. Additionally, it would appear that Wearmouth is already subject to a creditor that has obtained a judgment against him in Wyoming which was also domesticated in Florida. Should the Proposed Settlement be approved, in the event of a default by Velanos, the Debtor's claim against Velanos and/or Wearmouth may be subordinated to non-estate creditors.