## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

GENIE INVESTMENTS NV INC.,                          Case No.: 3:24-bk-00496-BAJ

           Debtor.                                   Chapter 7

_____/

### TRUSTEE'S RESPONSE TO COMBINED MOTION FOR SANCTIONS AND
### PROTECTIVE ORDER AND REQUEST FOR EVIDENTIARY HEARING

Aaron R. Cohen, Chapter 7 Trustee (the "Trustee"), by and through his undersigned counsel, files his Response to the Combined Motion for Sanctions and Protective Order Against Chapter 7 Trustee For Retaliatory Conduct, Abuse of Process, and Breach of Fiduciary Duty (Doc. 274) (the "Motion") filed by John Michael Cohan ("Cohan") and David Hughes ("Hughes") and requests that the Court hold an evidentiary hearing on the Motion. In support the Trustee states as follows:

1.  On February 21, 2024 (the "Petition Date"), Genie Investments NV Inc. (the "Debtor") filed a Voluntary Petition for Relief (Doc. 1) under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, in the case styled *In re Genie Investments NV Inc.*, Case No: 3:24-bk-00496-BAJ (the "Bankruptcy Case").

2.  On August 12, 2024, the Bankruptcy Case was converted to a Chapter 7 liquidation case and the Trustee was appointed to administer the Debtor's estate (Doc. 207).

3.  Cohan and Hughes are the owners and former principals of the Debtor, with each owning 50% of the Debtor. (Debtor's Statement of Financial Affairs (Doc. 40) at p. 15).

4.      In 2022 and 2023, the Debtor entered into loan agreements with several companies owned by Cohan and Hughes including Zoomeral, Inc., Capitulum Homes, LLC, Genie Investments II, LLC, Better Methods, LLC, and Genie's Angels, LLC (collectively, the "Insider Companies") (Chapter 11 Examiner's Report at pp. 29-45). The Trustee has copies of the loan agreements and has reviewed them. Each of the loan agreements provided for an interest rate of only .1% and that the loans would be repaid in one balloon payment in seven years with the option to extend the loans given solely to the Insider Companies. According to the Chapter 11 Examiner's Report, which was based on her review of the Debtor's bank statements, the Debtor transferred over $3.6 million to the Insider Companies. (*Id*.). Given that the purported loans were made to insiders and that the loans were not commercially reasonable, the Trustee believes that the $3.6 million transferred to the Insider Companies constitute fraudulent transfers.

5.      After holding the Section 341 Meeting of Creditors, taking a Rule 2004 examination of the Debtor, and attempting to determine the disposition of over $1.1 million in the Debtor's Chase Bank accounts that were closed in August 2023 and whether those funds were transferred to the Insider Companies, the Trustee was ready to move forward with claims against the Insider Companies. Therefore, on January 24, 2025, the Trustee's counsel sent demand letters to each of the Insider Companies demanding return of the fraudulently transferred funds. The Trustee intends to file an adversary complaint against the Insider Companies seeking return of the fraudulently transferred funds.

6.      The Motion filed by Cohan and Hughes attempts to argue the merits of the Trustee's fraudulent transfer claims against the Insider Companies and requests that the Court enter a protective order prohibiting the Trustee from suing the Insider Companies. There is no basis in

2

law or fact for such a protective order and the merits of the Trustee's claims against the Insider Companies will be determined by the Court in the adversary proceeding the Trustee intends to file.

7.      Additionally, on its Schedules, the Debtor listed a malpractice claim against the Warren Law Group as an asset of the bankruptcy estate. (Schedule A/B (Doc. 39) at p. 13). The Warren Law Group represented the Debtor in connection with the Debtor's joint venture agreement with Velanos Principal Capital. After the Trustee was appointed, he obtained documents related to the malpractice claim from the Debtor's attorneys. The Debtor had retained counsel to pursue the malpractice claim before this case was converted to Chapter 7. The Trustee interviewed the attorney retained by the Debtor as malpractice counsel and determined that the bankruptcy estate would be better served by retaining new malpractice counsel because the attorney retained by the Debtor had never handled a legal malpractice case before and was located in Texas, while the Warren Law Group is located in New York and any malpractice action would have to be brought in New York.

8.      The Trustee began to search for and interview potential malpractice counsel in New York. The Trustee also served a subpoena on the Warren Law Group in order to perform some due diligence on the malpractice claim. (Notice of Issuance of Subpoena, Doc. 256)[1]. The Warren Law Group served its response to the subpoena on December 26, 2024 with additional documents being provided on January 8, 2025. After review of the documents from the Warren Law Group, the Trustee has contacted and interviewed five different law firms who handle legal malpractice cases in New York and is in the process of selecting an attorney to represent the estate for the legal malpractice claim.

---

[1] The Subpoena attached to Doc. 256 reflects an issue date of October 24, 2024 and a response date of November 25, 2024. After that Subpoena was served, the Trustee was informed that the wrong law firm had been served and therefore a new subpoena was issued on November 25, 2024 with a response date of December 26, 2024.

79726991;1

9.      On January 22, 2025, the Trustee's counsel was notified by counsel for the Warren Law Group that it had received a demand letter from Cohan and Hughes demanding $4 million for their personal financial losses, "reputational damage," "emotional and professional strain", and "breach of trust" resulting from the Warren Law Group's representation of the Debtor. A copy of this letter is attached as **Exhibit A**. The Trustee's counsel immediately contacted Cohan and Hughes and informed them that the malpractice claim against the Warren Law Group was an asset of the bankruptcy estate to be administered by the Trustee and requesting that they immediately cease and desist from asserting claims for legal malpractice against the Warren Law Group. The Trustee's counsel acknowledged that Cohan and Hughes were free to assert any personal claims they hold against third parties, but that their attempt to assert personal claims against the Warren Law Group, even if unsuccessful, would adversely impact the bankruptcy estate because the firm would look to its legal malpractice insurance policy to pay defense costs, which would deplete any recovery from the same policy for the bankruptcy estate. A copy of the emails exchanged between Trustee's counsel and Cohan and Hughes are attached as Exhibit H to the Motion.

10.     On January 24, 2025, the Trustee's counsel sent a letter to Cohan and Hughes reiterating that any claims for malpractice against the Warren Law Group belonged to the bankruptcy estate and could only be asserted by the Trustee and informing them that if they continued to pursue claims that belonged to the bankruptcy estate, the Trustee would file a motion for sanctions. A copy of this letter is attached to the Motion as Exhibit F.

11.     On January 27, 2024 and in response to the demand letters to the Insider Companies and the correspondence regarding the malpractice claim against Warren Law Group, the Trustee received two letters from Cohan and Hughes, copies of which are attached as **Exhibit B** and **Exhibit C**. The letters contain the same arguments as the Motion and demanded that the Trustee

pay Cohan and Hughes $500,000 to "settle" claims Cohan and Hughes assert against the Trustee. *See* Exhibit C at p. 2.

12.     Before the Trustee could even respond to the January 27 letters from Cohan and Hughes, they filed the Motion seeking sanctions against the Trustee in the amount of $750,000 and a protective order prohibiting the Trustee from pursuing claims against the Insider Companies. The Motion claims that the demand letters sent to the Insider Companies for repayment of the purported "loans" was a "retaliatory action" by the Trustee for Cohan's and Hughes' claims against the Warren Law Group. The Motion also alleges that the Trustee has failed to act in good faith by not pursuing valid claims against third parties, such as the Warren Law Group and that the Trustee has breached his fiduciary duty by "targeting" the Insider Companies while not pursuing the Warren Law Group. Finally, the Motion alleges that the Trustee has failed to "maintain transparency" because he has not informed Cohan and Hughes of the status of the Trustee's prosecution of the Warren Law Group malpractice claim. The Motion requests that the Court enter a protective order prohibiting the Trustee from asserting claims against the Insider Companies.

13.     As detailed above, there is no basis in fact or law for the allegations and relief requested in the Motion. The Trustee has a duty to pursue any and all claims held by the bankruptcy estate, including potential claims against the Insider Companies. Whether the purported loans to the Insider Companies are fraudulent transfers or were legitimate loans will be determined by this Court in due course in the context of an adversary proceeding. The demand letters sent to the Insider Companies were not "retaliatory actions" by the Trustee but instead, was a coincidence of timing, because the Trustee and his counsel determined that the time was ripe for sending the demand letters since they concluded that no additional information regarding the disposition of the funds in the Debtor's bank accounts would be provided by Cohan and Hughes. Furthermore, the

claim for legal malpractice against the Warren Law Firm clearly belongs to the bankruptcy estate and not Cohan and Hughes because the Warren Law Firm was engaged to represent the Debtor in its transaction with Velanos – the law firm did not represent Cohan and Hughes in their individual capacities. Finally, the Trustee has no duty of "transparency" to the Debtor's former principals with respect to the claims the Trustee is pursing. Notably, Cohan and Hughes have never asked the status of the prosecution of the malpractice claim against the Warren Law Firm – had Cohan and Hughes asked the Trustee the status of the malpractice claim, the Trustee would have provided it.

14.     The Court has scheduled a non-evidentiary hearing on the Motion for February 25, 2025 at 10:00 a.m. The Trustee believes that an evidentiary hearing on the Motion is necessary and requests that the Court hold an in-person evidentiary hearing on the Motion.

## **Memorandum of Law**

### A.     **Sanctions Cannot Be Imposed On the Trustee**

Cohan and Hughes are prohibited from seeking sanctions against the Trustee for acts undertaken in his official capacity as bankruptcy trustee. It is black letter law that bankruptcy trustees are entitled to qualified immunity for any actions that are taken within the scope of the trustee's official duties. *See Matter of Ondova Ltd. Co.*, 914 F.3d 990, 993 (5th Cir. 2019) (holding that bankruptcy trustees are entitled to qualified immunity for actions that fall within the scope of their official duties); *In re McKenzie*, 716 F.3d 404, 413 (6th Cir. 2013) ("[A] bankruptcy trustee is ordinarily entitled to quasi-judicial (or derivative) immunity from suit by third parties for actions taken in his official capacity."); *Sierra v. Seeber*, 966 F.2d 1444 (4th Cir. 1992) (same); *In re Lickman*, 297 B.R. 162 (Bankr. M.D. Fla. 2003) (trustees have immunity for acts taken that are within the scope of their duties in administering the estate); *In re Clearwater Bay Marine Service,*

*Inc.*, 236 B.R. 285 (Bankr. M.D. Fla. 1999) (same); *In re Sanchez Energy Corp.*, 661 B.R. 522 (Bankr. S.D. Tex. 2024) (trustee enjoys qualified immunity for acts within the scope of his duties as trustee).

