UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION

In re:
Genie Investments NV, Inc.,
Debtor.

Case No.: 3:24-bk-00496-BAJ
Chapter 7



### REPLY TO TRUSTEE'S RESPONSE TO MOTION FOR SANCTIONS AND PROTECTIVE ORDER

John Michael Cohan ("John") and David Hughes ("David"), stakeholders of Genie Investments NV, Inc., along with their affiliated entities—Capitulum LLC, Better Methods LLC, Genie's Angels LLC (aka Merkton Group LLC), Zoomeral Inc., and Genie Investments II LLC (collectively, the "Affiliated Businesses")—in their capacities as Sole Trustees and Sole Beneficiaries with durable powers of attorneys in place, as the entities are property of and are currently managed by the secured party, GENIE INVESTMENTS TRUST, by and through their undersigned representatives, hereby file this respectfully submit this reply to the Trustee's response to the Motion for Sanctions and Protective Order, and in support state as follows:

### I. Summary of Trustee's Response and Key Arguments

The Trustee argues that:

1. The demand letters sent to Movants' affiliated companies were not retaliatory but rather a natural progression of the Trustee's investigation.

2. The Trustee is immune from sanctions under the doctrine of quasi-judicial immunity.

3. The malpractice claim against the Warren Law Group belongs exclusively to the bankruptcy estate, preventing Movants from asserting personal claims.

4. The Trustee is not obligated to maintain transparency with former principals of the Debtor and has no duty to inform them of estate administration details.

5. A protective order preventing the Trustee from pursuing claims against Movants' affiliated entities is legally baseless.

Each of these arguments is flawed, misleading, and contradicted by case law and newly discovered evidence. Additionally, the Trustee's response ignores certain key evidence of their misconduct, including:

1. The Trustee attempted to suppress information that was not under a protective order and had no legal basis to demand confidentiality restrictions (see Exhibit G in the original motion).

2. A separate third-party case was filed against Velanos, which could have direct implications on this bankruptcy estate. Movants immediately notified the Trustee and Bryan Mickler, attorney for the Debtor, who advised that the case should be stayed under well-established bankruptcy principles after the Trustee stated that they could not affect or stay the other case, which clearly showed their negligence or ignorance regarding the remedy. Again, Bryan Mickler had to point out to the Trustee that the third-party case could and should be stayed. Moreover, John and David found the case which the Trustee should have already known about and acted on given their role as a fiduciary.

3. Since the Trustee has failed to provide transparency, it is our assertion and belief that he has refused to file for a stay in the Velanos matter, despite the strong legal precedent supporting such an action.

4. Bryan Mickler provided direct case law supporting the stay, including:

   o *Durr Mechanical Constr., Inc. v. I.K. Constr. Inc. (In re Durr Mechanical Constr., Inc.)*, 604 B.R. 131 (S.D.N.Y. 2019)

   o *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir. 1986)

   o *Johns–Manville Corp. v. Asbestos Litig. Grp. (In re Johns–Manville Corp.)*, 26 B.R. 420 (Bankr. S.D.N.Y. 1983)

   o *McCartney v. Integra Nat'l Bank N.*, 106 F.3d 506 (3d Cir. 1997)

See Exhibit K – Email correspondence between Bryan Mickler and Stakeholders.

The Trustee's failure to act—or at minimum, provide transparency about their decision—further proves a pattern of bad faith, selective enforcement, negligence, gross negligence, and improper administration of the estate.

## II. Rebuttal to Trustee's Arguments

1. **Trustee's Demand Letters Were Retaliatory**

   The Trustee's demand letters were sent in retaliation for Movants' legal claims, in violation of **28 U.S.C. § 1927**, which prohibits attorneys from engaging in vexatious litigation that unnecessarily multiplies proceedings. Courts have consistently imposed sanctions for such conduct, as seen in *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

- **Summary:** The Trustee sent demand letters to Movants' affiliated companies just three days after Movants pursued personal claims against the Warren Law Group. The timing alone suggests retaliation and abuse of discretion.

- **Case Law:** Courts have recognized retaliatory litigation as a basis for sanctions:

  o *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)

  o *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993)

- **Application:** The Trustee remained inactive for over five months and only acted after Movants asserted personal claims.

- **Conclusion:** The Trustee's actions constitute bad faith and warrant sanctions.

## 2. Trustee's Allegation Regarding the $1.1 Million Transfer

The Trustee falsely asserts that $1.1 million was fraudulently transferred, despite lacking evidence of fraudulent intent as required under **11 U.S.C. § 548(a)(1)(A)**. Under this statute, a transfer is only avoidable if made with "actual intent to hinder, delay, or defraud" creditors. Moreover, **Federal Rule of Bankruptcy Procedure 9011** prohibits misrepresentations to the court, and the Trustee's reliance on misleading claims violates these legal principles.

In the Trustee's response, he stated: "After holding the Section 341 Meeting of Creditors, taking a Rule 2004 examination of the Debtor, and attempting to determine the disposition of over $1.1 million in the Debtor's Chase Bank accounts that were closed in August 2023 and whether those funds were transferred to the Insider Companies, the Trustee was ready to move forward with claims against the Insider Companies."

- **Summary:** The Trustee asserts they were unable to determine the disposition of $1.1 million, but evidence shows Chase Bank initiated the transfers, not the Debtor.

- **Case Law:** Transfers caused by third-party actions do not constitute fraudulent conveyances:

    o   *In re Lyondell Chem. Co.*, 567 B.R. 55 (Bankr. S.D.N.Y. 2017)

    o   *In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005)

- **Application:** The Trustee completely fabricated this false claim in a clear attempt to mislead this court into thinking their supportive statement would hint that their motivation was not retaliatory. They failed to review prior testimony given by Mr. Hughes, whereby he stated that Chase Bank sent the $1.1 Million wire after they took account access away from Genie management due to fraudulent claims by certain creditors. The Trustee's assertion of this 100% false claim shows their desperation to come up with a story. In any event they failed to recognize Chase Bank's role in the transaction, which was that they sent they wire of $1.1 Million dollars without any input form Mr. Cohan or Mr. Hughes.

- **Conclusion:** The fraudulent transfer claim is meritless and fraudulent in and of itself. The Trustee's reliance on this reasoning to pursue claims against the Insider Companies is erroneous. The Chase Bank letters—already disclosed on the record and provided to Debtor's counsel and the Examiner—proves the funds' disposition was beyond the Debtor's or Insider Companies' control. Trustees must base actions on substantive evidence, not speculation. See *In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005) (fraudulent transfer claims require clear intent to defraud). *In re Lyondell Chem. Co.*, 567 B.R. 55 (Bankr. S.D.N.Y. 2017) confirms that third-party transfers outside a debtor's control do not constitute fraudulent conveyances. The Trustee's pursuit of claims despite clear evidence contradicts fiduciary obligations.

See Exhibits L – Chase Bank Letters disclosed during testimony and submitted to Debtor's counsel and the Examiner and extracted pages from the $1.MM McMann white–labeled Genie to Borrower agreement.

3. **Trustee's Mishandling of the Warren Law Group Malpractice Claim**
**Summary:**

The Trustee improperly rejected pre-approved, cost-effective counsel in violation of **11 U.S.C. § 327(a),** which mandates that a trustee must employ professionals in a manner that is in the best interests of the estate. Instead, the Trustee's arbitrary rejection of pre-approved legal counsel has caused unnecessary financial harm, contrary to established bankruptcy law. The Trustee ignored cost-effective, pre-retained legal counsel and instead sought unnecessary new representation simply because the originally retained counsel refused to work without compensation. This decision was arbitrary, financially irresponsible, and contrary to the best interests of the estate.

**Case Law:**
Trustees are required to act in the best interests of the bankruptcy estate and its creditors. See *In re Smart World Techs., LLC,* 423 F.3d 166 (2d Cir. 2005). Courts have also held that trustees must avoid engaging in wasteful litigation that unnecessarily depletes estate resources. See *In re Hyman,* 502 F.3d 61 (2d Cir. 2007); *In re Kmart Corp.,* 359 F.3d 866 (7th Cir. 2004).

**Application:**
The Trustee's decision to reject pre-approved, cost-effective counsel was unjustified and financially reckless. Furthermore, the Trustee made materially false statements under oath. In **Exhibit N,** Nicholas Spigner, Esq., expressly attests to having experience in legal malpractice cases, a fact that was confirmed by both Mr. Cohan and David before engaging his firm. Yet, in the Trustee's response (¶7), he misleadingly asserts:

"...and determined that the bankruptcy estate would be better served by retaining new malpractice counsel because the attorney retained by the Debtor had never handled a legal malpractice case before..."

This statement is demonstrably false and constitutes perjury under 18 U.S.C. § 1621. The Trustee's pattern of deception and mismanagement undermines his fiduciary obligations under 11 U.S.C. § 704(a), which mandates that a trustee must "collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest."

Moreover, the Trustee's continued use of estate funds to pursue frivolous and meritless claims represents a clear breach of fiduciary duty. Rather than preserving assets for legitimate creditors, the Trustee has engaged in litigation tactics devoid of legal or factual merit, seemingly designed to harass and obstruct the Movants. Courts have repeatedly held that trustees must act in good faith and avoid litigation that serves no legitimate estate purpose. See *In re Reed,* 178 B.R. 817, 821 (Bankr. D. Ariz. 1995) (holding that a trustee who engages in litigation without

merit violates their fiduciary duty).

The Trustee's repeated bad-faith filings, wasteful litigation, and misrepresentation warrant sanctions under Rule 11 of the Federal Rules of Civil Procedure, which prohibits filings that are frivolous, legally baseless, or made for improper purposes. Additionally, under 28 U.S.C. § 1927, any attorney who "multiplies the proceedings in any case unreasonably and vexatiously" may be required to personally satisfy the excess costs, expenses, and attorneys' fees incurred due to such conduct.

**Conclusion:**
The Trustee's handling of the Warren Law Group malpractice claim exemplifies a breach of fiduciary duty, financial mismanagement, and deliberate misrepresentation. The Court should take appropriate action, including sanctions, to prevent further depletion of estate resources and to hold the Trustee accountable for his misconduct.

Exhibit M: Copy of the Fee Agreement with Ali Law Group

Exhibit N: Attestation Form from Nicholas Spigner, Esq., confirming the Trustee's misleading statements to the Court

4.   The Malpractice Claim Against Warren Law Group is Not Exclusively Estate Property.

**Summary:** Movants' personal claims are separate from estate property under 11 U.S.C. § 541(a)(1), which defines the bankruptcy estate and does not extend to personal claims. The Supreme Court in Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416 (1972) has reinforced that trustees do not have standing to assert claims belonging to individual stakeholders.

**Case Law:** Trustees cannot prevent stakeholders from asserting personal damages (*Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416 (1972)*; *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982)*).

**Application:** Movants' claims are for personal damages unrelated to estate assets.

**Conclusion:** The Trustee has no authority to interfere with Movants' personal legal actions.

5.   Trustee's Allegation Regarding Insider Loan Agreements

**Summary:** The Trustee fails to prove fraudulent intent in insider loan agreements under 11 U.S.C. § 548(a)(1)(B), which requires a showing that the debtor was insolvent at the time of transfer or received less than reasonably equivalent value. Without such proof, the Trustee's allegations are legally deficient.

The Trustee alleges that loan agreements between the Debtor and the Insider Companies were not commercially reasonable and that the $3.6 million in transfers constituted fraudulent transfers. However, the Trustee's conclusions are unsupported by legal precedent, fail to account for the nature of these agreements, and overlook the fact that the Debtor engaged in standard industry practices when structuring these loans.

### Fraudulent Transfer Claims Require Clear Intent to Defraud

The mere existence of insider relationships does not automatically render loans fraudulent. Courts require clear and convincing evidence of fraudulent intent.

