## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

In re:

GENIE INVESTMENTS NV INC.,                    Case No.: 3:24-bk-00496-BAJ

          Debtor.                    Chapter 7

_____/

### TRUSTEE'S MOTION TO ENFORCE AUTOMATIC STAY

Aaron R. Cohen, Chapter 7 Trustee (the "Trustee"), by and through his undersigned counsel, pursuant to 11 U.S.C. §§ 105(a) and 362, respectfully requests that the Court enter an order to enforce the automatic stay as to the Velanos Lawsuit (defined below) and, in support, would show the Court as follows:

### Factual Background

1.     On February 21, 2024 (the "Petition Date"), Genie Investments NV Inc. (the "Debtor") filed a Voluntary Petition for Relief (Doc. 1) under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, in the case styled *In re Genie Investments NV Inc.*, Case No: 3:24-bk-00496-BAJ (the "Bankruptcy Case").

2.     On August 12, 2024, the Bankruptcy Case was converted to a Chapter 7 liquidation case and the Trustee was appointed to administer the Debtor's estate (Doc. 207).

3.     The principals of the Debtor are John Cohan ("Cohan") and David Hughes ("Hughes") who each own 50% of the Debtor. (Statement of Financial Affairs, Doc. 40, at p. 15).

4.      Before the Bankruptcy Case converted to Chapter 7, on May 23, 2024 the Debtor filed a Motion to Approve Settlement Agreement Between Genie Investments NV, Inc. and Velanos Principal Capital ("Velanos"), pursuant to Federal Rule of Bankruptcy Procedure 9019

(Doc. 107) (the "Compromise Motion") which sought approval of a settlement agreement (the "Settlement Agreement") with Velanos. After the Bankruptcy Case was converted to Chapter 7, the Trustee and Velanos executed an Amendment to the Settlement Agreement (the "Amendment") to substitute the Trustee in place of the Debtor for purposes of the Settlement Agreement which was filed with the Court on October 17, 2024 (Doc. 249). On October 24, 2024, the Court entered an Order Granting the Compromise Motion and approving the Settlement Agreement (Doc. 257).

5.      Velanos defaulted under the terms of the Settlement Agreement by failing to make the settlement payment due December 31, 2024.

6.      On January 10, 2025, the Trustee filed a Complaint for Confirmation of Arbitration Award against Velanos which was designated Adversary Proceeding 3:25-ap-00007-BAJ (the "Velanos Adversary Proceeding") which seeks to confirm an arbitration award entered as part of the Settlement Agreement against Velanos and entry of a judgment against Velanos. The Velanos Adversary Proceeding remains pending.

7.      On February 14, 2025, Cohan and Hughes filed a Complaint against Velanos, its principal Joshua Wearmouth and others in the Circuit Court in and for Duval County (the "State Court") seeking damages for Velanos' breach of the Settlement Agreement (the "Velanos Lawsuit"). A copy of the Complaint is attached as **Exhibit A**.

8.      The Velanos Lawsuit was filed independently of the Trustee's administration of the bankruptcy estate. All of Cohan's and Hughes' claims in the Velanos Lawsuit are based on the same harm caused by Velanos' breach and default of the Settlement Agreement entered into *with the Trustee*. Each alleged harm in the Velanos Lawsuit derives from and is a continuation of the

initial harm – the Debtor and consequently the bankruptcy estate's direct loss due to Velanos' breach of the Settlement Agreement.

9.      Each count in the Velanos Lawsuit Complaint is interconnected to the same alleged harm and thus all of the subsequent harm and injury caused by Velanos' breach of the Settlement Agreement are legal claims that belong to the bankruptcy estate which the Trustee has the exclusive standing to pursue.

10.     Count I of the Velanos Lawsuit Complaint alleges a claim for breach of contract for Velanos' breach of the Settlement Agreement. The Settlement Agreement was entered into between the Trustee and Velanos. Such claim belongs exclusively to the bankruptcy estate and only the Trustee has standing to pursue a claim against Velanos for breach of the Settlement Agreement.

11.     Count II of the Velanos Lawsuit Complaint alleges a claim for fraudulent misrepresentation for Velanos' allegedly making false and misleading statements regarding its financial capabilities and intention to honor the Settlement Agreement and derives from the same harm incurred by the Debtor and bankruptcy estate in connection with Velanos' breach of the Settlement Agreement.

12.     Count III of the Velanos Lawsuit Complaint alleges a claim for unjust enrichment and fraudulent conveyance and also derives from the same harm incurred by the Debtor and bankruptcy estate in connection with Velanos' breach of the Settlement Agreement.

### Relief Requested

13.     By this Motion, the Trustee seeks entry of an order substantially in the form attached as **Exhibit B** providing for the enforcement of the automatic stay as to the Velanos

Lawsuit, because the alleged claims asserted therein are property of the bankruptcy estate and belong exclusively to the Trustee.

## Basis for Relief Requested

14.    Section 362 of the Bankruptcy Code imposes an automatic stay on all collection actions, enforcement of judgments, and litigation pursuits against the Debtor once a bankruptcy petition is filed. The stay applies to "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The automatic stay in bankruptcy serves as a way to centralize all claims against the debtor and provide a systematic, equitable distribution of the debtor's assets. *See Matter of Patel*, 642 B.R. 187, 196 (Bankr. N.D. Ga. 2022) ("The automatic stay is considered one of the fundamental debtor protections provided by the bankruptcy laws, and one of its primary purposes is to provide the debtor "breathing room" upon filing a bankruptcy petition"); *In re Howard*, 391 B.R. 511, 520 (Bankr. N.D. Ga. 2008) ("[the automatic stay] performs the important function of protect[ing] creditors by avoiding the piece-meal or distressed liquidation of the debtor's assets and a race to the courthouse, thus furthering administration of assets in an orderly fashion to achieve an equitable distribution within the framework of the Bankruptcy Code.").

15.    Section 541 provides that "[p]roperty of the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case wherever located and by whomever held." "This includes legal causes of action the debtor had against others at the commencement of the bankruptcy case."   *In re Icarus Holding, LLC*, 391 F. 3d 1315, 1319 (11th Cir. 2004).

16.    The "bankruptcy trustee stands in the shoes of the debtor and has standing to bring any suit that the debtor could have instituted had it not been thrown into bankruptcy." *O'Halloran*

*v. First Union Nat'l Bank of Fla.*, 350 F.3d 1197, 1202 (11th Cir. 2003). Causes of action that belong to the bankruptcy estate must be pursued by the Trustee. *Mennen v. Onkyo Corp.*, 248 F. App'x 112, 113 (11th Cir. 2007) ("[i]f a cause of action belongs to the estate, then the trustee has exclusive standing to assert the claim.").

17.     While creditors of a bankruptcy estate may have direct claims against a third party, a creditor is only allowed to bring a direct claim against a third party where it is harmed directly. If the creditor's harm is derived from an injury to the debtor, then the cause of action belongs to the bankruptcy estate. *Mennen v. Onkyo Corp.*, 248 F. App'x 112, 113 (11th Cir. 2007) ("If a cause of action alleges only indirect harm to a creditor (*i.e.*, an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate."). Here, ***Cohan and Hughes are not even creditors of the bankruptcy estate*** – they are merely the owners and principals of the Debtor.

