**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA, JACKSONVILLE DIVISION**
**IN RE:**
**Genie Investments NV, Inc., Debtor.**
**Case No.: 3:24-bk-00496-BAJ**
**Chapter 7**

### MOVANTS' BRIEF ON THE INAPPLICABILITY OF THE AUTOMATIC STAYS TO PERSONAL CLAIMS

**COME NOW, Movants, John Michael Cohan and David Hughes, specially appearing pro se, in their personal capacities, and submit this brief at the Court's request regarding the applicability of the automatic stays under 11 U.S.C. § 362. Movants respectfully assert that the automatic stays do not apply to their independent claims, that the Trustee has selectively and improperly extended the stays' scope, and that its application in this case violates established precedent, due process rights, and bankruptcy law.**

## I. INTRODUCTION

The Trustee has improperly extended the automatic stays to suppress Movants' independent claims against third parties, despite these claims not being property of the estate under **11 U.S.C. § 541**. The Supreme Court and circuit courts have consistently ruled that **the automatic stay applies only to actions against the debtor or property of the estate**, not independent claims held by non-debtors.

Movants are **asserting their personal rights** in litigation separate from the bankruptcy estate, yet the Trustee has sought to extend the automatic stays beyond their lawful limits to interfere with these claims. The improper application of the stays has resulted in the **suppression of Movants' constitutional rights**, undue litigation delays and financial harm.

## II. THE AUTOMATIC STAYS DOES NOT APPLY TO MOVANTS' PERSONAL CLAIMS

### A. The Scope of the Automatic Stays are Limited to Estate Property

Under **11 U.S.C. § 362(a)(3)**, the automatic stay prohibits actions to obtain possession of or exercise control over **property of the estate**. However, courts have ruled that claims owned by individuals **outside the bankruptcy estate are not subject to the automatic stays**:

- *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995) – The Supreme Court affirmed that the automatic stay does not extend to non-debtor third parties or their independent claims.

- *In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012) – Trustees cannot misuse the automatic stay to suppress third-party claims that do not belong to the bankruptcy estate.

- *In re Smart World Technologies, LLC*, 423 F.3d 166 (2d Cir. 2005) – Courts will not extend the stay to claims that do not affect estate assets.

**B. Movants' Claims are Separate from the Estate and Do Not Impact Creditors**

The claims at issue involve **personal rights** against **Joshua Wearmouth, Velanos, Resydency, Nordic Trust Alliance KB, Scarinci Hollenbeck, Warren Law Group, and Scott Oh, hereinafter referred to as "Defendants"**—none of whom are the debtor. These claims involve, but are not limited to:

- **Breach of contract**
- **Fraudulent misrepresentation**
- **Personal Financial Harm**
- **Personal Reputational Harm**
- **Legal Malpractice**

Movants are not seeking estate property, nor are these claims derivative of the debtor's rights. Courts have ruled that trustees **cannot expand the stays' protections** to shield non-debtor third parties:

- *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999-1002 (4th Cir. 1986) – Trustees cannot invoke the stay to protect non-debtor entities absent extraordinary circumstances.

**C. Velanos Settlement Supports Movants Standing in their Complaints**

The Trustee falsely asserts that the claims Movants have against Defendants are property of the bankruptcy estate. However, under *In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012), and *In re Smart World Techs., LLC*, 423 F.3d 166 (2d Cir. 2005), the **automatic stay applies only to estate assets, not independent claims.** Movants are asserting their own financial interests separate from the bankruptcy estate, over which the Trustee **has no legal authority**.

- o  The **Velanos Settlement Agreement (Exhibit 1** in *Doc. 107* of this matter) explicitly provides that it is binding upon and inures to the **benefit of Movants' successors, assigns, agents, heirs, and representatives.** The Trustee lacks legal authority to interfere with these claims, which **extend beyond the bankruptcy estate** and **are independently enforceable by Movants**.

- o  Additionally, the definition of **"Genie"** within the Settlement Agreement includes not only Genie itself but also its **predecessors, successors, assigns, officers, directors, employees, attorneys, agents, representatives, and heirs**. This definition further confirms that the **rights and obligations arising from the settlement extend beyond Genie itself**, reinforcing that Movants **retain independent standing** to enforce their claims.

- o  As stated by the Trustee, Velanos defaulted under the terms of the Settlement Agreement by failing to make the settlement payment due December 31, 2024, directly affecting the bankruptcy estate AND the Movants personally as shown above.

In this case, the **Trustee has wrongfully sought to include Movants' claims under the stays, despite their clear separation from the bankruptcy estate. Movants' complaints (Exhibits A**

**and B, Line 8 and Line 13 respectively) explicitly state that they are pursuing their personal claims, separate from any corporate or estate claims. The Trustee's continued assertion that these claims belong to the estate demonstrates either a failure to properly review/read the complaints or a deliberate attempt to mislead the Court by mischaracterizing Movants' legal position.**

### III. THE TRUSTEE'S SELECTIVE AND INCONSISTENT ENFORCEMENT OF THE STAY

**A. The Trustee Only Sought a Stay in Warren Law Group Case After It Was Pointed Out by Movants**

The Trustee **did not initially seek to stay the Warren Law Group case** but only did so **after Movants pointed out this omission.** (Line 5 subsection "Prior Discussions and Repeated Distractions" in Movants' AMENDMENT TO MOTION TO STRIKE TRUSTEE'S MOTION FOR AUTOMATIC STAY AS PROCEDURALLY IMPROPER, MOTION FOR RECONSIDERATION OF ORDER GRANTING TRUSTEE'S MOTION TO STRIKE MOVANTS' MOTION TO DISMISS ADVERSARY COMPLAINT, AND REQUEST FOR ADDITIONAL SANCTIONS FOR CLEAR BREACH OF FIDUCIARY DUTY) This demonstrates:

1. **Selective enforcement of the automatic stay** – The Trustee is using the stay **strategically** rather than lawfully.

2. **Bad-faith litigation** – If the Trustee believed the automatic stay applied, he **would have filed for stays in all cases simultaneously** rather than selectively seeking one only when challenged.

3. **Retaliatory litigation tactics** – This conduct aligns with the Trustee's previous pattern of selectively targeting Movants to suppress their independent claims.

**B. The Trustee's Use of the Stays Conflict with His Own Litigation Strategy**

- The Trustee initially allowed Movants' claims to proceed but later attempted to **suppress them after Movants challenged his misconduct.**

- The Trustee's actions are inconsistent with standard **bankruptcy practice,** where trustees either enforce a uniform stay **or allow independent claims to proceed.**

- The **Trustee has intentionally omitted all exhibits submitted with Movants' complaint against Joshua Wearmouth, Velanos, Resydency, and Nordic Trust Alliance KB,** which contained **exculpatory** and **critical evidence proving contractual breaches, and misrepresentation.** This omission is not a clerical error but a **deliberate effort to mislead the Court** and suppress material facts that support Movants' assets' claims and defenses. (**Exhibit B** of this motion.)

- Furthermore, Trustee intentionally wrote that Movants sued "Joshua Wearmouth and others," again, misleading the court.

- The **Trustee has intentionally misrepresented the nature of Movants' lawsuit** by selectively referring to the defendants as **"Joshua Wearmouth and others"** instead of

stating the **full and correct case title:** *John Michael Cohan and David Hughes v. Joshua Wearmouth, Velanos, Resydency, and Nordic Trust Alliance KB LLC.* By doing so, the **Trustee has deliberately misled the Court** into believing that the harm in question was solely caused by **Joshua Wearmouth and Velanos,** when in fact, additional defendants—including **Resydency and Nordic Trust Alliance KB LLC—are equally responsible.**

- **This omission is a material misrepresentation** intended to **obscure the Trustee's failure to pursue claims against all responsible parties.** The **Trustee is aggressively targeting insiders while deliberately avoiding legal action against the actual parties who caused harm,** namely **Scarinici Hollenbeck (successor to Warren Law Group), Scott Oh, Joshua Wearmouth, William Byrd, Velanos, Resydency, and Nordic Trust Alliance KB LLC.** This selective enforcement is a **clear abuse of discretion,** violating the Trustee's fiduciary duty under *Christensen v. Jubber (In re Christensen)*, 106 F.3d 403 (10th Cir. 1997), which holds that a **trustee owes duties to the entire estate, including beneficiaries, and must act with impartiality.**

- **The Trustee's failure to acknowledge all defendants while aggressively pursuing Insiders personally constitutes a violation of fundamental fairness and due process.** Courts have long recognized that a **trustee's selective enforcement of claims is evidence of bad faith and improper administration of the estate.** See *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) (holding that courts have inherent power to sanction bad-faith litigation tactics) and *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365 (2007) (trustee misconduct can justify judicial intervention).

- The **intentional omission of material parties from the Trustee's filings constitutes a violation of Florida Rules of Professional Conduct, Rule 4-3.3,** which **prohibits attorneys from knowingly making false statements or omitting material facts to mislead the Court.** The **Trustee's strategic failure to include the full case title is not a clerical oversight—<u>it is a deliberate effort to conceal their failure to pursue claims against all responsible parties</u>.**

- **Trustees are required to act in the best interest of the estate as a whole,** rather than selectively targeting certain individuals while ignoring equally or more culpable parties. By selectively omitting the full list of defendants, the Trustee has violated his **fiduciary duty of impartiality,** which mandates that they **administer the estate equitably** and **not favor certain creditors or insiders over others.** See **Uniform Trust Code (UTC) § 802,** which imposes a **duty of loyalty and impartiality upon fiduciaries.**

- **Movants respectfully request that the Court recognize this material misrepresentation and direct the Trustee to correct the record to reflect the full and complete list of defendants, as well as justify their failure to pursue claims against all responsible parties.** Furthermore, **this Court should view the Trustee's selective enforcement of claims as evidence of bad faith and an improper expansion of his authority over independent claims not belonging to the bankruptcy estate.**

This Court should **not allow the trustee to manipulate the bankruptcy process** by selectively enforcing stays and litigation **only when it serves their interests.**

**C. The Trustee Ignores Case Precedent and Good-Faith Discussions Regarding Personal Claims**

- **Movants had good-faith discussions with the Trustee,** presenting their **legal basis for their personal claims** and **outlining their companies' defenses in advance. (Exhibit B** of the TRUSTEE'S RESPONSE TO COMBINED MOTION FOR SANCTIONS AND PROTECTIVE ORDER AGAINST CHAPTER 7 TRUSTEE FOR RETALIATORY CONDUCT, ABUSE OF PROCESS, AND BREACH OF FIDUCIARY DUTY and **Exhibit G and H** of COMBINED MOTION FOR SANCTIONS AND PROTECTIVE ORDER AGAINST CHAPTER 7 TRUSTEE FOR RETALIATORY CONDUCT, ABUSE OF PROCESS, AND BREACH OF FIDUCIARY DUTY and **Exhibit C** of this motion) Instead of engaging in a fair resolution, the Trustee **proceeded with the stays and the Adversary Complaint.**

**D.  Legal Precedents Supporting Beneficiary Rights**

- It is well-established that beneficiaries hold equitable interests that are distinct from mere ownership. For instance, under **11 U.S.C. § 541(d)**, property in which the debtor holds only legal title, without an equitable interest, does not become part of the bankruptcy estate. This provision ensures that beneficiaries retain their equitable interests, preventing such property from being used to satisfy the debtor's obligations.

- Furthermore, in *Christensen v. Jubber (In re Christensen)*, the court acknowledged that a trustee owes fiduciary duties to the bankruptcy estate and its beneficiaries, not just the creditors or the estate in abstraction. This case underscores the legal recognition of beneficiaries' rights within bankruptcy proceedings. The Trustee's deliberate misrepresentation of Movants' status, in the TRUSTEE'S MOTION TO IMPOSE AN AUTOMATIC STAY, as "merely the owners and principals of the Debtor" constitutes a clear breach of fiduciary duty, as it disregards our rights as beneficiaries of the bankruptcy estate.

---

## IV. THE AUTOMATIC STAY CANNOT BE USED TO SUPPRESS MOVANTS' CONSTITUTIONAL RIGHTS

**A. Suppression of Due Process and Access to Courts**

The Supreme Court has ruled that procedural rules **cannot override constitutional protections**, including access to courts:

- *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) – Due process requires an opportunity to be heard before adverse rulings.

- *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) – Any ruling that deprives individuals of a fair opportunity to present claims violates constitutional protections.

Here, the Trustee's enforcement of the automatic stay has had **the practical effect of barring Movants from seeking legal redress** in non-bankruptcy courts. The **automatic stay was never**

**intended to be a tool for trustees to suppress constitutional rights.**

**B. The Trustee is Engaging in Procedural Suppression, Not Estate Protection**

- The Trustee's **first retaliatory demand letter** threatened **Movants personally** with sanctions for exercising their constitutional rights against Warren Law Group.

- The Trustee **issued back-to-back demand letters within a one half-hour period** in an effort to **coerce Movants into silence.**

- The Trustee's failure to **acknowledge Movants' personal legal standing** further demonstrates a pattern of **bad-faith litigation and abuse of process**.

- While the Trustee ignores Case Precedent and Good Faith discussions to suppress our constitutional protected individual claims, to the best of the Movants' knowledge, the Trustee has still refused to impose a stay on another matter that involves Joshua Wearmouth, Case No. 3:24-cv-02392-D, Exhibit K of Movants' REPLY TO TRUSTEE'S RESPONSE TO MOTION FOR SANCTIONS AND PROTECTIVE ORDER and also a part of Exhibit B of this Motion.

- <u>The record of abuse of process, retaliation, breach of fiduciary duty, and bad-faith litigation could not be more clear.</u>

**C. Trustee's Citations are Flawed**

- The **Trustee has improperly cited legal authority** in an attempt to expand the **automatic stay beyond its lawful scope** and suppress Movants' **personal claims** that do not belong to the bankruptcy estate. **The automatic stay under 11 U.S.C. § 362(a)(3) applies only to estate property,** preventing actions to obtain possession or control over assets that belong to the debtor's estate. However, **Movants' claims against Defendants are personal in nature, arising from direct contractual breaches and independent harm,** not from estate property or claims that the estate could have pursued. Courts have repeatedly held that **the automatic stay does not extend to independent claims brought by third parties.** See *In re Thorpe Insulation Co.*, 677 F.3d 869 (9th Cir. 2012) and *In re Smart World Techs., LLC*, 423 F.3d 166 (2d Cir. 2005).

- The **Trustee's reliance on** *Matter of Patel,* 642 B.R. 187 (Bankr. N.D. Ga. 2022), and *In re Howard*, 391 B.R. 511 (Bankr. N.D. Ga. 2008), **is misplaced.** These cases involved creditors seeking to collect estate assets, **not independent claimants pursuing their own damages.** *Patel* and *Howard* do not stand for the proposition that all claims related to a debtor's business become estate property; rather, they confirm that **only claims belonging to the debtor at the time of bankruptcy fall under the estate's control. Movants' claims arose post-petition and pertain to harm inflicted on them individually by Defendants, making them separate from the estate.**

- **Similarly, the Trustee's citation** to *In re Icarus Holding, LLC,* 391 F.3d 1315 (11th Cir. 2004), **is inapplicable,** as that case involved **pre-petition claims that had already been adjudicated as belonging to the debtor's estate.** In contrast, **Movants' claims against Defendants are not derivative of the estate** and do not belong to the debtor—they belong

to Movants in their individual capacities. See *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995) (confirming that the **automatic stay cannot extend beyond estate property**).

These actions do **not** serve the bankruptcy estate. Instead, they **unlawfully suppress independent claims** through procedural manipulation.

## V. THE COURT SHOULD LIFT THE STAY ON MOVANTS' PERSONAL CLAIMS

**Allowing the Stay to Remain Would Reward Bad-Faith Litigation**

- **A stay should not be used as a litigation weapon.** The Trustee is attempting to **shield non-debtors** while selectively enforcing bankruptcy protections.

- **Movants have been personally financially harmed** through unnecessary legal fees, loss of time at work and delays.

- **The Trustee's conduct warrants sanctions, not continued protection under the stay.**

## VI. CONCLUSION & PRAYER FOR RELIEF

For the foregoing reasons, Movants respectfully request that this Court:

1. **Lift the automatic stays on Movants' personal claims**, as they are independent of the bankruptcy estate.

2. **Reject the Trustee's improper attempt to extend the automatic stays to non-debtor third parties.**

3. **Acknowledge the Trustee's selective enforcement of the automatic stays** and his **inconsistent litigation strategy**.

4. **Sanction the Trustee for abuse of process, suppression of exculpatory evidence**, and **bad-faith litigation tactics**.

The record is clear: **Movants' claims do not belong to the estate, and the automatic stays should be lifted and not be used as a weapon to silence Movants.**

**Dated:** March 3, 2025

**Respectfully submitted in Good Faith,**

**John Michael Cohan and David Hughes, Pro Se**

# EXHIBIT A

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

**JOHN MICHAEL COHAN and DAVID HUGHES,**
Plaintiffs,

v.

**SCARINCI HOLLENBECK, LLC, as successor in interest to WARREN LAW GROUP, and SCOTT OH,**
Defendants.

**Case No.: _____**

---

### COMPLAINT FOR LEGAL MALPRACTICE, NEGLIGENCE, BREACH OF FIDUCIARY DUTY, BAD FAITH, FRAUD, COERCION, AND EXTORTION

Plaintiffs, **John Michael Cohan and David Hughes** (collectively, "Plaintiffs"), bring this action against **Scarinci Hollenbeck, LLC, as successor in interest to Warren Law Group, and Scott Oh** ("Defendants") for **legal malpractice, negligence, breach of fiduciary duty, bad faith, fraud, coercion, and extortion**, and allege as follows:

---

### I. PARTIES

1. **Plaintiff John Michael Cohan** is a resident of Florida and a **stakeholder** in **Genie Investments NV, Inc.**, which retained Defendants for legal services.

2. **Plaintiff David Hughes** is a resident of Illinois and a **stakeholder** in **Genie Investments NV, Inc.**, which retained Defendants for legal services.

3. **Defendant Scarinci Hollenbeck, LLC** is a law firm and the **successor entity to Warren Law Group**, following a **forward merger between the two entities**.

4. **Defendant Scott Oh** was, at all relevant times, a licensed attorney and a partner at **Warren Law Group, now part of Scarinci Hollenbeck, LLC**. It is **unknown whether Scott Oh's employment is still active**.

---

### II. JURISDICTION AND VENUE

5. This Court has **jurisdiction** pursuant to **28 U.S.C. § 1332**, as the controversy arises out of **actions conducted by Defendants that resulted in personal harm to Plaintiffs**, with one Plaintiff residing in Florida.

6. **Venue is proper** in the **Middle District of Florida, Jacksonville Division**, under **28 U.S.C. § 1391(b)**, as the acts giving rise to the claims occurred in this district, and one of the Plaintiffs resides in Florida.

7. The courthouse is located at **300 North Hogan Street, Jacksonville, Florida 32202.**

## III. FACTUAL BACKGROUND

### A. Personal Claims & Explicit Disclaimer

8. Plaintiffs **are not pursuing claims on behalf of Genie Investments NV, Inc.** or its bankruptcy estate.

9. Instead, this action is brought **solely for the personal financial losses, reputational harm, and emotional distress suffered by Plaintiffs** due to Defendants' misconduct.

10. Defendants' **malpractice, negligence, and fraudulent conduct** did not just harm Genie Investments NV, Inc., but also **personally harmed Plaintiffs,** who relied on Defendants for legal counsel and suffered **direct financial, reputational, and emotional damages** as a result.

### B. Adam Walker's Findings (Exhibit A)

11. Plaintiffs submit as **Exhibit A** the **sworn declaration of Adam B. Walker,** a **12-year veteran FINRA enforcement attorney** who routinely investigated **fraudulent financial schemes.**

12. Adam Walker's declaration provides **expert findings and factual evidence** that:

- **Defendants failed to conduct any meaningful due diligence** on Velanos Principal Capital;

- **Defendants ignored clear fraud warnings issued by federal regulators** (SEC, FBI, FTC, and U.S. Treasury);

- **Defendants misrepresented the SBLC transaction as "safe," despite clear fraud indicators;**

- **Defendant Oh failed to warn Plaintiffs of the substantial risk of personal financial harm.**

### C. Defendants' Failure to Provide Competent Legal Services

11. **Plaintiffs retained Defendants for personal and financial protection** regarding a **Joint Venture Agreement (JVA)** involving **Standby Letter of Credit (SBLC) trading.**

12. **Defendant Scott Oh failed to conduct any due diligence** on **Velanos Principal Capital,** despite being hired to **ensure that Plaintiffs were not personally exposed to risk.**

13. Defendant Oh ignored multiple **red flags of fraud,** including:

- **Unrealistic profit promises** (an 800% return within weeks);

- **Lack of transparency regarding transactions;**
- **Lack of documentation or proof of prior successful deals**.

**D. Misrepresentations That Directly Harmed Plaintiffs**

14. Defendant Oh **personally misrepresented** the legitimacy of the JVA, stating that **SBLC trading was "nothing safer"** and that he could **"monetize SBLCs in a day."**

15. Plaintiffs relied on these **misrepresentations,** which resulted in **personal financial exposure** and **substantial reputational harm**.

**E. Coercion and Extortion**

16. **Defendant Oh demanded Plaintiffs sign an escrow agreement after funds had already been deposited, leveraging his legal position to coerce compliance.**

17. He **withheld the release of funds until the agreement was signed,** effectively **extorting** Plaintiffs into paying a **0.5% legal fee** that was never disclosed or agreed upon beforehand.

18. Defendant **prioritized personal financial gain over his ethical obligations,** leading to **direct financial losses for Plaintiffs**.

**F. Reputational and Emotional Harm**

19. Plaintiffs' **personal and professional reputations** suffered due to **Defendant Oh's failure to disclose fraud risks,** associating Plaintiffs with a **fraudulent financial scheme**.

20. Plaintiffs **experienced extreme emotional distress,** including **anxiety and mental anguish,** due to **Defendants' coercion, misleading legal advice, and extortion tactics**.

---

## IV. CLAIMS FOR RELIEF

**COUNT I: LEGAL MALPRACTICE**

**Legal Standard:**
Under **Florida law,** legal malpractice occurs when an attorney:

1. **Owes a duty of care to the client,**

2. **Breaches that duty through negligence,**

3. **Proximately causes damage to the client.** See **Silvestrone v. Edell, 721 So. 2d 1173 (Fla. 1998).**

**Application:**

- Defendants **owed Plaintiffs a duty of care** in providing legal counsel.

- Defendant **failed to conduct due diligence,** ignored **red flags of fraud,** and **misrepresented the safety of the SBLC transaction**.

- As a **direct result of Defendants' legal malpractice,** Plaintiffs suffered **personal financial loss and reputational damage.**

**COUNT II: NEGLIGENCE**

**Legal Standard:**
Negligence under Florida law requires:

1. A **duty of care,**
2. A **breach of duty,**
3. **Causation,** and
4. **Damages.** See **Florida Statutes § 95.11(4)(a).**

**Application:**

- Defendants **failed to protect Plaintiffs** from an **obviously fraudulent financial transaction.**
- Plaintiffs **relied on Defendants' misrepresentations,** leading to **personal financial losses.**
- Defendants' negligence **directly resulted in economic harm to Plaintiffs,** independent of Genie Investments NV, Inc.

**COUNT III: BREACH OF FIDUCIARY DUTY**

**Legal Standard:**
Attorneys owe clients a **fiduciary duty of loyalty, honesty, and full disclosure.** See **Matter of Cooperman, 83 N.Y.2d 465 (1994).**

**Application:**

- Defendants **prioritized their own financial gain over their duty to Plaintiffs.**
- Defendants **failed to disclose risks** and **engaged in self-serving financial demands.**
- Plaintiffs **suffered personal financial losses and reputational harm as a result.**

**COUNT IV: BAD FAITH**

**Legal Standard:**
Bad faith arises when a party **intentionally acts dishonestly to benefit at another's expense.** See **Browning v. Peyton, 918 So. 2d 1071 (Fla. 2d DCA 2006).**

**Application:**

- Defendants **knowingly provided misleading legal advice** to Plaintiffs.
- Defendants **refused to disclose critical risks,** causing **financial losses.**

- Defendants **acted in bad faith by pressuring Plaintiffs into signing agreements under coercion.**

## COUNT V: FRAUD

**Legal Standard:**
Fraud requires:

1. A **false statement of material fact,**

2. **Knowledge that the statement is false,**

3. **Intent to induce reliance,**

4. **Justifiable reliance**, and

5. **Damages.** See **Butler v. Yusem, 44 So. 3d 102 (Fla. 2010).**

**Application:**

- Defendants **falsely claimed** SBLC trading was "safe" despite **knowing it was a high-risk, fraudulent investment scheme.**

- Plaintiffs **relied on these statements**, resulting in **personal financial harm.**

## COUNT VI: COERCION

**Legal Standard:**
Coercion occurs when a party **uses undue pressure or threats to influence another's decisions.** See **Fla. Stat. § 836.05** (criminal coercion).

