UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
In re: Genie Investments NV Inc., Debtor.
Case No. 3:24-bk-00496-BAJ
Chapter 7

FILED USBC JAX, FL
JUL 30 '25 PM4:21

## MOTION TO VACATE JUDGMENT FOR FRAUD ON THE COURT AND WRONGFUL CONVERSION

*Filed Pursuant to Federal Rule of Civil Procedure 60(d)(3) and Chambers v. NASCO, Hazel-Atlas*

This Court has jurisdiction under 28 U.S.C. §§ 157 and 1334, and venue is proper under 28 U.S.C. § 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). The relief requested herein is authorized by Federal Rule of Civil Procedure 60(d)(3), made applicable to this case by Federal Rule of Bankruptcy Procedure 9024, and the Court's inherent authority to prevent abuse of process and correct judgments obtained through fraud on the court.

## I. INTRODUCTION

The integrity of this case has been fatally compromised by a systematic pattern of falsehoods, misrepresentations, and knowing concealment of truth, all of which culminated in a judgment that was not based on the merits, but on deception. The Examiner's Report, relied upon by the United States Trustee (UST), the Chapter 7 Trustee, and their counsel, falsely implied that affiliate loans were fraudulent. That assertion was never made in the report itself, but it was repeatedly testified to under oath. The misstatements are material, repeated, and relied upon by this Court. This case represents a fraud on the court, multi-layered deception perpetrated by the very officers sworn to uphold judicial integrity. The fraud began with the UST's reckless allegations, enabled by our own counsel's inexplicable inaction, metastasized through a fabricated Examiner's report, and culminated in a Chapter 7 Trustee's bad-faith prosecution based on shifting, invented theories.

When confronted with conclusive documentary evidence disproving the report's characterizations, the Chapter 7 Trustee's counsel immediately backtracked, claiming the report was not solely relied upon contradicting testimony already given. The Examiner herself misled the Court at the conversion hearing, stating that funds were transferred after Velanos had defaulted, when in fact all funds were transferred before any performance obligation by Velanos began.

This is not a case of mistaken interpretation. This is fraud on the court, plain and direct, under the standards of *Hazel-Atlas*, 322 U.S. 238 (1944), and *Chambers v. NASCO*, 501 U.S. 32 (1991). The adversary complaint and subsequent judgment must be vacated, with prejudice.

The Chapter 7 Trustee's recent opposition brief doubles down on the same misrepresentations already documented herein, including repeating the false claim that insider loans were "fraudulent transfers" and invoking inflammatory analogies such as "RICO" and "Madoff", comparisons that appear nowhere in the Examiner's report. These unsubstantiated claims, made by officers of the court, continue to corrupt the record and further support this Motion for vacatur.

The record reveals an unmistakable pattern:

## 1. U.S. Trustee Scott Bomkamp's Initial Fraud launched this fraud by:

  - Filing a conversion motion accusing Debtor of having "simply took the money and didn't provide any benefit"

  - Making these allegations without reviewing bank records

  - Violating local rules by failing to confer with Debtor's counsel Bryan Mickler

  - Offering no evidence beyond unverified creditor complaints

## 2. Professional Failures by Attorney Bryan Mickler's Complicity that enabled this fraud:

  - Failing to challenge Bomkamp's baseless allegations

  - Refusing to explain why Bomkamp never contacted him

  - Abandoning his duty to protect his clients from this violation of due process

## 3. Examiner Maria Yip's Fabrications institutionalized the fraud by:

  - Falsely testifying about transfer timing at the conversion hearing

  - Violating GAAP principles in her analysis (i.e. tax filings)

## 4. Chapter 7 Trustee Aaron Cohen's Bad Faith completed the fraud by:

  - Filing adversary complaints without reviewing key bank records or a proper independent investigation

  - Cycling through *three* different rationales ($1.1M transaction → Yip report → loan terms) as each collapsed

  - Continuing prosecution and collection efforts after learning the factual foundation was fraudulent

This was not a series of mistakes. It was a calculated effort to substitute manufactured allegations for evidence, enabled at every turn by professionals who abandoned their duties.

## II. LEGAL STANDARD AND CHRONOLOGY OF FRAUD

"Fraud on the court" under Rule 60(d)(3) is not ordinary fraud between parties. It refers to conduct "that defiles the court itself," typically involving officers of the court engaging in deceitful practices that subvert the integrity of the judicial process. See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944). It includes knowingly false statements, deliberate omission of material facts, or manipulation of the factual record such that the court is misled into issuing a ruling that would not have been made had the truth been disclosed. See also *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991); *Herring v. United States*, 424 F.3d 384, 386 (3d Cir. 2005).

Federal Rule of Civil Procedure 60(d)(3) authorizes a court to "set aside a judgment for fraud on the court." The Supreme Court in *Hazel-Atlas* defined this as conduct that corrupts the judicial machinery itself — particularly fraud committed by officers of the court that prevents fair adjudication. A party need not prove that the outcome would have been different, only that the judicial process itself was compromised.

The Court also retains inherent authority, reaffirmed in *Chambers*, to vacate judgments and impose sanctions where parties or officers of the court abuse the judicial process through fraud, bad faith, or manipulation. In this case, the record is clear:

- Falsehoods were made;
- Repeated under oath;
- Relied upon by the Court;
- And never corrected, even when exposed.

## III. CHRONOLOGY OF FRAUD

This fraud was not a single event, but a progressive pattern of misconduct, initiated by the U.S. Trustee, advanced by a compromised Examiner, and consummated by a Trustee acting without independent diligence. It unfolded in three phases:

A. Phase I – Foundational Procedural Failures: Bomkamp's and Mickler's Initial Fraud

1. U.S. Trustee Scott Bomkamp's First Motion falsely claimed that the Debtor "simply took the money and didn't provide any benefit."

    o Knowingly False: Bank records show that the Debtor did provide value.

- o Reckless: Bomkamp made this claim without reviewing the transaction records.

- o Unprofessional: The motion was filed without even conferring with Debtor's counsel, Bryan Mickler, in violation of standard protocol.

2. Attorney Bryan Mickler's failure to act further undermined procedural safeguards::

- o He never challenged Bomkamp's failure to confer.

- o He refused to demand that Bomkamp review the Debtor's financials.

- o When asked why Bomkamp didn't call to verify the facts, Mickler simply shrugged—demonstrating passive indifference to material misrepresentation.

B. Escalation of Misstatements and Examiner Involvement: Bomkamp and Yip's Collaboration

After Bomkamp's meritless initial motion, he escalated the misconduct:

1. He hand-selected Examiner Maria Yip, who demonstrated clear bias aligned with his agenda.

2. He knowingly relied on Yip's speculative report, which included:

- o The manufactured term "customer funds," unsupported by any contract;

- o False implications of fraud, despite governing agreements clearly stating all funds were earned revenue;

- o Basic violations of Generally Accepted Accounting Principles (GAAP) in her analysis, despite Yip being a licensed CPA with full access to the Debtor's tax filings and accounting records.

C. Final Reliance on Examiner Findings and Resulting Harm: Trustee Cohen's Shifting Theories

Chapter 7 Trustee Aaron Cohen completed the sequence of fraud by:

1. Filing adversary claims while citing without reviewing the $1.1 million transaction records;

2. Cycling through three untenable legal theories, each abandoned when exposed:

- o First Theory: The $1.1 million transfer was fraudulent, disproven by documentation.

- o Second Theory: The speculative Examiner's report, that justified conversion, and is completely undermined when shown to be fabricated.

- o Third Theory: Affiliate loan terms were "too favorable", a legally baseless claim under any applicable precedent (see Exhibit A, Adam Walker Memo).

This sequence of escalating misconduct, originating with an unfounded allegation, progressing through a fraudulent report, and culminating in bad-faith litigation, is the textbook definition of fraud on the court. The integrity of the judicial process has been irreparably tainted, and vacatur is not only justified, it is required.

## IV. WALKER MEMO – LEGAL CONFIRMATION THAT FRAUD OCCURRED

Attached as Exhibit A is a memorandum from Adam Walker, a 12-year FINRA enforcement attorney and securities law expert. Mr. Walker affirms that the Examiner's report misrepresents legal and factual issues, and that the United States Trustee's reliance on it to make the allegations constituted fraud in and of itself.

Crucially, Mr. Walker's analysis shows that Scott Bomkamp, the U.S. Trustee, committed knowing fraud by filing a motion to convert based entirely on what he knew was a factually and legally deficient report. Mr. Walker, a 12-year FINRA enforcement attorney, directly rebuts the foundation of the Trustee's motion to convert and adversary complaint. He concludes the Examiner's report was both factually deficient and legally untenable, and that Mr. Bomkamp's reliance on it, despite knowing its defects, constitutes fraud upon the court. This renders the initial conversion voidable for fraud.

## V. EXAMINER'S MISSTATEMENT IN COURT – NEVER CORRECTED

But the fraud does not stop there, it only accelerates. On the day of the conversion hearing, Examiner Maria Yip testified that Genie Investments NV Inc. transferred funds to Velanos after Velanos had defaulted on its obligation to return funds. This was false.

Under the parties' agreement, Velanos had no obligation to return funds until December 5, 2023. All $9 million in transfers, $3 million per transaction, were completed before that date. Thus, Velanos was not in default at the time of the transfers, and Yip's statement to the contrary was materially misleading.

When this misstatement was made in open court, the undersigned and John Michael Cohan requested a sidebar with their attorney, Bryan Mickler, and explained the truth, that the Examiner had misled the Court. We instructed Mickler to return into the court and correct the record. He refused. Instead, he made a vague comment that "something could be fact-checked later," and failed to request reconsideration or clarify the Examiner's misstatement, despite knowing it was false. When provided the clear timeline of transfers and the agreement, along drafted reconsideration and appeal motion, he also refused, instructed us to hire new counsel [while collecting $60,000 from the debtor and continuing to bill the estate.

Attached as Exhibit X is a contemporaneous verification letter from legal counsel for Velanos. This letter, provided to us during the transaction, expressly represented that the Velanos program was legitimate and that Velanos' legal counsel stood behind the program.

**Clarifying Timeline and Legal Reliance:**

To set the record straight, Plaintiff submits the following indisputable timeline and facts. On October 20, 2022, Genie Investments transmitted the first $3 million to Velanos, only after receiving affirmative legal authorization from Scott Oh of Warren Law Group, who had completed initial due diligence and negotiated the original transactional contract. Following that, the second $3 million was sent on **November 21, 2022** (before Velanos defaulted), again with legal endorsement and upon Warren Law Group's review and modification of the agreement. The **third tranche of $3 million** was transferred on **November 30, 2022** (before Velanos defaulted), subsequent to receiving the **Gowling Law letter**, which Velanos provided in good faith to further substantiate its operational legitimacy.

These funds were sent before any contractual breach or default occurred. Contrary to Examiner Maria Yip's misleading characterization during trial, Velanos had not defaulted at the time these transfers were made. The first and only date on which Velanos became contractually obligated to return funds was December 5, 2022. (Exhibit B "JV Timeline and Transfers Email") Thus, all three $3 million transfers occurred prior to any default, and no funds were sent in violation of prudent business practice or in disregard of a known breach.

Further, the Gowling Law capabilities letter, was an unsolicited third-party legal opinion voluntarily provided by Velanos as part of their effort to demonstrate transparency and credibility. While this letter was not the original basis for initiating the relationship, it served to bolster confidence in Velanos' operational infrastructure and legal standing prior to the second or third transfer. At no time did Plaintiff act recklessly, and at every critical juncture, Plaintiff sought, obtained, and relied on licensed legal counsel.

These facts directly rebut the Trustee's narrative of gross negligence and deliberate misconduct. They also undermine the core predicate for conversion and the adversary complaint. The omission of this evidence by Plaintiff's former attorney and its subsequent misrepresentation in court form a material part of the broader fraud on the court, which has tainted the fairness and integrity of these proceedings and warrants immediate vacatur and evidentiary review.

