FILED INTAKE USBC
OCT 14 '25 PM2:19

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re: Genie Investments NV Inc., Debtor.
Case No. 3:24-bk-00496-BAJ
Chapter 7

**MOVANTS' MOTION FOR RECONSIDERATION OF ORDER GRANTING TRUSTEE'S MOTION TO ENFORCE AUTOMATIC STAY AND DENYING WITH PREJUDICE THIRD PARTY INDIVIDUAL'S MOTIONS FOR SANCTIONS (DOC. 432)**

Movant, David Hughes (the "Third Party Individual"), respectfully files this Motion for Reconsideration of the Court's Order entered September 30, 2025 (Doc. 432). This Motion is necessary to correct a manifest error of fact and to prevent the use of this Court's orders to effectu a clear legal error: the extinguishment of Movants' personal, non-derivative claims against third parties via an impermissible non-consensual release, which is directly forbidden by controlling Supreme Court precedent.

**INTRODUCTION: THE IMPERMISSIBLE EXTINGUISHMENT OF THIRD-PARTY RIGHTS**

This Motion arises from a single, critical issue: The Chapter 7 Trustee is attempting to use the bankruptcy process to sell a release for claims he does not own. Movants are not parties to the estate's settlement with the Warren Law Group ("WLG"). The Engagement Letter proves they were not WLG's clients. Yet, the proposed "Bar Order" is a textbook non-consensual third-party release, designed to permanently enjoin Movants from seeking redress in any court for the direct, personal harms they suffered, including defamatory public attacks on Ripoff Report and the loss of a multi-million dollar deal documented on BiggerPockets.

The Supreme Court has unequivocally held that the Bankruptcy Code "contains no authority for… nondebtor releases in a Chapter 11 plan" that discharge "claims against nondebtors without the consent of the claimants." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 223 (2024). This principle is rooted in the fundamental right of access to the courts. This Court's September 30 Order, by enforcing the stay against Movants' defensive actions, facilitates this unauthorized power grab. Reconsideration is required to prevent a manifest injustice and a clear error of law.

**LEGAL STANDARD**

Reconsideration is proper to correct "manifest errors of law or fact." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007). A ruling that enables a legal act expressly forbidden by a superior court constitutes a manifest error of law.

**ARGUMENT**

**1. The Supreme Court's Decision in *Harrington v. Purdue Pharma* Directly Prohibits the Relief Sought by the Trustee.**

The legal landscape for non-consensual third-party releases was definitively settled by the Supreme Court in 2024. In *Purdue Pharma*, the Court examined whether a bankruptcy court could approve a plan that released claims against non-debtor third parties without the claimants' consent. The Court held it could

not, stating plainly that the bankruptcy code "does not authorize a release and injunction of this sort." 603 U.S. at 224.

The Court's reasoning is fatal to the proposed Bar Order:

- **No Statutory Authority:** The Court meticulously reviewed the Code and found no statutory basis for such a release. This logic applies with equal, if not greater, force in Chapter 7, where the statutory grounds for such extraordinary relief are even narrower than in Chapter 11.

- **Consent is Required:** The release is only permissible with the "consent of the claimant/s." *Id.* Movants' consent is expressly and vigorously withheld.

- **The Right to Personal Redress is Protected:** The decision safeguards the fundamental principle that a bankruptcy discharge is "personal to the debtor." *Id.* (citing *In re Seaside Eng'g & Surveying, Inc.*, 780 F.3d 1070, 1073 (11th Cir. 2015)). It is a profound error to use the Debtor's bankruptcy to discharge the separate, personal liabilities of its former attorneys to non-debtor parties.

For this Court to approve a settlement that includes such a release would be to act where the Supreme Court has said there is no power to act. This is the definition of a manifest error of law.

**2. Movants' Claims Are Personal and Fall Outside the Court's Jurisdiction to Release.**

The proposed Bar Order is not only unauthorized but also substantively overbroad. It seeks to enjoin claims "arising out of or related to" WLG's representation. Movants' claims, however, are for direct, personal injuries:

- **Damage to Personal Reputation:** Publicly being labeled a "con man" on Ripoff Report is a personal tort (defamation) that damages an individual's reputation, not a corporate asset. All one has to do is to visit:https://www.ripoffreport.com/, then search for the name David Hughes. You will seek fictitious authors who will not identify themselves, yet the defamation is undeniable and personal in nature.

- **Loss of Personal Business Opportunity:** The loss of a multi-million dollar deal for a new venture, evidenced by the BiggerPockets text message stating "Hard pass. Your name is publicly associated with David Hughes," is a personal financial loss suffered by Mr. Cohan and Mr. Hughes.

These claims belong to Movants, not the bankruptcy estate. *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 (1972). A bankruptcy court's jurisdiction is limited to matters concerning the debtor and the estate. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). This Court lacks the authority to extinguish the personal claims of non-debtor third parties against other non-debtor third parties. *See In re Munzenrieder Corp.*, 62 B.R. 1009, 1011 (Bankr. M.D. Fla. 1986).

**3. The Trustee's Contradictory Testimony Reveals the Bad Faith Underpinning This Effort.**

The procedural path to this juncture is itself tainted. The Court's September 30 Order denied Movants' sanctions motions based on the Trustee's sworn testimony. Newly discovered evidence—a post-hearing email from the Trustee's counsel (**Exhibit III**) stating "The Trustee did not rely entirely on the Chapter 11

Examiner's report"—directly contradicts his sworn testimony that he "relied primarily on the Yip report" (Tr. 43:20-21).

This contradiction is a manifest error of fact that undermines the foundation of the Court's Order. It reveals that the Trustee's aggressive litigation, which created the procedural trap Movants now face, was not conducted with the candor required of a court officer. To allow an order based on such testimony to then facilitate the unauthorized extinguishment of Movants' rights compounds the error.

**4. The Trustee, as a Court-Appointed Officer, Should Be Held to a Higher Standard and His Request for a Bar Order Demonstrates a Failure to Meet That Standard.**

The Chapter 7 Trustee is not an ordinary litigant; he is a fiduciary and an officer of the Court. As such, he is charged with knowing and adhering to the boundaries of the Bankruptcy Code. The Supreme Court's decision in *Harrington v. Purdue Pharma L.P.* was not a subtle shift in jurisprudence; it was a clear, unequivocal repudiation of the very type of non-consensual third-party release the Trustee now seeks.

For a Trustee to request such a release after the *Purdue Pharma* decision demonstrates, at best, a reckless disregard for binding precedent and, at worst, a deliberate attempt to expand the powers of the estate beyond their legal limits. This Court should not countenance such action from a party who holds a position of public trust. The Trustee's conduct in pursuing this Bar Order, combined with the newly discovered evidence contradicting his sworn testimony, reveals a pattern of overreach that this Court has an independent duty to correct in order to protect the integrity of the judicial process. *See, e.g., Jimenez v. Madison Area Technical College*, 321 F.3d 652, 657 (7th Cir. 2003).

**CONCLUSION**

The foundational document governing the legal relationship at the heart of this dispute—the Engagement Letter between Warren Law Group and its client—conclusively demonstrates that Movant David Hughes is a third party with distinct, personal rights. The agreement is exclusively between "Warren Law Group" and "Genie Investments NV, LLC and you [Caleb Michael Davis]" as the "Client." **David Hughes is not a signatory, not mentioned as a client, and is not a party to this contract.** His status as a co-owner or associate of the corporate Debtor does not, as a matter of law, transform the firm's duties to the corporate client into a releasable asset of the bankruptcy estate belonging to the Trustee. His personal claims for defamation and business interference stand apart.

The path forward is clear under the law. The Supreme Court has spoken in *Purdue Pharma*, and this Court lacks the authority to grant the central relief the Trustee seeks in his settlement. The newly discovered evidence further reveals that the procedural journey to this point was paved with contradictory testimony. Movants are confident that a review of the papers and the incontrovertible legal principles is sufficient for the Court to correct course.

**WHEREFORE**, Movant David Hughes respectfully requests that the Court, based on a review of the papers and the manifest legal error presented, grant this Motion and:

1. Vacate its September 30, 2025, Order (Doc. 432).

2. Issue an order stating it will not approve any settlement containing a bar order that purports to release the personal, non-derivative claims of John Michael Cohan or David Hughes against the Warren Law Group, as such a release is impermissible under *Harrington v. Purdue Pharma L.P.*

3. **In the event the Court is inclined to deny the foregoing relief, Movant respectfully request an evidentiary hearing.** Such a hearing is necessary to create a full record concerning the Trustee's contradictory testimony and the good faith of his administration, and to allow Movants to formally present their evidence of direct, personal harm. Movants propose that Mr. Cohan will appear in person and Mr. Hughes will appear remotely for such a hearing.

Respectfully submitted,

*[signature]*

Dated: 10-14-2025

David Hughes

**CERTIFICATE OF SERVICE**

I hereby certify that on this 14th day of October, 2025, a true and correct copy of the foregoing motion was served on all interested parties via the Court's CM/ECF system.

John Michael Cohan

**Exhibit List:**

- **Exhibit I:** Compilation of Pleadings, Transcripts, and Correspondence
- **Exhibit II:** Draft Opposition to U.S. Trustee's Motion & Adam Walker's Internal Analysis
- **Exhibit III:** Post-Trial Email Correspondence (July 23, 2025)
- **Exhibit IV:** Chapter 7 Trustee Contradictions Side-by-Side
- **Exhibit V:** Industry-wise Lending Advertisements
- **Exhibit VI:** Evidence of Inflated Creditor Claims and Federal Resolution
- **Exhibit VII:** Warren Law Group Engagement Letter
- **Exhibit VIII:** Evidence of Personal Harm (Ripoff Report, BiggerPockets Communication)

# EXHIBIT I

4.      In 2022 and 2023, the Debtor entered into loan agreements with several companies owned by Cohan and Hughes including Zoomeral, Inc., Capitulum Homes, LLC, Genie Investments II, LLC, Better Methods, LLC, and Genie's Angels, LLC (collectively, the "Insider Companies") (Chapter 11 Examiner's Report at pp. 29-45). The Trustee has copies of the loan agreements and has reviewed them. Each of the loan agreements provided for an interest rate of only .1% and that the loans would be repaid in one balloon payment in seven years with the option to extend the loans given solely to the Insider Companies. According to the Chapter 11 Examiner's Report, which was based on her review of the Debtor's bank statements, the Debtor transferred over $3.6 million to the Insider Companies. (*Id*.). Given that the purported loans were made to insiders and that the loans were not commercially reasonable, the Trustee believes that the $3.6 million transferred to the Insider Companies constitute fraudulent transfers.

5.      After holding the Section 341 Meeting of Creditors, taking a Rule 2004 examination of the Debtor, and attempting to determine the disposition of over $1.1 million in the Debtor's Chase Bank accounts that were closed in August 2023 and whether those funds were transferred to the Insider Companies, the Trustee was ready to move forward with claims against the Insider Companies. Therefore, on January 24, 2025, the Trustee's counsel sent demand letters to each of the Insider Companies demanding return of the fraudulently transferred funds. The Trustee intends to file an adversary complaint against the Insider Companies seeking return of the fraudulently transferred funds.

6.      The Motion filed by Cohan and Hughes attempts to argue the merits of the Trustee's fraudulent transfer claims against the Insider Companies and requests that the Court enter a protective order prohibiting the Trustee from suing the Insider Companies. There is no basis in

2

**As shown through submitted evidence and at trial, on *January 22, 2025*, the undersigned and his business partner began their pursuit for claims against Warren Law Group and others. After a cease-and-desist email and letter threatening sanctions was sent to both Mr. Cohan and Mr. Hughes within three (3) hours of commencement of their action against defendants, some good faith discussion by email in between and then forty-eight (48) hours later, the Chapter 7 Trustee sent 10-day multi-million dollar demand letters, followed by the automatic stay enforcement and the reason for their actions was as follows:**

Case 3:24-bk-00496-BAJ Doc 276 Filed *01/29/25* Page 2 of 45:

5. After holding the Section 341 Meeting of Creditors [*September 2022*], taking a Rule 2004 examination of the Debtor, and attempting to determine the disposition of over $1.1 million in the Debtor's Chase Bank accounts that were closed in August 2023 and whether those funds were transferred to the Insider Companies, the [Chapter 7] Trustee was ready to move forward with claims against the Insider Companies. [*4 months past*] Therefore, on *January 24, 2025*, the [Chapter 7] Trustee's counsel sent demand letters to each of the Insider Companies demanding return of the fraudulently transferred funds. The [Chapter 7] Trustee intends to file an adversary complaint against the Insider Companies seeking return of the fraudulently transferred funds. [*February 6, 2025* the adversary complaint was filed.]

