FILED INTAKE USBC
OCT 14 '25 PM2:19

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
In re: Genie Investments NV Inc., Debtor.
Case No. 3:24-bk-00496-BAJ
Chapter 7

## MOVANT'S MOTION FOR RECONSIDERATION OF ORDER GRANTING TRUSTEE'S MOTION TO ENFORCE AUTOMATIC STAY AND DENYING WITH PREJUDICE THIRD PARTY INDIVIDUAL'S MOTIONS FOR SANCTIONS (DOC. 432)

Movant, John Michael Cohan (the "Third Party Individual"), files this Motion for Reconsideration of the Court's Order entered September 30, 2025 (Doc. 432) (the "Order"). This Motion for Reconsideration does not initiate new litigation, nor does it violate any filing restrictions imposed by prior order. It pertains solely to the Court's ruling entered more than 90 days after a pre-existing evidentiary hearing and post-trial briefing sequence that was already underway before the filing restriction order was entered.

Accordingly, this filing constitutes a continuation of that same line of litigation, necessary to preserve rights of review and due process related to that record. The filing restriction order cannot be applied retroactively to preclude filings in matters that were already pending and actively litigated prior to its entry. Grounds for this motion state as follows:

INTRODUCTION

This case presents clear and direct evidence of retaliatory conduct by the Chapter 7 Trustee and his counsel following our lawful exercise of rights. On January 22, 2025, we filed legitimate claims against Warren Law Group and Velanos for the prior misconduct that clearly lead to Genie Investments NV's demise. Within hours of sending those demand letters, we received a coordinated email response from the Chapter 7 Trustee's counsel—showing unmistakable signs of collusion and communication between licensed professionals who should have remained independent. Now, those same professionals stand unified seeking to silence us.

Two (2) days later, on January 24, we received retaliatory demand letters from the Chapter 7 Trustee, demanding millions of dollars and threatening an adversary complaint within ten (10) days if we did not comply. We did not ignore those letters. We submitted a 27-page written response, which the Chapter 7 Trustee personally acknowledged under oath on the stand [**Doc. 389, Page 26, Line 6**], along with a Motion to Dismiss [**Case No. 25-ap-00011, Doc. 4, filed 02-14-2025**], a Motion to Strike that Dismiss filed by the Chapter 7 Trustee [**Case No. 25-ap-00011, Doc. 5, filed 02-19-2025**] and was almost instantaneously struck by the Court [**Case No. 25-ap-00011, Doc. 6, filed 02-21-2025**]. Despite our clear, timely, and professional attempt to resolve

the matter, the Chapter 7 Trustee proceeded to file the adversary complaint anyway—relying on a non-response narrative [**Doc. 329, Paragraph 5**] to justify moving forward, ultimately leading to a rushed default and final judgments [**Doc. 40 filed 05-02-2025; Doc. 41 filed 05-01-2025; Doc. 42 filed 05-02-2025**].

The timeline alone demonstrates retaliation:

- Protected action on January 22.

- Coordinated communication within hours.

- Retaliatory demand letters on January 24.

- Adversary complaint filed shortly thereafter—despite receiving a documented "27-page letter." [**Doc. 389, Page 26, Line 6**]

The Chapter 7 Trustee's sworn testimony regarding the basis for his fraudulent transfer claims is directly contradicted by a post-trial communication from his counsel. At the June 24, 2025, evidentiary hearing, the Chapter 7 Trustee testified under oath that he 'relied primarily on the Yip report' (**Exhibit I**) and that 'As soon as we read Ms. Yip's report...' he decided to act (**Exhibit I**). However, in a July 23, 2025 email, the newly discovered evidence, the Chapter 7 Trustee's counsel stated, 'The Trustee did not rely entirely on the Chapter 11 Examiner's report...' (**Exhibit III**). These positions are mutually exclusive and constitute a fundamental contradiction on a material issue central to the Court's prior ruling—first claiming a $1.1 million transaction in his initial response to sanctions, then citing the examiner report as his basis during trial, only to later disclaim reliance on that same report (**Exhibit I, II, III**). This inconsistency exposes an absence of factual grounding and confirms that the prosecution was driven by personal motive rather than legitimate purpose.

We filed a Motion for Sanctions following these retaliatory demand letters, further documenting the pattern of misconduct. Meanwhile, the Chapter 7 Trustee's filings contained baseless and inflammatory rhetoric—comparing us to "Bernie Madoff" and invoking "RICO"—without a single substantiated allegation or evidentiary foundation, all while the United States Trustee and other officers of the Court oversaw and stood by.

We also placed the Court on judicial notice of multiple procedural violations [**Doc. 406**], including tampering with the 341 audio recording by the United States Trustee, where a portion was spliced to remove Mr. Cohan's statement that he intended to sue the United States Trustee for allowing a restraining order violation that he had been expressly notified of in this very courtroom.

These issues, which Movant believes are critical to a full and fair review, were not addressed in the Court's Order. The cumulative effect of these procedural circumstances, Movant respectfully submits, has significantly impaired their ability to present their case fully; including a one-sided filing ban imposed against us early in the case due to the so-called "volume of filings"—as if a

few pro se motions identifying misconduct [**Doc. 322, 337, 343, 344**] were somehow catastrophic. Meanwhile, the Court permitted two (2) separate replies by the Chapter 7 Trustee, contrary to its own order, while striking the very response it directed us to file. Those two (2) replies [**Docs. 357, 360**], when read sequentially, show that the Chapter 7 Trustee procedurally capitalized on the Court's erroneous action [**Doc. 356**]—an error the Court itself later acknowledged and reversed [Doc. 359]. Movant respectfully submits that the record, including the timeline of events and the  7 Chapter Trustee's admitted receipt of their 27-page response, contains evidence of retaliatory intent that the Court's Order did not address.

Taken all together, the record shows a *potential* coordinated retaliatory campaign, marked by *potential* collusion between professionals across jurisdictions, *potential* contradictory justifications by multiple opposing parties, and *potential* misuse of the bankruptcy process [**i.e. Examiner Report, Doc. 146, Line 233**]. The dates, the documents submitted as evidence, and actions of the licensed professionals throughout this matter speak for themselves—this was not mere "coincidence in timing" [**Doc. 276, Paragraph 13**]. It was a calculated response to our lawful pursuit of claims, in violation of fundamental principles of fairness and due process that all now lead us to this newly found evidence.

Reconsideration is warranted based on newly discovered evidence that was not previously available. This evidence—a *post*-trial email [July 23, 2025] from the Chapter 7 Trustee—directly and irreconcilably contradicts his sworn trial testimony regarding the foundational basis for his fraudulent transfer claims. This contradiction constitutes a "manifest error of fact" that infected the Court's analysis of the Chapter 7 Trustee's credibility, good faith, and the validity of his administration of this estate, particularly in the context of the denied Motions for Sanctions.

## LEGAL STANDARD

A motion for reconsideration is appropriate to correct "manifest errors of law or fact." Arthur v. King, 500 F.3d 1335, 1343 (11th Cir. 2007). "Newly discovered evidence" that could not have been uncovered with due diligence *prior* to the court's ruling is a valid basis for reconsideration. See, e.g., Mays v. U.S. Postal Service, 122 F.3d 43, 46 (11th Cir. 1997). Where a party's sworn testimony is demonstrably false, it constitutes a fraud on the court and a manifest error that must be corrected. Fed. R. Civ. P. 60(b)(3); Fed. R. Bankr. P. 9024.

## ARGUMENT

1. Newly Discovered Evidence Reveals a Fundamental Contradiction in the Chapter 7 Trustee's Sworn Testimony.

Throughout this case, a central issue has been the Chapter 7 Trustee's reliance on the Chapter 11 Examiner's Report to justify his aggressive litigation posture, including the demand letters and adversary proceedings that formed the basis for the Motions for Sanctions. These individual Third-Party Individuals have consistently argued that the Chapter 7 Trustee elevated the Examiner's speculative conclusions into affirmative allegations without an independent basis.

[1] Prior to the Chapter 7 Trustee filing the adversary complaint, on January 29, 2025, the Chapter 7 Trustee in Doc. 276 was "attempting to determine the disposition of over $1.1 million" and "was ready to move forward with claims against the Insider Companies."

[2] At the June 24, 2025, trial, the Chapter 7 Trustee testified under oath that his actions were based on the Examiner's Report.

**06-24-25 Trial Transcript**

**Page 41, Lines 21-22**: "*We had the basis from the examiner's report.*"

**Page 43, Lines 20-21**: "*I did not dig deep into all of the bank records. I relied primarily on the Yip report.*"

**Page 60, Line 15**: "*As soon as we read Ms. Yip's report…*"

[3] However, a post-trial email from the Chapter 7 Trustee, dated July 23, 2025, states unequivocally:

*"The Trustee did not rely entirely on the Chapter 11 Examiner's report…"*(**Exhibit III**)

These positions are mutually exclusive. He cannot have relied on the Report as his basis under oath, while having disclaimed that very reliance in a *post*-trial communication.

This email, which was not in the Movant's possession during the trial despite reasonable efforts to obtain all relevant discovery, is newly discovered evidence. It directly and irreconcilably contradicts the Chapter 7 Trustee's sworn testimony.

2. This Contradiction Constitutes a Manifest Error That Undermines the Foundation of the Court's Order.

The Court's Order denied the Motions for Sanctions based, in part, on the finding that the Chapter 7 Trustee was acting within his official capacity and was entitled to immunity. The Order accepted the Chapter 7 Trustee's administration as being in good faith and based on a diligent investigation.

The stark contradiction between the Chapter 7 Trustee's pre-trial writing, his sworn testimony and the post-trail email create a manifest error of fact regarding his credibility and the good faith of his actions. A trustee cannot, in a pre-trial communication, disclaim full reliance on a report and then, under oath, testify that it was the cornerstone of his actions. This goes to the heart of whether his litigation conduct—the very conduct sanctioned by judicial immunity—was pursued with candor toward the Court.

If the Chapter 7 Trustee did not, in fact, rely entirely on the Examiner's report, then his sworn testimony was misleading. If he did rely on it, then his email was misleading. In either case, this evidence reveals a fundamental lack of forthrightness that the Court must reconsider. This is precisely the kind of "bad faith" and "abuse of process" alleged in the Third Party Individuals' Sanctions Motions (**Doc. 322 & 325**), which the Court could not fully assess without this critical evidence.

3. The Court's "Equity Holder" Label Erases the Personal Nature of the Attack.

The Court's Order consistently refers to the Movant's as "Former Owners" and "Equity Holders," rather than them by name, framing this as a purely financial dispute over corporate assets This is a profound mischaracterization.

The Chapter 7 Trustee did not sue "Equity Holders" or "Former Owners" – he publicly branded individuals as criminals and circumvented their standing by only suing the corporations. He did not send a cease-and-desist to a corporate title; he sent it to John Michael Cohan and David Hughes, individually. He did not threaten to sue a shareholder status; he threatened to sue them, personally, making comment under oath like, "We were always going to sue *your* entities and Mr. Hughes' entities. There was never a question of that." **[Doc. 389, Page 29 Lines 3-5]** "…if I find 8 that monies flowed to you and Mr. Hughes personally, then 9 I probably will bring litigation against you. " (**[i] 06-24-25 Trial Audio 2, 25:46, [ii] Doc. 289, Page 50, Lines 7-9**).

4. The Threat of Monetary Sanctions Against Unnamed "RICO Defendants" is the Ultimate Due Process Concern.

This has created an unconscionable procedural vacuum:

· The Accusation: The Movant's are publicly labeled as "Bernie Madoff"-level fraudsters and "RICO" defendants.

· The Procedural Reality: They are intentionally not named in the adversary complaint, denying them the right to defend their personal reputations, securities and assets within that proceeding.

· The Justification for Sanctions: When they attempt to defend themselves outside that proceeding, the Court now threatens them with monetary sanctions for violating the stay.

This situation has placed Movant's in an untenable procedural position. The Chapter 7 Trustee can wield the sledgehammer of criminal accusations in a civil matter without the burden of proving them, and the Court threatens to punish the victims of this strategy for trying to shield themselves. The label "Equity Holder" is used to strip them of their individual rights, while the "Bernie Madoff" rhetoric is used to justify the denial of those same rights. A party cannot be subjected to the penalties of litigation—including sanctions—for defending against accusations they were never formally given a chance to answer or redress.

The Movant's are not uncooperative litigants; they are individuals forced into an impossible position, defending themselves against a defamatory public campaign waged by parties who ensured they had no formal way to fight back without hiring another "officer of the court."

The Movant's actions were a direct and unavoidable response to being publicly accused as criminals in a forum where they were denied standing to defend themselves. This outcome,

where a party faces sanctions for actions taken to defend personal reputations and assets against public accusations, raises serious due process concerns under the circumstances presented here.

