

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
In re: Genie Investments NV Inc., Debtor.
Case No. 3:24-bk-00496-BAJ
Chapter 7

## EMERGENCY MOTION TO VACATE CONVERSION ORDER UNDER RULE 9024/60(d)(3), FOR IMMEDIATE TEMPORARY RESTRAINING ORDER, AND TO PRESERVE ALL RIGHTS PENDING FULL BRIEFING

COMES NOW, John Michael Cohan, upon special appearance, pro se, and respectfully moves this Honorable Court, pursuant to Fed. R. Bankr. P. 9024, incorporating Fed. R. Civ. P. 60(b)(3), (d)(1), and (d)(3), to vacate the Order converting this case from Chapter 11 to Chapter 7. Concurrently, the undersigned urgently moves under Local Rule 9073-1(A)(2) for an immediate Temporary Restraining Order ("TRO") enjoining any distribution of estate assets pending the hearing on this Motion. The Conversion Order was procured by a fraud on this Court, based on the United States Trustee's material misrepresentations, material omissions and their subsequent cover-up concerning the Debtor's alleged "gross mismanagement," and "fraud" which is conclusively refuted by evidence of the Debtor's good-faith reliance on licensed professionals that committed legal malpractice.

TABLE OF CONTENTS

I. Standing / Party in Interest ………………………………………………3

II. Preservation of Rights and Reservation of Appellate Claims …………….3

III. Factual and Procedural Grounds for Vacatur ……………………………..4-5

i. The "Gross Mismanagement" Was Legal Malpractice, Not Debtor Misconduct…4

ii. Criminal Corruption of the §341 Record, Cover-Up, and Confirmation by State Authorities....4

iii. Fabricated Evidence to Support the False Narrative…..4

iv. A Record Corrupted to Omit Good Faith…5

v. Retaliatory Motions Filed in Bad Faith……5

vi. Obstruction of the Truth….5

IV. Legal Basis for Vacatur Under Rule 60(d)(3) ……………………………6

V. Emergency Request for Temporary Restraining Order ……………………6-7

    A. Irreparable Harm, Mootness, and Immediate Need for Relief….6

B. Substantial Likelihood of Success…7

C. Balance of Equities and Public Interest…7

VI. Additional Factual Support: Misconduct and Viable Operations …………………7

VII. Prayer for Relief ……………………………………………………………………8

VIII. Certificate of Compliance With Local Rule 9073-1(A)(2) ………………………9

IX. Exhibits …………………………………………………………………………9


TABLE OF AUTHORITIES
• 11 U.S.C. § 1109(b)………………………………………………………………3
• *Cohan v. Bomkamp*, Case No. 1:25-cv-2009 (D.D.C.)………………………3
• *M.D. ex rel. Daniels v. Auto-Owners Ins. Co.*, 29 F.4th 1291, 1297 (11th Cir. 2022)…5
• *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012)…...5
• *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) ………6
• *In re Tri-Cran, Inc.*, 98 B.R. 609 (Bankr. D. Mass. 1989) …………………6
• 11 U.S.C. § 341 ("§ 341")……………………………………………………3,4,5
• Uniform Commercial Code……………………………………………………7

RULES
• Fed. R. Bankr. P. 9024 ……………………………………………………1,8
• Fed. R. Civ. P. 60(b)(3), (d)(1), (d)(3) ……………………………………1,6,8
• Local Rule 9073-1(A)(2) …………………………………………………1,7,8-9
• Local Rule 9013-1(C) ………………………………………………………5

EXHIBITS
• **Exhibit 1**: Spliced §341 audio waveform referenced herein….4,5,6
• **Exhibit 2**: Florida State Attorney's Office email confirming judge-signed warrant obtained November 19, 2025 & accompanying Jacksonville Sheriff's Office's police report (25-471040)….4,5,6
• **Exhibit 3**: Former FINRA internal memorandum and declaration (expert opinion)...4,5,6
• **Exhibit 4**: Debtor's counsel refusal to allege fraud / seek reconsideration post-conversion…5,6
• **Exhibit 5**: Sample list of categories of capital providers and accredited investors ready, willing and able to fund loans…7
• **Exhibit 6**: Contracts and UCC provisions authorizing collection, foreclosure, and remedies…7
• **Exhibit 7**: Active third-party customer with letter confirming intent to make payment within thirty (30) days of reconversion…7
• **Exhibit 8**: Default letters sent to borrowers on August 2, 2024 vs. Chapter 7 Trustee Erroneous "Voluntary Repayment" Collection Plan Email…7

## I. STANDING / PARTY IN INTEREST

1. The undersigned, John Michael Cohan, is an interested party and a protected person in the above-captioned case. Pursuant to 11 U.S.C. § 1109(b), the undersigned is entitled to be heard on matters affecting the estate, including the conversion of this case from Chapter 11 to Chapter 7. The undersigned's rights and interests are directly affected by the conversion order, including but not limited to preservation of documentary evidence, protection of estate assets, and the integrity of the § 341 meeting record. Accordingly, the undersigned has standing to file this Emergency Motion to Vacate Conversion Order and to seek appropriate relief, including a Temporary Restraining Order and preservation of rights for future appellate review.

2. The undersigned further gives notice that the findings, evidence, and determinations from *Cohan v. Bomkamp*, Case No. 1:25-cv-2009 (D.D.C.), are preserved for consideration and may be referenced herein in support of the arguments. Nothing in this Bankruptcy case should be construed as merging the two (2) cases, nor should it prejudice the undersigned's rights in either matter. The relief requested in this Motion—vacatur of the Chapter 7 conversion—pertains solely to this Bankruptcy case.

3. *The undersigned further notes the Honorable Court's recent posture and demonstrated commitment to transparency, accountability, and the proper administration of justice. The undersigned respectfully brings this Motion at this time to provide the Bankruptcy Court an opportunity to address and correct the fraud that tainted this case and conversion order from the outset. This Motion is presented in good faith and in recognition of the Court's authority and renewed focus on restoring the integrity of the record and the administration of this case.*

## II. PRESERVATION OF RIGHTS AND RESERVATION OF APPELLATE CLAIMS

4. The undersigned expressly preserves all rights, claims, defenses, and objections, including but not limited to challenges to the conversion order, fraudulent *pre*-conversion actions of the United States Trustee, procedural errors, and all appellate rights. Nothing in this Motion shall be construed as a waiver of any such rights. The undersigned reserves the right to supplement this Motion with additional evidence, claims, or arguments as may be necessary to fully protect his interests.

5. The undersigned further requests that the Court establish a full briefing schedule in accordance with the proposed schedule in the prayer for relief section in this motion, if the Court deems it necessary, for opposition, reply, and hearing, ensuring that the Court has a complete record and adequate time for consideration. All evidence referenced herein—including **Exhibits 1–8**—is already in the undersigned's possession, and/or on the record, and may be considered by the Court in evaluating this Motion without delay, regardless of whether Debtor's counsel submitted or relied upon such evidence.

### III. FACTUAL AND PROCEDURAL GROUNDS FOR VACATUR: THE "GROSS MISMANAGEMENT" NARRATIVE WAS FALSE

6. The Court converted this case based on a finding of "gross mismanagement," a finding induced by a fraud upon the Court. The undisputed evidence demonstrates that the Debtor acted in good faith at all times, was misled by licensed attorneys into a Ponzi scheme, and upon discovery, diligently worked to recover funds for creditors for over a year prior to petitioning for bankruptcy. The United States Trustee's motions knowingly or recklessly mischaracterized and ignored this conduct.

   i. The "Gross Mismanagement" Was Legal Malpractice, Not Debtor Misconduct

7. The estate's losses stem from reliance on the advice and actions of licensed attorneys who involved the estate in a Ponzi scheme. Upon discovery, the Debtor immediately acted to mitigate losses and recover assets for creditors. The United States Trustee's ("UST" or "U.S. Trustee") motions falsely reframed third-party attorney malpractice as "gross mismanagement" by the Debtor.

   ii. Criminal Corruption of the § 341 Record, Cover-Up by the U.S. Trustee, and Confirmation by State Authorities

8. The administrative record—the § 341 audio recording—was criminally corrupted. During the meeting, a crime was committed. The U.S. Trustee was informed prior to, in real time and still allowed it to proceed. When confronted for its misconduct, the U.S. Trustee spliced and manipulated the audio to conceal the crime and create a false record (**Exhibit 1**).

9. Recently, the Florida State Attorney's Office confirmed that a judge-signed arrest warrant exists for the crime committed during the § 341 meeting (**Exhibit 2**). The U.S. Trustee, an officer of this Court, the purported "watchdog," therefore presided over a criminally tainted proceeding, failed to prevent the crime, and actively doctored evidence to cover it up. This constitutes fraud upon the judicial process itself by material omissions.

   iii. Fabricated Evidence to Support the False Narrative

10. The U.S. Trustee's Second Motion to Convert included fabricated or materially inaccurate confirmations of misconduct. A former 12-year FINRA internal memorandum demonstrates that assertions of fraud in the Motion "unsupported by any evidence in the [Examiner's] Report or elsewhere in the record of this case" and "reveals the UST's unwillingness to grapple with inconvenient facts."(**Exhibit 3**) Further, the memorandum shows that Examiner's Report itself was fundamentally flawed by misrepresenting contract terms, inventing unsupported interpretations, and mischaracterizing routine business transactions as "*potentially*" fraudulent, inserted to allow the U.S. Trustee, the Chapter 7 Trustee and other governmental agencies to make countless frivolous arguments, which they have done and are currently doing, harming the protected person and others.

### iv. A Record Corrupted to Omit Good Faith

11. The administrative record was tainted *pre*-conversion. Criminal activity during § 341 meetings and spliced audio erased evidence of the Debtor's good-faith efforts and created a false impression of malfeasance.

### v. Retaliatory Motions Filed in Bad Faith

12. The U.S. Trustee's Second Motion to Convert was retaliatory in nature. This retaliation followed the undersigned's objections to the U.S. Trustee allowing a violation of a court-issued restraining order during the § 341 meeting on April 17, 2024 and the Debtor retaining Debtor-in-Possession after a two (2) day trial. Instead of accepting defeat and addressing the misconduct, the U.S. Trustee pursued conversion through a motion that mischaracterized the Debtor's actions, further compounding the harm and obstructing justice. The First Motion to Convert was filed in violation of Local Rule 9013-1(C) and fundamental due process by the U.S. Trustee's failure to confer with the Debtor's attorney—a plain and fatal defect on the face of the motion. This violation was not hidden. While Debtor's counsel actively contested other aspects of the Motion to Convert, the Debtor's representatives specifically brought this mandatory conferral failure to his attention and demanded he raise the issue with the Court. Counsel refused and dismissed the concern with a nonverbal shrug of the shoulders. This was not mere oversight; it was a deliberate, selective abdication of the duty of representation on this specific, meritorious procedural ground. Under the clear precedent of the Eleventh Circuit, '[w]hen a party fails to respond to an argument in an opposition brief, that argument is deemed abandoned.' *M.D. ex rel. Daniels v. Auto-Owners Ins. Co.*, 29 F.4th 1291, 1297 (11th Cir. 2022); *see also Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012). By willfully ignoring this dispositive issue—abandoning a clear-winning argument—counsel made a tacit judicial admission that the violation cannot be legitimately contested. This strategic omission removed any factual dispute about the U.S. Trustee's misconduct and allowed a procedurally void motion to proceed. Such conduct is inexplicable absent an improper motive, such as the fear or undue influence alleged herein, and it confirms that the due process violation was both incontrovertible and intentionally suppressed by an officer of the court, directly facilitating the fraud upon this Honorable Court. This act of selective abdication, previously baffling, is now revealed as a constituent part of the coordinated effort to suppress the truth and procure the Conversion Order.

### vi. Obstruction of the Truth

13. When presented with an expert opinion detailing the U.S. Trustee's fraudulent characterization of events, the Debtor's counsel refused to allege the fraud or seek reconsideration/appeal post-conversion, preventing the Court from correcting the record (**Exhibit 4**).

## IV. LEGAL BASIS FOR VACATUR UNDER RULE 60(d)(3)

14. A judgment procured by submission of materially false evidence or arguments is a fraud on the court. *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 245 (1944). Fraud occurs where a party knowingly sets in motion a scheme calculated to interfere with the judicial system's ability to impartially adjudicate a matter. *In re Tri-Cran, Inc.*, 98 B.R. 609, 617 (Bankr. D. Mass. 1989).

15. Here, the U.S. Trustee engaged in such a scheme by:

    i. reframing attorney malpractice as debtor misconduct in an attempt to shield himself from liability;

    ii. fabricating evidence to support that false frame; and

    iii. relying on a corrupted record (**Exhibits 1–4**).

16. Timing of Discovery of Fraud: Although a year has passed since the conversion order, Rule 60(d)(3) allows this Court to vacate a judgment or order at any time when it was procured by fraud on the court. The full scope of the fraud—including criminal acts confirmed by the recently obtained judge-signed warrant (**Exhibit 2**)—was not fully ascertainable until recently, and therefore this Motion is timely under Rule 60(d)(3).

17. The conversion was thus secured under false pretenses, and Rule 60(d)(3) exists precisely to vacate such orders.

## V. EMERGENCY REQUEST FOR TEMPORARY RESTRAINING ORDER

A. Irreparable Harm, Mootness, and Immediate Need for Relief

18. The Chapter 7 Trustee may imminently distribute estate assets. Any such distribution would cause irreparable harm and render vacatur moot. If the Court grants this Motion, the estate must remain intact under Chapter 11 to fund a plan and protect all viable parties. Recovery of distributed funds after the fact is impracticable, if not impossible.

19. Immediate entry of a Temporary Restraining Order is necessary to preserve the status quo and prevent further prejudice to the estate. Granting this TRO will allow the Court to address and correct the fraud that tainted the conversion order and any related post-conversion orders without delay. *The undersigned further represents that, upon the Court's granting of this Motion and reversal of such orders, he is prepared to withdraw the pending appeals immediately—demonstrating that the relief requested herein is fully sufficient to remedy the harm, including the improper post-conversion rulings, and that judicial resources will be conserved by resolving the matter at this level.*

B. Substantial Likelihood of Success

20. The evidence demonstrates a substantial likelihood of success in proving fraud on the court. Showing that the core premise for conversion ("gross mismanagement") was false is dispositive.

C. Balance of Equities and Public Interest

21. A brief pause in distributions harms no one, while an erroneous liquidation causes permanent injury. The public interest mandates that the Court retain power to remedy a fraud perpetrated upon it.

VI. ADDITIONAL FACTUAL SUPPORT: MISCONDUCT AND VIABLE OPERATIONS

22. Upon information and belief, the undersigned asserts that United States Trustee, Scott Bomkamp, acted independently in initiating the conversion, and that, due to the hierarchical pressures of the United States Trustee's Office, the Examiner, the Chapter 7 Trustee and the Debtor's counsel followed suit out of fear, rather than on an independent assessment of the record or the merits. This, however, does not excuse their alleged misconduct as they have the duty to report any and all irregularities regardless of who the U.S. Trustee thinks he may or may not be.

23. The Debtor has a roster of capital providers, accredited investors, and third-party customers that it is fully capable of utilizing and serving *post*-reconversion. These parties represent active business relationships and revenue streams that the Debtor can continue to fulfill without disruption. For example, the recovery of approximately $1.5 million for the estate would enable the Debtor to fund at least one or two new loans directly to new customers and per the controlling contract, the Debtor would be able to start making refunds to viable creditors immediately, demonstrating an imminent pathway to generate value for the creditors. Additionally, since many of the Debtor's borrowers are in default, the Debtor can pursue collection on those loans, as outlined in the default letters sent to borrowers on August 2, 2024, to maximize recoveries for the creditors via Uniform Commercial Code (UCC) foreclosure process per the contracts, unlike the erroneous "*voluntary repayment*" program the Chapter 7 Trustee has internally recently proposed by email. These provisions and lender remedies (Sections 13.1–13.7 of the contracts) allow the Debtor to foreclose on all company assets if the borrower is in default, maximizing recovery. Certain alleged creditors who previously harmed the Debtor, which was wrongfully abandoned by the Chapter 7 Trustee, will also be rightfully pursued. Maintaining the Chapter 11 posture ensures that the Debtor can meet its contractual obligations, preserve goodwill with these parties, and maximize value for all stakeholders and viable creditors in a controlled and orderly manner. (**Exhibits 5-8**)

## VII. PRAYER FOR RELIEF

24. WHEREFORE, the undersigned respectfully prays that this Honorable Court:

a. ISSUE AN IMMEDIATE TEMPORARY RESTRAINING ORDER, pursuant to Local Rule 9073-1(A)(2), enjoining the Chapter 7 Trustee, the United States Trustee, and all parties-in-interest from making any distribution, transfer, sale, or disbursement of any property of the estate pending the hearing on this Emergency Motion;

b. SET AN EXPEDITED HEARING on this Motion and establish a full briefing schedule, if the Court deems it necessary, for opposition due December 26, 2025, a reply due January 16, 2025, and hearing scheduled shortly thereafter;

c. AFTER NOTICE AND HEARING, VACATE the Order converting this case to Chapter 7 pursuant to Fed. R. Bankr. P. 9024 and Fed. R. Civ. P. 60(d)(3), as the conversion was procured through fraud on the Court and through fundamental procedural defects;

d. RE-CONVERT this case to Chapter 11, restoring the case to its lawful posture immediately prior to the tainted conversion order;

e. UPON RE-CONVERSION, VACATE all subsequent orders entered after the conversion, including but not limited to:

  • adversary proceeding 3:25-ap-00011;
  • any adverse orders issued during the period in which service, standing, and jurisdiction were disputed;
  • and the Order to Show Cause, which cannot stand once the underlying defective orders are removed;

f. ACKNOWLEDGE that, upon grant of this Motion, the undersigned will promptly withdraw the pending appeals, and that withdrawal will render meaningless unless the Court vacates the defective post-conversion orders identified herein, ensuring the case returns to a constitutionally sound footing;

g. RESTORE the legal effect of all filings made by the undersigned that were improperly disregarded or nullified solely because of the disputed conversion;

h. DIRECT that no adverse inferences be drawn from the undersigned's prior refusal to participate in proceedings in the adversary matter that were jurisdictionally and procedurally defective;

i. GRANT SUCH OTHER AND FURTHER RELIEF as the Court deems just and proper to restore the integrity of the record, remedy the effects of fraud and procedural irregularities, and ensure a lawful administration of this case moving forward.

## VIII. CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 9073-1(A)(2)

25. The undersigned certifies that, given the imminent risk of asset distribution causing irreparable harm, this Motion is filed as an emergency motion as defined by Local Rule 9073-1(A)(2). A good-faith effort to resolve this emergency has not been practicable because the alleged misconduct originates within the Office of the United States Trustee. The Chapter 7 Trustee's ongoing administration poses an immediate risk of irreversible harm, and Debtor's counsel failed to disclose, raise, or correct the fraud when it first became known—thereby preventing resolution through normal professional channels.

## IX. EXHIBITS

• **Exhibit 1**: Spliced §341 audio waveform referenced herein
• **Exhibit 2**: Florida State Attorney's Office email confirming judge-signed warrant obtained November 19, 2025 and accompanying Jacksonville Sheriff's Office's police report (25-471040)
• **Exhibit 3**: Former FINRA internal memorandum and declaration (expert opinion)
• **Exhibit 4**: Debtor's counsel refusal to allege fraud / seek reconsideration post-conversion
• **Exhibit 5**: Sample list of categories of capital providers and accredited investors ready, willing and able to fund loans
• **Exhibit 6**: Contracts and UCC provisions authorizing collection, foreclosure, and remedies
• **Exhibit 7**: Active third-party customer with letter confirming intent to make payment within thirty (30) days of reconversion
• **Exhibit 8**: Default letters sent to borrowers on August 2, 2024 vs. Chapter 7 Trustee Erroneous "Voluntary Repayment" Collection Plan Email

Dated: 12-05-2025

Respectfully submitted in good faith,

John Michael Cohan, without prejudice, without recourse, UCC 1-308, 1-103
iustusprocessus@outlook.com

### Certificate of Service

I hereby certify that all interested parties have been duly served a copy of the following documents by the CM/ECF system.

# EXHIBIT 1



# EXHIBIT 2

**iustusprocessus@outlook.com**

| | |
|---|---|
| **From:** | Asbrand, Justin <JAsbrand@coj.net> |
| **Sent:** | Wednesday, November 19, 2025 1:44 PM |
| **To:** | Debitus Processus |
| **Subject:** | RE: Following Up >> Warrant Status - JSO Report 25-471040 |

Good afternoon,

I just wanted to let you know that Judge Charbula signed the warrant on 11/10/25 and that it is active right now.

Thanks



**Justin Asbrand**
Assistant State Attorney
**State Attorney's Office, 4th Circuit**
311 W. Monroe St. – Jacksonville, FL 32202
O: (904) 255-2782
**PURSUE JUSTICE ALWAYS**



**From:** Debitus Processus <iustusprocessus@outlook.com>
**Sent:** Monday, November 17, 2025 12:08 PM
**To:** Asbrand, Justin <JAsbrand@coj.net>
**Subject:** RE: Following Up >> Warrant Status - JSO Report 25-471040

**EXTERNAL EMAIL:** This email originated from a non-COJ email address. Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Mr. Asbrand,

Understood. I will await your confirmation regarding the system. Also, if it's any help to law enforcement, the last known jurisdiction she was in is Philadelphia, Pennsylvania. (See attached)

Thank you.

