FILED INTAKE USBC
AUG 18 '26 AM10:18

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

**GENIE INVESTMENTS NV, INC.,**
Debtor.

Case No. 3:24-bk-00496-BAJ
Chapter 7

# DAVID C. HUGHES II'S MOTION UNDER RULE 60(d)(3) FOR RELIEF FROM THE AUGUST 12, 2024, CONVERSION ORDER BASED ON FRAUD ON THE COURT, FOR AN EVIDENTIARY HEARING, DISCOVERY, AND RELATED RELIEF

David C. Hughes II, individually and appearing pro se, moves under Fed. R. Civ. P. 60(d)(3), as incorporated by Fed. R. Bankr. P. 9024, for relief from the August 12, 2024, Conversion Order. The Conversion Order was entered "for the reasons stated in open court." Mr. Hughes alleges that the factual foundation presented by the Examiner, the United States Trustee, and other officers of the Court materially misconstrued, distorted, or removed critical evidence from context, thereby impairing the Court's adjudicative function.

Mr. Hughes seeks authorization to file this Motion, an evidentiary hearing, discovery, and relief from the Conversion Order if the Court finds that fraud on the court materially affected the proceeding.

## I. AUTHORIZATION TO FILE

The Court's March 27, 2025, filing restriction requires Mr. Hughes to obtain authorization before filing substantive papers. Mr. Hughes therefore requests leave to docket this Motion.

The Motion is filed by Mr. Hughes individually. He does not represent Genie Investments NV, Inc., John-Michael Cohan, the Chapter 7 Trustee, the United States Trustee, or any other person or entity.

The Motion raises specific, document-based issues concerning:

1. the alleged post-default-transfer narrative;
2. the characterization of Genie-owned funds as "customer funds";
3. the alleged statement that the Examiner's Report "confirmed" fraud;
4. the omission of the BELOC Agreement's controlling provisions that directly contradict the Examiner's flawed statements;
5. the omission of Gowling WLG's legal guidance;
6. The Nordic Trust-to-Chase banking evidence, specifically, the approximately $9.5 million payment received by Genie in June 2023, which demonstrated that Velanos had made a good-faith effort to repay Genie and that Genie had a credible basis to continue operating.;

7. the omission of other material banking and legal-advice evidence; and

8. the omission of evidence concerning substantial new customers and ongoing business operations.

## II. MR. HUGHES'S INDIVIDUAL INTEREST

Mr. Hughes was a 50% owner and principal of Genie. He personally participated in the transactions and management matters presented during conversion. He does not represent Genie, the Chapter 7 Trustee, the United States Trustee, or any other person or entity. He seeks only to protect his personal interests and to correct the record that has been used to assert personal liability against him.

The Chapter 7 Trustee subsequently filed Proof of Claim No. 9-1 in Mr. Hughes's Illinois bankruptcy case, asserting a personal claim of $1,771,555.74. Mr. Hughes identifies that filing as concrete evidence that the Conversion Order has continuing legal consequences for him personally.

Mr. Hughes has suffered irreparable harm directly related to the United States Trustee's alleged fraudulent conduct, including damage to his reputation, personal liability claims, and ongoing legal consequences across multiple jurisdictions.

Mr. Hughes seeks review of the integrity of the Conversion Order because it is being used as a predicate for personal liability against him in many states.

## II.A. The Conversion Followed a Limited Record and Relied on Post-Trial Materials

The Court's April 11, 2024 Order was entered after a two-day evidentiary trial on the United States Trustee's request for appointment of a Chapter 11 trustee, dismissal, or conversion. The Court did not grant the United States Trustee's requested conversion relief at that time. Instead, the Court permitted Genie to continue operating as a debtor in possession and appointed an Examiner to investigate specified allegations, including the Velanos transaction, alleged affiliate transfers, and other alleged misconduct.[2]

The subsequent conversion proceeding therefore occurred against the backdrop of a prior evidentiary record developed through that trial. Mr. Hughes does not contend that the Examiner's Report or the United States Trustee's later conversion motion were literally the only documents filed after the trial. His narrower and material allegation is that the principal new evidentiary materials relied upon to justify conversion were **(1) the Examiner's Report and (2) the United States Trustee's proposed conversion motion**, which presented the Report as confirming fraud and used the Report's disputed factual narrative to seek conversion.

