**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

GENIE INVESTMENTS NV INC., Case No.: 3:24-bk-00496-BAJ

Debtor. Chapter 7

________________________________________/

**TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ON TRUSTEE'S OBJECTION TO CLAIM 5-3 OF CHARLES BLAKE STRINGER/NUTRA-ACRES LLC**

Aaron R. Cohen, Chapter 7 Trustee, (the "Trustee"), by and through undersigned counsel, moves this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to this contested matter pursuant to Federal Rules of Bankruptcy Procedure 7056 and 9014, for entry of summary judgment on the Trustee's Objection to Claim 5-3 (Doc. 561) filed by Charles Blake Stringer and Nutra-Acres LLC (collectively "Creditors"), and in support would show the Court as follows:

## I. SUMMARY OF ARGUMENT

Claim 5-3 (the "Claim") seeks $14,247,750 from the Bankruptcy Estate. Creditors concede they paid the Debtor only $400,000, and the Trustee does not object to the claim in that reduced amount. The Trustee objects to Creditors' claim for over $14 million in damages for "actual and consequential" damages arising from Debtor's breach of contract and failure to fund a $24,000,000 loan. As discussed more fully below, the operative loan instrument governing the loan at issue is the Business Expansion Line of Credit Agreement dated March 9, 2023 between Nutra-Acres and a third party, McMann Commercial Lending LLC ("McMann") – not the Debtor. Under settled Florida law, a breach-of-contract claim requires a valid contract between the plaintiff and the defendant, and damages for failure to fund the BELOC loan can run, if at all, only against the

contracting lender, McMann. Thus, because there is no privity between Creditors and Debtor, no contractual obligation to fund the loan ran from Debtor to Creditors. As such, Creditors cannot bring a claim against Debtor for purported damages resulting from a failure to fund the loan. Moreover, Creditors' reliance on the Bridge Loan Agreement and the Intercreditor Agreement between Nutra-Acres and Debtor as the basis for their breach of contract claim cannot stand because neither of those instruments created an enforceable obligation for Debtor to fund the $24 million loan. Creditors also cannot rely on a third-party beneficiary argument or detrimental reliance argument to support their Claim because the elements are not present in this case. Because there is no genuine dispute of material fact and the disputed balance of Claim 5-3 is unenforceable against the Debtor as a matter of law, the Trustee is entitled to summary judgment sustaining his Objection and allowing Claim 5-3 as a general unsecured claim of $400,000.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

### A. Factual Background

1. On February 21, 2024 (the "Petition Date"), Genie Investments NV Inc. (the "Debtor") filed a Voluntary Petition for Relief (Doc. 1) under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Middle District of Florida, Jacksonville Division, in the case styled *In re Genie Investments NV Inc.*, Case No: 3:24-bk-00496-BAJ (the "Bankruptcy Case").

2. On August 12, 2024, the Bankruptcy Case was converted to a Chapter 7 liquidation case and the Trustee was appointed to administer the Debtor's estate (Doc. 207).

3. On July 15, 2024, Creditors filed Claim 5-3 in the amount of $14,247,750 based on "Failure to provide loan under contract." (Claim 5-3)

4. Attached to Claim 5-3 is a Bridge Loan Agreement between Nutra-Acres (as borrower) and the Debtor (as lender) dated February 7, 2023 providing for a loan from the Debtor to Nutra-Acres of $2,400,000. (Claim 5-3 at pp. 72-85). The Bridge Loan Agreement provides for the Debtor to make a $2.4 million loan to Nutra-Acres which "the Lender shall hold . . . in Lender's account on behalf of the Borrower." (Bridge Loan Agreement at § 2.02, Claim 5-3 at p. 74). Therefore, none of the proceeds of the Bridge Loan were to be actually disbursed to Nutra-Acres.

5. Notably, there is no loan agreement for a loan of $24 million by the Debtor attached to Creditors' Claim. However, at the April 9, 2024 trial on the U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (the "Conversion Trial"), the U.S. Trustee admitted into evidence, as U.S. Trustee's Exhibit 36, a copy of the March 9, 2023 BELOC Agreement between Nutra-Acres and McMann (the "McMann BELOC Agreement"). (Doc. 46-7. A copy of the U.S. Truste's Ex. 36 is attached as Exhibit A to the Declaration of Raye Elliott In Support of Trustee's Motion for Summary Judgment ("Elliott Decl.") attached hereto as **Exhibit 1**). The McMann BELOC Agreement is between Nutra-Acres as borrower and McMann, ***as lender*** and provides for a loan of $24,960,000 to be made by McMann – not the Debtor. (Elliott Decl., Ex. A at p. 4).

6. Also attached to the Claim is an Intercreditor Agreement between the Debtor and Nutra-Acres which states that the Debtor is providing the bridge loan to fund the interest credit account ("ICA") required by the BELOC Agreement.[1] (Claim 5-3 at pp. 102-108, Recital F). The ICA is "an account on the books and records of Lender" which was to be used "for purposes of satisfying interest payments" under the McMann BELOC Agreement. (McMann BELOC

[1] The Intercreditor Agreement describes the Debtor as the "LOC Lender" and refers to a $24 million business line of credit agreement between the Debtor and Nutra-Acres dated February 7, 2023. No such agreement has been provided by Creditors and the Trustee is not aware of such an agreement. Typically an intercreditor agreement is made between different creditors of the same borrower – not the borrower and creditor.

Agreement at Recital D, Elliott Decl. Ex. A at p. 4). The McMann BELOC Agreement, the Bridge Loan Agreement, and the Intercreditor Agreement make clear that the $2.4 million "bridge loan" from the Debtor to Nutra-Acres was never going to be actually disbursed to Nutra-Acres and, instead, was to be carried on the books of McMann to satisfy interest payments due under the McMann BELOC Agreement.

7. Also admitted into evidence at the Conversion Trial as U.S. Trustee's Exhibit 28 was a Statement by Blake Stringer in which he explains that his $24 million loan was to be made by McMann and that the Debtor was to provide the bridge loan "in order to receive the 10% up front funds to lock in the loan for the borrowers." (Elliott Decl. Ex. B at p. 2). Mr. Stringer's Statement makes clear that all of his dealings for the $24 million loan, and even the Bridge Loan, were with McMann – the Debtor. (*Id.*)

8. Also admitted into evidence at the Conversion Trial were the following documents:

- U.S. Trustee's Exhibit 29 – Dec. 14, 2022 email from a loan officer for McMann sending the McMann business line of credit application and explanation to Mr. Stringer (Elliott Decl. Ex. C);
- U.S. Trustee's Exhibit 30 – Dec. 27, 2022 email from a loan officer for McMann to Mr. Stringer sending a proposed timeline for McMann's funding of the loan (Elliott Decl. Ex. D);
- U.S. Trustee's Exhibit 32 – Jan. 19, 2023 email from a loan officer for McMann to Mr. Stringer sending a sample bridge loan agreement (Elliott Decl. Ex. E);
- U.S. Trustee's Exhibit 33 – Jan. 18, 2023 email from a loan officer for McMann to Mr. Stringer sending a proposed due diligence agreement between the Debtor and Nutra-Acres related to the proposed bridge loan from the Debtor (Elliott Decl. Ex. F);
- U.S. Trustee's Exhibit 38 – May 26, 2023 demand letter from Creditors' attorney to McMann and the Debtor stating that "McMann Commercial Lending LLC ("McMann") agreed to provide a loan in the amount of $24 million (the "BELOC Loan")." (Elliott Decl. Ex. G);

- U.S. Trustee's Exhibit 39 – June 8, 2023 letter from McMann to Mr. Stringer's email regarding funding of the BELOC loan from McMann (Elliott Decl. Ex. H);

- U.S. Trustee's Exhibit 40 – June 23, 2023 letter from attorney for McMann to Mr. Stringer and Nutra-Acres terminating the McMann BELOC Agreement (Elliott Decl. Ex. I);

Each of the above referenced exhibits were admitted into evidence by the Court at the Conversion Trial (U.S. Trustee's Annotated Exhibit List, Doc. 59, attached as Ex. J to the Elliott Decl.).

**B. Procedural Posture**

9. On February 27, 2026, the Trustee filed the Objection to the Claim. (Doc. 561). In the Objection, the Trustee stated that there were no documents attached to Claim 5-3 that show that Mr. Stringer or Nutra-Acres paid any money to the Debtor. However, the Trustee's review of the Debtor's bank records showed that on February 6, 2023, Mr. Stringer wired $40,000 to the Debtor; on February 13, 2023, Nutra-Acres wired $115,000 to the Debtor; and, on March 22, 2023, Stringer Farms, Inc. wired $245,000 to the Debtor. Therefore, the Trustee did not, and does not, object to the Claim in the reduced amount of $400,000.

10. On May 18, 2026, Creditors filed their Response to the Trustee's Objection to Claim 5-3 of Charles Blake Stringer and Nutra-Acres, LLC (the "<u>Response</u>"). (Doc. 581). In their Response, the Creditors agree that they paid the Debtor $400,000 as "prepaid interest and fees" on an alleged "promised Business Line of Credit from Debtor to the Creditors in the amount of $24,000,000," but no such Business Line of Credit agreement is attached to the Response. (*Id.* at 2.). In the Response, Creditors further allege that the Intercreditor Agreement provided that "the Debtor would provide Nutra-Acres with a $24,000,000 line of credit" and that Debtor "failed to provide Nutra-Acres with the $24,000,000 line of credit." (*Id.* at 3.) Without providing any evidence that Debtor promised to fund the loan or any evidence or explanation of the alleged damages, Creditors then allege that they detrimentally relied on Debtor to fund the $24,000,000

line of credit and that they allegedly suffered actual and consequential damages in excess of $14,000,000 as a result thereof. (*Id.* at 3). Conspicuously, Creditors fail to acknowledge or attach the McMann BELOC Agreement in their Response.

11. The Court has scheduled a Trial on the Objection for February 4, 2027. (Doc. 745).

## III. MEMORANDUM OF LAW

### A. Legal Standard

Federal Rule of Civil Procedure 56, made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A movant is not required "to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof." *Celotex*, 477 U.S. at 325. The moving party's burden "may be discharged by 'showing' — that is, pointing out to the [trial] court — that there is an absence of evidence to support the nonmoving party's case." *Id.*

Once the moving party shows the absence of evidence to support the nonmoving party's claim, the nonmoving party "must now identify record evidence showing that there is a genuine issue for trial," and in doing so, must "*go beyond the pleadings*" and "submit record evidence to designate *specific facts*" in support of their claim. *Hum. Rts. Def. Ctr. v. Dixon,* No. 21-81391-CV, 2022 WL 4242727, at *3-4 (S.D. Fla. Aug. 19, 2022) (citing *Celotex*, 477 U.S. at 324). Summary judgment is appropriate where "there is an absence of evidence to support the nonmoving party's case." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004).

Objections to claims are governed by 11 U.S.C. § 502(a), and a proof of claim filed in accordance with the rules constitutes prima facie evidence of the validity and amount of the claim. *In re Mission Health, Inc.*, 252 B.R. 223, 228 (Bankr. M.D. Fla. 2000). Generally, "when a claim is based on a writing, the claimant must also file with its proof of claim a copy of the writing giving rise to the debt." *In re Walston*, 606 F. App'x 543, 545-46 (11th Cir. 2015). Once an objection is filed, the burden is on the objecting party to produce evidence equivalent in probative value to that of the claimant to rebut the prima facie effect of the proof of claim; however, the ultimate burden of persuasion rests with the claimant. *Mission Health*, 252 B.R. at 228. The objecting party must produce evidence "which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *In re Thornburg*, 596 B.R. 766, 770 (Bankr. M.D. Fla. 2018) (alterations adopted) (citation omitted). "This can be done by the objecting party producing specific and detailed allegations that place the claim into dispute, by the presentation of legal arguments based upon the contents of the claim and its supporting documents [] in which evidence is presented to bring the validity of the claim into question." *Id.* (citation omitted).

If the objecting party meets these evidentiary requirements, then the burden of going forward with the evidence shifts back to the claimant to sustain its ultimate burden of persuasion to establish the validity and amount of the claim by the preponderance of the evidence. *Id.* (citation omitted); *see also In re Win Dixie Stores, Inc.*, 418 B.R. 475, 476 (Bankr. M.D. Fla. 2009) ("If the objecting party rebuts the prima facie validity of the proof of claim, the claimant bears the burden of persuasion to substantiate the validity and the amount of the claim by a preponderance of the evidence."). Consistent with this framework, the Eleventh Circuit has held that "an objecting party overcomes a prima facie case by producing evidence that is sufficient to negate one or more of the facts set forth in the proof of claim," after which the burden falls to the party who would bear it

outside of bankruptcy. *In re Walston*, 606 F. App'x 543, 546 n.6 (11th Cir. 2015). Even if a proof of claim is prima facie valid, a claim must be disallowed under 11 U.S.C. § 502(b)(1) if it is unenforceable against the debtor under any agreement or applicable law. *Id.* at 547.

The enforceability of a claim against the estate is governed by applicable non-bankruptcy law. A creditor's entitlement in bankruptcy "arise[s] in the first instance from the underlying substantive law creating the debtor's obligation," and the "basic federal rule" is that state law governs the substance of claims. *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000). Property interests and rights to payment "are created and defined by state law," and "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Butner v. United States*, 440 U.S. 48, 55 (1979). Section 502(b)(1) accordingly "is most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007). Where, as here, a claim is unenforceable against the Debtor under Florida law, § 502(b)(1) requires that it be disallowed.

Separately, where a claim is based on a writing, the claimant must attach the operative writing to its proof of claim, and the failure to do so deprives the claim of prima facie validity – the claimant "cannot rest on the proof of claim." *In re Taylor,* 363 B.R. 303, 307 (Bankr. M.D. Fla. 2007). A proof of claim that lacks prima facie validity "is quickly disallowed upon a valid objection, unless the claimant then provides sufficient evidence to establish the validity of the claim by a preponderance of the evidence." *Id.* at 308. Failure to establish a legally enforceable agreement supporting the claimed debt warrants disallowance under § 502(b)(1). *Id.*

### B. <u>The Conversion Trial Exhibits Are Properly Before the Court and May Be Considered on This Motion</u>

The material facts establishing that McMann and not the Debtor was the lender obligated to fund the $24 million BELOC Loan are drawn from documents this Court already admitted into evidence at the Conversion Trial. (Doc. 59). Those exhibits are properly before the Court on this Motion for three independent reasons.

First, the Court may take judicial notice of its own record. "A court may take judicial notice of its own records and the records of inferior courts." *United States v. Rey*, 811 F.2d 1453, 1457 at n.5 (11th Cir. 1987). The Conversion Trial exhibits are part of this Court's own docket, and the Court may take judicial notice of the existence and content of those records under Federal Rule of Evidence 201(b) and (c). *Whitfield v. Thompson*, 165 F. Supp. 3d 1227, 1239 (S.D. Fla. 2016). Courts in this Circuit routinely determine the undisputed material facts on summary judgment from the docketed record of which they take judicial notice. *Id*. Judicial notice establishes the existence and content of the court's records, although not the truth of matters asserted in records that were not themselves admitted. *Sprengle v. Smith Maritime Inc.*, 660 F. Supp. 3d 1337, 1351 (M.D. Fla. 2023). That limitation poses no obstacle here, because the exhibits were admitted into evidence at the Conversion Trial; their evidentiary use rests on the fact of admission into evidence at the Conversion Trial – not merely on their presence on the docket.

Second, Rule 56 expressly authorizes the Court to consider these materials. A movant supports summary judgment by "identifying those portions of the record" that demonstrate the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A), (c)(3). Evidence may be considered on summary judgment so long as it can be reduced to admissible form at trial. *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1304 (11th Cir. 2022). The Conversion Trial exhibits satisfy, and indeed exceed, that standard, because they have already been admitted

into evidence by this Court and thus can be presented in admissible form. The concern that "unknown witnesses" might be needed to authenticate summary-judgment evidence is absent here, because the authentication and admissibility of the exhibits are already established of record.

Third, to the extent any further foundation is required, the Trustee has supplied it. The Declaration of Raye Elliot In Support of Trustee's Motion for Summary Judgment on Trustee's Objection to Claim 5-3 of Charles Blake Stringer/Nutra-Acres, LLC attached as **Exhibit 1**, authenticates and places the admitted exhibits and the Conversion Trial record before the Court. A qualified affiant may lay the foundation for documentary evidence at the summary-judgment stage. *Carrizosa*, 47 F.4th at 1299. The Trustee accordingly relies on Conversion Trial Exhibits 28, 29, 30, 32, 33, 36, 38, 39, and 40 and requests that the Court take judicial notice of its own record.

## C. <u>Argument</u>

The Trustee is entitled to entry of judgment as a matter of law on his Objection to Claim 5-3 because the Debtor is not a party to the operative loan agreement – the March 9, 2023 McMann BELOC Agreement – and Creditors cannot bring a breach of contract claim, or claim for the alleged resulting damages, against Debtor for failure to fund the loan.

### 1. Creditors and the Debtor Are Not in Privity of Contract for the $24 Million Loan and the Breach of Contract Claim Therefore Fails as a Matter of Law

Under Florida law, a borrower's claim against a lender for failure to fund a loan is a breach of contract claim. *See Jericho All-Weather Opportunity Fund, LP v. Pier Seventeen Marina and Yacht Club*, LLC, 207 So. 3d 938, 941 (Fla. 4th DCA 2023). To prevail, the borrower must identify and sue upon the contract creating the obligation to fund the loan. *Id.* (reversing final judgment against lender and finding that the loan agreement sued upon by the borrower did not contain a

promise to fund the loan and lender's failure to fund the loan was not a breach of the loan agreement; rather the failure to fund the loan was a breach of the second commitment letter, which was not the agreement the borrower sued upon).

By Creditors' own account, the disputed $14 million is composed of "actual damages and consequential damages" allegedly flowing from the failure to fund the $24,000,000 loan. (Response at 3; Claim 5-3 providing the basis for the claim as "Failure to provide loan under contract."). Those damages sound in contract. Under Florida law, to prevail on a breach-of-contract claim a party must establish (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach. *Univ. of S. Fla. Bd. of Trs. v. Moore*, 347 So. 3d 545, (Fla. 2d DCA 2022) (citations omitted). ); *Taboada v. Duarte*, 393 So. 3d 775, 778 at n.3 (Fla. 3d DCA 2024) (a plaintiff who cannot establish a valid, enforceable contract fails the first element, which "alone" precludes summary judgment in its favor on a breach claim).

The first element for a breach of contact claim requires privity — a contractual relationship between the plaintiff and the defendant. "Privity of contract in its basic form means parties are in a contractual relationship with one another." *Pickell v. Lennar Homes, LLC*, 372 So. 3d 1279, 1281 (Fla. 6th DCA 2023). Where a plaintiff cannot establish a valid contract with the defendant, the plaintiff cannot meet the first element and the breach claim fails. *See Baskerville-Donovan Eng'rs v. Pensacola Exec. House Condo. Assn'n.*, 581 So. 2d 1301, 1303 (Fla. 1991) (explaining that "[a]t early common law, only those in direct privity to a contract could sue on a contract" and that the doctrine of third-party beneficiary (inapplicable here) "merely modified the common law to allow suits upon a contract despite the absence of direct contractual privity under narrowly defined circumstances" (again, inapplicable here)). As a general rule, "a person who is not a party to a

contract cannot sue for a breach of the contract even if the person receives some incidental benefit from the contract." *Greenacre Props., Inc. v. Rao*, 933 So. 2d 19, 23 (Fla. 2d DCA 2006).

Here, it is undisputed that Creditors and Debtor are not in direct contractual privity with respect to the unfunded $24 million loan because the operative contract, the McMann BELOC Agreement, is between McMann and Nutra-Acres; the Debtor is not a party to the McMann BELOC Agreement. Indeed all of the other exhibits from the Conversion Trial attached to the Elliott Declaration make clear that Creditors' application for the BELOC Loan was made to McMann, all correspondence regarding the BELOC loan and the bridge loan was with McMann, Creditors' attorney sent a demand letter to McMann referencing McMann's failure to fund the BELOC loan, and McMann terminated the McMann BELOC Agreement. Accordingly, Creditors' claim for damages for failure to fund the $24 million loan lies, if at all, against McMann. Because Creditors cannot bring a claim against Debtor for breach of the McMann BELOC for failure to fund the loan, Creditors cannot bring the claim in this bankruptcy case against Debtor for alleged damages resulting from said breach of a contract to which it was not a party. As such, Claim 5-3 must be disallowed.

Moreover, the operative loan document to which Creditors were a party – the Bridge Loan Agreement – does not require the proceeds of the bridge loan to actually be disbursed to Creditors. Instead, the purpose of the bridge loan was to fund the ICA account for the $24 million loan to be made by McMann. Section 2.02(a) of the Bridge Loan Agreement states, "On the Effective Date, the Lender shall hold Bridge Loan in Lender's account on behalf of the Borrower." (Claim 5-3 at p. 74). Recital F of the Intercreditor Agreement states, "LOC Lender will provide the Bridge Loan on behalf of the Debtor [Nutra-Acres] to the ICA to enable the Debtor [Nutra-Acres] to secure the LOC from the LOC Lender." (Claim 5-3 at p. 102). Recital D of the McMann BELOC Agreement

explains the ICA: "An account on books and records of Lender shall be created to serve as an Interest Credit Account (the "ICA"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein." (U.S. Trustee's Ex. 38 from Conversion Trial attached as Ex. A to the Elliott Declaration). It is clear from the plain language of the Creditors' own loan documents that the proceeds of the bridge loan were never to be disbursed to Creditors – instead the proceeds were to be held in an account noted on the books and records of McMann. Therefore, the Creditors cannot have a breach of contract claim against the Debtor for failure to fund the bridge loan because the Creditors were never entitled to receive the proceeds of the bridge loan.

### 2. Creditors Are Not Third-Party Beneficiaries of the McMann BELOC Agreement

To the extent Creditors contend they may enforce the McMann BELOC Agreement — or any obligation to fund the $24 million loan — against the Debtor as a third-party beneficiary, that theory fails. Florida recognizes the third-party-beneficiary exception to privity only in "narrowly defined circumstances." *Baskerville-Donovan*, 581 So. 2d at 1303 (Fla. 1991). "A party is an intended beneficiary only if the parties to the contract clearly express, or the contract itself expresses, an intent to primarily and directly benefit the third party or a class of persons to which that party claims to belong." *Dingle v. Dellinger*, 134 So. 3d 484, 488 (Fla. 5th DCA 2014). It is not enough that a non-party derives an incidental benefit; rather, "it must be shown that both contracting parties intended to benefit the third party," and "[a] person who is not a party to a contract may not sue for breach of that contract where that person receives only an incidental or consequential benefit from the contract." *Id*. The Debtor is a stranger to the McMann BELOC Agreement, and nothing in that agreement reflects any intent by McMann and Nutra-Acres to confer on the Debtor an enforceable obligation to fund McMann's loan. Creditors likewise cannot

invoke the doctrine to sue the Debtor on an agreement to which the Debtor was not a party and from which it received no direct, intended benefit. *Greenacre*, 933 So. 2d at 23.

**3. Creditors' Detrimental-Reliance Theory is Barred as a Matter of Law**

In their Response, Creditors allege that they "detrimentally relied" on the Debtor to fund the $24,000,000 loan. (Response at 3). That theory cannot salvage the Claim. Under Florida law, promissory estoppel[2] "is an equitable doctrine for the enforcement of agreements, not a device to nullify an expressly-agreed, written contractual term," and it "is not available as a remedy when parties have a written contract addressing the relevant issue." *Coral Reef Drive Land Dev., LLC v. Duke Realty Ltd. P'ship*, 45 So. 3d 897 (Fla. 3d DCA 2010). Promissory estoppel is unavailable "where a written contract between the parties covered" the same subject matter, and it "is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract." *Advanced Mktg. Sys. Corp. v. ZK Yacht Sales*, 830 So. 2d 924, 928 (Fla. 4th DCA 2002). Where the parties' dealings are governed by written agreements — the McMann BELOC Agreement, the Bridge Loan Agreement, and the Intercreditor Agreement — a reliance theory addressed to the same funding obligation is foreclosed. *Devon Med., Inc. v. Ryvmed Med., Inc.*, 60 So. 3d 1125, 1130 (Fla. 4th DCA 2011). Moreover, the equitable doctrine of detrimental reliance "may not be used to circumvent" the statute of frauds; a promise unenforceable under that statute cannot be enforced through reliance. *DK Arena, Inc. v. EB Acquisitions I, LLC*, 112 So. 3d 85, 95 (Fla. 2013).

[2] Detrimental reliance is the essential element of the claim of promissory estoppel, but is not a claim in and of itself. *W.R. Grace and Co. v. Geodata Services, Inc.*, 547 So. 2d 919, 924 (Fla. 1994).

### 4. The Statute of Frauds Independently Bars Any Claim That the Debtor Agreed to Fund the $24 Million Loan

Even setting aside the absence of privity, Creditors' Claim independently fails under Florida's "Banking Statute of Frauds." Section 687.0304, Florida Statutes, provides that "[a] debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, and is signed by the creditor and the debtor." § 687.0304(2), Fla. Stat. A "credit agreement" is defined broadly to include "an agreement to lend or forbear repayment of money . . . to otherwise extend credit, or to make any other financial accommodation," and "may not be implied from the relationship, fiduciary, or otherwise, of the creditor and the debtor."§ 687.0304(1)(a), (3)(b). Applying § 687.0304, Florida courts hold that a borrower's claim that a lender agreed to extend credit or make a financial accommodation is "legally insufficient" as a matter of law absent a signed writing expressing consideration and setting forth the relevant terms. *Coral Reef Drive Land Dev.*, 45 So. 3d at 903. Creditors have never produced a written $24,000,000 credit agreement signed by the Debtor — none is attached to the Claim or the Response — and § 687.0304 forecloses any implied or oral obligation on the Debtor to fund the line of credit. The general statute of frauds reinforces the result, because an agreement not to be performed within one year, such as a multi-year line of credit, must likewise be in a signed writing. § 725.01, Fla. Stat. And as noted, Creditors cannot use detrimental reliance to escape these writing requirements. *DK Arena*, 112 So. 3d at 95. Claim 5-3 must be separately disallowed because it violates the statute of frauds.

## IV. CONCLUSION

WHEREFORE, Aaron R. Cohen, Chapter 7 Trustee, respectfully requests that the Court enter an order (i) granting summary judgment on the Trustee's Objection to Claim 5-3; (ii) sustaining the Objection as to the disputed balance; (iii) allowing Claim 5-3 as a general unsecured

claim in the amount of $400,000 and disallowing the remainder; and (iv) granting such other and further relief as the Court deems just and proper.

Dated: October 2, 2026

AKERMAN LLP

By: /s/ *Raye C. Elliott*

Raye C. Elliott, Esq.
Florida Bar Number: 018732
Email: raye.elliott@akerman.com
401 East Jackson Street, Suite 1700
Tampa, FL 33602
Phone: (813) 223-7333
Fax: (813) 223-2837

*Attorneys for Aaron R. Cohen, Chapter 7 Trustee*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on October 2, 2026, I filed a true and correct copy of the foregoing with the United States Bankruptcy Court for the Middle District of Florida using the Court's CM/ECF system, which will serve copies on all counsel of record.

*/s/ Raye C. Elliott*
Attorney

# Exhibit 1

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

In re:

GENIE INVESTMENTS NV INC., Case No.: 3:24-bk-00496-BAJ

Debtor. Chapter 7

______________________________________/

**DECLARATION OF RAYE ELLIOTT IN SUPPORT OF TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ON TRUSTEE'S OBJECTION TO CLAIM 5-3 OF CHARLES BLAKE STRINGER/NUTRA-ACRES LLC**

I, Raye Elliott, declare as follows:

1. I am the attorney for Aaron Cohen, Chapter 7 Trustee of the bankruptcy estate of Genie Investments NV, Inc. (the "Debtor"), over the age of 18, and make this Declaration based upon my own personal knowledge.

2. Attached as exhibits are documents admitted into evidence by the Court at the April 9, 2024 trial on the U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 which I obtained from Pacer that were filed on the docket in this case. The documents and exhibits are as follows:

> **Exhibit A** – U.S. Trustee's Exhibit 36: March 9, 2023 Business Expansion Line of Credit Agreement between Nutra-Acres, LLC and McMann Commercial Lending, LLC ("McMann") (Doc. 46-7);
>
> **Exhibit B** – U.S. Trustee's Exhibit 28: Statement of Blake Sringer (Doc. 46-2);
>
> **Exhibit C** – U.S. Trustee's Exhibit 29: Dec. 14, 2022 email from a loan officer for McMann sending the McMann business line of credit application and explanation to Blake Stringer ("Mr. Stringer") (Doc. 46-3);
>
> **Exhibit D** – U.S. Trustee's Exhibit 30: Dec. 27, 2022 email from a loan officer for McMann to Mr. Stringer sending a proposed timeline for McMann's funding of the loan (Doc. 49-1);

**Exhibit E** – U.S. Trustee's Exhibit 32: Jan. 19, 2023 email from a loan officer for McMann to Mr. Stringer sending a sample bridge loan agreement (Doc. 49-2);

**Exhibit F** – U.S. Trustee's Exhibit 33: Jan. 18, 2023 email from a loan officer for McMann to Mr. Stringer sending a proposed due diligence agreement between the Debtor and Nutra-Acres related to the proposed bridge loan from the Debtor (Doc. 46-5);

**Exhibit G** – U.S. Trustee's Exhibit 38: May 26, 2023 demand letter from Mr. Stringer's attorney to McMann and the Debtor (Doc. 49-4);

**Exhibit H** – U.S. Trustee's Exhibit 39: June 8, 2023 letter from McMann to Mr. Stringer's email regarding funding of the BELOC loan from McMann (Doc. 46-9);

**Exhibit I** – U.S. Trustee's Exhibit 40: June 23, 2023 letter from attorney for McMann to Mr. Stringer and Nutra-Acres terminating the McMann BELOC Agreement (Doc. 46-10);

**Exhibit J** – U.S. Trustee's Annotated Exhibit List for April 9, 2024 trial indicating that the documents listed above were admitted into evidence by the Court;

Pursuant to 28 U.S.C.§ 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: October 2, 2026

Raye Elliott



88623931;1

# Exhibit A

# EXHIBIT COVER SHEET

| | | |
|---|---|---|
| | | **Exhibit** |
| Party Submitting: | **Mary Ida Townson, U.S. Trustee for Region 21** | |
| Admitted: | **YES or NO (circle one)** | **36** |
| Chapter 11 Debtor: | **Genie Investments NV, Inc.** | |
| Case No. | **3:24–bk–00496–BAJ** | |
| Nature of Hearing: | **Trial on**<br><br>**U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**<br><br>**Debtor's Response Thereto (Doc. No. 34)**<br><br>**U.S. Trustee's Reply (Doc. No. 38)** | |
| Trial Date: | **April 9, 2024, at 9:00 a.m.** | |

**United States Bankruptcy Court**
**Middle District of Florida**

**Dated:____________________________, 2024.**

**By: ________________________, Deputy Clerk**

MC

McMANN Commercial Lending

March 9, 2023

**Wiring Instructions**

**Step 1**: As per your Term Sheet, within seven (7) calendar days the Company must wire the necessary amount, **plus (+) a seventy-five-dollar ($75) wiring fee** to the account listed below:

**Bank Name & Address:**
Chase Bank
1515 Atlantic Boulevard
Jacksonville, Florida 32207

**Account Mailing Address:**
401 Ryland Street Suite 200-A
Reno, Nevada 89502

**Routing Number:** [redacted]

**Credit Account Number:** [redacted]

**Account Title:** Genie Investments NV

****When sending the wire, please write "ICA" in the Memo along with your User ID (2791).****

**Step 2**: The Company must then send a message to Provider, stating that they have remitted to Provider *and* attach proof of the transferred funds.

