FILED INTAKE USBC
OCT 20 '26 PM3:49

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
In re: Genie Investments NV Inc., Debtor.
Case No. 3:24-bk-00496-BAJ
Chapter 7

# VERIFIED RESPONSE AND PARTIAL OBJECTION TO TRUSTEE'S MOTION FOR SUMMARY JUDGMENT ON TRUSTEE'S OBJECTION TO CLAIM 5-3 OF CHARLES BLAKE STRINGER/NUTRA-ACRES LLC

COMES NOW John Michael Cohan, protected person under Marsy's Law and the First Amendment of the United States Constitution, interested party, pro se, and respectfully responds to and partially objects to the Trustee's Motion for Summary Judgment on Trustee's Objection to Claim 5-3 (Bankr. Doc. 759). [1]

## I. THE UNDERSIGNED AGREES WITH THE TRUSTEE ON THE FOLLOWING POINTS

1. The agreements control.

2. The operative loan agreement is between Nutra-Acres LLC and McMann Commercial Lending LLC, ***not*** the Debtor.

3. Creditors and the Debtor are ***not*** in privity of agreement for the $24 million loan.

[1] The six (6) individuals who filed the Joinder have distanced themselves from Claim 5-3. The Joinder states: "A joint hearing on claim preservation and Ponzi-fraud determination, including The Feb. 2027 hearing is separate and this filing asks nothing about it." (3:25-ap-00011, Adv. Doc. 158, at ¶ 24, incorporated by reference). That is a disclaimer, not an endorsement. The six (6) signers do *not* adopt the "Ponzi-scheme" theory underlying Claim 5-3.

4. The $24 million loan was *never* to be disbursed to Nutra-Acres LLC from the Debtor, instead McMann Commercial Lending LLC was the party contracted to carry out this obligation.

5. The Bridge Loan proceeds were *never* supposed to be disbursed to Nutra-Acres LLC. The Creditors *cannot* have a breach of contract claim against the Debtor for failure to fund the bridge loan because the Creditors were never entitled to receive the proceeds of the bridge loan.

6. The Intercreditor Agreement does ***not*** create an obligation for the Debtor to fund the $24 million loan.

7. Claim 5-3 is at least inflated by $13,847,750.

II. THE UNDERSIGNED OBJECTS TO THE FOLLOWING POINT

8. The Trustee asks the Court to allow Claim 5-3 as a general unsecured claim in the amount of $400,000 (Bankr. Doc. 759 at 1, 22).

9. That request *contradicts* the Trustee's *own* argument.

10. If the agreements control, and the agreements plain language say the fees are "non-refundable", then the $400,000 was non-refundable too, Section 2.03(b) of the Bridge Loan Agreement (Bankr. Doc. 105 at pg. 105). The Due Diligence agreement at states similar plain "non-refundable" language in Section 2

(*attached*). The Due Diligence Agreement *further* states "The interest of this Bridge Loan is 100% non-refundable". In other words, *not only* did the Bridge Loan agreement plainly state its was "non-refundable" in Section 2.03(b), but also, the agreement that preceded the Bridge Loan agreement, the Due Diligence agreement also states that the Bridge Loan interest is "non-refundable", in plain language.

11. The Trustee argues that the agreements control, and the undersigned agrees. However, the Trustee applies this principle selectively. The Trustee asks this Court to enforce the McMann BELOC Agreement to defeat the $24 million claim, but then asks the Court to ignore the plain language of the Bridge Loan Agreement and Due Diligence Agreement to allow a $400,000 claim. This is *not* consistent application of contract law; it is result-oriented advocacy. Mr. Stringer testified at the April 9, 2024 trial. Mr. Mickler read the Due Diligence Fee Agreement into the record. Section 2 states the borrower shall pay a "non-accountable and non-refundable fee of $40,000." (Bankr. Doc. 79, April 9 Transcript, Page 58, Lines 7-15). Mr. Stringer confirmed he signed it. Mr. Mickler then read Section 2.03(b) of the Bridge Loan Agreement: "Borrower understands that this payment is fully non-refundable." (Bankr. Doc. 79, April 9 Transcript, Page 63, Lines 14-22). Mr. Stringer confirmed he signed that agreement as well. The Trustee admits Mr. Stringer paid $400,000 to the Debtor. (Bankr. Doc. 759, Pg. 5, ¶ 9). Under the plain

language of the agreements, that $400,000 is "non-refundable". The Trustee *cannot* argue the agreements control to defeat the $14 million claim while ignoring the same agreements to allow the $400,000 claim. The Trustee states: "Creditors and the Debtor are not in privity of agreement for the $24 million loan." (Bankr. Doc. 759, Pg. 3, ¶ 6). This is correct. The only agreements between the Claim 5-3 and the Debtor are the Bridge Loan Agreement and the Due Diligence Agreement. Both contain explicit "non-refundable" language. If there is no privity for the $24 million loan, then the only enforceable agreements are the ones that say the fees are "non-refundable". The Trustee's request to allow the $400,000 claim is therefore inconsistent with his own legal theory.

