FILED INTAKE USBC
NOV 2 '26 PM1:06

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
In re: Genie Investments NV Inc., Debtor.
Case No. 3:24-bk-00496-BAJ
Chapter 7

**VERIFIED STATEMENT OF POSITION**

COMES NOW John Michael Cohan, interested party, 50% equity holder of the Debtor, pro se, protected person under Marsy's Law and the United States Constitution, and respectfully files this Verified Statement of Position.

THE STANDING ISSUE AND THE REASONABLE POSSIBILITY OF SURPLUS

1. The Trustee states there is no surplus. The applicable standard is whether there is a "reasonable possibility" of a surplus, not a "guarantee" of surplus. The undersigned respectfully submits the following potential scenarios:

   **Scenario A — Objections unopposed.** The undersigned filed objections (Bankr. Doc. 644). If no one responds (Bankr. Doc. 711), the objections could be deemed unopposed and the claims could be disallowed. Potential reasonable surplus: $1.5 million+.

   **Scenario B — Objections heard and sustained.** According to the Trustee, the claims could potentially be reduced from $39 million to

$13–14 million (2:26-mp-00001, Misc. Doc. 45 at pg. 4, incorporated by reference). The BELOC Agreements do not appear to support the "customer funds" narrative (Bankr. Doc. 146, incorporated by reference) nor the "Ponzi-scheme"/"fraudulent loan-scheme" narratives (3:26-ap-00063, Adv. Docs. 1, 21; CDIL, *In re: David Choate Hughes II*, 25-70566, Docs. 477, 478, 481, 483, 498, 499, 508, 509, 510, 513, 514, 517, 518, 519, 531, 604, incorporated by reference). There appears to be **no** "trust" language, **no** "escrow", and **no** "deposit" designation. The agreement refers to an "Interest Credit Account" and an "Interest Reserve Account." The term "customer funds" does not appear anywhere in the agreements. The agreements state the funds "will not be refundable, nor partially refundable." The Promissory Note and Security Agreement appear to confirm the ICA Payment is part of the loan, secured by collateral, not held in trust. The claims may be inflated because the agreements are seemingly being ignored by the Trustee. Potential reasonable surplus: substantial.

**Scenario C — Non-refundable payments applied.** The agreements state the bridge interest and due diligence fees are "non-refundable". Applying that language could reduce the claims further. Section 3.6 states the ICA Payment is not refundable after the first Advance.

Section 3.9 states the LOC Fee and Promote Fee are fully earned and non-refundable. Section 3.11 states legal and incidental fees are non-refundable. The agreements state the funds "will not be refundable, nor partially refundable" once certain terms are met. These provisions appear to be plain language. Applying them could reduce the claims. Also, please see the example non-refundable agreements (Bankr. Doc. 513, incorporated by reference), specifically the:

[1] Due Diligence Agreement states:

· Wiring Instructions: "This fee for Due Diligence is 100% non-refundable."

· Section 2: "2. Payment...As a material inducement to Company to commence the Services, the Borrower shall pay Company a non-accountable and non-refundable fee of [XXX] Dollars ($[XX],000), payable prior to commencement of the Services. Payment of the diligence fee is not a guarantee that Company will offer funding to Borrower, or that any offer will be on terms and conditions acceptable to Borrower...This interest of this Bridge Loan is 100% nonrefundable.";

[2] and the Bridge Loan Agreement states:

· Section 2.03(b): "(b) Payment of Interest. Pre-paid interest on the outstanding principal amount of the Loan shall be paid in kind and capitalized on this Business Day and shall be paid in cash in full upon acceptance of this agreement. Borrower understands that this payment is fully non-refundable." Potential reasonable surplus: substantial.

