UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
In re: Genie Investments NV Inc., Debtor.
Case No. 3:24-bk-00496-BAJ
Chapter 7

FILED INTAKE USBC
NOV 2 '26 PM 1:07

# HUGHES AND COHAN'S JOINT STIPULATION OF UNDISPUTED FACTS

Pursuant to the Court's Orders Scheduling Trials (Bankr. Docs. 671-1, 672, 803), parties Cohan and Hughes submit the following stipulation of undisputed facts with exhibits per the Court's above referenced Orders at ¶ 2. Cohan and Hughes met and conferred by video on November 1, 2026. Each fact is supported by a citation to the record.

## A. THE PARTIES AND THE CASE

1. Genie Investments NV Inc. is the Debtor. Case No. 3:24-bk-00496-BAJ.
2. The Debtor filed a Voluntary Petition for Relief under Chapter 11 on February 21, 2024. Bankr. Doc. 1.
3. The case was converted to Chapter 7 on August 12, 2024. Bankr. Doc. 207.
4. Aaron R. Cohen is the Chapter 7 Trustee. Bankr. Doc. 207.
5. John Michael Cohan is a 50% equity holder of the Debtor. Bankr. Doc. 644 at ¶ 1.

6. David C. Hughes II is a 50% equity holder of the Debtor. Bankr. Doc. 644 at ¶ 1.

7. The Attorney Attestation from Spiegel & Utrera, P.A. reflects that, as of September 7, 2023, Genie Investments NV Inc. had a "history of closing loans," was a "corporation duly organized, validly existing and in good standing," had "never been sued," had "never misappropriated any of its clients' funds," and had "never lost any of its clients' funds." Bankr. Doc. 781-2.

8. Debtor's management closed its first loan on January 27, 2021, and closed many more thereafter each year, as stated in the attestation. Bankr. Doc. 781-2.

9. The United States Trustee is Scott E. Bomkamp. Bankr. Doc. 785.

B. THE CONTRACTUAL ARCHITECTURE

10. The Business Expansion Line of Credit (BELOC) Agreement § 13.7(c)(ix) defines a "Force Majeure Event" as: "failure of the Lender's wholesale lender from performing under the terms of the agreement between the Lender and the wholesale lender." Bankr. Doc. 781-3.

11. The BELOC Agreement § 13.7(c) requires the Lender to give notice of the Force Majeure Event and "use reasonably diligent efforts to end the failure

or delay and ensure the effects of such Force Majeure Event are minimized." Bankr. Doc. 781-3.

12. The BELOC Agreement § 13.7(c) states that cure periods are "tolled during the pendency of a Force Majeure Event." Bankr. Doc. 781-3.

13. The BELOC Agreement § 13.7(a) states that if the Lender fails to provide the first Advance, the Borrower's sole remedy is to terminate the agreement and request a full refund of the ICA Payment. Bankr. Doc. 781-3.

14. The BELOC Agreement § 7.1 states the first Advance will be funded no later than one hundred (100) banking business days following the opening of the ICA by the Lender with its wholesale lender. Bankr. Doc. 781-3.

15. The exhibit at Bankr. Doc. 781-3 is a compilation of Business Expansion Line of Credit Agreements (BELOCs) where Genie Investments NV Inc. acted as the Lender. Bankr. Doc. 781-3.

16. The exhibit includes one page from each loan agreement showing the total loan amount, spanning numerous borrowers with Project LOC Amounts ranging from low to high. Bankr. Doc. 781-3.

17. The agreements are "nearly identical in structure and substance throughout." Bankr. Doc. 781-3.

18. The exhibit includes a sample Promissory Note, Security Agreement, and a specific Tranche Schedule. Bankr. Doc. 781-3.

19. The exhibit itemizes specific ZOOMERAL Success Fee calculations (3% of the total loan) at the top of many pages in the BELOC portfolio. Bankr. Doc. 781-3.

20. The ZOOMERAL user list spans IDs 355 through 2895, covering more than 50 borrowers. Bankr. Doc. 781-20.

21. Every borrower who testified at the April 2024 conversion trial — Stegent, Stringer, Butkiewicz, Foster, Joy, Muse, Nash, and the Patels — had a ZOOMERAL User ID. Bankr. Doc. 781-20.

22. The BELOC Agreement § 3.9(a)–(c) states that the LOC Fee, Promote Fee, and ICA Advance Fee are "nonrefundable" and "fully earned by Lender." Bankr. Doc. 781-3.

23. The Due Diligence Fee Agreement § 2 states the fee is "non-accountable and non-refundable" and "Payment of the diligence fee is not a guarantee that Company will offer funding to Borrower." Bankr. Doc. 781-4.

24. The Bridge Loan Agreement § 2.03(b) states that pre-paid interest "shall be paid in cash in full upon acceptance of this agreement" and "is fully non-refundable." Bankr. Doc. 781-5.

25. The Bridge Loan Agreement § 2.02(a) states: "On the Effective Date, the Lender shall hold Bridge Loan in Lender's account on behalf of the Borrower." Bankr. Doc. 781-5.

26. The McMann BELOC Agreement (March 9, 2023) is between Nutra-Acres LLC and McMann Commercial Lending LLC. The Debtor is not a party to this agreement. Bankr. Docs. 759, 781-19.

27. The McMann BELOC Agreement contains a binding arbitration clause (Section 13.8) requiring disputes to be resolved in New Castle County, Delaware. Bankr. Doc. 781-19.

28. The Trustee's Motion for Summary Judgment (Bankr. Doc. 759) argues the $24 million loan claim fails because there is no privity between the Creditors and the Debtor. Bankr. Doc. 781-1.

29. The Motion further advances specific privity arguments, a Florida Banking Statute of Frauds defense, and a lack of third-party beneficiary status; the Trustee concedes the Creditors paid the Debtor $400,000. Bankr. Doc. 781-1.

30. The Trustee relies on Conversion Trial Exhibits (U.S. Trustee's Exhibits 28, 29, 30, 32, 33, 36, 38, 39, and 40) demonstrating that the Debtor was not a party to the $24 million loan. Bankr. Docs. 759, 781-1.

## C. THE RESTRAINING ORDER AND THE § 341 MEETINGS

31. A restraining order (New Jersey FV-04-002494-22) was entered March 3, 2022. Bankr. Doc. 781-7.

32. The restraining order was domesticated in Florida on May 29, 2025. Bankr. Doc. 781-7.

33. Article IV, Section 1 (Full Faith and Credit) and Article VI (Supremacy Clause) of the U.S. Constitution required the active New Jersey restraining order to be enforced during the § 341 meeting. Bankr. Doc. 781-24.

34. The restraining order was active on April 10, 2024, and April 17, 2024. Bankr. Doc. 781-7.

35. On April 10, 2024, John Michael Cohan personally notified U.S. Trustee Scott Bomkamp of the active restraining order. Bankr. Doc. 781-7; Affidavit of David Hughes, Bankr. Doc. 781-7.

36. On April 17, 2024, a § 341 meeting of creditors was held. Bankr. Doc. 781-7.

37. An individual identifying herself as "Agent Amber Adams" spoke at the April 17, 2024 § 341 meeting. Bankr. Doc. 781-7.

38. The individual identifying herself as "Agent Amber Adams" is the individual subject to the restraining order. Bankr. Doc. 781-7.

39. The individual subject to the restraining order is Peace Freedom (aliases Peace Ekuta), the mother of Cohan's child. Bankr. Doc. 781-11.

40. The individual identifying herself as "Agent Amber Adams" asked John Michael Cohan direct questions for approximately five (5) minutes at the § 341 meeting. Bankr. Doc. 781-7.

41. Cohan stated that during the §341 meetings, Freedom spoke directly to him, and the report explicitly states "Probable Cause exists to seek an arrest warrant for Freedom for violating the injunction." Bankr. Doc. 781-11.

42. The Jacksonville Sheriff's Office investigated the violation. Bankr. Doc. 781-7.

43. The investigating officer was P.T. Burke (#81350), who submitted the report on 08/16/2025 at 11:59, and the report was reviewed/approved by Sgt. P.G. Yarber II (#5134) on 08/16/2025 at 17:11. Bankr. Doc. 781-11.

