UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION
In re: Genie Investments NV Inc., Debtor.
Case No. 3:24-bk-00496-BAJ
Chapter 7

FILED INTAKE USBC
NOV 12 '26 PM3:44

# JOHN MICHAEL COHAN'S SUPPLEMENTAL STATEMENT IN SUPPORT OF THE TRUSTEE'S MOTION FOR SUMMARY JUDGMENT IN PART AND LIMITED OBJECTION TO ALLOWANCE OF CLAIM 5 IN THE AMOUNT OF $400,000

John Michael Cohan ("Cohan"), protected person under Marsy's Law and the United States Constitution, a party in interest, proceeding pro se and *in forma pauperis*, submits this Supplemental Statement in Support of the Trustee's Motion for Summary Judgment on the Trustee's Objection to Claim 5 (Bankr. Doc. 759) (the "Motion") insofar as it seeks reduction of Claim 5 by $13,847,750, and a Limited Objection to the Motion insofar as it requests that Claim 5 be allowed as a general unsecured claim in the amount of $400,000. In support, Cohan incorporates Bankr. Doc. 801 in its entirety as fully set-forth herein:

## I. COHAN SUPPORTS REDUCTION OF CLAIM 5 BY $13,847,750.

1. Cohan agrees with the Trustee that Nutra-Acres LLC/Charles Blake Stringer ("Alleged Creditors") *cannot* maintain a breach-of-contract claim against the Debtor for failure to fund a $24,000,000 loan. The operative agreement for that

loan is the March 9, 2023 Business Expansion Line of Credit ("BELOC") Agreement between Nutra-Acres, LLC and McMann Commercial Lending LLC (U.S. Trustee Ex. 36). The Debtor is *not* a party to it. Motion at pgs. 10–12; Bankr. Doc. 759, Ex. A. Even if the Debtor was a party, loan proceeds being a part of a claim is plainly a ridiculous request *not* supported by any rule, statute or law found anywhere in any jurisdiction. On this point, the claimant's counsel does *not* cite any authority for which it does.

2. Cohan further agrees that the Alleged Creditors' claim for "actual and consequential damages" is foreclosed by the agreements the Alleged Creditors themselves ask the Court to enforce. Section 13.7(b) of the McMann BELOC Agreement bars indirect, special, incidental, and consequential damages. Section 10.12 of the Bridge Loan Agreement does the same and further bars arbitration or legal claims against the Lender for delays caused by a wholesale lender where the Lender takes reasonable steps to pursue the wholesale lender (Bankr. Docs. 781-14, 781-15).

3. For these reasons, the $13,847,750 reduction sought by the Trustee should be granted.

II. COHAN OBJECTS TO ALLOWANCE OF THE $400,000 CLAIM.

4. The Trustee asks the Court to allow Claim 5 in the reduced amount of $400,000

— the three (3) wires the Alleged Creditors paid to the Debtor (February 6, 2023, $40,000; February 13, 2023, $115,000; March 22, 2023, $245,000) (Motion at pg. 5). That request *cannot* be reconciled with the Trustee's own legal theory.

5. The Trustee's theory is that the agreements control. The same agreements say the fees are "non-refundable". Section 2 of the Due Diligence Fee Agreement states that the Borrower "shall pay Company a non-accountable and non-refundable fee of Forty Thousand Dollars ($40,000)," and that "[t]he interest of this Bridge Loan is 100% non-refundable." Section 2.03(b) of the Bridge Loan Agreement states: "Borrower understands that this payment is fully non-refundable." The Alleged Creditors signed and initialed both. Bankr. Doc. 79 (Apr. 9, 2024 Tr.) at 58:7–15, 63:14–22. Section 3.9(a) and (b) of the BELOC Agreement likewise state that the LOC Fee and Promote Fee are "nonrefundable" and "fully earned" (Bankr. Doc. 781-3). [1] [2]

---

[1] The Trustee did *not* review the transcripts of the April 9 and 10, 2024 trial before filing the Motion. The Trustee's counsel has stated in writing by email to the undersigned that "[t]he Trustee does not have a recording or transcript of the April 2024 trial" (Bankr. Docs. 681 at pg. 14; 781-22 at pg. 49), then later disclosed that they were on the docket. Those transcripts (Bankr. Docs. 79, 80) were on the docket at the time the Trustee filed the Motion and available to the Trustee. Had they been properly reviewed, the Trustee would have seen that the Alleged Creditors themselves admitted under oath that the fees at issue were "non-refundable" — testimony that is directly relevant to, and inconsistent with, the Motion's request to allow the $400,000.