The doctrine of trustees' immunity has also been applied to motions seeking sanctions against a trustee. In *In re Solar Financial Services, Inc.*, 255 B.R. 801 (Bankr. S.D. Fla. 2000), the Chapter 7 trustee filed an accounting malpractice action against the Debtor's former accountants in state court. The accountants filed a motion for sanctions against the trustee for abandoning certain records, which the trustee felt were duplicative of other files in storage, because the accountants argued they were entitled to review the records. The motion for sanctions was removed to the bankruptcy court. After explaining the general rule that trustees are entitled to qualified judicial immunity for acts taken within their authority as an officer of the court, the court held that the doctrine applied to the accountants' motion for sanctions. The accountants had attempted to argue that its motion for sanctions was not a "suit" against the trustee and therefore the doctrine did not apply. The court rejected that argument stating that the "essence of the Barton Doctrine is to protect the trustee who is carrying out his duties to administer the case and to protect the integrity of the Court." 255 B.R. at 805.  Since the Trustee abandoned the records in his official capacity as trustee and followed the requisite notice requirement for abandonment of the records, the *Barton* doctrine prohibited sanctions against the Trustee. *See also In re Day*, No. 14-01908, 2014 WL 4271647 (D.N.J. Aug. 28, 2014) (*Barton* doctrine applied to frivolous litigation claims against a bankruptcy trustee).

In sending demand letters to the Insider Companies and in acting to preserve the Debtor's malpractice claim as property of the estate, the Trustee was acting in his official capacity and therefore is immune from sanctions.

79726991;1

**B.      Cohan and Hughes Are Not Entitled to a Protective Order**

In their Motion, Cohan and Hughes also request that the Court enter a protective order prohibiting the Trustee from pursuing claims against the Insider Companies. However, a protective order clearly cannot prohibit the Trustee from pursuing legitimate claims, even if Cohan and Hughes were entitled to such an order which they are not. The Motion cites to Rule 26(c), Federal Rules of Civil Procedure, which is applicable to bankruptcy adversary proceedings pursuant to Rule 7026, Federal Rules of Bankruptcy Procedure, and provides for protective orders for persons from whom discovery is sought. The Trustee is not seeking any discovery from Cohan and Hughes and therefore Rule 26 is inapplicable.

In reality what Cohan and Hughes are seeking is an injunction prohibiting the Trustee from seeking to recover the transfers to their Insider Companies. Cohan and Hughes are not entitled to such an injunction. In layman's terms, the party seeking an injunction must show, among other things, that the defendant has done something wrong and that the defendant's actions will cause irreparable injury without the court's intervention.

A court may only grant injunctive relief if the movant demonstrates (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that if issued, the injunction would not be adverse to the public interest. *Oscar Ins. Co. of Fla. v. Blue Cross & Blue Shield of Fla., Inc.*, 360 F. Supp. 3d 1278, 1283 (M.D. Fla. 2019). *See also Nat'l Hisp. Corp. Achievers, Inc. v. Theodorides-Bustle*, No. 6:08-cv-1520, 2008 WL 5111254, at *1 (M.D. Fla. Dec. 3, 2008). Cohan and Hughes cannot meet the requirements for an injunction prohibiting the Trustee from pursuing claims against them or the Insider Companies.

79726991;1

The Trustee has a reasonable basis for asserting that the "loans" are, in reality, fraudulent transfers given the terms of the purported loans with a .1% interest rate. For example, the prime interest rate for the time period in which the loans to the Insider Companies were made ranged from 6.25% to 8.5%. Even the IRS "Applicable Federal Rate" used to determine whether loans to insiders are actual loans or gifts for federal income tax purposes was 2.22% to 3.24% during the same time period. The Trustee believes that he will be able to prove the elements of fraudulent transfer in an adversary proceeding against the Insider Companies. Accordingly, there is absolutely no basis for an injunction prohibiting the Trustee from pursuing claims against the Insider Companies.

Finally, the Trustee requests that the Court hold an evidentiary hearing on the Motion. The issue of the imposition of sanctions against the Trustee and whether Cohan and Hughes are entitled to an injunction require factual findings by the Court and therefore, the Trustee believes that an evidentiary hearing is necessary.

WHEREFORE, Aaron R. Cohen, Chapter 7 Trustee, respectfully requests that the Court hold an evidentiary hearing on the Combined Motion for Sanctions and Protective Order Against Chapter 7 Trustee, deny the Motion, and for such other and further relief as the Court deems just and proper.

Dated:  January 29, 2025                                  AKERMAN LLP

By: */s/ Raye C. Elliott*
    Raye  C. Elliott, Esq.
    Florida Bar Number: 018732
    Email: raye.elliott@akerman.com
    401 East Jackson Street, Suite 1700
    Tampa, FL 33602
    Phone:  (813) 223-7333
    Fax:  (813) 223-2837

Attorneys for Aaron R. Cohen, Chapter 7 Trustee

79726991;1

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 29, 2025, I filed a true and correct copy of the foregoing with the United States Bankruptcy Court for the Middle District of Florida using the Court's CM/ECF system, which will serve copies on all counsel of record and by U.S. Mail and email to:

John Michael Cohan
11179 Limerick Dr.
Jacksonville, FL 32256
jmcohan@genieinvestments.com

David Hughes
PO Box 60443
Jacksonville, FL 32211
dhughes@genieinvestments.com

*/s/ Raye C. Elliott*
Attorney

79726991;1

9589 0710 5270 1520 9772 75

John Michael Cohan & David Hughes
PO BOX 60443
JACKSONVILLE, FLORIDA 32236
jmcohan@genieinvestments.com; dhughes@genieinvestments.com

01-21-2025

**VIA CERTIFIED MAIL & REGULAR MAIL**

WARREN LAW GROUP
519 8th Avenue, 25th Floor
New York, NY 10018

**Re: Demand for Settlement – Professional Negligence, Breach of Duty, and Unethical Conduct by Scott Oh**

**Plaintiffs: John Michael Cohan and David Hughes**

Dear Warren Law Group and Mr. Scott Oh,

This letter serves as a formal demand on behalf of the undersigned plaintiffs, John Michael Cohan and David Hughes, regarding substantial financial losses, reputational harm, and damages allegedly caused by the professional malpractice, breach of fiduciary duty, and unethical conduct of Mr. Scott Oh in connection with our business dealings as owners of Genie Investments NV, Inc. ("Genie") and its Joint Venture Agreement (JVA) with Velanos Principal Capital.

**Background**

The declaration of Adam B. Walker and additional evidence reveal a pattern of negligence and unethical conduct by Mr. Oh, including but not limited to:

1. **Failure to Conduct Due Diligence:** Despite being retained to advise us and protect our interests, Mr. Oh allegedly failed to investigate Velanos or the proposed SBLC trading arrangement. He purportedly ignored clear red flags commonly associated with fraudulent investment schemes and did not provide warnings about the significant risks involved.

2. **Misleading Encouragement of the Transaction:** Mr. Oh reportedly assured us that SBLC trading was "nothing safer," claimed he could monetize SBLCs "in a day," and offered to "hook us up" with his brother-in-law, an English barrister, if issues arose. These assurances misrepresented the true nature of the transaction and induced us to proceed.

3. **Unethical Extortion of Funds:** Mr. Oh is alleged to have pressured us into signing an escrow agreement that paid Warren Law Group a 0.5% fee after funds had already been deposited. It is further alleged that he withheld the release of funds, despite knowing we were due a refund from a high-value customer, until the agreement was signed. Moreover, Mr. Oh never even bothered to create any escrow agreement before requesting that we send the funds into his account. Finally, no fee was ever discussed for the escrow account and Mr. Oh knew that all of these funds would have to be refunded to our client in full. None the less, Mr. Oh

**Exhibit A**

demanded his payment and failed to communicate with us until we told him that the agreement was signed.

4. **Reputational and Financial Harm:** Mr. Oh's conduct directly harmed our personal and professional reputations, as well as our financial standing, casting doubt on the integrity of our business decisions and practices.

## Harm to John Michael Cohan and David Hughes

As individuals and business owners, we suffered significant personal and professional harm as a result of Mr. Oh's actions:

- **Financial Losses:** The financial losses incurred by Genie directly impacted us as its owners, reducing the value of our investments and compromising our ability to operate and generate returns.

- **Reputational Damage:** Mr. Oh's alleged negligence and conduct caused widespread reputational harm, damaging our credibility within the financial and business communities and complicating future business opportunities.

- **Emotional and Professional Strain:** The fallout from Mr. Oh's actions placed undue strain on us personally and professionally, forcing us to defend the integrity of our business decisions amidst unwarranted scrutiny.

- **Breach of Trust:** As legal counsel, Mr. Oh was entrusted to provide sound advice and protect our interests. His failure to fulfill these responsibilities resulted in avoidable losses and unnecessary harm.

## Entitlement to Damages

Similar claims involving professional malpractice in financial transactions of this magnitude often range between $1 million and $10 million, with settlements typically achieved for 30%-70% of the claimed amount. Given the evidence of alleged negligence, unethical conduct, and the resulting financial and reputational harm, this case falls on the higher end of this range.

## Settlement Proposal

In light of the foregoing, we demand a settlement of **$4 million** to resolve all claims related to this matter, including professional negligence, breach of fiduciary duty, unethical conduct, financial losses, and reputational harm. This demand aligns with the average settlement range of $2 million to $4 million, reflecting the severity and impact of Mr. Oh's actions.