- *In re Sharp Int'l Corp.,* 403 F.3d 43 (2d Cir. 2005)

    - Case Law: A fraudulent transfer claim cannot be based on mere suspicions or the existence of insider relationships; actual intent to hinder, delay, or defraud must be proven.

    - Application: The Trustee has not provided specific evidence that the insider loans were made with fraudulent intent. The loans were structured, documented, and reflected legitimate business purposes.

- *In re Geltzer,* 502 B.R. 760 (Bankr. S.D.N.Y. 2013)

    - Case Law: A trustee must demonstrate both the lack of fair consideration and intent to defraud creditors for a transfer to be deemed fraudulent.

    - Application: The loans in question had structured repayment terms and were used for business development—they were not sham transactions designed to avoid creditors.

    ### Loans Made in the Ordinary Course of Business Are Not Fraudulent

If loans were issued in the normal course of business and carried reasonable terms, courts have ruled that they cannot be reclassified as fraudulent transfers.

- *In re Lyondell Chem. Co.,* 567 B.R. 55 (Bankr. S.D.N.Y. 2017)

    - Case Law: Courts should not retroactively classify legitimate business transactions as fraudulent transfers without strong evidence of deception.

    - Application: The insider loans were issued in the ordinary course of Genie's operations, had repayment obligations, and were not secretive or concealed from creditors.

- *In re U.S.A. Inns of Eureka Springs*, 9 F.3d 680 (8th Cir. 1993)

    - Case Law: Loans made between insiders can be valid and enforceable if they serve a business purpose and contain structured repayment terms.

    - Application: The Trustee has not demonstrated that these loans deviated from industry norms—the existence of an insider relationship alone is insufficient to establish fraud.

    ### Business Judgment Rule Protects Properly Executed Loans

Courts defer to the debtor's business judgment when issuing loans, provided there is no evidence of bad faith or self-dealing. Refer to *Exhibit I* (Declaration of Adam Walker) and *Exhibit J* (Examiner's Report) from the original motion.

- *In re Tower Air, Inc.*, 416 F.3d 229 (3d Cir. 2005)

  o Case Law: The court must defer to the business judgment of the debtor unless there is compelling evidence of fraud or gross mismanagement.

  o Application: The Trustee is improperly second-guessing financial decisions made by Genie, despite the absence of fraud. The Trustee must demonstrate actual misconduct, not simply allege that insider loans are inherently suspect.

- *In re Johns-Manville Corp.*, 60 B.R. 612 (Bankr. S.D.N.Y. 1986)

  o Case Law: A company's financial decisions—including intercompany loans—must be respected unless there is clear evidence of abuse.

  o Application: Genie's insider loans were well-documented, had defined repayment terms, and were executed with a business purpose—there is no evidence of bad faith.

### Insolvency at the Time of Transfer Must Be Proven

A fraudulent transfer claim requires the Trustee to prove that the debtor was insolvent at the time of the transfer. The Trustee has failed to demonstrate this essential element, making their allegations legally unsound.

1. The Insider Loan Agreements Were Executed Prior to Insolvency

   o At the time the loans were structured and executed, Genie Investments NV, Inc. was solvent and conducting ordinary business transactions in good faith.

   o The financial records and supporting documents will show that Genie maintained positive cash flow and had the financial capacity to engage in these agreements before any allegations of insolvency arose.

   o The Trustee has not provided any analysis showing Genie was insolvent at the time these loans were executed, rendering their claims legally defective.

2. Case Law Supporting the Need for Insolvency Proof:

   o *In re TOUSA, Inc.*, 680 F.3d 1298 (11th Cir. 2012)
   Case Law: A fraudulent transfer cannot be established unless the debtor was insolvent or received less than reasonable equivalent value at the time of the transfer.
   Application: The Trustee has not proven that Genie was insolvent when these loans were issued—making the fraudulent transfer classification improper.

   o *In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005)
   Case Law: Fraudulent transfer claims must be supported by clear and convincing evidence of intent to defraud, and insolvency must be established at the time of the transfer.
   Application: The Trustee has not provided any analysis showing Genie was

insolvent at the time these loans were executed, rendering their claims legally defective. He has not proven, so because he is unable to.

### The Trustee's Allegations Regarding Loan Terms Are Misleading and Legally Unsupported

The Trustee's assertion that the loans from the Debtor to affiliated entities were fraudulent transfers based on its terms—specifically the 0.1% interest rate, extended balloon payment structure, and borrower's right to extend the terms—is factually incorrect and legally unsupported for the following reasons:

### A. The Existence of Below-Market Interest Rates Does Not Establish Fraud

- Courts have consistently held that below-market interest rates do not automatically render a loan fraudulent. This is industry standard, i.e. normal sales and marketing, such as car loans, vehicle loans, and all the other loans on television commercials that entice customers at rates as low as 0%.

- *In re U.S.A. Inns of Eureka Springs,* 9 F.3d 680 (8th Cir. 1993)
  **Case Law:** A low-interest loan between affiliates is not inherently fraudulent if there is a legitimate business purpose and the loan terms are agreed upon in good faith.
  **Application:** The 0.1% interest rate was part of an intra-company financing structure intended to facilitate investment and ensure financial sustainability.

- *In re Lyondell Chem. Co.,* 567 B.R. 55 (Bankr. S.D.N.Y. 2017)
  **Case Law:** The court ruled that even "unusual" loan terms do not constitute fraudulent transfers unless there is a clear intent to hinder creditors.
  **Application:** The Trustee has provided no evidence that the low-interest rate was used to defraud creditors—rather, it was structured for financial flexibility.

### B. Balloon Payment Structures Are Standard Practice in Commercial Lending

- Long-term balloon payment structures with extended repayment terms are common in private lending, real estate, and intercompany financing agreements. So are deferred interest options. The mortgage industry uses deferred interest options all the time when clients get behind in making their payments, etc. They give the residential borrower the opportunity to modify their loan, start over, and apply all unpaid principal and interest to the end of the loan term. This is a Nationally approved program available in all states.

- *In re Chateaugay Corp.,* 89 F.3d 942 (2d Cir. 1996)
  **Case Law:** Balloon payments do not render a loan fraudulent unless the lender never intended to repay the debt.
  **Application:** The affiliated entities had the full intent and ability to repay the loan—there is no evidence of an intent to default.

- *In re Iridium Operating LLC,* 478 F.3d 452 (2d Cir. 2007)
  **Case Law:** Flexible loan repayment structures are not improper if they serve a business purpose.

**Application:** The balloon structure was agreed upon for financial flexibility and was part of a broader strategy to maximize estate recoveries.

## C. The Right to Extend Loan Terms Is a Common Financial Provision

- Loan agreements often contain extension clauses to provide financial flexibility, especially in intercompany transactions.

- *In re Sharp Int'l Corp.,* 403 F.3d 43 (2d Cir. 2005)
  **Case Law:** The presence of borrower-friendly loan terms does not prove fraud; instead, a trustee must demonstrate that these terms were designed to defraud creditors.
  **Application:** The Trustee has not provided evidence that the loan extension rights were structured with fraudulent intent.

- *In re Bay Plastics, Inc.,* 187 B.R. 315 (Bankr. C.D. Cal. 1995)
  **Case Law:** Loan extension provisions are standard financial instruments and cannot be classified as fraudulent without clear evidence of abuse.
  **Application:** The affiliated entity loan extension rights were contractually negotiated and do not constitute fraudulent intent.

## D. The Debtor Received Substantial Consideration in Exchange for the Transfers

- The Trustee's claim that the Debtor "received nothing" in return is factually inaccurate.

- Consideration for the loans included:

  1. Customer-facing software and marketing initiatives The United States Trustee referred to ZOOMERAL as a "Storefront," for Genie Investments NV Inc. indicating its intrinsic value to Genie Investments NV Inc. Every contract Genie Investments NV Inc. provided to a customer or to a White Labeler referred to ZOOMERAL Inc., as a Software as a Service (SaaS) product.

  2. Financial support for affiliated entities to maintain estate value

  3. Operational support

  4. Goodwill

  5. A structured repayment obligation, as documented in loan agreements and supporting financial records

- *In re Fordu,* 201 F.3d 693 (6th Cir. 1999)
  **Case Law:** The presence of indirect economic benefits to the estate, including business continuity and financial support, satisfies consideration requirements.
  **Application:** The Debtor benefited from the transaction, making the Trustee's claim of "no consideration" legally unsound.

- *In re TOUSA, Inc.,* 680 F.3d 1298 (11th Cir. 2012)
  **Case Law:** Trustees must prove that a debtor received less than reasonable equivalent value—not merely argue that a transaction was "too favorable" to one party.

**Application:** The Trustee has failed to prove the affiliated company loan terms caused financial harm to the estate.

### E. Examiner's Report and Declaration of Adam Walker Confirm the Validity of the Loan

- *Exhibit I* (Declaration of Adam Walker) and *Exhibit J* (Examiner's Report), both presented in the original motion, confirm that affiliated entity loans were structured in accordance with financial norms.

- No evidence of fraudulent intent or financial harm to the estate was found in these independent analyses.

- The Examiner acknowledged that the loan was part of a broader financial strategy to protect estate value.

### Conclusion: The Trustee's Fraudulent Transfer Allegation Fails on Legal and Factual Grounds

The Trustee's claim that the insider loans are fraudulent due to its terms is legally unsupportable.

1. The 0.1% interest rate alone does not prove fraud—courts have ruled that below-market rates are permissible in legitimate business transactions (*In re U.S.A. Inns of Eureka Springs,* 9 F.3d 680).

2. Balloon payment structures are common in financial agreements and do not automatically equate to fraudulent transfers (*In re Chateaugay Corp.,* 89 F.3d 942).

3. Loan extension clauses are standard industry provisions and cannot be classified as fraudulent without additional evidence (*In re Sharp Int'l Corp.,* 403 F.3d 43).

4. The Debtor received substantial indirect benefits in return for the transfers—meeting the legal standard for consideration (*In re Fordu,* 201 F.3d 693).

5. Independent reports (*Examiner's Report and Declaration of Adam Walker*) confirm that the loan was properly structured and not fraudulent.

The Trustee's attempts to reclassify these loans as fraudulent transfers are legally unfounded and contradict well-established case law. The Trustee's assertion that these transfers were fraudulent lacks merit and ignores applicable legal precedent. Without evidence of actual fraudulent intent or harm to creditors, the Trustee's claims should be rejected. These transactions were conducted in good faith, documented appropriately, and in accordance with industry standards. Therefore, the court should dismiss the Trustee's allegations regarding fraudulent transfers related to the Insider Companies.

### III. Trustee Has Not Been Transparent Regarding the Velanos Stay Issue

#### Summary

The Trustee has not disclosed actions taken or justified inaction, in violation of 11 U.S.C. § 105(a), which authorizes the court to issue necessary orders to prevent abuse of process. Moreover,

Federal Rule of Bankruptcy Procedure 2015(a)(2) requires trustees to maintain transparency in estate administration, a duty the Trustee has failed to uphold.

Referring back to Exhibit K, the Trustee was provided with direct legal precedent supporting the need for a stay in the Velanos matter but has failed to disclose any actions taken or provide justification for inaction. Transparency is a fundamental duty of bankruptcy trustees, ensuring that all stakeholders are informed of critical decisions affecting estate administration. The Trustee's refusal to act—or even explain why a stay was not pursued—demonstrates a failure to uphold fiduciary obligations. This lack of transparency not only disadvantages Movants but also raises concerns about the Trustee's impartiality and motivations. The Trustee's decision to remain silent despite clear case law supporting a stay constitutes bad faith administration and selective enforcement, further reinforcing the pattern of biased estate management.

1. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985)

   - o **Case Law:** A Trustee assumes the fiduciary duty of the debtor and must act in the best interests of the estate, including full transparency in decision-making. Failure to disclose material decisions constitutes a breach of this duty.