18.     Cohan and Hughes have **no** direct claims against Velanos. The direct harm was caused to the Debtor and bankruptcy estate through Velanos' breach of the Settlement Agreement. Thus, the rights to pursue direct claims arising out of the breach of the Settlement Agreement are property of the bankruptcy estate.

19.     The Trustee is working to recover a judgment against Velanos for its breach of the Settlement Agreement and then will work to collect on that judgment. Failing to enforce the automatic stay against the Velanos Lawsuit will only further deplete the estate's resources and thus, the ultimate distributions to the Debtor's creditors.

20.     Enforcing the stay also will ensure that a primary objective of Chapter 7 is accomplished; *i.e.*, assuring equality of distribution among similarly situated creditors. The automatic stay is integral to Chapter 7 as it prevents one creditor from seizing assets before others

have an opportunity to do so. By putting all creditors on a level playing field, the stay replaces the chaotic "race to the courthouse" that would otherwise ensue in the absence of bankruptcy with an organized distribution scheme. *See In re Meier*, No. 14-AP-237, 2014 WL 5426763, at *2 (Bankr. N.D. Ill. Oct. 21, 2014) (explaining that the automatic stay "protects creditors by ending the race to the courthouse and the piecemeal liquidation of the debtor's estate in favor of the fair and equal treatment of creditors."); *In re Medicar Ambulance Co., Inc.*, 166 B.R. 918, 924 (Bankr. N.D. Cal. 1994) (explaining that, "By preventing a race to the courthouse, bankruptcy results in either a reorganization or an orderly liquidation of the debtor which will benefit all creditors.").  Here, Cohan and Hughes are not even creditors with direct claims against Velanos and their actions only serve to deplete estate resources to the detriment of the Debtor's creditors.

21.    Judge Colton recently issued a similar order to what the Trustee seeks here in *In re The Center for Special Needs Trust Administration, Inc.*, No. 8:24-bk-00676-RCT (Bank. M.D. Fla. August 5, 2024), *aff'd*, No. 8:24-cv-0192-WFJ (M.D. Fla. Feb. 19, 2025)[1], in which she found that lawsuits filed by creditors of the bankruptcy estate violated the automatic stay and were therefore void *ab initio*. After analyzing the claims brought by the creditors in their lawsuits, Judge Colton found that each of the claims was derivative of claims held by the bankruptcy trustee and that the creditors were seeking to recover the same funds that the trustee was seeking to recover. Accordingly, the court found that the claims the creditors were attempting to assert were property of the bankruptcy estate and the creditors' attempts to pursue those claims violated the automatic stay.

22.    Similarly, here, each of the claims asserted by Cohan and Hughes in the Velanos Lawsuit are identical to or derivative of the claims held by the Trustee against Velanos. The first

---

[1] A copy of Judge Colton's opinion and the District Court opinion affirming Judge Colton is attached as **Composite Exhibit C**.

count of the complaint in the Velanos Lawsuit is for breach of contract for Velanos' breach of the Settlement Agreement. Clearly, any claim for breach of the Settlement Agreement is a claim held by the bankruptcy estate and Cohan's and Hughes' attempts to assert that claim violates the automatic stay. Count II of the Velanos Lawsuit complaint asserts a claim for fraudulent misrepresentation for Velanos' alleged false and misleading statements regarding its financial capabilities and intention to honor the Settlement Agreement. This claim is derivative of the bankruptcy estate's claims against Velanos for breach of the Settlement Agreement and, again, is property of the bankruptcy estate. Count III of the Velanos Lawsuit complaint is a claim for unjust enrichment for Velanos' retention of the $9 million the Debtor invested with Velanos. This claim, too, is derivative of the bankruptcy estate's claims against Velanos because that claim was resolved in the Settlement Agreement with the Trustee. Each of the claims brought by Cohan and Hughes in the Velanos Lawsuit is property of the bankruptcy estate and their pursuit of those claims violates the automatic stay and should be declared void *ab initio*.

23.     Finally, in the unlikely event that the Court determines the automatic stay is inapplicable to the Velanos Lawsuit claims, the Court should extend the stay to non-debtor Velanos under section 105(a) of the Bankruptcy Code[2], as the Velanos Lawsuit claims are duplicative and seek recovery of the same amount sought to be recovered by the Trustee in the Velanos Adversary Proceeding (*i.e.*, damages for Velanos' breach of the Settlement Agreement), and interferes with the Trustee's claims against Velanos. *See Fox v. Picard (In re Bernard L. Madoff Inv. Sec. LLC)*,

---

[2] Section 105(a) authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." Section 105(a) is intended "to assure the bankruptcy courts['] power to take whatever action is appropriate or necessary in aid of the exercise of its jurisdiction." 2 Collier on Bankruptcy ¶ 105.01 (16th ed.).  Further, 28 U.S.C. § 1334 gives the bankruptcy court "exclusive jurisdiction of all the property, wherever located, of the debtor as of the commencement of [its] case, and of property of the estate." "The broad jurisdictional grant in section 1334(e) is implemented in part by section 105, which gives the court the power to 'issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [title 11].'" 2 Collier on Bankruptcy ¶ 105.02[2] (16th ed.).

848 F. Supp. 2d 469, 478-85 (S.D.N.Y. 2012) (extending the automatic stay via section 105 injunction to bar a creditor's actions against a third party which duplicated the trustee's fraudulent transfer claims against the same party, ruling that those claims were property of the estate); *see also Marshall v. Picard (In re Bernard L. Madoff Inv. Secs.)*, 740 F.3d 81, 84, 96 (2d Cir. 2014) (finding individual investor complaints impermissibly attempted to "plead around" the bankruptcy court's injunction barring all claims "derivative" of those asserted by the trustee and, although they sought damages that were not recoverable in an avoidance action, their complaints were nothing more than an attempt to recover fraudulent withdrawals from the company); *A.H. Robins Co., Inc. v. Piccinin*, 788 F.2d 994, 999-1002 (4th Cir. 1986) (determining that where suit against a third-party defendant sought "possession or control over property of the debtor," a stay may be warranted for the third-party defendant); *In re Adelphia Communications Corp.*, 302 B.R. 439 (Bankr. S.D.N.Y. 2003) (extending the automatic stay under Section 105 to non-debtors to avoid interference with debtor's reorganization process or when actions might lead to duplicate efforts that harm the bankruptcy estate); *In re United Health Care Org.*, 210 B.R. 228, 232 (S.D.N.Y. 1997) (granting extension of automatic stay under Section 105 where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment against the debtor").