**Application:**

- Defendant Oh **withheld the release of funds,** effectively **forcing Plaintiffs to sign an escrow agreement under duress.**

- This **coerced financial loss personally harmed Plaintiffs.**

## COUNT VII: EXTORTION

**Legal Standard:**
Extortion occurs when one **forces another to provide money or benefits under threat.** See **Florida Statutes § 836.05.**

**Application:**

- Defendant Oh **refused to return funds until Plaintiffs agreed to pay unjustified fees.**

- This **constituted extortion**, resulting in **personal financial harm to Plaintiffs.**

---

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1. **Compensatory Damages:**
   - $10 million for personal financial losses, reputational harm, and diminished business opportunities.

2. **Emotional Distress Damages.**

3. **Punitive Damages.**

4. **Legal Fees and Costs.**

**Dated:** 02-14-2025

**Respectfully submitted,**

**JOHN MICHAEL COHAN and DAVID HUGHES**

# UNITED STATES BANKRUPTCY COURT

## MIDDLE DISTRICT OF FLORIDA

### JACKSONVILLE DIVISION

In re:

GENIE INVESTMENTS NV, INC.

Debtor.

Case No.: 3:24-bk-00496-BAJ

Chapter 11

## DECLARATION OF ADAM B. WALKER

STATE OF MISSOURI

COUNTY OF JACKSON

The undersigned, ADAM B. WALKER, declares as follows:

1. I, ADAM B. WALKER, am an attorney licensed to practice in Missouri. I am the owner and manager of Walker Law Office, LLC d/b/a AW Securities Law. I previously worked for more than 12 years as an enforcement lawyer for the Financial Industry Regulatory Authority (FINRA), where I routinely investigated fraudulent and potentially fraudulent investment activity.

2. I began representing Genie Investments in or around July 2023 at the request of one of its owners, David Hughes. I had previously done legal work for another business in which Mr. Hughes also has an ownership interest. Before July 2023 I was aware that Genie existed and that it was in the lending business, but I had no other knowledge of or involvement with Genie.

3. In July 2023, Genie asked me to help resolve a contract dispute between it and Velanos Principal Capital. I learned that Genie and Velanos had executed a "Joint Venture Agreement" (JVA) in October 2022 and subsequently amended it three times. Through conversations with

Genie's principals and review of the JVA and its amendments, I learned the essential terms of the agreement, which were:

- Genie and Velanos agreed to form a joint venture.

- Genie agreed to contribute $9.0 million in capital to the joint venture.

- Velanos agreed to use the $9.0 million capital contribution to buy and sell standby letters of credit (SBLCs).

- Velanos agreed to distribute profits from the SBLC transactions to Genie within 60 days of Genie's capital contributions.

- The JVA, as amended, stated that Velanos would return a total of $75 million to Genie, consisting of the $9.0 million capital contribution and $66 million in profits.

4. As of July 2023, Velanos had not distributed any profits to Genie and had returned only $500,000 of its capital contributions. Velanos was, therefore, in material breach of the JVA.

5. I also learned that Genie, shortly before executing the JVA, retained an attorney, referred to herein as "SO," to represent it with respect to what was then the "proposed joint venture" between Genie and Velanos. SO was and still is a partner with an established New York-based law firm.

6. Almost immediately after talking with Genie about the Velanos transaction and reviewing the JVA, I strongly suspected that the SBLC-trading program offered by Velanos was fraudulent. With minimal research, I found numerous judicial opinions, press releases, and other materials supporting my suspicions. The U.S. Securities and Exchange Commission, Federal Bureau of Investigation, Federal Trade Commission, and U.S. Department of Treasury, in addition to other regulators and law-enforcement agencies, have in recent years issued warnings to the public about fraudulent prime-banking scams, including many involving fictitious SBLC trading.

7. On or about July 24, 2023, I spoke with SO by telephone for approximately one hour to talk, among other things, about his review of the JVA, his knowledge of and experience with

2

SBLC trading, and whether he viewed the investments as potentially fraudulent or had any other reservations about Genie entrusting its capital to Velanos for the purposes described in the JVA.

8.  SO told me that he had extensive background with SBLCs, which he characterized as a legitimate investment used in "high level trade finance." He described SBLC trading as a "financing mechanism" that arose from the 1944 Bretton-Woods agreement, which created the World Bank and the International Monetary Fund.

9.  SO represented that Velanos, as promised, had used the $9.0 million in capital that Genie contributed to the joint venture to make profitable SBLC trades. SO acknowledged, however, that he had never received detailed information about any SBLC transactions that Velanos supposedly made.

10. I asked SO to describe how SBLC trading could generate massive profits in a matter of weeks. His response lacked detail. He stated only that it was a "rinse and repeat" process of buying SBLCs at a discount with ensuing profitable sales already prearranged. SO also repeatedly stated that there is "just a lot of leverage that's involved" or some variation thereof.

11. I asked SO if he was aware that SBLC trading was a frequent subject of fraud alerts and enforcement actions, both civil and criminal, by the federal government; he said that he was, but contended nonetheless that what Velanos promised Genie was not fraud. When I asked him how he knew that what Velanos promised was different from the numerous and well-publicized instances of fraud involving SBLCs, he stated that Velanos had "syndicated" the funds. He added, however, that he did not know the particulars of Velanos' ostensible syndication arrangement.

12. I have conducted extensive research into SBLC and other "prime banking" scams. In doing so, I learned that certain phrases, terms, and references are common among SBLC scams. The JVA contains several such phrases and terms. Likewise, SO described SBLC trading to me as

3

"royal-family type stuff" that happens every day, although not in the United States. According to SO, the U.S. government does not want its citizens involved in SBLC trading. Such assertions are often cited by law enforcement and regulators as markers of SBLC and other varieties of prime-banking fraud.

13. The JVA contains other "red flags" of fraud. For example, Velanos promised to generate an extremely high rate of return – more than 800% – in a matter of weeks. It is also, in my professional opinion, very poorly drafted, with some passages best described as gibberish.

14. Genie terminated its representation by SO and his law firm on or around July 24, 2023. On Genie's behalf, I requested all records from SO's representation of Genie. After several weeks' delay, SO provided what he described as the complete client file. That file, which I have reviewed, contains no documentation indicating that SO:

- conducted any meaningful investigation into Velanos, its principals, or its affiliates,

- noted any red flags in the JVA or any potential that the proposed investment was fraudulent,

- advised Genie of any appreciable risk of losing all or a portion of its principal, or

- mentioned to Genie that the transaction bore similarities to a well-known and heavily publicized type of investment fraud.

15. Based on my investigation and analysis of the JVA and my research into prime-banking fraud, I believe the SBLC trading Velanos promised to conduct with Genie's money was at all times fictitious and blatantly fraudulent.

16. Based on my communications with SO and my review of the client file obtained from him, I believe that SO's review of the JVA was inadequate; that he failed to conduct an appropriate and thorough investigation of the transaction, Velanos, and/or its principals and affiliates; and that, as a result, he likely did not discharge his professional obligations to Genie. For these reasons, it

is my opinion that Genie has a colorable claim against its former lawyer and law firm for professional malpractice. I am not equipped, however, to estimate any potential recovery if Genie were to pursue such an action.

17. Although many outside observers now impugn Genie's business judgment and competence for having invested in a fraudulent enterprise, it is critical to acknowledge that Genie did so only after receiving the advice of a licensed attorney from a well-regarded law firm, which it retained specifically to guard against placing its money in an illegitimate investment. Whatever one might say with the benefit of hindsight, the proper lens for evaluating Genie's competence to manage its affairs requires consideration of its entire operating history and the fact that it sought, paid for, and relied on the assistance of legal counsel that, by all appearances, had the experience and knowledge to advise it appropriately.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 14, 2024.


_____

Adam B. Walker

WALKER LAW OFFICE, LLC d/b/a AW
SECURITIES LAW

5

# EXHIBIT B

**IN THE CIRCUIT COURT OF THE FOURTH JUDICIAL CIRCUIT IN AND FOR DUVAL COUNTY, FLORIDA CIVIL DIVISION**

**CASE NO.:** _____

**JOHN MICHAEL COHAN and DAVID HUGHES,**
Plaintiffs,
vs.
**JOSHUA WEARMOUTH, VELANOS, RESYDENCY and NORDIC TRUST ALLIANCE KB, LLC,**
Defendants.

## COMPLAINT

Plaintiffs, **JOHN MICHAEL COHAN and DAVID HUGHES**, file this Complaint against **JOSHUA WEARMOUTH, VELANOS, RESYDENCY, and NORDIC TRUST ALLIANCE KB, LLC** ("Defendants") and allege as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to **Fla. Stat. § 48.193**, as Defendants have conducted business in Florida, and the events giving rise to this action occurred in Duval County.

2. Venue is proper in Duval County under **Fla. Stat. § 47.011**, as the causes of action arose in this jurisdiction.

### PARTIES

3. Plaintiff **John Michael Cohan** is a resident of Florida.

4. Plaintiff **David Hughes** is a resident of Illinois.

5. Defendant **Joshua Wearmouth** is an individual residing at **20101 Southwest Cypress Street, Newport Beach, California 92660**.

6. Defendant **Velanos** is a business entity registered in Wyoming but conducting business in Florida.

7. Defendant **Resydency** is a business entity operating in Florida and is believed to be holding real estate assets that were purchased using funds obtained through illegal and fraudulent transfers.

8. Defendant **Nordic Trust Alliance KB, LLC** is a limited liability company operating in Florida.

## FACTUAL ALLEGATIONS

9. Plaintiffs entered into a **Settlement Agreement and subsequent amendments** with Defendants on **May 15, 2024,** to resolve prior disputes stemming from financial dealings between the parties.

10. Under the terms of the Settlement Agreement and its amendments, Defendants agreed to make installment payments to Plaintiffs in a timely manner.

11. Despite these clear obligations, **Defendants defaulted on their obligations,** failing to make the required payments as outlined in the Settlement Agreement and amendments.

12. Plaintiffs relied on the Defendants' representations and suffered financial harm as a result of their non-compliance.

13. **This action does not assert any business-related claims nor does it seek any relief related to Genie Investments NV or its estate claims.**

14. Plaintiffs also suffered **personal reputational harm** due to the Defendants' wrongful conduct, which resulted in financial instability and damage to their credibility.

15. Plaintiffs believe that **Resydency is holding real estate that was purchased using funds obtained through fraudulent and illegal financial transfers facilitated by the Defendants**.

16. According to the **Declaration of Adam B. Walker,** a former enforcement attorney with the Financial Industry Regulatory Authority (FINRA), the financial transactions orchestrated by Velanos included **fraudulent SBLC (Standby Letter of Credit) trading schemes,** which have been widely recognized as fraudulent by multiple U.S. government agencies.

17. The Declaration further states that Genie Investments NV was promised an **800% return on investment** through these fraudulent schemes and was misled by Velanos and its affiliates.

18. Plaintiffs allege that funds originating from these fraudulent transactions were subsequently transferred to Resydency and used to acquire real estate assets, constituting **fraudulent conveyance and unjust enrichment.**

## CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT

19. Plaintiffs reallege and incorporate paragraphs 1-18 as if fully set forth herein.

20. The Settlement Agreement and subsequent **amendments** were valid and binding contracts between Plaintiffs and Defendants.

21. Defendants **breached** the contract by failing to make payments as required, in violation of **Fla. Stat. § 672.703.**

22. As a result, Plaintiffs have suffered damages in excess of **$66,000,000.**

23. Plaintiffs demand judgment for damages, attorneys' fees, and any other relief deemed just and proper under **Fla. R. Civ. P. 1.100**.

## COUNT II – FRAUDULENT MISREPRESENTATION

24. Plaintiffs reallege and incorporate paragraphs 1-18 as if fully set forth herein.

25. Defendants made **false and misleading statements** regarding their financial capabilities and intention to honor the settlement, violating **Fla. Stat. § 817.034 (Florida Communications Fraud Act)**.

26. Plaintiffs reasonably relied on these representations to their detriment.

27. As a result of Defendants' fraudulent misrepresentations, Plaintiffs have suffered significant financial and reputational damages.

28. Plaintiffs seek **compensatory and punitive damages** in an amount to be determined at trial, pursuant to **Fla. Stat. § 768.72**.

## COUNT III – UNJUST ENRICHMENT AND FRAUDULENT CONVEYANCE

29. Plaintiffs reallege and incorporate paragraphs 1-18 as if fully set forth herein.

30. Defendants received financial benefits from Plaintiffs without providing fair consideration in return, violating the principles set forth in **Ruck Bros. Brick v. Kellogg & Kimsey, Inc., 668 So. 2d 205 (Fla. 2d DCA 1995)**.

31. Plaintiffs seek **restitution and disgorgement** of the improperly retained funds, including any real estate assets held by Resydency that were obtained through fraudulent means.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

1. Compensatory damages in an amount to be proven at trial greater than **$66,000,000**;

2. Punitive damages for fraudulent misrepresentation under **Fla. Stat. § 768.72**;

3. Pre- and post-judgment interest under **Fla. Stat. § 55.03**;

4. Attorneys' fees and costs pursuant to **Fla. Stat. § 57.105**;

5. A declaration that **Resydency holds real estate assets obtained through fraudulent and illegal financial transfers** and an order for their disgorgement;

6. Any other relief this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues triable as of right under **Fla. R. Civ. P. 1.430**.

Dated: 02-14-2025

**Respectfully submitted,**

**John Michael Cohan and David Hughes**
**Plaintiffs**

DocuSign Envelope ID: ECE307DC-B04C-4E79-9B71-46C15018BEDE

## SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This Settlement Agreement and Release of Claims (the "Settlement Agreement") is entered into effective May 15, 2024 between (1) Genie Investments NV, a Nevada corporation ("Genie"), and (2) Velanos Principal Capital, a business entity registered in Ontario, Canada ("Velanos"), with respect to the following:

    a.  On or about October 21, 2022, Genie and Velanos (individually "Party" and collectively "the Parties") entered into a "Joint Venture Agreement" ("JVA").

    b.  On October 25, 2023, Genie commenced an arbitration proceeding (the "Arbitration") against Velanos with JAMS, seeking a determination that Velanos materially breached the JVA and an award of damages.

    c.  On February 6, 2024, Genie filed a lawsuit in the U.S. District Court for the Middle District of Florida, case number 6:24-cv-00271 (the "Florida Litigation"), in which it asserted claims related to the JVA against multiple defendants other than Genie.

    d.  Genie and Velanos now wish to settle their dispute and resolve both the Arbitration and the Florida Litigation according to the terms set forth below.

NOW, THEREFORE, in consideration of the following mutually agreed covenants and other valuable consideration, the receipt and sufficiency of which is acknowledged, the Parties agree as follows:

    1.  <u>Definitions</u>. For purposes of this Settlement Agreement, the following definitions shall apply:

    A.  "Genie" means and includes its predecessors, successors, assigns, parents, subsidiaries, affiliates, officers, directors, employees, shareholders, attorneys, agents, representatives and heirs, and any person or entity who may claim by or through any of them.

    B.  "Velanos" means and includes its predecessors, successors, assigns, parents, subsidiaries, affiliates, officers, directors, employees, shareholders, attorneys, agents, representatives and heirs, and any person or entity who may claim by or through any of them.

    C.  "Trading Account Interest" refers to Velanos' ownership interest in the account ("Trading Account") described and identified in Section 3 of this Settlement Agreement and **Exhibit B** hereto.

1

2.  <u>Settlement Amount</u>. Velanos shall pay Genie the total sum of Fifteen Million ($15,000,000.00) dollars (the "Settlement Amount"). The Settlement Amount shall be paid to Genie in ten installments ("Installment Payments"), as follows:

    A.  The first Installment Payment shall be completed within two (2) business days of the effective date of the Settlement Agreement, in the amount of fifty thousand dollars ($50,000.00).

    B.  The second Installment Payment shall be completed on or before June 30, 2024, in the amount of five hundred thousand dollars ($500,000.00).

    C.  The third Installment Payment shall be completed on or before September 30, 2024, in the amount of one million dollars ($1,000,000.00).

    D.  The fourth Installment Payment shall be completed on or before December 31, 2024, in the amount of two million dollars ($2,000,000.00).

    E.  The fifth Installment Payment shall be completed on or before March 31, 2025, in the amount of two million dollars ($2,000,000.00).

    F.  The sixth Installment Payment shall be completed on or before June 30, 2025, in the amount of two million dollars ($2,000,000.00).

    G.  The seventh Installment Payment shall be completed on or before September 30, 2025, in the amount of two million dollars ($2,000,000.00).

    H.  The eighth Installment Payment shall be completed on or before December 31, 2025, in the amount of two million dollars ($2,000,000.00).

    I.  The ninth Installment Payment shall be completed on or before March 31, 2026, in the amount of two million dollars ($2,000,000.00).

    J.  The tenth Installment Payment shall be completed on or before June 30, 2026, in the amount of one million four hundred and fifty thousand dollars ($1,450,000.00).

Unless otherwise instructed by Genie in accordance with the requirements set forth below, Velanos shall direct all Installment Payments to the account (the "Recipient Account") identified in **Exhibit A** to this Settlement Agreement. At any time, Genie may, at its sole discretion, designate a different Recipient Account by providing Velanos with written notice identifying the alternate Recipient Account at least fifteen (15) business days before the Installment Payment's due date.

An Installment Payment will be considered completed as of the time it is received in the Recipient Account, as reflected in the records of the bank where the Recipient Account is held. An Installment Payment shall be deemed timely completed if it is received in the Recipient Account prior to 11:59 PM Central time on its due date.

3.  <u>Confidential Trading Account Information; Immediate Disclosure of Account Documents Upon Event of Default</u>. Concerning the Trading Account and Trading Account Interest, Velanos represents and warrants that its owner and CEO, Joshua Wearmouth, has duly executed the

DocuSign Envelope ID: ECE307DC-B04C-4E79-9B71-46C15018BEDE

affidavit attached as **Exhibit B** to this Settlement Agreement with full authority to do so. Velanos further represents and agrees that:

A. Velanos is the sole owner of the Trading Account Interest.

B. The present principal value of the Trading Account Interest is at least $5,000,000.

C. Velanos has provided  its legal counsel with unredacted copies of documentation (collectively, "Account Documents") concerning the Trading Account and the Trading Account Interest, including, but not limited to: (i) any and all agreements showing Velanos' ownership share in the Trading Account, (ii) any and all agreements governing activity in or administration of the Trading Account, (iii) statements created by or obtained from the showing all activity in the Trading Account since its formation, and (iv) such other documents as necessary to give the holder of the Account Documents all information necessary to locate the Trading Account, accurately assess the value of the Trading Account Interest, and understand any salient restrictions on the ability of the owner(s) of the Trading Account Interest to access the principal and profits therein.

D. Velanos agrees to supplement the information and documentation it has provided to its legal counsel pursuant to Section 3(C) of this Settlement Agreement either on or before the due date for each Installment Payment or more frequently, in the event of any material change the terms governing the Trading Account or of any communication from, or public statement by, the entity administering the Trading Account indicating that the Trading Account will or may be closed during the term of this Settlement Agreement.

E. Velanos authorizes and instructs its legal counsel to hold the Account Documents in trust during the term of this Settlement Agreement. Upon the occurrence of any Event of Default under this Settlement Agreement, however, Genie shall have the right to request and immediately obtain from Velanos' legal counsel all Account Documents. Notwithstanding any obligations to the contrary, Velanos authorizes and instructs its legal counsel to make immediate delivery of the Account Documents to Genie, and to provide Genie any other documents or information reasonably necessary for Genie to enforce the arbitration award and/or judicial confirmation described in Section 6 of this Settlement Agreement, upon the occurrence of any Event of Default.

F. If, during the term of this Settlement Agreement, the legal counsel identified herein ceases to represent Velanos in connection with this matter, then Velanos shall immediately: (i) engage substitute legal counsel, (ii) provide Genie written notice of the change in legal counsel and the identity of Velanos' substitute legal counsel, and (iii) authorize, instruct, and equip its substitute legal counsel to perform each of the duties described in this Section.

G. The Parties agree that failure to comply fully and timely with any portion of this Section shall result in additional damages to Genie, for which Velanos shall immediately be liable to Genie in the amount of one hundred thousand dollars ($100,000.00). This amount constitutes liquidated damages, and not penalties, and is additional to all other rights of Genie hereunder, including the right to declare an Event of Default. The Parties further acknowledge that (i) the amount of loss or damages likely to result from

3

DocuSign Envelope ID: ECE307DC-B04C-4E79-9B71-46C15018BEDE

a violation of this Section is incapable of precise determination, (ii) the amount specified herein bears a reasonable relationship to, and is not plainly or grossly disproportionate to, the loss likely to result from a violation of this Section, and (iii) the Parties have agreed to the liquidated-damages amount because of the uncertainty and presumptive costs of litigating the question of actual damages.

4.   Genie's Release of Velanos. Subject to the conditions set forth in this Settlement Agreement, Genie hereby releases and forever discharges Velanos from any and all liabilities, damages, costs, expenses, contracts, obligations, accounts, torts, causes of action, suits or claims of every nature, whether known or unknown, contingent or otherwise, or which may accrue in the future, arising from or in consequence of the JVA, including but not limited to all claims that were or could have been asserted in the Arbitration, *provided, however*:

A.   This release shall not apply to claims arising out of the enforcement of this Settlement Agreement.

B.   Genie's release of any rights, claims, causes of action, damages, liabilities or demands, whether in law or in equity, against Velanos shall be of no force and effect until the successful completion of all Installment Payments contemplated by this Settlement Agreement.

C.   Any Event of Default by Velanos shall void the release set forth in this paragraph.

5.   Velanos' Release of Genie. Velanos hereby releases and forever discharges Genie from any and all liabilities, damages, costs, expenses, contracts, obligations, accounts, torts, causes of action, suits, or claims of every nature, whether known or unknown, contingent or otherwise, or which may accrue in the future, arising from or in consequence of the JVA.

6.   Consent Award in Arbitration and Judicial Confirmation Thereof. The Parties agree that, within three (3) business days of the effective date of this Settlement Agreement, they will jointly submit and request entry of a proposed Consent Award pursuant to Rule 28(c) of the Comprehensive Arbitration Rules & Procedures of JAMS Arbitrators and Arbitration Services. The Consent Award submitted by the Parties is attached as **Exhibit C** to this Settlement Agreement and, in pertinent part, states that Genie is awarded damages totaling twenty million dollars ($20,000,000.00), which amount is due and payable by Velanos within fifteen (15) calendar days of the Consent Award's entry.

A.   Immediately upon entry of the Consent Award, Genie shall, at its sole discretion, have the option to apply to any court of competent jurisdiction for confirmation of the Consent Award and, thereby, obtain a valid and enforceable judgment against Velanos for the full amount of the arbitration award, plus post-judgment interest at the rate of nine percent (9.0%) annually.

B.   Velanos agrees not to oppose or challenge any such application by Genie for judicial confirmation of the arbitration award. Violation of this subparagraph by Velanos shall result in additional damages to Genie, for which Velanos shall be immediately liable to Genie in the amount of one million dollars ($1,000,000.00), plus interest accruing at an annual rate of nine percent (9.0%) from the date of the violation. This amount constitutes liquidated damages, and not penalties, and is additional to all other rights of

4

DocuSign Envelope ID: ECE307DC-B04C-4E79-9B71-46C15018BEDE

Genie hereunder, including the right to declare an Event of Default. The Parties further acknowledge that (i) the amount of loss or damages likely to result from a violation of this Section is incapable of precise determination, (ii) the amount specified herein bears a reasonable relationship to, and is not plainly or grossly disproportionate to, the loss likely to result from a violation of this Section, and (iii) the Parties have agreed to the liquidated-damages amount because of the uncertainty and presumptive costs of litigating the question of actual damages.

C. Genie agrees that it will not seek to collect on the arbitration award, or on any judgment confirming the arbitration award, prior to either (i) the occurrence of any Event of Default or (ii) an indication by Velanos, through either words or actions, that an Event of Default is imminent.

D. If the arbitrator in the Arbitration refuses to enter an Award that is identical or substantially identical in substance to the proposed Consent Order submitted by the Parties, then the Parties shall have seven (7) calendar days from the date on which JAMS notified the Parties of that fact to reach a mutually agreeable amendment of this Settlement Agreement. If they are unable to do so within that time, then this Settlement Agreement shall have no further force or effect.

7. <u>Dismissal of Florida Litigation</u>. No later than three (3) business days after the receipt of the second installment payment, Genie will file a Motion to Dismiss the Florida Litigation without prejudice. Velanos agrees to consent to that motion and to take no action to oppose or contest the motion or to delay the Court's action regarding it.

8. Genie agrees that it will not, prior to the occurrence or reasonable anticipation of any Event of Default by Velanos, make contact in any manner whatsoever with any person or entity whom Genie knows to be a partner, asset holder, bank officer, escrow officer, or paymaster of Velanos, with the exception of any persons or entities with whom Genie, its principals, or its representatives had a prior business relationship, for the purposes of obtaining information about or interfering with any of Velanos' existing or prospective business relationships.