This document demonstrates that we did not act recklessly or with fraudulent intent. On the contrary, we had further formal legal assurances in hand, provided directly by the other party's attorney. The subsequent failure of Velanos and the damage caused to us and our estate does not change the fact that these steps were taken at the time.

The existence of this letter, combined with the Examiner not finding fraud, directly undercuts the Trustee's narrative of fraudulent transfers or gross mismanagement.

This material was not speculative; it was vetted, documented, and supplied by counsel. Yet Mickler never submitted it to the Court, never disclosed it to the Examiner, and never offered it in rebuttal to the false implication. Had this evidence been provided, it would have directly contradicted the Examiner's insinuations and neutralized the core predicate of the Chapter 7 Trustee's adversary complaint.

This omission further illustrates the collapse of the adversarial process, a key element of fraud on the court, and supports vacatur.

## VI. EXAMINER IGNORED STATEMENTS WRITTEN IN EMAILS AND IN TESTIMONY RESULTING IN A FALSE CONCLUSION

Attached as Exhibit C is a series of emails exchanged between our legal counsel and Examiner Yip and her assistant. These emails clearly advised the Examiner that the funds sent to Velanos were not customer funds, but revenue earned through contracts and agreements. The Examiner ignored this.

The United States Trustee's opposition brief does not address, and therefore concedes, the fact that the Examiner was explicitly told, via contemporaneous emails with counsel present, that the funds transferred to Velanos were revenue, not customer deposits.

This manipulation laid the foundation for the Chapter 7 Trustee's adversary complaint, falsely suggesting Madoff-like behavior that never occurred.

### A. The Examiner's Assertion of "Customer Funds" Was Contractually Impossible and Knowingly False

As explained in Adam Walker's memorandum (Exhibit A) and supported by the governing contracts themselves, the funds transferred to Velanos could not have been "customer funds" under any definition applicable to this case. Genie operated under three agreements: the BELOC loan agreement, the bridge loan agreement, and the due diligence agreement. In each of these contracts, all payments received by Genie became the property of Genie upon receipt and were classified as earned revenue. There was no fiduciary trust relationship, no escrow condition, and no legal or contractual duty to segregate funds or return them unless specifically conditioned.

Therefore, the Examiner's repeated use of the term "customer funds," and her assertion that David Hughes said as much, is not just false, it is contractually impossible. The Examiner either deliberately ignored the plain language of the contracts or manufactured a false narrative by inserting a legally loaded term that was never used by the parties. Mr. Hughes never stated that customer funds were sent to Velanos, and even if he had, that statement would contradict the contracts and the known accounting treatment of those revenues as earned at the time of receipt.

The Trustee's reliance on this manufactured report, and their failure to produce any language from the contracts themselves that would support the "customer funds" theory, is further evidence of the falsity and bad faith that underpins the [1] entire conversion, the [2] adversary complaint, and [3] all subsequent orders.

## B. Examiner Yip's Conduct Violated Her Fiduciary Duties and Ethical Obligations as a Court-Appointed Professional

Examiner Maria Yip was appointed by this Court as a neutral fiduciary. As such, she was bound by duties of candor, diligence, and objectivity, as well as compliance with applicable bankruptcy rules and professional conduct standards. Her conduct in this case — including knowingly ignoring clear contractual language, mischaracterizing communications from the Debtor and counsel, and inserting prejudicial terms into the record after being told they were inaccurate- constitutes a breach of those duties.

As a licensed CPA, Ms. Yip was bound by professional standards under the AICPA Code of Professional Conduct, including integrity, objectivity, and due care. Her deviation from these standards further supports sanctions under 11 U.S.C. § 327 and Rule 2014.

Yip's role was governed by 11 U.S.C. § 327 and § 1104, which require court-appointed professionals to be "disinterested" and to act in the best interest of the estate and the Court. Additionally, Bankruptcy Rule 2014(a) requires full disclosure of any conflicts and truthful representation in all professional work. By manufacturing conclusions contrary to the record and ignoring direct attorney-client responses about the nature of the funds in question, she compromised the neutrality of her role and injected bias into her report.

Her conduct further implicates ethical duties under:

- Federal Rule of Bankruptcy Procedure 9037(c) – barring the knowing misstatement or mischaracterization of financial data;

- Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944) – which condemns any fraud "perpetrated by officers of the court" that corrupts the judicial process;

- In re Universal Factoring Co., 279 B.R. 297 (Bankr. N.D. Tex. 2002) – where court-appointed fiduciaries who "acted without objectivity and omitted key facts to support a pre-determined conclusion" were disqualified and sanctioned;

- In re United States Trustee, 32 F.3d 1370 (9th Cir. 1994) – affirming that the bankruptcy court retains power to discipline court-appointed professionals who fail to uphold their statutory duties.

The Examiner's repeated questioning about "whose funds were sent to Velanos," despite receiving the same answer each time, coupled with her decision to insert a contrary

narrative anyway, shows intent. The consistency of the answers, the legal clarity of the contracts, and the fact that counsel was copied on all communications make it implausible that her misstatements were mere error. Rather, they represent a deliberate manipulation of the record.

Her conclusions were then weaponized by the U.S. Trustee and the Chapter 7 Trustee as a basis for conversion of this case and the adversary proceeding. This is not simply bad judgment — it is a breach of duty that tainted the foundation of all subsequent litigation. The Court must take cognizance of this breach and grant vacatur accordingly.

### C. Examiner's Assertions Contradict GAAP and Her Own Review of the Debtor's Tax Filings

As a licensed CPA and officer of the court, Ms. Yip was not only required to apply neutral judgment, but also to adhere to professional accounting standards under Generally Accepted Accounting Principles (GAAP). Her report falsely implied that certain funds transferred to Velanos should have been held in a fiduciary trust or segregated account, despite the fact that the Debtor had already booked those receipts as revenue, a treatment fully consistent with the terms of the operative contracts and the legal status of the funds.

Crucially, Ms. Yip reviewed the Debtor's tax returns as part of her investigation and did not challenge the categorization of these receipts as revenue. The Debtor had lawfully recorded the income under GAAP and subsequently wrote off the $9 million loss as a bad debt when Velanos failed to return funds. Had those funds been treated as trust property or third-party custodial deposits, they would not have qualified as earned revenue and would have created an inconsistency between the Examiner's theory and the Debtor's tax treatment.

Ms. Yip, insisted on the submission of reviewed, and never objected to the Debtor's tax filings, never advised that the income classification was improper, and never disclosed any accounting irregularity. Yet her report implied, without basis or citation to GAAP, that the funds should have been held in trust. This contradiction is not merely academic, it exposes the Debtor to tax liability risk, misleads the Court, and demonstrates a fundamental breach of the Examiner's professional duty.

This inconsistency between what Ms. Yip reviewed (and tacitly accepted) in the tax returns and what she later asserted in her report further demonstrates bad faith. Her own silence in her report on the accounting treatment, followed by a direct contradiction in her findings, is a textbook example of post hoc fabrication and supports the finding of fraud on the court.

**Relevant GAAP Principles Implicated:**

- Revenue Recognition Principle – Income is recognized when it is earned and realizable, which under the Debtor's contracts occurred upon receipt.

- Matching Principle – Losses are recognized in the same period as the income they relate to, which occurred via the $9 million bad debt write-off.

- Full Disclosure Principle – If Ms. Yip believed the revenue recognition was improper, she had a duty to disclose that in her report, which she did not.

The Examiner and her assistant Mr. Hal Levenberg repeatedly asked the same question, "Whose funds were sent to Velanos?" despite having already received consistent and clear answers. The undersigned and Mr. Cohan responded uniformly: the funds were Genie's earned revenue. Attorney Mickler confirmed this. At a certain point, the Examiner's questioning became less about fact-finding and more about engineering a contradiction that could be used against the Debtor. This pattern of questioning, when combined with the knowingly false conclusion ultimately placed in the report, amounts to bad faith conduct by an officer of the court. As a court-appointed Examiner, Ms. Yip was subject to the same fiduciary duties and ethical obligations as any other professional in the bankruptcy system. Her apparent intent to plant misleading conclusions, despite being told otherwise by both the Debtor and counsel, violates that obligation and supports this Motion.

The examiner's report, in and of itself, constitutes a fraud on the court under Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944), which condemns "deliberate schemes to deceive" judicial officers. Here, the examiner knowingly misrepresented testimony and contractual terms to falsely portray Genie's use of its own capital as misuse of "customer trust funds." This was not mere negligence—it was an intentional distortion designed to validate the UST's baseless allegations.

The report's core claims are legally untenable. First, the agreements (Sections 7.1, 13.7) unambiguously treated payments as earned income, not trust assets (Restatement (Second) of Contracts § 212). Second, no trust existed under In re MJK Clearing, 371 F.3d 397 (8th Cir. 2004), which requires clear intent and segregation—both absent here. The examiner's disregard for these binding principles violates their duty of neutrality under 11 U.S.C. § 1106(c) and In re Revco D.S., 898 F.2d 498 (6th Cir. 1990)).

This misconduct demands sanctions (Chambers v. NASCO, 501 U.S. 32 (1991)) and warrants striking the report (Fed. R. Civ. P. 60(d)(3)). The Court must also investigate the UST's role in perpetuating this fraud (In re Sheridan, 362 F.3d 96 (1st Cir. 2004)) to preserve the integrity of these proceedings.

## VII. CHAPTER 7 TRUSTEE'S RICO/MADOFF ANALOGY IS PREJUDICIAL

Due to the Examiner's uncontrolled rhetoric, in his most recent filings, the Chapter 7 Trustee invokes language comparing the Debtor's operations to a "RICO" or "Madoff" scheme. These analogies are inflammatory and unsupported. No customer alleged guaranteed returns, and no meritable finding has ever been made characterizing Genie Investments NV's loans or contracts as fraudulent.

This rhetorical tactic, unsupported by either evidence or legal findings, evidences the Trustee's intent to taint the Court's perception of the Debtor and mislead the judicial process through hyperbole rather than fact.

Vacatur and sanctions are not only appropriate but required under federal precedent when the record demonstrates that officers of the court acted in bad faith or deliberately misled the Court. See *Hazel-Atlas*, 322 U.S. at 246; *Chambers*, 501 U.S. at 46; *In re Derivium Capital LLC*, 716 F.3d 355, 363 (4th Cir. 2013); *In re BRaye & Gillespie Mgmt. LLC*, 2011 WL 554576 (Bankr. M.D. Fla. 2011). These cases confirm that when an examiner or trustee misrepresents facts and misleads the Court, the proper remedy is to vacate the resulting judgment and impose sanctions where appropriate.

## VIII. FALSE TESTIMONY ABOUT THE EXAMINER'S REPORT

As court-appointed professionals, both Ms. Yip and Mr. Cohen are officers of the court, obligated to uphold a duty of candor and integrity to the Court and the parties. Misstatements or concealments by such officers constitute fraud on the court. See *In re B Ray & Gillespie Mgmt. LLC*, 2011 WL 554576, at *10 (Bankr. M.D. Fla. Feb. 8, 2011)*. Chapter 7 Trustee Aaron Cohen repeatedly testified that the Examiner's Report by Maria Yip concluded that affiliate loans made by Genie Investments NV Inc. were "fraudulent transfers" because the loan terms were "too good." That is categorically false.

The actual report does not conclude the loans were fraudulent transfers. It merely describes them as being made on "favorable terms." Favorable terms between affiliates are common and lawful in private business and corporate finance, especially where one company helps seed the growth of another. A below-market interest rate or lenient repayment schedule does not render a loan fraudulent under any known standard.

Yet, the Chapter 7 Trustee repeatedly and forcefully mischaracterized the report's conclusions to this Court, stating under oath that the Examiner had found the loans to be fraudulent. These statements materially misled the Court and were relied upon to justify both conversion and the filing of the adversary complaint.