**After Mr. Cohan and Mr. Hughes proved the $1.1 million transaction was done by a third-party (Chase Bank) in their *February 5th* filing, both the adversary complaint omitted the said transaction and the tune at the hearing had changed to the "Yip Report":**

*June 24, 2025* Trial/Evidentiary Hearing Transcript

> 1. Page 41, Line 19-22
>
> *19 Q So you made fraudulent transfer allegations*
> *20 without reviewing all the bank records?*
> *21 A Yes. We had the basis from the examiner's*
> *22 report from our own view of the bank statements that it*
> *23 was likely that there were fraudulent transfers.*
>
> 2. Page 43-44, Lines 20-25, 1-4
>
> *13 Q Did you review all the Debtor's bank*
> *14 statements before asserting your claims of fraudulent*
> *15 transfers?*
> *16 A I reviewed most of them and my — I relied on*
> *17 my attorney to review the rest.*
> *18 Q Just to clarify, not all of them?*
> *19 A I did not dig deep into all of the bank*
> *20 records. I relied primarily on the Yip report.*
> *21 Q And did the Yip report find fraud?*

22 A Yes.
23 Q Where in the Yip report did it find fraud?
24 A The Yip report specifically indicated that the
25 loans to the insiders were well below market terms and

1 that there were — that the Debtor had no ability to fund
2 or interest to fund preferences and fraudulent transfers
3 against the insider companies. That's at Line 233, I
4 believe, of the Yip report.
5 Q But she — she found fraud? Because I'm pretty
6 -- if she found fraud, I don't think it [the case] would have been
7 converted for gross mismanagement.

3. Page 60, Line 15

15 As soon as we read Ms. Yip's report and
16 spoke to her and saw the terms of the loans, so it wasn't
17 like this was a surprise."

4. Page 64, Lines 14-25

14 Q So what part of the examiner report said that
15 there were fraud — that there was fraud involved?
16 A There was a section that was devoted to loans
17 to shareholders and then there was a section about
18 recovering the loans from shareholders as preferences and
19 fraudulent transfers. It's at, I believe, Line 233, if
20 you have a copy of it in front of you.
21 Q I have this one. I can pull it up. Just give
22 me a moment.
23 THE COURT: I can read Lineg if it would
24 help, Mr. Cohan.
25 MR. COHAN: It would, but I'll have it

5. Page 65, Lines 1-22

1 in two seconds.
2 THE COURT: Okay.
3 MR. COHAN: Here we go. Okay.
4 Line 233 reads, it appears that potential —
5 potential distributions for the creditors of this estate
6 may result from the avoidance of potential preferential
7 transfers and potential fraudulent transfers to insiders
8 and potential claims against professionals.
9 Where does that say that fraud existed?
10 A If you go back to the rest, in that particular
11 passage, she indicates that the loans are potentially
12 fraudulent.

39

1  to now?

2      A    I don't know what Chase -- what the Exhibit L

3  you're talking about.  We separately subpoenaed Chase

4  Bank and they produced a copy of the check.  We did not

5  receive a copy of the check from Mr. Mickler despite

6  three or four attempts.

7      Q    Okay.  That's good information.  Thank you.

8           What was the date of the subpoena?

9      A    I don't know.

10     Q    What was the date of the demand letters?

11     A    I don't have them in front of me.  I don't know

12 off the top of my head.

13     Q    Okay.  In my filings, do I state them to being

14 on the same day?

15     A    I don't know.

16     Q    Okay.  You filed an adversary complaint and you

17 also filed a Chase Bank subpoena.

18     A    Yes.

19     Q    So you made fraudulent transfer allegations

20 without reviewing all the bank records?

21     A    Yes.  We had the basis from the examiner's

22 report from our own view of the bank statements that it

23 was likely that there were fraudulent transfers.  All the

24 elements were there.  And if the 1.1 million dollars came

25 back and showed it went to either you or Mr. Hughes

41

1    Q    Did you ever independently request to review

2  the contract before you filed the adversary complaint?

3  I'm talking about the same 1.1 million dollar

4  transaction.

5    A    With Mr. Chu (phonetic)?

6    Q    Mrs. Chu, yeah.

7    A    No.

8    Q    If the contract existed and was known to

9  Debtor's counsel, or at least the Chase Bank records

10  were, why was it not properly disclosed in your filing

11  from the outset?

12    A    Because we didn't know who the check went to.

13    Q    Did you review all the Debtor's bank

14  statements before asserting your claims of fraudulent

15  transfers?

16    A    I reviewed most of them and my -- I relied on

17  my attorney to review the rest.

18    Q    Just to clarify, not all of them?

19    A    I did not dig deep into all of the bank

20  records. I relied primarily on the Yip report.

21    Q    And did the Yip report find fraud?

22    A    Yes.

23    Q    Where in the Yip report did it find fraud?

24    A    The Yip report specifically indicated that the

25  loans to the insiders were well below market terms and

42

1    that there were -- that the Debtor had no ability to fund

2    or interest to fund preferences and fraudulent transfers

3    against the insider companies.  That's at Line 233, I

4    believe, of the Yip report.

5        Q    But she -- she found fraud?  Because I'm pretty

6    -- if she found fraud, I don't think it would have been

7    converted for gross mismanagement.

8        A    What do you --

9        Q    I mean, if --

10            THE COURT:  Mr. Cohan, you need to ask a

11   question.

12            MR. COHAN:  Sure.

13            THE COURT:  Not just make statements.

14            MR. COHAN:  Yeah, you're right.  I apologize.

15            THE COURT:  That's all right.

16   BY MR. COHAN:

17       Q    Is it correct that the bank records and

18   transfers referencing this 1.1 million dollar transaction

19   was in the possession of Debtor's counsel and provided to

20   him on at least two separate occasions?

21       A    How do I know?

22       Q    I made it, I put it in the filings.

23       A    That doesn't mean I know what Mr. Mickler had

24   in his office.

25       Q    Okay.  However, the filings E and F of one of

232. In addition, funds were transferred from Genie II to other businesses owned by Hughes and Cohan as summarized in the table below:

| (Payee)/Payor | Net Amount | |
|---|---|---|
| Zoomeral Inc | $ | (979,250) |
| Better Methods I LLC | | (100,000) |
| Genie Investments LLC / TD Bank x2998 | | (500) |
| TOTAL | $ | (1,079,750) |

233. It appears that potential distributions for the creditors of this estate may result from the avoidance of potential preferential transfers and potential fraudulent transfers to insiders and potential claims against professionals.

234. Without the appointment of an independent fiduciary, it is unlikely that the Debtor-in-Possession can independently pursue avoidance of potential preference actions and potential fraudulent transfers against insiders to maximize recoveries for the creditors of the estate.

### Funding From Third Parties

235. As previously stated, none of Genie NV's customers had loans funded by Genie NV's Lender Capital Partners. Genie NV attempted to locate potential Lender Capital Partners, however none of the Lender Capital Partners came to fruition and provided funding.

236. The Debtor entered an agreement with Velanos in which the Debtor proceeded to transfer $9,000,000 on the promise that Velanos would provide a 100% return in 30 days and profit participation up to approximately 900% in total.

58

1    A    Yes.  I've answered this 15 times today.

2    Q    Okay.  What was the basis?

3    A    That the loans were fraudulent transfers, that

4  the Debtor made to inside corporations under the terms

5  that were made.

6    Q    So it wasn't because there was a lack of

7  response?

8    A    Let me help you, Mr. Cohan.  When I got this

9  case, there were four buckets of assets that we were

10  looking at primarily from the beginning.  The first was

11  Velanos, the second was the Warren Group, the third had

12  to do with the notes and receivables that the Debtor had

13  made, and the fourth had to do with the malpractice

14  claim.  We always intended to bring the fraudulent

15  transfer action.  As soon as we read Ms. Yip's report and

16  spoke to her and saw the terms of the loans, so it wasn't

17  like this was a surprise.

18    Q    So it's your position that favorable terms is

19  fraud -- means fraudulent transfers?

20    A    Under these circumstances, yes, because they

21  weren't favorable terms.  They were terms that didn't

22  exist outside of what you and Mr. Hughes created.  There

23  are no loans like this in the commercial world.

24    Q    There's -- there's no loans with no personal

25  guarantees?

# EXHIBIT II

 Outlook

**Rough draft -- opposition to US Trustee's 2d motion**

From Adam Walker <adam@awsecuritieslaw.com>

Date Fri 7/19/2024 6:09 PM

To      David from Genie Investments <dhughes@genieinvestments.com>; John from Genie Investments
        <jmcohan@genieinvestments.com>

📎 1 attachment (42 KB)
Opp UST's 2d Motion Appt Trustee.docx;

Attached is the current draft opposition to the US Trustee's motion. It's far from complete -- needs to
be bulked up in places and I'll add much more polish to it. This lets you see where I'm heading with it
and how I see it coming together.

Let me know if you have concerns, questions, suggestions, etc.

Adam Walker
AW Securities Law
www.awsecuritieslaw.com
(816) 226-6476

On March 5, 2024, the U.S. Trustee (UST) filed a motion seeking various forms of relief, including appointment of a Chapter 11 trustee. In that motion, the UST asserted that Genie was a fraudulent enterprise that "simply stole" money from its customers and other ostensible creditors and invested $9.0 million of "other people's money" in an "obviously suspect" transaction. *See* Doc. 20 ¶¶ 16-17. The UST based these allegations solely on the statements of 18 small-business owners. Following a hearing on the motion, the Court granted only the request to appoint an Examiner. The UST subsequently selected and appointed an Examiner. After a lengthy investigation, the Examiner issued a Report. According to the UST, the Examiner's Report[1] ("Report") fully supports the UST's earlier allegations. Nothing could be further from the truth.

Insisting that the Report corroborates its entrenched position reveals much more about the UST than about Genie. For starters, it demonstrates that the UST has failed to review the Report with a critical eye. Had it done so, it would have realized that the Report is rife with inaccuracies, unsupported conclusions, and omissions of material and pertinent evidence. Among other things, the Report inaccurately reports fundamental aspects of Genie's business. It states falsely, for example, that Genie required a borrower seeking a Business Expansion Line of Credit ("BELOC") to enter a separate Due Diligence Agreement,[2] and that, "In some instances, borrowers paid McMann [Commercial Lending] an upfront initial application fee related to a loan with Genie NV."[3]

The Report contains numerous other errors, many of them attributable to the Examiner's decision to ignore foundational documents (e.g., contracts) and other evidence that would be crucial to any reasonable analysis. As a result, the Report persistently mischaracterizes Genie's operating history, revenues, management, the terms of its relationships with borrowers and business partners, and its future

---

[1]  Doc. 146.

[2]  Report ¶ __. In fact, Genie only required borrowers who sought bridge loans to complete the Due Diligence Agreement, which is evident upon even a cursory review of the relevant contracts.

[3]  Report ¶ __. This never happened. Any borrower who paid fees of any kind to McMann did not have a BELOC Agreement with Genie but was presumably in a lender-borrower relationship with McMann.

prospects. This taints the entire Report and undermines the instant motion, in which the UST cherry-picks snippets that support its existing positions without bothering to determine whether those passages are supported by evidence or analysis.

The UST's insistence that the Report "confirms" key allegations from its initial motion not only shows its lack of concern for the Report's investigative and analytical rigor, but also reveals its willingness to mischaracterize and embellish the Report's contents to suit its purposes. This is most notable in connection with the UST's allegations of fraud. At the very outset of its motion, the UST brazenly claims that the Report "confirms" that a trustee "must be appointed in this case because the Debtor engaged in fraud and gross mismanagement…"[4] But nowhere in the 51-page Report is there any finding or conclusion that Genie engaged in fraud. The UST simply invented this "confirmation" and attributed it to its hand-selected Examiner.

1.  *The BELOC Agreement, which both the Examiner and the UST ignore, makes clear that ICA Payments received by Genie were not required to be held in trust and therefore did not constitute "customer funds."*

Much of the Report proceeds from a false premise: that Genie was required to hold ICA Payments in trust for the borrowers who paid them. It is indisputable that the BELOC Agreement between Genie and its borrowers governs what ICA Payments are and how they are treated. The Report, however, offers no analysis of the relevant portions of the BELOC Agreement. It never acknowledges, for example, that the BELOC Agreement does not require or even suggest that ICA Payments will be held in escrow or in trust. The Report does, however, reference an email from McMann's principal, a demand letter from McMann's law firm, and an affidavit from one borrower as support for the Examiner's conclusion that ICA Payments remained "customer funds" after their receipt by Genie.[5] It should go without saying that the opinions of interested parties are insufficient, standing alone, to override the unambiguous language of

---

4      Second Motion, at 2.

5      Report ¶¶ 81, 39, 82.

a written contract. As already noted, however, the Report simply ignores the actual contract language. Worse yet, the Report attempts to support its flawed premise by inventing and repeating improper terminology – i.e., "ICA reserves" and "ICA deposits"[6] – despite the fact that those terms do not appear anywhere in the BELOC Agreement in connection with ICA Payments.