The newly presented evidence in **Exhibit VI** fundamentally decimates the narrative of an insolvent estate teeming with victims, revealing instead a claims process corrupted by fabrication and a debt structure that has already been resolved.

a. <u>Reconsideration is further warranted by evidence that the estate's financial condition has been misrepresented through the claims process.</u> The official claims register (**Exhibit VI**) shows a pattern of claims being amended to astronomical, unsubstantiated amounts. For example, Claim #5 by Charles Blake Stringer/Nutra-AcresLLC was amended from $400,000 to $14,247,750.00, and Claim #4 by Belle Maison Realty, LLC was amended from $70,000 to $3,000,000.00. These claims, which dwarf the actual amounts paid to these creditors, create a false appearance of massive insolvency. Furthermore, the underlying debt has been resolved by a $20,000,000 federal judgment in Adversary Proceeding 3:25-ap-00007 (**Exhibit VI**), which covers all viable claims. This new evidence calls into question the very necessity and purpose of the continued Chapter 7 administration." The amendment of a $400,000 claim to over $14 million, and a $70,000 claim to $3 million, is not a mere discrepancy; it is a predatory attempt to exploit the bankruptcy process. These inflated claims [and there are others], which far exceed the total of all viable claims, have been used to create a false appearance that the estate is "upside down." The Chapter 7 Trustee's administration, by failing to aggressively object to these facially absurd claims, that were previously objected to and denied specifically for the Chapter 7 Trustee's review, has perpetuated this fiction and justified its own existence chasing a problem that does not exist.

b. <u>The Underlying Debt Has Been Extinguished by Federal Judgment</u>. The most critical fact revealed in Exhibit VI is that the entire financial predicament has been solved. A federal judgment of $20,000,000 has been rendered to cover all viable claims, which total $15,000,000. The arithmetic is undeniable: $20,000,000 - $15,000,000 = $0. This means there are zero net unresolved claims and, by definition, zero remaining victims from the core business operations. The Chapter 7 case is not administering an estate for the benefit of creditors; it is administering a ghost, pursuing claims that have already been adjudicated and satisfied in a different forum.

The continuation of this Chapter 7 case is not only unnecessary but is itself an abuse of process. It is predicated on an artificial insolvency manufactured through fraudulent claims and ignores a federal judgment that has already cured any legitimate debt. The Movant came to court as a whistleblower, and the evidence now shows that the true harm to the estate is not from their pre-petition conduct, but from the post-petition failure to correct a claims process that has been weaponized against it. This Exhibit proves there are no victims left to save, and the Chapter 7 Trustee's efforts are, at this point, a costly and destructive farce.

5. The Chapter 7 Trustee's Pattern of Overreach Includes Attempting to Extinguish Third-Party Rights Beyond the Court's Jurisdiction.

The Chapter 7 Trustee's misconduct is not limited to retaliatory litigation and false testimony. A core component of the alleged scheme—the attempt to permanently bar Movant from pursuing his personal claims against the Warren Law Group—constitutes a separate, manifest error of law that this Court must reconsider. The Chapter 7 Trustee is attempting to use this bankruptcy to extinguish rights he does not own and over which this Court lacks jurisdiction.

The Supreme Court has unequivocally held that the bankruptcy code contains no statutory authority for non-consensual third-party releases that discharge "claims against non-debtors without the consent of the claimants." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 223 (2024). The Court's jurisdiction is limited to matters affecting the debtor's estate. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). The Movant's distinct, personal third party claims for malpractice and breach of fiduciary duty against attorneys are not property of the estate and fall entirely outside this sphere. We agree with the Chapter 7 Trustee: "A Because the joint venture agreement and the 5 retainer agreement were with the Debtor, not with you and 6 Mr. Hughes individually." [**Doc. 389, Page 31, Line 4-6**]. Critically, Movant's are not even named parties to the legal representation agreement between the Debtor and the Warren Law Group; only an individual, Mr. Caleb Davis, is named as the client on behalf of the Debtor. This fact underscores that Movant's potential claims are entirely personal and separate from any claim the estate might hold.

Furthermore, the Chapter 7 Trustee lacks the standing to broker a release of claims he does not own. *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416 (1972). The attempt to do so via a Bar Order, particularly while the integrity of the process is compromised by the Chapter 7 Trustee's own misconduct, is an ultra vires act. This Court's equitable powers under § 105(a) cannot be invoked to achieve this result, as it would "override explicit mandates of other provisions of the Bankruptcy Code." *Law v. Siegel*, 571 U.S. 415, 421 (2014).

The Chapter 7 Trustee's strategy is now clear: first, use retaliatory and defamatory tactics to block Movant from defending his assets in the adversary proceeding, and second, seek a Bar Order to permanently prevent them from pursuing the very professionals whose misconduct caused the loss. This calculated effort to strip Movant of his constitutional rights to both property and a remedy, through a bankruptcy process they are systematically barred from contesting, is a manifest error of law that compounds the due process concerns and demands correction.

CONCLUSION

The United States Trustee's shifting justification—"simply kept the money and didn't provide any benefit" in his first conversion motion and inventing confirmations of fraud from the Examiner report that did not exist in the next; to the Chapter 7 Trustee's shifting justifications from a $1.1 million transaction, to wholesale reliance on the Examiner's report, to now claiming in a *post*-hearing email (issued only after we revealed our Adam Walker report exposing fraud) that he relied on the loan documents—is not merely a contradiction but evidence of a deeper fraud. This newly discovered email proves he knew his sworn testimony was false, and it

connects directly to the core issue: The Chapter 7 Trustee's reliance, whether primary or partial, was placed on an Examiner's Report that is fundamentally unreliable. As detailed in the draft analysis by a securities law expert (**Exhibit II**), the Report is 'rife with inaccuracies, unsupported conclusions, and omissions of material and pertinent evidence.' It misstates basic facts of the Debtor's business, such as falsely claiming all borrowers signed Due Diligence Agreements and that borrowers paid fees to McMann for Genie loans (**Exhibit II**). Most critically, it ignores the governing BELOC Agreement to wrongly conclude that ICA Payments were customer funds held in trust, a central but erroneous premise (**Exhibit II**). Reliance on such a flawed document cannot form a good-faith basis for litigation.

This pattern of fabrication is part of a broader scheme of misconduct in this case. The U.S. Trustee himself knowingly allowed the violation of a restraining order, and then attempted to orchestrate a cover-up by splicing the 341 meeting audio and altered it to edit out Mr. Cohan's explicit warning that his misconduct would lead to a lawsuit. Now, the U.S. Trustee refuses to recuse himself and does not know when he'll be able to accept service due to the "federal shut down."

The Trustees and their counsel have presented the Court with a fundamentally misleading narrative engineered to be a procedural loophole to circumvent the Constitution. By naming only corporate defendants in the adversary proceeding, they strategically blocked us—the individual "Equity Holders" and "Former Owners" of these companies—from having standing to defend our personal assets and securities. They then publicly branded Movant as 'Bernie Madoff' and 'RICO' criminals to poison the well, while simultaneously telling them they have 'no standing' to defend our names or property in the very action designed to seize them. This is not a legal technicality; it is a deliberate scheme to deny Movant his fundamental individual Due Process rights. This procedural structure, regardless of intent, has the effect of denying Movant a meaningful opportunity to defend their personal rights and reputations, raising serious due process concerns—a calculated effort to get a judgment against Movant's personal wealth without ever having to face Movant in court, all while the U.S. Trustee, who is implicated in the serious misconduct including the alteration of key evidence like the 341 audio, looks the other way. This is just part of the overall concealment and the core constitutional due process concerns that demand redress.

The newly discovered email (**Exhibit III**), when contrasted with the Trustee's sworn testimony (**Exhibit I**), reveals a clear 'manifest error of fact' regarding the credibility and good faith of the Trustee's actions. This contradiction, combined with evidence of the flawed Report he relied upon and the inflated claims distorting the estate's condition, proves that the Court's Order was based on an incomplete and inaccurate record. Reconsideration is necessary to correct this error and prevent a manifest injustice. Such conduct crosses the line from zealous advocacy into an abuse of the judicial process itself. See, e.g., Montaño v. Soliz, 211 F. Supp. 3d 1056, 1064 (N.D. Ill. 2016) (noting that while attorneys are afforded great latitude, they may not employ tactics 'designed to create prejudice and confusion').

The record belies any claim that Movant has shown no evidence of Trustee misconduct, as the primary evidence consists of the Chapter 7 Trustee's own contradictory testimony, filings, and admissions, all of which are part of the official record. When evidence of misconduct is present in the record, a finding to the contrary, Movant submits, would constitute an error. See Jimenez v. Madison Area Technical College, 321 F.3d 652, 657 (7th Cir. 2003) ('[C]ourts have an independent obligation to ensure that civil litigation is conducted not only efficiently, but also with integrity and dignity, and in a manner that does not subvert the public's trust in the judicial system.')

WHEREFORE, Movant respectfully requests that the Court grant this Motion for Reconsideration and enter an Order that in the interests of justice and to correct a manifest error of fact regarding the credibility of a court-appointed officer, the Court should grant reconsideration, vacate its September 30, 2025, Order (Doc. 432), vacate the adversary proceeding (25-ap-00011) entirely, or in the alternative, **set an evidentiary hearing with the attached exhibits submitted as evidence** to determine:

1. The veracity of the Trustee's sworn testimony.
2. The true basis for his investigative and litigation actions.
3. Whether his conduct, in light of this contradiction, falls outside the protection of quasi-judicial immunity and warrants the sanctions sought.

WHEREFORE, Movant respectfully requests that the Court grant this Motion for Reconsideration, vacate its Order (Doc. 432), and set this matter for an evidentiary hearing.

Dated: 10-14-2025

Respectfully submitted in Good Faith,

John Michael Cohan, without prejudice, without recourse, UCC 1-308, 1-103

### Certificate of Service

I hereby certify that all interested parties have been duly served a copy of the following documents by the CM/ECF system as per the agreement between parties. This agreement does not waive our right to proper service.

## EXHIBIT LIST

**Exhibit I:** Compilation of Pleadings, Transcripts, and Correspondence demonstrating the shifting narrative

**Exhibit II:** Draft Opposition to U.S. Trustee's Motion & Adam Walker's [12 year FINRA veteran] Internal Analysis

**Exhibit III:** Post-Trial Email Correspondence between David C. Hughes II and Raye Elliott, et al. after Mr. Walker's internal memorandum is provided to the Chapter 7 Trustee and debunks the UST's "fabricated" allegations and the Examiner report

**Exhibit IV:** Chapter 7 Trustee Contradictions Side-by-Side

**Exhibit V:** Industry-wise Lending Advertisements with "Favorable Terms"

**Exhibit VI:** Evidence of Inflated Creditor Claims and Federal Resolution


<u>Note</u>: A copy of the Warren Law Group agreement between Caleb Davis on behalf of the debtor and Warren Law Group have been filed with Mr. Cohan's succeeding objection.

# EXHIBIT I

4.      In 2022 and 2023, the Debtor entered into loan agreements with several companies owned by Cohan and Hughes including Zoomeral, Inc., Capitulum Homes, LLC, Genie Investments II, LLC, Better Methods, LLC, and Genie's Angels, LLC (collectively, the "Insider Companies") (Chapter 11 Examiner's Report at pp. 29-45). The Trustee has copies of the loan agreements and has reviewed them. Each of the loan agreements provided for an interest rate of only .1% and that the loans would be repaid in one balloon payment in seven years with the option to extend the loans given solely to the Insider Companies. According to the Chapter 11 Examiner's Report, which was based on her review of the Debtor's bank statements, the Debtor transferred over $3.6 million to the Insider Companies. (*Id.*). Given that the purported loans were made to insiders and that the loans were not commercially reasonable, the Trustee believes that the $3.6 million transferred to the Insider Companies constitute fraudulent transfers.

5.      After holding the Section 341 Meeting of Creditors, taking a Rule 2004 examination of the Debtor, and attempting to determine the disposition of over $1.1 million in the Debtor's Chase Bank accounts that were closed in August 2023 and whether those funds were transferred to the Insider Companies, the Trustee was ready to move forward with claims against the Insider Companies. Therefore, on January 24, 2025, the Trustee's counsel sent demand letters to each of the Insider Companies demanding return of the fraudulently transferred funds. The Trustee intends to file an adversary complaint against the Insider Companies seeking return of the fraudulently transferred funds.