John Michael Cohan

**From:** Asbrand, Justin <JAsbrand@coj.net>
**Sent:** Monday, November 17, 2025 11:31 AM
**To:** Debitus Processus <iustusprocessus@outlook.com>
**Subject:** RE: Following Up >> Warrant Status - JSO Report 25-471040

Good morning,

The technical problem is still ongoing; I will get you the info as soon as I can access it. They are telling us the system should be back sometime today. There will not be an assigned attorney or case number until she is arrested. The warrant is only in Florida, so she would not be arrested for it unless she is in the state of Florida

Thanks,



**Justin Asbrand**
Assistant State Attorney
**State Attorney's Office, 4th Circuit**
311 W. Monroe St. – Jacksonville, FL 32202
O: (904) 255-2782
**PURSUE JUSTICE ALWAYS**



**From:** Debitus Processus <iustusprocessus@outlook.com>
**Sent:** Monday, November 17, 2025 8:53 AM
**To:** Asbrand, Justin <JAsbrand@coj.net>
**Subject:** Re: Following Up >> Warrant Status - JSO Report 25-471040

EXTERNAL EMAIL: This email originated from a non-COJ email address. Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Mr. Asbrand,

Thank you for your email on Friday.

I am following up as I have not yet received the confirmation of the signed warrant. Please confirm if the technical issue has been resolved and provide an estimated timeframe for when I can expect to receive the official confirmation/documentation of the signed warrant.

For my records and for the related federal court proceedings, could you please also provide the name of the assigned Supervising State Attorney for this case and the official court case number associated with the warrant?

I appreciate your assistance in this urgent matter.

Sincerely,

John Michael Cohan

**From:** Asbrand, Justin <JAsbrand@coj.net>
**Sent:** Friday, November 14, 2025 1:59 PM
**To:** Debitus Processus <iustusprocessus@outlook.com>
**Subject:** RE: Following Up >> Warrant Status - JSO Report 25-471040

Hello,

Our warrant system is down right now so I cannot check. However, I'm pretty sure I remember seeing the warrant was signed. I will update you once the system is back up.

Thanks,



**Justin Asbrand**
Assistant State Attorney
**State Attorney's Office, 4th Circuit**
311 W. Monroe St. – Jacksonville, FL 32202
O: (904) 255-2782
**Pursue Justice Always**



---

**From:** Debitus Processus <iustusprocessus@outlook.com>
**Sent:** Friday, November 14, 2025 1:03 PM
**To:** Asbrand, Justin <JAsbrand@coj.net>
**Subject:** Following Up >> Warrant Status - JSO Report 25-471040

EXTERNAL EMAIL: This email originated from a non-COJ email address. Do not click any links or open any attachments unless you trust the sender and know the content is safe.

Mr. Asbrand,

I am following up on our conversation from November 7, 2025 regarding the restraining order violation.

Could you please confirm if the judge has signed the warrant yet?
Also, what is the judge's name that is presiding over the matter?

Thank you for your assistance and time.

John Michael Cohan



**Jacksonville Sheriff's Office**
**Incident (Offense)**

**2025-0471040**

**Sheriff T.K. Waters**

## Route To
*Groups:*
*People:*

## Incident Information
**Incident Location**

**1425 CHAFFEE RD S**
**JACKSONVILLE, FL 32221**
*Sub-sector:* **T2**   *TAZ:* **544**
*Location Type:* **ONLINE**
*Primary Weapon Used:* **THREAT / INTIMIDATION**

*Day/Date/Time Reported:* **Saturday, 08/16/2025 09:19**
*Day/Date/Time Incident From:* **Friday, 08/15/2025 17:28  To:  Friday, 08/15/2025 17:28**
*Is this a Corrections Information Report?:* **NO**

*School Name:*                                                              *School Number:*
*Incident Occurred:* **Outside Location**  *Incident Occurred In the Parking Lot at this Location?:* **NO**

**Miscellaneous**
*Drug Activity:* **NOT APPLICABLE**              *Drug Type:* **NOT APPLICABLE**              *# of Offenses:* 1
                                                                                                                                *# of Victims:*  1
*MCI Case:* **YES**                          *Follow-up By:* **Patrol**                                          *# of Suspects:* 1
*Was Hate Crime Involved?:* **NO**    *Dating Violence Involved?:* **NO**    *Is Offense(s) Related to Domestic Violence?:* **NO**
*If not Domestic Violence, Is it Domestic Related?:* **NO**              *Any Children under 18 Involved as a Victim?:* **NO**
**NIBIN Leads**

**Associated CCR Numbers**

## Offense(s)
**#1**   *Statute #:* **741.31(4)(A)**              *Degree:* **M1**   *UCR Code:* **9000**   *Attempt Code:* **Committed**
**VIOLATION OF INJUNCTION FOR PROTECTION AGAINST DOMESTIC VIOLENCE**
*Criminal Activity Type:*

## Victim #1 - COHAN, JOHN MICHAEL
*Did victim invoke right to prevent the disclosure of personal info (Marsy's Law)?:* **NO**
**Demographics**
*Race:* **WHITE**              *Sex:* **MALE**       *Date of Birth:* **07/05/1989**
*Ethnicity:* **NOT OF HISPANIC ORIGIN**
*Primary Language:* **English**  *Secondary Language:* **NOT APPLICABLE**
*Age:* **36**                        *Height (inches):* **5'10"**                *Weight (lbs):* **170**
*Hair Style:* **NAPPY / UNKEMPT**   *Hair Color:* **BROWN**              *Hair Length:* **LONG**
*Build:* **THIN**                     *Eye Color:* **BLUE**                 *Facial Hair:* **BEARD**
*Complexion:* **PALE**   *Voice:* **NORMAL**
*Clothing/Description:*
**Contact Information**
*Home Phone #:*                          *Bus. Phone #:*                          *Ext.:*                *Alt. Phone #:*
*Cell Phone #:* **(516) 547-2810**   *Cell Phone Provider:*
*Email Address:*
**Primary Identification**
*Type of ID Given:* **DRIVERS LICENSE**              *ID:* **C500**░░░░░░              *Issuing State:* **FLORIDA**
**Home Address**                          **Mailing Address**                          **Alternate Address**
░░░░░░░░░░░░░░░░
**JACKSONVILLE, FL** ░░░░░░
*Sub-sector:* **T4**   *TAZ:* **456**
**Employment/School**
*Employer:*      **UK**                          *Occupation:* **UK**
*School Last Attended:*
**Alternate Contact Information**
*Home Phone #:*                          *Bus. Phone #:*                          *Ext.:*
*Cell Phone #:*                          *Cell Phone Provider:*
*Email Address:*
**Other Information**
*Residence Type:* **CITY**              *Residence Status:* **RESIDENT**

## Incident (Offense)   2025-0471040 (Continued)

*Drugs Involved?:* **NO**    *Alcohol Involved?:* **NO**    *Computer Involved?:* **NO**   *Mode of Travel:* **FOOT**
*Victim Type:* **ADULT**   *Injury Extent:* **NONE**  *Injury Type:* **NOT APPLICABLE**
*Hospital Victim Taken To:* **NOT APPLICABLE**  *Sexual Battery Type:*

**Life Saving Measures**
*Used?:* **NO**    *Type:*                    *Narcan Administered By:*                  *Narcan Outcome:*

**Weapon(s) Involved**
   *Weapon(s):* **THREAT / INTIMIDATION**

**Victim Relationship to Offender(s):**
   *Relationship:* **CHILD IN COMMON**   *To:* **Suspect (01) - FREEDOM, PEACE M**

**Related Offenses**
   **<unset>**

---

### Suspect #1 - FREEDOM, PEACE M

**Demographics**
*Race:* **BLACK**             *Sex:* **FEMALE**      *Date of Birth:* **01/15/1993**
*Ethnicity:* **UNKNOWN**
*Primary Language:* **English**  *Secondary Language:* **NOT APPLICABLE**
*Age:* **32**                *Height (inches):* **5'05" to 5'06"**       *Weight (lbs):* **130 to 140**
*Hair Style:*                *Hair Color:* **BLACK**           *Hair Length:*
*Build:*                     *Eye Color:* **BROWN**           *Facial Hair:*
*Complexion:* **DARK**   *Voice:* **UNKNOWN**
*Clothing/Description:* **UK**
*Place of Birth:* **UNKNOWN, UNKNOWN**
*Nicknames:*
*Aliases:* **PEACE EKUTA**

**Distinguishing Marks (Scars, Marks, and Tattoos)**

**Contact Information**
*Home Phone #:*                  *Bus. Phone #:*                *Ext.:*             *Alt. Phone #:*
*Cell Phone #:* **UK**            *Cell Phone Provider:*
*Email Address:*

**Primary Identification**
*Type of ID Given:* **DRIVERS LICENSE**        *ID:* **204_____**          *Issuing State:* **DELAWARE**
**Home Address**              **Mailing Address**              **Alternate Address**

**Employment/School**
*Employer:* **UK**                        *Occupation:* **UK**
*School Last Attended:*

**CEW (Conducted Electric Weapon)**
*ECD Usage:*
*RTR Written Related to This Incident?:* **NO**     *RTR Incident Year:*            *RTR Incident #:*

**Other Information**
*Drugs Involved?:* **UNKNOWN**  *Alcohol Involved?:* **UNKNOWN**  *Computer Involved?:* **UNKNOWN**
*Mode of Travel:* **UNKNOWN**  *Juvenile?:* **UNKNOWN**  *Confessed?:* **NO**
*Arrested?:* **At Large**  *Were Miranda Rights Given?:* **NO**  *Jail # Type:* **NA**  *Jail Booking #:*

**Related Offenses**
   **<unset>**

**Life Saving Measures**
*Used?:* **NO**    *Type:*                    *Narcan Administered By:*                  *Narcan Outcome:*

---

### Property #1 - Documents/ Personal or Business

*Quantity:* **1**      *Status:* **NONE**
*Turned in at:* **NOT APPLICABLE**
*Manufacturer:*                                  *Model:*
*Serial Number:*                                 *Color:*
*Description:* **Copies of screenshots, injunction, and miscellaneous documents**
*Related Charge:* **#01: 741.31(4)(A) - VIOLATION OF INJUNCTION FOR PROTECTION AGAINST DOMESTIC VIOLENCE**
*Value Stolen or Damaged:*          *Value Recovered:*           *Victim/Complaint Signed Signature Card:* **N/A**
*Was Property Recovered From Vehicle?:* **NO**   *Vehicle Property Recovered From:*
**Property Owner:**

### JACKSONVILLE SHERIFF'S OFFICE
*Bus. Contact Name:* **P.T. BURKE ( #81350 )**  *Bus. Contact Phone #:* **(904) 630-0500**  *Ext.:*

---

## Incident (Offense)    2025-0471040 (Continued)

**Received From:**
Victim (01) - COHAN, JOHN MICHAEL

### Additional Information

On 08/16/2025 at 0954, I responded to the Chaffee Public Library (1425 Chaffee Rd S) in reference to written threats to kill (CCR #25-471040) and a violation of injunction (this CCR). Upon arrival, I made contact with the victim, Mr. Cohan.

Note: Cohan and the suspect (Peace Freedom) were in an intimate relationship for 10 years and share a child ▮▮▮▮▮▮▮▮▮▮ together. Cohan has a foreign (New Jersey) injunction (#FV-04-002494-22), which has been entered into Florida (#16-2025-AO-156901-FXXX-MA).

Cohan advised that on 04/09/2024 and 04/17/2024, Freedom telephonically (voice only) called in to his company's Federal Bankruptcy 341 hearing, knowing the injunction has been active since 03/03/2022. Cohan stated Freedom was not invited to the hearing, nor was she a part of the company. However, the hearing details were publicly available and the Federal Trustee (Mr. Bonkamp) allowed Freedom to remain in the hearing and to speak during the hearing and ask questions. According to Cohan, Bonkamp was notified of the active injunction and still allowed Freedom to remain. Cohan stated Freedom never identified herself by her real name and he did not see her, but due to their long shared history he recognized her voice immediately.

When speaking to Sgt. P. Yarber #5134, Cohan advised during the bankruptcy hearings Freedom spoke directly to him.

Cohan also provided a typed "Affidavit to Witness Statement" from a Mr. Hughes, who corroborates his account of the violation of injunction during the bankruptcy hearings.

Cohan further advised that between 05/2025-06/29/2025, Freedom "poked" him on Pi KSY cryptocurrency app, which sends him notifications to "keep mining" for cryptocurrency. The app allows users in the same crypto mining circle to send fellow miners reminders to continue mining, but no actual talking/ typing occurs. Cohan advised he was unable to remove Freedom from his group and he did not leave the group because he would lose all of his money/ crypto if he did.

It should be noted, Freedom's current location and contact information is unknown. Freedom's last police contact was in 2024 in Virginia, and her most recent driver's license is out of Delaware.

Because Cohan can reasonably identify Freedom's voice due to their history, Probable Cause exists to seek an arrest warrant for Freedom for violating the injunction.

The copies of the provided documents (property 1) were placed in the property room.

Case not cleared. Pending SAO disposition.

### Additional Question(s)

**Body Worn Camera Footage**

| | | |
|---|---|---|
| 01 | Is there Body Worn Camera (BWC) footage for incident?: | YES |

**Risk Protection Order**

| | | |
|---|---|---|
| 01 | Subject poses a significant danger of causing personal injury to himself/herself or others: | NO |
| 02 | Subject owns, has care, custody or control of, or has the ability to purchase, possess, or receive firearm(s) and/or ammunition: | |
| 03 | Subject was involved in a recent act or threat of violence against himself/herself or others, whether or not such violence involved a firearm: | |
| 04 | Subject has made a threat of violence in the past 12 months against himself/herself or others: | |
| 05 | Subject is seriously mentally ill or has recurring mental health issues: | |
| 06 | Subject was a respondent of, or violated, a previous/existing injunction related to domestic, dating, sexual, or repeat violence and/or stalking: | |
| 07 | The subject has previously been issued an RPO: | |
| 08 | Subject has previously violated the provisions of an RPO: | |
| 09 | Subject has been convicted of, had adjudication withheld on, or pled nolo contendere to, a crime constituting domestic violence in any state: | |
| 10 | Subject has used, or threatened to use, against himself/herself or others, any weapons or physical force: | |
| 11 | Subject has unlawfully or recklessly used, displayed, or brandished a firearm: | |
| 12 | Subject has stalked another person: | |
| 13 | Subject has been arrested for, convicted of, had adjudication withheld, or pled nolo contendere to a crime or threat of violence in any other state: | |
| 14 | Is evidence to demonstrate the abuse of controlled substances or alcohol by the subject: | |
| 15 | Is evidence to demonstrate the subject has recently acquired firearm(s) or ammunition: | |
| 16 | Is there any other relevant information provided by a family/household member concerning the subject. (If yes, place information into the narrative): | |

**Investigative Resource Use**

## Incident (Offense)    2025-0471040 (Continued)

| | | |
|---|---|---|
| 1 | *Use of LPR assisted in investigation?:* | **NO** |
| 2 | *Use of NIBN assisted in investigation?:* | **NO** |
| 3 | *Use of RTCC assisted in investigation?:* | **NO** |

### Misc Information

*Clearance Status:*  **CASE NOT CLEARED**          *Clearance Code:*  **NOT APPLICABLE**    *Date Case Was Cleared:*
*Case Not Cleared Type:*  **PENDING STATE ATTORNEY'S OFFICE DISP?**                    *Number of Cases Cleared:*
*Is there additional information included on a continuation report?:*  **NO**        *Are there other Pertinent Reports?:*  **NO**
*Did this incident qualify as a "Cargo Theft"?:*
*Is this a "TeleServ" report?:*  **NO**          *Was victim provided options to obtain rights card?:*
*Option provided to victim?:*
*In your opinion is there significant reason to believe that the crime can be solved by a patrol follow-up investigation?:*
*Neighborhood Canvass Conducted?:*

**Case Card Information Left with:  Person**
  Victim (01) - COHAN, JOHN MICHAEL
**Handouts**
  **#1:    Case Information Card**
**Bias Motivation(s)**

### Investigation Time #1

*Hour(s):*  **03**          *Minute(s):*  **00**          *Cost Amount:*  **$144.72**

### Signature

**Signature(s)**

| | | | |
|---|---|---|---|
| Reporting Officer #1: | **P.T. BURKE ( #81350 )** | *Division:*  **PATROL** | *Section/Unit:*  **ZONE 5** |
| Reporting Officer #2: | **N/A** | *Division:* | *Section/Unit:* |
| Report submitted on: | **08/16/2025 11:59** | | |
| Report Reviewer: | **P.G. YARBER II ( #5134 )** | *Status:*  **Approved** | |
| Report approved on: | **08/16/2025 17:11** | | |

## Your Case Information

Law Enforcement Agency: Jacksonville Sheriff's Office (JSO)
Emergency: 9-1-1 *(TTY Services Available)*
JSO's Non-Emergency: (904) 630-0500
JSO's Victim Advocates: (904) 630-1764
JSO's General Information: (904) 630-7600

Case Number: 25 - 471040    @ 471179

Date of Report: 08/16 , 20 25

Incident Type: Written Threats to Kill
Violation of Injunction

Officer's Name / I.D. Number: P.T. Burke #81350

VINE Pin Number:
Victim Information & Notification Everyday (VINE) - www.vinelink.com
*VINE provides custody status and criminal case information.*
*Registration is required for this service*
Toll-Free VINE Line: 1-877-VINE-4-FL / 1-877-846-3435
TTY: 1-866-847-1298

Sgt Yarbar 1pm "we will apply for a
V#5134 warrant to be
issued."

## Local Resources

Certified Rape Crisis Center: The Women's Center of Jacksonville
*(Rape Recovery Team)*
thewcj.org | 5644 Colcord Avenue, Jacksonville, FL 32211
Phone: (904) 722-3000 | 24-Hour Rape Crisis Hotline: (904) 721-7273

Domestic Violence Center: Hubbard House
hubbardhouse.org | 24-Hour hotline: (904) 354-3114 or
1-800-500-1119 | TTY: (904) 354-3958

First Coast Crime Stoppers: 1-866-845-TIPS (8477)
*More resources available on pages 16-18.*

3

John Michael Cohen
516 547 2810
For Body Cam
Audio 8-16-24

Request Number
P477706
Public Records Unit
904-630-2209 option 4

**Welcome To Jacksonville**
**Display Ticket For Proof Of Purchase**
EXPIRE TIME

# 2025-08-18
# 1:32 pm

Fee Paid
$1.00
MASTERCARD

ENTRY 12:32 pm 2025-08-18
Location: J010

****4532

# EXHIBIT 3

## UNITED STATES BANKRUPTCY COURT

## MIDDLE DISTRICT OF FLORIDA

## JACKSONVILLE DIVISION

In re:

Case No.: 3:24-bk-00496-BAJ

GENIE INVESTMENTS NV, INC.

Chapter 11

Debtor.

## DECLARATION OF ADAM B. WALKER

STATE OF MISSOURI

COUNTY OF JACKSON

The undersigned, ADAM B. WALKER, declares as follows:

1.  I, ADAM B. WALKER, am an attorney licensed to practice in Missouri. I am the owner and manager of Walker Law Office, LLC d/b/a AW Securities Law. I previously worked for more than 12 years as an enforcement lawyer for the Financial Industry Regulatory Authority (FINRA), where I routinely investigated fraudulent and potentially fraudulent investment activity.

2.  I began representing Genie Investments in or around July 2023 at the request of one of its owners, David Hughes. I had previously done legal work for another business in which Mr. Hughes also has an ownership interest. Before July 2023 I was aware that Genie existed and that it was in the lending business, but I had no other knowledge of or involvement with Genie.

3.  In July 2023, Genie asked me to help resolve a contract dispute between it and Velanos Principal Capital. I learned that Genie and Velanos had executed a "Joint Venture Agreement" (JVA) in October 2022 and subsequently amended it three times. Through conversations with

Genie's principals and review of the JVA and its amendments, I learned the essential terms of the agreement, which were:

- Genie and Velanos agreed to form a joint venture.

- Genie agreed to contribute $9.0 million in capital to the joint venture.

- Velanos agreed to use the $9.0 million capital contribution to buy and sell standby letters of credit (SBLCs).

- Velanos agreed to distribute profits from the SBLC transactions to Genie within 60 days of Genie's capital contributions.

- The JVA, as amended, stated that Velanos would return a total of $75 million to Genie, consisting of the $9.0 million capital contribution and $66 million in profits.

4.  As of July 2023, Velanos had not distributed any profits to Genie and had returned only $500,000 of its capital contributions. Velanos was, therefore, in material breach of the JVA.

5.  I also learned that Genie, shortly before executing the JVA, retained an attorney, referred to herein as "SO," to represent it with respect to what was then the "proposed joint venture" between Genie and Velanos. SO was and still is a partner with an established New York-based law firm.

6.  Almost immediately after talking with Genie about the Velanos transaction and reviewing the JVA, I strongly suspected that the SBLC-trading program offered by Velanos was fraudulent. With minimal research, I found numerous judicial opinions, press releases, and other materials supporting my suspicions. The U.S. Securities and Exchange Commission, Federal Bureau of Investigation, Federal Trade Commission, and U.S. Department of Treasury, in addition to other regulators and law-enforcement agencies, have in recent years issued warnings to the public about fraudulent prime-banking scams, including many involving fictitious SBLC trading.

7.  On or about July 24, 2023, I spoke with SO by telephone for approximately one hour to talk, among other things, about his review of the JVA, his knowledge of and experience with

2

SBLC trading, and whether he viewed the investments as potentially fraudulent or had any other reservations about Genie entrusting its capital to Velanos for the purposes described in the JVA.

8. SO told me that he had extensive background with SBLCs, which he characterized as a legitimate investment used in "high level trade finance." He described SBLC trading as a "financing mechanism" that arose from the 1944 Bretton-Woods agreement, which created the World Bank and the International Monetary Fund.

9. SO represented that Velanos, as promised, had used the $9.0 million in capital that Genie contributed to the joint venture to make profitable SBLC trades. SO acknowledged, however, that he had never received detailed information about any SBLC transactions that Velanos supposedly made.