The Examiner's Report itself states that it was prepared after the April 11 Order and that the Examiner reviewed records, communications, bank statements,

contracts, and other materials during the investigation.[2] The Report thus became the central post-trial evidentiary vehicle through which the United States Trustee presented the Velanos transaction, the alleged "customer funds" theory, and alleged affiliate transfers to the Court. The United States Trustee's conversion motion then characterized the Report as confirming that Genie had engaged in fraud and gross mismanagement, although the Report contains no express categorical finding that Genie committed fraud.[1]

That characterization was contemporaneously challenged by Adam B. Walker, counsel for Genie and a former FINRA enforcement attorney. In his opposition to the United States Trustee's motion, Walker wrote:

"The UST's insistence that the Report 'confirms' key allegations from its initial motion not only shows its lack of concern for the Report's investigative and analytical rigor, but also reveals its willingness to mischaracterize and embellish the Report's contents to suit its purposes. . . . But nowhere in the 51-page Report is there any finding or conclusion that Genie engaged in fraud. The UST simply invented this 'confirmation' and attributed it to its hand-selected Examiner."[1]

Walker also addressed the United States Trustee's separate assertion that the Report supplied "direct evidence" of fraudulent intent concerning transfers to Better Methods:

"The 'express purpose' alleged by the UST as direct evidence of fraud is itself a fraud, fabricated by the UST and unsupported by any evidence in the Report or elsewhere in the record of this case."[1]

Mr. Hughes offers these statements not as conclusive proof that the United States Trustee or any other participant committed fraud on the Court, but as contemporaneous evidence that the alleged mischaracterizations were identified before conversion and were specifically tied to the United States Trustee's use of the Examiner's Report. The central issue under Fed. R. Civ. P. 60(d)(3) and Fed. R. Bankr. P. 9024 is whether materially false representations or material omissions corrupted the adjudicative process and materially affected the Conversion Order.

The Conversion Order was entered "for the reasons stated in open court." Accordingly, the August 8, 2024, hearing transcript is necessary to determine whether the Court relied on the Examiner's alleged statements that Genie sent funds to Velanos after Velanos's default, whether the Court relied on the "customer funds" characterization, and whether the United States Trustee's description of the Examiner's Report as confirming fraud materially influenced the conversion decision. Mr. Hughes therefore requests discovery and an evidentiary hearing directed to those issues.

## III. GOVERNING STANDARD

Fed. R. Civ. P. 60(d)(3) preserves the Court's authority to set aside a judgment for fraud on the court. In bankruptcy, the rule applies through Fed. R. Bankr. P. 9024.

Fraud on the court is limited to conduct that corrupts the judicial process itself. Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 245–46 (1944). The Eleventh Circuit describes it as:

"that species of fraud which does or attempts to defile the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." Travelers Indemnity Co. v. Gore, 761 F.2d 1549, 1552–53 (11th Cir. 1985).

Mr. Hughes does not rely merely on disagreement with the result, ordinary negligence, or counsel's tactical decisions. He alleges that objectively verifiable facts and controlling documents were materially mischaracterized or omitted entirely by officers of the Court and that the resulting narrative was presented as the basis for conversion.

The allegations address:

- the identity of the speaker;
- the statement or omission;

- the objective evidence contradicting it;
- the opportunity to know the correct facts;
- the vehicle through which the information reached the Court;
- materiality; and
- the effect on the Conversion Order.

## IV. ITEM ONE: THE POST-DEFAULT-TRANSFER NARRATIVE

### A. The record distinguishes transfers from later customer receipts

The Examiner's Report identifies Genie's transfers to Velanos before the alleged December 2022 default. The Report separately states that, after the alleged default, Genie received additional ICA and bridge-interest deposits from customers.