**Step 3**: Provider will confirm the receipt of the wire transfer back to the Company.

**Step 4**: The Company must submit all requested deliverables to Provider prior to delivering funds. By submitting all deliverables and executed loan agreements, the Company is providing written authorization to transfer funds in a to be created Provider account and lock the funds in that account with Provider's Warehouse Lending Source.

**Step 5**: Once Provider aggregates the Company's funds with other borrowers to meet its minimum threshold, the funds will be transferred and locked in a Provider account with Provider's Warehouse Lending Source, where the funds remain in the account until your Line of Credit funds.

During this funding period, funds will be blocked and will not be available for use, nor will they be refundable, nor partially refundable. In the event that the Company's line of credit is not funded within the time frame as per the Business Growth Line of Credit Agreement after funds have been delivered, then the Company's funds will be returned in full less the wiring fee of seventy-five dollars ($75).

Initials: CBS

**BUSINESS EXPANSION LINE OF CREDIT AGREEMENT**

among

**McMann Commercial Lending LLC**

as Lender

and

**Nutra-Acres LLC.**
as Borrower

dated as of

March 9, 2023

Initials: CBS

# BUSINESS EXPANSION LINE OF CREDIT AGREEMENT

This Business Expansion Line of Credit Agreement (as the same may from time to time be amended, restated or otherwise modified, this "**Agreement**") is made and entered as of March 9, 2023, between McMann Commercial Lending LLC (the "**Lender**"), and Nutra-Acres LLC., a Texas Limited Liability Company ("**Borrower**").

## RECITALS

**A.** The Borrower desires to obtain from Lender an asset backed line of credit loan (the "**LOC**") in an aggregate principal amount not to exceed the Maximum Amount, as hereinafter defined.

**B.** The Borrower desires to obtain the LOC from Lender for the purpose of Business Expansion for Organic Production Farm and Handling Facility (as more fully described on **Exhibit D** attached hereto the "**Project**"). Acquired assets will be legally described on **Exhibit E** attached hereto (the "**Property**").

**C.** The Borrower has agreed to pay a minimum contribution of one and one half percent (1.5%) of the Project LOC Amount to Lender, by establishing the Interest Reserve (as hereinafter defined) and the ICA (as hereinafter defined), collectively, (the "**Interest Reserve Account**"), within seven (7) calendar days after the fully executed LOC Documents (as hereinafter defined) are received by Lender.

**D.** The Borrower has agreed to pay, pursuant to Section 3.6 hereof, the aggregate amount of Three Hundred Sixty Thousand Dollars and No Cents ($360,000), (the "**ICA Payment**"), by bank wire to Lender. An account on the books and records of Lender shall be created to serve as an Interest Credit Account (the "**ICA**"). A credit equal to the ICA Payment shall be noted in the ICA for purposes of satisfying interest payments under the LOC and upon the terms and conditions set forth herein.

**E.** Lender has agreed to make Advances (as hereinafter defined) under the LOC to Borrower in an aggregate amount, according to **Exhibit B**, amount not to exceed the Maximum Amount for the purposes set forth in these recitals and the Promissory Note attached hereto as Exhibit A and upon the terms and subject to theconditions hereinafter set forth.

**NOW THEREFORE**, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Borrower and Lender agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1. Certain Defined Terms**. Except as otherwise provided herein, accounting terms not specifically defined shall be construed, and all accounting procedures shall be performed in accordance with generally accepted accounting principles consistently applied. As used in this

Initials: CBS

Agreement, the following terms have the following meanings, which apply to both the singular and plural forms:

**"Advance(s)"** means any loan advance made by Lender in accordance with the terms and conditions of this Agreement.

"**Applicable Interest Rate**" means the fixed interest rate specified in the Promissory Note.

**"Borrower"** means that term as defined in the first paragraph of this Agreement.

**"Business Expansion"** means any transaction or use, including for working capital, that relates to the expansion of the businessof the Borrower, or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the expansion by the Borrower or any of its subsidiaries of all or substantially anyand all assets, or of any business or division, (b) the expansion by the Borrower or any of its subsidiaries of capital stock, partnership interests, membership interests or equity, or otherwise causing any business to become a subsidiary of the Borrower or (c) a merger or consolidation or any other combination by the Borrower or any of its subsidiaries with another Person or business(other than a Person that is a subsidiary) provided that the Borrower (or a Person that succeeds tothe Borrower in connection with such transaction or series of related transactions) or a subsidiaryof the Borrower (or a Person that becomes a subsidiary of the Borrower as a result of such transaction) is the surviving entity; provided that any Person that is a subsidiary at the time of execution of the definitive agreement related to any such transaction or series of related transactions (or, in the case of a tender offer or similar transaction, at the time of filing of the definitive offer document) shall constitute a subsidiary for purposes of this definition even if in connection with such transaction or series of related transactions, such Person becomes a direct orindirect holding company of the Borrower.

"**Business Plan**" means the document(s) outlining the accurate and up to date business operations of the End-Borrower, as previously provided by End-Borrower, substantially in the form set forth in EXHIBIT D, and subject to review by Lender's Capital Partners as described in Section 8.1 of this Agreement.

**"Closing Date"** means the last date of signed execution of this Agreement by Lender and Borrower.

**"Collateral"** means any and all property securing repayment of the obligations of Borrower under this Agreement, as such collateral is evidenced by a Security Document, including all additions thereto, replacements and proceeds, thereof.

**"Event(s) of Default"** means any event or condition that shall constitute an event of default as described in Article 13 of this Agreement.

"**ICA**" means the definition given in Recital D of this Agreement.

"**ICA Payment**" means the amount remitted pursuant to Recital D of this Agreement.

Initials: CBS

"**Interest Reserve**" means credit on the books and records of Lender as an interest reserve on Advances under the LOC. This credit is provided on behalf of the Borrower when there is a contribution from a Borrower JV Partner, received by the Lender. When there is no such contribution, the Interest Reserve exists with no credit available. This credit is simultaneously created when the ICA is established.

"**Interest Reserve Account**" means the definition given in Recital C of this

Agreement.

"**Lender**" means that term as defined in the first paragraph of this Agreement.

"**Lender's Capital Partners**" means the one or more lender-clients of Lender

providing funding towards the LOC.

"**LOC**" means that term as defined in Recital A of this Agreement.

"**LOC Disbursement Account**" means that term as defined in Section 3.12 hereof.

"**LOC Document(s)**" means, collectively, this Agreement, the Promissory Note and each Security Document, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced, and any other document delivered pursuant thereto.

"**Maximum Amount**" means Twenty Four Million Nine Hundred Sixty Thousand Dollars and No Cents ($24,960,000). The Maximum Amount is the Project LOC Amount plus all fees, costs and expenses which are the Borrower's responsibility to pay.

"**Organizational Documents**" means, with respect to any Person (other than an individual), such Person's Articles (Certificate) of Incorporation or equivalent formation documents, and regulations (Bylaws), operating agreement, JV operating agreement, partnership agreement or equivalent governing documents, and any amendments to any of the foregoing.

"**Other Taxes**" means any and all present or future stamp or documentary taxes or any other excise, ad valorem or property taxes, goods and services taxes, harmonized sales taxes and other sales taxes, use taxes, value added taxes, transfer taxes, charges or similar taxes or levies arising from any payment made hereunder or under any other LOC Document, or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other LOC Document.

"**Person**" means any individual, sole proprietorship, partnership, joint venture, unincorporated organization, corporation, limited liability company, unlimited liability company, institution, trust, estate, governmental authority or any other entity.

"**Project**" means that term as defined in Recital B of this Agreement.

Initials: CBS

**"Project Costs"** means the amount of the LOC proceeds/all Advances not to exceed the Maximum Amount, to be utilized by Borrower for the purpose of implementation or execution of the Project (including but not limited to payment of taxes, insurance and all items reasonably necessary for the successful execution of the Project), as more specifically set forth in the Project budget set forth on **Exhibit C** attached hereto.

"**Project LOC Amount**" means Twenty Four Million Dollars and No Cents Dollars ($24,000,000).

"**Property**" means that term as defined in Recital B of this Agreement.

"**Promissory Note**" means the Promissory Note, in the form attached hereto as **Exhibit A**.

"**Security Agreement**" means that certain Security Agreement, dated as of the Closing Date, executed by the Borrower in favor of Lender, in the form attached hereto as **Exhibit E**.

"**Security Document**" means each security agreement (including, without limitation, the Security Agreement) each pledge agreement, each intellectual property security agreement, each control agreement, each mortgage, each U.C.C. Financing Statement or similar filing filed in connection herewith or perfecting any interest created in any of the foregoing documents, and any other document pursuant to which any lien is granted by any Person to Lender, as security for the obligations under this Agreement or under the Promissory Note, or any part thereof, and each other agreement executed or provided to the Lender in connection with any of the foregoing, as any of the foregoing may from time to time be amended, restated or otherwise modified or replaced.

"**Scheduled Maturity Date**" means the 15th year anniversary of the Closing Date, as the same be extended pursuant to Section 3.2 hereof.

**"Subsidiary"** means any entity (other than the Borrower) in an unbroken chain of entities beginning with the Borrower if each of the entities owns stock, units or other interests that represent fifty percent (50%) or more of the total combined voting power of all classes of stock in one ofthe other corporations in such chain

**"Taxes"** means any and all present or future taxes of any kind, including, but not limited to, levies, imposts, duties, assessments, surtaxes, charges, fees, deductions or withholdings (including backup withholding), or other charges now or hereafter imposed, levied, collected, withheld or assessed by any governmental authority (together with any interest, penalties, fines, additions to taxes or similar liabilities with respect thereto); provided that "Taxes" shall not include, with respect to those imposed on Lender, income, capital gain, sales, use, franchise, excise, taxes or withholding on account of foreign investment in the United States or other taxes on Lender or the revenues derived by Lender with respect to the LOC.

"**Term Sheet**" means that document(s) dated as of 2/7/2023 betweenBorrower and Lender, setting forth a general summary of the terms of agreement memorializedmore fully herein in final form.

**"Tranche Schedule"** means the schedule of Advances to Borrower from the Lender, based

Initials: CBS

upon the dates of the disbursements attached hereto as **Exhibit B**; provided that Borrower may request in writing to Lender adjustments to the Tranche Schedule (so long as the aggregate amount of all Advances thereunder do not exceed the Maximum Amount), with any such adjustments subject to the approval of Lender in its sole discretion.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

## ARTICLE 2
## THE CREDIT

**Section 2.1. Line of Credit Amount**. Subject to the terms and conditions of this Agreement, Lender agrees to make Advances to Borrower under the LOC in an aggregate amount not to exceed the Maximum Amount. The obligation of Borrower to repay such Advances, with interest thereon, shall be evidenced by the Promissory Note.

**Section 2.2. Line of Credit Documents**. The obligation of the Borrower to repay the Advances under the LOC shall be evidenced by the Promissory Note, this Agreement and each Security Document. The LOC shall be secured by the LOC Documents, all of which shall be in form and substance satisfactory to Lender and its counsel.

## ARTICLE 3
## TERM, INTEREST AND PAYMENTS

**Section 3.1. Initial Term**. The initial term of the LOC is Fifteen (15) years and shall commence on the Closing Date and expire on the Scheduled Maturity Date. The aggregate outstanding amount of all Advances and any accrued but unpaid interest and fees shall be payable in full thereon and all other amounts due and owing hereunder and under the Promissory Note shall be repaid by Borrower on the Scheduled Maturity Date.

**Section 3.2. Extended Term.** At the end of the initial term set forth in Section 3.1 hereof, and at the end of each Extended Term (as defined below, if any), provided the LOC is not then and has not been in default beyond any applicable notice and cure period, and Borrower has been in full compliance with the terms and conditions of the LOC Documents, and Lender has not provided Borrower notice that an event then exists which, through the passage of time, the giving of notice and the expiration of any cure period would become an Event of Default, and further provided that all conditions to extension set forth below are fully satisfied, Borrower may elect to extend the term of the LOC and this Agreement for an additional twenty-four (24) month period, up to a total of one (1) such additional consecutive periods (separately, "**Extended Term**"; collectively, the "**Extended Terms**"). In connection with Lender's granting of each Extended Term, (a) Borrower shall execute all documents which Lender, in its reasonable discretion, deems necessary to implement such extension, and (b) Borrower will pay all reasonable costs and expenses incurred by Lender in connection with such extension, including but not limited to Lender's attorneys' fees, as a one (1)-time fee equal to one percent (1%) of the Project LOC Amount.

Initials: CBS

**Section 3.3. Applicable Interest Period.** The interest period with respect to each Advance under the LOC shall be the period commencing on the date such Advance was made to Borrower by Lender, which shall commence the date such funds were withdrawn by Borrower from the LOC Disbursement Account, and continuing until such Advance is repaid in full.

**Section 3.4. Interest Rate Calculation**. Interest shall be calculated on the basis of a 365-day year and the actual number of days elapsed in a 365-day year and at the rate set forth in the Promissory Note (the "Applicable Interest Rate"). The interest rate payable on Advances shallbe subject, however, to the limitation that such interest rate shall never exceed the highest rate which the Borrower may contract to pay under applicable law (the "**Maximum Interest Rate**"). If Lender shall receive interest in an amount that exceeds the Maximum Interest Rate, the excess interest shall be applied to the unpaid principal balance outstanding under the Promissory Note or,if it exceeds such unpaid principal, refunded to the Borrower.

**Section 3.5. Interest Payments**. Interest on the outstanding principal balance of Advances under the LOC shall be paid from the Interest Reserve Account at the rate and at the times set forth in the Promissory Note. Such interest payments shall be deducted by Lender (a) first from the ICA until such funds are depleted, and (b) second, from the Interest Reserve. Interestshall be calculated on Advances made from the date of each Advance.

**Section 3.6. Reserves**. Following the signing of this Agreement, the Borrower shall remit Three Hundred Sixty Thousand Dollars and No Cents ($360,000) as the ICA Payment in accordance with the terms and the time period set forth in Recital D of this Agreement. Upon the funding of the first Advance under the Tranche Schedule, the ICA shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and not refundable to the Borrower unless otherwise specifically provided for in this Agreement. All credits to the Interest Reserve Account shall be used, absent the occurrence of an Event of Default, for purposes of payment on interest payable on the Advances as and when such interest payments are due and payable.

**Section 3.7. Prepayment**. Borrower may, without penalty, prepay all or any portion of the outstanding principal balance of the LOC.

**Section 3.8. Interest Credit Account**. If, at any time, no balance remains in the Interest Reserve Account (having been applied as provided in this Agreement), upon notice from Lender to Borrower, which notice shall be delivered to and received by Borrower no less than thirty (30) days prior to the date of the next interest payment date, Borrower shall remit into the ICA the funds necessary to make such interest payment prior to the date such interest payment is due and payable.

**Section 3.9. Fees.**

(a) **LOC Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable fee for the LOC in an aggregate amount equal to Four percent (4%) multiplied by the Project LOC Amount, which is equal to Nine Hundred Sixty Thousand Dollars and No Cents ($960,000) (the "**LOC Fee**"). The LOC Feehas been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

Initials: CBS

(b) **Promote Fee**. At Closing and out of the initial Advance, the Borrower shall pay Lender a nonrefundable success fee in an aggregate amount equal to One percent (1%) multiplied by the Project LOC Amount, which is Two Hundred Forty Thousand Dollars and No Cents ($240,000) (the "**Promote Fee**"). The Promote Fee has been fully earned by Lender and is due and payable in full to Lender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition.

(c) **ICA Advance Fee**. To the extent the Borrower used Lender to provide the ICA Payment, at Closing and out of the initial Advance, the Borrower shall reimburse Lender in an amount equal to the ICA Payment advanced by Lender plus a nonrefundable fee in an aggregate amount equal to Zero percent (0%) of the ICA Payment, which is No Dollars and No Cents Dollars ($-) (the "**ICA Advance Fee**"). The ICA Advance Fee has been fully earned by Lender and is due and payable in full toLender commensurate with the funding of, and from the proceeds of, the first Advance under the Tranche Schedule, without condition. Borrower will take the Project LOC Amount in full on the closing of the first tranche.

**Section 3.10. Line of Credit Extension Fees.** Concurrently with the commencement of each Extended Term, if any, Borrower shall pay to the Lender, on the first date of each such Extended Term, a nonrefundable LOC extension fee for each extension in an aggregate amount equal to one percent (1%) multiplied by the Maximum Amount.

**Section 3.11. Legal and Incidental Fees, Charges and Costs**. Borrower shall pay at Closing, all reasonable out of pocket and up to Twelve Thousand, Five Hundred U.S. Dollars ($12,500) for legal fees, recording and filing fees, documentary stamps, taxes, service charges, credit reports, UCC search costs, title company fees and costs, third party paymaster fees and administrative expenses, attorneys' fees and expenses, and all other charges or expenses incurred by Lender including administrative fees and expenses (a) in connection with the LOC, (b) in connection with efforts to collect any amount due under the LOC, or (c) in any action or proceeding to enforce the provisions of any of the LOC Documents, including those incurred in post-judgment collection efforts and in any bankruptcy proceeding (including any action for relief from the automatic stay of any bankruptcy proceeding) or judicial or non-judicial proceeding; provided that Lender will provide Borrower ten (10) days' advance notice of any legal fees pursuant to this Section 3.11 that will exceed Twelve Thousand, Five Hundred U.S. Dollars ($12,500). Lender shall not be required to pay any premium or other charge or any brokerage fee or commission or similar compensation in connection with the LOC or with satisfying the conditions of any commitment for standby or permanent financing. Borrower hereby agrees to indemnify and hold Lender harmless against and from any and all claims for such fees, commissions, and compensation in connection with the LOC; provided that Lender shall not have the right to be indemnified under this Section 3.11 for its own gross negligence or willful misconduct.

**Section 3.12. Line of Credit Disbursement Account**. The proceeds of each Advance under the LOC shall be advanced into the LOC Disbursement Account with Lender to be used by Borrower for payment of the Borrower's Project Costs, solely for the purposes and in the manner

set forth in this Agreement. The LOC Disbursement Account will be held jointly in the name of Borrower and Lender. Borrower hereby irrevocably assigns to Lender as additional security for repayment of the LOC, all of Borrower's rights and interest in and to the LOC Disbursement Account, which assignment will be effective only upon the occurrence and continuation of an Event of Default, subject to an applicable Default Cure Period (as hereinafter defined).

**Section 3.13. Taxes.**

(a) All payments made by the Borrower under any LOC Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes or Other Taxes. If any Taxes or Other Taxes are required to be deducted or withheld from any amounts payable to Lender hereunder, the amounts so payable to Lender shall be increased to the extent necessary to yield to Lender (after deducting, withholding and payment of all Taxes and Other Taxes, including such deductions, withholdings and payments of Taxes and Other Taxes applicable to other sums payable under this Section 3.13) interest or any such other amounts payable hereunder at the rates or in the amounts specified in the LOC Documents.

(b) Whenever any Taxes or Other Taxes are required to be withheld and paid by the Borrower, the Borrower shall timely withhold and pay such taxes to the relevant governmental authorities. As promptly as possible thereafter, the Borrower shall send to the Lender a certified copy of an original official receipt received by the Borrower showing payment thereof or other evidence of payment reasonably acceptable to Lender. If the Borrower shall fail to pay any Taxes or OtherTaxes when due to the appropriate governmental authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall indemnify Lender on demand for any incremental Taxes or Other Taxes paid or payable by the Lender as a result ofany such failure.

(c) The agreements in this Section 3.13 shall survive the termination of the LOC Documents and the payment of the Advances and all other amounts payable under the LOC Documents.

## ARTICLE 4
## CONDITIONS TO CLOSING AND DISBURSEMENT

The obligation of Lender to provide the LOC and make any Advance hereunder will be subject to the satisfaction, at Borrower's cost and expense, of each of the following conditions, unless waived by Lender in writing:

**Section 4.1. Delivery of the LOC Documents.**

(a) As of the Closing Date, Borrower shall have executed and delivered to Lender in a manner satisfactory to Lender all of the LOC Documents.

Initials: CBS

(b) The Borrower shall have delivered to the Lender an executed Control Agreement (as defined in the Security Agreement), for each Payment Account and Security Account (both as defined under UCC § 9-102 and as further defined in the Security Agreement) maintained by the Borrower.

(c) Contemporaneously with Borrower's acquisition of the Property, Borrower shall have delivered an executed and notarized mortgage or deed of trust in form and substance required by Lender granting Lender a first priority lien and security interest in and to the Property (the "**Security Instrument**"), and such Security Instrument shall be promptly recorded in the real property records of the county in which such real property is located. If required by Lender, (i) the closing of such Advance and recording of the Security Instrument shall be completed through the services of a title company chosen by Lender, and (ii) such title company shall issue, at Borrower's expense and for the benefit of Lender, a loan policy of title insurance with respect to the Property. For the avoidance of doubt, this Section 4.1(c) shall not operate to preclude any Advances to Borrower to fund pre-acquisition costs.

**Section 4.2. Authority**. On the Closing Date, the Borrower shall have delivered to the Lender an officer's certificate (or comparable document) certifying the names of the officers, members or managers of the Borrower authorized to sign the LOC Documents, together with the true signatures of such Persons and certified copies of (a) the resolutions of the board of directors (or comparable document) of the Borrower evidencing approval of the execution, delivery and performance of the LOC Documents and the consummation of the transactions contemplated thereby, (b) the Organizational Documents of the Borrower (including, if applicable, copies of the partnership and corporate documentation of each of the general partners or members of Borrower and copies of all equity participation agreements), and (c) a contemporaneous certificate of good standing with regard to the Borrower.

**Section 4.3. Liens**. The Project is free from any prior liens. All taxes and assessments affecting the Project or any part thereof due and payable (including without limitation any taxes) have been paid. The Project is not impaired by any existing undisclosed covenants, conditions or restrictions. At the request of Lender, the Borrower shall (i) deliver to the Lender the results of UCC lien searches, satisfactory to the Lender, (ii) the results of federal andstate tax lien and judicial lien searches and pending litigation and bankruptcy searches, in each case satisfactory to the Lender, and (iii) UCC or other lien termination statements reflecting termination of all liens previously filed by any Person and not expressly permitted pursuant to the LOC Documents. Borrower agrees that no lien, other than as required bythis Agreement and the LOC Documents, shall be placed on the Property, the Project or any Collateral without the express written permission of Lender.

**Section 4.4. Litigation**. As of the Closing Date and as of the date of each Advance, there shall be no material Litigation pending against Borrower which in Lender's reasonable business judgment materially affects Borrower's ability to perform all of the terms and provisions of this Agreement.

**Section 4.5. Events of Default**. As of the Closing Date and as of the date of each Advance, no Event of Default shall have occurred and be continuing, and the Borrower shall otherwise be in

full compliance with the terms and provisions of this Agreement.

**Section 4.6. Purchase and Agreement Contracts.** Lender shall receive copies of all material contracts entered in connection with the Property and the Project, and all other contracts material to the Borrower's operations and/or properties.

**Section 4.7. Compliance with Certain Requirements**. Lender shall receive evidence reasonably satisfactory to Lender that the business is in material compliance with all applicable laws, regulations, ordinances, conditions, reservations, and restrictions imposed on the business(es) under local, state, federal and international laws, procedures, statutes, regulations, and ordinances, conditions applicable to the Project.

**Section 4.8. Evidence of Insurance**.

(a) For the period beginning with the execution of this Agreement and continuing throughout the term of the LOC, Borrower shall take out, pay for and will keep in full force, property and liability insurance on the Borrower and the Project against such risks, in such amounts, and with such lenders' loss payable and additional insured clauses and endorsements as shall be satisfactory to Lender and otherwise customarily carried by businesses of similar size and character that of the business of the Borrower, and Borrower shall furnish Lender with the satisfactory evidence of such underlying Borrower insurance and promptly notify Lender of any changes to such insurance. Borrower shall include Lender as an additional insured under all insurance policies applicable to the Project and the Property.

(b) Within five (5) business of receipt of End-Borrower insurance pursuant to Section 4.8(a), Lender shall acknowledge receipt and communicate to Borrower the approval and sufficiency of such End-Borrowers certificate of insurance.

**Section 4.9. Financial Statements**. Lender shall have received all financial reports required by Section 8.6 hereof.

**Section 4.10. Business Pro Forma**. Lender shall receive a pro forma income and expense statement annually in connection with the Project.

**Section 4.11. Management Plan**. Lender shall receive a detailed management plan, concurrently with delivery of the annual financials required pursuant to Section 8.6 hereof, which will consist of the business operation, and budget for all expenses of Borrower's business.

**Section 4.12. Material Change.** Throughout the term of the LOC, Borrower shall advise Lender of any material change in conditions affecting the Borrower's ability to perform under this Agreement or the Project that would materially alter the documentation and information submitted by Borrower to satisfy the above conditions precedent, and will submit amended documentation and information reflecting these changed conditions for the reasonable approval of Lender.

**Section 4.13. Non-Subordination.** Under this Agreement, the payment and performance obligations of the Borrower and/or its subsidiaries shall never put the Lender in a position subordinate to any indebtedness owing to any other creditor of the Borrower and/or any such Subsidiary (excepting interim obligations for labor and materials incurred in the normal course of development and construction of the Project, which obligations will be timely satisfied in the

Initials: CBS

normal and reasonable management of the Project).

**Section 4.14. Securitization.** Lender may in its sole discretion securitize the LOC funding through an insurer of its choosing. Should Lender decide to securitize this transaction, Borrower agrees to cooperate with any preliminary determination or reasonable due diligence required by the insurer.

## ARTICLE 5
## USE OF LINE OF CREDIT PROCEEDS

**Section 5.1. Project Costs: Business Expansion Costs**.

(a) Proceeds of Advances under the LOC shall be utilized by Borrower solely for the purpose of financing the Project Costs, as more fully described on the attached **Exhibit C,** in connection with Borrower Business Expansion as further detailed in the Business Plan, updated yearly by Borrower.

(b) The proceeds of the LOC shall be used exclusively for the purposes set forth in this Agreement. Borrower warrants and represents that the use of the LOC proceeds as set forth herein is for business and commercial purposes only and that the LOC proceeds will not be used for personal, family or household purposes. Borrower will not, directly or indirectly, use the proceeds of the Advances under the LOC, or lend, contribute or otherwise make available such proceeds to any joint venture partner or other Person, (i) to fund any activities or business of or with any Person, or in any country or territory, that, at the time of such funding, is, or whose government is, the subject of Sanctions, or (ii) in any other manner that would result in a violation of Sanctions by any Person.

## ARTICLE 6
## INSPECTIONS

**Section 6.1. Project Inspection**. Lender, through its officers, agents, contractors, affiliates, or employees, shall have the right, at all reasonable times during business hours upon fifteen (15) days' prior written notice to Borrower to enter on-site offices of the Project site and to inspect the operations in connection with the Project; provided that the foregoing inspections shall be limited to twice per year absent the occurrence of an Event of Default.

**Section 6.2. Books and Records**. Lender shall have the right, at all reasonable times, to examine the books, records, accounting data, and other documents of Borrower pertaining to the Project, the Property, and the Borrower and to make extracts therefrom or copies thereof.

**Section 6.3. Force Majeure Event Inspection Right.** In the event of a Force Majeure Event (as hereinafter defined) which interrupts, stops, or otherwise impedes the Borrower's ability to continue with the Project, upon notice by Borrower to Lender in writing of such Force Majeure Event occurrence, Lender shall have the right to periodically inspect the Project, surrounding conditions, and interview employees, contractors, vendors involved in the development of the Project until such time as Lender is satisfied of Borrower's ability to resume operations to develop the Project. Following a Force Majeure Event, Lender has the right to modify the terms upon which future Advances may be made as a result of a change in circumstances as determined by Lender

in Lender's sole discretion, that the Borrower has ability to perform or continue to perform the Project scope of work. Borrower shall execute any additional documents, amendments or other agreement of terms required by Lender, before Lender's obligation to continue to make Advances shall resume.

## ARTICLE 7
## ADVANCE OF FUNDS

**Section 7.1. Timing and Advances to Payee**. Advances will be made as set forth in the Tranche Schedule and shall be transferred into the LOC Disbursement Account. So long as all conditions precedent to an Advance have been met pursuant to the terms of this Agreement, Lender agrees that the first Advance will be funded no later than seventy-five (75) calendar days following the opening of the ICA by the Lender with its wholesale lender. Lender shall deliver written notice to Borrower of the commencement of such seventy-five (75)-day period. Lender shall deliver written notice to Borrower via the ZOOMERAL messaging system of the commencement of such seventy-five (75)-day period.

**Section 7.2. Conditions Precedent to Advance of Funds**. Lender's obligation to make Advances hereunder shall be conditioned upon fulfillment of the terms set forth in Article 4 hereof.

**Section 7.3. Unpaid Lien Claims.** If Lender receives notice of nonpayment from a potential lien claimant or a lien is filed that is not insured over, or if contested then offset with a segregated loss reserve account, or until the potential lien claimant acknowledges payment or otherwise rescinds its notice in such form and with such other acknowledgments as Lender may require, in accordance with applicable law, Lender, at its option may (a) refuse to make any further Advances to Borrower; or (b) withhold one hundred percent (100%) of the lien amount claimed from future Advances.

**Section 7.4. Mandatory Advances**. Notwithstanding any other term or provision of this Agreement, it is understood that interest on Advances under the LOC shall be paid from the ICA and that such method of interest payment is mandatory and not optional. If Lender agrees that Borrower may pay the interest directly, Lender shall have the right to advance the LOC proceeds to pay said interest if not otherwise paid when due. If the LOC funds allocated for these purposes are depleted, Borrower is not relieved from paying directly when due these or any other expenses or amounts required under the terms of this Agreement or any other LOC Document.

## ARTICLE 8
## BORROWER'S AFFIRMATIVE COVENANTS

As a material inducement to Lender to make the LOC to Borrower, and until payment in full of the Advances and other amounts outstanding under the LOC and performance of all other obligations of Borrower under the LOC Documents, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing:

**Section 8.1. Project.** (a) Complete, on an ongoing basis, all due diligence required or necessary in connection with the Project, and (b) be the entity that is counterparty to each material primary contract and agreement related to (i) the Project and (ii) the development, construction, operation and management of the

Initials: CBS

Project.

**Section 8.2.** **Compliance with Laws**. Comply with and provide to Lender upon Lender's reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations applicable to the Project.

**Section 8.3.** **Compliance with Documents**. Perform and comply with all the terms and conditions of this Agreement and the other LOC Documents.