12. The Creditors' Addendum (Bankr. Doc. 786), filed after the undersigned's Response, attempts to abandon the $24 million privity theory entirely and now pleads agency, ratification, fraud in the inducement, and unjust enrichment. Those theories were *not* in Claim 5-3 as filed and are new claims asserted more than two (2) years after the proof of claim. They are untimely and should be disregarded or treated as an amendment requiring good cause, not a response.

13. The Addendum's own exhibits defeat the new agency theory. Exhibit C is the March 9, 2023 BELOC Agreement between Nutra-Acres and McMann — not the Debtor. McMann is defined as "Lender." Nutra-Acres terminated its agreement with McMann on June 23, 2023. Nothing in any exhibit gives the Claim 5-3 the

right to control the Debtor's lending decisions, which Florida law requires for agency. Acceptance of the $400,000 is *not* ratification of a $24 million funding obligation the Debtor *never* had.

14. The Trustee filed suit against all of the undersigned's companies *without* reviewing the bank records (3:25-ap-00011, Adv. Doc. 1; Bankr. Doc. 389, 390) and the April 2024 trial that preceded and ordered the Trustee's appointment (Bankr. Doc. 203). According to the Trustee's counsel in an email, "The Trustee does not have a recording or transcript of the April 2024 trial" (Bankr. Doc. 781-22, pg. 49). This Court has already advised many of the alleged creditors that he feared that they would *not* appear on the refund list; Debtor's counsel already had many of the alleged creditors during that trial admit that their agreements stated the fees were non-refundable, had the Trustee reviewed the April 2024 trial audio or transcript, which was indeed on the record prior to writing this objection (Bankr. Docs. 79, 80), the Trustee would already know this and would *not* be filing frivolous arguments, pleadings or litigation wasting Estate and Judicial resources.

15. The Trustee also settled — entirely off the record — with the attorneys whose lack of due diligence led the Debtor into the prime-bank fraud at issue. That settlement agreement purported to bar the undersigned's personal claims through an "unappealable" order, which this Court approved. In doing so, the Court struck the undersigned's objection and cancelled the hearing that directly affected those

personal claims (Bankr. Doc. 471). This occurred the day after a police report was *re*-filed (Bankr. Doc. 470) — a report that this Court has currently declined to take judicial notice of [despite the law requiring them to do otherwise] — and the police report was then removed from the docket for a second time without notice, motion, order, or hearing (Bankr. Docs. 476, 477, 490, 781-8).

16. Throughout these and the related proceedings, the opposing parties have repeatedly labeled the undersigned "vexatious" and applied other unsupported characterizations — "fraudulent scheme," "fantastic government manipulations," "conspiracy theory," "frivolous," etc. — in filings across multiple courts (Bankr. Docs. 347, 648; 2:26-00001, Misc. Docs. 18, 21; 1:25-cv-02009, ECF No. 70; 2:23-cv-07288, Doc. 49, all incorporated by reference). These characterizations [used to prejudice Cohan and Hughes] are completely *unsupported* by the agreements, reality and the record in this and any other courtroom.

17. **Everything** Cohan puts in front a court (*unlike* Mr. Stringer and the Trustee), **is** supported by documentation/evidence (Bankr. Doc. 781), including but not limited to, the alteration of the §341 audio (Bankr. Doc. 501, Bankr. Doc. 781-6), which is supposed to be, by law (Federal Rule of Bankruptcy Procedure 2003(c)), “record[ed] verbatim”. If the Court refuses or fails to look at the documentation/evidence, that is an error by the Court, ***not*** Cohan (2:26-00001, Misc. Docs. 85, 86, 86-1, 91). Cohan firmly believes that this was the reason for