**Scenario D — Section 13.7 applied.** Section 13.7(c)(ix) provides that the Force Majeure provision may excuse the Lender's performance when the wholesale lender fails. Section 13.7(a) provides that the Borrower's sole remedy may be a refund of the ICA Payment minus any interest owed. Applying this provision could reduce the claims further. The agreement also appears to require reasonable diligent efforts to end or minimize the Force Majeure event. The record appears to show demand letters were sent to Velanos Principal Capital, arbitrations were initiated, lawsuits were filed, Scott Oh and Warren Law Group were pursued for legal malpractice, and the company was put into bankruptcy to "reduce the defensive spend and maximize creditor recovery" (Mr. Hughes, paraphrased at April 2024 trial). These actions could be construed as the actions of a company trying to survive a fraud allegedly perpetrated against it. The Force Majeure

event was allegedly caused by Velanos Principal Capital's alleged fraud and Scott Oh's alleged legal malpractice. Applying Section 13.7 could reduce the claims further. Potential reasonable surplus: substantial.

**Scenario E — Velanos judgment collected.** The $20 million judgment is uncollected. If collected, even partially, there could be a surplus. The Genie Management Declaration, signed under penalty of perjury, documents the Velanos joint venture, the $9 million capital contribution, the $75 million promised return, the $20 million judgment, and that Velanos allegedly returned $500,000 in May 2023. $50,000 was provided at the signing of the settlement agreement and a total of $1,000,000 has been collected post-conversion. The Gowling WLG letter appears to confirm Velanos engaged a Canadian law firm to provide legal advice in connection with structured finance programs, *another* potential avenue of pursuit for recovery that the Trustee seemingly ignores. The iMessage screenshots appear to show a $19,800,000 available balance in a Velanos account as of November 1, 2023. The judgment may be collectible. Potential reasonable surplus: substantial.

**Scenario F — Wearmouth located.** The Trustee states the judgment is “very unlikely” uncollectible because he cannot find Wearmouth. If Wearmouth is found, or if he surfaces, or if the Trustee looks harder, the judgment could become collectible. The iMessage screenshots appear to show Wearmouth was active and communicating as of November 1, 2023. The Gowling WLG letter may provide a paper trail. The Trustee appears to have subpoena power, investigative resources with the federal government as his backing. If he cannot find Wearmouth, that could be a failure of diligence — not a basis to deny standing. Potential reasonable surplus: substantial.

**Scenario G — Warren Law malpractice.** The $435,000 settlement was allegedly never delivered. Litigating the malpractice claim could recover additional funds. The Walker Declaration states that Scott Oh's (“SO”) review of the JVA was "inadequate" and that he "failed to conduct an appropriate and thorough investigation." The Walker Legal Analysis concludes the UST allegedly fabricated the fraud narrative and that the Examiner's Report is "rife with inaccuracies." The bar order extinguished the undersigned's third-party personal claims [without hearing] in order to make this recovery, an erroneous settlement term again invented by the licensed professionals. The

settlement appears to have never been delivered. The claim may remain viable. Potential reasonable surplus: substantial.

**Scenario H — Contractual Power of Attorney.** The agreements appear to contain an *irrevocable* power of attorney *upon default.* Section 13.2(b) of the BELOC Agreement appears to appoint the Lender as the Borrower's attorney-in-fact with full power to step into the Borrower's shoes. It appears to be a power [1] coupled with an interest, [2] irrevocable, and [3] exercisable upon default. Many of the Borrowers, except at least three (3), were allegedly in default as of August 2, 2024, before the Trustee was appointed. Potential reasonable surplus: substantial (Bankr. Doc. 501, Ex. 8, incorporated by reference).

**Scenario I — Avoidance actions against McMann and customers.** The Trustee filed adversary proceedings against multiple entities. The Trustee can file or could have filed more. The Trustee is choosing or chose not to. Each recovery, even partial, could increase the estate. Potential reasonable surplus: reasonable possibility.