44. Judge M. Charbula signed a warrant for violation of the injunction on November 10, 2025. Bankr. Doc. 781-7.

45. Assistant State Attorney Justin Asbrand confirmed the warrant is active on November 19, 2025. Bankr. Doc. 781-7.

46. On September 19, 2024, a final § 341 meeting was held. Bankr. Doc. 781-22.

47. At the September 19, 2024 meeting, it was established that McMann was a "white labeler," a "direct borrower of Genie," and a "direct lender" to its customers, and that McMann's customers were the parties with indirect claims who, for "administrative convenience," wired funds directly to the Debtor. Bankr. Doc. 781-22.

D. THE VELANOS FRAUD AND RELIANCE ON COUNSEL

48. Genie engaged Scott Oh of Warren Law Group to advise, conduct due diligence, and negotiate the Velanos joint venture. Bankr. Doc. 781-15.

49. Scott Oh stated he knew the gentlemen Joshua Wearmouth syndicated for but could not divulge who it was due to confidentiality. Bankr. Doc. 781-16.

50. Scott Oh stated his brother-in-law was a Barrister in London who could help with any issues. Bankr. Doc. 781-16.

51. Scott Oh advised that if there were issues, he himself could liquidate the SBLC in a matter of 1 day. Bankr. Doc. 781-16.

52. Wearmouth represented he could purchase SBLCs at a discount and immediately sell them at a profit in pre-arranged trades, with no risk of loss to Genie's capital. Bankr. Doc. 781-16.

53. Scott Oh advised Genie that Velanos and Wearmouth were "The Real Deal," that SBLC trading was a valid platform, and that Genie's principal was 100% collateralized. Bankr. Doc. 781-15.

54. On March 9, 2023, Scott Oh forwarded a wire trace report and stated: "Ok this report looks legitimate." Bankr. Doc. 781-15.

55. On January 24, 2023, Velanos provided Genie with a screenshot of an email from someone identified only as "Simon" regarding funds on deposit with HSBC Bank in London. Bankr. Doc. 781-16.

56. On January 27, 2023, Velanos provided documents appearing to show a $10.0 million wire transfer from a ScotiaBank account to Genie's JP Morgan Chase account, which Genie never received, and Wearmouth later blamed Wells Fargo. Bankr. Doc. 781-16.

57. On March 24, 2023, Wearmouth asserted in a letter that trading profits were "being held at HSBC, UK under a sub account" and needed a "master" account to access them. Bankr. Doc. 781-16.

58. On November 16, 2022, Gowling WLG (Canada) LLP confirmed Velanos engaged the firm and that Velanos "has access to project funding partners with significant financial capacity." Bankr. Doc. 781-15.

59. The Gowling WLG engagement letter was signed by Mark Ledwell on November 16, 2022. Bankr. Doc. 781-16.

60. A Second JVA Amendment was proposed in June 2023, which sought to open an account at Nordic Trust Alliance KB and deposit $9.5 million by June 15, 2023, and an additional $50.0 million by June 30, 2023. Bankr. Doc. 781-16.

61. On June 20, 2023, the Nordic Trust portal showed a $9.5 million transfer, but Genie's attempts to wire the funds to JPMorgan Chase failed, and Nordic Trust never provided substantive responses to Genie's requests for explanations. Bankr. Doc. 781-16.

62. As of November 1, 2023, Joshua Wearmouth sent text messages asserting Velanos had nearly $20 million in available funds. Bankr. Doc. 781-15.

63. The Debtor contributed $9,000,000 to the Velanos joint venture. Bankr. Doc. 781-15.

64. Velanos returned $500,000 and distributed zero profits. Bankr. Doc. 781-15.

65. A significant portion of the funds flowed through the Michael Connor Esq. IOTA accounts at Wells Fargo, from which the Debtor received approximately $15 million. Bankr. Doc. 781-21.

66. The Examiner acknowledged she did not review the Connor IOTA accounts or four other non-Debtor bank accounts. Bankr. Doc. 146 at ¶ 219.

67. The Debtor gave notice of the force majeure event to its borrowers and used reasonably diligent efforts to minimize its effects. Bankr. Doc. 781-14.

68. The Debtor filed arbitration against Velanos in October 2023. Bankr. Doc. 781-14.

69. The arbitration produced the $20,000,000 judgment. Adv. Pro. No. 3:25-ap-00007-BAJ, Doc. 9.

70. The Debtor's principals relied on licensed counsel, on proof of funds, and on the wire trace report. Bankr. Doc. 781-15.

71. Multiple federal lawsuits (*Klein v. Velanos*, N.D. Tex. Case No. 3:25-cv-01991-S; *Hantash v. Byrd*, N.D. Tex. Case No. 3:24-cv-02392-D) allege that Velanos, Wearmouth, and Byrd operated a fraudulent "prime bank" scheme. Bankr. Doc. 781-20.

72. The *Hantash* complaint states the scheme against Genie is "nearly identical" to the scheme against Dr. Hantash. Bankr. Doc. 781-20.

E. THE WALKER ANALYSIS

73. Adam B. Walker, Esq. is a 12-year former FINRA enforcement attorney. Bankr. Doc. 781-9.

74. Mr. Walker reviewed the Velanos JVA and found multiple "red flags" of fraud, concluding the SBLC trading was "at all times fictitious and blatantly fraudulent." Bankr. Doc. 781-9.

75. Mr. Walker prepared a declaration and memorandum concluding that the U.S. Trustee's fraud theory was fabricated and unsupported by any evidence in the Examiner's Report. Bankr. Doc. 781-9.

76. The memorandum states: "The 'express purpose' alleged by the UST as direct evidence of fraud is itself a fraud, fabricated by the UST and unsupported by any evidence in the Report or elsewhere in the record of this case." Bankr. Doc. 781-9.

77. Adam B. Walker, Esq. concluded in his sworn declaration that the Debtor acted in good faith at all times, including because the Debtor retained licensed counsel, Scott Oh of Warren Law Group, to vet the Velanos

transaction before contributing funds. Bankr. Docs. 34, pgs. 100-104; 781-9; 781-15.

78. The U.S. Trustee has not responded to the Walker declaration or memorandum. Bankr. Doc. 781-9; Bankr. Doc. 785.

F. THE EXAMINER'S REPORT

79. Maria M. Yip was appointed as Examiner. Bankr. Doc. 146.

80. The Examiner's Report was filed on June 28, 2024. Bankr. Doc. 146.

81. The Debtor closed approximately 44 loans totaling $4,061,000, with an average loan amount of $92,000. Bankr. Doc. 781-21.

82. The Examiner's Report identifies approximately $4.5 million in non-insider loan receivables. Bankr. Doc. 146 at ¶ 228.

83. The Examiner's Report identifies $4,600,100 in scheduled balloon payments. Bankr. Doc. 146 at ¶ 229.

84. The majority of those balloon payments ($3,340,600) are not due to come in until 2032. Bankr. Doc. 781-21.

85. Velanos was formed in Wyoming; Joshua Wearmouth was the sole owner; neither Velanos nor Wearmouth were registered investment advisers. Bankr. Doc. 781-21.

86. Prior to owning Velanos, Wearmouth owned a similar company called S.S.O. Capital, which was subject to a $1,000,000 judgment for fraud and breach of fiduciary duty in the "413 Litigation." Bankr. Doc. 781-21.

G. THE VELANOS JUDGMENT

87. A Final Judgment was entered in favor of the Debtor and against Velanos Principal Capital, Inc. in the amount of $20,000,000.00. Adv. Pro. No. 3:25-ap-00007-BAJ, Doc. 9.

88. The Final Judgment was entered on March 4, 2025. Adv. Pro. No. 3:25-ap-00007-BAJ, Doc. 9.

89. The judgment bears interest at 9%. Bankr. Doc. 781-13.

90. The Trustee has not moved to abandon the Velanos judgment.

91. The Trustee is actively enforcing the Velanos judgment in the Central District of California. Case No. 8:25-cv-01740-TJH-DFM.

92. The judgment was registered on May 7, 2025 (Doc. 1); the Application to Enforce was filed July 30, 2025 (Doc. 2); and the Order to Appear for Examination was entered August 15, 2025 (Doc. 4), setting the examination for September 30, 2025, at 10:00 a.m. in Courtroom 6B, Santa Ana Courthouse. Bankr. Doc. 781-13.

93. The judgment debtor examination was vacated "without prejudice to the Judgment Creditor's right to reapply for a new judgment debtor examination once the whereabouts of Joshua Wearmouth have been established." Case No. 8:25-cv-01740-TJH-DFM, Doc. 6.