[2] The Creditors' own sworn testimony bears on the weight of their Response. At the April 9, 2024 trial, Mr. Stringer testified that he did *not* review the Genie bridge loan or due diligence agreement before signing, and that he "just signed it" (Bankr. Doc. 79 at 56:6–57:4). He further testified that he initialed Section 2.02 and Section 2.03(b) of the Bridge Loan Agreement (Bankr. Doc. 79 at 61:19–64:5). The Alleged Creditors' Response now asks the Court to enforce those same sections as written. A party who disclaims knowledge of a contract at signing *cannot* now claim the benefit of its fine print at summary judgment.

6. The Trustee *cannot* invoke the agreements to defeat $13.8 million and then disregard the same language to allow $400,000. If the agreements control, they control for the whole claim. Either the “non-refundable” clauses are enforceable, in which case the $400,000 is disallowed as well, or they are not, in which case the Trustee's premise for reducing the $13.8 million fails. The Trustee has *not* identified any contractual basis for treating the two (2) components of the claim differently.

7. The alleged Creditors' Response (Bankr. Doc. 860) does *not* cure this. It reframes the claim as one for "restricted funds" held for the alleged Creditors' benefit. But Section 2.02(a) of the Bridge Loan Agreement provides that "the Lender shall hold Bridge Loan in Lender's account on behalf of the Borrower" — the funds are held by the Lender, in the Lender's account, to fund the ICA. The word "trust" does *not* appear in Section 2.02(a). The word "trust" does *not* appear in the Bridge Loan, BELOC or Due Diligence Agreements. There is *no* escrow agreement, *no* trust agreement, and *no* segregated trust account identified anywhere in the record. The alleged Creditors' own Cross-Motion asks the Court to declare that the funds "were restricted funds" and "not earned income." A party *cannot* manufacture a trust by characterizing an ordinary commercial account as one. As established at the April 2024 trial, the Court did *not* find that the Debtor held these funds in trust or committed fraud; the failure of the BELOC loan was

caused by the Velanos' fraud, *not* by Genie's failure to provide the product the Alleged Creditors contracted for.

8. To the extent the Alleged Creditors argue the Debtor breached Section 2.02(a) by using its general operating account for other purposes, that argument was squarely addressed and rejected at the April 2024 trial. Section 2.02(a) of the Bridge Loan Agreement required only that the Lender "hold Bridge Loan in Lender's account on behalf of the Borrower" (Bankr. Doc. 51-3 at 5). There is no trust agreement, no escrow agreement, and no segregated account required or identified in the contract. The Court did *not* find fraud or breach on the part of the Debtor regarding the Bridge Loan; it found that the failure of the BELOC loan was caused by the Velanos' fraud, *not* by Genie's failure to provide the product the Alleged Creditors contracted for. The Alleged Creditors *cannot* now use a summary judgment motion to relitigate the meaning of the contract and the findings of the Court.

9. The Alleged Creditors' ratification theory cuts against them. The Alleged Creditors argue the Debtor ratified the agreements by accepting the $400,000 and enforcing them (Bankr. Doc. 860 at ¶ 6). If the Debtor ratified the agreements, it ratified them as written — including the "non-refundable" clauses and the § 10.12 and § 13.7(b) damages waivers. The Alleged Creditors *cannot* ratify the contract for the purpose of imposing liability and disavow its limitations.