This settlement offer represents an opportunity to resolve the dispute without further legal action. Should Warren Law Group fail to respond or accept this offer within 14 days, we will proceed with all available legal remedies, including filing a malpractice lawsuit and seeking compensatory and punitive damages.

**Exhibit A**

**Conclusion**

We strongly urge you to contact us at the email addresses above to discuss this matter further. We remain committed to resolving this dispute amicably and expeditiously but will not hesitate to pursue all available legal avenues to protect our rights.

Sincerely,


**John Michael Cohan & David Hughes**

**Exhibit A**

John Michael Cohan & David Hughes
PO BOX 60443
JACKSONVILLE, FLORIDA 32236
jmcohan@genieinvestments.com; dhughes@genieinvestments.com

01-21-2025

**VIA CERTIFIED MAIL & REGULAR MAIL**

WARREN LAW GROUP
519 8th Avenue, 25th Floor
New York, NY 10018

**Re: Preservation of Evidence – Professional Negligence, Breach of Duty, and Unethical Conduct by Warren Law Group and Scott Oh**

Dear Warren Law Group and Mr. Scott Oh:

This letter serves as a formal demand to preserve all evidence relevant to the claims being asserted by the undersigned Plaintiffs, John Michael Cohan and David Hughes, against Warren Law Group and Mr. Scott Oh. These claims concern professional negligence, breach of fiduciary duty, unethical conduct, financial losses, and reputational harm related to the Joint Venture Agreement (JVA) between Genie Investments NV, Inc. ("Genie") and Velanos Principal Capital.

**Preservation Requirement**

You are obligated to preserve all evidence, both electronic and physical, that is relevant to this matter. This includes, but is not limited to:

1. **Communications**:

   o   Emails, text messages, instant messages, and other communications involving Scott Oh, the Warren Law Group, and any parties related to Genie, Velanos Principal Capital, and the JVA.

   o   Internal communications regarding the SBLC trading arrangement and related advice or recommendations.

2. **Documentation**:

   o   All drafts, final versions, and communications regarding the escrow agreement and related payments.

   o   Any records of financial transactions, including deposits, escrow accounts, and payments made by or to Genie, John Michael Cohan, or David Hughes.

   o   Documents or notes regarding due diligence performed (or not performed) on Velanos Principal Capital and the SBLC trading arrangement.

**Exhibit A**

3. **Records Related to Extortion Allegations:**

  - Any internal or external communications involving the withholding of funds or related agreements.

  - Documentation or communications regarding the 0.5% fee paid to Warren Law Group.

4. **Marketing and Advertising Statements:**

  - Any materials or records referencing representations made by Mr. Oh or Warren Law Group concerning SBLC trading safety, monetization capabilities, or other assurances given to the Plaintiffs.

5. **Professional Standards and Guidelines:**

  - All relevant policies, procedures, or guidelines governing the firm's obligations to its clients, including fiduciary responsibilities and due diligence protocols.

**Scope of Preservation**

This obligation applies to all forms of data, whether stored electronically or in physical form, and includes information on:

- Personal and work computers.
- Mobile devices and smartphones.
- Cloud-based storage platforms.
- Backup systems or archives.

You are required to suspend any routine data destruction, overwriting, or backup recycling policies to ensure all relevant evidence is preserved.

**Consequences of Non-Compliance**

Failure to preserve evidence may result in sanctions, including adverse inference rulings, exclusion of evidence, or other penalties as determined by the court.

**Confirmation of Compliance**

Please confirm in writing within **14 days of receipt of this letter** that you have taken all necessary steps to preserve evidence relevant to this matter. If you fail to provide such confirmation or if evidence is destroyed, we will seek all available remedies under the law.

If you have any questions regarding your obligations, please contact us directly at the email addresses above.

Sincerely,

**John Michael Cohan & David Hughes**

**Exhibit A**

# UNITED STATES BANKRUPTCY COURT

## MIDDLE DISTRICT OF FLORIDA

### JACKSONVILLE DIVISION

In re:

Case No.: 3:24-bk-00496-BAJ

Chapter 11

GENIE INVESTMENTS NV, INC.

Debtor.

---

## DECLARATION OF ADAM B. WALKER

STATE OF MISSOURI

COUNTY OF JACKSON

The undersigned, ADAM B. WALKER, declares as follows:

1. I, ADAM B. WALKER, am an attorney licensed to practice in Missouri. I am the owner and manager of Walker Law Office, LLC d/b/a AW Securities Law. I previously worked for more than 12 years as an enforcement lawyer for the Financial Industry Regulatory Authority (FINRA), where I routinely investigated fraudulent and potentially fraudulent investment activity.

2. I began representing Genie Investments in or around July 2023 at the request of one of its owners, David Hughes. I had previously done legal work for another business in which Mr. Hughes also has an ownership interest. Before July 2023 I was aware that Genie existed and that it was in the lending business, but I had no other knowledge of or involvement with Genie.

3. In July 2023, Genie asked me to help resolve a contract dispute between it and Velanos Principal Capital. I learned that Genie and Velanos had executed a "Joint Venture Agreement" (JVA) in October 2022 and subsequently amended it three times. Through conversations with

**Exhibit A**

Genie's principals and review of the JVA and its amendments, I learned the essential terms of the agreement, which were:

- Genie and Velanos agreed to form a joint venture.

- Genie agreed to contribute $9.0 million in capital to the joint venture.

- Velanos agreed to use the $9.0 million capital contribution to buy and sell standby letters of credit (SBLCs).

- Velanos agreed to distribute profits from the SBLC transactions to Genie within 60 days of Genie's capital contributions.

- The JVA, as amended, stated that Velanos would return a total of $75 million to Genie, consisting of the $9.0 million capital contribution and $66 million in profits.

4.  As of July 2023, Velanos had not distributed any profits to Genie and had returned only $500,000 of its capital contributions. Velanos was, therefore, in material breach of the JVA.

5.  I also learned that Genie, shortly before executing the JVA, retained an attorney, referred to herein as "SO," to represent it with respect to what was then the "proposed joint venture" between Genie and Velanos. SO was and still is a partner with an established New York-based law firm.

6.  Almost immediately after talking with Genie about the Velanos transaction and reviewing the JVA, I strongly suspected that the SBLC-trading program offered by Velanos was fraudulent. With minimal research, I found numerous judicial opinions, press releases, and other materials supporting my suspicions. The U.S. Securities and Exchange Commission, Federal Bureau of Investigation, Federal Trade Commission, and U.S. Department of Treasury, in addition to other regulators and law-enforcement agencies, have in recent years issued warnings to the public about fraudulent prime-banking scams, including many involving fictitious SBLC trading.

7.  On or about July 24, 2023, I spoke with SO by telephone for approximately one hour to talk, among other things, about his review of the JVA, his knowledge of and experience with

2

**Exhibit A**

SBLC trading, and whether he viewed the investments as potentially fraudulent or had any other reservations about Genie entrusting its capital to Velanos for the purposes described in the JVA.

8.   SO told me that he had extensive background with SBLCs, which he characterized as a legitimate investment used in "high level trade finance." He described SBLC trading as a "financing mechanism" that arose from the 1944 Bretton-Woods agreement, which created the World Bank and the International Monetary Fund.

9.   SO represented that Velanos, as promised, had used the $9.0 million in capital that Genie contributed to the joint venture to make profitable SBLC trades. SO acknowledged, however, that he had never received detailed information about any SBLC transactions that Velanos supposedly made.

10. I asked SO to describe how SBLC trading could generate massive profits in a matter of weeks. His response lacked detail. He stated only that it was a "rinse and repeat" process of buying SBLCs at a discount with ensuing profitable sales already prearranged. SO also repeatedly stated that there is "just a lot of leverage that's involved" or some variation thereof.

11. I asked SO if he was aware that SBLC trading was a frequent subject of fraud alerts and enforcement actions, both civil and criminal, by the federal government; he said that he was, but contended nonetheless that what Velanos promised Genie was not fraud. When I asked him how he knew that what Velanos promised was different from the numerous and well-publicized instances of fraud involving SBLCs, he stated that Velanos had "syndicated" the funds. He added, however, that he did not know the particulars of Velanos' ostensible syndication arrangement.

12. I have conducted extensive research into SBLC and other "prime banking" scams. In doing so, I learned that certain phrases, terms, and references are common among SBLC scams. The JVA contains several such phrases and terms. Likewise, SO described SBLC trading to me as

3

**Exhibit A**

"royal-family type stuff" that happens every day, although not in the United States. According to SO, the U.S. government does not want its citizens involved in SBLC trading. Such assertions are often cited by law enforcement and regulators as markers of SBLC and other varieties of prime-banking fraud.

13. The JVA contains other "red flags" of fraud. For example, Velanos promised to generate an extremely high rate of return – more than 800% – in a matter of weeks. It is also, in my professional opinion, very poorly drafted, with some passages best described as gibberish.

14. Genie terminated its representation by SO and his law firm on or around July 24, 2023. On Genie's behalf, I requested all records from SO's representation of Genie. After several weeks' delay, SO provided what he described as the complete client file. That file, which I have reviewed, contains no documentation indicating that SO:

- conducted any meaningful investigation into Velanos, its principals, or its affiliates,

- noted any red flags in the JVA or any potential that the proposed investment was fraudulent,

- advised Genie of any appreciable risk of losing all or a portion of its principal, or

- mentioned to Genie that the transaction bore similarities to a well-known and heavily publicized type of investment fraud.

15. Based on my investigation and analysis of the JVA and my research into prime-banking fraud, I believe the SBLC trading Velanos promised to conduct with Genie's money was at all times fictitious and blatantly fraudulent.

16. Based on my communications with SO and my review of the client file obtained from him, I believe that SO's review of the JVA was inadequate; that he failed to conduct an appropriate and thorough investigation of the transaction, Velanos, and/or its principals and affiliates; and that, as a result, he likely did not discharge his professional obligations to Genie. For these reasons, it

4

**Exhibit A**

is my opinion that Genie has a colorable claim against its former lawyer and law firm for professional malpractice. I am not equipped, however, to estimate any potential recovery if Genie were to pursue such an action.