   - o **Application:** The Trustee's refusal to disclose the reasoning behind the failure to seek a stay violates this duty and deprives stakeholders of critical information affecting estate recoveries.

2. *In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012)

   - o **Case Law:** Trustees cannot withhold information regarding material decisions, as doing so undermines the integrity of the bankruptcy process. Courts emphasize the need for transparency in all fiduciary actions.

   - o **Application:** By failing to disclose the decision-making process regarding the Velanos stay, the Trustee is obstructing Movants' ability to challenge estate administration decisions and ensure fair treatment.

3. *In re Smart World Techs., LLC*, 423 F.3d 166 (2d Cir. 2005)

   - o **Case Law:** A Trustee must not suppress or withhold information that could materially impact creditor claims or estate litigation. Transparency is essential to prevent selective enforcement and manipulation of estate matters.

   - o **Application:** The Trustee's lack of disclosure regarding the Velanos stay supports the inference that this decision was made in bad faith or to benefit certain parties while disadvantaging others.

4. *In re Marvel Entm't Grp., Inc.*, 140 F.3d 463 (3d Cir. 1998)

   - o **Case Law:** Trustees must act as neutral fiduciaries and cannot selectively withhold or delay actions based on strategic motives.

   - o **Application:** The Trustee's silence on the Velanos stay issue suggests an intentional effort to disadvantage Movants rather than a neutral fiduciary decision.

### Application

Despite being provided with direct case law supporting a stay, the Trustee has taken no action and refuses to disclose any reasoning for inaction. This failure is particularly concerning given that Velanos is now a well-known bad actor, and delaying or refusing to stay litigation against Velanos could materially impact creditor recoveries. The Trustee's lack of transparency serves no legitimate estate interest and instead appears to align with a broader strategy of selectively enforcing claims while protecting third-party liabilities. Case law has consistently affirmed that Trustees must act as neutral fiduciaries, meaning that critical case decisions—such as whether to pursue a stay—must be justified and disclosed to stakeholders. The Trustee's failure to do so is an abuse of discretion, depriving Movants of due process and obstructing legitimate estate administration oversight.

Moreover, this lack of transparency is compounded by the Trustee's refusal to explain why third-party defamation claims (such as those against some of the creditors) have been ignored while insider transactions are aggressively pursued. This selective enforcement further supports the inference that the Trustee's inaction regarding the Velanos stay was not an oversight but a deliberate strategic choice to benefit specific legal counterparts. Courts have ruled that such manipulation of estate proceedings constitutes a breach of fiduciary duty and bad faith administration.

### Conclusion

The Trustee's failure to disclose material decisions regarding the Velanos stay issue is a direct violation of fiduciary obligations and established legal precedent. Bankruptcy law requires transparency in Trustee actions, particularly when such actions—or inactions—could materially affect estate recoveries and creditor rights. The Trustee's refusal to explain the failure to seek a stay demonstrates selective enforcement, bad faith, and an abuse of discretion. Courts have consistently ruled that Trustees must act in the best interests of creditors, and the refusal to disclose why a stay was not pursued indicates improper administration of the estate. As such, the Trustee must be compelled to provide a full explanation for this decision and justify their actions—or lack thereof—in accordance with established bankruptcy law.

## IV. Fulfilling Contractual Obligations Under Section 13.7 of the Business Expansion LOC Agreement

### INTRODUCTION

Genie fulfilled its contractual obligations under the BELOC Agreement, which is enforceable under 11 U.S.C. § 365(a), governing the trustee's ability to assume or reject executory contracts. The Trustee's attempt to disregard this agreement lacks legal justification. Exhibit O is submitted to demonstrate that Genie Investments NV, Inc. ("Genie") fulfilled its contractual obligations under Section 13.7 (Exhibit O) of the Business Expansion Line of Credit Agreement ("BELOC Agreement") by actively pursuing legal remedies against Velanos Principal Capital ("Velanos") and securing a Settlement Agreement and Release of Claims before the appointment of the Trustee.

## CONTRACTUAL REQUIREMENTS UNDER SECTION 13.7

Section 13.7 of the BELOC Agreement required Genie to take reasonable and necessary steps to minimize or eliminate any force majeure event affecting the estate. This obligation included:

1. Taking proactive measures to recover funds invested in distressed ventures.

2. Exercising legal remedies against parties responsible for financial losses.

3. Negotiating settlements in good faith to preserve estate value.

4. Maximizing recoveries for creditors and stakeholders.

## GENIE'S ACTIONS TO SATISFY SECTION 13.7

### A. Pursuing Legal Action Against Velanos

- On October 25, 2023, Genie initiated arbitration proceedings against Velanos with JAMS, asserting that Velanos materially breached the Joint Venture Agreement ("JVA").

- On February 6, 2024, Genie escalated legal action by filing a federal lawsuit against Velanos and related entities in the U.S. District Court for the Middle District of Florida (Case No. 6:24-cv-00271).

### B. Settlement Agreement Executed Prior to Trustee's Appointment

- After nearly two years of litigation, Genie successfully negotiated and executed a Settlement Agreement and Release of Claims with Velanos on May 15, 2024.

- The Settlement Agreement required Velanos to pay Genie $15 million in structured installment payments, maximizing estate recovery.

- The Trustee was appointed after this agreement was fully executed, proving that Genie independently fulfilled its contractual obligations without Trustee involvement.

### C. Trustee's Immediate Acceptance of the Velanos Settlement

- Upon taking over the estate, the Trustee swiftly accepted the Velanos Settlement Agreement, confirming its validity and value to the estate.

- This demonstrates that Genie's actions were in the best interest of creditors, and the settlement was legally sound and enforceable.

### D. Efforts to Minimize Force Majeure Impact

- At the time of investment, Velanos was not known to be fraudulent.

- Genie took every reasonable step to investigate and recover funds once issues arose.

- By securing a legally binding settlement, Genie acted in good faith to restore financial stability and fulfill its fiduciary obligations to creditors.

## EVIDENCE SUPPORTING GENIE'S GOOD FAITH ACTIONS

The Declaration of Adam B. Walker (March 14, 2024) (Exhibit I of the original motion) and the

Examiner's Report (June 28, 2024) (Exhibit J of the original motion) provide independent verification that Genie acted in good faith and pursued all reasonable legal avenues to protect the estate's interests.

Additionally, Exhibit P (Legal Opinion Letter issued by Spiegel & Utrera, P.A.) further confirms that Genie Investments NV, Inc. was in good standing, had no history of misappropriation, and maintained a strong financial track record. This legal opinion, rendered by an independent law firm, directly refutes any claim of fraudulent intent or improper financial management.

- *Exhibit I – Adam B. Walker's Declaration* confirms that Genie retained competent legal counsel to review the Velanos transaction and acted based on professional advice.

- *Exhibit J – Examiner's Report* acknowledges that Genie pursued litigation against Velanos and made efforts to recover its investments before the Trustee's appointment.

- These reports establish that Genie took all necessary steps to fulfill its contractual obligations, mitigate financial risks, and maximize creditor recoveries.

## CONCLUSION

The Settlement Agreement with Velanos is conclusive evidence that Genie fulfilled its contractual obligations under Section 13.7 of the BELOC Agreement. The agreement was executed prior to the Trustee's appointment, and the Trustee's immediate acceptance of the settlement further validates its legitimacy. Genie acted in good faith, pursued legal remedies, and maximized creditor recoveries, fulfilling every requirement under the agreement.

## V. TRUSTEE'S DECISION-MAKING MUST ACCOUNT FOR GENIE'S GOOD FAITH ACTIONS

The Trustee has ignored Genie's legitimate financial transactions, violating 11 U.S.C. § 548(c), which protects good faith transferees who provide value in exchange for a transfer. Furthermore, Restatement (Second) of Contracts § 205 establishes a general duty of good faith in contract performance, which applies here.

All contractual agreements and legal actions undertaken by Genie Investments NV, Inc.— including the Settlement Agreement with Velanos and other contractual obligations—were executed in good faith with the intent to maximize recoveries for creditors and ensure financial stability. These binding agreements demonstrate a clear commitment to upCase Law fiduciary duties and resolving financial disputes through proper legal channels. Given these extensive efforts, the Trustee must take into full account the substantial good faith negotiations, settlements, and financial recoveries achieved when assessing claims of insider fraudulent transfers. Ignoring these legitimate transactions in favor of a blanket presumption of fraud would mischaracterize valid business dealings and undermine the integrity of the estate's administration.

1. Trustees Must Consider Good Faith Business Transactions

- *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985)

- o **Case Law:** The trustee assumes the fiduciary duty of the debtor and must act in the best interest of creditors, which includes assessing all material facts before voiding transactions.
- o **Application:** The Trustee must account for Genie's documented efforts to recover funds and act in good faith before labeling any transactions as fraudulent

- *In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005)

  - o **Case Law:** A fraudulent transfer claim cannot be based on mere suspicions; the plaintiff must show an actual intent to defraud, and not simply the existence of insider relationships.
  - o **Application:** The Settlement Agreement with Velanos was executed before the Trustee's appointment, and there is no evidence of fraud—only documented legal recoveries.

## 2. Business Judgment Rule Protects Legitimate Financial Decisions

- *In re Johns-Manville Corp.*, 60 B.R. 612 (Bankr. S.D.N.Y. 1986)

  - o **Case Law:** Bankruptcy courts should not second-guess business decisions that were made in the ordinary course and with due diligence.
  - o **Application:** The Trustee must recognize that Genie's legal efforts to recover creditor funds were executed properly..

## 3. Settlements Are Enforceable in Bankruptcy

- *In re Chateaugay Corp.*, 89 F.3d 942 (2d Cir. 1996)

  - o **Case Law:** Settlement agreements negotiated in good faith prior to bankruptcy are enforceable and must be honored unless there is clear evidence of fraud.
  - o **Application:** The Velanos Settlement Agreement was executed before the Trustee's appointment and was later accepted by the Trustee—demonstrating its validity and enforceability.

## 4. Fraudulent Transfer Claims Require Clear Evidence of Intent to Defraud

- *In re Geltzer*, 502 B.R. 760 (Bankr. S.D.N.Y. 2013)

  - o **Case Law:** A trustee must prove that a transfer was made with the actual intent to defraud creditors, and not simply that it was made between related entities.
  - o **Application:** The Velanos settlement and other contractual transactions were made with the intent to maximize creditor recoveries, not to shield assets from the estate.

- *In re Lyondell Chem. Co.*, 567 B.R. 55 (Bankr. S.D.N.Y. 2017)

- o **Case Law:** Courts should not retroactively classify legitimate business transactions as fraudulent transfers without strong evidence of deception.

- o **Application:** Genie's contracts, settlements, and legal actions were executed transparently, making it improper to assume fraudulent intent.

## Conclusion

The **Trustee must not ignore legitimate business dealings or arbitrarily classify insider loans as fraudulent transfers.** These legal precedents confirm that settlements and insider loans were executed in good faith, and financial decisions made with due diligence must be given full weight in bankruptcy proceedings.

By disregarding the Settlement Agreement with Velanos and other valid financial transactions, the Trustee would be violating established legal principles, which require trustees to consider the totality of circumstances and actual intent behind each transaction.

## VI. Trustee's Selective Enforcement: Evidence of Retaliatory Targeting

The Trustee has selectively targeted Movants while ignoring other stakeholders, violating **11 U.S.C. § 704(a)(1),** which mandates equal treatment in estate administration. Additionally, **Federal Rule of Bankruptcy Procedure 2004** allows broad discovery but must be exercised fairly and without bad faith.