24.     In circumstances similar to this case, courts in this District have stayed proceedings to avoid piecemeal litigation where all claims and counter-claims are comprised of common questions of law and fact, to conserve judicial resources, and when there is a risk of inconsistent judgments against the parties. *Peterson v. Avantair, Inc.*, No. 8:13-cv-1683-T-33EAJ, 2013 WL 4506414, at *2 (M.D. Fla. Aug. 23, 2013); *SCI Northbay Commerce Fund 4, LLC v. SCI Real*

*Estate Invs.*, No. 8:11-cv-31-T-24TGW, 2011 WL 1133898, at *1 (M.D. Fla. Mar. 28, 2011).[3] Thus, this Court may properly exercise its authority under section 105(a) to enjoin the Velanos Lawsuit because the lawsuit is duplicative and seeks recovery of the same amount sought to be recovered by the Trustee in the Velanos Adversary Proceeding, and a failure to enjoin them would detrimentally affect the bankruptcy estate and adversely impact the Trustee's ability to collect assets of the Debtor and to distribute funds fairly and equitably to the Debtor's creditors. *See, e.g., Willis v. Celotex Corp.*, 978 F.2d 146, 149 (4th Cir. 1992).

## Conclusion

WHEREFORE, Aaron R. Cohen, Chapter 7 Trustee, respectfully requests that the Court enter an order substantially in the form as **Exhibit B** attached hereto enforcing the automatic stay against the Velanos Lawsuit to allow the Trustee to efficiently and effectively manage, settle or prosecute the bankruptcy estate's claims arising from Velanos' breach of the Settlement Agreement, and for such other and further relief as the Court deems just and proper.

Dated:  February 19, 2025              AKERMAN LLP

By: */s/ Raye C. Elliott*
      Raye  C. Elliott, Esq.
      Florida Bar Number: 018732
      Email: raye.elliott@akerman.com
      401 East Jackson Street, Suite 1700
      Tampa, FL 33602
      Phone:  (813) 223-7333
      Fax:  (813) 223-2837

Attorneys for Aaron R. Cohen, Chapter 7 Trustee

---

[3] Notably, "[a] district court's inherent power to stay proceedings is not mitigated or obviated by § 362(a)." *Kreisler v. Goldberg*, 478 F.3d 209, 215 (4th Cir. 2007).

80094194;1

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 19, 2025, I filed a true and correct copy of the foregoing with the United States Bankruptcy Court for the Middle District of Florida using the Court's CM/ECF system, which will serve copies on all counsel of record and a true and correct copy was served by email and by U.S. Mail to:

John Cohan
PO Box 60443
Jacksonville, FL 32236
jmcohan@genieinvestments.com

David Hughes
PO Box 60443
Jacksonville, FL 32236
dhughes@genieinvestments.com

*/s/ Raye C. Elliott*
Attorney

# Exhibit A

**IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT IN AND FOR DUVAL COUNTY, FLORIDA CIVIL DIVISION**

**CASE NO.: _____**

**JOHN MICHAEL COHAN and DAVID HUGHES,**
Plaintiffs,
vs.
**JOSHUA WEARMOUTH, VELANOS, RESYDENCY and NORDIC TRUST ALLIANCE KB, LLC,**
Defendants.

---

### COMPLAINT

Plaintiffs, **JOHN MICHAEL COHAN and DAVID HUGHES**, file this Complaint against **JOSHUA WEARMOUTH, VELANOS, RESYDENCY, and NORDIC TRUST ALLIANCE KB, LLC** ("Defendants") and allege as follows:

---

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to **Fla. Stat. § 48.193**, as Defendants have conducted business in Florida, and the events giving rise to this action occurred in Duval County.

2. Venue is proper in Duval County under **Fla. Stat. § 47.011**, as the causes of action arose in this jurisdiction.

---

### PARTIES

3. Plaintiff **John Michael Cohan** is a resident of Florida.

4. Plaintiff **David Hughes** is a resident of Illinois.

5. Defendant **Joshua Wearmouth** is an individual residing at **20101 Southwest Cypress Street, Newport Beach, California 92660**.

6. Defendant **Velanos** is a business entity registered in Wyoming but conducting business in Florida.

7. Defendant **Resydency** is a business entity operating in Florida and is believed to be holding real estate assets that were purchased using funds obtained through illegal and fraudulent transfers.

8. Defendant **Nordic Trust Alliance KB, LLC** is a limited liability company operating in Florida.

## FACTUAL ALLEGATIONS

9. Plaintiffs entered into a **Settlement Agreement and subsequent amendments** with Defendants on **May 15, 2024**, to resolve prior disputes stemming from financial dealings between the parties.

10. Under the terms of the Settlement Agreement and its amendments, Defendants agreed to make installment payments to Plaintiffs in a timely manner.

11. Despite these clear obligations, **Defendants defaulted on their obligations**, failing to make the required payments as outlined in the Settlement Agreement and amendments.

12. Plaintiffs relied on the Defendants' representations and suffered financial harm as a result of their non-compliance.

13. **This action does not assert any business-related claims nor does it seek any relief related to Genie Investments NV or its estate claims.**

14. Plaintiffs also suffered **personal reputational harm** due to the Defendants' wrongful conduct, which resulted in financial instability and damage to their credibility.

15. Plaintiffs believe that **Resydency is holding real estate that was purchased using funds obtained through fraudulent and illegal financial transfers facilitated by the Defendants**.

16. According to the **Declaration of Adam B. Walker**, a former enforcement attorney with the Financial Industry Regulatory Authority (FINRA), the financial transactions orchestrated by Velanos included **fraudulent SBLC (Standby Letter of Credit) trading schemes**, which have been widely recognized as fraudulent by multiple U.S. government agencies.

17. The Declaration further states that Genie Investments NV was promised an **800% return on investment** through these fraudulent schemes and was misled by Velanos and its affiliates.

18. Plaintiffs allege that funds originating from these fraudulent transactions were subsequently transferred to Resydency and used to acquire real estate assets, constituting **fraudulent conveyance and unjust enrichment**.

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT

19. Plaintiffs reallege and incorporate paragraphs 1-18 as if fully set forth herein.

20. The Settlement Agreement and subsequent **amendments** were valid and binding contracts between Plaintiffs and Defendants.

21. Defendants **breached** the contract by failing to make payments as required, in violation of **Fla. Stat. § 672.703**.

22. As a result, Plaintiffs have suffered damages in excess of **$66,000,000**.

23. Plaintiffs demand judgment for damages, attorneys' fees, and any other relief deemed just and proper under **Fla. R. Civ. P. 1.100**.

## COUNT II – FRAUDULENT MISREPRESENTATION

24. Plaintiffs reallege and incorporate paragraphs 1-18 as if fully set forth herein.

25. Defendants made **false and misleading statements** regarding their financial capabilities and intention to honor the settlement, violating **Fla. Stat. § 817.034 (Florida Communications Fraud Act)**.

26. Plaintiffs reasonably relied on these representations to their detriment.

27. As a result of Defendants' fraudulent misrepresentations, Plaintiffs have suffered significant financial and reputational damages.

28. Plaintiffs seek **compensatory and punitive damages** in an amount to be determined at trial, pursuant to **Fla. Stat. § 768.72**.