9. <u>Events of Default</u>. For purposes of this Settlement Agreement, "Events of Default" include the following:

A. Failure of Velanos to make any Installment Payment when due.

B. Failure of Velanos to perform or observe any of Velanos' covenants or agreements contained in this Settlement Agreement.

C. The depletion of the principal amount of Velanos' ownership share in the Trading Account below five million dollars ($5,000,000.00) at any time before Velanos' satisfaction in full of all of the obligations imposed on it by this Settlement Agreement, regardless of whether such depletion results from any action of failure to act by Velanos or from any external factor, including trading losses, market forces, or the action or inaction of any third party or parties.

D. Failure of Velanos to comply with every aspect of Paragraph 11 ("Security Interest") of this Settlement Agreement.

DocuSign Envelope ID: ECE307DC-B04C-4E79-9B71-46C15018BEDE

E.  The sale or other transfer by Velanos of all or any material part of its property or assets except in the usual and ordinary course of the operation of its business; or a change in the general character, or suspension of any significant part, of Velanos' business.

F.  Actions by or on behalf of Velanos to: (1) make an assignment for the benefit of creditors or petition or apply to any tribunal for the appointment of a custodian, receiver, or trustee for it or a substantial part of its assets, (2) commence any proceeding under any bankruptcy, reorganization, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect, (3) have any such petition or application filed or any such proceeding commenced against it that is not dismissed within thirty (30) days, (4) indicate, by any act or intentional and purposeful omission, its consent to, approval of or acquiescence in any such petition, application, proceeding or order for relief or the appointment of a custodian, receiver or trustee for it or a substantial part of its assets, or (5) suffer any such custodianship, receivership or trusteeship that continues undischarged for a period of thirty (30) days or more.

G.  Entry against Velanos of a judgment or decree in excess of Fifty Thousand Dollars ($50,000) that becomes non-appealable and remains undischarged, unsatisfied by insurance or otherwise, and unstayed for more than thirty (30) days.

H.  The existence of a default or an event that, with the giving of notice (1) would constitute a default, under any other indebtedness of Velanos, for borrowed money or (2) would cause (or would permit any holder of such indebtedness or trustee to cause) such indebtedness, or a portion thereof in an aggregate amount exceeding Fifty Thousand Dollars ($50,000.00), to become due prior to its stated maturity or prior to its regularly scheduled dates of payment.

I.  Violation by Genie of Paragraph 8 of this Settlement Agreement.

10.  Default. Upon the occurrence of any "Event of Default," as described in Paragraph 9 of this Settlement Agreement:

A.  The entire amount of the Consent Award and any court judgment confirming that award, including all accrued post-judgment interest thereunder, and less the total amount of Installment Payments completed as of the Event of Default, shall, without any prior notice, presentment, or demand, become immediately due and payable in full.

B.  Genie shall immediately have the right to take any and all legal action it deems proper to enforce the Consent Award and/or any court judgment confirming that award.

C.  Genie shall immediately have the right to take any and all legal action it deems proper, including but not limited to reinstating the Florida Litigation.

D.  Genie shall be entitled to recover any and reasonable attorney's fees, costs, and expenses that it reasonably incurs as a result of Velanos challenging or contesting any action taken by Genie based in furtherance of the rights created under this Paragraph, absent a ruling by a court of competent jurisdiction that Velanos' challenge or contest of such action is valid.

11. <u>Security Interest</u>. As security for the prompt and full satisfaction of the outstanding balance of all sums due under this Settlement Agreement or under the Consent Award, Velanos agrees that Genie shall have, and Velanos hereby grants and pledges to Genie, a security interest in all: accounts, chattel paper, commercial tort claims, deposit accounts, documents, general intangibles, goods, instruments, investment property, letter-of-credit rights, money, insurance and insurance claims, supporting obligations, and all other personal and fixture property, whether governed by Article 9 of the Uniform Commercial Code ("UCC") or other law wherever located, whether now owned or hereafter acquired or arising, and all proceeds and products thereof (collectively, the "Collateral").

A. In addition to all rights and remedies given to Genie by this Settlement Agreement, Velanos and Genie agree that this Settlement Agreement constitutes a security agreement under the UCC, and that Genie shall have all the rights and remedies of a secured party thereunder.

B. Velanos agrees that it shall preserve and protect Genie's security interest in the Collateral and that it shall not, without Genie's prior written consent, grant or create or permit to attach or exist any mortgage, security interest, lien, judgment, or other encumbrance of or in the Collateral or any portion thereof, other than the security interest provided for in this Settlement Agreement.

C. Velanos agrees to provide from time to time at Genie's reasonable request such additional redacted documents or instruments, for Genie to perfect and maintain its security interest in the Collateral. Velanos consents to Genie filing or causing to be filed or recorded, such instruments, documents, or notices, including assignments, financing statements, and continuation statements as Genie may deem necessary or advisable from time to time in order to perfect, to continue perfected, and to preserve the priority of the lien and security interest in the Collateral granted pursuant to this Settlement Agreement.

12. <u>Entire Agreement; No Parol Evidence</u>. This Settlement Agreement is a complete integration of the Parties' agreement and constitutes the entire agreement between them with respect to the subject matter hereof. This Settlement Agreement supersedes any and all other oral or written communications, representations, understandings, agreements, negotiations and discussions between the Parties and their attorneys. No parol evidence shall be admissible to interpret, explain, vary, or supplement this Settlement Agreement.

13. <u>Modification and Waiver</u>. No provision of this Settlement Agreement may be changed, altered, or modified except in writing signed by the Parties. The failure of either Party to enforce any provision of this Settlement Agreement shall not be construed as a waiver or modification of such provision, or impairment of its right to enforce such provision or any other provision of this Settlement Agreement thereafter. No waiver of any term or right in this Settlement Agreement shall

DocuSign Envelope ID: ECE307DC-B04C-4E79-9B71-46C15018BEDE

be effective unless set forth in writing and signed by an authorized representative of the waiving Party.

14. <u>Severability</u>. If any term of this Settlement Agreement is determined, either by a court of lawful jurisdiction or by the parties' mutual agreement, to be invalid, illegal, or otherwise unenforceable, then

    A. The Parties shall use all reasonable efforts to negotiate in good faith to amend the term to eliminate any such invalidity, illegality, or unenforceability to the extent practically possible, taking into full account their original intent when entering into this Agreement in the first instance, and

    B. The remaining provisions hereof shall continue in full force and effect.

15. <u>Pendency of Bankruptcy Proceedings</u>. The Parties acknowledge that this Settlement Agreement is contingent upon the approval of this Settlement Agreement and confirmation of the Genie Chapter 11 plan in case number 3:24-bk-00496-BAJ pending in the Middle District of Florida Jacksonville Division of the United States Bankruptcy Court. To the extent that there is a Trustee appointed in that bankruptcy case, the Settlement Agreement is not approved by the Court, and/or Genie's Chapter 11 Plan is not confirmed with the essential terms of this Settlement Agreement incorporated into such confirmation, then the Settlement Agreement shall be voided as to any remaining obligations by all parties.

16. <u>Choice of Law and Venue</u>. This Settlement Agreement shall be governed in all respects by the laws of the state of New York, including as to interpretation, enforceability, validity, and construction. The Parties also agree that the venue for any legal action to enforce the provisions of this Settlement Agreement, or any document executed in connection with this Settlement Agreement, shall be in the state of New York. The Parties agree they will not contest the choice of law and venue provisions in this Section.

17. <u>Construction</u>. Because this Settlement Agreement was the result of arms-length negotiations between the Parties and their respective attorneys, no party shall be considered the drafter; consequently, the rule of construction that all conflicts and ambiguities should be construed against the drafter shall not be employed in the interpretation of this Settlement Agreement.

18. <u>Attorney's Fees and Costs in Enforcement of the Agreement</u>. If either Party incurs any attorney's fees, costs, or expenses in any proceeding to enforce the terms of this Settlement Agreement or any of the rights provided hereunder, the prevailing Party shall be entitled to recover

DocuSign Envelope ID: ECE307DC-B04C-4E79-9B71-46C15018BEDE

its reasonable attorney's fees and any court, arbitration, mediation, or other litigation expenses from the other Party.

19. <u>References to Time</u>. Unless otherwise specified, references to time periods in this Settlement Agreement refer to calendar days.

20. <u>Successors and Assigns</u>. This Settlement Agreement shall be binding upon and inure to the benefit of the Parties' successors, assigns, agents, heirs, and personal representatives.

21. <u>Third Parties</u>. This Settlement Agreement shall not confer any rights or remedies upon any third party other than the Parties to this Settlement Agreement and their respective successors, assigns, agents, heirs, and personal representatives. The Parties have not transferred, by assignment or otherwise, any of the claims released in this Settlement Agreement.

22. <u>Counterparts</u>. This Settlement Agreement may be executed in one or more counterparts, all of which shall be considered one instrument, and a copy or facsimile of each will be deemed an original and shall be binding when one or more counterparts have been signed by each of the parties.

23. <u>Advice of Counsel</u>. The Parties acknowledge and represent that they have read this Settlement Agreement in full and understand and voluntarily consent to each of its provisions after having had ample time and opportunity to consult with their respective attorneys concerning the Settlement Agreement. The Parties further acknowledge and represent that they are sophisticated in matters of business and have negotiated this Settlement Agreement at arms' length.

24. <u>Authority to Bind</u>. By signing below the Parties represent that the signatories are authorized to execute this Settlement Agreement on behalf of their respective business entities and that the execution and delivery of this Settlement Agreement are the duly authorized and binding acts of their respective business entities.

25. <u>Non-Disparagement</u>. The Parties hereby understand and agree that the business reputation of each Party is of paramount importance. As a material inducement to the execution of this Settlement Agreement, the Parties agree that they will not make any disparaging comments about each other which is intended to adversely affect either the conduct of the Parties' business or profession, or the Parties' business or professional reputation, which conduct shall include, but not be limited to, business defamation and/or disparagement of professional skill, judgment, and reputation for probity and thrift. This includes, but is not limited to, any disparaging comments that are made available to any third parties via the internet. Violation of this paragraph shall entitle the aggrieved party to actual damages only and shall not constitute an Event of Default.

26. <u>Confidentiality.</u> The terms of this Settlement Agreement, including but not limited to the Settlement Payment, are to be held in strict confidence and are not to be disclosed by the Parties to any person with the sole exception of: (1) the Parties' attorneys (2) the Parties' tax advisors and/or accountants, for purposes of tax reporting, regulatory reporting and/or financial planning; (3) as necessary in connection with the Parties' current or future liability insurance and/or any disclosure requirements to which the Parties are subject; (4) as necessary to enforce this Settlement Agreement; and (5) as required or otherwise permitted by law or legal process, including, but not necessarily limited to, communicating with regulatory or law-enforcement authorities, defending

9

DocuSign Envelope ID: ECE307DC-B04C-4E79-9B71-46C15018BEDE

legal or regulatory claims brought against either Party, or asserting legal claims not otherwise prohibited by the terms of this Settlement Agreement. The conveyance of the terms of this Settlement Agreement to third parties as referenced above or as are necessary to contact in connection with subparagraphs 1 through 3 above is conditioned upon such third parties' acceptance of the terms of this Confidentiality provision and that they accept responsibility to keep such terms confidential. Both Parties agree, that prior to such disclosure, they will advise the intended recipient of the confidentiality requirements of this Confidentiality provision and that disclosure of this Settlement Agreement's terms may subject him or her to potential legal action. It shall be considered a breach of this confidentiality provision if the Parties fail to advise any individual to whom a disclosure is made pursuant to this Confidentiality provision of the confidentiality requirements of this Confidentiality provision and if that individual communicates, publishes, publicizes or discloses confidential information to any third party or causes confidential information to be communicated, published, publicized or disclosed to any third party. Violation of this paragraph shall entitle the aggrieved party to actual damages only and shall not constitute an Event of Default.

27. Notices and Legal Counsel. Any notices or other communications required by or otherwise necessary to effectuate the terms of this Settlement Agreement shall be delivered to the Parties as set forth below. Each Party agrees to inform the other promptly of any changes to the information below, including any changes to its legal counsel.

Velanos Principal Capital
c/o Joshua Wearmouth, CEO
120 Adelaide Street West, Suite 2500
Toronto, Ontario M5H 1T1
CANADA
jwearmouth@velanosprincipalcapital.com

Legal counsel for Velanos Principal Capital
Boddie & Associates P.C.
c/o Corey D. Boddie
40 Exchange Place, suite 1800
New York, NY 10005
corey@boddieassoc.com

Genie Investments NV
c/o David Hughes
2812 Pat Tillman Drive
Springfield, Illinois 62711
dhughes@genieinvestments.com

Legal counsel for Genie Investments:
AW Securities Law
c/o Adam Walker
4010 Pennsylvania Ave., Suite 115-10
Kansas City, Missouri 64111
adam@awsecuritieslaw.com

DocuSign Envelope ID: ECE307DC-B04C-4E79-9B71-46C15018BEDE

In witness whereof, the Parties hereto have executed this Settlement Agreement on the date(s) set forth below.

GENIE INVESTMENTS NV

By: _David Hughes_

David Hughes

Title: Managing Member

Date: _____

VELANOS PRINCIPAL CAPITAL

By: _____

Joshua Wearmouth

Title: _____

Date: 5/16/2024 _____

11

## EXHIBIT A

### RECIPIENT ACCOUNT INFORMATION

Routing #:    043000096

Acct #:    4731874578

Bank info:    PNC BANK
500 First Avenue
Mailstop: P7-PFSC-03-W
Pittsburgh, PA 15219

**EXHIBIT B**

## AFFIDAVIT OF JOSHUA WEARMOUTH

Joshua Wearmouth, the CEO of Velanos Principal Capital Inc., a Canadian corporation, being duly sworn, depose and say:

1.    I am Joshua Wearmouth, the CEO of Velanos Principal Capital, Inc., a Canadian corporation ("Velanos").

2.    As CEO of Velanos, I attest that I have given our attorney Corey D. Boddie all relevant, unredacted documentation concerning the Velanos account which is currently being traded on the Forex platform on May 13, 2024.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 13th day of May 2024.

Joshua Wearmouth,
CEO of Velanos Principal Capital Inc.

Sworn to before me
This 13 day of
May, 2024

COREY DELON BODDIE
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02BO6282620
Qualified in New York County
My Commission Expires: May 28, 2025

**EXHIBIT C**

GENIE INVESTMENTS NV,

     Claimant,

v.                                     JAMS Ref No. 5425001617

VELANOS PRINCIPAL CAPITAL, INC.,

     Respondent.

---

### JOINT MOTION FOR ENTRY OF CONSENT AWARD

     Claimant Genie Investments NV (Genie) and Respondent Velanos Principal Capital (Velanos) have executed a settlement agreement intended to resolve all claims asserted in this matter. As a condition of that settlement agreement (attached to this motion as **Exhibit A**) and pursuant to Rule 28(c) of JAMS Comprehensive Arbitration Rules & Procedures, Genie and Velanos move jointly for entry of a consent award setting forth the following terms in such form and with such other terms as the arbitrator deems necessary and appropriate to effectuate the Parties' settlement agreement:

     1.     On or about October 21, 2022, the Parties entered into a "Joint Venture Agreement" (JVA).

     2.     On October 25, 2023, Genie commenced this proceeding, identified as JAMS Ref No. 5425001617 (the Arbitration) against Velanos, seeking both a determination that Velanos materially breached the JVA and an award of compensatory and other damages.

     3.     During this Arbitration, the Parties completed the discovery permitted by the rules and scheduling order governing this Arbitration. In addition, the Parties briefed multiple motions, including a dispositive motion submitted by the Claimant.

**EXHIBIT C**

4.    Before concluding the Arbitration, the Parties reached and executed a settlement agreement intended to resolve, among other things, all claims and defenses asserted herein.

5.    As a condition of that settlement agreement, the Parties agreed to consent to an award in this Arbitration stating (a) that Velanos breached the JVA and (b) that Genie is awarded damages for that breach in the amount of twenty million dollars ($20,000,000.00).

6.    Throughout the entirety of this Arbitration, each Party has been represented by an attorney and has received legal counsel and advice concerning potential outcomes if this Arbitration were to end in a determination on the merits, whether based on a dispositive motion or full evidentiary hearing. The instant motion reflects the Parties' respective decisions to resolve the dispute at issue in this Arbitration through settlement on the terms set forth herein, rather than through a determination by the arbitrator.

7.    The damages awarded to Genie are due and payable by Velanos within fifteen (15) calendar days following entry of this award.

8.    Immediately upon entry of the Consent Award, Genie shall, at its sole discretion, have the option to apply to any court of competent jurisdiction for confirmation of the Consent Award and, thereby, obtain a valid and enforceable judgment against Velanos for the full amount of the arbitration award, plus post-judgment interest at the rate of nine percent (9.0%) annually.

9.    Each Party shall bear one half of all fees assessed by JAMS in connection with this Arbitration, except to the extent that any fee, penalty, or other charge assessed by JAMS is the result of either Party's lateness, delay, or noncompliance with any rule or order governing this Arbitration, in which case the Party whose lateness, delay, or noncompliance resulted in a fee, penalty, or other charge shall be fully responsible for paying it.

2

**EXHIBIT C**

Respectfully submitted,

_____
Adam Walker
AW Securities Law
4050 Pennsylvania Ave., Suite 115-10
Kansas City, Missouri 64111

*Counsel for Genie Investments NV*


_____
Corey D. Boddie
Boddie & Associates P.C.
40 Exchange Place, suite 1800
New York, NY 10005
corey@boddieassoc.com

*Counsel for Velanos Principal Capital*

3

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

**GENIE INVESTMENTS NV, LLC,**

**Plaintiff,**

v.                                          **Civil Action No.**

**JOSHUA WEARMOUTH, JAMES**          **[Jury Trial Demanded]**
**WILLIAM BYRD, and NORDIC**
**TRUST ALLIANCE KB, LLC,**

**Defendants.**

## COMPLAINT

Plaintiff Genie Investments NV (Genie), by and through its attorneys, Spiegel & Utrera, P.A., files this Complaint against Defendants Joshua Wearmouth, James William Byrd, and Nordic Trust Alliance KB, LLC (Nordic Trust) and alleges, on knowledge at to its own actions, and otherwise upon information and belief, that:

## SUMMARY

1.    In 2022 and 2023, Respondents Joshua Wearmouth and James Byrd, directly and through Velanos Principal Capital (Velanos), an entity that Wearmouth controlled, defrauded Plaintiff Genie Investments NV (Genie) out of

1

$9.0 million using a type of scheme commonly referred to as a "prime bank" or "advanced-fee" fraud.

2.     Wearmouth and Byrd represented to Genie verbally and in writing that Wearmouth, through Velanos, could procure one or more standby letters of credit (SBLCs), which Wearmouth would then sell at a significant profit in pre-arranged trades. Wearmouth and Byrd told Genie that Wearmouth would use this trading profit to procure one or more additional SBLCs, which Wearmouth would again sell in pre-arranged trades, again at a significant profit.

3.     In October 2022, Wearmouth and Byrd told Genie that, if Genie contributed $3.0 million to a joint venture with Velanos, Wearmouth would use Genie's capital to generate profits of many times the amount of the capital contribution within 60 days. Wearmouth and Byrd subsequently told Genie that it could increase its profit by making additional capital contributions.

4.     Based on these representations, Genie invested a total of $9 million in a joint venture with Velanos. Wearmouth and Byrd represented that Genie would receive a total of $75.0 million – comprising a return of its $9 million in capital contributions plus $66 million in profit – by the end of 2022.

5.     Wearmouth and Byrd represented to Genie that the SBLC trading presented no risk of loss to Genie's capital contribution.

2

6.    Wearmouth and Velanos never obtained SBLCs with Genie's capital, never earned any of the promised returns in a trading program, never paid any profits to Genie, and never intended to do so. To date, Velanos has returned only $500,000 of the $9 million invested by Genie.

7.    To keep the scheme going and to forestall legal action against them and Velanos, Wearmouth, Byrd, and Defendant Nordic Trust Alliance KB (Nordic Trust) made lulling statements to Genie, representing falsely that the trading program was successful and/or that payments to Genie were imminent or had been made.

## PARTIES

8.    Plaintiff Genie Investments NV (Genie) is a closely held corporation organized and existing under the laws of the state of Nevada, with its principal place of business in Reno, Nevada. Since 2021, Genie has been in the business of providing financing to small and medium-sized businesses through lines of credit.

9.    Defendant Joshua Wearmouth is an individual who, on information and belief, resides in Newport Beach, California, and is a citizen of the state of California.

10.    Defendant James William Byrd is an individual who, on information and belief, resides in Dallas, Texas, and is a citizen of the state of Texas.

3

11.    Defendant Nordic Trust Alliance KB is a limited-liability company

that is organized under the laws of the state of Florida and that has its principal

place of business in Miami, Florida.

## JURISDICTION AND VENUE

12.    This Court has original subject-matter jurisdiction of this action

pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 because it concerns

violations of the Securities Act of 1933 ("the '33 Act"), the Securities Exchange

Act of 1934 ("the '34 Act"), and Exchange Act Rule 10b-5.

13.    This Court also has subject-matter jurisdiction pursuant to 28 U.S.C. §

1332 because the amount in controversy exceeds $75,000, exclusive of interest and

costs, and there is complete diversity of citizenship between Plaintiff and the

Defendants.

14.    This Court has jurisdiction over Plaintiff's related state-law claims

pursuant to the doctrine of supplemental jurisdiction, 28 U.S.C. § 1367.

15.    Defendants have, directly or indirectly, made use of the means or

instrumentalities of interstate commerce or of the mail in connection with the

transactions, acts, practices, and courses of business alleged in this complaint.

16.    Venue in this district is proper pursuant to Section 22(a) of the '33

Act, 15 U.S.C. § 77v(a), and Section 27(a) of the '34 Act, 15 U.S.C. § 78aa.

Among other things, certain of the acts, practices, and courses of business

4

constituting the violations of the federal securities laws alleged herein occurred within this district, including that Defendants directed misrepresentations and deceptive conduct toward Genie representatives residing within this district.

17.    This Court has personal jurisdiction over Defendant Wearmouth because Wearmouth purposefully directed actions at this forum in furtherance of the SBLC scheme.

18.    This Court has personal jurisdiction over Defendant Byrd because Byrd purposefully directed actions at this forum with respect to the SBLC Scheme.

19.    This Court has personal jurisdiction over Defendant Nordic Trust Alliance because Nordic Trust Alliance maintains a place of business within this district and purposefully directed its conduct at this forum with respect to the SBLC Scheme.

## DEFENDANTS' PRIME BANK SCHEME

20.    In late 2023, Genie was seeking capital to lend to customers. Byrd, who had previously acted as a finder for Genie, introduced Genie to Wearmouth, who ran a business called Velanos Principal Capital (Velanos).

21.    Wearmouth and Byrd represented to Genie both verbally and in writing that Wearmouth, through Velanos, regularly used financial instruments known as standby letters of credit (SBLCs) to raise capital.

22.    Wearmouth and Byrd told Genie that Wearmouth had specialized experience, knowledge, and connections through allowed him to purchase SBLCs at a discount and immediately sell them at a large profit in pre-arranged transactions.

23.    Wearmouth proposed a joint venture between Genie and Velanos whereby Velanos, using capital supplied by Genie, would initiate a series of SBLC trades that would generate massive profits for Genie and Velanos (the SBLC scheme).

24.    Byrd regularly acted as Wearmouth's go-between in communications with Genie concerning the SBLC scheme.

25.    Wearmouth and Byrd told Genie that Velanos would return Genie's principal and distribute profits to Genie of up to 800% of the principal investment within 60 days.

26.    Wearmouth and Byrd assured Genie that the SBLC scheme posed no risk of loss to Genie's capital.

27.    Wearmouth also introduced Genie to a lawyer who, according to Byrd, had experience with financing arrangements similar to the SBLC scheme. Genie retained the lawyer to advise them about the proposed joint venture.

28. On or about October 19, 2022, Velanos and Genie executed a Joint Venture Agreement (JVA) concerning the SLBC scheme. Wearmouth executed the JVA on behalf of Velanos.

29. The JVA required Genie to contribute $3.0 million in capital to the joint venture, which Velanos would use to engage in a "Strategic Capital/Systematic Purchase and Sell Transaction" involving SBLCs issued by HSBC or other "Top Rated" issuers.

30. The JVA also required Velanos to return Genie's capital contribution, plus half the profits generated through the transactions, within 60 days.

31. Shortly after Genie and Velanos executed the JVA, Wearmouth and Byrd told Genie that it could increase its capital contribution by an additional $3 million and, in exchange, would receive a guaranteed profit distribution of $50 million. Genie agreed and, on November 21, 2022, Genie and Velanos executed an amendment to the JVA (First JVA Amendment) providing that Genie would increase its capital contribution to $6.0 million and that, in return, Velanos would increase Genie's profit to $50 million dollars.