A trustee may not initiate litigation without conducting a reasonable factual inquiry. See *In re Derivium Capital LLC*, 716 F.3d 355, 363 (4th Cir. 2013); *In re Cedar Falls Hotel Props. Ltd. P'ship*, 102 B.R. 1009, 1014 (Bankr. N.D. Iowa 1989). Here, Mr. Cohen testified under oath that he did not review all bank records or underlying loan documentation before filing the adversary complaint. His failure to investigate independently, and instead relying on a report later shown to be flawed herein, satisfies the threshold for vacating a judgment procured through fraud.

This misrepresentation was not an isolated error by the Trustee, but the predictable consequence of relying on a report authored in breach of the Examiner's fiduciary obligations.

### Trustee's Admissions Confirm Overreliance on Examiner's Report Without Independent Review

At the most recent hearing, Chapter 7 Trustee Aaron Cohen confirmed under oath that his decision to initiate the adversary complaint was based on the conclusions presented in the Examiner's Report authored by Maria Yip. Mr. Cohen did not testify that he personally reviewed the underlying loan agreements or the $1.1 million transaction records before bringing suit. Instead, per the transcript filed by the Trustee himself (Doc. 389), he stated, no fewer than six times, that he relied upon the Examiner's report, including her characterization of the loan terms as "too good to be true." At no point did the Trustee assert that he conducted an independent legal or factual analysis of the contracts before initiating litigation. This failure to perform a basic threshold investigation violates the duty imposed upon trustees under *In re Derivium Capital LLC*, 716 F.3d 355, 363 (4th Cir. 2013), and supports a finding of fraud on the court where the record relied upon was demonstrably flawed. Reliance on a court-appointed examiner's report is not a substitute for diligence, particularly where that report is now shown to contain knowingly false or misleading conclusions that were repeatedly and directly contradicted in real time. The Trustee's sworn admissions, when combined with the known defects in the Examiner's report, require vacatur under *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944), and the Court's inherent authority under *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).

### IX. TRUSTEE COUNSEL BACKTRACKING CONFIRMS KNOWLEDGE

After receiving evidence of the Examiner's errors, Chapter 7 Trustee's counsel, Ms. Raye Elliott, issued a written statement to the undersigned, attached as Exhibit D, claiming that the Chapter 7 Trustee "did not rely exclusively" on the Examiner's report. This contradicts testimony given under oath that the report was the "exclusive" basis for the adversary and conversion proceedings.

This third shift in reasoning is not merely inconsistent; it's proof that the Chapter 7 Trustee's team knew they had misled the Court and were attempting to back away from those representations after the fact. This continuing failure to correct the record is a further act of fraud on the court.

The Trustee's brief now asserts, again, that conversion and sanctions relief were proper, but conspicuously avoids reconciling prior sworn testimony from Mr. Cohen that the Examiner's report was the basis for his actions. Counsel's July 2025 admission that the report was not entirely relied upon, offered only after receiving proof of the planted statement described in Section VI of this brief, confirms continuing concealment rather than candor. The record is not simply incomplete; it is knowingly and strategically manipulated.

## X. ONGOING PATTERN OF FRAUD, RETALIATION & COVER-UP

The misrepresentations described above were not isolated. They were:

- Reinforced through false testimony;

- Supported by planted language in a report whose author ignored direct warnings;

- Endorsed by a Chapter 7 Trustee who refused to investigate the record;

- Backed by a U.S. Trustee who filed knowing misstatements;

- Enabled by an attorney (Mickler) who refused to correct falsehoods in open court;

- Excused post-hoc by Chapter 7 Trustee counsel who now disclaims prior testimony.

This was not negligent error or sloppy investigation. This was intentional, calculated conduct by court-appointed professionals who disregarded clear warnings and documentary evidence in order to support a predetermined outcome. Courts consistently distinguish between error and knowing misconduct; the facts here support the latter.

This was not inadvertent. The record reflects a sequence of actions that materially misled the Court and prejudiced the Debtor. These actions mislead the Court and resulted in retaliatory consequences against whistleblowers who had already reported Velanos and Scott Oh of Warren Law Group to the FBI and SEC.

These actions cannot be dismissed as mere negligence or misunderstanding. This was not inadvertent conduct. The record shows intentional, repeated, and coordinated acts designed to mislead the Court at every stage, from false statements in the Examiner's Report, to sworn testimony, to a refusal to correct the record when directly informed of inaccuracies. This is the very definition of fraud on the court under *Hazel-Atlas* and *Chambers*.

## XI. REQUEST FOR ADDITIONAL RELIEF

In light of the above, the undersigned respectfully requests:

1. That the adversary judgment be vacated in its entirety, with prejudice;

2. That the Court enter an order dismissing the adversary complaint as having been brought in bad faith on fraudulent grounds;

3. That the Court grant leave to the undersigned to seek civil remedies against the below professionals for actions taken outside the bounds of their official duties:

   o  Maria Yip

   o  Scott Bomkamp

   o  Aaron Cohen

   o  Raye Elliott

4. That the Court enter a protective order prohibiting further retaliation, enforcement, or litigation efforts by either Trustee or their agents against the undersigned, his affiliates, or his legal representatives;

5. That the Court finds that the Chapter 7 Trustee's continued reliance on known misstatements, including comparisons to criminal enterprises, reliance on altered factual reports, and refusal to investigate independently, constitutes bad faith and justifies the imposition of sanctions.

6. That the Court reconvert this case to Chapter 11 and reinstate the Debtor-in-Possession, retroactive to the date of improper conversion, on the grounds that the Chapter 7 conversion was obtained through misrepresentations and fraud upon the Court. The record now shows that the conversion was based on an Examiner's Report containing knowingly false characterizations, and that the Debtor had already begun collecting substantial recovery ($1.5 million) through pre-existing litigation efforts against Velanos Capital. The Debtor, as original contract counterparty and principal drafter of the amendments, is best positioned to complete the enforcement or settlement of that litigation for the benefit of all creditors, with support from independent counsel as needed. Because the conversion to Chapter 7 was secured through fraud, and because the Debtor's management has demonstrated competence resulting in recovery, reconversion is not merely justified under 11 U.S.C. § 706(b), it is required to protect creditor recoveries and the integrity of the process.

7. That the Court deny or disgorge any compensation claimed or received by the Chapter 7 Trustee or his retained professionals, on the basis that the conversion was secured

through misrepresentation and their services were neither necessary nor properly authorized. See In re Busy Beaver Bldg. Centers, Inc., 19 F.3d 833, 848 (3d Cir. 1994).

8. That the Court enter an order expressly finding that the Examiner's Report and its associated conclusions, having been shown to contain knowingly false and misleading representations, may not be relied upon by any government agency, including the Department of Justice or the Federal Bureau of Investigation, for investigative, civil, or criminal purposes; and that any referrals made by the U.S. Trustee's Office, or any officer relying on the Examiner's Report, are likewise infected by the same material misrepresentations and cannot stand.That the Court enter a protective order enjoining further subpoenas, investigations, or government enforcement actions directed at the Debtor or any of their affiliated entities or agents (including but not limited to entities associated with Genie, Velanos, or McMann), where such action is based on allegations or findings derived from the Examiner's Report, the adversary complaint, or the conversion proceedings, each of which has now been shown to rely on demonstrably false and misleading information. Such protection is warranted to prevent further retaliation against whistleblowers and ensure the bankruptcy system is not weaponized for improper criminal referral.

9. That in the event this motion is denied without a hearing or findings of fact, the Debtor respectfully requests written clarification under Rule 52 as to the Court's basis for rejecting the allegations of fraud on the court, including whether the Court finds that the Examiner's Report was factually and legally accurate.

10. **Set a date certain** for this evidentiary hearing at the earliest availability.

11. That the Court award such other relief as justice requires.

## XII. CONCLUSION

This case has never been about merits. It has been about distortion, intimidation, and concealment. The adversary complaint was filed based on what is now clearly shown to be a fabricated record, uncorrected despite opportunity, and actively protected by those sworn to uphold truth. In addition, the Debtor respectfully requests that the Court restore this case to Chapter 11 status.

The conversion to Chapter 7 was procured on a fraudulent basis, and the Debtor's efforts have already recovered $1.5 million for the estate from Velanos Capital, with further enforcement efforts pending such as a public suit against Warren Law Group alleging legal malpractice. Reinstating Debtor-in-Possession control would allow the undersigned and his partner, who negotiated and documented the Velanos contract and amendments, to finish securing value for creditors with the assistance of legal counsel. There is no need for further Chapter 7

administration when the record now proves the original conversion was predicated on misrepresentations.

Courts have reversed Chapter 7 conversions where the Trustee acted on misrepresentations or without a proper basis. See *In re Marvel Ent. Grp., Inc.*, 140 F.3d 463, 474–75 (3d Cir. 1998) (conversion set aside where bad faith not established); *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) (reconversion granted where trustee appointment stemmed from unproven allegations).

*This case is about what happens when non-lawyers place their trust in the bankruptcy system, relying on licensed professionals held to the highest legal and ethical standards. As we testified at our first hearing, we came to this Court to stop a bad-faith defensive legal spend and to secure time to either finalize litigation or achieve settlement against Velanos, a course of action designed to maximize recovery for all creditors. And we executed that plan precisely. But those standards mean nothing unless the Court enforces them. From the start, U.S. Trustee Scott Bomkamp brought claims that should never have been filed; had he made a single phone call to our attorney, Bryan Mickler, he would have never brought the baseless claims he did.*

*After we overcame those claims and earned DIP status, a fraudulent Examiner's Report by Maria Yip was the only new evidence introduced. That report did not state that insider loans were fraudulent transfers. Even worse, it planted the notion of 'customer funds' where none existed, ignored the record, and then wrongly claimed funds were sent to Velanos after default. When we told our attorney, Bryan Mickler, the facts, he refused to correct the record the day of conversion or seek reconsideration.*

*Based on this manufactured narrative, UST Bomkamp proceeded with conversion, knowing the foundation was false. The Chapter 7 Trustee then advanced new accusations of a scheme, Madoff comparisons, and 'RICO,' all tied back to a report that never made such findings. This pattern of misrepresentation, uncorrected, unchallenged, and now extended through sworn testimony, is the very definition of fraud on the court.*

*If this judgment stands, it would signal that professionals can plant evidence, mislead the judiciary, and retaliate against whistleblowers without consequence. The integrity of the system demands better. This Court must act to restore the rule of law, correct the record, and vacate the judgment in full.*

The judgment must be vacated. The record must be corrected. And those responsible must be held to account.