This shoddy methodology results in a fatally flawed Report. Because Genie was never required to hold ICA Payments in trust for customers, those payments constituted revenue realized by Genie. The possibility that ICA Payments could later become refundable does not change that. In this way, Genie is no different from a retail store or service provider that promises refunds to unsatisfied purchasers. Nordstrom and Wal-Mart do not have to set aside money received from customers until all opportunity for a refund has passed and neither did Genie. Thus, the funds Genie received in the form of ICA Payments were its own funds, not "customer funds," as the Examiner asserts.

The UST displays a similar lack of interest in engaging with the relevant source material. Its motion contains this bewildering passage:

> The Examiner *found* that the purpose of the ICA funds was to pre-pay interest amounts on customer loans. The Examiner also *found* that the Debtor provided contradictory statements regarding whether ICA funds were supposed to held in trust for customers or could be utilized in the ordinary course of the Debtor's business.[7]

The "purpose" of ICA Payments[8] is not, however, a question of fact for the Examiner to "find," but a matter of contract interpretation. Statements by any person, whether a party to the BELOC Agreement or not, cannot change its intrinsic meaning.[9]

---

[6]    *E.g.*, Report ¶¶ 25, 29, 39, 77, 79, 80.

[7]    Second Mot., at 5-6 (¶ 11) (emphases added).

[8]    The term "ICA funds" is a misnomer – that phrase never appears in the BELOC Agreement – and presumably refers to "ICA Payments."

[9]    Further, the UST mischaracterizes both the Report and the testimony cited therein when it refers to Genie's statements as "contradictory."

Neither the Report nor the instant motion even feints at contract interpretation and, as such, neither offers any basis for a determination that Genie had an obligation to hold ICA Payments in trust as customer funds. That alone is grounds to deny the instant motion. Nonetheless, a brief discussion of the relevant contract provisions dispels the faulty premise that ICA Payments were to be held in trust and that they therefore constituted "customer funds."

Regarding the ICA Payments, the BELOC Agreements only require the Lender to create an Interest Credit Account "on the books and records of the Lender," note "a credit equal to the ICA Payment" in the Interest Credit Account, use the Interest Credit Account to satisfy interest payments as they become due, and refund ICA Payments if and when specified preconditions are satisfied.[10] The BELOC Agreement does not restrict how the Lender may use ICA Payment funds between their receipt and a potential termination by the Borrower. As such, the Lender has no obligation to hold those funds in trust.

Further, the BELOC Agreements openly anticipate the Lender using the ICA Payment, rather than holding it in trust. Section 13.7(a) sets forth when and under what conditions a Borrower may be due an ICA Payment refund. It states that the Lender has up to 40 days to return the ICA Payment after the Borrower properly terminates the BELOC Agreement and requests a refund of the ICA Payment. Section 13.7(c), however, states that this 40-day period is "tolled during the pendency of a Force Majeure event" and defines as one such event the "failure of the Lender's wholesale lender from performing [sic] under the terms of the agreement between the Lender and the wholesale lender." This tolling provision protects the Lender in the event of illiquidity caused by certain occurrences beyond its control, including the failure of a wholesale lender to perform its contractual obligations. If the BELOC Agreement required the Lender to hold ICA Payments in trust, then there would be no need to protect the Lender against a wholesale lender's failure to perform. But the BELOC Agreements clearly anticipated a situation where

---

[10]   BELOC Agmt. §§ 1.1, 3.5 13.7.

the Lender's ability to refund ICA Payments depends on a wholesale lender performing its contractual obligations to the Lender. Otherwise, the tolling provision in section 13.7(c) would be superfluous.

Courts applying Illinois law "look to the contract as a whole" and "attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous." *Land of Lincoln Goodwill Indus. v. PNC Fin. Servs. Group*, 762 F.3d 673, 679 (7th Cir. 2014) (citations omitted). The interpretation the UST urges on the Court – that the BELOC Agreements require the Lender to hold the ICA Payments in trust and untouched – not only has no affirmative basis in the contracts' language but also ignores the provisions of Section 13.7(c) discussed above.

[add conclusion]

2.  *The Report excludes evidence that Genie had a good-faith belief, based in part on guidance and advice from a reputable law firm, that the Velanos transaction was a sound investment.*

In October 2022, Genie received an offer to enter into a joint venture with Velanos Principal Capital (Velanos). The proposal called for Genie to provide $3.0 million in capital that Velanos, the joint venture's manager, would use to purchase and sell standby letters of credit (SBLCs) at a substantial profit. Before deciding whether to accept the offer, Genie engaged Scott Oh, a lawyer with Warren Law Group (WLG), to perform due diligence on the proposed deal, advise Genie on risks associated with it, and, if necessary, review and revise the joint-venture agreement. According to his firm's website, Oh was an experienced attorney who "often advise[d] and facilitate[d] his clients in identifying, analyzing, and structuring…private placement opportunities, joint ventures, and other private capital transactions, conventional/unconventional asset-based credit facilities, credit enhancements, and corporate debt transactions." Oh advised Genie that SBLC trading was legitimate and that he was familiar with at least one person for whom Velanos and/or its CEO syndicated. Oh notably did not warn Genie either that the promised returns were too good to be true or that SBLC trading was a frequent vehicle for financial fraud.

Oh represented Genie from October 2022 to July 2023. During that time, he regularly consulted with Genie about the joint venture, reviewed multiple amendments to the Joint Venture Agreement, and communicated frequently with Velanos on Genie's behalf. At no time did Oh express to Genie any

concern that the joint venture was fraudulent. In late 2022, when Genie twice increased its capital contribution to the joint venture to a total of $9.0 million, Oh did not advise Genie against doing so. And when Velanos failed to make the payments required under the Joint Venture Agreement, Oh never told Genie that Velanos' various excuses were of questionable validity.

Although the Report states that the Examiner reviewed WLG's bank records, it does not appear that the Examiner interviewed Oh or WLG regarding the substance of Oh's work for Genie. The Report castigates Genie for entering into the joint venture with Velanos. "Neither Velanos nor Wearmouth were registered investment advisors and the returns promised by Velanos pursuant to the Velanos JVA were 100% in 30 days and profit participation that would have resulted in a 900% return, which should have raised a red flag."[11] The Report gives no consideration to the fact that Genie sought out and hired a professional to apprise it of risks and concerns raised by the joint venture. Oh claimed to have a history of helping clients "joint ventures," "conventional/unconventional asset-based credit facilities," and other transactions, which suggests he was an appropriate choice for the job. The Report nonetheless concludes that Genie's decision to enter the joint venture constitutes "gross mismanagement." In doing so, it discounts the effect on Genie of obtaining what it believed to be competent legal guidance from a partner with a reputable law firm.

The UST not only seizes on this conclusion, but expands on it, stating that "Debtor engaged in gross mismanagement, *at a minimum*, in its dealings with Velanos…"[12]

---

[11]    Report ¶ 83.

[12]    Second Mot., at 2.

### 3. *The UST cannot meet its burden of demonstrating that Genie's loans to affiliated entities constituted either fraud or gross mismanagement.*

The UST's motion brands loans from Genie to six affiliated entities as "fraudulent transfers and not true loans."[13] The UST alleges, almost in passing, direct evidence of fraudulent intent in the transfers from Genie to its affiliate, Better Methods. This allegation falls well short of the movant's burden of proof ad, moreover, misstates the Report's findings. According to the UST, "The direct evidence is the express purpose of the transfers to Better Methods as asset protection from the Debtor's creditors."[14] As support for this allegation, the UST cites paragraph 188 of the Examiner's Report, which states, in its entirety, "According to [John Michael] Cohan, Better Methods is an asset management company set up to protect the Debtor's assets and the assets of the Debtor's clients." The "express purpose" alleged by the UST as direct evidence of fraud is itself a fraud, fabricated by the UST and unsupported by any evidence in the Report or elsewhere in the record of this case.

The UST also asks the Court to find circumstantial evidence of fraudulent intent. The UST recites the "badges of fraud" often employed by Federal Courts of Appeals in determining, for purposes of 11 U.S.C. § 548, whether a debtor "intended to hinder, delay, or defraud" creditors. The UST's motion only addresses some of those factors, however, and does so in an extremely cursory fashion. It states, for example:

- The transfers at issue occurred "while the Debtor was being sued or was under threat of suit for failing to fund loans."[15]

- Genie received "less than the equivalent value based on the non-market nature of the loans."[16]

- The funds were transferred "in a concealed manner attempting to disguise the fraudulent transfers as loans."[17]

---

[13]    Second Mot. ¶ 16.

[14]    Second Mot. ¶ 17.

[15]    Second Mot. ¶ 19.

[16]    Second Mot. ¶ 19.

[17]    Second Mot. ¶ 19.

**AI Conclusion from the Draft Opposition to the U.S. Trustee's Second Motion**

Exhibit II, a draft legal memorandum, systematically deconstructs the U.S. Trustee's (UST) motion to appoint a Chapter 11 trustee by exposing the profound and fatal flaws in the Examiner's Report upon which the motion relies. The conclusion drawn from this detailed analysis is that the UST's motion is built upon a foundation of sand; it is an exercise in cherry-picking from a report that is itself unreliable, inaccurate, and the product of a shoddy investigative methodology. The UST has not only failed to meet its burden of proof but has actively mischaracterized the Report's contents to manufacture a false narrative of fraud and gross mismanagement.

The key conclusions specific to Exhibit II are:

1. The Examiner's Report is Fundamentally Unreliable: The draft opposition establishes that the Report cannot serve as a valid basis for any judicial action. It is "rife with inaccuracies, unsupported conclusions, and omissions of material and pertinent evidence." Specific examples include false statements about Genie's business requirements and the source of certain fees. The Report's methodology is condemned for ignoring "foundational documents (e.g., contracts)" in favor of statements from "interested parties," resulting in a persistent mischaracterization of Genie's operations.

2. The UST Engaged in Intellectual Dishonesty and Embellishment: The UST is accused of abdicating its duty to review the Report with a critical eye. Instead, it "cherry-picks snippets" that support its pre-existing position. Most egregiously, the UST is shown to have "simply invented" a critical finding, brazenly claiming the Report "confirms" that Genie "engaged in fraud," when no such finding exists anywhere in the 51-page document. This represents a serious misrepresentation to the court.

3. The Central Premise Regarding "Customer Funds" is Legally and Factually Wrong: A core allegation—that Genie misused customer funds held in trust—is dismantled through a rigorous contract law analysis. The opposition demonstrates that the BELOC Agreement, the governing document, does not require ICA Payments to be held in trust. It explicitly outlines a contractual credit system and includes provisions (like a 40-day refund period tolled for illiquidity) that are logically incompatible with a trust relationship. The Report's and UST's failure to engage with the actual contract language renders their entire premise "fatally flawed."

4. The Allegation of "Gross Mismanagement" is Unfair and Incomplete: The opposition counters the claim of gross mismanagement in the Velanos transaction by introducing a crucial mitigating factor: Genie's good-faith reliance on advice from a seemingly qualified attorney, Scott Oh of Warren Law Group. The Report is criticized for giving "no consideration" to this fact, which fundamentally changes the character of the decision from reckless to informed, even if the investment ultimately failed. Omitting this context is presented as a critical failure of the investigation.

5. The UST's "Fraudulent Transfer" Argument is Legally Insufficient: The motion highlights the UST's cursory and unconvincing attempt to establish fraudulent intent behind loans to affiliates. It points out that the UST's alleged "direct evidence" is a fabrication, misstating the Report's actual content. Further, its analysis of "badges of fraud" is "extremely cursory" and fails to properly address the required factors, falling well short of the necessary burden of proof.

In summary, Exhibit II concludes that the UST's motion is not based on a dispassionate review of the evidence but is a result-driven effort that overlooks the Examiner's Report's extensive deficiencies and, in some instances, actively misrepresents its findings. The motion to convert should be denied because its foundational document is unreliable, its legal arguments are superficial and legally unsound, and it ignores key facts that undermine its allegations of misconduct.

# EXHIBIT III

**Then their narrative switched once more after Adam Walker's internal report was unveiled by email:**

From: raye.elliott@akerman.com
Date: Wed, Jul 23, 2025 at 9:57 AM
Subject: RE: Request for Confidentiality, Update on Chapter 11, and Concerns Regarding Examiner Report and Adversary Proceedings

To: davidchoatehughes@gmail.com

Mr. Hughes,

I forwarded your email and documents to the Trustee and discussed it with him. The Trustee did not rely entirely on the Chapter 11 Examiner's report that you claim is false to make the decision to file the adversary proceeding against Zoomeral and the other companies. The Trustee relied upon the loan documents between the Debtor and Zoomeral and the other companies that do not contain commercially reasonable terms, as well as my review of the Debtor's bank records to confirm the transfers made to the companies. If the companies believe that the transfers were not fraudulent transfers and the loans were legitimate, it was the companies' responsibility to retain an attorney to defend them in the adversary proceeding, as Judge Burgess ordered, and present evidence to the court regarding the loans. The companies did not do that and a default judgment has been entered. The Trustee will not agree to vacate that default judgment. If the companies wish to retain an attorney at this point to file something with the court to try to vacate the default judgment, they are free to do that. Thank you.