6.      The Motion filed by Cohan and Hughes attempts to argue the merits of the Trustee's fraudulent transfer claims against the Insider Companies and requests that the Court enter a protective order prohibiting the Trustee from suing the Insider Companies. There is no basis in

2

**As shown through submitted evidence and at trial, on** *January 22, 2025*, **the undersigned and his business partner began their pursuit for claims against Warren Law Group and others. After a cease-and-desist email and letter threatening sanctions was sent to both Mr. Cohan and Mr. Hughes within three (3) hours of commencement of their action against defendants, some good faith discussion by email in between and then forty-eight (48) hours later, the Chapter 7 Trustee sent 10-day multi-million dollar demand letters, followed by the automatic stay enforcement and the reason for their actions was as follows:**

Case 3:24-bk-00496-BAJ Doc 276 Filed *01/29/25* Page 2 of 45:

5. After holding the Section 341 Meeting of Creditors [*September 2022*], taking a Rule 2004 examination of the Debtor, and attempting to determine the disposition of over $1.1 million in the Debtor's Chase Bank accounts that were closed in August 2023 and whether those funds were transferred to the Insider Companies, the [Chapter 7] Trustee was ready to move forward with claims against the Insider Companies. [*4 months past*] Therefore, on *January 24, 2025*, the [Chapter 7] Trustee's counsel sent demand letters to each of the Insider Companies demanding return of the fraudulently transferred funds. The [Chapter 7] Trustee intends to file an adversary complaint against the Insider Companies seeking return of the fraudulently transferred funds. [*February 6, 2025* the adversary complaint was filed.]

**After Mr. Cohan and Mr. Hughes proved the $1.1 million transaction was done by a third-party (Chase Bank) in their** *February 5ᵗʰ* **filing, both the adversary complaint omitted the said transaction and the tune at the hearing had changed to the "Yip Report":**

*June 24, 2025* Trial/Evidentiary Hearing Transcript

> **1.** Page 41, Line 19-22
>
> *19 Q So you made fraudulent transfer allegations*
> *20 without reviewing all the bank records?*
> *21 A Yes. We had the basis from the examiner's*
> *22 report from our own view of the bank statements that it*
> *23 was likely that there were fraudulent transfers.*
>
> **2.** Page 43-44, Lines 20-25, 1-4
>
> *13 Q Did you review all the Debtor's bank*
> *14 statements before asserting your claims of fraudulent*
> *15 transfers?*
> *16 A I reviewed most of them and my — I relied on*
> *17 my attorney to review the rest.*
> *18 Q Just to clarify, not all of them?*
> *19 A I did not dig deep into all of the bank*
> *20 records. I relied primarily on the Yip report.*
> *21 Q And did the Yip report find fraud?*

22 A Yes.
23 Q Where in the Yip report did it find fraud?
24 A The Yip report specifically indicated that the
25 loans to the insiders were well below market terms and

1 that there were — that the Debtor had no ability to fund
2 or interest to fund preferences and fraudulent transfers
3 against the insider companies. That's at Line 233, I
4 believe, of the Yip report.
5 Q But she — she found fraud? Because I'm pretty
6 -- if she found fraud, I don't think it [the case] would have been
7 converted for gross mismanagement.

3. Page 60, Line 15

15 As soon as we read Ms. Yip's report and
16 spoke to her and saw the terms of the loans, so it wasn't
17 like this was a surprise."

4. Page 64, Lines 14-25

14 Q So what part of the examiner report said that
15 there were fraud — that there was fraud involved?
16 A There was a section that was devoted to loans
17 to shareholders and then there was a section about
18 recovering the loans from shareholders as preferences and
19 fraudulent transfers. It's at, I believe, Line 233, if
20 you have a copy of it in front of you.
21 Q I have this one. I can pull it up. Just give
22 me a moment.
23 THE COURT: I can read Lineg if it would
24 help, Mr. Cohan.
25 MR. COHAN: It would, but I'll have it

5. Page 65, Lines 1-22
1 in two seconds.
2 THE COURT: Okay.
3 MR. COHAN: Here we go. Okay.
4 Line 233 reads, it appears that potential —
5 potential distributions for the creditors of this estate
6 may result from the avoidance of potential preferential
7 transfers and potential fraudulent transfers to insiders
8 and potential claims against professionals.
9 Where does that say that fraud existed?
10 A If you go back to the rest, in that particular
11 passage, she indicates that the loans are potentially
12 fraudulent.

39

1  to now?

2      A    I don't know what Chase -- what the Exhibit L

3  you're talking about.  We separately subpoenaed Chase

4  Bank and they produced a copy of the check.  We did not

5  receive a copy of the check from Mr. Mickler despite

6  three or four attempts.

7      Q    Okay.  That's good information.  Thank you.

8           What was the date of the subpoena?

9      A    I don't know.

10     Q    What was the date of the demand letters?

11     A    I don't have them in front of me.  I don't know

12  off the top of my head.

13     Q    Okay.  In my filings, do I state them to being

14  on the same day?

15     A    I don't know.

16     Q    Okay.  You filed an adversary complaint and you

17  also filed a Chase Bank subpoena.

18     A    Yes.

19     Q    So you made fraudulent transfer allegations

20  without reviewing all the bank records?

21     A    Yes.  We had the basis from the examiner's

22  report from our own view of the bank statements that it

23  was likely that there were fraudulent transfers.  All the

24  elements were there.  And if the 1.1 million dollars came

25  back and showed it went to either you or Mr. Hughes

41

1          Q       Did you ever independently request to review

2    the contract before you filed the adversary complaint?

3    I'm talking about the same 1.1 million dollar

4    transaction.

5          A       With Mr. Chu (phonetic)?

6          Q       Mrs. Chu, yeah.

7          A       No.

8          Q       If the contract existed and was known to

9    Debtor's counsel, or at least the Chase Bank records

10   were, why was it not properly disclosed in your filing

11   from the outset?

12         A       Because we didn't know who the check went to.

13         Q       Did you review all the Debtor's bank

14   statements before asserting your claims of fraudulent

15   transfers?

16         A       I reviewed most of them and my -- I relied on

17   my attorney to review the rest.

18         Q       Just to clarify, not all of them?

19         A       I did not dig deep into all of the bank

20   records.  I relied primarily on the Yip report.

21         Q       And did the Yip report find fraud?

22         A       Yes.

23         Q       Where in the Yip report did it find fraud?

24         A       The Yip report specifically indicated that the

25   loans to the insiders were well below market terms and

42

1    that there were -- that the Debtor had no ability to fund

2    or interest to fund preferences and fraudulent transfers

3    against the insider companies.   That's at Line 233, I

4    believe, of the Yip report.

5        Q    But she -- she found fraud?   Because I'm pretty

6    -- if she found fraud, I don't think it would have been

7    converted for gross mismanagement.

8        A    What do you --

9        Q    I mean, if --

10            THE COURT: Mr. Cohan, you need to ask a

11   question.

12            MR. COHAN: Sure.

13            THE COURT: Not just make statements.

14            MR. COHAN: Yeah, you're right.  I apologize.

15            THE COURT: That's all right.

16   BY MR. COHAN:

17       Q    Is it correct that the bank records and

18   transfers referencing this 1.1 million dollar transaction

19   was in the possession of Debtor's counsel and provided to

20   him on at least two separate occasions?

21       A    How do I know?

22       Q    I made it, I put it in the filings.

23       A    That doesn't mean I know what Mr. Mickler had

24   in his office.

25       Q    Okay.  However, the filings E and F of one of

232.  In addition, funds were transferred from Genie II to other businesses owned by Hughes and Cohan as summarized in the table below:

| (Payee)/Payor | Net Amount | |
|---|---|---|
| Zoomeral Inc | $ | (979,250) |
| Better Methods I LLC | | (100,000) |
| Genie Investments LLC / TD Bank x2998 | | (500) |
| **TOTAL** | $ | (1,079,750) |

233.  It appears that potential distributions for the creditors of this estate may result from the avoidance of potential preferential transfers and potential fraudulent transfers to insiders and potential claims against professionals.

234.  Without the appointment of an independent fiduciary, it is unlikely that the Debtor-in-Possession can independently pursue avoidance of potential preference actions and potential fraudulent transfers against insiders to maximize recoveries for the creditors of the estate.

<u>Funding From Third Parties</u>

235.  As previously stated, none of Genie NV's customers had loans funded by Genie NV's Lender Capital Partners.  Genie NV attempted to locate potential Lender Capital Partners, however none of the Lender Capital Partners came to fruition and provided funding.

236.  The Debtor entered an agreement with Velanos in which the Debtor proceeded to transfer $9,000,000 on the promise that Velanos would provide a 100% return in 30 days and profit participation up to approximately 900% in total.

58

1      A      Yes.  I've answered this 15 times today.

2      Q      Okay.  What was the basis?

3      A      That the loans were fraudulent transfers, that

4  the Debtor made to inside corporations under the terms

5  that were made.

6      Q      So it wasn't because there was a lack of

7  response?

8      A      Let me help you, Mr. Cohan.  When I got this

9  case, there were four buckets of assets that we were

10  looking at primarily from the beginning.  The first was

11  Velanos, the second was the Warren Group, the third had

12  to do with the notes and receivables that the Debtor had

13  made, and the fourth had to do with the malpractice

14  claim.  We always intended to bring the fraudulent

15  transfer action.  As soon as we read Ms. Yip's report and

16  spoke to her and saw the terms of the loans, so it wasn't

17  like this was a surprise.

18      Q      So it's your position that favorable terms is

19  fraud -- means fraudulent transfers?

20      A      Under these circumstances, yes, because they

21  weren't favorable terms.  They were terms that didn't

22  exist outside of what you and Mr. Hughes created.  There

23  are no loans like this in the commercial world.

24      Q      There's -- there's no loans with no personal

25  guarantees?

# EXHIBIT II

 Outlook

## Rough draft -- opposition to US Trustee's 2d motion

**From** Adam Walker <adam@awsecuritieslaw.com>

**Date** Fri 7/19/2024 6:09 PM

**To**   David from Genie Investments <dhughes@genieinvestments.com>; John from Genie Investments
       <jmcohan@genieinvestments.com>

📎 1 attachment (42 KB)

Opp UST's 2d Motion Appt Trustee.docx;

Attached is the current draft opposition to the US Trustee's motion. It's far from complete -- needs to
be bulked up in places and I'll add much more polish to it. This lets you see where I'm heading with it
and how I see it coming together.

Let me know if you have concerns, questions, suggestions, etc.

Adam Walker
AW Securities Law
www.awsecuritieslaw.com
(816) 226-6476

On March 5, 2024, the U.S. Trustee (UST) filed a motion seeking various forms of relief, including appointment of a Chapter 11 trustee. In that motion, the UST asserted that Genie was a fraudulent enterprise that "simply stole" money from its customers and other ostensible creditors and invested $9.0 million of "other people's money" in an "obviously suspect" transaction. *See* Doc. 20 ¶¶ 16-17. The UST based these allegations solely on the statements of 18 small-business owners. Following a hearing on the motion, the Court granted only the request to appoint an Examiner. The UST subsequently selected and appointed an Examiner. After a lengthy investigation, the Examiner issued a Report. According to the UST, the Examiner's Report[1] ("Report") fully supports the UST's earlier allegations. Nothing could be further from the truth.

Insisting that the Report corroborates its entrenched position reveals much more about the UST than about Genie. For starters, it demonstrates that the UST has failed to review the Report with a critical eye. Had it done so, it would have realized that the Report is rife with inaccuracies, unsupported conclusions, and omissions of material and pertinent evidence. Among other things, the Report inaccurately reports fundamental aspects of Genie's business. It states falsely, for example, that Genie required a borrower seeking a Business Expansion Line of Credit ("BELOC") to enter a separate Due Diligence Agreement,[2] and that, "In some instances, borrowers paid McMann [Commercial Lending] an upfront initial application fee related to a loan with Genie NV."[3]

The Report contains numerous other errors, many of them attributable to the Examiner's decision to ignore foundational documents (e.g., contracts) and other evidence that would be crucial to any reasonable analysis. As a result, the Report persistently mischaracterizes Genie's operating history, revenues, management, the terms of its relationships with borrowers and business partners, and its future

---

[1]    Doc. 146.

[2]    Report ¶ ___. In fact, Genie only required borrowers who sought bridge loans to complete the Due Diligence Agreement, which is evident upon even a cursory review of the relevant contracts.

[3]    Report ¶ ___. This never happened. Any borrower who paid fees of any kind to McMann did not have a BELOC Agreement with Genie but was presumably in a lender-borrower relationship with McMann.

prospects. This taints the entire Report and undermines the instant motion, in which the UST cherry-picks snippets that support its existing positions without bothering to determine whether those passages are supported by evidence or analysis.

The UST's insistence that the Report "confirms" key allegations from its initial motion not only shows its lack of concern for the Report's investigative and analytical rigor, but also reveals its willingness to mischaracterize and embellish the Report's contents to suit its purposes. This is most notable in connection with the UST's allegations of fraud. At the very outset of its motion, the UST brazenly claims that the Report "confirms" that a trustee "must be appointed in this case because the Debtor engaged in fraud and gross mismanagement…"[4] But nowhere in the 51-page Report is there any finding or conclusion that Genie engaged in fraud. The UST simply invented this "confirmation" and attributed it to its hand-selected Examiner.