10. I asked SO to describe how SBLC trading could generate massive profits in a matter of weeks. His response lacked detail. He stated only that it was a "rinse and repeat" process of buying SBLCs at a discount with ensuing profitable sales already prearranged. SO also repeatedly stated that there is "just a lot of leverage that's involved" or some variation thereof.

11. I asked SO if he was aware that SBLC trading was a frequent subject of fraud alerts and enforcement actions, both civil and criminal, by the federal government; he said that he was, but contended nonetheless that what Velanos promised Genie was not fraud. When I asked him how he knew that what Velanos promised was different from the numerous and well-publicized instances of fraud involving SBLCs, he stated that Velanos had "syndicated" the funds. He added, however, that he did not know the particulars of Velanos' ostensible syndication arrangement.

12. I have conducted extensive research into SBLC and other "prime banking" scams. In doing so, I learned that certain phrases, terms, and references are common among SBLC scams. The JVA contains several such phrases and terms. Likewise, SO described SBLC trading to me as

"royal-family type stuff" that happens every day, although not in the United States. According to SO, the U.S. government does not want its citizens involved in SBLC trading. Such assertions are often cited by law enforcement and regulators as markers of SBLC and other varieties of prime-banking fraud.

13. The JVA contains other "red flags" of fraud. For example, Velanos promised to generate an extremely high rate of return – more than 800% – in a matter of weeks. It is also, in my professional opinion, very poorly drafted, with some passages best described as gibberish.

14. Genie terminated its representation by SO and his law firm on or around July 24, 2023. On Genie's behalf, I requested all records from SO's representation of Genie. After several weeks' delay, SO provided what he described as the complete client file. That file, which I have reviewed, contains no documentation indicating that SO:

- conducted any meaningful investigation into Velanos, its principals, or its affiliates,

- noted any red flags in the JVA or any potential that the proposed investment was fraudulent,

- advised Genie of any appreciable risk of losing all or a portion of its principal, or

- mentioned to Genie that the transaction bore similarities to a well-known and heavily publicized type of investment fraud.

15. Based on my investigation and analysis of the JVA and my research into prime-banking fraud, I believe the SBLC trading Velanos promised to conduct with Genie's money was at all times fictitious and blatantly fraudulent.

16. Based on my communications with SO and my review of the client file obtained from him, I believe that SO's review of the JVA was inadequate; that he failed to conduct an appropriate and thorough investigation of the transaction, Velanos, and/or its principals and affiliates; and that, as a result, he likely did not discharge his professional obligations to Genie. For these reasons, it

4

is my opinion that Genie has a colorable claim against its former lawyer and law firm for professional malpractice. I am not equipped, however, to estimate any potential recovery if Genie were to pursue such an action.

17. Although many outside observers now impugn Genie's business judgment and competence for having invested in a fraudulent enterprise, it is critical to acknowledge that Genie did so only after receiving the advice of a licensed attorney from a well-regarded law firm, which it retained specifically to guard against placing its money in an illegitimate investment. Whatever one might say with the benefit of hindsight, the proper lens for evaluating Genie's competence to manage its affairs requires consideration of its entire operating history and the fact that it sought, paid for, and relied on the assistance of legal counsel that, by all appearances, had the experience and knowledge to advise it appropriately.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 14, 2024.

_Adam B. Walker_ (signature)
_____

Adam B. Walker

WALKER LAW OFFICE, LLC d/b/a AW
SECURITIES LAW

 **Outlook**

**Rough draft -- opposition to US Trustee's 2d motion**

**From** Adam Walker <adam@awsecuritieslaw.com>

**Date** Fri 7/19/2024 6:09 PM

**To**    David from Genie Investments <dhughes@genieinvestments.com>; John from Genie Investments
<jmcohan@genieinvestments.com>

📎 1 attachment (42 KB)
Opp UST's 2d Motion Appt Trustee.docx;

Attached is the current draft opposition to the US Trustee's motion. It's far from complete -- needs to
be bulked up in places and I'll add much more polish to it. This lets you see where I'm heading with it
and how I see it coming together.

Let me know if you have concerns, questions, suggestions, etc.

Adam Walker
AW Securities Law
www.awsecuritieslaw.com
(816) 226-6476

On March 5, 2024, the U.S. Trustee (UST) filed a motion seeking various forms of relief, including appointment of a Chapter 11 trustee. In that motion, the UST asserted that Genie was a fraudulent enterprise that "simply stole" money from its customers and other ostensible creditors and invested $9.0 million of "other people's money" in an "obviously suspect" transaction. *See* Doc. 20 ¶¶ 16-17. The UST based these allegations solely on the statements of 18 small-business owners. Following a hearing on the motion, the Court granted only the request to appoint an Examiner. The UST subsequently selected and appointed an Examiner. After a lengthy investigation, the Examiner issued a Report. According to the UST, the Examiner's Report[1] ("Report") fully supports the UST's earlier allegations. Nothing could be further from the truth.

Insisting that the Report corroborates its entrenched position reveals much more about the UST than about Genie. For starters, it demonstrates that the UST has failed to review the Report with a critical eye. Had it done so, it would have realized that the Report is rife with inaccuracies, unsupported conclusions, and omissions of material and pertinent evidence. Among other things, the Report inaccurately reports fundamental aspects of Genie's business. It states falsely, for example, that Genie required a borrower seeking a Business Expansion Line of Credit ("BELOC") to enter a separate Due Diligence Agreement,[2] and that, "In some instances, borrowers paid McMann [Commercial Lending] an upfront initial application fee related to a loan with Genie NV."[3]

The Report contains numerous other errors, many of them attributable to the Examiner's decision to ignore foundational documents (e.g., contracts) and other evidence that would be crucial to any reasonable analysis. As a result, the Report persistently mischaracterizes Genie's operating history, revenues, management, the terms of its relationships with borrowers and business partners, and its future

---

[1]    Doc. 146.

[2]    Report ¶ ___. In fact, Genie only required borrowers who sought bridge loans to complete the Due Diligence Agreement, which is evident upon even a cursory review of the relevant contracts.

[3]    Report ¶ ___. This never happened. Any borrower who paid fees of any kind to McMann did not have a BELOC Agreement with Genie but was presumably in a lender-borrower relationship with McMann.

prospects. This taints the entire Report and undermines the instant motion, in which the UST cherry-picks snippets that support its existing positions without bothering to determine whether those passages are supported by evidence or analysis.

The UST's insistence that the Report "confirms" key allegations from its initial motion not only shows its lack of concern for the Report's investigative and analytical rigor, but also reveals its willingness to mischaracterize and embellish the Report's contents to suit its purposes. This is most notable in connection with the UST's allegations of fraud. At the very outset of its motion, the UST brazenly claims that the Report "confirms" that a trustee "must be appointed in this case because the Debtor engaged in fraud and gross mismanagement..."[4] But nowhere in the 51-page Report is there any finding or conclusion that Genie engaged in fraud. The UST simply invented this "confirmation" and attributed it to its hand-selected Examiner.

1. *__The BELOC Agreement, which both the Examiner and the UST ignore, makes clear that ICA Payments received by Genie were not required to be held in trust and therefore did not constitute "customer funds."__*

Much of the Report proceeds from a false premise: that Genie was required to hold ICA Payments in trust for the borrowers who paid them. It is indisputable that the BELOC Agreement between Genie and its borrowers governs what ICA Payments are and how they are treated. The Report, however, offers no analysis of the relevant portions of the BELOC Agreement. It never acknowledges, for example, that the BELOC Agreement does not require or even suggest that ICA Payments will be held in escrow or in trust. The Report does, however, reference an email from McMann's principal, a demand letter from McMann's law firm, and an affidavit from one borrower as support for the Examiner's conclusion that ICA Payments remained "customer funds" after their receipt by Genie.[5] It should go without saying that the opinions of interested parties are insufficient, standing alone, to override the unambiguous language of

---

[4]   Second Motion, at 2.

[5]   Report ¶¶ 81, 39, 82.

a written contract. As already noted, however, the Report simply ignores the actual contract language. Worse yet, the Report attempts to support its flawed premise by inventing and repeating improper terminology – i.e., "ICA reserves" and "ICA deposits"[6] – despite the fact that those terms do not appear anywhere in the BELOC Agreement in connection with ICA Payments.

This shoddy methodology results in a fatally flawed Report. Because Genie was never required to hold ICA Payments in trust for customers, those payments constituted revenue realized by Genie. The possibility that ICA Payments could later become refundable does not change that. In this way, Genie is no different from a retail store or service provider that promises refunds to unsatisfied purchasers. Nordstrom and Wal-Mart do not have to set aside money received from customers until all opportunity for a refund has passed and neither did Genie. Thus, the funds Genie received in the form of ICA Payments were its own funds, not "customer funds," as the Examiner asserts.

The UST displays a similar lack of interest in engaging with the relevant source material. Its motion contains this bewildering passage:

> The Examiner *found* that the purpose of the ICA funds was to pre-pay interest amounts on customer loans. The Examiner also *found* that the Debtor provided contradictory statements regarding whether ICA funds were supposed to held in trust for customers or could be utilized in the ordinary course of the Debtor's business.[7]

The "purpose" of ICA Payments[8] is not, however, a question of fact for the Examiner to "find," but a matter of contract interpretation. Statements by any person, whether a party to the BELOC Agreement or not, cannot change its intrinsic meaning.[9]

---

[6]   *E.g.*, Report ¶¶ 25, 29, 39, 77, 79, 80.

[7]   Second Mot., at 5-6 (¶ 11) (emphases added).

[8]   The term "ICA funds" is a misnomer – that phrase never appears in the BELOC Agreement – and presumably refers to "ICA Payments."

[9]   Further, the UST mischaracterizes both the Report and the testimony cited therein when it refers to Genie's statements as "contradictory."

Neither the Report nor the instant motion even feints at contract interpretation and, as such, neither offers any basis for a determination that Genie had an obligation to hold ICA Payments in trust as customer funds. That alone is grounds to deny the instant motion. Nonetheless, a brief discussion of the relevant contract provisions dispels the faulty premise that ICA Payments were to be held in trust and that they therefore constituted "customer funds."

Regarding the ICA Payments, the BELOC Agreements only require the Lender to create an Interest Credit Account "on the books and records of the Lender," note "a credit equal to the ICA Payment" in the Interest Credit Account, use the Interest Credit Account to satisfy interest payments as they become due, and refund ICA Payments if and when specified preconditions are satisfied.[10] The BELOC Agreement does not restrict how the Lender may use ICA Payment funds between their receipt and a potential termination by the Borrower. As such, the Lender has no obligation to hold those funds in trust.

Further, the BELOC Agreements openly anticipate the Lender using the ICA Payment, rather than holding it in trust. Section 13.7(a) sets forth when and under what conditions a Borrower may be due an ICA Payment refund. It states that the Lender has up to 40 days to return the ICA Payment after the Borrower properly terminates the BELOC Agreement and requests a refund of the ICA Payment. Section 13.7(c), however, states that this 40-day period is "tolled during the pendency of a Force Majeure event" and defines as one such event the "failure of the Lender's wholesale lender from performing [sic] under the terms of the agreement between the Lender and the wholesale lender." This tolling provision protects the Lender in the event of illiquidity caused by certain occurrences beyond its control, including the failure of a wholesale lender to perform its contractual obligations. If the BELOC Agreement required the Lender to hold ICA Payments in trust, then there would be no need to protect the Lender against a wholesale lender's failure to perform. But the BELOC Agreements clearly anticipated a situation where

---

[10]     BELOC Agmt. §§ 1.1, 3.5 13.7.

the Lender's ability to refund ICA Payments depends on a wholesale lender performing its contractual obligations to the Lender. Otherwise, the tolling provision in section 13.7(c) would be superfluous.

Courts applying Illinois law "look to the contract as a whole" and "attempt to give meaning to every provision of the contract and avoid a construction that would render a provision superfluous." *Land of Lincoln Goodwill Indus. v. PNC Fin. Servs. Group*, 762 F.3d 673, 679 (7th Cir. 2014) (citations omitted). The interpretation the UST urges on the Court – that the BELOC Agreements require the Lender to hold the ICA Payments in trust and untouched – not only has no affirmative basis in the contracts' language but also ignores the provisions of Section 13.7(c) discussed above.

[add conclusion]

2.  *The Report excludes evidence that Genie had a good-faith belief, based in part on guidance and advice from a reputable law firm, that the Velanos transaction was a sound investment.*

In October 2022, Genie received an offer to enter into a joint venture with Velanos Principal Capital (Velanos). The proposal called for Genie to provide $3.0 million in capital that Velanos, the joint venture's manager, would use to purchase and sell standby letters of credit (SBLCs) at a substantial profit. Before deciding whether to accept the offer, Genie engaged Scott Oh, a lawyer with Warren Law Group (WLG), to perform due diligence on the proposed deal, advise Genie on risks associated with it, and, if necessary, review and revise the joint-venture agreement. According to his firm's website, Oh was an experienced attorney who "often advise[d] and facilitate[d] his clients in identifying, analyzing, and structuring... private placement opportunities, joint ventures, and other private capital transactions, conventional/unconventional asset-based credit facilities, credit enhancements, and corporate debt transactions." Oh advised Genie that SBLC trading was legitimate and that he was familiar with at least one person for whom Velanos and/or its CEO syndicated. Oh notably did not warn Genie either that the promised returns were too good to be true or that SBLC trading was a frequent vehicle for financial fraud.

Oh represented Genie from October 2022 to July 2023. During that time, he regularly consulted with Genie about the joint venture, reviewed multiple amendments to the Joint Venture Agreement, and communicated frequently with Velanos on Genie's behalf. At no time did Oh express to Genie any

concern that the joint venture was fraudulent. In late 2022, when Genie twice increased its capital contribution to the joint venture to a total of $9.0 million, Oh did not advise Genie against doing so. And when Velanos failed to make the payments required under the Joint Venture Agreement, Oh never told Genie that Velanos' various excuses were of questionable validity.

Although the Report states that the Examiner reviewed WLG's bank records, it does not appear that the Examiner interviewed Oh or WLG regarding the substance of Oh's work for Genie. The Report castigates Genie for entering into the joint venture with Velanos. "Neither Velanos nor Wearmouth were registered investment advisors and the returns promised by Velanos pursuant to the Velanos JVA were 100% in 30 days and profit participation that would have resulted in a 900% return, which should have raised a red flag."[11] The Report gives no consideration to the fact that Genie sought out and hired a professional to apprise it of risks and concerns raised by the joint venture. Oh claimed to have a history of helping clients "joint ventures," "conventional/unconventional asset-based credit facilities," and other transactions, which suggests he was an appropriate choice for the job. The Report nonetheless concludes that Genie's decision to enter the joint venture constitutes "gross mismanagement." In doing so, it discounts the effect on Genie of obtaining what it believed to be competent legal guidance from a partner with a reputable law firm.

The UST not only seizes on this conclusion, but expands on it, stating that "Debtor engaged in gross mismanagement, *at a minimum*, in its dealings with Velanos…"[12]

---

[11]   Report ¶ 83.

[12]   Second Mot., at 2.

### 3. *The UST cannot meet its burden of demonstrating that Genie's loans to affiliated entities constituted either fraud or gross mismanagement.*

The UST's motion brands loans from Genie to six affiliated entities as "fraudulent transfers and not true loans."[13] The UST alleges, almost in passing, direct evidence of fraudulent intent in the transfers from Genie to its affiliate, Better Methods. This allegation falls well short of the movant's burden of proof ad, moreover, misstates the Report's findings. According to the UST, "The direct evidence is the express purpose of the transfers to Better Methods as asset protection from the Debtor's creditors."[14] As support for this allegation, the UST cites paragraph 188 of the Examiner's Report, which states, in its entirety, "According to [John Michael] Cohan, Better Methods is an asset management company set up to protect the Debtor's assets and the assets of the Debtor's clients." The "express purpose" alleged by the UST as direct evidence of fraud is itself a fraud, fabricated by the UST and unsupported by any evidence in the Report or elsewhere in the record of this case.

The UST also asks the Court to find circumstantial evidence of fraudulent intent. The UST recites the "badges of fraud" often employed by Federal Courts of Appeals in determining, for purposes of 11 U.S.C. § 548, whether a debtor "intended to hinder, delay, or defraud" creditors. The UST's motion only addresses some of those factors, however, and does so in an extremely cursory fashion. It states, for example:

- The transfers at issue occurred "while the Debtor was being sued or was under threat of suit for failing to fund loans."[15]

- Genie received "less than the equivalent value based on the non-market nature of the loans."[16]

- The funds were transferred "in a concealed manner attempting to disguise the fraudulent transfers as loans."[17]

---

[13]   Second Mot. ¶ 16.

[14]   Second Mot. ¶ 17.

[15]   Second Mot. ¶ 19.

[16]   Second Mot. ¶ 19.

[17]   Second Mot. ¶ 19.

The UST does not even bother to cite the Report or any other evidence for these claims. That alone should doom the Motion, as unsupported, conclusory statements cannot establish fraud. But because the UST also urges the Court to find that the loans to affiliates constituted "gross mismanagement," a proper analysis of the factors referenced in the motion is warranted.

<u>The timing of Genie's transfers to affiliates does not support a finding of constructive fraud.</u>

The UST asserts that "Debtor's funds were transferred (1) to insiders or affiliates; (2) while the Debtor was being sued or under threat of suit for failing to fund loans..."[18] This is flatly and blatantly false, and it reveals the UST's unwillingness to grapple with inconvenient facts.

The affiliate transfers identified in the Report were all made pursuant to loan agreements executed in September 2022. At that time, Genie had successfully funded dozens of loans, had never failed to issue a properly requested refund of an ICA Payment, had not agreed to contribute any money to the joint venture with Velanos, and had never been sued or threatened with suit related to an alleged breach of a BELOC Agreement.

The Report provides details about each of these transfers, which happened piecemeal over the course of many months, with nearly all of them taking place between September 2022 and July 2023.[19] What these schedules show is that Genie's transfers to affiliated entities generally took place before Genie was insolvent or had any reason to believe that it would become insolvent, and before any putative creditor had sued Genie or threatened suit against it.[20]

With respect to Genie's transfers to its affiliate, Zoomeral, Inc., the Report shows that the net total transferred by Genie to Zoomeral in that period – through roughly 60 separate transactions – was $1,771,555.74. Of these transactions, 14 occurred before Genie entered the joint venture with Velanos.

---

[18]  Second Mot. ¶ 19.

[19]  Report, Exh. 4 (showing approximately 60 separate transfers from Genie to Zoomeral, Inc., between September 12, 2022, and July 28, 2023); Report ¶¶ 147, 159 (showing more than 25 transfers apiece from Genie to Capitulum Homes and Cald Holdings between September 2022 and July 2023).

[20]  Genie received its first threat of legal action regarding an ICA Payment refund in [October?] 2023.

Another 20 occurred before Velanos was late making any payments due under the Joint Venture Agreement.

Further, as discussed above, Genie had a good-faith belief until at least July 2023 that it would shortly receive a payment of at least $9.5 million from Velanos pursuant to the Joint Venture Agreement. Considering that the vast majority of the affiliate transfers at issue occurred before that time, the evidence clearly shows that few, if any, of those transfers occurred when Genie was insolvent or had reason to believe it would soon become insolvent.

### Genie received reasonably equivalent value for the affiliate transfers

The UST alleges that Genie transferred funds to affiliates "for less than the equivalent value based on the non-market nature of the loans."[21] By "non-market nature," the UST refers to the low interest rate, the absence of personal guarantees, the absence of a periodic-payment requirement, and the borrowers' option to extend the loan term for 10 years. The UST bases its allegation that the terms of these loans would not have been available to Genie's affiliates in the open market on the Report. For its part, the Report is devoid of any evidence regarding the terms that might have been available to the affiliate borrowers.

The UST fails to note that each of the loans at issue requires repayment in full of the loan's principal amount. The loans are not forgivable. Moreover, even assuming that the loan terms were more favorable than the affiliate borrowers would likely have found elsewhere, this fact alone cannot prove that Genie received less than "reasonably equivalent value" in exchange for the money lent. When evaluating the value received in exchange for allegedly fraudulent transfers, Courts recognize various "indirect" benefits – i.e., benefits that may not be easily

---

[21]    Second Motion ¶ 19.

reduced to a specific dollar value. Here, the indirect benefits of the affiliate loans are real and were shared with the Examiner.

Zoomeral, Inc., was the affiliate that received the largest amount of loans from Genie. Zoomeral built and operated the software platform that Genie and its borrowers used for communication, record management, and _____. In 2022-23, the Zoomeral platform was an integral part of Genie's business, and both Genie and Zoomeral expected that improvements to Zoomeral's systems would benefit both companies. Genie loaned money to Zoomeral so that it could hire developers to improve the software platform, establish a relationship with one or more payment processors, and create a marketing campaign to attract more potential borrowers. Genie reasonably expected its loan to Zoomeral to result in more business for Genie.

Better Methods

Capitulum

Cald

Case law research:

- "All of the authorities agree that the appointment of a trustee under § 1104 is an extraordinary remedy. Therefore, the evidence to support the appointment of a trustee must be clear and convincing." In re Tyler, 18 B.R. 574, 577 (S.D. Fla. 1982)

- Standard of proof: clear and convincing evidence that appointment of trustee is warranted

- Strong presumption that DIP shall remain in control of its business while in bankruptcy

- Court must "weigh the benefits that would be derived by the appointment of a Trustee against the expense of the appointment." *General Oil Distributors,* 42 Bankr. 402, at 409 (Bankr. E.D. N.Y. 1984).

- As a general rule, . . . a trustee will not be appointed where affiliate transactions are called into question, unless the movant can demonstrate that the transactions were improper, detrimental to the debtor estate, or were actually fraudulent." Norton Bankruptcy Law & Practice § 53.04; *See also General Oil Distributors,* supra, 42 Bankr. at 402; *All Sun Juices,* 34 Bankr. 162 (Bankr. M.D. Fla. 1983).