Those are different events:

| Event | Character |
|---|---|
| Funds transferred by Genie to Velanos | Pre-default capital contributions |
| Funds later received by Genie from customers | Post-default customer receipts |
| Funds received by Genie from Velanos | Later repayment or partial payment |

The Report identifies the pre-default Velanos contributions at paragraphs 59, 62, and 65. It then discusses post-default customer receipts at paragraphs 79 and 80.

Nothing in those paragraphs establishes that Genie sent additional funds to Velanos after the alleged default.

**B. The alleged mischaracterization**

Mr. Hughes alleges that, during the August 8, 2024, conversion hearing, the Examiner repeatedly stated that Genie sent or continued sending funds to Velanos after Velanos defaulted on its contractual obligations. He further alleges that the United States Trustee repeated or adopted the same narrative.

The allegation is not that the Court misunderstood a disputed accounting judgment. The allegation is that the proceeding conflated:

1. transfers **from Genie to Velanos before default**; with
2. deposits **received by Genie from customers after default.**

The United States Trustee's motion stated that Genie continued accepting customer deposits after Velanos's December 2022 default. But the motion used that post-default-receipt fact to support a broader narrative that Genie continued funding Velanos after default.

That inference was materially misleading because it converted a fact concerning funds received by Genie into an assertion concerning funds sent by Genie.

### C. Materiality

The distinction was material. The post-default-transfer narrative suggested that Genie knowingly continued funding a failed venture after default. That proposition was used to support:

- fraud;
- gross mismanagement;
- misuse of customer funds;
- lack of rehabilitation; and
- conversion to Chapter 7.

The Court's Conversion Order incorporated the reasons stated in open court. The transcript will show whether the Court relied on the alleged chronology in finding gross mismanagement and ordering conversion.

## V. ITEM TWO: THE "CUSTOMER FUNDS" THEORY

### A. The alleged factual error

The Examiner's Report states that the source of the $9 million contributed to Velanos was ICA payments, bridge-loan interest, and due diligence payments received from customers. The Report then characterizes those funds as "customer funds."

Mr. Hughes alleges that this characterization was factually and contractually wrong. The funds transferred to Velanos were funds owned by Genie under the governing agreements. They were not customer deposits held in trust, escrowed funds, or segregated borrower property.

The Report's own paragraph 74 attributes to Mr. Cohan the statement that the source of the $9 million was income earned by Genie during 2021 and 2022. The Report nevertheless transformed the source of revenue into a conclusion that the funds remained customer property.

**B. Repeated Source-of-Funds Inquiries and the Written Clarification**

Before issuing the Examiner's Report, the Examiner and her staff repeatedly questioned the source and ownership of the funds Genie transferred to Velanos. The repeated inquiries are significant because they show that the source-of-funds issue remained a central focus immediately before the Report was issued. Genie's response remained consistent: the funds were earned by Genie as income during 2021 and 2022, including ICA payments, bridge-loan interest, and due-diligence payments. Genie further identified the bank records and contractual materials available to verify that explanation.

The written response, was provided to the Examiner shortly before issuance of the Report. It expressly stated that the approximately $9 million transferred to Velanos

was sourced entirely by Genie and constituted income earned by Genie before the transfers. The response also directed the Examiner to the relevant bank statements and underlying transactions. Thus, the Examiner was not merely told that the funds came from "customers"; she was specifically informed that the payments had become Genie's earned revenue under the parties' contractual arrangements and were not customer property held in trust, escrow, or for the benefit of any particular customer.

The Examiner's repeated requests, followed by the omission or failure to reconcile this final written clarification, support a reasonable inference that the source-of-funds issue was being developed to support a "customer funds" narrative rather than presented as a disputed question requiring analysis of the governing agreements. The Report acknowledges that, according to Cohan, the $9 million consisted of income earned by Genie from "ICA payments by customers, bridge loan interest by customers and due diligence payments by customers." It nevertheless characterizes the same funds as "customer funds" without identifying a contractual provision requiring Genie to hold those earned fees in trust or escrow, and without fairly presenting or resolving Genie's contrary ownership explanation.