**Section 8.4.** **Books and Records**. Keep and maintain complete and accurate books of account, in accordance with generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower and the Project.

**Section 8.5.** **Payment of Obligations**. Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established in accordance with generally accepted accounting principles).

**Section 8.6.** **Financial Reports**. Deliver to Lender, with respect to Borrower as soon as available and in any event (a) within sixty (60) days after the end of each calendar quarter duringthe term of the LOC, financial statements of Borrower for such quarter and (b) within ninety (90) days after the end of each fiscal year of the Borrower, annual financial statements of the Borrower,in each case of the foregoing, certified as true and correct (which reports shall be prepared in accordance with generally accepted accounting principles consistently applied) and operating statements in form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender. Borrower must also complete their ZOOMERAL business profile and keep the business profile up to date throughout the term of this agreement.

**Section 8.7.** **Notification to Lender**. Promptly after learning thereof, notify Lender of: (a) the details of any material action, proceeding, investigation or claim against or affecting the Borrower, the Property, or the Project instituted before any court, arbitrator or governmental authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority involving or related to the Property or the Project; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a material adverse effect on the business of the Borrower of the Project; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or the Project or any application for any refinancing of the LOC.

**Section 8.8.** **Partnership/Corporate Existence**. Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

Initials: CBS

## ARTICLE 9
## BORROWER'S NEGATIVE COVENANTS

Until payment in full of the Advances under the LOC and the performance of all other obligations of Borrower under the LOC, and in addition to all other covenants and agreement of Borrower contained herein or in any other LOC Documents, Borrower agrees that unless Lender shall otherwise consent in writing Borrower shall not:

**Section 9.1. <u>Liquidation, Merger and Sale of Assets</u>.** Liquidate, merge or consolidate with any other Person or otherwise transfer to an unrelated Person fifteen percent (15%) or more of the equity securities of Borrower, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business. Notwithstanding, any initial public offering or acquisition by another company will require Lender's approval or full payment of outstanding loan balance.

**Section 9.2. <u>Liens</u>.** Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or constituting the Project or any portion thereof other than (a) any lien securing indebtedness owing to Lender, (b) liens for taxes not yet due or that are being actively contested in good faith by appropriate proceedings and for which adequate reserves shall have been established in accordance with generally accepted accounting principles, (c) other statutory liens, including, without limitation, statutory liens of landlords, carriers, warehousers, utilities, mechanics, repairmen, workers and material-men, incidental to the ownership and/or development of the Project that (i) were not incurred in connection with the incurring of indebtedness or the obtaining of advances or credit, and (ii) do not in the aggregate materially detract from the value of the Borrower's property or assets or the Project, (d) easements or other minor defects or irregularities in title of the Property not interfering in any material respect with the use of such property in the development of the Project, and (e) liens existing on the Closing Date and previously disclosed to and approved by Lender (but only to the extent that the amount of debt secured thereby, and the amount and description of property subject to such liens,shall not be increased).

**Section 9.3. <u>Indebtedness</u>.** Create, incur or have outstanding any indebtedness of any kind, other than (a) indebtedness owing to the Lender under this Agreement and the other LOC Documents, and (b) indebtedness of the Borrower existing as of the Closing Date as disclosed to and approved by Lender (and any extension, renewal or refinancing thereof but only to the extent that the principal amount thereof does not increase after the Closing Date).

**Section 9.4. <u>Investments, Loans and Guarantees</u>**. (a) Create, acquire or hold any subsidiary, (b) make or hold any investment in any stocks, bonds or securities of any kind (c) be or become a party to any joint venture or other partnership, or (d) make or keep outstanding any advance or loan to any Person, or (e) be or become a guarantor of any kind.

**Section 9.5. <u>Acquisitions</u>.** Enter into any transaction or series of related transactions forthe purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all ofthe assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another

Initials: CBS

Person by a merger, amalgamation or consolidation or any other combination with such Person, unless specifically stated and approved prior to execution of this Agreement.

**Section 9.6. Organizational Documents**. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

**Section 9.7. Project and Project Documents**. Willfully or voluntarily abandon the Project or its activities to develop, construct, operate or maintain the Project. If the same would (i) be a major decision under the Organizational Documents of Borrower, or (ii) have a material adverse effect on the Lender and is not necessary or desirable for continued development of the Project.

(a) terminate or cancel or consent to or accept any cancellation or termination of; amend, modify or supplement any provision in any material respect; or grant consent under or waive any material default under, or material breach of, or material provision of or the performance of a material obligation by any other Person under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related to the development, construction, operation and maintenance of the Project, in each case that would have an adverse effect on the Lender; or

(b) sell, assign (other than to Lender) or otherwise dispose of any of its rights or interest under, any contracts or agreements (A) related to the Property, (B) between the Borrower and contractors for the Project, or (C) otherwise related the development, construction, operation and maintenance of the Project without Lender's consent, which consent shall not be unreasonably withheld.

## Article 10
## REPRESENTATIONS AND WARRANTIES

Borrower hereby represents and warrants to Lender that:

**Section 10.1. Validity of Agreement**. The Borrower has the right and power and is duly authorized and empowered to enter, execute and deliver the LOC Documents to which it is a party and to perform and observe the provisions of the LOC Documents. The LOC and the execution, delivery and performance of the LOC Documents have been duly authorized by all necessary action, and when executed and delivered by Borrower will constitute the valid and binding agreements of Borrower, enforceable in accordance with their terms. The execution, delivery and performance of the LOC Documents do not conflict with, result in a breach in any of the provisions of, constitute a default under, or result in the creation of a lien (other than liens permitted under Section 9.2 hereof) upon any assets or property of the Borrower under the provisions of, the Borrower's Organizational Documents or any material agreement to which the Borrower is a party.

**Section 10.2. Existing Defaults**. As of the date of execution of this Agreement, Borrower (or any subsidiary of Borrower) is not in material default in the performance or observance of any material obligation, agreement, covenant, or condition contained in any bond, debenture, note, or other evidence of indebtedness or in any contract, indenture, mortgage, agreement, lease, or other

Initials: CBS

agreement or instrument to which Borrower (or any subsidiary of Borrower) is a party or by which it, or any of its properties, subsidiaries, partners or other related entities may be bound.

**Section 10.3.** **No Default in Other Agreements**. The execution and delivery and performance of this Agreement and all other LOC Documents, the incurrence of the obligations herein set forth, and the consummation of the transactions herein contemplated, will not result in the creation of a lien on any of its property (except the liens created by the LOC Documents), and will not conflict with, result in a breach of any bond, debenture, note, contract, indenture, mortgage, lease, or any other evidence of indebtedness, agreement or instrument to which it is a party or by which it or any of its properties, subsidiaries, partners or other related entities may be bound, or result in the violation by it of any law, order, rule, ordinance, or regulation of any court or governmental agency or body having jurisdiction over it or any of its properties, subsidiaries, partners or other related entities.

**Section 10.4.** **No Consents**. No consent, approval, authorization, or other acknowledgment of any court or governmental agency or body, other than those specifically referenced herein, is required for the consummation by Borrower of any of the transactions contemplated by this Agreement, except those permits and licenses required in the ordinary courseof construction of the Project.

**Section 10.5.** **Litigation**. There is no material litigation at law or in equity and no proceedings before any commission or other administrative authority ("Litigation") pending or to Borrower's knowledge threatened against or affecting Borrower, its principals, subsidiaries, partners, or other related entities, or the Project, except as disclosed to and approved in writing by Lender. There is no material Litigation currently contemplated, threatened, or pending by Borrower against any entity or person which would have a material effect on Lender, this Agreement, the LOC, or the transactions contemplated hereunder. Borrower's failure to timely disclose to Lender any Litigation that is pending, threatened or contemplated by Borrower as of the date of Borrower's execution of the LOC Documents shall constitute a material breach of this Agreement and shall justify Lender's excuse from performance of any terms hereof, including funding of any Advance, until Lender is satisfied that such Litigation has been resolved in Lender's sole discretion.

**Section 10.6.** **Financial Statements**. Any and all balance sheets, statements of income or loss, reconciliation of surplus, and financial data of any other kind furnished to Lender by or on behalf of Borrower are true and correct in all material respects, have been prepared in accordance with generally accepted accounting principles consistently applied, and fully and accurately present the financial condition of the subjects thereof as of the dates thereof and no material adverse change has occurred in the financial condition reflected therein since the dates of the most recent thereof.

**Section 10.7.** **Legal Requirements**. The Borrower (a) holds permits, certificates, licenses, orders, registrations, franchises, authorizations, and other approvals from any governmental authority necessary for the conduct of its business and is in compliance with all applicable laws relating thereto, and (b) is in compliance with all federal, state, local, or international applicable statutes, rules, regulations, ordinances, and orders including, without limitation, those relating to

Initials: CBS

environmental protection, occupational safety and health, zoning and equal employment practices.

**Section 10.8. Taxes**. The Borrower has filed all tax returns and reports required of it, has paid all taxes which are due and payable, and has provided adequate reserves for payment of any tax whose payment is being contested; the charges, accruals and reserves on the books of the Borrower in respect of taxes for all fiscal periods to date are accurate; and there are no questions or disputes between the Borrower and any governmental authority with respect to any taxes except as otherwise previously disclosed to the Lender in writing.

**Section 10.9. Organization and Good Standing**. The Borrower is a duly formed or organized, validly existing and in good standing under the laws of the State of its formation or organization as set forth in the first paragraph of this Agreement, and is qualified as a foreign entity and in good standing in each jurisdiction where the Property and the Project are located.

**Section 10.10. Insurance**. The Borrower maintains with financially sound and reputable insurers insurance with coverage (including, if applicable, flood insurance on all mortgaged property that is in a Special Flood Hazard Zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act as amended from time to time or as otherwise required by Lender) and limits as required by law and as is customary with Persons engaged in the same business(es) as the Borrower.

**Section 10.11. Accurate and Complete Statements**. Neither the LOC Documents nor any written statement made by the Borrower in connection with any of the LOC Documents contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein or in the LOC Documents not misleading. Lender represents to Borrower:

**Section 10.12. Timing of Lender Funding.** Provided Borrower has met the conditions to Advances in this Agreement, including without limitation the timing for requests set forth in this Section, Lender shall fund Advances in accordance with under the Tranche Schedule, but in no event anymore frequently than every sixty (60) day, unless otherwise consented to in writing by Lender. Borrower must deliver Advance requests to Lender thirty (30) business-banking days prior to the week represented on the Tranche Schedule for which Borrower wishes to receive the proceeds of such Advance from the LOC Disbursement Account. Upon notice of an Advance Request from Borrower, Lender has a forty (40) international business-banking day window based on the Tranche Schedule (with the exception of the first Advance according to Section 7.1) to Payment the requested Advance into the LOC Disbursement Account. Absent a written Advance request from Borrower, in accordance with the conditions and requirements set forth herein, Lender is not obligated to disburse the next scheduled Advance under the Tranche Schedule.

## ARTICLE 11
## NATURE OF REPRESENTATIONS AND WARRANTIES

**Section 11.1. Generally.** The representations and warranties made by Borrower herein and otherwise in connection with the LOC are and shall remain true and correct in all material respects as of the Closing Date and as of the date of each Advance, omit no materials facts, and shall survive

Initials: CBS

so long as any of Borrower's obligations under the LOC Documents have not been satisfied and/or the LOC or any part thereof shall remain outstanding. Each request by Borrower for an Advance shall constitute an affirmation that the representations and warranties remain true and correct in all material respects (or, as to any representations and warranties which are subjectto a materiality qualifier, true and correct in all respects) as of the date thereof, except for any representations and warranties that are made as of a specific date. All representations and warranties made in any document delivered to Lender by or on behalf of Borrower pursuant to or in connection with the LOC shall be deemed to have been relied upon by Lender.

## ARTICLE 12
## EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "**Event of Default**"):

**Section 12.1. Nonpayment**. Failure to make any payment required by the Promissory Note, this Agreement or any other LOC Documents, and such failure continues for a period of thirty (30) days after notice of such default is sent by Lender to Borrower.

**Section 12.2. Other Covenants and Agreements.** Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement (other than those referred to in Section 12.6 hereof), or any of the LOC Documents and such failure shall not have been fully corrected, by performance of or compliance with such covenants or agreements, within twenty (20) days after notice of such default is sent by Lender to Borrower.

**Section 12.3. Representations and Warranties.** If any representation, warranty or statement made in or pursuant to this Agreement or any other LOC Document or any other material information furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made. Such Event of Default can be corrected by presentation of accurate and current material information furnished by the Borrower to the Lender to correct the false or erroneous representation, warranty or statement within ten (10) days after notice of such default is sent by Lender to Borrower.

**Section 12.4. Security.** If any lien granted in this Agreement or any other LOC Document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute, but in no event more than five (5) business days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of Collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute, but in no event more than five (5) business days from the date such change in the lien statusoccurs appropriate documents to correct such matters.

**Section 12.5. Validity of LOC Documents.** If (a) any material provision, in the sole opinion of the Lender, of any LOC Document shall at any time cease to be valid, binding and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any LOC

Initials: CBS

Document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any LOC Document; or (d) any LOC Document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative or in any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

**Section 12.6. Petition for Bankruptcy, Insolvency**. The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as they come due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, of any order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any governmental authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for a period of ninety (90) days; or the taking of action by Borrower to authorize any of the actions set forth in this Section 12.6.

**Section 12.7. Material Litigation**. Any action, suit, proceeding or investigation of any kind involving, or threatened in writing against, Borrower or any subsidiary thereof, or the Project, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a material adverse effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any LOC Documents. Promptly after the commencement thereof of any Litigation , Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation and proceedings before any court or governmental department, commission, board, bureau, agency or instrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, partners, or other related entities, or the Project and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, partners, or other related entities, or the Project of the disclosed Litigation.

## ARTICLE 13
## REMEDIES

**Section 13.1. General**. Following the occurrence of one (1) or more Events of Default, a default cure period of sixty (60) days begins ("Default Cure Period"), except as otherwise provided in Section 13.3 or Section 13.4. If Borrower fails to cure the Event of Default (in the manner specified for each Event of Default pursuant to Article 12) within the Default Cure Period, then the Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b) terminate all obligations to make further Advances under the LOC; and (c) pursue and enforce, either successively or concurrently, all rights and remedies set forth in the Promissory Note, in the LOC Documents, or in any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or in equity, including such rights as are provided in this Article 13. If a Bankruptcy Event referred to in Section 12.6 hereof occurs, (i) all obligations

Initials: CBS

of the Lender to make further Advances under the LOC shall automatically and immediately terminate, if not previously terminated, and the Lender thereafter shall not be under any obligation to make any further Advance, and (ii) the principal of and interest then outstanding on the LOC, and all of the other obligations owing under the LOC Documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without any presentment, demand or notice of any kind, which are hereby waived by the Borrower.

Upon the occurrence of any Event of Default hereunder pursuant to Section 12.1 whereby Borrower has missed more than two (2) scheduled payments, if Borrower does not have any interest reserve account established for the benefit of the Lender, Borrower shall have a) sixty (60) days Default Cure Period to cure the Event of Default and must (b) Payment an additional one year's worth of interest payments into the Interest Reserve Account.

**Section 13.2. <u>Default and Right to Acquire.</u>**

In the event the Borrower is unable to cure the Event of Default (in the manner specified to correct each Event of Default pursuant to Article 12 or within the Default Cure Period,

(a) Upon the occurrence of an Event of Default hereunder Lender shall have the right, in person or by agent, in addition to all other rights and remedies available to Lender hereunder or under the LOC documents, to enter into possession of the Project and perform or cause enforce any liquidity plan.

(b) Lender may enter into possession of the Project and perform or cause to be performed any and all work and labor necessary to complete the Project, to operate and maintain the Project and/or to otherwise run the business of the Borrower. All sums expended by the Lender in doing so, together with interest on such total amount at the default Rate (as defined in the Promissory Note), shall be repaid by the Borrower to the Lender upon demand and shall be secured by the LOC documents, notwithstanding that such expenditures may, together with amounts advanced under this Agreement, exceed the Maximum Amount.

(c) Borrower thereby, following such Bankruptcy Event or relevant cure periods pursuant to Section 13.2 constitutes and appoints the Lender as its true and lawful attorney-in-fact, with full power of substitution, in the name of the Borrower to complete the Project, to operate and maintain the Project, and/or to otherwise run the business of the Borrower, and hereby empowers such attorney or attorneys as follows:

(i) to enter and endorse all agreements, instruments, and documents in connection therewith.

(ii) to use any unadvanced proceeds of the LOC for the purpose of completing, operating, or maintaining the Project.

(iii) to make such changes and corrections in the applicable plans and specifications of the Project as reasonably shall be necessary or desirable to complete the work on the Project.

Initials: CBS

(iv) to employ such managers, contractors, subcontractors, agents, architects, and inspectors as reasonably shall be required for the foregoing purposes.

(v) to pay, settle or compromise all bills and claims which may be or become liens against the Project or the Collateral or any part thereof, unless a bond or other security satisfactory to the Lender has been provided.

(vi) to execute applications and certificates in the name of the Borrower which reasonably may be required by the LOC Documents or any other agreement or instrument executed by or on behalf of the Borrower in connection with the Project.

(vii) to prosecute and defend all actions or proceedings in connection with the Project or the Collateral or any part thereof, and to take such action and require such performance as such attorney reasonably deems necessary under any performance and payment bond and the LOC Documents; and

(viii) to do any and every act which the Borrower might do on its behalf with respect to the Collateral or any part thereof, or the Projcct and to exercise any or all of the Borrower's rights and remedies under any or all of the agreements and documents for the Project.

This power of attorney shall be deemed to be a power coupled with an interest and shall be (A) irrevocable, (B) exercisable by the Lender at any time and without any request upon the Borrower by the Lender, and (C) exercisable in the name of the Lender or the Borrower. The Lender shall not be bound or obligated to take any action to preserve any rights therein against prior parties thereto.

**Section 13.3. <u>Curing of Defaults by Advances</u>**. Upon the occurrence of an Event of Default under Section 12.2 through 12.4 hereof which may be cured by the payment of money, Lender, without waiving any right of acceleration or foreclosure under the LOC Documents which Lender may have by reason of such Event of Default or any other right Lender may have against Borrower because of said Event of Default, shall have the right to make such payment from the LOC, thereby curing the Event of Default. Any cash so remitted, and interest thereon will be disbursed by Lender in accordance with the terms hereof before any additional proceeds of the LOC are disbursed.

**Section 13.4. <u>Remedies Are Cumulative</u>**. No remedy conferred upon or reserved to Lender in the LOC Documents shall be exclusive of any other remedy provided in the LOC Documents or by law or in equity, but each shall be cumulative and shall be in addition to every other remedy given Lender, under any of the LOC Documents or now or hereafter existing at law or in equity or by statute. Lender, at its sole option and without limiting or affecting any rights and remedies hereunder, may exercise any of the rights and remedies to which it may be entitled under the LOC Documents concurrently or in such order as it may determine. The exercise of anyrights of Lender shall not in any way constitute a cure or waiver of Event of Default or invalidateany act done pursuant to any notice of default, or prejudice Lender in the exercise of any of its other rights or elsewhere unless, in the exercise of said rights, Lender realizes all amounts owed to it hereunder and under the Promissory Note, and any other LOC Documents.

Initials: CBS

**Section 13.5.** **Offsets**. If there shall occur or exist any Event of Default referred to in Section 12.6 hereof or if the maturity of the obligations owing under the Promissory Note or the other LOC documents is accelerated pursuant to Section 13.1 hereof, the Lender shall have the right at any time to set off against, and to appropriate and apply toward the payment of, any and all of such obligations then owing by the Borrower, whether or not the same shall then have matured, any andall Payment (general or special) balances, and any and all balances in the Interest Reserve Accountand all other indebtedness then held or owing by the Lender to or for the credit or account of the Borrower, all without notice to or demand upon the Borrower or any other Person or entities, all such notices and demands being hereby expressly waived by the Borrower.

**Section 13.6.** **Collateral**. The Lender shall at all times have the rights and remedies of a secured party under the UCC, in addition to the rights and remedies of a secured party provided elsewhere within this Agreement, in any other LOC Documents executed by the Borrower or otherwise provided in law or equity. Upon the occurrence of an Event of Default and at all times thereafter, the Lender may require the Borrower to assemble the Collateral securing the obligations under the LOC documents, which the Borrower agrees to do, and make it available to the Lender at a reasonably convenient place to be designated by the Lender. The Lender may, with or without notice to or demand upon the Borrower and with or without the aid of legal process, make use of such reasonable force as may be necessary to enter any premises where such Collateral, or any thereof, may be found and to take possession thereof (including anything found in or on such Collateral that is not specifically described in this Agreement or any other LOC document, each of which findings shall be considered to be an accession to and a partof such Collateral) and for that purpose may pursue such Collateral wherever the same may be found, without liability for trespass or damage caused thereby to the Borrower. After any deliveryor taking of possession of the Collateral securing the obligations under the LOC documents, or any portion thereof, pursuant to this Agreement, then, with or without resort to the Borrower personally or any other Person or property, all of which the Borrower hereby waives, and upon such terms and in such manner as the Lender may deem advisable, the Lender, in its discretion, may sell, assign, transfer and deliver any of such Collateral at any time, or from time to time. Noprior notice need be given to the Borrower or to any other Person in the case of any sale of such Collateral that Lender determines to be perishable or to be declining speedily in value or that is customarily sold in any recognized market, but in any other case the Lender shall give the Borrower not fewer than ten (10) calendar days prior notice of either the time and place of any public sale of such Collateral or of the time after which any private sale or other intended disposition thereof is to be made. The Borrower waives advertisement of any such sale and (exceptto the extent specifically required by the preceding sentence) waives notice of any kind in respectof any such sale. At any such public sale, Lender may purchase such Collateral, including by credit bid, or any part thereof, free from any right of redemption, all of which rights the Borrower herebywaives and releases. After deducting all costs and expenses, and after paying all claims, if any, secured by liens having precedence over this Agreement, Lender may apply the net proceeds of each such sale to or toward the payment of the obligations under the LOC documents, whether or not then due, in such order and by such division as the Lender, in its sole discretion, may deem advisable. Any excess, to the extent permitted by law, shall be paid to Borrower, and Borrower shall remain liable for any deficiency. In addition, after the occurrence of an Event of Default, the Lender shall at all times have the right to obtain new appraisals of the Borrower or any Collateral securing the obligations under the LOC documents, the cost of which shall be paid by Borrower.

Initials: CBS

**Section 13.7. <u>Default by Lender and Borrower's Sole Remedy.</u>**

(a) Provided Borrower has fully satisfied and complied with all conditions to Advance, if Lender fails to provide the first (1st) Advance when due, pursuant to the Tranche Schedule and Section 7.1, Borrower shall have the option to terminate this Agreement and request a full refund of the ICA Payment. Upon the occurrence of such default, Borrower shall deliver written notice in the form of a notarized termination letter, a copy of which is attached hereto as **<u>Exhibit F</u>** ("the **Termination Letter**"), to Lender by certified mail. Upon receipt of such notice, Lender shall have forty (40) international business-banking days from the date of receipt ("**Refund Period**") within which to return the ICA Payment to Borrower.

(b) If Lender is unable or unwilling to deliver good funds to Borrower, such failure to deliver an Advance other than the first Advance shall constitute a "Lender Default" hereunder. Upon the occurrence of a Lender Default, Borrower shall provide written notice to Lender in the form of a notarized Termination Letter to Lender by certified mail. Within forty (40) international business-banking days from the date of receipt of such notice by Lender, Borrower shall be entitled to (a) refund of the ICA Payment, minus any interest outstanding and unpaid as of the date of the Lender Default, (b) release of all security interests granted by Borrower to Lender hereunder and under the other LOC Documents, and (c) termination of Borrower's obligations to Lender hereunder with the exception of Borrower's obligation to repay to Lender the outstanding principal balance of the Promissory Note including accrued and unpaid interest thereon up to and including the date of the Lender Default, upon which date interest under the Promissory Note shall ceaseto accrue. Notwithstanding any other provision of this Agreement to the contrary, in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person,Borrower's subsidiaries, partners or other related entities, for any indirect, special, incidental or consequential damages, losses or expenses in connection with Borrower's oranother Person's activities related to, or otherwise by reason of, the LOC, the Advances, the Agreement or the other LOC documents.

(c) Notwithstanding anything to the contrary in the subpart (a) above or anywhere else in this Agreement or the other LOC documents, Lender shall not be liable or responsible to the Borrower, nor be deemed to have defaulted under or breached this Agreement, for any failure or delay in funding Advances pursuant to this Agreement, when and to the extent such failure or delay is caused by or results from acts beyond Lender's control, including, without limitation, the following force majeure events ("Force Majeure Event(s)"): (i) acts of God; (ii) flood, fire, earthquake, explosion or prolonged break-down of transport, telecommunications or electric current; (iii) war (whether declared or not), armed conflict or the serious threat of the same (including but not limited to hostile attack, blockade, military embargo), hostilities, invasion, act of a foreign enemy, extensive military mobilization, civil war, riot, rebellion, revolution, military or usurped power, insurrection, civil commotion or disorder, mob violence, act of civil disobedience, act of terrorism, sabotage or piracy; (iv) plague, epidemic, pandemic, outbreaks of infectious disease or any other public health crisis, including quarantine, or other restrictions; (v) act of authority whether lawful or unlawful, compliance with any law or governmental order, rule, regulation or direction, curfew

Initials: CBS

restriction, expropriation, compulsory acquisition, seizure of works, requisition, nationalization; (vi) embargoes or blockades in effect on or after the date of this Agreement; (vii) national or regional emergency; (viii) strikes, labor stoppages or slowdowns or other industrial disturbances; (ix) failure of the Lender's wholesale lender from preforming under the terms of the agreement between the Lender and the wholesale lender. Lender shall give notice of the Force Majeure Event to the Borrower within a reasonable period from the date Lender realizes such Force Majeure Event has or will have an impact on Lender's ability to fund, stating the period of time the occurrence is expected to continue. Lender shall use reasonably diligent efforts to end the failure or delay and ensure the effects of such Force Majeure Event are minimized. Lender shall resume the performance of its obligations as soon as reasonably practicable after the removal of the cause. The cure periods provided for in subparts (a) and (b) above shall be tolled during the pendency of a Force Majeure Event.

**Section 13.8** **Binding Arbitration.** Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one (1) arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 herein. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Anydisputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriatejurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended bythe Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

## ARTICLE 14
## GENERAL PROVISIONS

**Section 14.1.** **Disclaimer of Liability**. Lender has no liability or obligation in connection

Initials: CBS

with the Project except to make Advances under the LOC as agreed under the terms of the LOC Documents and makes no warranties or representations in connection therewith. No claim may be made by the Borrower or any other Person against the Lender or the Affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

**Section 14.2. <u>Publicity</u>**. Lender and Borrower shall have the right to issue periodic news releases concerning the Project and its financing in such form as mutually approved by each of them, such approval not to be unreasonably withheld. Lender shall have the right indicating that it has provided the financing for the Project.

**Section 14.3. <u>Confidentiality.</u>** Borrower agrees that the specific terms of this Agreement, the LOC, and the related terms regarding Lender's agreement to fund the Project, including Lender's related entities, partners, subsidiaries, and vendors are proprietary in nature, and Borrower hereby agrees to maintain confidential this Agreement, the LOC documents, and any information disclosed by Lender related to the terms upon which funding of the LOC is to take place. Borrower's disclosure of a confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative in nature.

**Section 14.4. <u>Responsibility for Application of Funds</u>**. Lender shall have no obligation to see that funds advanced under the LOC are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement of funds advanced pursuant to this Agreement. Lender may rely solely upon Borrower's requests for Advances, affidavits, statements and reports in making said Advances and Borrower does hereby release and indemnify Lender and hold Lender harmless from any and all losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the LOC proceeds by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final andnon-appealable decision).

**Section 14.5. <u>Non-Disparagement</u>**. Borrower agrees and covenants that Borrower shall not at any time make, publish, or communicate to any person or entity or in any public forum any defamatory, maliciously false, or disparaging remarks, comments, or statements concerning the

Initials: CBS

Lender or its businesses, or any of its employees, officers, or directors and its existing and prospective clients, suppliers, investors, and other associated third parties, now or in the future. For the avoidance of doubt, breach of this Section 10.04 shall constitute an Event of Default pursuant to Section 7.02 under which Lender has the right to terminate all obligations under the Loan Documents pursuant to Section 9.01(b).

**Section 14.6** **Opportunity to Consult with Counsel**. Borrower acknowledges that it has had an opportunity to consult with and be represented by counsel of Borrower's choosing in the review of the Loan Documents, that it has been advised by Lender to do so, that the Borrower is fully aware of the contents of the Loan Documents and of its legal effect, and that Borrower enters into these Loan Documents freely, without duress or coercion, and based on Borrower's own judgment and wishes and not in reliance upon any representation or promise made by the Lender, other than those contained herein.

**Section 14.7** **Notices**. All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety six (96) hours after deposit in first class certified United States mail, postage prepaid, return receipt requested, or two (2) business days if sent by pre-paid nationally recognized overnight courier service,sent to the Party at its address set forth below, or such other address as a Party may designate fromtime to time by written notice given pursuant to this paragraph:

To Borrower: Nutra-Acres Inc.
130 North Dumas Avenue
Dumas, Texas 79029

To Lender:
McMann Commercial Lending LLC
205 N Michigan Avenue, Ste 810
Chicago, Illinois 60601

**Section 14.8.** **Applicable Law**. This Agreement and, unless otherwise specifically provided for therein, each other LOC document, shall be governed by and construed in accordance with the laws of the State of Illinois and the United States.

**Section 14.9.** **Successors and Assigns**. The terms of this Agreement will bind and benefit the successors and assigns of the Parties, provided that except as permitted under the LOC Documents, Borrower may not assign this Agreement or any proceeds from the LOC or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

**Section 14.10.** **Severability**. The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision, except that if a condition to an Advance is held to be illegal or invalid, Lender will not be required to make the Advance which was the subject of that condition. In the event of any conflict or inconsistency between the terms and provisions of this Agreement and any of the LOC Documents, the terms and provisions of this Agreement shall control.

Initials: CBS

**Section 14.11. Amendments**. This Agreement may not be modified or amended except by written agreement signed by the Borrower and Lender.

**Section 14.12. Headings; Attachments**. The several headings to articles, sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part hereof.

**Section 14.13. No Third-Party Rights**. This Agreement is made entirely for the benefit of Borrower, the Lender, and their successors in interest (including any participants). No third party shall have any rights hereunder.

**Section 14.14. Indemnification**. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys 'fees), or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designated a party thereto) or any other claim by any Person relating to or arising out of the Project, the LOC Documents or any actual or proposed use of proceeds of the Advances, or any activities of the Borrower or its affiliates; provided that the Lender shall not have the right to be indemnified under this Section 14.12 for its own gross negligence or willful misconduct, as determined by a final and non-appealable decision in arbitration as for any dispute between the Parties, or by judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 14.12 shall survive any termination of this Agreement. The Borrower hereby agrees to indemnify, defend and hold harmless Lender, the managers of Lender, and all of their members, managers, affiliates and advisors, from any andall damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs)that they may incur by reason of Borrower's failure to fulfill all of the terms and conditions of thisAgreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to,any damages, losses, liabilities, costs and expenses (including attorneys' fees and costs) incurred by Lender, the managing members of Lender, or any of its members, managers, affiliates or advisors, defending against any alleged violation of federal or state securities laws which is basedupon or related to any untruth or inaccuracy of any of the representations, warranties or agreementscontained herein or in any other documents the Borrower has furnished in connection with this transaction.