[1] the filing of the foreclosure order (Bankr. Docs. 347, 660) and its subsequent strikes, the reason for [2] the Trustees' silence on many of the issues, including but not limited to *fraud on the court*, brought before this Court, [3] the unsupportable labeling, the reason that [4] the Court currently refusing to provide an indigent party copies of the many of the hearings, the reason that [5] the Court refuses to send all of Cohan's appeals to the District Court, the reason why [6] there was no evidentiary hearing prior to conversion after the flawed examiner report (Bankr. Doc. 146) surfaced and the reason for [7] the recent Order to Show Cause (Bankr. Doc. 734) that threatens to deny all of Cohan's filings, grant all filings against Cohan and impose filing restrictions against Cohan. Not because they are "vexatious", "frivolous" or that Cohan intentionally attempted to mislead the court with any [unidentified] citations or quotations, but because the Trustees *cannot* argue with Cohan's evidence or Cohan's fact-based record-supported arguments and the Court is seemingly protecting them from impartial scrutiny.

18. However, to continue with the *plain* language agreement argument, *made by* the Trustee and *supported by* Cohan, Section 3.6 of the McMann BELOC Agreements, *which are nearly identical to every Genie Investments NV Inc. BELOC Agreements*, states that the ICA Payment "shall remain part of the Interest Reserve Account and subject to the provisions of this Agreement, and not

refundable to the Borrower unless otherwise specifically provided for in this Agreement."

19. Section 3.9(a) states that the LOC Fee is "nonrefundable" and "has been fully earned by Lender."

20. Section 3.9(b) states that the Promote Fee is "nonrefundable" and "has been fully earned."

21. The Due Diligence Fee Agreement, Section 2, states that the fee is "non-refundable" and that "This interest of this Bridge Loan is 100% non refundable."

22. The Bridge Loan Agreement, Section 2.03(b) states that the interest is "100% non-refundable."

23. The agreements are written in plain English. "Non-refundable" means the money does ***not*** get returned under any circumstances.

24. The Trustee cannot argue that the agreements control for the $13.8 million portion of the claim, and then ask the Court to ignore the same plain "non-refundable" language for the remaining $400,000 or any other "non-refundable" fee deriving from these plain language agreements.

25. The Trustee argues that "none of the proceeds of the Bridge Loan were to be actually disbursed to Nutra-Acres." (Bankr. Doc. 759, Pg. 3, ¶ 4). This is true but

irrelevant. The Bridge Loan Agreement required the Lender to hold the funds in the Lender's account on behalf of the Borrower. (Bankr. Doc. 759, Pg. 105, Bridge Loan Agreement, Section 2.02, Bankr. Doc. 781-5). Mr. Cohan testified that the bridge loans were funded and that the funds were held in the Morgan Stanley account. "The bridge loan was funded." (Bankr. Doc. 80, April 10 Transcript, Pgs. 118-119). Mr. Cohan also testified that there were sufficient funds to cover the bridge loans at all times. (Bankr. Doc. 80, April 10 Transcript, Page 109, Lines 14-18). The Examiner was tasked to find fraud and found none (Bankr. Doc. 146). The Trustee's argument that the Bridge Loan was *not* funded because it was *not* disbursed directly to Mr. Stringer ignores the plain language of the agreement, which required the funds to be held in the Lender's account, as the Trustee concedes, as funds were.

26. Additionally, as determined at April 2024 trial, the bridge loan proceeds were held in the Debtor's account and credited to Nutra-Acres LLC, *therefore* the Debtor satisfied its contractual obligations. The Trustee *cannot* selectively enforce the same agreement language. If the agreements control, they control for the whole claim, not just the part the Trustee wants to reduce.

27. Section 7.1 of the Business Expansion Line of Credit agreement required the Lender to open the ICA with its wholesale lender. Section 13.7(c)(ix) expressly excuses the Lender from default if that wholesale lender fails to perform. The plain

language of the contract therefore both mandated the act and allocated its risk to the wholesale lender relationship — not to the Lender. The Lender a.k.a. the Debtor, *cannot* be held liable for gross mismanagement of an act the contract required and a risk the contract expressly excused that the Borrowers expressly to agreed upon the execution of said contract.