**Scenario J — The McMann double-counting and offset.** McMann's claim (No. 64) and McMann's clients' claims (~24 total) appear to be

potentially double-counted. The North Haven and Wallingford entities now appear to hold two (2) claims each — their direct claims (Claims 42 and 43) and the transferred McMann Claim 64. That appears to be potential double-counting. McMann allegedly admitted in the Northern District of Illinois litigation (1:23-cv-16264), incorporated by reference, that the claims against it and Genie are "inextricably intertwined" and that it seeks "complete indemnification and reimbursement from Genie." A claim purchaser may step into the shoes of the seller and take the claim subject to all defenses that could have been asserted against the seller. If the duplicative claims are eliminated, the claims could be reduced by millions. Potential reasonable surplus: reasonable possibility.

**Scenario K — The Stringer claim.** Claim 5-3 appears to be a ~$14+ million claim for a ~$385,000 payment. Debtor's counsel allegedly verbally agreed the claim "is a fraud." The Trustee allegedly admits the misrepresentation but says he will 'address it later' (paraphrased). Eliminating it could reduce the claims by ~$14+ million. This appears to be set for trial in 2027, but *after* the undersigned's trial on his standing. Potential reasonable surplus: substantial.

**Scenario L — The Belle Maison claim.** Claim 4 appears to be a $3 million claim for a $70,000 payment. Eliminating it reduced the claims by ~$3 million. Potential reasonable surplus: substantial.

**Scenario M — The claims of Kristen Stegent (Rolling by the Dozen) and Kim Nash (A Complete Home Inspection).** Default judgments were entered against them in Miami-Dade (Case No. 2024-008427-CA-01) by a Debtor affiliate for defamation, false light, extortion, civil conspiracy, tortious interference, etc. The Debtor potentially shares these claims. There were other parties that allegedly acted in concert and/or violated the arbitration and confidentiality clauses, among others. If their claims are disallowed, the claims could be reduced. Potential reasonable surplus: reasonable possibility.

**Scenario N — The missing police report and audio.** If spoliation is proven, the estate may have claims against the United States Trustee or other parties, but the Trustee refuses to investigate (Bankr. Doc. 590, incorporated by reference). The police report (JSO# 2025-0471040) was allegedly filed as Bankr. Docs. 406-3 and 470-1, then allegedly removed both times without motion, notice, order or hearing. The audio recording of the April 17, 2024 §341 meeting appears to contain a waveform flatline, potentially indicating the

audio was altered, which allegedly removed the undersigned's invocation of his rights as a crime victim. The United States Trustee appears to be the only party responsible for recording, storing, and preserving the §341 meeting audios. Potential reasonable surplus: reasonable possibility.

**Scenario O — The Trustee's accounting.** The Trustee's own interim reports appear to show inconsistent calculations. His calculation of customer loans appears to exclude the ICA Payment credit that is part of the agreements and potentially recoverable by the estate. If a complete accounting reveals additional assets, the estate could grow. Potential reasonable surplus: reasonable possibility.

**Scenario P — The Trustee's [lack of] investigation.** The Trustee allegedly admitted he did not review bank records before filing fraudulent transfer claims (Bankr. Doc. 389; June 24, 2025, Trial Audio 2, 12:40, 15:17, incorporated by reference). He also allegedly refused to investigate the spoliation claims against the United States Trustee (Bankr. Doc. 590, incorporated by reference) and to subpoena Michael Connor's IOLTA account records (Bankr. Doc. 597, incorporated by reference) until recently. He allegedly acts only when forced to do so by the undersigned's filings (please see renew motion

to compel (3:25-cv-00164, Dkt. 31 pg. 25 at ¶ 26). If a **complete** investigation reveals additional recoveries, the estate could substantially grow. Potential reasonable surplus: reasonable possibility.

**Scenario Q — The $20 million Velanos judgment.** The Trustee states it is uncollectible because he cannot find Wearmouth. Wearmouth allegedly has been active. The iMessage screenshots appear to show a $19,800,000 available balance in a Velanos account as of that date. The Gowling WLG letter appears to confirm Velanos engaged a Canadian law firm. That letter may provide a paper trail to recovery. The judgment may be collectible. Potential reasonable surplus: substantial.