94. The Trustee filed a Request to Vacate on September 24, 2025 (Doc. 5), and the Court granted it on September 26, 2025 (Doc. 6), by Magistrate Judge Douglas F. McCormick. Bankr. Doc. 781-13.

95. The Chapter 7 Trustee has not filed a motion to abandon any asset of the estate. He has not filed a motion to abandon the Velanos judgment. He has not filed a motion to abandon the loan receivables.

96. The Trustee's belief that the Velanos judgment is "very likely uncollectible" rests on his statements that process servers and a private investigator could not locate Wearmouth and a bank account search found no assets. Bankr. Doc. 781-22.

97. A judgment or receivable remains an asset of the estate until the Trustee abandons it under 11 U.S.C. § 554 or the Court authorizes its compromise under Federal Rule of Bankruptcy Procedure 9019. The Trustee has done neither.

98. The Chapter 7 Trustee has stated that the loan documents are "mostly unenforceable" because the Debtor failed to obtain and retain original promissory notes. Bankr. Doc. 787 at ¶ 13.

99. Every loan in the Debtor's portfolio has a UCC-1 financing statement attached to it. Bankr. Doc. 781-3; Bankr. Doc. 781-5.

100. The UCC-1 financing statements perfect the Debtor's security interest in the borrowers' assets. Bankr. Doc. 781-3; Bankr. Doc. 781-5.

101. The Debtor's bank records show the funds that were advanced to each borrower. Bankr. Doc. 781-15.

102. The Chapter 7 Trustee has not conducted post-judgment discovery on the default judgments he obtained against the Debtor's borrowers. Bankr. Doc. 787 at ¶ 13.

103. The Chapter 7 Trustee has not conducted post-judgment discovery on the Velanos judgment. Case No. 8:25-cv-01740-TJH-DFM, Doc. 6.

104. The Chapter 7 Trustee has not moved to abandon any of the default judgments or the Velanos judgment.

## H. THE WARREN LAW SETTLEMENT

105. The Court approved a settlement with Warren Law Group/Scott Oh in the amount of $435,000.00. Bankr. Doc. 471.

106. The motion/notice of settlement is at Bankr. Doc. 435 and the order granting it is at Bankr. Doc. 471. Bankr. Doc. 781-13.

107. Before the Trustee's appointment, a Velanos-Debtor Settlement Agreement was executed and filed at M.D. Fla. Case No. 6:24-cv-00271-ACC-LHP, Doc. 16 on June 25, 2024, and was subsequently struck from the docket (Doc. 17) because the case was closed. Bankr. Doc. 781-13.

108. The original complaint against Velanos was filed on February 7, 2024 (M.D. Fla. Case No. 6:24-cv-00271-ACC-LHP, Doc. 1), and the Court entered an Order Dismissing Complaint without prejudice on May 13, 2024 (Doc. 13). Bankr. Doc. 781-13.

## I. THE HUGHES BANKRUPTCY CLAIM

109. David C. Hughes II filed a Chapter 7 bankruptcy case in the Central District of Illinois. Case No. 25-70566.

110. The Trustee filed a proof of claim in the Hughes bankruptcy case. Bankr. Doc. 787 at ¶ 8.

111. The proof of claim is based on a judgment against ZOOMERAL for which Hughes was the majority owner, but Hughes' bankruptcy trustee has objected to the claim, making distribution uncertain. Bankr. Doc. 781-22.

112. The Trustee expects to receive a distribution from the Hughes bankruptcy case. Bankr. Doc. 787 at ¶ 8.

113. The Trustee does not know how much the distribution will be, if any. Bankr. Doc. 787 at ¶ 8.

J. THE CLAIMS REGISTER

114. The claims register reflects approximately $39,281,218.89 in filed claims. Bankr. Doc. 787 at ¶ 6.

115. Claim 4 (Belle Maison Realty, LLC) was reduced from $3,000,000 to $70,000 by agreed order. Bankr. Doc. 583.

116. The Trustee seeks to reduce Claim 5-3 by $13,847,750. Bankr. Doc. 759.

117. The Trustee seeks to reduce Claim 64-2 by $3,972,311.48. Bankr. Doc. 772.

118. The Trustee's Interim Report (Doc. 573) shows the estate held $1,578,710.86 in cash as of March 31, 2026, and that the Trustee had collected a total of $1,566,544.77. Bankr. Doc. 781-22.

119. If the Trustee's pending objections are sustained, claims will total $18,355,432.41. Bankr. Doc. 787 at ¶ 7.

120. The Trustee states that claims will "total in excess of $18 million" by the conclusion of the case. Bankr. Doc. 787 at ¶ 7.

121. The Trustee has stated in other proceedings that claims will total $13–14 million after objections. 2:26-mp-00001-FMR, Misc. Doc. 45.

K. THE UNOPPOSED CLAIMS

122. The undersigned filed an Amended Verified Omnibus Objection to Claim Nos. 1–71 on August 5, 2026. Bankr. Doc. 644.

123. The Objections were served on the claimants.

124. The response deadline was October 19, 2026. Bankr. Doc. 711.

125. No claimant filed a response, an objection, or a motion for extension of time.

126. Charles Blake Stringer/Nutra-Acres LLC filed an Addendum (Bankr. Doc. 786), not a response.

127. The Addendum was filed after the response deadline. Bankr. Doc. 786.

128. The corporate claimants have not retained counsel.

129. The undersigned has contemporaneously filed a Motion to Deem Requests for Admission Admitted.

130. The Chapter 7 Trustee has not objected to Claims 4, 5, 29, or 64 on the ground that they are inflated. He has objected to Claim 5-3 on privity grounds and to Claim 64-2 on duplicity grounds. He has not objected to the claims on the ground that the underlying agreements are non-refundable.

131. The Chapter 7 Trustee's decision not to object to the claims on non-refundable grounds is not a finding that the claims are valid. It is a discretionary decision. The undersigned has objected to the claims on non-refundable grounds. See Bankr. Doc. 644.

## L. THE DISCOVERY

132. The undersigned served Requests for Admission, Interrogatories, and Requests for Production on September 14, 2026 in the miscellaneous proceeding (2:26-mp-00001-FMR).

133. The Requests for Admission were served on August 19, 2026, on eight (8) specific entities (Rolling By The Dozen, Sun Coast Entertainment, A Complete Home Inspection, Belle Maison Realty, Global Verse Holdings, Legacy Land Developers, Meetopolis, and Nutra-Acres Inc.). Bankr. Doc. 781-11 (2:26-mp-00001-FMR).

134. The discovery included 13 Requests for Production and 15 Interrogatories served on the creditors, including specific requests for: communications with Judge Jason A. Burgess or his chambers; records related to knowledge of the police report and spoliation allegations; communications from any person identifying themselves as representing or working with other alleged creditors; and records related to the defamatory online posts and the website victimsbelocscam.com. Bankr. Doc. 781-17 (2:26-mp-00001-FMR).

135. The response deadline was October 17, 2026 (3:24-bk-00496-BAJ).

136. The response deadline for the Requests for Admission served on or around August 19, 2026, was September 21, 2026. Bankr. Doc. 781-11.

137. No claimant filed a response to the discovery (3:24-bk-00496-BAJ & 2:26-mp-00001-FMR)

138. The U.S. Trustee filed a Motion for Protective Order (Bankr. Doc. 785) resting entirely on standing. (3:24-bk-00496-BAJ)

139. The U.S. Trustee did not respond to the discovery request-by-request. Bankr. Doc. 785. (3:24-bk-00496-BAJ)

140. The Chapter 7 Trustee responded to the discovery request-by-request but objected on relevance. Bankr. Doc. 787. (3:24-bk-00496-BAJ)

141. The Chapter 7 Trustee did not raise standing in his discovery responses. (3:24-bk-00496-BAJ)

142. The Chapter 7 Trustee asserted a single privilege claim without a privilege log. (3:24-bk-00496-BAJ)

143. Under Rule 36(a)(3), the matters set forth in the Requests for Admission are deemed admitted, including that the governing agreements stated fees were "100% non-refundable." (3:24-bk-00496-BAJ & 2:26-mp-00001-FMR)

M. THE IFP DETERMINATIONS

144. The U.S. District Court for the District of Columbia granted leave to appeal *in forma pauperis*. *Cohan v. Bomkamp*, No. 1:25-cv-02009-RDM (D.D.C. July 17, 2026).

145. The Minute Order was signed by Judge Randolph D. Moss on July 17, 2026, and explicitly noted that the case was closed on June 16, 2026. Bankr. Doc. 781-23.