10. The Alleged Creditors' agency theory is similarly self-defeating. The Alleged Creditors ask the Court to find that "McMann acted as the Debtor's agent, or with its apparent authority, in procuring the Alleged Creditors' agreement to the Loan Documents." (Bankr. Doc. 860 at Request 3). If McMann was the Debtor's agent, then McMann's June 23, 2023 termination of the BELOC Agreement (U.S. Trustee Ex. 40) was an act of the principal. That termination was expressly based on the Alleged Creditors' prior breach of § 14.5 (the non-disparagement clause) of the BELOC Agreement (U.S. Trustee Ex. 40). The Alleged Creditors *cannot* treat McMann as the Debtor's agent when it funds the loan and as a stranger when it terminates the loan based on their own contractual breaches.

11. The Alleged Creditors' reliance on the Examiner's Report (Bankr. Doc. 146) does *not* help them. The Examiner made *no* finding of fraud. The Report uses the word "potential" in describing avoidance actions at *Id.*, ¶¶ 233–234 and does *not* find that the Debtor held ICA payments in trust. The Report's characterization of the ICA as a "reserve" (*Id.*, ¶¶ 25, 29, 39, 77, 79, 80) is the Examiner's gloss, *not* the contract language. Indeed, the Examiner found that the Debtor's 2022 revenues of less than $400,000 "could not have been the source of the $9,000,000 contributed [to] Velanos" (*Id.*, ¶ 76)—confirming that the Velanos loss was caused by Velanos's fraud, *not* by any fraud or breach on the part of the Debtor.

12. The Alleged Creditors' Response is an attempt to relitigate the April 2024 trial. At the April 9, 2024 trial, Mr. Stringer was cross-examined extensively regarding Section 2.02(a) and Section 2.03(b) of the Bridge Loan Agreement. He admitted that he initialed the pages of both sections and understood the "non-refundable" nature of the fees (Bankr. Doc. 79 at 61:19–64:5). The Alleged Creditors now ask this Court to find that those same funds were "restricted funds" held for their benefit, and that the Debtor ratified the agreements by accepting them. These arguments contradict Mr. Stringer's own sworn testimony and the plain language of the contracts that were admitted into evidence at the first trial. A summary judgment motion is *not* the proper vehicle to relitigate factual findings and admissions made under oath at a prior evidentiary hearing. The Alleged Creditors had their opportunity to litigate the meaning of these contracts, and they *cannot* now rewrite the record to defeat the Trustee's Motion.

III. CLAIM 5 IS SUBJECT TO DISALLOWANCE ON SEPARATE AND INDEPENDENT GROUNDS.

13. On August 5, 2026, Cohan filed an Amended Verified Omnibus Objection to Claim Nos. 1–71 (Bankr. Doc. 644) (the "644 Objection"). The 644 Objection was served on the claimants in accordance with Federal Rule of Bankruptcy Procedure 3007. On September 17, 2026, this Court entered an Order (Bankr. Doc. 711) setting the response deadline at thirty (30) days, or October 19, 2026.

14. The Alleged Creditors' own litigation conduct underscores the weakness of their position and supports disallowance. As established on April 9, 2024, Claimant Charles Blake Stringer is a repeat bankruptcy filer who is intimately familiar with the bankruptcy process. (Bankr. Doc. 79 at 53:10–19). Despite this familiarity, the Alleged Creditors did *not* file a substantive response to the 644 Objection. Instead, their counsel filed an Addendum (Bankr. Doc. 786) asserting new theories, and withdrew their unsupportable Ponzi-scheme complaint (3:26-ap-00063-BAJ, Adv. Docs. 1, 21). The Alleged Creditors' reliance on counsel to obscure the record—rather than answering the 644 Objection on the merits—confirms that they *cannot* substantiate the $400,000 claim under the plain language of the agreements they signed. The record establishes that Mr. Stringer admitted he *never* knew who Genie Investments was prior to signing an agreement with McMann, and he *never* reviewed the Genie documents with Genie or with counsel before executing them (Bankr. Doc. 79 at 56:6–57:4). A claimant who hides behind counsel, refuses to answer a valid Rule 3007 objection, and abandons his own pleadings *cannot* expect this Court to reward him with an allowed claim.