17. Although many outside observers now impugn Genie's business judgment and competence for having invested in a fraudulent enterprise, it is critical to acknowledge that Genie did so only after receiving the advice of a licensed attorney from a well-regarded law firm, which it retained specifically to guard against placing its money in an illegitimate investment. Whatever one might say with the benefit of hindsight, the proper lens for evaluating Genie's competence to manage its affairs requires consideration of its entire operating history and the fact that it sought, paid for, and relied on the assistance of legal counsel that, by all appearances, had the experience and knowledge to advise it appropriately.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 14, 2024.

Adam B. Walker

WALKER LAW OFFICE, LLC d/b/a AW SECURITIES LAW

5

**Exhibit A**

**John Michael Cohan and David Hughes**
PO Box 60443
Jacksonville, Florida 32236
jmcohan@genieinvestments.com; dhughes@genieinvestments.com

**VIA EMAIL**

**Aaron Cohen, Chapter 7 Trustee**
**Raye Elliott**
**Tampa: Akerman LLP**
50 North Laura Street, Suite 3100
Jacksonville, Florida 32202
raye.elliott@akerman.com

**01-27-2025**

**Subject:** Response to Trustee Regarding Personal Claims, Retaliatory Actions, and Lack of Communication

Dear Mr. Cohen/Ms. Elliott,

### Introduction

We are writing to address the serious concerns arising from the Trustee's conduct in the administration of the bankruptcy estate of Genie Investments NV. Specifically, we strongly contest the baseless allegations made against our affiliated companies, the Trustee's improper interference with our personal claims, the failure to pursue valid claims against the Warren Law Group, and the issuance of retaliatory and unethical demand letters.

We remain fully committed to cooperating with the Trustee and the Court to ensure the proper administration of the estate. However, we cannot and will not tolerate actions that undermine the fairness and integrity of the bankruptcy process. These actions, including the obstruction of lawful personal claims and the apparent misuse of estate resources to retaliate against us, demand immediate correction.

This letter outlines our personal claims, defends the integrity of our affiliated companies, addresses the lack of transparency and fiduciary shortcomings of the Trustee, and demands the cessation of retaliatory actions. We trust that this comprehensive response will compel the Trustee to adhere to their legal and ethical obligations.

**Exhibit B**

## 1. Personal Claims vs. Estate Claims

We are pursuing claims exclusively in our individual capacities, including but not limited to harm caused by **professional malpractice, professional negligence, breach of duty, and unethical conduct** that has directly and personally impacted us. These claims include **reputational harm, emotional distress, and other personal damages** that are **separate and distinct from the corporate claims** of Genie Investments NV, Inc.

It is well established that claims for personal damages, particularly those arising from malpractice or negligence by professionals engaged by a corporate entity, can be pursued individually when the harm is **direct and personal in nature**. Courts have long recognized that claims for **reputational harm and emotional distress** fall outside the scope of corporate claims that belong to the bankruptcy estate. Specifically, these personal claims include **damages caused by the Warren Law Group and Scott Oh's misconduct**, which directly impacted our reputations and emotional well-being as individuals.

Furthermore, the Trustee has **no standing to block or interfere with personal claims** that are legally distinct from the estate's claims. Case law unequivocally states that trustees **cannot assert or control personal claims belonging to individuals**, nor can they prevent individuals from asserting them. **Any attempt to obstruct such claims infringes on our constitutional rights** and could constitute an abuse of the Trustee's fiduciary duty. These claims are supported by **clear evidence of personal harm**, and we will vigorously pursue them regardless of the Trustee's objections.

Additionally, we must raise **ethical and fiduciary concerns** regarding the Trustee's demand that we abandon these valid personal claims. Such intimidation constitutes **bad faith conduct** and undermines the principles of **equity and fairness in bankruptcy proceedings**.

- **Case Law**: *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972): Trustees cannot pursue claims on behalf of individuals, nor can they prevent individuals from pursuing their own distinct claims.
  **Application:** The Trustee's attempt to block or interfere with our personal claims against the Warren Law Group violates the principle established in Caplin, which states that trustees cannot assert claims on behalf of individuals or prevent them from pursuing their own distinct claims.

- **Case Law**: *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991): Courts can sanction bad faith conduct, including coercion or retaliation designed to suppress valid claims.
  **Application:** The Trustee's retaliatory actions, including the issuance of demand letters immediately after we asserted personal claims, demonstrate bad faith conduct aimed at suppressing valid claims.

- **Case Law**: *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982): The Court highlighted the importance of protecting individual rights to

**Exhibit B**

pursue claims separate from bankruptcy proceedings.

**Application:** The Trustee's interference with our personal claims disregards the principle in *Northern Pipeline* that individuals retain the right to pursue claims independent of bankruptcy proceedings.

Finally, we remind the Trustee that any attempt to hinder these lawful claims violates our **due process rights** under the **Fifth and Fourteenth Amendments,** as well as established case law that protects the ability of individuals to seek redress for personal injuries.

## 2. Legal Basis for Personal Claims

Our legal basis for asserting personal claims against the Warren Law Group, Scott Oh, and others stems from well-established principles that recognize and protect claims involving **personal harm, distinct from corporate injury**. These claims are not only separate from the bankruptcy estate but are also supported by a robust body of case law and constitutional protections.

**Distinct Claims Recognized by Law**

- **Case Law**: *In re Icarus Holding, LLC*, 391 F.3d 1315 (11th Cir. 2004): Courts have consistently held that individuals have standing to pursue personal claims separate from the bankruptcy estate, particularly when the harm is personal in nature and not derivative of the corporation's injury.
  **Application:** Our personal claims, which arise from direct harm to us as individuals and not from injuries to Genie Investments NV, are supported by Icarus, where the court affirmed that individuals have standing to pursue personal claims distinct from the bankruptcy estate.

- **Case Law**: *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575 (5th Cir. 2008): Recognized that a trustee cannot assert claims that are uniquely personal to individual stakeholders and unrelated to the bankruptcy estate.
  **Application:** The Trustee's suggestion that our personal claims fall within the estate's control contradicts *Seven Seas*, which establishes that trustees cannot assert claims that are uniquely personal to individual stakeholders and unrelated to the bankruptcy estate.

**Trustee's Limitations**

- **Case Law**: *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972): Trustees cannot pursue claims on behalf of individuals, nor can they prevent individuals from pursuing their own distinct claims. This principle underscores that our personal claims are **outside the Trustee's purview** and cannot be subordinated to the estate's interests.
  **Application:** The Trustee's attempts to obstruct our personal claims violate the

**Exhibit B**

principle in *Caplin*, which holds that trustees lack the authority to prevent individuals from pursuing their own claims outside of the estate's purview.

## Constitutional Right to Due Process

- •   **Case Law**: *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982): Denying our ability to pursue remedies for personal harm would violate our **constitutional right to access the courts and seek justice**.
  **Application:** The Trustee's efforts to interfere with our ability to seek remedies for personal harm contradict *Logan*, which underscores that denying access to legal remedies for personal injuries infringes on constitutional rights to due process and access to the courts.

## Reputational Harm and Emotional Distress

Claims for **reputational harm and emotional distress**, particularly those arising from professional malpractice, are well recognized as personal in nature. Courts have consistently upheld the right of individuals to pursue these claims independently of any corporate interest. These personal injuries are **direct and individual**, unrelated to any injury to Genie Investments NV.

## Implications of Trustee's Actions

The Trustee's speculative assertion that our claims could adversely impact the estate's malpractice insurance limits is **unsupported by evidence**. This raises concerns about whether the Trustee is improperly prioritizing the estate's claims over our constitutional and legal rights. Any such attempt to obstruct our claims violates fiduciary obligations to **act impartially and in good faith**.

- •   **Case Law**: *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991): Courts have inherent authority to sanction parties who engage in coercive or retaliatory actions to suppress lawful claims.
  **Application:** The Trustee's retaliatory and coercive behavior, including the issuance of demand letters timed to suppress our lawful claims, aligns with the misconduct addressed in Chambers, where courts sanctioned bad faith actions that obstructed justice and suppressed valid claims.

## Ethical and Fiduciary Concerns

The Trustee's **demand that we abandon valid personal claims** is improper and unethical. Attempts to suppress these claims using **coercion or threats** directly contravene principles of fairness and fiduciary responsibility. Trustees are bound by their fiduciary duties to act with **integrity, impartiality, and fairness**, and any deviation from these principles is a breach of those duties.

**Exhibit B**

### 3. Refuting Allegations Against Affiliated Companies

The allegations against our affiliated companies, including **Genie's Angels**, **Better Methods**, **Genie Investments II**, **Capitulum**, and **Zoomeral**, are entirely without merit or legal basis.. Furthermore, the claim that the Trustee can "state a prima facie case" based on the receipt of transfers is unsupported by the law and lacks factual evidence. Your claims that loans to these entities were fraudulent or improper are based on incomplete or inaccurate conclusions, which we contest on multiple grounds with the Examiner's Report and the Declaration of Adam Walker, Esq.:

**A. Lack of Evidence Supporting Fraudulent Transfers**

1. **No Evidence of Fraudulent Intent**

    • Fraudulent transfer claims based on actual intent require clear and convincing evidence of fraudulent intent. Courts consider specific "badges of fraud" such as insider dealings, concealment, and lack of legitimate purpose.

    • **Case Law**: In *In re TOUSA, Inc., 680 F.3d 1298 (11th Cir. 2012)*, the Court held that speculative or generalized claims of fraudulent intent are insufficient to establish liability without concrete evidence of bad faith or intent to defraud.
    **Application:** Speculative claims of fraudulent intent, without concrete evidence, cannot establish liability. The Trustee's claims lack the required specific evidence of intent to defraud.

2. **Transparency of Transactions**

    • All transfers to affiliated companies were conducted transparently and documented appropriately in financial records provided to the Examiner.

    • **Case Law**: *In re Global Outreach, S.A., 562 B.R. 618 (Bankr. D. Del. 2017)*: Fraudulent transfer claims must be supported by specific, transaction-based evidence, not speculation.
    **Application:** Fraudulent transfer claims must rely on transaction-specific evidence, not speculation. The Trustee's generalized assertions fail this standard.