The **Trustee's failure to target CALD Holdings,** despite its former ownership stake and financial involvement, provides **clear evidence of selective enforcement and retaliation** against Movants. This selective enforcement is **not only legally improper but also serves as a means to suppress personal claims against the Warren Law Group and other third parties.**

### 1. Selective Enforcement Violates Fiduciary Duties and Legal Precedents

The **Trustee has a fiduciary duty** to administer the estate impartially and pursue claims **equitably across all stakeholders. Ignoring CALD Holdings while aggressively targeting Movants is a direct violation of that duty.**

Legal Precedents Prohibiting Selective Enforcement:

- • *In re AFI Case Law, Inc.*, 530 F.3d 832 (9th Cir. 2008)

  - o **Case Law:** Trustees **must enforce claims fairly and cannot engage in selective enforcement** to favor or suppress certain parties.

  - o **Application:** The **Trustee's failure to investigate CALD Holdings, despite its former ownership stake, demonstrates an intentional bias against Movants.**

- • *In re Plaza de Diego Shopping Ctr., Inc.*, 911 F.2d 820 (1st Cir. 1990)

  - o **Case Law:** A Trustee must treat similarly situated entities equally and **cannot pick and choose targets without justification.**

- o **Application:** CALD Holdings had similar financial exposure, yet it was ignored, proving the Trustee is acting with an ulterior motive rather than pursuing equal recovery for creditors.

- *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985)

  - o **Case Law:** A Trustee's discretion is not unlimited—they must act in a manner that protects the estate's value and does not unfairly target specific parties.

  - o **Application:** The Trustee is weaponizing their authority against Movants while shielding CALD Holdings from scrutiny.

## 2. Failure to Target CALD Holdings Proves Retaliation Against Movants

The Trustee's sudden targeting of Movants, while ignoring other similarly positioned stakeholders, is retaliatory in nature.

**Retaliation is Evident Because:**

1. CALD Holdings was equally involved in the same transactions, yet no action was taken against it.

2. Movants filed claims against the Warren Law Group, and within days, the Trustee began issuing demand letters against Movants, but not against CALD Holdings.

3. The Examiner's Report and Declaration of Adam Walker confirm the legitimacy of transactions—yet the Trustee deliberately ignores this evidence to suppress Movants.

**Legal Precedents on Retaliatory Targeting:**

- *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)

  - o **Case Law:** Courts have ruled that retaliatory litigation is sanctionable misconduct.

  - o **Application:** The Trustee's decision to only pursue Movants immediately after they asserted personal claims is clear evidence of retaliation.

- *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993)

  - o **Case Law:** The timing and pattern of legal actions can establish bad faith intent.

  - o **Application:** The Trustee remained inactive for five months, then immediately pursued Movants after they filed claims—this pattern confirms intentional suppression.

## 3. Suppressing Personal Claims Against the Warren Law Group

The Trustee's actions serve to protect third-party liabilities (such as Warren Law Group's malpractice) while diverting estate attention toward Movants instead.

- Why is the Trustee not targeting CALD Holdings?

- o Because CALD Holdings has not asserted claims against Warren Law Group.
- o By selectively targeting Movants, the Trustee ensures that claims against Warren Law Group remain suppressed.

**Legal Precedents on Suppression of Counterclaims:**

- *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972)
  - o **Case Law:** A Trustee cannot manipulate bankruptcy estates to shield third-party liabilities at the expense of creditors.
  - o **Application:** The Trustee is using the estate as a shield to suppress Movants' claims against Warren Law Group.

- *In re Smart World Techs., LLC,* 423 F.3d 166 (2d Cir. 2005)
  - o **Case Law:** A Trustee must not suppress evidence or claims that could be beneficial to the estate.
  - o **Application:** The Trustee's refusal to equally investigate all parties is a direct violation of their duty to maximize estate recoveries.

**Conclusion: Trustee's Actions Violate Bankruptcy Law and Must Be Challenged**

1. The Trustee's failure to pursue CALD Holdings while targeting Movants is clear evidence of selective enforcement (*In re AFI Case Law, Inc.*, 530 F.3d 832).
2. The sudden demand letters against Movants, immediately after they filed claims, prove retaliatory targeting (*Chambers v. NASCO, Inc.*, 501 U.S. 32).
3. The Trustee is suppressing third-party malpractice claims against Warren Law Group by shifting attention to Movants (*Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416).

## VII. Trustee's Attempt to Suppress Information Without Legal Basis

### Summary

The Trustee has attempted to suppress information without a legal basis, violating 11 U.S.C. § 107(a), which states that bankruptcy records are public unless sealed by the court for good cause. Furthermore, Bankruptcy Rule 9018 governs the sealing of documents, and the Trustee's actions do not meet the necessary legal standard.

The Trustee's effort to suppress information that was not under a protective order and impose unnecessary confidentiality restrictions constitutes a clear violation of fiduciary duties and an abuse of discretion. The Trustee has no legal authority to restrict access to publicly available or non-confidential material. Such actions obstruct transparency, prevent Movants from effectively asserting their rights, and indicate an attempt to manipulate the bankruptcy proceedings to favor certain parties while disadvantaging others. This suppression not only undermines the fundamental

principles of fairness in bankruptcy but also raises concerns regarding the Trustee's true motivations in selectively withholding critical information.

## Case Law

1. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985)

   o **Case Law:** A Trustee assumes the fiduciary duty of the debtor and must act in the best interests of the estate, including the duty to disclose material information unless subject to a valid protective order.

   o **Application:** The Trustee's suppression of information contradicts their obligation to ensure transparency and fairness in estate administration.

2. *In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012)

   o **Case Law:** Trustees cannot selectively withhold information to favor certain parties while disadvantaging others. Doing so undermines the integrity of the bankruptcy process.

   o **Application:** The Trustee's suppression of non-confidential information demonstrates selective enforcement and bad faith conduct designed to manipulate estate administration.

3. *In re Smart World Techs., LLC*, 423 F.3d 166 (2d Cir. 2005)

   o **Case Law:** A Trustee must not suppress material evidence that could impact estate decisions and creditor rights.

   o **Application:** By attempting to prevent Movants from accessing critical information, the Trustee is violating their fiduciary obligations and unfairly restricting Movants' ability to defend themselves.

## Application

The Trustee's actions serve no legitimate estate purpose and instead create an environment where Movants are deprived of necessary information to respond to legal challenges. Suppressing non-confidential material without a court order or valid legal justification directly contradicts well-established fiduciary responsibilities. Instead of ensuring fairness and transparency, the Trustee is selectively restricting access to information, which in turn shields third-party misconduct while disproportionately targeting Movants. This suppression aligns with the broader pattern of the Trustee's actions—deliberately obstructing Movants' ability to assert personal claims while prioritizing litigation against them. Courts have held that such conduct amounts to bad faith administration and is grounds for sanctions or corrective judicial intervention.

## Trustee's Mischaracterization of Movants' Motion

The Trustee's claim that Movants are seeking an injunction rather than a sanctions motion is procedurally incorrect and a bad-faith attempt to misrepresent the nature of this filing. Movants are

not requesting injunctive relief but are seeking sanctions for the Trustee's misconduct, including selective enforcement, suppression of material information, and bad faith litigation tactics. Courts have ruled that mischaracterizing a motion to evade accountability is improper (*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)). This court should reject the Trustee's misrepresentation and address the sanctions motion on its merits.

## Conclusion

The Trustee's attempt to impose unwarranted confidentiality restrictions without legal authority is an abuse of discretion and a direct violation of fiduciary obligations. Case law clearly establishes that Trustees must maintain transparency and cannot selectively withhold material information to manipulate the bankruptcy process. By engaging in these suppression tactics, the Trustee has acted in bad faith, obstructing Movants' legal rights while protecting certain legal counterparts. The court must recognize this misconduct and compel the Trustee to provide full disclosure regarding all estate matters that are not legally protected by a valid confidentiality order.

## VIII. Appellate Division Court Cases Supporting Movants' Position

Below are three appellate cases that support Movants' arguments against the Trustee's actions:

1. *In re Smart World Techs., LLC*, 423 F.3d 166 (2d Cir. 2005)
   *Case Law:* Trustees must not suppress material evidence that could impact estate decisions and creditor rights. Transparency is essential to prevent selective enforcement and manipulation of estate matters.
   *Application:* The Trustee's refusal to disclose critical information obstructs Movants' ability to challenge estate administration decisions and ensure fair treatment.

2. *In re Plaza de Diego Shopping Ctr., Inc.*, 911 F.2d 820 (1st Cir. 1990)
   *Case Law:* A trustee must treat similarly situated entities equally and cannot selectively target parties without justification.
   *Application:* The Trustee's focus on Movants while ignoring similar claims against other entities, such as CALD Holdings, demonstrates selective enforcement and violates established fiduciary principles.

3. *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991)
   *Case Law:* Courts have inherent authority to impose sanctions on parties who engage in bad faith litigation and abuse of process.
   *Application:* The Trustee's retaliatory demand letters, selective enforcement, and obstruction of disclosure constitute bad faith litigation tactics warranting sanctions.

## IV. Final Request for Relief

The Trustee should be sanctioned for misconduct and bad faith litigation under Federal Rule of Bankruptcy Procedure 9011(b), which prohibits filings made for improper purposes, including harassment. Additionally, 28 U.S.C. § 1927 authorizes sanctions against parties that unnecessarily

multiply proceedings. Courts have also imposed sanctions under Federal Rule of Civil Procedure 11 for similar misconduct.

The Trustee should be prohibited from further retaliatory actions under Federal Rule of Bankruptcy Procedure 7026, which allows courts to issue protective orders to prevent abusive litigation.

The Trustee must explain why they have not sought a stay under 11 U.S.C. § 362(a), which governs the automatic stay and the trustee's obligation to enforce it.

Given the Trustee's pattern of misconduct, retaliation, selective enforcement, and abuse of process, Movants request the following relief:

## 1. Grant the Motion for Sanctions Against the Trustee

The Trustee has engaged in bad faith litigation tactics, retaliatory actions, suppression of material information, selective enforcement, and abuse of process, all of which warrant monetary and punitive sanctions.

**Abuse of Process Justification**

- The Trustee has weaponized the bankruptcy process to serve personal or professional interests rather than to fulfill fiduciary duties.

- The Trustee issued retaliatory demand letters immediately after Movants filed malpractice claims, a clear effort to harass and intimidate.

- The Trustee has deliberately ignored legal precedent regarding the Velanos stay, refusing to take action or provide justification, demonstrating a manipulative strategy to advance selective claims.

- Courts have ruled that abuse of process occurs when legal procedures are misused to achieve an improper purpose, which aligns with the Trustee's pattern of conduct in this case.

**Case Law Supporting High Sanctions for Abuse of Process**

1. *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) – Courts have inherent authority to impose sanctions for abuse of process and bad faith litigation tactics.

2. *Goodyear Tire & Rubber Co. v. Haeger,* 581 U.S. 101 (2017) – Courts must ensure that misuse of legal procedures does not provide an unfair advantage to any party.

3. *In re Intel Securities Litigation*, 791 F.2d 672 (9th Cir. 1986) – A party engages in abuse of process when they exploit legal procedures for improper purposes, including harassment and suppression of opposing claims.

Recommended Sanction Breakdown – Total: $750,000

**Compensatory Sanctions – $250,000 (*Remedial damages for harm caused by the Trustee's misconduct)*

- **Justification:** The Trustee's abuse of process, suppression of material information, selective enforcement, and retaliatory litigation have caused significant harm, including:
    - Delayed estate proceedings
    - Unwarranted legal expenses
    - Obstruction of Movants' rights
- **Case Law Supporting High Compensatory Sanctions:**
    - *Roadway Express, Inc. v. Piper*, 447 U.S. 752 (1980) – Compensatory sanctions should reflect actual harm caused by misconduct.
    - *In re Rainbow Magazine, Inc.*, 77 F.3d 278 (9th Cir. 1996) – Sanctions are justified when trustee misconduct causes delays or increased financial burden on creditors.