## COUNT III – UNJUST ENRICHMENT AND FRAUDULENT CONVEYANCE

29. Plaintiffs reallege and incorporate paragraphs 1-18 as if fully set forth herein.

30. Defendants received financial benefits from Plaintiffs without providing fair consideration in return, violating the principles set forth in **Ruck Bros. Brick v. Kellogg & Kimsey, Inc., 668 So. 2d 205 (Fla. 2d DCA 1995)**.

31. Plaintiffs seek **restitution and disgorgement** of the improperly retained funds, including any real estate assets held by Resydency that were obtained through fraudulent means.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1. Compensatory damages in an amount to be proven at trial greater than **$66,000,000**;

2. Punitive damages for fraudulent misrepresentation under **Fla. Stat. § 768.72**;

3. Pre- and post-judgment interest under **Fla. Stat. § 55.03**;

4. Attorneys' fees and costs pursuant to **Fla. Stat. § 57.105**;

5. A declaration that **Resydency holds real estate assets obtained through fraudulent and illegal financial transfers** and an order for their disgorgement;

6. Any other relief this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues triable as of right under **Fla. R. Civ. P. 1.430**.

Dated: 02-14-2025

**Respectfully submitted,**

**John Michael Cohan and David Hughes**
**Plaintiffs**

# Exhibit B

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

GENIE INVESTMENTS NV INC.,                    Case No.: 3:24-bk-00496-BAJ

        Debtor.                                      Chapter 7

_____/

## ORDER GRANTING TRUSTEE'S MOTION TO ENFORCE AUTOMATIC STAY

THIS CASE is before the Court on the Motion to Enforce Automatic Stay (the "Motion")[1]

(Doc. ___) filed by Aaron Cohen, as Chapter 7 Trustee of the bankruptcy estate of Debtor, Genie

Investments NV, Inc. (the "Debtor").  After proper notice to interested parties pursuant to Local

Bankruptcy Rule 2002-4; and this Court having jurisdiction to consider the Motion and the relief

requested therein pursuant to 28 U.S.C. §§ 157 and 1334, having found that this is a core

proceeding pursuant to 28 U.S.C. § 157(b)(2), and having reviewed the Motion and determined

that the legal and factual bases set forth in the Motion establish just cause for the relief granted

herein and that the relief sought in the Motion is in the best interests of the bankruptcy estate and

its creditors, upon review of the record before the Court and having heard argument of counsel at

_____

[1] Defined terms from the Motion are incorporated by reference herein.

80108528;1

the hearing held on _____ ___, 2025, good and sufficient cause exists to grant the relief requested.  It is hereby

**ORDERED**:

1.      The Motion is **GRANTED**.

2.      Because the Velanos Lawsuit violates the automatic stay, it is void *ab initio*.

3.      The Trustee is authorized and empowered to take all actions he deems necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

4.      The Trustee shall promptly file a copy of this Order in the Velanos Lawsuit in the Circuit Court In and For Duval County, Florida, notifying that court of the enforcement of the automatic stay as it relates to the Velanos Lawsuit.

5.      This Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Attorney Raye C. Elliott is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and to file a proof of service within three days of entry of this order.

80108528;1

# Composite Exhibit C

ORDERED.

**Dated:  August 05, 2024**

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

                                               Case No. 8:24-bk-00676-RCT

The Centers for Special Needs
Trust Administration, Inc.,

                                               Chapter 11

             Debtor.
_____/

## ORDER (I) GRANTING CHAPTER 11 TRUSTEE'S MOTION TO ENFORCE AUTOMATIC STAY; AND (II) DENYING AS MOOT AMERICAN MOMENTUM BANK'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY

       This case came before the Court at a hearing on July 23, 2024, on two motions: (1) the

Chapter 11 Trustee's Motion to Enforce Automatic Stay (Doc. 195) and related filings (Docs.

210, 252, 290, 297, 299); and (2) American Momentum Bank's ("AMB") Motion for Relief

from the Automatic Stay (Doc. 291) and related filings (Docs. 302, 305, 306).  As explained

below, the Court grants the Trustee's motion and denies as moot AMB's motion.

## I.  Background

       Debtor The Centers for Special Needs Trust Administration, Inc. served as the trustee

or co-trustee of numerous special needs trusts, including both individual, stand-alone trusts and

pooled trusts (collectively, "SNTs") for over 2,000 beneficiaries who suffer from various levels

of disability (the "Beneficiaries"). Debtor's primary duty as trustee of the SNTs is to manage

the SNTs, maintain records for assets managed by third-party investment managers, respond to requests for distributions from Beneficiaries, and make distributions in a manner that ensures that the applicable beneficiary meets the income and asset thresholds to qualify for certain critical public assistance benefits, such as Medicaid, Social Security, and Supplemental Security Income.

Of the more than 2,000 SNTs administered by Debtor, 1,270 SNTs are combined into pooled accounts ("Pooled Trusts") and approximately 750 SNTs are individual trusts. Each Beneficiary has its own trust account or sub-trust account ("SNT Account") that reflects the specific assets allocated to the respective Beneficiary's SNT (collectively, "SNT Funds").

The Pooled Trusts are governed by a Master Declaration of Trust, dated March 10, 2001, which was amended and restated four times, before it was reformed and amended, effective prospectively and retroactively immediately upon its execution on July 10, 2018 ("Reformed Trust Declaration").[1]  The Reformed Trust Declaration provides that the Trust is irrevocable, and, although separate sub-accounts are established and maintained for each Beneficiary, "the Trust shall pool these sub-accounts for investment and management purposes."[2]  The Trust is structured somewhat ambiguously to protect the right of the Beneficiaries to receive public assistance.[3]

Before filing a Chapter 11 petition, Debtor's leadership discovered that Debtor had loaned approximately $100 million to a third-party, Boston Financial Group ("BFG") (the "BFG Loan").  BFG is a company controlled by Debtor's founder, Leo Govoni ("Govoni").

---

[1] Doc. 290, p. 14-27.
[2] Doc. 290, p. 22, ¶ 7.1.
[3] For example, while paragraph 1.1 of the Reformed Trust Declaration states that the pooled trust is established for the sole benefit of the trust beneficiaries, paragraph 3.1 states that "none of the Beneficiaries have any right of entitlement to the Trust corpus or income, except as the Trustee elects to disburse the same in its sole, complete, absolute, and unfettered discretion."  (Doc. 290, p. 14, 17).