32. The First JVA Amendment did not change any terms of the JVA besides the amounts of (a) Genie's capital contribution and (b) its profit participation.

7

33.     Shortly after the First JVA Amendment, Wearmouth and Byrd again offered to increase Genie's profit from the JVA, to a total of $66 million, in exchange for an additional $3 million capital contribution.

34.     Genie agreed and provided Velanos an additional $3 million, bringing its total capital contribution to the joint venture to $9.0 million.

35.     Although the parties did not memorialize Genie's third $3 million payment with a formal amendment to the JVA, correspondence from both Wearmouth and Byrd reflected the updated terms of the agreement – namely, that Genie would receive a total of $66 million in profits, in addition to the return of its $9 million in capital, by mid-January 2023.

36.     Velanos and Wearmouth never paid Genie any of the profits promised in the JVA and has returned barely 5% of Genie's capital contributions.

37.     Since January 2023, Wearmouth and Byrd have repeatedly and falsely represented that Wearmouth transferred or initiated transfers of multimillion-dollar payments to Genie.

38.     On or about January 24, 2023, Wearmouth provided Genie with a screenshot of an email that Wearmouth supposedly received from a person identified only as "Simon," who, according to Wearmouth, was a banker with HSBC Bank. The email stated that Velanos had more than 349 million Euros on account with HSBC Bank in London and provided an account number. Wearmouth

8

asserted that this amount included the profits realized from the Genie-Velanos joint venture's trading activity.

39.    Approximately three days later, Velanos provided Genie with photographs and a screenshot that appeared to show a $10.0 million wire transfer from a ScotiaBank account to Genie's account at Chase Bank.

40.    In March 2023, Wearmouth falsely told Genie in writing that the $10.0 million wire transfer he supposedly initiated on January 27, 2023, was being held up by Wells Fargo Bank, which he described as the "corresponding bank" for the wire transfer.

41.    In the same letter, Wearmouth falsely claimed that profits from trading conducted using Genie's $9.0 million in capital were "being held at HSBC, UK under a sub account…" and that Velanos would need to open a "master" account with HSBC to access the trading profits in the subaccount.

42.    In early June 2023, Wearmouth and Byrd proposed that Genie agree to an amendment of the JVA. The proposal, as memorialized in a "Second Amendment to Joint Venture Agreement" (Second JVA Amendment), was for Velanos to (1) "facilitate the opening of a commercial bank account" in Genie's name at Nordic Trust Alliance KB (Nordic Trust) in Miami, Florida, (2) deposit $9.5 million into Genie's Nordic Trust account on or before June 15, 2023, and (3)

deposit an additional $50.0 million into Genie's Nordic Trust account on or before June 30, 2023.

43.    The parties executed the Second JVA Amendment on June 3, 2023. Shortly afterward, Genie received notice that its Nordic Trust account had been established and that it had access to an online account portal (Portal). On June 20, 2023, according to the Portal, Velanos transferred $9.5 million into Genie's Nordic Trust Account. Genie promptly instructed Nordic to wire the $9.5 million to its checking account at Chase Bank. That transfer never happened, however, and the Portal showed that Nordic Trust canceled the request as of June 29, 2023.

44.    On June 30, 2023, Genie attempted to initiate a transfer of $9.4 million from its Nordic Trust account to its Chase account. Although the Portal showed that this transaction was executed – the Portal thereafter reflected a remaining balance of $100,000 in Genie's account – no money ever transferred to Genie's Chase account from Nordic Trust.

45.    Genie sent multiple requests through the Portal for information from Nordic Trust about the status of its outgoing wire transfers. The only responses it received were non-substantive. When Genie asked to speak with an individual so that it could arrange to visit Nordic in Florida and withdraw the money in person, it received no reply at all. Shortly thereafter, Genie lost its ability to view account-related information through the Portal.

46.    On information and belief, Nordic Trust is not a legitimate bank, never held any funds in Genie's name, and knowingly participated in Wearmouth's and Byrd's efforts to forestall legal action against Wearmouth, Byrd, and others by convincing Genie that it would imminently receive a portion of the promised SBLC scheme proceeds.

47.    From late 2022 to mid-2023, Genie entered various agreements to provide lines of credit to customers and did so in reliance on Defendants' false promises and misrepresentations that Genie would soon receive some or all of the promised proceeds from the SBLC scheme.

48.    Genie's reliance on these false statements and misrepresentations was reasonable given the lengths Defendants went to give their false statements and misrepresentations an air of legitimacy. In addition, Genie's attorney at the time did not advise Genie that there was any reason to question the validity of either the SBLC scheme or any of the Defendants' subsequent statements about Velanos' ability and intention to distribute profits to Genie and return its capital contributions.

49.    Genie relied on Defendants' false statements and misrepresentations to its substantial detriment, in that it was ultimately unable to provide the financing it had promised to numerous customers, which in turn led to an avalanche of terminations, refund requests, demand letters, disparaging public statements, and

11

legal actions against Genie. In addition, Defendants' false statements and misrepresentations, and Genie's detrimental reliance on them, have made it impossible for Genie to enter into new lending arrangements with customers.

50.    Other than a $500,000 payment it received in or about May 2023, Genie has never received any return of its capital contributions. It has never received any of the promised profits from the joint venture.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5(a) and (c) – All Defendants

51.    Genie realleges and incorporates by reference its allegations in Paragraphs 1 through 50.

52.    During 2022 and 2023, Defendants Wearmouth, Byrd, and Nordic Trust, in the purchase or sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mail, directly and indirectly:

a.    employed devices, schemes, and artifices to defraud,

b.    made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and

12

      c.     engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

53.    Defendants Wearmouth, Byrd, and Nordic Trust made these misrepresentations and omissions of material fact with scienter – that is, with an intent to deceive, manipulate, or defraud, or with a severely reckless disregard for the truth by inducing Genie's investment in the SBLC scheme while having no intention of using Genie's funds to carry out any legitimate trading of securities or other financial instruments.

54.    Genie relied on the misrepresentations and omissions of Wearmouth, Byrd, and Nordic Trust, both in contributing capital to the putative Genie-Velanos joint venture and in delaying legal action against the Defendants and others.

55.    Defendants carried out their fraudulent and deceptive acts using means or instrumentalities of interstate commerce. Defendants used interstate electronic messages and telephone communication to propose the SBLC scheme, to induce Genie's participation in the joint venture, and to communicate with Genie about why Genie did not receive either the promised profits or a return of its capital contributions.

13

56.    As a direct and proximate result of the Defendants' conduct described herein, Genie has suffered economic loss in that it has been deprived of the benefit of its bargain and has suffered lost profits and consequential damages.

57.    Through the Defendants' conduct described herein, Wearmouth, Byrd, and Nordic Trust willfully violated Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5.

## SECOND CLAIM FOR RELIEF

### California Corp. Code § 25401 – Against Wearmouth and Byrd

58.    Genie realleges and incorporates by reference its allegations in Paragraphs 1 through 50.

59.    During 2022 and 2023, Defendants Wearmouth and Byrd, in the offer and sale of the securities described herein in and/or from the State of California, made untrue statements and/or misrepresentations of material fact to Genie. The false statements and misrepresentations included, without limitation:

a.    Wearmouth and Byrd falsely stated that SBLCs were tradable instruments and that the SBLC scheme was a legitimate investment program that presented no risk of loss to Genie's capital,

b.    Wearmouth and Byrd represented that Genie's capital contributions would be returned after the contributions were used to

14

purchase and trade SBLCs, when in fact, Defendants never returned Genie's

investment principal and, on information and belief, never used Genie's

capital contributions to purchase and trade SBLCs, and

     c.    Wearmouth and Byrd represented that the SBLC scheme would

generate significant profits and that Genie would receive a guaranteed profit

of $66.0 million in addition to the return of its capital contributions.

60.    The misstatements and omissions referred to herein concerned

"material facts" within the meaning of the California Corporations Code section

25401.

61.    As a result of the Defendants' conduct described herein, Genie has

been damaged in an amount to be determined at trial, but not less than $10 million.

62.    Through the conduct described herein, Defendants Wearmouth and

Byrd violated California Corporations Code section 25401.

### THIRD CLAIM FOR RELIEF

**Common-Law Fraud – Against All Defendants**

63.    Genie realleges and incorporates by reference its allegations in

Paragraphs 1 through 50.

64.    As alleged above, Defendants Wearmouth, Byrd, and Nordic Trust

made false written and verbal statements and/or material omissions of material fact

to Genie, including but not limited to:

      a.     Wearmouth's ability to purchase SBLCs and resell them for a profit;

      b.     The legitimacy of any investment strategy involving trading SBLCs;

      c.     Wearmouth's intention to pay Genie the promised profits and to return Genie's capital contributions;

      d.     Wearmouth's knowledge and experience trading SBLCs;

      e.     Attempts by Wearmouth/Velanos to issue payments to Genie between January 2023 and the present;

      f.     Nordic Trust's legitimacy as a bank and its ability to accept deposits and process withdrawals.

65.    The statements and/or omissions were false when made and were in service of an actual fraud.

66.    Wearmouth and Byrd knew that the representations were untrue and/or that the omissions were misleading.

67.    Wearmouth and Byrd made each of the aforementioned misrepresentations and omissions with the intent that Genie would rely on them in deciding to contribute capital to the joint venture and/or to refrain from bringing legal action against Velanos, Wearmouth, Byrd, and others.

68.    Genie did, in fact, rely on the aforementioned misrepresentations and omissions when it contributed $9.0 million in capital to the joint venture and when it refrained from bringing legal action for several months after Wearmouth and Velanos failed to return those capital contributions and distribute promised profits on schedule.

69.    But for Wearmouth's and Byrd's material omissions and misrepresentations alleged above, Genie would not have contributed capital to the joint venture with Velanos and would have brought legal action against Wearmouth, Byrd, and others long ago.

70.    Genie's reliance upon Wearmouth's and Byrd's material omissions and misrepresentations of fact was reasonable.

71.    Wearmouth's and Byrd's material omissions and misrepresentations of fact have damaged Genie in an amount in excess of $10 million, with the exact amount of damages to be determined at trial.

72.    Wearmouth's and Byrd's conduct alleged herein was willful and wanton and they acted with actual malice, fraud, and/or gross negligence.

## **PRAYER FOR RELIEF**

WHEREFORE, Genie respectfully requests that this Court enter a judgment against Defendants, granting Plaintiff the following relief:

- The entry of judgment in favor of the Genie on each and every cause of action;

- The award of actual, consequential, and statutory damages in an amount to be established at trial, but not less than $10 million;

- The award of punitive damages in an amount to be established at trial;

- The award of costs of the suit and attorney's fees; and

- Such other relief as the Court deems just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Genie demands a trial by jury on all issues that are so triable.

Dated: 2-6-2024

Respectfully submitted,


*/s/ Michael Faragalla*

Michael Faragalla  (Bar No. 1014235)

Spiegel & Utrera P.A

1840 Coral Way Fl 4

Miami, FL 33145-2748

Telephone: (800) 603-3900, x204

Facsimile: (800) 520-7800

Email:

attorneyfaragalla@amerilawyer.com CC:

litassistant@amerilawyer.com

Attorneys for Plaintiff Genie Investments

NV

19

# CERTIFICATE OF SERVICE

TRANSACTION CODE: JVA/VPCL-GINV-I-10192022

**VELANOS** PRINCIPAL CAPITAL

# JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT (HEREINAFTER REFERRED TO AS ("**AGREEMENT**" OR "**JVA**") IS EXECUTED WITHOUT PREJUDICE OR CONFLICT OF INTEREST, DULY UNDERSTOOD AND SIGNED BY BOTH PARTIES ACTING AT THEIR OWN ACCORD ON THIS DAY, OCTOBER 19TH, 2022, BY AND BETWEEN:

## THE REFERRING PARTNER ("PARTY A")

| | |
|---|---|
| COMPANY NAME | GENIE INVESTMENTS NV, LLC |
| REGISTERED ADDRESS | 11064 Lothmore Rd, Jacksonville, FL 32221 |
| REGISTRATION NUMBER | 87-4036343 |
| REPRESENTED BY | CALEB MICHAEL DAVIS |
| POSITION | MANAGING PARTNER |
| PASSPORT NUMBER | 670625919 |
| COUNTRY OF ISSUE | UNITED STATES OF AMERICA |
| TELEPHONE | +1 (904) 487-8650 |
| EMAIL | calebmdavis8@gmail.com |

AND

## THE MANAGING PARTNER ("PARTY B")

| | |
|---|---|
| COMPANY NAME | VELANOS PRINCIPAL CAPITAL INC. |
| REGISTERED ADDRESS | 120 Adelaide Street West, Suite 2500, Toronto ON, M5H 1T1, Canada |
| REGISTRATION NUMBER | 1095476-4 |
| REPRESENTED BY | JOSHUA M. WEARMOUTH |
| POSITION | MANAGING PARTNER |
| PASSPORT NUMBER | 515363842 |
| COUNTRY OF ISSUE | UNITED STATES OF AMERICA |
| TELEPHONE | +1 949-220-3555 |
| EMAIL | JMW@VELANOS.ORG |

EACH OF THE PARTIES, AS THE CONTEXT MAY REQUIRE, MAY SOMETIMES HEREAFTER BE REFERRED TO AS COLLECTIVELY AS THE "**PARTIES**".

Initials

STRICTLY PRIVATE AND CONFIDENTIAL

TRANSACTION CODE: JVA/VPCL-GINV-I-10192022

VELANOS PRINCIPAL CAPITAL

**RECITALS:**

I.   WHEREAS THE PARTIES WISH TO FORM A JOINT VENTURE IN ORDER TO PARTICIPATE IN ONE OR MORE PRIVATE BUSINESS OPPORTUNITIES, INCLUDING BUT NOT LIMITED TO THE TRADING OF CURRENCY, NOTES, BONDS, FINANCIAL INSTRUMENTS, PHYSICAL COMMODITIES, PRECIOUS METALS, AND PROJECT FINANCING INITIATIVES(EACHA"TRANSACTION(S)" OR"TRADE(S)", AND HAVING THE SAME MEANING HEREIN); AND

II.   WHEREAS PARTY B IS EXPERIENCED IN AND WILL PROVIDE THE STRUCTURING TO GENERATE LIQUIDITY AND RETURNS AND PROJECT FINANCING FROM ASSETS AND CASH THROUGH COLLATERALISATION, SECURITISATION, MANAGING TRADES AND TRANSACTIONS, AND STRUCTURING AND ADMINISTERING JOINT VENTURES; AND

III.   WHEREAS PARTY A IS PREPARED TO MAKE AVAILABLE A FINANCIAL INSTRUMENT(S) FOR MONETIZATION, AND/OR CASH TO PUT ON TRADE OR TO FACILITATE TRANSACTIONS, (THE "CASH/ASSET") TO PROVIDE THE JOINT VENTURE PARTNER WITH INITIAL CAPITAL RESOURCES; AND

IV.   WHEREAS PARTY A HEREBY CONFIRMS, WITH FULL LEGAL RESPONSIBILITY, UNDER PENALTY OF PERJURY OF LAW THAT IT IS READY, WILLING AND ABLE TO DELIVER A FULLY CASH BACKED STANDBY LETTER OF CREDIT (SBLC) AND/OR CASH FUNDS, UNDER THE TERMS AND CONDITIONS DESCRIBED BELOW, BASED ON GOOD, CLEAN, CLEAR UNENCUMBERED FUNDS OF NON-CRIMINAL ORIGIN; AND

V.   WHEREAS PARTY B IS PREPARED TO DIRECT AND MANAGE THE PLACEMENT OF THE CASH/ASSET(S) INTO ONE OR MORE TRADES, AND/OR FACILITATE ONE OR MORE TRANSACTIONS TO ACCOMPLISH THE OBJECTIVES OF THE JOINT VENTURE (THE "PURPOSE"),

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND SUFFICIENCY OF WHICH IS HEREBY ACKNOWLEDGED, THE PARTIES AGREE IN-PRINCIPLE TO THE FOLLOWING:

1.   **JOINT VENTURE:** THE PARTIES AGREE TO ENTER INTO THIS JOINT VENTURE (THE "JV") ON THE TERMS AND CONDITIONS SET FORTH HEREIN. THE JV SHALL NOT BE A NEW CORPORATE, LEGAL, OR SPECIAL PURPOSE VEHICLE / ENTITY, BUT INSTEAD BE CREATED BY THIS AGREEMENT AND MANIFESTED THROUGH THE MUTUAL COOPERATION OF THE EXISTING TWO ENTITIES ACCORDING TO THEIR SPECIFIC CONTRIBUTIONS AS DETAILED HEREIN ("ACTIVITIES"), AND THE SHARING OF PROFITS THAT RESULT FROM THE JV ACTIVITIES AND ARE CONTRACTUALLY FOR THE BENEFIT OF THE JV ("PROFITS"). THE JV SHALL COMMENCE OPERATIONS AS OF THE EFFECTIVE DATE OF EACH TRANSACTION WHICH WILL BE BASED ON THE DATE OF THE CASH/ASSET CONTRIBUTION AND ADVISED BY PARTY B TO PARTY A ON A CASE-BY-CASE BASIS.

2.   **BUSINESS PURPOSE / CONTRIBUTIONS / PROFIT SHARING:** THE PARTIES ARE ENTERING INTO THIS JV TO COLLECTIVELY PURSUE PRIVATE BUSINESS OPPORTUNITIES FOR THEIR MUTUAL BENEFIT CONSISTENT WITH THE PURPOSE AND ACTIVITIES. THEPARTIES'CONTRIBUTIONSANDROLESINTHE JV SHALL BE AS FOLLOWS:

2.1.   PARTY A SHALL CONTRIBUTE THE CASH/ASSET FOR TRANSACTION/TRADE ACCORDING TO THE TERMS AND CONDITIONS BELOW AND THE SCHEDULE ATTACHED HEREIN.

2.2.   PARTY A SHALL BE CONSIDERED TO HAVE DONE SO BY SIGNING THIS AGREEMENT AND WILL SERVE AS THE CAPITAL PARTNER TO THE JV.

2.3.   REGARDING THE CONTRIBUTED ASSET, PARTY A REPRESENTS AND WARRANTS THAT:

VELANOS PRINCIPAL CAPITAL

2.3.1. IT OWNS, CONTROLS, AND/OR HAS BEEN GRANTED NECESSARY AUTHORITY OVER THE CASH/ASSET THROUGH ANOTHER AGREEMENT THAT IS OUTSIDE OF THIS AGREEMENT AND TO WHICH THE MANAGING PARTNER IS NOT A PARTY, AND IT WILL TAKE FULL AND SOLE RESPONSIBILITY AND LIABILITY FOR ITS PROPER AND TIMELY DELIVERY AS REQUIRED BY THE TERMS AND CONDITIONS BELOW AND PROCEDURES DESCRIBED HEREIN; AND

2.3.2. THE CASH/ASSET IS FREE AND CLEAR OF ANY AND ALL LIENS AND ENCUMBRANCES AND COMPOSED OF GOOD, CLEAR, CLEAN FUNDS OF NON-CRIMINAL ORIGIN; AND

2.3.3. IT HAS SUCCESSFULLY COMPLETED RIGOROUS DUE DILIGENCE ON THE CASH/ASSET AND ANY ASSOCIATED PARTIES AND CONFIRMS THEIR CREDIBILITY AND LEGITIMACY.

2.4. PARTY B SHALL CONTRIBUTE ITS EXPERIENCE, INTELLECTUAL PROPERTY, CONTACTS, RELATIONSHIPS AND STRUCTURAL RESOURCES, PROFESSIONAL SERVICE PROVIDERS, AND FACILITIES TO THE JV AND SERVE AS THE MANAGING PARTNER OF THE JV AS SET FORTH BELOW. PARTY B SHALL HAVE THE AUTHORITY TO STRUCTURE AND EXECUTE ASSET LIQUIDITY AND PROJECT FINANCING STRATEGIES, PLACE CASH/ASSET(S) INTO OR TO FACILITATE ONE OR MORE TRANSACTION/TRADE(S) AND TO MANAGE, DIRECT, AND OVERSEE SUCH TRANSACTION/TRADE(S).

2.5 PARTY B SHALL NOT BE CONSTRUED AS AN INVESTMENT OR FUND MANAGER OR ADVISOR, OR IN ANY WAY BE CONSIDERED TO BE CONDUCTING ANY FINANCIAL OR OTHER ACTIVITY WHATSOEVER WHERE A REGULATORY LICENSE WOULD BE REQUIRED.

3. **COMPENSATION:** THE PARTIES SHALL BE COMPENSATED HEREUNDER ON A PROFIT-SHARING BASIS.
THE COMPENSATION SHALL BE DISTRIBUTED TO THE PARTIES ACCORDING TO THE SPECIFIC SCHEDULE FOR EACH TRANSACTION (DETAILED IN THE "PROFIT SHARING SCHEDULE" IN APPENDIX I HEREIN), EACH WITH ITS OWN UNIQUE REFERENCE CODE. FOR PURPOSES HEREIN, PROFITS SHALL BE DEFINED AS THE GROSS PROFITS RESULTING FROM THE ACTIVITIES WHICH ARE CONTRACTUALLY FOR THE BENEFIT OF THE JV PARTNERS AS DETAILED IN THE PROFIT SHARING SCHEDULE I, LESS ANY BANKING, LEGAL, ADMINISTRATIVE, OR PROFESSIONAL SERVICES COSTS INCURRED BY THE JV IN THE COURSE OF CONDUCTING THE ACTIVITIES.

4. **JOINT VENTURE GOVERNANCE:** PARTY B SHALL MANAGE THE BUSINESS AFFAIRS OF THE JV FOR THE BENEFIT OF THE PARTIES IN ITS REASONABLE BUSINESS JUDGMENT AND SHALL CONFER WITH THE PARTY A ON A REGULAR BASIS WITH REGARD TO JV MATTERS.

5. **COSTS AND EXPENSES:** EACH PARTY SHALL BE RESPONSIBLE FOR ITS OWN COSTS IN CONNECTION WITH THE PREPARATION, NEGOTIATION OF THE FORMATION OF THE JOINT VENTURE AND THE EXECUTION OF THIS AGREEMENT.

6. **BREACH, LAW, JURISDICTION AND REMEDIES:** PARTY B'S FAILURE TO PAY PROFITS TO PARTY A WITHIN 60 DAYS OF ITS CONTRIBUTION OF ASSETS SHALL CONSTITUTE A MATERIAL BREACH OF CONTRACT. IN THE EVENT OF MATERIAL BREACH BY PARTY B, PARTY A MAY TERMINATE THIS AGREEMENT AND DECLARE THE SAME NULL AND VOID BY WRITTEN NOTICE DELIVERED TO PARTY B BY EMAIL, WHICH SHALL BE EFFECTIVE UPON DELIVERY. UPON RECEIVING PARTY A'S NOTICE OF BREACH, PARTY B SHALL IMMEDIATELY RELEASE AND RETURN PARTY A'S ASSETS TO PARTY A BY WIRE TRANSFER TO PARTY A'S DESIGNATED BANK COORDINATES. PARTY A'S FAILURE TO CONTRIBUTE ASSETS AS REQUIRED BY THE AGREEMENT SHALL CONSTITUTE A MATERIAL BREACH WHICH SHALL ENTITLE PARTY B TO TERMINATE THIS AGREEMENT BY WRITTEN NOTICE AS DESCRIBED HEREINABOVE. THIS AGREEMENT SHALL BE GOVERNED BY THE LAW OF NEW YORK, NY, UNITED STATES. ALL DISPUTES BETWEEN THE PARTIES SHALL BE RESOLVED BY ARBITRATION AT THE NEW YORK INTERNATIONAL ARBITRATION CENTER. THE PARTIES HEREBY AGREE AND ADMIT TO THE PERSONAL JURISDICTION OF, AS APPLICABLE, THE NEW YORK INTERNATIONAL ARBITRATION CENTER. THE PARTIES AGREE THAT THE LOSING PARTY IN ANY SUCH ARBITRATION HEARING HEREUNDER SHALL HOLD THE PREVAILING PARTY HARMLESS FROM ALL COST, DAMAGE AND EXPENSE INCURRED AS A RESULT OF THE APPLICABLE CLAIM OR ACTION.

TRANSACTION CODE: JVA/VPCL-GINV-I-10192022

VELANOS PRINCIPAL CAPITAL

7. **LEGAL ADVICE:** EACH PARTY HAS HAD THE OPPORTUNITY TO RECEIVE BUSINESS, FINANCIAL AND LEGAL ADVICE WITH RESPECT TO THIS AGREEMENT, AND/OR HAS THE REQUISITE EXPERIENCE AND SOPHISTICATION TO UNDERSTAND, INTERPRET AND AGREE TO THE TERMS AND PROVISIONS HEREOF AND HAVE VOLUNTARILY WAIVED THEIR RIGHT TO RECEIVE INDEPENDENT COUNSEL AND ADVICE WITH RESPECT THERETO.