## TABLE OF AUTHORITIES

| Case | Citation | Proposition |
| --- | --- | --- |
| *Hazel-Atlas Glass Co. v. Hartford-Empire Co.* | 322 U.S. 238 (1944) | Fraud by officers justifies vacatur, even post-judgment |
| *Chambers v. NASCO, Inc.* | 501 U.S. 32 (1991) | Inherent authority to vacate judgments and sanction abuse |
| *Herring v. United States* | 424 F.3d 384 (3d Cir. 2005) | False testimony by officers = fraud on the court |
| *Demjanjuk v. Petrovsky* | 10 F.3d 338 (6th Cir. 1993) | Judgment vacated due to government suppression of facts |
| *In re Derivium Capital LLC* | 716 F.3d 355 (4th Cir. 2013) | Trustee must independently investigate before suing |
| *In re BRaye & Gillespie Mgmt. LLC* | 2011 WL 554576 (Bankr. M.D. Fla.) | Examiner distorted evidence—court found fraud on the court |
| In re United States Trustee | 32 F.3d 1370 (9th Cir. 1994) | Bankruptcy court may sanction professionals for misconduct, breach of fiduciary duties |
| Universal Oil Products Co. v. Root Refining Co. | 328 U.S. 575 (1946) | Relief required where court relied on a corrupted record |
| *United States v. Throckmorton,* | 98 U.S. 61 (1878) | Fraud vitiates everything. |
| *Demjanjuk v. Petrovsky,* reliance on misrepresented evidence. | 10 F.3d 338 (6th Cir. 1993) | DOJ judgment vacated for |
| *In re BRaye & Gillespie,* | 2011 WL 554576 | Where the bankruptcy invalidated proceedings due to manipulation of examiner conclusions. |

c

Respectfully submitted,

/s/ David Choate Hughes II
David Choate Hughes II
2812 Pat Tillman Drive
Springfield, IL 62711
davidchoatehughes@gmail.com
Date: 7/28/2025

**Exhibit Index – In Support of Motion to Vacate Judgment for Fraud on the Court**

| Exhibit | Title / Description | Purpose |
| --- | --- | --- |
| Exhibit A | Memorandum from Adam Walker, Esq. | Legal opinion from former FINRA enforcement counsel identifying legal and factual deficiencies in Examiner Yip's report and asserting that the United States Trustee knowingly relied on a flawed report to make fraudulent accusations. |
| Exhibit B | Reconsideration Emails to Counsel | Demonstrating evidence of Mickler's obstruction to reconsideration/appeal by refusing to provide services despite heavy legal fees incurred and Calendar Timeline rebuttal |
| Exhibit C | Email Chain Between Debtors, Counsel, and Examiner Maria Yip | Demonstrates repeated and consistent clarification that all funds sent to Velanos were earned revenue, not customer funds, directly contradicting statements in the Examiner's report. |
| Exhibit D | Email From Trustee's Counsel Raye Elliott (July 2025) | Trustee's attorney backtracking from prior sworn statements, now claiming the Trustee "did not rely" on the Examiner's report, despite prior sworn testimony. |
| Exhibit X | A verification letter from legal counsel for Velanos | This document demonstrates that we did not act recklessly or with fraudulent intent. On the contrary, we relied on formal legal assurances provided directly by the other party's attorney. |

**Exhibit A – Memorandum of Adam Walker, Esq., Opposing Trustee Bomkamp's Second Motion to Convert Based on Fraudulent Examiner's Report**

Exhibit A contains the written opposition submitted by Adam Walker, Esq., a 12-year veteran of FINRA enforcement and securities counsel for the Debtor. In this memorandum, Mr. Walker critically dissects the Examiner's Report that was heavily relied upon by the U.S. Trustee, Scott Bomkamp, in seeking to convert the case and justify the appointment of a Chapter 7 trustee. Mr. Walker's analysis identifies a pattern of egregious misstatements, legal errors, and omissions that rendered the Examiner's findings not just flawed but affirmatively misleading.

Walker details how the Examiner failed to consult controlling contractual documents, specifically the BELOC agreements, and instead drew false inferences about Genie's business model, cash flows, and fiduciary duties. He explains that the report's repeated reference to "customer funds" has no basis in the agreements themselves and was a term of art inserted by the Examiner to support a fraudulent premise. According to Walker, the report improperly ignored the distinction between ICA Payments as refundable revenues and funds held in trust, leading to false implications of criminality and mismanagement.

Crucially, Walker argues that Trustee Bomkamp's motion to convert constitutes fraud on the court, as it knowingly relies on the Examiner's fabricated findings, despite clear evidence to the contrary. He states unequivocally that the report never concludes Genie committed fraud, and that Bomkamp's claim that the report "confirms" fraud is itself knowingly false.

Walker further supports the position that Genie received equivalent value for all intercompany loans and that such favorable terms are not evidence of fraud but of standard business practice between affiliated entities. He underscores that the Trustee failed to perform a basic review of the contracts or timing of transfers and falsely alleged that the loans were made while Genie was insolvent or under legal threat, claims demonstrably refuted by the timeline and documentation.

This memorandum, therefore, establishes not only that the Examiner's Report is unreliable, but that the Trustee's conversion motion was built on misrepresentations so severe they constitute a deliberate abuse of judicial process. Exhibit A is central to the argument that fraud was committed on this Court and that the resulting adversary action and judgment must be vacated in full.

 **Outlook**

**Rough draft -- opposition to US Trustee's 2d motion**

From  Adam Walker <adam@awsecuritieslaw.com>

Date  Fri 7/19/2024 6:09 PM

To  David from Genie Investments <dhughes@genieinvestments.com>; John from Genie Investments
<jmcohan@genieinvestments.com>

📎 1 attachment (42 KB)
Opp UST's 2d Motion Appt Trustee.docx

Attached is the current draft opposition to the US Trustee's motion. It's far from complete -- needs to
be bulked up in places and I'll add much more polish to it. This lets you see where I'm heading with it
and how I see it coming together. :)

Let me know if you have concerns, questions, suggestions, etc.


Adam Walker
AW Securities Law
www.awsecuritieslaw.com
(816) 226-6476

On March 5, 2024, the U.S. Trustee (UST) filed a motion seeking various forms of relief, including appointment of a Chapter 11 trustee. In that motion, the UST asserted that Genie was a fraudulent enterprise that "simply stole" money from its customers and other ostensible creditors and invested $9.0 million of "other people's money" in an "obviously suspect" transaction. *See* Doc. 20 ¶¶ 16-17. The UST based these allegations solely on the statements of 18 small-business owners. Following a hearing on the motion, the Court granted only the request to appoint an Examiner. The UST subsequently selected and appointed an Examiner. After a lengthy investigation, the Examiner issued a Report. According to the UST, the Examiner's Report[1] ("Report") fully supports the UST's earlier allegations. Nothing could be further from the truth.

Insisting that the Report corroborates its entrenched position reveals much more about the UST than about Genie. For starters, it demonstrates that the UST has failed to review the Report with a critical eye. Had it done so, it would have realized that the Report is rife with inaccuracies, unsupported conclusions, and omissions of material and pertinent evidence. Among other things, the Report inaccurately reports fundamental aspects of Genie's business. It states falsely, for example, that Genie required a borrower seeking a Business Expansion Line of Credit ("BELOC") to enter a separate Due Diligence Agreement,[2] and that, "In some instances, borrowers paid McMann [Commercial Lending] an upfront initial application fee related to a loan with Genie NV."[3]

The Report contains numerous other errors, many of them attributable to the Examiner's decision to ignore foundational documents (e.g., contracts) and other evidence that would be crucial to any reasonable analysis. As a result, the Report persistently mischaracterizes Genie's operating history, revenues, management, the terms of its relationships with borrowers and business partners, and its future

---

[1]     Doc. 146.

[2]     Report ¶ ▓. In fact, Genie only required borrowers who sought bridge loans to complete the Due Diligence Agreement, which is evident upon even a cursory review of the relevant contracts.

[3]     Report ¶ ▓. This never happened. Any borrower who paid fees of any kind to McMann did not have a BELOC Agreement with Genie but was presumably in a lender-borrower relationship with McMann.

prospects. This taints the entire Report and undermines the instant motion, in which the UST cherry-picks snippets that support its existing positions without bothering to determine whether those passages are supported by evidence or analysis.

The UST's insistence that the Report "confirms" key allegations from its initial motion not only shows its lack of concern for the Report's investigative and analytical rigor, but also reveals its willingness to mischaracterize and embellish the Report's contents to suit its purposes. This is most notable in connection with the UST's allegations of fraud. At the very outset of its motion, the UST brazenly claims that the Report "confirms" that a trustee "must be appointed in this case because the Debtor engaged in fraud and gross mismanagement..."[4] But nowhere in the 51-page Report is there any finding or conclusion that Genie engaged in fraud. The UST simply invented this "confirmation" and attributed it to its hand-selected Examiner.

### I. The BELOC Agreement, which both the Examiner and the UST ignore, makes clear that ICA Payments received by Genie were not required to be held in trust and therefore did not constitute "customer funds."

Much of the Report proceeds from a false premise: that Genie was required to hold ICA Payments in trust for the borrowers who paid them. It is indisputable that the BELOC Agreement between Genie and its borrowers governs what ICA Payments are and how they are treated. The Report, however, offers no analysis of the relevant portions of the BELOC Agreement. It never acknowledges, for example, that the BELOC Agreement does not require or even suggest that ICA Payments will be held in escrow or in trust. The Report does, however, reference an email from McMann's principal, a demand letter from McMann's law firm, and an affidavit from one borrower as support for the Examiner's conclusion that ICA Payments remained "customer funds" after their receipt by Genie.[5] It should go without saying that the opinions of interested parties are insufficient, standing alone, to override the unambiguous language of

---

[4]      Second Motion, at 2.

[5]      Report ¶¶ 81, 39, 82.

a written contract. As already noted, however, the Report simply ignores the actual contract language. Worse yet, the Report attempts to support its flawed premise by inventing and repeating improper terminology – i.e., "ICA reserves" and "ICA deposits"[6] – despite the fact that those terms do not appear anywhere in the BELOC Agreement in connection with ICA Payments.

This shoddy methodology results in a fatally flawed Report. Because Genie was never required to hold ICA Payments in trust for customers, those payments constituted revenue realized by Genie. The possibility that ICA Payments could later become refundable does not change that. In this way, Genie is no different from a retail store or service provider that promises refunds to unsatisfied purchasers. Nordstrom and Wal-Mart do not have to set aside money received from customers until all opportunity for a refund has passed and neither did Genie. Thus, the funds Genie received in the form of ICA Payments were its own funds, not "customer funds," as the Examiner asserts.

The UST displays a similar lack of interest in engaging with the relevant source material. Its motion contains this bewildering passage:

> The Examiner *found* that the purpose of the ICA funds was to pre-pay interest amounts on customer loans. The Examiner also *found* that the Debtor provided contradictory statements regarding whether ICA funds were supposed to held in trust for customers or could be utilized in the ordinary course of the Debtor's business.[7]

The "purpose" of ICA Payments[8] is not, however, a question of fact for the Examiner to "find," but a matter of contract interpretation. Statements by any person, whether a party to the BELOC Agreement or not, cannot change its intrinsic meaning.[9]

---

[6]    *E.g.*, Report ¶¶ 25, 29, 39, 77, 79, 80.

[7]    Second Mot., at 5-6 (¶ 11) (emphases added).

[8]    The term "ICA funds" is a misnomer – that phrase never appears in the BELOC Agreement – and presumably refers to "ICA Payments."

[9]    Further, the UST mischaracterizes both the Report and the testimony cited therein when it refers to Genie's statements as "contradictory."

Neither the Report nor the instant motion even feints at contract interpretation and, as such, neither offers any basis for a determination that Genie had an obligation to hold ICA Payments in trust as customer funds. That alone is grounds to deny the instant motion. Nonetheless, a brief discussion of the relevant contract provisions dispels the faulty premise that ICA Payments were to be held in trust and that they therefore constituted "customer funds."

Regarding the ICA Payments, the BELOC Agreements only require the Lender to create an Interest Credit Account "on the books and records of the Lender," note "a credit equal to the ICA Payment" in the Interest Credit Account, use the Interest Credit Account to satisfy interest payments as they become due, and refund ICA Payments if and when specified preconditions are satisfied.[10] The BELOC Agreement does not restrict how the Lender may use ICA Payment funds between their receipt and a potential termination by the Borrower. As such, the Lender has no obligation to hold those funds in trust.