**Raye Elliott**
Tampa: Akerman LLP | 401 East Jackson Street, Suite 1700 | Tampa, FL 33602
D: 813 209 5013 | T: 813 223 7333| F: 813 223 2837
Jacksonville: Akerman LLP | 50 North Laura Street, Suite 3100 | Jacksonville, FL 32202
T: 904 798 3700 | F: 904 798 3730

*It is now very clear why the Chapter 7 Trustee repeatedly mentioned his procedural default when asked about the fraudulent transfers, rather than answering with substance. Favorable terms alone do not constitute fraud. The Trustee's avoidance of the issue highlights his inability to meet the statutory elements of 11 U.S.C. § 548(a)(1)(B), which requires a showing that the debtor received less than reasonably equivalent value. A commercially favorable agreement is, by its nature, one for which value is given. As the Fourth Circuit held in In re Jeffrey Bigelow Design Group, Inc., the test is not whether the transaction was optimal, but whether the value received fell within the range of reasonableness. The Trustee's focus on procedure over substance is a tacit admission that he cannot prove the essential element of a fraudulent transfer claim.*

 Outlook

**Fwd: Request for Confidentiality, Update on Chapter 11, and Concerns Regarding Examiner Report and Adversary Proceedings**

**From** David Choate <davidchoatehughes@gmail.com>
**Date** Wed 7/23/2025 12:42 PM
**To**   Debitus Processus <iustusprocessus@outlook.com>

Thank you and Respectfully,

David C. Hughes II
2812 Pat Tillman Drive
Springfield, Illinois 62711
217.416.5059

---------- Forwarded message ---------
From: <raye.elliott@akerman.com>
Date: Wed, Jul 23, 2025 at 9:57 AM
Subject: RE: Request for Confidentiality, Update on Chapter 11, and Concerns Regarding Examiner Report and Adversary Proceedings
To: <davidchoatehughes@gmail.com>

Mr. Hughes,

I forwarded your email and documents to the Trustee and discussed it with him. The Trustee did not rely entirely on the Chapter 11 Examiner's report that you claim is false to make the decision to file the adversary proceeding against Zoomeral and the other companies. The Trustee relied upon the loan documents between the Debtor and Zoomeral and the other companies that do not contain commercially reasonable terms, as well as my review of the Debtor's bank records to confirm the transfers made to the companies. If the companies believe that the transfers were not fraudulent transfers and the loans were legitimate, it was the companies' responsibility to retain an attorney to defend them in the adversary proceeding, as Judge Burgess ordered, and present evidence to the court regarding the loans. The companies did not do that and a default judgment has been entered. The Trustee will not agree to vacate that default judgment. If the companies wish to retain an attorney at this point to file something with the court to try to vacate the default judgment, they are free to do that. Thank you.

**Raye Elliott**

Tampa: Akerman LLP | 401 East Jackson Street, Suite 1700 | Tampa, FL 33602

D: 813 209 5013 | T: 813 223 7333| F: 813 223 2837

Jacksonville: Akerman LLP | 50 North Laura Street, Suite 3100 | Jacksonville, FL 32202
T: 904 798 3700 | F: 904 798 3730

raye.elliott@akerman.com

vCard | Profile



700+ Lawyers
25 Offices
akerman.com

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** David Choate <davidchoatehughes@gmail.com>
**Sent:** Tuesday, July 22, 2025 3:21 PM
**To:** Elliott, Raye (Ptnr-Tpa) <raye.elliott@akerman.com>
**Subject:** Fwd: Request for Confidentiality, Update on Chapter 11, and Concerns Regarding Examiner Report and Adversary Proceedings

**[External to Akerman]**
                        Ms. Elliott,

The narrative I promised you. After careful review, please let me know if Mr. Cohen will stipulate to vacate the adversary and default. His position and reliance upon the examiner's report can't be ethically supported any longer after you review these materials. The report and the conversion was Fraud on the court and there is no doubt.

I hope this message finds you well, and thanks for the earlier phone call.  I'm writing to provide a formal update and respectfully request discretion regarding my recent personal filing.

I have filed a Chapter 11 personal reorganization case in the Central District of Illinois. The purpose of this filing is primarily to uncloud title to properties lawfully acquired through UCC foreclosure from MIMS-IPR, LLC (Mitchel Mims), and to allow for orderly resolution of pending issues. In connection with that, I respectfully request that the case number and details not be circulated or referenced in the Florida case or to any adversary parties, especially those affiliated with McMann Commercial Lending. As you well know, we have never communicated with those McMann Commercial Lending borrowers, and yet many have launched defamatory and baseless attacks. Exposure of my personal filing would open the door to further slander, libel, and potentially meritless creditor activity, undermining the entire purpose of the reorganization.

I also want to update you on the ongoing issues related to Mr. Mim's continued fraudulent conduct, including documentation now provided to the FBI showing he fraudulently removed our lien, triggering the contested ownership dispute. Mim's had a third party remove our 1st position with a UCC 3 without our knowledge. That company admitted and corrected their mistake. We've since reasserted the lien with a **UCC-5** (attached), and this evidence supports the legitimacy of our foreclosure on Mims' and proves the fraudulent attempt for Mims' to claim

creditor status within this proceeding. Mims will have many lenders to answer to as he fraudulently filed false applications before stacking 4 other debt providers in his company without our knowledge or consent. A civil suit is now pending against Mr. Mims in Illinois, and a second one where I am quieting title with my personal restructuring. Further documentation has been provided to federal authorities, including Judge Jason Calhoun (Probate Judge), with whom Mims had the ex-parte meeting. Judge Calhoun also happens to own the Allstate Insurance company across the street from the courthouse. We will soon find out through interrogatories and testimony if Calhoun provided insurance to Mims' old properties before making a decision to not recuse himself from litigation.

In addition, I am bringing, this week, a wrongful conversion based on fraud-on-the-court. I will be respectfully requesting leave to bring causes against both Bomkamp & Maria Yip for their fraud allowed by way of the conversion of the Genie case (it's still within the allowed year after conversion). The facts are now undeniable:

- We came to this court as whistleblowers, not as perpetrators.

- We testified that we filed the 11 to stop defensive spending and to finalize our settlement with Velanos.

- We executed on these management goals efficiently and flawlessly.

- We told the honorable judge exactly why we entered into his court and what we were going to do to take care of "all of our creditors" in full including non-refundables to the best of our ability.

- We defeated every baseless and fraudulent claim raised by Bomkamp, the U.S. Trustee, and others during the trial. We successfully walked out of that courtroom without heads held high because Burgess granted us with the coveted status of Debtor in Possession.
- The only development between our success in retaining DIP status and the conversion was Maria Yip's intentionally fraudulent examiner report, a report that is factually flawed, legally misleading, certainly rife with intentionally manufactured falsehoods, that are provably false.

The examiner's report falsely states that I, David Hughes, told Ms. Yip that customer funds were sent to Velanos. This is demonstrably untrue. In fact, an email exchange between myself, John Cohan, and Bryan Mickler, submitted to Mr. Mickler one week before Ms. Yip issued her report, makes clear that we consistently and unequivocally stated that all funds sent to Velanos were our own. Maria Yip and Hal Levenberg repeatedly asked whether those funds were client funds, and our answers never changed: they were not. Despite that, Ms. Yip deliberately and fraudulently inserted a fabricated and damaging misstatement into her report.

Mr. Mickler later told us that a "Madoff-style Ponzi scheme" theory could be built around that "one planted comment", a comment Maria invented and which Trustee Cohen has similarly referenced in writing in his public filings. There is no reasonable person/basis for any neutral person could possibly conclude that either I or Mr. Cohan made such a statement. The fabricated assertion appears nowhere in our correspondence or records, and it contradicts the contemporaneous email chain with counsel.

Similarly, the examiner's claim that we sent $6 million in late payments to Velanos after default obligations arose is also false. Every dollar sent to Velanos was wired prior to December 5th, before any payments were due under the agreement. These transactions are fully documented and traceable. Nonetheless, Mr. Mickler failed to raise this point at the critical moment. During a sidebar at the conversion hearing, I personally presented these facts to Mr. Mickler, expecting he would correct the record. Instead, he returned to the courtroom and simply told Judge Burgess that I had shared information "that could be fact-checked later." No correction was made, no exhibit was submitted, and no effort (reconsideration, nor appeal) was taken to prevent the record from being tainted by materially false and prejudicial assertions. Rather than standing up against fraud, Mr. Mickler allowed this fraud by Maria and Hal to stand on the record and remain as the basis for conversion immediately before the judge made the conversion at trial.

The default judgments in the adversary cases were grounded in that flawed report, and Trustee Cohen testified repeatedly that he relied on her report. That reliance now carries legal implications. I am respectfully requesting that Mr. Cohen review the materials I am providing and stipulate to vacate those defaults. The companies involved are dissolved. The adversary complaints should never have been brought.

The Court was explicitly misled and the continued reliance on a demonstrably false examiner report cannot stand to harm me personally and continue flawed arguments. In the forthcoming motion I plan to file later this week or early next week, I will respectfully seek leave to pursue claims for fraud on the court against Ms. Yip and Mr. Bomkamp, based on their coordinated use of false statements and misrepresentations. I am not including Mr. Cohen at this time, as I am allowing him to review the evidence I am sure he has not seen and stipulate to vacate the adversary defaults entered against the dissolved companies, defaults that were based on a report which found no fraud and made no legal determination of fraudulent transfers. If that record is not corrected, and if the reputational harm continues, then the resulting consequences will lie with Mr. Cohen's refusal to act. This action by him will clear the decks for Mr. Cohan and myself to remove fraudulent clouds that are presently causing harm.

This is not a threat. It is a final attempt to clear the air, restore credibility, and protect what remains of the estate's value, something I still believe is possible. But there must be a willingness to confront the truth, admit error, and correct the record.  Given the evidence now presented to you and Mr. Cohen, there is a clear duty to correct the record. If the trustee continues to rely on the examiner's materially false and misleading report, despite having received documentation disproving its key assertions, it would raise serious concerns under Fed. R. Bankr. P. 9011(b), fiduciary duties owed to the estate as a whole, and the duty of candor to the Court. At this stage, the proper course is to stipulate to vacate the adversary defaults against the dissolved companies and withdraw any further reliance on tainted claims. This would also need to include any further personal pursuit against myself or Mr. John Cohan personally. If Mr. Cohen is unable or unwilling to do so very quickly, I will have no choice but to request leave of court, under Barton doctrine, to pursue appropriate relief, including an action for fraud on the court naming him and others he is working with. I remain hopeful that resolution can be reached voluntarily, now that the factual record has been clarified.

The most tragic aspect of this entire proceeding is that we came forward as whistleblowers. We entered this court in good faith for the purpose of restructuring and protecting client interests, which we did, successfully negotiating a $20 million settlement after years of dedicated work. In matters of this magnitude, the public must be able to trust the integrity of government officials, especially DOJ-appointed trustees, and licensed professionals such as attorneys, CPAs, and examiners. These individuals are expected to uphold the highest ethical standards and are supposed to be held to those higher standards. Yet what the attached evidence certainly proves, concretely and irrefutably, is that those very professionals engaged in and enabled conduct so riddled with falsehoods, omissions, and deliberate misrepresentations that the real harm stemmed not from the debtor, but from those entrusted to oversee it. They coordinated to bring falsehoods to the Honorable Judge Burgess.

There is no perfect system, but the average person must be able to place faith in the court, the process, and, most critically, in those professionals licensed to uphold it. That faith was shattered here. The conduct of our former counsel, Mr. Bryan Mickler, mirrors that of the Warren Law Group in both outcome and principle, constituting professional malpractice and a profound betrayal of duty.

No competent or ethical attorney would allow a knowingly false statement, that client funds were sent to Velanos, to be adopted in an official examiner's report without immediate and forceful correction. Mr. Mickler had the opportunity to correct this falsehood prior to and after Chapter 11 conversion. He chose not to. That failure enabled a knowingly false narrative, crafted by Aaron Cohen and now echoed under oath, that we misused client funds. No reasonable person, juror, or legal observer would characterize that as oversight. It was a calculated omission. It caused real harm. And it must be corrected.

The examiner's report authored by Maria Yip is deeply flawed and demonstrably fraudulent. The second motion to convert, filed by U.S. Trustee Scott Bomkamp, relied heavily on that report, despite it being riddled with falsehoods and omissions. Worse, Mr. Bomkamp knew it was defective, yet proceeded with a second round of arguments built entirely upon a foundation he had every reason to know was false. That is not just misconduct, it is fraud on the court.