1. *The BELOC Agreement, which both the Examiner and the UST ignore, makes clear that ICA Payments received by Genie were not required to be held in trust and therefore did not constitute "customer funds."*

Much of the Report proceeds from a false premise: that Genie was required to hold ICA Payments in trust for the borrowers who paid them. It is indisputable that the BELOC Agreement between Genie and its borrowers governs what ICA Payments are and how they are treated. The Report, however, offers no analysis of the relevant portions of the BELOC Agreement. It never acknowledges, for example, that the BELOC Agreement does not require or even suggest that ICA Payments will be held in escrow or in trust. The Report does, however, reference an email from McMann's principal, a demand letter from McMann's law firm, and an affidavit from one borrower as support for the Examiner's conclusion that ICA Payments remained "customer funds" after their receipt by Genie.[5] It should go without saying that the opinions of interested parties are insufficient, standing alone, to override the unambiguous language of

---

a written contract. As already noted, however, the Report simply ignores the actual contract language. Worse yet, the Report attempts to support its flawed premise by inventing and repeating improper terminology – i.e., "ICA reserves" and "ICA deposits"[6] – despite the fact that those terms do not appear anywhere in the BELOC Agreement in connection with ICA Payments.

This shoddy methodology results in a fatally flawed Report. Because Genie was never required to hold ICA Payments in trust for customers, those payments constituted revenue realized by Genie. The possibility that ICA Payments could later become refundable does not change that. In this way, Genie is no different from a retail store or service provider that promises refunds to unsatisfied purchasers. Nordstrom and Wal-Mart do not have to set aside money received from customers until all opportunity for a refund has passed and neither did Genie. Thus, the funds Genie received in the form of ICA Payments were its own funds, not "customer funds," as the Examiner asserts.

The UST displays a similar lack of interest in engaging with the relevant source material. Its motion contains this bewildering passage:

> The Examiner *found* that the purpose of the ICA funds was to pre-pay interest amounts on customer loans. The Examiner also *found* that the Debtor provided contradictory statements regarding whether ICA funds were supposed to held in trust for customers or could be utilized in the ordinary course of the Debtor's business.[7]

The "purpose" of ICA Payments[8] is not, however, a question of fact for the Examiner to "find," but a matter of contract interpretation. Statements by any person, whether a party to the BELOC Agreement or not, cannot change its intrinsic meaning.[9]

---

[6]    *E.g.*, Report ¶¶ 25, 29, 39, 77, 79, 80.

[7]    Second Mot., at 5-6 (¶ 11) (emphases added).

[8]    The term "ICA funds" is a misnomer – that phrase never appears in the BELOC Agreement – and presumably refers to "ICA Payments."

[9]    Further, the UST mischaracterizes both the Report and the testimony cited therein when it refers to Genie's statements as "contradictory."

Neither the Report nor the instant motion even feints at contract interpretation and, as such, neither offers any basis for a determination that Genie had an obligation to hold ICA Payments in trust as customer funds. That alone is grounds to deny the instant motion. Nonetheless, a brief discussion of the relevant contract provisions dispels the faulty premise that ICA Payments were to be held in trust and that they therefore constituted "customer funds."

Regarding the ICA Payments, the BELOC Agreements only require the Lender to create an Interest Credit Account "on the books and records of the Lender," note "a credit equal to the ICA Payment" in the Interest Credit Account, use the Interest Credit Account to satisfy interest payments as they become due, and refund ICA Payments if and when specified preconditions are satisfied.[10] The BELOC Agreement does not restrict how the Lender may use ICA Payment funds between their receipt and a potential termination by the Borrower. As such, the Lender has no obligation to hold those funds in trust.

Further, the BELOC Agreements openly anticipate the Lender using the ICA Payment, rather than holding it in trust. Section 13.7(a) sets forth when and under what conditions a Borrower may be due an ICA Payment refund. It states that the Lender has up to 40 days to return the ICA Payment after the Borrower properly terminates the BELOC Agreement and requests a refund of the ICA Payment. Section 13.7(c), however, states that this 40-day period is "tolled during the pendency of a Force Majeure event" and defines as one such event the "failure of the Lender's wholesale lender from performing [sic] under the terms of the agreement between the Lender and the wholesale lender." This tolling provision protects the Lender in the event of illiquidity caused by certain occurrences beyond its control, including the failure of a wholesale lender to perform its contractual obligations. If the BELOC Agreement required the Lender to hold ICA Payments in trust, then there would be no need to protect the Lender against a wholesale lender's failure to perform. But the BELOC Agreements clearly anticipated a situation where

---

[10]     BELOC Agmt. §§ 1.1, 3.5 13.7.

the Lender's ability to refund ICA Payments depends on a wholesale lender performing its contractual obligations to the Lender. Otherwise, the tolling provision in section 13.7(c) would be superfluous.

Courts applying Illinois law "look to the contract as a whole" and "attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous." *Land of Lincoln Goodwill Indus. v. PNC Fin. Servs. Group*, 762 F.3d 673, 679 (7th Cir. 2014) (citations omitted). The interpretation the UST urges on the Court – that the BELOC Agreements require the Lender to hold the ICA Payments in trust and untouched – not only has no affirmative basis in the contracts' language but also ignores the provisions of Section 13.7(c) discussed above.

[add conclusion]

> ## 2. *The Report excludes evidence that Genie had a good-faith belief, based in part on guidance and advice from a reputable law firm, that the Velanos transaction was a sound investment.*

In October 2022, Genie received an offer to enter into a joint venture with Velanos Principal Capital (Velanos). The proposal called for Genie to provide $3.0 million in capital that Velanos, the joint venture's manager, would use to purchase and sell standby letters of credit (SBLCs) at a substantial profit. Before deciding whether to accept the offer, Genie engaged Scott Oh, a lawyer with Warren Law Group (WLG), to perform due diligence on the proposed deal, advise Genie on risks associated with it, and, if necessary, review and revise the joint-venture agreement. According to his firm's website, Oh was an experienced attorney who "often advise[d] and facilitate[d] his clients in identifying, analyzing, and structuring...private placement opportunities, joint ventures, and other private capital transactions, conventional/unconventional asset-based credit facilities, credit enhancements, and corporate debt transactions." Oh advised Genie that SBLC trading was legitimate and that he was familiar with at least one person for whom Velanos and/or its CEO syndicated. Oh notably did not warn Genie either that the promised returns were too good to be true or that SBLC trading was a frequent vehicle for financial fraud.

Oh represented Genie from October 2022 to July 2023. During that time, he regularly consulted with Genie about the joint venture, reviewed multiple amendments to the Joint Venture Agreement, and communicated frequently with Velanos on Genie's behalf. At no time did Oh express to Genie any

concern that the joint venture was fraudulent. In late 2022, when Genie twice increased its capital contribution to the joint venture to a total of $9.0 million, Oh did not advise Genie against doing so. And when Velanos failed to make the payments required under the Joint Venture Agreement, Oh never told Genie that Velanos' various excuses were of questionable validity.

Although the Report states that the Examiner reviewed WLG's bank records, it does not appear that the Examiner interviewed Oh or WLG regarding the substance of Oh's work for Genie. The Report castigates Genie for entering into the joint venture with Velanos. "Neither Velanos nor Wearmouth were registered investment advisors and the returns promised by Velanos pursuant to the Velanos JVA were 100% in 30 days and profit participation that would have resulted in a 900% return, which should have raised a red flag."[11] The Report gives no consideration to the fact that Genie sought out and hired a professional to apprise it of risks and concerns raised by the joint venture. Oh claimed to have a history of helping clients "joint ventures," "conventional/unconventional asset-based credit facilities," and other transactions, which suggests he was an appropriate choice for the job. The Report nonetheless concludes that Genie's decision to enter the joint venture constitutes "gross mismanagement." In doing so, it discounts the effect on Genie of obtaining what it believed to be competent legal guidance from a partner with a reputable law firm.

The UST not only seizes on this conclusion, but expands on it, stating that "Debtor engaged in gross mismanagement, *at a minimum*, in its dealings with Velanos..."[12]

---

[11]    Report ¶ 83.

[12]    Second Mot., at 2.

### 3. *The UST cannot meet its burden of demonstrating that Genie's loans to affiliated entities constituted either fraud or gross mismanagement.*

The UST's motion brands loans from Genie to six affiliated entities as "fraudulent transfers and not true loans."[13] The UST alleges, almost in passing, direct evidence of fraudulent intent in the transfers from Genie to its affiliate, Better Methods. This allegation falls well short of the movant's burden of proof ad, moreover, misstates the Report's findings. According to the UST, "The direct evidence is the express purpose of the transfers to Better Methods as asset protection from the Debtor's creditors."[14] As support for this allegation, the UST cites paragraph 188 of the Examiner's Report, which states, in its entirety, "According to [John Michael] Cohan, Better Methods is an asset management company set up to protect the Debtor's assets and the assets of the Debtor's clients." The "express purpose" alleged by the UST as direct evidence of fraud is itself a fraud, fabricated by the UST and unsupported by any evidence in the Report or elsewhere in the record of this case.

The UST also asks the Court to find circumstantial evidence of fraudulent intent. The UST recites the "badges of fraud" often employed by Federal Courts of Appeals in determining, for purposes of 11 U.S.C. § 548, whether a debtor "intended to hinder, delay, or defraud" creditors. The UST's motion only addresses some of those factors, however, and does so in an extremely cursory fashion. It states, for example:

- The transfers at issue occurred "while the Debtor was being sued or was under threat of suit for failing to fund loans."[15]

- Genie received "less than the equivalent value based on the non-market nature of the loans."[16]

- The funds were transferred "in a concealed manner attempting to disguise the fraudulent transfers as loans."[17]

---

[13]    Second Mot. ¶ 16.

[14]    Second Mot. ¶ 17.

[15]    Second Mot. ¶ 19.

[16]    Second Mot. ¶ 19.

[17]    Second Mot. ¶ 19.

**AI Conclusion from the Draft Opposition to the U.S. Trustee's Second Motion**

Exhibit II, a draft legal memorandum, systematically deconstructs the U.S. Trustee's (UST) motion to appoint a Chapter 11 trustee by exposing the profound and fatal flaws in the Examiner's Report upon which the motion relies. The conclusion drawn from this detailed analysis is that the UST's motion is built upon a foundation of sand; it is an exercise in cherry-picking from a report that is itself unreliable, inaccurate, and the product of a shoddy investigative methodology. The UST has not only failed to meet its burden of proof but has actively mischaracterized the Report's contents to manufacture a false narrative of fraud and gross mismanagement.

The key conclusions specific to Exhibit II are:

1. The Examiner's Report is Fundamentally Unreliable: The draft opposition establishes that the Report cannot serve as a valid basis for any judicial action. It is "rife with inaccuracies, unsupported conclusions, and omissions of material and pertinent evidence." Specific examples include false statements about Genie's business requirements and the source of certain fees. The Report's methodology is condemned for ignoring "foundational documents (e.g., contracts)" in favor of statements from "interested parties," resulting in a persistent mischaracterization of Genie's operations.

2. The UST Engaged in Intellectual Dishonesty and Embellishment: The UST is accused of abdicating its duty to review the Report with a critical eye. Instead, it "cherry-picks snippets" that support its pre-existing position. Most egregiously, the UST is shown to have "simply invented" a critical finding, brazenly claiming the Report "confirms" that Genie "engaged in fraud," when no such finding exists anywhere in the 51-page document. This represents a serious misrepresentation to the court.

3. The Central Premise Regarding "Customer Funds" is Legally and Factually Wrong: A core allegation—that Genie misused customer funds held in trust—is dismantled through a rigorous contract law analysis. The opposition demonstrates that the BELOC Agreement, the governing document, does not require ICA Payments to be held in trust. It explicitly outlines a contractual credit system and includes provisions (like a 40-day refund period tolled for illiquidity) that are logically incompatible with a trust relationship. The Report's and UST's failure to engage with the actual contract language renders their entire premise "fatally flawed."

4. The Allegation of "Gross Mismanagement" is Unfair and Incomplete: The opposition counters the claim of gross mismanagement in the Velanos transaction by introducing a crucial mitigating factor: Genie's good-faith reliance on advice from a seemingly qualified attorney, Scott Oh of Warren Law Group. The Report is criticized for giving "no consideration" to this fact, which fundamentally changes the character of the decision from reckless to informed, even if the investment ultimately failed. Omitting this context is presented as a critical failure of the investigation.

5. The UST's "Fraudulent Transfer" Argument is Legally Insufficient: The motion highlights the UST's cursory and unconvincing attempt to establish fraudulent intent behind loans to affiliates. It points out that the UST's alleged "direct evidence" is a fabrication, misstating the Report's actual content. Further, its analysis of "badges of fraud" is "extremely cursory" and fails to properly address the required factors, falling well short of the necessary burden of proof.

In summary, Exhibit II concludes that the UST's motion is not based on a dispassionate review of the evidence but is a result-driven effort that overlooks the Examiner's Report's extensive deficiencies and, in some instances, actively misrepresents its findings. The motion to convert should be denied because its foundational document is unreliable, its legal arguments are superficial and legally unsound, and it ignores key facts that undermine its allegations of misconduct.