- Bankruptcy Court order appointing a trustee constitutes a final order that is immediately appealable to 11th Circuit

- "...it now appears the appointment of a trustee, saddling the estate with the expense of a appointed trustee and additional counsel, and the removal of the Garbaczes from management may well seriously handicap the Debtor's efforts to maintain its customer base and operating income." *In re Waterworks, Inc.,* 538 B.R. 445, 465-66 (Bankr. N.D. Ill. 2015)

# EXHIBIT 4

 Outlook

---

**RE: Arguing fraudulent transfer in context of motion to appoint trustee**

---

**From** John from Genie Investments <jmcohan@genieinvestments.com>

**Date** Tue 7/23/2024 11:25 AM

**To**   Adam Walker <adam@awsecuritieslaw.com>

**Cc**   David from Genie Investments <dhughes@genieinvestments.com>

Adam,

Thank you. We definitely want this direct text approach. We will speak to Bryan about it and insist that he uses it.

Sincerely,

---

**John Michael Cohan**
**Genie Investments, Director**



A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.

DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710   AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm

PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

**From:** Adam Walker <adam@awsecuritieslaw.com>
**Sent:** Tuesday, July 23, 2024 11:17 AM
**To:** John from Genie Investments <jmcohan@genieinvestments.com>
**Cc:** David from Genie Investments <dhughes@genieinvestments.com>
**Subject:** Re: Arguing fraudulent transfer in context of motion to appoint trustee

There's a comment attached to the first numbered paragraph. If you expand it (by clicking on it), you should see the proposed replacement text. This image doesn't capture all of what's in the

 Outlook

---

**RE: Updated edits to draft opposition**

---

**From** David from Genie Investments <dhughes@genieinvestments.com>
**Date** Tue 7/23/2024 3:40 PM
**To**  John from Genie Investments <jmcohan@genieinvestments.com>; Adam Walker
<adam@awsecuritieslaw.com>; Bryan Mickler <bkmickler@planlaw.com>

Would just like to add: As support for this allegation, the UST cites paragraph 188 of the Examiner's Report, which states, in its entirety, "According to [John Michael] Cohan, Better Methods is an asset management company set up to protect the Debtor's assets and the assets of the Debtor's clients." The "express purpose" alleged by the UST as direct evidence of fraud is itself a fraud, fabricated by the UST and unsupported by any evidence in the Report or elsewhere in the record of this case.

And making sure that the judge knows that we did not use clients funds to refund other clients like she said she found a few examples of.

Sincerely,

---

## David Hughes
## Genie Investments, Director

 **GENIE INVESTMENTS**

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.
DISCLAIMER: The sender (dhughes@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. The sender is a Consultant and makes no warranties or representations as to the Buyer, Seller, or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, the Recipient must return any and all documents in their original receipted condition to the Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710   AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.
This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

**From:** John from Genie Investments <jmcohan@genieinvestments.com>
**Sent:** Tuesday, July 23, 2024 1:58 PM
**To:** Adam Walker <adam@awsecuritieslaw.com>; Bryan Mickler <bkmickler@planlaw.com>; David from Genie

Investments <dhughes@genieinvestments.com>
**Subject:** RE: Updated edits to draft opposition

Adam and Bryan,

I like this version. I made one simple edit via a comment. I'm sure David would like to add a few things, but thank you both.

Sincerely,

---

## John Michael Cohan
**Genie Investments, Director**



A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.
DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.
This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

**From:** Adam Walker <adam@awsecuritieslaw.com>
**Sent:** Tuesday, July 23, 2024 12:27 PM
**To:** Bryan Mickler <bkmickler@planlaw.com>; David from Genie Investments <dhughes@genieinvestments.com>; John from Genie Investments <jmcohan@genieinvestments.com>
**Subject:** Updated edits to draft opposition

This version includes edits to the final section. Let me know what you think.

To see what it would do to the overall length of the document, I also incorporated the changes I suggested yesterday. If we went with those -- and I'm not assuming we necessarily will -- it would put the body of the document at about 10 1/2 pages. That's pretty close to where we need to be.

David/John -- please chime in on anything major you think isn't covered.

Adam Walker
AW Securities Law

www.awsecuritieslaw.com
(816) 226-6476

 Outlook

---

**URGENT Please Respond Appropriately**

---

**From** John from Genie Investments <jmcohan@genieinvestments.com>

**Date** Sun 8/11/2024 12:00 PM

**To**　bkmickler@planlaw.com <bkmickler@planlaw.com>

**Cc**　David from Genie Investments <dhughes@genieinvestments.com>

Bryan,

David and I are writing to express our deep concern regarding the current status of our case. Despite our numerous respectful email requests since last Thursday to schedule a meeting with you, we have yet to receive a satisfactory response. Your indication that you will only speak with us once the Trustee is in place and ignoring our other concerns is absolutely unacceptable. We must immediately begin work on a motion for reconsideration, and if that fails, we need to prepare for an appeal, along with additional legal actions we need to take. We hope that your lack of response is due to an unavoidable delay and that you fully intend to pursue these actions. If this is the case, we would appreciate prompt confirmation.

As you are well aware, the U.S. Trustee has committed fraud through motions based on what he knew was a fraudulent report—a fact clearly highlighted by both Adam Walker, Esq, a 12-year securities enforcement attorney for FINRA who "routinely investigated fraud," and us. Despite our repeated written requests, you failed to include this critical information in your response, nor did you address it in court. Additionally, the examiner's report is fraudulent, and although the U.S. Trustee is aware of this, you did not challenge the examiner and U.S. Trustee's false statements during the hearing. During the Examiner's testimony, it was evident that her statements were untruthful, and although we discussed this during a sidebar, you failed to address these lies effectively when you returned to court. It is a fact that Velanos' money was not due until December 5th, and we transferred the entire $9MM to Velanos before that date. The Examiner's report contained false information, and we requested that you address this in your response, yet you did not, allowing her to repeat these falsehoods in court.

Our families have been and are now at risk, and we cannot and will not stand idly by. If you choose not to do so, David and I will file a cause of action against the U.S. Trustee and request his immediate removal from the case for committing fraud. We have undeniable evidence to support this action. Additionally, we will be filing a cause of action against YIP for her fraudulent and incompetent conduct. These two filings, along with disciplinary action with their respective boards, will occur this week regardless of whether we receive your commitment or not.

The judge's decision to deny us Debtor-In-Possession (DIP) status was based on a flawed CPA report that dismissed Adam Walker's clear statement that we used an attorney to vet Velanos, just one of the many defenses we have against gross mismanagement, none of which you raised. Mr. Walker, a twelve-year veteran of FINRA investigations and a securities specialist, deserves more weight than YIP's fraudulent report. We believe an appellate judge would side with us on this matter, and that Judge Burgess would also reconsider. We have new evidence that justifies reconsideration, <u>including other ongoing business that was not presented</u>. Furthermore, Section 13.7 of our agreement with Velanos is critical. We have settled with Velanos and should now be able to focus on fulfilling our contractual obligations, including making refunds. We are perplexed as to why you did not argue for the option to dismiss the case based on Section 13.7, given that the force majeure event has ended with our settlement with Velanos. The clear attempt of the UST and Examiner to ignore our contract is repulsive.

The last thing we want is for professionals to take Velanos' money while Genie is destroyed, <u>especially when we have performed our contractual duties</u> admirably. Let me be clear: if you are not fully committed to pursuing these matters to the fullest extent, and we do not hear back from you promptly (by EOD Monday, 8/12/24), we will be forced to take all necessary legal steps to remove you from this case for cause. You are well aware that the U.S. Trustee committed fraud and that the report is

incompetent/fraudulent. It is your duty to act in the best interest of the estate. Ignoring Section 13.7 and jeopardizing our Velanos settlement agreement is not in the estate's best interest.

We hope to work with you to restore integrity to this process and put an end to this injustice. It is crucial that you prioritize our case over any potential future relationship with the U.S. Trustee or the Examiner. We need to protect the creditors, the estate, our families, and we expect your unwavering support. We look forward to your immediate response.


Sincerely,


**John Michael Cohan**
Genie Investments, Director



A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.

DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm

PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

4/21/25, 11:33 AM                                 Mail - John from Genie Investments - Outlook

 Outlook

---

**URGENT Motion of Reconsideration and/or Appeal**

---

**From** John from Genie Investments <jmcohan@genieinvestments.com>
**Date** Fri 8/9/2024 11:38 AM
**To**    Bryan Mickler <bkmickler@planlaw.com>
**Cc**    Adam Walker <adam@awsecuritieslaw.com>; David from Genie Investments
          <dhughes@genieinvestments.com>

📎 3 attachments (35 MB)
UNITED STATES BANKRUPTCY COURT Reconsideration-Appeal Discharge.docx; SBLC Trading & Scott Oh Research.mp4;
Declaration of Adam B. Walker [3-14-2024].pdf;

Bryan,

Please see the attached drafted motion for reconsideration/notice of appeal. We understand these are
two separate filings, but this is the basis for both. Please see attached online search of "SBLC", again
the television comments by the judge were erroneous. The judge used no legal basis to come to his
decision as no court case, code, statute, or law was cited. David already sent you text messages of
another investor and emails of another business seeking funding through us which was not included in
the previous motion. We are not laying down and waiting for the Chapter 7 appointment to be made as
we only have 14 days to file our appeal. Please advise as how you would like to proceed. We need to
hear from you as soon as possible with a time we can conference. Thank you.

Sincerely,

---

**John Michael Cohan**
**Genie Investments, Director**

 **GENIE INVESTMENTS**

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as
Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators
and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification
& due diligence on their own before going into any opportunity.
DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S.
Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or
Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached
related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt
of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted,
Recipient must return any and all documents in their original receipted condition to Sender. This electronic
communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-
2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF
NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is
intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from

Case 3:25-cv-00164-HES-MCR    Document 18    Filed 06/24/25    Page 10 of 168 PageID 166

disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

4/21/25, 11:38 AM                                    Mail - John from Genie Investments - Outlook

 **Outlook**

**JV Timeline and Transfers**

**From** John from Genie Investments <jmcohan@genieinvestments.com>
**Date** Mon 8/12/2024 4:56 PM
**To** bkmickler@planlaw.com <bkmickler@planlaw.com>
**Cc** David from Genie Investments <dhughes@genieinvestments.com>

🖉 4 attachments (813 KB)
JV Canada.pdf; Velanos Wire $3MM 10-20-22.pdf; Velanos Wire $3MM 11-30-22.pdf; $3MM Warren account to Velanos.png;

Bryan,

I used a Date Calculator to arrive at these dates: https://www.timeanddate.com

**Contract date:** 10/19/2022
**Commencement date:** 10/20/2022
**Instrument Commencement Date Within Ten (10) Banking Days, post contribution:** 11/03/2022
**Profit Distribution Frequency Thirty (30) days post commencement:** Saturday
12/3/2022>>>therefore Monday 12/5/2022
**Additional Transfer dates to Velanos:** 11/21/24 Genie instructed Warren to send; 11/30/2022

Additional Notes:
**Instrument Term Sixty (60) Banking Days:** 1/31/2023
**Target Return Period One Hundred Percent (100%) in Thirty (30) days:** 12/3/2022;
**remaining within Sixty (60) days, post commencement:** 1/2/2023
**Veteran's Day:** Friday 11/11/2022
**Thanksgiving Day:** Thursday 11/24/2022

Velanos was <u>not</u> in default at the time of the additional transfers. Let us know if you come up with something different but I used the contract language to derive at the dates presented above.

Thanks.

Sincerely,

**John Michael Cohan**
Genie Investments, Director



A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.
DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached

related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm

PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

4/21/25, 11:37 AM                                    Mail - John from Genie Investments - Outlook

🖼 Outlook

---

**Re: URGENT Please Respond Appropriately**

---

**From** John from Genie Investments <jmcohan@genieinvestments.com>
**Date** Mon 8/12/2024 8:55 AM
**To**    Bryan Mickler <bkmickler@planlaw.com>
**Cc**    David from Genie Investments <dhughes@genieinvestments.com>

Bryan,

Thanks for your reply. A couple of questions:

(1) What was his factual and legal obligation that's clear? Please cite any case law, statute, code or
     law that would apply.
          - We were an ongoing entity. (We only provided one example of ongoing business and he
tossed it out like it didn't exist because of the language written on the capital provider's letter which
would be on any letter in this industry. We have another that wasn't presented, and we have a quoted
15 additional interested parties from one of our sources.)
          - Lack of Intent (we had none), Adherence to Established Procedures (we followed our
contracts to the T and performed), External Factors (failure of capital provider = force majeure event),
and Consultation with Experts (a licensed attorney knowingly and intentionally sold us a scam) are our
defenses to any gross mismanagement, so I'm having hard time seeing the basis especially with a
LICENSED BAR ATTORNEY at the forefront of the transaction, verifying fraudulent wire reports along
the way. If SBLC is such an obvious scam, why is it still out there and how do people keep falling for it?
Has every VICTIM of SBLC fraud been accused and convicted of gross mismanagement? Doubt it.
          - After 2 years of litigation, we settled with Velanos and they placed $550K in your account.
          - We have already provided you our research on SBLC's. Absolutely nothing negative came up
in the searches. In fact, it was mostly positive, so, his television comment is ridiculous.
          - He said we didn't look for other capital providers; we have over 50,000 verified capital
providers on ZOOMERAL since the middle of last year.
          - What did I miss?


(2) Whom do we go to to report Bomkamp for fraud?

(3) Whom do we go to to report Yip for fraud/incompetence?


Sincerely,


**John Michael Cohan**
**Genie Investments, Director**

4/21/25, 11:37 AM                              Mail - John from Genie Investments - Outlook

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.

DISCLAIMER: Sender)(jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710 AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm

PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

---

**From:** Bryan Mickler <bkmickler@planlaw.com>
**Sent:** Monday, August 12, 2024 8:25:42 AM
**To:** John from Genie Investments <jmcohan@genieinvestments.com>
**Cc:** David from Genie Investments <dhughes@genieinvestments.com>
**Subject:** RE: URGENT Please Respond Appropriately

I understand your frustration, but I had to wait until the Court entered the order converting the case. It was entered this weekend and is attached. You have 14 days from the date of the order to appeal.

Based upon the evidence that the Judge relied upon, it is clear to me that he had the factual and legal obligation to either appoint a trustee or convert the case. It would be within his discretion to choose either option. The judge took a lot of time to have all of the evidence from the examiner and your records to make a well supported decision. You may disagree with the interpretation of the evidence by the Judge but that would be an issue for appeal.

Based upon my review of the case and the evidence, I do not believe that an appeal would be successful. You are free to remove me as your counsel if you wish, but I will not be able to provide you with appellate services in this case. Please let me know if you have any questions or would like me to withdraw from the case so that you can hire additional counsel.

Thank you.

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

**From:** John from Genie Investments <jmcohan@genieinvestments.com>
**Sent:** Sunday, August 11, 2024 12:00 PM
**To:** Bryan Mickler <bkmickler@planlaw.com>

4/21/25, 11:37 AM                                      Mail - John from Genie Investments - Outlook

Cc: David from Genie Investments <dhughes@genieinvestments.com>
Subject: URGENT Please Respond Appropriately

CAUTION: This message was sent from outside the company

Bryan,

David and I are writing to express our deep concern regarding the current status of our case. Despite our numerous respectful email requests since last Thursday to schedule a meeting with you, we have yet to receive a satisfactory response. Your indication that you will only speak with us once the Trustee is in place and ignoring our other concerns is absolutely unacceptable. We must immediately begin work on a motion for reconsideration, and if that fails, we need to prepare for an appeal, along with additional legal actions we need to take. We hope that your lack of response is due to an unavoidable delay and that you fully intend to pursue these actions. If this is the case, we would appreciate prompt confirmation.

As you are well aware, the U.S. Trustee has committed fraud through motions based on what he knew was a fraudulent report—a fact clearly highlighted by both Adam Walker, Esq, a 12-year securities enforcement attorney for FINRA who "routinely investigated fraud," and us. Despite our repeated written requests, you failed to include this critical information in your response, nor did you address it in court. Additionally, the examiner's report is fraudulent, and although the U.S. Trustee is aware of this, you did not challenge the examiner and U.S. Trustee's false statements during the hearing. During the Examiner's testimony, it was evident that her statements were untruthful, and although we discussed this during a sidebar, you failed to address these lies effectively when you returned to court. It is a fact that Velanos' money was not due until December 5th, and we transferred the entire $9MM to Velanos before that date. The Examiner's report contained false information, and we requested that you address this in your response, yet you did not, allowing her to repeat these falsehoods in court.

Our families have been and are now at risk, and we cannot and will not stand idly by. If you choose not to do so, David and I will file a cause of action against the U.S. Trustee and request his immediate removal from the case for committing fraud. We have undeniable evidence to support this action. Additionally, we will be filing a cause of action against YIP for her fraudulent and incompetent conduct. These two filings, along with disciplinary action with their respective boards, will occur this week regardless of whether we receive your commitment or not.

The judge's decision to deny us Debtor-In-Possession (DIP) status was based on a flawed CPA report that dismissed Adam Walker's clear statement that we used an attorney to vet Velanos, just one of the many defenses we have against gross mismanagement, none of which you raised. Mr. Walker, a twelve-year veteran of FINRA investigations and a securities specialist, deserves more weight than YIP's fraudulent report. We believe an appellate judge would side with us on this matter, and that Judge Burgess would also reconsider. We have new evidence that justifies reconsideration, including other ongoing business that was not presented. Furthermore, Section 13.7 of our agreement with Velanos is critical. We have settled with Velanos and should now be able to focus on fulfilling our contractual obligations, including making refunds. We are perplexed as to why you did not argue for the option to dismiss the case based on Section 13.7, given that the force majeure event has ended with our settlement with Velanos. The clear attempt of the UST and Examiner to ignore our contract is repulsive.

The last thing we want is for professionals to take Velanos' money while Genie is destroyed, especially when we have performed our contractual duties admirably. Let me be clear: if you are not fully committed to pursuing these matters to the fullest extent, and we do not hear back from you promptly (by EOD Monday, 8/12/24), we will be forced to take all necessary legal steps to remove you from this case for cause. You are well aware that the U.S. Trustee committed fraud and that the report is incompetent/fraudulent. It is your duty to act in the best interest of the estate. Ignoring Section 13.7 and jeopardizing our Velanos settlement agreement is not in the estate's best interest.

We hope to work with you to restore integrity to this process and put an end to this injustice. It is crucial that you prioritize our case over any potential future relationship with the U.S. Trustee or the Examiner. We need to protect the creditors, the estate, our families, and we expect your unwavering support. We look forward to your immediate response.

Sincerely,

**John Michael Cohan**
Genie Investments, Director

# GH | GENIE INVESTMENTS

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.

DISCLAIMER: Sender (jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm

PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.

This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

Case 3:24-bk-00496-BAJ   Doc 501   Filed 12/05/25   Page 55 of 159
Case 3:25-cv-00164-HES-MCR   Document 18   Filed 06/24/25   Page 17 of 168 PageID
173

4/21/25, 11:41 AM                                Mail - John from Genie Investments - Outlook

 **Outlook**

---

**Re: When can we conference.. we have some questions,**

---

**From** John from Genie Investments <jmcohan@genieinvestments.com>
**Date** Thu 8/8/2024 3:10 PM
**To**   David from Genie Investments <dhughes@genieinvestments.com>; Bryan Mickler <bkmickler@planlaw.com>

Bryan,

My question specifically is how do we go about filing an appeal?

The judge erred in his decision, and this is a prima fascia case. We hired reputable counsel to do due diligence on Velanos. A LICENSED attorney sold us a product, doubled & tripled down on that product that he himself continues to defend to this day. Who else would someone hire to vet a company other than a licensed attorney? When we received wire trace reports, he claimed they were legitimate and told us as soon as the money was sent, it was considered to be ours. They then fictitiously put $9.5MM in Nordic's bank account which he stood by. Stand By Letters of Credit are a real thing despite the court's negative interpretation of their reputation. Type "Standby Letter of Credit" in Google and nothing negative pops up at all. In fact, Investopedia, a reputable source, is the first on the Google feed, describes their purpose and how they work. So, the judges comment about "anyone who watches TV knows" is an erroneous statement based on nothing but his own opinion. 100% returns, 300% returns or 1000% returns are not impossible to make. If you make the right trades, you can do them over and over again in the market. Just ask Warren Buffet. The creditors signed agreements knowing that a wholesale lender was involved. We were contractually obligated to send the funds to a 3rd party. The 3rd party was "vetted" and "highly recommended" by a licensed attorney in the financial field and it failed.

Secondly, Section 13.7 – We have no creditors based on our agreements; #1 non-refundables are gone. #2 a wholesale lender failed. We've done everything reasonable and in good faith to make the recovery. Destroying a company to make refunds is not a reasonable effort, it's an extreme. The 7 TTEE should interpret our contract and understand that clearly.

Please response with direction on how we go about making an appeal. Thank you.

Sincerely,

**John Michael Cohan**
**Genie Investments, Director**

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.

Case 3:24-bk-00496-BAJ   Doc 501   Filed 12/05/25   Page 56 of 159
Case 3:25-cv-00164-HES-MCR   Document 18   Filed 06/24/25   Page 18 of 168 PageID
174

4/21/25, 11:41 AM                          Mail - John from Genie Investments - Outlook

DISCLAIMER: Sender)(jmcohan@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. Sender is a Consultant and makes no warranties or representations as to the Buyer, Seller or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, Recipient must return any and all documents in their original receipted condition to Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710 AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.
This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

---

From: David from Genie Investments <dhughes@genieinvestments.com>
Sent: Thursday, August 8, 2024 1:23:23 PM
To: Bryan Mickler <bkmickler@planlaw.com>; John from Genie Investments <jmcohan@genieinvestments.com>
Subject: RE: When can we conference.. we have some questions,

Agreed but John and I had some very general questions we wanted to go over with you first.