The material distinction is between the source of the revenue and the legal ownership of the funds after Genie earned and received them. The fact that

customers' transactions generated fees does not, without more, establish that the resulting revenue remained customer property. The Examiner's Report does not identify any provision of the governing agreements that required Genie to segregate, hold in trust, or return the relevant earned fees, nor does it explain why the written clarification and supporting records did not alter the "customer funds" conclusion.

Mr. Hughes alleges that this omission was material because the Examiner and the United States Trustee relied on the "customer funds" characterization to support findings of gross mismanagement and to justify conversion. The Court was therefore entitled to receive the written clarification, the governing contractual provisions, and the supporting bank records before deciding whether Genie misused customer property. The failure to disclose, analyze, or reconcile that evidence allegedly deprived the Court of a complete and accurate presentation of the central source-of-funds issue and formed part of the materially misleading narrative through which the Conversion Order was wrongfully obtained.

**C. The BELOC Agreement**

The BELOC Agreement governs the parties' rights concerning ICA payments. The Agreement does not require ICA payments to be held in trust or escrow for borrowers.

The United States Trustee and Examiner nevertheless treated the ICA payments as customer funds without addressing the Agreement's language. Adam Walker's opposition stated:

"The BELOC Agreement, which both the Examiner and the UST ignore, makes clear that ICA Payments received by Genie were not required to be held in trust and therefore did not constitute 'customer funds.'"

The alleged misconduct is not simply that the United States Trustee adopted an unfavorable contract interpretation. It is that the controlling contract was omitted while an opposing characterization was presented as an established fact.

**VI. ITEM THREE: THE ALLEGED "CONFIRMATION" OF FRAUD**

The United States Trustee stated:

"The Examiner's Report confirms that a trustee must be appointed in this case because the Debtor engaged in fraud and gross mismanagement."

Adam Walker's opposition stated:

"But nowhere in the 51-page Report is there any finding or conclusion that Genie engaged in fraud. The UST simply invented this 'confirmation' and attributed it to its hand-selected Examiner."

The Report contains findings concerning transactions, management, and the Velanos relationship. But the Report does not appear to make a categorical finding that Genie committed fraud. The United States Trustee's statement therefore allegedly converted disputed investigative observations into an independent Examiner-confirmed finding of fraud.

That distinction was material because it gave the United States Trustee's position the appearance of independent confirmation by a court-appointed Examiner.

## VII. ITEM FOUR: OMITTED LEGAL ADVICE AND DUE DILIGENCE

### A. Gowling WLG

Before the alleged default and before Genie transferred the remaining capital contribution to Velanos, Genie received legal guidance from Gowling WLG (Canada) LLP.

The Gowling material addressed Velanos's funding relationships, financial capacity, compliance review, and related representations. The letter predated the alleged default and was relevant to:

- what Genie knew;
- whether Genie reasonably relied on Velanos;
- whether Genie performed due diligence;

- whether the investment was objectively fraudulent; and
- whether management's conduct constituted gross mismanagement.

Mr. Hughes alleges that the Gowling evidence was provided or made available to Debtor's counsel Bryan K. Mickler, that counsel was asked to include it, and that counsel failed to present it meaningfully during the conversion proceeding.

The Examiner's Report and the United States Trustee's presentation instead portrayed Genie's conduct as obviously fraudulent without addressing the contemporaneous legal guidance.

**B. Warren Law Group and other banking evidence**

The record also included evidence involving:

- Warren Law Group;
- Nordic Trust;
- JPMorgan Chase;
- the approximately $9.5 million payment or transfer received by Genie in June;
- the transfer from the Nordic Trust account to Genie's Nordic and Chase Bank account;

- other banks and accounts involved in Genie's operations; and
- the legal and banking professionals who reviewed Velanos's representations.