**Section 14.15. General Limitation of Liability**. No claim may be made by the Borrower or any other Person against the Lender or the affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the

Initials: CBS

transactions contemplated by this Agreement or any of the LOC Documents, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accrued and whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. In addition to the tolling provided under Section 6.3, Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

**Section 14.16. Entire Agreement**. This Agreement, the Promissory Note and any other LOC Document or other agreement, document or instrument attached hereto or executed on or as of the Closing Date integrate all of the terms and conditions mentioned herein or incidental hereto and supersede all oral representations and negotiations and prior writings with respect to the subject matter hereof.

**Section 14.17. Execution in Counterparts**. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, and by facsimile or other electronic signature, each of which when so executed together shall constitute one and the same Agreement.

**Section 14.18. Legal Representation of the Parties**. The LOC Documents were negotiated by the Parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other LOC Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

**Section 14.19. JURY TRIAL WAIVER**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

[Remainder of page intentionally left blank; Signatures follow]

Initials: CBS

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

**LENDER:** MCMANN COMMERCIAL LENDING LLC

By: [signature]

Name: Walter P Trock III

**BORROWER:** Nutra-Acres LLC

By: [signature]
Name: Charles Stringer
Title: ______________________

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 9th day of March, 2023

[signature]
NOTARY PUBLIC
In and for the State of Texas

My Commission Expires:

2/10/2027

SHEILA R. MARTINEZ
Notary Public, State of Texas
My Commission Expires
February 10, 2027
NOTARY ID 13011160-8

Initials: CBS

**EXHIBIT A**
**PROMISSORY NOTE**

$24,960,000 – Maximum Principal Amount March 9, 2023

FOR VALUE RECEIVED, Nutra-Acres LLC, a Texas Limited Liability Company

(the "**Maker**"), hereby promises to pay to MCMANN COMMERCIAL LENDING LLC or any subsequent holder of this Promissory Note (the "**Payee**"), at suchplace as Payee may designate, the principal sum of Twenty Four Million Dollars and No Cents ($24,000,000) or the aggregate unpaid principal amount of all Advances, plus the Fees set forth in Section 3.9 of the LOC Agreement, as such terms are defined in the LOC Agreement (as hereinafter defined) and the other LOC Documents, made by Payee to Maker pursuant to the LOC Agreement, whichever is greater, plus interest on the principal sum and all unpaid balances and all other amounts owed by Maker to Payee at the interest rate set forth below, payment of principal and interest to be made in lawful money of the United States in immediately available funds, as set forth below. Capitalized terms used herein and defined in the LOC Agreement, but not otherwise defined herein, shall have the meaning given such term in the LOC Agreement; and

(a) Maker shall make payments under this Master Promissory Note (as the same may from time to time be amended, restated or otherwise modified, this "**Note**") as follows: (i) simple interest payments on the outstanding principal amount of the Advances, at a fixed rate equal to Four and One Half percent (4.5%) per annum, which interest payments shall be due and payable to Payee quarterly in arrears, onthe first (1st) business day of each January, April, June and September of each year, with the first payment due on the first such date immediately following the date of the first Advance hereunder; and (ii) the outstanding principal balance of the Note, and all remaining accrued and unpaid interest, late charges and all other amounts due to Payee pursuant to this Note and the LOC Documents shall be due and payable in full no later than the Scheduled Maturity Date.

(b) Except for the quarterly payments set forth above, this Note may be prepaid in whole or in part, as provided in the LOC Agreement.

(c) All payments made will be applied first to any late charges or other accrued fees and charges, then to accrued interest, and then to the principal amount of the Note. Maker shall make each payment hereunder to the Payee without any deduction, offset, abatement, recoupment, counterclaim or withholding whatsoever. The receipt of any payment by Payee, at its option, shall not be considered a payment on account until such payment is honored when presented for payment at the drawee bank. Whenever any payment to be made hereunder, including, without limitation, any payment to be made on any Advance, shall be stated to be due on a day that is not a business day, such payment shall be made on the next business day and such extension of time shall in each case be included in the computation of the interest payable on such Advance. The aggregate unpaid amount of Advances and similar information with respect to the LOC set forth on the records of Payee shall be rebuttably presumptive evidence with respect to such information, including the amounts of principal, interest and fees owing to Payee.

Initials: CBS

(d) Maker shall pay all amounts due under this Note to MCMANN COMMERCIAL LENDING, Corporate Office at the address provided under Section 14.5 of the LOC Agreement or such other offices as may be designated by Payee from time to time.

(e) All amounts owed by Maker pursuant to this Note shall be collectively referred to herein as the **"Obligation"** of Maker.

In addition, the following provisions shall govern this Note:

1. **LINE OF CREDIT AGREEMENT AND LINE OF CREDIT DOCUMENTS.** This Note is made and delivered to Payee pursuant to and is subject to all terms and conditions set forth in the that certain Business Expansion Line of Credit Agreement of even dateherewith between Maker and Payee (as the same may from time to time be amended, restated or otherwise modified, the "**LOC Agreement**"). This Note is secured by certain Collateral, as evidenced by the LOC Documents, covering the personal and/or real property described therein.

2. **LATE CHARGES.** If any amount payable under this Note is paid more than ten (10) business days after the due date thereof, then late charges (the **"Late Charges"**) shall be added to the delinquent payment in an amount equal to five percent (5.00%) of such late payment for the extra expense in handling past due payments. Any such Late Charges shall be due and payable without demand, and Payee, at its option, may (i) refuse any late payment or any subsequent payment unless accompanied by the applicable Late Charge, (ii) add the Late Charges to the principal balance of this Note, and (iii) treat the failure to pay the Late Charges as demanded as an Event of Default under this Note. If Late Charges are added to the principal balance of this Note, those Late Charges shall bear interest at the same rate as the principal balance under this Note. Any payment to Payee by check, draft or other item shall be received by Payee subject to collection and will constitute payment only when collected and not when received.

3. **DEFAULT, CROSS-DEFAULT AND ACCELERATION.** Time is of the essence. If Maker fails to make any payment of principal, interest or any other Obligation on the date the same is due and payable under this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or Maker or any other party fails to meet or perform any other obligation under any term or condition of this Note, the LOC Agreement, any of the other LOC Documents, or any other agreement between Maker and Payee, or an Event of Default occurs under the LOC Agreement or any of the other LOC Documents, and subject to any applicable notice and cure periods set forth in the LOC Agreement or any other LOC Documents, such Event of Default is not cured, then this Note shall be in default ("Default"). Upon Default, Payee shall provide written notice to Maker specifying the nature of the Default and directing that it be remedied within the applicable notice and cure period as set forth in the LOC Agreement. Upon Default, the interest rate provided for in this Note shall immediately increase to eighteen percent (18%) per annum (the "Default Rate"), unless and until cured by Maker, and upon Maker's failure to cure any default, the entire unpaid amount of this Note shall be immediately due and payable without further notice or

Initials: CBS

demand from Payee. Until cured, interest shall accrue daily after default with daily interest being added to principal on the last day of each calendar month and thereafter compounded to calculate interest on the amounts owed pursuant to this Note, and Maker shall thereafter be liable for all costs of collection, including reasonable attorneys' fees and costs, in addition to the payment of principal, interest and any other amount.

Should there be a material misappropriation of more than ten (10%) percent of the proceeds of the Advances which causes anEvent of Default, the Borrower shall immediately surrender controlling management interest in Nutra-Acres LLC, and the Project to MCMANN COMMERCIAL LENDING.

4. **COSTS, FEES AND COMPENSATION.** Maker further promises to pay all amounts owed under this Note, the LOC Agreement and the other LOC Documents, and all Obligations owed pursuant to this Note, the LOC Agreement and the LOC Documents, and shall pay all such amounts as specified therein.

5. **WAIVER.** Maker and all endorsers, guarantors and all Persons liable or to become liable on this Note waive presentment, demand, notice of dishonor, notice of default or delinquency, notice of acceleration, notice of nonpayment, notice of costs, expenses or losses and interest thereon, and any and all other notices or matters of a like nature, other than notices required pursuant to this Note, the LOC Agreement or the other LOC Documents.

6. **SUCCESSOR AND ASSIGNS.** The terms of this Note shall apply to, inure to the benefit of, and bind all Parties hereto and their respective successors, and assigns.

7. **CUMULATIVE REMEDIES.** Upon the occurrence of any default under this Note, the LOC Agreement, or any of the other LOC Documents, or an Event of Default occurs, Payee shall have all rights specified therein and as provided under relevant law. No remedy or election hereunder shall be deemed exclusive but shall wherever possible, be cumulative with all other remedies at law or equity.

8. **GOVERNING LAW; VENUE AND JURISDICTION; BINDING ARBITRATION; WAIVER OF TRIAL BY JURY.** This Note shall be governed by and construed in accordance with the laws of the State of Illinois and the United States.

**BINDING ARBITRATION**: Any dispute, claim or controversy arising out of or relating to this Note, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for arbit shall serve notice of such demand pursuant to the notice requirements Section 14.5 of the LOC Agreement. Within three (3) banking-bu service of any demand for arbitration, the Parties to the dis cooperatively to mutually select an agreeable arbitrator. If the Parties are unable to reach agreement on an

Initials: _

arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Note, this agreement to arbitrate, or any of the LOC Documents.

**JURY TRIAL WAIVER**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

9. **AUTHORIZATION.** To induce Payee to enter into this Note and extend and advance funds to Maker pursuant to the terms contained herein and pursuant to the LOC Agreement, Maker hereby represents and warrants as follows, acknowledging that Payee is relying on the truth and accuracy of the following representations and warranties in entering into this Note:

(a) That the undersigned is the authorized representative of Maker and has the authority to bind Maker; and

(b) that Maker is duly organized and validly existing and in good standing under the laws of the State of its formation, and duly qualified to transact business and in good standing in any United States state where the nature of its business or properties requires such qualification, with full power and authority, corporate or otherwise, to enter into and perform this Note; that Maker has taken all actions required to be taken in connection herewith; and

(c) that upon execution of this Note by the undersigned, this Note will constitute a legal, valid, and binding Obligation of Maker and will be enforceable against Maker as set forth herein, except as enforceability thereof may be limited by bankruptcy, insolvency, moratorium and similar laws and by equitable principles, whether considered at law or in equity.

10. **ATTORNEY FEES AND COSTS OF COLLECTION.** Maker shall pay Payee all reasonable expenses, attorney fees and costs incurred in any action or proceeding by Payee to enforce the terms of this Note, the LOC Agreement and/or any of the LOC Documents, including, without limitation, all reasonable expenses, attorney fees and costs on appeal.

**11. MISCELLANEOUS PROVISIONS.**

(a) No delay or omission on the part of the Payee in exercising any rights hereunder or under the terms of any Security Agreement, pledge agreement, any guaranty made to guarantee payment of this Note or any other Security Document given to secure this Note, shall operate as a waiver of such rights or of any other right hereunder or under said security agreements, pledge agreements, guaranties or other documents.

(b) The invalidity or unenforceability of any provision hereof, of this Note, the LOC Agreement or any of the other LOC Documents, or of any other instrument, agreement or document now or hereafter executed in connection with the loan made pursuant thereto, or any Obligation created thereunder shall not impair or vitiate any other provision of any of such instruments, agreements and documents, all of which provisions shall be enforceable to the fullest extent now or hereafter permitted by law.

(c) This Note, the LOC Agreement and the other LOC Documents may only be amended, terminated, extended, or otherwise modified by a writing signed by the Party against which enforcement is sought. In no event shall any oral agreements, promises, actions, inactions, knowledge, course of conduct, course of dealing, or the like be effective to amend, terminate, extend, or otherwise modify any of same.

(d) This Note and the rights and remedies provided for herein may be enforced by Payee or any subsequent holder hereof. Wherever the context permits, each reference to the term "holder" herein shall mean and refer to Payee or the then subsequent holder of this Note.

(e) Maker agrees that the holder of this Note may, without notice to Maker and without affecting the liability of Maker, accept security for this Note and any additional orsubstitute security, if any, or release any security or any party liable for this Note, includingany guarantor, or extend or renew this Note.

[Remainder of page intentionally left blank; Signature page follows]

Initials: ____

IN WITNESS WHEREOF, the Maker has duly executed and delivered this Promissory Note as of the date first set forth above.

**MAKER**

Nutra-Acres LLC

By: [signature]

Name: Charles Stringer

Title: Managing Member

Address: 130 North Dumas Avenue, Dumas, Texas 79029

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 10th day of March, 2023

[signature]
NOTARY PUBLIC
In and for the State of Texas

My Commission Expires:

2/10/2027

SHEILA R. MARTINEZ
Notary Public, State of Texas
My Commission Expires
February 10, 2027
NOTARY ID 13011160-8

Initials: CBS

**EXHIBIT B**
**TRANCHE SCHEDULE**

| | | |
|---|---|---|
| Tranche 1 | Within 75 calendar days of confirmation of the clearing of the funds remitted by Borrower being funded to the wholesale lender by Lender pursuant to Section 7.1 | $4,800,000 |
| Tranche 2 | 75 calendar days after the date of the funding of Tranche 1 | $19,200,000 |
| Tranche 3 | N/A | |
| Tranche 4 | N/A | |

Initials: CBS

**EXHIBIT C**
**PROJECT COSTS**

(Please explain the use of the funds below in accordance with the project. Please see "Project Costs" defined in Article 1 of this agreement.)

Initials: CBS

**EXHIBIT D**
**THE PROJECT**
(Please attach a copy of your Business Plan, Executive Summary and/or Slide Deck.)

Initials: CB

**EXHIBIT E**
**SECURITY AGREEMENT**

This SECURITY AGREEMENT, dated as of March 9, 2023 (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**"), is made by Nutra-Acres LLC, (the "**Grantor**"), in favor of McMann Commercial Lending LLC (the "**Secured Party**").

WHEREAS, the Grantor and the Secured Party are entering into that certain Business Expansion LOC Agreement, dated of even date herewith (as amended, supplemented, or otherwise modified from time to time, the "**LOC Agreement**").

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all the Secured Obligations (as hereinafter defined); and

WHEREAS, it is a condition to the obligation of the Lender to make the LOC under the LOC Agreement that the Grantor execute and deliver this Agreement, and this Agreement is being executed and delivered in consideration of the Secured Party entering into the LOC Agreement and each financial accommodation granted to the Secured Party by the Lender .

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. Definitions. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the LOC Agreement. Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement. Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9. For purposes of this Agreement, the following terms shall have the following meanings:

"**Collateral**" has the meaning set forth in Section 2 hereof.

"**Control Agreement**" means (a) with respect to a Payment account, each Payment Account Control Agreement (or similar agreement with respect to a Payment Account) among the Grantor,the Lender and a depository institution, to be in form and substance satisfactory to the Lender, and
(b) with respect to a Securities Account, each Securities Account Control Agreement (or similar agreement with respect to a Securities Account) among the Grantor, the Lender and a securities intermediary, to be in form and substance satisfactory to the Lender; as any of the foregoing may from time to time be amended, restated or otherwise modified.

"**Payment Account**" means a Payment account, as that term is defined in the

UCC."**Event of Default**" has the meaning set forth in the LOC Agreement.

"**First Priority**" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the LOC Agreement).

Initials: CBS

"**Proceeds**" means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.

"**Secured Obligation(s)**" has the meaning set forth in Section 3 hereof.

"**Securities Account**" means a securities account, as that term is defined in the UCC.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Illinois or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2. Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of Grantor's right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**"):

(a) all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims described on Schedule 1 hereof as supplemented by any written notification given by the Grantor to the Secured Party pursuant to Section 4(e) hereof, general intangibles (including all payment intangibles), money, Payment accounts, and any other contract rights or rights to the payment of money; intellectual property, rights or right to receive royalties therefor, and

(b) all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

3. Secured Obligations. The Collateral secures the due and prompt payment and performance of:

(a) the obligations of the Grantor from time to time arising under the LOC Agreement, this Agreement, any other LOC Document or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the LOC (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, reasonable attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or

contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the LOC Agreement, this Agreement and the other LOC Documents; and

(b) all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the LOC Agreement, this Agreement, the other LOC Documents or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in this Section 3 being herein collectively called the "**Secured Obligations**").

4. <u>Perfection of Security Interest and Further Assurances</u>.

(a) The Grantor shall, from time to time, as may be required by the Secured Party with respect to all Collateral, promptly take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable, the Grantor shall promptly take all actions as may be requested from time to time by the Secured Party so that the security interest in the Collateral granted hereunder is obtained and at all times held by the Secured Party. All the foregoing shall be at the sole cost and expense of the Grantor.

(b) The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section 4 promptly to the Secured Party upon request. The Grantor also hereby ratifies any and all financing statements or amendments previously filed by the Secured Party in any jurisdiction

(c) The Grantor hereby further authorizes the Secured Party to file with the United States Patent and Trademark Office and the United States Copyright Office (and any successor office and any similar office in any state of the United States or in any other country) this Agreement and other documents for the purpose of perfecting, confirming,

Initials: CBS

continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law.

(d) If the Grantor shall at any time hold or acquire any certificated securities, promissory notes, tangible chattel paper, negotiable documents or warehouse receipts relating to the Collateral, then the Grantor shall promptly endorse, assign and deliver the same to the Secured Party, accompanied by such instruments of transfer or assignment duly executed in blank as the Secured Party may from time to time specify.

(e) If the Grantor shall at any time hold or acquire a commercial tort claim, the Grantor shall (i) promptly notify the Secured Party in a writing signed by the Grantor of the particulars thereof and grant to the Secured Party in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance satisfactory to the Secured Party and (ii) deliver to the Secured Party an updated Schedule 1.

(f) If any Collateral is at any time in the possession of a bailee, the Grantor shall promptly notify the Secured Party thereof and, at the Secured Party's request and option, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to the Secured Party, that the bailee holds such Collateral for the benefit of the Secured Party and the bailee agrees to comply, without further consent of the Grantor, at any time with instructions of the Secured Party as to such Collateral.

(g) The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

5. Representations and Warranties. The Grantor represents and warrants as follows:

(a) (i) the Grantor's exact legal name is correctly stated in the first paragraph of this Agreement and on the signature page hereof, and (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the first paragraph of this Agreement.

(b) The Grantor holds no commercial tort claims except as indicated on Schedule 1. None of the Collateral constitutes, or is the proceeds of, (i) farm products, (ii) as-extracted collateral, (iii) manufactured homes, (iv) health-care-insurance receivables, (v) timber to be cut, (vi) aircraft, aircraft engines, satellites, ships or railroad rolling stock. None of the account debtors or other persons obligated on any of the Collateral is a governmental authority covered by the Federal Assignment of Claims Act or like federal, state, or local statute or rule in respect of such Collateral. The Grantor has at all times operated its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and

ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

(c) At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the LOC Agreement.

(d) The pledge of the Collateral pursuant to this Agreement creates a valid andperfected First Priority security interest in the Collateral, securing the payment andperformance when due of the Secured Obligations.

(e) Grantor has full power, authority, and legal right to borrow the Advances under the LOC and pledge the Collateral pursuant to this Agreement.

(f) Each of this Agreement, the LOC Agreement, and the LOC Documents has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

(g) No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Advances under the LOC and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor or the performance by the Grantor of its obligations thereunder.

(h) The execution and delivery of the LOC Agreement, this Agreement and the other LOC Documents by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(i) The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

(j) Schedule 2 hereto lists all banks, other financial institutions and securities intermediaries at which the Grantor maintains Payment Accounts or Securities Accounts as of the Closing Date, and Schedule 2 hereto correctly identifies the name, address and telephone number of each such financial institution or securities intermediary, the name in

Initials: CBS

which the account is held, a description of the purpose of the account, and the complete account number therefor.

(k) Schedule 3 hereto lists all intellectual property and rights which Grantor holds an interest, ownership, or other right.

6. Receivables. If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7. Covenants. The Grantor covenants as follows:

(a) The Grantor will not, without providing at least thirty (30) days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b) The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4 hereof, will be kept at those locations of the Grantor previously disclosed to the Secured Party and the Grantor will not remove the Collateral from such locations without providing at least thirty (30) days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c) The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d) The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the LOC Agreement or herein or with the prior written consent of the Secured Party.

(e) The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located pursuant to the provisions of the LOC Agreement.

Initials: CBS

(f) The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

(g) The Grantor will continue to operate its business in compliance with all applicable provisions of the federal Fair Labor Standards Act, as amended, and with all applicable provisions of federal, state and local statutes and ordinances dealing with the control, shipment, storage or disposal of hazardous materials or substances.

(h) The Grantor shall promptly notify the Secured Party in writing upon the acquisition or creation by the Grantor of a Payment Account or Securities Account not listed on Schedule 2 hereto, and, prior to or simultaneously with the creation of such Payment Account or Securities Account, provide for the execution of a Control Agreement with respect thereto, if required by the Secured Party.

(i) The Grantor shall provide the Secured Party with prompt written notice with respect to any material real or personal property (other than property acquired in the ordinary course of business) acquired by the Grantor subsequent to the Closing Date. In addition to any other right that the Secured Party may have pursuant to this Agreement or otherwise, upon written request of the Secured Party, whenever made, the Grantor shall grant to the Secured Party, as additional security for the Secured Obligations, a First Priority lien on any real or personal property of the Grantor (other than for leased equipment or equipment subject to a purchase money security interest in which the lessor or purchase money lender of such equipment holds a first priority security interest, in which case, the Secured Party shall have the right to obtain a security interest junior only to such lessor or purchase money lender), including, without limitation, such property acquired subsequent to the Closing Date, in which the Secured Party does not have a First Priority lien. The Grantor agrees that, within thirty (30) days after the date of such written request, to secure all of the Secured Obligations by delivering to the Secured Party security agreements, intellectual property security agreements, pledge agreements, mortgages (or deeds of trust, if applicable) or other documents, instruments or agreements or such thereof as the Secured Party may require. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

(j) At the request of the Secured Party, the Grantor shall, with respect to any real property owned by the Grantor or any real property on which the Project is located, provide, or cause to be provided, to the Secured Party, (a) a mortgage (or comparable document) relating to such real property, in form and substance satisfactory to Secured Party, (b) title and lien searches with respect to such real property and such other information, documents or agreements as may be deemed necessary or advisable by the Secured Party r in connection with such mortgage, and (c) such corporate governance and authorization documents and an opinion of counsel with respect to such mortgage as may be deemed necessary or advisable by the Secured Party. The Grantor shall pay all reasonable and documented recordation, legal and other expenses in connection therewith.

8. Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party as the Grantor's attorney-in-fact, with full authority in the place and stead of

Initials: CJS

the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9. Secured Party May Perform. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10. Reasonable Care. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11. Remedies Upon Default.

(a) If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten (10) days prior to the date of such disposition shall constitute reasonable notice. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. At any sale of the Collateral, if permitted by applicable law,

Initials: CBS

the Secured Party may be the purchaser, licensee, assignee or recipient of the Collateral or any part thereof and shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold, assigned or licensed at such sale, to use and apply any of the Secured Obligations as a credit on account of the purchase price of the Collateral or any part thereof payable at such sale. To the extent permitted by applicable law, the Grantor waives all claims, damages and demands Grantor may acquire against the Secured Party arising out of the exercise by Secured Party of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

(b) If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the reasonable fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(c) If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section 11, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12. <u>No Waiver and Cumulative Remedies</u>. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14 hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

Initials: CBS

13. SECURITY INTEREST ABSOLUTE. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon, and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a) any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument.

(b) any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the LOC Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c) any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver, or other modification of any guaranty, for all or any of the Secured Obligations.

(d) any manner of sale, disposition, or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations.

(e) any default, failure, or delay, willful or otherwise, in the performance of the Secured Obligations.

(f) any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

(g) any other circumstance (including, without limitation, any statute of limitations) or manner of administering the LOC or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14. Amendments. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15. Addresses for Notices. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the LOC Agreement, and addressed to the respective parties at their addresses as specified in the LOC Agreement or as to either Party at such other address as shall be designated by such Party in a written notice to each other Party.

Initials: CBS

16. Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 17 hereof, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party. Without limiting the generality of the foregoing clause (c), any assignee of the Secured Party's interest in any agreement or document which includes all or any of the Secured Obligations shall, upon assignment, become vested with all the benefits granted to the Secured Party herein with respect to such Secured Obligations.

17. Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18. GOVERNING LAW. This Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Illinois and the United States.

19. Binding Arbitration. Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in Illinois, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, atthe election of the party initiating the arbitration. The Party initiating a demand for arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 14.5 of the LOC Agreement. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to be arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available

Initials: CBS

remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Illinois. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, this agreement to arbitrate, or any of the LOC Documents.

**20. JURY TRIAL WAIVER. EACH PARTY HERETO, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN THE GRANTOR AND THE SECURED PARTY, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED AMONG THEM IN CONNECTION WITH THIS AGREEMENT, THE LOC AGREEMENT, ANY OTHER LOC DOCUMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.**

21. Counterparts. This Agreement and any amendments, waivers, consents, or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the other LOC Documents constitute the entire contract among the Parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

*Signatures Follow on Next Page*

Initials: CBS

IN WITNESS WHEREOF, the Grantor hereto has executed this Security Agreement as of the date first set forth above.

**GRANTOR**
Nutra-Acres LLC.

By: Charles Blake Stringer
Name: Charles Stringer
Title: Managing Member

March **SUBSCRIBED AND SWORN TO BEFORE ME** on this 10th day of March, 20__.

Sheila R. Martinez
NOTARY PUBLIC
In ~~and for~~ the State of
Texas

My Commission Expires:

2/10/2027

SHEILA R. MARTINEZ
Notary Public, State of Texas
My Commission Expires
February 10, 2027
NOTARY ID 13011160-8

Initials: CBS

**EXHIBIT F**
**FORM TERMINATION LETTER**

MCMANN COMMERCIAL LENDING LLC
205 N Michigan Avenue, Ste 810
Chicago

Re: Nutra-Acres LLC
To Whom it May Concern:

The undersigned Borrower has decided to exercise its rights to terminate the above referenced transaction pursuant to the terms of the LOC Agreement dated March 9, 2023.

Please consider this letter as notice of Borrower's termination of the LOC Agreement and request for refund of Borrower's ICA payment, less any amounts due and owed to Lender under Section 13.7 of the LOC Agreement.

BORROWER: McMann Commercial Lending LLC - Nutra-Acres Inc.

By: [signature]
Name: Charles Stringer
Title: managing member

**SUBSCRIBED AND SWORN TO BEFORE ME** on this 10th day of March, 2023

[signature]
NOTARY PUBLIC
In and for the State of Texas

My Commission Expires:

2/10/2027

Please confirm your Wiring Instructions:
Account Title:
Address on Account:
Bank Name:
Bank Address:
Routing #:
Account #:

SHEILA R. MARTINEZ
Notary Public, State of Texas
My Commission Expires
February 10, 2027
NOTARY ID 13011160-8

Initials: CBS

# Exhibit B

# EXHIBIT COVER SHEET

| | | |
|---|---|---|
| | | **Exhibit** |
| Party Submitting: | **Mary Ida Townson, U.S. Trustee for Region 21** | |
| Admitted: | **YES or NO (circle one)** | **28** |
| Chapter 11 Debtor: | **Genie Investments NV, Inc.** | |
| Case No. | **3:24−bk−00496−BAJ** | |
| Nature of Hearing: | **Trial on**<br><br>**U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**<br><br>**Debtor's Response Thereto (Doc. No. 34)**<br><br>**U.S. Trustee's Reply (Doc. No. 38)** | |
| Trial Date: | **April 9, 2024, at 9:00 a.m.** | |

**United States Bankruptcy Court**
**Middle District of Florida**

**Dated:____________________________, 2024.**

**By: _______________________, Deputy Clerk**

Genie Investments

In October 2022 I was seeking an option for a refinance package on my existing 7,000 acre organic farming operation in the Texas Panhandle.
I had a broker by the name of Clyde Allsop from New Jersey that had been given some information about a financial institution by the name of Mcmann Commercial Lending LLC located out of Chicago, Illinois.
This finance group had a program called a BELOC business expansion line of credit. I paid an initial $7900 for an application, application fee upfront to McMann.
This loan product looked to be a very good fit for what I was exploring.
My initial contact with Mcmann was with their loan officer a fellow named Michael Lanza,
He presented me with the contracts, and also made several calls and question and answer sessions with my Lenders and even their attorneys on numerous conference calls. My loan that I was approved on was for 24 million against my 35 million in assets of my current operations. This loan was to refinance roughly $18 million in pre-existing debt and provide me with some additional operating capital.
I also had dealings with the owner and manager of Mcmann, Mr. Walter Trock. Mr. Trock later made many representations to my Lenders with letters of guarantees & explanations of funding delays.

The Mcmann group provided all the initial loan documentation, and as a part of their services as being agents for a " Sister Company" of Genie Investments NV .
Mcmann facilitated what they called a bridge loan and an ICA interest Carry account that Was needed in order to facilitate the business expansion line of credit BELOC loan.
It was explained over and over to myself, my Lenders and others, That it was necessary to put up 10% on the total loan value in order to do a lock on the rates on the business expansion line of credit.
Where Genie comes into the picture is this Mcmann claimed that Genie was their "Sister company" and had vast experience in the funding process of these BELOC Loans and because of that Genie would provide the Bridge loan or the necessary bridge funding in order to receive the 10% upfront funds to lock in the loan for the borrowers that were unable to put up the entire amount, themselves out-of-pocket.
Mcmann provided to me & my new formed entity Nutra-Acres LLC the necessary documentation, and loan documentation for the bridge loan that Genie investments would provide in front of the Mcmann BLOC loan package.
In Feb-March of 2023 I paid in a total of $365,000 by wire into the Genie Investment ICA account.
It was represented to us that this was a trust account set up for the pre-payment of interest on the total of the Bridge loan that would be provided further to Mcmann and the BELOC business expansion line of credit loan.

This money was wired into Chase Bank
ABA 021000021
Account 852288502
Genie Investments NV

It was understood that this money would preserve the position of an interest carry account on the bridge loan. I have multiple emails & the contracts that explain this and even several phone recording conversations from Mr. LANZA explaining this.

The original contractual agreement from Mcmann explained and outlined that once the ICA account was fully funded then we would receive a notice and at that point the "timeline" would start on a 14-75 day period for the receipt of the first Tranche payment of 20% Of the total loan. I was refinancing existing debt, and I was under an agreement with my current lenders to wait for the funds to close the refinance process. The money never showed and after the 75 day Period and many many conversations of excuses and letters of the delays I had an attorney that I had previously worked with who is a bankruptcy attorney from Fort Worth Texas by the name of Jeff Prostok he served a letter of demand to Genie investments, and Mcmann commercial lending group, we never got a satisfactory response from either party.
I later served a demand letter of civil theft from my attorney, Mr. John Lovell from Amarillo Texas. This demand letter was to all parties both Mcmann and Genie and again no response.