28. Under the plain language of Section 13.8 of the Debtor's BELOC Agreement, which many of the alleged creditors clearly ignored, if the Debtor prevails, the other side pays the Debtor's reasonable attorneys' fees and costs. Section 13.7(c)(ix) defines the force majeure event as *"failure of the Lender's wholesale lender from preforming under the terms of the agreement between the Lender and the wholesale lender."* Section 13.7(c) additionally required the Lender to give notice and use reasonably diligent efforts to end or minimize the wholesale lender's failure. The Debtor did both — it noticed all parties, pursued arbitration and litigation against Velanos Principal Capital, Inc., the wholesale lender, and after a year of pursuit, multiple wires being "held" according to the wholesale lender as "legitimate" (Text message from Scott Oh, counsel for Debtor at the time) wire trace reports, and a fake banking portal with Nordic Trust Alliance (3:25-cv-01991, Doc. 4; 3:24-cv-02392, Doc. 1) arrived at a settlement (6:24-cv-00271-ACC-LHP, Doc. 16) before the Trustee was appointed (Bankr. Docs. 203, 781-14). The Trustee then administered the agreement, including a subsequent amendment (Bankr. Doc.

257) and collected on the already-in-place settlement. That is ***not*** gross mismanagement — that is compliance with the plain language of the agreement. Per the plain language of the agreement, the recovery being less than the amount going out limits the refund pool; it does ***not*** constitute a breach, ***nor*** does it constitute gross mismanagement. And the company's survival is precisely what the Force Majeure clause, 13.7(c), was designed to protect. It does ***not*** say the company must be destroyed and it does ***not*** say any favorable provision in the agreement for the Debtor should be ignored.

29. Section 13.7(c)(ix) identifies the force majeure event as *"failure of the Lender's wholesale lender from preforming under the terms of the agreement between the Lender and the wholesale lender."* That is the event. It is ***not*** a default by the Debtor. It is ***not*** misconduct by the Debtor's principals. It is ***not*** a failure of the Debtor's affiliates. It **is** the failure of a third party — the wholesale lender. The force majeure event in this case was caused by Velanos Principal Capital, Inc. whose program was sold to and advocated for to the Debtor by Scott Oh and Warren Law Group. The failure of the wholesale lender to perform — the event Section 13.7(c)(ix) identifies — was caused by Velanos and those attorneys, ***not*** by Cohan, ***not*** by Hughes, and ***not*** by any of their affiliated entities.

30. The Trustee is correct that Mr. Stringer *cannot* bring a claim against the Debtor for the $24 million loan. However, even if he could, his claim for "actual and

consequential damages" is barred by the plain language of the McMann BELOC Agreement and the Bridge Loan Agreement. Section 13.7(b) of the McMann BELOC states: "in no event shall Lender or its affiliates be liable to the Borrower or any other non-party Person, Borrower's subsidiaries, partners or other related entities, for any indirect, special, incidental or consequential damages." (Bankr. Doc 759, Exhibit A, Pg. 46). The Trustee's Motion should be granted as to the $13,847,750 reduction, but the request to allow the $400,000 claim should be denied.

31. Section 13.7(c) requires the Lender to give notice of the force majeure event and to use reasonably diligent efforts to end the failure or delay and minimize its effects. It does ***not*** require the Debtor to dissolve its own company. It does ***not*** require the Debtor to pursue its own principals. It does ***not*** require the Debtor to dismantle its affiliates. The contract says what it says. It requires notice and diligent efforts. It does ***not*** require self-destruction. The Debtor provided McMann Commercial Lending LLC with notice and instructed McMann to pass the information along to its borrowers. According to the Trustee's own argument, if McMann Commercial Lending LLC failed to notice his customers of the force majeure event, which Cohan wholeheartedly believes that McMann did *not* notice his customers, that liability falls on McMann, *not* the Debtor. Section 14.14 contains the indemnification clause, which excludes indemnification only for the

Lender's "own gross negligence or willful misconduct." Section 14.3 states that "Borrower's disclosure of a confidential terms shall constitute a material breach of this Agreement." Section 14.5 states that breach of non-disparagement "shall constitute an Event of Default." Section 13.8 states that "The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys' fees." The affiliates and their principals are protected. The Trustee blatantly ignored the plain language of the agreements when filing the adversary complaint. If the force majeure event was caused by a third party, then the parties who suffered the loss — the Debtor, its affiliates and its principals — are entitled to the protection the contracts provide (i.e. Section 14, indemnification, non-disparagement, confidentiality, etc.), *not* to be pursued as if they themselves caused the event.

32. The Addendum repeats the Ponzi-scheme allegation but cites no finding. The Yip Report (Bankr. Doc. 146) contains no finding of fraud — only the repeated use of the word "potential" at ¶¶ 233, 234. The Court found at the April 2024 trial that the U.S. Trustee failed its burden and the records were "impeccable." The Trustee admitted under oath on June 24, 2025 that he relied "primarily on the Yip Report" and the Trustee, at the same trial, could *not* identify a fraud finding in it (Bankr. Doc. 146).