2. Most of the customers appear to have defaulted. Roughly $4 million in customer loans appear to be in default. The Trustee admits approximately $1.8 million. Either way, the defaulted accounts may be assets of the estate. The Trustee appears to have the contractual right to step into their shoes and collect. He appears to have the power of attorney. He appears to have the right to prosecute and settle. The Debtor has UCC-1s against forty-four (44) of the borrowers.

3. Yet, he allegedly has not done it. He allegedly has not filed a single motion to execute on the default judgments. He allegedly has not levied bank accounts. He allegedly has not seized property. He allegedly has not invoked the *irrevocable* power of attorney. He allegedly has not meaningfully pursued the defaulted borrowers.

4. Instead, he simply states there is no surplus and washes his hands.

5. That cannot be considered a definitive legal determination. That could be seen as an excuse for not trying. If he exercised the *irrevocable* power of attorney and collected on even a fraction of the defaulted accounts, there could be a surplus.

6. The Trustee should not be able to claim there is no surplus while allegedly refusing to exercise the contractual rights that could create one. The power of attorney appears to be a contractual right, irrevocable, and enforceable. The Trustee appears to have it. He allegedly has not used it. That could be a failure of diligence — not a basis to deny standing. The standard is reasonable possibility, not certainty. It does not seem that the Trustee has met his burden.

7. That is **not** one (1) potential scenario of a reasonable possibility of a surplus. <u>**That is at least seventeen (17) potential scenarios of a reasonable**</u>

**<u>possibility of a surplus</u>!** Each one, standing alone, could create a reasonable possibility of surplus. The Trustee's only arguments are that recovery is "unlikely" because Wearmouth is missing and parties did not respond to his litigation. The Trustee appears to have subpoena power, investigative resources, and the weight of the federal government behind it. If the Trustee cannot find Wearmouth, that could be a failure of diligence by the Trustee, and certainly by Warren Law Group and Scott Oh.

8. The standard may be reasonable possibility, *not* certainty. The Trustee has not met his burden to show there is no possibility.

9. The exhibits tied to Bankr. Docs. 501, 625, 646, and 649 and others, all incorporated by reference, appear to support this. The agreements appear to support that the claims may be inflated and the funds may be non-refundable. The Walker Declaration (Bankr. Doc. 34 at pgs. 100-104) and Legal Analysis (Bankr. Doc. 625 at pgs. 27-38), both incorporated by reference, appear to significantly support that the fraud narrative may have been fabricated. The Genie Management Declaration appears to support that the Velanos judgment is real. The Gowling WLG letter appears to support that Velanos had professional counsel. The iMessage screenshots appear to support that the money existed. The Police Report appears to support that a crime may have occurred during these proceedings. The Florida State

Attorney Asbrand emails appear to support that the warrant may be active for said crime. The D.D.C. Order appears to support that a federal judge took judicial notice of the police report. The M.D. Fla. Order and the State Court Order appear to support that at least two (2) other judges recognized Mr. Cohan's safety concerns. The contrast is stark. This Court allegedly denied him that same protection while simultaneously entertaining the Trustee's motion to potentially silence him. That should not be considered neutral. It should be considered bias or at the very least, an appearance of bias (Bankr. Docs. 622, 628; 2:26-mp-00001).