146. The U.S. Bankruptcy Court for the Middle District of Florida approved Cohan's application to proceed without prepaying fees. Bankr. Doc. 666.

147. The Order was entered on September 3, 2026, and directed the Clerk to process the Notice of Appeal filed by Cohan on November 12, 2025 and approved Cohan's motion for leave to proceed on appeal *in forma pauperis*. (Bankr. Docs. 480, 669). Bankr. Doc. 781-23.

148. The U.S. Bankruptcy Court for the Middle District of Florida, Fort Myers Division, approved Cohan's motion for leave to proceed on appeal *in forma pauperis*. Misc. Pro. No. 2:26-mp-00001-FMR, Misc. Doc. 104.

149. The order was signed by Judge Luis E. Rivera II on October 5, 2026, and granted the waiver for the Notice of Appeal filed on September 30, 2026. Bankr. Doc. 781-23.

150. The Circuit Court for the Fourth Judicial Circuit in Duval County issued a Certificate of Indigency. *Cohan v. Ekuta*, No. 16-2026-CA-006395-AXXX-MA.

151. The certificate was signed by Jody Phillips, Clerk of the Circuit Court, and Deputy Clerk Lisa A. Reeves on Sept. 11, 2026. Bankr. Doc. 781-23.

152. The Circuit Court for the Fourth Judicial Circuit in Duval County issued a Certificate of Indigency. *U.S. Bank Trust Nat'l Ass'n v. ADH Holdings FL LLC*, No. 16-2025-CA-004534-AXXX-MA.

153. The certificate was signed by Deputy Clerk Pamela R. Harrell on Sept. 14, 2026. Bankr. Doc. 781-23.

154. The Supreme Court of Alabama granted *in forma pauperis* relief (SC-2026-0886).

N. THE PROCEDURAL HISTORY

155. The Court entered prior Orders Scheduling Trials at Bankr. Docs. 671-1 and 672.

156. The Court entered an additional Order Scheduling Trial at Bankr. Doc. 803.

157. The trials are set for November 9, 2026, at 10:00 AM in Courtroom 4A. Bankr. Docs. 671-1, 672, 803.

158. The trial will address (1) the Verified Motion to Expedite Consideration of Request for Orders to Show Cause (Bankr. Doc. 783); (2)

the Verified Motion for Judicial Notice of the Court's Own Docket and Transcripts (Bankr. Doc. 780); and (3) the Verified Motion to Expedite Consideration of the Verified Notice of Filing of Police Reports and Request for Judicial Notice (Bankr. Doc. 782). Bankr. Doc. 803.

159. Article I, Section 8, Clause 4 (the Uniform Laws on Bankruptcies clause) is relevant because the Trustee's administration of the claims register in Florida (addressing ~3% of claims) compared to the parallel Illinois case (addressing 100%) raises a question of whether the uniformity requirement is being honored. Bankr. Docs. 650, 781-24.

160. The discovery cutoff is seven (7) days before the trial, approximately November 2, 2026. Bankr. Doc. 803 at ¶ 4.

161. On October 28, 2026, the Court entered a Notice of Hearing on the six (6) discovery motions. Bankr. Doc. 808.

162. The hearing on the six (6) discovery motions is set for January 13, 2027, at 9:00 AM in Courtroom 4A. Bankr. Doc. 808.

163. The hearing on the six (6) discovery motions is a non-evidentiary hearing. Bankr. Doc. 808.

164. The hearing on the six (6) discovery motions is set sixty-six (66) days after the November 9, 2026 trial and seventy-two (72) days after the November 2, 2026 discovery cutoff. Bankr. Docs. 803, 808.

165. The Court struck the Combined Motion (Doc. 713) without prejudice. Bankr. Doc. 812.

166. The Court denied the Motion to Continue Trial. Bankr. Doc. 813.

167. The Court granted in part and denied in part the Motions for Authorization to File Electronically filed by David Hughes. Bankr. Doc. 814.

168. The Court denied the Trustee's Objection to and Motion for Protective Order for Witness List. Bankr. Doc. 815.

169. The Court granted the U.S. Trustee's Expedited Motion for Protective Order. Bankr. Doc. 816.

170. The Order Granting the U.S. Trustee's Expedited Motion for Protective Order relieves the U.S. Trustee of responding to discovery. It does not relieve the U.S. Trustee of the Rule 2003(c) obligation to preserve and produce the unaltered § 341 audio. Bankr. Doc. 816.

171. The Court denied the Combined Notice of Intent to Serve Subpoenas Duces Tecum and Motion for Service by the United States Marshals Service. Bankr. Doc. 817.

172. The denial of the Combined Notice of Intent to Serve Subpoenas was without prejudice. Bankr. Doc. 817.

O. THE DEBTOR'S PRE-CONVERSION RECOVERY EFFORTS

173. The Debtor hired Scott Oh of Warren Law Group to vet the Velanos transaction. Bankr. Doc. 781-15.

174. Scott Oh advised the Debtor that Velanos was legitimate and that the SBLC trading program was real. Bankr. Doc. 781-15.

175. The Debtor contributed $9,000,000 to the Velanos joint venture. Bankr. Doc. 781-15.

176. Velanos returned $500,000 and distributed zero profits. Bankr. Doc. 781-15.

177. The Debtor gave notice of the force majeure event to its borrowers and used reasonably diligent efforts to minimize its effects. Bankr. Doc. 781-14.

178. The Debtor filed arbitration against Velanos in October 2023. Bankr. Doc. 781-14.

179. The arbitration produced the $20,000,000 judgment. Adv. Pro. No. 3:25-ap-00007-BAJ, Doc. 9.

180. The Debtor's principals relied on licensed counsel, on proof of funds, and on the wire trace report. Bankr. Doc. 781-15.

181. Adam B. Walker, Esq. concluded in his sworn declaration that the Debtor acted in good faith at all times, including because the Debtor retained licensed counsel, Scott Oh of Warren Law Group, to vet the Velanos transaction before contributing funds. Bankr. Docs. 34, pgs. 100-104; 781-9; 781-15.

P. THE EFFECT OF DISALLOWANCE

182. If the unopposed claims are disallowed, the claims pool could be reduced below the Trustee's own estimate of $13–14 million. 2:26-mp-00001-FMR, Misc. Doc. 45.

183. Cohan attempted to resolve the issue informally on December 8, 2025, by sending Raye Elliott a detailed email identifying the exact inflated amounts: Claim #5 from $385,000 to $14,247,750, Claim #4 from $70,000 to $3,000,000, and Claim #29 from $100,000 to $2,500,000. The email

requested corrective action by EOD before escalating to the Court. Bankr. Doc. 781-17.

184. If the claims pool is reduced below $13–14 million, the estate's assets exceed the claims pool. Bankr. Doc. 781-10.

185. If the estate's assets exceed the claims pool, a reasonable potential surplus exists.

186. If a surplus exists, John Michael Cohan and David C. Hughes II, as 50% equity holders, have a pecuniary interest in the estate.

Q. THE STATUTORY DUTIES OF THE CHAPTER 7 TRUSTEE AND THE UNITED STATES TRUSTEE

187. The Chapter 7 Trustee is the representative of the estate. 11 U.S.C. § 323(a).

188. The Chapter 7 Trustee has a fiduciary obligation to the estate and to all parties in interest. 11 U.S.C. § 704(a).

189. The Chapter 7 Trustee is required to "collect and reduce to money the property of the estate." 11 U.S.C. § 704(a)(1).

190. The Chapter 7 Trustee is required to "investigate the financial affairs of the debtor." 11 U.S.C. § 704(a)(4).

191. The Chapter 7 Trustee is required to "examine proofs of claims and object to the allowance of any claim that is improper." 11 U.S.C. § 704(a)(5).

192. The Chapter 7 Trustee is required to "furnish such information concerning the estate and the estate's administration as is requested by a party in interest." 11 U.S.C. § 704(a)(7).

193. The Chapter 7 Trustee is required to "prepare and file a final report and account" before the case is closed. 11 U.S.C. § 704(a)(9).

194. The Chapter 7 Trustee is required to account for all property of the estate and to make distributions in accordance with the Bankruptcy Code. 11 U.S.C. §§ 726, 704(a)(9).

195. The Chapter 7 Trustee has not filed a motion to abandon any asset of the estate. 11 U.S.C. § 554.

196. The Chapter 7 Trustee has not filed a motion to compromise any asset of the estate. Fed. R. Bankr. P. 9019.

197. The Chapter 7 Trustee has not conducted post-judgment discovery on the Velanos judgment or on the default judgments against the Debtor's borrowers.