15. The Alleged Creditors' conduct precludes the equitable relief they seek. The Alleged Creditors are *not* passive victims; they actively engaged in a targeted online defamation and extortion campaign against the Debtor. Mr. Stringer admittedly published the website "victimsbelocscam.com," (Bankr. Doc. 859, Ex.

L) publicly accusing the Debtor and its principals of fraud, and texted Mr. Hughes stating that he had launched the site and demanding that the Debtor fund his loan. (Bankr. Doc. 80, Apr. 10, 2024 Tr. at 91:20–92:1). Relatively, Ms. Stegent told Mr. Hughes that she would "burn your house down" if her loan was not funded. (Bankr. Doc. 80 at 89:23–90:3). The Debtor's attorneys at Spiegel & Utrera issued a cease-and-desist letter on August 10, 2023, specifically detailing the defamatory nature of the website and the attempted wire fraud (Bankr. Doc. 859, Ex. M). The McMann BELOC Agreement explicitly provides that a borrower's breach of the non-disparagement clause "shall constitute an Event of Default" (§ 14.5), and McMann formally terminated the BELOC Agreement, citing those exact breaches. (U.S. Trustee Ex. 40). A party who weaponizes the internet, threatens corporate destruction, and breaches the very contract he now asks the Court to enforce is *not* entitled to the equitable allowance of the $400,000 claim. The Trustee's Motion simply ignores this conduct. [3]

16. Claimant Charles Blake Stringer/Nutra-Acres LLC is represented by counsel, Scott W. Spradley, Esq., who has been a member of the Florida Bar since 1988 and

[3] The credibility of the Alleged Creditors' filings is further affected by the conduct described in the termination letter of June 23, 2023 (U.S. Trustee Ex. 40) and the July 11, 2023 text exchange among Mr. Stringer, Mr. Hughes, and Mr. Trock (Bankr. Doc. 859, Ex. L). Furthermore, the credibility of the Alleged Creditors' filings is further affected by the conduct described in the termination letter of June 23, 2023 (U.S. Trustee Ex. 40), the July 11, 2023 text exchange among Mr. Stringer, Mr. Hughes, and Mr. Trock (Bankr. Doc. 859, Ex. L), and the defamatory website "victimsbelocscam.com" (Bankr. Doc. 859, Exs. L, M). Cohan does *not* ask the Court to resolve disputed facts on these points. He identifies them only because the Trustee's Motion rests in part on the proposition that the Creditors' agreements are enforceable as written, and the Creditors' own conduct and testimony are part of the record bearing on that proposition.

is admitted to practice before this Court. Mr. Spradley is charged with knowledge of Rule 3007 and of this Court's order at Bankr. Doc. 711. The Alleged Creditors did *not* file a response to the 644 Objection. Instead, they filed an Addendum (Bankr. Doc. 786), which asserts new theories — agency, ratification, fraud in the inducement, and unjust enrichment — that were *not* in Claim 5 as filed. An Addendum is *not* a response under Rule 3007.

17. On October 20, 2026, Cohan filed a Verified Motion for Order Sustaining Objections to Claims and Disallowing Claims Pursuant to Federal Rule of Bankruptcy Procedure 3007 (Bankr. Doc. 802) (the "3007 Motion"). That motion is *pending*. It identifies the same failure to respond and requests that the 644 Objection be sustained as unopposed under Local Rule 2002-4. The proposed order attached to the 3007 Motion excludes the Alleged Creditors from the relief granted therein, consistent with the procedural posture of Claim 5 as the subject of the Trustee's Motion and the alleged Creditors' Response.