3. **No Badges of Fraud**

    • The Examiner's Report mentions only "potential" fraudulent transfers without identifying any badges of fraud, such as concealment, lack of consideration, or intent to hinder creditors.

    • **Case Law**: *In re Sharp Int'l Corp., 403 F.3d 43 (2d Cir. 2005*): Transfers made for legitimate business purposes, even if to insiders, are not fraudulent absent evidence of intent to hinder creditors.
    **Application:** Transfers for legitimate business purposes are not fraudulent absent

**Exhibit B**

evidence of intent to hinder creditors. This applies to our intra-company transactions.

## B. Commercial Reasonableness of Loan Terms

1. **Interest Rates and Loan Terms**
   - The loans extended to our affiliated entities were structured with interest rates below the Applicable Federal Rates (AFR) established by the IRS for intrafamily loans, which ranged from 2.22% to 3.24% during the relevant period. While these rates were below the AFR, it's important to note that the AFR serves as a guideline to prevent the characterization of below-market loans as gifts for tax purposes. In the context of related-party transactions, especially within corporate groups, loans may be structured with terms that differ from standard commercial lending practices due to the unique relationships and strategic objectives involved. The key consideration is whether these loans were made with legitimate business purposes and whether the terms were adequately documented and agreed upon by the parties involved.

- **Case Law:** *In re TOUSA, Inc.,* 680 F.3d 1298 (11th Cir. 2012): This case emphasizes that speculative or generalized claims of fraudulent intent, without concrete evidence, are insufficient to establish liability. The court held that for a transfer to be avoided as fraudulent, there must be clear evidence of intent to hinder, delay, or defraud creditors.
  **Application:** Speculative or generalized claims of fraudulent intent are insufficient to establish liability. Clear evidence of intent to hinder, delay, or defraud creditors is required, which the Trustee has not provided in this case.

2. **Documented Business Justifications**

- Transfers served legitimate purposes, such as operational support for facilitating real estate transactions, developing customer-facing software, providing asset protection, and creating goodwill.

- **Case Law**: *In re Bay Plastics, Inc.,* 187 B.R. 315 (Bankr. C.D. Cal. 1995): Indirect benefits, such as operational support and goodwill, satisfy the "reasonably equivalent value" requirement for transfers.
  **Application:** Indirect benefits, such as goodwill and operational support, satisfy the "reasonably equivalent value" standard. Our transfers provided such benefits.

3. **Private Loan Terms Are Not Per Se Fraudulent**

- Engaging in private loans with affiliated entities, even at interest rates below the AFR, does not inherently constitute a fraudulent transfer. Fraudulent transfer claims require evidence of actual intent to hinder, delay, or defraud creditors, or that the debtor received less than reasonably equivalent value in exchange for the transfer while insolvent. In the absence of such evidence, the structuring of loans

**Exhibit B**

with affiliated entities, even under non-commercial terms, is generally permissible. As noted in legal analyses, the transfer of assets or the structuring of financial transactions among related parties must be evaluated based on the specific facts and circumstances, including the intent of the parties and the economic substance of the transactions. Without concrete evidence of fraudulent intent or harm to creditors, such transactions are not deemed fraudulent per se.

- **Case Law:** *In re Sharp International Corp.,* 403 F.3d 43 (2d Cir. 2005)**:** The court found that transfers made for legitimate business purposes, even if to insiders, are not fraudulent absent evidence of intent to hinder, delay, or defraud creditors. This case supports the position that intra-company loans, even at below-market rates, are not per se fraudulent.
  **Application:** Transfers made for legitimate business purposes, even to insiders, are not fraudulent without evidence of intent to hinder, delay, or defraud creditors. This supports that intra-company loans, even at below-market rates, are not inherently fraudulent.

4. **Favorable Loan Terms**

- Favorable loan terms, while often scrutinized, do not inherently indicate fraudulent activity. Courts have consistently held that fraud requires intentional deceit (*scienter*) or misrepresentation, not merely generous or unconventional business practices. The following case law demonstrates that as long as terms are transparent, supported by legitimate business rationale, and devoid of fraudulent intent, they are lawful.
- **Case Law:** *Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976): Fraud requires intent (scienter); negligence or overly favorable terms alone are insufficient to prove fraud.
  **Application:** Our loan terms, such as low interest rates, balloon payments, no personal guarantees and extensions are typical terms used in today's lending industry (0% Interest APR is well-known and commonplace used by various banks and lenders), and cannot be considered fraudulent without evidence of intentional deceit. Transparency in disclosures and absence of intent to mislead support our case.
- **Case Law:** *Marriott v. Brune,* 262 F.2d 411 (10th Cir. 1958): Promising high returns or favorable terms is not fraud if there is a reasonable basis for such representations.
  **Application:** Our loan terms are a legitimate business decision, and cannot be deemed fraudulent in the absence of misrepresentation or concealment.

**Exhibit B**

C. **Timing of Transfers**

  1. **Transfers Predate Insolvency or Litigation Threats**

  • Most of the transfers occurred before Genie faced insolvency or litigation threats, further undermining any claim of fraudulent intent. As stated in the Examiner's Report, many transactions took place between September 2022 and July 2023, well before any financial distress became apparent.

  • **Case Law:** *In re Rodriguez,* 895 F.2d 725 (11th Cir. 1990): Transfers occurring in the ordinary course of business and during periods of solvency are presumed valid.
  **Application:** Transfers made during solvency and in the ordinary course of business are presumed valid. The Trustee's claims ignore these circumstances.

  2. **Misinterpretation of ICA Payments**

  • The Examiner's assertion that ICA Payments were "customer funds" held in trust is directly contradicted by the BELOC Agreements, which do not impose any such obligation.

  • **Case Law:** *Land of Lincoln Goodwill Indus. v. PNC Fin. Servs. Group,* 762 F.3d 673 (7th Cir. 2014): Courts must interpret contracts as a whole and avoid construing provisions in ways that render others meaningless.
  **Application:** Contracts must be interpreted as a whole. The Examiner's interpretation of ICA Payments contradicts the BELOC Agreements, which gave Genie Investments NV the ability to spend funds as it deemed necessary to fulfill its obligations under the agreements.

**D. Reasonably Equivalent Value Was Provided**

Fraudulent transfer claims fail when the debtor receives reasonably equivalent value for the transfers. Each affiliated company provided substantial benefits to Genie Investments NV, which were critical to its operations and overall financial stability:

  1. **Better Methods LLC and Genie Investments II LLC**

  • Provided asset protection and funded professional expenses, including legal and accounting fees, which directly benefited Genie Investments NV by reducing exposure to fraudulent claims.

  • **Case Law:** *In re Bay Plastics, Inc.,* 187 B.R. 315 (Bankr. C.D. Cal. 1995): Indirect benefits, such as operational support or reduced risk, are sufficient to satisfy the reasonably equivalent value standard.
  **Application:** The asset protection and professional expenses funded by affiliated companies provided indirect benefits, such as operational support and reduced risk, which directly benefited Genie Investments NV. This satisfies the reasonably equivalent value standard by mitigating exposure to fraudulent claims.

**Exhibit B**

2. **CAPITULUM LLC**

• Contributed critical real estate investment expertise, assisting in evaluating potential projects and facilitating real estate transactions if clients defaulted.

• **Case Law:** *In re Rodriguez,* 895 F.2d 725 (11th Cir. 1990): Courts recognize that professional services and expertise provided in the ordinary course of business constitute value.
**Application:** CAPITULUM LLC's real estate investment expertise and assistance in facilitating transactions when clients defaulted constituted professional services provided in the ordinary course of business, establishing value for Genie Investments NV.

3. **ZOOMERAL Inc.**

• Developed customer-facing software and marketing initiatives aimed at generating new business for Genie Investments NV, directly improving operational capacity.

• **Case Law**: *In re W.R. Grace & Co.,* 281 B.R. 852 (Bankr. D. Del. 2002): Investments in tools or initiatives that enhance a company's operational capacity are considered valuable.
**Application:** ZOOMERAL Inc.'s development of customer-facing software and marketing initiatives improved operational capacity and generated new business for Genie Investments NV, making these investments valuable under the law.

4. **Genie's Angels LLC**

• Designed programs to assist individuals with credit card debt, indirectly benefiting Genie Investments NV by creating goodwill and generating referrals.

• **Case Law:** *In re Bay Plastics, Inc.,* 187 B.R. 315 (Bankr. C.D. Cal. 1995): The court held that indirect benefits, such as goodwill and potential future opportunities, constitute reasonably equivalent value in the context of fraudulent transfer claims.
**Application:** Genie's Angels LLC was to created with the intention of providing goodwill and to generate referrals through its credit card debt assistance programs, indirectly benefiting Genie Investments NV. The court's recognition of goodwill and potential future opportunities as valuable validates these contributions.

## E. No Evidence of Insolvency

Constructive fraud claims also require proof that the debtor was insolvent at the time of the transfers or became insolvent as a result of them. The Examiner's Report and Mr. Walker's Declaration provide no such evidence.

1. **Financial Stability Confirmed**

• Mr. Walker's Declaration highlights that Genie Investments NV remained solvent at the time of the transfers and continued operating in the ordinary course of business.

**Exhibit B**

- **Case Law**: *In re W.R. Grace & Co.,* 281 B.R. 852 (Bankr. D. Del. 2002): Insolvency must be demonstrated with concrete financial data; speculative claims do not suffice.
**Application:** The Trustee has not provided concrete financial data to establish insolvency at the time of the transfers. Speculative claims or generalized assertions about the financial condition of Genie Investments NV are insufficient to meet the burden of proof under this standard.

2. **Bank Statements Substantiated Transactions**

- The banking records provided to the Examiner confirm that the transfers were consistent with normal business operations, further undermining any claims of insolvency.