**Punitive Sanctions – $400,000** *(To punish and deter future misconduct, including abuse of process)*

- **Justification:** Courts impose punitive sanctions when a party deliberately abuses the judicial process, particularly when fiduciary duties are violated, and bad faith conduct is evident.
- The Trustee's conduct—including retaliatory demand letters, refusal to act on the Velanos stay, and suppression of critical evidence—demonstrates willful misconduct that warrants a severe punitive sanction.
- **Case Law Supporting High Punitive Sanctions:**
    - *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) – Courts can impose substantial punitive sanctions for abuse of process and bad faith litigation.
    - *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017) – Punitive sanctions should reflect the severity of misconduct to deter future violations.
    - *In re Geltzer*, 502 B.R. 760 (Bankr. S.D.N.Y. 2013) – Trustee misconduct that undermines the integrity of the bankruptcy process warrants punitive financial penalties.

**Coercive Sanctions – $100,000** *(To ensure compliance with court orders and deter further misconduct)*

- **Justification:** Courts impose coercive sanctions to compel compliance with fiduciary duties and prevent further abuse of process. The Trustee has demonstrated a pattern of selective enforcement, lack of transparency, and retaliatory tactics that demand a strong deterrent.
- The Trustee's demand letters were not a "coincidence"—they were a deliberate and calculated act of retaliation, weaponizing the bankruptcy process to intimidate Movants

and suppress their malpractice claims. This blatant abuse of power exposes the Trustee's bad faith, corruption, and willingness to manipulate legal procedures for personal or professional gain.

- **The court should also order full disclosure of estate decisions and prohibit further retaliatory litigation.**

- **Case Law Supporting Coercive Sanctions:**

  - *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343 (1985) – **Bankruptcy trustees must maintain transparency and act in the best interest of creditors.**

  - *In re Smart World Techs., LLC*, 423 F.3d 166 (2d Cir. 2005) – **Trustees cannot suppress information or engage in selective enforcement.**

  - *In re Plaza de Diego Shopping Ctr., Inc.*, 911 F.2d 820 (1st Cir. 1990) – **Coercive sanctions are justified when a trustee fails to treat all parties equitably and transparently.**

### Final Recommended Sanction Amount: $750,000

| Sanction Type | Amount ($) | Purpose |
|---|---|---|
| Compensatory Sanctions | $250,000 | Remedy financial harm caused by the Trustee's misconduct (delays, retaliatory litigation, suppression of evidence). |
| Punitive Sanctions | $400,000 | Punish the Trustee for bad faith conduct and deter future violations. |
| Coercive Sanctions | $100,000 | Ensure compliance with fiduciary duties and prevent further misconduct. |

### Conclusion

A **$750,000 sanction is warranted given the Trustee's abuse of process, bad faith litigation tactics, suppression of material information, and selective enforcement.** Courts have consistently imposed significant sanctions when trustees act in bad faith, suppress material evidence, engage in retaliatory litigation, or violate the principles of bankruptcy administration.

This amount serves three distinct purposes:

1. **Compensating for direct harm** caused by misconduct ($250,000).

2. Punishing and deterring willful misconduct ($400,000).

3. Ensuring compliance with fiduciary duties and preventing future violations ($100,000).

The court must impose these sanctions to uphold the integrity of the bankruptcy process and ensure that such misconduct does not continue or set a dangerous precedent for future cases.

**2. Compel the Trustee to Disclose Material Information**

- The Trustee must provide full disclosure regarding claim selection, administrative decisions, and communications related to estate recoveries.

**3. Issue a Protective Order Preventing Further Retaliatory Litigation**

- The Trustee must be prohibited from further retaliatory enforcement actions against Movants and their affiliates.

**4. Compel the Trustee to Justify Their Decision Not to Extend the Stay in the Velanos Case**

- Given the lack of transparency, the Trustee must explain why they have not sought a stay, despite clear legal precedent supporting such an action.

**Final Statement**

The Trustee's repeated abuse of process, selective enforcement, and retaliatory actions have compromised the fairness and integrity of the bankruptcy proceedings. Courts have consistently held that such *misuse* of judicial procedures demands substantial monetary and coercive sanctions.

Dated: February 5, 2025

Respectfully Submitted,

John Michael Cohan and David Hughes
Stakeholders of GENIE INVESTMENTS NV INC.
Sole Trustees & Sole Beneficiaries of GENIE INVESTMENTS TRUST
Authorized Representatives, without prejudice and without recourse,
Movants, Pro Se, In Rem, Corpus Juris, Quasi In Rem, In personam, Under Fiduciary Duty, FS 736.0816, UTC 801-817, UPAA 203 & 207, 11 USC 541, UCC §9-109, UCC §9-503, UCC §9-607, UCC §9-615, UCC §9-202, Restatement (Third) of Trusts 70 & 85, Dodge v. Ford Motor Co. (1919), Hodel v. Irving, 481 U.S. 704 (1987), C.E. Pope Equity Trust v. United States, 818 F.2d 696 (9th Cir. 1987)

CC VIA EMAIL:

**Aaron Cohen**, Chapter 7 Trustee
**Raye Elliott**
**Akerman LLP**
50 North Laura Street, Suite 3100
Jacksonville, Florida 32202
aaron@arcohenlaw.com; raye.elliott@akerman.com

**Bryan K. Mickler**, Attorney for the Debtor
**Law Offices of Mickler & Mickler, LLP**
5452 Arlington Expy.
Jacksonville, Florida 32211
bkmickler@planlaw.com

Exhibit List

**Exhibit K** – Email correspondence between Bryan Mickler and Stakeholders regarding the Velanos stay issue.

**Exhibit L** – Chase Bank Letters disclosed during testimony and submitted to Debtor's counsel and the Examiner.

**Exhibit M** – Copy of the Fee Agreement with Ali Law Group.

**Exhibit N** – Attestation Form from Nicholas Spigner, Esquire, indicating the Trustee misled the Court.

**Exhibit O** – Business Expansion Line of Credit Agreement ("BELOC Agreement"), specifically Section 13.7, demonstrating Genie's contractual obligations.

**Exhibit P**  - Legal Opinion Letter issued by Spiegel & Utrera, P.A., directly supports the argument that Genie acted lawfully and responsibly, aligning with other evidentiary documents.

# EXHIBIT K

**From:** Bryan Mickler
**To:** raye.elliott@akerman.com; John from Genie Investments; David from Genie Investments
**Subject:** RE: FYI Byrd and Wearmouth Complaint 09-20-24 - Genie Issues
**Date:** Monday, December 9, 2024 10:34:44 AM
**Attachments:** image001.png

_Durr Mechanical Constr., Inc. v. I.K. Constr. Inc. (In re Durr Mechanical Constr., Inc.), 604 B.R. 131 (S.D.N.Y. 2019)_ – surety bond issues and discusses three specific examples that would warrant an extension of the stay: (1) a claim to establish an obligation as to which the debtor is a guarantor, id. at 287 (citing McCartney, 106 F.3d at 510–11); (2) a claim against the debtor's insurer, id. at 287-88 (citing Johns–Manville Corp. v. Asbestos Litig. Grp. (In re Johns–Manville Corp.), 26 B.R. 420, 435–36 (Bankr. S.D.N.Y 1983)); and (3) actions where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant[.]" Id. at 288 (citing A.H. Robins Co. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986)).

Please shepardize the Robins case and see the thousands of examples of extending the stay to third parties where there would be a direct economic impact on the estate. I have used this successfully in front of Judge Burgess on multiple occasions to extend the stay.

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

**From:** raye.elliott@akerman.com <raye.elliott@akerman.com>
**Sent:** Monday, December 9, 2024 10:05 AM
**To:** Bryan Mickler <bkmickler@planlaw.com>; jmcohan@genieinvestments.com; dhughes@genieinvestments.com
**Subject:** RE: FYI Byrd and Wearmouth Complaint 09-20-24 - Genie Issues

CAUTION: This message was sent from outside the company

Bryan,

Thank you for sending the complaint. I really don't know of any authority to extend the automatic stay to an unrelated third party. It's hard enough to get an injunction/stay for non-debtor parties that are directly related to the debtor such as affiliate companies or individual guarantors. I don't see Judge Burgess extending the stay to a wholly unrelated third party simply because they owe money to the debtor. If you have any authority for that, I am happy to review it. Thanks.

**Raye Elliott**
Tampa: Akerman LLP | 401 East Jackson Street, Suite 1700 | Tampa, FL 33602
D: 813 209 5013 | T: 813 223 7333| F: 813 223 2837
Jacksonville: Akerman LLP | 50 North Laura Street, Suite 3100 | Jacksonville, FL 32202

T: 904 798 3700 | F: 904 798 3730
raye.elliott@akerman.com

vCard | Profile

_____

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** Bryan Mickler <bkmickler@planlaw.com>
**Sent:** Monday, December 9, 2024 9:20 AM
**To:** Elliott, Raye (Ptnr-Tpa) <raye.elliott@akerman.com>; John from Genie Investments <jmcohan@genieinvestments.com>; David from Genie Investments <dhughes@genieinvestments.com>
**Subject:** FW: FYI Byrd and Wearmouth Complaint 09-20-24 - Genie Issues

[External to Akerman]

Raye

Received the attached from Genie representatives this morning. Appears that a third party has filed suit against Velanos and related entities. Not sure if the Trustee can extend the Genie Chapter 7 stay to this suit since it would impact the ability of the Trustee to recover for the Genie Estate if Velanos was sued and made to pay a judgment instead of the Genie agreement? Appears to be an excellent example of estate property being impacted in order to extend the stay. Please let me know if need anything further from Genie or myself in relation to this issue.

Thank you.

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

**From:** John from Genie Investments <jmcohan@genieinvestments.com>
**Sent:** Friday, December 6, 2024 6:00 PM
**To:** Bryan Mickler <bkmickler@planlaw.com>
**Cc:** David from Genie Investments <dhughes@genieinvestments.com>
**Subject:** FYI Byrd and Wearmouth Complaint 09-20-24

CAUTION: This message was sent from outside the company

Bryan,

See attached. FYI 3:2024cv02392, I'm sure you are all aware. Thank you.

Sincerely,

**John Michael Cohan**
**Genie Investments, Director**

 GENIE INVESTMENTS 00

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity. DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710   AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see:
http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.
This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

# EXHIBIT L

**Executive Office (Mail Code OH4-7120)**
3415 Vision Drive
Columbus, OH 43219

**CHASE** 🟦

October 24, 2023

Genie Investments NV
Attn: Caleb Davis
cdavis@genieinvestments.com

**The Deposit Account Agreement (DAA) allows us to close an account**

Dear Caleb Davis:

We are responding to your complaint about the account closures and wire recalls. Thank you for sharing your concerns.

We have received multiple fraud wire recalls from multiple parties and banks against the account. We returned the funds that we received an indemnification agreement for. Your business accounts were closed and the decision is final. No new accounts can be opened. When the accounts closed, we mailed the remaining funds for $66,478 to the address on file.

The Deposit Account Agreement allows us to close an account other than a CD at any time, for any reason or no reason, and without prior notice. You were provided a copy of the agreement when you opened the account. You can see the current agreement on chase.com.

If you have questions, please call and reference case number ECW230912-00967. We accept operator relay calls. We're here Monday through Friday from 8 a.m. to 9 p.m. and Saturday from 9 a.m. to 6 p.m. Eastern Time.

Sincerely,

Executive Office
1-877-805-8049
1-866-535-3403 Fax; it's free from any Chase branch
chase.com
executive.office@chase.com

Esta comunicación contiene información importante acerca de la cuenta. Si tiene alguna pregunta o necesita ayuda para traducirla, comuníquese con nosotros llamando al 1-877-805-8049, de lunes a viernes de 8 a.m. a 9 p.m. y sábados de 9 a.m. a 6 p.m., hora del Este.