The BFG Loan is evidenced by multiple revolving line of credit loan agreements between BFG and Debtor, a security agreement giving Debtor a security interest in all of BFG's real and personal property, promissory notes by BFG made in favor of Debtor for $100 million, and a personal guaranty executed by Govoni (collectively, the "Loan Documents").  The Loan Documents were executed by Govoni, on behalf of BFG, and by Todd Belisle, on behalf of Debtor. The Beneficiaries are not parties to the Loan Documents.  The BFG Loan matured on January 1, 2017 and is in default.[4]

Debtor filed for bankruptcy under Chapter 11 on February 9, 2024.  On March 4, 2024, the Office of United States Trustee appointed an Official Committee of Creditors.[5]  By Order dated March 11, 2024, this Court directed the appointment of a Chapter 11 Trustee.[6]  And, on March 21, 2024, the Court approved the U.S. Trustee's selection of Michael Goldberg as the Chapter 11 Trustee.[7]

### The Trustee's Adversary Proceeding

On April 25, 2024, the Chapter 11 Trustee filed an adversary proceeding against BFG and Govoni for breach of the Loan Documents, for turnover of property of the estate, and for an accounting, seeking to recover the outstanding amount due under the BFG Loan of not less than $142,283,314 (the "Adversary Proceeding").[8]

The Chapter 11 Trustee's Complaint (filed just over a month after his appointment) makes the following allegations.[9]  Govoni, a purported financial and investment advisor, founded Debtor in 2000 and served on its Board of Directors until his resignation in 2008 or

---

[4] Adv. Proc. No. 8:24-ap-00139-RCT, Doc. 10, ¶ 81.
[5] Docs. 75, 76.  By Order dated March 18, 2024, the Court approved the Committee's application to employ bankruptcy counsel (Doc. 99).
[6] Doc. 93.
[7] Doc. 109.
[8] Adv. Proc. No. 8:24-ap-00139-RCT.
[9] AP Doc. 1.

2009. However, despite resigning, Govoni continued to exert control over Debtor's operations, finances, human resources, and information technology.

After Govoni resigned, between 2009 and 2020, Debtor made numerous transfers from SNT Funds to BFG totaling $100 million. It started on June 1, 2009, by Debtor and BFG entering into a $2.5 million line of credit loan agreement. In connection with the 2009 loan, BFG executed a promissory note for $2.5 million and a security agreement that granted Debtor a security interest in all BFG's real and personal property.

Then, on December 1, 2009, Debtor and BFG entered into an amended line of credit loan agreement, which increased the credit line to $15 million (along with a $15 million promissory note). The line of credit was increased three more times: (1) on March 15, 2010, it was increased to $30 million (and BFG executed a $30 million promissory note); (2) on March 15, 2011, it was increased to $50 million (and BFG executed a $50 million promissory note and an amended promissory note that changed the interest rate); and (3) on January 1, 2012, it was increased to $100 million (and BFG executed a $100 million promissory note). In connection with the 2012 amendment to the loan, Govoni executed a personal guaranty for the $100 promissory note.

The 2012 promissory note matured on January 1, 2017, and BFG had only made a few payments on the loan, both before and after it matured (with the last payment being made on October 27, 2023). On September 8, 2023, Debtor sent BFG a demand for payment for all amounts due. As of April 23, 2024, Debtor was owed $100 million in principal and $42,283,314 in interest.

The Chapter 11 Trustee filed a motion for summary judgment as to liability for the BFG Loan in the Adversary Proceeding. Specifically, he seeks summary judgment on Count I (breach of the promissory notes by BFG) and Count II (Govoni's breach of his personal

guaranty).  At a pretrial status conference on July 23, 2024, the Chapter 11 Trustee stated that he was expecting to submit an agreed order granting the motion.

### The Class Actions

After Debtor's Chapter 11 petition was filed, two separate class actions were filed on behalf of the Beneficiaries in the United States District Court for the Middle District of Florida (collectively, the "Class Actions").  The Class Action Plaintiffs did not seek relief from the automatic stay prior to filing either Class Action.

The first class action was filed on February 19, 2024, by Beneficiary Clark Chamberlin, a disabled minor child, by and through his parents and co-guardians, Todd Chamberlin and Kelli Chamberlin, and on behalf of all other similarly situated Beneficiaries against defendants BFG; Boston Asset Management, Inc.; Govoni; John W. Staunton, Esq. ("Staunton"); Jonathan Golden; Prospect Funding Holdings, LLC; Prospect Funding Partners, LLC; Prospect Funding Holdings (NY) III, LLC; AMB; Boston Holding Company, LLC; and FTAS alleging thirteen different counts (the "Chamberlin Class Action").[10]

The second class action was filed on April 9, 2024, by T.L, a disabled adult by and through Shawnta Orris, his guardian ad litem, individually and on behalf of all others similarly situated against defendants Govoni, Staunton, Todd Belisle, Richard Shonter, Caitlin Janicki, Tracey Gregory, Michelle Diebert, Laura Davis, Carl Schroeder, and BFG alleging four different counts (the "Orris Class Action").[11]

No class has been certified in either action.

---

[10] *Chamberlin v. Boston Finance Group, LLC*, No. 8:24-cv-00438-SDM-AEM (M.D. Fla. filed Feb. 19, 2024).
[11] *Orris v. Govoni*, No. 8:24-cv-00874-CEH-AEP (M.D. Fla. filed Apr. 9, 2024).

## II.  Trustee's Motion to Enforce the Stay

By his Motion to Enforce the Stay, the Chapter 11 Trustee seeks to enforce the automatic stay against both Class Actions on grounds that the claims made in the Class Actions are based on the same harm and misconduct caused by BFG's breach and default of the $100 million secured loan by Debtor to BFG and that the Class Actions seek recovery of the same funds owed to Debtor under the Loan Documents.  The Trustee further maintains that Debtor's former directors and officers ("D&O") owed a fiduciary duty to Debtor, and as such, the claims raised in the Class Actions, including claims against any D&O policies, belong to the bankruptcy estate.  The Orris Class Action Plaintiffs do not oppose the Chapter 11 Trustee's Motion to Enforce the Stay, and the Official Committee of Unsecured Creditors supports the Trustee's motion.[12]  However, the Chamberlin Class Action Plaintiffs oppose the Trustee's motion.[13]

At the heart of the Trustee's Motion is the creation of a bankruptcy estate and the automatic stay that arises to protect to protect the estate.  The bankruptcy estate is created to facilitate a centralized administration of all assets of a debtor and all claims against the debtor:

> The purpose of bankruptcy law is to address the collective-action problem that a bankruptcy poses. When a company's liabilities exceed its ability to pay creditors, every creditor has an incentive to maximize its own recovery before other creditors deplete the pot. Without a mandatory collective system, the creditors would race to the courthouse to recover first. One or a few successful creditors could then recover substantial funds, deplete the assets, and . . . leav[e] other creditors with nothing.[14]

---

[12] Doc. 297.

[13] Docs. 252, 299.

[14] *Harrington v. Purdue Pharma L. P.*, 144 S. Ct. 2071, 2090 (2024) (Kavanaugh, J., dissenting) (internal citations omitted); *see also Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 390 (2023) (stating that "the Bankruptcy Code offers debtors a fresh start by discharging and restructuring their debts in an 'orderly and centralized' fashion").