8. **ENTIRE AGREEMENT / ASSIGNMENT / RECITALS:** THIS AGREEMENT CONTAINS THE ENTIRE UNDERSTANDING AND AGREEMENT BETWEEN THE PARTIES HERETO WITH RESPECT TO THE SUBJECT MATTER HEREOF, SUPERSEDING ALL NEGOTIATIONS, PRIOR DISCUSSIONS, PRELIMINARY AGREEMENTS AND ALL PRIOR AGREEMENTS BETWEEN THE PARTIES AND THEIR AFFILIATES MADE PRIOR TO THE DATE HEREOF, AND SHALL NOT BE CHANGED EXCEPT BY AN INSTRUMENT SIGNED BY THE PARTIES HERETO. THIS AGREEMENT MAY NOT BE ASSIGNED WITHOUT THE EXPRESS, WRITTEN PERMISSION OF THE NON-ASSIGNING PARTIES. THE RECITALS TO THIS AGREEMENT SHALL BE DEEMED TO BE PART OF THE AGREEMENT.

9. **NOTICES:** ALL NOTICES HEREUNDER SHALL BE IN WRITING, ADDRESSED TO THE PARTY AT THE ADDRESS SET FORTH HEREIN, AND SHALL BE SENT, WITH PROOF OF DELIVERY, BY ELECTRONIC, CERTIFIED OR REGISTERED MAIL, OR BY COURIER. IN THE EVENT THAT THE ADDRESS OR CONTACT INFORMATION FOR ANY PARTY CHANGES, SUCH PARTY SHALL PROMPTLY PROVIDE NOTICE TO THE OTHER PARTY OF SUCH CHANGE(S).

10. **CONFIDENTIAL INFORMATION:** BY VIRTUE OF THIS AGREEMENT, EACH PARTY MAY OBTAIN CERTAIN CONFIDENTIAL OR PROPRIETARY INFORMATION. FOR PURPOSES OF THIS AGREEMENT, THE TERM **"CONFIDENTIAL INFORMATION"** MEANS ALL INFORMATION WHICH IS DELIVERED BY ANY PARTY, THEIR AFFILIATES OR THEIR REPRESENTATIVES IN CONNECTION WITH THIS AGREEMENT, WHICH IS NON- PUBLIC AND IDENTIFIED AS BEING CONFIDENTIAL OR PROPRIETARY. THE PARTIES AGREE THAT THEY AND THEIR RESPECTIVE REPRESENTATIVES WILL NOT USE ANY CONFIDENTIAL INFORMATION FOR ANY PURPOSE OTHER THAN TO FULFILL THEIR UNDERTAKINGS PURSUANT TO THIS AGREEMENT FOR A PERIOD OF FIVE YEARS FROM TERMINATION OF THIS AGREEMENT. THE PARTIES AND THEIR RESPECTIVE REPRESENTATIVES WILL KEEP THE CONFIDENTIAL INFORMATION COMPLETELY CONFIDENTIAL; PROVIDED, HOWEVER, THAT THE CONFIDENTIAL INFORMATION MAY BE DISCLOSED TO THEIR REPRESENTATIVES OR AFFILIATES WHO NEED TO REVIEW THE CONFIDENTIAL INFORMATION (IT BEING UNDERSTOOD THAT THEIR REPRESENTATIVES SHALL BE INFORMED OF THE CONFIDENTIAL NATURE OF SUCH CONFIDENTIAL INFORMATION AND SHALL BE DIRECTED TO TREAT THE CONFIDENTIAL INFORMATION IN ACCORDANCE WITH THIS AGREEMENT). THE PARTIES SHALL TREAT AS CONFIDENTIAL ALL NAMES, TELEPHONE NUMBERS, EMAIL ADDRESSES, TELEX NUMBERS, FACSIMILE NUMBERS AND ANY OTHER FORM OF CONTACT COORDINATES AS WELL AS ANY OTHER INFORMATION EXCHANGED BETWEEN THE PARTIES, EACH PLEDGING NOT TO DISCLOSE TO ANY OTHER ENTITY OR INDIVIDUALS, EXCEPT WHEN REQUIRED FOR THE PURPOSE OF THE JV TRANSACTION(S), ANY SUCH INFORMATION, WITHOUT THE EXPRESS, WRITTEN CONSENT OF THE NON-DISCLOSING PARTY. SHOULD THE NON-DISCLOSING PARTY OR ANY RELATED INDIVIDUALS, CORPORATIONS, DIVISIONS, ASSOCIATES, THIRD PARTIES OR OTHER FORM OF ENTITY RELATED IN ANY WAY TO THE NON-DISCLOSING PARTY ATTEMPT TO PARTICIPATE IN A SUBSEQUENT TRANSACTION INVOLVING THE OF THE SAME INDIVIDUALS OR ENTITIES DISCLOSED BY THE DISCLOSING PARTY DURING THE TERM OF THIS AGREEMENT AND DURING THE THREE (3) YEARS THEREAFTER IN RESPECT OF INTRODUCTIONS, INFORMATION, RECOMMENDATIONS, DATA OR OTHER KNOWLEDGE ACQUIRED FROM THE DISCLOSING PARTY, THE DISCLOSING PARTY SHALL BE ENTITLED TO COMPENSATION IN AN AMOUNT EQUAL TO ALL PROCEEDS PAID TO THE NON-DISCLOSING PARTY OR ITS RELATED PARTIES OR AFFILIATES.

11. **REQUIRED DISCLOSURE:** IN THE EVENT THAT A PARTY OR ANY OF THEIR REPRESENTATIVES RECEIVES A REQUEST, OR IS REQUIRED (BY DEPOSITION, INTERROGATORY, REQUEST FOR DOCUMENTS, SUBPOENA, CIVIL INVESTIGATIVE DEMAND OR SIMILAR PROCESS) TO DISCLOSE CONFIDENTIAL INFORMATION, THE PARTIES AGREE TO (I) IMMEDIATELY NOTIFY THE OTHER PARTY OF THE EXISTENCE, TERMS AND CIRCUMSTANCES SURROUNDING SUCH A REQUEST; (II) CONSULT WITH THE OTHER PARTY ON THE ADVISABILITY OF TAKING LEGALLY AVAILABLE STEPS TO RESIST OR NARROW SUCH REQUEST; AND (III) ASSIST THE OTHER PARTY IN SEEKING A PROTECTIVE ORDER OR OTHER APPROPRIATE REMEDY. IN THE EVENT THAT SUCH PROTECTIVE ORDER OR OTHER REMEDY IS NOT OBTAINED, OR THE OTHER PARTY WAIVES COMPLIANCE WITH THE PROVISIONS HEREOF, (I) A PARTY OR THEIR REPRESENTATIVES MAY DISCLOSE TO ANY TRIBUNAL ONLY THAT PORTION OF SUCH CONFIDENTIAL INFORMATION WHICH THEY ARE ADVISED BY COUNSEL IS LEGALLY REQUIRED TO BE DISCLOSED, AND SHALL EXERCISE THEIR BEST EFFORTS TO OBTAIN ASSURANCE THAT CONFIDENTIAL TREATMENT WILL BE ACCORDED SUCH CONFIDENTIAL

TRANSACTION CODE: JVA/VPCL-GINV-I-10192022

**VELANOS** PRINCIPAL CAPITAL

INFORMATION; AND (II) THEY SHALL NOT BE LIABLE FOR SUCH DISCLOSURE UNLESS DISCLOSURE TO ANY SUCH TRIBUNAL WAS CAUSED BY OR RESULTED FROM A PREVIOUS DISCLOSURE BY A PARTY OR THEIR REPRESENTATIVES NOT PERMITTED BY THIS AGREEMENT.

13. **NON-CIRCUMVENTION:** WITH RESPECT TO ANY INTRODUCTIONS MADE BY THE PARTIES TO EACH OTHER HEREUNDER, THE PARTIES AGREE THAT THEY SHALL EACH NOT: (I) CIRCUMVENT, OR ATTEMPT TO CIRCUMVENT, THE OTHER PARTY FOR THE PURPOSE OF DEPRIVING THE OTHER PARTY OF ANY COMPENSATION TO WHICH THE OTHER PARTY IS OR WOULD BE ENTITLED TO HEREUNDER; AND (II) SOLICIT ANY PARTY INTRODUCED BY THE OTHER PARTY FOR THE PURPOSE OF ANY TRANSACTION, DEAL OR OPPORTUNITY FOR A PERIOD OF FIVE (5) YEARS FROM THE DATE OF ANY SUCH INTRODUCTION, WITHOUT THE EXPRESS WRITTEN CONSENT OF THE INTRODUCING PARTY. THE PARTIES FURTHER AGREE THAT IN THE EVENT THAT A PARTY CIRCUMVENTS OR ATTEMPTS TO CIRCUMVENT THE OTHER PARTY, THE NON-CIRCUMVENTING PARTY SHALL BE ENTITLED TO LIQUIDATED DAMAGES EQUAL TO THE TOTAL COMPENSATION RECEIVED BY THE CIRCUMVENTING PARTY FROM THE TRANSACTION IN WHICH THE ATTEMPTED CIRCUMVENTION OR ACTUAL CIRCUMVENTION OCCURS.

14. **REPRESENTATIONS AND WARRANTIES:** THE PARTIES REPRESENT AND WARRANT AS FOLLOWS:

  14.1.    THE PARTIES ARE NOT REGISTERED AND ARE NOT REQUIRED TO BE REGISTERED AS INVESTMENT ADVISERS.

  14.2.    THE INDIVIDUAL PERSONS EXECUTING THIS AGREEMENT ON BEHALF OF EACH RESPECTIVE PARTY ARE DULY AUTHORIZED TO ENTER INTO THIS AGREEMENT BY AND ON BEHALF OF EACH RESPECTIVE PARTY.

  14.3.    THE PARTIES ARE DULY FORMED, VALIDLY EXISTING AND IN GOOD STANDING UNDER THE REGISTRAR OF COMPANIES IN THEIR JURISDICTION OF FORMATION AND ARE QUALIFIED TO DO BUSINESS IN ALL OTHER JURISDICTIONS WHERE THEIR BUSINESS REQUIRES THEM TO BE QUALIFIED.

15. **BINDING EFFECT:** THIS AGREEMENT SHALL BE BINDING UPON THE PARTIES HERETO AND UPON THEIR RESPECTIVE HEIRS, SUCCESSORS, LEGATEES, EXECUTORS, ADMINISTRATORS AND PERMITTED ASSIGNS, AND WILL INURE TO THEIR BENEFIT.

16. **WARRANTIES / DISCLAIMER:** THE PARTIES MUTUALLY WARRANT AND REPRESENT TO EACH OTHER THAT THEY EACH HAVE THE FULL RIGHT, POWER, AND AUTHORITY TO ENTER INTO THIS AGREEMENT AND TO FULLY PERFORM THEIR OBLIGATIONS HEREUNDER.

17. **BENEFICIARIES:** THE BENEFIT OF THIS AGREEMENT AFTER EXECUTED BY THE PARTIES HEREIN SHALL BE INCLUSIVE TO THE HEIRS OF THE ESTATES OF THE NAMED PARTIES/BENEFICIARIES AND THE PARTIES' ASSIGNS.

18. **TAXES:**   NO REPRESENTATIONS ARE HEREBY MADE OR IMPLIED WITH REGARD TO THE TAX IMPLICATIONS, IF ANY, IN RESPECT OF ANY TRANSACTIONS HEREUNDER. THE PARTIES INDIVIDUALLY AND SEPARATELY ACCEPT THEIR OWN RESPONSIBILITIES AND LIABILITIES FOR ANY TAXES, IMPOSTS, LEVIES, DUTIES OR CHARGES THAT MAY ARISE FROM THEIR RESPECTIVE INTERESTS IN THE JOINT VENTURE AND ITS ACTIVITIES.

19. **FORCE MAJEURE:** THIS AGREEMENT SHALL BE SUBJECT TO THE GENERAL RULES OF "FORCE MAJEURE" AS ESTABLISHED BY THE LAW OF THE STATE OF NEW YORK, NY, UNITED STATES AND RESOLVED BY ARBITRATION AT THE NEW YORK INTERNATIONAL ARBITRATION CENTER.   FURTHER, SHOULD ANY ACT OF GOD, WAR, BANK OR GOVERNMENT COMPUTER FAILURE, INSURRECTION OR CIVIL DISTURBANCE OCCUR IN ANY COUNTRY WHERE THE JOINT VENTURE IS ACTIVE, IN WHOLE OR IN PART, THEREBY DELAYING OR MAKING PERFORMANCE BY ANY OF THE PARTIES AND/OR COUNTER PARTIES IMPOSSIBLE, THEN THIS AGREEMENT SHALL BE EXTENDED FOR SUCH TERM, AS IS REASONABLY DETERMINED BY THE NATURE OF THE OCCURRENCE.

20. **COUNTERPARTS / SIGNATURES:** THIS AGREEMENT MAY BE EXECUTED IN COUNTERPARTS, EACH OF WHICH SHALL BE DEEMED TO BE AN ORIGINAL, AND ALL OF WHICH TAKEN TOGETHER SHALL CONSTITUTE ONE AND THE SAME DOCUMENT. A DIGITAL OR FACSIMILE SIGNATURE ON THIS AGREEMENT SHALL BE THE EQUIVALENT OF AN ORIGINAL SIGNATURE AND SUCH AGREEMENT SHALL BE DEEMED AN ORIGINAL AND SHALL BE FULLY ADMISSIBLE AND ENFORCEABLE IN ALL PROCEEDINGS.

Initials

TRANSACTION CODE: JVA/VPCL-GINV-I-10192022

VELANOS PRINCIPAL CAPITAL

21. <u>EXCLUSIVITY / ADDITIONAL TRANSACTIONS:</u> THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS JV IS EXCLUSIVE. IN THE EVENT THAT THE PARTIES MUTUALLY AGREE FOR ADDITIONAL ASSETS TO BE INVESTED INTO THE JV (THE"NEWINVESTMENT"), THEN THEY SHALL AMEND THIS AGREEMENT BY A WRITTEN AMENDMENT, SIGNED BY THE AUTHORIZED SIGNATORIES OF PARTY A AND THE TERMS AND CONDITIONS HEREOF SHALL APPLY TO ANY SUCH NEW TRANSACTION.

WHEREUPON THE PARTIES HERETO HAVE CAUSED THIS AGREEMENT TO BE EXECUTED BY THEIR RESPECTIVE DULY AUTHORIZED SIGNATORIES AS OF THE EFFECTIVE DATE HEREOF.

SIGNED ON THIS DAY, OCTOBER 19TH, 2022

FOR AND BEHALF OF PARTY A:

_____

NAME: MR. CALEB MICHAEL DAVIS
TITLE: MANAGING PARTNER

FOR AND BEHALF OF PARTNER B:

_____

NAME: MR. JOSHUA MATTHEW WEARMOUTH
TITLE: MANAGING PARTNER

Initials

TRANSACTION CODE: JVA/VPCL-GINV-I-10192022

**VELANOS** PRINCIPAL CAPITAL

## APPENDIX I:

### TRANSACTION PROFIT SHARING SCHEDULE

| | |
|---|---|
| TRANSACTION CODE | JVA/VPCL-GINV-I-10192022 |
| TRANSACTION TYPE | Strategic Capital/Systematic Purchase and Sell Transaction |
| TRANSACTING ASSET(S) | SBLC (Standby Letter of Credit) HSBC London/Top Rated Issuer |
| CAPITAL PARTY CONTRIBUTION | Liquid Cash Funds |
| CAPITAL PARTY INSTRUMENT | Rolling Strategic Participation |
| CAPITAL PARTY CONTRIBUTION SIZE | $3,000,000.00 USD (Three Million US Dollars) |
| CAPITAL PARTY CONTRIBUTION DATE | Within Twenty-Four (24) Hours of the JVA Execution |
| INSTRUMENT COMMENCEMENT DATE | Within Ten (10) Banking Days, post contribution |
| INSTRUMENT TERM | Sixty (60) Banking Days |
| INSTRUMENT RETURN CALCULATION PERIOD | Monthly |
| TARGET RETURN PERIOD | One Hundred Percent (100%) in (30) days; remaining within Sixty (60) days, post commencement |
| PROFIT DISTRIBUTION FREQUENCY | Thirty (30) days post commencement |
| CAPITAL PARTY CONTINUATION TERMS | Subject to opportunity and mutual agreement |
| TRANSACTIONAL BANK(S) | HSBC London / Barclays London |
| SPECIAL NOTES | 1. PARTY A WILL RETURN THE DULY EXECUTED JOINT VENTURE AGREEMENT WITH DUE DILIGENCE DOCUMENTS AS REQUIRED BY PARTY B. 2. PARTY A WILL REMIT THE CAPITAL PARTNER CONTRIBUTION TO PARTY B'S RECEIVING BANK COORDINATES. 3. PARTY B WILL DEPLOY THE CONTRIBUTED CASH/ASSET STRATEGICALLY AND WITH DISCRETION, INCLUDING FACILITATING A SYSTEMATIC PURCHASE AND SALE OF FINANCIAL NSTRUMENTS ROUTINE. 4. PARTY B WILL PROVIDE PARTY A WITH A ROLLING PROFIT PARTICIPATION IN THE JV ACTIVITIES UP TO $25,000,000.00. 5. PARTY A MAY CHOOSE TO RECEIVE PROFITS DISTRIBUTIONS TO ANY OF ITS NOMINATED BANK COORDINATES. 6. PARTY A MAY DECIDE TO WITHDRAW ITS CONTRIBUTED ASSET PLUS ANY ACCRUED PROFITS ENTITLEMENT AND EXIT THE JV AT ANY TIME AFTER THE FIRST DISTRIBUTION. 7. SUBJECT TO OPPORTUNITY AND MUTUAL AGREEMENT, AT THE END OF THE INSTRUMENT TERM, PARTY A MAY CONTINUE ITS ROLLING STRATEGIC PARTICIPATION. 8. AFTER PARTY A CONTRIBUTES ITS ASSETS, PARTY B SHALL PROVIDE PARTY A COPIES OF THE CURRENT TRANSACTIONAL BANK ACCOUNT STATEMENT SHOWING THE RELEVANT TRADE TRANSACTIONS EVERY 30 DAYS DURING PARTY A'S PARTICIPATION IN THE JV. |

ACKNOWLEDGED, ACCEPTED, AND SIGNED ON THIS DAY: OCTOBER 19TH 2022,

FOR AND BEHALF OF PARTY A:

NAME: MR. CALEB MICHAEL DAVIS
TITLE: MANAGING MEMBER

Initials

STRICTLY PRIVATE AND CONFIDENTIAL

TRANSACTION CODE: JVA/VPCL-GINV-I-10192022

VELANOS PRINCIPAL CAPITAL

### APPENDIX II:

#### PARTY A BANKING COORDINATES FOR SENDING CONTRIBUTED CASH/ASSET

| | |
|---|---|
| BANK NAME | JP Morgan Chase |
| BANK ADDRESS | 7301 Baymeadows Way, Jacksonville, FL 32256 |
| SWIFT CODE | CHASUS33 |
| SORT CODE | N/A |
| EUR ACCOUNT NUMBER | N/A |
| USD ACCOUNT NUMBER | 4012372222 |
| IBAN | N/A |
| ACCOUNT NAME | Genie Investments NV, LLC |
| BANK OFFICER | Stephen Massicotte |
| BANK TELEPHONE | Office: 904-462-1016 | Cell: 904-536-7959 |
| BANK OFFICER EMAIL | stephen.m.massicotte@chase.com |
| SPECIAL INSTRUCTIONS | |

#### PARTY B BANKING COORDINATES FOR RECEIVING CONTRIBUTED CASH/ASSET

| | |
|---|---|
| BANK NAME | Scotiabank / Bank of Nova Scotia |
| BANK ADDRESS | 3401 Dufferin St Mail Box 54, Toronto, Ontario, Canada M6A 2T9 |
| SWIFT CODE | NOSCCATT |
| SORT CODE | N/A |
| EUR ACCOUNT NUMBER | N/A |
| USD ACCOUNT NUMBER | 2215200076171520007617 |
| IBAN | N/A |
| ACCOUNT NAME | VELANOS PRINCIPAL CAPITAL INC. |
| BANK OFFICER | Jasotha Ulaganathan |
| BANK TELEPHONE | 416-784-5126 x4300 |
| BANK OFFICER EMAIL | jasotha.ulaganathan@scotiabank.com |
| SPECIAL INSTRUCTIONS | |

Initials



Confirmation: Creation Successful
Wire Payment has been successfully created, Reference # - 75924287.

Payment Type*    Please select

Payment Details

Amount*    0.00                          Payment Currency*    Pleas

Due Date*    01/27/2023                  Debit/Credit*    Please

Originator Details

Settlement Account*    Please select     Service Group*    Please se

Agreement ID*    Please select           Currency

Institution                              Transit



## Payment Details

Account* 10000000.00

Payment Currency* USD - U.S. Dollar

Value Date* 01/27/2023

## Originator Details

Debit Account* 22152 00076 17 USD VELANO

Service Group* VELANOS S0352880002

Currency USD

Originator Name* VELANOS PRINCIPAL CAPITAL INC

Originator Address 120 ADELAIDE STREET W
SUITE 2500
TORONTO, ON, M5H1T1
Canada

## Recipient Information

Recipient Name* Gene IANVESTMENTS NV

Account Nickname/Recipient ID

Vendor Number

Address

Please enter the full street address that does not include P.O. Box

Address 1* 401 Ryland st Suite 200

Address 2

City* Reno

Country* United States

Postal / Zip Code* 89502

Province / State* Nevada

## Recipient Bank Information

Bank Country* United States

Recipient Bank* SWIFT

Account Number* 852288502

SWIFT BIC* CHASUS33XXX

Validate/Bank Search

Bank Details JPMorgan Chase Bank NA
270 Park Ave

Case 3:24-cv-02392-D   Document 1   Filed 09/20/24   Page 1 of 44   PageID 1

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| BASIL M. HANTASH, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| JAMES WILLIAM BYRD, JOSHUA | § | Civil Action No. 24-2392 |
| MATTHEW WEARMOUTH, KEVIN | § | |
| ROBERT GILLESPIE, WALDON | § | |
| FENSTER, DANIEL FERNANDES ROJO | § | |
| FILHO, HERIBERTO CANDELARIO | § | Jury Trial Demanded |
| PEREZ VALDES, DEAL EXCHANGE, | § | |
| LLC, SOTERIA GROUP, LLC, and | § | |
| NORDIC TRUST ALLIANCE KB, LLC, | § | |
| | § | |
| *Defendants.* | § | |

### ORIGINAL COMPLAINT

Plaintiff Dr. Basil M. Hantash ("Plaintiff" or "Hantash") files this Original Complaint against Defendants James William Byrd, Joshua Matthew Wearmouth, Kevin Robert Gillespie, Waldon Fenster, Daniel Fernandes Rojo Filho, Heriberto Candelario Perez Valdes, Deal Exchange, LLC, Soteria Group, LLC, and Nordic Trust Alliance KB, LLC (collectively, "Defendants"), and alleges as follows:

### SUMMARY OF THE ACTION

1.      Defendants are members of a criminal enterprise engaged exclusively in defrauding individuals out of their hard-earned money through a variety of investment scams. In 2023, Defendants James Willia Byrd, Joshua Wearmouth, and their accomplices, directly and through Velanos Principal Capital Inc. ("Velanos"), an entity Mr. Byrd and Mr. Wearmouth control, defrauded Plaintiff Hantash out of $4 million using an illegal scheme commonly referred to as a "prime bank" or "advanced-fee" fraud.

2.      Defendants represented to Dr. Hantash, verbally and in writing, that Velanos could procure one or more standby letters of credit ("SBLC"), which Velanos would then sell at a significant profit in pre-arranged trades. The profit from that sale would then be used to purchase additional SBLCs that would again be sold in pre-arranged trades at additional significant profit.

3.      Byrd and Wearmouth told Dr. Hantash he needed to front the cash to purchase the SBLCs. For their efforts, Dr. Hantash and Velanos would both experience incredible returns from their investments in a short period of time. Defendants represented to Dr. Hantash that the SBLC investment presented absolutely no risk of loss to Dr. Hantash's capital contribution.

4.      Based on these representations, Dr. Hantash invested a total of $4 million in a joint venture with Velanos. Mr. Byrd, Mr. Wearmouth, and their accomplices informed Dr. Hantash that his capital would generate a return of $20 million, including his original capital contribution, within 90 days.

5.      To keep the scheme going and to forestall legal action against them, Defendants falsely represented to Dr. Hantash that the investment was successful and that payments of the proceeds to Dr. Hantash were imminent and/or had already been made. Defendants even created a fake bank, fake bank websites, fake wire confirmations, and other detailed falsehoods to mislead Dr. Hantash while absconding with his money.

6.      In truth, Defendants never obtained SBLCs with Dr. Hantash's capital, never earned the promised returns in a trading program, never paid any profits to Dr. Hantash, and never intended to do so. They stole his money.