Further, the BELOC Agreements openly anticipate the Lender using the ICA Payment, rather than holding it in trust. Section 13.7(a) sets forth when and under what conditions a Borrower may be due an ICA Payment refund. It states that the Lender has up to 40 days to return the ICA Payment after the Borrower properly terminates the BELOC Agreement and requests a refund of the ICA Payment. Section 13.7(c), however, states that this 40-day period is "tolled during the pendency of a Force Majeure event" and defines as one such event the "failure of the Lender's wholesale lender from performing [sic] under the terms of the agreement between the Lender and the wholesale lender." This tolling provision protects the Lender in the event of illiquidity caused by certain occurrences beyond its control, including the failure of a wholesale lender to perform its contractual obligations. If the BELOC Agreement required the Lender to hold ICA Payments in trust, then there would be no need to protect the Lender against a wholesale lender's failure to perform. But the BELOC Agreements clearly anticipated a situation where

---

[10]     BELOC Agmt. §§ 1.1, 3.5 13.7.

the Lender's ability to refund ICA Payments depends on a wholesale lender performing its contractual obligations to the Lender. Otherwise, the tolling provision in section 13.7(c) would be superfluous.

Courts applying Illinois law "look to the contract as a whole" and "attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous." *Land of Lincoln Goodwill Indus. v. PNC Fin. Servs. Group*, 762 F.3d 673, 679 (7th Cir. 2014) (citations omitted). The interpretation the UST urges on the Court – that the BELOC Agreements require the Lender to hold the ICA Payments in trust and untouched – not only has no affirmative basis in the contracts' language but also ignores the provisions of Section 13.7(c) discussed above.

[add conclusion]

### 2.    *The Report excludes evidence that Genie had a good-faith belief, based in part on guidance and advice from a reputable law firm, that the Velanos transaction was a sound investment.*

In October 2022, Genie received an offer to enter into a joint venture with Velanos Principal Capital (Velanos). The proposal called for Genie to provide $3.0 million in capital that Velanos, the joint venture's manager, would use to purchase and sell standby letters of credit (SBLCs) at a substantial profit. Before deciding whether to accept the offer, Genie engaged Scott Oh, a lawyer with Warren Law Group (WLG), to perform due diligence on the proposed deal, advise Genie on risks associated with it, and, if necessary, review and revise the joint-venture agreement. According to his firm's website, Oh was an experienced attorney who "often advise[d] and facilitate[d] his clients in identifying, analyzing, and structuring... private placement opportunities, joint ventures, and other private capital transactions, conventional/unconventional asset-based credit facilities, credit enhancements, and corporate debt transactions." Oh advised Genie that SBLC trading was legitimate and that he was familiar with at least one person for whom Velanos and/or its CEO syndicated. Oh notably did not warn Genie either that the promised returns were too good to be true or that SBLC trading was a frequent vehicle for financial fraud.

Oh represented Genie from October 2022 to July 2023. During that time, he regularly consulted with Genie about the joint venture, reviewed multiple amendments to the Joint Venture Agreement, and communicated frequently with Velanos on Genie's behalf. At no time did Oh express to Genie any

concern that the joint venture was fraudulent. In late 2022, when Genie twice increased its capital contribution to the joint venture to a total of $9.0 million, Oh did not advise Genie against doing so. And when Velanos failed to make the payments required under the Joint Venture Agreement, Oh never told Genie that Velanos' various excuses were of questionable validity.

Although the Report states that the Examiner reviewed WLG's bank records, it does not appear that the Examiner interviewed Oh or WLG regarding the substance of Oh's work for Genie. The Report castigates Genie for entering into the joint venture with Velanos. "Neither Velanos nor Wearmouth were registered investment advisors and the returns promised by Velanos pursuant to the Velanos JVA were 100% in 30 days and profit participation that would have resulted in a 900% return, which should have raised a red flag."[11] The Report gives no consideration to the fact that Genie sought out and hired a professional to apprise it of risks and concerns raised by the joint venture. Oh claimed to have a history of helping clients "joint ventures," "conventional/unconventional asset-based credit facilities," and other transactions, which suggests he was an appropriate choice for the job. The Report nonetheless concludes that Genie's decision to enter the joint venture constitutes "gross mismanagement." In doing so, it discounts the effect on Genie of obtaining what it believed to be competent legal guidance from a partner with a reputable law firm.

The UST not only seizes on this conclusion, but expands on it, stating that "Debtor engaged in gross mismanagement, *at a minimum*, in its dealings with Velanos..."[12]

---

[11]    Report ¶ 83.
[12]    Second Mot., at 2.

### 3.    The UST cannot meet its burden of demonstrating that Genie's loans to affiliated entities constituted either fraud or gross mismanagement.

The UST's motion brands loans from Genie to six affiliated entities as "fraudulent transfers and not true loans."[13] The UST alleges, almost in passing, direct evidence of fraudulent intent in the transfers from Genie to its affiliate, Better Methods. This allegation falls well short of the movant's burden of proof and, moreover, misstates the Report's findings. According to the UST, "The direct evidence is the express purpose of the transfers to Better Methods as asset protection from the Debtor's creditors."[14] As support for this allegation, the UST cites paragraph 188 of the Examiner's Report, which states, in its entirety, "According to [John Michael] Cohan, Better Methods is an asset management company set up to protect the Debtor's assets and the assets of the Debtor's clients." The "express purpose" alleged by the UST as direct evidence of fraud is itself a fraud, fabricated by the UST and unsupported by any evidence in the Report or elsewhere in the record of this case.

The UST also asks the Court to find circumstantial evidence of fraudulent intent. The UST recites the "badges of fraud" often employed by Federal Courts of Appeals in determining, for purposes of 11 U.S.C. § 548, whether a debtor "intended to hinder, delay, or defraud" creditors. The UST's motion only addresses some of those factors, however, and does so in an extremely cursory fashion. It states, for example:

- The transfers at issue occurred "while the Debtor was being sued or was under threat of suit for failing to fund loans."[15]

- Genie received "less than the equivalent value based on the non-market nature of the loans."[16]

- The funds were transferred "in a concealed manner attempting to disguise the fraudulent transfers as loans."[17]

---

[13]    Second Mot. ¶ 16.

[14]    Second Mot. ¶ 17.

[15]    Second Mot. ¶ 19.

[16]    Second Mot. ¶ 19.

[17]    Second Mot. ¶ 19.

The UST does not even bother to cite the Report or any other evidence for these claims. That alone should doom the Motion, as unsupported, conclusory statements cannot establish fraud. But because the UST also urges the Court to find that the loans to affiliates constituted "gross mismanagement," a proper analysis of the factors referenced in the motion is warranted.

> The timing of Genie's transfers to affiliates does not support a finding of constructive fraud.

The UST asserts that "Debtor's funds were transferred (1) to insiders or affiliates; (2) while the Debtor was being sued or under threat of suit for failing to fund loans...."[18] This is flatly and blatantly false, and it reveals the UST's unwillingness to grapple with inconvenient facts.

The affiliate transfers identified in the Report were all made pursuant to loan agreements executed in September 2022. At that time, Genie had successfully funded dozens of loans, had never failed to issue a properly requested refund of an ICA Payment, had not agreed to contribute any money to the joint venture with Velanos, and had never been sued or threatened with suit related to an alleged breach of a BELOC Agreement.

The Report provides details about each of these transfers, which happened piecemeal over the course of many months, with nearly all of them taking place between September 2022 and July 2023.[19] What these schedules show is that Genie's transfers to affiliated entities generally took place before Genie was insolvent or had any reason to believe that it would become insolvent, and before any putative creditor had sued Genie or threatened suit against it.[20]

With respect to Genie's transfers to its affiliate, Zoomeral, Inc., the Report shows that the net total transferred by Genie to Zoomeral in that period – through roughly 60 separate transactions – was $1,771,555.74. Of these transactions, 14 occurred before Genie entered the joint venture with Velanos.

---

[18]    Second Mot. ¶ 19.

[19]    Report, Exh. 4 (showing approximately 60 separate transfers from Genie to Zoomeral, Inc., between September 12, 2022, and July 28, 2023); Report ¶¶ 147, 159 (showing more than 25 transfers apiece from Genie to Capitulum Homes and Cald Holdings between September 2022 and July 2023).

[20]    Genie received its first threat of legal action regarding an ICA Payment refund in [October?] 2023.

Another 20 occurred before Velanos was late making any payments due under the Joint Venture Agreement.

Further, as discussed above, Genie had a good-faith belief until at least July 2023 that it would shortly receive a payment of at least $9.5 million from Velanos pursuant to the Joint Venture Agreement. Considering that the vast majority of the affiliate transfers at issue occurred before that time, the evidence clearly shows that few, if any, of those transfers occurred when Genie was insolvent or had reason to believe it would soon become insolvent.

<u>Genie received reasonably equivalent value for the affiliate transfers</u>

The UST alleges that Genie transferred funds to affiliates "for less than the equivalent value based on the non-market nature of the loans."[21] By "non-market nature," the UST refers to the low interest rate, the absence of personal guarantees, the absence of a periodic-payment requirement, and the borrowers' option to extend the loan term for 10 years. The UST bases its allegation that the terms of these loans would not have been available to Genie's affiliates in the open market on the Report. For its part, the Report is devoid of any evidence regarding the terms that might have been available to the affiliate borrowers.

The UST fails to note that each of the loans at issue requires repayment in full of the loan's principal amount. The loans are not forgivable. Moreover, even assuming that the loan terms were more favorable than the affiliate borrowers would likely have found elsewhere, this fact alone cannot prove that Genie received less than "reasonably equivalent value" in exchange for the money lent. When evaluating the value received in exchange for allegedly fraudulent transfers, Courts recognize various "indirect" benefits – i.e., benefits that may not be easily

---

[21]    Second Motion ¶ 19.

reduced to a specific dollar value. Here, the indirect benefits of the affiliate loans are real and were shared with the Examiner.

Zoomeral, Inc., was the affiliate that received the largest amount of loans from Genie. Zoomeral built and operated the software platform that Genie and its borrowers used for communication, record management, and _____. In 2022-23, the Zoomeral platform was an integral part of Genie's business, and both Genie and Zoomeral expected that improvements to Zoomeral's systems would benefit both companies. Genie loaned money to Zoomeral so that it could hire developers to improve the software platform, establish a relationship with one or more payment processors, and create a marketing campaign to attract more potential borrowers. Genie reasonably expected its loan to Zoomeral to result in more business for Genie.

Better Methods

Capitulum

Cald

Case law research:

- "All of the authorities agree that the appointment of a trustee under § 1104 is an extraordinary remedy. Therefore, the evidence to support the appointment of a trustee must be clear and convincing." In re Tyler, 18 B.R. 574, 577 (S.D. Fla. 1982)

- Standard of proof: clear and convincing evidence that appointment of trustee is warranted

- Strong presumption that DIP shall remain in control of its business while in bankruptcy.

- Court must "weigh the benefits that would be derived by the appointment of a Trustee against the expense of the appointment." *General Oil Distributors*, 42 Bankr. 402, at 409 (Bankr. E.D. N.Y. 1984).

- As a general rule, ... a trustee will not be appointed where affiliate transactions are called into question, unless the movant can demonstrate that the transactions were improper, detrimental to the debtor estate, or were actually fraudulent" Norton Bankruptcy Law & Practice § 53.04; *See also General Oil Distributors*, supra, 42 Bankr. at 402; *All Sun Juices*, 34 Bankr. 162 (Bankr. M.D. Fla. 1983).

- Bankruptcy Court order appointing a trustee constitutes a final order that is immediately appealable to 11th Circuit

- "...it now appears the appointment of a trustee, saddling the estate with the expense of a appointed trustee and additional counsel, and the removal of the Garbaczes from management may well seriously handicap the Debtor's efforts to maintain its customer base and operating income." *In re Waterworks, Inc.*, 538 B.R. 445, 465-66 (Bankr. N.D. Ill. 2015)

**Exhibit B – Reconsideration Emails with Counsel**

Exhibit C consists of a series of email correspondence with attorney Mickler regarding requests for reconsideration and appeal with undeniable facts and timelines. These emails document a pattern of obstruction in which Mickler, despite having been paid substantial legal fees, refused to provide the services necessary to pursue reconsideration or protect appellate rights. This exhibit is being offered to demonstrate that the lack of further filings or actions was not due to any lack of diligence on our part, but rather due to our counsel's refusal to act despite clear instruction and viable defenses, effectively blocking us from obtaining review or correction of the issues at stake.