What is perhaps most disturbing is that our own attorney, Mr. Mickler, refused to present the strongest, clearest argument available to us: that the government's motion relied upon demonstrably fraudulent evidence. He disregarded detailed legal analysis provided by a 12-year veteran securities attorney FINRA Investigator, Mr. Adam Walker, someone I respect greatly, who laid out the legal defects and factual misstatements in the examiner's

report in black and white. Mr. Mickler had in hand every tool necessary to defend us, and he declined to use them. Over and over again, Mr. Cohan and I asked him to call out the fraud. He refused.

Worse still, when we presented Mr. Mickler with further evidence, requesting a motion for reconsideration or appeal, he again declined. He told us, verbatim, "Don't worry, guys. Chapter 7 trustees are inherently lazy. If you try to bring reconsideration yourself, I've seen it before. The court will discredit you and might sanction you, and I don't want to see that happen to you guys." He also stated that he didn't believe it would be "ethical" to call out the UST for fraud. These statements capture everything wrong with this situation. Instead of advocating zealously for his clients, Mr. Mickler warned us into silence. He went into court during the conversion hearing pitching softballs, then laid down without correcting egregious, misleading testimony by Yip herself, and then advised us, days later, to do the same.

This cannot stand. To be clear, this is not an attack on the Court itself. I remain wholeheartedly respectful of the Court's honor and complete authority. But when licensed trustees, attorneys, CPAs, and court-appointed examiners abuse the trust vested in them, allowing falsehoods, omissions, and manipulated narratives to drive outcomes, particularly in a case where reputations, livelihoods, and millions of dollars are at stake, the entire system begins to break down.

The harm does not fall on the whistleblowers alone. It falls on the very clients we worked tirelessly to protect. Had we remained in DIP status, those clients would already have checks in hand. Despite having no legal obligation to do so, we were preparing to include even non-refundable clients in distributions, because we believed it was the right thing to do under the circumstances.

We had already recovered funds through our negotiated settlement with Velanos, independent of any trustee effort, and were poised to recover additional funds through a JAMS malpractice proceeding against Warren Law Group. That litigation was ready for prosecution by Nicholas Sprigner, Esq., at $200/hour plus 20% contingent upon recovery.  We had the path, we had the facts, and we had the momentum.

Now let us see what the Ch. 7 Trustee will recover after his 25% statutory carve-out, the hourly professional fees he will inevitably incur, and whether non-refundable clients will be treated with any of the same equity and consideration we had planned. Unlike the Trustee, our services under DIP were pledged as free of charge. That is what client-centered stewardship looks like.

Time will tell whether the Trustee's approach yields a better result for the estate. But there can be no dispute that our intentions and our conduct, as fiduciaries and as whistleblowers, were rooted in protecting those harmed, not in preserving professional reputations or hiding behind flawed reports.

Finally, I appreciate (Ms. Elliot), the efforts you made in the past to de-escalate specific issues, including your intervention with Mr. Stringer. I hope we can maintain that constructive tone here and bring closure to these matters in a way that honors the truth and prevents further harm.



Hal/Maria,

3. For the $9,000,000 transferred to Velanos, what was the source of monies used to fund these transfers? The $9,000,000 transferred to Velanos were 100% sourced by Genie Investments SV. Our answer has been consistent each time this question has been asked. The source of these funds was income earned by Genie during the period of 2021 and 2022 prior to the transfer to Velanos. You should have all of the bank account statements to show income from ICA payments by customers, bridge loan interest by customers and due diligence payments by customers during this time period.

## Rough draft -- opposition to US Trustee's 2d motion

📎  📄 Opp U...Trustee.docx

**AW**  Adam Walker<adam@awsecuritieslaw.com>    Fri 7/19/2024 5:09 PM
To: David from Genie Investments;  John from Genie Investments

You replied on Tue 7/23/2024 2:37 PM

📄 Opp UST's 2d Motion Appt Tru...
   42 KB

Attached is the current draft opposition to the US Trustee's motion. It's far from complete -- needs to be bulked up in places and I'll add much more polish to it. This lets you see where I'm heading with it and how I see it coming together.

Let me know if you have concerns, questions, suggestions, etc.

Adam Walker
AW Securities Law
www.awsecuritieslaw.com
(816) 226-6476

↩ Reply     ↩ Reply all     ↪ Forward

Thank you and Respectfully,

David C. Hughes II

2812 Pat Tillman Drive

Springfield, Illinois 62711

217.416.5059

# EXHIBIT IV

**CHAPTER 7 TRUSTEE CONTRADICTIONS — SIDE-BY-SIDE**

1. Attorney Experience
   A: "The attorney they hired had no experience." | B: "The attorney they hired did not have enough experience."
   → Demonstrates: *Inconsistency, Misrepresentation, Credibility Issue*

2. RICO Allegation
   A: Invoked "RICO" in early filings. | B: Testified under oath: "I do not remember ever saying RICO."
   → Demonstrates: *Denial, Bad Faith, Narrative Shifting*

3. Social Media Presence
   A: Claimed "I do not have social media." | B: Official Facebook account exists identifying him as a Trustee.
   → Demonstrates: *Misleading, Lack of Transparency, Misrepresentation*

4. Reliance on Examiner Report
   A: "I relied primarily on the Yip report." | B: "The Trustee did not entirely rely on the Chapter 11 Examiner's report..."
   → Demonstrates: *Contradiction, Evidence Manipulation, Bad Faith*

5. Sequence of Evidence ($1.1M Chase Transfer→ Examiner → Loan Docs)
   A: Allegation $1.1M made before examiner report explanation existed. | B: Later claimed examiner Report, then changed the basis again to loan documents.
   → Demonstrates: *Retroactive Justification, Inconsistency, Misrepresentation*

6. Written and Verbal Statement Excuses
   A: "The writing was unfortunate." | B: "Coincidence in timing"
   → Demonstrates: *Rationalization, Avoidance, Credibility Issue*

7. Response / Communication Claim
   A: "We never received a response," so adversary filed. | B: Later admitted in the same filing receiving a response and a 27-page response letter under oath.
   → Demonstrates: *Contradiction, Retaliation, Bad Faith*

Summary: *All in the record and on the record, the Chapter 7 Trustee, a court-appointed official, appears to have acted in bad faith and lacks credibility. The evidence suggests a pattern of making false or misleading statements under oath, shifting their story to fit the circumstances, and possibly manipulating the timeline of events to justify aggressive legal actions. Essentially, their words and actions are frequently in direct contradiction, making them seem untrustworthy.*

# EXHIBIT V

Sep 6, 2025



**NEWS**
**REPLACE PREDATORY TERMS WITH 0% INTEREST, NO TAX RETURNS, NO PROOF OF REV, NO COLLATERAL**

bluewaterlending.co
We Get You $50k-150k at 0% Interest in 30 Days    Learn more
Interest for 12 months or more.... See more

**WE FUND THE LOANS THAT OTHER LENDERS WON'T**
WE MAKE *CRAZY LOANS!*

**Investment Property Loans with No FICO Restrictions and No Restricted States**
Bankruptcy Bailouts and Rural or Single-Purpose OK

**Direct Private Money Financing for Real Estate Investors**
Simple, Fast Process - No Tax Returns & No Income Documentation

Get Funded Fast! >

FORM ON FACEBOOK
Customized Loan Solutions for You    Learn more
314        123 comments


CHASE
**BREAKING NEWS**
**Dozens of U.S. Banks Reopen Access to $300k of 0% APR Business Funding Without Proof Of Income**

**BANKS HAVE REOPENED PROGRAM FOR BUSINESS OWNERS TO ACCESS $50K-$150K OF 0% BUSINESS FUNDING WITHOUT PROOF OF INCOME**
WELLS FARGO

fundingaccelerator.com
Receive Up To $150k with 0% Interest    Learn more
Get the best business financing in one pl... See more

YARROW FINANCIAL
**BUSINESS LINES OF CREDIT**
UP TO **$2,000,000**
**STARTING** AT **3.99%**
OVER **1-10 YEAR TERMS**

**DSCR Loans Done Right**
No Pay Stubs, W2s, or Tax Returns Needed
We Fund Fast — You Scale Faster Loans from $100k to $5M+
Apply Now – Close in 2 Weeks

CEREBRO CAPITAL
Business Financing Breakthrough!

**Business Loans**

**BUSINESS OWNERS WITH 700+ SCORE**
Get Access To:
**$200K+**
IN 0% BUSINESS FUNDING
• No Docs Needed
• Start Ups Welcome
**Funding As Fast As 14 Days**


# EXHIBIT VI

8:44



CM▥ECF    Query    Reports ▾    Utilities ▾    Help    Log Out

Claim #28 filed by Bird Credit LLC, Amount claimed: $750000.00 (Auto-Claim Filer)

**Description:**

**Remarks:**

*Creditor:*  (30864173)
Autonomous Drone Solutions DBA Calaway Solutions L
2121 Brittmoore 2200
Houston, TX 77043

Amount claimed: $2500000.00

**Claim No: 29**
*Original Filed Date:* 04/25/2024
*Original Entered Date:* 04/25/2024

*Status:*
*Filed by:* CR
*Entered by:* Auto-Claim Filer
*Modified:*

**History:**

Details    29-1    04/25/2024    Claim #29 filed by Autonomous Drone Solutions DBA Calaway Solutions L, Amount
claimed: $2500000.00 (Auto-Claim Filer)

**Description:**

*Remarks:* (29-1) Account Number (last 4 digits):0496



8:34

CM/ECF    Query    Reports ▼    Utilities ▼    Help    Log Out

*Remarks:*

Creditor:    (30864175)    History
Belle Maison Realty, LLC
Attn: Lea Muse
1133 E 83rd Street 171
Chicago, IL 60619

Amount claimed: $3000000.00
Priority  claimed: $200000.00

*History:*

| Details | 4-1 | 04/14/2024 | Claim #4 filed by Belle Maison Realty, LLC, Amount claimed: $70000.00 (Auto-Claim Filer) |
| Details | 4-2 | 06/06/2024 | Amended Claim #4 filed by Belle Maison Realty, LLC, Amount claimed: $3000000.00 (Auto-Claim Filer) |

**Claim No: 4**
*Original Filed Date:* 04/14/2024
*Original Entered Date:* 04/14/2024
*Last Amendment Filed:* 06/06/2024
*Last Amendment Entered:* 06/06/2024

*Status:*
*Filed by:* CR
*Entered by:* Auto-Claim Filer
*Modified:* 06/06/2024

*Description:*
*Remarks:*

Creditor:    (30881178)    History
Charles Blake Stringer/Nutra-AcresLLC
149 South Shore Drive
Amarillo, TX 79118

Amount claimed: $142247750.00

*History:*

| Details | 5-1 | 04/14/2024 | Claim #5 filed by Charles Blake Stringer/Nutra-AcresLLC, Amount claimed: $400000.00 (Auto-Claim Filer) |
| Details | 5-2 | 06/04/2024 | Amended Claim #5 filed by Charles Blake Stringer/Nutra-AcresLLC, Amount claimed: $142247750.00 (Tonya) |
| Details | 5-3 | 07/15/2024 | Amended Claim #5 filed by Charles Blake Stringer/Nutra-AcresLLC, Amount claimed: $142247750.00 (Cathy) |

**Claim No: 5**
*Original Filed Date:* 04/14/2024
*Original Entered Date:* 04/14/2024
*Last Amendment Filed:* 07/15/2024
*Last Amendment Entered:* 07/15/2024

*Status:*
*Filed by:* CR
*Entered by:* Auto-Claim Filer
*Modified:*

*Description:* (5-3) To Add Supplemental Documents to the Contract
*Remarks:*

Legend (top right):

- HOA Total: $ 9,727,644
- DD Total: $ 5,002,735
- Bridge Total: $ 5,907,000
- Total Refunded: $ 9,727,644
- Total Non: $ 7,004,655
- Refund + Non: $ 16,732,459
- Out?: $ 4,431,250
- Refund + Upside: $ 14,148,894
- McHann IOU: $ 4,454,000
- McHann DD: $ 497,200.0
- McHann Bridge: $ 6,117,765.9