# EXHIBIT III

**Then their narrative switched once more after Adam Walker's internal report was unveiled by email:**

From: raye.elliott@akerman.com
Date: Wed, Jul 23, 2025 at 9:57 AM
Subject: RE: Request for Confidentiality, Update on Chapter 11, and Concerns Regarding Examiner Report and Adversary Proceedings

To: davidchoatehughes@gmail.com

Mr. Hughes,

I forwarded your email and documents to the Trustee and discussed it with him. The Trustee did not rely entirely on the Chapter 11 Examiner's report that you claim is false to make the decision to file the adversary proceeding against Zoomeral and the other companies. The Trustee relied upon the loan documents between the Debtor and Zoomeral and the other companies that do not contain commercially reasonable terms, as well as my review of the Debtor's bank records to confirm the transfers made to the companies. If the companies believe that the transfers were not fraudulent transfers and the loans were legitimate, it was the companies' responsibility to retain an attorney to defend them in the adversary proceeding, as Judge Burgess ordered, and present evidence to the court regarding the loans. The companies did not do that and a default judgment has been entered. The Trustee will not agree to vacate that default judgment. If the companies wish to retain an attorney at this point to file something with the court to try to vacate the default judgment, they are free to do that. Thank you.

**Raye Elliott**
Tampa: Akerman LLP | 401 East Jackson Street, Suite 1700 | Tampa, FL 33602
D: 813 209 5013 | T: 813 223 7333| F: 813 223 2837
Jacksonville: Akerman LLP | 50 North Laura Street, Suite 3100 | Jacksonville, FL 32202
T: 904 798 3700 | F: 904 798 3730

*It is now very clear why the Chapter 7 Trustee repeatedly mentioned his procedural default when asked about the fraudulent transfers, rather than answering with substance. Favorable terms alone do not constitute fraud. The Trustee's avoidance of the issue highlights his inability to meet the statutory elements of 11 U.S.C. § 548(a)(1)(B), which requires a showing that the debtor received less than reasonably equivalent value. A commercially favorable agreement is, by its nature, one for which value is given. As the Fourth Circuit held in In re Jeffrey Bigelow Design Group, Inc., the test is not whether the transaction was optimal, but whether the value received fell within the range of reasonableness. The Trustee's focus on procedure over substance is a tacit admission that he cannot prove the essential element of a fraudulent transfer claim.*

 Outlook

**Fwd: Request for Confidentiality, Update on Chapter 11, and Concerns Regarding Examiner Report and Adversary Proceedings**

**From** David Choate <davidchoatehughes@gmail.com>

**Date** Wed 7/23/2025 12:42 PM

**To**    Debitus Processus <iustusprocessus@outlook.com>

Thank you and Respectfully,

David C. Hughes II
2812 Pat Tillman Drive
Springfield, Illinois 62711
217.416.5059

---------- Forwarded message ---------
From: <raye.elliott@akerman.com>
Date: Wed, Jul 23, 2025 at 9:57 AM
Subject: RE: Request for Confidentiality, Update on Chapter 11, and Concerns Regarding Examiner Report and Adversary Proceedings
To: <davidchoatehughes@gmail.com>

Mr. Hughes,

I forwarded your email and documents to the Trustee and discussed it with him. The Trustee did not rely entirely on the Chapter 11 Examiner's report that you claim is false to make the decision to file the adversary proceeding against Zoomeral and the other companies. The Trustee relied upon the loan documents between the Debtor and Zoomeral and the other companies that do not contain commercially reasonable terms, as well as my review of the Debtor's bank records to confirm the transfers made to the companies. If the companies believe that the transfers were not fraudulent transfers and the loans were legitimate, it was the companies' responsibility to retain an attorney to defend them in the adversary proceeding, as Judge Burgess ordered, and present evidence to the court regarding the loans. The companies did not do that and a default judgment has been entered. The Trustee will not agree to vacate that default judgment. If the companies wish to retain an attorney at this point to file something with the court to try to vacate the default judgment, they are free to do that. Thank you.

**Raye Elliott**

Tampa: Akerman LLP | 401 East Jackson Street, Suite 1700 | Tampa, FL 33602

D: 813 209 5013 | T: 813 223 7333| F: 813 223 2837

Jacksonville: Akerman LLP | 50 North Laura Street, Suite 3100 | Jacksonville, FL 32202
T: 904 798 3700 | F: 904 798 3730

raye.elliott@akerman.com

vCard | Profile



700+ Lawyers
25 Offices
akerman.com

CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** David Choate <davidchoatehughes@gmail.com>
**Sent:** Tuesday, July 22, 2025 3:21 PM
**To:** Elliott, Raye (Ptnr-Tpa) <raye.elliott@akerman.com>
**Subject:** Fwd: Request for Confidentiality, Update on Chapter 11, and Concerns Regarding Examiner Report and Adversary Proceedings

**[External to Akerman]**
Ms. Elliott,

The narrative I promised you. After careful review, please let me know if Mr. Cohen will stipulate to vacate the adversary and default. His position and reliance upon the examiner's report can't be ethically supported any longer after you review these materials. The report and the conversion was Fraud on the court and there is no doubt.

I hope this message finds you well, and thanks for the earlier phone call.  I'm writing to provide a formal update and respectfully request discretion regarding my recent personal filing.

I have filed a Chapter 11 personal reorganization case in the Central District of Illinois. The purpose of this filing is primarily to uncloud title to properties lawfully acquired through UCC foreclosure from MIMS-IPR, LLC (Mitchel Mims), and to allow for orderly resolution of pending issues. In connection with that, I respectfully request that the case number and details not be circulated or referenced in the Florida case or to any adversary parties, especially those affiliated with McMann Commercial Lending. As you well know, we have never communicated with those McMann Commercial Lending borrowers, and yet many have launched defamatory and baseless attacks. Exposure of my personal filing would open the door to further slander, libel, and potentially meritless creditor activity, undermining the entire purpose of the reorganization.

I also want to update you on the ongoing issues related to Mr. Mim's continued fraudulent conduct, including documentation now provided to the FBI showing he fraudulently removed our lien, triggering the contested ownership dispute. Mim's had a third party remove our 1st position with a UCC 3 without our knowledge. That company admitted and corrected their mistake. We've since reasserted the lien with a **UCC-5** (attached), and this evidence supports the legitimacy of our foreclosure on Mims' and proves the fraudulent attempt for Mims' to claim

creditor status within this proceeding. Mims will have many lenders to answer to as he fraudulently filed false applications before stacking 4 other debt providers in his company without our knowledge or consent. A civil suit is now pending against Mr. Mims in Illinois, and a second one where I am quieting title with my personal restructuring. Further documentation has been provided to federal authorities, including Judge Jason Calhoun (Probate Judge), with whom Mims had the ex-parte meeting. Judge Calhoun also happens to own the Allstate Insurance company across the street from the courthouse. We will soon find out through interrogatories and testimony if Calhoun provided insurance to Mims' old properties before making a decision to not recuse himself from litigation.

In addition, I am bringing, this week, a wrongful conversion based on fraud-on-the-court. I will be respectfully requesting leave to bring causes against both Bomkamp & Maria Yip for their fraud allowed by way of the conversion of the Genie case (it's still within the allowed year after conversion). The facts are now undeniable:

- We came to this court as whistleblowers, not as perpetrators.

- We testified that we filed the 11 to stop defensive spending and to finalize our settlement with Velanos.

- We executed on these management goals efficiently and flawlessly.

- We told the honorable judge exactly why we entered into his court and what we were going to do to take care of "all of our creditors" in full including non-refundables to the best of our ability.

- We defeated every baseless and fraudulent claim raised by Bomkamp, the U.S. Trustee, and others during the trial. We successfully walked out of that courtroom without heads held high because Burgess granted us with the coveted status of Debtor in Possession.
- The only development between our success in retaining DIP status and the conversion was Maria Yip's intentionally fraudulent examiner report, a report that is factually flawed, legally misleading, certainly rife with intentionally manufactured falsehoods, that are provably false.

The examiner's report falsely states that I, David Hughes, told Ms. Yip that customer funds were sent to Velanos. This is demonstrably untrue. In fact, an email exchange between myself, John Cohan, and Bryan Mickler, submitted to Mr. Mickler one week before Ms. Yip issued her report, makes clear that we consistently and unequivocally stated that all funds sent to Velanos were our own. Maria Yip and Hal Levenberg repeatedly asked whether those funds were client funds, and our answers never changed: they were not. Despite that, Ms. Yip deliberately and fraudulently inserted a fabricated and damaging misstatement into her report.

Mr. Mickler later told us that a "Madoff-style Ponzi scheme" theory could be built around that "one planted comment", a comment Maria invented and which Trustee Cohen has similarly referenced in writing in his public filings. There is no reasonable person/basis for any neutral person could possibly conclude that either I or Mr. Cohan made such a statement. The fabricated assertion appears nowhere in our correspondence or records, and it contradicts the contemporaneous email chain with counsel.

Similarly, the examiner's claim that we sent $6 million in late payments to Velanos after default obligations arose is also false. Every dollar sent to Velanos was wired prior to December 5th, before any payments were due under the agreement. These transactions are fully documented and traceable. Nonetheless, Mr. Mickler failed to raise this point at the critical moment. During a sidebar at the conversion hearing, I personally presented these facts to Mr. Mickler, expecting he would correct the record. Instead, he returned to the courtroom and simply told Judge Burgess that I had shared information "that could be fact-checked later." No correction was made, no exhibit was submitted, and no effort (reconsideration, nor appeal) was taken to prevent the record from being tainted by materially false and prejudicial assertions. Rather than standing up against fraud, Mr. Mickler allowed this fraud by Maria and Hal to stand on the record and remain as the basis for conversion immediately before the judge made the conversion at trial.

The default judgments in the adversary cases were grounded in that flawed report, and Trustee Cohen testified repeatedly that he relied on her report. That reliance now carries legal implications. I am respectfully requesting that Mr. Cohen review the materials I am providing and stipulate to vacate those defaults. The companies involved are dissolved. The adversary complaints should never have been brought.

The Court was explicitly misled and the continued reliance on a demonstrably false examiner report cannot stand to harm me personally and continue flawed arguments. In the forthcoming motion I plan to file later this week or early next week, I will respectfully seek leave to pursue claims for fraud on the court against Ms. Yip and Mr. Bomkamp, based on their coordinated use of false statements and misrepresentations. I am not including Mr. Cohen at this time, as I am allowing him to review the evidence I am sure he has not seen and stipulate to vacate the adversary defaults entered against the dissolved companies, defaults that were based on a report which found no fraud and made no legal determination of fraudulent transfers. If that record is not corrected, and if the reputational harm continues, then the resulting consequences will lie with Mr. Cohen's refusal to act. This action by him will clear the decks for Mr. Cohan and myself to remove fraudulent clouds that are presently causing harm.

This is not a threat. It is a final attempt to clear the air, restore credibility, and protect what remains of the estate's value, something I still believe is possible. But there must be a willingness to confront the truth, admit error, and correct the record. Given the evidence now presented to you and Mr. Cohen, there is a clear duty to correct the record. If the trustee continues to rely on the examiner's materially false and misleading report, despite having received documentation disproving its key assertions, it would raise serious concerns under Fed. R. Bankr. P. 9011(b), fiduciary duties owed to the estate as a whole, and the duty of candor to the Court. At this stage, the proper course is to stipulate to vacate the adversary defaults against the dissolved companies and withdraw any further reliance on tainted claims. This would also need to include any further personal pursuit against myself or Mr. John Cohan personally. If Mr. Cohen is unable or unwilling to do so very quickly, I will have no choice but to request leave of court, under Barton doctrine, to pursue appropriate relief, including an action for fraud on the court naming him and others he is working with. I remain hopeful that resolution can be reached voluntarily, now that the factual record has been clarified.

The most tragic aspect of this entire proceeding is that we came forward as whistleblowers. We entered this court in good faith for the purpose of restructuring and protecting client interests, which we did, successfully negotiating a $20 million settlement after years of dedicated work. In matters of this magnitude, the public must be able to trust the integrity of government officials, especially DOJ-appointed trustees, and licensed professionals such as attorneys, CPAs, and examiners. These individuals are expected to uphold the highest ethical standards and are supposed to be held to those higher standards. Yet what the attached evidence certainly proves, concretely and irrefutably, is that those very professionals engaged in and enabled conduct so riddled with falsehoods, omissions, and deliberate misrepresentations that the real harm stemmed not from the debtor, but from those entrusted to oversee it. They coordinated to bring falsehoods to the Honorable Judge Burgess.

There is no perfect system, but the average person must be able to place faith in the court, the process, and, most critically, in those professionals licensed to uphold it. That faith was shattered here. The conduct of our former counsel, Mr. Bryan Mickler, mirrors that of the Warren Law Group in both outcome and principle, constituting professional malpractice and a profound betrayal of duty.