Sincerely,

**David Hughes**
**Genie Investments, Director**

 | GENIE INVESTMENTS

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.
DISCLAIMER: The sender (dhughes@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. The sender is a Consultant and makes no warranties or representations as to the Buyer, Seller, or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, the Recipient must return any and all documents in their original receipted condition to the Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm
PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information.  It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.
This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

4/21/25, 11:41 AM                          Mail - John from Genie Investments - Outlook

**From:** Bryan Mickler <bkmickler@planlaw.com>
**Sent:** Thursday, August 8, 2024 11:42 AM
**To:** David from Genie Investments <dhughes@genieinvestments.com>; John from Genie Investments <jmcohan@genieinvestments.com>
**Subject:** RE: When can we conference.. we have some questions,

Let me see who is appointed as trustee and I will immediately set up a time to review.

Bryan K. Mickler, Attorney
Law Offices of Mickler & Mickler, LLP
5452 Arlington Expy.
Jacksonville, FL 32211
904-725-0822
904-725-0855 FAX
www.planlaw.com

**From:** David from Genie Investments <dhughes@genieinvestments.com>
**Sent:** Thursday, August 8, 2024 11:34 AM
**To:** John from Genie Investments <jmcohan@genieinvestments.com>
**Cc:** Bryan Mickler <bkmickler@planlaw.com>
**Subject:** When can we conference.. we have some questions,

CAUTION: This message was sent from outside the company

Sincerely,

**David Hughes**
**Genie Investments, Director**

 **GENIE INVESTMENTS**

A Word of Caution to Sellers & Buyers Business is based on trust. Genie Investments (Genie) is acting solely as Consultants, Genie does not accept any liability on behalf of Sellers or Buyers or their associated Facilitators and/or Intermediaries. Genie advises Buyers and Sellers to take the course of wisdom and perform full verification & due diligence on their own before going into any opportunity.
DISCLAIMER: The sender (dhughes@genieinvestments.com) is NOT a United States Securities Dealer or Broker or U.S. Investment Advisor. The sender is a Consultant and makes no warranties or representations as to the Buyer, Seller, or Transaction. All due diligence is the responsibility of the Buyer and Seller. This E-mail letter and the attached related documents are never to be considered a solicitation for any purpose in any form or content. Upon receipt of these documents, the Recipient hereby acknowledges this Disclaimer. If acknowledgment is not accepted, the Recipient must return any and all documents in their original receipted condition to the Sender. This electronic communication is covered by the Electronic Communications Privacy Act of 1986, Codified at 18 U.S.C 1367,2510-2521,2701-2710    AS PER GRAMM-LEACH-BLILEY ACT 15 USC, SUBCHAPTER I, SEC 6801-6809 DISCLOSURE OF NONPUBLIC PERSONAL INFORMATION. Also see: http://www.ftc.gov/privacy/glbact/glbsub1.htm PRIVATE AND CONFIDENTIAL: This communication may contain privileged and/or confidential information. It is intended solely for the use of the addressee. If you are not the intended recipient, you are strictly prohibited from disclosing, copying, distributing, or using any of this information. Please inform the sender if you have received this email in error.
This email is not a solicitation or recommendation to buy, sell, or hold securities. This email is meant for informational and educational purposes only and does not provide investment advice.

# EXHIBIT 5

Categories of Family Offices/Lenders – Over 10,000 Inside Database



# EXHIBIT 6

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

among

## GENIE INVESTMENTS

as Lender

and



as Borrower

_____

dated as of

February 3, 2023

_____

2704

## BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated or otherwise modified, this **"Agreement"**) is made and entered as of February 3, 2023, between GENIE INVESTMENTS (the **"Lender"**), and ▇▇▇▇▇▇▇ a Rhode Island Limited Liability Company (**"Borrower"**).

## RECITALS

**A.**    The Borrower desires to obtain from Lender an asset backed line of credit loan (the **"LOC"**) in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

**B.**    The Borrower desires to obtain the LOC from Lender for the purpose of Business Expansion for Real Estate Investing (as more fully described on **Exhibit D** attached hereto the **"Project"**). Acquired assets will be legally described on **Exhibit E** attached hereto (the **"Property"**).

**C.**    The Borrower has agreed to pay a minimum contribution of ten percent (10%) of the Project LOC Amount to Lender, by establishing the Interest Reserve (as hereinafter defined) and the ICA (as hereinafter defined), collectively,(the **"Interest Reserve Account"**), within seven (7) calendar days after the fully executed LOC Documents (as hereinafter defined) are received by Lender.

**D.**    The Borrower has agreed to pay, pursuant to Section 3.6 hereof, the aggregate amount of Twenty Thousand Dollars and No Cents Dollars ($20,000), (the **"ICA Payment"**), by bank wire to Lender. An account on the books and records of Lender shall be created to serve as an Interest Credit Account (the **"ICA"**). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon theterms and conditions set forth herein.

**E.**    Lender has agreed to make Advances (as hereinafter defined) under the LOC to Borrower in an aggregate amount, according to **Exhibit B**, amount not to exceed the Maximum Amount for the purposes set forth in these recitals and the Promissory Note attached hereto as **Exhibit A** and upon the terms and subject to theconditions hereinafter set forth.

**NOW THEREFORE,** for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1. <u>Certain Defined Terms</u>**. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed in accordance with generally accepted accounting principles consistently applied.  As used in this

Agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

"**Advance(s)**" means any loan advance made by Lender in accordance with the terms and conditions of this Agreement.

"**Applicable Interest Rate**" means the fixed interest rate specified in the Promissory Note.

"**Borrower**" means that term as defined in the first paragraph of this Agreement.

"**Business Expansion**" means any transaction or use, including for working capital, that relates to the expansion of the business of the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially any and all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business(other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds to the Borrower in connection with such transaction or series of related transactions) or a subsidiary of the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct or indirect holding company of the Borrower.

"**Business Plan**" means the document(s) outlining the accurate and up to date business operations of the End-Borrower, as previously provided by End-Borrower, substantially in the form set forth in EXHIBIT D, and subject to review by Lender's Capital Partners as described in Section 8.1 of this Agreement.

"**Closing Date**" means the last date of signed execution of this Agreement by Lender and Borrower.

"**Collateral**" means any and all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements and proceeds, thereof.

"**Event(s) of Default**" means any event or condition that shall constitute an event of default as described in Article 13 of this Agreement.

"**ICA**" means the definition given in Recital D of this Agreement.

"**ICA Payment**" means the amount remitted pursuant to Recital D of this Agreement.

"**Interest Reserve**" means credit on the books and records of Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from a Borrower JV Partner, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"**Interest Reserve Account**" means the definition given in Recital C of this

Agreement.

"**Lender**" means that term as defined in the first paragraph of this Agreement.

"**Lender's Capital Partners**" means the one or more lender-clients of Lender

providing funding towards the LOC.

"**LOC**" means that term as defined in Recital A of this Agreement.

"**LOC Disbursement Account**" means that term as defined in Section 3.12 hereof.

"**LOC Document(s)**" means, collectively, this Agreement, the Promissory Note and each Security Document, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced, and any other document delivered pursuant thereto.

"**Maximum Amount**" means Two Hundred Eight Thousand Dollars and No Cents Dollars ($208,000). The Maximum Amount is the Project LOC Amount plus all fees, costs and expenses which are the Borrower's responsibility to pay.

"**Organizational Documents**" means, with respect to any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"**Other Taxes**" means any and all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other LOC Document.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority or any other entity.

"**Project**" means that term as defined in Recital B of this Agreement.

2704

"**Project Costs**" means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by Borrower for the purpose of implementation or execution of the Project (including but not limited to payment of taxes, insurance and all items reasonably necessary for the successful execution of the Project), as more specifically set forth in the Project budget set forth on **Exhibit C** attached hereto.

"**Project LOC Amount**" means Two Hundred Thousand Dollars and No Cents Dollars ($200,000).

"**Property**" means that term as defined in Recital B of this Agreement.

"**Promissory Note**" means the Promissory Note, in the form attached hereto as **Exhibit A**.

"**Security Agreement**" means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as **Exhibit E**.

"**Security Document**" means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each U.C.C. Financing Statement or similar filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or under the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

"**Scheduled Maturity Date**" means the 10th year anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

"**Subsidiary**" means any entity (other than the Borrower) in an unbroken chain of entities beginning with the Borrower if each of the entities owns stock, units or other interests that represent fifty percent (50%) or more of the total combined voting power of all classes of stock in one ofthe other corporations in such chain

"**Taxes**" means any and all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, with respect to those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender with respect to the LOC.

"**Term Sheet**" means that document(s) dated as of 2/3/2023 betweenBorrower and Lender, setting forth a general summary of the terms of agreement memorializedmore fully herein in final form.

"**Tranche Schedule**" means the schedule of Advances to Borrower from the Lender, based

upon the dates of the disbursements attached hereto as **Exhibit B**; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder do not exceed the Maximum Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Delaware or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

## ARTICLE 2
## THE CREDIT

**Section 2.1. Line of Credit Amount**. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

**Section 2.2. Line of Credit Documents**. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note, this Agreement and each Security Document. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to Lender and its counsel.

## ARTICLE 3
## TERM, INTEREST AND PAYMENTS

**Section 3.1. Initial Term**. The initial term of the LOC is Ten (10) years and shall commence on the Closing Date and expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full thereon and all other amounts due and owing hereunder and under the Promissory Note shall be repaid by Borrower on the Scheduled Maturity Date.

**Section 3.2. Extended Term**. At the end of the initial term set forth in Section 3.1 hereof, and at the end of each Extended Term (as defined below, if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, through the passage of time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty-four (24) month period, up to a total of one (1) such additional consecutive periods (separately, "**Extended Term**"; collectively, the "**Extended Terms**"). In connection with Lender's granting of each Extended Term, (a) Borrower shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorneys' fees, as a one (1)-time fee equal to one percent (1%) of the Project LOC Amount.

2704

**Section 3.3. <u>Applicable Interest Period</u>.** The interest period with respect to each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full.

**Section 3.4. <u>Interest Rate Calculation</u>.** Interest shall be calculated on the basis of a 365-day year and the actual number of days elapsed in a 365-day year and at the rate set forth in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shall be subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "**Maximum Interest Rate**"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to the unpaid principal balance outstanding under the Promissory Note or, if it exceeds such unpaid principal, refunded to the Borrower.

**Section 3.5. <u>Interest Payments</u>.** Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times set forth in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interest shall be calculated on Advances made from the date of each Advance.

**Section 3.6. <u>Reserves</u>.** Following the signing of this Agreement, the Borrower shall remit Twenty Thousand Dollars and No Cents Dollars ($20000) as the ICA Payment in accordance with the terms and the time period set forth in Recital D of this Agreement. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and not refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable.

**Section 3.7. <u>Prepayment</u>.** Borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC.

**Section 3.8. <u>Interest Credit Account</u>.** If, at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which notice shall be delivered to and received by Borrower no less than thirty (30) days prior to the date of the next interest payment date, Borrower shall remit into the ICA the funds necessary to make such interest payment prior to the date such interest payment is due and payable.

**Section 3.9. <u>Fees</u>.**

    (a) **<u>LOC Fee</u>.** At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable fee for the LOC in an aggregate amount equal to One percent (1%) multiplied by the Project LOC Amount, which is equal to Two Thousand Dollars and No Cents Dollars ($2,000) (the "**LOC Fee**"). The LOC Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

    (b) **<u>Promote Fee</u>.** At Closing and out of the initial Advance, the Borrower shall pay

Lender a nonrefundable success fee in an aggregate amount equal to Three percent (3%) multiplied by the Project LOC Amount, which is Six Thousand Dollars and No Cents Dollars ($6,000) (the "**Promote Fee**"). The Promote Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

(c) **ICA Advance Fee**. To the extent the Borrower used Lender to provide the ICA Payment, at Closing and out of the initial Advance, the Borrower shall reimburse Lender in an amount equal to the ICA Payment advanced by Lender plus a nonrefundable fee in an aggregate amount equal to Zero percent (0%) of the ICA Payment, which is No Dollars and No Cents Dollars ($-) (the "**ICA Advance Fee**"). The ICA Advance Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition. Borrower will take the Project LOC Amount in full on the closing of the first tranche.

**Section 3.10.** **Line of Credit Extension Fees**. Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a nonrefundable LOC extension fee for each extension in an aggregate amount equal to two percent (2%) multiplied by the Maximum Amount.

**Section 3.11.** **Legal and Incidental Fees, Charges and Costs**. Borrower shall pay at Closing, all reasonable out of pocket and up to Twelve Thousand, Five Hundred U.S. Dollars ($12,500) for legal fees, recording and filing fees, documentary stamps, taxes, service charges, credit reports, UCC search costs, title company fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial proceeding; provided that Lender will provide Borrower ten (10) days' advance notice of any legal fees pursuant to this Section 3.11 that will exceed Twelve Thousand, Five Hundred U.S. Dollars ($12,500). Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from any and all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or willful misconduct.

**Section 3.12.** **Line of Credit Disbursement Account**. The proceeds of each Advance under the LOC shall be advanced into the LOC Disbursement Account with Lender to be used by Borrower for payment of the Borrower's Project Costs, solely for the purposes and in the manner set forth in this Agreement. The LOC Disbursement Account will be held jointly in the name of

Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights and interest in and to the LOC Disbursement Account, which assignment will be effective only upon the occurrence and continuation of an Event of Default, subject to an applicable Default Cure Period (as hereinafter defined).

**Section 3.13.**  **Taxes**.

(a)    All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after deducting, withholding and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

(b)    Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to Lender. If the Borrower shall fail to pay any Taxes or Other Taxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result of any such failure.

(c)    The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

# ARTICLE 4
## CONDITIONS TO CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing:

**Section 4.1.**  **Delivery of the LOC Documents**.

(a)    As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

(b)    The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Payment Account and Security Account (both as defined under UCC § 9-102 and as further defined in the Security Agreement) maintained by the Borrower.

(c)    Contemporaneously with Borrower's acquisition of the Property, Borrower shall have delivered an executed and notarized mortgage or deed of trust in form and substance required by Lender granting Lender a first priority lien and security interest in and to the Property (the "**Security Instrument**"), and such Security Instrument shall be promptly recorded in the real property records of the county in which such real property is located. If required by Lender, (i) the closing of such Advance and recording of the Security Instrument shall be completed through the services of a title company chosen by Lender, and (ii) such title company shall issue, at Borrower's expense and for the benefit of Lender, a loan policy of title insurance with respect to the Property. For the avoidance of doubt, this Section 4.1(c) shall not operate to preclude any Advances to Borrower to fund pre-acquisition costs.

**Section 4.2. <u>Authority</u>**. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery and performance of the LOC Documents and the consummation of the transactions contemplated thereby, (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners or members of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing with regard to the Borrower.

**Section 4.3. <u>Liens</u>**. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions or restrictions. At the request of Lender, the Borrower shall (i) deliver to the Lender the results of UCC lien searches, satisfactory to the Lender, (ii) the results of federal and state tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) UCC or other lien termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required by this Agreement and the LOC Documents, shall be placed on the Property, the Project or any Collateral without the express written permission of Lender.

**Section 4.4. <u>Litigation</u>**. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

**Section 4.5. <u>Events of Default</u>**. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in full compliance with the terms and provisions of this Agreement.

2704

**Section 4.6. <u>Purchase and Agreement Contracts</u>.** Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

**Section 4.7. <u>Compliance with Certain Requirements</u>.** Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) under local, state, federal and international laws, procedures, statutes, regulations, and ordinances, conditions applicable to the Project.

**Section 4.8.   <u>Evidence of Insurance</u>.**

(a)    For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for and will keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders' loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of similar size and character that of the business of the Borrower, and Borrower shall furnish Lender with the satisfactory evidence of such underlying Borrower insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

(b)    Within five (5) business of receipt of End-Borrower insurance pursuant to Section 4.8(a), Lender shall acknowledge receipt and communicate to Borrower the approval and sufficiency of such End-Borrowers certificate of insurance.

**Section 4.9. <u>Financial Statements</u>.** Lender shall have received all financial reports required by Section 8.6 hereof.

**Section 4.10. <u>Business Pro Forma</u>.** Lender shall receive a pro forma income and expense statement annually in connection with the Project.

**Section 4.11. <u>Management Plan</u>.** Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of Borrower's business.

**Section 4.12. <u>Material Change</u>.** Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower's ability to perform under this Agreement or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent, and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.

**Section 4.13. <u>Non-Subordination</u>.** Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such Subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the normal and reasonable management of the Project).

**Section 4.14. Securitization.** Lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or reasonable due diligence required by the insurer.

## ARTICLE 5
## USE OF LINE OF CREDIT PROCEEDS

**Section 5.1.    Project Costs: Business Expansion Costs.**

(a)      Proceeds of Advances under the LOC shall be utilized by Borrower solely for the purpose of financing the Project Costs, as more fully described on the attached **Exhibit C**, in connection with Borrower Business Expansion as further detailed in the Business Plan, updated yearly by Borrower.

(b)      The proceeds of the LOC shall be used exclusively for the purposes set forth in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family or household purposes. Borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

## ARTICLE 6
## INSPECTIONS

**Section 6.1. Project Inspection.** Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days' prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

**Section 6.2. Books and Records.** Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower pertaining to the Project, the Property, and the Borrower and to make extracts therefrom or copies thereof.

**Section 6.3. Force Majeure Event Inspection Right.** In the event of a Force Majeure Event (as hereinafter defined) which interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until such time as Lender is satisfied of Borrower's ability to resume operations to develop the Project. Following a Force Majeure Event, Lender has the right to modify the terms upon which future Advances may be made as a result of a change in circumstances as determined by Lender in Lender's sole discretion, that the Borrower has ability to perform or continue to perform the

Project scope of work. Borrower shall execute any additional documents, amendments or other agreement of terms required by Lender, before Lender's obligation to continue to make Advances shall resume.

## ARTICLE 7
## ADVANCE OF FUNDS

**Section 7.1. Timing and Advances to Payee.** Advances will be made as set forth in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance have been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than seventy-five (75) calendar days following the opening of the ICA by the Lender with its wholesale lender. Lender shall deliver written notice to Borrower of the commencement of such seventy-five (75)-day period. Lender shall deliver written notice to Borrower via the ZOOMERAL messaging system of the commencement of such seventy-five (75)-day period.

**Section 7.2.    Conditions Precedent to Advance of Funds.** Lender's obligation to make Advances hereunder shall be conditioned upon fulfillment of the terms set forth in Article 4 hereof.

**Section 7.3. Unpaid Lien Claims.** If Lender receives notice of nonpayment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, in accordance with applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower; or (b) withhold one hundred percent (100%) of the lien amount claimed from future Advances.

**Section 7.4. Mandatory Advances.** Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.

## ARTICLE 8
## BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing:

**Section 8.1. Project.** (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation and management of the Project.

**Section 8.2. <u>Compliance with Laws</u>**. Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

**Section 8.3. <u>Compliance with Documents</u>**. Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

**Section 8.4. <u>Books and Records</u>**. Keep and maintain complete and accurate books of account, in accordance with generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

**Section 8.5. <u>Payment of Obligations</u>**. Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established in accordance with generally accepted accounting principles).

**Section 8.6. <u>Financial Reports</u>**. Deliver to Lender, with respect to Borrower as soon as available and in any event (a) within sixty (60) days after the end of each calendar quarter duringthe term of the LOC, financial statements of Borrower for such quarter and (b) within ninety (90) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower,in each case of the foregoing, certified as true and correct (which reports shall be prepared in accordance with generally accepted accounting principles consistently applied) and operating statements in form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender. Borrower must also complete their ZOOMERAL business profile and keep the business profile up to date throughout the term of this agreement.

**Section 8.7. <u>Notification to Lender</u>**. Promptly after learning thereof, notify Lender of: (a) the details of any material action, proceeding, investigation or claim against or affecting the Borrower, the Property, or the Project instituted before any court, arbitrator or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Property or the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower of the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

**Section 8.8. <u>Partnership/Corporate Existence</u>**. Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

## ARTICLE 9
## BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing Borrower shall not:

**Section 9.1. Liquidation, Merger and Sale of Assets.** Liquidate, merge or consolidate with any other Person or otherwise transfer to an unrelated Person fifteen percent (15%) or more of the equity securities of Borrower, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business. Notwithstanding, any initial public offering or acquisition by another company will require Lender's approval or full payment of outstanding loan balance.

**Section 9.2. Liens.** Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such liens, shall not be increased).

**Section 9.3. Indebtedness.** Create, incur or have outstanding any indebtedness of any kind, other than (a) indebtedness owing to the Lender under this Agreement and the other LOC Documents, and (b) indebtedness of the Borrower existing as of the Closing Date as disclosed to and approved by Lender (and any extension, renewal or refinancing thereof but only to the extent that the principal amount thereof does not increase after the Closing Date).

**Section 9.4. Investments, Loans and Guarantees.** (a) Create, acquire or hold any subsidiary, (b) make or hold any investment in any stocks, bonds or securities of any kind (c) be or become a party to any joint venture or other partnership, or (d) make or keep outstanding any advance or loan to any Person, or (e) be or become a guarantor of any kind.

**Section 9.5. Acquisitions.** Enter into any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another Person by a merger, amalgamation or consolidation or any other combination with such Person,

2704

unless specifically stated and approved prior to execution of this Agreement.

**Section 9.6. <u>Organizational Documents</u>.** (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

**Section 9.7.    <u>Project and Project Documents</u>.** Willfully or voluntarily abandon the Project or its activities to develop, construct, operate or maintain the Project. If the same would (i) be a major decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

(a)  terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance of a material obligation by any other Person under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the development, construction, operation and maintenance of the Project, in each case that would have an adverse effect on the Lender; or

(b)    sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation and maintenance of the Project without Lender's consent, which consent shall not be unreasonably withheld.