Mr. Hughes alleges that this evidence was omitted or materially underdeveloped, leaving the Court with the false impression that Genie had no credible funding source or reasonable basis to continue operating.

The Report itself references the contractual requirement that $9.5 million be deposited into Genie's Nordic Trust account and then transferred to Genie's Chase account. The omission concerns the evidence of what actually occurred and what Genie knew at the time of the transfer, including the receipt and movement of the approximately $9.5 million.

**C. New customers and ongoing operations**

Mr. Hughes further alleges that Debtor's counsel failed to present evidence concerning substantial new customers and loans being originated or serviced during the relevant period. Those customers were material because the United States Trustee argued that Genie was not funding ordinary customers and was instead transferring funds to insiders. This is provably inaccurate.

The Examiner's Report itself refers to customer loans and customer-related transactions. The Court should receive the complete customer and loan records before determining whether the "insider-only" narrative was accurate.

## VIII. OFFICERS OF THE COURT AND THE VEHICLE OF PRESENTATION

The alleged misrepresentations and omissions entered the proceeding through officers of the court, including: the United States Trustee's motion to convert; the Examiner's written Report; the Examiner's oral testimony; the United States Trustee's oral argument; Examiner's counsel's presentation; and Debtor's counsel's failure to present corrective evidence the United States Trustee's motion to convert;

1. the Examiner's written Report;
2. the Examiner's oral testimony;
3. the United States Trustee's oral argument;
4. Examiner's counsel's presentation;
5. Debtor's counsel's failure to present corrective evidence; and
6. the Court's oral findings incorporated into the Conversion Order.

Mr. Hughes alleges that the participants had access to the relevant contracts, bank records, communications, and legal advice. The alleged post-default-transfer narrative and customer-funds theory were therefore not unavoidable misunderstandings. They were propositions capable of verification against the record.

## IX. MATERIAL EFFECT ON THE CONVERSION ORDER

The Conversion Order was entered for the reasons stated in open court. The Court's ruling relied materially on:

- the Examiner's Report;
- the Examiner's oral presentation;
- the United States Trustee's conversion argument;
- the alleged treatment of Genie funds as customer funds;
- the alleged post-default funding narrative; and
- the portrayal of the Velanos transaction as obvious fraud or gross mismanagement.

If the transcript confirms that the Examiner and United States Trustee represented that Genie sent funds to Velanos after default, while the underlying evidence shows only pre-default transfers and later customer receipts, the Court should determine whether that misstatement materially affected conversion.

If the Examiner received written confirmation that the funds were Genie-owned and failed to disclose or reconcile it, the Court should determine whether the omission materially impaired the adjudicative process.

If the controlling BELOC Agreement, Gowling letter, Nordic-to-Nordic evidence, other banking records, and new-customer evidence were omitted, the Court should determine whether the Court received a materially incomplete factual record.

## X. INTENT, OPPORTUNITY, AND VEHICLE

Mr. Hughes alleges sufficient facts to warrant discovery concerning:

| Element | Alleged facts |
|---|---|
| **Intent or reckless disregard** | The alleged narrative was repeated despite access to the Report, agreements, bank records, and written clarification concerning ownership of funds. |
| **Opportunity** | The Examiner, United States Trustee, Examiner's counsel, and Debtor's counsel had access to the relevant evidence. |
| **Vehicle** | The conversion motion, Report, hearing testimony, and oral argument. |
| **Materiality** | The alleged inaccuracies supported fraud, gross mismanagement, customer-funds misuse, and conversion. |
| **Judicial effect** | The Conversion Order adopted reasons stated in open court. |
| **Process-level harm** | The Court allegedly decided conversion on a materially distorted and incomplete factual narrative. |

Mr. Hughes reserves the right to supplement these allegations after production of the complete conversion transcript and discovery.