Genie filed an arbitration suit against me and my entity some months later. That suit was objected to and has been put in a position of stay due to my January 2, 2023 forced filing of Chapter 11 bankruptcy in the Northern District of Texas. Case # 24-20000-11
I have listed Genie investments, and Mcmann commercial lending in my schedules, As a claimant.
The plan is to list both these lenders as an adversarial and file suit in the bankruptcy case.
All of the above comments and writings are as of fact.

Blake Stringer
Nutra-Acres LLC

2/28/2024

# Exhibit C

**EXHIBIT COVER SHEET**

| | | |
|---|---|---|
| | | **Exhibit** |
| Party Submitting: | **Mary Ida Townson, U.S. Trustee for Region 21** | |
| Admitted: | **YES or NO (circle one)** | **29** |
| Chapter 11 Debtor: | **Genie Investments NV, Inc.** | |
| Case No. | **3:24−bk−00496−BAJ** | |
| Nature of Hearing: | **Trial on**<br><br>**U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**<br><br>**Debtor's Response Thereto (Doc. No. 34)**<br><br>**U.S. Trustee's Reply (Doc. No. 38)** | |
| Trial Date: | **April 9, 2024, at 9:00 a.m.** | |

**United States Bankruptcy Court**
**Middle District of Florida**

**Dated:____________________________, 2024.**

**By: _______________________, Deputy Clerk**

Case 3:24-bk-00496-BAJ Doc 46 Filed 10/02/24 Page 2 of 10

**From:** Michael Lanza
**To:** Charles Stringer
**Cc:** Clyde Allsop
**Subject:** Documents as promised.
**Date:** Wednesday, December 14, 2022 11:20:38 AM
**Attachments:** Outlook-image.png.png
Outlook-image.png.png
McMann BELOC Fillable Application DB.pdf
McMann Business Plan Template WT.pdf
McMann BELOC Timeline.docx

---

It was a pleasure speaking to you today. See the attached Application, Business Plan Template and the summary of the timeline. If after reviewing the documents you have any questions please give me a call.

Michael J. Lanza
**Direct 321-295-4808**
**Office 800-616-7276**
**Senior Commercial Loan Officer**
McMannCommercialLending.com
Appointment Calendar

| Sales Representative# 2 |
|---|
| Name: Walt Trock |
| Contact 800-616-7276 |

This is a PDF fillable doc. Handwritten Applications are unacceptable.

Mc

McMANN Commercial Lending

# Business Line of Credit Application

**Fax Completed Application to 312-871-3344 Or email to info@mcmanncommercial lending.com**

## BUSINESSINFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Type of Entity (checkone) | ☐ Corporation ☐ SCorporation ☐ GeneralPartnership ☐ Nonprofit ☐ LLC ☐ Other ________ ☐ LP ☐ SoleProprietorship ☐ LLP | | | | Federal ID |
| Merchants LegalName | | D/B/A | | | Business Phone |
| Physical Address | | City, State,Zip | | | Business Fax |
| Mailing Address / BillingAddress | | City, State,Zip | | | Use of Proceeds |
| Business Type; Product/ServiceSold | State ofIncorporation/Organization | Date business started(mm/yy) | Length ofOwnership | | |
| ContactName | Position | EmailAddress | WebAddress | Requested AdvanceAmount | |

## MERCHANT/OWNER INFORMATION(1)

| | | | | |
|---|---|---|---|---|
| Corporate Officer/OwnerName | Title | Social SecurityNumber | Date ofBirth | Ownership% |
| Driver's License &State | Home PhoneNumber | Cell PhoneNumber | EmailAddress | |
| ResidenceAddress | | City, State,Zip | | |

## OWNER INFORMATION (2) – ONLY IF MERCHANT/OWNER (1) IS LESS THAN 51% (both Owners must exceed51%)

| | | | | |
|---|---|---|---|---|
| Corporate Officer/OwnerName | Title | Social SecurityNumber | Date ofBirth | Ownership% |
| Driver's License &State | Home PhoneNumber | Cell PhoneNumber | EmailAddress | |
| ResidenceAddress | | City, State,Zip | | |

## SALES & CREDIT CARD PROCESSINGINFORMATION

Visa/MasterCard: Card Swipe______% Manually Keyed______% Phone/MailOrder______% Internet______% Total(100%)

Avg. Gross Monthly Sales (Cash, Checks,Credit Cards)

SeasonalSales: ☐ Yes ☐ No Ifyes,highvolumemonths: ☐ Jan ☐ Feb ☐ Mar ☐ Apr ☐ May ☐ Jun ☐ Jul ☐ Aug ☐ Sep ☐ Oct ☐ Nov ☐ Dec

| | | | |
|---|---|---|---|
| # ofTerminals | Terminal Make &Model | Software Type / POSSystem | Software Type / POS System - Contact Name &Phone |

## BACKGROUNDINFORMATION

Are you currently paying back acashadvance? ☐ YES ☐ NO IfYes,Company:____________ Whentakenout?____________ Balance:____________

Are you currently behind on any ofthefollowing? ☐ YES ☐ NO IfYes, How much?Utilities:________ SalesTax:________ LiquorTax:________ Rent:________ BankLoans:________

Any State / Federal Liens against the owners orbusiness? (salestax,mixedbeverage,941,etc.) ☐ YES ☐ NO If Yes,Details: ____________

Have you ever filedforBankruptcy? ☐ YES ☐ NO If Yes,Details: ____________

Do you have any Lawsuits or Judgments against you or your businesspending? ☐ YES ☐ NO If Yes, Details:____________

| | | |
|---|---|---|
| TRADE REFERENCE (1) BusinessName | Contact, AccountNumber | PhoneNumber |
| TRADE REFERENCE (2) BusinessName | Contact, AccountNumber | PhoneNumber |

## BUSINESS PROPERTYINFORMATION

| | | | | | |
|---|---|---|---|---|---|
| Own/Lease | Lease StartDate | LeaseTerm | MonthlyRent/Mtg | Type of Building | Square Footage(approx) |

| | Contact Name | Phone Number | Fax |
|---|---|---|---|
| Managing Member | | | |

**Here is what is needed to complete your request for a Unsecured Business Line of Credit**

-Please fill out, sign, and return the attached MCL Business Application
-Executive Summary: Sample Format Attached
-Articles of Incorporation, Good Standing, Operating Agreements, EIN from the IRS.
-2 Forms of personal ID State driver's licenses and a US Visa (copies of all owners ID's with more than 20% ownership in the Corp)
-Personal Financial statement (limited edition part of this application)
-Borrowers Consent (owners of 20% or more of Corp or LLC
-Due Diligence Deposit per LOI which is part of this application as all due diligence deposits are Non Refundable.

**-The Following Can Wait until the On Line Data Base Platform is set up or until a Secure folder is sent for uploads: Business Bank Statements, Profit and Loss Statement from Business, Previous Year Business Tax Returns.**

# Executive Summary Line of Credit

**Purpose and Use of Funds:**

is requesting a $ Line of Credit to support the leased additional warehouse space that was leased in July of this year. Company has already stocked about 15% of this space and is expected to have 75%- 85% of this new space occupied by January of 2021. The Line of Credit will be used to support the anticipated growth over the next 3 years that the additional space will provide

**Exit Strategy of LOC:**

In 2020, the company grew by 40%. The same growth is expected to continue in 2021. The expanded storage space that is now available and the additional 85% demand for unique food storage products will provide sufficient profitability with which to repay the Line of Credit.

**About The Company:**

Company Inc. is a growing food storage and distribution company. Founded in 2005, the company has been growing steadily and are proud to say that many of the customers we started with are still with us today, our customers are growing due in part to our excellent supportive services. We are FDA registered and GMP certified which is not a requirement but demonstrates that we take food storage seriously. This year, we have begun the process of a new certification, one that is deemed the highest level of certification that a food-grade warehouse can achieve. Our audit date for this certification is in February 2021.

Case 3:24-bk-00496-BAJ Doc 45-3 Filed 04/24/24 Page 6 of 10

McMann Commercial Lending ● 800-616-7276 ● Chicago IL 60611

# Borrowers Consent

I hereby give our consent to McMann and its affiliates and/or successors and/or assigns permission to obtain ANY AND ALL INFORMATION regarding ownership, of assets, employment, checking/savings and/or all banking accounts, verifications of mortgages, payoffs, credit obligations and ALL OTHER MATTERS which may be required with our loan application for a loan.

THIS FORM MAY BE REPRODUCED AND THAT COPY SHALL BE AS EFFECTIVE AS THE ORIGINAL CONSENT WHICH WE HAVE SIGNED.

Borrowers Signature ______ Date ______ Date of Birth ______

Borrowers name typed or printed ______ Social Security # ______ Email Address ______

Primary Residence Address, City, State, Zip ______

Co Borrowers Signature ______ Date ______ Date of Birth ______

Co Borrowers name typed or printed ______ Social Security # ______ Email Address ______

Primary Residence Address, City, State, Zip ______

Co Borrowers Signature ______ Date ______ Date of Birth ______

Co Borrowers name typed or printed ______ Social Security # ______ Email Address ______

Primary Residence Address, City, State, Zip ______

Co Borrowers Signature ______ Date ______ Date of Birth ______

Co Borrowers name typed or printed ______ Social Security # ______ Email Address ______

Primary Residence Address, City, State, Zip ______

McMANN Commercial Lending ● 205 N Michigan Ave ● Chicago IL 60601
312-224-8559 Fax 312-871-3344

# UnSecured LOC Due Diligence Checklist as of 10/13/2021

**1. Income Statement (past five years or less starting with company establishment)**

**2. Balance Sheets (past five years or less starting with company establishment)**

**3. Cash Flow Statements (past five years or less starting with company establishment)**

**4. Tax Returns (past five years or less starting with company establishment)**

**5. Net Worth Statement/s for All Equity Owners That Have A 5% Or Higher Ownership Stake**

**6. Business Plan Including A 2 Year Forecast/Proforma & Management Bios**

**7. Previous 5 Month's Business Bank Statements for All Business Bank Accounts**

**8. Post-Closing Balance Assuming Term Sheet Terms/Rates**

**9. All UCC Lien Filings & Current List of All Creditors**

**10. Articles of Incorporation, Corporate Bylaws/Operating Agreement, & A Recent Certificate of Good Standing**

**11. Capitalization Table of All Outstanding Stock Shares, Stock Warrants, & Stock Options**

**12. All Registered Intellectual Property**

McMANN Commercial Lending • 205 N Michigan Ave • Chicago IL 60601
312-224-8559 Fax 312-871-3344

# McMann Commercial Lending Wire Instructions:

**Beneficiary: McMann Commercial Lending LLC,**
**205 N Michigan Ave, Suite 810 Chicago IL 60601**
**Bank: Old Plank Trail Community Bank 60423**
**Phone: 815-464-6888**
**Account #: [redacted]6406, Routing: [redacted]6582**

As of December 1, 2022 the BELOC Due Diligence Deposit is $7,900 Non-Refundable.

# Executive Summary Line of Credit

**Purpose and Use of Funds:**

is requesting a $ Line of Credit to support the leased additional warehouse space that was leased in July of this year. Company has already stocked about 15% of this space and is expected to have 75%- 85% of this new space occupied by January of 2021. The Line of Credit will be used to support the anticipated growth over the next 3 years that the additional space will provide

**Exit Strategy of LOC:**

In 2020, the company grew by 40%. The same growth is expected to continue in 2021. The expanded storage space that is now available and the additional 85% demand for unique food storage products will provide sufficient profitability with which to repay the Line of Credit.

**About The Company:**

Company Inc. is a growing food storage and distribution company. Founded in 2005, the company has been growing steadily and are proud to say that many of the customers we started with are still with us today, our customers are growing due in part to our excellent supportive services. We are FDA registered and GMP certified which is not a requirement but demonstrates that we take food storage seriously. This year, we have begun the process of a new certification, one that is deemed the highest level of certification that a food-grade warehouse can achieve. Our audit date for this certification is in February 2021.

McMANN Commercial Lending • 205 N Michigan Ave • Chicago IL 60601
312-224-8559 Fax 312-871-3344

March 27, 2024

Proposed Timeline:

1. **Once Approved you will receive an activation link per SEC Guidelines where you go online an activate your account by uploading your application and business plan to avoid solicitation and verify, we did not change any info to get you approved.**
2. **Once Activated you will receive the Retention Agreement to retain McMann to secure the Bridge loan. Once executed and the Bridge loan fee of XXK is paid for the XXXM Bridge we move forward.**
3. **within 48-72 hours you will receive the Terms Sheet, Data Management Agreement and the Bridge Loan agreement. Once executed you return all three agreements.**
4. **Within 48-72 hours you receive your loan agreement for review by you and your lawyer. Once executed you return and wire in your prepaid interest for the 90-day Bridge loan. The rate on that is 5% per month.**
5. **Once the loan agreement executed and the prepaid interest is received the bridge lender will deposit the XXXM into the ICA Account.**
6. **At this point you are closed, and the clock starts ticking on the wait until your funding is received. This as stated can be 14-75 days for the first Tranche of 20%. Once this deposit is made the clock starts ticking on the second tranche which again could be 14-75 days for the remaining 80%.**

**Any questions give me a call.**

# Exhibit D

# EXHIBIT COVER SHEET

**Exhibit**

Party Submitting: **Mary Ida Townson, U.S. Trustee for Region 21**

Admitted: **YES or NO (circle one)** **30**

Chapter 11 Debtor: **Genie Investments NV, Inc.**

Case No. **3:24−bk−00496−BAJ**

Nature of Hearing: **Trial on**

**U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**

**Debtor's Response Thereto (Doc. No. 34)**

**U.S. Trustee's Reply (Doc. No. 38)**

Trial Date: **April 9, 2024, at 9:00 a.m.**

**United States Bankruptcy Court**
**Middle District of Florida**

**Dated:____________________________, 2024.**

**By: _______________________, Deputy Clerk**

**From:** Michael Lanza
**To:** Charles Stringer
**Cc:** Clyde Allsop
**Subject:** Timeline as promised.
**Date:** Tuesday, December 27, 2022 3:42:09 PM
**Attachments:** Outlook-image.png.png
Outlook-image.png.png
McMann BELOC Timeline.docx

---

See attached. Any questions give me a call.

Michael J. Lanza
**Direct 321-295-4808**
**Office 800-616-7276**
**Senior Commercial Loan Officer**
McMannCommercialLending.com
Appointment Calendar

McMANN Commercial Lending • 205 N Michigan Ave • Chicago IL 60601
312-224-8559 Fax 312-871-3344

December 27, 2022

Proposed Timeline:

1. **Once Approved you will receive an activation link per SEC Guidelines where you go online an activate your account by uploading your application and business plan to avoid solicitation and verify, we did not change any info to get you approved.**
2. **Once Activated you will receive the Retention Agreement to retain McMann to secure the Bridge loan. Once executed and the Bridge loan fee of XXK is paid for the XXXM Bridge we move forward.**
3. **within 48-72 hours you will receive the Terms Sheet, Data Management Agreement and the Bridge Loan agreement. Once executed you return all three agreements.**
4. **Within 48-72 hours you receive your loan agreement for review by you and your lawyer. Once executed you return and wire in your prepaid interest for the 90-day Bridge loan. The rate on that is 5% per month.**
5. **Once the loan agreement executed and the prepaid interest is received the bridge lender will deposit the XXXM into the ICA Account.**
6. **At this point you are closed, and the clock starts ticking on the wait until your funding is received. This as stated can be 14-75 days for the first Tranche of 20%. Once this deposit is made the clock starts ticking on the second tranche which again could be 14-75 days for the remaining 80%.**

**Any questions give me a call.**

# Exhibit E

# EXHIBIT COVER SHEET

**Exhibit**

Party Submitting: **Mary Ida Townson, U.S. Trustee for Region 21**

Admitted: **YES or NO (circle one)** **32**

Chapter 11 Debtor: **Genie Investments NV, Inc.**

Case No. **3:24−bk−00496−BAJ**

Nature of Hearing: **Trial on**

**U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**

**Debtor's Response Thereto (Doc. No. 34)**

**U.S. Trustee's Reply (Doc. No. 38)**

Trial Date: **April 9, 2024, at 9:00 a.m.**

**United States Bankruptcy Court**
**Middle District of Florida**

**Dated:____________________________, 2024.**

**By: _______________________, Deputy Clerk**

**From:** Charles Stringer
**To:** Kelly Carrell
**Subject:** Fwd: DRAFT Documents.
**Date:** Sunday, February 5, 2023 12:01:24 PM
**Attachments:** Outlook-image.png.png
Outlook-image.png.png
McMann BELOC Draft Loan Agreement WT.pdf
McMann Bridge Loan Redacted SC.pdf

---

---------- Forwarded message ---------
From: **Michael Lanza** <mlanza@mcmanncommerciallending.com>
Date: Thu, Jan 19, 2023 at 3:01 PM
Subject: DRAFT Documents.
To: Charles Stringer <cbs.llc2019@gmail.com>
CC: Clyde Allsop <ccccllc54@gmail.com>, Rene Jamulitrat <rJamulitrat@mcmanncommerciallending.com>

See attached. This is highly confidential please do not share.

Michael J. Lanza
**Direct 321-295-4808**
**Office 800-616-7276**
**Senior Commercial Loan Officer**
McMannCommercialLending.com
Appointment Calendar

AMERICAN ASSOCIATION of PRIVATE LENDERS

BBB ACCREDITED BUSINESS A+

# BRIDGE LOAN AGREEMENT

This Bridge Loan Agreement (this "**Agreement**") is made and entered into as of November 21, 2022 (the "**Effective Date**"), between [redacted] (the "**Lender**"), and [redacted] ("**Borrower**").

## ARTICLE I
## DEFINITIONS AND INTERPRETATIONS

### Section 1.01 Definitions.

**"Affiliate"** as to any Person, means any other Person that, directly or indirectly through one or more intermediaries, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

**"Business Day"** means (a) for all purposes other than as covered by subsection (b) below, a day other than a Saturday, Sunday, or other day on which commercial banks in [redacted] are authorized or required by law to close.

**"Default"** means any of the events specified in Article 7 which constitutes an Event of Default or which, upon the giving of notice, the lapse of time, or both pursuant to Article 7 would, unless cured or waived, become an Event of Default.

**"Event of Default"** has the meaning set forth in Article 7.

**"Governmental Authority"** means the government of any nation or any political subdivision thereof, whether at the national, state, territorial, provincial, municipal, or any other level, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of, or pertaining to, government.

**"Lien"** means any mortgage, pledge, hypothecation, assignment (as security), Payment arrangement, encumbrance, lien (statutory or other), charge, or other security interest, or any preference, priority, or other security agreement or preferential arrangement of any kind or nature whatsoever having substantially the same economic effect as any of the foregoing (including any conditional sale or other title retention agreement and any capital lease).

"**Loan**" means the Bridge Loan.

"**Loan Documents**" means, collectively, this Agreement, the Security Agreement, the Promissory Note, the Intercreditor Agreement and all other agreements, documents, certificates, and instruments executed and delivered to the Lender by any Loan Party in connection therewith.

"**Loan Parties**" means the Borrower.

"**Material Adverse Effect**" means a material adverse effect on (a) the business, assets, properties, liabilities (actual or contingent), operations, or condition (financial or otherwise) or prospects of the Borrower, individually, or the Borrower and its Subsidiaries taken as a whole, (b) the validity or enforceability of any Loan Document, (c) the perfection or priority of any material Lien purported to be created by any Loan Document, (d) the rights or remedies of the Lender under any Loan Document, or (e) the ability of any Loan Party to perform any of its material payment obligations under any Loan Document to which it is a party.

**"Material Litigation"** has the meaning set forth in Section

8.04. **"Maturity Date"** means 2/21/2023.

**"Person"** means any individual, corporation, limited liability Borrower, trust, joint venture, association, Borrower, limited or general partnership, unincorporated organization, Governmental Authority, or other entity.

**"Security Agreement"** means the Security Agreement made by the Borrower and in favor of the Lender, dated as of November 21, 2022.

**Section 1.02 Interpretation.** With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument, or other document shall be construed as referring to such agreement, instrument, or other document as from time to time amended, supplemented, or otherwise modified (subject to any restrictions on such amendments, supplements, or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein,"

Initials: _________

"hereof," and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits, and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified, or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights.

(b) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c) Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in Dollars in full in cash or immediately available funds.

(d) All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP as in effect from time to time, and applied on a consistent basis in a manner consistent with that used in preparing the Borrower's audited financial statements, except as otherwise specifically prescribed herein.

## ARTICLE II
## AMOUNT AND TERMS OF LOAN

**Section 2.01 Bridge Loan Commitment.**

(a) Subject the terms and conditions of this Agreement, the Lender agrees to make:

(i) on the Effective Date, a Bridge Loan in an amount equal to [redacted] (the "**Bridge Loan**" or "**Loan**");

(b) Amounts borrowed under Section 2.01(a) and repaid or prepaid may not be reborrowed.

**Section 2.02 Procedures for Loan Borrowing**.

(a) Bridge Loan. On the Effective Date, the Lender shall hold Bridge Loan in Lender's account on behalf of the Borrower.

Initials: _________

**Section 2.03 Interest.**

(a) Computation of Interest. Interest on the outstanding principal amount of the Loan shall accrue at an interest rate of [redacted] per month. All computations of interest for Loan shall be made on the basis of a year or 365 or 366 days, as applicable, and the actual number of days elapsed. In no event shall any interest charged collected or reserved in respect of a Loan exceed the maximum a rate then permitted by applicable laws, and if any payment of interest made by the Borrower in respect of a Loan exceeds such maximum rate, then such excess sum shall be credited by the Lender as a payment of principal.

(b) Payment of Interest. Pre-paid interest on the outstanding principal amount of the Loan shall be paid in kind and capitalized on this Business Day and shall be paid in cash in full upon acceptance of this agreement. Borrower understands that this payment is fully non-refundable.

**2.04. Security Interest.** The Loan shall be secured in accordance with the provisions of a Security Agreement with Borrower, in the form attached hereto as Exhibit A (the "**Security Agreement"**), the provisions of a Promissory Note with Borrower, in the form attached hereto as Exhibit B and shall be subject to an Intercreditor Agreement between the Lender and Borrower, in the form attached hereto Exhibit C (the "**Intercreditor Agreement**").

**2.05 Repayment.** The aggregate principal amount outstanding and accrued and unpaid interest of the Loan shall be due and payable by the Borrower on the Maturity Date. The Borrower may at any time and from time to time prepay the Loan, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Lender no later than 11:00 AM at least three (3) Business Days prior thereto.

**2.06 Payments.** All payments shall be made in lawful money of the United States of America in the manner designated by Lender in writing to the Borrower. Payment shall be credited first to accrued interest due and payable, with any remainder to principal.

## ARTICLE III
## CONDITIONS PRECEDENT TO BRIDGE LOAN

**3.01 Conditions to Lender's Obligations.** The obligations of the Lender to make the Loan is subject to the fulfillment or waiver of each of the following conditions:

(a) Representations and Warranties. Each of the representations and warranties of the Borrower contained in Section 4 shall be true and correct in all material respects on the Effective Date except for (i) representations and warranties made as of a particular date, which shall be true and correct in all

material respects on and as of that particular date, and (ii) representations and warranties that are qualified as to “materiality”, “Material Adverse Effect” or similar language, which shall be true and correct in all respects on and as of the Effective Date or such earlier date as the case may be.

(b) Loan Documents. The Borrower shall deliver to the Lender:

(i) a duly executed copy of this Agreement;

(ii) a duly executed copy of the Security Agreement;

(iii) a duly executed copy of the Note;

(iii) duly executed copies of the ancillary documents required to perfect the Lender’s security interests in the collateral contemplated by the Security Agreement;

(iv) a duly executed copy of the Intercreditor Agreement.

(c) Qualifications. All authorizations, approvals or permits, if any of any Governmental Authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance of the Loan pursuant to this Agreement shall be obtained and effective as of the Effective Date or Borrowing Date, as applicable.

(d) Certificates and Documents. The Borrower shall deliver to Lender:

(i) The Certificate of Incorporation of the Borrower, certified as of a recent date by the Secretary of State of Texas;

(ii) A certificate of good standing issued by the Secretary of State of Texas; and

(iv) A customary certificate of the Secretary of the Borrower, dated as of the Effective Date, in the form reasonably approved by Lender, certifying:

a. True and correct copies of the Borrower’s BYLAWS or OPERATING AGREEMENT; and

b. True and correct copies of the resolutions of the Borrower’s Board of Directors approving the transactions contemplated thereby.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF THE BORROWER**

Initials: _________

Case 3:24-bk-00496-BAJ Doc 59 Filed 04/04/24 Page 107 of 180

**Section 4.01 Representations and Warranties of the Borrower**. The Borrower represents and warrants to the Lender, the following representations and warranties are true and complete as of the Effective Date and as of the date of each borrowing of the Loan hereunder.

**Section 4.02 Organization, Qualifications and Corporate Power**. The Borrower is a Limited Liability Company duly, incorporated, validly existing and in good standing under the laws of the State of Texas.

**Section 4.03 Authorization.** All corporate action on the part of the Borrower, and its officers, directors, and stockholders necessary for the authorization, execution and delivery of this Agreement and the Security Agreement and the performance of the obligations of the Borrower hereunder and thereunder has been taken.

**Section 4.04 Governmental Consents and Filings**. No consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with any federal, state or local Governmental Authority is required on the part of the Borrower in connection with the transactions contemplated by this Agreement.

**Section 4.05 Enforceability.** This Agreement and the Security Agreement constitute valid and legally binding obligations of the Borrower, enforceable in accordance with their respective terms.

**Section 4.06 Noncontravention**. The execution, delivery and performance by the Borrower of this Agreement and the security Agreement, will not cause a default under, or otherwise breach, its BYLAWS, OPERATING AGREEMENT or any other document or agreement to which Borrower is a party or by which it is bound, or any laws, rule or regulation applicable to the Borrower or its assets which such default or breach would have a Material Adverse Effect on the Borrower.

## ARTICLE V
## AFFIRMATIVE COVENANTS OF THE BORROWER

**Section 5.01 Affirmative Covenants of the Borrower**. The Borrower covenants and agrees with the Lender that until all principal of an interest on the Loan and all other amounts due or which become due hereunder are repaid in full and performance of all other obligations of Borrower, Borrower agrees to do all of the following unless Lender shall otherwise consent in writing:

**Section 5.02 Compliance with Laws.** Comply with and provide to Lender upon Lender’s reasonable request evidence of material compliance with, all applicable state, local federal, and international laws, procedures, acts, ordinances, and regulations.

**Section 5.03 Compliance with Documents.** Perform and comply

Initials: _________

with all the terms and conditions of this Agreement and the other Loan Documents.

**Section 5.04 Books and Records.** Keep and maintain complete and accurate books of account, in accordance with generally accepted accounting principles consistently applied, reflecting all financial transactions of the Borrower.

**Section 5.05 Payment Obligations.** Pay and discharge before the same shall become delinquent all material obligations, claims, indebtedness, taxes, and other obligations (except only those so long as and to the extent that the same shall be contested in good faith by appropriate and timely proceedings and for which adequate provisions have been established in accordance with generally accepted accounting principles).

**Section 5.06 Financial Reports.** Deliver to Lender, with respect to Borrower as soon as available and in any event (a) within twenty (20) days after the end of each calendar [month] during the term of the Loan, financial statements of Borrower for such [month], certified as true and correct (which reports shall be prepared in accordance with generally accepted accounting principles consistently applied) and operating statements in form reasonably satisfactory to Lender. Borrower shall also deliver to Lender, promptly upon request therefor, such other financial information of the Borrower (and its subsidiaries, if any) as may reasonably be requested by Lender.

**Section 5.07 Notification to Lender.** Promptly after learning thereof, notify Lender of:

(a) the details of any material action, proceeding, investigation or claim against or affecting the Borrower instituted before any court, arbitrator or Governmental Authority or to the Borrower's knowledge threatened in writing to be instituted; (b) any material dispute between Borrower and any governmental authority; (c) any labor controversy which has resulted in or, to the Borrower's knowledge, threatens to result in a strike or disruption which would reasonably be expected to have a Material Adverse Effect on the business of the Borrower; (d) the occurrence of any Event of Default; and (e) any written agreement to purchase any part of the Borrower or any application for any refinancing of the Loan.

**Section 5.08 Partnership/Corporate Existence**. Preserve and maintain its existence, rights, franchises, and privileges in the jurisdiction of its formation.

## ARTICLE VI
## NEGATIVE CONVENANTS OF THE BORROWER

**Section 6.01 Negative Covenants of the Borrower.** The Borrower covenants and agrees with the Lender that until all principal of an interest on the Loan and all other amounts due or which become due hereunder are repaid in full and performance of all other obligations of Borrower, Borrower shall

note:

**Section 6.02. Liquidation, Merger and Sale of Assets**. Liquidate, merge or consolidate with any other Person, or sell, lease or transfer or otherwise dispose of any assets to any Person other than in the ordinary course of business.

**Section 6.03 Liens.** Create or incur any mortgage, security interest, lien, or other encumbrance of any kind upon the assets of the Borrower or any portion thereof other than (a) any lien securing indebtedness owing to Lender.

**Section 6.04 Investments, Loan and Guaranties.** (a) be or become a party to any joint venture or other partnership, or (b) be or become a guarantor of any kind.

**Section 6.05 Acquisitions.** Enter into any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (b) the acquisition of any of the outstanding capital stock (or other equity interest) of any Person, or (c) the acquisition of another Person by a merger, amalgamation or consolidation or any other combination with such Person.

**Section 6.06 Organizational Documents**. (a) Amend its Organizational Documents in any manner adverse to Lender, or (b) amend its Organizational Documents to change its name or state, province or other jurisdiction of organization, or its form of organization.

## ARTICLE VII
## EVENTS OF DEFAULT

Any of the following specified events shall constitute an Event of Default (each an "**Event of Default**"):

**Section 7.01 Nonpayment.** Failure to make any payment required by the Promissory Note, this Agreement or any other loan documents, and such failure continues for a period of thirty (30) days after notice of such default is sent by Lender to Borrower.

**Section 7.02 Other Covenants and Agreements.** Failure by Borrower to perform or comply with any of the other covenants or agreements contained in this Agreement, or any of the Loan Documents and such failure shall nothave been fully corrected within twenty (20) days after notice of such default is sent by Lender toBorrower.

**Section 7.03 Representations and Warranties**. If any

Initials: _________

representation, warranty or statement made in or pursuant to this Agreement or any other loan document or any other materialinformation furnished by the Borrower to the Lender, shall be false or erroneous in any material respect when made or when deemed made.

## ARTICLE VIII
## SECURITY

**Section 8.01 Security.** If any lien granted in this Agreement or any other loan document in favor of the Lender, shall be determined to be (a) void, voidable or invalid, or is subordinated or not otherwise given the priority contemplated by this Agreement and the Borrower has failed to promptly execute within thirty (30) calendar days from the date such change in lien status occurs appropriate documents to correct such matters, or (b) unperfected as to any material amount of collateral (as determined by the Lender, in its reasonable discretion) and the Borrower has failed to promptly execute within three (3) calendar days from the date of such change in the lien statusoccurs appropriate documents to correct such matters.