33. The damages claimed in Addendum Exhibit D — forced-sale land shortfall, capital-gains tax, crop losses, depreciation recapture — are indirect, special, incidental, and consequential damages expressly barred by Section 13.7(b) of the McMann BELOC and Section 10.12 of the Bridge Loan Agreement. They are not recoverable as a matter of contract. If the fees are "non-refundable", there are no direct damages either.

## III. THE SAME RULE APPLIES TO EVERY CLAIM

34. If the Court enforces the agreements as written against Claim 5-3, the same rules applies to every claim in this case.

35. Some fees are "non-refundable". Some are not. Some customers received due diligence and bridge loan agreements, others received the Business Expansion Line of Credit (BELOC) Agreements. Some had BELOCs with McMann and other third-party resellers, others had BELOCs directly with the Debtor. Regardless, the agreements are the agreements. The plain language is the plain language.

36. The undersigned requests that the Court apply the agreements consistently across the board.

## IV. THE REDUCTION IN CLAIMS AFFECTS COHAN'S STANDING

37. The Trustee's motion, if granted, would reduce Claim 5-3 from $14,247,750 to

$400,000 (Bankr. Doc. 759 at 1, 22). Even if including the "non-refundable" $400,000, that is a drastic reduction in claims.

38. The record also reflects a substantial reduction to Claim 4 (Belle Maison Realty, LLC) — from approximately $3,000,000 to approximately $70,000. (Bankr. Docs. 513, 583).

39. The Trustee has previously acknowledged that the claims could be reduced from approximately $39 million to $13–14 million. (2:26-mp-00001, Misc. Doc. 45).

40. These reductions, taken together, and *there should be more* (i.e. Bankr. Docs. 650, 755), materially affect the surplus analysis. An equity holder has standing where there is a reasonable possibility of a surplus.

41. The undersigned requests that the Court consider the effect of these reductions on the standing analysis, which remains *pending*.

42. For the record, Nutra-Acres LLC and its principal are one of the parties that *admittedly* started this false narrative about the Debtor and its principal pertaining to the Florida Bankruptcy, Federal Rule of Civil Procedure 36(a)(3) and Nutra-Acres LLC and its principal's claim, along with the claims of the other parties' who engaged in similar conduct should be reduced accordingly. Please see 3:24-bk-00496, Bankr. Doc. 355, Bankr. Doc. 781-10, contemporaneously filed VERIFIED

MOTION TO DEEM REQUESTS FOR ADMISSION ADMITTED, VERIFIED MOTION TO COMPEL ANSWERS TO INTERROGATORIES, VERIFIED MOTION TO COMPEL PRODUCTION OF DOCUMENTS, and 2:26-mp-00001, Misc. Docs. 86, 86-1, all incorporated by reference.

43. For the reasons stated above, the Trustee's request to allow Claim 5-3 as a general unsecured claim in the amount of $400,000 is inconsistent with his own legal theory and the plain language of the agreements. If the agreements control, the $400,000 in fees is indeed "non-refundable". The Court should deny the request to allow the $400,000 claim.

V. REQUESTED RELIEF

WHEREFORE, the undersigned respectfully requests that this Court:

i. Grant the Trustee's Motion for Summary Judgment on Claim 5-3 (Doc. 759) as to the *dramatic* $13,847,750 reduction;

ii. Deny the request to allow $400,000, because plain language of the agreements say the fees are "non-refundable";

iii. Apply the agreements consistently to all claims in this case as all agreements are materially identical in structure and substance to the agreement at issue in this case; and

iv. Disregard the new theories asserted in the Addendum (Bankr. Doc. 786) as untimely, or in the alternative strike Bankr. Doc. 786, Exhibits A–D to the extent they assert claims not raised in Claim 5-3.

v. Confirm that the Addendum's own concession that the Debtor received only $400,000 — and that McMann was the $24 million lender — supports the *pending* standing analysis.

vi. Consider the effect of the claim reductions on the standing analysis.

VERIFICATION

I, John Michael Cohan, declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct to the best of my knowledge and belief.

Dated: 10-20-2026

**Respectfully submitted in good faith,**

**John Michael Cohan, without prejudice, without recourse, UCC 1-308, 1-103**
iustusprocessus@outlook.com

Certificate of Service

I hereby certify that all interested parties have been duly served a copy of the foregoing document and/or its attachments by the CM/ECF system, U.S. Mail and/or email.