POTENTIAL FRAUD(S) ON THE COURT

10. The professionals, allegedly including this Court, in this case appear to have engaged in a pattern of conduct that may defile the judicial process itself:

a. First, a crime allegedly occurred during the §341 meeting. A Florida state judge allegedly found probable cause that the undersigned's restraining order was violated and has been or will be subpoenaed. The police report documenting that alleged crime was allegedly filed on the docket. It was allegedly removed — not once, but twice (Bankr. Docs. 406-3, 470-1) — without motion, notice, order, or hearing. The effect of that alleged removal could be that the appellate

court, when reviewing the record, may not see the evidence of the alleged crime. Removing filed evidence from the docket without court approval may constitute fraud on the court. The New Jersey Final Restraining Order was issued on March 3, 2022. It appears to be active. It appears to be entitled to full faith and credit. The Defendant in the underlying Florida state matter (2026-CA-6395, incorporated by reference) allegedly violated it during the §341 meeting. The United States Trustee was allegedly notified in advance. The United States Trustee allegedly allowed the abuser to speak. The United States Trustee allegedly ended the call moments after Mr. Cohan invoked his rights. The audio recording appears to contain a waveform flatline, potentially indicating the audio was altered to remove that invocation, *another* potential fraud on this court. The United States Trustee appears to be the only party responsible for recording, storing, and preserving the §341 meeting audios. The David Hughes Affidavit appears to corroborate the alleged violation. It states that Mr. Hughes allegedly witnessed Mr. Cohan showed and informed Mr. Bomkamp of the Order of Protection. It states that Mr. Cohan allegedly instructed Mr. Bomkamp to ensure the abuser would not be present on future calls. It states that during the April 17, 2024 §341 meeting, the

abuser allegedly was again present, and Mr. Cohan allegedly was very upset. It states that there is no question in Mr. Hughes believed that Mr. Cohan acted responsibly and in good faith. It states that it is deeply concerning and perplexing that Mr. Bomkamp allegedly failed to ensure that a person subject to a valid court-issued protective order was excluded, or at least not provided a platform to violate the order. The Asbrand emails appear to confirm that Judge Charbula signed a related warrant on November 10, 2025, and that it may be active. This appears to be a sitting state judge finding probable cause that a crime occurred. This is not a "conspiracy theory." This is a warrant for a crime that may have been committed during this federal bankruptcy proceeding. [1]

b. Second, the professionals allegedly created a "customer funds" narrative that does not appear in any agreement. The agreements state what they state. They do not state "customer funds." The narrative may have been invented, used to justify the conversion, and used to manufacture a Ponzi scheme narrative. That may constitute fraud on the court. The BELOC Agreement appears to contain no trust language, no escrow, and no deposit designation. The term "customer funds" does not appear anywhere in the agreements. The agreements

refer to an "Interest Credit Account" and an "Interest Reserve Account." Recital D states a "*credit* equal to the ICA Payment is noted on the Lender's books". Section 3.6 states the ICA Payment is not refundable after the first Advance. Section 3.9 states the LOC Fee and Promote Fee are fully earned and non-refundable. Section 3.11 states legal and incidental fees are non-refundable. Section 13.7(c)(ix) states the Force Majeure provision may excuse the Lender's performance when the wholesale lender fails. Section 13.7(a) states the Borrower's sole remedy is a refund of the ICA Payment minus interest owed. These provisions do not support the "customer funds" narrative. They actually support the complete opposite. The Term Sheets appear to confirm the same thing. The agreements refer to the money as "reserved funds." It does not refer to it as "customer funds", "trust funds", or "escrow". The Promissory Note and Security Agreement appear to confirm the ICA Payment is part of the loan, secured by "collateral", not "held in trust". The Walker Declaration is the sworn statement of a former FINRA enforcement attorney with 12 years of experience investigating fraud. He states in a separate legal analysis that the UST allegedly "invented" fraud findings. He states that the Examiner's Report is "rife with inaccuracies" and that the UST

allegedly "failed to review the Report with a critical eye." It appears the Examiner formed legal conclusions without a law license. Yet, the former FINRA enforcement attorney states that the "customer funds" narrative is not supported by the agreement. This is not an opinion from a disgruntled debtor. This is the opinion of a former securities regulator, a licensed attorney, stating that the government allegedly fabricated its case, an all-too-common occurrence in this country, but the undersigned is sure others are worse. The Walker Legal Analysis is the 12-page draft opposition to the UST's motion. It walks through the agreement provisions line by line. It shows that the BELOC Agreement does not require the Lender to hold ICA Payments in trust. It shows that Section 13.7(c) would be superfluous if the Lender had to hold the funds untouched. It shows that the UST's "customer funds" narrative may be a legal fiction invented to justify the conversion after losing the first conversion motion at trial.