198. The United States Trustee is an official of the Department of Justice appointed by the Attorney General to supervise the administration of bankruptcy cases. 28 U.S.C. §§ 581–589.

199. The United States Trustee is required to "establish, maintain, and supervise a panel of private trustees" and to "supervise the administration of cases and trustees." 28 U.S.C. § 586(a).

200. The United States Trustee is required to be impartial. 28 C.F.R. § 58.6.

201. The United States Trustee "may raise and may appear and be heard on any issue in any case or proceeding." 11 U.S.C. § 307.

202. The United States Trustee filed a motion for protective order to avoid responding to discovery about his own conduct during the § 341 meeting. Bankr. Doc. 785.

203. The United States Trustee has not produced the unaltered audio. He has not explained the flatline. He has not denied that the police report was removed from the docket.

204. The United States Trustee has taken positions in this case that are adverse to the Debtor's principals, including the motion to convert and the motion for protective order.

205. The United States Trustee has not taken a position on the coordination between the courts, the removal of the police report, or the alteration of the audio.

R. THE COORDINATED DEFAMATION CAMPAIGN

206. The claimants engaged in a coordinated online defamation campaign against the Debtor and its principals. Bankr. Doc. 781-10.

207. The campaign included posts on BiggerPockets, Trustpilot, Ripoff Report, and other platforms. Bankr. Doc. 781-10.

208. The Recorded Call Summary and Transcript in 781-17 reflects the strict conduct clauses Genie enforced with its borrowers: all updates had to occur via the ZOOMERAL messaging system in writing only; borrowers agreed to non-disparagement and confidentiality clauses; all testimonials and reviews had to be approved by Genie Investments and ZOOMERAL prior to being publicized; and any breach of non-disparagement or confidentiality may result in termination and a potential lawsuit for damages. Bankr. Doc. 781-17.

209. The profiles of "Sandra Tate" and "Christine Ellsworth" have been identified as fake profiles created as part of the campaign and are not on the claims register. Bankr. Doc. 781-10.

210. Borrowers were told they would owe ZOOMERAL a 3% success fee for any debt transaction, and the Due Diligence fee was split into equal thirds between ZOOMERAL, Cald Holdings, and Capitulum (as shown in the transaction log). Bankr. Doc. 781-17.

211. The ZOOMERAL defamation lawsuit (Case No. 2024-008427-CA-01) documented that the campaign participants attempted a fraudulent wire recall, filed false FBI reports, organized a group to file fraudulent law enforcement complaints amongst other claims such as false light and extortion. Bankr. Doc. 781-10.

212. Defaults were entered against some of the campaign participants. Bankr. Doc. 781-10.

213. The First Amendment protects the right to petition the Government for redress of grievances—the right Cohan exercised in filing the motions, objections, and appeals in this case and in the related proceedings. Bankr. Doc. 781-24.

S. THE FEDERAL INVESTIGATION

214. The Federal Bureau of Investigation, the Securities and Exchange Commission, and the Illinois Secretary of State police investigated the

Debtor's principals. No charges were filed. No indictments were returned. No arrests were made.

215. The only Ponzi-scheme complaint filed against the estate was voluntarily dismissed on August 17, 2026, without any ruling on the merits. Bankr. Doc. 781-10.

216. The undersigned was approved as a volunteer for Florida's Public Schools on October 16, 2026, following a Level 2 background screening under Fla. Stat. § 435.04. The screening returned no disqualifying records.

217. The undersigned, Mr. Hughes and the Debtor, through Adam B. Walker, Esq., reported Velanos Principal Capital, Inc., its principals, and its associates to the Federal Bureau of Investigation, the Securities and Exchange Commission, the Federal Trade Commission, and the Royal Canadian Mounted Police in 2024. See Bankr. Doc. 781-20.

## T. THE CORPORATE SEPARATION AND PARALLEL CASES

218. Claim No. 16, filed in the name of MIMS-IPR, LLC, was withdrawn and reduced to $0.00 by the lawful successors-in-interest of MIMS-IPR, LLC in Bankr. Doc. 366. Bankr. Doc. 781-12.

219. The Illinois Chapter 7 Trustee (Robert E. Eggmann) addressed 100% of claims in the related Hughes case (34 of 54) compared to only 2 of 71 (3%) in the Florida case at the time of the filing. Bankr. Docs. 650, 781-12.

220. The Illinois court entered orders sustaining objections and disallowing claims for 20 of 54 claims. Bankr. Docs. 650, 781-12.

221. The Illinois court struck responses filed by non-attorneys on behalf of corporate entities and sustained the Trustee's objections. Bankr. Docs. 650, 781-12.

U. COUNSEL'S REFUSAL TO ACT AND PRESERVATION OF APPEAL

222. Immediately after the Court entered the order converting the case to Chapter 7 (over the weekend of August 10–11, 2024), Cohan and Hughes wrote to their counsel, Bryan Mickler, on Sunday, August 11, 2024, directing him to begin work on a motion for reconsideration and, if that fails, an appeal. Bankr. Doc. 781-18.

223. They attached a pre-drafted motion for reconsideration and notice of appeal, the Walker Declaration, and SBLC research. Bankr. Doc. 781-18.

224. Mickler responded on Monday, August 12, 2024, at 8:25 AM, stating: "Based upon my review of the case and the evidence, I do not believe that an appeal would be successful. You are free to remove me as your counsel if

you wish, but I will not be able to provide you with appellate services in this case." Bankr. Doc. 781-18.

225. On August 12, 2024, Cohan explicitly asked Bryan Mickler, "Whom do we go to to report Bomkamp for fraud?" and "Whom do we go to to report Yip for fraud/incompetence?" and never received a response. Bankr. Doc. 781-17.

226. Cohan and Hughes never received a response to their direct inquiries regarding whom to contact to report U.S. Trustee Bomkamp and Examiner Yip for fraud. Bankr. Doc. 781-18.

## V. THE APRIL 9–10, 2024 CONVERSION TRIAL TESTIMONY

227. On April 9 and 10, 2024, the Court held a two-day evidentiary trial on the U.S. Trustee's expedited motion to appoint a Chapter 11 trustee or convert the case. Bankr. Doc. 79, 80.

228. Bryan Mickler appeared for the Debtor; David Hughes and John Michael Cohan were present; Scott Bomkamp appeared for the U.S. Trustee; Adam Walker appeared via Zoom. Bankr. Doc. 80 at 3.

229. All parties' exhibits were admitted into evidence without objection; the parties agreed to forgo opening statements and to call witnesses sequentially. Bankr. Doc. 79 at 4–5.

230. At the April 9, 2024 trial, the U.S. Trustee called Kristin Stegent, Charles Blake Stringer, Lisa Butkiewicz, Adam Foster, Rejoe Joy, Lea Muse, Shailesh Patel, Preet Patel, and Kim Nash. Bankr. Doc. 79.

231. The U.S. Trustee also called Daniel Munoz, an auditor employed by the U.S. Trustee's Orlando office. Bankr. Doc. 79.

232. At the April 10, 2024 trial, the Debtor called Adam Walker, David Hughes, and John Cohan. Bankr. Doc. 80.

233. Every borrower who testified at the conversion trial — Stegent, Stringer, Butkiewicz, Foster, Joy, Muse, Nash, and the Patels — had a ZOOMERAL User ID. Bankr. Docs. 79, 781-20.

W. TESTIMONY ON THE FORCE MAJEURE EVENT AND THE McMANN RELATIONSHIP

234. Muse testified that Genie's October 25, 2023 ZOOMERAL message terminated the agreement effective immediately pursuant to Section 13.7. Bankr. Doc. 79.

235. Muse testified that Genie's letter expressly stated that Velanos's failure to fund Genie was a force majeure event. Bankr. Doc. 79.

236. Hughes testified that Genie never had a website, never actively solicited borrowers, and had no interaction with McMann's customers; McMann opened the ZOOMERAL account and messaged Genie what it needed. Bankr. Doc. 80.

237. Hughes testified that Genie did not set the due diligence amounts for McMann customers, bridge loan amounts, or initiation fees. Bankr. Doc. 80.

238. Cohan testified that Genie never accepted a fourth bridge loan payment, that all bridge loans were provided, and did not take additional interest from customers after the 90-day period expired. Bankr. Docs. 51 through 51-8; 80, Cohan's testimony.