18. Cohan does *not* ask this Court to rule on the 3007 Motion in connection with the Trustee's Motion. He identifies it so the Court is aware that Claim 5 is the subject of three (3) pending requests: the Trustee's Motion, which seeks reduction to $400,000, the 644 Objection, which seeks disallowance based on various reasons, and the 3007 Motion, which seeks disallowance on the independent

ground that no response was filed. The Court can and should decide the Trustee's Motion on the merits as it pertains to Claim 5 without first ruling on the 3007 Motion. But the existence of the 3007 Motion confirms that the Alleged Creditors' failure to respond to the 644 Objection is *not* a matter of dispute.

19. The Alleged Creditors' failure to respond to the 644 Objection is also relevant to the merits of the Trustee's Motion. A claimant who does *not* respond to a Rule 3007 objection *cannot* expect to be heard on a summary judgment motion that seeks to allow the same claim in part. The Alleged Creditors' Addendum, filed in place of a response, is the only opposition of record to the 644 Objection, and it is the same Addendum that the 3007 Motion addresses as untimely and not in accordance with the rules. A claimant who declines to respond to a Rule 3007 objection in accordance with the applicable rules bears the consequence of that choice when the Court weighs the sufficiency of its opposition to a related motion.

## IV. THE CLAIM REDUCTIONS BEAR ON THE PENDING SURPLUS AND STANDING ANALYSIS.

20. The Motion, if granted, would reduce Claim 5 from $14,247,750 to $400,000 (Bankr. Doc. 759 at pg. 2). The record also reflects a reduction to Claim 4 (Belle Maison Realty, LLC) from approximately $3,000,000 to approximately $70,000 (Bankr. Doc. 513; Bankr. Doc. 583). The Trustee has previously acknowledged

potential reduction of claims from approximately $39 million to $13–14 million (2:26-mp-00001-FMR, Misc. Doc. 45).

21. An equity holder has standing where there is a reasonable possibility of a surplus. These reductions, including the lack of response to the 644 objection by ALL claimants despite the Court's order at Bankr. Doc. 711 and the *unrebutted* criminal actions by the United States Trustee's Trial Attorney against the undersigned and the Debtor which the Trustee has refused to consider, taken together, materially affect the surplus analysis, which remains pending. Cohan requests that the Court consider the effect of these reductions on that analysis.

RELIEF REQUESTED

WHEREFORE, Cohan respectfully requests that the Court:

(a) grant the Motion insofar as it reduces Claim 5 by $13,847,750;

(b) deny the Motion insofar as it requests allowance of Claim 5 as a general unsecured claim in the amount of $400,000, or, in the alternative, defer that request to trial on February 4, 2027, for the reasons stated above;

(c) note that the Alleged Creditors did *not* respond to the 644 Objection within the deadline set by Bankr. Doc. 711, and that the 3007 Motion (Bankr. Doc. 802) is pending on that basis; and

(d) consider the effect of the claim reductions on the pending surplus and standing analysis.

VERIFICATION

I, John Michael Cohan, declare under penalty of perjury under the laws of the United States and the State of Florida that the foregoing is true and correct to the best of my knowledge and belief.

Dated: 11-12-2026

**Respectfully submitted in good faith,**

**John Michael Cohan, without prejudice, without recourse, UCC 1-308, 1-103**
iustusprocessus@outlook.com

## Certificate of Service

I hereby certify that all interested parties have been duly served a copy of the foregoing document and/or its attachments by the CM/ECF system, U.S. Mail and/or email.

Debtor
Genie Investments NV Inc.
represented by Bryan K. Mickler
Mickler & Mickler
5452 Arlington Expressway
Jacksonville, FL 32211
904-725-0822
Email: court@planlaw.com

U.S. Trustee
represented by Scott E. Bomkamp
DOJ-Ust
United States Trustee
400 W. Washington St., Ste 1100
Orlando, FL 32801
407-648-6069
Email: scott.e.bomkamp@usdoj.gov

Chapter 7 Trustee
Aaron R. Cohen
represented by Raye Curry Elliott
Akerman LLP
401 East Jackson Street, Suite 1700
Tampa, FL 33602
(813) 223-7333
Email: raye.elliott@akerman.com

David C. Hughes II
davidchoatehughes@gmail.com