- **Case Law**: *In re W.R. Grace & Co.,* 281 B.R. 852 (Bankr. D. Del. 2002): Insolvency must be demonstrated with concrete financial data; speculative claims do not suffice.
**Application:** The banking records provided to the Examiner clearly confirm that the transfers were consistent with normal business operations. As established in In re W.R. Grace & Co., insolvency cannot be presumed or inferred without concrete evidence. The absence of such data in the Trustee's claims further undermines the argument that the transfers were made while Genie Investments NV was insolvent.

## F.  Professional Malpractice as an Offset for Liability

Any allegations of harm or liability related to transfers involving affiliated companies must take into account the significant damages caused by the professional malpractice of the Warren Law Group. The firm's failure to provide competent legal representation directly contributed to financial losses experienced by Genie Investments NV and, by extension, the creditors. Courts have consistently held that damages caused by professional negligence or malpractice can offset liability when such harm is shown to have contributed to the alleged financial detriment.

1. **Impact of Professional Malpractice on Liability**:

- The Warren Law Group's negligence, breach of duty, and failure to act in the best interests of Genie Investments NV played a substantial role in creating the financial circumstances now being attributed to the affiliated companies.

- **Case Law**: *Henderson v. Sec. Nat'l Bank,* 72 F.3d 805 (10th Cir. 1995): A party may be excused or have its liability reduced when the harm is shown to have been caused by the negligence or malpractice of a professional upon whom they reasonably relied.
**Application:** Liability for the transfers should be reduced or excused

**Exhibit B**

because the financial harm was directly caused by the Warren Law Group's negligence, upon which Genie Investments NV reasonably relied.

- **Case Law**: *In re Food Mgmt. Group, LLC,* 380 B.R. 677 (Bankr. S.D.N.Y. 2008): Claims of liability against stakeholders must account for the mitigating effects of professional malpractice that contributed to the financial losses. **Application:** The Trustee's claims must consider the mitigating impact of the Warren Law Group's malpractice, which substantially contributed to the debtor's financial losses, reducing the liability of affiliated entities.

2. **Failure to Address Professional Malpractice**:

- Despite the clear role of professional malpractice in this matter, the Trustee has not adequately pursued claims against the Warren Law Group or acknowledged their contributions to the harm now being alleged. This omission raises concerns about the fairness and completeness of the estate's allegations against affiliated companies.

3. **Offset for Damages**:

- Any alleged liability tied to the transfers involving affiliated entities must be reduced or excused entirely to the extent that the financial losses stemmed from the Warren Law Group's malpractice. The responsibility for these damages lies with the negligent professionals who failed to uphold their legal and ethical duties, not with the entities or individuals that acted in good faith to support Genie Investments NV.

By ignoring the impact of the Warren Law Group's malpractice and focusing solely on affiliated companies, the Trustee is unfairly shifting blame and failing to address the root causes of the financial challenges faced by Genie Investments NV. This approach not only undermines the credibility of the estate's claims but also raises questions about the priorities and motivations of the Trustee.

---

## 4. Lack of Communication and Trustee's Obligations

The Trustee's failure to communicate directly about whether any action is being taken against the Warren Law Group violates their fiduciary duty under *11 U.S.C. § 704(a)(7)*, which requires the Trustee to furnish information requested by parties in interest. This lack of transparency raises serious concerns about the Trustee's ability to act in good faith and fulfill their obligations to creditors, beneficiaries, and other stakeholders.

## Exhibit B

**1. Transparency Obligations**

Transparency is a cornerstone of a Trustee's fiduciary duties. A lack of communication regarding the status of potential claims against the Warren Law Group and/or creditors that caused the estate harm, including the estate's reputational harm, undermines the confidence of stakeholders and violates statutory and ethical obligations. Stakeholders have a right to understand how the estate is being managed, including whether valid claims that could benefit the estate are being pursued or dismissed.

• **Case Law:** *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985): Trustees are fiduciaries who owe duties of fairness, good faith, and transparency to all parties in interest. This duty includes providing material information relevant to the estate's administration.
   **Application:** The Trustee's refusal to provide clear and direct information about claims against the Warren Law Group and/or creditors that caused the estate harm violates their fiduciary duty to act with transparency and fairness, depriving stakeholders of material information essential for evaluating the administration of the estate.

• **Case Law:** *In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012): Beneficiaries of the estate have the right to material information about the Trustee's administration of the estate, including decisions regarding potential claims and recoveries.
   **Application:** The Trustee's refusal to provide clear and direct information about claims against the Warren Law Group and/or creditors that caused the estate harm violates their fiduciary duty to act with transparency and fairness, depriving stakeholders of material information essential for evaluating the administration of the estate.

**Concerns:**

•    The Trustee has failed to provide specific information on whether claims against the Warren Law Group and/or creditors that caused the estate harm are being investigated or pursued. This silence leaves creditors and stakeholders in the dark and raises questions about whether the Trustee is prioritizing estate recoveries.

•    The lack of updates on such a significant issue creates the appearance of either neglect or an intentional effort to shield the Warren Law Group and/or creditors that caused the estate harm from accountability, further eroding stakeholder confidence.

**2. Undue Influence and Intimidation**

The Trustee's speculative assertion that pursuing personal claims could harm the estate's malpractice insurance policy appears designed to discourage valid claims through

**Exhibit B**

intimidation rather than grounded legal reasoning. Such tactics are improper and undermine the fiduciary responsibility to act in the best interest of all parties.

•      The Trustee has suggested that our personal claims could exhaust malpractice insurance funds, which would harm the estate. However, this assertion lacks evidentiary support and appears speculative at best.

•      Such statements can deter valid personal claims and raise concerns about whether the Trustee is improperly using their position to shield professionals like the Warren Law Group from scrutiny.

•      **Case Law:** *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991): Courts have inherent authority to sanction bad faith conduct, including efforts to intimidate or coerce stakeholders.
       **Application:** The Trustee's retaliatory actions and efforts to coerce us into abandoning legitimate claims demonstrate bad faith conduct, warranting potential sanctions under the court's inherent authority.

•      **Case Law:** *In re Smith*, 524 B.R. 689 (Bankr. S.D. Tex. 2015): Trustees must act in good faith and avoid actions that create undue pressure or obstruct legitimate claims.
       **Application:** The Trustee's retaliatory actions and efforts to coerce us into abandoning legitimate claims demonstrate bad faith conduct, warranting potential sanctions under the court's inherent authority.

**3. Precedent on Fiduciary Duties**

Trustees are required to act in the best interests of the estate and ensure stakeholders have access to relevant information. The failure to provide clarity on potential claims against the Warren Law Group violates these duties and raises concerns about conflicts of interest and impartiality.

•      **Case Law:** *In re Smart World Technologies, LLC*, 423 F.3d 166 (2d Cir. 2005): Trustees are obligated to ensure that stakeholders have access to information relevant to estate administration. Failure to do so constitutes a breach of fiduciary duty.
       **Application:** The Trustee's refusal to share critical information about estate administration breaches their fiduciary duty and denies stakeholders access to relevant information necessary to evaluate their rights and interests.

•      **Case Law:** *In re Schepps Food Stores, Inc.*, 160 B.R. 792 (Bankr. S.D. Tex. 1993): Trustees must act impartially and avoid actions or omissions that create the appearance of bad faith or favoritism.
       **Application:** The Trustee's selective targeting of claims and actions suggesting favoritism or bad faith undermine their impartiality and breach fiduciary duties owed to all stakeholders.

**Exhibit B**

**Concerns:**

- The Trustee's refusal to disclose their intentions regarding claims against the Warren Law Group and/or creditors that caused the estate harm deprives benevolent creditors and stakeholders of critical information necessary to evaluate the administration of the estate.

- The absence of transparency raises questions about whether the Trustee is prioritizing certain parties or entities over others, contrary to their fiduciary obligations to act impartially and in the best interest of all stakeholders.

**4. Trustee's Demand to Withhold Information and Further Transparency Concerns**

The Trustee's demand that we refrain from sharing her communications regarding our personal claims against creditors is deeply concerning and represents a clear violation of our rights under both federal bankruptcy law and established principles of transparency. Such demands not only infringe upon our legal ability to share information lawfully provided by a fiduciary but also raise significant questions about the Trustee's motives and adherence to ethical standards.

**Legal Violations and Lack of Transparency**

- Under federal law, information provided by a Trustee in the course of administering a bankruptcy estate is not privileged or confidential unless specifically protected by a court order. Absent such an order, we are entitled to share this information in the interest of ensuring transparency, protecting our legal rights, and maintaining accountability in the bankruptcy process.

- **Case Law:** *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985): Trustees owe fiduciary duties of fairness, transparency, and impartiality to all parties in interest. These duties extend to the disclosure of relevant information about the administration of the estate.
  **Application:** By failing to provide transparency and fairness, the Trustee has violated their fiduciary obligations to disclose material information essential to the proper administration of the estate.

- **Case Law:** *In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012): Beneficiaries and stakeholders have the right to material information about the Trustee's administration of the estate and the ability to share it to protect their interests.
  **Application:** The Trustee's lack of disclosure regarding decisions on potential recoveries infringes on stakeholders' rights to material information, hindering their ability to protect their legal interests.

The Trustee's attempt to suppress the dissemination of her communications is a troubling breach of these principles. Information provided by the Trustee directly impacts our personal claims and is critical to our ability to seek justice and defend against baseless

**Exhibit B**

allegations. Her demand raises questions about whether she is attempting to shield improper actions or prevent scrutiny of her administration of the estate.

**Fiduciary Obligations and Stakeholder Rights**

•    **Statutory Basis:** *11 U.S.C. § 704(a)(7):* Trustees are required to furnish information reasonably requested by parties in interest. This duty includes allowing stakeholders to share relevant information, particularly when it relates to their rights or legal claims.

**Our Legal Right to Share Trustee Communications**

•    As stakeholders, we have the legal right to share information received from the Trustee to protect our interests and advocate for a fair administration of the estate. Courts have consistently held that Trustees cannot restrict stakeholders from discussing or disclosing information unless such restrictions are explicitly authorized by law or ordered by the court.