ID pM1VLzyhJh
ECN04

**Executive Office (Mail Code OH4-7120)**
3415 Vision Drive
Columbus, OH 43219

CHASE ⬡

November 7, 2023

Caleb Davis
Genie Investments NV
cdavis@genieinvestments.com

**We will not provide a wire recall transaction history**

Dear Caleb Davis:

We are responding to your inquiry requesting a transaction history for wire recalls. Thank you for sharing your concerns.

We received a wire recall and a Hold Harmless Letter (HHL) from Bank of America on August 30, 2023, about a $1,100,000 deposit from April 4, 2023. We returned the funds to Bank of America upon receipt of the HHL.

We sent the remaining funds from the account closures in one check totaling $66,478 on August 21. The check was paid, on September 1.

We will not provide a wire recall transaction history. All accounts have been closed and our decision remains the same. The Deposit Account Agreement allows us to close an account other than a CD at any time, for any reason or no reason, and without prior notice. You were provided a copy of the agreement when you opened the account. You can see the current agreement on chase.com.

If you have questions, you can call us at the number below and reference case number ECW230912-00967-R1. We accept operator relay calls. We're here Monday through Friday from 8 a.m. to 9 p.m. and Saturday from 9 a.m. to 6 p.m. Eastern Time.

Sincerely,

Executive Office
1-877-805-8049
1-866-535-3403 Fax; it's free from any Chase branch
chase.com
executive.office@chase.com

Esta comunicación contiene información importante acerca de la cuenta. Si tiene alguna pregunta o necesita ayuda para traducirla, comuníquese con nosotros llamando al 1-877-805-8049, de lunes a viernes de 8 a.m. a 9 p.m. y sábados de 9 a.m. a 6 p.m., hora del Este.

ID pM1VLzyhJh
ECN04

GENIE INVESTMENTS
*Believe in your Dreams*

**Terms and Contingent Commitment Letter**
**3/16/2023**

RE:  Hotel Nationwide USA LLC ("Company")

To Whom It May Concern,

Hotel Nationwide USA LLC and Linger Chu ("Client") are PRE-APPROVED for funding via non- recourse, asset-backed Line of Credit ("LOC") with Genie Investments ("Provider") to be a capital contribution to the Company used for the construction and development of the Project (Business Plan) and to be used at the Company's discretion within the scope of the agreement. Tranche schedules are subject to the needs of the business and will be mutually agreed upon after further review of the Project.

*(PLEASE INITIAL THE CORRESPONDING BOX.)*

**Company Remits Interest Credit Payment**

**LOC AMOUNT:** $11,000,000
**INTEREST CREDIT PAYMENT AMOUNT:** $1,100,000 (reserved funds)
**TERM:** 120 Months
RATE: 2.5% I/O
POINTS: 2.5%
SUCCESS FEE: 0% (ZOOMERAL, Inc.)
PPP: None
**DELIVERY:** Tranche Schedule
**FUNDING DATE:** LOC will be available within 75 calendar days from aggregated funds being locked.
**ESTIMATED FUNDING DATE:** 5/30/2023

**Initial Below**

*This approval expires on 3/23/2023, 5 pm ET and is subject to the following:*

Applicant signature: _____

Date: 03/20/23 _____

Initials: _____



# McMANN Commercial Lending

March 22, 2023

## Wiring Instructions

**Step 1:** As per your Term Sheet, within seven (7) calendar days the Company must wire the necessary amount, plus (+) a seventy-five-dollar ($75) wiring fee to the account listed below:

**Bank Name & Address:**
Chase Bank
1515 Atlantic Boulevard
Jacksonville, Florida 32207

**Account Mailing Address:**
401 Ryland Street Suite 200-A
Reno, Nevada 89502

**Routing Number:** 021000021

**Credit Account Number:** 852288502

**Account Title:** Genie Investments NV

**\*\*When sending the wire, please write "ICA" in the Memo along with your User ID (2810).\*\***

**Step 2:** The Company must then send a message to Provider, stating that they have remitted to the Provider *and* attach proof of the transferred funds.

**Step 3:** The provider will confirm the receipt of the wire transfer back to the Company.

**Step 4:** The Company must submit all requested deliverables to the Provider before delivering funds. By submitting all deliverables and executed loan agreements, the Company is providing written authorization to transfer funds to the Provider account and lock the funds in that account with Provider's Warehouse Lending Source.

**Step 5:** Once the Provider aggregates the Company's funds with other borrowers to meet its minimum threshold, the funds will be transferred and locked in a Provider account with the Provider's Warehouse Lending Source, where the funds remain in the account until your Line of Credit funds.

During this funding period, funds will be blocked and will not be available for use, nor will they be refundable, nor partially refundable. If the Company's line of credit is not funded within the time frame as per the Business Growth Line of Credit Agreement after funds have been delivered, then the Company's funds will be returned in full less the wiring fee of seventy-five dollars ($75).

Initials: _____

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

among

## McMann Commercial Lending LLC

as Lender

and

## Hotel Nationwide USA LLC
as Borrower

dated as of

March 22, 2023

Initials:

## BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated, or otherwise modified, this "Agreement") is made and entered as of March 22, 2023, between McMann Commercial Lending LLC (the "Lender"), and Hotel Nationwide USA LLC, a California Limited Liability Company ("Borrower").

## RECITALS

A.      The Borrower desires to obtain from Lender an asset-backed line of credit loan (the "LOC") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

B.      The Borrower desires to obtain the LOC from Lender for Business Expansion for Hotel Property (as more fully described in Exhibit D attached hereto the "Project"). Acquired assets will be legally described on Exhibit E attached hereto (the "Property").

C.      The Borrower has agreed to pay a minimum contribution of the Project LOC Amount to Lender, by establishing the Interest Reserve (as hereinafter defined) and the ICA (as hereinafter defined), collectively,(the "Interest Reserve Account"), within seven (7) calendar days after the fully executed LOC Documents (as hereinafter defined) are received by Lender.

D.      The Borrower has agreed to pay, under Section 3.6 hereof, the aggregate amount of One Million One Hundred Thousand Dollars and No Cents ($1,100,000), (the "ICA Payment"), by bank wire to Lender. An account on the books and records of the Lender shall be created to serve as an Interest Credit Account (the "ICA"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

E.      Lender has agreed to make Advances (as hereinafter defined) under the LOC to Borrower in an aggregate amount, according to Exhibit B, an amount not to exceed the Maximum Amount for the purposes outlined in these recitals and the Promissory Note attached hereto as Exhibit A and upon the terms and subject to the conditions hereinafter set forth.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1. Certain Defined Terms. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed per generally accepted accounting principles consistently applied. As used in this

Initials: _____

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

among

## GENIE INVESTMENTS

as Lender

and

## Hotel Nationwide USA LLC
as Borrower

dated as of

March 22, 2023

Initials: _____

## BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated, or otherwise modified, this "Agreement") is made and entered as of March 22, 2023, between GENIE INVESTMENTS (the "Lender"), and Hotel Nationwide USA LLC, a California Limited Liability Company ("Borrower").

## RECITALS

A.    The Borrower desires to obtain from Lender an asset-backed line of credit loan (the "LOC") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

B.    The Borrower desires to obtain the LOC from Lender for Business Expansion for Hotel Property (as more fully described in **Exhibit D** attached hereto the "Project"). Acquired assets will be legally described on **Exhibit E** attached hereto (the "Property").

C.    The Borrower has agreed to pay a minimum contribution of the Project LOC Amount to Lender, by establishing the Interest Reserve (as hereinafter defined) and the ICA (as hereinafter defined), collectively, (the "Interest Reserve Account"), within seven (7) calendar days after the fully executed LOC Documents (as hereinafter defined) are received by Lender.

D.    The Borrower has agreed to pay, under Section 3.6 hereof, the aggregate amount of One Million One Hundred Thousand Dollars and No Cents ($1,100,000), (the "ICA Payment"), by bank wire to Lender. An account on the books and records of the Lender shall be created to serve as an Interest Credit Account (the "ICA"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

E.    Lender has agreed to make Advances (as hereinafter defined) under the LOC to Borrower in an aggregate amount, according to **Exhibit B**, an amount not to exceed the Maximum Amount for the purposes outlined in these recitals and the Promissory Note attached hereto as **Exhibit A** and upon the terms and subject to the conditions hereinafter set forth.

**NOW THEREFORE**, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE 1
## DEFINITIONS

Section 1.1. **Certain Defined Terms.** Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed per generally accepted accounting principles consistently applied. As used in this

Initials: _____

## DISCLOSURE AND AUTHORIZATION OR CONSUMER REPORTS

In connection with my application for funding with _____, I understand consumer reports will be requested by (The Company). These reports may include, as allowed by law, the following types of information, as applicable: names and dates of previous employers, the reason for termination of employment, work experience, reasons for termination of tenancy, former landlords, education, accidents, licensure, credit, etc. I further understand that such reports may contain public record information such as, but not limited to: my driving record, workers' compensation claims, judgments, bankruptcy proceedings, evictions, criminal records, etc., from federal, state, and other agencies that maintain such records.

### Authorization

I hereby authorize the procurement of consumer report(s) and investigative consumer report(s) by the Company. If funded (or contracted), this authorization shall remain on file and shall serve as ongoing authorization for the Company to procure such reports at any time during my employment, contract, or volunteer period. I authorize without reservation, any person, business, or agency contacted by the consumer reporting agency to furnish the above-mentioned information.

This authorization is conditioned upon the following representations of my rights:

Printed Name: **Linger Chu**

Signature: _____

Date: **3-17-23**

For identification purposes only:

Social Security No.: **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**       ; Date of Birth: **03/10/1952**

Drivers License No.: **c0242248**       ; State of Issue: **CA**

Present Address: **2917 E Cortez St. West Covina, CA 91791**

Previous Address 1: **6042 Hart Ave. Temple City, CA 91780  2006-2015**

Previous Address Dates: (MM/YY): ___/___ to ___/___

Previous Address 2: **926 S. Beach Blvd. Anaheim, CA 92804  1996-2004**

Previous Address Dates (MM/YY): ___/___ to ___/___

*Please attach a separate page if you have additional addresses.*

Initials: _____

## CLIENT INFORMATION SUMMARY

Under Articles two (2) through five (5) of the Due Diligence Convention and the Federal Banking Commission Circular of December 1998, concerning the prevention of money laundering, and Article 305 of the Swiss Criminal Code, the following information may be supplied to banks and/or other financial institutions for verification of identity. All parties must respect professional secrecy and take all appropriate precautions to protect the confidentiality of the information each holds in respect of the other's activities. This legal obligation shall remain in full force and effect at all times.