In this way, "[t]he bankruptcy system works to preserve a bankrupt company's limited assets and to then fairly and equitably distribute those assets among the creditors."[15]

Here, the Beneficiaries have substantial claims against Debtor. Debtor's former D&Os have been ousted by Court Order. In their place, the Court has appointed an independent Chapter 11 Trustee, who is charged with winding down Debtor's operations, liquidating the assets of the bankruptcy estate, and paying the Beneficiaries' claims as soon as possible. The Court has also approved the appointment of a Creditors' Committee, who is charged with protecting the rights of all Beneficiaries.[16]

The tool that effects this centralization anticipated by the Bankruptcy Code is the automatic stay, as set forth in 11 U.S.C. § 362.[17] The stay applies to "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[18]

Section 541(a)(1) provides that property of the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case wherever located and by whomever held.[19] Property of the estate also includes any cause of action that a debtor has at the commencement of the case.[20]

To determine if the Chamberlin Class Action violates the automatic stay, a review of the allegations set forth in the Chamberlin Amended Class Action Complaint ("CCC")[21] is required. The CCC asserts thirteen claims against the following defendants: (1) BFG – the

---

[15] *Purdue Pharma*, 144 S. Ct. at 2088 (Kavanaugh, J., dissenting).
[16] In this Chapter 11 case, unlike other commercial cases, there are no significant creditors other than the Beneficiaries.
[17] *See S.E.C. v. Miller*, 808 F.3d 623, 630 (2d Cir. 2015) (citations omitted).
[18] 11 U.S.C. § 362(a)(3).
[19] *See In re Dorand*, 95 F.4th 1355, 1363 (11th Cir. 2024).
[20] *See In re Icarus Holding*, LLC, 391 F.3d 1315, 1319 (11th Cir. 2004) (citations omitted).
[21] Case No. 8:24-cv-00438-SDM-AEP (M.D. Fla. filed Feb. 19, 2024) (Doc. 41).

company to which Debtor loaned $100 million; (2) Boston Asset Management, Inc. ("BAM") – the company that provided investment management and marketing services for the SNT Funds that were invested via the BFG Loan;[22] (3) Prospect Funding Holdings, LLC; Prospect Funding Partners, LLC; and Prospect Funding Holdings (NY) III, LLC (collectively, "Prospect") – companies that received funds from BFG that BFG received from the BFG Loan; BFG has owned the membership interests in Prospect;[23] (4) AMB – the bank where Debtor held the SNT Funds in eight different accounts;[24] (5) Boston Holding Company, LLC ("BHC") – an entity allegedly used by Govoni, Golden, and Staunton to defraud Beneficiaries whose SNT Funds were misappropriated;[25] (6) FTAS – an entity controlled by Govoni, Staunton, and Golden that was Debtor's accounting firm that prepared SNT annual accountings for Beneficiaries, which purported to show the receipts, disbursements, and inventory of their SNTs, but which did not disclose the BFG Loan and BFG's failure to repay it;[26] (7) Govoni – he served as BFG's and BHC's managing member and BAM's director and president, and he controlled these entities' operations and affairs alongside Golden and Staunton; he also co-founded Debtor with Staunton; he also controlled Prospect's operations and affairs;[27] (8) Staunton – he is an attorney and has been a principal of and/or owned membership interests in BFG and stock in BAM and controlled those entities' operations and affairs alongside Govoni and Golden; he also co-founded Debtor with Govoni; he also controlled Prospect's operations and affairs;[28] and (9) Golden – he is an attorney and has been a beneficial owner of BFG, BHC,

---

[22] CCC, ¶ 89.
[23] CCC, ¶ 29, 99, 102, 105, 396.
[24] CCC, ¶ 119.
[25] CCC, ¶ 398, 400.
[26] CCC, ¶ 88, 92, 136.
[27] CCC, ¶ 20, 30.
[28] CCC, ¶ 22, 30, 64.

and BAM and controlled these entities' operations and affairs alongside Govoni and Staunton; he also controlled Prospect's operations and affairs.[29]

The Chamberlin Class Action Plaintiffs allege that: (1) BAM took over from Debtor essentially all duties related to SNT assets, including investing and managing SNT assets and that this led to at least $100 million being misappropriated from SNT Accounts to fund the BFG Loan;[30] (2) the SNT Funds were maintained in (and were transferred to BFG from) pooled SNT accounts held at AMB;[31] (3) Debtor also maintained two operating accounts at AMB;[32] (4) Debtor failed to segregate SNT Funds and commingled them with the funds in its operating and/or master-general deposit accounts at AMB;[33] and (5) BFG transferred some of the funds that it received via the BFG Loan to Prospect.[34]  Based on these allegations, the Chamberlin Class Action Plaintiffs assert claims of conversion, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, negligence, unjust enrichment, and conversion against the defendants.

However, at its core, the Chamberlin Class Action Plaintiffs' claims arise from Debtor funding a $100 million loan to BFG with SNT Funds, and BFG's subsequent breach and default of the BFG Loan.  Thus, the Chamberlin Class Action Plaintiffs seek recovery of the same funds owed to Debtor under the Loan Documents, *i.e.*, the $100 million in principal amount loaned by Debtor to BFG.  And yet, the legal claims based on the Loan Documents are property of the bankruptcy estate and are to be administered by the Chapter 11 Trustee.

---

[29] CCC, ¶ 21, 30, 64.
[30] CCC, ¶ 78, 90.
[31] CCC, ¶ 95.
[32] CCC, ¶ 121.
[33] CCC, ¶ 293a, 320a.
[34] CCC, ¶116.

At this point in the case, the Chapter 11 Trustee is still investigating the best way to recover on the BFG Loan.  His first step has been to bring the Adversary Proceeding and to move for summary judgment on the Loan Documents.  Although the Chapter 11 Trustee has not sued all the parties who are defendants in the Class Actions, at some point, the Chapter 11 Trustee may choose to do so on behalf of the estate for the benefit of all Beneficiaries.  The timing and order of pursuing those claims is up to the Chapter 11 Trustee.  Those claims, as well as claims against any D&O policies, may be pursued by the Trustee after further investigation or after a final determination that the moneys are not recoverable from the parties to the Loan Documents.  That process in this Chapter 11 case has just begun, and any such claims on behalf of the bankruptcy estate most certainly have not been abandoned by the Chapter 11 Trustee.

The Chapter 11 Trustee has adopted a measured strategy designed to minimize litigation costs and to preserve potential insurance claims in order to increase the money that eventually will go to pay the claims of the Beneficiaries.  The Chamberlain Class Action has interfered with and jeopardized the Trustee's work and the administration of this Chapter 11 case by attempting to exercise control over the recovery of the BFG Loan proceeds.

The Chamberlin Class Action Plaintiffs attempt to argue that, because they are trying to recover funds contributed by the Beneficiaries that were to be held in trust for them by Debtor, 11 U.S.C. § 541(b)(1)[35] provides that the funds that they are seeking to recover are not property of the bankruptcy estate, and the Trustee lacks standing to pursue claims to recover property that does not belong to the bankruptcy estate.  They make this argument without specifying

---

[35] Section 541(b)(1) provides that "[p]roperty of the estate does not include . . . any power that the debtor may exercise solely for the benefit of an entity other than the debtor."  Therefore, if a debtor holds property in trust for someone else, that property does not become property of the debtor's bankruptcy estate.  *See Peachtree Special Risk Brokers, LLC v. Kartzman (In re Rocco Co., Inc.)*, No. 10-18799 (DHS), Adv. No. 12-1269 (DHS), 2014 WL 7404566, at *4 (D.N.J. Dec. 29, 2014).

whether the funds invested in the BFG Loan came from pooled or individual trusts. At this point, the Court cannot accept their argument.