## JURISDICTION

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this is a civil action arising under 18 U.S.C. §§ 1961 *et seq.*, the Racketeer Influenced and Corrupt Organizations Act ("RICO").

8.      This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and because Plaintiff and Defendants share no common citizenship.

9.      This Court has supplemental jurisdiction over the state-law claims in this action pursuant to 28 U.S.C. § 1367 because the state-law claims arise from the same case or controversy as the claims over which this Court has original jurisdiction.

10.     This Court has personal jurisdiction over Mr. Byrd because he is domiciled in the state of Texas.

11.     Pursuant to 18 U.S.C. § 1964, this Court has personal jurisdiction over all other Defendants because this Court has personal jurisdiction over Mr. Byrd and the ends of justice require that other parties residing in any other district be brought before the Court.

## VENUE

12.     Venue is proper in this district under 28 U.S.C. § 1391(b)(1) because this is the judicial district in which Mr. Byrd resides.

13.     Pursuant to 18 U.S.C. § 1965, venue is proper in this district as to the defendants residing outside of this judicial district because venue is proper for Mr. Byrd and the ends of justice require that all other parties residing in any other district be brought before the Court.

## PARTIES AND RELEVANT NON-PARTIES

14.     Plaintiff Dr. Basil M. Hantash is an individual who resides in San Juan, Puerto Rico. Plaintiff is a citizen of Puerto Rico.

## I.    DEFENDANTS.

15.     Defendant James William Byrd (a/k/a Wilbur Byrd a/k/a Will Byrd) is an individual who resides in Dallas, Texas and may be served with process at 5665 Arapaho Road, Unit 2828, Dallas, Texas 75248 or wherever he may be found. Mr. Byrd is a citizen of Texas.

16.    Defendant Waldon Fenster is an individual who resides in Downers Grove, Illinois and may be served with process at 4740 Saratoga Avenue, Downers Grove, Illinois 60515 or wherever he may be found. Mr. Fenster is a citizen of Illinois.

17.    Defendant Kevin Robert Gillespie is an individual who resides in Carpentersville, Illinois and may be served with process at 6625 Majestic Way, Carpentersville, Illinois 60110 or wherever he may be found. Mr. Gillespie is a citizen of Illinois.

18.    Defendant Joshua Matthew Wearmouth is an individual who resides in Newport Beach, California and may be served with process at 1226 Newberg Commons, San Jacinto, California 92582 or wherever he may be found. Mr. Wearmouth is a citizen of California.

19.    Defendant Daniel Fernandes Rojo Filho (a/k/a Danyel Fernandes) is an individual who resides in Clermont, Florida and may be served with process at 3211 Vineland Road, PMB 309, Kissimmee, Florida 34746 or wherever he may be found. Mr. Fernandes is a citizen of Florida.

20.    Defendant Heriberto Candelario Perez Valdes (a/k/a Eddie Perez) is an individual who resides in Miami Gardens, Florida and may be served with process at 18201 NW 32nd Avenue, Miami Gardens, Florida 33056 or wherever he may be found. Mr. Perez is a citizen of Florida.

21.    Defendant Deal Exchange, LLC is a Wyoming limited liability company with its principal office at 1718 Capitol Avenue, Cheyenne, Wyoming 82001. Deal Exchange, LLC may be served by and through its registered agent, Anderson Registered Agents, at 1716 Capitol Avenue, Suite 100, Cheyenne, Wyoming 82001. Deal Exchange, LLC is a citizen of Wyoming.

22.    Defendant Soteria Group, LLC is a Texas limited liability company with its principal office at 539 W. Commerce Street, Suite 5208, Dallas, Texas 75208. Soteria Group, LLC

Case 3:24-cv-02392-D    Document 1    Filed 09/20/24    Page 5 of 44    PageID 5

may be served by and through its registered agent, Seth Hicks, at 539 W. Commerce Street, Suite 5208, Dallas, Texas 75208. Soteria Group, LLC is a citizen of Texas.

23.    Defendant Nordic Trust Alliance KB, LLC ("NTA") is a Florida limited liability company with its principal office at 121 S Orange Avenue, Suite 1500, Orlando, Florida 32801. Nordic Trust Alliance KB, LLC may be served by and through its registered agent, Ester G. Nascimento Ramos, at 3211 Vineland Road, PMB 309, Kissimmee, Florida 34746. Nordic Trust Alliance KB, LLC is a citizen of Florida.

## II.    RELEVANT NON-PARTIES.

24.    Velanos Principal Capital Inc. ("Velanos") is a Canadian corporation with its principal place of business at 120 Adelaid Street West, Suite 2500, Toronto, Ontario M5H 1T1, Canada. Velanos was the entity used by Defendants to purportedly invest Dr. Hantash's money in the SBLCs.

25.    Escape Therapeutics, Inc. is a California corporation. Escape Therapeutics was founded by Dr. Hantash and is the entity for which Dr. Hantash sought capital to fund its projects.

26.    John P. Ferrick is an individual who resides in Northbrook, Illinois. Mr. Ferrick is a member of Escape Therapeutics' Board and was tasked with seeking capital sources at Dr. Hantash's request.

27.    Kevin J. Cawley is an individual who resides in Downers Grove, Illinois. Mr. Cawley is a business associate of Mr. Ferrick and introduced Mr. Ferrick and Dr. Hantash to Deal Exchange.

28.    Martin Brian Tobias Gibbins (a/k/a Martin Gibbons) is an individual who resides in England. Mr. Gibbins is a purported banker with residences in both the United Kingdom and the United Arab Emirates. Mr. Gibbins served as an alleged reference for Velanos' investment strategy to coax Dr. Hantash into parting with his money.

Case 3:24-cv-02392-D    Document 1    Filed 09/20/24    Page 6 of 44    PageID 6

29.     Jasotha Ulaganathan (a/k/a Jasotha Ulganathan) is Defendant Velanos Principal Capital Inc.'s purported banking officer. Jasotha Ulaganathan is located in Canada.

30.     Edward Koziel is NTA's purported compliance officer. Dr. Hantash attempted to contact Mr. Koziel regarding his issues with NTA's banking system via his listed email address and phone number.

31.     James A. Hutchinson is purportedly on the board of directors for Velanos. Dr. Hantash contacted Mr. Hutchinson regarding the status of his investment after he uncovered the criminal scheme.

32.     Lucia Harris (a/k/a Lucia De Faima Alves Do Couto a/k/a Lucia Alves) is and/or was on the board of directors for Velanos. Ms. Harris corresponded with Dr. Hantash regarding the status of his investment after he uncovered the criminal scheme.

## <u>GENERAL ALLEGATIONS</u>

33.     Dr. Hantash is the founder and Chief Executive Officer of Escape Therapeutics, Inc. Escape Therapeutics is an early-stage biotechnology company focused on accelerating the commercial availability of allogeneic stem cell therapies. Escape Therapeutics' technology seeks to revolutionize the treatment of numerous medical diseases that require cell and/or organ replacement such as type I diabetes, Parkinson's, leukemia, and more.

34.     In January 2023, Dr. Hantash sought project financing of approximately $20 million to fund commercial development of new biotechnologies with his company, Escape Therapeutics.

35.     Through mutual connections, Dr. Hantash was introduced to Mr. Fenster, who, in turn, introduced Dr. Hantash to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie. These individuals would turn out to be the main actors in a criminal enterprise designed to deprive wealthy investors of their hard-earned money and pad their own pockets.

36.    Both verbally and in writing, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie represented to Dr. Hantash that, through their investment entity, Velanos, they regularly raised millions of dollars in capital through financial instruments known as standby letters of credit ("SBLCs").

37.    Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie had specialized experience, knowledge, and connections that allowed them to purchase SBLCs at a discount and immediately sell them at a large profit in pre-arranged transactions.

38.    Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie proposed a joint venture between Dr. Hantash and Velanos whereby Velanos, using capital supplied by Dr. Hantash, would initiate a series of SBLC trades that would generate massive profits for Dr. Hantash and Velanos together.

39.    Over the course of a few months, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie slowly convinced Dr. Hantash of the investment's validity. They even assured Dr. Hantash that the SBLC investment posed no risk of loss to Dr. Hantash.

40.    Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie assured Dr. Hantash that the SBLC investment would return Dr. Hantash's capital and distribute profits to Dr. Hantash of up to 500% of the principal investment within 90 days. By way of example, Dr. Hantash could raise the $20 million he needed for his research with only a $4 million principal investment in merely 90 days.

41.    To further convince Dr. Hantash to "invest" $4 million, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie introduced Dr. Hantash to a supposed Velanos investor named Martin Gibbins. Dr. Hantash spoke with Mr. Gibbins over the telephone. Mr. Gibbins spoke highly of Velanos and assured him that the Defendants' representations were all accurate.

Case 3:24-cv-02392-D    Document 1    Filed 09/20/24    Page 8 of 44    PageID 8

42.    On or about April 12, 2023, Dr. Hantash and Velanos executed a Joint Venture Agreement ("JV Agreement") concerning the SBLC investment. Mr. Wearmouth executed the JV Agreement on behalf of Velanos.

43.    The JV Agreement required Dr. Hantash to contribute $4 million in capital to the joint venture, which Velanos would use to engage in its planned transactions involving SBLCs.

44.    Dr. Hantash's expectation under the JV Agreement is memorialized through the agreement itself and numerous emails and text messages between the individuals involved.

45.    Dr. Hantash never received any of the profits promised from the JV Agreement nor the return of his original capital contributions.

46.    To contribute the required $4 million to the joint venture, Dr. Hantash obtained a loan against securities in his brokerage account. In addition to never receiving his promised profits, Dr. Hantash incurred millions of dollars in losses pursuant to covering margin calls associated with the loan on his brokerage account.

47.    Since May 2023, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie have repeatedly and falsely represented certain transfers, returning multi-million dollar payments to Dr. Hantash, have occurred. This was, and remains, false.

48.    In June 2023, Dr. Hantash began raising concerns about the distributions he was owed under the JV Agreement. Dr. Hantash provided instructions for the first distribution to be wired to the same account listed in the JV Agreement as the original source of the funds contributed to the SBLC investment.

49.    Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie informed Dr. Hantash that his money was safe and in an account at Nordic Trust Alliance ("NTA"), a supposedly U.S.-licensed bank. This would also prove to be false. Accordingly, Dr. Hantash also requested a personal checking

account be created for him at the NTA bank. Dr. Hantash completed the appropriate paperwork and an account was purportedly created for him with NTA.

50.    Dr. Hantash immediately attempted to initiate a transfer of his funds from the NTA account to his prior bank account from which the funds originated. The transfer was cancelled.

51.    After going back and forth with NTA's representative, NTA's website eventually reflected that the transfer had been executed. But no money was ever transferred to Dr. Hantash's account.

52.    Dr. Hantash sent multiple requests through NTA's online portal and via email about the status of its outgoing wire transfers. The only responses he received were non-substantive. Eventually, the NTA line of communication went silent.

53.    After Dr. Hantash's numerous emails and attempts to contact Mr. Byrd, Mr. Byrd ultimately admitted that NTA was not a U.S.-licensed bank, but instead a foreign bank. This also proved false.

54.    NTA was just another cog in the criminal enterprise orchestrated to steal Dr. Hantash's money.

55.    Dr. Hantash's reliance on these false statements and misrepresentations was reasonable given the lengths to which Defendants went to give their false statements and misrepresentations an air of legitimacy. At the time Dr. Hantash committed his capital to the SBLC investment, there was no reason to question the validity of the investment or any of the Defendants' statements about Velanos' ability and intention to distribute profits to Dr. Hantash and return his capital contributions.

56.    Dr. Hantash relied on Defendants' false statements and misrepresentations to his substantial detriment in that he was personally deprived of $4 million and his company, Escape

Therapeutics, was unable to raise the capital it needs to perform life-saving medical research and development.

## DETAILED ALLEGATIONS

57.     Beginning in at least July 2020, and continuing through at least March 2024, Defendants, and others known and unknown, were associated together in fact as an enterprise for the common purpose of enriching its members and associates, through the repeated commission of diverse criminal acts set forth below.

## GOAL AND PURPOSE

58.     The goal of this conspiracy and the purpose of the Defendants' criminal enterprise was to scam Dr. Hantash out of Four Million Dollars ($4,000,000) by taking advantage of Escape Therapeutics' need for financing to fund its lifesaving, industry-shaping research and instead line its members' and its associates' pockets through repeated commissions of criminal acts such as wire fraud, and more.

## ENTERPRISE

59.     Defendants' enterprise ("SBLC Syndicate") was itself not a legal entity, but an association in fact of persons, sometimes acting through legal entities at the direction of Mr. Byrd.

60.     Mr. Byrd knowingly, willfully, and with the requisite intent, induced Dr. Hantash to wire Velanos, a company under Mr. Byrd's control, $4 million. Mr. Byrd also knowingly, willfully, and with the requisite intent made repeated misrepresentations regarding the details alleged investment opportunity, the other people and entities involved in the investment, the expected outcome of the investment and more. By way of example, Mr. Byrd misrepresented to Dr. Hantash that there was zero downside risk to investing his money with Velanos. Mr. Byrd misrepresented that the investment existed in the first place and that such profits were realistic.

Mr. Byrd made these misrepresentations to Dr. Hantash with knowledge that Dr. Hantash needed a significant amount of money to fund his life-saving medical research.

61.    For most of the scheme, Mr. Byrd represented that he was the controlling party of Velanos, emailing consistently from a Velanos email address. Once Dr. Hantash began to ask questions and sent Velanos a notice of default under the JV Agreement, Mr. Byrd stated he was not a member of Velanos. This was contrary to everything Mr. Byrd had told Dr. Hantash previously. Thus, at a minimum, one of these statements was a blatant misrepresentation. Mr. Byrd also misrepresented that no investor would want to discuss their prior investments with Dr. Hantash. Nevertheless, Mr. Byrd eventually introduced Dr. Hantash to Mr. Gibbins, an alleged investor, to further induce Dr. Hantash to participate in the scheme. This statement was made to induce Dr. Hantash to invest without speaking to any prior investors. Mr. Byrd also misrepresented to Mr. Hantash that NTA was a licensed bank in the United States. Mr. Byrd made repeated misrepresentations to Dr. Hantash regarding the status of his investment, the profits to be obtained therefrom, the location of his funds, and the timeline of the alleged investment. Eventually, Mr. Byrd stopped responding to Dr. Hantash's inquires and questions because Dr. Hantash had already invested his $4 million. Mr. Byrd accomplished this goal through numerous phone calls, emails, text messages, and other forms of electronic communication. Mr. Byrd committed these acts and others to enrich himself and to Dr. Hantash's detriment.

62.    Mr. Wearmouth knowingly, willfully, and with the requisite intent, induced Dr. Hantash to wire Velanos, a company under Mr. Byrd's control, $4 million. As a member of Velanos, Mr. Wearmouth was instrumental in perpetrating the fraud and misrepresentations critical to the success of the SBLC Syndicate's scheme. Mr. Wearmouth also knowingly, willfully, and with the requisite intent made repeated misrepresentations regarding the details of the alleged investment

opportunity, the other people and entities involved in the investment, the expected outcome of the investment and more. Among examples others, Mr. Wearmouth misrepresented to Dr. Hantash that there was zero downside risk to investing his money with Velanos. Mr. Wearmouth also misrepresented that no investor would want to discuss their prior investments with Dr. Hantash. This statement was made to induce Dr. Hantash to invest without speaking to any prior investors. Nevertheless, Mr. Wearmouth assisted in arranging for Dr. Hantash to speak with Mr. Gibbins, an alleged previous investor with Velanos. Mr. Wearmouth also misrepresented to Dr. Hantash that the per trade profit of the investment was approximately 55%. Eventually, Mr. Wearmouth stopped responding to Dr. Hantash's inquires and questions because Dr. Hantash had already invested his $4 million. Mr. Wearmouth accomplished this goal through numerous phone calls, emails, text messages, and other forms of electronic communication. Mr. Wearmouth committed these acts and others to enrich himself and to Dr. Hantash's detriment.

63.    Mr. Fenster knowingly, willfully, and with the requisite intent, defrauded and induced Dr. Hantash to wire Velanos $4 million. As a member of Deal Exchange, LLC Mr. Fenster was instrumental in connecting Dr. Hantash with Mr. Gillespie and Mr. Byrd for the purpose of defrauding Dr. Hantash of his property. Mr. Fenster perpetrated the fraud by assisting Dr. Hantash in completing the debt intake application on Deal Exchange's website. This form allegedly vetted Dr. Hantash as a proper investor for the alleged investment opportunity. Mr. Fenster furthered the SBLC Syndicate's main goal by informing Dr. Hantash that Soteria Group, LLC was interested in the opportunity and introduced Dr. Hantash to Mr. Gillespie. Mr. Fenster further misrepresented that Soteria had completed several successful financing deals. Thus, Mr. Fenster personally vouched for Mr. Gillespie's trustworthiness in furtherance of the SBLC Syndicate's goal. Mr. Fenster accomplished this goal through numerous phone calls, emails, text messages, and other

Case 3:24-cv-02392-D    Document 1    Filed 09/20/24    Page 13 of 44    PageID 13

forms of electronic communication. Mr. Fenster committed these acts and others to enrich himself and to Dr. Hantash's detriment.

64.    Mr. Gillespie knowingly, willfully, and with the requisite intent, defrauded and induced Dr. Hantash to wire Velanos $4 million. As a member of Soteria, Mr. Gillespie was instrumental in connecting Dr. Hantash with Mr. Byrd for the purpose of defrauding Dr. Hantash of his property. Mr. Gillespie initially introduced Mr. Byrd to Dr. Hantash. Mr. Gillespie, along with Mr. Byrd, was responsible for informing Dr. Hantash of the SBLC investment scheme. Mr. Gillespie, through multiple communications, continuously pressured Dr. Hantash into investing his money into the SBLC Syndicate's scheme. Mr. Gillespie also represented to Dr. Hantash that it would be impossible for him to meet with prior investors. Mr. Gillespie also repeatedly assured Dr. Hantash that he and Velanos would share equally in the profits generated from the investment. Of course, this proved false. Mr. Gillespie also repeatedly misinformed Dr. Hantash that his first distribution would be fulfilled. Then, once an account freeze was in place, Mr. Gillespie misrepresented to Mr. Hantash that Mr. Byrd, Mr. Wearmouth, and Mr. Fernandes were working with the Federal Reserve and other organizations to resolve the issues. Mr. Gillespie accomplished this goal through numerous phone calls, emails, text messages, and other forms of electronic communication. Mr. Gillespie committed these acts and others to enrich himself and to Dr. Hantash's detriment.

65.    Mr. Fernandes knowingly, willfully, and with the requisite intent, defrauded and deprived Dr. Hantash of $4 million. As an alleged administrator at NTA, Mr. Fernandes was instrumental in perpetrating the SBLC Syndicate's scheme to deprive Dr. Hantash of his property. Mr. Fernandes allegedly resolved an issue with the classification of Dr. Hantash's account at NTA to further uphold the façade that NTA was a functioning U.S. bank. Following Dr. Hantash's

requests regarding the anticipated fulfillment of his first and second distributions, Mr. Fernandes never responded in clear violation of his alleged duties as an alleged NTA administrator. Mr. Fernandes further failed to respond to Dr. Hantash's messages on the NTA portal system, phone calls, voicemails, or emails. Mr. Fernandes likely could not assist Dr. Hantash because NTA is not a licensed U.S. bank, if a bank at all. Mr. Fernandes accomplished this goal by knowingly, willfully, and with the requisite intent misrepresenting to Dr. Hantash that his $4 million was secure in a NTA bank account. Mr. Fernandes committed these acts and others to enrich himself and to Dr. Hantash's detriment.

66.    Mr. Perez knowingly, willfully, and with the requisite intent, defrauded and deprived Dr. Hantash of $4 million. As an alleged director of NTA, Mr. Perez was instrumental in perpetrating the SBLC Syndicate's scheme to deprive Dr. Hantash of his property. After experiencing errors in NTA's banking system, Dr. Hantash attempted to call Edward Koziel, NTA's purported compliance officer. Instead, Mr. Perez answered the call from Dr. Hantash. Mr. Perez informed Dr. Hantash that he would forward his complaints to NTA's Swedish office to resolve his issues. Mr. Perez likely could not assist Dr. Hantash because NTA is not a licensed U.S. bank, if a bank at all. Consequently, NTA likely does not have any Swedish office or main office of operations. Mr. Perez accomplished this goal by knowingly, willfully, and with the requisite intent misrepresenting to Dr. Hantash that his $4 million was secure in a NTA bank account. Mr. Perez committed these acts and others to enrich himself and to Dr. Hantash's detriment.

67.    The SBLC Syndicate used Deal Exchange, Soteria, Velanos, and NTA to introduce, coerce, and trap Dr. Hantash into the SBLC Syndicate's investment racket. All four entities held different roles within the SBLC Syndicate. Deal Exchange, under Mr. Fenster's hand, purported to offer private equity funds to off-market assets for acquisition. In reality, Deal Exchange was used

to source victims for the SBLC Syndicate. Soteria, under Mr. Byrd and Mr. Gillespie's hands, was used to introduce Dr. Hantash and further vet him as an ideal candidate to defraud through the alleged investments offered. Velanos operated as the vehicle through which Dr. Hantash was defrauded of his $4 million. NTA, under Mr. Fernandes's hand, was used to perpetrate and prolong the fraud in an attempt to convince Dr. Hantash that everything was operating as normal.

## PATTERN OF CRIMINAL ACTIVITY

I.    **Hantash Sought Capital to Fund Life-Saving Medical Research.**

68.    Dr. Hantash is the founder and Chief Executive Officer of Escape Therapeutics, Inc. Escape Therapeutics is an early-stage biotechnology company focused on accelerating the commercial availability of allogeneic stem cell therapies. Escape Therapeutics' technology seeks to revolutionize the treatment of numerous medical diseases that require cell and/or organ replacement such as type I diabetes, Parkinson's, leukemia, and more.

69.    In January 2023, Dr. Hantash sought project financing of approximately $20 million to fund commercial development of new biotechnologies. Accordingly, Dr. Hantash tasked a member of Escape Therapeutics' Board of Directors, John P. Ferrick, with finding project financing institutions that work with biotechnology companies.

70.    Mr. Ferrick spoke with Kevin Cawley on the phone regarding Escape Therapeutics' need for financing. Mr. Cawley informed Mr. Ferrick that he would connect Escape Therapeutics with Waldon Fenster at Deal Exchange, LLC ("Deal Exchange").

71.    On or about January 26, 2023, Mr. Cawley emailed Mr. Fenster to schedule a phone call with Mr. Ferrick to inform him of a potential biotechnology opportunity.

72.    <u>Criminal Act No. 1-2: Violations of 18 U.S.C. § 1343 (Wire Fraud).</u> On or about January 26, 2023, Mr. Fenster sent an email to Mr. Ferrick requesting availability in Mr. Ferrick's

schedule. The same day, Mr. Fenster sent a second email to Mr. Ferrick and confirmed that he would call the following morning. Mr. Fenster transmitted these communications by means of interstate wire to Mr. Ferrick in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

73.     Deal Exchange purports to connect private equity funds to off-market assets for acquisition. In this instance, Deal Exchange claimed it could link Escape Therapeutics, who needed project funding, with entities that offer capital.

74.     <u>Criminal Act No. 3: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about January 30, 2023, Mr. Fenster sent an email to Mr. Ferrick providing a link to Deal Exchange's intake form. Mr. Fenster transmitted this communication by means of interstate wire to Mr. Ferrick in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises. Mr. Fenster transmitted this communication by means of interstate wire to Mr. Ferrick in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

75.     Following additional phone calls with Mr. Fenster, Mr. Ferrick and Dr. Hantash completed the debt intake application on Deal Exchange's website.

**II.    Hantash is Introduced to the Criminal SBLC Syndicate.**

76.     <u>Criminal Act No. 4: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about February 8, 2023, Mr. Fenster emailed Mr. Ferrick and informed him that Soteria Group, LLC ("Soteria") was interested in having conversations about financing a debt round for the opportunity. In doing so, Mr. Fenster introduced Kevin Robert Gillespie. Mr. Fenster transmitted this communication by means of interstate wire to Mr. Ferrick in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

77.    Criminal Act No. 5: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about February 13, 2023, Mr. Gillespie formally met Dr. Hantash via Zoom. This meeting served as the first in a long stream of illicit actions Mr. Gillespie would undertake to defraud Dr. Hantash from his property.