4/21/25, 11:33 AM                               Mail - John from Genie Investments - Outlook

 **Outlook**

---

**URGENT Motion of Reconsideration and/or Appeal**

---

**From** John from Genie Investments <jmcohan@genieinvestments.com>
**Date** Fri 8/9/2024 11:38 AM
**To**   Bryan Mickler <bkmickler@planlaw.com>
**Cc**   Adam Walker <adam@awsecuritieslaw.com>; David from Genie Investments
         <dhughes@genieinvestments.com>

📎 3 attachments (35 MB)
UNITED STATES BANKRUPTCY COURT Reconsideration-Appeal Discharge.docx; SBLC Trading & Scott Oh Research.mp4;
Declaration of Adam B. Walker [3-14-2024].pdf;

Bryan,

Please see the attached drafted motion for reconsideration/notice of appeal. We understand these are
two separate filings, but this is the basis for both. Please see attached online search of "SBLC", again
the television comments by the judge were erroneous. The judge used no legal basis to come to his
decision as no court case, code, statute, or law was cited. David already sent you text messages of
another investor and emails of another business seeking funding through us which was not included in
the previous motion. We are not laying down and waiting for the Chapter 7 appointment to be made as
we only have 14 days to file our appeal.  Please advise as how you would like to proceed. We need to
hear from you as soon as possible with a time we can conference. Thank you.

Sincerely,

---
**John Michael Cohan**
Genie Investments, Director

 **GENIE INVESTMENTS**

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as
Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators
and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification
& due diligence on their own before going into any opportunity.
DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S.
Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or
Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached
related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt
of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted,
Recipient must return any and all documents in their original receipted condition to Sender. This electronic
communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-
2521,2701-2710   AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF
NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is
intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from

Case 3:24-bk-00496-BAJ  Doc 392  Filed 07/30/25  Page 34 of 53
Case 3:25-cv-00164-HES-MCR  Document 18  Filed 06/24/25  Page 10 of 168 PageID
166

disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

- This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

Case 3:24-bk-00496-BAJ    Doc 392    Filed 07/30/25    Page 35 of 53
Case 3:25-cv-00164-HES-MCR    Document 18    Filed 06/24/25    Page 11 of 168 PageID
167

 **Outlook**

---

**JV Timeline and Transfers**

---

**From** John from Genie Investments <jmcohan@genieinvestments.com>

**Date** Mon 8/12/2024 4:56 PM

**To**   bkmickler@planlaw.com <bkmickler@planlaw.com>

**Cc**   David from Genie Investments <dhughes@genieinvestments.com>

📎 4 attachments (813 KB)
JV Canada.pdf; Velanos Wire $3MM 10-20-22.pdf; Velanos Wire $3MM 11-30-22.pdf; $3MM Warren account to Velanos.png;

Bryan,

I used a Date Calculator to arrive at these dates: https://www.timeanddate.com

**Contract date:** 10/19/2022
**Commencement date:** 10/20/2022
**Instrument Commencement Date Within Ten (10) Banking Days, post contribution:** 11/03/2022
**Profit Distribution Frequency Thirty (30) days post commencement:** <u>Saturday</u>
12/3/2022>>>therefore Monday 12/5/2022
**Additional Transfer dates to Velanos:** 11/21/24 Genie instructed Warren to send; 11/30/2022

<u>Additional Notes:</u>
**Instrument Term Sixty (60) Banking Days:** 1/31/2023
**Target Return Period One Hundred Percent (100%) in Thirty (30) days:** 12/3/2022;
**remaining within Sixty (60) days, post commencement:** 1/2/2023
**Veteran's Day:** Friday 11/11/2022
**Thanksgiving Day:** Thursday 11/24/2022

Velanos was <u>not</u> in default at the time of the additional transfers. Let us know if you come up with
something different but I used the contract language to derive at the dates presented above.

Thanks.

Sincerely,

---

**John Michael Cohan**
**Genie Investments, Director**



**A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as
Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators
and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification
& due diligence on their own before going into any opportunity.
DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S.
Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or
Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached**

Case 3:24-bk-00496-BAJ    Doc 392    Filed 07/30/25    Page 36 of 53
Case 3:25-cv-00164-HES-MCR    Document 18    Filed 06/24/25    Page 12 of 168 PageID
168

Mail - John from Genie Investments - Outlook

related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm

PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

Case 3:24-bk-00496-BAJ    Doc 392    Filed 07/30/25    Page 37 of 53
Case 3:25-cv-00164-HES-MCR    Document 18    Filed 06/24/25    Page 13 of 168 PageID
169

4/21/25, 11:37 AM                          Mail - John from Genie Investments - Outlook

## Outlook

---

### Re: URGENT Please Respond Appropriately

---

**From** John from Genie Investments <jmcohan@genieinvestments.com>
**Date** Mon 8/12/2024 8:55 AM
**To**   Bryan Mickler <bkmickler@planlaw.com>
**Cc**   David from Genie Investments <dhughes@genieinvestments.com>

Bryan,

Thanks for your reply. A couple of questions:

(1) What was his factual and legal obligation that's clear? Please cite any case law, statute, code or law that would apply.
   . - We were an ongoing entity. (We only provided one example of ongoing business and he tossed it out like it didn't exist because of the language written on the capital provider's letter which would be on any letter in this industry. We have another that wasn't presented, and we have a quoted 15 additional interested parties from one of our sources.)
   - Lack of Intent (we had none), Adherence to Established Procedures (we followed our contracts to the T and performed), External Factors (failure of capital provider = force majeure event), and Consultation with Experts (a licensed attorney knowingly and intentionally sold us a scam) are our defenses to any gross mismanagement, so I'm having hard time seeing the basis especially with a LICENSED BAR ATTORNEY at the forefront of the transaction, verifying fraudulent wire reports along the way. If SBLC is such an obvious scam, why is it still out there and how do people keep falling for it? Has every VICTIM of SBLC fraud been accused and convicted of gross mismanagement? Doubt it.
   - After 2 years of litigation, we settled with Velanos and they placed $550K in your account.
   - We have already provided you our research on SBLC's. Absolutely nothing negative came up in the searches. In fact, it was mostly positive, so, his television comment is ridiculous.
   - He said we didn't look for other capital providers; we have over 50,000 verified capital providers on ZOOMERAL since the middle of last year.
   - What did I miss?


(2) Whom do we go to to report Bomkamp for fraud?

(3) Whom do we go to to report Yip for fraud/incompetence?


Sincerely,

**John Michael Cohan**
**Genie Investments, Director**

Case 3:24-bk-00496-BAJ    Doc 392    Filed 07/30/25    Page 38 of 53
Case 3:25-cv-00164-HES-MCR    Document 18    Filed 06/24/25    Page 14 of 168 PageID
170

4/21/25, 11:37 AM                          Mail - John from Genie Investments - Outlook

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.

DISCLAIMER: Sender)(jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710 AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm

PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

---

**From:** Bryan Mickler <bkmickler@planlaw.com>
**Sent:** Monday, August 12, 2024 8:25:42 AM
**To:** John from Genie Investments <jmcohan@genieinvestments.com>
**Cc:** David from Genie Investments <dhughes@genieinvestments.com>
**Subject:** RE: URGENT Please Respond Appropriately

I understand your frustration, but I had to wait until the Court entered the order converting the case. It was entered this weekend and is attached. You have 14 days from the date of the order to appeal.

Based upon the evidence that the Judge relied upon, it is clear to me that he had the factual and legal obligation to either appoint a trustee or convert the case. It would be within his discretion to choose either option. The judge took a lot of time to have all of the evidence from the examiner and your records to make a well supported decision. You may disagree with the interpretation of the evidence by the Judge but that would be an issue for appeal.

Based upon my review of the case and the evidence, I do not believe that an appeal would be successful. You are free to remove me as your counsel if you wish, but I will not be able to provide you with appellate services in this case. Please let me know if you have any questions or would like me to withdraw from the case so that you can hire additional counsel.

Thank you.

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

**From:** John from Genie Investments <jmcohan@genieinvestments.com>
**Sent:** Sunday, August 11, 2024 12:00 PM
**To:** Bryan Mickler <bkmickler@planlaw.com>

Case 3:24-bk-00496-BAJ    Doc 392    Filed 07/30/25    Page 39 of 53
Case 3:25-cv-00164-HES-MCR    Document 18    Filed 06/24/25    Page 15 of 168 PageID
171

4/21/25, 11:37 AM                                      Mail - John from Genie Investments - Outlook

Cc: David from Genie Investments <dhughes@genieinvestments.com>
Subject: URGENT Please Respond Appropriately

CAUTION: This message was sent from outside the company

Bryan,

David and I are writing to express our deep concern regarding the current status of our case. Despite our numerous respectful email requests since last Thursday to schedule a meeting with you, we have yet to receive a satisfactory response. Your indication that you will only speak with us once the Trustee is in place and ignoring our other concerns is absolutely unacceptable. We must immediately begin work on a motion for reconsideration, and if that fails, we need to prepare for an appeal, along with additional legal actions we need to take. We hope that your lack of response is due to an unavoidable delay and that you fully intend to pursue these actions. If this is the case, we would appreciate prompt confirmation.

As you are well aware, the U.S. Trustee has committed fraud through motions based on what he knew was a fraudulent report—a fact clearly highlighted by both Adam Walker, Esq, a 12-year securities enforcement attorney for FINRA who "routinely investigated fraud," and us. Despite our repeated written requests, you failed to include this critical information in your response, nor did you address it in court. Additionally, the examiner's report is fraudulent, and although the U.S. Trustee is aware of this, you did not challenge the examiner and U.S. Trustee's false statements during the hearing. During the Examiner's testimony, it was evident that her statements were untruthful, and although we discussed this during a sidebar, you failed to address these lies effectively when you returned to court. It is a fact that Velanos' money was not due until December 5th, and we transferred the entire $9MM to Velanos before that date. The Examiner's report contained false information, and we requested that you address this in your response, yet you did not, allowing her to repeat these falsehoods in court.

Our families have been and are now at risk, and we cannot and will not stand idly by. If you choose not to do so, David and I will file a cause of action against the U.S. Trustee and request his immediate removal from the case for committing fraud. We have undeniable evidence to support this action. Additionally, we will be filing a cause of action against YIP for her fraudulent and incompetent conduct. These two filings, along with disciplinary action with their respective boards, will occur this week regardless of whether we receive your commitment or not.

The judge's decision to deny us Debtor-In-Possession (DIP) status was based on a flawed CPA report that dismissed Adam Walker's clear statement that we used an attorney to vet Velanos, just one of the many defenses we have against gross mismanagement, none of which you raised. Mr. Walker, a twelve-year veteran of FINRA investigations and a securities specialist, deserves more weight than YIP's fraudulent report. We believe an appellate judge would side with us on this matter, and that Judge Burgess would also reconsider. We have new evidence that justifies reconsideration, including other ongoing business that was not presented. Furthermore, Section 13.7 of our agreement with Velanos is critical. We have settled with Velanos and should now be able to focus on fulfilling our contractual obligations, including making refunds. We are perplexed as to why you did not argue for the option to dismiss the case based on Section 13.7, given that the force majeure event has ended with our settlement with Velanos. The clear attempt of the UST and Examiner to ignore our contract is repulsive.

The last thing we want is for professionals to take Velanos' money while Genie is destroyed, especially when we have performed our contractual duties admirably. Let me be clear: If you are not fully committed to pursuing these matters to the fullest extent, and we do not hear back from you promptly (by EOD Monday, 8/12/24), we will be forced to take all necessary legal steps to remove you from this case for cause. You are well aware that the U.S. Trustee committed fraud and that the report is incompetent/fraudulent. It is your duty to act in the best interest of the estate. Ignoring Section 13.7 and jeopardizing our Velanos settlement agreement is not in the estate's best interest.