- O = Genie $ELOC
- GO = Genie DD
- GOB = No McHann $ELOC, Genie DD Bridge
- GOBA = Genie DD Bridge Not Received
- M GOB = McHann $ELOC, Genie DD Bridge
- M = McHann $ELOC

| Calc'd amounts | DD (non) | Promoter | Business Name | Management | Address | City, State, Zip |
|---|---|---|---|---|---|---|
| 100,000 | | 2542 | Autonomous Drone Solutions DBA Calaway Solutions LLC | Garald Calaway | 2212 Brittmoore unit 2200 | Houston, Texas 77043 |
| 170,000 | | 2647 | | Michelle Oster-Porter | 420 Foytras Suite 1460 | New Orleans, Louisiana 70130 |
| 180,000 | | 2542 | | Rustyn Smith | 1070 S 650 West | Farmington, UT 84025 |
| 48,000 | | 607 M N | The Generations Group | Don Brockland | 1050 Troy Hill Dr. | Brecham, Texas 77833 |
| 500,000 | | 607 G | Brookside Heights LLC | Shameka Amin | 307 N Lincoln Street | Tallulah, LA 71282 |
| 5,000 | | 2542 | Iron Dragon Corp. | John Ruz | 70 Winding Way | Glassboro, NJ 08026 |
| 100,000 | | 1886 | HoF A Dime LTD | Bryor Nichols | Box 653 | Brewdrudge, Alberta T0MOC0 |
| 500,000 | | 1076 | The Farming Co Pty Ltd | Massimo Prestico | 86 Lakeside Drive | Helena Valley, WA 6056 |
| 210,000 | 25,000 | 2225 | Another Chance Group Home Inc | Sajjar Whitfield | 54 N Vista Ave | Casa Grande, AZ 85122 |
| 110,000 | | 1 | Skyward Tax & Accounting Service LLC | Anthony L Wong Shue | 3506 LAKE LYNDA DR. SUITE 200 | Orlando, Florida 32817 |
| 100,000 | | | SSC Services Inc | Adriano Sampaio | 59 Franklin Street | Framingham, MA 01702 |
| 100,000 | | 607 G | Terry Florists LLC | Anthony Ricco | 46 Bigelow Plaza | Red Bank, New Jersey 07701 |
| 400,000 | | 2362 | Bart + Bear Properties LLC | Aster Rogers | 1140 E 67th Street | Chicago, Illinois 60619 |
| 150,000 | | 607 M N | Wallingford Lodging Partners LLC | Shailesh Patel & Vinay Patel | 2517 W Brentridge Circle | Sioux Falls, SD 57108 |
| 1,800,000 | | 607 M N | North Haven Lodging Partners LLC | Shailesh Patel & Vinay Patel | 2517 W Brentridge Circle | Sioux Falls, SD 57108 |
| 1,800,000 | | 607 M N | AMROCOO HOLDINGS, LLC | Roberta Toomer | 2265 Candlestick Ave | Henderson, Nevada 89052 |
| 170,000 | | 607 G | Cool Beans LLC | Michael Stan and Dylan Padilla | 6565 Decatur Boulevard | Las Vegas, Nevada 89118 |
| 70,000 | | 607 G | | Joseph Juliano | 191 Moonachie Road | Moonachie, New Jersey 07074 |
| 45,000 | 25,000 | 607 G | S&L Zoppotodi DBA 52 Waves Inc. | Forsaties Lewis | 16643 S. Wood Street P.O. Box 1096 | Harvey, IL 60426 |
| 225,000 | | 607 G | New Mount Olive Missionary Baptist Church Inc. | Valentine Perrina | 23 Uptown St | Peabody, MA 01960 |
| 30,000 | | 2542 | ALI Capital LLC | Angelo Perrina | 23 Uptown St | Peabody, MA 01960 |
| 30,000 | | 2542 | Hospitality Growth Capital LLC | Angelo Perrina | 23 Uptown St | Peabody, MA 01960 |
| 30,000 | | 2542 | Solar Capital Funding LLC | Angelo Perrina | 23 Uptown St | Peabody, MA 01960 |
| 97,500 | | 607 M N | Name Leasing LLC | Denis Reichard | 88 Mountain Avenue | Berkeley Heights, New Jersey 07922 |
| 250,000 | | 607 G | Story Book Memories LLC | Dr. Desurre Bartholomew | 41 Flatbush Avenue, 1st Floor | Brooklyn, New York 11227 |
| 300,000 | | 2225 | On Site Life Care Inc. | Miss Downey | 1938 E Williams Field Rd Suite 201 | Gilbert, AZ 85296 |
| 300,000 | | 2225 | Alerra LLC | John Young | 990 Cedar Bridge Avenue | Brick, New Jersey 08723 |
| 57,100 | | 607 G | Braces at Brick, PA | Anthony Wong Shue | 3020 West 10th Street | Greeley, CO 80634 |
| 700,000 | | 2367 | Golden Grades LLC | Candice Cobb | 101 Honey Suckle Circle | Bangor, CA 95714 |
| 80,000 | | 2364 | Coba Utilities Inc. | Kevin Moser | 557 S 180 E | Smithfield, UT 84335 |
| 120,000 | | 2542 | Moser Holdings LLC | Jonathan Burnham | 3139 W. Holcombe Blvd #4429 | Houston, TX 77025 |
| 50,000 | | 2465 | Fmn Capital Inc | Michael Caliotto | 22214 Brook St, Suite 3A | Middletown, Delaware 19709 |
| 50,000 | | 2594 | H&M Essential Services, LLC | Doug Daniels | 3244 Basor Compton Ln | Cedar Hill, UT 84042 |
| 200,000 | | 607 M N | Sunlight Storage LLC | Joseph Andertal | 1922 N 3950 W | Lehi, UT 84043 |
| 60,000 | | 862 | Astoria Dynasty Real Estate LLC | Arnold Amistry | 9216. Parker Street, Ste 1 | Lakeland, Florida 33801 |
| 100,000 | | 2542 | Nomical Capital Inc | Chauquize Fawole | 6301 Lone West Drive | Jamesville, New York 13078 |
| 100,000 | | 2542 | Lobenhaus Capital, LLC | John Donaho | 1135 Chestnut Tree Rd | Moorestown, PA 16364 |
| 15,000 | | 2542 | Dojo Properties LLC | Michael Thompson | 1449 W Salmon Cedela Drive | Bluffdale, Utah 84065 |
| 100,000 | | 2534 | Archer Capital Investments | Amir Rizai Taj | 10 Windsor Dr | Foxboro, MA 02035 |
| 100,000 | | 2542 | Taj Construction LLC | Cheryl Rowehl | 227 Floyd Road | Shirley, New York 11967 |
| 15,000 | | 2542 | Rovehi & Russo Properties LLC | Sanjo Ramirez | 7700 Irvine Center Drive Suite 800 | Irvine, California 92618 |
| 100,000 | | 2542 | My Dripping Home Solutions, LLC | Joseph Woolridge | 64 Grand Street | Brooklyn, New York 11249 |
| 15,000 | | 2542 | NYSF Senior Service LLC | Cheryl Rowehl | 227 Floyd Road | Shirley, New York 11967 |
| 350,000 | | 2465 | NCR Digital Corp. | Randy Leonti | 470 N. Main Street | Brigham, Utah 84302 |
| 150,000 | | 2542 | Amik Construction Inc | Frank Girmoldi | 108 Patriot Dr Ste 4 | Middletown, Delaware 19709 |
| | | | Zebra Properties LLC | | | |

Note: This page is a rotated (landscape) spreadsheet. The columns, left to right, are: line number, reference number, amount columns, claim reference, amount, entity name, individual name, and address. Values are transcribed to the best reading of the image.

| # | Ref | Amt (left) | Amt | Claim Ref | Amt (mid) | Entity | Individual | Address |
|---|-----|-----------|-----|-----------|-----------|--------|-----------|---------|
| 46 | 2376 | 150,000 | | 2542 | | Zelco Properties LLC | Frank Broomall | 109 Parriol Dr Ste A, Middletown, Delaware 19709 |
| 47 | 3052 | 50,000 | | 2267 | | Knvi LLC | Daniel Knutsen | 6971 N740 E, Lehi, Utah 84043 |
| 48 | 2056 | 58,500 | | | | Platinum Investemenst USA LLC | Amarnth Nagagappan | 431 Lindsey Street, Burwood NSW 2134 AUSTRALIA USA TBC. |
| 49 | 2885 | 20,000 | | | | Window Homes LLC | Ryan Winslow | 3533 Tuscany Reserve Blvd, New Smyrna Beach, FL 32168 |
| 50 | 607 | $ 15,000 | | 1 | | McMann Commercial Lending LLC | Walter P Trock III | 5001 N Michigan Ave. Suite 600, Chicago, IL 60611 |
| 51 | 2651 | | | 2637 | 750,000 | Bid Creek LLC | Eggren Dayron | 30 N Gould Street, Ste #30212, Sheridan, Wyoming 82801 |
| 52 | 2846 | | | 2637 | 1,500,000 | Latent Wealth Group LLC | Mark Steiner | 302 E Abajo Peak Way, Heber City, Utah 84032 |
| 53 | 1903 | | | | 31,500 | Just Hewitt LLC | Daniel J Hewitt | 2052 E Idalgo Avenue, Raymondville, Texas 78580 |
| 54 | 2267 | | | 2260 | 75,000 | CNF Solutions LLC | Steve Daniels | 135 East 620 South, Smithfield, UT 84335 |
| 55 | 2534 | | 24,000 | 2267 | 200,000 | 20Twenty Development LLC | Bryan Dilson | 1088 E Benchview Drive, Ogden, UT 84404 |
| 56 | 2541 | | 9,000 | 2494 | 281,250 | BAVI Capital Management LLC | Temidayo Adebayo | 148 Undercliff Avenue, Edgewater, NJ 07020 |
| 57 | 2482 | | 40,000 | 607 | 330,000 | Sun Coast Entertainment Live LLC | Nicholas Virhe | 6950 Brescia Way, Orlando, Florida 33319 |
| 58 | 2645 | | 15,000 | 2837 | 75,000 | CannaVision Inc | David Russell | 7777 Main Street Suite 600, Fort Worth, Texas 76102 |
| 59 | 2841 | | 9,000 | 2837 | | Meteoobiz LLC | Lisa Lukteewicz | 5434 E Kathleen Road, Scottsdale, Arizona 85254 |
| 60 | 2544 | | 9,000 | 2494 | 900,000 | Solace Realty Concepts LLC | Ayo Agbejimi | 112 Lehigh Avenue, Newark, New Jersey 07112 |
| 61 | 2580 | | 15,000 | 2837 | 95,000 | Darnell Development, LLC | Panick Darnell | 2814 W Newton CT, Vitalia, California 93291 |
| 62 | 2520 | | 15,000 | 607MGDB | | Ficara Holdings LLC | Robert Ficarra | 289 Parker Driv, Pittsburgh, Pennsylvania 15216 |
| 63 | 2844 | 45,000 | 15,000 | 2837 | 45,000 | Faith Investor Services LLC | Lourndy St. Louis | 406 Billings Road, Somers, Connecticut 06071 |
| 64 | 2597 | | 15,000 | 2494 | | Raza Ventures LLC | Kimbal Ricks | 1522 4th Ave, Auburn Park, New Jersey 07712 |
| 65 | 2600 | | 15,000 | 2837 | 7,500 | V/V LLC | Doug Wiker | 1354 W 190 S, Logan, Utah 84321 |
| 66 | 2606 | | 9,000 | 2837 | 45,000 | Oregon Business Management Group Inc | Michael Covali | 28620 E Howie Road, Rockford, Washington 99030 |
| 67 | 2627 | | 12,000 | 2260 | 9,000 | Helicon LLC dba Odin | Vrexi Lindsay | 12800 SW 72nd Ave. suite 140, Tigard, Oregon 97223 |
| 68 | 2843 | | 9,000 | | | Spangel Farms-Landholdings LLC | David Springer & Travis Nick | 1300 S Litchfield Rd, #230A, Goodyear, Arizona 85338 |
| 69 | 2864 | | 9,000 | | | Amewa LLC | Brian Bevan | 325 N 1000 E, American Fork, Utah 84003 |
| 70 | 2732 | | 15,000 | 607MGSN | 600,000 | Expansive Investments LLC | Joe Dargan | 282 E 300 c, Smithfield, UT 84335 |
| 71 | 2533 | | 25,000 | 2837 | 45,000 | Belle Maison Realty, LLC | Lexi Muze | 3855 S 500 V Suite B, Salt Lake City, UT 84115 |
| 72 | 2617 | | 30,000 | 2837 | 58,350 | Adaptive Medical Technologies LLC | Timothy Rogers | 1133 E 83rd Street, #171, Chicago, Illinois 60619 |
| 73 | 2743 | | 18,000 | 2837 | 607,500 | Knife & Spirit LLC | Scott Carey | 7243 Paseo Del Sur, Scottsdale, Arizona 85258 |
| 74 | 2786 | | 20,000 | 2837 | | Phoenix Rising LLC | Scott Rogers | 7217 E 4th Avenue, Scottsdale, Arizona 85251 |
| 75 | 2809 | | | 2534 | | Seeking First LLC | Hernan Roldan | 172 Cerner St, Jackson, Wyoming 83001 |
| 76 | 2830 | | 35,000 | 2260 | | A Complete Home Inspecton, LLC | Kipp Nash | 3330 Laurel Dale Drive, Tampa Bay, Florida 33618 |
| 77 | 2633 | | 40,000 | 600MGDB | 26,805 | Rolling by the Dozen RV Park LLC | Kissin & Ryan Siegert | 110 Velcco Lane, Port Sulphur, LA 70083 |
| 78 | 2634 | | 40,000 | 607GDB | 37,500 | Nutra-Acres Inc | Deborah Uiscak | 40 Country Road 237, Somerville, 73079 |
| 79 | 2731 | | 18,000 | 2837 | | True Living Global USA LLC | Christopher Lovett | 2051 N Mohigan Ave, Chicago, IL 60611 |
| 80 | 2676 | | 24,000 | 607GDB | 345,000 | Tnc NOLA Holdings LLC | John Holford | 4538 Vulcan Ridge Circle, Mcdonald, PA 15057 |
| 81 | 2678 | | 24,000 | 607GDB | 34,500 | High Dunes LLC | Joseph Juliano | 1461 Annunciacion street, Unit B, New Orleans, Louisiana 70130 |
| 82 | 2563 | | 15,000 | 2534 | | S&L Zeppeeeli DBA SLZ Waste Inc. | Thuc Tu | 77 Lockwood Drive, Charleston, SC 29401 |
| 83 | 2357 | 45,000 | 40,000 | 607MGDB | | Humane Care 7 Days Medical Group Inc. | Sean Yoneyama | 1915moonahie Road, Moorestown, New Jersey 07074 |
| 84 | 2669 | | 25,000 | 607MGDB | | Edge Development LLC | Ben Fuzzell | 6852 Boba Avenue, Suite N, Moorhead Beach, CA 92647 |
| 85 | 2688 | | 40,000 | 607MGDB | | Prime Energy Services LLC | John Wilson | 315 239th Ct. SE, Sammamish, Washington 98074 |
| 86 | 2673 | | 15,000 | 2M | | Vai Holdings LLC | Terry Glassman | 450 Grass Rd, Houston, Texas 77067 |
| 87 | 2679 | | 15,000 | 607MGDB | | VT-I LLC | John Wilson | 45 Nonh Market, Wailuku, Hawaii 96793 |
| 88 | 2808 | | 25,000 | 607GDB | | Michele Ruiz Productions, LLC dba Ruiz Strategies | Michele Ruiz | 706 Leander Dr, Leander, Texas 78641 |
| 89 | 2762 | | 25,000 | 607GDB | | Foster Group LLC | Adam Foster | 925 Century Park East, Suite 1700, Los Angeles, California 90065 |
| 90 | 2803 | | 30,000 | 607 | | Acera & Royalty LLC | David Guest | 2533 N 300 E, Lehi, UT 84321 |
| 91 | 2804 | | 18,000 | 607GD | | MAA GFV Investments LLC | Mayur Patel | 205 N Michigan Ave, Chicago, Illinois 60601 |
| 92 | 2814 | 45,044 | 45,000 | 607GD | | JCs TL Inc. | Chi Ping Teng | 2549 Amelia Island, Paxh, Southlake, Texas 7609 |
| 93 | 2811 | | 27,000 | 607 | | Dun Agro Hemp Group Inc. | Albert Dun | 18865 Magnolia Avenue #B, Chino, California 91710 |
| 94 | 2895 | | 18,000 | 607 | | | | PO Box 475, Shelbyville, Indiana 46176 |
| 95 | 2521 | | 30,000 | 607MGDB | 45,000 | Global Verse Holdings LLC | Pejoe Joy | 1735 Vintage Lane, Wylie, Texas 75098 |
| 96 | | | 50,000 | | | | | |