No competent or ethical attorney would allow a knowingly false statement, that client funds were sent to Velanos, to be adopted in an official examiner's report without immediate and forceful correction. Mr. Mickler had the opportunity to correct this falsehood prior to and after Chapter 11 conversion. He chose not to. That failure enabled a knowingly false narrative, crafted by Aaron Cohen and now echoed under oath, that we misused client funds. No reasonable person, juror, or legal observer would characterize that as oversight. It was a calculated omission. It caused real harm. And it must be corrected.

The examiner's report authored by Maria Yip is deeply flawed and demonstrably fraudulent. The second motion to convert, filed by U.S. Trustee Scott Bomkamp, relied heavily on that report, despite it being riddled with falsehoods and omissions. Worse, Mr. Bomkamp knew it was defective, yet proceeded with a second round of arguments built entirely upon a foundation he had every reason to know was false. That is not just misconduct, it is fraud on the court.

What is perhaps most disturbing is that our own attorney, Mr. Mickler, refused to present the strongest, clearest argument available to us: that the government's motion relied upon demonstrably fraudulent evidence. He disregarded detailed legal analysis provided by a 12-year veteran securities attorney FINRA Investigator, Mr. Adam Walker, someone I respect greatly, who laid out the legal defects and factual misstatements in the examiner's

report in black and white. Mr. Mickler had in hand every tool necessary to defend us, and he declined to use them. Over and over again, Mr. Cohan and I asked him to call out the fraud. He refused.

Worse still, when we presented Mr. Mickler with further evidence, requesting a motion for reconsideration or appeal, he again declined. He told us, verbatim, "Don't worry, guys. Chapter 7 trustees are inherently lazy. If you try to bring reconsideration yourself, I've seen it before. The court will discredit you and might sanction you, and I don't want to see that happen to you guys." He also stated that he didn't believe it would be "ethical" to call out the UST for fraud. These statements capture everything wrong with this situation. Instead of advocating zealously for his clients, Mr. Mickler warned us into silence. He went into court during the conversion hearing pitching softballs, then laid down without correcting egregious, misleading testimony by Yip herself, and then advised us, days later, to do the same.

This cannot stand. To be clear, this is not an attack on the Court itself. I remain wholeheartedly respectful of the Court's honor and complete authority. But when licensed trustees, attorneys, CPAs, and court-appointed examiners abuse the trust vested in them, allowing falsehoods, omissions, and manipulated narratives to drive outcomes, particularly in a case where reputations, livelihoods, and millions of dollars are at stake, the entire system begins to break down.

The harm does not fall on the whistleblowers alone. It falls on the very clients we worked tirelessly to protect. Had we remained in DIP status, those clients would already have checks in hand. Despite having no legal obligation to do so, we were preparing to include even non-refundable clients in distributions, because we believed it was the right thing to do under the circumstances.

We had already recovered funds through our negotiated settlement with Velanos, independent of any trustee effort, and were poised to recover additional funds through a JAMS malpractice proceeding against Warren Law Group. That litigation was ready for prosecution by Nicholas Sprigner, Esq., at $200/hour plus 20% contingent upon recovery.  We had the path, we had the facts, and we had the momentum.

Now let us see what the Ch. 7 Trustee will recover after his 25% statutory carve-out, the hourly professional fees he will inevitably incur, and whether non-refundable clients will be treated with any of the same equity and consideration we had planned. Unlike the Trustee, our services under DIP were pledged as free of charge. That is what client-centered stewardship looks like.

Time will tell whether the Trustee's approach yields a better result for the estate. But there can be no dispute that our intentions and our conduct, as fiduciaries and as whistleblowers, were rooted in protecting those harmed, not in preserving professional reputations or hiding behind flawed reports.

Finally, I appreciate (Ms. Elliot), the efforts you made in the past to de-escalate specific issues, including your intervention with Mr. Stringer. I hope we can maintain that constructive tone here and bring closure to these matters in a way that honors the truth and prevents further harm.



**Rough draft -- opposition to US Trustee's 2d motion**

**AW**  Adam Walker<adam@awsecuritieslaw.com>

To: David from Genie Investments;  John from Genie Investments          Fri 7/19/2024 5:09 PM

You replied on Tue 7/23/2024 2:37 PM

Opp UST's 2d Motion Appt Tru...
42 KB

Attached is the current draft opposition to the US Trustee's motion. It's far from complete -- needs to be bulked up in places and I'll add much more polish to it. This lets you see where I'm heading with it and how I see it coming together.

Let me know if you have concerns, questions, suggestions, etc.

Adam Walker
AW Securities Law
www.awsecuritieslaw.com
(816) 226-6476

← Reply     ← Reply all     → Forward

Thank you and Respectfully,

David C. Hughes II

2812 Pat Tillman Drive

Springfield, Illinois 62711

217.416.5059

# EXHIBIT IV

## CHAPTER 7 TRUSTEE CONTRADICTIONS — SIDE-BY-SIDE

1. Attorney Experience
   A: "The attorney they hired had no experience."  |  B: "The attorney they hired did not have enough experience."
   → Demonstrates: *Inconsistency, Misrepresentation, Credibility Issue*

2. RICO Allegation
   A: Invoked "RICO" in early filings.  |  B: Testified under oath: "I do not remember ever saying RICO."
   → Demonstrates: *Denial, Bad Faith, Narrative Shifting*

3. Social Media Presence
   A: Claimed "I do not have social media."  |  B: Official Facebook account exists identifying him as a Trustee.
   → Demonstrates: *Misleading, Lack of Transparency, Misrepresentation*

4. Reliance on Examiner Report
   A: "I relied primarily on the Yip report."  |  B: "The Trustee did not entirely rely on the Chapter 11 Examiner's report..."
   → Demonstrates: *Contradiction, Evidence Manipulation, Bad Faith*

5. Sequence of Evidence ($1.1M Chase Transfer→ Examiner → Loan Docs)
   A: Allegation $1.1M made before examiner report explanation existed.  |  B: Later claimed examiner Report, then changed the basis again to loan documents.
   → Demonstrates: *Retroactive Justification, Inconsistency, Misrepresentation*

6. Written and Verbal Statement Excuses
   A: "The writing was unfortunate."  |  B: "Coincidence in timing"
   → Demonstrates: *Rationalization, Avoidance, Credibility Issue*

7. Response / Communication Claim
   A: "We never received a response," so adversary filed.  |  B: Later admitted in the same filing receiving a response and a 27-page response letter under oath.
   → Demonstrates: *Contradiction, Retaliation, Bad Faith*

Summary: *All in the record and on the record, the Chapter 7 Trustee, a court-appointed official, appears to have acted in bad faith and lacks credibility. The evidence suggests a pattern of making false or misleading statements under oath, shifting their story to fit the circumstances, and possibly manipulating the timeline of events to justify aggressive legal actions. Essentially, their words and actions are frequently in direct contradiction, making them seem untrustworthy.*

# EXHIBIT V

**Sep 6, 2025**



REPLACE PREDATORY TERMS WITH 0% INTEREST, NO TAX RETURNS, NO PROOF OF REV, NO COLLATERAL

bluewaterlending.co
We Get You $50k-150k at 0% Interest in 30 Days

Learn more

Interest for 12 months or more.... See more



WE FUND THE LOANS THAT OTHER LENDERS WON'T
WE MAKE CRAZY LOANS!
Investment Property Loans with No FICO Restrictions and No Restricted States
Bankruptcy Bailouts and Rural or Single-Purpose OK

Direct Private Money Financing for Real Estate Investors
Simple, Fast Process - No Tax Returns & No Income Documentation

Get Funded Fast! >

FORM ON FACEBOOK
Customized Loan Solutions for You

Learn more

314        123 comments



CHASE

BREAKING NEWS

Dozens of U.S. Banks Reopen Access to $300k of 0% APR Business Funding Without Proof of Income



BANKS HAVE REOPENED PROGRAM FOR BUSINESS OWNERS TO ACCESS $50K-$150K OF 0% APR BUSINESS FUNDING WITHOUT PROOF OF INCOME

WELLS FARGO

fundingaccelerator.com
Receive Up To $150k with 0% Interest

Learn more

Get the best business financing in one pl... See more

YARROW FINANCIAL

BUSINESS LINES OF CREDIT
UP TO $2,000,000
STARTING AT 3.99%
OVER 1-10 YEAR TERMS

DSCR Loans Done Right

No Pay Stubs, W2s, or Tax Returns Needed

We Fund Fast — You Scale Faster
Loans from $100k to $5M+

Apply Now – Close in 2 Weeks



CEREBRO CAPITAL
Business Financing Breakthrough!

Business Loans



BUSINESS OWNERS WITH 700+ SCORE

Get Access To:
$200K+
IN 0% BUSINESS FUNDING
• No Docs Needed
• Start Ups Welcome
Funding As Fast As 14 Days

# EXHIBIT VI

8:44



# CM ECF

Query   Reports ▾   Utilities ▾   Help   Log Out

Claim #28 filed by Bild Credit LLC, Amount claimed: $75000.00 (Auto-Claim Filer)

*Description:*

*Remarks:*

Creditor: (30864173)
Autonomous Drone Solutions DBA Calaway Solutions L
2121 Brittmoore 2200
Houston, TX 77043

Amount claimed: $2500000.00

**Claim No: 29**
*Original Filed Date:* 04/25/2024
*Original Entered Date:* 04/25/2024

*Status:*
*Filed by:* CR
*Entered by:* Auto-Claim Filer
*Modified:*

*History:*

Details   29-1   04/25/2024   Claim #29 filed by Autonomous Drone Solutions DBA Calaway Solutions L, Amount claimed: $2500000.00 (Auto-Claim Filer)

*Description:*

*Remarks:* (29-1) Account Number (last 4 digits):0496



CM/ECF    Query    Reports ▾    Utilities ▾    Help    Log Out




8:34

*Remarks:*

Creditor:    (30864175)
Belle Maison Realty, LLC
Attn: Lea Muse
1133 E 83rd Street 171
Chicago, IL 60619

Amount claimed: $3000000.00
Priority claimed: $2000000.00

**Claim No: 4**
*Original Filed Date:* 04/14/2024
*Original Entered Date:* 04/14/2024
*Last Amendment Filed:* 06/06/2024
*Last Amendment Entered:* 06/06/2024

*Status:*
*Filed by:* CR
*Entered by:* Auto-Claim Filer
*Modified:* 06/06/2024

*History:*

| Details | 4-1 | 04/14/2024 | Claim #4 filed by Belle Maison Realty, LLC; Amount claimed: $70000.00 (Auto-Claim Filer) |
| Details | 4-2 | 06/06/2024 | Amended Claim #4 filed by Belle Maison Realty, LLC, Amount claimed: $3000000.00 (Auto-Claim Filer) |

*Description:*

*Remarks:*

Creditor:    (30881178)
Charles Blake Stringer/Nutra-AcresLLC
149 South Shore Drive
Amarillo, TX 79118

Amount claimed: $142477750.00

**Claim No: 5**
*Original Filed Date:* 04/14/2024
*Original Entered Date:* 04/14/2024
*Last Amendment Filed:* 07/15/2024
*Last Amendment Entered:* 07/15/2024

*Status:*
*Filed by:* CR
*Entered by:* Auto-Claim Filer
*Modified:*

*History:*

| Details | 5-1 | 04/14/2024 | Claim #5 filed by Charles Blake Stringer/Nutra-AcresLLC, Amount claimed: $400000.00 (Auto-Claim Filer) |
| Details | 5-2 | 06/06/2024 | Amended Claim #5 filed by Charles Blake Stringer/Nutra-AcresLLC, Amount claimed: $142477750.00 (Tonya) |
| Details | 5-3 | 07/15/2024 | Amended Claim #5 filed by Charles Blake Stringer/Nutra-AcresLLC, Amount claimed: $142477750.00 (Cathy) |

*Description:* (5-3) To Add Supplemental Documents to the Contract

*Remarks:*

**Legend (colored summary boxes, right margin):**

| Label | Amount |
|---|---|
| SCA Total | $ 9,727,644 |
| DD Total | $ 4,077,225 |
| Bridge Total | $ 5,927,509 |
| Total Refundable | $ 9,727,644 |
| Total Not | $ 7,004,855 |
| Refund + Cash — Refund + Cash in | $ 4,421,250 |
| Refund + Cash — Cash in | $ 16,722,499 |
| McMann/CA | $ 4,654,000 |
| McMann/CA (total) | $ 14,140,894 |
| McMann DD | $ 427,320.3 |
| McMann Bridge | $ 1,298,355 |
| McMann Bridge (total) | $ 6,117,755.9 |

**Key:**
- G = Gene BELOC
- M = McMann BELOC
- DD = Gene DD
- GCB = No McMann BELOC, Gene DD Bridge
- GCBN = Gene DD Bridge Not Received
- M DDB = McMann BELOC, Gene DD Bridge