### Article 10
### REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender that:

**Section 10.1. <u>Validity of Agreement</u>.** The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents. The LOC and the execution, delivery and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable in accordance with their terms. The execution, delivery and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than liens permitted under Section 9.2 hereof) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

**Section 10.2. <u>Existing Defaults</u>.** As of the date of execution of this Agreement, Borrower (or any subsidiary of Borrower) is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other agreement or instrument to which Borrower (or any subsidiary of Borrower) is a party or by which

it, or any of its properties, subsidiaries, partners or other related entities may be bound.

**Section 10.3. <u>No Default in Other Agreements</u>**. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a party or by which it or any of its properties, subsidiaries, partners or other related entities may be bound, or result in the violation by it of any law, order, rule, ordinance, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties, subsidiaries, partners or other related entities.

**Section 10.4. <u>No Consents</u>**. No consent, approval, authorization, or other acknowledgment of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary course of construction of the Project.

**Section 10.5. <u>Litigation</u>**. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to Borrower's knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.

**Section 10.6. <u>Financial Statements</u>**. Any and all balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared in accordance with generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

**Section 10.7. <u>Legal Requirements</u>**. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to environmental protection, occupational safety and health, zoning and equal employment practices.

**Section 10.8. <u>Taxes</u>**. The Borrower has filed all tax returns and reports required of it, has paid all taxes which are due and payable, and has provided adequate reserves for payment of any tax whose payment is being contested; the charges, accruals and reserves on the books of the Borrower in respect of taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority with respect to any taxes except as otherwise previously disclosed to the Lender in writing.

**Section 10.9. <u>Organization and Good Standing</u>**. The Borrower is a duly formed or organized, validly existing and in good standing under the laws of the State of its formation or organization as set forth in the first paragraph of this Agreement, and is qualified as a foreign entity and in good standing in each jurisdiction where the Property and the Project are located.

**Section 10.10. <u>Insurance</u>**. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

**Section 10.11. <u>Accurate and Complete Statements</u>**. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

**Section 10.12. <u>Timing of Lender Funding.</u>** Provided Borrower has met the conditions to Advances in this Agreement, including without limitation the timing for requests set forth in this Section, Lender shall fund Advances in accordance with under the Tranche Schedule, but in no event anymore frequently than every sixty (60) day, unless otherwise consented to in writing by Lender. Borrower must deliver Advance requests to Lender thirty (30) business-banking days prior to the week represented on the Tranche Schedule for which Borrower wishes to receive the proceeds of such Advance from the LOC Disbursement Account. Upon notice of an Advance Request from Borrower, Lender has a forty (40) international business-banking day window based on the Tranche Schedule (with the exception of the first Advance according to Section 7.1) to Payment the requested Advance into the LOC Disbursement Account. Absent a written Advance request from Borrower, in accordance with the conditions and requirements set forth herein, Lender is not obligated to disburse the next scheduled Advance under the Tranche Schedule.

## ARTICLE 11
## NATURE OF REPRESENTATIONS AND WARRANTIES

**Section 11.1. <u>Generally.</u>** The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or

the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subject to a materiality qualifier, true and correct in all respects) as of the date thereof, except for any representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower pursuant to or in connection with the LOC shall be deemed to have been relied upon by Lender.

## ARTICLE 12
## EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "**Event of Default**"):

Section 12.1. **Nonpayment**. Failure to make any payment required by the Promissory Note, this Agreement or any other LOC Documents, and such failure continues for a period of thirty (30) days after notice of such default is sent by Lender to Borrower.

Section 12.2. **Other Covenants and Agreements.** Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not have been fully corrected, by performance of or compliance with such covenants or agreements, within twenty (20) days after notice of such default is sent by Lender to Borrower.

Section 12.3. **Representations and Warranties.** If any representation, warranty or statement made in or pursuant to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made. Such Event of Default can be corrected by presentation of accurate and current material information furnished by the Borrower to the Lender to correct the false or erroneous representation, warranty or statement within ten (10) days after notice of such default is sent by Lender to Borrower.

Section 12.4. **Security.** If any lien granted in this Agreement or any other LOC Document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute, but in no event more than five (5) business days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of Collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute, but in no event more than five (5) business days from the date such change in the lien status occurs appropriate documents to correct such matters.

Section 12.5. **Validity of LOC Documents.** If (a) any material provision, in the sole opinion of the Lender, of any LOC Document shall at any time cease to be valid, binding and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny

that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

**Section 12.6. <u>Petition for Bankruptcy, Insolvency</u>**. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for a period of ninety (90) days; or the taking of action by Borrower to authorize any of the actions set forth in this Section 12.6.

**Section 12.7. <u>Material Litigation</u>**. Any action, suit, proceeding or investigation of any kind involving, or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof of any Litigation , Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, partners, or other related entities, or the Project and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, partners, or other related entities, or the Project of the disclosed Litigation.

# ARTICLE 13
# REMEDIES

**Section 13.1. <u>General</u>**. Following the occurrence of one (1) or more Events of Default, a default cure period of sixty (60) days begins ("Default Cure Period"), except as otherwise provided in Section 13.3 or Section 13.4. If Borrower fails to cure the Event of Default (in the manner specified for each Event of Default pursuant to Article 12) within the Default Cure Period, then the Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies set forth in the Promissory Note, in the LOC Documents, or in any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or in equity, including such rights as are provided in this Article 13. If a Bankruptcy Event referred to in Section 12.6 hereof occurs, (i) all obligations of the Lender to make further Advances under the LOC shall automatically and immediately

terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Upon the occurrence of any Event of Default hereunder pursuant to Section 12.1 whereby Borrower has missed more than two (2) scheduled payments, if Borrower does not have any interest reserve account established for the benefit of the Lender, Borrower shall have a) sixty (60) days Default Cure Period to cure the Event of Default and must (b) Payment an additional one year's worth of interest payments into the Interest Reserve Account.

### Section 13.2. <u>Default and Right to Acquire.</u>

In the event the Borrower is unable to cure the Event of Default (in the manner specified to correct each Event of Default pursuant to Article 12 or within the Default Cure Period,

(a)     Upon the occurrence of an Event of Default hereunder Lender shall have the right, in person or by agent, in addition to all other rights and remedies available to Lender hereunder or under the LOC documents, to enter into possession of the Project and perform or cause enforce any liquidity plan.

(b)     Lender may enter into possession of the Project and perform or cause to be performed any and all work and labor necessary to complete the Project, to operate and maintain the Project and/or to otherwise run the business of the Borrower. All sums expended by the Lender in doing so, together with interest on such total amount at the default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured by the LOC documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

(c)     Borrower thereby, following such Bankruptcy Event or relevant cure periods pursuant to Section 13.2 constitutes and appoints the Lender as its true and lawful attorney-in-fact, with full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

(i)     to enter and endorse all agreements, instruments, and documents in connection therewith.

(ii)     to use any unadvanced proceeds of the LOC for the purpose of completing, operating, or maintaining the Project.

(iii)     to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

(iv)     to employ such managers, contractors, subcontractors, agents, architects,

and inspectors as reasonably shall be required for the foregoing purposes.

(v)　　to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security satisfactory to the Lender has been provided.

(vi)　　to execute applications and certificates in the name of the Borrower which reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

(vii)　　to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

(viii)　　to do any and every act which the Borrower might do on its behalf with respect to the Collateral or any part thereof, or the Project and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be (A) irrevocable, (B) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (C) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

**Section 13.3.　Curing of Defaults by Advances**. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which Lender may have by reason of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender in accordance with the terms hereof before any additional proceeds of the LOC are disbursed.

**Section 13.4.　Remedies Are Cumulative**. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of any rights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidate any act done pursuant to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

**Section 13.5. <u>Offsets</u>.** If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC documents is accelerated pursuant to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, any and all of such obligations then owing by the Borrower, whether or not the same shall then have matured, any and all Payment (general or special) balances, and any and all balances in the Interest Reserve Account and all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

**Section 13.6. <u>Collateral</u>.** The Lender shall at all times have the rights and remedies of a secured party under the UCC, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Documents executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC documents, which the Borrower agrees to do, and make it available to the Lender at a reasonably convenient place to be designated by the Lender. The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC document, each of which findings shall be considered to be an accession to and a part of such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any delivery or taking of possession of the Collateral securing the obligations under the LOC documents, or any portion thereof, pursuant to this Agreement, then, with or without resort to the Borrower personally or any other Person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. No prior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case the Lender shall give the Borrower not fewer than ten (10) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made. The Borrower waives advertisement of any such sale and (except to the extent specifically required by the preceding sentence) waives notice of any kind in respect of any such sale. At any such public sale, Lender may purchase such Collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower hereby waives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC documents, the cost of which shall be paid by Borrower.

**Section 13.7. <u>Default by Lender and Borrower's Sole Remedy.</u>**

(a)    Provided Borrower has fully satisfied and complied with all conditions to Advance, if Lender fails to provide the first (1st) Advance when due, pursuant to the Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver written notice in the form of a notarized termination letter, a copy of which is attached hereto as **<u>Exhibit F</u>** ("the **Termination Letter**"), to Lender by certified mail. Upon receipt of such notice, Lender shall have forty (40) international business-banking days from the date of receipt ("**Refund Period**") within which to return the ICA Payment to Borrower.

(b)    If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice to Lender in the form of a notarized Termination Letter to Lender by certified mail. Within forty (40) international business-banking days from the date of receipt of such notice by Lender, Borrower shall be entitled to (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) termination of Borrower's obligations to Lender hereunder with the exception of Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall cease to accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners or other related entities, for any indirect, special, incidental or consequential damages, losses or expenses in connection with Borrower's or another Person's activities related to, or otherwise by reason of, the LOC, the Advances, the Agreement or the other LOC documents.

(c)    Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances pursuant to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, act of civil disobedience, act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew restriction, expropriation, compulsory acquisition, seizure of works, requisition,

2704

nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from preforming under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period of time the occurrence is expected to continue. Lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. Lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

**Section 13.8 <u>Binding Arbitration.</u>** Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Delaware, before one (1) arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Delaware. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

**ARTICLE 14**
**GENERAL PROVISIONS**

**Section 14.1. <u>Disclaimer of Liability</u>**. Lender has no liability or obligation in connection with the Project except to make Advances under the LOC as agreed under the terms of the LOC

Documents and makes no warranties or representations in connection therewith. No claim may be made by the Borrower or any other Person against the Lender or the Affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

Section 14.2. **Publicity**. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. Lender shall have the right indicating that it has provided the financing for the Project.

Section 14.3. **Confidentiality.** Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary in nature, and Borrower hereby agrees to maintain confidential this Agreement, the LOC documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place. Borrower's disclosure of a confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative in nature.

Section 14.4. **Responsibility for Application of Funds**. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced pursuant to this Agreement. Lender may rely solely upon Borrower's requests for Advances, affidavits, statements and reports in making said Advances and Borrower does hereby release and indemnify Lender and hold Lender harmless from any and all losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final andnon-appealable decision).

Section 14.5. **Non-Disparagement**. Borrower agrees and covenants that Borrower shall not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory, maliciously false, or disparaging remarks, comments, or statements concerning the Lender or its businesses, or any of its employees, officers, or directors and its existing and

prospective clients, suppliers, investors, and other associated third parties, now or in the future. For the avoidance of doubt, breach of this Section 10.04 shall constitute an Event of Default pursuant to Section 7.02 under which Lender has the right to terminate all obligations under the Loan Documents pursuant to Section 9.01(b).

**Section 14.6 <u>Opportunity to Consult with Counsel</u>.** Borrower acknowledges that it has had an opportunity to consult with and be represented by counsel of Borrower's choosing in the review of the Loan Documents, that it has been advised by Lender to do so, that the Borrower is fully aware of the contents of the Loan Documents and of its legal effect, and that Borrower enters into these Loan Documents freely, without duress or coercion, and based on Borrower's own judgment and wishes and not in reliance upon any representation or promise made by the Lender, other than those contained herein.

**Section 14.7 <u>Notices</u>.** All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety six (96) hours after deposit in first class certified United States mail, postage prepaid, return receipt requested, or two (2) business days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given pursuant to this paragraph:

To Borrower:    

To Lender:    Genie Investments
P.O. Box 5886
Wilmington, Delaware 19808

**Section 14.8. <u>Applicable Law</u>.** This Agreement and, unless otherwise specifically provided for therein, each other LOC document, shall be governed by and construed in accordance with the laws of the State of Delaware and the United States.

**Section 14.9. <u>Successors and Assigns</u>.** The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

**Section 14.10. <u>Severability</u>.** The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition. In the event of any conflict or inconsistency between the terms and provisions of this Agreement and any of the LOC Documents, the terms and provisions of this Agreement shall control.

**Section 14.11. <u>Amendments</u>**. This Agreement may not be modified or amended except by written agreement signed by the Borrower and Lender.

**Section 14.12. <u>Headings; Attachments</u>**. The several headings to articles, sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part hereof.

**Section 14.13. <u>No Third-Party Rights</u>**. This Agreement is made entirely for the benefit of Borrower, the Lender, and their successors in interest (including any participants). No third party shall have any rights hereunder.

**Section 14.14. <u>Indemnification</u>**. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement. The Borrower hereby agrees to indemnify, defend and hold harmless Lender, the managers of Lender, and all of their members, managers, affiliates and advisors, from any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs)that they may incur by reason of Borrower's failure to fulfill all of the terms and conditions of thisAgreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to,any damages, losses, liabilities, costs and expenses (including attorneys' fees and costs) incurred by Lender, the managing members of Lender, or any of its members, managers, affiliates or advisors, defending against any alleged violation of federal or state securities laws which is basedupon or related to any untruth or inaccuracy of any of the representations, warranties or agreementscontained herein or in any other documents the Borrower has furnished in connection with this transaction.

**Section 14.15. <u>General Limitation of Liability</u>**. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the

transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. In addition to the tolling provided under Section 6.3, Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

**Section 14.16. <u>Entire Agreement</u>.** This Agreement, the Promissory Note and any other LOC Document or other agreement, document or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings with respect to the subject matter hereof.

**Section 14.17. <u>Execution in Counterparts</u>.** This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute one and the same Agreement.

**Section 14.18. <u>Legal Representation of the Parties</u>.** The LOC Documents were negotiated by the Parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

**Section 14.19. <u>JURY TRIAL WAIVER</u>.** THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

[Remainder of page intentionally left blank; Signatures follow]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

LENDER: GENIE INVESTEMENTS

By: *Genie Investments*

    Name: Genie Investments

BORROW~~~~

    By:
    Nam~~
    Titl~~

SUBSCRIBED AND SWORN TO BEFORE ME on this *10th* day of

*February*, 20~~23~~

*Catherine M Pytel*
NOTARY PUBLIC
In and for the State of *Rhode Island*

My Commission Expires: 6/18/2025

CATHERINE M. PYTEL
Notary Public, State of Rhode Island
My Commission Expires June 18, 2025

2704

**EXHIBIT A**
**PROMISSORY NOTE**

$208,000 – Maximum Principal Amount                    February 3, 2023

FOR VALUE RECEIVED, ████████, a Rhode Island Limited Liability Company (the "**Maker**"), hereby promises to pay to GENIE INVESTMENTS or any subsequent holder of this Promissory Note (the "**Payee**"), at such place as Payee may designate, the principal sum of Two Hundred Thousand Dollars and No Cents and 00/100 Dollars ($200,000) or the aggregate unpaid principal amount of all Advances, plus the Fees set forth in Section 3.9 of the LOC Agreement, as such terms are defined in the LOC Agreement (as hereinafter defined) and the other LOC Documents, made by Payee to Maker pursuant to the LOC Agreement, whichever is greater, plus interest on the principal sum and all unpaid balances and all other amounts owed by Maker to Payee at the interest rate set forth below, payment of principal and interest to be made in lawful money of the United States in immediately available funds, as set forth below. Capitalized terms used herein and defined in the LOC Agreement, but not otherwise defined herein, shall have the meaning given such term in the LOC Agreement; and

(a)    Maker shall make payments under this Master Promissory Note (as the same may from time to time be amended, restated or otherwise modified, this "**Note**") as follows: (i) simple interest payments on the outstanding principal amount of the Advances, at a fixed rate equal to Two and One Half percent (2.5%) per annum, which interest payments shall be due and payable to Payee quarterly in arrears, on the first (1st) business day of each January, April, June and September of each year, with the first payment due on the first such date immediately following the date of the first Advance hereunder; and (ii) the outstanding principal balance of the Note, and all remaining accrued and unpaid interest, late charges and all other amounts due to Payee pursuant to this Note and the LOC Documents shall be due and payable in full no later than the Scheduled Maturity Date.

(b)    Except for the quarterly payments set forth above, this Note may be prepaid in whole or in part, as provided in the LOC Agreement.

(c)    All payments made will be applied first to any late charges or other accrued fees and charges, then to accrued interest, and then to the principal amount of the Note. Maker shall make each payment hereunder to the Payee without any deduction, offset, abatement, recoupment, counterclaim or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on account until such payment is honored when presented for payment at the drawee bank. Whenever any payment to be made hereunder, including, without limitation, any payment to be made on any Advance, shall be stated to be due on a day that is not a business day, such payment shall be made on the next business day and such extension of time shall in each case be included in the computation of the interest payable on such Advance. The aggregate unpaid amount of Advances and similar information with respect to the LOC set forth on the records of Payee shall be rebuttably presumptive evidence with respect to such information, including the amounts of principal, interest and fees owing to Payee.

(d)    Maker shall pay all amounts due under this Note to GENIE INVESTMENTS, Corporate Office at the address provided under Section 14.5 of the LOC Agreement or such other offices as may be designated by Payee from time to time.

(e)    All amounts owed by Maker pursuant to this Note shall be collectively referred to herein as the **"Obligation"** of Maker.

In addition, the following provisions shall govern this Note:

1.    **LINE OF CREDIT AGREEMENT AND LINE OF CREDIT DOCUMENTS.** This Note is made and delivered to Payee pursuant to and is subject to all terms and conditions set forth in the that certain Business Expansion Line of Credit Agreement of even date herewith between Maker and Payee (as the same may from time to time be amended, restated or otherwise modified, the **"LOC Agreement"**). This Note is secured by certain Collateral, as evidenced by the LOC Documents, covering the personal and/or real property described therein.

2.    **LATE CHARGES.** If any amount payable under this Note is paid more than ten (10) business days after the due date thereof, then late charges (the **"Late Charges"**) shall be added to the delinquent payment in an amount equal to five percent (5.00%) of such late payment for the extra expense in handling past due payments. Any such Late Charges shall be due and payable without demand, and Payee, at its option, may (i) refuse any late payment or any subsequent payment unless accompanied by the applicable Late Charge, (ii) add the Late Charges to the principal balance of this Note, and (iii) treat the failure to pay the Late Charges as demanded as an Event of Default under this Note. If Late Charges are added to the principal balance of this Note, those Late Charges shall bear interest at the same rate as the principal balance under this Note. Any payment to Payee by check, draft or other item shall be received by Payee subject to collection and will constitute payment only when collected and not when received.

3.    **DEFAULT, CROSS-DEFAULT AND ACCELERATION.** Time is of the essence. If Maker fails to make any payment of principal, interest or any other Obligation on the date the same is due and payable under this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or Maker or anyother party fails to meet or perform any other obligation under any term or condition of thisNote, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or an Event of Default occurs under the LOC Agreement or anyof the other LOC Documents, and subject to any applicable notice and cure periods set forth in the LOC Agreement or any other LOC Documents, such Event of Default is not cured, then this Note shall be in default ("Default"). Upon Default, Payee shall provide written notice to Maker specifying the nature of the Default and directing that it be remedied within the applicable notice and cure period as set forth in the LOC Agreement. Upon Default, the interest rate provided for in this Note shall immediately increase to eighteen percent (18%) per annum (the "Default Rate"), unless and until cured by Maker, and upon Maker's failure to cure any default, the entire unpaid amount of this Note shall be immediately due and payable without further notice or

2704

demand from Payee. Until cured, interest shall accrue daily after default with daily interest being added to principal on the last day of each calendar month and thereafter compounded to calculate interest on the amounts owed pursuant to this Note, and Maker shall thereafter be liable for all costs of collection, including reasonable attorneys' fees and costs, in addition to the payment of principal, interest and any other amount.

Should there be a material misappropriation of more than ten (10%) percent of the proceeds of the Advances which causes anEvent of Default, the Borrower shall immediately surrender controlling management interest in ▮▮▮▮▮▮▮▮▮▮ and the Project to GENIE INVESTMENTS.

4.    **COSTS, FEES AND COMPENSATION.** Maker further promises to pay all amounts owed under this Note, the LOC Agreement and the other LOC Documents, and all Obligations owed pursuant to this Note, the LOC Agreement and the LOC Documents, and shall pay all such amounts as specified therein.

5.    **WAIVER.** Maker and all endorsers, guarantors and all Persons liable or to become liable on this Note waive presentment, demand, notice of dishonor, notice of default or delinquency, notice of acceleration, notice of nonpayment, notice of costs, expenses or losses and interest thereon, and any and all other notices or matters of a like nature, other than notices required pursuant to this Note, the LOC Agreement or the other LOC Documents.

6.    **SUCCESSOR AND ASSIGNS.** The terms of this Note shall apply to, inure to the benefit of, and bind all Parties hereto and their respective successors, and assigns.

7.    **CUMULATIVE REMEDIES.** Upon the occurrence of any default under this Note, the LOC Agreement, or any of the other LOC Documents, or an Event of Default occurs, Payee shall have all rights specified therein and as provided under relevant law. No remedy or election hereunder shall be deemed exclusive but shall wherever possible, be cumulative with all other remedies at law or equity.