## XI. DISCOVERY

Mr. Hughes requests discovery concerning:

1. communications between the Examiner and United States Trustee concerning the Report;
2. communications concerning the post-default-transfer narrative;
3. all records showing transfers to and from Velanos;
4. the date and legal nature of the alleged Velanos default;
5. the Examiner's communications concerning ownership of the funds;
6. the BELOC Agreement and its interpretation;
7. the Gowling WLG letter and related communications;
8. the Nordic Trust and Chase transactions;
9. Warren Law Group's due diligence work;
10. other banks, accounts, and financial intermediaries;
11. evidence concerning new customers and loans;
12. materials supporting the "customer funds" characterization;
13. materials supporting the statement that the Report "confirmed" fraud;
14. communications concerning Walker's opposition; and
15. the Examiner's, United States Trustee's, and other relevant witnesses' testimony.

Mr. Hughes requests broad discovery reasonably related to the alleged fraud-on-the-court conduct, subject to the Court's management of privilege, confidentiality, and protective-order issues.

## XII. EVIDENTIARY HEARING

Mr. Hughes requests an evidentiary hearing concerning but not limited to:

1. whether Genie sent any funds to Velanos after the alleged default;
2. whether the Examiner and United States Trustee conflated post-default customer receipts with transfers to Velanos;
3. whether the transferred funds were Genie-owned funds;
4. what the Examiner was told by email before issuing the Report;
5. whether the BELOC Agreement governed the funds' legal characterization;
6. whether the Gowling evidence was available and omitted;
7. whether other evidence from Warren Law Group, (Scott Oh) was omitted;
8. whether the approximately $9.5 million Nordic-to-Chase evidence was available and omitted;
9. whether evidence concerning other banks and new customers was omitted;

10. whether the United States Trustee represented that the Report confirmed fraud; and

11. whether these matters materially affected the Conversion Order.

## XIII. BARTON LEAVE

After the evidentiary hearing, Mr. Hughes requests that the Court determine whether Barton leave is required and, if so, whether such leave should be granted for claims against persons for whom leave is legally required.

Mr. Hughes does not request that the Court resolve those potential claims now. He requests that the issue be addressed after the factual record has been developed.

## XIV. RELIEF REQUESTED

Mr. Hughes respectfully requests that the Court:

1. authorize filing and docketing of this Motion;

2. permit affected parties to respond;

3. set an evidentiary hearing;

4. permit discovery reasonably related to the alleged fraud-on-the-court conduct;

5. require production of relevant nonprivileged documents;

6. permit depositions of witnesses with relevant knowledge;

7. permit Mr. Hughes to supplement the Motion after discovery;

8. determine whether the post-default-transfer narrative, customer-funds theory, "confirmed fraud" assertion, and omissions concerning legal, banking, and customer evidence materially affected the Conversion Order;

9. vacate or otherwise grant relief from the August 12, 2024, Conversion Order and later orders under Fed. R. Civ. P. 60(d)(3) if the Court finds fraud on the court; and

10. after the evidentiary hearing, determine whether Barton leave is required and whether it should be granted.

Respectfully submitted,

/s/ David C. Hughes II
**David C. Hughes II**
3309 Robbins Road, PMB 160
Springfield, Illinois 62711
(217) 416-5059
davidchoatehughes@gmail.com
Pro Se Movant

Dated: 8/17/2026

## Certificate of Service

I hereby certify that all interested parties have been duly served a copy of the foregoing document and/or its attachments by the CM/ECF system, U.S. Mail and/or email.

Debtor
Genie Investments NV Inc.
represented by Bryan K. Mickler
Mickler & Mickler
5452 Arlington Expressway
Jacksonville, FL 32211
904-725-0822
Email: court@planlaw.com

U.S. Trustee
represented by Scott E. Bomkamp
DOJ-Ust
United States Trustee
400 W. Washington St., Ste 1100
Orlando, FL 32801
407-648-6069
Email: scott.e.bomkamp@usdoj.gov

Chapter 7 Trustee
Aaron R. Cohen
represented by Raye Curry Elliott
Akerman LLP
401 East Jackson Street, Suite 1700
Tampa, FL 33602
Email: raye.elliott@akerman.com

John Michael Cohan
iustusprocessus@outlook.com