**Section 8.02 Validity of Loan Documents.** If (a) any material provision, in the sole opinion of the Lender, of any Loan Document shall at any time cease to be valid, binding and enforceable against the Borrower, and the Borrower has failed to promptly execute appropriate documents to correct such matters; (b) the validity, binding effect or enforceability of any loan document against the Borrower shall be contested by the Borrower; (c) the Borrower shall deny that it has any or further liability or obligation under any loan document; or (d) any loan document shall be terminated, invalidated or set aside, or be declared ineffective or inoperative orin any way cease to give or provide to the Lender the benefits purported to be created thereby, and the Borrower has failed to promptly execute appropriate documents to correct such matters.

**Section 8.03 Petition for Bankruptcy, Insolvency.** The insolvency of; the filing by Borrower in any jurisdiction of a petition for bankruptcy, liquidation or reorganization, seeking, consenting to or appointment of any trustee, receiver, liquidator, or custodian of it or of all or substantially all of its property; or any such proceedings shall have been voluntarily or involuntarily instituted against Borrower; the failure of Borrower to generally pay its debts as theycome due or any admission in writing in that regard; the making by Borrower of a general assignment for the benefit of creditors; the entry against Borrower, voluntarily or involuntarily, ofany order for relief in any bankruptcy reorganization, liquidation, or similar proceeding or the declaration of or action taken by any Governmental Authority which operates as a moratorium on the payment of debts of Borrower, which such order or declaration or action shall have remained in place and undischarged or unstayed for a period of ninety (90) days; or the taking of action by Borrower to authorize any of the actions set forth in this Section 8.03.

**Section 8.04 Material Litigation**. Any action, suit, proceeding or

investigation of any kind involving, or threatened in writing against, Borrower or any subsidiary thereof, before any court or arbitrator or any other authority which (a) would reasonably be expected to have a Material Adverse Effect, or (b) calls into question the validity or enforceability of, or otherwise seeks to invalidate, any Loan Documents. Promptly after the commencement thereof, Borrower shall deliver to Lender notice of all actions, suits, investigations, litigation and proceedings before any court or governmental department, commission, board, bureau, agency orinstrumentality, domestic or foreign, affecting Borrower or any of its subsidiaries, and promptly after the occurrence thereof, notice of any adverse change in the status or the financial effect on Borrower or any of its subsidiaries, of the disclosed litigation.

## ARTICLE IX
## REMEDIES

**Section 9.01 General.** Following the occurrence of one or more Events of Default, Lender at its option, may (a) declare all outstanding indebtedness evidenced by the Promissory Note, including principal and interest, immediately due and payable; (b) terminate all obligations under the loan documents; and (c) pursue and enforce, either successively or concurrently, all rights and remedies set forth in the Promissory Note, in the loan documents, or in any other Collateral instrument held by Lender or accruing to Lender by law, and such other rights and remedies as Lender may have in law or in equity, including such rights as are provided in this Article 9. If an Event of Default referred to in Section 6 hereof occurs, (i) all obligations of the Lender under the Loan Documents shall automatically and immediately terminate, if not previously terminated, and (ii) the principal of and interest then outstanding on the Loan, and all of the other obligations owing under the loan documents, shall thereupon become and thereafter be immediately due and payable in full (if not already due and payable), all without anypresentment, demand or notice of any kind, which are hereby waived by the Borrower.

## ARTICLE X
## GENERAL PROVISION

**Section 10.01 Disclaimer of Liability.** Lender has no liability or obligations except those under the terms of the Loan Documents and makes no warranties or representations in connection therewith.

**Section 10.02 Confidentiality.** Borrower agrees that the specific terms of this Agreement,and Borrower hereby agrees to maintain confidential this Agreement, and any information disclosed by Lender related to the terms upon which funding of the Bridge Loan is to take place. Borrower's disclosure of a confidential terms shall constitute a material breach of this Agreement, and will subject Borrower to injunctive relief, pecuniary damages, or other remedies available to Lender in law or at equity. All such remedies are cumulative in nature.

**Section 10.03 Responsibility for Application of Funds.** Lender shall have no obligation to see that funds advanced under the Bridge Loan are used for the purpose set forth in this Agreement. Borrower shall be fully responsible for the proper application according to the terms of this Agreement. Lender may rely solely upon Borrower's statements and reports in making said Bridge Loan and Borrower does hereby release and indemnify Lender and hold Lender harmless from any and all losses, claims, demands, or expenses which may arise or result from misapplication or misuse of the Bridge Loan by Borrower or its agents. Borrower's indemnification of Lender shall not extend to losses arising from Lender's material breach of this Agreement or Lender's gross negligence or willful misconduct (in each case as determined by a court of competent jurisdiction in a final andnon-appealable decision).

**Section 10.04 Notices**. All notices given under this Agreement, unless otherwise specifiedherein, must be in writing and will be effectively served by: [redacted] (ii) upon delivery or, if sent certified mail upon the first to occur of receipt by the addressee or the expiration of ninety six (96)hours after deposit in first class certified United States mail, postage prepaid, return receipt requested, or two business days if sent by pre-paid nationally recognized overnight courier service,sent to the Party at its address set forth below, or such other address as a Party may designate fromtime to time by written notice given pursuant to this paragraph:

To Borrower: [redacted]

To Lender: [redacted]

**Section 10.05 Applicable Law.** This Agreement and, unless otherwise specifically provided for therein, shall be governed by and construed in accordancewith the laws of the State of [redacted] and the United States.

**Section 10.0 6 Successors and Assigns**. The terms of this Agreement will bind and benefitthe successors and assigns of the Parties. Borrower may not assign this Agreement or any proceeds from the Bridge Loan or assign or delegate any of its rights or obligations hereunder without the prior written consent of Lender, which may be withheld in Lender's sole discretion.

**Section 10.07 Severability.** The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other

Initials: _________

provision.

**Section 10.08 Amendments.** This Agreement may not be modified or amended except bywritten agreement signed by the Borrower and Lender.

**Section 10.09 Headings; Attachments.** The several headings to articles, sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement. Each schedule or exhibit attached to this Agreement shall be incorporated herein and shall be deemed to be a part hereof.

**Section 10.10 No Third-Party Rights**. This Agreement is made entirely for the benefit of Borrower, the Lender, and their successors in interest (including any participants). No third Person shall have any rights hereunder.

**Section 10.11 Indemnification**. The Borrower agrees to defend, indemnify and hold harmless the Lender (and its Affiliates, officers, directors, attorneys, agents and employees) from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys 'fees), or disbursements of any kind or nature whatsoever thatmay be imposed on, incurred by or asserted against the Lender in connection with any investigative, administrative or judicial proceeding (whether or not the Lender shall be designateda party thereto) or any other claim by any Person relating to or arising out of the Loan Documents or any actual or proposed use of proceeds of the Loan, or any activities of the Borrower or its Affiliates; provided that the Lender shall not have the right to be indemnified underthis Section 10.11 for its own gross negligence or willful misconduct, as determined by a final andnon-appealable decision in arbitration as for any dispute between the Parties, or by final non- appealable judgment of a court of competent jurisdiction when such dispute involves another third party Person. All obligations provided for in this Section 10.11 shall survive any termination of this Agreement. The Borrower hereby agrees to indemnify, defend and hold harmless the Lender,the Manager of Lender, and all of their members, managers, Affiliates and advisors, from any andall damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs) that they may incur by reason of Borrower's failure to fulfill all of the terms and conditions of thisAgreement or by reason of the untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished to any of the foregoing in connection with this transaction. This indemnification includes, but is not limited to, any damages, losses, liabilities, costs and expenses (including attorneys' fees and costs) incurred by Lender, the managing member of Lender, or any of its members, managers, Affiliates or advisors, defending against any alleged violation of federal or state securities laws which is based upon or related to any untruth or inaccuracy of any of the representations, warranties or agreements contained herein or in any other documents the Borrower has furnished in connection with this transaction. The Lender hereby agrees to indemnify, defend and hold harmless the Borrower, theofficers of Lender, and all of their shareholders, managers, Affiliates and advisors, from

any and all damages, losses, liabilities, costs and expenses (including reasonable attorneys' fees and costs)that they may incur by reason of Lender’s default of its obligations under this Agreement.

**Section 10.12 General Limitation of Liability.** No claim may be made by the Borrower or any other Person against the Lender or the Affiliates, directors, officers, employees, attorneys or agents of the Lender for any damages other than actual compensatory damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement, or any act, omission or event occurring in connection therewith; and the Borrower and Lender hereby, to the fullest extent permitted under applicable law, waive, release and agree not to sue or counterclaim upon any such claim for any special, indirect, consequential or punitive damages, whether or not accruedand whether or not known or suspected to exist in their favor and regardless of whether Lender has been advised of the likelihood of such loss of damage. Borrower further agrees that, in the event of a delay in funding by the wholesale lender that causes a delay in funding from Lender to Borrower, Borrower shall not file for arbitration or otherwise pursue legal claims against Lender for such delay to the extent Lender takes reasonable steps to pursue claims it may have against the wholesale lender; provided, further, that this provision is superseded by the limitations of liability otherwise provided for in this Agreement and is not intended to create any rights in favor of Borrower.

**Section 10.13 Legal Representation of the Parties**. The Loan Documents were negotiated by the parties with the benefit of legal representation and any rule of construction or interpretation otherwise requiring this Agreement or any other Loan Document to be construed or interpreted against any Party shall not apply to any construction or interpretation hereof or thereof.

**Section 10.14 JURY TRIAL WAIVER**. THE BORROWER AND THE LENDER, TO THE EXTENT PERMITTED BY LAW, HEREBY WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE, BETWEEN THE BORROWER AND THE LENDER, ARISING OUT OF, IN CONNECTION WITH, RELATED TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN THEM IN CONNECTION WITH THIS AGREEMENT OR ANY NOTE OR OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH OR THE TRANSACTIONS RELATED THERETO.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Initials: _________

Redaction

By _____ Redaction _____

[redacted] Redaction

By______________________
Name: Redaction

Title: ________________

**SUBSCRIBED AND SWORN TO BEFORE ME** on this____day of ________________, 20__.

____________________________________
NOTARY PUBLIC
In and for the State of ________________

My Commission Expires:

___________________________________

EXHIBIT A

# SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of November 21, 2022 (as amended, supplemented or otherwise modified from time to time in accordance with the provisions hereof, this "**Agreement**"), made by and among [redacted] Limited Liability Company (the "**Grantor**"), in favor of [redacted] (the "**Secured Party**").

WHEREAS, on the date hereof, the Secured Party has made a loan to the Grantor in an aggregate unpaid principal amount not exceeding [redacted] (the "**Loan**"), evidenced by that certain Bridge Loan Agreement of even date herewith (as amended, supplemented or otherwise modified from time to time, the "**Loan Agreement**") made by the Grantor and payable to the order of the Secured Party. Capitalized terms used but not otherwise defined herein shall have the meanings assigned to such terms in the Loan Agreement;

WHEREAS, this Agreement is given by the Grantor in favor of the Secured Party to secure the payment and performance of all of the Secured Obligations; and

WHEREAS, it is a condition to the obligations of the Lender to make the Loans under the Loan Agreement that the Grantor execute and deliver this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Definitions.

(a) Unless otherwise specified herein, all references to Sections and Schedules herein are to Sections and Schedules of this Agreement.

(b) Unless otherwise defined herein, terms used herein that are defined in the UCC shall have the meanings assigned to them in the UCC. However, if a term is defined in Article 9 of the UCC differently than in another Article of the UCC, the term has the meaning specified in Article 9.

(c) For purposes of this Agreement, the following terms shall have the following meanings:

"**Collateral**" has the meaning set forth in Section 2.

"**Event of Default**" has the meaning set forth in the Loan Agreement.

"**First Priority**" means, with respect to any lien and security interest purported to be created in any Collateral pursuant to this Agreement, such lien and security interest is the most senior lien to which such Collateral is subject (subject only to liens permitted under the Loan Agreement or Intercreditor Agreement).

"**Perfection Certificate**" has the meaning set forth in Section 5.

Initials: _________

"**Proceeds**" means "proceeds" as such term is defined in section 9-102 of the UCC and, in any event, shall include, without limitation, all dividends or other income from the Collateral, collections thereon or distributions with respect thereto.

"**Secured Obligations**" has the meaning set forth in Section 3.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of Delaware or, when the laws of any other state govern the method or manner of the perfection or enforcement of any security interest in any of the Collateral, the Uniform Commercial Code as in effect from time to time in such state.

2. Grant of Security Interest. The Grantor hereby pledges and grants to the Secured Party, and hereby creates a continuing First Priority lien and security interest in favor of the Secured Party in and to all of its right, title and interest in and to the following, wherever located, whether now existing or hereafter from time to time arising or acquired (collectively, the "**Collateral**"):

(a) all fixtures and personal property of every kind and nature including all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, commercial tort claims, general intangibles (including all payment intangibles), money, Payment accounts, and any other contract rights or rights to the payment of money; and

(b) all Proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all Proceeds of any insurance, indemnity, warranty or guaranty payable to the Grantor from time to time with respect to any of the foregoing.

3. Secured Obligations. The Collateral secures the due and prompt payment and performance of:

(a) the obligations of the Grantor from time to time arising under the Loan Agreement, this Agreement or otherwise with respect to the due and prompt payment of (i) the principal of and premium, if any, and interest on the Loans (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, attorneys' fees and disbursements, reimbursement obligations, contract causes of action, expenses and indemnities, whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of the Grantor under or in respect of the Loan Agreement and this Agreement; and

(b) all other covenants, duties, debts, obligations and liabilities of any kind of the Grantor under or in respect of the Loan Agreement, this Agreement or any other document made, delivered or given in connection with any of the foregoing, in each case whether evidenced by a note or other writing, whether allowed in any bankruptcy, insolvency, receivership or other similar proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether primary, secondary, direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise

(all such obligations, covenants, duties, debts, liabilities, sums and expenses set forth in Section 3 being herein collectively called the "**Secured Obligations**").

4. Perfection of Security Interest and Further Assurances.

(a) The Grantor shall, from time to time, as may be required by the Secured Party with respect to all Collateral, immediately take all actions as may be requested by the Secured Party to perfect the security interest of the Secured Party in the Collateral, including, without limitation, with respect to all Collateral over which control may be obtained within the meaning of sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable, the Grantor shall immediately take all actions as may be requested from time to time by the Secured Party so that control of such Collateral is obtained and at all times held by the Secured Party. All of the foregoing shall be at the sole cost and expense of the Grantor.

(b) The Grantor hereby irrevocably authorizes the Secured Party at any time and from time to time to file in any relevant jurisdiction any financing statements and amendments thereto that contain the information required by Article 9 of the UCC of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by the Grantor hereunder, without the signature of the Grantor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by the Grantor, or words of similar effect. The Grantor agrees to provide all information required by the Secured Party pursuant to this Section promptly to the Secured Party upon request.

(c) The Grantor agrees that at any time and from time to time, at the expense of the Grantor, the Grantor will promptly execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable, or that the Secured Party may reasonably request, in order to create and/or maintain the validity, perfection or priority of and protect any security interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

5. Representations and Warranties. The Grantor represents and warrants as follows:

(a) It has previously delivered to the Secured Party a certificate signed by the Grantor and entitled "Perfection Certificate" ("**Perfection Certificate**"), and that: (i) the Grantor's exact legal name is that indicated on the Perfection Certificate and on the signature page hereof, (ii) the Grantor is an organization of the type, and is organized in the jurisdiction, set forth in the Perfection Certificate, (iii) the Perfection Certificate accurately sets forth, the Grantor's place of business (or, if more than one, its chief executive office), and its mailing address, (iv) all other information set forth on the Perfection Certificate relating to the Grantor is accurate and complete and (v) there has been no change in any such information since the date on which the Perfection Certificate was signed by the Grantor.

(b) All information set forth on the Perfection Certificate relating to the Collateral is accurate and complete and there has been no change in any such information since the date on which the Perfection Certificate was signed by the Grantor.

(c) At the time the Collateral becomes subject to the lien and security interest created by this Agreement, the Grantor will be the sole, direct, legal and beneficial owner thereof, free and

clear of any lien, security interest, encumbrance, claim, option or right of others except for the security interest created by this Agreement and other liens permitted by the Loan Agreement.

(d) The pledge of the Collateral pursuant to this Agreement creates a valid and perfected First Priority security interest in the Collateral, securing the payment and performance when due of the Secured Obligations.

(e) It has full power, authority and legal right to borrow the Loans and pledge the Collateral pursuant to this Agreement.

(f) Each of this Agreement and the Loan Agreement has been duly authorized, executed and delivered by the Grantor and constitutes a legal, valid and binding obligation of the Grantor enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and subject to equitable principles (regardless of whether enforcement is sought in equity or at law).

(g) No authorization, approval, or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the borrowing of the Loans and the pledge by the Grantor of the Collateral pursuant to this Agreement or for the execution and delivery of the Loan Agreement and this Agreement by the Grantor or the performance by the Grantor of its obligations thereunder.

(h) The execution and delivery of the Loan Agreement and this Agreement by the Grantor and the performance by the Grantor of its obligations thereunder, will not violate any provision of any applicable law or regulation or any order, judgment, writ, award or decree of any court, arbitrator or governmental authority, domestic or foreign, applicable to the Grantor or any of its property, or the organizational or governing documents of the Grantor or any agreement or instrument to which the Grantor is party or by which it or its property is bound.

(i) The Grantor has taken all action required on its part for control (as defined in sections 8-106, 9-104, 9-105, 9-106 and 9-107 of the UCC, as applicable) to have been obtained by the Secured Party over all Collateral with respect to which such control may be obtained pursuant to the UCC. No person other than the Secured Party has control or possession of all or any part of the Collateral.

6. Voting, Distributions and Receivables.

(a) The Secured Party agrees that unless an Event of Default shall have occurred and be continuing, the Grantor may, to the extent the Grantor has such right as a holder of the Collateral consisting of securities, or indebtedness owed by any obligor, vote and give consents, ratifications and waivers with respect thereto, except to the extent that, in the Secured Party's reasonable judgment, any such vote, consent, ratification or waiver would detract from the value thereof as Collateral or which would be inconsistent with or result in any violation of any provision of the Loan Agreement or this Agreement.

**(b)** If any Event of Default shall have occurred and be continuing, the Secured Party may, or at the request and option of the Secured Party the Grantor shall, notify account debtors and other persons obligated on any of the Collateral of the security interest of the Secured Party in any account, chattel paper, general intangible, instrument or other Collateral and that payment thereof is to be made directly to the Secured Party.

7. Covenants. The Grantor covenants as follows:

(a) The Grantor will not, without providing at least 30 days' prior written notice to the Secured Party, change its legal name, identity, type of organization, jurisdiction of organization, corporate structure, location of its chief executive office or its principal place of business or its organizational identification number. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably requested by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(b) The Collateral, to the extent not delivered to the Secured Party pursuant to Section 4, will be kept at those locations listed on the Perfection Certificate and the Grantor will not remove the Collateral from such locations without providing at least 30 days' prior written notice to the Secured Party. The Grantor will, prior to any change described in the preceding sentence, take all actions reasonably required by the Secured Party to maintain the perfection and priority of the Secured Party's security interest in the Collateral.

(c) The Grantor shall, at its own cost and expense, defend title to the Collateral and the First Priority lien and security interest of the Secured Party therein against the claim of any person claiming against or through the Grantor and shall maintain and preserve such perfected First Priority security interest for so long as this Agreement shall remain in effect.

(d) The Grantor will not sell, offer to sell, dispose of, convey, assign or otherwise transfer, grant any option with respect to, restrict, or grant, create, permit or suffer to exist any mortgage, pledge, lien, security interest, option, right of first offer, encumbrance or other restriction or limitation of any nature whatsoever on, any of the Collateral or any interest therein except as expressly provided for in the Loan Agreement/herein or with the prior written consent of the Secured Party.

(e) The Grantor will keep the Collateral in good order and repair and will not use the same in violation of law or any policy of insurance thereon. The Grantor will permit the Secured Party, or its designee, to inspect the Collateral at any reasonable time, wherever located.

(f) The Grantor will pay promptly when due all taxes, assessments, governmental charges, and levies upon the Collateral or incurred in connection with the use or operation of the Collateral or incurred in connection with this Agreement.

8. Secured Party Appointed Attorney-in-Fact. The Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time during the continuance of an Event of Default in the Secured Party's discretion to take any action and to execute any instrument which the Secured Party may deem necessary or advisable to accomplish the purposes of this Agreement (but the Secured Party shall not be obligated to and shall have no liability to the Grantor or any third party for failure to do so or take action). This appointment, being coupled with an interest, shall be irrevocable. The Grantor hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof.

9. Secured Party May Perform. If the Grantor fails to perform any obligation contained in this Agreement, the Secured Party may itself perform, or cause performance of, such obligation, and the expenses of the Secured Party incurred in connection therewith shall be payable by the Grantor; provided that the Secured Party shall not be required to perform or discharge any obligation of the Grantor.

10. Reasonable Care. The Secured Party shall have no duty with respect to the care and preservation of the Collateral beyond the exercise of reasonable care. The Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which the Secured Party accords its own

property, it being understood that the Secured Party shall not have any responsibility for (a) ascertaining or taking action with respect to any claims, the nature or sufficiency of any payment or performance by any party under or pursuant to any agreement relating to the Collateral or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve rights against any parties with respect to any Collateral. Nothing set forth in this Agreement, nor the exercise by the Secured Party of any of the rights and remedies hereunder, shall relieve the Grantor from the performance of any obligation on the Grantor's part to be performed or observed in respect of any of the Collateral.

11. Remedies Upon Default.

(a) If any Event of Default shall have occurred and be continuing, the Secured Party, without any other notice to or demand upon the Grantor, may assert all rights and remedies of a secured party under the UCC or other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose of all or any portion of the Collateral. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the Grantor at its notice address as provided in Section 15 hereof ten days prior to the date of such disposition shall constitute reasonable notice, but notice given in any other reasonable manner shall be sufficient. So long as the sale of the Collateral is made in a commercially reasonable manner, the Secured Party may sell such Collateral on such terms and to such purchaser(s) as the Secured Party in its absolute discretion may choose, without assuming any credit risk and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Without precluding any other methods of sale, the sale of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with reasonable commercial practices of creditors disposing of similar property. To the extent permitted by applicable law, the Grantor waives all claims, damages and demands it may acquire against the Secured Party arising out of the exercise by it of any rights hereunder. The Grantor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Secured Obligations or otherwise. At any such sale, unless prohibited by applicable law, the Secured Party or any custodian may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. Neither the Secured Party nor any custodian shall be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing, nor shall it be under any obligation to take any action whatsoever with regard thereto. The Secured Party shall not be obligated to clean-up or otherwise prepare the Collateral for sale.

(b) If any Event of Default shall have occurred and be continuing, any cash held by the Secured Party as Collateral and all cash Proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral shall be applied in whole or in part by the Secured Party to the payment of expenses incurred by the Secured Party in connection with the foregoing or incidental to the care or safekeeping of any of the Collateral or in any way relating to the Collateral or the rights of the Secured Party hereunder, including reasonable attorneys' fees, and the balance of such proceeds shall be applied or set off against all or any part of the Secured Obligations in such order as the Secured Party shall elect. Any surplus of such cash or cash Proceeds held by the Secured Party and remaining after payment in full of all the Secured Obligations shall be paid over to the Grantor or to whomsoever may be lawfully entitled to receive such surplus. The Grantor shall remain liable for any deficiency if such cash and the cash Proceeds of any sale or other realization of the Collateral are insufficient to pay the Secured Obligations and the fees and other charges of any attorneys employed by the Secured Party to collect such deficiency.

(c) If the Secured Party shall determine to exercise its rights to sell all or any of the Collateral pursuant to this Section, the Grantor agrees that, upon request of the Secured Party, the Grantor will, at its own expense, do or cause to be done all such acts and things as may be necessary to make such sale of the Collateral or any part thereof valid and binding and in compliance with applicable law.

12. <u>No Waiver and Cumulative Remedies</u>. The Secured Party shall not by any act (except by a written instrument pursuant to Section 14), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any Default or Event of Default. All rights and remedies herein provided are cumulative and are not exclusive of any rights or remedies provided by law.

13. <u>SECURITY INTEREST ABSOLUTE</u>. The Grantor hereby waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance hereon and all other demands and notices of any description. All rights of the Secured Party and liens and security interests hereunder, and all Secured Obligations of the Grantor hereunder, shall be absolute and unconditional irrespective of:

(a) any illegality or lack of validity or enforceability of any Secured Obligation or any related agreement or instrument;

(b) any change in the time, place or manner of payment of, or in any other term of, the Secured Obligations, or any rescission, waiver, amendment or other modification of the Loan Agreement, this Agreement or any other agreement, including any increase in the Secured Obligations resulting from any extension of additional credit or otherwise;

(c) any taking, exchange, substitution, release, impairment or non-perfection of any Collateral or any other collateral, or any taking, release, impairment, amendment, waiver or other modification of any guaranty, for all or any of the Secured Obligations;

(d) any manner of sale, disposition or application of proceeds of any Collateral or any other collateral or other assets to all or part of the Secured Obligations;

(e) any default, failure or delay, willful or otherwise, in the performance of the Secured Obligations;

(f) any defense, set-off or counterclaim (other than a defense of payment or performance) that may at any time be available to, or be asserted by, the Grantor against the Secured Party; or

(g) any other circumstance (including, without limitation, any statute of limitations) or manner of administering the Loans or any existence of or reliance on any representation by the Secured Party that might vary the risk of the Grantor or otherwise operate as a defense available to, or a legal or equitable discharge of, the Grantor or any other grantor, guarantor or surety.

14. <u>Amendments</u>. None of the terms or provisions of this Agreement may be amended, modified, supplemented, terminated or waived, and no consent to any departure by the Grantor therefrom shall be effective unless the same shall be in writing and signed by the Secured Party and the Grantor, and then such amendment, modification, supplement, waiver or consent shall be effective only in the specific instance and for the specific purpose for which made or given.

15. <u>Addresses For Notices</u>. All notices and other communications provided for in this Agreement shall be in writing and shall be given in the manner and become effective as set forth in the Loan Agreement, and addressed to the respective parties at their addresses as specified on the signature

pages hereof or as to either party at such other address as shall be designated by such party in a written notice to each other party.

16. Continuing Security Interest; Further Actions. This Agreement shall create a continuing First Priority lien and security interest in the Collateral and shall (a) subject to Section 16, remain in full force and effect until payment and performance in full of the Secured Obligations, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of the Secured Party and its successors, transferees and assigns; provided that the Grantor may not assign or otherwise transfer any of its rights or obligations under this Agreement without the prior written consent of the Secured Party.

17. Termination; Release. On the date on which all Secured Obligations have been paid and performed in full, the Secured Party will, at the request and sole expense of the Grantor, (a) duly assign, transfer and deliver to or at the direction of the Grantor (without recourse and without any representation or warranty) such of the Collateral as may then remain in the possession of the Secured Party, together with any monies at the time held by the Secured Party hereunder, and (b) execute and deliver to the Grantor a proper instrument or instruments acknowledging the satisfaction and termination of this Agreement.

18. GOVERNING LAW. This Agreement and the Loan Agreement and any claim, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or the Loan Agreement (except, as to the Loan Agreement, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the laws of the State of Redaction.

19. Counterparts. This Agreement and any amendments, waivers, consents or supplements hereto may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement. This Agreement and the Loan Agreement constitute the entire contract among the parties with respect to the subject matter hereof and supersede all previous agreements and understandings, oral or written, with respect thereto.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Redaction

By ____ Redaction ____

[redacted] Redaction

By______________________
Name: Redaction

Title: ________________

**SUBSCRIBED AND SWORN TO BEFORE ME** on this____day of _______________, 20__.

__________________________________
NOTARY PUBLIC
In and for the State of _______________

My Commission Expires:

__________________________________

# Perfection Certificate

Reference is hereby made to that certain Security Agreement (the "**Security Agreement**"), dated as of November 21, 2022, between [redacted], (the "**Company**"), in favor of [redacted] (the "**Lender**). Capitalized terms used but not defined herein have the meanings assigned to them in the Security Agreement.

The undersigned hereby certifies to the Lender:

1. Name.

(a) The exact legal name of the Company, as such name appears in its respective certificate of incorporation or any other formation or organizational document, is as follows:

______________________________

(b) The following are any other legal names that the Company has had in the past four months, together with the date of the relevant change:

______________________________

______________________________

______________________________

(c) The following are any other names (including trade names) used by the Company, or any other business or organization to which the Company became the successor by merger, consolidation, acquisition, change in form, nature or jurisdiction of organization or otherwise, now or at any time during the past four months:

______________________________

______________________________

______________________________

2. Other Identifying Factors.

(a) The Company is the type of entity described next to its name below:

(b) The jurisdiction of organization or formation of the Company is as follows:

(c) The Company has not changed its jurisdiction of organization or formation at any time during the past four months, except as set forth below:

______________________________

Initials: _________

(d) The federal taxpayer identification number of the Company is:

____________________________

3. <u>Current Locations</u>.

(a) The chief executive office of the Company is located at the following address:

____________________________

____________________________

(b) The principal mailing address of the Company is the following address, if different from the Chief Executive office:

If principal mailing address is the same as the Chief Executive office please put an "X" this box: [ ]

____________________________

____________________________

4. <u>Fixtures</u>.

Listed below is the information required by UCC § 9-502(b) of each state in which any of the Collateral consisting of fixtures is or is to be located and the name and address of each real estate recording office where a mortgage on the real estate on which such fixtures are or are to be located would be recorded:

____________________________

____________________________

____________________________

5. <u>Real Property</u>.

(a) The following is a list of real property owned or leased by the Company:

____________________________

____________________________

____________________________

____________________________

Initials: _________

6. Stock Ownership and Other Equity Interests.

The following is a list of all of the authorized, and the issued and outstanding, stock, partnership interests, limited liability company membership interests or other equity interests of the Company, the record and beneficial owners of such stock, partnership interests, membership interests or other equity interests and whether such interests are certificated or non-certificated:

______________________________

______________________________

______________________________

______________________________

______________________________

______________________________

7. Instruments and Tangible Chattel Paper.

The following is a list of all instruments (other than checks to be deposited in the ordinary course of business), promissory notes, tangible chattel paper and other evidence of indebtedness held by the Company:

______________________________

______________________________

______________________________

______________________________

______________________________

______________________________

8. Commercial Tort Claims.

The following is a list of all Commercial Tort Claims held by the Company, including a brief description thereof:

______________________________

______________________________

______________________________

______________________________

______________________________

Initials: _________

9. Deposit Accounts and Securities Accounts.

(a) The following is a list of all deposit accounts and securities accounts maintained by the Company, including the name of each institution where each such account is held, the name and account number of each such account and the name of each entity that holds each account:

____________________________

____________________________

____________________________

____________________________

____________________________

____________________________

(b) If the Company maintains a securities account with a securities intermediary, (i) the account agreement is not governed by the law of a foreign country and does not provide that the issues governed by Article 2(1) of the Hague Securities Convention are determined by the law of a foreign country, and (ii) the securities intermediary maintains an office in the United States that qualifies under the second sentence of Article 4(1) of the Hague Securities Convention.