Debtor
Genie Investments NV Inc.
represented by Bryan K. Mickler
Mickler & Mickler
5452 Arlington Expressway
Jacksonville, FL 32211
904-725-0822
Email: court@planlaw.com

U.S. Trustee
represented by Scott E. Bomkamp
DOJ-Ust
United States Trustee
400 W. Washington St., Ste 1100
Orlando, FL 32801
407-648-6069
Email: scott.e.bomkamp@usdoj.gov

Chapter 7 Trustee
Aaron R. Cohen
represented by Raye Curry Elliott
Akerman LLP
401 East Jackson Street, Suite 1700
Tampa, FL 33602
(813) 223-7333
Email: raye.elliott@akerman.com

David C. Hughes II
davidchoatehughes@gmail.com

Scott W. Spradley, Attorney for Creditor Stringer/Nutra-Acres — Law Offices of Scott W. Spradley, P.A., 301 S. Central Avenue, P.O. Box 1, Flagler Beach, FL 32136; scott@flaglerbeachlaw.com

# GENIE INVESTMENTS

*Believe in your Dreams*

January 18, 2023

**Wiring Instructions**

As per your Due Diligence Fee Agreement, the Borrower must wire the necessary amount to:

**Bank Name & Address:**
Chase Bank
1515 Atlantic Boulevard
Jacksonville, Florida 32207

**Account Mailing Address:**
401 Ryland Street Suite 200-A
Reno, Nevada 89502 8

**Routing Number:** 021000021

**Credit Account Number:** 852288502

**Account Title:** Genie Investments NV

*This fee for Due Diligence is 100%* ***non-refundable.***

***When sending the wire, please write "Due Diligence" in the Memo***



Initials: CBS

**DUE DILIGENCE FEE AGREEMENT**

This Due Diligence Fee Agreement (this "**Agreement**"), dated as of January 18, 2023 (the "**Effective Date**"), is entered into between Nutra-Acres LLC, having an address at 130 North Dumas Avenue, Dumas, Texas 79029 ("**Borrower**"), and Genie Investments, having an address at P.O. Box 5886, Wilmington, Delaware 19808 ("**Company**"), and together with the Borrower, the "Parties," and each, a "Party").

WHEREAS, Borrower desires to compensate **Company** for its costs to conduct certain due diligence services ("Services") upon the terms and conditions hereinafter set forth, and **Company** is willing to perform such Services.

In consideration of the mutual covenants and agreements hereinafter set forth, the Parties agree as follows:

1. **Performance of Services**

Upon request of Company, Company agrees to the Services in connection with Borrower applying for funding.

2. **Payment**

As a material inducement to Company to commence the Services, the Borrower shall pay Company a non-accountable and non-refundable fee of Forty Thousand Dollars ($40,000), payable prior to commencement of the Services.

Payment of the diligence fee is not a guarantee that Company will offer funding to Borrower, or that any offer will be on terms and conditions acceptable to Borrower. Assuming sufficiency of the diligence materials provided by Borrower, Company intends to offer a Bridge Loan to Borrower to cover the Interest Credit Account amount. The maximum cost of this Bridge Loan will be Fifteen Thousand dollars per One Hundred Thousand dollars needed ($15,000/$100,000) or Fifteen percent (15%) of the Interest Credit Account. The interest of this Bridge Loan is 100% non-refundable.

3. **Term and Termination**
   a. Terms
      This Agreement shall commence as of the Effective Date and shall continue thereafter until the completion of the Services, unless sooner terminated pursuant to this section.

   b. Termination
      Company may terminate this Agreement, upon the occurrence of any of the following events:

      a. Borrower fails, in the absence of a bona fide dispute with respect to such payment, to make payment for Services on its due date, provided however, that Borrower may cure such breach by making



Initials: CBS

payment within 5 days of Borrower's receipt of notice that it failed to make such payment when due;

b. Borrower requests that Company violate any applicable law or the rules of any regulatory body having jurisdiction and Borrower does not promptly revoke such request upon Company's refusal to comply;

c. Borrower requests that Company take any action which would result in the commission of a fraud upon any person or party and Borrower does not promptly revoke such request upon Company's refusal to comply; or

d. Borrower requests that Company take any action that, upon the advice of counsel to Company, could subject Company to liability or material damages in a civil litigation and Borrower does not promptly revoke such request upon Company's refusal to comply).