c. Third, the professionals allegedly omitted or are allegedly attempting to omit the agreements from the record. They allegedly rely on the agreements to administer the claims. They allegedly use the agreements to calculate the claim amounts. But when the undersigned seeks to introduce them, they allegedly argue the

agreements are "irrelevant." They may be using the Court's own procedures to prevent the Court from seeing the evidence that defines the claims, which this Court has already seen at the trial [that the Trustee has allegedly not reviewed] and confirmed that it has “read” the agreements. Another material omission that may constitute fraud on this Court. The BELOC Agreement is the agreement that defines the claims. The Promissory Note is the instrument that evidences the outstanding debts. The Security Agreement is the document that may grant the lien. These are the documents that may define the claims. The Trustees may not be able to rely on the agreement to calculate claims while allegedly ignoring the agreement when it may defeat their narrative.

d. Fourth, no one appears willing to address the Walker Legal Analysis. A 12-year FINRA securities attorney — a former securities regulator — allegedly stated in writing that the United States Trustee committed fraud, which this record appears to certainly support. That statement repeatedly appears on the record. No judge, no Trustee, and no professional appears to have rebutted it. They do not seem to be able to because the analysis seems to be deadly accurate. Their silence may be all the proof this Court needs. The Walker Declaration is the

sworn statement of a former FINRA enforcement attorney with 12 years of experience investigating fraud. He states that the UST allegedly "invented" fraud findings. He states that the Examiner's Report is "rife with inaccuracies" and that the UST allegedly "failed to review the Report with a critical eye." He states that the "customer funds" narrative is not supported by the agreement. The Walker Legal Analysis is the 12-page draft opposition to the UST's *second* motion to convert (Bankr. Doc. 154). It walks through the agreements' provisions line by line. It shows that the BELOC Agreement does not require the Lender to hold ICA Payments in trust. It shows that Section 13.7(c) would be superfluous if the Lender had to hold the funds untouched. It shows that the UST's "customer funds" narrative may be a legal fiction invented to justify the conversion. No one appears to have rebutted him. Their silence may be the proof. Debtor's attorney allegedly refused to introduce this narrative before conversion, while passing on the opportunity for an evidentiary hearing after the Examiner report had been filed, while refusing to file a reconsideration or an appeal, while verbally threatening sanctions against the undersigned and Mr. Hughes if they were to file (Bankr. Doc. 501, Ex. 4, incorporated by reference).

VERIFICATION

I, John Michael Cohan, declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct to the best of my knowledge and belief.

Dated: 11-02-2026

Respectfully submitted in good faith,

**John Michael Cohan, without prejudice, without recourse, UCC 1-308, 1-103**
iustusprocessus@outlook.com

Certificate of Service

I hereby certify that all interested parties have been duly served a copy of the foregoing document and/or its attachments by the CM/ECF system, U.S. Mail and/or email.

Debtor
Genie Investments NV Inc.
represented by Bryan K. Mickler
Mickler & Mickler
5452 Arlington Expressway
Jacksonville, FL 32211
904-725-0822
Email: court@planlaw.com

U.S. Trustee
represented by Scott E. Bomkamp
DOJ-Ust
United States Trustee
400 W. Washington St., Ste 1100
Orlando, FL 32801
407-648-6069
Email: scott.e.bomkamp@usdoj.gov

Chapter 7 Trustee
Aaron R. Cohen
represented by Raye Curry Elliott
Akerman LLP
401 East Jackson Street, Suite 1700
Tampa, FL 33602
(813) 223-7333
Email: raye.elliott@akerman.com

David C. Hughes II
davidchoatehughes@gmail.com