X. THE JUNE 24, 2025 ADVERSARY PROCEEDING TESTIMONY

239. In the June 24, 2025 adversary proceeding, Cohan asked the Chapter 7 Trustee whether he had seen internet postings about Cohan or the Debtor; the Trustee answered "No." Bankr. Doc. 389.

240. The Chapter 7 Trustee testified that if third parties name Cohan individually as "thief, incompetent," that would be Cohan's personal claim. Bankr. Doc. 389.

241. The Chapter 7 Trustee testified that he filed fraudulent transfer claims "without reviewing all the bank records" and that he "did not dig deep into

all of the bank records" and "relied primarily on the Yip report." Bankr. Doc. 389.

242. The Chapter 7 Trustee testified he did not independently request to review the Linger Chu contract before filing the adversary complaint. Bankr. Doc. 389.

243. The Chapter 7 Trustee testified the $1.1 million Chase debit was ultimately traced to a customer refund, not to Cohan, Hughes, or any insider, and that the judgment was entered only for the insider loans. Bankr. Doc. 389.

Y. THE AUGUST 12, 2026 RECUSAL HEARING

244. Cohan filed a Verified Motion for Recusal and Disqualification of Judge Jason A. Burgess on July 6, 2026, which Judge Burgess referred to Judge Rivera with his consent. Misc. Doc. 110.

245. At the August 12, 2026 hearing, Cohan argued that the U.S. Trustee spliced the April 17, 2024 § 341 audio to remove his invocation of rights; that the audio waveform flatline proves it; and that the U.S. Trustee's program is the only party tasked with recording, storing, and preserving § 341 audio. Misc. Doc. 110.

246. Cohan argued that the police report was removed from the docket twice without motion, hearing, or order, and that he has a side-by-side comparison in Bankr. Docs. 477 and 490; Bank Misc. Doc. 110.

247. Cohan stated that the original docket for Bankr. Doc. 470 was about 51 pages and now shows 26 pages. Misc. Doc. 110.

248. Cohan stated that he told U.S. Trustee Bomkamp before the § 341 meeting not to let Peace Ekuta ("Agent Amber Adams") in or let her speak, and that Bomkamp gave her five (5) minutes. Misc. Doc. 110.

249. Cohan stated that the "flurry of filings" justification for the filing ban was unsupported: at the time of the March 27, 2025 Order to Show Cause there were exactly eight filings between two people over seven and a half months, or one filing every fifty-six days. Misc. Doc. 110.

250. Cohan stated that the filing ban was imposed the day after he refiled the police report (Bankr. Docs. 470, 471), and that one week after he filed the recusal motion the Trustee moved to permanently enjoin him. Misc. Doc. 110.

251. Hughes stated that the second motion to convert rested solely on the Examiner's Report; that the Examiner was hand-picked with no opportunity

to interview for neutrality; and that they never received an evidentiary hearing on the second conversion motion. Misc. Doc. 110.

252. Hughes stated that Judge Burgess approved Adam Walker as attorney to finish the lawsuit against Velanos, and that Walker's memorandum concluded the U.S. Trustee's allegation of direct evidence of fraud "was a fraud fabricated by the United States Trustee and unsupported by any evidence in the Examiner's Reports or anywhere else in the record." Misc. Doc. 110.

253. Elliott represented that Akerman LLP employed Taylor King, who served as Judge Burgess's term law clerk from May 2022 through May 2026, and that an ethical screen was put in place with no contact regarding this case. Misc. Doc. 110.

254. The Court denied the motion to stay, the motion to expand scope, and the motion to compel discovery, and gave the parties seven days to file additional briefing on the recusal motion. Misc. Doc. 110.

## Z. ADDITIONAL FACTS FROM THE MOTIONS AND ADVERSARY PROCEEDING RECORD

255. On October 10, 2022, Will Byrd hosted a meet-and-greet conference call between Genie management, attorney Scott Oh of Warren Law Group,

and Velanos principal Joshua Wearmouth. Bankr. Doc. 429 at 142; 3:25-ap-00011, Adv. Pro. Doc. 75.

256. On October 20, 2022, Genie transferred the first $3 million to Velanos, after receiving affirmative legal authorization from Scott Oh, who negotiated the contract. Bankr. Doc. 392; Bankr. Doc. 429.

257. On November 16, 2022, Genie received a letter from Gowling WLG (Canada) LLP, Velanos' legal counsel, verifying Velanos had engaged the firm for structured finance and confirming Velanos had access to funding partners with "significant financial capacity." Bankr. Doc. 392.

258. On November 21, 2022, Genie transferred the second $3 million to Velanos, before any default, following Warren Law Group's review and modification of the agreement. Bankr. Doc. 392; Bankr. Doc. 429.

259. On November 30, 2022, Genie transferred the third $3 million to Velanos, before any default, after receiving the Gowling WLG letter. Bankr. Doc. 392; Bankr. Doc. 429.

260. December 5, 2022 was the first and only date on which Velanos became contractually obligated to return funds or make a profit distribution. All $9 million was therefore transferred **before** Velanos defaulted. Bankr. Doc. 392; 3:25-ap-00011, Adv. Pro. Doc. 116.

261. In June 2023, Velanos proposed a Second Amendment to the JVA to deposit $9.5 million into Genie's Nordic Trust account; the portal showed the transfer, but Genie could never wire the funds out, and Nordic Trust never provided substantive answers. Bankr. Doc. 429.

262. In August 2024, Genie settled with Velanos, and Velanos placed $550,000 into attorney Bryan Mickler's account. Bankr. Doc. 392.

263. The Examiner falsely characterized the $9 million sent to Velanos as "customer funds" held in trust. The BELOC Agreements expressly state that ICA Payments become Genie's earned revenue upon receipt; there is no trust, escrow, or fiduciary duty to segregate them. Bankr. Doc. 392; 3:25-ap-00011, Adv. Pro. Doc. 112.

264. Examiner Yip testified under oath at the conversion hearing that Genie transferred funds to Velanos **after** Velanos defaulted. The timeline establishes all transfers occurred **before** the December 5, 2022 obligation date. Bankr. Doc. 392; 3:25-ap-00011, Adv. Pro. Doc. 112.

265. Before the Report issued, Genie's counsel emailed Yip and her assistant stating the funds were earned revenue, not customer deposits. The Examiner ignored the clarification. Bankr. Doc. 392; Adv. Pro. Doc. 112.

266. Yip, a licensed CPA, reviewed Genie's tax returns, which categorized the $9 million as revenue and later wrote it off as bad debt; Yip never objected to that accounting treatment in her review, yet her Report contradicted it. Bankr. Doc. 392; 3:25-ap-00011, Adv. Pro. Doc. 112.

267. The 51-page Examiner's Report contains no express finding that Genie committed fraud. Bankr. Doc. 651; Bankr. Doc. 392.

268. U.S. Trustee Bomkamp told the Court that the Examiner's Report "confirms" the Debtor engaged in fraud. Attorney Adam Walker noted: "The UST simply invented this 'confirmation' and attributed it to its hand-selected Examiner." Bankr. Doc. 651; Bankr. Doc. 392.

269. The Chapter 7 Trustee testified under oath that he filed the adversary complaint based on the Examiner's Report without personally reviewing the underlying loan agreements, bank records, or the $1.1 million transaction records. Bankr. Doc. 392.

270. After evidence of the Examiner's errors was produced, Trustee's counsel Raye Elliott claimed the Trustee "did not rely exclusively" on the Report, contradicting Cohen's prior sworn testimony. Bankr. Doc. 392 at 12; 3:25-ap-00011, Adv. Pro. Doc. 112 at 11.

271. During the conversion hearing, when the Examiner misstated the timeline, Hughes and Cohan requested a sidebar with Mickler and instructed him to correct the record. Mickler refused and stated it "could be fact-checked later." Bankr. Doc. 392; 3:25-ap-00011, Adv. Pro. Doc. 112.

272. Mickler failed to submit the Gowling WLG letter or the Nordic Trust/Chase banking evidence to the Court or the Examiner, evidence that would have directly contradicted the "customer funds" and "gross mismanagement" narratives. Bankr. Doc. 651; Bankr. Doc. 392.

273. On March 26, 2025, Movants filed a Notice of Material Change stating that Zoomeral, Capitulum, Better Methods, Genie Investments II, and Genie's Angels were formally dissolved in their respective states (Delaware, Wyoming, New York) due to lack of assets and operations. 3:25-ap-00011, Adv. Pro. Docs. 20, 75.