**Case Law:**

•    **Case Law:** *In re Smart World Technologies, LLC*, 423 F.3d 166 (2d Cir. 2005): Trustees cannot impose confidentiality restrictions on stakeholders unless authorized by the court, as doing so would impede transparency and stakeholder rights.
   **Application:** The Trustee's attempt to impose confidentiality restrictions on our dissemination of information is unlawful without explicit court authorization. This action impedes our rights to transparency and to protect our interests as stakeholders.

•    **Case Law:** *In re Cooper*, 405 B.R. 801 (Bankr. N.D. Tex. 2009): Stakeholders have the right to disseminate information relevant to their interests, provided there is no court order barring disclosure.
   **Application:** We are entitled to share estate-related information to safeguard our legal claims. Absent a court order restricting dissemination, the Trustee's demands to withhold communication violate stakeholder rights.

**5. Broader Implications for Stakeholders**

The lack of communication and attempts to suppress information have broader implications for stakeholders, including:

•    **Missed Opportunities for Recovery:** If the Trustee fails to pursue valid malpractice claims against the Warren Law Group and/or claims against creditors who caused harm to the estate, it prevents stakeholders from addressing critical issues, it could result in significant lost recovery opportunities for the estate and creditors.

**Exhibit B**

- **Erosion of Confidence in the Process:** The Trustee's lack of transparency and suppressive conduct undermines confidence in the integrity and fairness of the bankruptcy process, potentially leading to increased litigation and stakeholder intervention.

## 6. Remedies for Stakeholders

If the Trustee fails to address this issue transparently and in good faith, stakeholders, including ourselves, may seek judicial intervention to ensure proper administration of the estate. Courts have the authority to compel Trustees to act in accordance with their fiduciary duties and provide the transparency required by law.

- Stakeholders can file motions to compel the Trustee to disclose their intentions and rationale regarding claims against the Warren Law Group and/or claims against creditors who cause harmed to the estate.

- Courts may impose sanctions or other remedies to address breaches of fiduciary duties or bad faith administration of the estate.

- **Case Law:** *In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012): Beneficiaries of the estate have the right to seek judicial oversight to ensure Trustees act equitably and transparently.
  **Application:** The lack of transparency in the Trustee's actions justifies our pursuit of judicial oversight to ensure fairness and accountability in the administration of the estate.

- **Case Law:** *In re Cooper*, 405 B.R. 801 (Bankr. N.D. Tex. 2009): Abuse of process claims can be raised against Trustees who act improperly or fail to fulfill their obligations.
  **Application:** In our case, the Trustee's issuance of demand letters just three days after we pursued personal claims, coupled with attempts to impose confidentiality restrictions and a lack of transparency, constitutes an abuse of process. These actions demonstrate improper motives and a failure to uphold fiduciary obligations, creating grounds for us to raise an abuse of process claim.

## 5. Concerns Regarding Lack of Action Against the Warren Law Group and/or Creditors That Caused Harm to the Estate

The Trustee's lack of timely action regarding claims against the Warren Law Group and/or the creditors that caused harm to the estate raises significant concerns about potential retaliation, failure to maximize recoveries for the estate, and breaches of fiduciary duty. Below are the key issues:

**Exhibit B**

## 1. Timing Suggests Retaliation

The Trustee's assertion of potential claims against the Warren Law Group only emerged after we pursued personal claims against the firm. This sequence of events strongly suggests retaliatory intent and undermines the integrity of the bankruptcy process.

- **Evidence of Retaliatory Motives**:

  • The Warren Law Group's malpractice was a known issue during earlier stages of the bankruptcy process, yet the Trustee failed to raise or investigate claims until our personal claims were asserted.

  • The abrupt and coincidental timing creates an appearance of retaliation aimed at discouraging or obstructing our lawful efforts.

  • **Case Law**: *Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991): Courts have inherent authority to sanction bad faith conduct, including retaliatory actions intended to obstruct legitimate claims.
    **Application:** The Trustee's retaliatory behavior, including unreasonable demands and pressure, constitutes bad faith conduct that warrants judicial sanctions for obstruction of legitimate claims.

    - **Case Law:** *In re Smith,* 524 B.R. 689 (Bankr. S.D. Tex. 2015): Trustees must act in good faith and avoid any appearance of retaliation or coercion in the administration of the estate.
      **Application:** Trustees are obligated to act in good faith and avoid actions that give the appearance of coercion or retaliation, such as unreasonably timed demands tied to our pursuit of personal claims.

## 2. Failure to Address Harm

The Warren Law Group's professional malpractice and the creditors that engaged in defamatory acts caused significant and demonstrable harm to Genie Investments NV. Despite this, the Trustee has failed to transparently address whether the estate intends to pursue claims against these parties.

- **Significant Damages**:

  • The firm's negligence in representing Genie Investments NV directly contributed to financial instability, regulatory scrutiny, and legal exposure.

  - The creditors that engaged in defamatory acts caused the estate's reputational harm also contributed to financial instability, regulatory scrutiny, and legal exposure.

  • These damages are well-documented in financial records, correspondence, and witness testimony.

**Exhibit B**

- **Trustee's Fiduciary Duty**:

  - The Trustee is obligated under *11 U.S.C. § 704(a)(1)* to collect and recover assets for the benefit of creditors. Pursuing valid malpractice claims against the Warren Law Group and creditors that caused the estate harm would meet this obligation.

    - **Case Law:** *In re Schepps Food Stores, Inc.,* 160 B.R. 792 (Bankr. S.D. Tex. 1993): Trustees cannot selectively pursue claims or act in ways that suggest retaliation or bad faith.
    **Application:** The Trustee's selective and retaliatory claims against affiliated companies reflect bad faith and a lack of impartiality, which undermines the administration of the estate.

## 3. Lack of Transparency

The Trustee's failure to provide clarity regarding claims against the Warren Law Group and/or creditors that caused the estate harm undermines confidence in the bankruptcy process.

- **Fiduciary Violations**:

  - **Case Law:** Commodity Futures Trading Comm'n v. Weintraub, *471 U.S. 343 (1985)*: Trustees owe duties of fairness, good faith, and transparency to all parties in interest.
  **Application:** The Trustee's duties include providing stakeholders with fair and transparent communication. Attempts to withhold material information contradict the fundamental fiduciary obligations owed to all parties in interest.

- **Implications for Stakeholders**:

  - The lack of transparency disproportionately harms creditors and stakeholders by preventing them from understanding the rationale behind the Trustee's actions.

## 4. Demand for Clarity

We respectfully request that the Trustee provide a clear and detailed explanation of their intentions regarding claims against the Warren Law Group and/or the creditors that caused harm to the estate. Failure to address these matters will leave us no choice but to seek judicial intervention.

## 6. Retaliation, Unethical Conduct, and Cease and Desist Demand

The Trustee's actions against our affiliated companies and the issuance of demand letters targeting us after we asserted personal claims constitute retaliatory conduct, bad faith litigation, and abuse of process.

### Exhibit B

**1. Timing and Nature of Demand Letters**

The Trustee's demand letters were issued only three days after we sent our demand letters to certain creditors and the Warren Law Group. These letters demanded payment within an unreasonable 10-day period, creating undue pressure. What is particularly troubling is that the Trustee had over five  months to prepare these demands but failed to take any action during that time. The timing of the demand letters, coupled with their threatening tone, creates the strong appearance that **these actions were taken in direct retaliation for our pursuit of personal claims**.

**Evidence of Retaliation:**

• **Five-Month Delay Followed by Abrupt Action:** The Trustee remained inactive for over 5 months, failing to pursue or investigate claims against us. It was only after we initiated personal claims against the Warren Law Group and certain creditors that the Trustee abruptly issued demand letters within days, rather than acting earlier with the benefit of a full investigation or legal justification.

• **Timing to Intimidate:** The Trustee's demands arrived immediately after we exercised our lawful rights to pursue personal claims, suggesting a calculated effort to intimidate and deter us from continuing these claims.

• **Baseless Allegations Without Case Law:** The Trustee's demand letters lack any grounding in relevant case law or legal precedent, further indicating that they were issued to exert undue pressure rather than present legitimate claims.

• **Knowledge of Exonerating Evidence:** The Trustee knows, following a trial and the Examiner's Report, that the transfers involving our affiliated companies were not fraudulent. Despite this, the Trustee's demands emerged only after we began pursuing our legitimate personal claims.

• **Case Law:** *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49 (1993)**:** Retaliatory legal actions designed to interfere with valid claims are unlawful.
**Application:** The Trustee's retaliatory legal actions, including issuing demand letters three days after we asserted personal claims, were intended to interfere with our valid claims. Such actions violate the principles of fairness and due process, as established in this case.
• **Case Law:** *Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991): Courts can sanction bad faith conduct, including coercive actions intended to suppress legitimate claims
**Application:** The Trustee's coercive attempts to suppress our legitimate claims, including threatening demand letters and confidentiality restrictions, constitute bad faith conduct that courts have the inherent authority to sanction.

**Exhibit B**

## 2. Abuse of Process

The Trustee's actions constitute an abuse of process, as the demand letters appear designed to harass and retaliate rather than fulfill legitimate estate objectives. The arbitrary and unreasonable 10-day deadline further reflects an improper motive to create undue pressure rather than pursue valid estate interests.

- **Case Law:** *In re Cooper,* 405 B.R. 801 (Bankr. N.D. Tex. 2009): Abuse of process occurs when legal proceedings are used for improper purposes, such as harassment or retaliation.
  **Application:** The Trustee's actions demonstrate an abuse of process, as they appear designed to harass and retaliate rather than fulfill legitimate estate objectives. Legal proceedings used for such improper purposes meet the standard for abuse of process claims.
  • **Case Law:** *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49 (1993)**:** Legal actions initiated with retaliatory intent violate principles of fairness and due process.
  **Application:** The Trustee's demand letters, issued shortly after we asserted our personal claims, demonstrate retaliatory intent aimed at interfering with valid claims. This violates principles of fairness and due process as established in this case.

## 3. Fiduciary Duty Violations

The Trustee's conduct represents a clear breach of fiduciary obligations to act impartially, in good faith, and in the best interests of all stakeholders. By issuing demands that contradict findings from the trial and the Examiner's Report, the Trustee appears to be using their position as a tool of intimidation rather than as a fiduciary obligated to ensure fairness and transparency.