**DATE:**   03/20/23

## Beneficiary / Client / Company

| | |
|---|---|
| Client / Signatory Name | Linger Chu |
| Nationality | USA |
| Driver License Number | C0242248 |
| Date of Issue | 02/19/2019 |
| Date of Expiration | 03/10/2024 |
| Country of Issue | USA |
| Date of Birth (MM/DD/YYYY) | 03/10/1952 |
| Place of Birth | Taipei, Taiwan |
| Contact Address | 2917 E Cortez St. West Covina, CA 91791 |
| Passport Number | 573785811 |
| Country of Residence | USA |
| Date of Issue | 02/01/2018 |
| Date of Expiration | 01/31/2028 |
| Contact Telephone | 562-787-9499 |
| Client E-mail Address | chulinger77@gmail.com |

## Business Information

| | |
|---|---|
| Business Name | Hotel Nationwide USA LLC |
| Business Address | 2917 E. Cortez St West Covina, CA 91791 |
| Mailing Address | 2917 E. Cortez St West Covina, CA 91791 |
| Registered Office Domicile | |
| Country / State of Incorporation | USA / CA |
| Business Telephone | |

1. Attach a copy of your Passport and Driver's License
2. Attach a copy of your Social Security Card
3. Attach a copy of the Accepted Term Sheet

Initials: _____





SIGNATURE OF BEARER / SIGNATURE DU TITULAIRE / FIRMA DEL TITULAR

PASSPORT
PASSEPORT
PASAPORTE

**UNITED STATES OF AMERICA**

Type / Type / Tipo    Code / Code / Código    Passport No / No du Passeport / No de Pasaporte
P    USA    449538001

Surname / Nom / Apellidos
**CHU**

Given Names / Prénoms / Nombres
**LINGER**

Nationality / Nationalité / Nacionalidad
**UNITED STATES OF AMERICA**

Date of birth / Date de naissance / Fecha de nacimiento
**10 Mar 1952**

Place of birth / Lieu de naissance / Lugar de nacimiento
**TAIWAN**

Date of issue / Date de délivrance / Fecha de expedición
**26 Aug 2008**

Date of expiration / Date d'expiration / Fecha de caducidad
**25 Aug 2018**

Endorsements / Mentions Spéciales / Anotaciones
**SEE PAGE 27**

Sex / Sexe / Sexo
**F**

Authority / Autorité / Autoridad
**United States
Department of State**



P<USACHU<<LINGER<<<<<<<<<<<<<<<<<<<<<<<<<<<<
4495380012USA5203105F1808258229775423<815724

## Wire Instructions
☑ U.S. Funds wires

McMANN Commercial Lending
312 224 8556  Fax 312 921 3344

| YOUR INFORMATION | |
|---|---|
| Name on the Account | Linger Chu - Hotel Nationwide USA LLC |
| Your Permanent Address | 2917 E Cortez St. |
| City West Covina | State CA  ZIP 91791  Country USA |
| Receiving Account Number | 325160264555 |

| RECEIVING/ INTERMEDIARY BANK INFORMATION | |
|---|---|
| Bank Name | Bank of America |
| Bank Address | 2901 E Eastland Center Dr. West Covina 91791 |
| Fedwire ABA Routing Number | 026009593 |
| Swift Code / IBAN Code | |

| BENEFICIARY BANK INFORMATION | |
|---|---|
| Bank Name | Bank of America |
| Bank Address | 2901 E Eastland Center Dr. West Covina, CA 91791 |
| Fedwire ABA Routing Number | 026009593 |
| Swift Code / IBAN Code | |

Please ensure that the above information matches the recipient information that the bank has on file
Note: A wire cost of $40 will be deducted from any earned fees being paid.

**Authorized User**

Linger Chu
Full name

Date  7/31/2023

Signature

EXHIBIT F
FORM TERMINATION LETTER

McMann Commercial Lending LLC
205 N Michigan Avenue, Ste 810
Chicago, Illinois 60601

Re: Hotel Nationwide USA LLC

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above-referenced transaction according to the terms of the LOC Agreement dated March 22, 2023.

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for a refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER: Hotel Nationwide USA LLC

By: _____

Name: Linger Chu

Title: _____ _Manager_

SUBSCRIBED AND SWORN TO BEFORE ME on this_____ day of
_____, 20__.


PLEASE SEE ATTACHED
NOTARIAL CERTIFICATE

_____
NOTARY PUBLIC
In and for the State of _____

My Commission Expires:

_____

Please confirm your Wiring Instructions:
Account Title:
Address on Account:
Bank Name:
Bank Address:
Routing #:
Account #:

Initials: _____

PLEASE SEE ATTACHED
NOTARIAL CERTIFICATE

# California Jurat

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles

Subscribed and sworn to (or affirmed) before me

on this $3/^{st}$ day of $July$ , 20$23$ ,

by

$Linger$ $Chu$ ,

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature _____

Signature of Notary Public

TIM HUANG
Notary Public - California
Los Angeles County
Commission # 2398478
My Comm. Expires Mar 9, 2026

*Place Notary Seal Above*

--------OPTIONAL INFORMATION--------
Although the information in this section is not required by law, it could prevent fraudulent removal and reattachment of this jurat to an unauthorized document and may prove useful to persons on the attached document.

Description of Attached Document

Title or Type of Document____ $Form$ $Termination$ $Letter$

Document Date $7/31/23$

Number of Pages: $1$

EXHIBIT M



# FEE AGREEMENT / POWER OF ATTORNEY

Ali Law Group, PLLC ("Attorney") and GENIE INVESTMENTS NV, INC., a Nevada corporation ("Client") hereby agree that Attorney will provide legal services to Client on the terms set forth below.

## 1. CONDITIONS

This Agreement will not take effect, and Attorney will have no obligation to provide legal services, until: (a) Client returns a signed copy of this Agreement; (b) Client pays the initial deposit called for under Paragraph 4; and (c) Attorney acknowledges acceptance of representation by counter-signing this Agreement and returning a fully executed copy to Client. Upon satisfaction of these conditions, this Agreement will be deemed to take effect as of the date the executed retainer and initial deposit are returned to Attorney.

## 2. SCOPE OF SERVICES AND ATTORNEY'S DUTIES

Client hires Attorney to provide legal services in the following matter: <u>Representation of Genie Investments NV, Inc. (erroneously identified as Genie Investments NV, LLC) regarding malpractice claims against Client's former attorney, Warren Law Group and Scott Oh.</u> Attorney will provide those legal services reasonably required to represent Client. Attorney will take reasonable steps to keep Client informed of progress and to respond to Client's inquiries. If a court action is filed, Attorney will represent Client through trial and post-trial motions. This Agreement does not cover representation on appeal or in collection proceedings after judgment or proceedings regarding renewal of a judgment. A separate written agreement for these services or services in any other matter not described above will be required. Attorney is representing Client only in the matter described above.

## 3. CLIENT'S DUTIES

Client agrees to be truthful with Attorney and not withhold information. Further Client agrees to cooperate, to keep Attorney informed of any information or developments which may come to Client's attention, to abide by this Agreement, to pay Attorney's bills on time, and to keep Attorney advised of Client's address, telephone number and whereabouts. Client will assist Attorney by timely providing necessary information and documents. Client agrees to appear at all legal proceedings when Attorney deems it necessary, and generally to cooperate fully with Attorney in all matters related to the preparation and presentation of Client's claims.

**ALG** Ali Law Group

## 4.  DEPOSIT

Client agrees to pay Attorney an initial deposit of $2,500.00 by within 5 business days, which will be deemed an advance deposit for fees and costs to be incurred in this matter. The hourly charges and costs will be charged against the Deposit. The initial Deposit, as well as any future deposits, will be held in Attorney's Client Trust Account. Client authorizes Attorney to use that deposit to pay the fees and other charges. Client acknowledges that the deposit is not an estimate of total fees and costs to be charged by Attorney, but merely an advance.

Client agrees to pay all deposits after the initial deposit within 5 business days of Attorney's demand. In the event there is any money from any deposit remaining in Attorney's Client Trust Account after Attorney's final bill is satisfied, that money will be promptly refunded to Client.

Whenever the deposit is exhausted, Attorney reserves the right to demand further deposits, each up to a maximum of $2,500.00 at any time before a trial or arbitration date is set. Once a trial or arbitration date is set, Client will pay all sums then owing and deposit the Attorney's fees estimated to be incurred in preparing for and completing the trial or arbitration, as well as the jury fees or arbitration fees, expert witness fees and other costs likely to be assessed. Those sums may exceed the maximum deposit.

## 5.  LEGAL FEES AND BILLING PRACTICES

Client agrees to pay by the hour at Attorney's rate of $200 per hour, for all time spent on Client's matter by Attorney and Attorney's legal personnel, in addition to 20% of any funds recovered through negotiation, settlement, or award of any court or tribunal.

The rates on this schedule are subject to change on 30 days written notice to Client. If Client declines to pay increased rates, Attorney will have the right to withdraw as attorney for Client if permitted under the Rules of Professional Conduct of the State Bar of Texas and/or applicable law.

The time charged will include, but is not limited to, the time Attorney spends on telephone calls, e-mails and other electronic communications relating to Client's matter, including calls and e-mails with Client, witnesses, opposing counsel, court personnel or other persons. The legal personnel assigned to Client's matter may confer among themselves about the matter, as required and appropriate. When they do confer, each person will charge for the time expended, as long as the work done is reasonably necessary and not duplicative. Likewise, if more than one of the legal personnel attends a meeting, court hearing or other proceeding, each will charge for the time spent. Time is billed in minimum increments one- tenth (6 minutes) of an hour. Attorney will charge for waiting time in court and elsewhere and for travel time, both local and out of town.

## 6.  COSTS AND OTHER CHARGES

(a)      Attorney will incur various costs and expenses in performing legal services under this Agreement. Client agrees to pay for all costs, disbursements and expenses in addition to the hourly fees. The costs and expenses commonly include, service of process charges, filing fees, court and



deposition reporters' fees, translator/interpreter fees, jury fees, notary fees, deposition costs, long distance telephone charges, messenger and other delivery fees, postage, outside photocopying and other reproduction costs, travel costs including parking, mileage, transportation, meals and hotel costs, investigation expenses, consultants' fees, expert witness, professional, mediator, arbitrator and/or special master fees and other similar items. The foregoing external costs and expenses will be charged at Attorney's cost.

(b)      Experts, Consultants and Investigators. To aid in the preparation or presentation of Client's case, it may become necessary to hire expert witnesses, consultants or investigators. Client agrees to pay such fees and charges. Attorney will select any expert witnesses, consultants or investigators to be hired, and Client will be informed of persons chosen and their charges.

(c)      Attorney will obtain client's consent before incurring any costs in excess of $500.00.

## 7.   OTHER FEES AND COSTS

Client understands that if Client's case proceeds to court action or arbitration, the court may award attorney fees as well as some or all the type of costs enumerated in Paragraph 6 above to the other party or parties. Payment of such attorney fees and costs shall be the sole responsibility of Client. Similarly, other parties may be required to pay some, or all of the fees and costs incurred by the Client. Client acknowledges that any such determination does not in and of itself affect the amount of the fees and costs to be paid by Client to Attorney pursuant to this agreement.

## 8.   BILLS

Attorney will send Client periodic bills for fees and costs incurred. Each bill will be payable within 1 0  days of its mailing date. Client may request a bill at intervals of no less than 30 days. If Client so requests, Attorney will provide one within 10 days. Bills for the fee portion of the bill will include the amount, rate, basis for calculation, or other method of determination of the Attorney's fees. Bills for the cost and expense portion of the bill will clearly identify the costs and expenses incurred and the amount of the costs and expenses. Client agrees to promptly review all bills rendered by Attorney and to promptly communicate any objections, questions, or concerns about their contents.

## 9.   CLIENT APPROVAL NECESSARY FOR SETTLEMENT

Attorney will not make any settlement or compromise of any nature of any of Client's claims without Client's prior approval. Client retains the absolute right to accept or reject any settlement.

## 10. DISCHARGE AND WITHDRAWAL

Client may discharge Attorney at any time. Attorney may withdraw with Client's consent or for good cause or if permitted under the Rules of Professional Conduct of the State Bar of Texas and/or applicable law. Among the circumstances under which Attorney may withdraw are: (a) with the consent of Client; (b) Client's conduct renders it unreasonably difficult for the Attorney to carry out the employment effectively; and/or (c) Client fails to pay Attorney's fees or costs as



required by this Agreement. Notwithstanding the discharge, Client will remain obligated to pay Attorney at the agreed rates for all services provided and to reimburse Attorney for all costs advanced.

## 11. CONCLUSION OF SERVICES

When Attorney's services conclude, whether by completing the services covered by this Agreement, or by discharge or withdrawal, all unpaid charges for fees or costs will be due and payable immediately.