The Chapter 11 Trustee's forensic accounting firm, KapilaMukamal, LLP ("KM Firm"), which has just begun the hard work of sorting out Debtor's business and SNT administration, has preliminarily observed that the funds were comingled and will take great effort to determine the source or sources of funds for the BFG Loan. The KM Firm has initially concluded that between the period of 2008 through June 2024: (1) there were as many as 6,900 SNTs administered by Debtor and in excess of 2.6 million transactions within the trust ledgers; and (2) during this time, the SNT Funds were maintained and commingled in numerous different bank and brokerage accounts.[36] Indeed, the Chamberlin Class Action Plaintiffs specifically allege in their CCC that Debtor failed to segregate SNT Funds and commingled them with the funds in its operating and/or master-general deposit accounts at AMB.[37]

Comingled funds generally constitute property of the bankruptcy estate unless and until they can be traced.[38] As a result, the Chapter 11 Trustee has standing to recover the commingled funds; this would seem to be particularly true for the pooled trust assets. Sometime in the future, if ever, it may be possible to trace the SNT Funds, but today, comingling is not seriously disputed.

Next, the Chamberlin Class Action Plaintiffs argue that, because Debtor "stole" the SNT Funds that it lent to BFG, the SNT Funds were never property of the bankruptcy estate, and only they (the Chamberlin Class Action Plaintiffs) are the proper party to recover their stolen SNT Funds. But the Chamberlain Class Action Plaintiffs must acknowledge that the SNT Funds were voluntarily given to Debtor to invest, administer, pay out when appropriate and

---

[36] Doc. 290, p. 30, ¶ 8 & p. 32, ¶ 14.

[37] CCC, ¶ 293a, 320a.

[38] *See Rocco*, 2014 WL 7404566, at *4-6.

hold for the benefit of the Beneficiaries. So, what the CCC really alleges is that Debtor breached its fiduciary duty to the Beneficiaries by making an improper loan to an insider, and that the measure of damages is in large part the amount represented by the BFG Loan. In this respect, the claims against the defendants in the CCC are so intertwined with the claims that the Beneficiaries have against Debtor that they are effectively claims against Debtor. As such, the determination of the claims in the CCC will impact the administration of this bankruptcy, whether through collateral estoppel, indemnification, or otherwise.

At oral argument, the Chamberlin Class Action Plaintiffs acknowledged that only Debtor has standing to bring an action under the BFG Loan Documents for the $100 million promissory note and whatever interest may be due thereupon. Thus, pivoting somewhat from their allegations in the CCC, the Chamberlin Class Action Plaintiffs argue that they have asserted individualized damages that go beyond the $100 million-plus that the Chapter 11 Trustee seeks to recover in the Adversary Proceeding. The Court does not disagree.

Individualized tort claims, or other direct claims, for emotional, special, or even punitive damages certainly may exist in favor of a specific Beneficiary, or even a group of similarly situated Beneficiaries against some or all of the defendants named in the CCC.[39] Nothing that happens in this Chapter 11 case will release any such claims without the consent of the Beneficiaries.[40] But the CCC, in substance, does not assert claims independent of the BFG Loan. Instead, the CCC seeks to recover the same funds (albeit through different claims against

---

[39] In addition to individualized tort claims, it was suggested at oral argument that some of the more recent Beneficiaries (who were left holding the bag when Debtor filed bankruptcy) may even be at odds with earlier Beneficiaries, whose accounts may have been replenished with new money deposited in the Pooled Trusts. The bottom line is that, at this stage of the Chapter 11 Trustee's investigation, no one knows what Debtor's records ultimately will reveal or whether any SNT Funds can be traced.

[40] *See Purdue Pharma*, 144 S. Ct. at 2084 (stating "that a bankruptcy court's powers are not limitless and do not endow it with the power to extinguish without their consent claims held by nondebtors").

additional defendants) as the Chapter 11 Trustee seeks to recover.[41]  Moreover, the CCC seeks

to recover those funds by impugning the validity of the Loan Documents, as the CCC's claims

are necessarily based on the premise that the BFG Loan and the Loan Documents are a sham.

The Chamberlin Class Action Plaintiffs also do not allege in the CCC that they dealt

directly with any of the defendants named in their CCC.  Instead, they allege a scheme—which,

at its heart, includes the BFG Loan—by which the same people (Govoni, Golden, and Staunton)

controlled (or exerted control over) Debtor (which held the SNT Funds), the recipients of the

SNT Funds (BFG and Prospect), and the entities that facilitated the scheme (BHC, BAM, and

FTAS).[42]  As such, the Chamberlin Class Action Plaintiffs' claims not only seek the same

recovery as, but they are derived from, the Trustee's claim for breach of the Loan Documents.[43]

Consequently, any claims by the Beneficiaries for recovery of the BFG Loan proceeds (as

articulated in the CCC) are arguably characterized as claims against Debtor, which violates the

automatic stay.[44]

Accordingly, the Court agrees with the Trustee and concludes that the Class Actions, as

currently pled, violate the automatic stay.  Therefore, the Court grants the Chapter 11 Trustee's

Motion to Enforce Automatic Stay (Doc. 195).

---

[41] *Securities Inv'r Protection Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 443 B.R. 295, 310 (Bankr. S.D.N.Y. 2011) (stating that the "[p]laintiffs cannot convincingly contend that their causes of action, no matter what form they take, are independent of their claims against the [bankruptcy] estate, and they are therefore bound by the automatic stay").

[42] The Chamberlin Class Action Plaintiffs also allege that AMB was another entity that facilitated the scheme, but they do not allege that Govoni, Golden, and Staunton controlled AMB.

[43] Stated differently, each alleged harm in the CCC is derived from and is a continuation of the initial harm—the direct loss due to the breach of the Loan Documents.  Each count in the CCC is interconnected to the same alleged harm, and thus, all the subsequent harm and injury caused by the breach of the Loan Documents are legal claims that belong to the bankruptcy estate, which the Chapter 11 Trustee has the exclusive standing to pursue.

[44] *See Madoff*, 443 B.R. at 314 (stating that "[w]hether sounding in bankruptcy, state law or common law, and whether purporting to recover fraudulent transfers or tort damages, the Third Party Actions seek to recover potential estate assets to redress harms common to all victims of Madoff's massive Ponzi scheme that, consistent with the purposes of the automatic stay, belong exclusively to the Trustee").

### III.  AMB's Motion for Relief from Stay

AMB filed a motion for relief from the stay to allow the district court rule on its pending motion to dismiss in the Chamberlin Class Action. AMB's motion to dismiss is based on the premise that, unlike Debtor, the Chamberlin Class Action Plaintiffs "are *not* AMB customers."[45]   However, because the Court finds that the Class Actions violate the automatic stay, they are void *ab initio*.[46]   As a result, the Court must deny as moot AMB's Motion for Relief from the Automatic Stay (Doc. 291).