78.    Mr. Gillespie represented he was a broker for Soteria. Mr. Gillespie informed Dr. Hantash of a program that grows principal to a generate a desired amount of project financing without incurring debt. Encouraged by Mr. Gillespie's suggested program, Dr. Hantash and Escape Therapeutics continued the process. Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

79.    Criminal Act No. 6: Violation of 18 U.S.C. § 1343 (Wire Fraud). During this Zoom call on or about February 13, 2023, Mr. Fenster represented and personally confirmed to Mr. Ferrick and Dr. Hantash that Soteria had completed several project-financing deals, including Mr. Fenster's own Cannabis company which received its desired project financing. Mr. Fenster personally vouched for Mr. Gillespie's trustworthiness. Mr. Fenster transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

80.    Criminal Act No. 7: Violation of 18 U.S.C. § 1343 (Wire Fraud). Following their first Zoom meeting, Dr. Hantash provided Mr. Gillespie with a term sheet. On or about February 16, 2023, Mr. Gillespie emailed Dr. Hantash to inform him that the term sheet was approved. Mr. Gillespie also provided Dr. Hantash with a checklist of documents needed to move forward. Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in

furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

81.     Criminal Act No. 8: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about February 19, 2023, Mr. Fenster emailed Dr. Hantash to say that the purported term sheet had been approved. Mr. Fenster also asked Dr. Hantash if he had any questions regarding the term sheet. Mr. Fenster transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

82.     Criminal Act No. 9: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about February 26, 2023, Mr. Gillespie followed up with Dr. Hantash via email to ask if the latter had any questions regarding the term sheet. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

83.     Criminal Act No. 10: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about March 3, 2023, Mr. Gillespie informed Dr. Hantash that he was still working to accommodate his requests on the term sheet. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

84.     Criminal Acts Nos. 11-12: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about March 13, 2023, Dr. Hantash coordinated with Mr. Gillespie in drafting and signing a new term sheet as well as providing the checklist of documents needed. Specifically, Mr. Gillespie emailed Dr. Hantash that he would provide a new term sheet the same day. Approximately three hours later, Mr. Gillespie sent a separate email to Dr. Hantash with the new term sheet. Mr.

Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

85.    <u>Criminal Acts Nos. 13-15: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 15, 2023, Mr. Gillespie emailed Dr. Hantash to arrange a phone to explain the details of the investment opportunities with Soteria. Two hours later, Mr. Gillespie emailed Dr. Hantash with an invite for a call titled "SBLC Introduction." The same day, Mr. Gillespie and Dr. Hantash had call wherein Mr. Gillespie explained the details of the SBLC investment.  Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

86.    <u>Criminal Act No. 16: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 19, 2023, Mr. Gillespie provided Dr. Hantash with a template Letter of Intent to review. Mr. Gillespie requested that Dr. Hantash customize the details of the template Letter of Intent and return the document. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

87.    <u>Criminal Act No. 17: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. Next, on or about March 21, 2023, Mr. Gillespie emailed an invite for a call titled SBLC Procedures with the purpose to introduce Dr. Hantash to James William Byrd, the purported owner of Soteria. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

Case 3:24-cv-02392-D    Document 1    Filed 09/20/24    Page 20 of 44    PageID 20

88.     Criminal Act No. 18: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about March 21, 2023, Mr. Bryd explained that his separate company, Velanos Principal Capital ("Velanos") would be able to satisfy Escape Therapeutics' need for project financing.

89.     Mr. Byrd represented that Velanos had a $500 billion quarterly allocation to purchase new $100 million notes for $44 million and resell them for a profit over the course of one to four days. Mr. Byrd also explained that Velanos always had a buyer for the note identified prior to making the initial purchase. This appeared to be the exact thing Escape Therapeutics and Dr. Hantash needed to fund their life-saving research. Mr. Byrd transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

## III.    The SBLC Syndicate Deceives Hantash with a Fake Prior Investor.

90.     Criminal Acts Nos. 19-20: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about March 22, 2023, Dr. Hantash had a follow up phone call with Mr. Byrd and his partner, Joshua M. Wearmouth. Mr. Byrd and Mr. Wearmouth explained how their program worked and how Dr. Hantash could choose the investment duration and proposed desired return. Mr. Byrd and Mr. Wearmouth also indicated that there was absolutely zero downside risk. Mr. Wearmouth and Mr. Byrd transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

91.     On or about March 24, 2023, Dr. Hantash, after customizing the details as Mr. Gillespie requested, returned the Letter of Intent to Mr. Byrd.

92.     Criminal Act No. 21: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about March 28, 2023, Mr. Gillespie emailed Dr. Hantash to work out certain details of their agreement including the saturation point, personal information, and the sum to be invested. Mr. Gillespie

transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

93.    <u>Criminal Act No. 22: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 22, 2023, Mr. Byrd and Mr. Wearmouth encouraged Dr. Hantash through phone calls to invest prior to March 31, 2023, because Mr. Wearmouth would close off the deal to new investments lower than $44 million after that date. Mr. Byrd and Mr. Wearmouth transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

94.    <u>Criminal Act No. 23: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about March 28, 2023, Mr. Wearmouth, as an agent of Velanos, caused Docusign to send Dr. Hantash a copy of a Joint Venture Agreement ("JV Agreement") to sign. Finding several errors in the draft JV Agreement, Dr. Hantash emailed Mr. Wearmouth requesting certain corrections. Mr. Wearmouth transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

95.    <u>Criminal Acts Nos. 24-26: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. In response, Dr. Hantash requested to speak to any references regarding the program as part of his normal due diligence. On or about March 29, 2023, Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie all indicated via text messages to Dr. Hantash that fulfilling such a request was not possible because no investor wants to speak about their private financial affairs for an invite-only program like theirs. Nevertheless, they said would attempt to find a reference with whom Dr. Hantash could discuss the investment. Mr. Gillespie, Mr. Byrd, and Mr. Wearmouth transmitted this communication by

means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

96.     **Criminal Act No. 27: Violations of 18 U.S.C. § 1343 (Wire Fraud).** On or about March 31, 2023, Mr. Byrd ultimately acquiesced and introduced Mr. Gibbins to Dr. Hantash via text. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

97.     On or about March 31, 2023, Dr. Hantash spoke with Mr. Gibbins. Mr. Gibbins described himself as a long-time banker very familiar with the type of instruments Velanos was advertising to Dr. Hantash. Mr. Gibbins confirmed that his group invested $10 million and, 90 days later, received $10 million in profit in addition to their $10 million initial capital investment. Mr. Gibbins also indicated that his group would be investing a second round with Velanos. Mr. Gibbins transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

98.     The next day, Dr. Hantash attempted to call Mr. Gibbins with a few follow-up questions and clarifications regarding tax treatment of the program profits, but Mr. Gibbins did not answer the phone or reply to Dr. Hantash's messages.

99.     **Criminal Acts Nos. 28-29: Violation of 18 U.S.C. § 1343 (Wire Fraud).** On or about April 3 and 4, 2023, Mr. Byrd and Mr. Gillespie called Dr. Hantash regarding his decision to invest in the program and again applied pressure to commit to the investment quickly. Mr. Byrd and Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

100.    Criminal Act No. 30: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about April 3, 2023, Dr. Hantash expressed that he had additional questions for Mr. Gibbins. In response, Mr. Byrd explained via phone that Mr. Gibbins was in the hospital for a cardiac-related issue and not able to answer his call. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

101.    Criminal Acts Nos. 31-34: Violation of 18 U.S.C. § 1343 (Wire Fraud). Between approximately April 5 and April 13, 2023, Dr. Hantash went back and forth with Mr. Byrd and Mr. Wearmouth over email rectifying a laundry list of questions and items that needed to be fixed in the JV Agreement before he would sign. Mr. Byrd responded and answered all of Dr. Hantash's questions to assuage his concerns – further inducing Dr. Hantash to enter the fraudulent JV Agreement. Mr. Byrd transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

IV.    **Hantash Invests His Money with the SBLC Syndicate.**

102.    Criminal Act No. 35: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about April 12, 2023, Velanos, through its agents, caused Docusign to transmit the final version of the JV Agreement to Dr. Hantash. The same day, Dr. Hantash and Velanos executed the JV Agreement whereby Dr. Hantash would contribute Four Million Dollars ($4,000,000) in capital to Velanos. The JV Agreement stipulated that Dr. Hantash would receive 50% of the proceeds from the $4 million investment approximately 30 days after sending the funds and a second distribution of up to $16 million by July 13, 2023 – 90 calendar days after commencing the investment. Velanos, through its agents, transmitted these communications by means of interstate wire to Dr. Hantash

in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

103.    On or about April 14, 2023, Dr. Hantash deposited, in two separate wires of equal magnitude, Four Million Dollars ($4,000,000) in committed capital with Velanos pursuant to the JV Agreement.

104.    Criminal Act No. 36: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about April 29, 2023, Mr. Bryd, via phone call, represented to Dr. Hantash that he had acquired two international banks to receive his funds. One of these banks was a Swedish entity named Nordic Trust Alliance KB ("NTA"). Mr. Bryd represented that NTA was a licensed U.S. Bank. This would later prove to be completely false. Upon information and belief, the second entity is AGFC Capital Trust ("AGFC"). AGFC has a Geneva location but does not appear to be a legitimate bank. Instead, both NTA and AGFC appear to be lead-generating for the purpose of identifying more victims of Defendants' scheme. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

105.    Criminal Act No. 37: Violation of 18 U.S.C. § 1343 (Wire Fraud). On April 24, 2023, Dr. Hantash emailed Mr. Gillespie regarding the underwriting period for the JV Agreement. Mr. Gillespie further reassured Dr. Hantash that the underwriting had already occurred and that all was going well with the investment plan. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

V.    **Hantash Began Probing the SBLC Syndicate Regarding Discrepancies He Noticed.**

106.    On or about May 1, 2023, and following Dr. Hantash depositing his capital, Dr. Hantash began to notice discrepancies between what Mr. Gillespie and Mr. Byrd were telling him

Case 3:24-cv-02392-D    Document 1    Filed 09/20/24    Page 25 of 44    PageID 25

regarding the mechanics of the investment. Accordingly, Dr. Hantash emailed Mr. Gillespie to request clarification on the details of his investment.

107.    Criminal Act No. 38: Violations of 18 U.S.C. § 1343 (Wire Fraud). On May 2, 2023, Mr. Gillespie responded to placate Dr. Hantash's concerns. Mr. Gillespie responded to each of Dr. Hantash's five concerns and provided excuses such as typographical errors in the JV Agreement, explanations of how funds would be transferred to Escape Therapeutics, and the original draw schedule of three tranches for the investment. Mr. Gillespie transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

108.    Criminal Acts Nos. 39-41: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about May 10, 2023, Dr. Hantash requested and had another phone call with Mr. Gillespie. On or about May 11, 2023, and during this call, Mr. Wearmouth touted that the per trade profit of the investment was approximately 55%. Mr. Gillespie also assured Dr. Hantash that him and Velanos would share equally in the profits generated from the investment. To the contrary, Mr. Byrd stated Dr. Hantash's profits were capped but Velanos could continue earning profits using Dr. Hantash's capital.

109.    In response to Dr. Hantash's concerns, Mr. Gillespie repeatedly assured Dr. Hantash that him and Velanos would share the same, identical profits from the investment. Mr. Byrd maintained his position that Velanos could continue using Dr. Hantash's capital after the investment reached a saturation point for Velanos's pure profit.

110.    Disturbed by Mr. Gillespie and Mr. Byrd's contradictions, Dr. Hantash requested weekly updates on the trades executed with his capital including the account balance. Dr. Hantash

Case 3:24-cv-02392-D   Document 1   Filed 09/20/24   Page 26 of 44   PageID 26

was entitled to this information under the JV Agreement to allow him to determine when to withdraw his capital.

111.   Mr. Byrd refused to ever provide Dr. Hantash with the requested trade details or account balance figures. Mr. Gillespie also could not furnish this information. Mr. Wearmouth never responded to Dr. Hantash's inquiries. Mr. Gillespie, Mr. Byrd, and Mr. Wearmouth transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

112.   Growing more concerned, Dr. Hantash decided to contact Velanos' previous client reference, Mr. Gibbins. Mr. Gibbins never answered Dr. Hantash's calls or responded to his messages.

113.   On or about May 12, 2023, and approximately 30 calendar days after the JV Agreement was executed, Dr. Hantash emailed Mr. Byrd and Mr. Wearmouth regarding opening a bank account of his own so that he can monitor his deposited funds. Dr. Hantash also reminded Mr. Byrd and Mr. Wearmouth of the emotional gravity this investment has and what is at stake. On May 25, 2023, Dr. Hantash followed up with Mr. Byrd and Mr. Wearmouth because he had not yet received a response.

114.   On or about May 30, 2023, and approximately 30 banking days after the JV Agreement was executed, Dr. Hantash inquired regarding the timing of the first distribution and the account balance. The JV Agreement indicated that Dr. Hantash could withdraw from the program within 10 banking days after 30 banking days from execution.

115.   Criminal Act No. 42: Violation of 18 U.S.C. § 1343 (Wire Fraud). Finally, Mr. Gillespie, responded to arrange a phone call set for June 1, 2023. Mr. Gillespie transmitted this

communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

116.    <u>Criminal Act No. 43: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. During the phone call on or about May 31, 2023, Mr. Byrd responded that 30 banking days had not yet lapsed. Dr. Hantash informed Mr. Byrd that, even with the most generous calculation of days lapsed – 30 days after 10 days after the execution of the JV Agreement (40 days total) – the first distribution of Four Million Dollars ($4,000,000) was due on June 9, 2023. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

117.    On or about June 5, 2023, Dr. Hantash again emailed Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie asking for an update on the status of his investment.

118.    <u>Criminal Act No. 44-45: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about June 7, 2023, Mr. Byrd informed Dr. Hantash that he would call him that evening to answer Dr. Hantash's questions. During the phone call, Mr. Byrd and Mr. Gillespie informed Dr. Hantash that the first distribution was forthcoming. This proved to be false. Mr. Byrd and Mr. Gillespie transmitted these communications by means of interstate wire to Dr. Hantash in furtherance of their scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

119.    On or about June 17, 2023, Dr. Hantash provided instructions for the first distribution to be wired to the same account listed in the JV Agreement as the original source of the funds contributed to the fund. Dr. Hantash also requested Mr. Byrd create a personal checking account at the NTA bank only if NTA did not have wire limits.

Case 3:24-cv-02392-D    Document 1    Filed 09/20/24    Page 28 of 44    PageID 28

120.    Criminal Act No. 46: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about June 18, 2023, Dr. Hantash received a bank account application form from Mr. Wearmouth. Interestingly, Mr. Wearmouth's email came from a Velanos domain, not an NTA domain. Nevertheless, Dr. Hantash completed the application. The same day, Dr. Hantash emailed NTA's primary email address to request the bank's fee schedules for outgoing wires. Mr. Wearmouth transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

121.    On or about June 18, 2023, Dr. Hantash also emailed Mr. Wearmouth to restate Dr. Hantash's intention to act on his rights under the JV Agreement to trade on his investment.

122.    Criminal Act No. 47: Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about June 20, 2023, Mr. Wearmouth caused Docusign to send Dr. Hantash a complete bank account application form to sign via email. Mr. Wearmouth transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

123.    Criminal Act No. 48 Violations of 18 U.S.C. § 1343 (Wire Fraud). On or about June 20, 2023, and upon accessing the account, Dr. Hantash noticed that while the application stated the account would be a private checking account, NTA created a business checking account for Dr. Hantash instead. The business name on the account was Elucent LLC, which is not even Dr. Hantash's company that was party to the JV Agreement. Accordingly, Mr. Wearmouth and NTA, through its agents, caused the transmission of a fake webpage to Dr. Hantash to further their fraudulent scheme. Dr. Hantash informed NTA of this error via email. Mr. Wearmouth and NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

Case 3:24-cv-02392-D    Document 1    Filed 09/20/24    Page 29 of 44    PageID 29

124.    Criminal Act No. 49: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about June 21, 2023, Dr. Hantash noticed a ledger entry showing $4 million was credited to his NTA account. "Velanos – FST Credit" was listed as the source. NTA, through its agents, had caused a fake webpage to be transmitted to Dr. Hantash to illustrate a fake wire transfer. Dr. Hantash quickly informed Mr. Byrd that he did not instruct any funds to be transferred, but Mr. Byrd failed to address this issue. NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

125.    Criminal Act No. 50: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about June 29, 2023, Dr. Hantash again emailed NTA's email address to request his account be changed from a business account to a personal checking account. NTA's purported admin, Defendant Daniel Fernandes caused the change to be made the same day. In reality, this change meant nothing because the entire account was later revealed to be fake. NTA, through its agents, transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

126.    Criminal Act No. 51: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about June 30, Dr. Hantash attempted to execute an outgoing wire request from his NTA account of $4 million. Dr. Hantash also emailed NTA to request that the outgoing wire transfer be approved immediately. The same day, Dr. Hantash received a private message through the NTA portal that the wire request had been cancelled without providing any explanation. NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

127.    Criminal Act No. 52: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about July 1, 2023, Dr. Hantash again attempted to execute an outgoing wire request from his NTA account for $3.99 million. The NTA website displayed that the transfer was executed on July 1, 2023, with an expected receipt date of July 5, 2023. This webpage was fake because no wire transfer had been executed. NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

128.    Criminal Act No. 53: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about July 5, 2023, the funds did not arrive. Instead, NTA, through its agents, caused an admin message to appear and indicate that due to a restriction, the funds would now be received on July 13, 2023. This message also turned out to be false because, on or about July 13, 2023, the funds did not arrive. Notably, July 13, 2023, was also the same date on which the *second* distribution was due to Dr. Hantash pursuant to the JV Agreement. Dr. Hantash had yet to receive any funds from his investment. NTA transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

129.    Between July 5, and July 13, 2023, Dr. Hantash repeatedly contacted Mr. Byrd to determine whether the JV Agreement would be extended, and the funds would remain in the NTA account. Mr. Byrd never sent any addendum or further directive pursuant to the JV Agreement. Therefore, Dr. Hantash directed the funds from the second distribution to be wired to a non-NTA account.

130.    The purported NTA admin, Mr. Fernandes, never responded to Dr. Hantash's requests to trace the second distribution or the July 1, 2023, transfer of $3.99 million. Mr.

Fernandes did not respond to phone calls, emails, or online messages through the NTA portal system. Dr. Hantash was consistently sent to Mr. Fernandes' voicemail. Mr. Fernandes never responded. Nor did any representative from NTA furnish any documentation or reasoning to support the failed wire transfer.

131. <u>Criminal Act No. 54: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. Between June 20 and June 26, 2023, Mr. Byrd contacted Dr. Hantash via phone to provide an explanation for NTA's failure to complete the wire transfer. The only explanation Mr. Byrd was able to provide was that Dr. Hantash should only execute a wire that leaves in the account a portion of the funds received into the NTA account. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

132. <u>Criminal Acts Nos. 55-56: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. As his suspicions grew, Dr. Hantash requested a proof of funds for the NTA account. On or about July 21, 2023, Dr. Hantash logged into his NTA portal. Instead of showing $4,000,000 in the account, the NTA portal now showed a balance of only $10,000. The same day, Dr. Hantash initiated a wire to transfer the $10,000 out of the NTA account. NTA, through its agents, caused a private message to be sent to Dr. Hantash through the NTA portal showing that the wire was executed on the same day. The NTA portal displaying a balance of $10,000 and the private message were both fake and/or false and created by NTA to further string Dr. Hantash along. NTA, through its agents, transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

Case 3:24-cv-02392-D    Document 1    Filed 09/20/24    Page 32 of 44    PageID 32

133.    To date, Dr. Hantash has not received any completed wire transfer for funds leaving the NTA account. The NTA account displays a balance of approximately negative $40 due to bank fees assessed for the account.

## VI.    Hantash Sends the SBLC Syndicate a Notice of Breach of Contract Under the Joint Venture Agreement.

134.    On or about July 27, 2023, Dr. Hantash sent Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie an email to provide a notice of breach of contract to the JV Agreement. Dr. Hantash's email outlined the multiple deficiencies, breaches, and failures to perform for which Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie were responsible. These breaches included, but were not limited to, failure distribute Dr. Hantash's funds as anticipated, failure to allow Dr. Hantash to direct his funds per his discretion, and failure to notify Dr. Hantash with any details regarding his investment. Dr. Hantash's email also provided notice to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie of the scope of his anticipated damages, but directly and indirectly related to the breach.

135.    <u>Criminal Act No. 57: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about July 27, 2023, Dr. Hantash also emailed Edward Koziel, NTA's purported compliance officer regarding the wires that were not executed and the deeply concerning fact his account now showed a $0 balance. Upon calling his listed number, the individual muttered his name – "Eddie Perez." The individual answered startled and, after gathering his thoughts, told Dr. Hantash that he would send a message to NTA's office in Sweden to contact Dr. Hantash and resolve the issues. Dr. Hantash later learned that Eddie Perez was an alias for Heriberto Candelario Perez Valdes, a Director of NTA. Mr. Perez transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

Case 3:24-cv-02392-D    Document 1    Filed 09/20/24    Page 33 of 44    PageID 33

136.    Both Mr. Fernandes and Mr. Perez were named defendants in a lawsuit brought by the SEC in the United States District Court for the District of Massachusetts for their roles in orchestrating a Ponzi scheme and defrauding individuals out of approximately fifteen million dollars ($15,000,000).

137.    On or about August 7, 2023, and after receiving no response to either of his previous emails, Dr. Hantash emailed Mr. Koziel at NTA to respond to his prior question. The same day Dr. Hantash also emailed Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie to respond to his prior notice of breach of contract. Indeed, in Dr. Hantash's email to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie, he told the receiving parties that he was now aware that NTA is not a bank, foreign bank, or trust bank in the United States, Sweden, or Switzerland.

138.    <u>Criminal Act No. 58: Violation of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about August 7, 2023, and following multiple requests for wire instructions and additional details, Mr. Byrd spoke with Dr. Hantash on the phone regarding his concerns. Mr. Byrd admitted NTA was not a U.S. licensed bank. Now, Mr. Byrd claimed NTA was a foreign bank licensed in Switzerland and Sweden. Mr. Byrd was unable to provide any proof of a foreign banking license in either country. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

139.    Dr. Hantash followed up with additional emails to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie on August 8 and August 9, 2023. In these emails, Dr. Hantash explained that he had received multiple liquidation notices pertaining to his wife's brokerage account., the same account from which Hantash borrowed funds to make the original $4,000,000 investment into the JV Agreement. Dr. Hantash previously explained that he was borrowing the funds from the brokerage

account and that funds needed to be repaid in 90 days, thus explaining Dr. Hantash's focus on understanding what return was feasible within a 90-day turnaround time. Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie went silent.

140.    On or about August 11, 2023, Dr. Hantash again emailed Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie requesting proof of funds for the second distribution due from his investment. Dr. Hantash also drew attention to his latest conversation with Mr. Byrd wherein Mr. Byrd explained he was not part of Velanos. Mr. Byrd has a Velanos email address and consistently held himself out as the individual with control over Velanos' operations.

141.    Criminal Act No. 59: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about August 15, 2023, Dr. Hantash emailed Mr. Fenster and Mr. Gillespie as a demand to share Deal Exchange's D&O policy and carrier information for claims against Velanos and/or Soteria. Mr. Fenster responded via email and told Dr. Hantash that he had no communication or information regarding Dr. Hantash's SBLC investment since April 2023. This is inconsequential. Mr. Fenster's actions from January through April 2023 solidified his and Deal Exchange's role in the SBLC Syndicate for which he is liable. Mr. Fenster transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

142.    On or about August 17, 2023, having received no response to his prior emails, Dr. Hantash sent a follow up email to Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie regarding Velanos' breach of contract in relation to the JV Agreement.

143.    Criminal Act No. 60: Violation of 18 U.S.C. § 1343 (Wire Fraud). On or about August 23, 2023, Mr. Byrd represented to Dr. Hantash via text message that he had an update regarding his investment. Dr. Hantash emailed Mr. Byrd and Mr. Wearmouth encouraging Mr.

Byrd to dictate his update in an email. Mr. Byrd did not respond. Mr. Byrd transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

144.    On or about August 29, 2023, Dr. Hantash emailed Mr. Gibbins, the supposed previously successful investor to whom Mr. Byrd and Mr. Gillespie referred Dr. Hantash, to inquire about his experience and set up a phone call. Mr. Gibbins did not respond.

145.    On or about August 28 and 29, 2023, Dr. Hantash emailed a notice of default under the JV Agreement to Lucia Harris (a/k/a Lucia Alves) and James Hutchinson, two directors of Velanos.

146.    <u>Criminal Act No. 61: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about August 29, 2023, Ms. Harris responded to Dr. Hantash's email stating that she would review his complaint and would follow up with Dr. Hantash once done. Ms. Harris transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

147.    <u>Criminal Act No. 62: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about August 29, 2023, Mr. Hutchinson responded to Dr. Hantash's email stating that he was in receipt of Dr. Hantash's complaint and that he would look into the matter. Mr. Hutchinson never responded in substance. Mr. Hutchinson transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises

148.    <u>Criminal Act No. 63: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about September 1, 2023, Dr. Hantash sent follow up emails to Ms. Harris and Mr. Hutchinson. Ms. Harris responded on September 3, 2023, that Velanos does not have D&O insurance that she

"cannot speak to the US Velanos Corporation." Ms. Harris also stated that she was not aware of any account Dr. Hantash may or may not have had with NTA. Ms. Harris transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

149. <u>Criminal Act No. 64: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. In a separate email on September 3, 2023, Ms. Harris told Dr. Hantash that she would provide him with information for her lawyer separate from Velanos should a lawsuit be filed. Ms. Harris also represented that she would reach out to NTA to request an explanation regarding Dr. Hantash's concerns. Ms. Harris transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

150. <u>Criminal Act No. 65: Violations of 18 U.S.C. § 1343 (Wire Fraud)</u>. On or about September 6, 2023, Ms. Harris emailed Dr. Hantash to say that she had not been a director at Velanos since January 27, 2023 – prior to the execution of the JV Agreement. Ms. Harris transmitted this communication by means of interstate wire to Dr. Hantash in furtherance of his scheme to obtain money by means of false or fraudulent pretenses, representations, or promises.