We hope to work with you to restore integrity to this process and put an end to this injustice. It is crucial that you prioritize our case over any potential future relationship with the U.S. Trustee or the Examiner. We need to protect the creditors, the estate, our families, and we expect your unwavering support. We look forward to your immediate response.

Sincerely,

Case 3:24-bk-00496-BAJ   Doc 392   Filed 07/30/25   Page 40 of 53
Case 3:25-cv-00164-HES-MCR   Document 18   Filed 06/24/25   Page 16 of 168 PageID
172

4/21/25, 11:37 AM                              Mail - John from Genie Investments - Outlook

**John Michael Cohan**
Genie Investments, Director

 **GENIE INVESTMENTS**

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.

DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710   AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm

PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

Case 3:24-bk-00496-BAJ    Doc 392    Filed 07/30/25    Page 41 of 53
Case 3:25-cv-00164-HES-MCR    Document 18    Filed 06/24/25    Page 17 of 168 PageID
173

4/21/25, 11:41 AM                                Mail - John from Genie Investments - Outlook

 **Outlook**

---

**Re: When can we conference.. we have some questions,**

---

**From** John from Genie Investments <jmcohan@genieinvestments.com>
**Date** Thu 8/8/2024 3:10 PM
**To** David from Genie Investments <dhughes@genieinvestments.com>; Bryan Mickler <bkmickler@planlaw.com>

Bryan,

My question specifically is how do we go about filing an appeal?

The judge erred in his decision, and this is a prima fascia case. We hired reputable counsel to do due diligence on Velanos. A LICENSED attorney sold us a product, doubled & tripled down on that product that he himself continues to defend to this day. Who else would someone hire to vet a company other than a licensed attorney? When we received wire trace reports, he claimed they were legitimate and told us as soon as the money was sent, it was considered to be ours. They then fictitiously put $9.5MM in Nordic's bank account which he stood by. Stand By Letters of Credit are a real thing despite the court's negative interpretation of their reputation. Type "Standby Letter of Credit" in Google and nothing negative pops up at all. In fact, Investopedia, a reputable source, is the first on the Google feed, describes their purpose and how they work. So, the judges comment about "anyone who watches TV knows" is an erroneous statement based on nothing but his own opinion. 100% returns, 300% returns or 1000% returns are not impossible to make. If you make the right trades, you can do them over and over again in the market. Just ask Warren Buffet. The creditors signed agreements knowing that a wholesale lender was involved. We were contractually obligated to send the funds to a 3rd party. The 3rd party was "vetted" and "highly recommended" by a licensed attorney in the financial field and it failed.

Secondly, Section 13.7 - We have no creditors based on our agreements; #1 non-refundables are gone. #2 a wholesale lender failed. We've done everything reasonable and in good faith to make the recovery. Destroying a company to make refunds is not a reasonable effort, it's an extreme. The 7 TTEE should interpret our contract and understand that clearly.

Please response with direction on how we go about making an appeal. Thank you.

Sincerely,

**John Michael Cohan**
**Genie Investments, Director**

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.

Case 3:24-bk-00496-BAJ   Doc 392   Filed 07/30/25   Page 42 of 53
Case 3:25-cv-00164-HES-MCR   Document 18   Filed 06/24/25   Page 18 of 168 PageID
174

DISCLAIMER: Sender)(jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710 AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.
This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

---

**From:** David from Genie Investments <dhughes@genieinvestments.com>
**Sent:** Thursday, August 8, 2024 1:23:23 PM
**To:** Bryan Mickler <bkmickler@planlaw.com>; John from Genie Investments <jmcohan@genieinvestments.com>
**Subject:** RE: When can we conference:. we have some questions,

Agreed but John and I had some very general questions we wanted to go over with you first.

Sincerely,

---

**David Hughes**
Genie Investments, Director

 | **GENIE INVESTMENTS**

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.
DISCLAIMER: The sender (dhughes@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. The sender is a Consultant and makes no warranties or representations as to the Buyer, Seller, or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, the Recipient must return any and all documents in their original receipted condition to the Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710   AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.
This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

Case 3:24-bk-00496-BAJ    Doc 392    Filed 07/30/25    Page 43 of 53
Case 3:25-cv-00164-HES-MCR    Document 18    Filed 06/24/25    Page 19 of 168 PageID
175

4/21/25, 11:41 AM                          Mail - John from Genie Investments - Outlook

**From:** Bryan Mickler <bkmickler@planlaw.com>
**Sent:** Thursday, August 8, 2024 11:42 AM
**To:** David from Genie Investments <dhughes@genieinvestments.com>; John from Genie Investments
<jmcohan@genieinvestments.com>
**Subject:** RE: When can we conference.. we have some questions,

Let me see who is appointed as trustee and I will immediately set up a time to review.

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

**From:** David from Genie Investments <dhughes@genieinvestments.com>
**Sent:** Thursday, August 8, 2024 11:34 AM
**To:** John from Genie Investments <jmcohan@genieinvestments.com>
**Cc:** Bryan Mickler <bkmickler@planlaw.com>
**Subject:** When can we conference.. we have some questions,

CAUTION: This message was sent from outside the company

Sincerely,

## David Hughes
Genie Investments, Director

 **GENIE INVESTMENTS**

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as
Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators
and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification
& due diligence on their own before going into any opportunity.
DISCLAIMER: The sender (dhughes@genieinvestments.com) is NOT a United States Securities Dealer or Broker or
U.S. Investment Advisor. The sender is a Consultant and makes no warranties or representations as to the Buyer,
Seller, or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the
attached related documents are never to be considered a solicitation for any purpose in any form or content.
Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not
accepted, the Recipient must return any and all documents in their original receipted condition to the Sender. This
electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C
1367,2510-2521,2701-2710   AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809
DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information. It is
intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from
disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received
this email in error.
This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for
informational and educational purposes only and does not provide investment advice.

Case 3:24-bk-00496-BAJ   Doc 392   Filed 07/30/25   Page 44 of 53
Case 3:25-cv-00164-HES-MCR   Document 18   Filed 06/24/25   Page 26 of 65 PageID
182



WARREN
LAW GROUP

Click to Call:
(866) 954-1587

HOME | PRACTICE AREAS ˅ | OUR TEAM | OUR TEAM | NEWS & LEGAL UPDATES ˅ | CONTACT US

English ˅

SCOTT J. OH
Partner

📞 (773) 931-6630
✉ scott@wzarren.law
in linkedin.com/in/scott-oh-75812401/

Practice Areas Include:

Corporate Governance and Regulatory Compliance
Commercial Litigation
Asset Protection Planning
Corporate Bankruptcy and Debt Restructuring
Blockchain Offerings, Cryptocurrency Defense and Investigations
Corporate Law and Financial Transactions



https://warren.thatmarketing.com/our-team/scott-j-oh/

f  𝕏  in  ✉  ✉      🌐 English    ▼

## WARREN LAW GROUP

Click to Call:
(866) 954-7687

HOME    PRACTICE AREAS ⌄    OUR TEAM    NEWS & LEGAL UPDATES ⌄    CONTACT US

Biography                                Representative Matters

## OUR TEAM

Scott J. Oh is a Partner of Warren Law Group.

Scott is a seasoned transactional & litigation attorney, as well as business consultant, with over 25 years of experience representing various companies in complex business transactions, federal, state & local tax services, tax audit defense, corporate law and governance, private capital formation, commercial and residential real estate transactions, SEC compliance services, corporate/trade finance and debt restructuring. As a litigator, Scott has represented various clients in complex business and commercial litigation, partnership disputes, consumer finance litigation, foreclosure litigation/defense, real estate litigation, and probate & trust litigation.

Scott also provides paymaster/escrow agent services to various domestic and international clients and financial institutions in transactions involving commodities, PPE, real estate, and digital assets/cryptocurrency. Scott also serves high net worth individuals and families in the areas of wealth and estate planning, asset protection, trust and probate administration. Over his career, Scott has served a wide variety of clientele: Fortune 500 companies, large privately held domestic and international companies, successful entrepreneurs, private family offices, and small business owners and their families.

In the early days of his legal career, Scott served as Asst. Attorney General for the State of Illinois enforcing various state regulations such as wage and labor laws, tax laws, consumer protection statutes, and civil rights. After public service, Scott further developed his legal skills in the private sector at large firms such as Deloitte, LLP (tax services) and Gardner, Carton and Douglas (now Fraeger, Drinker, Biddle and Reath LP).

Thereafter, Scott decided to start his own practice offering his legal services and expertise to both the Chicago area and international business community to which he remains committed to today. Also, in 2006, he formed a business consulting firm focused on assisting businesses achieve optimal operating efficiencies and sustainability by designing and implementing debt restructuring and re-capitalization strategies, as well as providing for increased opportunities for capital access and formation.

### Private Placement/Private Capital Transactions

Over the years, Scott developed a global network of highly esteemed professionals in investment banking, corporate finance, law, wealth management, as well as various government leaders. His clients often benefit from his relationships by engaging new business opportunities in various industries, private capital transaction opportunities, and forging new strategic business

Christopher D. Warren

Thomas J. McCabe

Jon-Jorge Aras

Paul Share

Cynthia Augello

David Rosenfield

Scott J. Oh

Jorge R. Salva

Jorge Marquez

Brittany Halbert

Maximilian Travis

James Meaney

ERROR:
invalid…

Q Search

               

9:05 AM
8/6/2025

 

Case 3:25-cv-00164-HES-MCR    Document 18    Filed 06/24/25    Page 28 of 33 PageID 184

HOME    PRACTICE AREAS ˅    OUR TEAM    NEWS & LEGAL UPDATES ˅    CONTACT US

Click to Call:
(866) 954-7687

Scott also provides paymaster/escrow agent services to various domestic and international clients and financial institutions in transactions involving commodities, PPE, real estate, and digital assets/cryptocurrency. Scott also serves high net worth individuals and families in the areas of wealth and estate planning, asset protection, trust and probate administration. Over his career, Scott has served a wide variety of clientele: Fortune 500 companies, large privately held domestic and international companies, successful entrepreneurs, private family offices, and small business owners and their families.

In the early days of his legal career, Scott served as Asst. Attorney General for the State of Illinois enforcing various state regulations such as wage and labor laws, tax laws, consumer protection statutes, and civil rights. After public service, Scott further developed his legal skills in the private sector at large firms such as Deloitte, LLP (tax services) and Gardner, Carton and Douglas (now Fraeger, Drinker, Biddle and Reath LP).

Thereafter, Scott decided to start his own practice offering his legal services and expertise to both the Chicago area and international business community to which he remains committed to today. Also, in 2006, he formed a business consulting firm focused on assisting businesses achieve optimal operating efficiencies and sustainability by designing and implementing debt restructuring and re-capitalization strategies, as well as providing for increased opportunities for capital access and formation.

Private Placement/Private Capital Transactions
Over the years, Scott developed a global network of highly esteemed professionals in investment banking, corporate finance, law, wealth management, as well as various government leaders. His clients often benefit from his relationships by engaging new business opportunities in various industries, private capital transaction opportunities, and forging new strategic business relationships.

To this end, Scott often advises and facilitates his clients in identifying, analyzing, and structuring various business opportunities, e.g., private placement opportunities, joint ventures, and other private capital transactions, conventional/ unconventional asset-based credit facilities, credit enhancements, and corporate debt transactions.