**ORDERED.**

**Dated: March 04, 2025**

Jason A. Burgess
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

GENIE INVESTMENTS NV INC.,                    Case No.: 3:24-bk-00496-BAJ

     Debtor.                                   Chapter 7

_____/

AARON R. COHEN, Chapter 7 Trustee,

     Plaintiff,                                Adversary No. 3:25-ap-00007-BAJ

v.

VELANOS PRINCIPAL CAPITAL, INC.,

     Defendant.

_____/

**FINAL JUDGMENT**

     THIS PROCEEDING came before the Court on the Motion of Plaintiff, Aaron R. Cohen,

Chapter 7 Trustee, for a Final Default Judgment (Adv. Doc. 7). Based upon the Default entered

by the Clerk on February 19, 2025, against Defendant, Velanos Principal Capital, Inc. ("Velanos"),

80188897;1

for failure to serve or file any paper in response to the Complaint for Confirmation of Arbitration Award (the "Complaint") as required by law, the Declaration of Aaron R. Cohen, Chapter 7 Trustee (the "Trustee's Declaration"), and there appearing sufficient cause, the Court hereby,

**FINDS AND ORDERS:**

1.    On January 10, 2025, the Trustee filed a one-count Complaint, whereby the Trustee sought to confirm the arbitration award in the amount of $20 million entered by the JAMS arbitrator (Adv. Doc. 1).

2.    A Summons was issued by the Clerk on January 13, 2025.

3.    A copy of the Complaint and Local Rule 7001-1 together with the Summons were served on January 21, 2025, by U.S. mail to Velanos, Attn.: Joshua Wearmouth, its Chief Executive Officer, 20101 SW Cypress Street, Newport Beach, CA 92660 and to Velanos at 4695 MacArthur Court, Suite 1100, Newport Beach, CA 92660

4.    No responsive pleading or motion has been filed by Velanos within the time specified by Rule 7012, Federal Rules of Bankruptcy Procedure, and no extension of time was sought or obtained by Velanos.

5.    On February 19, 2025, the Clerk issued a Default against Velanos.

6.    As a result of Velanos' default, each and every allegation set forth in the Complaint, which are incorporated by reference herein, is deemed admitted by the Defendant. *See, e.g., Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("A 'defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred form contesting on appeal the facts thus established.'"); *Suntrust Bank v. Truzman*, 2010 WL 3359710, at *2 (M.D. Fla. August 6, 2010) (determining that

2

80188897;1

because a default was properly entered, the plaintiff was deemed to have admitted the allegations made in plaintiff's complaint); *see also* Fed. R. Bankr. P. 7055 (making Fed. R. Civ. P. 55 applicable in adversary proceedings, which provides, in part, that when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, the clerk must enter the party's default).

7.      Given the substantial, undisputed proof set forth in the Complaint, **JUDGMENT** is hereby entered against Velanos as follows:

8.      Final Judgment is hereby entered in favor of the Trustee and against Velanos.

9.      The arbitration Award is confirmed.

10.      Plaintiff, Aaron R. Cohen, in his capacity as Chapter 7 Trustee of the bankruptcy estate of Genie Investments NV, Inc., whose mailing address is P.O. Box 4218, Jacksonville, FL 32201-4218, shall recover from Defendant, Velanos Principal Capital, Inc., whose last known address is Attn. Joshua Wearmouth, its Chief Executive Officer, 20101 SW Cypress Street, Newport Beach, CA 92660, the sum of **$20,000,000.00**, that shall bear interest at the rate of nine percent (9%), as agreed by Velanos in the Settlement Agreement for which let execution issue.

11.      The Court does not retain jurisdiction to issue post-judgment enforcement orders or writs. Enforcement of this Judgment shall be through the appropriate state court.[1]

---

[1] Ordered modified in chambers.

80188897;1

Copies to:

Raye C. Elliott, Esq.
Akerman LLP
401 East Jackson Street, Suite 1700
Tampa, FL 33602
*Attorney for Plaintiff, Aaron R. Cohen,
Chapter 7 Trustee*

Velanos Principal Capital, Inc.
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660

Velanos Principal Capital, Inc.
Attn. Joshua Wearmouth, its Chief
Executive Officer
20101 SW Cypress Street
Newport Beach, CA 92660

80188897;1

# EXHIBIT VII



519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 · warren.law

October 14, 2022

<u>**VIA E-MAIL**</u>

Caleb Michael Davis, Managing Partner
Genie Investments NV, LLC
11064 Lothmore Rd.
Jacksonville, FL 32221
calebdavis8@gmail.com

<u>**Re: Letter of Engagement ; Joint Venture with Velano Principal Capital, Inc.**</u>

Dear Caleb:

Thank you for selecting the Warren Law Group ("we", "us", or the "Firm") to represent and advise Genie Investments NV, LLC and you ("You" or the "Client") with respect to the proposed joint venture with Velanos Principal Capital, Inc. ("Matter"). This engagement shall include but may not be limited to: general counsel/advice, contract/legal document preparation and or review, transaction structuring, strategic planning & asset protection, escrow/paymaster services. Please note that escrow and paymaster services may be provided under a separate engagement addendum with different terms, conditions, and fee structure which the Firm will provide for your review and approval at the appropriate time. You explicitly authorize the Firm to undertake any other matters that relate to or flow from these issues at its discretion. This engagement does not include representation in litigation or arbitration proceedings but may be included herein by separate signed addendum. This document is a privileged and confidential agreement for legal services ("Agreement") that states the terms of our representation. Please read it carefully.

1.      <u>**Professional Undertaking**</u>

The Firm has undertaken to advise you and provide you representation in the Matter. If You desire to retain the Firm for services outside the scope of the above, you and the Firm will enter into a separate Letter of Engagement for those matters. While our representation will include post-trial or arbitration motions on the Matter, this Agreement does not include re-trial or appeals on any judgment or award that may be obtained by or against You, unless we otherwise agree in a subsequent writing.

Either at the commencement or during the course of our representation, we may express opinions or beliefs concerning various courses of action to be taken and the results that might be anticipated. You acknowledge that any such statement made by any attorney or employee of the



519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 · warren.law

Firm is intended to be an expression of opinion only, based on information available to us at the time, and should not be construed as a promise or guarantee, nor as an attorney opinion letter unless the words "attorney opinion letter" appear on the document.

## 2. __Client's Duties__

To enable us to represent You in the Matter effectively, You agree to be truthful and to cooperate fully with the Firm in all matters related to the negotiation of the Matter and preparation and presentation of Client's claims or defenses in the Matter. You agree to keep us informed of any information or developments that may come to your attention, to abide by this Agreement, to pay the Firm's statements for services on time and as set forth in this Agreement, and to keep the Firm advised of Your address, telephone number and whereabouts (if called for in the representation), as well as any potential conflicts of interest. You agree to assist the Firm by timely providing necessary information and documents. You agree to advise the Firm of any potential or actual conflicts of interest.  Subject to separate agreed addendum if applicable, You also agree to appear at all legal proceedings when we deem it necessary and generally to cooperate fully with the Firm in all matters related to the preparation and presentation of Your claims and defenses, as well as continuing to pay your invoices in a timely fashion. You also represent that you have not engaged any other attorney or agreed to pay another attorney or person a contingency or success-based fee with respect to this Matter.

## 3. __Retainer Fee & Flat or Contingency Fee Interest__

In consideration for the Firm's services, You agree to pay our hourly rates as set forth in Schedule A annexed hereto (the "Fee"). We will require an initial retainer of **$10,000**, which we will bill against as we work on your matters. The initial retainer shall be allocated into two segments: (i) joint venture transaction review and engagement for $5,000 flat fee; and (ii) ongoing representation post transaction commencement, which may include strategic planning/asset protection, tax services, and other required services which shall be billed against the remaining balance of the initial retainer until exhausted. We will inform you monthly of Your remaining retainer amount, and when the retainer is nearing depletion, we may ask that You replenish the retainer, and you agree to do so. No attorney-client relationship will exist concerning this matter until this retainer has been paid, and until this engagement letter has been executed by both parties. You specifically authorize and agree that any attorney, investigator, paralegal, secretary, or another person in the Firm, or an associated counsel in another Firm, may, at our professional discretion, perform necessary services under the direction of the attorney designated as lead counsel by the Firm.

You authorize the Firm to withdraw the funds from the Firm's Attorney Trust Account to pay the Firm's fees. If the Firm receives a written objection from You within 10 days of sending



519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 · warren.law

Your bill, the Firm shall consider that amount in dispute and will return those escrow funds to the Attorney Trust Account until the dispute is resolved. The Firm will cease all work on your Matter until the dispute is resolved.

With respect to litigation/arbitration matters, the Firm may request additional retainer deposits within 90 days of the date set for a trial or arbitration hearing. You shall, upon the Firm's request, deposit all fees and costs the Firm reasonably expects will be incurred to prepare for and complete the trial or arbitration hearing (the "Trial Deposit"), unless You decide not to continue the representation and the Firm is able to withdraw from the engagement. If there is any remaining retainer funds in the Firm's Attorney Trust Account at the end of this engagement, and the Firm's final bill is satisfied, those funds shall be promptly refunded to You.

### 4.    <u>Costs and Expenses</u>

The Firm will incur various costs and expenses in performing legal services under this Agreement. Client agrees to pay for all costs, disbursements and expenses in addition to the hourly fees. Client shall pay for all costs incurred for each engagement, either directly or to the Firm if the Firm has paid the costs. In this Agreement, "costs" mean any charge, disbursement, expense, fee, or other debt incurred by the Firm for Client's engagement. For the avoidance of doubt, "costs" are not limited to court costs and are intended only to exclude Firm's legal fees.