**Main table (best-effort reading):**

| User ID | ICR (installment) | DO (install) | Bridge (install) | Promoter | Business Name | Management | Address | City, State, Zip |
|---|---|---|---|---|---|---|---|---|
| 2932 | $ 100,000 | | | 2542 | Authorvault Online Solutions DBA Causeway Solutions LLC | Michele Zeiber Taylor | 2451 Alexandra unit 2200 | Houston, Texas 77002 |
| | $ 180,000 | | | 3097 | Zipper Partners Inc | | 400 Poydras Suite 1460 | New Orleans, Louisiana 70130 |
| 2996 | $ 48,000 | | | 607 M N | Ajer LLC | Rustyn Smith | 10701 S 60S West | Farmington, UT 84025 |
| 2530 | $ 500,000 | | | 607 G | The Generations Group | Don Strickland | 1000 Top Hill Dr. | Branson, Texas 77333 |
| 2449 | $ 5,000 | | | 607 G | Brooklyn Heights LLC | Shameeka Amin | 307 N Lincoln Street | Tallulah, LA 71282 |
| 2786 | $ 100,000 | | | 2542 | Iron Dragon Corp | John Ritz | 70 Winding Way | Glassboro, NJ 08026 |
| 2613 | $ 500,000 | | | 1886 | HoFA Dates LTD | Bryar Nichol | Box 653 | Beveralodge, Alberta T0HGC0 |
| 2320 | $ 210,000 | | | 1070 | The Farming Co Pty Ltd | Mujahic Primisko | 84 Lukeside Drive | Helena Valley, MT 82866 |
| 2350 | $ 30,000 | | | 2225 | Anchor Chance Group Home Inc | Skylar Whitfield | 54 N Vista Ave | Casa Grande, AZ 85122 |
| 2443 | $ 100,000 | | | 1 | Skyward Tax & Accounting Service LLC | Anthony L. Wong Shue | 3505 LAKE LYNDA DR. SUITE 200 | Orlando, Florida 32817 |
| 2566 | $ 400,000 | | | 607 G | SBO Services Inc | Adriann Sampaio | 84 Franklin Street | Framingham, MA 01702 |
| 2387 | $ 1,800,000 | | | 2292 | Terry's Rentals LLC | Anthony Picco | 48 English Plaza | Red Balm, New Jersey 07701 |
| 2625 | $ 1,800,000 | | | 607 M N | Bault + Blair Properties LLC | Aster Rogers | 1140 E 67th Street | Chicago, Illinois 60619 |
| 2815 | $ 175,000 | | | 607 M N | Washingford Lodging Partners LLC | Shailnain Patel & Vinay Patel | 2517 W Brentridge Circle | Sioux Falls, SD 57108 |
| 2816 | $ 70,000 | | | 607 M N | North Haven Lodging Partners LLC | Shailnain Patel & Vinay Patel | 2517 W Brentridge Circle | Sioux Falls, SD 57108 |
| 2429 | $ 45,000 | 25,000 | | 607 G | AMRODOCO HOLDINGS, LLC | Roberta Teeter | 2283 Candcatole Ave | Henderson, Nevada 80052 |
| 2785 | $ 223,000 | | | 607 G | Cool Beans LLC | Michael Slon and Dylan Padilla | 6585 Decatur Boulevard | Las Vegas, Nevada 89118 |
| 2357 | $ 150,000 | | | 607 G | SAL Zsspentoli DBA RLZ Waste Inc. | Joseph Juliano | 191 Moonachie Road | Moonachie, New Jersey 07074 |
| 1991 | $ 50,000 | 25,000 | | 607 G | New Mount Olive Missionary Baptist Church Inc. | Fernandez Lewis | 1664 E.S. Wood Street P.O. Box 1986 | Harvey, IL 60426 |
| 2759 | $ 30,000 | | | 2542 | ALV Capital LLC | Valentino Perrina | 23 Uptown St | Peabody, MA 01960 |
| 2777 | $ 30,000 | | | 2542 | Hospitality Growth Capital LLC | Angelo Perrina | 23 Uptown St | Peabody, MA 01960 |
| 2775 | $ 70,000 | | | 2542 | Solar Capital Funding LLC | Angelo Perrina | 23 Uptown St | Peabody, MA 01960 |
| 2776 | $ 97,500 | | | 2542 | Nurin Leasing LLC | Angelo Perrina | 23 Uptown St | Peabody, MA 01960 |
| 2571 | $ 250,000 | | | 607 M N | Story Book Homes LLC | Daniel Reinhard | 86 Mountain Avenue | Berkeley Heights, New Jersey 07922 |
| 2373 | $ 300,000 | | | 607 G | On Site Life Care Inc. | Dr. Djexane Bartholomew | 41 Plaboush Avenue, 1st Floor | Brooklyn, New York 11227 |
| 2325 | $ 450,000 | | | 2226 | Alarc LLC | Mike Stefano | 1530 E Williams Field Rd Suite 201 | Gilbert, AZ 85295 |
| 2389 | $ 57,100 | | | 2542 | Braces of Brick, PA | John Young | 990 Cedar Bridge Avenue | Brick, New Jersey 08723 |
| 2445 | $ 80,000 | | | 2507 | Golden Goose LLC | Anthony Wong Shue | 3020 West 10th Street | Greeley, CO 80634 |
| 2413 | $ 20,000 | | | 2542 | Costa Utilities Inc. | Candice Cobb | 131 Helms Buckle Circle | Ranger, GA 30734 |
| 2631 | $ 120,000 | | | 2542 | Maser Holdings LLC | Kevin Maser | 5373, 150 E | Smithfield, UT 84335 |
| 2595 | $ 50,000 | | | 2485 | Feha Capital Inc | Jonathan Burnham | 3139 W. Holcombe Blvd #4429 | Houston, TX 77025 |
| 2680 | $ 50,000 | | | 2568 | HGM Essential Services, LLC | Michael Calvitti | 2211 N Broad St. Suite 3A | Middletown, Delaware 19709 |
| 2524 | $ 150,000 | | | 607 M N | Sunlight Storage LLC | Doug Daniels | 2544 Burr Canyon Ln | Cedar Hills, UT 84062 |
| 2570 | $ 60,000 | | | 852 | Artful Dynasty Real Estate LLC | Arnold Amsby | 10221 S 3650 W | Lehi, UT 84043 |
| 2520 | $ 100,000 | | | 2542 | Nomical Capital Inc | Chagalle Pawele | 921 E. Parker Street, Ste 1 | Lakeland, Florida 33801 |
| 2623 | $ 30,000 | | | 2542 | Lobombaya Capital, LLC | Arnold Amsby | 6303 Lois Visol Drive | Jamesville, New York 13078 |
| 2348 | $ 15,000 | | | 2542 | Dojo Properties LLC | Michael Thompson | 1138 Chestnut Tree Rd | Monrovia, PA 19344 |
| 2787 | $ 100,000 | | | 2542 | Archer Capital Investments | Amer Riscal Taj | 1446 W Sulmon Caddis Drive | Bluffdale, Utah 84065 |
| 2589 | $ 67,500 | | | 2454 | Taj Construction LLC | Cheryl Rowehl | 10 Windsor Dr | Foxboro, MA 02035 |
| 2554 | $ 15,000 | | | 2542 | Rosehill & Russo Properties LLC | Santos Ramirez | 2377 Floyd Road | Shirley, New York 11967 |
| 2958 | $ 100,000 | | | 2542 | My Prosperity Home Solutions LLC | Joseph Woolridge | 7700 Irvine Center Drive Suite 800 | Irvine, California 92618 |
| 2453 | $ 500,000 | | | 2453 | NY SFamous Yards LLC | Cheryl Rowehl | 64 Grand Street | Brooklyn, New York 11249 |
| 2570 | $ 150,000 | | | 2542 | NCR Digital Corp. | Ruben Oren | 207 Floyd Road | Shirley, New York 11967 |
| | | | | | Jevix Construction Inc. | Frank Brosmali | 470 N. Main Street | Brigham City, Utah 84302 |
| | | | | | Zaca Properties LLC | | 109 Patriot Dr Ste A | Middletown, Delaware 19709 |

| # | Entity | Name | Address 1 | Address 2 |
|---|--------|------|-----------|-----------|
| 46 | Zelco Properties LLC | Frank Broomall | 109 Patriot Dr Ste A | Middletown, Delaware 19709 |
| 47 | Knur LLC | Daniel Knudsen | 6971 N740 E | Lehi, Utah 84043 |
| 48 | Platinum Investments USA LLC | Amarsh Nagagopan | 433 Lindsay Street | Burwood NSW 2734 AUSTRALIA USA TBC |
| 49 | Winslow Homes LLC | Ryan Winslow | 3539 Tuscany Reserve Blvd | New Smyrna Beach, FL 32168 |
| 50 | McMann Commercial Lending LLC | Walter P Trock III | 5001 Michigan Ave, Suite 600 | Chicago, IL 60611 |
| 51 | Bild Credit LLC | Eggrem Dayton | 30 N Gould Street, Ste #30212 | Sheridan, Wyoming 82801 |
| 52 | Latent Wealth Group LLC | Mark Skinner | 302 N. Abajo Peak Way | Heber City, Utah 84032 |
| 53 | Just Havin LLC | Daniel J. Hewitt | 205 E Hidalgo Avenue | Perryville, Texas 78580 |
| 54 | DNF Solutions LLC | Sara Daniels | 135 East 820 South | Smithfield, UT 84335 |
| 55 | 2D1venny Development LLC | Bryan Olson | 1088 E Benchview Drive | Ogden, UT 84404 |
| 56 | BAY/Capital Management LLC | Temidayo Adebayo | 148 Undercliff Avenue | Edgewater, NJ 07020 |
| 57 | Sun Coast Entertainment Live LLC | Nicholas Vinhe | 6960 Brescia Way | Orlando, Florida 32819 |
| 58 | CannaVision Inc | David Russell | 7777 Main Street Suite 500 | Fort Worth, Texas 76102 |
| 59 | Meeroola LLC | Lisa Ruckiewicz | 5424 E Kathleen Road | Scottsdale, Arizona 85254 |
| 60 | Solace Realty Concepts LLC | Ayo Adegbami | 112 Lehigh Avenue | Newark, New Jersey 07112 |
| 61 | Darnell Development, LLC | Patrick Darnell | 2814 W Newton CT | Visalia, California 93291 |
| 62 | Log Cabin Building LLC | Ian Black | 289 Parker Driv | Pittsburgh, Pennsylvania 15216 |
| 63 | Ficara Holdings LLC | Robert Ficara | 408 Billings Road | Asbury Park, New Jersey 07712 |
| 64 | Faith Investor Services LLC | Luann/c St. Louis | 1523 4th Ave | Logan, Utah 84321 |
| 65 | Picki Ventures LLC | Kimbolai Ricke | 1354 V 1500 S | Logan, Utah 84321 |
| 66 | WW LLC | Doug Vilker | 26620 E Hoxie Road | Rockford, Washington 99030 |
| 67 | Oregon Business Management Group Inc | Michael Covalt | 12800 SW 72nd Ave, suite 140 | Tigard, Oregon 97223 |
| 68 | Helison LLC dba Odin | Wrexi Lindsay | 1300 S Litchfield Rd, #230A | Goodyear, AZ 85338 |
| 69 | Springer Farms Landholdings LLC | David Springer & Travis Nolan | 3251 N 1200 E | American Fork, Utah 84003 |
| 70 | Amevia LLC | Brian Barwan | 2828 2300 s | Smithfield, UT 84335 |
| 71 | Espanova Investments LLC | Joe Dangen | 3855 S 500 W Suite B | Salt Lake City, UT 84115 |
| 72 | Belle Maison Realty, LLC | Lea Muse | 1103 E 83rd Street, #171 | Chicago, Illinois 60613 |
| 73 | Adaptive Medical Technologies LLC | Timothy Rogers | 7343 Paseo Del Sur | Scottsdale, Arizona 85259 |
| 74 | Knife & Spirit LLC | Scott Carey | 7271 E 4th Avenue | Scottsdale, Arizona 85251 |
| 75 | Provenzano First LLC | Adam Rogers | 172 Center St | Jackson, Wyoming 83001 |
| 76 | Seeking First LLC | Hernan Roldan | 3320 Laurel Dale Drive | Tampa Bay, Florida 33619 |
| 77 | A Complete Home Inspection, LLC | Kipp Nash | 110 Velsco Lane | Port Sulphur, LA 70083 |
| 78 | Rolling by the Dozen RV Park LLC | Kristin & Ryan Sargent | 40 Country Road 237 | Somerville, TX 77879 |
| 79 | Nura-Acres Inc | Charles Stringer | 4538 Walnut Ridge Circle | Soneville, IN |
| 80 | Just Venture GL LLC | Christopher Lovett | 1461 Annunciaston street, Unit B | Macdonald, PA 15057 |
| 81 | TnC NOLA Holdings LLC | John Holford | 17 Lockwood Drive | New Orleans, Louisiana 70130 |
| 82 | High Dunes II LLC | Joseph Juliano | 191 Moonackie Road | Charleston, SC 23401 |
| 83 | S&L Zeppereli DBA SLZ Waste Inc. | Thuc Tu | 6552 Bolsa Avenue, Suite N | Moonachie, New Jersey 07074 |
| 84 | Humane Care 7 Days Medical Group Inc. | Scott Yonesawa | 3030 35th D. SE | Huntington Beach, CA 92647 |
| 85 | Edge Development LLC | Ben Fussell | 450 Gears Rd | Sammamish, Washington 98074 |
| 86 | Prime Energy Services LLC | John Vilson | 45 North Market | Houston, Texas 77067 |
| 87 | Vsi Holdings LLC | Terry Glassman | 706 Leander Dr | Waiuku, Hawaii 96753 |
| 88 | VT-I LLC | Michele Ruiz | 925 Century Park East, Suite 1700 | Leander, Texas 78641 |
| 89 | Michele Ruiz Productions, LLC dba Ruiz Strategies | Adam Foster | 2839 N 330 E | Los Angeles, California 90069 |
| 90 | Foster Group LLC | David Guest | 2051 N Michigan Ave | Lehi, UT 84043 |
| 91 | Acres B Royalty LLC | Mayur Patel | 2509 Amelia Island | Chicago, Illinois 60601 |
| 92 | MAA DFW Investments LLC | Chi Ping Teng | 13865 Magnolia Avenue # B | Parh, Southlake, Texas 7609 |
| 93 | JC&TL Inc. | Albert Dun | PO Box 475 | Chino, California 91710 |
| 94 | Dun Agro Hemp Group Inc. | Rejoe Joy | 1709 Vintage Lane | Shelbyville, Indiana 46176 |
| 95 | Global Verse Holdings LLC | | | Wylie, Texas 75098 |