8.    **GOVERNING LAW; VENUE AND JURISDICTION; BINDING ARBITRATION; WAIVER OF TRIAL BY JURY.** This Note shall be governed by and construed in accordance with the laws of the State of Delaware and the United States.

**BINDING ARBITRATION:** Any dispute, claim or controversy arising out of or relating to this Note, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Delaware, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, atthe election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forthin Section 14.5 of the LOC Agreement. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an

arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Delaware. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Note, this agreement to arbitrate, or any of the LOC Documents.

**JURY TRIAL WAIVER**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

9.    **AUTHORIZATION.** To induce Payee to enter into this Note and extend and advance funds to Maker pursuant to the terms contained herein and pursuant to the LOC Agreement, Maker hereby represents and warrants as follows, acknowledging that Payee is relying on the truth and accuracy of the following representations and warranties in entering into this Note:

(a)    That the undersigned is the authorized representative of Maker and has the authority to bind Maker; and

(b)    that Maker is duly organized and validly existing and in good standing under the laws of the State of its formation, and duly qualified to transact business and in good standing in any United States state where the nature of its business or properties requires such qualification, with full power and authority, corporate or otherwise, to enter into and perform this Note; that Maker has taken all actions required to be taken in connection herewith; and

(c)     that upon execution of this Note by the undersigned, this Note will constitute a legal, valid, and binding Obligation of Maker and will be enforceable against Maker as set forth herein, except as enforceability thereof may be limited by bankruptcy, insolvency, moratorium and similar laws and by equitable principles, whether considered at law or in equity.

10.     **ATTORNEY FEES AND COSTS OF COLLECTION.**  Maker shall pay Payee all reasonable expenses, attorney fees and costs incurred in any action or proceeding by Payee to enforce the terms of this Note, the LOC Agreement and/or any of the LOC Documents, including, without limitation, all reasonable expenses, attorney fees and costs on appeal.

11.     **MISCELLANEOUS PROVISIONS.**

(a)     No delay or omission on the part of the Payee in exercising any rights hereunder or under the terms of any Security Agreement, pledge agreement, any guaranty made to guarantee payment of this Note or any other Security Document given to secure this Note, shall operate as a waiver of such rights or of any other right hereunder or under said security agreements, pledge agreements, guaranties or other documents.

(b)     The invalidity or unenforceability of any provision hereof, of this Note, the LOC Agreement or any of the other LOC Documents, or of any other instrument, agreement or document now or hereafter executed in connection with the loan made pursuant thereto, or any Obligation created thereunder shall not impair or vitiate any other provision of any of such instruments, agreements and documents, all of which provisions shall be enforceable to the fullest extent now or hereafter permitted by law.

(c)     This Note, the LOC Agreement and the other LOC Documents may only be amended, terminated, extended, or otherwise modified by a writing signed by the Party against which enforcement is sought. In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealing, or the like be effective to amend, terminate, extend, or otherwise modify any of same.

(d)     This Note and the rights and remedies provided for herein may be enforced by Payee or any subsequent holder hereof. Wherever the context permits, each reference to the term "holder" herein shall mean and refer to Payee or the then subsequent holder of this Note.

(e)     Maker agrees that the holder of this Note may, without notice to Maker and without affecting the liability of Maker, accept security for this Note and any additional or substitute security, if any, or release any security or any party liable for this Note, including any guarantor, or extend or renew this Note.

[Remainder of page intentionally left blank; Signature page follows]

2704

IN WITNESS WHEREOF, the Maker has duly executed and delivered this Promissory Note as of the date first set forth above.

**MAKER**

Title: _____

Address: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

SUBSCRIBED AND SWORN TO BEFORE ME on this _10th_ day of _February_, 20*23*

*Catherine M Pytel*
NOTARY PUBLIC
In and for the State of _Rhode Island_

My Commission Expires: _6/18/2025_

CATHERINE M. PYTEL
Notary Public, State of Rhode Island
My Commission Expires June 18, 2025

2704

**EXHIBIT B**
**TRANCHE SCHEDULE**

| | | |
|---|---|---|
| Tranche 1 | Within 75 calendar days of confirmation of the clearing of the funds remitted by Borrower being funded to the wholesale lender by Lender pursuant to Section 7.1 | $40,000 |
| Tranche 2 | 75 calendar days after the date of the funding of Tranche 1 | $160,000 |
| Tranche 3 | N/A | |
| Tranche 4 | N/A | |

2704

**EXHIBIT C**
**PROJECT COSTS**

**EXHIBIT D**
**THE PROJECT**

**EXHIBIT E**
**SECURITY AGREEMENT**

This SECURITY AGREEMENT, dated as of February 3, 2023    (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**"), is made by ▮▮▮▮▮▮▮ (the "**Grantor**"), in favor of GENIE INVESTMENTS (the "**Secured Party**").

WHEREAS, the Grantor and the Secured Party are entering into that certain Business Expansion LOC Agreement, dated of even date herewith (as amended, supplemented, or otherwise modified from time to time, the "**LOC Agreement**").

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all the Secured Obligations (as hereinafter defined); and

WHEREAS, it is a condition to the obligation of the Lender to make the LOC under the LOC Agreement that the Grantor execute and deliver this Agreement, and this Agreement is being executed and delivered in consideration of the Secured Party entering into the LOC Agreement and each financial accommodation granted to the Secured Party by the Lender .

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.    <u>Definitions</u>. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the LOC Agreement. Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement. Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9. For purposes of this Agreement, the following terms shall have the following meanings:

"**Collateral**" has the meaning set forth in Section 2 hereof.

"**Control Agreement**" means (a) with respect to a Payment account, each Payment Account Control Agreement (or similar agreement with respect to a Payment Account) among the Grantor, the Lender and a depository institution, to be in form and substance satisfactory to the Lender, and
(b) with respect to a Securities Account, each Securities Account Control Agreement (or similar agreement with respect to a Securities Account) among the Grantor, the Lender and a securities intermediary, to be in form and substance satisfactory to the Lender; as any of the foregoing may from time to time be amended, restated or otherwise modified.

"**Payment Account**" means a Payment account, as that term is defined in the

UCC. "**Event of Default**" has the meaning set forth in the LOC Agreement.

"**First Priority**" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the LOC Agreement).

2704

**"Proceeds"** means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.

**"Secured Obligation(s)"** has the meaning set forth in Section 3 hereof.

**"Securities Account"** means a securities account, as that term is defined in the UCC.

**"UCC"** means the Uniform Commercial Code as in effect from time to time in the State of Delaware or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2.    Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of Grantor's right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the **"Collateral"**):

(a)    all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, Payment accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

(b)    all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

3.    Secured Obligations. The Collateral secures the due and prompt payment and performance of:

(a)    the obligations of the Grantor from time to time arising under the LOC Agreement, this Agreement, any other LOC Document or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the LOC (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, reasonable attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or

2704

contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the LOC Agreement, this Agreement and the other LOC Documents; and

(b)      all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the LOC Agreement, this Agreement, the other LOC Documents or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in this Section 3 being herein collectively called the "**Secured Obligations**").

4.      Perfection of Security Interest and Further Assurances.

(a)      The Grantor shall, from time to time, as may be required by the Secured Party with respect to all Collateral, promptly take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable, the Grantor shall promptly take all actions as may be requested from time to time by the Secured Party so that the security interest in the Collateral granted hereunder is obtained and at all times held by the Secured Party. All the foregoing shall be at the sole cost and expense of the Grantor.

(b)      The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section 4 promptly to the Secured Party upon request. The Grantor also hereby ratifies any and all financing statements or amendments previously filed by the Secured Party in any jurisdiction

(c)      The Grantor hereby further authorizes the Secured Party to file with the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any state of the United States or in any other country) this Agreement and other documents for the purpose of perfecting, confirming,

continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

(d)    If the Grantor shall at any time hold or acquire any certificated securities, promissory notes, tangible chattel paper, negotiable documents or warehouse receipts relating to the Collateral, then the Grantor shall promptly endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.

(e)    If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (i) promptly notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

(f)    If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

(g)    The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

5.    <u>Representations and Warranties</u>. The Grantor represents and warrants as follows:

(a)    (i) the Grantor's exact legal name is correctly stated in the first paragraph of this Agreement and on the signature page hereof, and (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the first paragraph of this Agreement.

(b)    The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes, or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state, or local statute or rule in respect of such Collateral. The Grantor has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and

ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

(c)     At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the LOC Agreement.

(d)     The pledge of the Collateral pursuant to this Agreement creates a valid andperfected First Priority security interest in the Collateral, securing the payment andperformance when due of the Secured Obligations.

(e)     Grantor has full power, authority, and legal right to borrow the Advances under the LOC and pledge the Collateral pursuant to this Agreement.

(f)     Each of this Agreement, the LOC Agreement, and the LOC Documents has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

(g)     No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Advances under the LOC and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor or the performance by the Grantor of its obligations thereunder.

(h)     The execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(i)     The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

(j)     Schedule 2 hereto lists all banks, other financial institutions and securities intermediaries at which the Grantor maintains Payment Accounts or Securities Accounts as of the Closing Date, and Schedule 2 hereto correctly identifies the name, address and telephone number of each such financial institution or securities intermediary, the name in

2704

which the account is held, a description of the purpose of the account, and the complete account number therefor.

(k)     Schedule 3 hereto lists all intellectual property and rights which Grantor holds an interest, ownership, or other right.

6.     Receivables. If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7.     Covenants. The Grantor covenants as follows:

(a)     The Grantor will not, without providing at least thirty (30) days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b)     The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4 hereof, will be kept at those locations of the Grantor previously disclosed to the Secured Party and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c)     The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d)     The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the LOC Agreement or herein or with the prior written consent of the Secured Party.

(e)     The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located pursuant to the provisions of the LOC Agreement.

2704

(f)     The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

(g)     The Grantor will continue to operate its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

(h)     The Grantor shall promptly notify the Secured Party in writing upon the acquisition or creation by the Grantor of a Payment Account or Securities Account not listed on Schedule 2 hereto, and, prior to or simultaneously with the creation of such Payment Account or Securities Account, provide for the execution of a Control Agreement with respect thereto, if required by the Secured Party.

(i)     The Grantor shall provide the Secured Party with prompt written notice with respect to any material real or personal property (other than property acquired in the ordinary course of business) acquired by the Grantor subsequent to the Closing Date. In addition to any other right that the Secured Party may have pursuant to this Agreement or otherwise, upon written request of the Secured Party, whenever made, the Grantor shall grant to the Secured Party, as additional security for the Secured Obligations, a First Priority lien on any real or personal property of the Grantor (other than for leased equipment or equipment subject to a purchase money security interest in which the lessor or purchase money lender of such equipment holds a first priority security interest, in which case, the Secured Party shall have the right to obtain a security interest junior only to such lessor or purchase money lender), including, without limitation, such property acquired subsequent to the Closing Date, in which the Secured Party does not have a First Priority lien. The Grantor agrees that, within thirty (30) days after the date of such written request, to secure all of the Secured Obligations by delivering to the Secured Party security agreements, intellectual property security agreements, pledge agreements, mortgages (or deeds of trust, if applicable) or other documents, instruments or agreements or such thereof as the Secured Party may require. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

(j)     At the request of the Secured Party, the Grantor shall, with respect to any real property owned by the Grantor or any real property on which the Project is located, provide, or cause to be provided, to the Secured Party, (a) a mortgage (or comparable document) relating to such real property, in form and substance satisfactory to Secured Party, (b) title and lien searches with respect to such real property and such other information, documents or agreements as may be deemed necessary or advisable by the Secured Party r in connection with such mortgage, and (c) such corporate governance and authorization documents and an opinion of counsel with respect to such mortgage as may be deemed necessary or advisable by the Secured Party. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

8.     Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party as the Grantor's attorney-in-fact, with full authority in the place and stead of

2704

the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9.     Secured Party May Perform. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10.    Reasonable Care. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11.    Remedies Upon Default.

(a)    If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days prior to the date of such disposition shall constitute reasonable notice. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law,

2704

the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages and demands Grantor may acquire against the Secured Party arising out of the exercise by Secured Party of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

(b)    If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the reasonable fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(c)    If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section 11, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12.    No Waiver and Cumulative Remedies. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14 hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

2704

13.    SECURITY INTEREST ABSOLUTE. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon, and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a)    any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument.

(b)    any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the LOC Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c)    any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver, or other modification of any guaranty, for all or any of the Secured Obligations.

(d)    any manner of sale, disposition, or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations.

(e)    any default, failure, or delay, willful or otherwise, in the performance of the Secured Obligations.

(f)    any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

(g)    any other circumstance (including, without limitation, any statute of limitations) or manner of administering the LOC or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14.    Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15.    Addresses for Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the LOC Agreement, and addressed to the respective parties at their addresses as specified in the LOC Agreement or as to either Party at such other address as shall be designated by such Party in a written notice to each other Party.

16.    Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 17 hereof, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

17.    Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18.    GOVERNING LAW. This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Delaware and the United States.

19.    Binding Arbitration. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Delaware, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 of the LOC Agreement. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available

2704

remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Delaware. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

20.   **JURY TRIAL WAIVER.** EACH PARTY HERETO, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE GRANTOR AND THE SECURED PARTY, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH THIS AGREEMENT, THE LOC AGREEMENT, ANY OTHER LOC DOCUMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

21.   Counterparts. This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other LOC Documents constitute the entire contract among the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

*Signatures Follow on Next Page*

2704

IN WITNESS WHEREOF, the Grantor hereto has executed this Security Agreement as of the date first set forth above.

GRANTOR

Title: _____

SUBSCRIBED AND SWORN TO BEFORE ME on this _____ day of
_February_, 20~~2~~3

_Catherine M Pytel_
NOTARY PUBLIC
In and for the State of
_Rhode Island_
My Commission Expires: _6/18/2025_

CATHERINE M. PYTEL
Notary Public, State of Rhode Island
My Commission Expires June 18, 2025

2704

**EXHIBIT F**
**FORM TERMINATION LETTER**

GENIE INVESTMENTS
P.O. Box 5886
Wilmington, Delaware 19808

Re: ▮▮▮▮▮▮▮

To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above referenced transaction pursuant to the terms of the LOC Agreement dated February 3, 2023.

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER: ▮▮▮▮▮▮▮

By:_____

Name: ▮▮▮▮▮▮_____

Title: _____

**SUBSCRIBED AND SWORN TO BEFORE ME** on this____day of
_____, 20__.

_____
NOTARY PUBLIC
In and for the State of _____

My Commission Expires:

_____

Please confirm your Wiring Instructions:
Account Title:
Address on Account:
Bank Name:
Bank Address:
Routing #:
Account #:

# EXHIBIT 7

# THOMPSON LOGISTICS LLC

2812 W Oxford Street
Philadelphia, Pennsylvania 19121

### Letter of Intent to Purchase Real Estate

2 December 2025

To whom it may concern:

This is a letter to confirm that THOMPSON LOGISTICS LLC ("THOMPSON") is authorized to purchase real estate. All transactions are required to follow company acquisition guidelines and real estate purchase procedures.

Upon reconversion of Genie Investments NV Inc. ("Genie"), a debtor in case number 3:24-BK-00496-BAJ, THOMPSON intends to enter an agreement with Genie to purchase real estate. THOMPSON has reviewed a contract from Genie, acknowledges and understands that an interest payment is required upfront to enter the transaction. THOMPSON intends to make that payment within thirty (30) days of reconversion of Genie.

If additional information is necessary, please call Angela at (904) 377-9301 or write to the address listed above.

Sincerely,

Angela C.
Operations Mgr.

# EXHIBIT 8



West Palm Holdings Inc.
ZOOMERAL USER ID: 1999

August 2, 2024

Re: Demand for Outstanding Principal

Dear Scott Mednick,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Seventy thousand dollars ($80,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $70,000 |
| (-) Interest Credit Account (ICA) balance: | $31,191 |
| **Amount due today (OP less ICA):** | **$38,809** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



festivalPass, LLC
ZOOMERAL USER ID: 2214

August 2, 2024

Re: Demand for Outstanding Principal

Dear Edward Vincent,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Two hundred thousand dollars ($200,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $200,000 |
| <u>(-) Interest Credit Account (ICA) balance:</u> | <u>$90,931</u> |
| **Amount due today (OP less ICA):** | **$109,069** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Prograta Group, LLC
ZOOMERAL USER ID: 621

August 2, 2024

Re: Demand for Outstanding Principal

Dear Jamaal Wilson,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Twenty-five thousand dollars ($25,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $25,000 |
| (-) Interest Credit Account (ICA) balance: | $1,164 |
| **Amount due today (OP less ICA):** | **$23,836** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Relco Industries LLC
ZOOMERAL USER ID: 2014

August 2, 2024

Re: Demand for Outstanding Principal

Dear Richard Ellison,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Eighty thousand dollars ($80,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a feasible settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $80,000 |
| (-) Interest Credit Account (ICA) balance: | $35,647 |
| **Amount due today (OP less ICA):** | **$44,353** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within 5 business days from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



LaneAxis
ZOOMERAL USER ID: 2113

August 2, 2024

Re: Demand for Outstanding Principal

Dear Rick Burnett,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **One hundred thousand dollars ($100,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $100,000 |
| (-) Interest Credit Account (ICA) balance: | $19,397 |
| **Amount due today (OP less ICA):** | **$80,603** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



**Gobi Group LLC**
ZOOMERAL USER ID: 2270

August 2, 2024

Re: Demand for Outstanding Principal

Dear Richard Meyers,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Fifty thousand dollars ($50,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

|  For your reference, here are your current totals: | | |
| --- | --- | --- |
| Outstanding Principal (OP): | $50,000 |
| (-) Interest Credit Account (ICA) balance: | $22,279 |
| **Amount due today (OP less ICA):** | **$27,721** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



NEWVENTURES1 LTD
ZOOMERAL USER ID: 2276

August 2, 2024

Re: Demand for Outstanding Principal

Dear Paul Dsouza,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Fifty-three thousand six hundred dollars ($53,600)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

> For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $53,600 |
| (-) Interest Credit Account (ICA) balance: | $24,369 |
| **Amount due today (OP less ICA):** | **$29,231** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

> Account Number: 890000167613
> ACH routing: 122287251
> Wire routing: 122287251
> Title: Genie Investments NV Inc.
> Address: P.O. Box 60443, Jacksonville, Florida 32236
> Bank Name: Axos Bank
> Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



**GENIE INVESTMENTS**

Helu U.S. Holdings Inc
ZOOMERAL USER ID: 2288

August 2, 2024

Re: Demand for Outstanding Principal

Dear Heather Lutz,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Twenty thousand dollars ($20,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

| For your reference, here are your current totals: | |
| --- | --- |
| Outstanding Principal (OP): | $20,000 |
| (-) Interest Credit Account (ICA) balance: | $8,911 |
| **Amount due today (OP less ICA):** | **$11,089** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Uncle Willie's Wings Inc.
ZOOMERAL USER ID: 2341

August 2, 2024

Re: Demand for Outstanding Principal

Dear Walter Green,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **One hundred twenty thousand dollars ($120,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a feasible settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $120,000 |
| (-) Interest Credit Account (ICA) balance: | $54,558 |
| **Amount due today (OP less ICA):** | **$65,442** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within 5 business days from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Knights Bank
ZOOMERAL USER ID: 2364

August 2, 2024

Re: Demand for Outstanding Principal

Dear Dustin Briggs,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Two hundred thousand dollars ($200,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $200,000 |
| <u>(-) Interest Credit Account (ICA) balance:</u> | <u>$96,372</u> |
| **Amount due today (OP less ICA):** | **$103,628** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Sumerian LLC
ZOOMERAL USER ID: 2377

August 2, 2024

Re: Demand for Outstanding Principal

Dear Mohammed Alhareb,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **One hundred twenty thousand dollars ($120,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

| For your reference, here are your current totals: | |
| --- | --- |
| Outstanding Principal (OP): | $120,000 |
| (-) Interest Credit Account (ICA) balance: | $54,838 |
| **Amount due today (OP less ICA):** | **$65,162** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Wasatch Home Buyers, Inc.
ZOOMERAL USER ID: 2384

August 2, 2024

Re: Demand for Outstanding Principal

Dear Jeff Rappaport,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Five hundred thousand dollars ($500,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

| For your reference, here are your current totals: | |
|---|---|
| Outstanding Principal (OP): | $500,000 |
| (-) Interest Credit Account (ICA) balance: | $228,493 |
| **Amount due today (OP less ICA):** | **$271,507** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Hachi Capital LLC
ZOOMERAL USER ID: 2399

August 2, 2024

Re: Demand for Outstanding Principal

Dear Craig Boddington,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **One hundred thousand dollars ($100,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a feasible settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $100,000 |
| (-) Interest Credit Account (ICA) balance: | $45,465 |
| **Amount due today (OP less ICA):** | **$54,558** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within 5 business days from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Atlas Global Enterprise LLC
ZOOMERAL USER ID: 2402

August 2, 2024

Re: Demand for Outstanding Principal

Dear Mario Wongshue,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **One hundred thousand dollars ($100,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a feasible settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $100,000 |
| (-) Interest Credit Account (ICA) balance: | $45,945 |
| **Amount due today (OP less ICA):** | **$54,055** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within 5 business days from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



# GENIE INVESTMENTS

LeRae Farms LLC
ZOOMERAL USER ID: 2465

August 2, 2024

Re: Demand for Outstanding Principal

Dear Travis Anderson,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Two hundred thousand dollars ($200,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a feasible settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $200,000 |
| (-) Interest Credit Account (ICA) balance: | $90,931 |
| **Amount due today (OP less ICA):** | **$109,069** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within 5 business days from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



10xmultifamily LLC
ZOOMERAL USER ID: 2531

August 2, 2024

Re: Demand for Outstanding Principal

Dear Omodolapo Abioro,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Forty thousand dollars ($40,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a feasible settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $40,000 |
| (-) Interest Credit Account (ICA) balance: | $19,351 |
| **Amount due today (OP less ICA):** | **$20,649** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within 5 business days from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