10. Letter-of-Credit-Rights.

The following is a list of all Letters of Credit issued in favor of the Company as beneficiary thereunder:

____________________________

____________________________

____________________________

____________________________

____________________________

____________________________

11. Extraordinary Transactions.

All of the Collateral has been originated by the Company in the ordinary course of business or consists of goods which have been acquired by the Company in the ordinary course of business from a person in the business of selling goods of that kind, except for those purchases, acquisitions and other transactions listed below:

____________________________

____________________________

[*Signature Page Follows*]

Initials: _________

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

[redacted]

By ____[redacted]____

[redacted]

By______________________
Name: [redacted]

Title: ________________

**SUBSCRIBED AND SWORN TO BEFORE ME** on this____day of ________________, 20__.

___________________________________
NOTARY PUBLIC
In and for the State of ________________

My Commission Expires:

___________________________________

[redacted]
By________________________
Name: [redacted]
Title: _________________

Initials: _________

EXHIBIT B

# Promissory Note

November 21, 2022

FOR VALUE RECEIVED, the undersigned, [redacted] Limited Liability Company, (the "**Borrower**"), hereby promises to pay [redacted], (the "**Lender**") the principal amount of [redacted] (the “**Loan**”) in accordance with the provisions of the Loan Agreement, dated as of November 21, 2022, among the Borrower and the Lender (the "**Loan Agreement**"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Loan Agreement.

(a) The Borrower promises to pay interest on the unpaid principal amount of Loan from the date of such Loan until such principal amount is paid in full, at the interest rates and at the times provided in the Loan Agreement. All payments of principal and interest shall be made to the Lender in Dollars in immediately available funds by a method designated in writing by Lender.

(b) This Note is secured by the Collateral. Upon the occurrence and continuation of any Event of Default under the Loan Agreement, all principal and all accrued interest then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided in the Loan Agreement.

(c) The Loan made by the Lender shall be evidenced by one or more records or accounts maintained by the Lender in the ordinary course of business.

(d) The Borrower hereby waives diligence, presentment, demand, protest, notice of intent to accelerate, notice of acceleration, and any other notice of any kind. No failure on the part of the holder hereof to exercise, and no delay in exercising, any right, power or privilege hereunder shall operate as a waiver thereof or a consent thereto; nor shall a single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

THIS NOTE AND THE OBLIGATIONS OF THE BORROWER HEREUNDER SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF [redacted].

[*Signature Page Follows*]

Initials: _________

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

[redacted] Redaction

By_____________________
Name: Redaction

Title: ______________

**SUBSCRIBED AND SWORN TO BEFORE ME** on this____day of _______________, 20__.

________________________________
NOTARY PUBLIC
In and for the State of ______________

My Commission Expires:

________________________________

Initials: _________

EXHIBIT C

# INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT, dated as of November 21, 2022 this "Agreement"), is made by and between [redacted], (the "Debtor"), [redacted], (the "LOC Lender"), herein referred to as each as a "Party" and together, the "Parties."

## RECITALS

A. The LOC Lender has approved the Debtor for a Line of Credit in the amount of [redacted] ((the "LOC") pursuant to the LOC Lender's Business Expansion Line of Credit Agreement (the "LOCA") in the dated November 21, 2022.

B. The executed LOCA requires the Debtor to deposit with the LOC Lender [redacted]), representing [redacted] of the LOC, (the "Debtor Deposit") into an Interest Credit Account (the "ICA") maintained by the LOC Lender for the benefit of Debtor.

C. [redacted] of the Debtor's Deposit, shall be paid to [redacted] for the purpose of an origination fee (the "Origination Fee").

D. [redacted]) of the Debtor's Deposit, for the purpose of Debtor's payment of interest, due and payable prior to the Bridge Term (as defined herein) of the LOCA.

E. The Debtor has requested and LOC Lender has agreed to provide an ICA for bridge funding in the amount of [redacted]) plus interest reserve and fees (the "Bridge Loan"). The Bridge Loan Bridge is subject to the terms and conditions set forth in the Promissory Note (the "Note"), Security Agreement, Guaranty, and this Agreement, of even date herewith executed by and between the Debtor and LOC Lender (collectively, the "Loan Documents")

F. LOC Lender will provide the Bridge Loan on behalf of the Debtor to the ICA to enable the Debtor to secure the LOC from the LOC Lender. Upon execution of the Loan Documents, LOC Lender will fund the ICA within three (3) Banking days.

Initials: _________

G. Commencing November 21, 2022, LOC Lender shall receive full payment of all interest from the ICA in the amount of [redacted]).

H. Debtor shall have the right to extend the Bridge Term for an additional term of thirty (30) days (the "Extension Option"). If Debtor wishes to extend the Bridge Term, Debtor shall notify LOC Lender in writing of its intention to exercise the Extension Option no later than five (5) business days prior to the end of the Bridge Term. If Debtor exercises the Extension Option, the Bridge Term shall continue month-to-month until Debtor notifies LOC Lender, in writing, of its intention to terminate the then-existing Bridge Term no later than five (5) business days prior to then-existing Bridge Term.

I. The Bridge Loan will be secured by, inter alia, a security interest in the LOC Lender Collateral senior to any security interest therein held by LOC Lender.

J. The LOC Lender holds or will hold a security interest in the LOC Lender Collateral.

K. The Creditors are executing this Agreement to set forth their lien and security priorities with respect to the Debtor transaction.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises, and intending to be legally bound hereby, the Parties hereby agree as follows:

1. DEFINITIONS. The following terms used herein shall have the following meaning. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code:

1.1. "Bankruptcy Code" - Title 11 of the United Sates Code.

1.2. "Bridge Loan" – See Recital C. & D.

1.3. "Bridge Term" – Ninety (90) calendar days from the date of agreement execution

1.4. "Chosen State" – Delaware

1.5. "Creditor(s)" - The LOC Lender

1.6. "Debtor" – See preamble.

1.7. "Default Notice" – See section 4.2

1.8. "LOC Lender" - See Preamble.

1.9. “LOC Lender Collateral” – All collateral which now or hereafter secures the LOC Lender Obligations.

1.10. “LOC Lender Obligations” – Indebtedness owed by the Debtor to the LOC Lender.

1.11. “LOC Lender Collateral ”—All collateral which now or hereafter secures the LOC Lender obligations pursuant to the Security Agreement.

1.12. “LOC Lender Obligations” – All obligations of the Debtor to LOC Lender under the Note or any other agreement between Debtor and LOC Lender.

1.13. “Party” – Each of the LOC Lender and the Debtor.

2. PRIORITY.

2.1. Notwithstanding the terms or provisions of any agreement or arrangement which either Creditor may now or hereafter have with the Debtor or any rule of law, and irrespective of the time, order, or method of attachment or perfection of any security interest or the recordation or other filing in any public record of any financing statement, any security interests now or hereafter held by LOC Lender in any and all assets of the Debtor, is and shall remain senior to any security interest therein now or hereafter held by the LOC Lender.

3. BRIDGE LOAN REPAYMENT TO LOC LENDER.

3.1. The Parties acknowledge and agree that the LOC Lender Obligations shall be due and payable to LOC Lender on Debtor’s first draw from the Debtor’s LOC. The LOC Lender affirms and warrants that no draw request from the Debtor shall be accepted if the LOC Lender Obligations have not been satisfied or the full amount of the LOC Lender Obligations isn’t included in the draw request. The first draw from the LOC shall be at a minimum sufficient to satisfy the LOC Lender Obligations, and no other payment from the Debtor’s LOC availability shall be disbursed unless and until the full amount of the LOC Lender Obligations have been paid. The Parties’ additionally agree that the first LOC draw request must occur within ninety banking days from the date of the opening of the Debtor’s ICA with the Lender (the “Bridge Loan Term”).

3.2. In the event the first draw request is not made and the LOC Lender Obligations are not satisfied within the Bridge Loan Term, or Debtor otherwise defaults in the performance of the LOC Lender Obligations, LOC Lender may send a Default Notice to LOC Lender demanding the full payment of the LOC Lender Obligations from the ICA.

3.3. Within one Business Day of the Default Notice, LOC Lender shall retain the full amount of the LOC Lender Obligations from the funds held in the Debtor’s ICA.

3.4. The Debtor understands that payments to LOC Lender hereunder by LOC Lender shall be deemed to be payments to the Debtor under the LOCA.

3.5. All payments to LOC Lender shall be made as follows (or in accordance with such other instructions as may be advised in writing by LOC Lender to Borrower):

Bank Name: Chase Bank
Bank Address: [redacted]
ABA #: [redacted]
Account Name: [redacted]
Account Address: [redacted]
Account #: [redacted]

4. <u>LOC LENDER COVENANTS AND WARRANTIES.</u>

4.1. LOC Lender shall not transfer, assign, withdraw, or otherwise disburse to the LOC Lender, the Debtor, or any other person, any funds from the ICA unless and until all LOC Lender Obligations are fully satisfied in accordance with the Note and this Agreement.

5. <u>CHOICE OF LAW.</u>

5.1. This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the Delaware.

6. JURISIDCTION; VENUE.

6.1. Jurisdiction. The Parties agree that any legal action, suit, or proceeding arising out of or relating to this Agreement may be brought in a state or federal court located in Delaware. The Parties submit to the exclusive jurisdiction of any such court in any such action, suit, or proceeding.

6.2. <u>Venue</u>. The Parties irrevocably and unconditionally waive to the fullest extent permitted by applicable law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement in any court referred to in **Error! Bookmark not defined.**6.1 and the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

7. <u>Waiver of Jury Trial</u>. THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY, WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY.

8. <u>BENEFITS OF THE AGREEMENT.</u>

8.1. This Agreement is solely for the benefit of and shall bind the Parties and their respective successors and assigns and no other entity shall have any right, benefit, priority, or interest hereunder.

9. <u>TERM.</u>

9.1. This Agreement may be terminated by the parties only upon full payment to LOC Lender of the LOC Lender Obligations by Debtor and/or the LOC Lender.

10. <u>ATTORNEYS FEES.</u>

10.1. In the event that any Party retains counsel in connection with the interpretation, defense, or enforcement of this agreement, the prevailing Party shall recover its reasonable attorney's fees and expenses from the unsuccessful Party.

11. <u>COUNTERPARTS.</u>

11.1. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if all signatures were upon the same instrument. Delivery of an executed counterpart of the signature page to this Agreement by facsimile shall be effective as delivery of a manually executed counterpart of this Agreement, and any Party delivering such an executed counterpart of the signature page to this Agreement by facsimile to any other Party shall thereafter also promptly deliver a manually executed counterpart of this Agreement to such other Party, provided that the failure to deliver such manually executed counterpart shall not affect the validity, enforceability, or binding effect of this Agreement.

12. <u>NOTICE.</u>

10.1 All notices required to be given to either Party hereunder shall be sent to the Parties at their respective addresses listed below and shall be deemed given upon the first to occur of: (a) deposit thereof, postage prepaid, in a receptacle under the control of the United States Postal Service; (b) the first business day following transmittal by electronic mail ; or (c) actual receipt by the Party to whom notice is being given, or an employee or agent of thereof.

**<u>LOC Lender</u>**

Name: [redacted]
Address: [redacted]

**<u>Debtor</u>**

Name: [redacted] [redacted] [redacted]

Address: [redacted]

Attention: [redacted]

Initials: _________

13. Amendments and Waivers. No term of this Agreement may be waived, modified, or amended except by an instrument in writing signed by both of the Parties. Any waiver of the terms hereof shall be effective only in the specific instance and for the specific purpose given.

14. Headings. The headings of the various Sections and subsections herein are for reference only and shall not define, modify, expand, or limit any of the terms or provisions hereof.

15. No Waiver; Cumulative Remedies. No failure to exercise, and no delay in exercising on the part of LOC Lender, of any right, remedy, power, or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege. The rights, remedies, powers, and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers, and privileges provided by law.

16. Electronic Execution. The words "execution," "signed," "signature," and words of similar import in this Agreement shall be deemed to include electronic or digital signatures or electronic records, each of which shall be of the same effect, validity, and enforceability as manually executed signatures or a paper-based record-keeping system, as the case may be, to the extent and as provided for under applicable law, including the Electronic Signatures in Global and National Commerce Act of 2000 (15 U.S.C. §§ 7001 to 7031), the Uniform Electronic Transactions Act (UETA), or any Redaction state law.

17. Severability. If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties shall negotiate in good faith to modify this Note so as to affect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

[*Signature Page Follows*]

Initials: _________

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first above written.

**LOC Lender:** Redaction

By: Redaction __________

**Debtor:** Redaction

By: ________________________________
Name: Redaction
Title: ________________________________

**SUBSCRIBED AND SWORN TO BEFORE ME** on this____day of _______________, 20__.

________________________________
NOTARY PUBLIC
In and for the State of _______________

My Commission Expires:

________________________________

Initials: _________

# Exhibit F

# EXHIBIT COVER SHEET

| | | |
|---|---|---|
| | | **Exhibit** |
| Party Submitting: | **Mary Ida Townson, U.S. Trustee for Region 21** | |
| Admitted: | **YES or NO (circle one)** | **33** |
| Chapter 11 Debtor: | **Genie Investments NV, Inc.** | |
| Case No. | **3:24−bk−00496−BAJ** | |
| Nature of Hearing: | **Trial on**<br><br>**U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**<br><br>**Debtor's Response Thereto (Doc. No. 34)**<br><br>**U.S. Trustee's Reply (Doc. No. 38)** | |
| Trial Date: | **April 9, 2024, at 9:00 a.m.** | |

**United States Bankruptcy Court**
**Middle District of Florida**

**Dated:______________________________, 2024.**

**By: _________________________, Deputy Clerk**

**From:** Charles Stringer
**To:** Kelly Carrell
**Subject:** Fwd: Retention Agreement.
**Date:** Sunday, February 5, 2023 12:00:05 PM
**Attachments:** Outlook-image.png.png
Outlook-image.png.png
Nutra-Acres LLC Retention Agreement SC.pdf

---

---------- Forwarded message ---------
From: **Michael Lanza** <mlanza@mcmanncommerciallending.com>
Date: Wed, Jan 18, 2023 at 8:36 PM
Subject: Retention Agreement.
To: Charles Stringer <cbs.llc2019@gmail.com>
CC: Clyde Allsop <ccccllc54@gmail.com>, Info MCL <info@mcmanncommerciallending.com>

Please find attached your retention agreement for the Bridge Loan. Please review the document and if you have any questions, let me know. Once executed please return with a copy of the wire confirmation for the fee. Once received will work on getting you your formal Terms Sheet, Data Management Agreement and your Bridge Loan Agreement. Thanks, and we look forward to working with you to get this loan closed and funded as soon as possible.

Michael J. Lanza
**Direct 321-295-4808**
**Office 800-616-7276**
**Senior Commercial Loan Officer**
McMannCommercialLending.com
Appointment Calendar

# GENIE INVESTMENTS

*Believe in your Dreams*

January 18, 2023

**Wiring Instructions**

As per your Due Diligence Fee Agreement, the Borrower must wire the necessary amount to:

**Bank Name & Address**:
Chase Bank
1515 Atlantic Boulevard
Jacksonville, Florida 32207

**Account Mailing Address:**
401 Ryland Street Suite 200-A
Reno, Nevada 89502 8

**Routing Number:** [redacted]

**Credit Account Number:** [redacted]

**Account Title:** Genie Investments NV

*This fee for Due Diligence is 100% **non-refundable**.*

*****When sending the wire, please write "Due Diligence" in the Memo*****



Initials: ________________

## DUE DILIGENCE FEE AGREEMENT

This Due Diligence Fee Agreement (this "**Agreement**"), dated as of January 18, 2023 (the "**Effective Date**"), is entered into between Nutra-Acres LLC, having an address at 130 North Dumas Avenue, Dumas, Texas 79029 ("**Borrower**"), and Genie Investments, having an address at P.O. Box 5886, Wilmington, Delaware 19808 ("**Company**"), and together with the Borrower, the "Parties," and each, a "Party").

WHEREAS, Borrower desires to compensate **Company** for its costs to conduct certain due diligence services ("Services") upon the terms and conditions hereinafter set forth, and **Company** is willing to perform such Services.

In consideration of the mutual covenants and agreements hereinafter set forth, the Parties agree as follows:

1. **Performance of Services**

Upon request of Company, Company agrees to the Services in connection with Borrower applying for funding.

2. **Payment**

As a material inducement to Company to commence the Services, the Borrower shall pay Company a non-accountable and non-refundable fee of Forty Thousand Dollars ($40,000), payable prior to commencement of the Services.

Payment of the diligence fee is not a guarantee that Company will offer funding to Borrower, or that any offer will be on terms and conditions acceptable to Borrower. Assuming sufficiency of the diligence materials provided by Borrower, Company intends to offer a Bridge Loan to Borrower to cover the Interest Credit Account amount. The maximum cost of this Bridge Loan will be Fifteen Thousand dollars per One Hundred Thousand dollars needed ($15,000/$100,000) or Fifteen percent (15%) of the Interest Credit Account. The interest of this Bridge Loan is 100% non-refundable.

3. **Term and Termination**
   a. Terms
      This Agreement shall commence as of the Effective Date and shall continue thereafter until the completion of the Services, unless sooner terminated pursuant to this section.

   b. Termination
      Company may terminate this Agreement, upon the occurrence of any of the following events:

      a. Borrower fails, in the absence of a bona fide dispute with respect to such payment, to make payment for Services on its due date, provided however, that Borrower may cure such breach by making

payment within 5 days of Borrower's receipt of notice that it failed to make such payment when due;

b. Borrower requests that Company violate any applicable law or the rules of any regulatory body having jurisdiction and Borrower does not promptly revoke such request upon Company's refusal to comply;

c. Borrower requests that Company take any action which would result in the commission of a fraud upon any person or party and Borrower does not promptly revoke such request upon Company's refusal to comply; or

d. Borrower requests that Company take any action that, upon the advice of counsel to Company, could subject Company to liability or material damages in a civil litigation and Borrower does not promptly revoke such request upon Company's refusal to comply).

**4. Borrower Representations**

a. Reliance

Borrower acknowledges and agrees that all materials and information Borrower provided to Company is accurate and complete, and that Company will, without independent verification, rely on it for the purpose of potentially providing funding. Company shall not assume any responsibility or have any liability for such materials or information. Borrower represents that Borrower has the right to supply such information to Company and that the supply of such information by Borrower and its use by Company for the purposes of the provision of the Services will not infringe any rights held by any third party, involve the unauthorized use of confidential information belonging to a third party or result in the breach by Borrower or Company of any law, regulation, fiduciary duty, intellectual property right or agreement.

b. Litigation

Borrower (i) is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is not a party or is not threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator, in each case that could be reasonably expected to result in a material adverse change in the business, financial condition, operations, results of operations, or future prospects of Borrower.



Initials: ________________

**5. Indemnification**

Borrower shall indemnify Company against any cost, loss, expense or liability which may be suffered or incurred by Company in the proper performance of its obligations under this Agreement including, without limitation, arising from any misrepresentation, misconduct, negligence or dishonesty on the part of any third party, except to the extent that the cost, loss, expense or liability is due to the breach of this Agreement, violation of law, negligence, willful
misconduct, fraud or dishonesty on the part of Company or to the extent that such liability cannot lawfully be excluded or limited.

6. **Independent Contractor**

Company's status shall be that of an independent contractor, and not that of an agent or employee of Borrower. Company shall not hold itself out as an employee or agent of Borrower except as contemplated by any other ancillary agreement.

**7. Arbitration**

Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in New Castle County, Delaware, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for Arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 9 herein. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to being arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Delaware. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, or this agreement to arbitrate.



Initials: ________________

**8. Confidentiality**

During the term of this Agreement, the Parties may communicate to each other certain confidential information to enable Company to perform the Services hereunder, or Company may develop confidential information for Borrower. Each Party agrees (i) to treat, and to cause its employees, agents, subcontractors and representatives, if any, to treat as secret and confidential, all such information, and (ii) except as necessary in the performance of the Services, not to disclose any such confidential information or make available any reports, recommendations or conclusions which Company may make for Borrower to any person, firm or corporation without first obtaining Company's written approval. The foregoing shall not prohibit or restrict any party from disclosing any information: (a) the disclosure of which is necessary to comply with any applicable laws, including, without limitation, federal or state securities laws, or any exchange listing or similar rules and regulations; (b) the disclosure of which is ordered pursuant to a subpoena or other order from a court or governmental body of competent jurisdiction; (c) such information is now, or hereafter is made, generally available to the public other than by disclosure in violation of this Agreement; (d) such information was disclosed to the disclosing Party by a third party that the disclosing Party, in good faith, believes was not bound by an obligation of confidentiality; or (vi) the Parties hereto consent to the form and content of any such disclosure. If any Party learns that disclosure of such information is sought in or by a court or governmental body of competent jurisdiction or through other means, such Party shall (1) give prompt notice to the other Party prior to making such disclosure and allow such other Party, at its expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, such information, (2) reasonably cooperate with such other Party in its efforts to prevent, or obtain a protective order for, such disclosure, and (3) disclose the minimum amount of information required to be disclosed.

**9. Notices**

All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety six (96) hours after deposit in first class certified United States mail, postage prepaid, return receipt requested, or two business days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given pursuant to this paragraph:

To Borrower: Nutra-Acres LLC
Attention: Charles Stringer
130 North Dumas Avenue
Dumas, Texas 79029

To Company: Genie Investments
P.O. Box 5886
Wilmington, Delaware 19808

 Initials: ________________

**10. Assignment**

Borrower may not assign, subcontract or delegate all of any part of its rights or obligations hereunder without Company's prior written approval (which may be withheld or delayed in Company's sole discretion).

**11. Binding Effect**

Subject to the provisions of section 10 above, the terms of this Agreement will bind and benefit the successors and assigns of the Parties.

**12. Waiver**

No delay or omission on the part of any party hereto in exercising any right hereunder shall operate as a waiver of such right or any other right under this Agreement.

**13. Headings**

The several headings to articles, sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement.

**14. Schedules, Attachments and Exhibits**

All schedules, attachments and exhibits, if any, referred to in or attached to this Agreement are and shall be deemed to be an integral part of this Agreement as if fully set forth herein.

**15. Amendments**

This Agreement may not be modified or amended except by written agreement signed by Borrower and Company.

**16. No Third-Party Rights**

This Agreement is made entirely for the benefit of Borrower, Company, and their successors in interest (including any participants). No third person shall have any rights hereunder.

**17. Force Majeure**

No liability shall result from the delay or nonperformance of Services caused by circumstances beyond the control of Company, including without limitation Act of God, fire, flood, snowstorm, pandemic, war, acts of terrorism, government action, riot, civil disturbance, accident, inability to obtain labor, material, or equipment ("Force Majeure"). During periods of Force Majeure, Services so affected by such Force Majeure may be eliminated without liability, but this Agreement shall remain otherwise unaffected. Timely notice of Force Majeure and its expected duration shall be given by the affected party to the other, and the party whose performance is affected by a Force Majeure event will use commercially reasonable efforts to avoid, remove or minimize the impact of such event on the performance of its obligations at the required level at the earliest possible date.

**18. Applicable Law**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware and the United States.

 Initials: ________________

**19. Severability**

The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision.

**20. Counterparts**

This Agreement may be signed in two or more counterparts, each of which shall be treated as an original but which, when taken together, shall constitute one and the same instrument. A signed facsimile or electronic copy of this Agreement shall constitute an original for all purposes.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

Nutra-Acres LLC

______________________________

Charles Stringer

Genie Investments
______________________________

Genie Investments



Initials: ________________

# Exhibit A

As agreed to in the Due Diligence Fee Agreement, Borrower agrees to provide the Company with all of the following (mark any not applicable as "N/A"):

1. Income Statement (past five years or less starting with company establishment)

2. Balance Sheets (past five years or less starting with company establishment)

3. Cash Flow Statements (past five years or less starting with company establishment)

4. Tax Returns (past five years or less starting with company establishment)

5. Net Worth Statement/s for All Equity Owners That Have A 5% Or Higher Ownership Stake

6. Business Plan Including A 2 Year Forecast/Proforma & Management Bios

7. Previous 3 Month's Business Bank Statements for All Business Bank Accounts

8. Post-Closing Balance Sheet Assuming Term Sheet Terms/Rates

9. All UCC Lien Filings & Current List of All Material Creditors

10. Articles of Incorporation and Corporate Bylaws/Operating Agreement

11. Capitalization Table of All Outstanding Stock Shares, Stock Warrants, & Stock Options

12. Documentation Related to All Registered Intellectual Property (Patents and Trademarks)



Initials: ________________

# Exhibit G

# EXHIBIT COVER SHEET

| | | |
|---|---|---|
| | | **Exhibit** |
| Party Submitting: | **Mary Ida Townson, U.S. Trustee for Region 21** | |
| Admitted: | **YES or NO (circle one)** | **38** |
| Chapter 11 Debtor: | **Genie Investments NV, Inc.** | |
| Case No. | **3:24−bk−00496−BAJ** | |
| Nature of Hearing: | **Trial on**<br><br>**U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**<br><br>**Debtor's Response Thereto (Doc. No. 34)**<br><br>**U.S. Trustee's Reply (Doc. No. 38)** | |
| Trial Date: | **April 9, 2024, at 9:00 a.m.** | |

**United States Bankruptcy Court**
**Middle District of Florida**

**Dated:____________________________, 2024.**

**By: _______________________, Deputy Clerk**

Case 3:24-bk-00496-BAJ Doc 79-4 Filed 10/24/24 Page 152 of 180

**From:** Charles Stringer
**To:** Christy Gromowsky
**Subject:** Fwd: CERTIFIED LEGAL NOTICE
**Date:** Monday, September 11, 2023 10:46:41 AM
**Attachments:** McMann-Genie ltr 05.26.23.pdf

---

---------- Forwarded message ---------
From: **Charles Stringer** <cbs.llc2019@gmail.com>
Date: Sat, May 27, 2023 at 9:05 AM
Subject: Fwd: CERTIFIED LEGAL NOTICE
To: <scott@warren.law>, <troberson@forsheyprostok.com>

Good afternoon.

On behalf of Mr. Prostok, attached is correspondence with respect to the above-referenced matter.

Thank you.

Teresa

**Teresa Roberson** | **FORSHEYPROSTOK**LLP

**Legal Assistant** | **P 817.877.8855** | **F817.877.4151**

**777 Main Street, Suite 1550 | Fort Worth, TX 76102**

**troberson@forsheyprostok.com**

Jeff Prostok*
Direct Dial No. (817) 877-4223
E-mail: jprostok@forsheyprostok.com
Fort Worth Office

FP
FORSHEY & PROSTOK, L.L.P.

*Board Certified Business Bankruptcy
Texas Board of Legal Specialization

May 26, 2023

McMann Commercial Lending
Attn: Walt Trock, Managing Partner
205 N. Michigan Ave.
Chicago, IL 60601

*Via FedEx*
*Also Via Email:*
*walt.trock@mcmanncommerciallending.com*
*Also Via Fax: 224.328.6440*

Genie Investments
Attn: David Hughes
Caleb Davis
John M. Cohan
Michael Connor
P.O. Box 60443
Jacksonville, FL 32236

*Via Email*
*david@zoomeral.com*
*dhughes@genieinvestments.com*
*Certified Mail, Return Receipt Requested*

Re: Charles Blake Stringer dba Nutra-Acres LLC

Dear Messrs. Trock and Hughes:

My firm represents Charles Blake Stringer dba Nutra-Acres LLC ("Stringer"). As you are aware, Stringer entered into (i) a Bridge Loan Agreement effective as of February 7, 2023 pursuant to which Genie Investments ("Genie") agreed to provide a bridge loan in the amount of $2.4 million (the "Bridge Loan"), and (ii) a Business Extension Line of Credit Agreement executed as of February 13, 2023 pursuant to which McMann Commercial Lending LLC ("McMann") agreed to provide a loan in the amount of $24 million (the "BELOC Loan"). Stringer worked with McMann in obtaining approval for both the Bridge Loan and the BELOC Loan. The primary purpose of the Bridge Loan and BELOC Loan was to refinance existing debt secured by approximately $30 million of farmland and other property owned by Stringer (the "Collateral").

As of February 13, 2023, Stringer had paid $360,000 (the "Pre-Paid Interest Payment") to Genie in accordance with the loan documents, as acknowledged in Mr. Trock's letter to Stringer dated February 24, 2023. Another bridge loan in the amount of $5 million has yet to fund despite representations made to Stringer on multiple occasions that such loan was to be funded by now. Likewise, the first tranche of the BELOC Loan has yet to fund despite McMann being obligated to fund the first tranche within 75 calendar days of receipt of the Pre-Paid Interest Payment. To date, McMann's and Genie's actions indicate that they have defrauded Stringer with respect to the Pre-Paid Interest Payment.

Stringer's requests for explanations for the delays in funding of the loans and other information regarding the status of these loans have been effectively ignored. Only vague responses have been provided. For example, Mr. Trock's letter dated May 4, 2023 to Stringer states that "compliance concerns" has delayed the "international source of funding" for the BELOC Loan. No concrete or otherwise meaningful information has been provided in response to Stringer's requests for information. Furthermore, McMann and Genie have failed to provide any justification for their defaults and failure to fulfill their contractual obligations to Stringer.

As a result of the unexcused delays and breaches of the loan agreements, the current first lienholder has posted the Collateral for a June 6, 2023 foreclosure sale. Unless McMann and Genie immediately provide funding under the loans to refinance the existing debts secured by the Collateral, Stringer will initiate a bankruptcy proceeding in Texas.

In a bankruptcy proceeding, Stringer will pursue any and all claims against McMann, Genie, and any individuals associated therewith responsible for the damages already suffered and to be suffered by Stringer. This would include, but is not limited to, claims to recover (i) the Pre-Paid Interest Payment, (ii) the significant attorney's fees and other costs that will be occasioned by the bankruptcy proceeding, and (iii) any equity in the Collateral that is lost by Stringer in the event that one of the existing lienholders is permitted to foreclose on any of the Collateral.

Stringer hereby requests that McMann and Genie, by no later than May 31, 2023, provide written communications to me fully explaining the status of the loans, the exact and detailed reasons why the loans have not been funded to date as required under the loan documents, identifying the amounts and locations of any funding that has been received and is being held, and identifying the date by which the loans will be funded. Your immediate attention to this matter is appreciated.