**4. Borrower Representations**

a. Reliance

Borrower acknowledges and agrees that all materials and information Borrower provided to Company is accurate and complete, and that Company will, without independent verification, rely on it for the purpose of potentially providing funding. Company shall not assume any responsibility or have any liability for such materials or information. Borrower represents that Borrower has the right to supply such information to Company and that the supply of such information by Borrower and its use by Company for the purposes of the provision of the Services will not infringe any rights held by any third party, involve the unauthorized use of confidential information belonging to a third party or result in the breach by Borrower or Company of any law, regulation, fiduciary duty, intellectual property right or agreement.

b. Litigation

Borrower (i) is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge or (ii) is not a party or is not threatened to be made a party to any action, suit, proceeding, hearing, or investigation of, in, or before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator, in each case that could be reasonably expected to result in a material adverse change in the business, financial condition, operations, results of operations, or future prospects of Borrower.



Initials: CBS

**5. Indemnification**

Borrower shall indemnify Company against any cost, loss, expense or liability which may be suffered or incurred by Company in the proper performance of its obligations under this Agreement including, without limitation, arising from any misrepresentation, misconduct, negligence or dishonesty on the part of any third party, except to the extent that the cost, loss, expense or liability is due to the breach of this Agreement, violation of law, negligence, willful
misconduct, fraud or dishonesty on the part of Company or to the extent that such liability cannot lawfully be excluded or limited.

6. **Independent Contractor**

Company's status shall be that of an independent contractor, and not that of an agent or employee of Borrower. Company shall not hold itself out as an employee or agent of Borrower except as contemplated by any other ancillary agreement.

**7. Arbitration**

Any dispute, claim or controversy arising out of or relating to this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, shall be determined by binding arbitration in New Castle County, Delaware, before one arbitrator. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures or by ADR Services pursuant to its Arbitration Rules, at the election of the party initiating the arbitration. The Party initiating a demand for Arbitration shall serve notice of such demand pursuant to the notice requirements set forth in Section 9 herein. Within three (3) banking-business days of service of any demand for arbitration, the Parties to the dispute shall work cooperatively to mutually select an agreeable arbitrator. If the Parties to the dispute are unable to reach agreement on an arbitrator, then the arbitration shall be selected pursuant to the JAMS or ADR Services arbitration selection protocol. Each side shall be entitled to propound one (1) set of requests for production of documents. The requests in each set shall not number more than twenty-five (25) and shall be limited to documents relevant to the issues to being arbitrated. Each side shall further be entitled to notice and take no more than three (3) depositions, which shall last no more than three (3) hours per deponent, including reasonable breaks and objections. No other discovery shall be permitted, except upon a showing of good cause to the arbitrator. Any disputes regarding discovery shall be submitted to and decided by the arbitrator. The prevailing party shall be entitled to an award of its reasonable costs and expenses, including but not limited to, attorneys 'fees, in addition to any other available remedies. Any award rendered therein shall be final and binding on each and all of the parties thereto and their personal representatives, and judgment may be entered thereon in any court of competent jurisdiction. This clause shall not preclude Parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction. Any action or proceeding brought to interpret or enforce this agreement to arbitrate shall be governed by the laws of the State of Delaware. This agreement to arbitrate is intended by the Parties to constitute a waiver of any right to trial by jury, or the right to proceed in any state or federal court for resolution of any dispute arising in relation to the enforcement or interpretation of this Agreement, or this agreement to arbitrate.



Initials: CBS ________

**8. Confidentiality**

During the term of this Agreement, the Parties may communicate to each other certain confidential information to enable Company to perform the Services hereunder, or Company may develop confidential information for Borrower. Each Party agrees (i) to treat, and to cause its employees, agents, subcontractors and representatives, if any, to treat as secret and confidential, all such information, and (ii) except as necessary in the performance of the Services, not to disclose any such confidential information or make available any reports, recommendations or conclusions which Company may make for Borrower to any person, firm or corporation without first obtaining Company's written approval. The foregoing shall not prohibit or restrict any party from disclosing any information: (a) the disclosure of which is necessary to comply with any applicable laws, including, without limitation, federal or state securities laws, or any exchange listing or similar rules and regulations; (b) the disclosure of which is ordered pursuant to a subpoena or other order from a court or governmental body of competent jurisdiction; (c) such information is now, or hereafter is made, generally available to the public other than by disclosure in violation of this Agreement; (d) such information was disclosed to the disclosing Party by a third party that the disclosing Party, in good faith, believes was not bound by an obligation of confidentiality; or (vi) the Parties hereto consent to the form and content of any such disclosure. If any Party learns that disclosure of such information is sought in or by a court or governmental body of competent jurisdiction or through other means, such Party shall (1) give prompt notice to the other Party prior to making such disclosure and allow such other Party, at its expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, such information, (2) reasonably cooperate with such other Party in its efforts to prevent, or obtain a protective order for, such disclosure, and (3) disclose the minimum amount of information required to be disclosed.