274. On September 11, 2025, Trustee's counsel Raye Elliott emailed demanding bank names. Hughes and Cohan requested an extension to September 16, which Elliott granted. On September 16, Hughes provided the banks: Zoomeral (West Central Bank); others (TD Bank, Wells Fargo); Capitulum (Dell One Credit Union, Oppenheimer); Better Methods (Morgan

Stanley). On September 17, Elliott replied: "Thank you." 3:25-ap-00011, Adv. Pro. Doc. 121.

275. Despite that compliance, Hughes was barred from filing the fraud motion due to a prior filing sanction tied to the specific discovery order now satisfied. 3:25-ap-00011, Adv. Pro. Doc. 121.

276. A creditor filed a parallel federal lawsuit in Louisiana (Civil Action No. 23-CV-7288, *Seiler Tucker*) relying on the Examiner's disputed report and attempting to relitigate the same core issues. Bankr. Doc. 394-1

277. Exhibits show coordinated online attacks on BiggerPockets, Trustpilot, and Ripoff Report labeling the Debtor a "Ponzi scheme" and "criminals." Bankr. Doc. 429.

278. A February 2023 Stegent text message states: "If you are interested in funding in tranches still, I will remove my McMann reviews after being funded... I will sign an agreement not to tell other borrowers... You are going to end up in a big lawsuit and possibly in prison." Bankr. Doc. 429.

279. A police report, JSO# 2025-0471040, was filed on August 16, 2025 by John Michael Cohan alleging violation of an injunction by Peace Freedom, who allegedly called into the federal bankruptcy § 341 hearings on **April 9 and April 17, 2024.** Bankr. Doc. 713.

280. The estate is the beneficiary of a $20 million judgment, but the claims register reveals approximately $39 million in claims. Evidence indicates the register is artificially inflated to create a false perception of insolvency; viable claims are estimated at approximately $15 million. Bankr. Doc. 429.

281. Four arbitrations in which the Debtor was the claimant have vanished from the estate's accounting without a court order. Bankr. Doc. 429.

282. Forty-four (44) bona fide loans valued at approximately $4 million in receivables are unaccounted for in the estate's accounting. Bankr. Doc. 429.

283. Trustee Cohen testified under oath that he did not have social media and did not see the creditors' online defamation, but Exhibit 1E shows his official Facebook account. Bankr. Doc. 429.

## AA. THE "CUSTOMER FUNDS" CHARACTERIZATION AND THE EARNED-REVENUE DEFENSE

284. The BELOC Agreements provide that ICA Payments become the Lender's earned revenue upon receipt and contain no trust, escrow, or segregation obligation. Bankr. Doc. 392; 3:25-ap-00011, Adv. Pro. Doc. 112.

285. Genie's counsel notified the Examiner in writing, before the Report issued, that the $9 million was earned revenue and not customer deposits held in trust. Bankr. Doc. 392; Adv. Pro. Doc. 112.

286. The Examiner did not address that written clarification in the Report. Bankr. Doc. 392; 3:25-ap-00011, Adv. Pro. Doc. 112.

287. The Examiner's "customer funds" characterization is the premise on which the U.S. Trustee's conversion motion, the Chapter 7 Trustee's adversary claims, and the parallel *Seiler Tucker* litigation rest. Bankr. Doc. 392; Bankr. Doc. 394-1.

## AB. THE EXAMINER'S QUALIFICATIONS AND HER CONTRACT CONCLUSIONS

288. Maria M. Yip, the Examiner, is a licensed certified public accountant. Bankr. Doc. 146.

289. The Examiner is not a licensed attorney and does not hold a law license. Bankr. Doc. 146.

290. The Examiner's Report draws legal conclusions about the meaning and effect of the BELOC Agreements, including the characterization of ICA Payments as "customer funds" held in trust. Bankr. Doc. 146; Bankr. Doc. 392.

291. The BELOC Agreements contain no trust, escrow, or segregation language, and provide that ICA Payments become the Lender's earned revenue upon receipt. Bankr. Doc. 781-3; Bankr. Doc. 392.

292. Genie's counsel notified the Examiner in writing by email, before the Report issued, that the funds were earned revenue rather than customer deposits held in trust. Bankr. Doc. 392; 3:25-ap-00011, Adv. Pro. Doc. 112.

293. The Examiner did not address that written clarification in the Report. Bankr. Doc. 392; 3:25-ap-00011, Adv. Pro. Doc. 112.

294. The Examiner reviewed Genie's tax returns, which treated the $9 million as revenue later written off as bad debt, and did not object to that accounting treatment. Bankr. Doc. 392; 3:25-ap-00011, Adv. Pro. Doc. 112.

295. The Examiner's contract characterizations — including "customer funds" — are the premise on which the U.S. Trustee's conversion motion, the Chapter 7 Trustee's adversary claims, and the parallel *Seiler Tucker* litigation rest. Bankr. Doc. 146; Bankr. Doc. 392; Bankr. Doc. 394-1.

AC. MISCELLANEOUS FACTS

296. In paragraph 11 of the U.S. Trustee's Second Motion, the U.S. Trustee represented that the Examiner found that the purpose of the ICA funds was to prepay interest on customer loans and that the Debtor made contradictory statements about whether those funds were to be held in trust or could be used in the ordinary course. (Bankr. Doc. 154, U.S. Trustee's Second Motion, at 5–6, ¶ 11.)

297. The BELOC Agreement uses the defined term "ICA Payment." The Walker opposition memorandum states that the phrase "ICA funds" does not appear in the BELOC Agreement. (Bankr. Doc. 781-3, BELOC Agreement; Bankr. Doc. 781-9, Walker opposition memorandum, at 3 & n.8.)

298. 300. Sections 1.1, 3.5, and 13.7 of the BELOC Agreement address the Interest Credit Account, the credit recorded in that account, the application of the credit to interest as it becomes due, and the circumstances in which an ICA Payment may be refunded. (Bankr. Doc. 781-3, BELOC Agreement §§ 1.1, 3.5, 13.7; Bankr. Doc. 781-9, Walker opposition memorandum, at 4 & n.10.)

299. 301. The BELOC Agreement describes the Interest Credit Account as an account maintained on the Lender's books and records and requires a credit equal to the ICA Payment to be recorded in that account. (Bankr. Doc. 781-3, BELOC Agreement §§ 1.1, 3.5; Bankr. Doc. 781-9, Walker opposition memorandum, at 4.)

300. 302. Section 13.7(a) provides a 40-day period for return of an ICA Payment after a Borrower properly terminates the BELOC Agreement and requests a refund, subject to the provisions of Section 13.7(c). (Bankr. Doc.

781-3, BELOC Agreement § 13.7(a), (c); Bankr. Doc. 781-9, Walker opposition memorandum, at 4.)

301. 303. Section 13.7(c) provides that the 40-day refund period is tolled during the pendency of a Force Majeure Event and includes the failure of the Lender's wholesale lender to perform under its agreement with the Lender as a defined Force Majeure Event. (Bankr. Doc. 781-3, BELOC Agreement § 13.7(c); Bankr. Doc. 781-9, Walker opposition memorandum, at 4.)

302. 304. The Walker opposition memorandum identifies Report paragraphs 39, 81, and 82 as passages in which the Examiner relied on a McMann principal's email, a demand letter from McMann's law firm, and an affidavit from a borrower in discussing the characterization of ICA Payments. (Bankr. Doc. 781-9, Walker opposition memorandum, at 2 & n.5.)

303. 305. The Walker opposition memorandum states that the Examiner's Report does not analyze BELOC Agreement Sections 1.1, 3.5, and 13.7 in addressing whether ICA Payments were required to be held in trust or escrow. (Bankr. Doc. 781-9, Walker opposition memorandum, at 2–4.)

304. 306. In paragraph 17 of the U.S. Trustee's Second Motion, the U.S. Trustee characterized the purpose of transfers to Better Methods as "asset protection from the Debtor's creditors" and described that characterization

as direct evidence of fraudulent intent. (Bankr. Doc. 154, U.S. Trustee's Second Motion ¶ 17; Bankr. Doc. 781-9, Walker opposition memorandum, at 7.)

305. 307. The Walker opposition memorandum quotes the entirety of Examiner's Report paragraph 188 as follows: "According to [John Michael] Cohan, Better Methods is an asset management company set up to protect the Debtor's assets and the assets of the Debtor's clients." (Bankr. Doc. 146, Examiner's Report ¶ 188; Bankr. Doc. 781-9, Walker opposition memorandum, at 7.)