- **Case Law:** *In re Thorpe Insulation Co.,* 677 F.3d 869 (9th Cir. 2012)**:** Trustees must act with fairness and avoid intimidation or coercion.
  **Application:** The Trustee's actions, including intimidating demand letters and attempts to deter lawful claims, fail to meet the standard of fairness required of fiduciaries and constitute coercive behavior, prohibited under this precedent.
- **Case Law:** *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343 (1985): Trustees owe duties of transparency and impartiality to all parties in interest.
  **Application:** The Trustee's lack of transparency and impartiality, particularly regarding the administration of claims and estate actions, breaches fiduciary duties owed to all parties in interest, as outlined in this case.

## Exhibit B

- **Case Law:** *In re Schepps Food Stores, Inc.,* 160 B.R. 792 (Bankr. S.D. Tex. 1993): Trustees cannot selectively pursue claims or act in ways that suggest retaliation or bad faith.
  **Application:** The Trustee's selective pursuit of claims and apparent retaliation against us demonstrate bad faith conduct. Trustees are required to act impartially and prioritize fairness over personal or political motivations.

## 4. Demand to Cease and Desist

We demand that the Trustee immediately cease engaging in retaliatory conduct, including issuing unreasonably timed and threatening demand letters. The 10-day compliance window is arbitrary, unreasonable, and indicative of bad faith. Furthermore, the Trustee's reliance on baseless allegations, contradicted by findings from the Examiner's Report, must cease immediately.

**Evidence of Undue Pressure:**

- The 10-day deadline is inconsistent with industry standards for demand letters, which often allow for 14 to 30 days for a response.

- By setting such an unreasonable deadline and coupling it with unfounded allegations, the Trustee has escalated the situation unnecessarily and acted in bad faith.

- **Case Law:** *In re Thorpe Insulation Co.,* 677 F.3d 869 (9th Cir. 2012): Trustees must act with fairness and avoid intimidation or coercion.
  **Application:** The Trustee's issuance of demand letters shortly after we asserted personal claims exhibits coercive behavior that fails to uphold the fairness required of fiduciaries. Trustees must act without intimidation or undue influence, as emphasized in this case.
- **Case Law:** *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343 (1985): Trustees owe duties of transparency and impartiality to all parties in interest.
  **Application:** The Trustee's refusal to maintain transparency and impartiality, particularly concerning the status of claims and estate administration, violates fiduciary obligations to all parties in interest. This lack of openness undermines stakeholder trust, contrary to the duties outlined in this precedent.
- **Case Law:** *In re Schepps Food Stores, Inc.,* 160 B.R. 792 (Bankr. S.D. Tex. 1993): Trustees cannot selectively pursue claims or act in ways that suggest retaliation or bad faith.
  **Application:** By selectively pursuing claims and appearing to act in retaliation, the Trustee is engaging in bad faith conduct. This case reinforces that Trustees must avoid favoritism or actions that compromise the integrity of estate administration.

Failure to comply with these demands will leave us no choice but to pursue all available legal remedies, including sanctions for abuse of process and violations of fiduciary

**Exhibit B**

obligations. We are prepared to take appropriate legal action to protect our rights and ensure that the estate is administered with fairness and integrity.

We look forward to the Trustee addressing these issues and committing to a course of action that aligns with their fiduciary obligations and ethical responsibilities.

## Conclusion

In closing, we remain committed to cooperating fully with the Trustee and the Court in managing the bankruptcy estate. However, we will not tolerate baseless allegations, retaliatory conduct, or attempts to infringe upon our personal, stakeholder and constitutional rights. The Trustee's refusal to communicate directly and transparently, coupled with the inaction and lack of clarity on critical matters such as claims against the Warren Law Group and/ creditors that caused harm to the estate, raises serious concerns about fiduciary breaches and ethical violations.

Furthermore, the findings of the trial and the Examiner's Report have unequivocally demonstrated a lack of evidence supporting the Trustee's claims of fraudulent transfers. These findings not only exonerate the transactions but also highlight the Trustee's pursuit of these baseless allegations as a clear instance of bad faith litigation, abuse of process and/or intimidation, among other potential claims. The continued insistence on advancing claims contradicted by the factual record further undermines the integrity of the bankruptcy process and raises questions about the Trustee's motives.

We strongly urge the Trustee to act in accordance with their fiduciary obligations to ensure fairness, transparency, and impartiality in the administration of the bankruptcy estate.

 Specifically, we demand that the Trustee:

1.  Cease any further retaliatory actions, including issuing unreasonable or threatening demand letters unsupported by law.

2.  Provide a detailed explanation regarding the status and intentions of any claims against the Warren Law Group and/or the creditors that caused the estate harm.

3.  Refrain from interfering with our legally distinct personal claims, which are supported by clear evidence of personal harm and established case law.

4. Retract your unreasonable, unethical and threatening demands.

5. Respond to our settlement letter accompanied with this correspondence.

We reserve the right to seek sanctions and all available remedies if these actions and inactions continue. Failure to address these matters promptly and in good faith will leave us no choice but to pursue legal remedies, including seeking judicial intervention to protect our rights and ensure the proper administration of the estate.

## Exhibit B

Thank you for your attention to this matter. We welcome the opportunity to resolve any misunderstandings in good faith and trust that the Trustee will take the necessary steps to fulfill their legal and ethical obligations.

Sincerely and In Good Faith,


**John Michael Cohan and David Hughes**
**Stakeholders of GENIE INVESTMENTS NV INC.**
**Sole Trustees & Sole Beneficiaries of GENIE INVESTMENTS TRUST**
**Authorized Representatives, without prejudice and without recourse,**
**Pro Se, In Rem, Corpus Juris, Quasi In Rem, In personam, Under Fiduciary Duty,**
**FS 736.0816, UTC 801-817, UPAA 203 & 207, 11 USC 541, UCC §9-109, UCC §9-503, UCC §9-607, UCC §9-615, UCC §9-202, Restatement (Third) of Trusts 70 & 85, Dodge v. Ford Motor Co. (1919), Hodel v. Irving, 481 U.S. 704 (1987), C.E. Pope Equity Trust v. United States, 818 F.2d 696 (9th Cir. 1987)**


**CC VIA EMAIL:**
**Bryan K. Mickler**, Attorney for the Debtor
**Law Offices of Mickler & Mickler, LLP**
5452 Arlington Expy.
Jacksonville, Florida 32211
bkmickler@planlaw.com


**Exhibit B**

**John Michael Cohan and David Hughes**
PO Box 60443
Jacksonville, Florida 32236
jmcohan@genieinvestments.com; dhughes@genieinvestments.com

**VIA EMAIL**

**Aaron Cohen, Chapter 7 Trustee**
**Raye Elliott**
Akerman LLP
50 North Laura Street, Suite 3100
Jacksonville, Florida 32202
raye.elliott@akerman.com

**01-27-25**

**Subject:** Proposal to Settle Claims of Breach of Fiduciary Duty, Abuse of Process, and Bad Faith Litigation

**Dear Mr. Cohen/Ms. Elliott,**

We write to propose a resolution to our claims against the Trustee arising from breaches of fiduciary duty, abuse of process, and bad faith conduct in the administration of Genie Investments NV's bankruptcy estate. These claims stem from retaliatory actions, lack of transparency, and improper interference with our personal claims, as well as the issuance of coercive demand letters.

We are committed to resolving this matter amicably to avoid protracted litigation and ensure fairness in the estate's administration.

---

**Legal Precedent Supporting Our Claims**

1. **Breach of Fiduciary Duty**

   o *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985): Trustees owe duties of fairness, good faith, and transparency to all stakeholders.

2. **Abuse of Process**

   o *In re Cooper*, 405 B.R. 801 (Bankr. N.D. Tex. 2009): Legal actions initiated for improper purposes, such as harassment or retaliation, constitute abuse of process.

3. **Bad Faith Litigation**

   o *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991): Courts sanction bad faith conduct, including coercive actions intended to suppress valid claims.

---

**Exhibit C**

**Application of Legal Precedent**

- The Trustee failed to act transparently by withholding critical information regarding claims against the Warren Law Group and demanding confidentiality without court authorization (*Weintraub*).

- Demand letters issued within three days of our personal claims, coupled with arbitrary deadlines, demonstrate retaliatory actions and abuse of process (*Cooper*).

- The Trustee's actions caused undue pressure, financial harm, and reputational damage, consistent with coercive conduct sanctioned in *Chambers*.

---

**Proposal to Settle**

To avoid further litigation and expense to the estate, we propose the following settlement terms:

1. **Payment of $500,000** to resolve all claims related to breach of fiduciary duty, abuse of process, and bad faith conduct.

2. A commitment to **transparency** and adherence to fiduciary duties in estate administration.

3. Agreement to refrain from further **retaliatory or coercive actions**.

---

**Conclusion**

This settlement is fair given the legal and factual circumstances. We hope to resolve this matter amicably to avoid further disruption. We request your response within **14 days**.

Sincerely and In Good Faith,

**John Michael Cohan and David Hughes**
**Stakeholders of GENIE INVESTMENTS NV INC.**
**Sole Trustees & Sole Beneficiaries of GENIE INVESTMENTS TRUST**
**Authorized Representatives, without prejudice and without recourse,**
**Pro Se, In Rem, Corpus Juris, Quasi In Rem, In personam, Under Fiduciary Duty, FS 736.0816,**
**UTC 801-817, UPAA 203 & 207, 11 USC 541, UCC §9-109, UCC §9-503, UCC §9-607, UCC §9-615,**
**UCC §9-202, Restatement (Third) of Trusts 70 & 85, Dodge v. Ford Motor Co. (1919), Hodel v.**
**Irving, 481 U.S. 704 (1987), C.E. Pope Equity Trust v. United States, 818 F.2d 696 (9th Cir. 1987)**

---

**CC VIA EMAIL:**
Bryan K. Mickler, Attorney for the Debtor
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, Florida 32211
bkmickler@planlaw.com

**Exhibit C**