Client may have access to Client's case file at Attorney's office at any reasonable time. At the end of the engagement, Client may request the return of Client's case file. If Client has not requested the return of Client's file, and to the extent Attorney has not otherwise delivered it or disposed of it consistent with Client's directions, Attorney will retain the case file for a period of 7 years after which Attorney is authorized by this agreement to have the case file destroyed. If Client would like Attorney to maintain Client's case file for more than 7 years after the conclusion of Attorney's services for Client on a given matter, a separate written agreement must be made between Attorney and Client, which may provide for Client to bear the cost of maintaining the file. In the event Client requests that Attorney transfer possession of Client's case file to Client or a third party, Attorney is authorized to retain copies of the case file at Attorney's expense.

## 12. DISCLAIMER OF GUARANTEE AND ESTIMATES

Nothing in this Agreement and nothing in Attorney's statements to Client will be construed as a promise or guarantee about the outcome of the matter. Attorney makes no such promises or guarantees. Attorney's comments about the outcome of the matter are expressions of opinion only, are neither promises nor guarantees, and will not be construed as promises or guarantees. Any deposits made by Client, or estimate of fees given by Attorney, are not a representation of a flat fee and will not be a limitation on fees or a guarantee that fees and costs will not exceed the amount of the deposit or estimate. Actual fees may vary significantly from estimates given.

## 13. NO TAX ADVICE

Attorney has not been retained to provide Client with any tax advice concerning any of the services described in paragraph 2. Any documents prepared by Attorney may have specific tax ramifications. To be sure Client understands and is certain of all the potential tax consequences, Client should consult with tax advisors regarding these matters.

## 14. ENTIRE AGREEMENT

This Agreement contains the entire agreement of the parties. No other agreement, statement, or promise made on or before the effective date of this Agreement will be binding on the parties.



## 15. SEVERABILITY IN EVENT OF PARTIAL INVALIDITY

If any provision of this Agreement is held in whole or in part to be unenforceable for any reason, the remainder of that provision and of the entire Agreement will be severable and remain in effect.

## 16. MODIFICATION BY SUBSEQUENT AGREEMENT

This Agreement may be modified by subsequent agreement of the parties only by an instrument in writing signed by both of them.

## 17. EFFECTIVE DATE

This Agreement will govern all legal services performed by Attorney on behalf of Client commencing with the date Attorney first performed services. The date at the beginning of this Agreement is for reference only. Even if this Agreement does not take effect, Client will be obligated to pay Attorney the reasonable value of any services Attorney may have performed for Client.

**THE PARTIES HAVE READ AND UNDERSTOOD THE FOREGOING TERMS AND AGREE TO THEM AS OF THE DATE ATTORNEY FIRST PROVIDED SERVICES. IF MORE THAN ONE CLIENT SIGNS BELOW, EACH AGREES TO BE LIABLE, JOINTLY AND SEVERALLY, FOR ALL OBLIGATIONS UNDER THIS AGREEMENT. CLIENT WILL RECEIVE A FULLY EXECUTED COPY OF THIS AGREEMENT.**

**GENIE INVESTMENTS NV, INC.**

_John Michael Cohan_                    04/05/2024
Signature                              Date

Name: John Michael Cohan on behalf of Genie Investments NV Inc.

Title: Director

Address: PO Box 60443, Jacksonville, Florida 32236

Telephone: 302.409.0640

E-mail Address: jmcohan@genieinvestments.com

**ALI LAW GROUP, PLLC**

By: _Nicolas Spignor_                    Date:  4/5/2024
ATTORNEY

# EXHIBIT N

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re:

GENIE INVESTMENTS NV INC.,           Case No.: 3-24-bk-00496-BAJ

         Debtor.                Chapter 7

_____/

## DECLARATION OF NICOLAS W. SPIGNER, ESQ.

I, NICOLAS W. SPIGNER, hereby declare as follows:

1. I am an attorney licensed to practice law in the States of California (Bar #: 312295), Arizona (Bar #: 034692), New York (Bar #: 1040175), and Texas (Bar #: 24141523).

2. The information set forth herein is based on my own personal knowledge, except for those matters which are based on information and belief, which are so labeled.

3. If necessary, I can and will truthfully testify to the information set forth herein.

4. On or about April 5, 2024, I was retained by Genie Investments NV Inc. ("Genie NV"), in relation to claims for malpractice against its former attorney, Warren Law Group and Scott Oh.

5. I have some experience in representing clients in disputes with former attorneys. Specifically, I have represented a former client in a fee dispute proceeding with his former attorney before the California bar. A hearing was held in that matter and I was able to secure a partial refund for my former client.

6. I also have experience in representing clients in lawsuits with malpractice claims against attorneys, accountants, and other professionals.

7. At present, the majority of my practice focuses on representing plaintiff's in personal injury actions.

8. I sent demand letters to Scott Oh and Warren Law Group, and engaged in some limited settlement discussions. Said negotiations were unsuccessful.

9. As the dispute resolution procedure set forth in Genie NV's fee agreement with Scott Oh and Warren Law Group required the parties to engage in mediation, I filed a demand for mediation with JAMS in June of 2004.

10. After the Mediation process was initiated, my Contact at Genie NV, David Hughes, informed that the company was involved in Bankruptcy proceedings, and a the Court had appointed Aaron R. Cohen, as a trustee to run Genie NV.

11. Subsequently the Trustee's office reached out to me for information about the status of the fee dispute with to Scott Oh and Warren Law Group. I updated them on the status of the negotiations and the Mediation.

12. Thereafter, the Trustee asked about my experience with fee disputes and malpractice claims. I informed the Trustee about the experience I had, as set forth in greater detail above.

13. The Trustee told me that they would review the matter and let me know how they would proceed. Thereafter, the Trustee asked me if I wanted to stay on the case and work on a contingency basis.

14. I told the trustee that I did not wish to continue representing Genie NV now that a trustee was running the company, and did not want to work on a contingency basis.

15. I transferred all my files to the Trustee, and introduced him to the mediation case manager so that he could continue with the mediation process.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Date: February 3, 2023                    _/s/ Nicolas W. Spigner_____

                                          Nicolas W. Spigner, Esq.
                                          ALI LAW GROUP, PLLC
                                          3303 Oakwell Ct., Ste. 110
                                          San Antonio, TX 78218
                                          (P): 210-667-2920
                                          (F): 210-667-2910
                                          (E): nick@aliinjurylaw.com

# EXHIBIT O

**Section 13.7.** **Default by Lender and Borrower's Sole Remedy.**

(a)      Provided Borrower has fully satisfied and complied with all conditions to Advance, if Lender fails to provide the first (1st) Advance when due, pursuant to the Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver written notice in the form of a notarized termination letter, a copy of which is attached hereto as **Exhibit F** ("the **Termination Letter**"), to Lender by certified mail. Upon receipt of such notice, Lender shall have forty (40) international business-banking days from the date of receipt ("**Refund Period**") within which to return the ICA Payment to Borrower.

(b)      If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice to Lender in the form of a notarized Termination Letter to Lender by certified mail. Within forty (40) international business-banking days from the date of receipt of such notice by Lender, Borrower shall be entitled to (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) termination of Borrower's obligations to Lender hereunder with the exception of Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners or other related entities, for any indirect, special, incidental or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise by reason of, the LOC, the Advances, the Agreement or the other LOC documents.

(c)      Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances pursuant to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, act of civil disobedience, act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew restriction, expropriation, compulsory acquisition, seizure of works, requisition,

nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from preforming under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period of time the occurrence is expected to continue. Lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. Lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

Section 13.8 **Binding Arbitration.** Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Delaware, before one (1) arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Anydisputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriatejurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Delaware. This agreement to arbitrate is intended bythe Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state orfederal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

## ARTICLE 14
## GENERAL PROVISIONS

Section 14.1. **Disclaimer of Liability.** Lender has no liability or obligation in connection with the Project except to make Advances under the LOC as agreed under the terms of the LOC

# EXHIBIT P

# Spiegel & Utrera, P.A.

Counselors & Attorneys at Law

| | | | |
|---|---|---|---|
| SANDY A. ADELSTEIN[7] | COURTNEY RIORDAN[10] | Offices located in: | 2545 Chandler Avenue, Suite 4 |
| JOEL BECK[3] | LUIS RUIZ[11] | Chicago | Las Vegas, NV 89120 |
| B. MARTIN DRUVAN[3] | LAWRENCE J. SPIEGEL[1] | Dover, DE | Telephone (702) 364-2200 |
| ALEJANDRO ECHEVERRIA[2] | MARY C. SPIEGEL[3] | Las Vegas | Facsimile (702) 458-2100 |
| MICHAEL S. FARAGALLA[6] | NICOLAS W. SPIGNER[9] | Los Angeles | |
| MATTHEW FORNARO[11] | NATALIA UTRERA[2] | Miami | [1] Licensed in Florida |
| MICHAEL P. OKAYO[7] | MICHAEL WELCHKO[6] | New York City | [2] Licensed in California and New York |
| | | Northern New Jersey | [3] Licensed in Illinois and Florida |
| | | | [4] Licensed in California, Arizona and New York |

| | |
|---|---|
| **SENIOR PARALEGALS** | |
| GRACIELA BATTAGLIA | CLAUDIA FERNANDEZ |

[5] Licensed Cuba
[6] Licensed Delaware
[7] Licensed in Nevada
[8] Licensed in New Jersey
[9] Licensed in California
[10] Licensed in Florida and New York
[11] Licensed in Florida and District of Columbia
[7] Licensed in Florida and Registered as a Foreign Lawyer in England and Wales

| | |
|---|---|
| PRESIDENT: | LAWRENCE J. SPIEGEL |
| SENIOR VICE PRESIDENT: | NATALIA UTRERA |
| EXECUTIVE VICE PRESIDENT: | MARY C. SPIEGEL |
| VICE PRESIDENT OF OPERATIONS: | HORACIO MONTERO |
| VICE PRESIDENT OF MARKETING: | ALEJANDRO ECHEVERRIA |
| VICE PRESIDENT OF LITIGATION: | MICHAEL S. FARAGALLA |
| REGIONAL VICE PRESIDENT: | MICHAEL WELCHKO |
| SECRETARY: | NATALIA UTRERA |
| TREASURER: | NATALIA UTRERA |

September 7, 2023

John Michael Cohan
GENIE INVESTMENTS NV
P.O. Box 60443
Jacksonville, Florida 32236

RE:    GENIE INVESTMENTS NV, a Nevada Corporation

With regard to GENIE INVESTMENTS NV, a Nevada Corporation having a business mailing address of P.O. Box 60443, Jacksonville, Florida 32236 (hereinafter the "Corporation") we have reviewed the following documents (referred to collectively as the "Documents"):

a)    the Statement executed by the Corporation's Director (the "Statement")

Further, we have examined the Certificate of Good Standing and all required entity documentation as necessary or appropriate to enable us to render the opinion hereinafter expressed. In such examination, we have assumed the genuineness of all signatures, the authenticity of all documents submitted to us as originals, the conformity to originals of all documents submitted to us as certified copies or photocopies and the authenticity of the originals of such latter documents.

On the basis of the preceding and such other investigations as we have deemed necessary, we are of the opinion that:

1.    The Borrower is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada, has all requisite power and authority to transact the business in which it is engaged.

2.    The Corporation has never been sued for any cause of action in any jurisdiction.

3.    The Corporation has never misappropriated any of its clients' funds. The Corporation has never lost any of its clients' funds.

4.    The Corporation has a history of closing loans. The Corporation closed its first loan on 27 January 2021 and has closed many more loans thereafter each year.

Please be advised that our Firm has no duty to notify you of any change with respect to the above-mentioned information. If you have any additional questions, please contact the Firm.

Sincerely,

*/s/ Joel Beck*

Spiegel & Utrera, P.A.
For the Firm