### IV.  Conclusion

Based on the above, it is **ORDERED**:

(1)     The Chapter 11 Trustee's Motion to Enforce Automatic Stay (Doc. 195) is **GRANTED**.

(2)     Because the Orris Class Action and Chamberlin Class Action violate the automatic stay, they are void *ab initio.*

(3)     AMB's Motion for Relief from the Automatic Stay (Doc. 291) is **DENIED AS MOOT**.

Attorney Steven Wirth is directed to serve a copy of this order on interested parties who do not receive service by CM/ECF and file a proof of service within three days of its entry.

---

[45] Doc. 291, p. 3, ¶ 5.
[46] In the Eleventh Circuit, actions in violation of the automatic stay are void *ab initio*.  *See Borg-Warner Acceptance Corp. v. Hall*, 685 F.2d 1306, 1308 (11th Cir. 1982) (citations omitted).

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**Clark Chamberlin, et al.,**

     Appellants,

v.                         Case No. 8:24-cv-01962-WFJ

**Michael Goldberg,**

     Appellee.

_____/

## ORDER AFFIRMING
## BANKRUPTCY COURT'S ORDER ON APPEAL

This appeal arises from a bankruptcy case, *In re: The Center for Special Needs Trust Administration, Inc.*, Case No. 8:24-bk-00676-RCT. ECF 1 at 6. Appellants appeal the bankruptcy court's order granting the Chapter 11 Trustee's motion to enforce the automatic stay, entered on August 5, 2024. ECF 4-2 at 14. Upon considering the filings, record, and oral argument from counsel, the Court affirms.

## BACKGROUND

Appellants' son is the beneficiary of a special needs trust administered by The Center for Special Needs Trust Administration ("Debtor"). ECF 10 at 3. On February 2, 2024, the Debtor filed for bankruptcy, disclosing it used $100 million from special needs trusts to fund a loan to Boston Financial Group ("BFG"). ECF 10 at 4.

1

Appellants filed a suit class action status on February 18, 2024, alleging thirteen counts and naming BFG and other associated persons, entities, and subsidiaries. ECF 4-2 at 5. Thereafter, Appellee was appointed Chapter 11 Trustee. ECF 4-2 at 7. On April 26, 2024, Appellee filed a motion to enforce the automatic stay, which the bankruptcy court granted on August 5, 2024. ECF 4-10; ECF 4-2 at 14. In doing so, the bankruptcy court declared the subject class action *void ab initio*. ECF 4-2.

Since then, the bankruptcy court has granted the Appellee's wind-down motion, transitioning trusts to a third party, and, in an adversary proceeding, the Appellee obtained a judgment of $120 million from some of the parties named in the Appellants' class action. ECF 15 at 22–23. Additionally, an accounting firm has been unable to trace the funds loaned to specific trust accounts. ECF 4-2 at 11; ECF 15 at 6–7. The Court affirms the order granting Appellee's motion to enforce the automatic stay. ECF 4-2 at 14.

### LEGAL STANDARD

In reviewing bankruptcy court decisions, legal conclusions and mixed questions of law and fact are reviewed de novo. *See Sundale, Ltd. v. Fla. Assocs. Capital Enters., LLC* (*In re Sundale, Ltd.*), 499 F. App'x 887, 889–90 (11th Cir. 2012); *see also Lightner v. Lohn*, 274 B.R. 545, 548–49 (M.D. Fla. 2002). A bankruptcy court's interpretation of statutory language is a conclusion of law.

2

*Nordberg v. Arab Banking Corp.* (*In re Chase & Sanborn Corp.*), 904 F.2d 588, 593 (11th Cir. 1990); *see also Eldorado Canyon Props., LLC v. Mantalvanos*, 515 B.R. 852, 854 (M.D. Fla. 2014).

## ANALYSIS

The Court has jurisdiction to hear appeals from final bankruptcy court orders.[1] In its August 5, 2024 order, ECF 4-4, the bankruptcy court correctly concluded that the Appellants' complaint violates the automatic stay, 11 U.S.C. § 362, because (1) it improperly seeks to exercise control over property of the estate, ECF 4-2 at 7, 9– 10, (2) the Appellee has not abandoned certain claims against defendants named in the class action, so it would be a violation of the automatic stay for the Appellant to pursue them, ECF 4-2 at 10, (3) the class action "has interfered with and jeopardized the Trustee's work and the administration of this . . . case by attempting to exercise control over the recovery of the BFG [l]oan proceeds," ECF 4-2 at 10, and (4) "the determination of the claims in the [Appellants' complaint] will impact the administration of this bankruptcy, whether through collateral estoppel, indemnification, or otherwise," ECF 4-2 at 12.

The Appellants' complaint is predicated in part on "impugning the validity of the Loan Documents," ECF 4-2 at 13, and proving that they are a "sham," *see, e.g.*,

---

[1] The order holding the class action *void ab initio* ended the proceeding on the stay motion, making it final and appealable to this Court. *See* 28 U.S.C. § 158(a)(1); *In re Ellingsworth Res. Comm.'y Ass'n*, Nos. 21-12969, 21-12971 & 21-13231, 2025 WL 78887, at *14 (11th Cir. Jan. 13, 2025).

ECF 4-24 at 21. The focus of the Appellants' Amended Complaint is on the Debtor and its officers and directors, blaming them for the misappropriation of trust fund assets. *See, e.g.,* ECF 4-24 at 46–47. A cause of action for breach of a loan and against officers and directors of a company is derivative and thereby property of the bankruptcy estate, irrespective of label. *See Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 443 B.R. 295, 310 (Bankr. S.D.N.Y. 2011). The bankruptcy court correctly determined that "the claims against the defendants in the [Appellants' complaint] are so intertwined with the claims . . . against Debtor that they are effectively claims against the Debtor." ECF 4-2 at 12.

Appellants' reliance on 11 U.S.C. § 541(b)(1) is misplaced. The bankruptcy court's conclusion conforms to this statute because "[c]omingled funds generally constitute property of the bankruptcy estate unless and until they can be traced." ECF 4-2 at 11 (citing *Peachtree Special Risk Brokers, LLC v. Kartzman* (*In re Rocco Co., Inc.*), No. 10-18799 (DHS), 2014 WL 7404566, at \*4–6 (D.N.J. Dec. 29, 2014)). The funds at issue have not been traced, ECF 4-2 at 11, and "were voluntarily given to Debtor to invest, administer, [and] pay out when appropriate," ECF 4-2 at 11. The Appellant's complaint implicates the automatic stay.

## CONCLUSION

Based on the foregoing, and review of the entire record, the bankruptcy court's order is **AFFIRMED**. **THE CLERK** is directed to enter judgment for the Appellee,

to close the case, and to transmit a copy of this order to the Clerk of the United States

Bankruptcy Court for the Middle District of Florida.

**DONE AND ORDERED** at Tampa, Florida, on February 19, 2025.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO**:
Counsel of Record