151. On or about October 3, 2023, Dr. Hantash again emailed Mr. Byrd, Mr. Wearmouth, and Mr. Gillespie regarding their failure to respond to his notice of default and their failure to cure their material breach of the JV Agreement.

**VII. Hantash Learns He is the Latest Victim to the SBLC Syndicate's Repeated Fraudulent Schemes.**

152. As days went by with no clear answers and no money returned, Dr. Hantash's suspicions grew that he had fallen victim to a multi-million-dollar fraudulent scheme. Accordingly, Mr. Hantash took it upon himself to research the individuals with whom he was in contact.

**PLAINTIFF'S ORIGINAL COMPLAINT**

Case 3:24-cv-02392-D    Document 1    Filed 09/20/24    Page 37 of 44    PageID 37

153. Dr. Hantash learned that Mr. Byrd was involved with an entity called FCC Capital Ventures in Dallas, Texas, albeit under the alias "Wilbur Byrd." Dr. Hantash further learned that Mr. Byrd was involved in a lawsuit related to FCC Capital Ventures in which it is alleged Mr. Byrd induced others into an investment fraud scheme. The relevant case is captioned as: Cause No. DC-21-05384 – *Aexonis Holdings, Inc. v. Wilbur Byrd, et al.* in the 101st District Court, Dallas County, Texas ("Aexonis Lawsuit").

154. Dr. Hantash contacted the plaintiff's attorney in the newly discovered lawsuit. The plaintiff's attorney indicated that at least five other individuals/entities had contacted him with concerns about investment fraud related to Mr. Byrd and entities under his control – each for tens of millions of dollars.

155. Dr. Hantash also learned that many individuals with whom he was in contact regarding his investment had provided pseudonyms or slightly misspelled names. For example, James William Byrd went by the name Wilbur Byrd based on the Aexonis Lawsuit. Velanos' Canadian bank officer was listed as "Jasotha Ulganathan"; however, further researched revealed the correct spelling was "Jasotha Ulaganathan." Hantash also learned that the reference investor with whom he spoke, and to whom Defendants consistently referred to as "Martin Gibbons," was more accurately spelled "Martin Gibbins." Additionally, the head of the NTA bank was introduced as "Danyel Fernandes" originally, when his real name is "Daniel Fernandes."

156. Dr. Hantash also learned that Mr. Byrd, Mr. Wearmouth, and NTA were all defendants in a lawsuit brought by Genie Investments NV in Florida Federal court. The relevant case is captioned as: Case No. 6:24-cv-271-ACC-LHP – *Genie Investments NV, LLC v. Joshua Wearmouth, James William Byrd, and Nordic Trust Alliance KB, LLC* in the in the United States District Court for the Middle District of Florida, Jacksonville Division ("Genie Lawsuit").

157.    In the Genie lawsuit, Plaintiff Genie Investments NV, LLC ("Genie") allege Mr. Byrd and Mr. Wearmouth defrauded Genie into contributing a total of nine million dollars ($9,000,000) into an investment with Velanos. Mr. Byrd, Mr. Wearmouth, and Velanos also worked with NTA to further their scheme against Genie, even including creating a fake bank account to display Genie's alleged investment.

158.    The structure of the scheme in the Genie Lawsuit is nearly identical to the scheme the Defendants have perpetrated against Dr. Hantash here. Genie lost millions as has Dr. Hantash.

159.    Defendants have demonstrated a pattern of repeated attempts to intentionally defraud millions of dollars from multiple individuals and companies. Thus, the SBLC Syndicate extends beyond just the illegal actions against Dr. Hantash. Accordingly, Defendants unequivocally represent what can only amount to a coordinated criminal organization.

## CAUSES OF ACTION

### COUNT I: RICO – 18 U.S.C. § 1962(c)

160.    Plaintiff hereby incorporates by reference the allegations and causes of action contained in the preceding paragraphs of this Complaint as if fully set forth herein.

161.    This Count is against all Defendants.

162.    The SBLC Syndicate is an enterprise engaged in and whose activities affect interstate commerce. Defendants are employed by or associated with the SBLC Syndicate.

163.    Defendants agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Dr. Hantash. The Defendants fraudulently induced Dr. Hantash into transferring Four Million Dollars ($4,000,000) to the SBLC Syndicate. The Defendants misrepresented the status and liquidity of Dr. Hantash's property to deprive him of the same and profit therefrom.

Case 3:24-cv-02392-D    Document 1    Filed 09/20/24    Page 39 of 44    PageID 39

164.    Pursuant to and in furtherance of their fraudulent scheme, the Defendants committed at least 65 related criminal acts as set forth above, which constitute racketeering activity pursuant to 18 U.S.C. § 1343 (relating to wire fraud).

165.    The 65 related criminal acts constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

166.    The Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity described above, in violation of 18 U.S.C. 1962(c).

167.    As a direct and proximate result of the Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Dr. Hantash has been injured through the theft of Four Million Dollars ($4,000,000).

168.    Dr. Hantash requests that this Court enter judgment against the Defendants awarding: (a) compensatory damages of $4,000,000 plus prejudgment interest at the statutory rate against Defendants jointly and severally; (b) consequential damages; (c) treble damages against Defendants jointly and severally; (d) attorneys' fees and costs pursuant to applicable law; and (e) all such further relief as this Court deems just and proper.

### COUNT II: RICO – 18 U.S.C. § 1962(d)

169.    Plaintiff hereby incorporates by reference the allegations and causes of action contained in the preceding paragraphs of this Complaint as if fully set forth herein.

170.    This Count is against all Defendants.

171.    As set forth above, Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, Defendants conspired to conduct and participate in the conduct of the affairs of the

SBLC Syndicate though a pattern of racketeering activity. The Defendants also conspired to conceal the conduct of the affairs of the SBLC Syndicate through a pattern of racketeering activity.

172.     Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), itself a violation of 18 U.S.C. § 1962(d).

173.     As a direct and proximate result of the Defendants' conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1961 *et seq.*, Dr. Hantash has been injured through the theft of Four Million Dollars ($4,000,000).

174.     Therefore, Dr. Hantash requests that this Court enter judgment against the Defendants awarding: (a) compensatory damages of $4,000,000 plus prejudgment interest at the statutory rate against Defendants jointly and severally; (b) consequential damages; (c) treble damages against Defendants jointly and severally; (d) attorneys' fees and costs pursuant to applicable law; and (e) all such further relief as this Court deems just and proper.

## COUNT III: COMMON LAW FRAUD

175.     Plaintiff hereby incorporates by reference the allegations and causes of action contained in the preceding paragraphs of this Complaint as if fully set forth herein.

176.     This Count is against all Defendants.

177.     As set forth above, Defendants, as individuals and acting by and through their respective principles, employes and agents, made material misrepresentations to Dr. Hantash as it concerned his investment of Four Million Dollars ($4,000,000) into the SBLC Syndicate's scheme including the validity of the investment, the terms of the investment as represented in the JV Agreement and elsewhere, the length of the investment, the profit-split of the investment, the return

Case 3:24-cv-02392-D   Document 1   Filed 09/20/24   Page 41 of 44   PageID 41

on investment, and more. Defendants represented that they offered a safe and lucrative investment for Dr. Hantash.

178.   These material representations were false.

179.   At the time these representations were made, Defendants knew the representations were false and/or made these representations recklessly, as a positive assertion, and without knowledge of the truth. In doing so, Defendants intended that Dr. Hantash rely on these representations and act on them.

180.   Dr. Hantash reasonably relied on these representations in investing his Four Million Dollars ($4,000,000) in the SBLC Syndicate's investment scheme.

181.   Dr. Hantash was damaged by his reliance on Defendants' misrepresentations. Dr. Hantash was deprived of Four Million Dollars ($4,000,000) of his property without any possibility of return or profit because the SBLC Syndicate's investment scheme was fraudulent.

182.   In addition to the foregoing, each Defendant is vicariously liable for the fraudulent acts because they directly benefited from the fraudulent conduct identified herein and had knowledge of the fraud.

183.   Dr. Hantash requests that this Court enter judgment against the Defendants awarding: (a) compensatory damages of $4,000,000 plus prejudgment interest at the statutory rate against Defendants jointly and severally; (b) consequential damages; and (c) all such further relief as this Court deems just and proper.

## COUNT III: UNJUST ENRICHMENT

184.   Plaintiff hereby incorporates by reference the allegations and causes of action contained in the preceding paragraphs of this Complaint as if fully set forth herein.

185.   This Count is against all Defendants.

**PLAINTIFF'S ORIGINAL COMPLAINT**

Case 3:24-cv-02392-D    Document 1    Filed 09/20/24    Page 42 of 44    PageID 42

186.    As set forth above, Defendants set out a fraudulent investment scheme to induce Dr. Hantash to turn over Four Million Dollars ($4,000,000) to Defendants. Accordingly, Dr. Hantash, at his own expense, provided Defendants $4,000,000 as an investment.

187.    Defendants were enriched by virtue of Dr. Hantash providing Defendants with the Four Million Dollars ($4,000,000).

188.    As set forth above, Defendants obtained the benefit by fraud.

189.    For the reasons set out above, Defendants have been unjustly enriched, and it would by unjust to permit Defendants to retain the $4,000,000 that Dr. Hantash provided.

190.    As a result of Defendants acts and omissions directly resulting in Defendants' retension of the benefit and unjust enrichment, Dr. Hantash has suffered actual and significant injury. Defendants will be unjustly enriched if allowed to retain the benefit; therefore, Dr. Hantash is entitled to full restitution of the Four Million Dollars ($4,000,000).

191.    Therefore, Dr. Hantash requests that this Court enter judgment against the Defendants awarding: (a) compensatory damages of $4,000,000 plus prejudgment interest at the statutory rate against Defendants jointly and severally; (b) consequential damages; (c) attorneys' fees and costs pursuant TEX. CIV. PRAC. & REM. CODE § 38.001 *et seq.*; and (c) all such further relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that that Defendants be cited to appear and answer, and that upon a final trial of this cause, Plaintiff recover appropriate relief or judgment against Defendants for:

(i)    actual damages;

(ii)    consequential damages;

(iii)   exemplary damages, including but not limited to, treble damages pursuant to 18 U.S.C. § 1964(c);

(iv)   pre-judgment and post-judgment interest at the maximum rate allowed by law;

(v)   reasonable and necessary attorneys' fees;

(vi)   costs of court; and

(vii)   such other relief, general and special, to which Plaintiff is entitled at law and/or in equity, and/or which the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues that are so triable.

Dated: September 20, 2024

Respectfully submitted,

**CHAMPION LLP**

*/s/ Austin Champion*
Austin Champion
Texas Bar No. 24065030
Austin.Champion@championllp.com

Eugene M. Massad, III
Texas Bar No. 24126247
Eugene.Massad@championllp.com
----
2200 Ross Avenue
Suite 4500W
Dallas, Texas 75201
214-225-8880 | Main
214-238-8881 | Fax

and

**STOKLEY PLLC**

W. Craig Stokley
State Bar No. 24051392
cstokley@stokleypllc.com
----
8150 N. Central Expressway
Suite 550
Dallas, Texas 75206
Telephone: (214) 295-6414

**COUNSEL FOR PLAINTIFF
BASIL M. HANTASH**

Feds Seizing Dallas Area Homes Bought By Fraudsters

Advertisement



*FFC Capital's Rob Welsh, Magnolia Financial Group's Christopher Fisher and Vanguard Holdings Group's Kenneth Alexander*

Advertisement

Dallas.

TFTWDEV Group Irrevocable Trust purchased the Fort Worth property in Oct. 2022. Alexander signed the deed for this property.

This home was built in 1939 and was valued at $767,150 in 2024, appraisal data shows.

# Sign Up for the National Weekly Newsletter

Enter Your Email

Feds Seizing Dallas Area Homes Bought By Fraudsters

Advertisement

According to the complaint, Conner bought the Heath house with the money he made selling his Dallas home, which he bought with funds "directly traceable to victim proceeds."

The 5,400-square-foot home has five bedrooms and six bathrooms and was built in 2023. Zillow estimates the property's market value is $1.9 million.

In June, Destiny Hunter also secured a $721,000 mortgage for 10 Sunset Trail in Rockwall, a $417,000 mortgage for 4321 Soaring Star Lane in Mesquite and a $239,000 mortgage for 1215 Paladao Drive, also in Mesquite. AMGT was the lender for all three loans.

Prosecutors are asking the district court to forfeit the Fort Worth and Heath

Feds Seizing Dallas Area Homes Bought By Fraudsters

Advertisement



DALLAS

## Bank claims New Jersey investor lied to score loan at Fort Worth's tallest tower

COMPANIES AND PEOPLE

Axiom Financial    Benchmark Capital Holdings and Magnolia Financial Group    Blackwater Capital Group

FFC Capital Ventures    LLC    LLC ("Magnolia")    Vanguard Holdings Group    Caedrynn Conner

Christopher Fisher    Kenneth Alexander    Robert Welsh

TAGS

DFW    district court    Lawsuit    ponzi

2/11/25, 11:48 AM                                    Feds Seizing Dallas Area Homes Bought By Fraudsters

Advertisement

 **Witkoff to revive Blavatnik and Scher's long planned Ocean Terrace project in Miami Beach**

 SOUTH FLORIDA    FEB 7, 2025
**Related Urban wants to bring mixed-income apartments to Coconut Grove**

 NATIONAL    FEB 10, 2025
**Hyatt acquiring resort operator for $2.6B**

 NEW YORK    FEB 7, 2025
**Back from the brink: One High Line sellout nears the finish line**

Advertisement

CAREERS

SHOP

All rights reserved © 2025 The Real Deal is a registered Trademark of Korangy Publishing Inc.

450 West 31st Street, New York, NY 10001 Phone: 212-260-1332



# EXHIBIT C

From:           John from Genie Investments
To:             "raye.elliott@akerman.com"; David from Genie Investments
Cc:             blackman@nlanlaw.com
Subject:        RE: In re Genie Investments, NV, Inc.
Date:           Thursday, January 23, 2025 11:20:00 AM
Attachments:    image001.png

Ms. Elliott,

We want to reassert that we are fully committed to cooperating with the Court and the Trustee to the fullest extent throughout this process. We also thank you for your assistance and attention to these matters, as we share the goal of ensuring the bankruptcy estate is handled fairly and equitably.

In response to your concerns regarding our personal claims against the Warren Law Group and Scott Oh, we would like to provide further clarification:

**1. Basis for Personal Claims**
While the Warren Law Group was retained to represent Genie Investments NV, Inc., our personal claims are rooted in harm that is **separate and distinct from the bankruptcy estate**. Specifically, the examiner's report acknowledged reputational harm that directly impacted us as individuals. This harm is unrelated to the corporate malpractice claims belonging to the estate.

**2. Relevant Legal Precedent**
The following case law supports our position that we are entitled to pursue personal claims:

- **In re Icarus Holding, LLC, 391 F.3d 1315 (11th Cir. 2004):** This case establishes a distinction between claims belonging to the bankruptcy estate and personal claims of stakeholders, affirming that individuals retain the right to pursue personal harm that is distinct from the corporate entity.
- **Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416 (1972):** The Court ruled that a trustee cannot bring claims on behalf of individuals and cannot prevent individuals from pursuing their own distinct claims.
- **Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982):** This case reaffirms the constitutional right to due process, which guarantees individuals access to the courts to seek remedies for personal harm.
- **In re Colonial Realty Co., 980 F.2d 125 (2d Cir. 1992):** Trustees must act within the limits of their authority and cannot interfere with claims that are not part of the estate.

**3. Response to Potential Impact on the Bankruptcy Estate**
We acknowledge your concern that pursuing our claims could impact the malpractice insurance policy available to the bankruptcy estate. However, it is important to emphasize:

- **Distinct Nature of Claims:** Our claims for reputational harm are independent of the

estate's claims for corporate malpractice. The trustee does not have standing to pursue damages for personal reputational harm, as such claims do not belong to the estate.

- **Rights to Personal Redress:** Denying us the ability to pursue personal claims would violate established legal principles, including our constitutional right to access the courts.

- **Allocation of Insurance Proceeds:** The allocation of insurance funds does not override our right to seek personal redress. Courts have recognized that insurance proceeds are subject to competing claims, and our claims do not diminish the trustee's authority to pursue corporate malpractice claims on behalf of the estate.

- **Certain Considerations Favor Individuals:** Courts have recognized that **certain considerations may indirectly favor individuals, particularly in cases involving personal harm or unique vulnerabilities.** For example:
  - In **Logan v. Zimmerman Brush Co., 455 U.S. 422 (1982),** the Court underscored the importance of access to the courts as a fundamental right, especially in cases where personal harm, such as reputational damage, affects the ability of individuals to provide for themselves and their families.
  - In re **Icarus Holding, LLC** also emphasized that harm to individuals that arises from reputational or professional damage is distinct from corporate harm and must be treated separately. These legal principles affirm that individuals have the right to seek remedies for their unique circumstances, even in cases involving a bankruptcy estate.

**Conclusion**

We remain committed to working collaboratively with the Trustee and the Court. At the same time, we must protect our individual rights to pursue remedies for personal harm that is not part of the bankruptcy estate. We respectfully assert that our claims are both legally valid and distinct, and we trust that they can coexist without adversely impacting the estate.

Thank you again for your assistance, and we are available to discuss this matter further to ensure clarity and alignment.

Sincerely,

**John Michael Cohan**
Genie Investments, Director



A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take

the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.

DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm

PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.


**From:** raye.elliott@akerman.com <raye.elliott@akerman.com>
**Sent:** Wednesday, January 22, 2025 6:48 PM
**To:** John from Genie Investments <jmcohan@genieinvestments.com>; David from Genie Investments <dhughes@genieinvestments.com>
**Cc:** bkmickler@planlaw.com
**Subject:** RE: In re Genie Investments, NV, Inc.

Mr. Cohan,

Thank you for email. I agree that any personal claims or causes of action that you and Mr. Hughes hold are not impacted by the Genie bankruptcy case. In fact, yesterday and today I have received emails from a few of the Debtors' creditors with copies of demand letters that you have sent them in your personal capacity and I have told each of them that the bankruptcy case does not impact any individual claims you may or may not hold against them.

I don't know what your legal counsel told you, but I don't see how you have a personal cause of action against the Warren Law Group and Scott Oh, since they were retained to represent Genie Investments and not you personally. My concern is that if you try to pursue a personal claim against the Warren Law Group, even if unsuccessful, the firm will look to its malpractice insurance policy to pay defense costs which will eat into the insurance policy limits that would otherwise be available to the bankruptcy estate when the Trustee pursues the malpractice claim on behalf of Genie. In that way, I am afraid that your attempting to pursue a personal claim against the Warren Law Group

would adversely impact the bankruptcy estate.

**Raye Elliott**
Tampa: Akerman LLP | 401 East Jackson Street, Suite 1700 | Tampa, FL 33602
D: 813 209 5013 | T: 813 223 7333| F: 813 223 2837
Jacksonville: Akerman LLP | 50 North Laura Street, Suite 3100 | Jacksonville, FL 32202
T: 904 798 3700 | F: 904 798 3730
raye.elliott@akerman.com

**From:** John from Genie Investments <jmcohan@genieinvestments.com>
**Sent:** Wednesday, January 22, 2025 5:05 PM
**To:** Elliott, Raye (Ptnr-Tpa) <raye.elliott@akerman.com>; David from Genie Investments
<dhughes@genieinvestments.com>
**Cc:** bkmickler@planlaw.com
**Subject:** RE: In re Genie Investments, NV, Inc.

[External to Akerman]

Ms. Elliot,

We hope this message finds you well. We are writing to clarify our intent regarding the claims
we are pursuing and to ensure that we remain cooperative and aligned with the trustee's
responsibilities while also protecting our individual rights.

First, we want to reaffirm that we fully respect the trustee's authority and role in managing the
claims and interests of the bankruptcy estate of Genie Investments NV, Inc. We are **not
attempting to overstep this authority** or infringe upon any claims that rightly belong to the
estate. Our focus is strictly on pursuing claims for the **personal harm** we have suffered, which
are separate and distinct from the estate's malpractice claims.

As noted in the examiner's report, we have endured significant harm to our personal
reputations. Additionally, we previously sought the trustee's assistance in addressing
damaging social media posts by [Stringer], which further exacerbated this harm. These actions
have caused personal damages—diminished credibility, loss of professional opportunities,
and emotional distress—that are independent of the company's operations and bankruptcy
estate.

After consulting with our legal counsel, we have been advised that pursuing these personal
claims is appropriate and does not conflict with the trustee's exclusive authority over the
estate. Our counsel has assured us that the harm we are addressing is uniquely personal and
unrelated to the corporate claims. While we remain fully cooperative and respectful of the
trustee's mandate, we also have a responsibility to protect ourselves and seek remedy for the
harm we have individually suffered.

We deeply value the trustee's role and are committed to ensuring that our actions do not interfere with the bankruptcy proceedings. However, we respectfully request clarification on how pursuing these personal claims could be viewed as conflicting with the estate's rights, particularly given the examiner's findings about our reputational harm and the direct personal impact we have experienced.

Our intention is to work collaboratively with the trustee while safeguarding our individual rights and ensuring we can address the unique damages we have suffered. We would greatly appreciate your guidance and understanding as we navigate this matter.
Thank you for your time and attention. Please let us know if further clarification or documentation would be helpful.

**Citations:** In re Icarus Holding, LLC, 391 F.3d 1315 (11th Cir. 2004), Caplin v. Marine Midland Grace Trust Co., 406 U.S. 416 (1972), In re Colonial Realty Co., 980 F.2d 125 (2d Cir. 1992)

Sincerely,

**John Michael Cohan**
**Genie Investments, Director**

GENIE INVESTMENTS

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.
DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this

information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

**From:** raye.elliott@akerman.com <raye.elliott@akerman.com>
**Sent:** Wednesday, January 22, 2025 3:12 PM
**To:** John from Genie Investments <jmcohan@genieinvestments.com>; David from Genie Investments <dhughes@genieinvestments.com>
**Cc:** bkmickler@planlaw.com
**Subject:** In re Genie Investments, NV, Inc.

Mr. Cohan and Mr. Hughes,

The attorney for Warren Law Group forwarded the attached letter to me that you sent to the firm asserting a claim for legal malpractice. Any claim for legal malpractice for the firm's representation of Genie Investments NV, Inc. belongs to the bankruptcy estate and can only be asserted by the Trustee. Accordingly, please immediately cease and desist with any communications or demands to the Warren Law Group or Scott Oh. Thank you.

**Raye Elliott**
Tampa: Akerman LLP | 401 East Jackson Street, Suite 1700 | Tampa, FL 33602
D: 813 209 5013 | T: 813 223 7333| F: 813 223 2837
Jacksonville: Akerman LLP | 50 North Laura Street, Suite 3100 | Jacksonville, FL 32202
T: 904 798 3700 | F: 904 798 3730
raye.elliott@akerman.com

vCard | Profile

Akerman Logo

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** John from Genie Investments
**To:** bkmickler@planlaw.com
**Subject:** Continued Harassment and Stay Violation By a Creditor - BLAKE STRINGER
**Date:** Monday, November 25, 2024 5:19:00 PM
**Attachments:** Screenshot 2024-11-25 162047.png
Image001.png
Screenshot 2024-11-25 162102.png
Screenshot 2024-11-25 162827.png
Screenshot 2024-11-25 163308.png
Screenshot 2024-11-25 163549.png
Screenshot 2024-11-25 164158.png

Bryan,

I hope this message finds you well. As of this 25th day of November 2024, we are experiencing ongoing challenges with a creditor, Blake Stringer, who continues to harass the estate, its owners, and their related entities. His most recent violation was within the past week. (See screenshot 164158) We respectfully request that the Trustee (TTEE) address this issue promptly to protect the interests of the estate and its beneficiaries. We appreciate your attention to this matter and look forward to a resolution that ensures the well-being of all parties involved. We would like a periodic update on the status of what the TTEE plans to do with Creditors who are continuously violating the bankruptcy stay after the judge's strong warning. Please confirm that you received this email. Thank you.


Sincerely,

**John Michael Cohan**
**Genie Investments, Director**

 GENIE INVESTMENTS

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity. DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see:
http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient,

you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.