Education
JD, Business Associations; Northwestern University School of Law
BSBA, Accounting, University of Illinois, Chicago

Bar Admissions & Memberships
State of Illinois

---

Cynthia Angello

David Rosenfeld

Scott J. Oh

Jorge R. Salva

Jorge Marquez

Brittany Hulbert

Maximilian Travis

James Meaney

Daniel Alper

Sankeetha Selvarajah

Paul McCulloch

Daniel Podhaskie

Susannah Griffee

              

**Exhibit C – Email Correspondence Between Examiner Maria Yip, Assistant Hal, and Debtors with Attorney Bryan Mickler (Highlighted Comments)**

This exhibit contains a sequence of email exchanges in the days immediately preceding the issuance of the Examiner's Report. These communications show that Maria Yip and her assistant Hal persistently asked a single question in various forms: *Whose funds were sent to Velanos Capital?* The answer, provided repeatedly by both John Michael Cohan and David Hughes, and copied to counsel Bryan Mickler, was consistent, clear, and unequivocal: *the funds belonged to Genie Investments NV and were not customer funds.*

The emails also demonstrate that:

- **The UST, Examiner and her assistant asked the same question multiple times** in slightly different ways, suggesting an intent to extract a different answer;

- **The responses were consistent every time,** leaving no ambiguity: the funds were the company's, earned through operations and due diligence agreements;

- **Attorney Bryan Mickler was included throughout the thread,** responded directly, and did not contradict or challenge the consistent answer given by his clients;

- **Yellow-highlighted comments from Mickler** show direct engagement with the Examiner's questions, and support the conclusion that the company, not its customers, owned the funds sent to Velanos.

Despite this, Examiner Yip inserted a statement into her final report falsely suggesting that David Hughes had stated the funds belonged to customers. That claim was never made. The record here proves otherwise. No reasonable examiner could interpret these emails to mean customer funds were involved, particularly not after asking the same question repeatedly and receiving the same consistent answer.

This exhibit supports the conclusion that:

1. The Examiner had clear knowledge the funds were not customer funds;

2. She included a false statement in her report anyway;

3. The false statement was then relied upon by the U.S. Trustee, the Chapter 7 Trustee, and the Court to justify conversion and later adversary action;

4. This constitutes intentional misrepresentation and a knowing fraud on the Court.

---

3. For the $9,000,000 transferred to Velanos, what was the source of monies used to fund those transfers? The $9,000,000 transferred to Velanos were 100% sourced by Genie Investments NV. Our answer has been consistent each time this question has been asked. The source of these funds was income earned by Genie during the period of 2021 and 2022 prior to the transfer to Velanos. You should have all of the bank account statements to show income from ICA payments by customers, bridge loan interest by customers and due diligence payments by customers during this time period.

From: John from Genie Investments <jmcohen@genieinvestments.com>
Sent: Monday, June 24, 2024 2:03 PM
To: David from Genie Investments <dhudson@genieinvestments.com>
Cc: Bryan Madden <bkmadden@dfwlaw.com>
Subject: RE: Thank You For The Call Earlier

CAUTION: This email originated from outside the company.

Hal/Maria,

1. The Morgan Stanley Portfolio Management Active Assets account ending #2290 – Do you have account opening documents for this account? Specifically, we are looking for whether this was a secured loan and if there were any personal guarantees? See attached (Opening Statement 1 & 2 and 2290 AAA Document) – The mortgage was opened on 5/10/2022 and this is all that we have on file right now. It was a secured loan and there are no personal guarantees on the loan. The account amount was opened with a balance of

2. The $121,600 in payments to the Law Offices of Scott J. Ota – Do you have or retain any invoices relating to these payments? See attached invoices and can wire receipt. A total of $79,455.42 was for retainer. $42,000 was from 1% of the $105,061 escrow agreement (attached GENIE-VIKING). $21,600 was paid to pond funds to anticipation of a partnership that never came to fruition. Total: $121,055. This is a sheet of your invoices. Documents attached (GENIE-OTA) here is the personal check

3. I'm the $9,000,000 transferred to Velsum, what was the source of monies used to fund these transfers? The $9,000,000 transferred to Velsum were 100% sourced by Genie Investments NV. Our answer has been consistent each time this question has been asked.

4. Velsum considered $499,976 to the Debtor on May 2, 2023. What is your understanding of what this payment from Velsum was for? Partial payment of what Velsum owed to Genie Investments NV.

5. For the loans funded in the "Loan Closing Date" schedule, what was the source of the funds used to provide these loans? The loans funded in the "Loan Closing Date" schedule were 100% sourced by Genie Investments NV. Our answer has been consistent each time this question has been asked.

6. Zoomend – According to the 341 audio, Zoomend is 83% owned by David and 17.5% owned by John. Who owns the additional 1.5%?

7. Better Methods – The Debtor transferred funds to Better Methods from January 2023 through January 2024. Do you have bank statements for Better Methods during that time? Yes, are attached.

8. Genie Investments NV, Inc. (Florida) – The Debtor's JPMorgan Chase account account ending #2502 transferred $11,215,000 to Genie Investments NV, Inc.'s Wells Fargo account ending #2981 on July 28, 2022. On September 22, 2022 the exact same amount was transferred back from the Wells Fargo account to the Debtor's JPMorgan Chase account ending #2502. Why is such a large sum transferred to the Wells Fargo account and then returned during this time?

9. Old Plank Trail Community Bank account ending #5406 – Did the Debtor maintain an account at Old Plank Trail Community Bank? Genie, nor any affiliate entity had account at Old Plank Trail Community Bank –

We can skip tomorrow morning's call if the answers above suffice. Please let us know. Thank you.

Sincerely,

John Michael Cohen
Genie Investments, Director

**GENIE INVESTMENTS**

**Exhibit D – Email from Trustee's Counsel Raye Elliott (July 2025): Post-Testimony Backtracking and Failure to Investigate**

This exhibit contains an email from Raye Elliott, counsel to Chapter 7 Trustee Erin Cohen, sent the week of July 21, 2025. The timing of this communication is significant: it followed the undersigned's production of evidence demonstrating that the Examiner's Report, relied upon as the foundation for the adversary complaint, which contained false statements and falsely implying that insider loans were fraudulent transfers.

In this email, Ms. Elliott attempts to distance the Trustee from the Examiner's findings, stating that the Trustee "did not rely exclusively" on the Examiner's Report. But this is demonstrably false. Trustee Cohen testified under oath, repeatedly, that his decision to file the adversary complaint was made when he reviewed the Examiner's Report. He did not cite any independent investigation, independent review of the loans, or review of the company's financial records as a basis for filing.

In fact, Trustee Cohen testified that he did not personally review all of the bank records or underlying documentation prior to initiating adversary litigation. That failure is not merely negligent, it is a direct violation of his fiduciary duty as trustee and his obligation to conduct a reasonable and independent investigation before initiating litigation on behalf of the estate.

The law is clear: a bankruptcy trustee has a duty to investigate potential claims independently, not merely rely on reports or summaries. Courts have consistently held that a trustee "must conduct a reasonable investigation of the validity and enforceability of claims before pursuing litigation" (*see* In re Derivium Capital LLC, 716 F.3d 355, 363 (4th Cir. 2013)), and that a trustee may be sanctioned for pursuing claims "without proper factual basis or inquiry" (*see* In re Cedar Falls Hotel Properties Ltd. P'ship, 102 B.R. 1009, 1014 (Bankr. N.D. Iowa 1989)). Cohen's sworn admission that he failed to do so, and his reliance on a report now proven to contain false statements, supports a finding of bad faith and a pattern of reckless disregard for the truth.

Ms. Elliott's email does not resolve this problem, it deepens it. The post hoc rationalization that Cohen relied on *other* factors contradicts both his sworn testimony and the representations made to this Court in prior pleadings. It is further evidence of a continuing fraud on the court, and it underscores why the adversary complaint, filed on a false factual basis and advanced without independent inquiry, must be vacated in full.

Mr. Hughes,

I forwarded your email and documents to the Trustee and discussed it with him. The Trustee did not rely entirely on the Chapter 11 Examiner's report that you claim is false to make the decision to file the adversary proceeding against Zoomeral and the other companies.


raye.elliott@akerman.com

Jul 23, 2025, 9:57 AM (2 days ago)    ☆    ☺    ↰    ⋮

to me ▾

Mr. Hughes,

I forwarded your email and documents to the Trustee and discussed it with him. The Trustee did not rely entirely on the Chapter 11 Examiner's report that you claim is false to make the decision to file the adversary proceeding against Zoomeral and the other companies. The Trustee relied upon the loan documents between the Debtor and Zoomeral and the other companies that do not contain commercially reasonable terms, as well as my review of the Debtor's bank records to confirm the transfers made to the companies. If the companies believe that the transfers were not fraudulent transfers and the loans were legitimate, it was the companies' responsibility to retain an attorney to defend them in the adversary proceeding, as Judge Burgess ordered, and present evidence to the court regarding the loans. The companies did not do that and a default judgment has been entered. The Trustee will not agree to vacate that default judgment. If the companies wish to retain an attorney at this point to file something with the court to try to vacate the default judgment, they are free to do that. Thank you

Raye Elliott
Tampa: Akerman LLP | 401 East Jackson Street, Suite 1700 | Tampa, FL 33602
D: 813 209-5013 | T: 813 223 7333| F: 813 223-2837
Jacksonville: Akerman LLP | 50 North Laura Street, Suite 3100 | Jacksonville, FL 32202
T: 904 798 3700 | F: 904 798 3730
raye.elliott@akerman.com

vCard | Profile

akerman

700+ Lawyers
25 Offices
akerman.com

**Exhibit X – Verification Letter from Gowling Counsel**

Exhibit X is a verification letter obtained from the law firm Gowling, which demonstrates that we did not rely solely on our own previous counsel, Mr. Scott Oh, in proceeding with the Velanos transaction. As part of our diligence, we required confirmation from Velanos' own counsel at Gowling to ensure that the investment was secure and that funds would be liquid and recoverable without issue in the event of a dispute. This exhibit shows that we sought assurances from multiple attorneys, and that our reliance on the transaction being safe and recoverable was based on legal representations from both sides, not just from our own counsel.



November 16, 2022

**Privileged & Confidential**

Mark Ledwell
Direct +1 416 862 4652
mark.ledwell@gowlingwlg.com

**Via E-Mail: jwearmouth@velanosprincipalcapital.com**

Velanos Principal Capital Inc.
120 Adelaide Street W
Suite 2500
Toronto, ON  M5H 1T1

**Attention:    Mr. Joshua Matthew Wearmouth**
**Director**

Dear Mr. Wearmouth:

**Re:  Velanos Principal Capital Inc. ("Velanos")**

We write to confirm that we have been engaged by Velanos to provide general legal advice in connection with structured finance programs and project finance. The programs involve banking relationships established by you in Europe and North America. You have requested our advice in evaluating programs of interest, agreements, compliance (including AML compliance), tax, and risk. You have also requested our legal advice in structuring project funding arrangements and investments by Velanos in selected projects that meet your requirements. You have provided information to us indicating that Velanos has access to project funding partners with significant financial capacity (this letter may not be used or relied upon by anyone as a proof of funds or confirmation of funds or financing by Velanos and/or its funding partners). Please note that our advice is limited to jurisdictions where we are qualified to practice. In some jurisdictions we will be required to engage local firms on your behalf.

Sincerely,

Gowling WLG (Canada) LLP

Mark Ledwell

ML:pcl

**Gowling WLG (Canada) LLP**
Suite 1600, 1 First Canadian Place
100 King Street West
Toronto ON  M5X 1G5 Canada

T +1 416 862 7525
F +1 416 862 7661
gowlingwlg.com

Gowling WLG (Canada) LLP is a member of Gowling WLG, an international law firm which consists of independent and autonomous entities providing services around the world. Our structure is explained in more detail at gowlingwlg.com/legal.

54162672\1

OFFICIAL BUSINESS

DEBTOR NAME _Genie Investments NV_

CASE # _3-24-bk-00496-BAJ_

EMAIL _david.choatehughes@gmail.com_

After Hours