Costs commonly include: service of process charges; filing fees; court and deposition reporters' fees; legal research fees; translator/interpreter fees; jury fees; notary fees; deposition costs; international telephone charges; messenger and other delivery fees; postage; professional photocopying and other reproduction costs; e-discovery processing and data-hosting expenses; travel costs, airfare (business class for flights longer than 1,200 miles, or first-class if no business-class seats are available), ride-sharing or taxi services, meals, and lodging costs; investigation expenses; consultants' fees; and expert witness, professional, mediator, arbitrator and/or special master fees. Any cost above $500 will be pre-authorized by you before you are charged. The exception are any filing fees, which will be due upon filing.

Client understands that if the Client's case proceeds to court action or arbitration, the court may award attorneys' fees as well as some or all of the type of costs enumerated herein to the other party/parties. Payment of such attorneys' fees and costs shall be the sole responsibility of Client.

Separately, any order entered awarding payment of attorneys' fees and/or costs to you, or any settlement between the parties in the Matter awarding you attorneys' fees and/or costs, does not affect your obligation to pay the Firm's attorneys' fees, costs, and other charges under the terms of this Agreement. Any such amounts received by the Firm, however, will be credited against



519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 • warren.law

the attorneys' fees, costs and other charges incurred by you. Client acknowledges that any such determination that fees are owed to you by another party, does not in and of itself affect the amount of the fees and costs to be paid by Client to the Firm pursuant to this Agreement.

### 5.    <u>Termination and Withdrawal</u>

You have the right to discharge the Firm at any time. We also have the right to withdraw from this representation for any other reason for which withdrawal is authorized or required by the New York Rules of Professional Conduct of the State Bar of New York and/or applicable law. Among the circumstances under which the Firm may withdraw are: (a) with the consent of Client; (b) Client's conduct renders it unreasonably difficult for the Firm to carry out the Agreement effectively; and/or (c) Client fails to pay the Firm's fees, retainer, or costs as required by this Agreement.

Notwithstanding the discharge, the Client will remain obligated to pay the Firm at the agreed rates for all services provided prior to the discharge and to reimburse the Firm for all costs advanced. You expressly acknowledge that Client's failure to pay the Firm's invoiced amounts due in a prompt manner shall be grounds for the Firm's withdrawal from any representation(s) the Firm has undertaken of Client, and Client will not oppose any such effort to withdraw by the Firm in such a "failure to pay" situation.

Should you breach this Agreement in such a manner that we are reasonably required to withdraw or to terminate the Agreement, we will attempt to accommodate new counsel should you choose to hire new counsel, but while we may choose to do so, under no circumstances are we required to relinquish any part of the Fee earned or any Contingency Fee Interest in order to make that accommodation.

### 6.    <u>Record Retention Policy</u>

The Firm maintains case files electronically using Clio and other software programs. During the normal course of representation, both paper and electronic files are collected. Upon the conclusion of the Matter, the Firm may retain portions of the case file pursuant to our Firm's record retention policy and any applicable confidentiality agreement or protective order. To reduce costs, the Firm recycles paper products and may discard old case files. If you want the Firm to return original client documents or send you any portion of the case file, you agree to let us know in writing within 30 days of the conclusion of the Matter. The Firm will not be responsible for file materials that you do not request in writing within 30 days and which are eventually destroyed under our record retention policy.



519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 · warren.law

7.    <u>**Option to Pay via Cryptocurrency**</u>

Please be advised that you have the option, at your sole and absolute discretion, to pay for any legal services which the Firm earns upon receipt of payment (*i.e.*, flat fees and payment on invoices for services already rendered by the Firm) with Firm Accepted Cryptocurrencies ("FACs"). Currently the only FACs are Bitcoin and Ethereum; however, the Firm reserves the right to change the FACs at any time in its sole discretion. The Firm does not hold FACs in trust for its clients in retainer to bill against on a later date. You agree that any FACs, or other funds, received by the Firm as payment for a Flat Fee or for services previously rendered are considered "earned" by the Firm upon receipt.

If you wish to use FACs to pay your retainer for our services, you agree that the Firm will, as soon as practicable, exchange the FACs it receives from you into U.S. dollars ("Fiat") and you will be credited the amount of Fiat received by the Firm after its processing costs. The Firm will provide you with a statement as soon as practicable after it receives the Fiat detailing the exchange used, exchange rate, costs, and received Fiat value. Please be advised that the value of any cryptocurrency, including FACs, can change rapidly based upon market conditions. Please make sure to take that into consideration in making your decision. We require that a test transfer be completed and confirmed by the Client and the Firm. After that confirmation, the Client agrees to transfer FAC at a specific time requested by the Firm as to be sure to convert the FACs into Fiat as quickly as possible to avoid unnecessary market risk.

If you do choose to pay the Firm in Accepted Cryptocurrencies, you agree to transfer the applicable cryptocurrency into the Firm's designated cryptocurrency wallet from a cryptocurrency wallet over which you have sole ownership and control. You also represent and warrant to the Firm that any cryptocurrencies you send to the Firm are of non-criminal origin and are free and clear of liens or other encumbrances.

For more information about your rights related to the use of cryptocurrencies for the payment of legal services, please see (as applicable) NYCBA formal opinion 2019-5[1], D.C. Bar Ethics Opinion 378[2], and/or the CA Committee on Professional Responsibility and Conduct discussion regarding unpublished opinion 21-0007[3]. The Firm reserves the right to change its payment policies and procedures at any time, upon written notice, based on any changes in the prevailing interpretation of the applicable Rules of Professional Conduct pertaining to the same.

8.    <u>**Integration, Choice of Law, Rules of Professional Conduct**</u>

---

[1] https://www.nycbar.org/member-and-career-services/committees/reports-listing/reports/detail/formal-opinion-2019-5-requiring-cryptocurrency-in-payment-for-legal-services

[2] https://dcbar.org/For-Lawyers/Legal-Ethics/Ethics-Opinions-210-Present/Ethics-Opinion-378

[3] https://board.calbar.ca.gov/docs/agendaItem/Public/agendaitem1000028381.pdf



519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 · warren.law

This Agreement represents the entire Agreement between us. In entering this Agreement, the Firm has not made, and you are not relying upon, any representations or promises other than those contained in writing in this Agreement. To avoid any misunderstanding over the terms of this representation, this Agreement shall not be modified or waived in any respect except in writing signed by both parties.

This Agreement shall be construed under and in accordance with the laws of the state of New York, excluding any conflicts of law, rule or principle that might otherwise refer to the substantive law of another jurisdiction.

It is our intention to follow the New York Rules of Professional Conduct.[4] If, despite that intent and endeavor, any part of this Agreement shall for any reason be found to be unenforceable, the parties agree that: all other portions shall nevertheless remain valid and enforceable; and a provision most similar to the stricken provision but otherwise complying with applicable law shall be substituted.

### 9.    <u>Mediation and Arbitration</u>

The Firm is required by New York law to inform You that in the unlikely event of a disagreement with respect to legal fees, Part 137 of the Rules of the Chief Administrator of the New York Courts ("Part 137") provides that certain fee disputes are subject to arbitration at Client's option. The Firm will provide You with a copy of the Rule upon request. Information may also be obtained at www.courts.state.ny.us/admin/feedispute/index.shtml.

If any dispute ("Dispute") arises between You and the Firm, including, but not limited to, disputes over billing, fees, malpractice, fraud-based claims, breach of professional duties (including fiduciary duty), or any other complaints, and if the Dispute cannot be settled through negotiation (or for fee disputes under Part 137), then the parties agree to try in good faith to settle the Dispute promptly by mediation administered by the New York, New York branch of the Judicial Arbitration and Mediation Service ("JAMS") within 60 days after either party sends written notice of its intent to mediate. The cost of mediation shall be borne equally by the parties.

If the Dispute cannot be settled by mediation, the Dispute shall be settled by arbitration. The arbitration must: (a) be administered by the Judicial Arbitration and Mediation Service ("JAMS"); (b) occur in New York, NY; (c) be governed, for purposes of procedure, by the JAMS' Comprehensive Arbitration Rules and Procedures in effect at the time the parties executed the

---

[4] Available at https://nysba.org/app/uploads/2020/02/NEW-YORK-RULES-OF-PROFESSIONAL-CONDUCT.pdf



519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 • warren.law

Agreement, the Federal Arbitration Act (9 U.S.C. §§ 1–16), and for substantive purposes, the laws of the State of New York; and (d) occur no later than 60 days after either party sends written notice that it believes the parties' private negotiations have reached an impasse, or as soon thereafter as the selected arbitrator is available.

A written, reasoned opinion must accompany any award issued by the arbitrator. The opinion must state that the Firm, the Client, or neither party prevailed. If the arbitrator determines that one party prevailed, the arbitrator shall award to the prevailing party its legal expenses reasonably incurred related to the claims made in the arbitration. The parties shall maintain the confidential nature of the arbitration proceeding and the award, including the hearing, except as necessary (1) to prepare for or conduct the hearing on the merits; (2) to challenge or enforce an award; or (3) to comply with any law or government order.

The Parties adopt and agree to implement the JAMS Optional Arbitration Appeal Procedure (as it exists on the effective date of this Agreement) with respect to any final award in an arbitration arising out of or related to this Agreement. Judgment on the arbitration award may be entered in any court having jurisdiction. Client and the Firm confirm that they have read and understand the forgoing paragraph, and voluntarily agree to binding arbitration.

## 10. <u>Judgment Lien</u>

You agree that, in the event that the Firm obtains a monetary award for You as part of this Matter, or any matters that flow from it, any outstanding amounts owed under the Firm's invoices by You will be immediately payable out of such monetary award. This monetary award includes *any* affirmative recovery on your behalf as part of the Matter, including, but not limited to, actual damages, punitive damages, attorneys' fees, or costs. You are therefore advised of the consequence of not paying any invoices when the Firm obtains a money judgment or other relief on Your behalf.

[ Signature Page to Follow ]



519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 · warren.law

If the foregoing correctly reflects your understanding of the terms and conditions of our representation, please indicate your acceptance by executing this letter in the space provided below and returning it to the Firm, as well as making the required retainer payments.

For future retainer or bill payments, please forward payment to the Firm's client trust account at the address below. Please contact us if you wish to pay by another method, such as credit card. In the event of a credit card payment, a 3% service charge will be incurred and added to the charged amount.

**Bank Name:** Signature Bank

**Bank Address:** 565 Fifth Avenue, 12th Floor, New York, NY 10017

**ABA #:** 026013576

**Account Name:** Warren Law Group (IOLA)

**Account Number:** 1504601990

**SWIFT Code:** SIGNUS33

Very truly yours,

**WARREN LAW GROUP**

*/s/ Christopher D. Warren*

Christopher D. Warren

Caleb Michael Davis, on behalf of Genie Investments NV, LLC, requests representation in accordance with the terms outlined above:

By: _____

Caleb Michael Davis, LLC



519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 • warren.law

SCHEDULE A – HOURLY RATES[5]

| Legal Professional | Hourly Rate |
|---|---|
| | |
| Partners | |
| Christopher Warren | $825 |
| David Rosenfield | $675 |
| Jon-Jorge Aras | $650 |
| Paul Share | $650 |
| Scott Oh | $650 |
| Tom McCabe | $675 |
| John Keenan | $650 |
| | |
| Associates | |
| Brittany Hulbert* | $450 |
| Jorge Marquez | $450 |
| David Szalyga | $450 |
| Other Associates | $450 |
| | |
| Of Counsel | |
| Todd Kulkin | $600 |
| Carol Williams | $550 |
| Dan Alper | $550 |
| Dan Kolber | $550 |
| Dan Podhaskie | $550 |
| Jorge Salva | $550 |

[5] Hourly rates are subject to change on the anniversary of this engagement and each year subsequent by no more than 10% to keep pace with cost-of-living adjustments and inflation.

*Pending Admission



519 8TH AVENUE, 25TH FLOOR
NEW YORK, NY 10018
866.928.5838 • warren.law

| | |
|---|---|
| Max Travis | $550 |
| C.A. Morrison | $550 |
| Stephen Reich | $550 |
| Other Of Counsel | $550 |
| | |
| Paraprofessionals | |
| Law Clerks | $250 |
| Paralegals | $175 |
| Interns | $125 |

# EXHIBIT VIII

9:55

B J

2 People >

time for you today?

just got your Voicemail

does 4 MST still work for you?

Fri, Nov 22 at 5:43 PM

Blake

I tried calling you now and went to voicemail

Thnksmarter@gmail.com

got it, will send portfolio shortly, ty

Sat, Nov 23 at 12:31 PM

Blake

Hard pass. Your name is publicly associated with David Hughes.



🔵 BiggerPockets®

STAY AWAY FROM McMann Capital
biggerpockets.com

Subject

iMessage



DAVID HUGHES Ripoff Reports, Complaints, Reviews, Scams, Lawsuits and Frauds Reported

**Your Search: David Hughes**

There may be more reports for "David Hughes"

For more results perform a general search for "David Hughes"

Showing 1-10 of 10 Found Reports For more results perform a general search for "David Hughes"

Wondering if a report is missing? We DO NOT remove reports.

| Date | Title | City, State |
|---|---|---|