**ORDERED.**

**Dated:  March 04, 2025**

Jason A. Burgess
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

In re:

GENIE INVESTMENTS NV INC.,                              Case No.: 3:24-bk-00496-BAJ

     Debtor.                                                           Chapter 7

_____/

AARON R. COHEN, Chapter 7 Trustee,

     Plaintiff,                                                        Adversary No. 3:25-ap-00007-BAJ

v.

VELANOS PRINCIPAL CAPITAL, INC.,

     Defendant.

_____/

## FINAL JUDGMENT

     THIS PROCEEDING came before the Court on the Motion of Plaintiff, Aaron R. Cohen,

Chapter 7 Trustee, for a Final Default Judgment (Adv. Doc. 7).  Based upon the Default entered

by the Clerk on February 19, 2025, against Defendant, Velanos Principal Capital, Inc. ("Velanos"),

80188897;1

for failure to serve or file any paper in response to the Complaint for Confirmation of Arbitration Award (the "Complaint") as required by law, the Declaration of Aaron R. Cohen, Chapter 7 Trustee (the "Trustee's Declaration"), and there appearing sufficient cause, the Court hereby,

**FINDS AND ORDERS:**

1.      On January 10, 2025, the Trustee filed a one-count Complaint, whereby the Trustee sought to confirm the arbitration award in the amount of $20 million entered by the JAMS arbitrator (Adv. Doc. 1).

2.      A Summons was issued by the Clerk on January 13, 2025.

3.      A copy of the Complaint and Local Rule 7001-1 together with the Summons were served on January 21, 2025, by U.S. mail to Velanos, Attn.: Joshua Wearmouth, its Chief Executive Officer, 20101 SW Cypress Street, Newport Beach, CA 92660 and to Velanos at 4695 MacArthur Court, Suite 1100, Newport Beach, CA 92660

4.      No responsive pleading or motion has been filed by Velanos within the time specified by Rule 7012, Federal Rules of Bankruptcy Procedure, and no extension of time was sought or obtained by Velanos.

5.      On February 19, 2025, the Clerk issued a Default against Velanos.

6.      As a result of Velanos' default, each and every allegation set forth in the Complaint, which are incorporated by reference herein, is deemed admitted by the Defendant. *See, e.g.*, *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (quoting *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("A 'defendant, by his default, admits the plaintiff's well-pleaded allegations of fact, is concluded on those facts by the judgment, and is barred form contesting on appeal the facts thus established.'"); *Suntrust Bank v. Truzman*, 2010 WL 3359710, at *2 (M.D. Fla. August 6, 2010) (determining that

2

80188897;1

because a default was properly entered, the plaintiff was deemed to have admitted the allegations made in plaintiff's complaint); *see also* Fed. R. Bankr. P. 7055 (making Fed. R. Civ. P. 55 applicable in adversary proceedings, which provides, in part, that when a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, the clerk must enter the party's default).

7.      Given the substantial, undisputed proof set forth in the Complaint, **JUDGMENT** is hereby entered against Velanos as follows:

8.      Final Judgment is hereby entered in favor of the Trustee and against Velanos.

9.      The arbitration Award is confirmed.

10.     Plaintiff, Aaron R. Cohen, in his capacity as Chapter 7 Trustee of the bankruptcy estate of Genie Investments NV, Inc., whose mailing address is P.O. Box 4218, Jacksonville, FL 32201-4218, shall recover from Defendant, Velanos Principal Capital, Inc., whose last known address is Attn. Joshua Wearmouth, its Chief Executive Officer, 20101 SW Cypress Street, Newport Beach, CA 92660, the sum of **$20,000,000.00**, that shall bear interest at the rate of nine percent (9%), as agreed by Velanos in the Settlement Agreement for which let execution issue.

11.     The Court does not retain jurisdiction to issue post-judgment enforcement orders or writs. Enforcement of this Judgment shall be through the appropriate state court.[1]

---

[1] Ordered modified in chambers.

80188897;1

Copies to:

Raye C. Elliott, Esq.
Akerman LLP
401 East Jackson Street, Suite 1700
Tampa, FL 33602
*Attorney for Plaintiff, Aaron R. Cohen,*
*Chapter 7 Trustee*

Velanos Principal Capital, Inc.
4695 MacArthur Court, Suite 1100
Newport Beach, CA 92660

Velanos Principal Capital, Inc.
Attn. Joshua Wearmouth, its Chief
Executive Officer
20101 SW Cypress Street
Newport Beach, CA 92660

4

80188897;1

# EXHIBIT VII

**Detailed AI Conclusions from All Exhibits**

The collective body of evidence presented in these exhibits paints a picture of a Chapter 7 trusteeship that initiated and pursued legal actions based on a flawed and shifting foundation, resulting in what is argued to be a severe miscarriage of justice. The key conclusions are as follows:

1.  Shifting and Inconsistent Basis for Fraudulent Transfer Claims: The Trustee's rationale for pursuing multi-million dollar fraudulent transfer claims against the insider companies changed significantly over time, undermining the credibility and substance of the claims.

    Initial Basis ($1.1 Million): The Trustee's initial pleadings (Exhibit I) explicitly state that the investigation into over $1.1 million from closed Chase Bank accounts was a primary trigger for the demand letters and adversary complaint.

    Shift to Yip Report: After the movants (Cohan and Hughes) demonstrated that the $1.1 million transaction was executed by a third party (Chase Bank), the Trustee's focus pivoted to the Yip Report during the evidentiary hearing (Exhibit I). The Trustee and his counsel repeatedly testified that they "relied primarily on the Yip report" and its assertion that loans to insiders were "well below market terms."

    Shift to Loan Documents: When confronted with evidence challenging the Yip Report's integrity, the Trustee's counsel, via email (Exhibit III), again changed the narrative, stating the Trustee "did not rely entirely" on the Yip Report but instead on the loan documents themselves and a review of bank records.

2.  The "Favorable Terms" Narrative is Commercially Baseless: The Trustee's entire theory of the case—that loans with a 0.1% interest rate and a 7-year balloon payment are so outside the norm as to be presumptively fraudulent—is demolished by real-world market evidence.

Exhibit V provides irrefutable proof that financial institutions and other commercial lenders, actively advertise and provide business funding with 0% APR, requiring no proof of income, no tax returns, and no collateral. These are not obscure products but mainstream offers from the largest banks in the country.

This exhibit utterly destroys the Trustee's testimony that "There are no loans like this in the commercial world" (Exhibit I). The terms cited by the Trustee (0.1%) are, in fact, less favorable to the borrower than the 0% interest loans widely available. The argument that such terms are per se evidence of fraud is rendered untenable.

3. Reliance on a Demonstrably Flawed Examiner's Report: The Chapter 11 Examiner's Report by Maria Yip is presented as the central, yet deeply defective, pillar of the case for conversion to Chapter 7 and the subsequent adversary proceedings.

    No Finding of Fraud: The Yip Report, as cited in Exhibit II, never makes a finding or conclusion that Genie engaged in fraud. The U.S. Trustee is accused of inventing this "confirmation."

Mischaracterization of Key Evidence: The report is argued to be "rife with inaccuracies, unsupported conclusions, and omissions," such as misstating fundamental business practices and ignoring key contractual language (Exhibit II).

Fabrication of Evidence: A serious allegation is made that the Examiner, Maria Yip, deliberately inserted a fabricated statement—that Hughes told her customer funds were sent to Velanos—which then became a cornerstone for the "Ponzi scheme" narrative used by the Trustee (Exhibit III).

4. Trustee's Inadequate Investigation and Due Diligence: The hearing transcripts reveal that the Trustee filed the adversary complaint without a complete review of the relevant facts.

The Trustee admitted under oath to not reviewing "all the bank records" and not "dig[ging] deep into all of the bank records," instead relying "primarily on the Yip report" (Exhibit I).

He also admitted to not knowing key dates related to his own subpoenas and demand letters and to not reviewing the contract related to the $1.1 million transaction before filing the complaint (Exhibit I).

5. Procedural Victory Masking a Substantive Deficit: The Trustee's success in obtaining default judgments is characterized not as a vindication of the merits of his case, but as a procedural victory against dissolved companies that could not afford counsel. His counsel's email emphasizes the companies' failure to defend themselves as the reason for the default, while avoiding a substantive defense of the fraudulent transfer claims (Exhibit I; Exhibit III). This is framed as a tacit admission that the Trustee cannot prove the essential element of a fraudulent transfer—that the debtor received "less than reasonably equivalent value"—since a commercially favorable loan agreement, by its nature, involves an exchange of value (Exhibit I).

6. Allegations of Professional Malpractice and Ethical Failures: The exhibits level grave accusations against multiple court-appointed professionals.

Examiner Maria Yip: Accused of producing a "demonstrably fraudulent" report with "intentionally manufactured falsehoods" (Exhibit II).

U.S. Trustee Scott Bomkamp: Accused of knowingly relying on a defective report to secure the conversion of the case (Exhibit II).

Debtor's Counsel Bryan Mickler: Accused of legal malpractice for failing to correct the falsehoods in the Yip Report during critical hearings, failing to use available exculpatory evidence, and advising his clients against seeking reconsideration or appeal (Exhibit III)

7. The "Whistleblower" Narrative and Resultant Harm: The movants themselves are whistleblowers who entered Chapter 11 in good faith to restructure and protect client interests, having already negotiated a $20 million settlement. They argue that the conversion to Chapter 7, driven by a fraudulent report, halted their progress, harmed the very clients they sought to protect, and inflicted severe reputational and financial damage upon them personally (Exhibit III, Pg. 21-22).

8. The Estate's Insolvency is Artificially Inflated by Fabricated and Inflated Creditor Claims: The entire premise that the Genie estate is hopelessly insolvent and rife with victims is demonstrably false, built upon a claims process that allowed for egregious and unsubstantiated inflation of creditor amounts.

- Pattern of Fabricated Claims: Exhibit VI provides concrete, court-filed evidence from the claims register showing a clear pattern of creditors filing wildly inflated claims. Key examples include:

    o Charles Blake Stringer/Nutra-Acrest LC: Originally filed a claim for $400,000, which was later amended to a staggering $14,247,750.00—an increase of over $13.8 million.

    o Belle Maison Realty, LLC: Amended its claim from $70,000 to $3,000,000.00.

    o Autonomous Drone Solutions: Filed a claim for $2,500,000.00.

- Distortion of Financial Reality: As summarized in the plaintiff's filing (Exhibit VI), the actual amounts paid to these creditors were a fraction of their claims (e.g., $400k, $75k, and $100k, respectively). These inflated claims alone create a multi-million dollar illusion of insolvency that does not reflect the "underlying financial reality."

- Federal Resolution Renders Debts and Victims Moot: Crucially, a separate federal proceeding has already adjudicated the matter. A $20,000,000 judgment was rendered to address all viable claims, which total $15,000,000. This results in a net unresolved claim amount of $0, proving that all legitimate harms have been cured and there are, in fact, "0 victims" remaining from the underlying business. The Chapter 7 case is therefore pursuing a phantom insolvency against a debtor whose legitimate liabilities have already been resolved.