KASY Consulting LLC
ZOOMERAL USER ID: 2565

August 2, 2024

Re: Demand for Outstanding Principal

Dear Kenneth Yesh II,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Twenty thousand dollars ($20,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $20,000 |
| (-) Interest Credit Account (ICA) balance: | $9,536 |
| **Amount due today (OP less ICA):** | **$10,464** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Casual Skillet LLC
ZOOMERAL USER ID: 2587

August 2, 2024

Re: Demand for Outstanding Principal

Dear Dominique Brown,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Sixty-five thousand dollars ($65,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a feasible settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $65,000 |
| (-) Interest Credit Account (ICA) balance: | $4,768 |
| **Amount due today (OP less ICA):** | **$60,232** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within 5 business days from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



CMZ Investments LLC
ZOOMERAL USER ID: 2594

August 2, 2024

Re: Demand for Outstanding Principal

Dear Carson Zuro,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Sixty thousand dollars ($60,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a feasible settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $60,000 |
| (-) Interest Credit Account (ICA) balance: | $27,567 |
| **Amount due today (OP less ICA):** | **$32,433** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within 5 business days from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



**GENIE INVESTMENTS**

BJP Investments LLC
ZOOMERAL USER ID: 2611

August 2, 2024

Re: Demand for Outstanding Principal

Dear Brandon Penn,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Twenty thousand dollars ($20,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $20,000 |
| (-) Interest Credit Account (ICA) balance: | $9,342 |
| **Amount due today (OP less ICA):** | **$10,658** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Latent Wealth Group LLC
ZOOMERAL USER ID: 2646

August 2, 2024

Re: Demand for Outstanding Principal

Dear Mark Steiner,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Six hundred thousand dollars ($600,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a feasible settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $600,000 |
| (-) Interest Credit Account (ICA) balance: | $263,350 |
| **Amount due today (OP less ICA):** | **$336,650** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within 5 business days from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Chalanco Funding LLC
ZOOMERAL USER ID: 2658

August 2, 2024

Re: Demand for Outstanding Principal

Dear Paul Chase,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Ten thousand dollars ($10,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a feasible settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $10,000 |
| (-) Interest Credit Account (ICA) balance: | $4,671 |
| **Amount due today (OP less ICA):** | **$5,329** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within 5 business days from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



JJHK Enterprise Inc.
ZOOMERAL USER ID: 2665

August 2, 2024

Re: Demand for Outstanding Principal

Dear Heather Forrey,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Fifty thousand dollars ($50,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

|  |  |
|---|---|
| Outstanding Principal (OP): | $50,000 |
| (-) Interest Credit Account (ICA) balance: | $23,356 |
| **Amount due today (OP less ICA):** | **$26,644** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Global Web3 Ventures LLC
ZOOMERAL USER ID: 2694

August 2, 2024

Re: Demand for Outstanding Principal

Dear Matthew Willis,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Forty thousand dollars ($40,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a feasible settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $40,000 |
| (-) Interest Credit Account (ICA) balance: | $18,684 |
| **Amount due today (OP less ICA):** | **$21,316** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within 5 business days from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Grindstone Inc.
ZOOMERAL USER ID: 2695

August 2, 2024

Re: Demand for Outstanding Principal

Dear Brian Parnell,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Forty thousand dollars ($40,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

|  For your reference, here are your current totals: | |
| --- | --- |
| Outstanding Principal (OP): | $40,000 |
| (-) Interest Credit Account (ICA) balance: | $18,693 |
| **Amount due today (OP less ICA):** | **$21,307** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



**GENIE INVESTMENTS**

ITYS LLC
ZOOMERAL USER ID: 2703

August 2, 2024

Re: Demand for Outstanding Principal

Dear Nahshunn Bing,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Forty thousand dollars ($40,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $40,000 |
| (-) Interest Credit Account (ICA) balance: | $18,684 |
| **Amount due today (OP less ICA):** | **$21,316** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Red Balloon Capital LLC
ZOOMERAL USER ID: 2701

August 2, 2024

Re: Demand for Outstanding Principal

Dear Kyle Seyboth,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Forty thousand dollars ($40,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $40,000 |
| (-) Interest Credit Account (ICA) balance: | $18,684 |
| **Amount due today (OP less ICA):** | **$21,316** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



**GENIE INVESTMENTS**

DEGEN LLC
ZOOMERAL USER ID: 2704

August 2, 2024

Re: Demand for Outstanding Principal

Dear Kiersten Luis,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Forty thousand dollars ($40,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a feasible settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $40,000 |
| (-) Interest Credit Account (ICA) balance: | $18,684 |
| **Amount due today (OP less ICA):** | **$21,316** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within 5 business days from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



527 Ten Rod Road, LLC
ZOOMERAL USER ID: 2716

August 2, 2024

Re: Demand for Outstanding Principal

Dear Michael Schein,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Forty thousand dollars ($40,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a feasible settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $40,000 |
| (-) Interest Credit Account (ICA) balance: | $18,684 |
| **Amount due today (OP less ICA):** | **$21,316** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within 5 business days from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Schein Realty, LLC
ZOOMERAL USER ID: 2717

August 2, 2024

Re: Demand for Outstanding Principal

Dear Michael Schein,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Forty thousand dollars ($40,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $40,000 |
| (-) Interest Credit Account (ICA) balance: | $18,684 |
| **Amount due today (OP less ICA):** | **$21,316** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Rockshop LLC
ZOOMERAL USER ID: 2735

August 2, 2024

Re: Demand for Outstanding Principal

Dear Ryan McGovern,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Twenty thousand dollars ($20,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $20,000 |
| (-) Interest Credit Account (ICA) balance: | $14,145 |
| **Amount due today (OP less ICA):** | **$5,855** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Just Hewitt LLC
ZOOMERAL USER ID: 1903

August 2, 2024

Re: Demand for Outstanding Principal

Dear Daniel J. Hewitt,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Twenty thousand dollars ($20,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $20,000 |
| (-) Interest Credit Account (ICA) balance: | $9,536 |
| **Amount due today (OP less ICA):** | **$10,464** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



**GENIE INVESTMENTS**

JMP Group LLC
ZOOMERAL USER ID: 862

August 2, 2024

Re: Demand for Outstanding Principal

Dear Jyoti Patel,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Forty thousand dollars ($40,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $40,000 |
| (-) Interest Credit Account (ICA) balance: | $1,460 |
| **Amount due today (OP less ICA):** | **$38,540** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Walker Global Enterprises LLC
ZOOMERAL USER ID: 1507

August 2, 2024

Re: Demand for Outstanding Principal

Dear Michael Walker,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Fifty-five thousand dollars ($55,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $55,000 |
| (-) Interest Credit Account (ICA) balance: | $9,794 |
| **Amount due today (OP less ICA):** | **$45,206** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Trizion Solutions LLC
ZOOMERAL USER ID: 1858

August 2, 2024

Re: Demand for Outstanding Principal

Dear Marlon Brooks,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **One hundred twelve thousand dollars ($112,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

For your reference, here are your current totals:

| | |
|---|---|
| Outstanding Principal (OP): | $112,000 |
| (-) Interest Credit Account (ICA) balance: | $49,905 |
| **Amount due today (OP less ICA):** | **$62,095** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team



Rockshop LLC
ZOOMERAL USER ID: 2735

August 2, 2024

Re: Demand for Outstanding Principal

Dear Ryan McGovern,

This correspondence serves as an official notice regarding the outstanding principal in the amount of **Twenty thousand dollars ($20,000)** owed under our agreement is due immediately. As of April 15, 2024, you were in default of the terms outlined in our agreement and you failed to cure the breach within the allotted 60-day period.

Before proceeding with any legal action, we wish to extend an opportunity for an **amicable resolution**. We are open to discussing a <u>feasible</u> settlement plan that works **for both parties**. Please contact us at your earliest convenience to initiate these discussions via this messaging system.

| For your reference, here are your current totals: | |
|---|---|
| Outstanding Principal (OP): | $20,000 |
| (-) Interest Credit Account (ICA) balance: | $14,145 |
| **Amount due today (OP less ICA):** | **$5,855** |

You can make your payment using the following Wiring Instructions for Wires or ACH:

Account Number: 890000167613
ACH routing: 122287251
Wire routing: 122287251
Title: Genie Investments NV Inc.
Address: P.O. Box 60443, Jacksonville, Florida 32236
Bank Name: Axos Bank
Bank Address: 4350 La Jolla Village Drive, Suite 140, San Diego, California 92150

However, should we not receive a response within <u>5 business days</u> from the date of this letter, we will be *compelled to pursue collection actions* as afforded to us under our agreement and applicable law.

Thank you for your prompt attention to this matter. We look forward to resolving this issue promptly.

Yours sincerely,

*Genie Investments*

Genie Investments
Legal Team

| From: | raye.eliott@akerman.com |
|---|---|
| To: | davidchoatehughes@gmail.com |
| Cc: | iustusprocessus@outlook.com |
| Subject: | RE: Formal Rebuttal to Trustee"s Position on Zoomeral, Inc. Claim & The Void Default Judgment |
| Date: | Wednesday, October 29, 2025 3:08:48 PM |

Mr. Hughes,

The Trustee and I have carefully reviewed your email and the documents you sent and we do not agree with your analysis.

First, the Zoomeral Terms of Use state that it is the borrower that pays the 3% success fee to Zoomeral, not the lender. The paragraph at the bottom of page 4 states, "Zoomeral charges businesses Three Percent (3%) for any debt transaction. For example, if your business accepts and closes a $500,000 line of credit or loan with a lender sourced from our platform, then your business would owe Zoomeral, Inc. $15,000 at loan closing and funding. This includes any restructuring efforts with your current lender(s). . . . It is very common for current lenders to evaluate what they currently charge you and then restructure or refinance your current loan/s in order to not lose your business. In this event, Zoomeral, Inc. would charge for this successful restructuring with any or all of your current lender(s). The charge would be the Three Percent (3%) success fee." The Terms of Use do not say that the lender pays the 3% fee.

The term sheet in the sample loan documents you sent just states, "Success Fee: 3% (Zoomeral, Inc.)". It doesn't state who is to pay it, but it's in the list of fees to be paid by the borrower. There is nothing in the loan documents whereby Genie agreed to pay Zoomeral 3%.

The Examiner's Report does not say that the Debtor paid Zoomeral a fee for originating the loan. Paragraph 16 of the report which you quote states that, "Borrowers would pay Zoomeral an origination fee for connecting the borrower with Genie NV."

There is no contract or document providing for the "due diligence fee." The fact that the Debtor allegedly paid due diligence fees to Zoomeral, Capitulum, and Cald Holdings does not mean that there was or is any written contractual obligation on the part of the Debtor to pay these fees.

The 4% LOC fee provided in § 3.9 of the loan agreement has nothing to do with amounts owed to Zoomeral.

The Trustee is attempting to collect the loans made by the Debtor by encouraging voluntary repayment by the borrowers. However, again, the loan documents do not provide for any payment from the Debtor to Zoomeral.

With respect to your allegations in your point #4, the Notice of Material Change you filed was

filed on March 26, 2025. The Trustee's Motion for Default Judgment was filed on May 1, 2025. Therefore, the Notice of Material Change was on the record when the court entered the default judgment and the court would have been aware of it. Additionally, as Judge Burgess informed Mr. Cohan at the June 24, 2025 hearing, dissolving the companies does not stop litigation from going forward against the companies.

For these reasons, the Trustee, again, will not agree to vacate the default judgment against Zoomeral. If you would like to try to have the default judgment vacated, I would suggest that you retain an attorney to file a motion with the court on behalf of Zoomeral.

**Raye Elliott**
Akerman LLP | 401 East Jackson Street, Suite 1700 | Tampa, FL 33602
D: 813 209 5013 | T: 813 223 7333 | F: 813 223 2837
raye.elliott@akerman.com

vCard | Profile



CONFIDENTIALITY NOTE: The information contained in this transmission may be privileged and confidential, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.

**From:** David Choate <davidchoatehughes@gmail.com>
**Sent:** Wednesday, October 29, 2025 10:26 AM
**To:** Elliott, Raye (Ptnr-Tpa) <raye.elliott@akerman.com>
**Cc:** Debitus Processus <iustusprocessus@outlook.com>
**Subject:** Fwd: Formal Rebuttal to Trustee's Position on Zoomeral, Inc. Claim & The Void Default Judgment

[External to Akerman]

Ms. Elliott,

This email serves as a formal rebuttal to the Trustee's position regarding the claim of Zoomeral, Inc. and the subsequent default judgment. The Trustee's position is factually and legally untenable, as it ignores the documented record, the estate's

own actions, and binding contractual obligations.

Below, we address and refute each of your points with conclusive evidence.

1. THE EXISTENCE OF A CONTRACTUAL AGREEMENT FOR ZOOMERAL'S FEES
Your Position: "We do not have any contract or agreement between the Debtor and Zoomeral providing that the Debtor would pay Zoomeral a 'BELOC Commission', a 'Bridge Commission', or 'DD Fees After Promotor Payout'."

The Reality: This statement is incorrect. The agreement is proven by three independent, mutually reinforcing sources:

A. The Master Contract – Zoomeral Terms of Use: The Debtor, as a participating lender on the Zoomeral platform, was bound by its Terms of Use, which explicitly state: "Zoomeral charges businesses Three Percent (3%) for any debt transaction." This is the foundational contract that governs the relationship. (See Exhibit: Zoomeral Terms of Use).  Genie Investments NV was an active lender on the Zoomeral platform. Genie operated, communicated with participants, and closed transactions directly through the site. Accordingly, Genie expressly agreed to and operated under the same mandatory Terms of Use as all other users. Those Terms required payment of the 3% success fee to Zoomeral, Inc. for every funded debt transaction. Genie's participation on the platform constitutes full acknowledgment and acceptance of that term. There is no plausible argument to the contrary.

Further evidence of this is reflected in Zoomeral's Promoter Payout Program, which compensated all affiliates and referral partners who introduced borrowers to the platform. Each promoter was paid a commission upon the successful closing of a loan. This program was fully documented and reflected in Genie's own payroll and disbursement records.

It is therefore impossible to argue that Zoomeral did not earn a fee. The platform's 3% success fee directly funded those promoter and referral commissions. If Zoomeral had not earned its fee, there would have been no lawful or operational basis to pay its promoters. The Trustee's own review of Genie's bank and payroll records confirms those payments.

B. The Specific Contracts – Loan Term Sheets: Each and every loan originated through Zoomeral contains a Term Sheet that lists "SUCCESS FEE: 3% (ZOOMERAL, Inc.)". This applies the master agreement to each specific transaction. (See Exhibit: Representative

Term Sheet Client ID 2213). This is inarguable.

C. The Independent Corroboration – Examiner's Report: The Court-appointed Examiner confirmed this fee structure, stating definitively: "Genie NV and Zoomeral... were to be paid: a. Zoomeral - a fee as the originator for the loan." (See Examiner's Report Excerpt below the signature line).

The Trustee cannot claim "no agreement" exists while his own case is built upon the loan agreements that contain the very fee provisions he denies.

2. THE DUE DILIGENCE FEE SPLIT WAS AN ESTABLISHED PRACTICE EVERY SINGLE TIME
Your Position: Implied that the "DD Fees" were not owed, or the arrangement did not exist. This could not be further from the truth.

The Reality: The Debtor's own bank records prove this was a standard practice. Attached is a transaction log (See Transaction Log Excerpt below the signature line) showing a series of payments from the Debtor to Zoomeral, Cald Holdings, and Capitulum, where the Due Diligence fee was systematically split into equal thirds. This was not a one-off event but a repeated course of conduct, demonstrating a clear and established financial agreement that the Debtor honored over many months. This again was contracted behavior, and any argument otherwise is unsupportable. Even Promotors and Affiliates of Zoomeral participated with a percentage. This was also covered in the examiner's report.

3. THE TRUSTEE'S CONTRADICTORY POSITION ON THE LOAN AGREEMENTS
Your position is logically impossible and demonstrates bad faith.

· To Borrowers: The Trustee has sent formal demand letters (See Trustee's Loan Letter 10-03-2025_Redacted) stating that the "account receivable for the Loan is property of the estate," thereby affirming the validity and enforceability of the loan agreements to collect money for the estate.
· To Zoomeral: The Trustee claims these same loan agreements are unenforceable or contain no obligation to Zoomeral, in order to avoid paying a legitimate expense of the estate.

The Trustee cannot "cherry-pick" the provisions of a contract that benefit the estate while repudiating the provisions that create expenses. This is the definition of unjust enrichment.

The Trustee also cannot claim that partial funding negates the 4% LOC Fee when the contract explicitly states this fee is payable 'from the proceeds of the first Advance' regardless of the total loan amount. This same contractual logic applies to Zoomeral's 3% success fee. (See Contract Section 3.9 below the signature line)

## 4. THE DEFAULT JUDGMENT IS VOID

Prior to entry of the default judgment, we filed a "Notice of Material Change in Circumstances" (attached) formally notifying the Court and all parties that Zoomeral, Inc. and the other entity defendants had been lawfully dissolved.

Once dissolution became effective, those corporations ceased to exist as legal entities capable of being sued or having judgment entered against them, except for narrow statutory winding-up purposes. Proceeding to default a dissolved entity, therefore deprived the Court of jurisdiction to enter judgment.

The default judgment obtained against Zoomeral, Inc. is thus void as a matter of law under Fed. R. Civ. P. 60(b)(4) (as incorporated by Fed. R. Bankr. P. 9024). Moreover, the Trustee's failure to disclose this material fact, despite the filed notice, when requesting default raises serious ethical and due-process concerns and violates the duty of candor owed to the Court.

## 5. CONCLUSION & DEMAND
The Trustee's position is built on a refusal to acknowledge the documented facts of the Debtor's own business. He affirms the loan agreements to collect assets while denying them to avoid liabilities.

For these reasons, we demand that the Trustee immediately:

a. AGREE TO VACATE the void default judgment against Zoomeral, Inc.
b. ACCEPT Zoomeral's claim for the 3% success fee and its share of the Due Diligence fees, as proven by the Terms of Use, Term Sheets, Examiner's Report, and the Debtor's own payment history.

Should a stipulation to resolve these matters not be reached, we will have no choice but

to interpret this as a continuation of bad faith and a fraud upon the court, and we will proceed with seeking all available disciplinary and remedial actions this Friday.

We expect a response by EOD tomorrow. Thank you.

Sincerely,

David Hughes


Example: User 2213 (see attached)

Every Contract:

Section 3.9. Fees.

(a) LOC Fee. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable fee for the LOC in an aggregate amount equal to Four percent (**4%**) multiplied by the Project LOC Amount, which is equal to Ten Thousand Dollars and No Cents Dollars ($10,000) (the "LOC Fee"). **The LOC Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, <u>the first Advance under the Tranche Schedule, without condition.</u>**


Every Term Sheet:

LOC AMOUNT: $250,000

INTEREST CREDIT DEPOSIT AMOUNT: $25,000 (reserved funds)

TERM: 120 Months

RATE: 3% I/O

POINTS: 4%

**SUCCESS FEE: 3% (ZOOMERAL, Inc.)**

PPP: None

DELIVERY: Tranche Schedule

FUNDING DATE: LOC will be available within 14-75 calendar days from funds clearing.

ESTIMATED FUNDING DATE: 5/25/2022


Examiner Report Language:

16. Genie NV was engaged in the lending business in a number of ways. Potential borrowers or customers would be connected with Genie NV through referral sources,

including through Zoomeral, Inc. ("Zoomeral"). Borrowers would pay Zoomeral an origination fee for connecting the borrower with Genie NV. Zoomeral is owned by Hughes and Cohan and will be covered in further detail later in the Report.

24. In certain instances, Genie NV would provide a bridge loan for the borrower to fund the ICA. The borrower on the bridge loan was typically required to prepay 15% of the ICA payment related to the loan in the form of a bridge interest payment prior to receiving the bridge loan ("Bridge Interest Fees").

25. Genie NV and Zoomeral (owned by Cohan and Hughes) were to be paid:

a. Zoomeral - a fee as the originator for the loan;

b. Genie NV - a Due Diligence Fee for doing the requisite research and approval of the loan;

c. Genie NV - the ICA reserves due to the lender as part of the BELOC loan; and

d. Genie NV - the interest due as the lender on the loan.

<u>1/3 DD Split Transactions to Zumeral, Cald Holdings, and Capitulum (Chase Bank Account: Genie Investments NV Bank Account Last Four Digits of Account Number: 8502)</u>:

| Date | To | Amount |
|------|------|------|
| 10/03/22 | Zumeral Inc | $20,000.00 |
| 10/03/22 | Cald Holdings LLC | $20,000.00 |
| 10/03/22 | Capitulum LLC | $20,000.00 |
| 10/20/22 | Zumeral Inc | $33,333.33 |
| 10/20/22 | Cald Holdings LLC | $33,333.33 |
| 10/20/22 | Capitulum LLC | $33,333.34 |
| 11/02/22 | Zumeral Inc | $4,666.66 |
| 11/02/22 | Cald Holdings LLC | $4,666.66 |
| 11/02/22 | Capitulum LLC | $4,666.66 |
| 11/14/22 | Zumeral Inc | $35,320.83 |
| 11/14/22 | Cald Holdings LLC | $35,320.83 |
| 11/14/22 | Capitulum LLC | $35,320.83 |
| 12/12/22 | Zumeral Inc | $2,812.50 |
| 12/12/22 | Cald Holdings LLC | $2,812.50 |
| 12/12/22 | Capitulum LLC | $2,812.50 |
| 01/04/23 | Zumeral Inc | $8,250.00 |
| 01/04/23 | Cald Holdings LLC | $8,250.00 |