Sincerely yours,

Jeff Prostok with permission

Jeff Prostok

CC: Charles Blake Stringer

Robert S. Strauss
SWK Attorneys at Law
500 Skokie Boulevard, Suite 600
Northbrook, IL 60062
*(via First Class Mail and via email: rstrauss@swkattorneys.com)*

# Exhibit H

**EXHIBIT COVER SHEET**

**Exhibit**

Party Submitting: **Mary Ida Townson, U.S. Trustee for Region 21**

Admitted: **YES or NO (circle one)** **39**

Chapter 11 Debtor: **Genie Investments NV, Inc.**

Case No. **3:24−bk−00496−BAJ**

Nature of Hearing: **Trial on**

**U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**

**Debtor's Response Thereto (Doc. No. 34)**

**U.S. Trustee's Reply (Doc. No. 38)**

Trial Date: **April 9, 2024, at 9:00 a.m.**

**United States Bankruptcy Court**
**Middle District of Florida**

**Dated:____________________________, 2024.**

**By: _______________________, Deputy Clerk**

From: **Charles Stringer** <cbs.llc2019@gmail.com>
Date: Thu, Jun 8, 2023 at 5:54 PM
Subject: Re: BELOC loan funding update
To: Clyde Allsop <cccclc54@gmail.com>, David Hughes <David@zoomeral.com>, David from Genie Investments <dhughes@genieinvestments.com>, Info MCL <info@mcmanncommerciallending.com>, Michael Lanza <mlanza@mcmanncommerciallending.com>, Rene Jamulitrat <rJamulitrat@mcmanncommerciallending.com>, Sandra Colthirst <scolthirst@mcmanncommerciallending.com>, <blake.nutraacres.llc@gmail.com>

To Walter Trock, and all business associates of Mcmann commercial lending.

I am in receipt of your email and Letter about the Beloc funding dated Today June 8 '23

Once again, we have received in writing something that means nothing.

This letter does not alleviate our concerns about funding of the Beloc Loan.
There is no definite timeline, no commitment language, no transparency, no contractual evidence of this loan funding at all, and as pointed out in previous written communications this is all very vague to what the facts really are.
In fact it raises even more questions to the validity of the loan, because in this letter, you are claiming to letting us terminate, and giving back a refund of the interest payment on the ICA bridge loan portion that the Genie Investment group Funded on behalf of Mcmann clients, and as you know from the previous correspondence last week a letter and response from David Hughes to my federal bankruptcy attorneys at the Prostok Law Firm, according to David Hughes that our contract is expired, but now, your representations in this letter, is saying there's a choice to terminate, and receive a refund? Mcmann, at this point your representations are that nothing about this loan program is expired.

Who is representing whom here?

There's been many communications with representations from all parties that are very misleading, & deceptive.
Bottom line there's still no proof or evidence there are any funds available, there is no proof or transparency that anyone will receive a Beloc loan.

Mr. Trock At this point as I explain to you by text yesterday the only way you will stop me from exposing everything & everybody I know about Mcmann, Zoomeral, Genie or any others involved in this loan process of yours, is simply this: FUND the loan, that you & your associates are contractually obligated too.

There are about 20 people involved at this point, I now have personally dealt with six attorneys, several brokers, and several others that are on the same Zoomeral/Mcmann platform currently waiting for the Beloc to fund,
I personally have been to the FBI, and have a case filed, yesterday I started filing complaints, CFPB,FINRA, the Texas, Attorney General, soon will be the Illinois attorney general, I'm encouraging all brokers and Mcmann clients that have not been funded by the Beloc to do the same, and name off every fact, detail and person involved in this horrible situation that Mcmann and all of its associates have failed to contractually obligate.

Unlike yourselves, we are being very factual and transparent about this situation.

This is already cost me, hundreds of thousands of dollars in damages & this is a fact.
If the funding remedy does not happen in the next few days, it is my intention to put you all on notice of a lawsuit, and I'm certain several will follow.

You're a timely and transparent response will be much appreciated.

Charles Blake Stringer
Nutra acres LLC

P.s. David Hughes, I will ask of you to send on, and for this to Mike Connor & the rest of the owners of Genie Investment, as I do not have their email addresses.

On Thu, Jun 8, 2023 at 3:03 PM Info MCL <info@mcmanncommerciallending.com> wrote:

McMANN Commercial Lending • 205 N Michigan Ave • Chicago IL 60601
312-224-8559 Fax 224-328-6440

June 8, 2023

To: BELOC Approved Loan Applicants
Re: Disbursement amounts and dates for the lst Tranche

Dear Messer's:

McMann Commercial Lending LLC ("McMann") has been in communication with its wholesale Private lenders. McMann is pleased to inform you that these investors have advised McMann that it intends to provide McMann with funds before the end of this month (June 2023), as delays on the investors end have purportedly been resolved. McMann thanks you for your patience.

Nevertheless, if you feel that you must exercise your option to terminate your BELOC agreement and obtain a refund of your Interest Credit Account payments, please complete, notarize, and submit the Termination form attached to your BELOC agreement and submit the request to McMann. The refund will then be promptly processed. To be clear, while these investors have advised McMann that funds will arrive before the end of June, this is not a guarantee of funding from McMann.

McMann will provide another update once the private investors provide McMann with additional information as to funding amounts and dates. McMann understands that you may desire more specific information; however, no more detail can be provided at this time. McMann has no option but to provide these private investors with the necessary time to perform. Again, McMann appreciates your patience and understanding in this matter.

# Exhibit I

# EXHIBIT COVER SHEET

**Exhibit**

| | | |
|---|---|---|
| Party Submitting: | **Mary Ida Townson, U.S. Trustee for Region 21** | |
| Admitted: | **YES or NO (circle one)** | **40** |
| Chapter 11 Debtor: | **Genie Investments NV, Inc.** | |
| Case No. | **3:24−bk−00496−BAJ** | |
| Nature of Hearing: | **Trial on**<br><br>**U.S. Trustee's Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Doc. No. 20)**<br><br>**Debtor's Response Thereto (Doc. No. 34)**<br><br>**U.S. Trustee's Reply (Doc. No. 38)** | |
| Trial Date: | **April 9, 2024, at 9:00 a.m.** | |

**United States Bankruptcy Court**
**Middle District of Florida**

**Dated:____________________________, 2024.**

**By: ________________________, Deputy Clerk**

S W K
ATTORNEYS AT LAW

500 SKOKIE BLVD., SUITE 600
NORTHBROOK, ILLINOIS 60062
(224) 260-3090

DANIEL S. KLAPMAN
(224) 260-3087
dklapman@swkattorneys.com

June 23, 2023

**VIA EMAIL AND CERTIFIED MAIL**
Attn: Charles Stringer, Managing Member
Nutra-Acres, LLC
130 North Dumas Avenue
Dumas, Texas 79029
Cbs.llc2019@gmail.com

Re: Termination of Business Expansion Line of Credit Agreement between McMann Commercial Lending LLC and Nutra-Acres LLC

Dear Mr. Springer:

Please be advised that this firm represents McMann Commercial Lending LLC ("McMann") concerning the above referenced Business Expansion Line of Credit Agreement ("BELOC") entered into by McMann as lender and Nutra-Acres LLC ("Nutra Acres" or "Borrower") on March 9, 2023. You are hereby notified that McMann has terminated the BELOC pursuant to its terms.

More specifically, at a minimum, as Nutra-Acres' managing member, you have repeatedly breached Section 14.5 of the BELOC, including in writing to various third parties, including but in no way limited to your email of June 8, 2023. These breaches constitute an event of default, giving McMann the right to terminate all obligations under the BELOC. Additional breaches and defaults by Nutra-Acres exist, and McMann reserves all rights concerning those breaches, including but not limited to potential failures to meet Borrower obligations under BELOC sections 7.2, 7.3, 8.1, 8.6, 8.7, and others. These breaches provide McMann remedies under Section 13.1, including the termination of all obligations to make advances to Nutra-Acres as borrowers.

Were Borrowers' breaches not sufficient to constitute a basis for termination, your continued harassment of McMann and Mr. Walter Trock, including but not limited to blocking his calendar with threatening messages, as well as your sending Mr. Trock a photo of his residence, have rendered McMann unwilling to deliver funds to Nutra-Acres as specified in to Section 13.7(b) of the BELOC.

Be advised that your obligations under Section 14.5 survive termination of the BELOC and McMann reserves all rights to pursue all available remedies for any past, continuing, and future breaches. Your continued harassment of McMann, and Walter Trock in particular, will not be tolerated. Govern yourself accordingly.

Sincerely,

Daniel S. Klapman

cc: Walter Trock
Robert Strauss

# Exhibit J

Admitted Into Evidence
APR 09 2024

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:

Genie Investments NV, Inc.,

Case No.: 3:24-bk-00496-BAJ

Debtor.

Chapter 11

______________________________ /

## UNITED STATES TRUSTEE'S EXHIBIT LIST (Part I)

Trial on Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Document No. 20)
Trial Date: April 9, 2024, at 9:00 a.m.

| **Exh. No.** | **Document Description** | **Date Identified** | ***Date Admitted*** | ***With or Without Objection*** |
|---|---|---|---|---|
| 1 | Docket for Case No. 3:24-bk-00496-BAJ | 4/9/24 | 4/9/24 | W/out |
| 2 | Voluntary Petition (Doc. No. 1) | | | |
| 3 | U.S. Trustee's Expedited Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint an Examiner, Dismiss This Case, or Convert This Case to Chapter 7 (Doc. No. 20) | | | |
| 4 | Debtor's Response to U.S. Trustee's Expedited Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint an Examiner, Dismiss This Case, or Convert Case to Chapter 7 (Doc. No. 34) | | | |
| 5 | U.S. Trustee's Reply to Debtor's Response to Expedited Motion to Appoint Chapter 11 Trustee, Appoint Examiner, Dismiss Case or Convert to Chapter 7 (Doc. No. 38) | | | |
| 6 | Statement of Small Business Owner, Kristin Stegent (Rolling By the Dozen RV Park, LLC) | | | |
| 7 | Stegent: $7,900 Wire Transfer | | | |
| 8 | Stegent: Due Diligence Fee Agreement signed & Wire Instructions to Genie | | | |
| 9 | Stegent: $35,000 Due Diligence Wire Transfer | | | |

| | | | | |
|---|---|---|---|---|
| 10 | Stegent: Bridge Loan Agreement signed | 4/9/24 | 4/9/24 | w/out |
| 11 | Stegent: $26,805 Prepaid Interest & Zoomeral Fees Wired | | | |
| 12 | Stegent: BELOC Agreement | | | |
| 13 | Stegent: Email with David Hughes re public post | | | |
| 14 | Stegent: Email with David Hughes re breach | | | |
| 15 | Stegent: Email with McMann re the status of the BELOC loan closing | | | |
| 16 | Stegent: Email with David Hughes re countersuit | | | |
| 17 | Stegent: Genie's Cease & Desist Demand Letter | | | |
| 18 | Stegent: Genie's Refund Opt-In Agreement | | | |
| 19 | Stegent: Email with Genie's counsel re service of Genie Arbitration Complaint | | | |
| 20 | Stegent: Email with Genie's counsel re arbitration | | | |
| 21 | Stegent: Genie's JAMS Arbitration Demand | | | |
| 22 | Stegent: Email with Genie's counsel re postings | | | |
| 23 | Stegent: Email with JAMS re extension for Arbitration Objection | | | |
| 24 | Stegent: Genie's email re removal of posts to agree to extension | | | |
| 25 | Stegent: Genie email to remove online reviews | | | |
| 26 | Stegent: Objections to Arbitration | | | |
| 27 | Stegent: Genie's email to JAMS re motion for summary judgment filing | | | |
| 28 | Statement of Small Business Owner, Charles Blake Stringer (Nutra-Acres, LLC) | | | |
| 29 | Stringer: Email with Application, Business Plan, and BELOC timeline | | | |
| 30 | Stringer: Emails re BELOC timeline | | | |
| 31 | Stringer: Due Diligence Fee Agreement & Wiring Instructions | | | |

| | | | | |
|---|---|---|---|---|
| 32 | Stringer: Email re BELOC Loan Agreement & Bridge Loan Agreement | 4/9/24 | 4/9/24 | w/out |
| 33 | Stringer: Email attaching Due Diligence Fee Agreement and Bridge Loan Agreement | | | |
| 34 | Stringer: Signed Bridge Loan Agreement | | | |
| 35 | Stringer: Email with notarized signature on the Bridge Loan Agreement with Genie | | | |
| 36 | Stringer: McMann Wiring Instructions to Genie's account for BELOC Loan Agreement | | | |
| 37 | Stringer: Email with David at Zoomeral attaching signed Bridge Loan Agreement | | | |
| 38 | Stringer: Email attaching Nutra-Acres Demand Letter to McMann and Genie | | | |
| 39 | Stringer: McMann BELOC loan funding update and Nutra-Acres email response | | | |
| 40 | Stringer: McMann termination letter of BELOC with Nutra-Acres | | | |
| 41 | Stringer: Email re unable to refund $115k wire | | | |
| 42 | Stringer: Email re unable to refund $245k wire | | | |
| 43 | Stringer: Genie's Cease & Desist Letter | | | |
| 44 | Stringer: Genie's email re update on Due Diligence & Bridge Interest Payments | | | |
| 45 | Stringer: Genie email re Refund Opt-In | | | |
| 46 | Stringer: Nutra-Acres Commercial Demand for Arbitration to AAA | | | |
| 47 | Stringer: Genie email serving Cease & Desist Letter re defamation, Arbitration Complaint, signed Due Diligence Agreement | | | |
| 48 | Stringer: Genie email re Nutra-Acres Response to Objections | | | |
| 49 | Stringer: Genie email re arbitration attorney | | | |
| 50 | Stringer: AAA email re submission by 11/16/23 | | | |
| 51 | Stringer: Nutra-Acres Objection to Arbitration | | | |

| | | | | |
|---|---|---|---|---|
| 52 | Stringer: EM from AAA Closing Arbitration | 4/9/24 | 4/9/24 | w/out |

BY: Kate Menard

Deputy Clerk

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:

Genie Investments NV, Inc., Case No.: 3:24–bk–00496–BAJ

Debtor. Chapter 11

_______________________________ /

**UNITED STATES TRUSTEE'S EXHIBIT LIST (Part II)**
Trial on Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Document No. 20)
Trial Date: April 9, 2024, at 9:00 a.m.

| **Exh. No.** | **Document Description** | **Date Identified** | ***Date Admitted*** | ***With or Without Objection*** |
|---|---|---|---|---|
| 53 | Statement of Small Business Owner, Lisa Butkiewicz (Meetopolis, LLC) | 4/9/24 | 4/9/24 | w/out |
| 54 | Butkiewicz: Email re line of credit options | | | |
| 55 | Butkiewicz: Email re use of funds | | | |
| 56 | Butkiewicz: Terms & Commitment | | | |
| 57 | Butkiewicz: Email re due diligence agreement | | | |
| 58 | Butkiewicz: Email re loan approval | | | |
| 59 | Butkiewicz: Email re due diligence fee of $15k | | | |
| 60 | Butkiewicz: Email re wire instructions | | | |
| 61 | Butkiewicz: Email with Zoomeral link to upload the business plan | | | |
| 62 | Butkiewicz: Genie wiring instructions and signed BELOC agreement | | | |
| 63 | Butkiewicz: Genie letter to Borrowers | | | |
| 64 | Butkiewicz: Genie letter re Update on Funding Delays | | | |
| 65 | Butkiewicz: Genie Refund Opt-In Agreement | | | |
| 66 | Butkiewicz: Text correspondence with Broker | | | |

| | | | | |
|---|---|---|---|---|
| 67 | Butkiewicz: Zoomeral correspondence with Genie | 4/9/24 | 4/9/24 | W/out |
| 68 | Small Business Owner, Adam Foster (Foster Group, LLC): Jeff Klie email with BELOC requirements | | | |
| 69 | Foster: Jeff Klie email with testimonials, BELOC requirements, Term Sheet and Wiring Instructions | | | |
| 70 | Foster: McMann emails regarding BELOC and terms | | | |
| 71 | Foster: McMann meeting with BELOC underwriting notes and BELOC advertisement | | | |
| 72 | Foster: Emails with McMann forwarding BELOC application and $7,900 wire confirmation | | | |
| 73 | Foster: Emails with McMann forwarding signed documents | | | |
| 74 | Foster: McMann emails to not end up cash short | | | |
| 75 | Foster: Email applying for the $11m BELOC | | | |
| 76 | Foster: Email forwarding $11m BELOC application, signed Due Diligence with Genie, and confirmation of $30k wire to Genie | | | |
| 77 | Foster: Email forwarding signed Data Management Agreement, Security Agreement, Promissory Note, Intercreditor Agreement | | | |
| 78 | Foster: McMann letter re funding status | | | |
| 79 | Foster: Wiring instructions and confirmation of $165k wire | | | |
| 80 | Foster: BELOC Loan Closing Protocol | | | |
| 81 | Foster: Email re Final Confirmation and Proceed with BELOC Funding | | | |
| 82 | Foster: Email to McMann requesting phone call | | | |
| 83 | Foster: Email from Genie Bridge Loan interest payments are non-refundable | | | |
| 84 | Foster: Email from Genie's lawyer re refund | | | |

| | | | | |
|---|---|---|---|---|
| 85 | Foster: Signed Opt-In Agreement | 4/9/24 | 4/9/24 | w/out |
| 86 | Foster: Demand Letter to McMann requesting refund | | | |
| 87 | Foster: Form Termination Letter (notarized) | | | |
| 88 | Foster: Zoomeral Termination Confirmation | | | |
| 89 | Foster: McMann email re recovery of funds | | | |
| 90 | Foster: McMann email advertising new program PLOC | | | |
| 91 | Foster: McMann Personal Business Line of Credit (PLOC) | | | |
| 92 | Foster: McMann email re Genie's fraud filing | | | |

BY: Kate Menard
Deputy Clerk

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:

Genie Investments NV, Inc., Case No.: 3:24−bk−00496−BAJ

Debtor. Chapter 11

______________________________ /

**UNITED STATES TRUSTEE'S EXHIBIT LIST (Part III)**
Trial on Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Document No. 20)
Trial Date: April 9, 2024, at 9:00 a.m.

| **Exh. No.** | **Document Description** | **Date Identified** | ***Date Admitted*** | ***With or Without Objection*** |
|---|---|---|---|---|
| 93 | Statement of Small Business Owner, Rejoe Joy (Global Verse Holdings, LLC) | 4/9/24 | 4/9/24 | w/out |
| 94 | Joy: Genie Due Diligence Fee Agreement (signed) and Wiring Instructions to Genie's account | | | |
| 95 | Joy: Wire transfer of $50k to Genie for retention fee | | | |
| 96 | Joy: Emails with McMann and Crestar attaching the loan agreements and requesting reallocation of the $50k Bridge Loan as a down | | | |
| 97 | Joy: Scan of Agreements | | | |
| 98 | Joy: Bridge Loan Agreement | | | |
| 99 | Joy: Wire transfer of $45k to Genie Investments for prepaid interest on the Bridge Loan Agreement | | | |
| 100 | Joy: Demand Letter to McMann | | | |
| 101 | Joy: McMann response to Demand Letter that refund must come from Genie for the $95k | | | |
| 102 | Joy: McMann email re Retention Fee Discount for future deal | | | |
| 103 | Joy: Email to McMann and Crestar regarding return of funds | ✓ | ✓ | ✓ |

| | | | | |
|---|---|---|---|---|
| 104 | Joy: BELOC Funding Timeline advertisement | 4/9/24 | 4/9/24 | w/out |
| 105 | Statement of Small Business Owner, Lea Muse (Belle Maison Realty, LLC) | | | |
| 106 | Muse: Literature from McMann advertising BELOC, BELOC application, Executive Summary Line of Credit, Borrowers Consent, Due Diligence checklist, and wiring instructions | | | |
| 107 | Muse: McMann email with application to complete, due diligence cost of $6,900 | | | |
| 108 | Muse: McMann email attaching BELOC application, business plan template and wiring instructions | | | |
| 109 | Muse: BELOC application | | | |
| 110 | Muse: $7,800 Wire to McMann | | | |
| 111 | Muse: McMann emails re request for advanced amount | | | |
| 112 | Muse: McMann emails re approved BELOC loan applicant and start up protocol including Zoomeral sign up | | | |
| 113 | Muse: Signed Due Diligence Fee Agreement and wiring instructions to Genie's account | | | |
| 114 | Muse: $25K Wire confirmation to Genie account | | | |
| 115 | Muse: Terms & Commitment Letter | | | |
| 116 | Muse: Bridge Loan Agreement | | | |
| 117 | Muse: Emails with McMann transferring documents | | | |
| 118 | Muse: Engagement letter and Mortgage Banking Data | | | |
| 119 | Muse: Loan Agreement and list of Closing Requirements | | | |
| 120 | Muse: Signed BELOC Agreement | | | |
| 121 | Muse: Signed & notarized BELOC Agreement | | | |
| 122 | Muse: BELOC Agreement Questions | | | |

| | | | | |
|---|---|---|---|---|
| 123 | Muse: $45K Wire confirmation to Genie account | 4/9/24 | 4/9/24 | w/out |
| 124 | Muse: BELOC Loan Funding Update | | | |
| 125 | Muse: BELOC Loan Closing Protocol | | | |
| 126 | Muse: Genie update on funding delays | | | |
| 127 | Muse: Genie corporation statement | | | |
| 128 | Muse: Zoomeral messages with Genie | | | |
| 129 | Muse: BELOC applicant update | | | |
| 130 | Muse: Genie's update on refund delays | | | |
| 131 | Muse: Genie Settlement Agreement re Velanos Trial | | | |
| 132 | Muse: Genie closed Chase bank account | | | |

BY: Kate Menard
Deputy Clerk

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:

Genie Investments NV, Inc., Case No.: 3:24-bk-00496-BAJ

Debtor. Chapter 11

______________________________ /

**UNITED STATES TRUSTEE'S EXHIBIT LIST (Part IV)**
Trial on Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Document No. 20)
Trial Date: April 9, 2024, at 9:00 a.m.

| Exh. No. | Document Description | Date Identified | *Date Admitted* | *With or Without Objection* |
|---|---|---|---|---|
| 133 | Statement of Small Business Owner Kim Nash (A Complete Home Inspection, LLC) | 4/9/24 | 4/9/24 | w/out |
| 134 | Nash: Email with McMann, Crestar, and Alliance Mortgage Now re a line of credit agreement and amendment | | | |
| 135 | Nash: Email wiring instructions for $7,800 fee | | | |
| 136 | Nash: Email re fee breakdown | | | |
| 137 | Nash: Email re the BELOC timeline | | | |
| 138 | Nash: Email re the new loan amount | | | |
| 139 | Nash: Email re Regions Bank Wire $7,900 | | | |
| 140 | Nash: Email re underwriter inquiry | | | |
| 141 | Nash: Email with Retention Agreement | | | |
| 142 | Nash: Email re Regions $20k wire to Genie for Due Diligence Fees | | | |
| 143 | Nash: Email attaching signed Bridge Loan Agreement | | | |
| 144 | Nash: McMann BELOC agreement signed | | | |
| 145 | Nash: BELOC agreement (altered by Genie in Arbitration) | ✓ | ✓ | ✓ |

| | | | | |
|---|---|---|---|---|
| 146 | Nash: Email attaching Security Agreement | 4/9/24 | 4/9/24 | w/out |
| 147 | Nash: Email forwarding BELOC Loan Agreement | | | |
| 148 | Nash: Email confirming $37,500 wire to Genie for 3 months pre-paid interest/ construction costs | | | |
| 149 | Nash: Email with McMann re loan agreement | | | |
| 150 | Nash: Email re Second Operating Agreement | | | |
| 151 | Nash: Email to McMann with HEIC file | | | |
| 152 | Nash: Email re Bridge Loan Agreement | | | |
| 153 | Nash: Email receipt of signature page forwarded to underwriting | | | |
| 154 | Nash: Email re first tranche in a week | | | |
| 155 | Nash: Email re first tranche week of 4/2/23 | | | |
| 156 | Nash: Email re funding update | | | |
| 157 | Nash: Email re status of the problem | | | |
| 158 | Nash: McMann email advising don't cancel BELOC | | | |
| 159 | Nash: Email requesting an update | | | |
| 160 | Nash: Email re hardship | | | |
| 161 | Nash: Hughes email re alternative financing | | | |
| 162 | Nash: Email re Zoomeral | | | |
| 163 | Nash: Genie letter re 5/5/23 text with David Hughes | | | |
| 164 | Nash: Genie Arbitration Complaint against A Complete Home Inspection, LLC | | | |
| 165 | Small Business Owner Shailesh Patel (North Haven Lodging Partners, LLC and Wallingford Lodging Partners, LLC) Emails regarding NCNDA agreement | | | |
| 166 | Shailesh Patel: Email with fillable BELOC application for North Haven and Wallingford | | | |
| 167 | Shailesh Patel: Email re $7,500 wire | ✓ | ✓ | ✓ |

| | | | | |
|---|---|---|---|---|
| 168 | Shailesh Patel: Email with Business Plan template | 4/9/24 | 4/9/24 | w/out |
| 169 | Shailesh Patel: Email re concerns about BELOC | | | |
| 170 | Shailesh Patel: Email attaching the corrected North Haven BELOC agreement (2816) | | | |
| 171 | Shailesh Patel: Email attaching the corrected Wallingford BELOC agreement (2815) | | | |
| 172 | Shailesh Patel: Email that all documents are in order, next send the wires | | | |
| 173 | Shailesh Patel: Email confirming $1.8m North Haven wire confirmation on 5/3/23 and $1.8m Wallingford wire confirmation on 5/3/23 both to Genie | | | |
| 174 | Shailesh Patel: Email re 75-day cycle and first tranche | | | |
| 175 | Shailesh Patel: Email re material and labor cost incurred for hotel construction, request funds | | | |
| 176 | Shailesh Patel: Email re termination of ICA loan 2816 and 2815 | | | |
| 177 | Shailesh Patel: Email requesting conference to discuss termination | | | |
| 178 | Shailesh Patel: Email to Hughes post conference forwarding termination template for termination and refund via a Zoomeral link | | | |
| 179 | Preet Patel (Representative for North Haven Lodging Partners, LLC and Wallingford Lodging Partners, LLC) Wiring instructions for North Haven Loan 2815 to Genie account | | | |
| 180 | Preet Patel: Wiring instructions for Wallingford Loan 2816 to Genie account | | | |
| 181 | Preet Patel: Email to David re dealings with McMann | | | |
| 182 | Preet Patel: Emails regarding expected refund date of 10/13/23 | | | |
| 183 | Preet Patel: Email with David Hughes re Zoomeral tutorial | | | |

| | | | | |
|---|---|---|---|---|
| 184 | Preet Patel: Email with David Hughes re expected ICA refund the week of 10/13/23 | 4/9/24 | 4/9/24 | w/out |
| 185 | Preet Patel: Email re ICA termination refund status | | | |
| 186 | Preet Patel: Genie's attorney's letter (Walker Law Office) re Update on Funding Delays | | | |
| 187 | Preet Patel: Emails with McMann forwarding Genie's letters for North Haven Lodging and Wallingord | | | |
| 188 | Preet Patel: Emails with McMann re their agreement with Genie re refunds | | | |
| 189 | Preet Patel: Emails requesting Genie provide $3.6m refund to the applicants | | | |
| 190 | Preet Patel: Email from David Hughes re teleconference to discuss the refund | | | |
| 191 | Preet Patel: Emails with McMann re Genie's prior requests for BELOC terminations and ICA refund | | | |
| 192 | Preet Patel: Email with David Hughes re the processing of the ICA refund | | | |
| 193 | Preet Patel: Email with David Hughes re further communications through counsel | | | |
| 194 | Preet Patel: McMann counsel's (Klapman) demand letter that Genie provide the $3.6m refund | | | |
| 195 | Preet Patel: Applicant counsel's (Morris) demand to McMann to refund the $3.6m ICA deposit | | | |
| 196 | Preet Patel: Applicant counsel's (Morris) demand to Genie re failure to refund post termination | | | |
| 197 | Preet Patel: Text messages with Walter Trock of McMann | | | |
| 198 | Preet Patel: Text messages with David Hughes of Genie | | | |
| 199 | Preet Patel: Zoomeral messages with David Hughes | ✓ | ✓ | ✓ |

BY: Kate Menard
Deputy Clerk

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
www.flmb.uscourts.gov

In re:

Genie Investments NV, Inc.,

Debtor.
_______________________________ /

Case No.: 3:24–bk–00496–BAJ

Chapter 11

**UNITED STATES TRUSTEE'S EXHIBIT LIST (Part V)**
Trial on Motion to Appoint Chapter 11 Trustee, or, in the Alternative, Appoint Examiner, Dismiss Case, or Convert Case to Chapter 7 (Document No. 20)
Trial Date: April 9, 2024, at 9:00 a.m.

| **Exh. No.** | **Document Description** | **Date Identified** | ***Date Admitted*** | ***With or Without Objection*** |
|---|---|---|---|---|
| 200 | Docket for U.S. District Court Case No. 6:24-cv-00271-ACC in the Middle District of Florida – Genie Investments NV, LLC v. Joshua Wearmouth, et al. | 4/9/24 | 4/9/24 | w/out |
| 201 | Complaint filed by Genie against Wearmouth and Velanos Principal Capital in the U.S. District Court Case No. 6:24-cv-00271-ACC for violations of the Exchange Act, California Corporate Code, and fraud seeking $10m+ in damages, etc. | ↓ | ↓ | ↓ |
| 202 | Docket for U.S. District Court Case No. 1:23-cv-16264 in the Northern District of Illinois – North Haven Lodging Partners, LLC and Wallingford Lodging Partners, LLC v. McMann Commercial Lending LLC and Genie Investments NV | ↓ | ↓ | ↓ |
| 203 | Complaint filed by North Haven and Wallingford against McMann and Genie in the U.S. District Court Case No. 1:23-cv-16264 for breach of contract, conversion, fraudulent transfer, fraudulent misrepresentation, breach of fiduciary duty, constructive trust, and unjust enrichment | ↓ | ↓ | ↓ |
| 204 | Suggestion of Bankruptcy filed by Genie in U.S. District Court Case No. 1:23-cv-16264 | ↓ | ↓ | ↓ |

| | | | | |
|---|---|---|---|---|
| 205 | Docket for U.S. Bankruptcy Court Adversary Proceeding Case No. 3:20-ap-07029, Gargula v. Hughes, II | 4/9/24 | 4/9/24 | w/out |
| 206 | U.S. Trustee's Complaint Objecting to the Discharge of Debtor David C. Hughes, II in Adversary Proceeding Case No. 3:20-ap-07029 | | | |
| 207 | U.S. Trustee's Motion for Entry of Default and Motion for Default Judgment in Adversary Proceeding Case No. 3:20-ap-07029 | | | |
| 208 | U.S. Trustee's Default Judgment to Deny Discharge of Debtor David C. Hughes, II in Adversary Proceeding Case No. 3:20-ap-07029 | | | |
| 209 | Genie's List of Money Owed to Customers provided to the U.S. Trustee | | | |
| 210 | Genie's Proof of Refunds provided to the U.S. Trustee | | | |
| 211 | Genie's Morgan Stanley Statement for Genie Investments NV for the period of January 1-31, 2024, provided to the U.S. Trustee | | | |
| 212 | Genie Investments NV's Summary of Assets, Schedules and Statements (Doc. No. 39) | | | |
| 213 | Genie Investments NV's Statement of Financial Affairs (Doc. No. 40) | | | |
| 214 | Genie Investments NV's List of Equity Security Holders (Doc. No. 41) | | | |
| 215 | Genie Investments NV's Statement of Corporate Ownership (Doc. No. 42) | | | |
| 216 | Genie Investments NV's Chapter 11 Case Management Summary (Doc. No. 44) | | | |

BY: Kate Menard
Deputy Clerk