**9. Notices**

All notices given under this Agreement, unless otherwise specified herein, must be in writing and will be effectively served by: (i) submission through the zoomeral.com portal using the Borrower's ZOOMERAL account and (ii) upon delivery or, if sent certified mail, upon the first to occur of receipt by the addressee or the expiration of ninety six (96) hours after deposit in first class certified United States mail, postage prepaid, return receipt requested, or two business days if sent by pre-paid nationally recognized overnight courier service, sent to the Party at its address set forth below, or such other address as a Party may designate from time to time by written notice given pursuant to this paragraph:

To Borrower: Nutra-Acres LLC
Attention: Charles Stringer
130 North Dumas Avenue
Dumas, Texas 79029

To Company: Genie Investments
P.O. Box 5886
Wilmington, Delaware 19808



Initials: CBS

**10. Assignment**

Borrower may not assign, subcontract or delegate all of any part of its rights or obligations hereunder without Company's prior written approval (which may be withheld or delayed in Company's sole discretion).

**11. Binding Effect**

Subject to the provisions of section 10 above, the terms of this Agreement will bind and benefit the successors and assigns of the Parties.

**12. Waiver**

No delay or omission on the part of any party hereto in exercising any right hereunder shall operate as a waiver of such right or any other right under this Agreement.

**13. Headings**

The several headings to articles, sections and subsections herein are inserted for convenience only and shall be ignored in interpreting the provisions of this Agreement.

**14. Schedules, Attachments and Exhibits**

All schedules, attachments and exhibits, if any, referred to in or attached to this Agreement are and shall be deemed to be an integral part of this Agreement as if fully set forth herein.

**15. Amendments**

This Agreement may not be modified or amended except by written agreement signed by Borrower and Company.

**16. No Third-Party Rights**

This Agreement is made entirely for the benefit of Borrower, Company, and their successors in interest (including any participants). No third person shall have any rights hereunder.

**17. Force Majeure**

No liability shall result from the delay or nonperformance of Services caused by circumstances beyond the control of Company, including without limitation Act of God, fire, flood, snowstorm, pandemic, war, acts of terrorism, government action, riot, civil disturbance, accident, inability to obtain labor, material, or equipment ("Force Majeure"). During periods of Force Majeure, Services so affected by such Force Majeure may be eliminated without liability, but this Agreement shall remain otherwise unaffected. Timely notice of Force Majeure and its expected duration shall be given by the affected party to the other, and the party whose performance is affected by a Force Majeure event will use commercially reasonable efforts to avoid, remove or minimize the impact of such event on the performance of its obligations at the required level at the earliest possible date.

**18. Applicable Law**

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware and the United States.



Initials: CB

**19. Severability**

The invalidity or unenforceability of any one or more of the provisions of this Agreement will in no way affect any other provision.

**20. Counterparts**

This Agreement may be signed in two or more counterparts, each of which shall be treated as an original but which, when taken together, shall constitute one and the same instrument. A signed facsimile or electronic copy of this Agreement shall constitute an original for all purposes.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the date first above written.

Nutra-Acres LLC

Charles Stringer

Genie Investments

Genie Investments



Initials: CBS

# Exhibit A

As agreed to in the Due Diligence Fee Agreement, Borrower agrees to provide the Company with all of the following (mark any not applicable as "N/A"):

1. Income Statement (past five years or less starting with company establishment)
2. Balance Sheets (past five years or less starting with company establishment)
3. Cash Flow Statements (past five years or less starting with company establishment)
4. Tax Returns (past five years or less starting with company establishment)
5. Net Worth Statement/s for All Equity Owners That Have A 5% Or Higher Ownership Stake
6. Business Plan Including A 2 Year Forecast/Proforma & Management Bios
7. Previous 3 Month's Business Bank Statements for All Business Bank Accounts
8. Post-Closing Balance Sheet Assuming Term Sheet Terms/Rates
9. All UCC Lien Filings & Current List of All Material Creditors
10. Articles of Incorporation and Corporate Bylaws/Operating Agreement
11. Capitalization Table of All Outstanding Stock Shares, Stock Warrants, & Stock Options
12. Documentation Related to All Registered Intellectual Property (Patents and Trademarks)

All these exhibits have been previously provided to McMahon commercial lending.

CHS



Initials: CHS