306. The quoted text in Examiner's Report paragraph 188 attributes the statement to John Michael Cohan; it does not state that the transfers were made to protect assets from the Debtor's creditors. (Bankr. Doc. 146, Examiner's Report ¶ 188; Bankr. Doc. 781-9, Walker opposition memorandum, at 7.)

307. 309. In paragraph 19 of the U.S. Trustee's Second Motion, the U.S. Trustee asserted that affiliate transfers occurred while the Debtor was being sued or threatened with suit for failing to fund loans, that the Debtor received less than reasonably equivalent value because the loans were non-market, and that the transfers were concealed or disguised as loans. (Bankr.

Doc. 146, U.S. Trustee's Second Motion ¶ 19; Bankr. Doc. 781-9, Walker opposition memorandum, at 7.)

308. 310. The Walker opposition memorandum identifies no citation in paragraph 19 of the U.S. Trustee's Second Motion to a specific paragraph, exhibit, transaction schedule, or other record evidence supporting those three assertions. (Bankr. Doc. 146, U.S. Trustee's Second Motion ¶ 19; Bankr. Doc. 781-9, Walker opposition memorandum, at 7.)

309. 311. The Walker opposition memorandum states that the affiliate transfers identified in the Examiner's Report were made pursuant to loan agreements executed in September 2022 and were made in separate transactions over a period extending from September 2022 through July 2023. (Examiner's Report, Exhibit 4 and ¶¶ 147, 159; Bankr. Doc. 781-9, Walker opposition memorandum, at 8 & n.19.)

310. 312. Examiner's Report Exhibit 4 reflects approximately 60 separate transfers from Genie to Zoomeral, Inc., between September 12, 2022, and July 28, 2023, with a net total of $1,771,555.74. (Bankr. Doc. 146, Examiner's Report, Exhibit 4; Bankr. Doc. 781-9, Walker opposition memorandum, at 8 & n.19.)

311. 313. Of the Zoomeral transfers identified in Examiner's Report Exhibit 4, 14 occurred before Genie entered the Velanos joint venture, and another 20 occurred before Velanos was late in making any payment due under the joint venture agreement. (Bankr. Doc. 146, Examiner's Report, Exhibit 4; Bankr. Doc. 781-9, Walker opposition memorandum, at 8.)

312. 314. The Walker opposition memorandum states that the Examiner's Report identifies more than 25 transfers apiece from Genie to Capitulum Homes and Cald Holdings between September 2022 and July 2023. (Bankr. Doc. 146, Examiner's Report ¶¶ 147, 159; Bankr. Doc. 781-9, Walker opposition memorandum, at 8 & n.19.)

313. 315. The Walker opposition memorandum states that each affiliate loan at issue required repayment in full of the principal amount and that the loans were not forgivable. (Bankr. Doc. 781-9, Walker opposition memorandum, at 9.)

314. 316. The Walker opposition memorandum identifies the terms cited by the U.S. Trustee as evidence of non-market lending: low interest rates, no personal guarantees, no periodic-payment requirement, and an option for the borrower to extend the loan term for ten years. (Bankr. Doc. 154, U.S.

Trustee's Second Motion ¶ 19; Bankr. Doc. 781-9, Walker opposition memorandum, at 9.)

315. 317. The Walker opposition memorandum states that the Examiner's Report contains no evidence identifying the loan terms that would have been available to the affiliate borrowers in the open market. (Bankr. Doc. 781-9, Walker opposition memorandum, at 9.)

316. 318. The Walker opposition memorandum describes Zoomeral as having built and operated the software platform used by Genie and its borrowers for communications and record management, and states that the platform was integral to Genie's business in 2022–2023. (Bankr. Doc. 781-9, Walker opposition memorandum, at 10.)

317. 319. The Walker opposition memorandum states that Genie expected improvements to Zoomeral's systems to benefit both companies and that the Zoomeral loan proceeds were intended to support software developers, relationships with payment processors, and marketing to attract additional potential borrowers. (Bankr. Doc. 781-9, Walker opposition memorandum, at 10.)

318. The Walker opposition memorandum states that Scott Oh of Warren Law Group represented Genie concerning the Velanos joint venture from

October 2022 through July 2023, reviewed multiple amendments to the joint venture agreement, and communicated frequently with Velanos on Genie's behalf. (Bankr. Doc. 781-9, Walker opposition memorandum, at 5.)

319. 321. The Walker opposition memorandum states that the Examiner's Report discusses the absence of registered-investment-adviser status and the projected returns under the Velanos joint venture, including a 100% return in 30 days and a potential 900% return, but does not discuss the work performed by Genie's retained counsel in evaluating the transaction. (Bankr. Doc. 146, Examiner's Report ¶ 83; Walker opposition memorandum, at 5–6.)

320. 322. The Walker opposition memorandum states that, although the Examiner's Report indicates that the Examiner reviewed Warren Law Group's bank records, the Report does not identify an interview of Scott Oh or Warren Law Group concerning the substance of the legal work performed for Genie. (Bankr. Doc. 146, Examiner's Report; Bankr. Doc. 781-9, Walker opposition memorandum, at 6.)

321. On June 17, 2025, the FBI was at the undersigned's home for approximately three and a half hours. During that visit, the FBI Agent stated verbally — and the undersigned paraphrases — that the undersigned's

version of events was more colorable than the version provided by the alleged creditors.

322. The Chapter 7 Trustee filed the adversary complaint against the Debtor's affiliated entities without reviewing all of the Debtor's bank records. Bankr. Doc. 389 at 41:19–23.

323. The Chapter 7 Trustee testified under oath: "I did not dig deep into all of the bank records. I relied primarily on the Yip report." Bankr. Doc. 389 at 43:13–24.

324. The Chapter 7 Trustee testified under oath that he made fraudulent transfer allegations "without reviewing all the bank records." Bankr. Doc. 389 at 41:19–22.

325. The U.S. Trustee filed the motion to appoint a Chapter 11 trustee or convert the case on the theory that the Debtor engaged in fraud. Bankr. Doc. 20.

326. The U.S. Trustee did not review Debtor's bank records before filing the motion (Bankr. Doc. 20).

327. The Examiner's Report acknowledges that she did not review five (5) non-Debtor bank accounts, including the Michael Connor IOTA account at Wells Fargo that received approximately $15,000,000 in funds. Bankr. Doc. 146 at ¶¶ 219–222.

328. The U.S. Trustee relied on the Examiner's Report. The Examiner did not review the accounts. The U.S. Trustee did not review the accounts. The Chapter 7 Trustee did not review the accounts. The fraud theories was filed without accounts being reviewed.

329. Adam B. Walker, Esq. concluded in his post-examiner brief that the U.S. Trustee's fraud theory was fabricated and unsupported by any evidence in the Examiner's Report. Bankr. Doc. 781-9.

AD. EXHIBITS THE COHAN AND HUGHES AGREE TO

330. Cohan and Hughes agree that the email from Maria M. Yip to counsel for the Debtor, dated June 26, 2024 is authentic and admissible. The email is attached hereto as Exhibit 25.

331. Cohan and Hughes agree that the UCC-1 Financing Statements for the Debtor's loans to its borrowers are authentic and admissible. The forty-four (44) UCC-1s are in possession of the Debtor are attached hereto as Exhibit 26.

332. Cohan and Hughes agree that the exhibits filed at Bankr. Doc. 781 are authentic and admissible. All of the exhibits at Bankr. Doc. 781, including 781-1 through 781-24 are incorporated by reference into this stipulation.

AE. THE AGREEMENT ON JUDICIAL NOTICE

333. Cohan and Hughes agree that the Court may take judicial notice of papers filed in this bankruptcy case including but not limited to the main docket and the claims register.

VERIFICATION

We, John Michael Cohan and David C. Hughes II, declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing facts are true and correct to the best of our knowledge and belief. The following exhibits are true and authentic copies submitted under Rule 901, 902 or any other applicable rule.

Respectfully submitted in good faith,

John Michael Cohan, without prejudice, without recourse, UCC 1-308, 1-103
iustusprocessus@outlook.com
/s/ John Michael Cohan
John Michael Cohan
Interested Party, 50% Equity Holder, Protected Person under Marsy's Law and the United States Constitution

/s/ David C. Hughes II
David C. Hughes II
Interested Party, 50% Equity Holder